## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-_____(JTD) |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

**COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS
AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 547, 548, AND 550,
BREACH OF FIDUCIARY DUTY PURSUANT TO ANTIGUAN COMMON LAW AND
THE ANTIGUA INTERNATIONAL BUSINESS CORPORATIONS ACT,
<u>AND FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)</u>**

Plaintiffs FTX Trading Ltd. and Maclaurin Investments Ltd. (together, the "<u>Plaintiffs</u>"), through their undersigned counsel, for their Complaint against Patrick Gruhn, Robin Matzke, Brandon Williams, and Lorem Ipsum UG (together, the "<u>Defendants</u>"), state as follows:

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd. is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

**NATURE OF THE CASE**

1.      Prior to the filing of these Chapter 11 Cases, Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, and Gary Wang (hereinafter, the "FTX Insiders") exercised complete control over the FTX Group.[2]  They used that control to perpetrate a massive fraud, misappropriating billions of dollars from the FTX Group to fund their own lavish personal expenditures, and utilizing Alameda Ventures Ltd. ("Alameda") as a vehicle to conceal the source and nature of those funds from creditors, including customers.  The FTX Insiders spent the funds they misappropriated on, among other things, private homes and jets, political and "charitable" contributions, and dubious investments designed to enrich themselves or further their criminal scheme.

2.      One such investment was the acquisition of Digital Assets DA AG ("DAAG"), a Swiss company that purported to issue structured financial products and related services.  The FTX Insiders caused FTX Trading Ltd. ("FTX Trading") and Alameda to acquire DAAG at nearly a $400 million valuation, despite knowing that DAAG had limited business and no intellectual property beyond a "business plan."  DAAG would ultimately come to be known as FTX Europe AG ("FTX Europe"), after the FTX Insiders caused the FTX Group to acquire it.

3.      The FTX Insiders pursued the DAAG acquisition because they believed DAAG's founders could provide access to European regulators that would allow FTX to obtain the necessary licenses for activities in the European Economic Area, and because they wanted to benefit Williams and Matzke, who had preexisting relationships with Bankman-Fried since at

---

[2]      The FTX Group is comprised of four Silos. These Silos include: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries; (b) a group composed of Debtor Alameda Research LLC and its Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

least 2018.  Access to licenses in the European Economic Area would have allowed the FTX Group to expand its customer base, in turn enabling the FTX Insiders to expand their fraudulent scheme and misappropriation of FTX Group funds.

4.    Without conducting any due diligence, negotiating over the price, or hiring counsel until the eleventh hour, the FTX Insiders caused Alameda and FTX Trading to enter into agreements to pay more than $376 million in consideration to Gruhn, Matzke, Ernest Ukaj, Lorem Ipsum UG ("Lorem Ipsum"), and Williams—a close associate of Bankman-Fried—in connection with the acquisition of DAAG.

5.    The FTX Insiders obtained the funds used to acquire DAAG by misappropriating them from the FTX Group, to the substantial detriment of creditors.  As part of the acquisition, Gruhn and Matzke were appointed to executive positions at DAAG.

6.    The acquisition documents required the FTX Group to pay millions in "earn-out" payments and "bonuses" in the event that DAAG successfully acquired a licensed investment firm within the European Union.  While acting as executives of FTX Europe, Matzke and Gruhn became contractually entitled to more than $100 million in earn-out payments and bonuses for acquiring a licensed Cyprus investment firm, K-DNA Financial Services Ltd. ("K-DNA").  Matzke and Gruhn satisfied the earn-out requirements by acquiring K-DNA for a mere €2 million.  Thus, the FTX Insiders caused Alameda and FTX Trading to agree to pay more than $376 million in consideration to, among others, a close associate of Bankman-Fried's in exchange for a "business plan" and a European securities license that was acquired for €2 million.

7.    Despite the unjustifiably high purchase price, Defendants held back information technology ("IT") infrastructure and intellectual property rights from the DAAG acquisition that

were held by Kephas Corporation ("Kephas"), a Delaware corporation, which upon information and belief was owned and controlled by Gruhn.  After assuming his position as Head of FTX Europe, Gruhn caused FTX Europe and its wholly owned subsidiary, FTX Switzerland GmbH ("FTX Switzerland"), to pay Kephas millions of dollars of misappropriated FTX Group funds for purported IT and consulting services.  Gruhn used these funds to finance his lavish lifestyle.

8.      Plaintiffs have determined, based on their analysis and investigation to date, that all of the aforementioned transfers and obligations, which are detailed in **Exhibit A**, are avoidable under the Bankruptcy Code.

9.      Accordingly, Plaintiffs bring this adversary proceeding pursuant to Sections 547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), to avoid and recover from the Defendants, or from any other person or entity for whose benefit the transfers were made, all transfers of property of Plaintiffs and all obligations of Plaintiffs to the Defendants made prior to the commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case") by FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").  Plaintiffs further bring claims against Defendants Gruhn and Matzke for breach of fiduciary duty under Antiguan law.

10.     On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for the Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the

Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I.

128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and

thereafter to prosecute, this adversary proceeding.

11.    Prior to the filing of the Chapter 11 Cases, FTX Trading was a digital asset

trading exchange controlled by Bankman-Fried, who owns approximately 80% of the company

through his ownership of Paper Bird Inc., a Delaware corporation.  Bankman-Fried was also a

director of FTX Trading along with Arthur Thomas and Singh.  Maclaurin Investments Ltd.,

f/k/a Alameda, was a cryptocurrency trading firm controlled by Bankman-Fried through his 90%

ownership of Alameda Research LLC, also a Delaware corporation.  Wang owned the other 10%

of Alameda Research LLC.  Bankman-Fried was the Managing Director and CEO of Alameda

and Ellison was a purported co-CEO of Alameda.  Both FTX Trading and Alameda were

operated as part of the broader FTX Group.

12.    Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to

disallow any and all claims filed or held by the Defendants in these Chapter 11 Cases unless and

until the Defendants have relinquished to Plaintiffs all property that they received in transfers

determined by the Court to be avoidable and/or recoverable.

13.    During the course of this adversary proceeding, Plaintiffs may learn (through

formal discovery or otherwise) of additional transfers made, or obligations incurred, to the

Defendants that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiffs intend

to avoid and/or recover all such transfers and obligations made to or for the benefit of the

Defendants or any other transferee and reserve the right to amend this Complaint.  In particular,

and without intending to create any limitation, Plaintiffs reserve the right to amend this

Complaint to include:  (i) further information regarding relevant transfers or obligations, (ii)

information regarding additional transfers made or obligations incurred, (iii) additional plaintiffs, (iv) modifications of and/or revisions to the Defendants' names, (v) additional defendants, and (vi) additional causes of action that may become known at any time during this adversary proceeding, through formal discovery or otherwise.

## THE PARTIES

14.     Plaintiff FTX Trading Ltd. is a corporation registered in Antigua and Barbuda.  Its principal place of business was in Nassau, Bahamas.  FTX Trading and its subsidiaries and affiliate entities, including DAAG, collectively did business as "FTX.com" and operated a digital asset trading exchange.  FTX Trading Ltd. is owned approximately 80% by Paper Bird Inc., a Delaware corporation that is wholly owned by Bankman-Fried.

15.     Plaintiff Maclaurin Investments Ltd., f/k/a Alameda Ventures Ltd., is a corporation registered in Seychelles wholly owned by Alameda Research Ltd., which, in turn, is wholly owned by Alameda Research LLC, a Delaware corporation.  Alameda Research LLC is owned 90% by Bankman-Fried and 10% by Wang.  Bankman-Fried was the Managing Director of Alameda Ventures Ltd. during the relevant timeframe.

16.     Defendant Lorem Ipsum UG, a/k/a Lorem Ipsum RM UG, is a German holding company controlled by Defendant Matzke.  Matzke is the sole Director and shareholder of Lorem Ipsum.  Prior to the acquisition of DAAG by FTX Trading, Matzke held his interest in DAAG through Lorem Ipsum.  Matzke signed certain share purchase agreements in his capacity as Managing Director of Lorem Ipsum pursuant to which FTX Trading obtained control over DAAG.

17.     Defendant Patrick Gruhn has lived in the United States since 2016.  He owns residences in both Montana and Oregon.  Gruhn co-founded DAAG with Defendant Matzke and incorporated it in Switzerland in July 2020.  He also founded Crypto Lawyers GmbH ("Crypto

Lawyers") in June 2018 and Kephas in 2014.  Corporate filings in the State of Delaware identify Gruhn as the President of Kephas, a corporation organized under the laws of the State of Delaware, although corporate filings for Kephas in the State of Texas identify Gruhn variously as CEO, Director, or President, depending on the year.  Gruhn has also held himself out as CEO of Kephas.  Gruhn is also the current Head of FTX Europe—a position he has held since September 2021.  In connection with the sale of DAAG to FTX Trading, Gruhn received payments to his account at First Interstate Bank in Kalispell, Montana.

18.     Defendant Robin Matzke is a resident of Germany.  Matzke co-founded DAAG along with Defendant Gruhn.  He is also the sole Managing Director and shareholder of Lorem Ipsum and current Head of Legal for FTX Europe—a position he has held since November 2021.

19.     Defendant Brandon Williams is a resident of Baltimore, Maryland.  He was an employee and shareholder of DAAG prior to its acquisition.  He is the Managing Director at Cosima Capital, a digital asset and cryptocurrency advisory and trading firm.

## **OTHER RELEVANT PERSONS**

20.     Digital Assets DA AG, now known as FTX Europe AG, was co-founded by Defendants Gruhn and Matzke and incorporated in Switzerland on July 1, 2020.  FTX Trading acquired DAAG and its wholly owned subsidiaries in three transactions between October 2020 and November 2021.  Prior to the acquisition, DAAG shareholders included Ukaj, Crypto Lawyers, Gruhn, Williams, and Matzke (through his company Lorem Ipsum).

21.     Crypto Lawyers GmbH was founded by Defendant Gruhn and incorporated in Switzerland in June 2018.[3]  It held itself out as a consulting firm specializing in the "preparation

---

[3] Crypto Lawyers was originally named K & G Lawyers for International Business and Tax Law GmbH.  The company was renamed Crypto Lawyers GmbH in February 2019, Canco GmbH in June 2021, and subsequently FTX Switzerland GmbH in April 2022, after it was acquired by FTX Trading as part of its acquisition of DAAG.

and execution of crypto currency transactions, [initial coin offerings] and in particular the structuring of utility token and security token offerings." The management team of Crypto Lawyers consisted of Max Rhotert, the COO of Crypto Lawyers and formerly the COO of FTX Europe, Gruhn, external and Managing Director of Crypto Lawyers and current Head and CEO of FTX Europe, and Ukaj, CEO of Crypto Lawyers. Crypto Lawyers was acquired by DAAG, and then subsequently acquired by FTX Trading as part of the DAAG acquisition. The company was then renamed FTX Switzerland GmbH.

22.    Ernest Ukaj is a resident of Switzerland. He was the CEO and Managing Director of Crypto Lawyers and a shareholder of DAAG prior to its acquisition.

23.    CM-Equity AG ("CM-Equity") is an investment firm incorporated in Germany and authorized by BaFin, the Federal Financial Supervisory Authority in Germany, to provide investment services. CM-Equity purportedly provided asset management and brokerage services for cryptocurrency assets. Alongside the acquisition of DAAG, FTX Group entities entered into a Joint Venture Agreement and a Tied Agency Agreement with CM-Equity in October 2020 whereby the parties agreed to jointly introduce and offer tokenized equities to end-users from FTX.com.

24.    Kephas Corporation, f/k/a Kephas TV Corporation, is a corporation organized under the laws of the State of Delaware. Since January 2021, Kephas has listed an address in Florence, Oregon as its principal place of business in all corporate filings in Oregon and Montana. Recent corporate filings in Texas also list the Florence, Oregon address as its principal place of business. Gruhn is the President of Kephas, which he also owns and/or controls. Since at least July 2021, Kephas has held itself out as a custom technology services company doing business as "DAAG Technology Services."

## JURISDICTION AND VENUE

25.      This adversary proceeding relates to the Plaintiffs' Chapter 11 Cases filed with this Court on the Petition Date.

26.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 1334(a), and 1367(a), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

27.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter final orders herein.

28.      Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

29.      The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 547, 548 and 550 of the Bankruptcy Code.

30.      This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Plaintiffs' Chapter 11 estate.  Fed. R. Bankr. P. 7001(1).

31.      In addition to this Court's *in rem* jurisdiction over the property of the Debtors and the bankruptcy estate, Defendants are subject to the general and specific personal jurisdiction of this Court because, as alleged in this Complaint, among other reasons:

  i.      Defendants transact business in the United States and have continuous and systematic contacts with, or minimum contacts to, the United States;

  ii.     Defendants entered into agreements with FTX Group companies based in, or owned by, United States corporations which contemplated payments to be made in U.S. dollars or shares of West Realm Shires Inc. ("FTX US") common stock;

  iii.    Defendants negotiated and executed those agreements with representatives from FTX Group based in the United States; and

iv.   Defendants Gruhn and Williams reside in the United States, and Defendants Matzke and Lorem Ipsum entered into business relationships with those United States residents.

32.   Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), Plaintiffs consent to the entry of a final order or judgment by the Court on these claims to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

### I.   Bankman-Fried and Other FTX Insiders Defrauded Investors, Creditors, and Customers of the FTX Exchange.

33.   Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

34.   As detailed in the First Day Declarations, the FTX Group's pre-filing operations were characterized by a complete failure of corporate controls and a total absence of trustworthy financial information.  *See* Decl. John J. Ray III, D.I. 24, at 2.  Along with other FTX Group insiders, Bankman-Fried took advantage of the FTX Group's lack of controls and recordkeeping

to spend FTX Group assets lavishly on, among other things, private homes and jets, political and "charitable" contributions, and dubious investments designed to enrich themselves. FTX Group's acquisition of DAAG was one such investment.

35.     Before filing the Chapter 11 Cases, FTX Trading and Alameda were both controlled by Bankman-Fried. Bankman-Fried and other FTX Insiders caused Alameda and FTX Trading to acquire DAAG in a series of transactions for a purchase price that far exceeded the company's value, for the benefit of Matzke, Gruhn, Ukaj, and Williams, a close associate of Bankman-Fried. This massive overpayment, huge bonus payments awarded to Matzke and Gruhn, and the lack of due diligence performed in connection with the DAAG acquisition demonstrate that the FTX insiders knew they were overpaying for DAAG with misappropriated FTX Group funds.

36.     Ostensibly, the FTX Insiders pursued the DAAG acquisition to benefit from the regulatory set-up which the DAAG founders claimed they could provide.

37.     The DAAG acquisition arose out of Bankman-Fried's close relationship with Williams. Over the course of that relationship, Williams touted that he and his colleagues "know global regulators extremely well." For example, he told Bankman-Fried that Gruhn "went to law school with" one of the regulators, that Gruhn "was tasked by Lichtenstein regulators to determine whether or not it is a security token," and that "some of our colleagues [] are current global regulators." Bankman-Fried also had a pre-existing relationship with Gruhn. In April 2019, Bankman-Fried was informed that Gruhn "is friends with Swiss regulators," and "offered to make a call on [Alameda's] behalf." It was this influence over European regulators that prompted the FTX Insiders to overpay for DAAG because they believed that DAAG's founders would be the most well positioned to obtain the requisite European licenses.

38.     In reality, when acquired DAAG did not possess any regulatory license pertinent to the FTX Group business, and after the acquisition no license was obtained from Swiss or Lichtenstein regulators through the vaunted relationships of the DAAG founders.  The hollowness of Williams's and Gruhn's claims and the inexistent value of those relationship for the FTX Group would have been revealed by even a modicum of regulatory due diligence.

39.     The FTX Insiders also overpaid for DAAG because they wanted to benefit Bankman-Fried's associates, Gruhn and Williams.  Bankman-Fried had a history of doing favors for Gruhn and Williams, and providing them and the other DAAG sellers with special treatment on the FTX platform.  On one occasion, for example, Bankman-Fried agreed via what he described as "a simple handshake deal" to let Williams, Ukaj, Matzke, and Gruhn sell $200,000 of restricted FTT,[4] a cryptocurrency token issued by the FTX Group, after Williams explained that "Ernest [Ukaj] is buying a house . . . and Patrick [Gruhn], well, Patrick is already rich." Bankman-Fried also provided a testimonial for DAAG's website at Williams's request.

40.     In pursuing the DAAG acquisition, the FTX Group performed almost no due diligence, which would have revealed the absence of any value commensurate with the consideration.  The FTX Group did not conduct a proper due diligence process for the DAAG acquisition because the FTX Insiders were indifferent to the company's financial situation, as well as its lack of intellectual property and existing business pertinent to the FTX business model, as FTX Group officials explicitly acknowledged.  Alameda and FTX Trading agreed to pay the enormous sums proposed by the DAAG sellers, amounting to over $376 million in consideration.  As a consequence, Alameda and FTX Trading paid far more than fair or

---

[4]     The FTT tokens were restricted pursuant to the October 2020 Joint Venture Agreement between FTX Trading GmbH, DAAG, and CM-Equity.

reasonably equivalent value for DAAG, and awarded Matzke and Gruhn extravagant and unwarranted bonuses.

41.     All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the acquisition of DAAG.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud; Ellison also pleaded guilty to conspiracy to commit money laundering. *See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). On February 28, 2023, Singh pleaded guilty to the same felonies as Ellison and also to conspiracy to make unlawful political contributions and defraud the Federal Election Commission.  *See* Min. Entry, Feb. 28, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

42.     In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda Research LLC "special privileges on the FTX platform," including to allow Alameda Research LLC unfettered use of assets on the FTX.com exchange, even while Alameda Research LLC maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies.  Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.  Using these "special privileges," the FTX Insiders frequently caused Alameda Research LLC to misappropriate funds from the FTX exchanges for their own benefit, including to make acquisitions like DAAG.

43.     Bankman-Fried has repeatedly, and publicly, stated that Alameda Research LLC operated as "a wholly separate entity" from FTX.com.  *See* Annie Massa et al., *Sam Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It*

*Collapsed. Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022, 5:58 AM),

https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-

flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison was quoted as saying that

"[w]e keep them [FTX exchange and Alameda Research LLC] quite separate in terms of day-to-

day operations." *Id.*  In reality, however, the FTX Insiders routinely, and secretly, used Alameda

Research LLC to loot "several billion dollars" from FTX.com using the "special privileges,"

thereby defrauding FTX.com's creditors, including customers and investors.  Plea Tr. 28:23-

29:2, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102; Plea Tr. 24:6-10,

*United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

44.      Bankman-Fried also conspired with Ellison and others to divert funds to Alameda

Research LLC that were intended to be deposited at FTX.com before they reached the exchange,

so that the FTX Insiders could use those funds to enrich themselves.  Beginning in 2019 and

continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank

accounts controlled by Alameda Research LLC, without disclosing to the banks that held those

accounts or to FTX.com customers the nature of the arrangement between FTX.com and

Alameda Research LLC.  *See* Superseding Indictment ¶ 15, *United States* v. *Bankman-Fried*,

22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

45.      Bankman-Fried exposed this aspect of the fraud in the days leading up to the

Petition Date, when he supplied potential investors with a purported Alameda Research LLC

balance sheet.  *Id.* ¶ 56.  This document included a liability of $8 billion in a "[h]idden, poorly

internally labled [*sic*] 'fiat@' account."  *Id.*  However, Bankman-Fried "well knew" that this

liability reflected "FTX customer fiat deposits accepted into Alameda's bank accounts that had

not been maintained for the benefit of customers or repaid to FTX[.]"  *Id.* ¶ 57.  These funds

were used by the FTX Insiders "to make investments in the name of Bankman-Fried and his associates, rather than in the name of Alameda." *Id.* ¶ 26.

46.    By approximately July 2022, after the agreements for the DAAG acquisition were signed, Ellison conspired with Bankman-Fried to "provide materially misleading financial statements to Alameda's lenders that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties." Plea Tr. 28:9-16, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 19.  Ellison also agreed with Bankman-Fried and others "not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement." *Id.* at 28:19-21.

47.    The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform" that allowed Alameda Research LLC to "borrow" (*i.e.*, loot) billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to the FTX Insiders. Ellison admitted that she was aware of this arrangement from 2019 through 2022, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols." *Id.* at 27:11-15.

48.    In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." *See* Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

**II.      The FTX Insiders Caused Plaintiffs to Overpay Severely for DAAG.**

49.      FTX Trading acquired DAAG and its wholly owned subsidiaries in three separate

transactions, using three separate share purchase agreements (the "SPAs," and "SPA 1," "SPA

2," and "SPA 3," respectively).  SPA 1 was executed on October 25, 2020.  SPA 2 was executed

on July 2, 2021.  SPA 3 was executed on November 14, 2021.

50.      Discussions between Bankman-Fried and Williams, Gruhn, Matzke, and Ukaj

about expanding FTX into Europe began around May 2020, when Williams pitched Bankman-

Fried to hire his advisory firm, Cosima Capital, and Gruhn's law firm, Crypto Lawyers.

51.      Prior to its acquisition by FTX, DAAG held itself out as a Banking as a Service

company—a company that provides banking products and services through third-party

distributors.  DAAG purportedly issued tokenized stocks and worked with partners to offer

financial products, including digital assets.  Defendant Williams was also involved in DAAG

from its founding, as both a shareholder and an employee.

**A.  SPA 1**

52.      In August 2020, Williams messaged Bankman-Fried to propose a business deal

between FTX and DAAG whereby DAAG would help FTX "use the liability umbrella of a firm

that has all the licenses" to provide "users of crypto . . . smooth access to buying and selling

fractional shares" of securities through "crypto channels."  Bankman-Fried asked, "to clarify

we'd be hopping on your guys' security licenses or something?"  Williams confirmed that his

understanding was "[c]orrect, if you want to be compliant - you will be come [*sic*] a tied agent

which grants you 100% useage [*sic*] and protection under our liability umbrella. . . . Basically we

take ALL the responsibility for the exchange in the eyes of the regulators."  Bankman-Fried

replied that he is "def interested" and "[w]ould love to start this process."

53.     On August 31, 2020, the former Head of Partnerships at FTX US emailed himself a form tied agency contract with the names of the parties left blank.  The subject of the email was "Cosima legal doc."  Williams was the Managing Director of Cosima Capital at this time.  Shortly thereafter, in September 2020, Daniel Friedberg, the Seattle-based then-General Counsel for FTX.com, including FTX Trading, discussed the specifics of the deal with Matzke, Gruhn, Williams, and Ukaj.  They discussed entering into agreements among DAAG, CM-Equity, and various FTX Group entities.

54.     Friedberg and Matzke discussed the terms of such an agreement on a September 11, 2020 Zoom call, and Matzke sent a draft term sheet to Friedberg later the same day.  Friedberg, Matzke, and Gruhn had another zoom call on October 10, 2020.  Additional discussions were conducted between Friedberg, Matzke, Gruhn, Williams, and Ukaj via Signal, an encrypted, ephemeral messaging service.  On or around September 24, 2020, Bankman-Fried sent a version of the term sheet directly to Williams.

55.     The parties initially contemplated the FTX Group forming a subsidiary called FC Interface Solutions Ltd ("FC") in Ireland.  FC would purchase 10% of DAAG authorized common shares in exchange for a capital contribution of $500,000.  Early drafts of the term sheet also included an exclusivity agreement under which DAAG and CM-Equity would provide exclusive services to FC in return for 138,000 FTT.

56.     Ultimately, instead of forming a new subsidiary to purchase shares in DAAG, the parties signed three agreements between October 25 and 27, 2020—just six weeks after the initial conversation between Friedberg and Matzke:

   i.    SPA 1, pursuant to which Alameda agreed to purchase 5% of DAAG's share capital from Crypto Lawyers, Ukaj, and Lorem Ipsum;

   ii.   A Joint Venture Agreement between DAAG, CM-Equity, and FTX Trading GmbH, a wholly owned German subsidiary of FTX Trading, whereby the parties

agreed to jointly introduce and offer tokenized equities to end-users from FTX.com, with an exclusivity period of four months; and

iii.    A Tied Agency Agreement between CM-Equity and FTX Trading GmbH which allowed FTX Trading GmbH to utilize CM-Equity's BaFin licenses by referring FTX.com end-users to CM-Equity's brokerage services.

57.    Bankman-Fried signed SPA 1 on behalf of Alameda.  Ukaj signed on behalf of himself and on behalf of Crypto Lawyers in his capacity as Managing Director.  Matzke signed on behalf of Lorem Ipsum in his capacity as Managing Director, and because Matzke held his interest in DAAG through Lorem Ipsum.  SPA 1 contemplates payments in U.S. dollars.

58.    Pursuant to SPA 1, Alameda agreed to pay Crypto Lawyers, Ukaj, and Lorem Ipsum a total of $700,000 in return for 5% of DAAG's share capital, thereby ascribing a $14 million valuation to DAAG.  The purchase price was to be paid in four installments, on a pro rata basis to each seller:  $166,666.66 to be paid at signing, an additional $166,666.66 to be paid on November 3 and November 30, 2020, and the final $200,000 to be paid on February 15, 2021.  Under the agreement, the purchase price could also be paid directly to DAAG as a loan.

59.    Alameda paid the first three installments totaling $500,000 USD Coin ("USDC")[5] to a DAAG wallet on the dates set forth in the agreement.  DAAG debited the final $200,000 payment as a receivable due from Alameda on February 15, 2021, also pursuant to SPA 1.  On those same dates, DAAG recorded four journal entries for "loans" to Matzke, each equal to Lorem Ipsum's pro rata share of the installments under SPA 1.  Each transfer was labeled as "Loren ipsum [*sic*], Share Purchase Agreement (5%)."

### B.  SPA 2

60.    On May 3, 2021, Bankman-Fried proposed a second transaction in which the FTX Group would invest in DAAG.  In a message to Williams, he asked:  "what would you guys

---

[5]    USDC is a cryptocurrency with a value pegged 1:1 to the U.S. dollar.

think about us investing in you guys?"  Williams responded: "[a]wesome!  Great news!  We ALWAYS welcome and appreciate your support and involvement."

61.    SPA 2 was executed on July 2, 2021 and closed on the same day.[6]  Pursuant to SPA 2, Alameda was to pay Gruhn, Williams, and Lorem Ipsum a total of $55.5 million in exchange for 15% of DAAG common shares, which was divided equally amongst the sellers.  As contemplated by SPA 2, and before it was even signed, on June 29, 2021, Alameda transferred $18.5 million in USDC from the primary Alameda Research exchange account to an external wallet controlled by Brandon Williams, and an additional $18.5 million in USDC to an FTX.com account registered under Matzke's name—even though Lorem Ipsum, not Matzke, was named as a party in SPA 2.  On July 1, 2021, Alameda wired the remaining $18.5 million to Gruhn.  Although only nine months had passed since SPA 1 was executed, the valuation SPA 2 ascribed to DAAG increased dramatically—from $14 million in October 2020 to $370 million in July 2021, representing over a 2500% increase in valuation in less than nine months.  The Debtors have found no record of the basis for this unexplained and implausible increase in valuation.

62.    As with SPA 1, Bankman-Fried signed SPA 2 on behalf of Alameda.  Matzke signed on behalf of Lorem Ipsum, and Gruhn and Williams signed on behalf of themselves.  SPA 2 contemplates payments in U.S. dollars as well as USDC.  It is governed by the laws of Montana and subject to the jurisdiction of Montana Courts.

### C.  SPA 3

63.    SPA 3 was executed on November 14, 2021 and closed on November 22, 2021.  Pursuant to SPA 3, FTX Trading purchased the remaining 80% of DAAG share capital from

---

[6]    Bankman-Fried signed an earlier version of SPA 2 on June 29, 2021, but the operative version of SPA 2 replaced this version and was executed on July 2, 2021.

Gruhn, Williams, and Lorem Ipsum for a consideration package worth up to $320 million, comprised of $166,666,656.26 payable in cash at closing (the "Cash Component") and the rest as future payments to Gruhn and Lorem Ipsum upon the occurrence of specific conditions related to the acquisition of a contract for differences ("CFD") broker licensed in the European Economic Area.  This purchase price implies a DAAG valuation of $400 million, representing over a 2700% increase from the SPA 1 valuation and an 8% increase from the SPA 2 valuation.

64.     Although Matzke was not personally a party to the agreement, Matzke transferred his interest in DAAG to FTX Trading through Lorem Ipsum, which he wholly owned.  Over the course of the discussions, it was also discovered that Matzke held one share of DAAG personally, which was also ultimately transferred to FTX Trading under SPA 3.

65.     At the same time SPA 3 was being negotiated, the General Counsel of FTX.com who succeeded Daniel Friedberg in the role was engaged in parallel employment negotiations with Gruhn, who would be appointed Head of FTX Europe, and Matzke, who would be appointed Head of Legal for FTX Europe.  The employment agreements, which included non-compete provisions, were attached as an appendix to SPA 3.  Certain payments under SPA 3 were contingent on the continued employment of Gruhn and Matzke.

66.     Also in conjunction with SPA 3, Gruhn and Matzke received offers of additional compensation in return for consulting services provided to Cottonwood Grove Ltd., a subsidiary of Alameda Research LLC that is based in Hong Kong, and FTX US, a Delaware corporation.  In return, they were to receive options to purchase one million SRM tokens[7] at a strike price of $0.10 and 500 shares of FTX US Class A common stock at a price to be established by the board after receipt of the applicable valuation.

---

[7]     An SRM token is a cryptocurrency issued by Serum, another exchange co-founded by Bankman-Fried.

67.     Although Williams, Gruhn, and Lorem Ipsum sold an equal number of shares, under SPA 3, Williams was to receive his entire consideration, $83,333,312.50, at closing as part of the Cash Component while Gruhn and Lorem Ipsum were each to receive $41,666,671.88 of the Cash Component at closing, and the remainder in the form of several conditional future payments.  Gruhn and Williams were paid their entire shares of the Cash Component on November 23, 2021.  Matzke, via Lorem Ipsum, was owed $41,666,671.88 under the Cash Component, and he received $26,666,671.88 on November 23, 2021.  That same day, however, Matzke also received $14,990,900 in USDC in his personal FTX.com exchange account and had earlier received $100 in USDC on November 19, 2021—an amount equal to the remainder of the Cash Component owed to Lorem Ipsum.

68.     SPA 3 also provided for various earn-out payments to Gruhn and Williams that were contingent on their achievement of certain "milestones":

i.      *First*, SPA 3 authorized a cash bonus payment of $33,333,337.50 to Gruhn (the "Bonus Component") and transfers of 228,874 common shares of FTX Trading (valued at $8,333,316.17) to Gruhn and 1,144,373 (valued at $41,666,690.07) to Lorem Ipsum (the "Stock Component") if, within one year of the closing date, Gruhn and Lorem Ipsum achieved the following two conditions:  "(1) Provide (via acquisition, services or other written relationship) a CFD broker that is licensed to and has the necessary Permits to service customers in the European Economic Area (including Germany), and actively solicits and provides to retail and professional customers in the European Economic Area (including Germany), under the FTX brand, futures and other derivatives with crypto assets as underlying (such as perpetual and dated futures, contracts for difference type OTC derivatives), provided that all such products allow a leverage of at least 2:1 ('Milestone 1'); and (2) Grant FTX Trading Ltd. (or an affiliate or other entity designated by FTX Trading Ltd.) an exclusive option to acquire the CFD broker mentioned in Milestone 1 ('Milestone 2') at conditions reasonable under the circumstances, provided that to the extent applicable, this Milestone 2 shall be conditioned upon approval by applicable governmental authorities."

ii.     *Second*, SPA 3 authorized an additional bonus of $5 million ("Extra Bonus Component") each to Gruhn and Lorem Ipsum if, within one month after the execution date, "the CFD broker mentioned in Milestone 1 receives all regulatory approvals to actively solicit and actually provides to retail and professional customers in the European Economic Area (including Germany), under the FTX

brand, all its futures and other derivatives with crypto assets as underlying (such as perpetual and dated futures, contracts for difference type OTC derivatives) with a leverage of at least 20:1."

    iii.    *Third*, under SPA 3, Gruhn and Lorem Ipsum would each receive an additional cash component of $30,000,000 (the "Additional Cash Component") to be paid over a period of four years in eight equal payments commencing six months after both Milestones were achieved, subject to Gruhn's and Matzke's continued employment with FTX Trading or one of its affiliates.

69.    Bankman-Fried signed SPA 3 on behalf of FTX Trading and Matzke signed on behalf of Lorem Ipsum.  Gruhn and Williams each signed on behalf of themselves.  SPA 3 contemplates payments in U.S. dollars.

70.    Although SPA 3 states that FTX Trading owned 20% of DAAG's share capital, on November 16, 2021, two days after SPA 3 was executed, FTX Trading's General Counsel realized that Alameda—not FTX Trading—was the entity which purchased DAAG's shares in the first two transactions.  Accordingly, Alameda and FTX Trading executed an intra-company Share Purchase Agreement on November 18, 2021, whereby Alameda sold its shares in DAAG to FTX Trading for $62.5 million.  This implies a $312.5 million DAAG valuation.  Bankman-Fried executed the agreement for both parties to the transaction.

71.    The FTX Group performed no meaningful due diligence in connection with the three SPAs that resulted in the complete acquisition of DAAG.

72.    Despite the recommendations of outside counsel to retain Swiss counsel in connection with SPA 1, the FTX Group did not retain a Swiss law firm until October 26, 2021 in connection with SPA 3.

73.    In an email chain discussing SPA 3 from late October to early November 2021, local counsel in Switzerland advised that a proper due diligence process should be conducted before proceeding with the acquisition of DAAG.  In an email on October 29, he noted that, although he understood from discussions with FTX Group counsel "that the timing is of the

essence for this transaction and that a state of the art due diligence is not a priority in this case," he nonetheless "strongly recommend[ed]" conducting at least a basic due diligence process.

74.    The FTX.com General Counsel involved in the acquisition and Swiss counsel spoke on the phone later that same day, and Swiss counsel followed up by email four days later with a new version of SPA 3.  He informed the General Counsel that one of the main changes to the document was the addition of various seller warranties, given that "we are not going to do a due diligence."

75.    The General Counsel acknowledged that a due diligence process would be in the best interest of FTX Group, but nonetheless insisted that due diligence would not be appropriate given the "business-oriented, pragmatic approach" that was being pursued for this transaction. He added:  "I know it can be hard as outside counsel to always try to gun for the most favorable position for your clients (many of our US counsel fall into that trap), so we appreciate your flexibility in working with us here.  This is exactly what we needed."

76.    The FTX Group did not conduct a proper due diligence process for the DAAG acquisition because the FTX Insiders were indifferent to the company's financial situation, as well as its lack of intellectual property and actual business pertinent to the FTX Group business model.  The representations and warranties which could, in the abstract, as Swiss counsel had noted, provide protection when diligence is limited, were in fact extremely narrow and further hollowed out at the direction of the General Counsel.  In a November 2 draft of SPA 3, the General Counsel deleted a number of "Representations and Warranties," and explained why each was not necessary to include:

  i. *First*, he deleted a provision regrading intellectual property rights, and commented, "[t]here's not much IP that they have other than the business plan."

  ii. *Second*, he deleted a provision stating that "the Sellers have disclosed all facts of objective significance relating to the assets, business, operations, financial

conditions, earnings or prospects of the Company or any of its Subisidiaries [*sic*]," and commented, "[n]ot much here either since they do not have any active business."

iii. *Third*, he deleted a provision representing that DAAG's financial statements are complete and correct, and commented, "[w]e've not seen any financial statements and it's not important for the business going forwards either."

iv. *Fourth*, he removed provisions warranting that the company has complied with various laws, including that the company has complied with "all obligations arising out of statutory provisions, regulations, employment agreements, collective bargaining agreements and final judicial decisions, if any." Alongside those provisions, he commented, "[t]hey are not yet operating," "[w]e're not too concerned," and "[n]ot too concerned either since they're not up and running yet."

77.    The FTX Group, therefore, was agreeing to pay almost $400 million dollars while cognizant that "there's not much IP," "they do not have any active business," and "they're not up and running yet."

## III.    Despite the Unjustifiably High Purchase Price, Defendants Held Back IT Infrastructure and Intellectual Property Rights from the DAAG Acquisition.

78.    Kephas Corporation was founded by Gruhn and incorporated by him in Delaware on October 15, 2014. Gruhn is also the President of Kephas.

79.    Since at least May 2021, Kephas, doing business as "DAAG Technologies Services," has provided IT services to DAAG, including the "Odoo" system. Kephas also purports to own proprietary intellectual property utilized by DAAG.

80.    On July 30, 2021 and August 2, 2021, Kephas officially registered "DAAG Technologies Services" as its assumed business name in Texas and Oregon, respectively.

81.    At the time FTX Trading acquired DAAG, Gruhn controlled both DAAG and Kephas. Yet despite DAAG's apparent complete reliance on the services and technology provided by Kephas, inexplicably such technology was excluded from the acquisition—neither was Kephas acquired nor did the FTX Group secure any meaningful rights to the technology provided by Kephas.

82.     Maintaining his ownership of Kephas allowed Gruhn to "sell" DAAG to FTX Trading for hundreds of millions of dollars, while holding back key aspects of the company so that Kephas could invoice FTX Europe in perpetuity for purportedly necessary services, including the provision of proprietary technology.  Disregarding his duties to FTX Europe, Gruhn allowed FTX Europe to make large payments to Kephas—without Kephas signing any contract or providing detailed invoices to justify the amounts being charged to FTX Europe. Between May 2021 and February 2023, FTX Europe and FTX Switzerland paid at least $4 million to Kephas, which was conducting business as DAAG Technology Services.  Although these payments to Kephas were purportedly for IT and consulting services, no written contract exists and Kephas's non-detailed invoices only purport to explain $1.65 million of the $4 million paid to Kephas.

83.     While collecting massive payments from FTX Group in connection with the DAAG acquisition and subsequent earn-out payments as well as fees to Kephas for purported IT services, Gruhn spent more than $13 million on properties in Oregon between July 2021 and December 2022, including:  (i) a five-bedroom house in Portland, Oregon for $1.9 million in July 2021; (ii) a $7.5 million property in La Pine, Oregon consisting of five contiguous parcels of land comprising roughly 700 acres in September 2021; (iii) a vacant lot near Gruhn's $2 million waterfront home in Yachats, Oregon for $165,000; (iv) two additional, adjacent lots in Yachats, Oregon for $1 million in May 2022; (v) two additional parcels of land, which are contiguous with the five parcels previously purchased by Gruhn in La Pine, Oregon, for $2.2 million in June 2022; and (vi) a two-bedroom house in Yachats, Oregon, down the road from his previously purchased waterfront properties for $270,000 on December 9, 2022.  On information and belief, these properties were purchased using funds fraudulently transferred from Plaintiffs.

84.     Gruhn also used Kephas to fund lavish personal expenditures, including the purchase of an armored Cadillac Escalade for $146,450 cash on August 26, 2022, which was delivered to his 700-acre Oregon home, and the salaries of several domestic servants at his various personal estates—including a butler, multiple estate managers, a full-time chef, and a housekeeper.

**IV.     While Acting as FTX Europe Executives, Gruhn and Matzke Received Excessive Earn-Out Payments in Connection with the Acquisition of K-DNA.**

85.     K-DNA was incorporated in Cyprus on September 10, 2014.  On April 23, 2015, it was licensed by the Cyprus Securities and Exchange Commission ("CySEC") to operate as a Cyprus Investment Firm.

86.     On October 22, 2021, weeks before SPA 3 was executed, Matzke, in his personal capacity, signed a Share Purchase Agreement to acquire K-DNA from Proverial Ltd. and Beniamino Baruh, a/k/a Benjamin Baruh, for €2 million (the "K-DNA SPA").

87.     The acquisition of K-DNA was specifically contemplated at the time SPA 3 was drafted, but K-DNA was not included by name in SPA 3 to avoid regulatory review.  In a November 4, 2021 email between the General Counsel and German outside counsel, the General Counsel noted that FTX Trading "do[es] not want to name the Cyprus entity explicitly" in SPA 3 because that "could trigger regulatory review."

88.     Minimal if any due diligence occurred prior to the acquisition of K-DNA.  For instance, although K-DNA reportedly had a history of engaging in "binary options" schemes,[8] for which a former director of K-DNA was indicted in Israel on December 26, 2018, there is no record of whether FTX ever investigated K-DNA's alleged connection to that scheme.  A

---

[8]     A binary option is a type of option that either pays a fixed monetary amount or nothing at all, depending on whether, at the time of expiry, the price of the underlying asset is on the correct side of the strike price.

cursory Google search of K-DNA would have uncovered media articles from 2018 naming K-DNA as a recipient of allegedly illegal transfers. Audited financials of K-DNA for 2020 show it incurred a net loss of €614,349 for the year.

89.      Under the terms of the K-DNA SPA, Matzke would pay a non-refundable initial purchase price of €100,000 (or 5% of the total purchase price) to an escrow account within seven business days of execution of the agreement. In return, Matzke received 5% of the shares of K-DNA. The remaining purchase price of €1.9 million was to be paid to an escrow account within seven business days from the date the initial purchase price was paid. The escrow agent would be directed to transfer the shares to the purchaser and release the remaining purchase price to the sellers only upon written approval from the CySEC. Such approval was necessary for the purchaser to become the legal owner of the shares.

90.      At the FTX Insiders' direction, including Gruhn who at this point was already Head of DAAG, DAAG effectively paid the purchase price, expenses, and financing needs related to the acquisition of K-DNA, pursuant to a November 18, 2021 agreement in which DAAG agreed to loan Matzke a maximum of €3 million to fund the acquisition, and Kephas agreed to act as guarantor of the loan. Kephas's address is listed on the loan agreement as 1254 Bay Street, Florence, Oregon 97439.

91.      An early version of the November 2021 loan agreement stated that "[t]he Borrower (Robin Matzke) is in the process of acquiring a Cypriot securities company, which will be transferred to the Lender (Digital Assets DA AG) after conclusion or receipt of the licenses from CySEC, at the full purchase price including all direct and indirect costs."[9] In a November 10, 2021 email from Gruhn to Matzke, Rhotert, and other DAAG employees, Gruhn notes that

---

[9]      This draft was written in German and formally translated by Plaintiffs.

Case 23-50437-JTD    Doc 1    Filed 07/12/23    Page 28 of 39


this paragraph "has to go" because it "would be illegal."[10] The final version of the loan document does not include this paragraph, and instead vaguely states that "[t]he [b]orrower intends to acquire a company" but does not have "[t]he necessary funds."[11]

92.     On November 29, 2021, before DAAG held any interest in K-DNA, a resolution of the K-DNA Board of Directors states that K-DNA was about to begin the process of changing its name to "FTX Trading (Europe) Ltd." The company ultimately adopted the name FTX EU Ltd.

93.     On December 15, 2021, Matzke assigned his rights under the K-DNA SPA to DAAG. Accordingly, upon CySEC approval of DAAG's acquisition of K-DNA, ownership of 100% of the shares in K-DNA was to be transferred to DAAG.

94.     On December 16, 2021—still prior to CySEC approval—Baruh transferred his entire 9.9% ownership interest in K-DNA (25,625 shares) to DAAG, purportedly to allow DAAG to inject funds to support the ongoing expenses of the company.[12] At this point, Proverial held 85.1% of K-DNA,  Matzke held 5%, and DAAG held 9.9%, with the option to acquire the remaining 90.1% upon CySEC approval. According to K-DNA's business plan, which was submitted to CySEC, Matzke would be appointed a Non-Executive Director of K-DNA upon CySEC approval.

95.     Because K-DNA had the necessary licenses to operate in the European Economic Area, Milestone 1 and Milestone 2 under SPA 3 were fulfilled once DAAG obtained the right to

---

[10]    This email was written in German and formally translated by Plaintiffs.

[11]    The final agreement was written in German and formally translated by Plaintiffs.

[12]    A provision of the K-DNA SPA provided that, until CySEC approval, K-DNA "shall not[] withdraw or transfer any funds out of the Company's bank accounts of other than for its regular course of business; make any distribution of any kind to its shareholders; issue or promise to issue any securities; enter into, amend or terminate any contract or agreement of any kind (written or oral) with any person without the Purchaser's consent; dispose of or acquire any assets; or incur any indebtedness or commitment of any kind."

acquire K-DNA from Matzke.  In turn, this assignment of rights triggered various earn-out Payments to Gruhn and Matzke (via his ownership in Lorem Ipsum) under SPA 3, which was signed less than one month prior.

96.     Specifically, DAAG's acquisition of K-DNA—for just €2 million—triggered:

i.      The Bonus Component of $33,333,337.50 to Gruhn;

ii.     The Stock Component of 228,874 common shares of FTX Trading to Gruhn and 1,144,373 to Lorem Ipsum;

iii.    The Extra Bonus Component of $5 million each to Gruhn and Lorem Ipsum; and

iv.     The Additional Cash Component of $30 million each to Gruhn and Lorem Ipsum, to be paid in eight equal installments.

Thus, by virtue of obtaining for FTX Europe the right to acquire a licensed securities firm in the European Economic Area for a total of €2 million, Gruhn and Matzke became entitled to receive over $103 million in cash, of which they actually received at least $50.8 million, plus 1,373,247 shares of FTX Trading common stock valued at an additional $50 million.

97.     As described in **Exhibit A**, the Bonus Component, the Stock Component, the Extra Bonus Component, and the first installments of the Additional Cash Component were paid by FTX Trading to Gruhn and Lorem Ipsum between January 1, 2022 and October 5, 2022.  At this point in time, Gruhn and Matzke had already been in their roles as Head of FTX Europe and Head of Legal for FTX Europe, respectively, for months.  Both Gruhn and Matzke reported directly to Bankman-Fried.

98.     The Debtors' investigation to date has shown that the FTX Trading bank account that transferred cash to Gruhn and Lorum Ipsum/Matzke in connection with the purchase of DAAG pursuant to SPA3, as well as the cash earn-out payments, contained commingled funds,

*i.e.*, funds that had been deposited by customers of the FTX.com exchange as well as corporate funds.

99.     The acquisition also cost DAAG an additional $5 million in fees to Mohammad Hans Dastmaltchi, a resident of Dubai who had previously been investigated by Lichtenstein regulators.  DAAG entered into an agreement with Dastmaltchi on June 5, 2021—a month before SPA 2 was executed—to help the company find a CySEC-licensed investment firm to acquire. Although the Debtors have not been able to identify records indicating that Gruhn was on the DAAG Board of Directors, Gruhn signed the agreement with Dastmaltchi in his capacity as the purported Chairman of the DAAG Board of Directors.  Pursuant to the agreement, DAAG was to pay an introductory fee of $5 million for Dastmaltchi's "introductory and referral services" leading to its purchase of a Cyprus investment firm.  This payment was made in two transfers on November 3, 2021, and September 8, 2022.

100.     A December 2019 Swiss media article reported that Dastmaltchi had been ordered to leave Union Bank as a director and controlling shareholder at the end of September 2019 by the Liechtenstein Financial Market Authority because he had brought on a company with ties to international corruption as an investor in Union Bank.  The Liechtenstein Financial Market Authority also reportedly revoked his banker's guarantee, necessary in Liechtenstein to work in banking management positions.  The article described the revocation as a de facto ban from working in banking in Europe.

101.     On February 22, 2022, CySEC allowed K-DNA to change its trade name to FTX EU and its domain to www.ftx.com/eu.

102.    On September 6, 2022, CySEC provided a letter of non-objection to the

acquisition of K-DNA by FTX Europe.  That same day, Matzke and Proverial transferred their

K-DNA shares to FTX Europe, leaving FTX Europe as the sole owner of K-DNA.

103.    On November 11, 2022, CySEC suspended K-DNA's license to operate as a

Cyprus investment firm as a consequence of the FTX Group collapse.

## V.    FTX Europe Lacks Value as an Asset and Is Unable to Be Sold.

104.    After the Chapter 11 Cases were filed, Debtors, with assistance from their bankers

at Perella Weinberg Partners, sought to initiate a sale process for FTX Europe as part of their

effort to monetize assets for the benefit of the estate.  The Debtors and their advisers sought to

make documentation available in a data room and to prepare presentation material for potentially

interested parties.  During such preparatory activities, it became apparent to the Debtors that

there was no realistic prospect of a successful sale of FTX Europe in light of the following:

    i.    The company had no meaningful saleable assets, no proprietary technology and insufficient rights under poorly documented intellectual property licenses.  Much of the technology and intellectual property rights apparently relied on by DAAG were inexplicably excluded from the acquisition by FTX Trading.

    ii.    Record-keeping appeared rudimentary and haphazard, resulting in unreliable and on their face inaccurate financial statements.  For example, the historical financial statements wrongly identified the counterparty on the company's largest liability, and officers and directors of the company appeared for some time unsure as to who the counterparty was; directors and officers disagreed regarding the magnitude of the company's second-largest liability, with Gruhn claiming that the liability was overstated by €20 million due to counting "some transactions multiple times," an assertion that neither Gruhn nor a team of forensic accountants hired by the Debtors were able to verify.  Multimillion-dollar transactions appeared to be traceable or explainable by management solely through Telegram messaging rather than the company's books and records.

    iii.    The Debtors' advisers were unable to verify or rationalize basic Key Performance Indicators that could be provided to potential buyers with respect to the company's historical performance.

    iv.    No clear and supportable value proposition that could attract a buyer for the company could be identified in conversations with management.

105.     Following approximately eight weeks of efforts, the Debtors concluded a sale process for FTX Europe could not credibly be pursued and no buyer would be prepared to pay meaningful value for the business.

## VI.     The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent to Hinder, Delay, or Defraud Creditors.

106.     As set forth above, multiple badges of fraud recognized by United States bankruptcy law permeate the transfers made and obligations incurred in connection with the acquisition of DAAG, including:

i.     The transfers were part of a scheme to enrich and otherwise benefit the FTX Insiders by expanding their fraudulent scheme to the European Economic Area, which would enable them to continue misappropriating assets of the FTX Group, including by overpaying their close associates whom they perceived to have access to European regulators in order to acquire required licenses;

ii.     Numerous material facts relating to the transfers were concealed, including the process by which K-DNA was acquired and the source of funds used to acquire DAAG and K-DNA;

iii.     The FTX Insiders removed or concealed Plaintiffs' assets, including funds transferred to acquire DAAG and K-DNA;

iv.     The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

v.     Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made;

vi.     The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts; and

vii.     The transfers arose out of a close relationship between an officer of the Debtors, Sam Bankman-Fried, and transferees, including Brandon Williams and Robin Matzke.

**CAUSES OF ACTION**

**COUNT ONE**
**FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST ALL DEFENDANTS)**

107.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 106 as if fully set forth here.

108.   Plaintiffs made the transfers and incurred the obligations addressed herein to Defendants on or around the dates specifically described in **Exhibit A**.  Each of the transfers to the Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

109.   Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud present or future creditors.

110.   Accordingly, each of the transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estate.

**COUNT TWO**
**FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST ALL DEFENDANTS)**

111.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 110 as if fully set forth here.

112.   Plaintiffs made the transfers and incurred the obligations addressed herein on or around the dates specifically described in **Exhibit A**.  Each of the transfers to Defendants was a transfer of property of Plaintiffs, and each obligation to Defendants was incurred by Plaintiffs.

113.   Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers and obligations.

114.     Each of the Plaintiffs:  (i) was insolvent on the date that each transfer was made; (ii) became insolvent as a result of the transfers and obligations; (iii) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (iv) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

115.     Accordingly, each of these transfers and obligations should be avoided as a fraudulent transfer pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estate.

**COUNT THREE**
**PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST DEFENDANTS GRUHN, MATZKE, AND LOREM IPSUM)**

116.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 115 as if fully set forth here.

117.     Plaintiffs transferred $50,833,337.50 to Defendants Gruhn, Matzke, and Lorem Ipsum as "earn-out payments" from April through October of 2022.  These transfers were transfers of property of Plaintiffs.

118.     Plaintiffs also transferred common shares of FTX Trading valued at $50,000,006.24 to Defendants Gruhn, Matzke, and Lorem Ipsum as earn-out payments.

119.     These transfers were made to benefit Defendants Gruhn, Matzke, and Lorem Ipsum.

120.     With respect to these transfers, Gruhn, Matzke, and Lorem Ipsum were creditors of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternatively, Gruhn, Matzke, and Lorem Ipsum received such transfers for the benefit of a creditor or creditors of Plaintiffs.

121.    These transfers were made on account of antecedent debts owed by Plaintiffs to Gruhn, Matzke, and Lorem Ipsum pursuant to SPA 3.

122.    At the time the transfers were made, Defendants Gruhn and Matzke were "insiders" of the debtor corporation under Section 547(b)(4)(B) pursuant to their roles as Head of FTX Europe and Head of Legal for FTX Europe, respectively.

123.    The transfers were made within one year of the Petition Date.

124.    The transfers were made while Plaintiffs were insolvent.

125.    The transfers enabled Gruhn, Matzke, and Lorem Ipsum to receive more than they would have received if:  (i) Plaintiffs' Chapter 11 Case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) the amount paid to Lorem Ipsum, Gruhn, and Matzke on account of the debt were determined by the Bankruptcy Code.

126.    Gruhn, Matzke, and Lorem Ipsum have not returned any portion of the $50,833,337.50, the common shares of FTX Trading valued at $50,000,006.24, or the value of those shares that were transferred to them as earn-out payments.

127.    Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence under the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe these transfers are avoidable.

128.    Accordingly, these transfers should be avoided as preferential transfers pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Gruhn, Matzke, and Lorem Ipsum the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estate.

**COUNT FOUR**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST ALL DEFENDANTS)**

129.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 128 as if fully set forth here.

130.     As alleged above, Plaintiffs are entitled to avoid each of these transfers addressed herein under Sections 547 and 548 of the Bankruptcy Code.

131.     Because the Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from the Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estate.

**COUNT FIVE**
**DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**
**(AGAINST ALL DEFENDANTS)**

132.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 131 as if fully set forth here.

133.     As alleged above, Defendants are transferees of transfers and recipients of obligations avoidable under Sections 547 and 548 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

134.     By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent the Court has determined the Defendants are liable pursuant to 11 U.S.C. § 550.

**COUNT SIX**
**BREACH OF FIDUCIARY DUTIES PURSUANT TO ANTIGUAN COMMON LAW**
**AND SECTION 95 OF THE ANTIGUA INTERNATIONAL BUSINESS**
**CORPORATIONS ACT**
**(AGAINST DEFENDANTS GRUHN AND MATZKE)**

135.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 134 as if
fully set forth here.

136.    At all relevant times, FTX Trading was a corporation incorporated in Antigua and
engaged in international trade or business as defined by the Antigua International Business
Corporations Act.

137.    Beginning in September 2021 and November 2021, respectively, Gruhn and
Matzke owed fiduciary duties to FTX Trading under Antiguan common law, including the duties
to act in good faith, honestly, fairly, and with due regard to FTX Trading's interests, and to use
their officer powers only for purposes which benefited FTX Trading.  Gruhn and Matzke were
required to act in FTX Trading's best interests, and not for their personal benefit.

138.    During the same period, Gruhn and Matzke owed fiduciary duties to FTX Trading
under Section 95 of the Antigua International Business Corporations Act, including the duties "to
act honestly and in good faith with a view to the best interest of the corporation; and exercise the
care, diligence, and skill that a reasonably prudent person would exercise in comparable
circumstances."

139.    Gruhn and Matzke breached their fiduciary duties to FTX Trading by causing
transfers to be made to Kephas, in exchange for which FTX Trading did not receive, and had
virtually no prospect of receiving, reasonably equivalent value, and from which Gruhn, a close
associate of Matzke, personally benefited.

140.    Gruhn and Matzke also breached their fiduciary duties to FTX Trading by causing
DAAG to transfer $5 million to Mohammad Dastmaltchi in exchange for purported

"introductory and referral services" in connection with the acquisition of a Cyprus investment firm, from which Matzke and Gruhn would personally benefit via bonus payments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

141.    Enter an order that the transfers addressed herein are avoidable fraudulent transfers and obligations, and/or preferences, under 11 U.S.C. §§ 547 and 548.

142.    Award Plaintiffs under 11 U.S.C. § 550 no less than $323,500,000 (plus the value of any additional avoidable transfers that Plaintiffs learn, through formal discovery or otherwise, were made to Defendants);

143.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants relinquish to Plaintiffs the amount ordered as an award for avoidable transfers;

144.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interest, and costs of suit; and

145.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: July 12, 2023
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephen Ehrenberg (*pro hac vice* pending)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
       ehrenbergs@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*