# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | Adv. Pro. No. 23-50437 (JTD) |
| -against- | |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

### Opening Brief In Support Of Motion
### To Dismiss Or For Summary Judgment

Lawrence J. Gebhardt (*pro hac vice pending*)
Gregory L. Arbogast (No. 6255)
GEBHARDT & SMITH LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801
T: (302) 295-5038
F: (443) 957-4325
Garbogast@gebsmith.com

*Attorneys for Defendant,
Brandon Williams*

# TABLE OF CONTENTS

I.      Statement of the Nature and Stage of the Proceeding............................................. 1

II.     Summary of the Argument.......................................................................................... 1

    A.      Brandon Williams relies on the following legal propositions. ............................. 1

        1.      Under Fed. R. Civ. P. 8 and 9, a complaint requires allegations of
            specific facts showing a plausible entitlement to the relief
            requested. .................................................................................................... 2

        2.      Fed. R. Civ. P. 56 requires entry of judgment when the material facts
            are not in dispute and permit resolution as a matter of law. ...................... 3

III.    A Concise Statement of the Allegations in the Complaint and the Material Facts Not
    in Genuine Dispute ..................................................................................................... 3

    A.      The Complaint is replete with inflammatory and irrelevant allegations that
        will not be addressed in this Brief........................................................................ 3

    B.      DAAG was formed on July 1, 2020, as a European issuer of derivatives for
        the crypto market. ............................................................................................... 4

    C.      FTX Trading was interested in acquiring access to European licenses and
        regulatory approvals so that it could lawfully both continue and expand its
        operations in the European market. ..................................................................... 7

    D.      FTX Trading became a DAAG partner while DAAG was in its infancy............... 9

    E.      Alameda, on behalf of FTX Trading, increased its equity stake in DAAG
        to 20% and later transferred this interest to FTX Trading. ............................... 10

    F.      FTX Trading desired to acquire one hundred percent of the equity in DAAG
        to increase its business and operations................................................................ 11

    G.      BDO appraised DAAG at the request of FTX Trading. ...................................... 13

    H.      FTX Trading was fully solvent at the time it acquired all the share interests
        in DAAG and afterward....................................................................................... 14

    I.      The acquisition of DAAG was not for the purposed of enriching Samuel
        Bankman-Fried. .................................................................................................. 17

    J.      The purchase of DAAG was not for the purpose of hindering, delaying, or
        defrauding FTX Trading's creditors. .................................................................. 18

IV.     Law and Argument ..................................................................................................... 19

A.    The Plaintiffs did not purchase DAAG with the actual intent to hinder, delay, or defraud creditors of FTX Trading within the meaning of Bankruptcy Code §548(a)(1)(A). ................................................................................................. 19

    1.    In determining if a fraudulent conveyance under Bankruptcy Code §548(a)(1)(A) occurred, the focus is on the transaction at issue and nothing else. ......................................................................................... 19

    2.    FTX Trading purchased DAAG for a legitimate business purpose and not with the intention of hindering, delaying, or defrauding its creditors..................................................................................................... 20

    3.    None of the badges of fraud have been properly alleged, and none are established by the material facts not in genuine dispute.......................... 22

B.    No constructive fraudulent transfer under the Bankruptcy Code § 548(a)(1)(B) has been alleged or shown by the material facts not in genuine dispute. ............. 24

    1.    FTX Trading has failed to carry its pleading burden to show by supported factual allegations that it received less than reasonably equivalent value when it acquired DAAG, and the material facts not in genuine dispute show that it did. ........................................................... 25

    2.    FTX Trading was not insolvent at the time of the acquisition and did not become insolvent as a result of it....................................................... 26

    3.    FTX Trading has not alleged and the material facts not in genuine dispute do not show that (a) FTX Trading either was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with it was an unreasonably small capital or (b) that FTX Trading intended to incur, or believed that it would incur, debts that would be beyond the its ability to pay as such debts matured. ......................................................... 27

    4.    FTX Trading has have not alleged and the material facts not in genuine dispute do not show that Brandon Williams was an "insider" within the meaning of the Bankruptcy Code. ........................................... 28

        a.    Statutory insider. .................................................................... 28

        b.    Non-statutory insider. ............................................................ 28

IV.    Conclusion ................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................................. 2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 2

*Clear Thinking Group LLC v. Brightstar US, Inc. (In re KCMVNO, Inc.)*, 08–10600 BLS,
 2010 WL 4064832 (Bankr.D.Del. Oct. 15, 2010) ...................................................... 29

*Ieradi v. Mylan Lab'ys, Inc.*, 230 F.3d 594 (3d Cir. 2000) ............................................. 16

*In re Art Inst. of Philadelphia LLC*, No. 18-11535 (CTG), 2022 WL 18401591 (Bankr. D.
 Del. Jan. 12, 2022) ................................................................................................. 19, 21

*In re Bayou Steel BD Holdings, L.L.C. v. Black Diamond Capital Mgt., L.L.C.*, 642 B.R.
 371 (Bankr. D. Del. 2022) ........................................................................................... 21

*In re Broadstripe, LLC*, 444 B.R. 51 (Bankr. D. Del. 2010) ........................................... 29

*In re Cred* Inc., 650 B.R. 803 (Bankr. D. Del. 2023) .............................. 2, 21, 23, 25

*In re DBSI, Inc.*, 477 B.R. 504 (Bankr. D. Del. 2012) .............................................. 4, 19

*In re HH Liquidation, LLC v. Comvest Group Holdings, LLC*, 590 B.R. 211 (Bankr. D.
 Del. 2018) ..................................................................................................................... 21

*In re Live Well Fin., Inc., No. 19-11317 (LSS)*, 2023 WL 3995900 (Bankr. D. Del. June 13,
 2023) ............................................................................................................................ 20

*In re PHP Healthcare Corp.*, 128 F. App'x 839 (3d Cir. 2005) ..................................... 17

*Insys Liquidating Trust v. Quinn Emanuel Urquhart & Sullivan, LLP (In re Insys
 Therapeutics, Inc.*), Adv. Pro. No. 21-50359 (Bankr. D. Del. 2021) ........................ 27

*Peters v. Delaware River Port Auth. of Pennsylvania & New Jersey*, 16 F.3d 1346 (3d Cir.
 1994) ............................................................................................................................ 17

*Physicians Healthsource, Inc. v. Cephalon*, Inc., 954 F.3d 615 (3d Cir. 2020) ............. 3

*Schubert v. Lucent Technologies, Inc.* (*In re Winstar Communications, Inc.),* 554 F.3d 382
 (3d Cir.2009) ............................................................................................................... 29

*VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) ..................................... 25

**Other Authorities**

Chuan, Gerszten, Hunter, Swem, and Carapella, "Tokenization: Overview and Financial Stability
 Implications" (August 3, 2023) ..................................................................................... 6

**Rules**

11 U.S.C. § 548 ................................................................................................................ 20

11 U.S.C.A. § 548 ............................................................................................................ 25

11. U.S.C. § 101 ............................................................................................................... 28

Bankruptcy Code §101 .................................................................................................... 26

Fed.R.Civ.P. 8 ................................................................................................................... 2

Fed.R.Civ.P. 9 ................................................................................................................... 2

Fed.R.Evid. 201 ............................................................................................................... 16

## I.
## Statement of the Nature and Stage of the Proceeding

Plaintiffs, FTX Trading Ltd. and Maclaurin Investments, Ltd. (known at all relevant times and referred to herein as "Alameda Ventures"), have sued Defendant, Brandon Williams, in Counts One and Two of the Complaint to recover the amounts he received for selling his interest in Digital Asset Group AG ("DAAG") to them in two negotiated, arms-length transactions in July and November 2021.[1]  The Plaintiffs allege that the purpose of the purchase was to hinder, delay, or defraud the creditors of FTX Trading and constituted either an actual fraudulent transfer under Bankruptcy Code §548(a)(1)(A) or constructive fraudulent transfer under Bankruptcy Code §548(a)(1)(B).

In response to the Complaint, Brandon Williams has filed a motion to dismiss or for summary judgment as to Counts One and Two of the Complaint, which are the only Counts that pertain to Williams, in contrast to the other Defendants, and are the only Counts that will be addressed in this Brief.

## II.
## Summary of the Argument

### A.    Brandon Williams relies on the following legal propositions.

The Complaint is replete with hollow, conclusory, and often misleading allegations of irrelevant facts that, even when combined with the actual, relevant facts that are alleged, are

---

[1]    Alameda Ventures shortly after completion of the acquisition, transferred its entire interest in DAAG to FTX Trading for $62.5 million, which implied the value of DAAG at $312.5 million. Compl. ¶70. The transfer and price paid by FTX Trading shows that Alameda Ventures received the fair equivalent in value for what it paid to acquire its interest in DAAG ($56.2 million), leaving Alameda Ventures without damage or loss (and, indeed, with a profit). While Alameda Ventures, having suffered no compensable damages, does not have standing in this case, Brandon Williams will not raise this procedural defect at this point but reserves the right to do so at a latter point if the suit is not ended as to him. Brandon Williams will refer to FTX Trading as though it were the sole Plaintiff, but the reference should be considered to include Alameda Ventures to the extent it has any claim or right of recovery.

insufficient to state a claim. And the material facts not in genuine dispute show that Brandon

Williams is entitled to judgment in his favor as a matter of law. For these reasons, Brandon

Williams has moved to dismiss under Fed. R. Civ. P. 12(b)(6) or alternatively for summary

judgment under Fed. R. Civ. P. 56,

> **1.     Under Fed. R. Civ. P. 8 and 9, a complaint requires allegations of specific facts showing a plausible entitlement to the relief requested.**

A complaint must contain sufficient specific factual allegations which, if accepted as true,

state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). Conclusions of fact or law or formulaic recitations of the elements of a claim are

insufficient and are to be disregarded in determining if a claim has been stated. *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). A purported factual allegation lacking foundational support is

conclusory and not to be considered. Nor do factual allegations plausibly show an entitlement to

relief based on unlawful conduct if they are susceptible to alternative interpretations from which

lawful conduct may properly and reasonably be inferred.  This Court, in a very recent case,

applied this standard and these principles to dismiss for failure to state a claim a complaint

seeking to recoverable purported fraudulent transfers.  *In re Cred* Inc., 650 B.R. 803, 813 (Bankr.

D. Del. 2023).

And, while constructive fraud need only satisfy the pleading requirements of Fed. R. Civ.

P. 8, when, as here, actual fraud is claimed, Fed. R. Civ. P. 9 requires even more factual

specificity in a complaint. *Ashcroft v. Iqbal*, 556 U.S. at 662; *In re Cred Inc*., 650 B.R. at 834

("Actual fraudulent transfer claims, unlike constructive fraudulent transfer claims, 'must meet

the elevated pleading standards of Federal Rule of Civil Procedure 9(b).'") As will be discussed,

the Complaint fails to satisfy the requirements of Fed. R. Civ. P. 8 for the constructive fraud

claim against Williams and glaringly fails to satisfy the heightened requirements of Fed. R. Civ.

P. 9 for the actual intent claim.

While lengthy, the Complaint "achieves a level of obscurity and incomprehensibility that is truly remarkable" but nevertheless is completely devoid of allegations of fact showing an entitlement to the relief claimed against Brandon Williams. *See In re Cred Inc.*, 650 B.R. at 813. The Complaint should be dismissed as to Brandon Williams under Fed. R. Civ. P. 12(b)(6).

        **2.**        **Fed. R. Civ. P. 56 requires entry of judgment when the material facts are not in dispute and permit resolution as a matter of law.**

Under Fed. R. Civ. P. 56(a), summary judgment may be entered if a moving party shows that no genuine dispute as to the material facts exists and judgment as a matter of applicable law is proper. A material fact is one whose determination might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Physicians Healthsource, Inc. v. Cephalon*, Inc., 954 F.3d 615, 618 (3d Cir. 2020). A dispute of material fact is genuine if a reasonable jury could determine that fact in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at, 248; *In re Trib. Media Co.*, 902 F.3d 384, 392 (3d Cir. 2018). A dispute of fact that is not material will not forestall the entry of summary judgment in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247.

When the material facts that are beyond genuine dispute are considered in the context of applicable law, summary judgment in favor of Brandon Williams should be entered, and this ill-conceived case against him ended in its earliest stage.

### III.
### A Concise Statement of the Allegations in the Complaint and the Material Facts Not in Genuine Dispute

        **A.**        **The Complaint is replete with inflammatory and irrelevant allegations that will not be addressed in this Brief.**

The Complaint is replete with inflammatory and accusatory allegations regarding alleged criminal conduct of Samuel Bankman-Fried and his associates that have absolutely nothing to do

with the two fraudulent transfer claims under Bankruptcy Code §548 brought against Brandon Williams. The issue before the Court is not whether Bankman-Fried and his associates committed crimes in activities having nothing to do with FTX Trading's acquisition of DAAG but whether the acquisition transaction, standing separate and apart and on its own, constituted a fraudulent transfer within the meaning of Bankruptcy Code §548. *In re DBSI, Inc.*, 477 B.R. 504, 511 (Bankr. D. Del. 2012) (holding that even when a broad fraudulent scheme existed, the Court must limit itself to consideration of the transaction at issue). A valid claim requires provable and relevant facts, not camouflage, misdirection, and subterfuge, as has been presented in the Complaint.  For this reason, Brandon Williams will ignore the inflammatory and irrelevant accusations about the alleged criminal conduct of Bankman-Fried and his cohorts in matters other than the acquisition of DAAG that permeate the Complaint and will focus only on the facts and law relevant to the Court's decision on Brandon Williams's motion.

### B.    DAAG was formed on July 1, 2020, as a European issuer of derivatives for the crypto market.

DAAG was formed on July 1, 2020, as a Swiss corporation. At the times relevant to the acquisition of Brandon Williams's interest, DAAG was owned equally by Patrick Gruhn, Robin Matzke (through his solely owned company, Lorem Ipsum UG), and Brandon Williams. Compl. ¶20; A.190(Williams Aff'd ¶3).

DAAG's business focused on the design, structure, and issuance of novel digital products and derivatives, such as free-floating tokenized securities, perpetual futures, a crypto spot derivative (SPOT+), and other financial instruments. A.190(Williams Aff'd. ¶4). As tokenization was explained in an article published by the Federal Reserve Board of Governors:[2]

---

[2]    Chuan, Gerszten, Hunter, Swem, and Carapella, "Tokenization: Overview and Financial Stability Implications" (August 3, 2023).

4

"tokenization" refers to the process of linking reference assets to crypto tokens via design features that link the token's price to the value of the token's reference asset. In the strictest sense, tokenization would allow for a crypto token holder to have a legally enforceable ownership claim over the token's reference asset.

DAAG was positioned to offer a regulatory-compliant framework for the creation of novel digital products for its clients through tokenization and to operate in combination with regulated investment firms for retail client trading in European and other foreign markets. A.190(Williams Aff'd. ¶4).

DAAG created all the know-how, processes, documents, procedures, and regulatory documents etc. required to enable DAAG, working with a licensed investment firm via a tied agency agreement, to enter the mass-retail business market in a regulatorily compliant way. DAAG dealt in over 50 tokenized stocks, including Facebook, Google, Tesla, and Netflix. DAAG offered an alternative to other exchanges that were restricted to a single exchange or blockchain and only gave users the option to open or close positions. DAAG was also the only company in Europe capable of offering true perpetual futures contracts, which is the most important trading product in the crypto currency space. A.190-191(Williams Aff'd. ¶5).

At the time of its acquisition by FTX Trading in November 2021, DAAG's most valuable asset was the proprietary know-how, knowledge, and expertise (collectively, "know-how") that it had developed and implemented. This proprietary know-how is what enabled DAAG to become licensed and regulatorily compliant in the various markets in which it operated at the time of the FTX Trading acquisition and that would enable it (or FTX Trading after the acquisition) to become licensed and regulatorily compliant in numerous additional markets going forward. This proprietary know- how was reflected in and evidenced by over 200,000 pages of documents and materials. These documents and materials included business processes and operational rules and procedures, product approvals (including an endorsed Security Prospectus), product governance

documents, and IT implementation requirement documents (which would allow DAAG to

implement regulatory compliant IT-Systems to support or automate those developed processes).

This proprietary know-how would enable any licensed investment firm (such as CM-Equity AG)

to start operating in the new and unique crypto-related tokenized derivatives business launched

by DAAG, as previously described. A.191-192(Williams Aff'd ¶6).

Once DAAG completed its planned acquisition of the Cypriot investment firm, K-DNA

Financial Services Ltd (which occurred shortly after the FTX Trading acquisition, as reflected in

Complaint ¶¶ 85-95), and using DAAG's proprietary know-how, DAAG (or FTX Trading after

the acquisition) would be able to service customers in the thirty countries in the European

Economic Area, as well as in Argentina, British Virgin Islands (BVI), Brunei, Cayman Islands,

China, Egypt, Georgia, Indonesia, Jordan, Kazakhstan, Kuwait, Lebanon, Malaysia, Mongolia,

Montenegro, Panama, Philippines, Qatar, South Korea, South Africa, Switzerland, Thailand,

Turkey, UAE, Ukraine. These licenses and approvals enabled FTX Trading upon the acquisition

of DAAG and the subsequent acquisition of K-DNA to operate in these markets and use the

proprietary know-how that FTX Trading acquired in its acquisition of DAAG. A.192(Williams

Aff'd ¶7); *See* A.113 (BDO Valuation at 6) (listing the various licenses that were available to

DAAG and provided value) and pages 21-22 (describing what each of the licenses enabled

DAAG to do and why they provided value).

BDO USA, LLP, in its post-acquisition Valuation, described the purpose of FTX

Trading's acquisition of DAAG in the following terms:

### RATIONALE FOR THE ACQUISITION

FTX Trading is a cryptocurrency brokerage firm that operates in Europe and
the Middle East. **The primary rationale behind the acquisition of DAAG
was to acquire its operating licenses**. The Company's operating licenses
allow it to sell public securities as tokens on the blockchain in a broad

> geographic area, including Cyprus, Switzerland, and Dubai.  FTX Trading
> through this acquisition aims to develop a strong presence in these markets.
> Furthermore, the Company's existing business relationship and in-process
> bank acquisition in Lichtenstein, will further facilitate FTX Trading's
> expansion through Europe by smoothing the regulatory processes in the region.

(*Emphasis added*) A.112 (BDO Valuation at 5).

While FTX Trading mischaracterizes DAAG as having limited business and no

intellectual property beyond a business plan, DAAG was a licensed and regulatorily compliant

operating entity that generated substantial revenue from its inception and was projected to

generate substantially increasing revenue in future years.  For the year ending December 31,

2021, and as referenced in the BDO Valuation, DAAG's gross revenue was $11.9 million, an

amount that was projected by BDO to grow to $205.7 million by the year ending December 31,

2026. The projected growth in DAAG's revenue was attributed to the "rising need for tokenized

public securities in the cryptocurrency environment." A.114 (BDO Valuation at 7.);

A.192(Williams Aff'd ¶8). The Complaint does not allege any facts to refute this point because

none exist.

### C.    FTX Trading was interested in acquiring access to European licenses and regulatory approvals so that it could lawfully both continue and expand its operations in the European market.

As recognized in both the Complaint and in the BDO Valuation, FTX Trading desired to

both continue and expand its operations in Europe and the Middle East and to access fully these

marketplaces but do so in a lawful and properly licensed manner.  Compl.  ¶¶ 3,37, 52; A.112

(BDO Valuation at 5). DAAG presented FTX Trading with an opportunity to fully accomplish

this objective. No facts are alleged in the Complaint to show that this was not FTX Trading's

objective or that the objective was not attained by the acquisition of DAAG.[3] Rather, the

---

[3]      FTX Trading already had substantial customers in the market in which DAAG
was licensed and relied on the "reverse solicitation" exception to the regulatory requirements to

Complaint, with the expected caviling, shows that the objective was obtained. Complaint ¶¶ 85-95.

In May 2020, Brandon Williams unsuccessfully requested Bankman-Fried to hire his advisory firm, Cosima Capital.[4] Compl. ¶50. Despite his lack success in convincing Bankman-Fried to retain Cosima Capital, Brandon Williams in August 2020 proposed to Bankman-Fried a business opportunity for FTX Trading in the form of an investment in DAAG. As proposed, FTX Trading could fly under the wings of the fully licensed and legal DAAG by making an initial investment and utilizing a "tied agent arrangement" with the German brokerage, CM-Equity AG,[5] with which DAAG has a relationship.  FTX Trading, through Bankman-Fried, its CEO, responded that FTX Trading was "def interested."[6]  Compl. at ¶52; A.193(Williams Aff'd ¶10).

---

continue its operations. Reverse solicitation refers to investment in funds by investors in the European Union on the exclusive initiative of those investors. But the continuation of FTX's operations was potentially in jeopardy due to its absence of regulatory compliance and reliance on the reverse solicitation exception. This, for example, happened recently to Binance, which relied, as did FTX Trading prior to the acquisition of DAAG, on the regulatory "reverse solicitation" exception and saw its operations in the Netherlands terminated. *See* https://www.cnbc.com/2023/06/16/binance-to-exit-the-netherlands-as-it-fails-to-get-regulatory-approval.html),

[4]     The communications between Williams and Bankman-Fried were primarily via Telegraph, a messaging application commonly used in the crypto-currency community.

[5]     CM-Equity AG is a fully licensed European securities and investment broker located principally in Germany, analogous to Charles Schwaab in the United States. *See* CM-EQUITY GLOBAL INVESTMENT SOLUTIONS, *https://cm-equity.de/en/*

[6]     FTX Trading and Bankman-Fried's abiding interest in acquiring regulatorily compliant exchanges motivated the acquisition in October 2021 of Ledger X, which became FTX US Derivatives. *See https://www.coindesk.com/business/2021/10/25/ftx-crypto-exchange-finalizes-ledgerx-acquisition/* In  *Forkast News*, Bankman-Fried is attributed to the following quote:

FTX Trading's interest in DAAG was piqued by the opportunity to "'use the liability umbrella of a firm that has all the licenses' to provide 'users of crypto . . . smooth access to buying and selling fractional shares' of securities through 'crypto channels." As Williams confirmed, FTX Trading would become a tied agent and granted 100% usage and the protection of DAAG's liability umbrella in which DAAG would take all responsibility for the exchange in the eyes of the regulators."  Compl.¶52; A.193(Williams Aff'd ¶10).

### D.    FTX Trading became a DAAG partner while DAAG was in its infancy.

Negotiations for FTX Trading to make an initial investment ensued, with term sheets and proposed documents being exchanged between Williams, Matzke, and Gruen and Bankman-Fried and other representatives of FTX Trading, which was being represented by Daniel Friedberg, an attorney formerly with Fenwick & West LLP and FTX Trading's general counsel. Compl. ¶¶ 52-55; A.193(Williams Aff'd. ¶11).

---

In an interview with Forkast News earlier this year, FTX CEO Sam Bankman-Fried said that while there was guidance from a lot of global regulators on spot cryptocurrency products, this was less true for derivatives. "We're excited for governments to start building out regulatory frameworks and licensing regimes for us to be able to offer that we can acquire for crypto derivatives," Bankman-Fried said. "That's going to play a big role in where we shift a lot of our resources to and we're having a lot of conversations behind the scenes right now and scoping places."

https://forkast.news/ftx-us-acquires-ledgerx-crypto-derivatives/ This quote exemplifies FTX Trading and Bankman-Fried's motivation in the DAAG transaction. *See also* https://markets.businessinsider.com/news/currencies/ftx-us-buys-ledgerx-crypto-derivatives-exchange-sam-bankman-fried-2021-08.  Sullivan & Cromwell represented FTX Trading in the Ledger X acquisition and represents FTX Trading in this adversary proceeding and should be well-aware of FTX Trading's intentions to become regulatorily compliant.

On October 26, 2020, Alameda Ventures,[7] as an affiliate of FTX Trading, invested $700,000 in DAAG in exchange for a 5% interest in the company pursuant to a Share Purchase Agreement of that date. See A.001(SPA 1). Brandon Williams was not a direct transferee or recipient of any of the $700,000 purchase price.  Compl. ¶¶56-57; A.193(Williams Aff'd. ¶12).

The parties executed three agreements in the original transaction: 1) SPA 1 in which Alameda Ventures purchased a 5% interest in DAAG for $700,000, 2) A Joint Venture Agreement between DAAG, CM-Equity, AG (the German brokerage), and FTX Trading Gmbh (FTX Trading's German special purpose vehicle) in which FTX Trading would be able to exclusively offer through DAAG tokenized equities to end users for a four month period, and 3) a Tied Agency Agreement with CM-Equity in which FTX Trading GmbH could utilize CM-Equity's BaFin licenses by referring customers to CM-Equity's brokerage services. Compl.¶ 56; A.193-194(Williams Aff'd ¶13).

**E.    Alameda, on behalf of FTX Trading, increased its equity stake in DAAG to 20% and later transferred this interest to FTX Trading.**

After six months of observing the development of the DAAG startup, FTX Trading wanted to increase its equity stake in DAAG, again through its affiliate, Alameda Ventures. Compl.¶60.  On July 2, 2021, Alameda Ventures, as buyer, and Brandon Williams, Patrick Gruhn, and Robin Matzke (through Lorem Ipsum UG), as sellers, executed and closed on a Stock Purchase Agreement for 15% of the equity in DAAG. See Exhibit 2 (SPA 2).  Compl.¶¶ 60, 61; A.194(Williams Aff'd ¶14).

Pursuant to SPA 2, Alameda Ventures acquired an additional fifteen percent interest in DAAG, raising its ownership percentage to 20%, for a price of $55,500,000. Each of the three

---

[7]     Alameda Ventures Ltd. is not Alameda Research LLC, the hedge fund that had allegedly improper access to FTX Trading's customer funds. The Complaint does not make clear this important distinction.

shareholders (including Brandon Wiliams), was paid $18.5 million for their respective 5% share interests. While Alameda Ventures was the signatory to SPA 2, the purchase was done by Alameda Ventures on behalf of FTX Trading. As evidence of this fact, after the execution of SPA 3 in November, Alameda Ventures transferred its 20% equity in DAAG to FTX Trading for $62.5 million, which was its then value.  Compl. ¶70; A.194(Williams Aff'd ¶15); A.112 (BDO Valuation at 5)[8]

F.    **FTX Trading desired to acquire one hundred percent of the equity in DAAG to increase its business and operations.**

Four and a half months after the execution of SPA 2 (July 2, 2021) and more than a year after the initial investment in DAAG (October 20, 2020), FTX Trading decided to acquire complete ownership of DAAG through the purchase of all of its stock not already owned by Alameda Ventures. FTX Trading had been a client and minority shareholder of DAAG for roughly one year prior to its final DAAG acquisition and had in-depth familiarity with DAAG and its operations, financials, and regulatory setup. Compl. ¶63; A.194(Williams Aff'd ¶14).

Negotiations over valuations, payment models, and terms began and continued over several months. FTX Trading in the negotiations was represented by in house lawyers Daniel Friedburg and Can Sun. A.194-195(Williams Aff'd. ¶17). FTX Trading ultimately retained a Swiss law firm to also represent its interests in the transaction. Compl. ¶¶ 72,73. Since Gruhn and Matzke were to remain employed by DAAG after the acquisition and receive incentive compensation (including stock ownership in FTX Trading) based on achieving certain goals,

---

[8]    Hence, Alameda Ventures made a profit of $6.3 million ($62.5 million received from FTX Trading less the $56.2 million paid to the DAAG shareholders) but is suing the Defendants on the allegation that the purchase price it paid for the 20% interest ($56.2 million) was an actual or constructive fraudulent transfer, ignoring the ultimate profit it made and seeking to recover the purchase price it paid for the 20% interest that it transferred to FTX Trading at a profit.

they primarily did the negotiating. Brandon Williams was not invited to remain with the company after the acquisition or to ultimately obtain an ownership interest in FTX Trading. For this reason, while he was kept fully informed, he relied upon Gruhn and Matzke to do the negotiating on their and his behalf. A.194(Williams Aff'd ¶15).

When the negotiations had been completed, FTX Trading and Brandon Williams, Patrick Gruhn, and Robin Matzke (through Lorem Ipsum UG) entered into a Stock Purchase Agreement (SPA 3) on November 14, 2021, in which FTX Trading would acquire all stock of DAAG not owned by Alameda.  Compl.¶ 63; A.019(SPA 3); A.194(Williams Aff'd ¶16).

Pursuant to SPA 3, FTX Trading acquired the remaining share interests in DAAG for a gross purchase price of $320,000,000, consisting of

(a)  an up-front cash payment of $166,666,656.26, payable to Williams ($83,333,312.50), Gruhn ($41,666,671.88), and Matzke, through Lorem Ipsum UG ($26,666,671.88) and

(b)   contingent and bonus cash and FTX Trading stock payments to Gruhn and Matzke (but not Williams) for the balance of the purchase price ($153,333,343.74) dependent upon the future achievement of certain specified milestones and goals, which focused upon obtaining additional licensing and regulatory approvals not then possessed by DAAG but which it was in line and fully able to obtain through the acquisition of the Cyprus licensed investment firm, K-DNA. These contingency payments were owed only to Gruhn and Matzke, who were to remain employed by the company, Gruhn as Gruhn as chief executive officer and Matzke as general counsel, but not Williams, who was not invited to remain with DAAG after the sale. A.019(SPA 3); Compl. ¶63,65; A.195(Williams Aff'd ¶19).

On November 21, 2021, Williams received a lump sum, one-time payment of $83,333,312.50 for his stock interest. Gruhn and Matzke, on the other hand, received

$68,333,343.76 ($41,666,671.88 and $26,666,671.88, respectively), for their shares plus the right to earn the contingent future cash and stock payments upon achievement of the defined licensing and regulatory goals. Compl. ¶ 67; A.019(SPA 3); A.196(Williams Aff'd ¶20).

Williams was not permitted to remain with or be employed by DAAG or participate in the future contingent money and stock payments. Once his share interest was acquired, Brandon Williams had no further relationship with the acquired DAAG or its business or activities. In substance, the amount of cash Williams received above the cash paid to each of Gruhn and Matzke was equivalent to a severance payment. A.195-196(Williams Aff'd ¶¶19, 20). All of the factual allegations of the Complaint describing the post-acquisition activities and license acquisitions is irrelevant to the claim against Brandon Williams, who was no longer with the company.

After the closing on SPA 3 and prior to the bankruptcy, FTX Trading, operating as DAAG but under the name "FTX Europe" (Compl. ¶20), was able to realize its initial goal. The objective was for FTX Europe to receive all regulatory approvals needed for it to actively solicit and actually provide to retail and professional customers in the European Economic Area (including Germany), under the FTX brand, all futures and other crypto derivatives products. Compl. at ¶¶ 68, 95-96.  The realization of these post-acquisition goals had nothing to do with Williams, who was no longer with or active in the company. Any post-acquisition payments of money or stock went solely to Gruhn and Matzke (through Lorem Ipsum) and not to Williams, who received nothing.

### G.    BDO appraised DAAG at the request of FTX Trading.

On April 7, 2022, BDO USA, LLP issued to Jen Chan, FTX Trading's Chief of Staff, its estimation of the fair value DAAG on an on-going concern basis as of November 14, 2021, the date FTX Trading became the 100% owner of DAAG pursuant to SPA 3. A.107(BDO

Valuation). BDO expressed the opinion that the fair value of the 80% interest in DAAG that FTX Trading acquired was, as of November 14, 2021, $153,500,000, with a value of the future cash (but not stock), contingencies (license acquisitions) of $83,479,000, for a total value of $236,979,000.  The 20% minority interest acquired by Alameda Ventures and transferred to FTX Trading was valued at $62.5 million, the amount FTX Trading paid Alameda Ventures. Thus, the total value of FTX Trading's 100% ownership interest in DAAG as of November 14, 2021, on a going concern basis, in the opinion of BDO, was $299,479,000, which compares to the $166.7 million in cash paid and the cash contingencies of $93.3 million (exclusive of FTX Trading stock) for the 80% interest, plus the $56.2 million paid by Alameda for the 20% interest, for a total cash price of $316.2 million.

Hence, as evidenced by the BDO valuation opinion, FTX Trading received "reasonably equivalent value" ($299,479,000) for the cash price it paid ($316.2 million) to acquire the 100% interest in DAAG.

### H.     FTX Trading was fully solvent at the time it acquired all the share interests in DAAG and afterward.

Prager Metis, a well-recognized international firm of public accountants, audited FTX Trading for the years ending December 31, 2021 and 2020 and issued an unqualified audit opinion accompanying the financial statements. A.042(Consolidated Statement). The audit opinion, without qualification, showed that FTX Trading was fully solvent as of December 31, 2021 and 2020. Furthermore, the statements reflected FTX Trading's positive net worth after it acquired DAAG and reflected the fair value ascribed FTX Trading in the BDO Valuation.

Underscoring FTX Trading's unquestionable solvency at the time it acquired DAAG, the financial information presented by John Ray in his First Day Declaration shows that as of September 30, 2022, FTX Trading had consolidated assets of $2,258,734 and liabilities of

$465,656, and a net worth of $1,793,078 and was fully solvent as of September 30, 2022. First Day Declaration Doc 24 ¶¶ 36-38; A.071. While Ray questioned the reliability of the financial information he was presenting, he has not presented in the Complaint or elsewhere any information indicating that FTX was balance sheet insolvent as of November 23, 2021, the day FTX Trading closed the SPA 3 transaction, or that contradicted the financial information in his Declaration.

Even more telling, in the Voyager Digital Holdings, Inc. bankruptcy, FTX Trading and its affiliates, represented by Andrew Dieterich and Sullivan & Cromwell, was the successful bidder in the two-week auction sale. FTX Trading was vetted and approved by both the debtors and the creditors' committee, including their investment banker consultant, Moelis, LLC, and was approved by the Court on October 20, 2022. *See In re: Voyager Digital Holdings, Inc. et al.* Case No.22-10943(MEW), United States Bankruptcy Court for the Southern District of New York. See A.198(FTX Joint Proposal) A.218(Debtor's Motion excerpt) A.227(Section 4.4 from Asset Purchase Agreement), A.228(Order approving sale), A.106(Dietderich email). In the Voyager bankruptcy proceeding, FTX Trading, represented by Andrew Dieterich and Sullivan & Cromwell, made representations about its financial condition and ability to close the transaction. See A.198(FTX Joint Proposal) and A.227(Section 4.4).  After questions arose about FTX Trading's financial situation and liquidity, Mr. Dietderich, emailed the creditors' committee counsel, Darren Azman, on November 7, 2022, just before the bankruptcy filing on November 11, 2022, and stated that FTX Trading's financial condition was "rock solid." A.106(Email). Now, FTX Trading, represented by the same Sullivan & Cromwell, alleges that a year earlier, on November 2021, FTX was insolvent (but, apparently, remarkably became solvent by the time of the Voyager auction sale).

FTX Trading filed bankruptcy, not because it was insolvent within the meaning of the definition of "insolvent" in Bankruptcy Code §101, but because it faced a "severe liquidity crisis that developed just before the bankruptcy filing [that] necessitated the filing of [the] Chapter 11 Cases on an emergency basis." Compl. ¶ 33. The bankruptcy filing was not based on FTX Trading's liabilities exceeding the value of its assets or an inability eventually to pay its creditors (customers) but its inability to respond to a torrent of customer requests to withdraw deposits precipitated by a publicly announced sale by a rival exchange of all of its FTT tokens, which were tokens issued by FTX Trading.

As explained by NBC News, Binance, the largest crypto currency platform and a rival of FTX Trading, and its chairman, Changpeng Zhou ("CZ"), were instrumental in causing FTX Trading's bankruptcy. Binance, which held a huge quantity of FTT tokens, publicly announced on November 6, 2022, that it was selling off all of its FTT tokens. This public announcement caused the price of FTT to drop sharply. The abrupt price drop resulted in FTX Trading customers, in the context of other crypto currency exchange collapses that had occurred, wanting to immediately withdraw their deposits. Exacerbating the problem, Binance publicly announced after its sale of the FTT tokens that it was going to purchase FTX Trading and then almost immediately publicly announced that it decided against the acquisition. This public announcement by Binance caused even more depositors to attempt to withdraw their assets from the FTX platform. FTX Trading suffered what resembled a classic bank run spurred on by customer solvency concerns and worries about their ability to make withdrawals before the bank runs out of cash.[9] *See* https://www.nbcnews.com/tech/crypto/sam-bankman-fried-crypto-ftx-

---

[9]     This Court may take judicial notice of this commonly known and incontestable fact in deciding this motion, whether as a motion to dismiss or for summary judgment. Fed.R.Evid. 201.  *Ieradi v. Mylan Lab'ys, Inc.*, 230 F.3d 594, 598 (3d Cir. 2000); *Peters v.*

collapse-explained-rcna57582. *See also* https://fortune.com/crypto/2023/10/05/binance-ceo-changpeng-zhao-trapped-bankman-fried-ftx/amp/ ; Zeke Faux, *Number Go Up*, Penguin Random House LLC, Chapter 23, pages 213-16 (describing the events leading to the run on the exchange and actions of CZ, who is described as the operator of one of the shadiest operations in Crypto). The situation is analogous to the failure of Silicon Valley Bank when the Federal Reserve raised interest rates and caused a bank run.

In the context of the liquidity crisis and the looming bankruptcy filing, Bankman- Fried turned over total control of FTX Trading to John Ray, as new Chief Executive Officer, and to Sullivan & Cromwell, as FTX Trading's existing counsel and new bankruptcy counsel.

### I.      The acquisition of DAAG was not for the purposed of enriching Samuel Bankman-Fried.

According to the Complaint, Samuel Bankman-Fried spent **"FTX Group assets lavishly on, among other things, private homes and jets, political and "charitable" contributions, and *dubious investments designed to enrich themselves. FTX Group's acquisition of DAAG was one such investment*."** (*Emphasis added*) Compl. ¶ 34. The inapplicability of this assertion to the FTX Trading bankruptcy is obvious:  DAAG was acquired by FTX Trading, not Samuel Bankman-Fried or anyone in his personal orbit. If the acquisition was to benefit in any way Samuel Bankman-Fried, the benefit was entirely derivative and would only occur because the transaction benefited FTX Trading.

Further, the Complaint falsely alleges that the purchase was motivated by Bankman-Fried's desire to financially benefit Brandon Williams, with whom he supposedly had a close

---

*Delaware River Port Auth. of Pennsylvania & New Jersey*, 16 F.3d 1346, 1356 (3d Cir. 1994); *In re PHP Healthcare Corp.*, 128 F. App'x 839, 844 (3d Cir. 2005) (affirming dismissal of fraudulent transfer claim based on judicial notice under Fed.R.Evid. 201 of facts contained in a news article).

personal relationship.[10] This allegation is not correct. Bankman-Fried and Brandon Williams

knew each other but only through electronic communications about business and matters related

to business, never met in person, and never spoke one-on-one on the phone. Their principal

interaction was Brandon William's unsuccessful attempt to secure FTX Trading as a client of his

consulting firm, Cosima Capital, and the FTX Trading/DAAG transactions. Bankman-Fried's

lack of a personal relationship with Brandon Williams is conclusively shown by his affidavit and

Williams not being permitted to remain with DAAG after the acquisition or participate in the

contingent future payments or potential stock ownership of FTX Trading. Williams Aff'd

¶¶22,23,2.

### J. The purchase of DAAG was not for the purpose of hindering, delaying, or defrauding FTX Trading's creditors.

Not one fact has been alleged in the Complaint that FTX Trading when it acquired

DAAG in November 2021 did so for the express purpose and intention of preventing its existing

or future creditors from being paid. Nor is there any evidence that preventing creditors from

being paid was the reason FTX Trading made the investment. The Complaint does not allege

facts to show, and the material facts not in genuine dispute, demonstrate that transaction was not

intended, actually or constructively, to prevent or hinder creditors from being paid.

---

[10]     The situation can be contrasted with that of FTX Trading's investment of over $400+ million in Modulo Capital, Inc. and related entities, a complete start up owned by persons living with Bankman-Fried in his penthouse in the Bahamas. *See* https://www.nytimes.com/2023/01/24/business/ftx-sbf-modulo-capital.html ("The fledgling firm, which was founded in March and operated out of the same Bahamian compound where Mr. Bankman-Fried lived, had no track record or public profile. One of the founders, Duncan Rheingans-Yoo, was only two years out of college. His business partner, Xiaoyun Zhang, known as Lily, was a former Wall Street trader who had previously been romantically involved with Mr. Bankman-Fried, according to four people with knowledge of their relationship.")

**IV.**
**Law and Argument**

A.    **The Plaintiffs did not purchase DAAG with the actual intent to hinder, delay, or defraud creditors of FTX Trading within the meaning of Bankruptcy Code §548(a)(1)(A).**

1.    **In determining if a fraudulent conveyance under Bankruptcy Code §548(a)(1)(A) occurred, the focus is on the transaction at issue and nothing else.**

When determining if a fraudulent transfer subject to avoidance under Bankruptcy Code §548(a)(1)(A) occurred, the focus is on the subject transaction only, and not on other, unrelated transactions, events, or circumstances, even if they evidence a broad and extensive fraudulent scheme perpetrated by the debtors.

In *In re DBSI, Inc*., 477 B.R. 504, 511 (Bankr. D. Del. 2012), the trustee clearly alleged the existence of a broad Ponzi scheme. But the Court noted that to determine if a challenged transaction constituted a transfer with the an actual intent to hinder, delay, or defraud creditors, the focus had to be on the challenged transaction only, and not on the broad contours of the Ponzi scheme apart from the transaction at issue. As stated in the opinion:

> This is because even where the plaintiff has alleged the existence of a broad, fraudulent scheme, "the [c]ourt must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of [an actually fraudulent transfer]."

*In re DBSI, Inc*., 477 B.R. at 511 (Bankr. D. Del. 2012).

A similar holding is found in *In re Art Inst. of Philadelphia LLC*, No. 18-11535 (CTG), 2022 WL 18401591, at *1 (Bankr. D. Del. Jan. 12, 2022), where the Court dismissed a complaint alleging that salary and other payments to certain of the debtor's employees constituted intentional fraudulent conveyances based on the allegation that the debtor's business was fundamentally fraudulent and represented an effort "to increase revenues by defrauding the government." The compliant, however, lacked "specific factual allegation (that would pass

muster under Rule 9(b)) to support the trustee's claim that the transfers in question were made with the requisite intent to hinder, delay or defraud creditors." *In re Art Inst. of Philadelphia LLC, No.* 2022 WL 18401591, at *17. *See also In re Live Well Fin., Inc., No. 19-11317 (LSS),* 2023 WL 3995900, at *17 (Bankr. D. Del. June 13, 2023).

FTX Trading both ignores and flouts this governing principle that requires it to focus solely on the challenged transaction and to show how it made the transfer with the actual intent and purpose of defrauding its creditors in violation of Bankruptcy Code §548(a)(1)(A). FTX Trading instead focuses almost exclusively on the purported general fraud and misconduct of Samuel Bankman-Fried and his cohorts in matters completely distinct from and having nothing to do with FTX Trading's acquisition of DAAG and its arms-length purchase of Brandon Williams's stock interest in DAAG. The Complaint for this reason fails to state a fraudulent transfer claim under Bankruptcy Code §548(a)(1)(A) against Brandon Williams based on the purchase by FTX Trading of his shares of DAAG. The material facts not in genuine dispute pellucidly show that no such claim exists, and that summary judgment is proper. There was simply nothing about the purchase of Brandon Williams's interest in DAAG that indicated the purchase was made to defraud the present or future creditors of FTX Trading. The fraudulent misconduct of Samual Bankman-Fried in other unrelated matters does not suffice to upend the challenged transaction.

### 2. FTX Trading purchased DAAG for a legitimate business purpose and not with the intention of hindering, delaying, or defrauding its creditors.

Under 11 U.S.C. § 548(a)(1)(A), a transfer of an interest of the debtor in property may be avoided if the debtor made the transfer with the actual intent to hinder, delay, or defraud creditors, meaning keeping creditors from being timely paid their legitimate claims in full. The statute's crux rests on the intent of the transferor in making the specific transfer, with the focus

being on an intent aimed at preventing legitimate creditors from being paid.  *In re Cred Inc.*, 650

B.R. 803, 834 (Bankr. D. Del. 2023); *In Re: The Art Institute of Philadelphia LLC v. Nelson*, AP

No. 20-50627, 2022 WL 18401591 *18-19 (Bankr. D. Del. January 12, 2022) ("the complaint

still must, at the very least, contain some factual allegation sufficient to support a finding that the

transferor intended to defraud its creditors."); *In re HH Liquidation, LLC v. Comvest Group*

*Holdings, LLC*, 590 B.R. 211, 262 (Bankr. D. Del. 2018) ("No claim for actual fraudulent

transfer can succeed where the plaintiff fails to prove actual intent to hinder, delay or defraud the

transferor's creditors.")    The intent of the debtor must have been to remove property from the

debtor's possession that could have been used to repay creditors.

    If the debtor intended to make the transfer for a legitimate business purpose and not to

elevate the transferee above creditors, then the debtor cannot sustain a claim for an actual

fraudulent transfer under the Bankruptcy Code.  *In re Bayou Steel BD Holdings, L.L.C. v. Black*

*Diamond Capital Mgt., L.L.C.*, 642 B.R. 371, 395-96 (Bankr. D. Del. 2022) (In dismissing a

fraudulent transfer claim, the Court in words that are apt to FTX Trading's acquisition of DAAG,

emphasized that that "The facts suggest that Fund IV and BDCF were trying to improve the

Debtors' liquidity position and by extension, creditors' chances of repayment.")

    The Complaint glaringly lacks any factual allegations that FTX Trading purchased

DAAG or Brandon Williams's equity in DAAG with the actual intent to hinder, delay, or

defraud FTX Trading's creditors. The material facts not in genuine dispute show that no such

factual allegations can be made.  To the contrary, the Complaint alleges and the material facts

not in genuine demonstrate conclusively that FTX Trading purchased DAAG and Brandon

William's equity in DAAG for the legitimate business purpose of expanding FTX Trading's

footprint into the European market and expanding its customer base in a regulatory compliant

manner.  Compl.¶ 3 ("The FTX Insiders pursued the DAAG acquisition because they believed DAAG's founders could provide access to European regulators that would allow FTX to obtain the necessary licenses for activities in the European Economic Area.") And it must be underscored that FTX Trading, not Samuel Bankman-Fried, purchased DAAG and Brandon Williams's interest in DAAG. The purchase was intended to benefit FTX Trading (not Bankman-Fried), and hence its creditors, and not to diminish any creditor's ability to be repaid.

In addition to the legitimate business purpose of expanding into the European market with regulatory compliance, FTX Trading, conclusorily alleges that the FTX Trading acquired Brandon Williams's interest in DAAG to benefit Brandon Williams.  The allegation is that Williams was a close associate of Bankman-Fried, with whom he had a pre-existing relationship, and that the purchase was, essentially, to bestow a gratuitous benefit and exorbitant largess upon a personal friend of Bankman-Fried.  As has been discussed, this allegation is patently false, is not supported by any factual allegations, and is demonstrably untrue, as is shown by the material facts not in genuine dispute. FTX Trading's acquisition of DAAG was not for the purpose of bestowing a financial gift on Brandon Williams.  Even if this false allegation were true, an intention to bestow a benefit on a friend does not equate to an intention to hinder, delay, or defraud creditors without much more than has been alleged in the Complaint.

### 3.    None of the badges of fraud have been properly alleged, and none are established by the material facts not in genuine dispute.

Nor will an examination of the badges of fraud in the context of the allegations in the Complaint and the material facts not in genuine dispute cure the deficiencies in FTX Trading's claim of an actual intent to hinder, delay, or defraud its creditors under Bankruptcy Code §548(a)(1)(A). The badges of fraud include, but are not limited to:

> (1) the relationship between the debtor and the transferee; (2) consideration for
> the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much
> of the debtor's estate was transferred; (5) reservation of benefits, control or
> dominion by the debtor over the property transferred; and (6) secrecy or
> concealment of the transaction.

*In re Cred Inc.,* 650 B.R. 803, 834 (Bankr. D. Del. 2023)*.* As stated in *In re Cred Inc.* "While the

Trust argues that it has alleged the existence of multiple badges of fraud, a closer look at the

Complaint reveals only conclusory statements. Facts to support these statements are missing." *In*

*re Cred Inc.*, 650 B.R. at  834 (Bankr. D. Del. 2023). That is the situation with the Complaint

and its assertion in paragraph 106 of various badges of fraud as support for its claim of FTX

Trading's actual intent to hinder, delay, or defraud its creditors. Paragraph 106 of the Complaint

alleges nothing but bald, factually unsupported conclusions.

And while the Complaint arguably alleges the negligence or the incompetence of the

management of FTX Trading in making the acquisition, the negligence or incompetence of a

debtor's management does not constitute a badge of fraud under any definition. Nor does a lack

of due diligence as to the company to be acquired. Compl. ¶76. If FTX Trading, under the

control of Samual Bankman-Fried and his cohorts, made a bad (or even stupid) investment or

agreed to less than beneficial terms in a business acquisition aimed at building the company's

business, or, as alleged, failed to perform comprehensive and competent due diligence, the

negligence, incompetence, or bad decision making do not constitute badges of fraud or indicate

an actual intent to hinder, delay, or defraud creditors that suffices under Bankruptcy Code

§548(a)(1)(A).

FTX Trading has not alleged actual facts (in contrast to conclusions) to show the

presence of any of the badges of fraud relating to its acquisition of Brandon Williams interest in

DAAG. The material facts not in genuine dispute show that none of the badges of fraud existed.

There is a simple reason for this: FTX Trading's acquisition of DAAG was not for the purpose of

and had nothing to do with hindering, delaying, or defrauding FTX Trading's creditors. The natural and intended consequences of FTX Trading's acquisition of DAAG was not to prevent or thwart its present or future creditors from being paid but was to enhance FTX Trading's licensed and regulatorily compliant business in Europe and the Mid-East and thereby insure that creditors, including all depositors in the exchange, were paid in full. Without the DAAG acquisition, FTX Trading was at risk to lose all clients and revenue from the jurisdictions DAAG was able to cover, something which would have adversely affected FTX Trading's creditors. The acquisition of DAAG actually benefited the creditors of FTX Trading by protecting FTX Trading's revenue.

**B.      No constructive fraudulent transfer under the Bankruptcy Code § 548(a)(1)(B) has been alleged or shown by the material facts not in genuine dispute.**

FTX Trading has not alleged facts to show that a constructive fraudulent transfer occurred when it acquired DAAG, and the material facts not in genuine dispute demonstrate that, as a matter of law, one did not. Bankruptcy Code § 548 (a)(1)(B) provides that an avoidable constructive fraudulent transfer may have occurred if facts are alleged and proven to show that the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation *and* the debtor:

- was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

- was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

- intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

- made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C.A. § 548(a)(B)(ii).  FTX Trading has not alleged and cannot establish in the context of

the material facts not in genuine dispute a claim for constructive fraudulent transfer involving the

acquisition of DAGG or of Brandon Williams's interest in it.

      1.     **FTX Trading has failed to carry its pleading burden to show by supported factual allegations that it received less than reasonably equivalent value when it acquired DAAG, and the material facts not in genuine dispute show that it did.**

As this Court has noted, a party receives reasonably equivalent value if it receives in

return roughly the value it has given in the transaction. *In re Cred Inc.*, 650 B.R. 803, 836

(Bankr. D. Del. 2023), quoting *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 630 (3d Cir.

2007). Customarily, the issue of whether reasonably equivalent value was exchanged is not one

to be resolved on a motion to dismiss. But this principle does not excuse FTX from alleging

"some facts that would ultimately support a finding regarding the lack of reasonably equivalent

value." *In re Cred Inc.*, 650 B.R. at 836. For instance, in November 2021, when FTX Trading

completed its acquisition, DAAG was an operating entity with a business that generated revenue.

After FTX Trading completed the acquisition, it continued the business and operations under the

name FTX Europe AG. Compl. ¶2. Yet FTX Trading never alleges what that business was, what

its revenue amounted to, or what were the tangible and intangible assets owned by the business

that were acquired. Nor does FTX Trading allege any facts to show the value or lack of value of

this acquired operating business and its tangible and intangible assets or that FTX Trading did

not acquire what it believed it was buying. While FTX Trading's Complaint in conclusory

allegations states that reasonably equivalent value was not exchanged in the acquisition, it

supplies no supporting facts to take its conclusory allegation of lack of reasonably equivalent

value into the world of plausibility rather than that of mere possibility. *In re Cred Inc.*, 650 B.R.

at 814. This Court could as reasonably conclude that FTX Trading paid DAAG's owners what it

believed was the value of the business and assets it was acquiring as that it did not and could as readily conclude reasonable equivalent value was exchanged as that it was not.

And the material facts not in genuine dispute show that FTX Trading received reasonably equivalent value for the price it paid to acquire DAAG. The BDO Valuation confirms that FTX Trading, in acquiring DAAG, received value roughly equal to what it paid. The price FTX Trading paid Alameda for Alameda's 20% interest further confirms reasonable equivalence.

Hence, the constructive fraud analysis should end at this point, but the other required elements also are not present and would not establish a constructive fraudulent transfer even if the value exchange was not reasonably equivalent.

> **2.      FTX Trading was not insolvent at the time of the acquisition and did not become insolvent as a result of it.**

While FTX Trading has alleged in a bald, conclusory fashion that it was insolvent at the time of the DAAG acquisition, it alleges no facts to go beyond this bald, conclusory, and inadequate allegation. To begin, as a matter of law, a liquidity crisis does not evidence balance sheet insolvency. For insolvency to exist, the value of the debtor's assets must be less than the amount of the debtor's debts. Bankruptcy Code §101.

And, the Prager-Metis audited financial statements, supported by the BDO appraisal, and even the Ray First Day Declaration conclusively show that FTX Trading was not insolvent at any relevant time. The only relevant time was November 14, 2021, the day the final acquisition of Brandon Williams's ownership interest in DAAG occurred.

FTX Trading's attempt to purchase the Voyager exchange and the representations it made in the sale proceeding (represented by its current counsel) in 2022, further undercut any allegation that FTX Trading was insolvent on November 14, 2021, when it acquired full ownership of DAAG. If FTX Trading was insolvent in November 2021, how did it become

solvent by October 20, 2022, the date the bankruptcy court approved its purchase of the Voyager exchange?

FTX Trading did not experience severe liquidity issues until November 2022 when there was a run on its FTT coin precipitated by Binance's actions and when the cryptocurrency markets saw a drastic downturn having nothing to do with DAAG or the acquisition of Brandon Williams interest in DAAG.

The Plaintiffs have not alleged a single fact supporting the bald allegation in Complaint ¶106 that FTX Trading was insolvent at the time of the DAAG acquisition (or even at the time of the bankruptcy filing). This Court has acknowledged that there is "no presumption of insolvency during the lookback period under § 548." *Insys Liquidating Trust v. Quinn Emanuel Urquhart & Sullivan, LLP (In re Insys Therapeutics, Inc.*), Adv. Pro. No. 21-50359 *5 (Bankr. D. Del. 2021) (dismissing a constructive fraud claim for failing to plead any facts supporting the insolvency of the debtor at the time of the transfer).  Without a presumption of insolvency, FTX Trading has failed to carry its burden of alleging, and cannot show under the material facts not in genuine dispute, that it was balance sheet insolvent at the time of or immediately after the transfers relating to its acquisition of Brandon Williams interest in DAAG.

Not only has FTX Trading failed to allege facts showing it was balance sheet insolvent at the time of or shortly after the transfers, the material facts not in genuine dispute show it was not.

> **3.    FTX Trading has not alleged and the material facts not in genuine dispute do not show that (a) FTX Trading either was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with it was an unreasonably small capital or (b) that FTX Trading intended to incur, or believed that it would incur, debts that would be beyond the its ability to pay as such debts matured.**

The Complaint does not make these allegations pertinent to a constructive fraudulent transfer claim, and the material facts not in genuine dispute show that they cannot be made.

**4.     FTX Trading has have not alleged and the material facts not in genuine dispute do not show that Brandon Williams was an "insider" within the meaning of the Bankruptcy Code.**

FTX Trading has also failed to allege any facts supporting the conclusory, threadbare recitation of the statutory element that Brandon Williams was an "insider" within the meaning of the Bankruptcy Code.  There are two types of insiders: statutory and non-statutory. Brandon Williams was neither.

**a.     Statutory insider.**

The Bankruptcy Code defines an "insider" as a "person in control of the debtor" or an "affiliate," which includes an "entity that ... owns ... 20 percent or more of the outstanding voting securities of the debtor." 11. U.S.C. § 101 (2)(A), (31)(B), (31)(E).  Pursuant to section 101(31) of the Bankruptcy Code, if a debtor is a corporation, the term "insider" *includes*: (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) …; (v) …; or (vi) a relative of a … director, officer, or person in control of the debtor.

Brandon Williams was a third-party who did not hold office with, did not own equity in, and was not a relative of anyone in control of FTX Trading.  He does not qualify as a statutory insider as defined in the Bankruptcy Code.

**b.     Non-statutory insider.**

Brandon Williams unquestionably was not a non-statutory insider of FTX Trading either. Brandon Williams was the transferee, and he had no relationship with FTX Trading, much less a "a close relationship" before or after the acquisition. The Complaint does not contain any factual allegations, and no facts exist, to show that Williams and FTX Trading dealt other than at arm's length or that Brandon Williams had the ability to coerce or direct or dominate the decisions of FTX Trading. *Schubert v. Lucent Technologies, Inc.* (*In re Winstar Communications, Inc.),* 554

F.3d 382, 396 (3d Cir.2009); *Clear Thinking Group LLC v. Brightstar US, Inc. (In re KCMVNO, Inc.)*, 08–10600 BLS, 2010 WL 4064832 (Bankr.D.Del. Oct. 15, 2010) (finding that a Complaint did not allege sufficient facts to establish insider status).  In *In re Broadstripe, LLC*, 444 B.R. 51, 80 (Bankr. D. Del. 2010), the Court enumerated factors that indicate insider status, none of which have been alleged or factually were present.

## IV.
## Conclusion

FTX Trading has failed to state a claim for a fraudulent transfer, either actual or constructive, under Bankruptcy Code §548.  The material facts not in genuine dispute show that as a matter of law, FTX Trading has no fraudulent transfer claim. FTX Trading acquired Brandon Williams's interest in DAAG for a legitimate business purpose and not to hinder, delay, or defraud its existing or future creditors. This Court should grant Brendon Williams's motion and not subject Brandon Williams to the abusive expense that multi-country discovery that this case will entail.

*/s/ Gregory L. Arbogast*
Lawrence J. Gebhardt (*pro hac vice pending*)
Gregory L. Arbogast (No. 6255)
GEBHARDT & SMITH LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801
T: (302) 295-5038
F: (443) 957-4325
Garbogast@gebsmith.com

*Attorneys for Defendant,*
*Brandon Williams*
