## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | Adv. Pro. No. 23-50437 (JTD) |
| -against- | |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

### Affidavit of Brandon Williams

Brandon Williams states as follows:

1.    I am a Defendant in the above adversary proceeding involving the sale of Digital Assets DA AG ("DAAG") to FTX Trading Ltd. between October 2020 and November 2021 and my interest in DAAG as a shareholder. I was involved in the incorporation of DAAG in July 2020 and remained involved until completion of the sale of DAAG to FTX Trading on November 14, 2021. After my share interest in

**A0189**

DAAG was sold, I had no further involvement with the company or its business and affairs. Based on my overall involvement in the incorporation of DAAG, its operation prior to its sale to FTX Trading, and the sale of DAAG to FTX Trading, I have personal knowledge of the matters and facts set forth and described in this Affidavit, and I am competent to be a witness to these matters and facts.

2. The three Stock Purchase in the Appendix (designated SPA 1, SPA 2, and SPA 3) are correct copies of the documents they purport to represent. I believe and therefore aver that the balance of the documents in the Appendix also are correct copies of the documents they purport to represent although I do not have personal knowledge of their authenticity.

3. DAAG was formed on July 1, 2020, as a Swiss corporation. At the times relevant to the acquisition of DAAG by Alameda and FTX Trading, DAAG was owned equally by Patrick Gruhn, Robin Matzke (through his solely owned company Lorem ipsum UG), and me.

4. DAAG's business focused on the design, structure, and issuance of novel digital products and derivatives, such as free-floating tokenized securities, perpetual futures, a crypto spot derivative (SPOT+), and other financial instruments. DAAG was positioned to offer a regulatory-compliant framework for the creation of novel digital products for its clients through tokenization and to operate in combination with regulated investment firms for retail client trading in European and other foreign markets.

5.      DAAG created all the know-how, processes, documents, procedures, and regulatory documents etc. required to enable DAAG, working with a licensed investment firm via a tied agency agreement, to enter the mass retail business market in a regulatorily compliant way. DAAG dealt in over 50 tokenized stocks, including Facebook, Google, Tesla, and Netflix. DAAG offered an alternative to other exchanges that were restricted to a single exchange or blockchain and only gave users the option to open or close positions. DAAG was also the only company in Europe capable of offering true perpetual futures contracts, which is the most important trading product in the crypto currency space.

6.      At the time of its acquisition by FTX Trading in November 2021, DAAG's most valuable asset was its proprietary know-how, knowledge, and expertise (collectively, "know-how") that it had developed and implemented. This proprietary know-how had enabled DAAG to become licensed and regulatorily complaint in the various markets in which it operated at the time of the FTX Trading acquisition and that would enable it (or FTX Trading) to become licensed and regulatorily compliant in numerous additional markets subsequent to the acquisition. This proprietary know- was reflected in and evidenced by over 200,000 pages of documents and materials. These documents and materials included business processes and operational rules and procedures, product approvals (including an endorsed Security Prospectus), product governance documents, and IT implementation requirement documents (which would allow DAAG to implement regulatory compliant IT-Systems to support or automate those developed processes).

A0191

This proprietary know-how would enable any licensed investment firm to start operating in the new and unique crypto related derivatives business launched by DAAG, as previously described.

7.      Once DAAG completed it's planned acquisition of the Cypriot investment firm, K-DNA Financial Services Ltd (which occurred shortly after the FTX Trading acquisition, as reflected in Complaint ¶¶ 85-95), and using DAAG's proprietary know-how, DAAG (or FTX Trading after the acquisition) would be able to service customers in the thirty countries in the European Economic Area, as well as in Argentina, British Virgin Islands (BVI), Brunei, Cayman Islands, China, Egypt, Georgia, Indonesia, Jordan, Kazakhstan, Kuwait, Lebanon, Malaysia, Mongolia, Montenegro, Panama, Philippines, Qatar, South Korea, South Africa, Switzerland, Thailand, Turkey, UAE, Ukraine. These licenses and approvals enabled FTX Trading upon the acquisition of DAAG and the subsequent acquisition of K-DNA to operate in these markets and use the proprietary know-how that FTX Trading acquired in its acquisition of DAAG.

8.      For the year ending December 31, 2021, DAAG's gross revenue was $11.9 million. This revenue was projected by BDO in its valuation to grow to $205.7 million for the year ending December 31, 2026. The projected growth in DAAG's revenue was attributed, as stated in the BDO appraisal, to the "rising need for tokenized public securities in the cryptocurrency environment."

A0192

9.      FTX Trading was a client and minority shareholder for roughly one year prior to its final DAAG acquisition and had in-depth familiarity with DAAG and its operations, financials, and regulatory setup.

10.     In May 2020, I unsuccessfully solicited Bankman-Fried to hire my advisory firm, Cosima Capital. Compl. ¶50. Despite my lack success in convincing Bankman-Fried to retain Cosima Capital, in August 2020, I proposed to Bankman-Fried a business opportunity for FTX Trading in the form of an investment in DAAG. As proposed, FTX Trading could fly under the wings of the fully licensed and legal DAAG by making an initial investment and utilizing a "tied agent arrangement" with the German brokerage, CM-Equity AG, with which DAAG had a relationship.  FTX Trading, through Bankman-Fried, its CEO, responded that FTX Trading was "def interested."

11.     Negotiations for FTX Trading to make an investment in DAAG ensued, with term sheets and documents being exchanged between Matzke,  Gruhn, and me and Bankman-Fried and representatives of FTX Trading, which was being represented by Daniel Friedberg, an attorney formerly with the firm of Fenwick & West LLP and FTX Trading's general counsel.

12.     On October 26, 2020, Alameda Ventures Ltd, as an affiliate of FTX Trading, invested $700,000 in DAAG in exchange for a 5% interest in the company pursuant to a Share Purchase Agreement of that date. See Exhibit 1 (SPA 1). I was not a direct transferee or recipient of any of the $700,000 purchase price.

A0193

13.     The parties ultimately executed three agreements in the original transaction: 1) SPA 1 in which Alameda purchased a 5% interest in DAAG for $700,000, 2) A Joint Venture Agreement between DAAG, CM-Equity, AG (the German brokerage), and FTX Trading GmbH (FTX Trading's German special purpose vehicle) in which FTX Trading would be able to exclusively offer through DAAG tokenized equities to end users for a four month period, and 3) a Tied Agency Agreement with CM-Equity in which FTX Trading GmbH could utilize CM-Equity's BaFin licenses, which was enabled by DAAG's proprietary knowhow (as previously described) by referring customers to CM-Equity's brokerage services.

14.     After six months of observing the development of the DAAG startup, FTX Trading wanted to increase its equity stake in DAAG, again through its affiliate, Alameda.   On July 2, 2021, Alameda, as buyer, and Patrick Gruhn, and Robin Matzke (through Lorem Ipsum UG) and I, as sellers, executed and closed on a stock purchase agreement ("SPA 2).

15.     Pursuant to SPA 2, Alameda acquired an additional fifteen percent interest in DAAG, raising its ownership percentage to 20%, for a price of $55,500,000. Each of the three shareholders (including me), was paid $18.5 million for their respective 5% share interests.

16.     Four and a half months after the execution of SPA 2 and more than a year after the initial investment in DAAG, FTX Trading decided to acquire complete ownership of DAAG through the purchase of its outstanding stock not already owned by Alameda.

A0194

17.    Negotiations over valuations, payment models, and terms began and continued over several months. FTX Trading in the negotiations was represented by in house lawyers Daniel Friedburg and Can Sun.  FTX Trading ultimately retained a Swiss law firm to represent its interests in the transaction.  Since Gruhn and Matzke were to remain employed by DAAG after the acquisition and receive incentive compensation (including stock ownership in FTX Trading) based on achieving certain goals, they primarily did the negotiating. I was not invited to remain with the company after the acquisition or to ultimately obtain an ownership interest in FTX Trading. I was kept fully informed of the negotiations and relied upon Gruhn and Matzke to do the negotiating on their and my behalf.

18.    When the negotiations had been completed, FTX Trading and Patrick Gruhn, Robin Matzke (through Lorem Ipsum UG), and I entered into a Stock Purchase agreement (SPA 3) on November 14, 2021, in which FTX Trading would acquire all stock of DAAG not owned by Alameda.

19.    Pursuant to SPA 3, FTX Trading acquired the remaining share interests in DAAG for a gross purchase price of $320,000,000, consisting of

(a) an up-front cash payment of $166,666,656.26 payable to Williams ($83,333,312.50), Gruhn ($41,666,671.88), and Matzke, through Lorem Ipsum UG ($26,666,671.88) and

(b) contingent and bonus cash and FTX Trading stock share payments to Gruhn and Matzke (but not Williams) for the balance of the purchase price ($153,333,343.74) dependent upon the future achievement of certain specified

7

milestones and goals, which focused upon obtaining additional licensing and regulatory approvals not then possessed by DAAG but which it was in line and able to obtain. These contingency payments were owed only to Gruhn and Matzke, who were to remain employed by the company, Gruhn as In-House Consultant for the Managing Directors of the licensed entities with the official Title of "Head of FTX Europe" and Matzke as Head of Legal Europe to provide legal advice to those local Managing Directors., but not me, as I was not invited to remain with DAAG after the sale.

20.     On November 21, 2021, I received a lump sum, one-time payment of $83,333,312.50 for his 26.67% stock interest. Gruhn and Matzke, on the other hand, received $68,333,343.76 ($41,666,671.88 and $26,666,671.88, respectively), for their shares plus the right to earn the contingent future cash and stock payments upon achievement of the defined licensing and regulatory goals.

21.     I was not permitted to remain with or be employed by DAAG or participate in the future contingent money and stock payments. Once his share interest was acquired, I had no further relationship with the acquired DAAG or its business or activities. In substance, the amount of cash Williams received above the cash paid to each of Gruhn and Matzke was equivalent to a severance payment.

22.     Despite the false allegations in the Complaint that the purchase of DAAG was motivated by Bankman-Fried's desire to financially benefit me due to our supposedly close personal relationship, I did not have a personal relationship with Samuel Bankman-Fried. Bankman-Fried and I knew each other but only

through electronic communications about business and matters related to business, never met in person, never spoke one-on-one on the phone. Our principal interaction was the FTX Trading/DAAG transaction.

23.    My lack of a personal relationship with Samuel Bankman-Fried is shown by my not being permitted to remain with DAAG after the acquisition or participate in the contingent future payments or potential stock ownership of FTX Trading.

24.    I strongly doubt Samuel Bankman-Fried would even know me if we met in public without being first introduced.

### Oath

In accordance with 28 U.S.C.A. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Brandon Williams

Dated As Of:  October 27, 2023.

9

A0197

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

**125 Broad Street**
**New York, New York 10004-2498**

_____

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

July 22, 2022

Voyager Digital Holdings, Inc.

c/o Jared Dermont
Moelis & Company LLC
399 Park Avenue, 4th Floor
New York, NY 10022

c/o Joshua A. Sussberg, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Re:   Customer Liquidity and Asset Purchase Agreement

Dear Jared and Josh,

FTX Trading Ltd and West Realm Shires Inc. (collectively, "FTX") and Alameda Ventures Ltd ("Alameda") have asked us to convey their joint proposal to enter into a Customer Liquidity and Asset Purchase Agreement, subject to the terms and conditions we describe in this letter and more fully in the attached term sheet.

FTX and Alameda have heard the statements made by Voyager about the importance of protecting customers. The chapter 11 case exposes customers with unsecured claims to extended illiquidity and a substantial risk of further losses, without the right to the appreciation of the specific crypto assets in which they originally invested.

FTX and Alameda each recognizes the scope of customer losses and jointly propose a transaction to mitigate the harm. Under this transaction, Voyager's customers would receive at least partial liquidity immediately, and the opportunity to withdraw that liquidity or freely reinvest it in their choice of digital assets. Our approach is not novel. It is consistent with how other failed retail financial institutions have prioritized the upfront protection of customers.

**A0198**

Specifically, as described in more detail in the attached term sheet, FTX and Alameda jointly propose a two-prong transaction whereby:

- Alameda will purchase all Voyager digital assets and digital asset loans (other than the loans to Three Arrows Capital ("3AC"), discussed below) in immediately available cash at fair market value. Alameda would pay the cash value of Voyager's digital assets into escrow; and

- FTX (or an applicable subsidiary thereof) will offer those Voyager customers who on-board with FTX the ability to receive their share of that cash in an account at FTX. Customers could withdraw their cash without gates or lockups or, if they choose, re-invest it in digital assets of their choice. FTX would waive the first month of trading fees for Voyager customers who wish to purchase digital assets rather than withdraw their cash.

Customers are under no obligation to sign up with FTX and doing so would be fully voluntary. FTX is also not requiring any minimum number of customers who would need to agree to participate. Any customer that does not wish to sign up with FTX would continue to retain all of their rights and claims in the bankruptcy proceedings, but would not receive early access to a distribution on their claim via FTX.

As unsecured creditors, Voyager's customers have a fixed US Dollar claim based on the value of digital assets in their wallets on July 5 (the "Petition Date"). The allowable amount of an unsecured claim does not change with fluctuations in the value of the debtor's property after the Petition Date.[1] However, customers are exposed to the risk of depreciation in cryptocurrency prices, as well as case costs, because each of these will reduce recoveries on the fixed US Dollar claim of the customer. This "one-way" risk results from customers having unsecured claims rather than property rights, and Voyager operating with co-mingled assets before and after the Petition Date.

Our proposal aims to solve this problem. Even those customers who wish to be "long" cryptocurrency should not be forced to do so by holding unsecured claims in a bankrupt company, at least not when there is an opportunity to receive cash immediately.

---

[1] "Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, **shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition**, and shall allow such claim in such amount . . . ." 11 U.S.C. § 502(b) (emphasis added). For example, unsecured foreign currency claims are converted to US Dollar claims on the same basis.

A few other notes with respect to the proposal.  First, FTX and Alameda are not interested in purchasing, and plan to leave behind in the bankruptcy estate, all 3AC-related litigation claims.  The chapter 11 case is the best place to pursue recoveries relating to Voyager's loan to 3AC.  We expect Voyager will use its bankruptcy powers to monetize these claims and provide supplemental recoveries to customers.

Second, Alameda will write off its own $75 million loan claim as part of the proposed transaction.  This claim would otherwise share in supplemental recoveries.  By writing off our loan, we will permit customers and other unsecured creditors to receive 100% of any incremental recoveries from the enforcement of the 3AC claim and any related litigation claims.

Third, we recognize that Voyager may have other ways to provide customers with liquidity with respect to 'FBO' cash accounts.  We are open to including or excluding these accounts from the transaction, as best for customers.

Fourth, FTX and Alameda do not ascribe independent value to the Voyager brand or intellectual property.  The proposal contemplates acquiring the brand and IP to avoid any customer confusion.  However, if Voyager has other parties interested in purchasing the Voyager brand or IP on a stand-alone basis, we can explore modifying the price and terms of the proposal to accommodate a separate transaction.

Time is of the essence.  Whatever goodwill exists with customers continues to erode with the passage of time.  More importantly, every day that passes with customers having their account value frozen exposes them to downside risk of cryptocurrency depreciation without a way to sell or hedge.

FTX and Alameda would like to move immediately to document and close this transaction.  They will pay their own expenses and seek no financial bid protections.  However, they are not in a position to hold their offer open subject to the continued loss of value that typically accompanies the insolvency of retail financial institutions.  We request an initial response to the proposal by Tuesday, July 26, and would aim for documentation to be in final form for execution by Saturday, July 30.

We understand that you are soliciting interest in Voyager's business from other potential buyers and have asked for indications of interest by Friday, July 29.  We have no concern with your doing so while also working expeditiously with us.  Voyager can then decide whether to sign our agreement depending on the terms and viability of the other bids received.  If Voyager chooses to sign with FTX and Alameda, we would do so over the weekend of July 30 and seek prompt bankruptcy court approval of the transaction, which we expect to implement pursuant to section 363 of the Bankruptcy Code.

-4-

   Attached is a term sheet describing the legal and financial terms of the
customer liquidity transaction, as well as a short annex describing some of its benefits for
FTX and Voyager customers.  As with other financial institution insolvencies, we would
seek expedited approval from the Bankruptcy Court of the customer liquidity transaction.
We would aim to have a closing by August 17, so that we can begin customer migration
promptly.

   We are available to discuss this proposal with you at your earliest
convenience.

        Sincerely,


        Andy Dietderich

cc:  Mitchell S. Eitel (Sullivan & Cromwell LLP)

**A0201**

## Annex A

## Term Sheet:  Customer Liquidity and Asset Purchase Agreement

*The following summary has been prepared to facilitate the preparation of a definitive agreement on the terms below (the "Agreement").  The summary is not binding and may be missing material terms, so no customer or other stakeholder should rely on anything herein.  A binding commitment will require agreed documentation and internal approvals not yet obtained.*

| | |
|---|---|
| **Buyers** | One or more of FTX Trading Ltd. and its affiliates ("FTX International"), and West Realm Shires Inc. and its affiliates ("FTX US", and together with FTX International "FTX"), and Alameda Ventures Ltd. and its affiliates (together, "Alameda"). |
| | FTX and Alameda are independently partnering together to make a joint proposal (each, a "Buyer" and collectively, the "Buyers").  FTX and Alameda will execute the Agreement and take financial responsibility for the performance by all applicable parties of the obligations of the Buyers. |
| **Seller** | Voyager Digital Holdings, Inc., Voyager Digital Ltd. and Voyager Digital, LLC, jointly and severally (the "Sellers"). |
| **Acquired Assets** | Subject to the terms hereof, on the Closing Date (as defined below), the applicable Buyer will purchase, and the Sellers will sell, as part of a simultaneous transaction (the "Acquisition"), all right, title and interest in the following assets (the "Acquired Assets"), free and clear of any liens, claims, interests and encumbrances, under section 363 of the Bankruptcy Code: |
| | 1.  all digital assets and digital asset loans (other than loans to Three Arrows Capital and its affiliates) ("Digital Assets"); |
| | 2.  all customer information and exclusive referral rights with respect to customer accounts, including digital asset and  "FBO" cash accounts ("Customer Accounts"); |
| | 3.  all preference, avoidance or other claims against customers or relating to Digital Assets, other than claims related to the loans to Three Arrows Capital; |
| | 4.  all trademarks and other intellectual property of the |

| | |
|---|---|
| | Sellers used or useful in the Sellers' business operations (the "Brand Assets"); and |
| | 5. at the option of the Buyers, any contracts, documents, accounts, rights, causes of action, books and records and other property or assets related to any of the foregoing. |
| **Excluded Assets** | "Excluded Assets" will include: |
| | 1. all cash; |
| | 2. all claims and causes of action relating to loans to Three Arrows Capital; |
| | 3. all other claims and causes of action not associated with an Acquired Asset; and |
| | 4. insurance policies and related rights. |
| **Assumed Liabilities** | None, other than obligations under any contract that the Buyers expressly agree to assume and perform. |
| | For the avoidance of doubt, FTX will not assume or perform the user agreements entered into by the Sellers with customers. Instead, FTX intends to on-board customers on FTX, subject to KYC requirements (utilizing the Sellers' files and relevant information to the fullest extent possible) and confirmation of customers' eligibility for an FTX account (see "New Customer Accounts at FTX" below). |
| | Any customer with a 'FBO' account with an available cash balance will have the opportunity to transfer that cash balance to an 'FBO' account through FTX pursuant to such mechanism as the Buyers and the Sellers agree. |
| **Purchase Price** | The purchase price (the "Purchase Price") will comprise: |
| | 1. with respect to Digital Assets, the Fair Market Value (as defined below) of such Digital Assets as of the second trading day immediately prior to the Closing Date (as defined below) or such other reference date as the parties may agree; |
| | 2. with respect to customer information and exclusive referral rights with respect to customer accounts, US$15 million; and |
| | 3. with respect to all other Acquired Assets, the |

A0203

| | cancellation of all amounts due under Alameda's $75 million loan to Voyager Digital Holdings, Inc. (on-lent to Voyager Digital, LLC). |
|---|---|
| | The "Fair Market Value" of any Digital Assets will be calculated by Alameda in good faith based on market practice and available pricing information, subject to confirmation by the Sellers of the reasonableness of such determination. If the parties cannot agree on the price of any specific Digital Asset, such Digital Asset shall constitute an Excluded Asset. |
| **Seller Option to Exclude Brand Assets** | The Sellers may by notice to the Buyers at any time prior to 11:59 p.m., Monday, August 1, notify the Buyer that they would like to exclude the Brand Assets from the Acquisition, in which case the parties will mutually agree on a reduction in the Purchase Price. If the parties are unable to agree on such a reduction, then the Acquisition shall not proceed. |
| **New Customer Accounts at FTX** | Each customer with a Customer Account who completes FTX's on-boarding and KYC process will receive a new account with FTX International or FTX US (their "FTX Account") into which the Sellers shall deposit all distributions payable to such customer with respect to the chapter 11 cases. These distributions will include an initial cash distribution (the "Initial Distribution") paid within 45 days of the Closing Date equal to the maximum amount the Sellers determine (in consultation with the Buyers) to be appropriate for distribution at such time, with subsequent distributions payable pursuant to any chapter 11 plan or as otherwise approved by the Bankruptcy Court. |
| | All amounts paid for the benefit of a customer to their FTX Account shall be payable in USD and immediately available to such customer for trading or withdrawal on the FTX platform. FTX will waive transaction fees for the first month of trading in order to allow customers to re-invest into the cryptocurrencies of their choice that are offered on FTX's platform. |
| | The procedures for the orderly and transparent migration of customers onto the FTX platform shall be developed by the Buyers, reasonably acceptable to the Sellers and subject to approval by the Court. Prominent links on the |

| | |
|---|---|
| | home page for all Voyager mobile and web platforms shall direct customers to the FTX migration process. |
| **Funding** | The Buyers shall pay the Purchase Price for the Digital Assets on the Closing Date into an escrow account with a financial institution selected by the Buyers and reasonably acceptable to the Sellers (the "Escrow Account").  During the first 45 days after the Closing Date, funds in the Escrow Account shall be released solely to fund Initial Distributions to FTX Accounts when established as contemplated above. After 45 days, the remaining balance shall be paid to the Sellers. <br><br> The Purchase Price for all other Acquired Assets shall be paid to the Sellers on the Closing Date. |
| **Court Approval and Closing** | The Buyers' commitment would be subject to strict compliance with the following milestones, which reflects the accelerated timetable common for the acquisition of customer accounts upon the bankruptcy of a financial institution: <br><br> 1. a motion for approval of the Agreement and the Acquisition filed in agreed form on or prior to August 3, 2022; <br><br> 2. court approval of the Agreement and the Acquisition on or prior to August 15, 2022; and <br><br> 3. closing on a date (the "Closing Date") on or prior to August 17, 2022. <br><br> The Buyers recognize that this timeline is subject to the scheduling orders of the Court as well as any regulatory requirements applicable to either party, but reserves the right to modify deal terms in the event of a material delay that changes the value of the Acquired Assets to the Buyers. |
| **Conditions** | The Buyers' commitment would be subject to satisfaction of customary closing conditions, including compliance with customary interim operating covenants. |
| **Deal Protection** | No exclusivity or no-shop provisions.  No overbid requirements.  No commitment, break or other fees. |
| **Expense Reimbursement** | None.  The Buyers will pay advisory fees out-of-pocket |

- 4 -

**A0205**

| | without reimbursement from the Sellers. |
|---|---|

## Annex B

## BENEFITS OF THE TRANSACTION

**Benefits for FTX – Why Are FTX and Alameda Proposing This Transaction?**

1.  FTX benefits from the opportunity to build relationships with new customers.  No customer would be required to remain a customer of FTX.  FTX expects that customers will like the FTX platform and decide to stay.

2.  Alameda benefits from the opportunity to monetize the digital assets it is acquiring for fair market value.  Alameda believes it can do so far more effectively than a chapter 11 debtor.

3.  FTX and Alameda also benefit from showing that a crypto business can be resolved like other financial institutions in a manner that focuses first on reducing harm to customers.  Crypto businesses will sometimes fail, just like other financial institutions.  Reducing customer losses will help keep confidence in crypto as an asset class.

**Benefits for Customers – Why Do We Believe This Transaction Helps Customers?**

1.  Customers benefit from immediate liquidity and access to a substantial portion of their investment in Voyager.

2.  Customers benefit from the option to take their recovery in cash or to reinvest in any crypto asset on the FTX platform, without trading fees for their first month of trading.

3.  Customers benefit from the elimination of the 'one-way risk' of holding a capped unsecured claim in a crypto business, as well as reduced exposure to chapter 11 costs.

4.  Customers benefit from FTX agreeing to pay full fair market value for the digital assets of Voyager, all at once, without discount.

5.  Finally, customers can still benefit from the proceeds of the assets and causes of action not purchased by FTX, including all claims related to Three Arrows Capital.  All this traditional bankruptcy litigation work can occur on a schedule that is independent of the customer liquidity transaction and may be a source of material supplemental recoveries.

**A0207**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF BRIAN TICHENOR**
**IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF**
**AN ORDER (I) AUTHORIZING ENTRY INTO THE ASSET PURCHASE**
**AGREEMENT, AND (II) GRANTING RELATED RELIEF**

I, Brian Tichenor, hereby declare under penalty of perjury:

1.      I am a Managing Director in the Financial Institutions Group at Moelis & Company

LLC ("Moelis").  Moelis is an investment banking firm that has its principal office at 399 Park

Avenue, 5th Floor, New York, New York 10022.  Among the businesses and products that fall

within the purview of the FIG Group are cryptocurrency, banks, asset managers, securities

exchanges, and insurance companies.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC
(8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY
10003.

A0208

2.    The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") engaged Moelis as investment banker.  I submit this declaration (this "<u>Declaration</u>") in support of the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement, and (II) Granting Related Relief* [Docket No. 472] (the "<u>Motion,</u>").[2]

3.    A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Steve Ehrlich, Co-Founder and Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "<u>First Day Declaration</u>"), and is incorporated by reference herein.

4.    Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the marketing and sale process and the Auction, (b) information learned from my review of relevant documents, or (c) information I received from the Debtors or the Debtors' other advisors.  I am not being specifically compensated for this testimony other than through payments that are proposed to be received by Moelis as a professional retained by the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

### Qualifications

5.    Moelis is an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022.  Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority.  Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the First Day Declaration (as defined herein), as applicable.

A0209

& Company Group LP.  Moelis & Company Group LP, together with its subsidiaries, has approximately 1,000 employees based in offices in North America, South America, Europe, the Middle East, and Asia.  Moelis & Company Group LP is a subsidiary of Moelis & Company, a public company listed on the New York Stock Exchange.

6.      Moelis provides a broad range of financial advisory and investment banking services to its clients, including (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising.  Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases.  Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including:  In re Knotel, Inc., No. 21-10146 (MFW) (Bankr. D. Del. Mar. 12, 2021); In re CBL & Assocs. Props., Inc., No. 20-35226 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); In re Energy Alloys Holdings, LLC, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); In re Jason Indus., Inc., No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); In re The Hertz Corp., No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); In re Extraction Oil & Gas, Inc., No. 20-11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); In re The McClatchy Co., No. 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); In re Internap Technology Solutions Inc., No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); In re Rentpath Holdings, Inc., No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); In re Sanchez Energy Corp., No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); In re Monitronics Int'l, Inc., No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 1, 2019); In re Aegerion Pharmaceuticals, Inc., No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); In re Joerns WoundCo Holdings, Inc., No. 19-11401 (JTD) (Bankr. D. Del. July 25, 2019); In re FTD Cos., No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019); In re Hexion Holdings LLC, No. 19-10684

3

(KG) (Bankr. D. Del. May 15, 2019); In re Aegean Marine Petroleum Network Inc., No. 18-13374 (MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); In re Parker Drilling Company, Inc., No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 15, 2019); In re Aralez Pharmaceuticals US Inc., No. 18-12425 (MG) (Bankr. S.D.N.Y. Oct. 31, 2018); In re iHeartMedia, Inc., No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); In re Global A&T Electronics Ltd., No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); In re Toys "R" US, Inc., No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); In re TK Holdings, Inc., No. 17-11375 (BLS) (Bankr. D. Del. Aug. 30, 2017); In re Basic Energy Services, Inc., No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); In re UCI International, LLC, No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016); In re AOG Ent., Inc., No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 8, 2016); In re SFX Entertainment, Inc., No. 16-10238 (MFW) (Bankr. D. Del. Mar. 21, 2016); In re American Apparel, Inc., No. 15-12055 (BLS) (Bankr. D. Del. Nov. 30, 2015); In re Allied Nevada Gold Corp., No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015); In re ITR Concession Co., No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); In re GSE Envt'l, Inc., No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); In re MACH Gen, LLC, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); In re MPM Silicones, LLC, No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014).

7.     I have over 10 years of investment banking experience advising companies, equity investors, financial vehicles, and creditors across a broad range of industries and geographies in a broad range of transactions.  Prior to joining Moelis, I was in the corporate and investment banking group at Citigroup Inc. where I focused on investment banking advisory transactions in the Financial Institutions Group.  I hold Bachelor of Science degrees in finance and computer science from Boston College and have a Master's of Business Administration degree from Georgetown University.

4

8.      I have been involved in several notable chapter 11 cases and restructuring assignments, including as advisor to the ad hoc group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; and as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding Corporation pursuant to a section 363 asset sale.  I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, Ambac Financial Group on its $557 million exchange offer of its Auction Market Preferred Shares, Ambac Financial Group on its $538 million exchange of Corolla Trust obligations and Junior Surplus Notes, an approximately $10 billion ad hoc group of non-litigating preferred shareholders in a proposed $6.9 trillion restructuring of Fannie Mae and Freddie Mac, secured lenders of AG Mortgage Investment Trust in its $3.0 billion restructuring of its repurchase agreement portfolio and secured lenders of MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio.

## Overview

9.      Moelis was engaged by the Debtors in June 2022 to advise the Debtors in their efforts to navigate challenges impacting the cryptocurrency industry and evaluate strategic alternatives in connection therewith.  I have been involved as a senior member of the Moelis team throughout our engagement.

A0212

**The Process**

10.     Beginning on or about June 20, 2022, Moelis initiated a dual-track process to solicit interest in, among other possible deal structures: (a) a sale of the Debtors' entire business to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise to allow the Debtors to weather volatility in public equity markets, declines in cryptocurrency prices, and dislocations in the cryptocurrency industry.

11.     While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not actionable, and no other potential counterparty was willing to participate in an out-of-court transaction on the timeline required.

12.     In light of the foregoing, the Debtors determined that filing for chapter 11 would improve their chances of effectuating a transaction to help stabilize the Debtors' business and preserve the value of the Debtors' enterprise in the best interests of the Debtors and their estates as well as the Debtors' creditors, customers, employees, and all other parties in interest.

13.     Since the filing of these chapter 11 cases, the Debtors, in consultation with the Unsecured Creditors' Committee, worked to identify the transaction that is in the best interest of all creditors under the circumstances. On July 21, 2022, the Debtors filed the *Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion," and procedures established therein, the "Bidding Procedures"),[3]

---

[3]     The Court granted the Bidding Procedures Motion on September 5, 2022. *See Order (I) Approving the Bidding*
(Continued)

A0213