which complemented the Debtors' *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Bidding Procedures provided the Debtors with the opportunity to continue to pursue a potential third-party transaction that may enhance value for stakeholders under the circumstances. The Bidding Procedures allowed the Debtors to receive and evaluate bids, hold an Auction, and prepare and negotiate a sale transaction to be consummated either outside of or through a chapter 11 plan.

14. Since the Petition Date, the Debtors communicated to all parties in interest that an expeditious timeline is necessary to reduce administrative costs, increase stakeholder recoveries, and minimize uncertainty while the cryptocurrency environment continues to fluctuate.

15. Over the past several months, Moelis, on behalf of the Debtors, reached out to approximately 90 strategic investors and financial sponsors, many of which had significant experience in the cryptocurrency industry. Ultimately, 54 parties executed non-disclosure agreements and were provided with access to a virtual data room with comprehensive information regarding the Debtors' business operations. The virtual data room was robust, supplemented throughout the marketing process, and ultimately contained over 1,000 diligence items. Moelis also held virtual diligence sessions with the Debtors and multiple interested parties.

16. The Debtors' marketing process yielded preliminary bids from several strategic investors with various structures and terms. Moelis, along with the Debtors' other advisors, helped the Debtors carefully consider each of the bids received. The marketing process involved the

---

*Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248].

**A0214**

Debtors working closely with each interested party, answering numerous requests for additional information, holding several conferences with the Debtors' management team, and diligently scrutinizing the viability of each bid that was received.

### The Auction

17.     The Debtors received multiple bids in advance of the bid deadline and on September 13, 2022, the Debtors commenced an auction (the "Auction") in accordance with the Bidding Procedures to determine the Successful Bid.  The Auction lasted two weeks, included multiple rounds of bidding, and featured extensive arm's-length negotiations with each participating bidder.  Moelis, along with the Debtors and their other advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased in the bid, (b) the total expected deal consideration, (c) the likelihood of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including treatment of customer claims, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment.

18.     The Debtors thoroughly engaged with and encouraged all participating bidders in the Auction to submit the highest and best bid that each party was willing to make. After receiving each participating bidder's final bid, the Debtors selected the bid from West Realm Shires Inc. ("FTX US" or the "Purchaser") and closed the Auction.  On September 27, 2022, the Debtors and FTX US executed that certain asset purchase agreement (the "Asset Purchase Agreement") memorializing the terms of the FTX US bid.  The Asset Purchase Agreement is attached as Exhibit B to the Motion.

19.     Pursuant to the Asset Purchase Agreement, FTX US will acquire substantially all of the Debtors' assets, including substantially all of the cryptocurrency held by the Debtors and the Debtors' customer accounts.  The transactions contemplated by the Asset Purchase Agreement

A0215

will be effectuated through a chapter 11 plan.  Ultimately, I believe that the FTX US bid provides the most value available under the circumstances for the Debtors' assets and ultimately to their stakeholders—including the Debtors' customers.  The Asset Purchase Agreement provides $1.422 billion of aggregate deal consideration, composed of (i) the fair market value of all Voyager cryptocurrency at a to-be-determined date in the future in a manner consistent with the Asset Purchase Agreement, which at current market prices as of September 26, 2022 is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated by the Debtors as providing approximately $111 million of incremental value.  I understand the Asset Purchase Agreement has a "No-Shop" provision which, upon entry of the Order, prohibits the Seller from soliciting alternative offers from third parties.  However, I also understand that the Asset Purchase Agreement includes a "Fiduciary Out" on the terms set forth in the Asset Purchase Agreement, that allows the Debtors to consider offers that may be superior to the Asset Purchase Agreement. The Debtors' claims against Three Arrows Capital will remain with the bankruptcy estate and any recovery thereon will be distributed to creditors.

20.     Based upon my involvement in the marketing process, including discussions and negotiations in which I both observed and participated, I believe that the Asset Purchase Agreement and the proposed Sale are the product of good-faith, arm's-length negotiations between sophisticated and well-represented parties, and, in light of the marketing process described above, the transactions contemplated by the Asset Purchase Agreement provide the most value for the Debtors' assets available under the circumstances.

A0216

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: September 29, 2022

*/s/ Brian Tichenor*
Name:  Brian Tichenor
Title:  Managing Director
     Moelis & Company LLC
     *Investment Banker and Financial*
     *Advisor to the Debtors and Debtors in*
     *Possession*

**A0217**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO
## THE ASSET PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state the following in support of this motion (this "<u>Motion</u>"):[2]

### Preliminary Statement

1.      The Debtors and their advisors worked tirelessly to identify the value-maximizing

transaction for their customers and other creditors on an expedited timeline over the last several

months.  These efforts were successful.  Following a two-week competitive auction process, the

Debtors selected the bid submitted by FTX US as the winning bid.  The Debtors value FTX US's

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms used by not defined herein shall have the meaning given to them in the Asset Purchase Agreement or the Bidding Procedures (each as defined below), as applicable.

bid at approximately $1.422 billion, comprised of (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates. Most importantly, the FTX US bid can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which FTX US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

2.    Before the Petition Date, and as discussed in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), the Debtors commenced a marketing process for an investment in, or a sale of the Debtors' business to, a third-party purchaser. Discussions with interested parties, however, revealed that an in-court process would be necessary to yield the most value-maximizing transaction available to the Debtors. Accordingly, the Debtors commenced these chapter 11 cases and continued their marketing efforts postpetition.

3.    The Debtors and their advisors left no stone unturned. Over the last several months, Moelis & Company LLC ("Moelis"), the Debtors' investment banker, reached out to 90 strategic investors and financial sponsors, many of which had significant experience in the cryptocurrency industry. Fifty-four parties executed non-disclosure agreements and were provided with access to a virtual data room with comprehensive information regarding the Debtors' business operations and financial position. The virtual data room was robust, supplemented throughout the marketing process, and contained thousands of diligence items. Moelis also held virtual diligence sessions with the Debtors and multiple interested parties.

2

A0219

4. On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan served as a floor for the marketing process. Shortly thereafter, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion," and the bidding procedures established therein, the "Bidding Procedures"),[3] which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.

5. The Debtors' marketing process proved fruitful and yielded bids from numerous strategic investors. Accordingly, on September 13, 2022, the Debtors commenced an auction (the "Auction") to determine the winning bid. The two-week Auction consisted of hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment, and in consultation with the Committee, selected the bid from West Realm Shires Inc. ("FTX US" or the "Purchaser") as the Successful Bid.[4] On September 27, 2022, Voyager Digital, LLC, as seller (the "Seller") and FTX US, as Purchaser, executed that certain asset purchase agreement (including all exhibits and schedules

---

[3]    The Court approved the Bidding Procedures Motion on August 5, 2022. See *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order").

[4]    *See* Notice of Successful Bidder [Docket No. 457].

related thereto, the "Asset Purchase Agreement") memorializing the terms of the Successful Bid and proposed sale transaction (the "Sale"). The Asset Purchase Agreement provides that the Sale will be consummated through a chapter 11 plan.

6.      As set forth in the Asset Purchase Agreement, the Sale contemplates approximately $1.422 billion of aggregate deal consideration comprised primarily of: (a) the value of all Voyager cryptocurrency as of a to be determined date, which, at current market prices as of September 26, 2022, is estimated to be $1.311 billion, plus (b) additional consideration estimated as providing approximately at least $111 million of incremental value for the Debtors' estates that includes (i) a cash payment of $51,000,000, (ii) an earn out of up to $20 million, (iii) the value associated with a $50 account credit for customers who pass Purchaser's KYC process, (iv) a cash payment equal to the Acquired Cash, and (v) the transfer to the Debtors of all right, title, and interest in the Loan Claims (collectively, the "Purchase Price").

7.      Notably, the Purchase Price provides substantially more value to the Debtors' estates than the original offer made by FTX US on July 22, 2022. The Debtors and their advisors conducted a rigorous, multi-month marketing process that featured competitive negotiations with all interested parties, including FTX US. Due to this comprehensive marketing process and robust Auction, the Sale provides all creditors with significantly more value through the Sale than they would have received had the Debtors accepted FTX US's original offer.

8.      The Sale is the result of months of outreach, negotiations, and discussions with strategic investors, cryptocurrency industry participants, and financial institutions and a very active and competitive Auction. The Sale maximizes the value of the Debtors' assets, provides customers with the best possible recovery, and is in the best interest of all stakeholders. By this Motion, the Debtors seek an Order authorizing the Seller's entry into the Asset Purchase Agreement and

authorizing Seller to perform its obligations under the Asset Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of an amended chapter 11 plan to be filed in the near term.

## Relief Requested

9.    The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) authorizing entry into the Asset Purchase Agreement and (ii) granting related relief.

10.    In support of the Debtors' request for entry of the Order, the Debtors submit the Tichenor Declaration, filed substantially contemporaneously herewith.[5]

## Jurisdiction and Venue

11.    The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The bases for the relief requested herein are sections 105(a), 363, 365, 1107, and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rule 2002 of the

---

[5]    *See Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief* (the "Tichenor Declaration"), filed substantially contemporaneously herewith.

A0222

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1 and 9006-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the *Sale*

*Guidelines for the Conduct of Asset Sales Established and Adopted by the United States*

*Bankruptcy Court for the Southern District of New York Pursuant to General Order M-383*

(the "Sale Guidelines").

## Background

14.     On July 5, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and

circumstances of these chapter 11 cases is set forth in the First Day Declaration, incorporated by

reference herein.

15.     The Debtors are operating their business and managing their property as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases

have been consolidated for procedural purposes only and are jointly administered pursuant to

Bankruptcy Rule 1015(b) [Docket No. 18].  On July 19, 2022, the United States Trustee for the

Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured

creditors [Docket No. 102] (the "Committee").

## The Proposed Sale

### I.     The Marketing Process and the Standalone Plan.

16.     In late June 2022, the Debtors, with the assistance of Moelis, commenced a

marketing process for a sale of the Debtors' business to, or an investment in the Debtors' business

from, a third-party investor.  Discussions with interested parties ultimately revealed that, though

there was significant interest in consummating a transaction with the Debtors, an in-court process

would be necessary to effectuate any transaction.  Accordingly, the Debtors commenced these

chapter 11 cases and continued their marketing efforts.

6

A0223

17.     Pursuant to the Debtors' marketing process, Moelis engaged with 90 interested parties, provided access to the virtual data room, facilitated telephone conferences with the Debtors' management team, and held multiple virtual diligence sessions with interested parties.

18.     In parallel to the Debtors' marketing process, the Debtors filed the Standalone Plan. The Standalone Plan contemplated a comprehensive restructuring transaction that would provide creditors with a meaningful recovery without the need for a transaction partner.  The Standalone Plan provided parties active in the Debtors' marketing process with a "floor" that any bid would need to clear to be considered by the Debtors.

## II.   The Bidding Procedures and the Auction.

19.     The Debtors established formal Bidding Procedures to guide their marketing process pursuant to the Bidding Procedures Order.  The Bidding Procedures established, among other things:

- the deadlines and requirements for submitting bids and the terms and conditions that must be satisfied;
- the criteria by which the winning bidder or bidders will be selected by the Debtors; and
- August 26, 2022 as the deadline by which all bids must be actually received (which deadline was later extended to September 6, 2022).

20.     The Debtors received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures.  The Auction spanned two weeks and featured multiple rounds of bids.  The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the

7

Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

21. Ultimately, the Debtors, in consultation with the Committee, determined that the FTX US bid was the highest and best bid and would provide meaningful value to the Debtors' estates and stakeholders.

22. It was well known that the Debtors' assets were for sale and all interested parties were encouraged to submit bids. The Debtors believe that an expeditious timeline is necessary to reduce the administrative costs of these chapter 11 cases, maximize stakeholder recoveries, and minimize uncertainty while the cryptocurrency environment continues to fluctuate. Nonetheless, as described in the Tichenor Declaration, the marketing process was thorough, public, fair, and produced the most value-maximizing transaction upon culmination of the two-week Auction. As evidenced by the competitive Auction process, the Debtors' ability to maximize value was not compromised by the timeline. Importantly, the Asset Purchase Agreement includes a "Fiduciary Out" on the terms set forth in the Asset Purchase Agreement. This express preservation of the Debtors' fiduciary duties ensures that the transaction the Debtors consummate is the highest, best, and, ultimately, value-maximizing for their estates and creditors.

23. In light of the foregoing, the Debtors believe that entry into the Asset Purchase Agreement is in the best interests of the Debtors' estates.

### Summary of the Key Terms of the Asset Purchase Agreement

24. As described herein, the Debtors executed the Asset Purchase Agreement following a robust and extensive marketing process and multiple rounds of bidding at the Auction over the

A0225

course of two weeks.  The following chart summarizes the principal terms of the Asset Purchase

Agreement.[6]

| Agreement Provision | Summary Description |
|---|---|
| **Parties** | <u>Seller</u>:  Voyager Digital, LLC <br> <u>Purchaser</u>:  West Realm Shires, Inc. |
| **Purchase Price** | • The Purchase Price to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a cash payment of $51,000,000, (iii) a cash payment equal to the Acquired Cash, (iv) the transfer to Seller of all right, title and interest in the Loan Claims, and (v) (A) the Fair Market Value of all Cryptocurrency of Seller (in each case, other than any Collateral or any proceeds under the Collateral) and (B) the Fair Market Value of the outstanding balance of any Acquired Cryptocurrency Loan, in each case of clause (A) and (B), determined in accordance with <u>Schedule 2.1(a)</u> of the Asset Purchase Agreement. <br><br> • Subject to the occurrence of the Closing and the terms and conditions set forth in <u>Section 2.6</u> of the Asset Purchase Agreement, Purchaser will pay to Seller the Supplemental Payment, equal to (x) the value of the daily average assets (in terms that are denominated in the digital commodity (or "digital asset") based on the decentralized open source protocol of the peer-to-peer Bitcoin computer network ("BTC") based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by Purchaser in good faith) attributable in the aggregate to the Transferred Creditors' FTX Accounts during the six (6) month period following the Initial Distribution Date, <u>divided by</u> (y) the value of the assets (in BTC-denominated terms based on the average daily exchange rate of any other Cryptocurrency or US Dollars into BTC, in each case, as determined by Purchaser in good faith) attributable in the aggregate to the Transferred Creditors' FTX Accounts on the day after the Initial Distribution Date, <u>multiplied by</u> (z) $10,000,000; <u>provided</u> that in no event shall the Supplemental Payment exceed $20,000,000. Purchaser shall make the Supplemental Payment to Seller within ten (10) Business Days following the end of the Payment Period and contemporaneously therewith shall provide to Seller Purchaser's calculation of the Supplemental Payment with reasonable supporting detail. <br><br> • At or promptly following the Closing (but in no event later than 30 days after the Closing Date), Purchaser shall credit to each Transferred Creditor's FTX Account an amount equal to $50.00, which Trading Credit shall be subject to only the following account withdrawal limitations: each Transferred Creditor must execute one trade from such FTX Account, which trade shall not be subject to any transaction fee, no minimum balance shall be required to be maintained, and the Trading Credit may be |

---

[6] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Asset Purchase Agreement, the Asset Purchase Agreement shall govern in all respects.  Capitalized terms used in the following summary shall have the meanings ascribed to them in the Asset Purchase Agreement.

A0226

(a)     Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions.

(b)     The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on the part of Purchaser are necessary to authorize the execution, delivery and performance by such Purchaser of this Agreement and the consummation by it of the Transactions.

(c)     This Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) violate any Law or Order applicable to Purchaser, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchaser to consummate the Transactions.

(b)     Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay the ability of Purchaser to consummate the Transactions.

4.4     Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Payment, Acquired Cash Payment and the Cryptocurrency Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     Absence of Restraints; Compliance with Laws; Permits.

25

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

## ORDER (I) AUTHORIZING ENTRY INTO THE
## ASSET PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (i) authorizing entry into the Asset Purchase Agreement and (ii) granting related relief; and this Court having entered the Bidding Procedures Order on August 5, 2022 approving, among other things, the proposed form of notice of the Hearing (as defined herein); and the Debtors having determined, after an extensive marketing process, that West Realm Shires, Inc. ("FTX US" or the "Purchaser") has submitted the highest or otherwise best bid for the Acquired Assets; and the Debtors having selected FTX US as the Winning Bidder pursuant to the Bidding Procedures Order; and upon adequate and sufficient notice of the Motion, all as more fully set forth in the Motion; and upon the First Day Declaration and the Tichenor Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and this Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

**I.    Notice of the Motion**.

1.    Notice of the Hearing, the Motion, and the Debtors' entry into the Asset Purchase Agreement, was timely, proper, and reasonably calculated to provide interested parties with timely and proper notice thereof, and no other or further notice of the Motion and the Hearing is, or shall be, required.  The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

2.    A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

**II.    Highest or Otherwise Best Offer.**

3.    The Debtors' pre- and postpetition marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.  The transactions contemplated by the Asset Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets,

2

A0229

and the Debtors' determination that the terms of the Asset Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment; *provided* that nothing in this Order shall limit or otherwise restrict in any way the Seller's rights and obligations under section 5.2 of the Asset Purchase Agreement.

4.      Approval of the Motion and entry into the Asset Purchase Agreement is in the best interests of the Debtors' chapter 11 estates, their creditors, and other parties in interest.

**III.    General Provisions**.

5.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice.

7.      The Motion is granted as set forth herein.

8.      Voyager Digital, LLC, as seller under the Asset Purchase Agreement, is authorized to enter into the Asset Purchase Agreement and perform its obligations under the Asset Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of a chapter 11 plan.  For the avoidance of doubt, the Asset Purchase Agreement is conditioned upon the confirmation and consummation of the Debtors' pending plan of reorganization.  If the pending plan of reorganization is not confirmed or the plan is not consummated, then the approval granted

3

A0230

by this Order shall terminate and be rendered ineffective, and in that event any request by the parties to proceed with the transactions contemplated by the Asset Purchase Agreement shall require a further application to the Court and entry of a further order.

9.     The Asset Purchase Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms, including, without limitation, Section 5.2 (the "No-Shop" provision) and, as applicable, those additional obligations set forth in Article V (Bankruptcy Court Matters) and Article VI (Covenants and Agreements) of the Asset Purchase Agreement.

10.     The Debtors are authorized, but not directed, to enter into non-material amendments to the Asset Purchase Agreement from time to time as necessary, subject to the terms and conditions set forth in the Asset Purchase Agreement, and without further order of the Court.

11.     The Debtors are authorized to rebalance their cryptocurrency portfolio; *provided* that such rebalancing transactions are subject to the consent of the Committee and FTX US pursuant to the consent rights held by FTX US under the Asset Purchase Agreement.

12.     The rights of the Ad Hoc Group of Equity Interest Holders, the Texas State Securities Board, the Texas Department of Banking, and the Office of the Texas Attorney General to object to the Plan are expressly preserved notwithstanding the approval of the Asset Purchase Agreement and the entry of this Order.

13.     Nothing in this Order, the Asset Purchase Agreement, the Plan, or any order confirming the Plan discharges, releases, impairs or otherwise precludes: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" within the meaning section 101(5) of the Bankruptcy Code; (ii) any claim of any Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the

4

A0231

owner or operator of property after the date of the closing of the Sale; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing any liability described in the preceding sentence. Notwithstanding anything to the contrary, nothing in this paragraph 13 shall be construed as a determination as to any liability or claim owing to a Governmental Unit or whether any Governmental Unit is subject to the automatic stay under section 362 of the Bankruptcy Code or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

14. Further, nothing in this Order, the Asset Purchase Agreement, the Plan, or any order confirming the Plan authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order, the Asset Purchase Agreement, the Plan, or any order confirming the Plan shall relieve any entity from any otherwise applicable obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in this Order, the Asset Purchase Agreement, the Plan, or any order confirming the Plan shall affect any valid setoff or recoupment rights of any Governmental Unit. Nothing in this Order, the Asset Purchase Agreement, the Plan, or any order confirming the Plan divests any state tribunal of any otherwise applicable jurisdiction it may have under police or regulatory law. Nothing in this Order, the Asset Purchase Agreement, the Plan, or any order confirming the Plan, shall be construed as a determination of whether the automatic stay applies to this paragraph 14 or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

A0232

15. Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

16. The Debtors shall maintain copies of their books and records as set forth in the Plan. Nothing in this Order shall affect the obligations of the Debtors and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

17. Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

18.     Nothing in this Order shall be deemed a waiver or limitation of the Committee's rights to object to any chapter 11 plan or disclosure statement filed or to be filed by the Debtors, other than with respect to provisions of such plan or disclosure statement effectuating the Sale, and any such rights are expressly preserved.

19.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

21.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

22.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

23.     The failure to specifically include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that entry into the Asset Purchase Agreement be authorized and approved in its entirety; *provided* that this Order shall govern if there is any inconsistency between the Asset Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order.

24.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary,

A0234

any and all disputes concerning or relating in any way to interpretation, implementation, or enforcement of the Asset Purchase Agreement.

25.     To the extent that this Order is inconsistent with the Motion, the terms of this Order shall govern.

Dated: New York, New York
        October 20, 2022

/s/ **Michael E. Wiles**
THE HONORABLE MICHAEL E WILES
UNITED STATES BANKRUPTCY JUDGE

A0235