# Tab 3



## "SHARE PURCHASE AGREEMENT

**THIS SHARE PURCHASE AGREEMENT** (the "**Agreement**") made and entered into this 14th day of November, 2021 (the "**Execution Date**"),

**BETWEEN:**

Patrick Gruhn of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(the "**Seller 1**")

Lorem Ipsum UG (haftungsbeschränkt) of c/o Lambda Law Rechtsanwaltsgesellschaft mbH, ▮▮▮▮▮▮

(the "**Seller 2**")

Brandon Williams of ▮▮▮▮▮▮▮▮▮▮▮▮

(the "**Seller 3**")

and

FTX Trading Ltd., Veridian Corporate Centre Bldg 27, Western Road, Nassau, The Bahamas
(the "**Purchaser**")

**BACKGROUND:**

WHEREAS, Digital Assets DA AG (the "**Company**") is a Swiss corporation limited by shares registered with the Commercial Register of Appenzell Ausserrhoden under the registration number CHE-175.231.191. The Company's registered share capital amounts to CHF 100,000.00, paid-up in the amount of CHF 50,000.00 (Liberierung) and is divided into 10,000,000 registered shares (Namenaktien) with a par value of CHF 0.01 (each such share hereinafter referred to as a "**Share**" and several of such shares together, the "**Shares**").

WHEREAS, Seller 1, Seller 2 and Seller 3 (collectively, the "**Sellers**") collectively own 8,000,000 Shares (the "**Sale Shares**"), of which (a) Seller 1 and Seller 2 each owns 2,666,667 (two million six hundred sixty-six thousand six hundred sixty-seven) Shares, each representing 26.67% of the Company's share capital, and (b) Seller 3 owns 2,666,666 (two million six hundred sixty-six thousand six hundred sixty-six) Shares, representing 26.66% of the Company's share capital.

WHEREAS, Purchaser is the owner of 2,000,000 (two million) Shares, representing 20% of the Company's share capital (the "**Existing Shares**").

WHEREAS, the purpose of the Company as a technology and financial company is to issue structured financial products, in particular financial instruments whose price is derived from an underlying asset, in Switzerland and worldwide, as well as to provide related services. The Company may establish branches in Switzerland and abroad, to participate in other enterprises in Switzerland and abroad, to acquire similar or related enterprises or to merge with such enterprises, and to enter into all business transactions and conclude all contracts which are suitable for promoting the purpose of the Company or which are directly or indirectly related to it. It may acquire, administer, encumber and sell land, intellectual property rights and licenses of all kinds.

WHEREAS, the Company holds 100% of the equity capital and the voting rights of the subsidiaries set forth on Exhibit A (the "**Subsidiaries**") other as contemplated herein.

WHEREAS, in accordance with the terms and subject to the conditions of this agreement ("**Agreement**"), the Sellers wish to sell and assign to the Purchaser, and the Purchaser wishes to buy and accept from the Sellers, all of the Sale Shares, representing 80% (eighty per cent) of the Company's share capital.

**IN CONSIDERATION OF** and as a condition of the parties entering into this Agreement and other valuable consideration, the receipt and sufficiency of which consideration is acknowledged, the parties (each a "**Party**", and collectively the "**Parties**") to this Agreement agree as follows:

### Purchase and Sale

1. Except as otherwise provided in this Agreement, all monetary amounts referred to in this Agreement are in USD (US Dollars).

2. The Sellers agree to sell and, at the Closing Date, to transfer to the Purchaser, and the Purchaser agrees to purchase and, at the Closing Date, to accept, all the rights, title, interest, and property of the Sellers in the Sale Shares, free and clear of any Liens, for an aggregate purchase price of $320,000,000.00 (the "**Purchase Price**"), which shall be paid via the Cash Component, the Additional Cash Component, the Bonus Component, the Extra Bonus Component and the Stock Component (each as defined below).

3. (a) A total sum of $166,666,656.26 will be payable to the Sellers on the Closing Date ("**Cash Component**"), as set forth on Exhibit B.

(b) Additionally, (i) a total sum of $33,333,337.50 ("**Bonus Component**") will be payable to Seller 1 and (ii) a total of 1,373,247 common shares of the Purchaser ("**Stock Component**") will be payable to Seller 1 and Seller 2, in each case as set forth on Exhibit B, upon the achievement of the below conditions within one year after the Closing Date:

   a.   The Sellers shall provide (via acquisition, services or other written relationship) a CFD broker that is licensed to and has the necessary Permits to service customers in the European Economic Area (including Germany), and actively solicits and provides to retail and professional customers in the European Economic Area (including Germany), under the FTX brand, futures and other derivatives with crypto assets as underlying (such as perpetual and dated futures, contracts for difference type OTC derivatives), provided that all such products allow a leverage of at least 2:1 ("**Milestone 1**"); and

   b.   The Sellers shall grant the Purchaser (or an affiliate or other entity designated by the Purchaser) an exclusive option to acquire the CFD broker mentioned in Milestone 1 ("**Milestone 2**") at conditions reasonable under the circumstances, provided that to the extent applicable, this Milestone 2 shall be conditioned upon approval by applicable governmental authorities.

The Bonus Component will be paid to Seller 1 eight weeks after the Achievement Date, provided that no such payment will be due and payable if any European regulator initiates an investigation or commences an administrative act within eight weeks of the Achievement Date, other than as a result of any violations of law taken by the Purchaser or its Affiliates, e.g. violations of advertising or products rules.

As soon as practicable after the date that is eight weeks after the Achievement Date, the Purchaser will issue and grant a total of 1,373,247 common shares of the Purchaser to Seller 1 and Seller 2 as set forth on Exhibit B, provided that no European regulator initiates an investigation or commences an administrative act within eight weeks of the Achievement Date, other than as a result of any violations of law taken by the Purchaser or its Affiliates, e.g., violations of advertising or products rules.

(c) Finally, an extra bonus of $5,000,000 ("**Extra Bonus Component**") will be payable to each of Seller 1 and Seller 2 as set forth on Exhibit B if, by not later than the date that is one month after the Execution Date, the CFD broker mentioned in Milestone 1 receives all regulatory approvals to actively solicit and actually provides to retail and professional customers in the European

Economic Area (including Germany), under the FTX brand, all its futures and other derivatives with crypto assets as underlying (such as perpetual and dated futures, contracts for difference type OTC derivatives) with a leverage of at least 20:1. If achieved, the Extra Bonus Component shall be paid by not later than two months after the Execution Date.

4. Seller 1 and Seller 2 shall each receive an additional cash component ("**Additional Cash Component**") in the total amount of each $ 30,000,000.00. The Additional Cash Component will be paid by the Purchaser over a period of 4 years in 8 equal payments commencing 6 months after the Achievement Date and each six months thereafter, subject to Seller 1 and Seller 2's continued employment with the Purchaser or one of its Affiliates on each date of payment.

5. All cash payments will be in the form of USDC Stablecoin/Wire transfer of immediately available funds to:

| Name | Amount | Destination Account |
|------|--------|---------------------|
| Seller 1 | Cash Component ($41,666,671.88) + Additional Cash Component ($30,000,000.00) + Bonus Component ($33,333,337.50) + Extra Bonus Component ($5,000,000.00) | Patrick Gruhn<br>Acct# ███████<br>Routing# ███████<br>First Interstate Bank Kalispell, Montana |

DocuSign Envelope ID: 51BB5614-C908-48D8-8818-5A190498E97B

| Seller 2 | Cash Component ($26,666,671.88) + Additional Cash Component ($30,000,000.00) + Extra Bonus Component ($5,000,000.00) | Lorem Ipsum RM UG<br>IBAN: ██████████████<br>BIC: ████████████ |
|----------|-------------------|-------------------------------|
| Seller 2 | Cash Component ($15,000,000.00) | ████████████████████ (SPL-USDC) |
| Seller 3 | Cash Component ($83,333,312.50) | ████████████████████ (SPL-USDC) |

### <u>Representations and Warranties of the Sellers</u>

6. Each of the Sellers hereby warrants and represents to the Purchaser that the following representations and warranties are true and correct and not misleading as of the Execution Date until and including the Closing Date, unless another date is explicitly stated:

   a. Each of the Company and its Subsidiaries (a) is a legal entity duly organized, validly existing and in good standing (or the equivalent) under the Laws of its jurisdiction of organization, (b) has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and (c) is qualified to do business and, to the extent such concept is applicable, is in good standing as a corporation or other legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification. The Sellers shall procure that the Company make available upon request to the Purchaser complete and correct copies of the Company's and its Subsidiaries' certificates of incorporation and by-laws or comparable governing documents, each as amended, prior to

the Execution Date ("**Organizational Documents**"), and each as so delivered is in full force and effect.

b.  The stock capital of the Company consists of 10,000,000 registered Shares with a nominal value of CHF 0.01 for each Share. The share capital is paid-up in the amount of CHF 50,000. There are no other shares outstanding nor are there any options, warrants or other convertible securities outstanding. There exists no authorization, obligation or arrangement (present or future, absolute, contingent or otherwise) of the Company or any Subsidiary to issue or sell shares to any Person. No further capital, shares or other equity instruments in any of the Company or the Subsidiaries have been or will be issued on or before the Closing Date.

c.  At the Closing Date, each of the Subsidiaries set forth on Exhibit A hereto is a wholly-owned subsidiary of the Company, will be founded by the Company, or will be transferred by the Sellers in due time to the Company except for CM-Equity AG (Germany), the full ownership of which may be acquired within due time by the Company at its option.

d.  The Sellers have all requisite corporate or similar power and authority and have taken all organizational or other actions necessary in order to execute, deliver and perform their obligations under this Agreement. This Agreement has been duly executed and the Sellers have been duly represented (if applicable). There is no requirement for the Sellers or the Company to make any filing to or to obtain any approval from any Governmental Entity or Self-Regulatory Organization as a condition to consummating the transaction contemplated by this Agreement.

e.  This Agreement has been duly executed and delivered by each of the Sellers and constitutes a legal, valid and binding agreement of the Sellers, enforceable against the Sellers in accordance with its terms.

f.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein will not conflict with, or result in any breach or violation of or default under, or give rise to any right of termination, loss of rights, adverse modification of provisions, cancellation or acceleration of any obligation under, or result in the creation of a Lien on any assets of the Company or any of its Subsidiaries, under (a) the Organizational Documents of the Company or any of its Subsidiaries, (b) any material agreement of the Company or any of its Subsidiaries, (c) any Laws to which the Company or any of its Subsidiaries is subject, and (d) any Permits of the Company.

g.  The Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with applicable bookkeeping regulation.

h.  The Company and each of its Subsidiaries is not a party to, and is not liable under, any agreement (1) involving the payment to or by the Company or a Subsidiary of any amount exceeding $1,000,000 (one million dollars), including but not limited to any debts, loan, or guarantees; (2) restricting the Company or any of its Subsidiaries' freedom to operate in whole or any part of its business, or to use or exploit any of its assets, including but not limited to any exclusivity "most favored nation", right of first offer or refusal, or other agreements, (3) not entered into on an arm's-length-basis or (4) outside the ordinary course of its business.

i.  There are no Actions pending or threatened in writing or, to the knowledge of the Sellers or the Company, threatened other than in writing against the Company or any of its Subsidiaries (nor has any party, including a Governmental Entity or Self-Regulatory Organization, indicated an intention to initiate such an Action). To the Sellers' knowledge, information and belief, no fact or circumstance exists which might give rise to any civil, criminal, arbitration, administrative or other proceeding involving the Company or any of its Subsidiaries, or a Person for whose acts or defaults the Company or its Subsidiaries may be liable. None of Company or any of its Subsidiaries is subject to any Order of any Governmental Entity or Self-Regulatory Organization.

j.  Neither the Company nor any of its Subsidiaries is a party to or subject to any Order.

k.  The business of the Company and its Subsidiaries is and has been operated in compliance with all Laws and rules and regulations of any Self-Regulatory Organization applicable thereto. The Company and its Subsidiaries have not received any notice or communication from any Governmental Entity or Self-Regulatory Organization alleging any noncompliance with any such Laws or the rules and regulations of any Self-Regulation Organization. Each of the Company and its Subsidiaries has obtained and is in compliance with all Permits necessary to conduct its business as presently conducted. Neither the Company nor any of its Subsidiaries is in default under any of such Permits and no suspension, cancellation or modification of any of such Permit is pending or has been threatened in writing or, to the knowledge of each of the Sellers, threatened other than in writing. None of such Permits will be adversely affected by the consummation of the transaction contemplated by this Agreement, none of such Permits will expire or terminate

as a result of the consummation of the transaction contemplated by this Agreement, and each such Permit will continue to be in full force and effect following the Closing without requiring the consent or approval of any Person, Governmental Entity or Self-Regulatory Organization.

l.   The Company and its Subsidiaries do not own any real property.

m.   No Takeover Statute is applicable to the Company, the Shares or the Transactions.

n.   The Company and each of its subsidiaries (i) have prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all income and other material Tax Returns required to be filed by any of them and all such filed Tax Returns are complete and accurate in all material respects, (ii) have paid all Taxes that are shown as due on such filed Tax Returns, (iii) have complied in all respects with all applicable Laws relating to the withholding of Taxes and have duly and timely withheld and paid over to the appropriate Tax authority all amounts required to be so withheld and paid over under all applicable Laws with respect to any employee, creditor or third party, except with respect to matters contested in good faith or immaterial amounts and (iv) have not waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

o.   The Company and its Subsidiaries own or have sufficient, unrestricted and valid rights to use all Intellectual Property Rights used in or otherwise necessary for the conduct of their respective businesses. The conduct of the respective businesses of the Company and its Subsidiaries, and the use thereof by customers, have not and do not, directly or indirectly, infringe, misappropriate or otherwise violate the Intellectual Property Rights of any Person. To the knowledge of the Sellers, no Person is infringing, misappropriating or otherwise violating, whether directly or indirectly, any Company Intellectual Property in any manner, and during the six (6)-year period prior to the Execution Date, neither the Company nor any of its Subsidiaries has asserted or threatened in writing any action against any Person alleging such infringement, misappropriation or violation.

p.   Each Seller, current and former employee, independent contractor or advisor of the Company and its Subsidiaries has entered into a valid written agreement with the Company that assigns to the Company or the applicable Subsidiary his or her rights in such Intellectual Property Rights.

q.  Each material asset of the Company and its Subsidiaries is owned solely by the Company or its Subsidiaries free from any Liens, and is in the possession or control of the Control or its Subsidiaries.

r.  The Company's IT assets (i) operate and perform in all material respects in accordance with their documentation and functional specifications and otherwise as required by each of the Company and its Subsidiaries in connection with their respective businesses, (ii) are sufficient for the current and currently anticipated needs of the businesses of the Company and its Subsidiaries, (iii) have not malfunctioned or failed within the past three (3) years in a manner that has caused material disruption to the business operations of the Company or any of its Subsidiaries, and (iv) to the knowledge of the Sellers, are free from any malicious code or other bugs or defects. Within the past three (3) years, there has been no unauthorized access to or unauthorized use of any technology devices, computers, software, servers, network, and other information technology equipment of the Company, or any information stored therein or transmitted thereby.

s.  There are no pending bankruptcy, reorganization, liquidation or other similar proceedings against the Company or any of its Subsidiaries in any jurisdiction.

t.  Neither the Company nor any of its Subsidiaries nor any director or officer of the Company or any of its Subsidiaries, nor any employee, agent or representative or other Person who performs or has performed services on behalf of the Company or any of its Subsidiaries, is a person that is the subject or target of economic sanctions administered by OFAC (including the designation as a "Specially Designated National or Blocked Person" thereunder), Her Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "**Sanctions**"), nor are any of the foregoing designated as a Specially Designated National or Blocked Person by OFAC. Since its incorporation neither the Company nor any of its subsidiaries has been in violation of applicable Sanctions.

u. All information provided by or on behalf of a Seller or the Company in connection with this Agreement and the transactions contemplated herein, including the information set out in this Agreement, is complete, true, accurate and not misleading in all material respects.

v. Except as provided in the articles of association of the Company, the Purchaser is not prevented or restricted in any way from re-selling the Shares in the future.

w. Each Seller is the sole legal and beneficial owner in clear title of that number of Sale Shares set out opposite such Seller's name on Exhibit B hereto, free of any Liens or other restrictions. Upon consummation of the transaction contemplated by this Agreement in accordance with the terms hereof, the Purchaser will receive good and valid title to the Sale Shares, free and clear of any Liens. The Sale Shares, together with the Existing Shares, comprise all of the Company's allotted and issued share capital and have been properly allotted and issued. There is no agreement or obligation requiring the issue of, or the grant to a person of the right to require the issue, a share in the capital of the Company.

x. The Sellers are not bound by any agreement that would prevent any transactions connected with this Agreement.

y. There is no legal action or suit pending against any party, to the knowledge of the Sellers, that would materially affect this Agreement.

z. None of the Company or any of its Subsidiaries has an obligation to make any severance, change-of-control or transaction bonus payment, or any payment of compensation for loss of office, employment or redundancy to any present or former director, officer or employee as a consequence of the transaction contemplated by this Agreement or otherwise, other than in accordance with applicable statutory Law. None of the key employees of the Company or any of its Subsidiaries has given notice of termination of his or her employment or has indicated an intention to terminate his or her employment for any other reason.

aa. There are no agreements or arrangements entered into between the Company or any of its Subsidiaries and any Seller, Affiliate of a Seller or related Person of a Seller that (i) have not been entered into at arm's-length-terms or (ii) have not been adequately recorded in the books and records of the Company or the respective Subsidiary.

DocuSign Envelope ID: 51BB5614-C908-4DD8-9918-6A199498E97B

## Representations and Warranties of the Purchaser

7.    The Purchaser warrants and represents to the Sellers as follows:

    a.  The Purchaser is not bound by any agreement that would prevent any transactions connected with this Agreement.

    b.  There is no legal action or suit pending against any party, to the knowledge of the Purchaser, that would materially affect this Agreement.

    c.  The Purchaser is not bound by any agreement that would prevent any transactions connected with this Agreement, especially with regards to the Stock Component.

## Exclusivity

8.    Each of the Sellers agrees that, following the Execution Date, it shall not, and shall cause the Company and its officers and directors not to, (a) initiate, solicit, encourage, facilitate or induce any inquiries or make, submit or announce any proposal that could reasonably be expected to result in an Acquisition Proposal, (b) have any discussions with or provide any confidential information or data to any Person relating to any Acquisition Proposal, or engage in any negotiations regarding an Acquisition Proposal, or knowingly facilitate any effort or attempt to make or implement an Acquisition Proposal, or (c) approve or recommend any Acquisition Proposal. The Sellers shall procure that the Company provide the Purchaser with written notice of the material terms and conditions within two (2) business days after receipt of an Acquisition Proposal.

## Closing Conditions

9.    The closing of the purchase and sale of the Sale Shares (the **"Closing"**) is conditional on the following conditions (**"Closing Conditions"**) being satisfied or waived by the Purchaser:

    (a)  the representations and warranties of the Sellers herein remaining true and accurate in all material respects and not misleading in any material respect as at Closing;

    (b)  no regulatory authority having indicated any objections to the transactions contemplated by this Agreement;

    (c)  no Material Adverse Event having occurred;

(d) the initiation of operations of FTX Europe, as reasonably determined by Purchaser.

**<u>Closing</u>**

10. Closing will take place within three business days after all closing conditions set forth in section 9 have been satisfied or waived by the Purchaser (the date on which the Closing actually takes place is referred to as the "**Closing Date**") at the offices of the Sellers or at such other time and place as the Sellers and the Purchaser mutually agree.

11. At the Closing, the Sellers shall present and deliver to the Purchaser:

    (a) written assignments in relation to the transfer and assignment of the Sale Shares from the Sellers to the Purchaser duly signed by the Sellers;

    (b) a resolution of the board of directors of the Company approving the transfer of the Sales Shares from the respective Seller to the Purchaser;

    (c) a certification by the Jurg Bavaud that the Purchaser owns 100% of the Company;

    (d) the duly signed share register (*Aktienbuch*) of the Company reflecting the transfer of the Sale Shares from the Sellers to the Purchaser and the registration of the Purchaser as the sole legal owner of all Shares with full voting rights;

    (e) the duly signed employment agreements between the Company and each of Patrick Gruhn and Robin Matzke, in form and substance as set forth in <u>Exhibit D</u>.

12. The Closing Conditions and Closing actions set forth in sections 9 and 11 herein are solely for the benefit of the Purchaser, and the Purchaser reserves the right to waive any of these conditions or actions. In the event that the Purchaser waives any of these conditions or actions, each of the Sellers hereby agrees to use all commercially reasonable efforts to cooperate with the Purchaser after the Closing Date to complete, sign, deliver, execute and provide any documentation or information required to complete such Closing Conditions and actions as soon as practicable after the Closing Date.

13. On the Closing Date, the Purchaser shall:

(a) present and deliver to the Sellers a copy of the duly signed notification to the Company of the ultimate beneficial owners of the Sale Shares according to article 697j of the Swiss Code of Obligations;

(b) pay the Cash Component to the Sellers as set forth in Exhibit B in the form of USDC Stablecoin/Wire transfer of immediately available funds to the destination account as set forth in section 5.

14. The benefit and risk of the Sale Shares shall pass to the Purchaser on the Closing Date.

### Indemnities

15. Each of the Sellers shall jointly and severally indemnify and hold the Purchaser and its Affiliates, and each of their directors, officers and employees (collectively, the "**Purchaser Indemnified Parties**") harmless from, against and in respect of any and all Losses incurred or suffered by any of the Purchaser Indemnified Parties resulting from, relating to, or arising out of any breach of this Agreement by the Sellers.

### Expenses and Taxes

16. All Parties agree to pay all their own costs and expenses in connection with this Agreement, except for the Swiss securities transfer stamp tax (*Umsatzabgabe*), which shall be split equally between the Sellers on the one hand and the Purchaser on the other hand.

### Finder's Fees

17. No Party will pay any type of finder's fee to any other Party or to any other individual in connection to this Agreement.

18. All Parties warrant and represent that no investment banker or broker or other intermediary has facilitated the transaction contemplated by this Agreement and is entitled to a fee or commission in connection with said transaction. All Parties indemnify and hold harmless all other Parties in connection with any claims for brokerage fees or other commissions that may be made by any Party.

## **Dividends**

19. Any dividends earned by the Sale Shares and payable before the Closing of this Agreement will belong to the Sellers, and any dividends earned by the Sale Shares and payable after the Closing of this Agreement will belong to the Purchaser.

20. Any rights to vote attached to the Sale Shares will belong to the Sellers before the Closing and will belong to the Purchaser after the Closing.

## **Governing Law and Arbitration**

21. This Agreement shall be governed by and construed in accordance with the substantive laws of Switzerland, to the exclusion of the principles of conflicts of laws thereof and the UN Convention on Contracts for the International Sale of Goods.

22. Any dispute, controversy, or claim arising out of, or in relation to, this Agreement, including regarding the validity, invalidity, breach, or termination thereof, shall be resolved by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Arbitration Centre in force on the date on which the Notice of Arbitration is submitted in accordance with those Rules. The number of arbitrators shall be three. The seat of arbitration shall be Zurich, Switzerland. The arbitration proceedings shall be conducted in English.

## **Miscellaneous**

23. Time is of the essence in this Agreement.

24. Digital Assets DA AG will be renamed (e.g., FTX Europe AG) and will serve as the main EEA/UAE entity (intermediate holding company). The board of directors of the Company will oversee all the Subsidiaries according to Annex A, provided it is approved by the regulator of the respective regulated Subsidiaries (if applicable). Seller 1 shall act as Chairperson of the board of directors of the Company, overseeing the group entities as well as develop and execute a legal strategy with focus on Switzerland, Liechtenstein, MiFID II/MiFIR. Robin Matzke shall oversee the establishment and operation of the European business and develop and execute a legal strategy with focus on Germany, Austria, Cyprus MiFID II/MiFIR.

25. Following the Closing Date, if any of the Subsidiaries is not a wholly-owned subsidiary of the Company, each of the Sellers agree to transfer, as soon as practicable, such Subsidiary to the

Company (other than CM-Equity AG (Germany), which may be acquired by the Company at its option) such that it becomes a wholly-owned subsidiary of the Company. Each of the Sellers hereby agree to promptly complete, execute, deliver and provide any documents, certification, agreements and other documents and information required for such transfer.

26. This Agreement may be executed in counterparts. Facsimile signatures are binding and are considered to be original signatures.

27. All warranties and representations of the Sellers and the Purchaser connected with this Agreement will survive the Closing and shall be time-barred (*verjährt*) as from 5 (five) years following the Closing Date. The Purchaser shall have the right to notify the Sellers of a misrepresentation, inaccuracy or breach of warranty at any time during this five-year period. The deadlines and obligations under articles 201 and 210 of the of the Swiss Code of Obligations are waived and replaced by the provisions of this section 27.

28. This Agreement will not be assigned either in whole or in part by any Party without the written consent of the other Parties.

29. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in the neuter gender include the masculine gender and the feminine gender and vice versa.

30. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

31. This Agreement contains the entire agreement between the Parties. All negotiations and understandings have been included in this Agreement. Statements or representations which may have been made by any Party to this Agreement in the negotiation stages of this Agreement may in some way be inconsistent with this final written Agreement. All such statements are declared to be of no value in this Agreement. Only the written terms of this Agreement will bind the Parties.

32. This Agreement and the terms and conditions contained in this Agreement apply to and are binding upon the Sellers and the Purchaser and their respective successors, assigns, executors, administrators, beneficiaries, and representatives.

33. Any notices or delivery required here will be deemed completed when hand-delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the Parties at the addresses contained in this Agreement or as the Parties may later designate in writing.

34. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

**IN WITNESS WHEREOF** the Sellers and Purchaser have duly affixed their signatures under hand and seal on this 14th day of November, 2021

Patrick Gruhn (Seller 1)

Lorem Ipsum UG (haftungsbeschränkt), represented by its Managing Director Dr. Robin Matzke (Seller 2)

Brandon Williams (Seller 3)

FTX Trading Ltd (Purchaser)

DocuSigned by:

*Sam Bankman-Fried*

672DA88132804B9...

Sam Bankman-Fried

**Exhibit A – List of Subsidiaries**

1. Canco GmbH (Switzerland)
2. Samhaber & Partner Vermögensverwaltungs AG (Austria)
3. DAAG Trading, DMCC (UAE)
4. DAAG Exchange Ltd (UAE)
5. A BaFin-regulated crypto custodian in Germany
6. DAAG Certificates GmbH (Switzerland)
7. DAAG Capital GmbH (Liechtenstein)
8. Digital Derivatives GmbH (Switzerland)
9. BCoin Digital Assets Ltd (Ireland)
10. FTX Trading AG (Switzerland)
11. FTX Exchange AG (Switzerland)
12. 9.9% of CM-Equity AG (Germany), Option to acquire 100% for 13 million

DocuSign Envelope ID: 51BB5614-C908-49D8-9818-6A190498E97B

**Exhibit B – Sellers and Sale Shares**

| Name | # of Shares | Price per Share | Cash Component | Bonus Component | Stock Component (# of common shares of Purchaser) | Extra Bonus Component | Additional Cash Component |
|---|---|---|---|---|---|---|---|
| Patrick Gruhn (Seller 1) | 2,666,667 | $31.25 | $41,666,671.88 | $33,333,337.50 | 228,874 | $5,000,000 | $30,000,000 |
| Lorem Ipsum UG (Seller 2) | 2,666,667 | $31.25 | $41,666,671.88 | - | 1,144,373 | $5,000,000 | $30,000,000 |
| Brandon Williams (Seller 3) | 2,666,666 | $31.25 | $83,333,312.50 | - | - | - | |

## Exhibit C - Definitions

"**Achievement Date**" means the date on which both Milestone 1 and Milestone 2 are completed.

"**Action**" means any civil, criminal or administrative action, suit, demand, claim, complaint, litigation, investigation, revie, audit, formal proceeding, arbitration, hearing or other similar dispute.

"**Acquisition Proposal**" means any offer or proposal for, or any indication of interest in, the (i) purchase, issuance, grant, license or disposition of any capital stock or other securities of the Company or any of its Subsidiaries or of all or any material part of the assets of the Company or any of its Subsidiaries, or (ii) any merger, consolidation, business combination, recapitalization, reorganization or similar transaction involving the Company or any of its Subsidiaries.

**Affiliate**" means, with respect to any Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "**control**" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or
Otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing.

"**Company Intellectual Property**" means any and all Intellectual Property Rights owned or purported by the Company or any of its Subsidiaries (directly or indirectly) to be owned by, or licensed exclusively to, the Company or any of its Subsidiaries.

"**Governmental Entity**" means any legislative, administrative or regulatory authority, agency, commission, body, court or other governmental or quasi-governmental entity in any jurisdiction, including any supranational body.

"**Intellectual Property Rights**" means all rights anywhere in the world in or to: (a) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, logos, symbols, trade dress, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of the same; (b) patents, patent applications, registrations and invention disclosures, including divisionals, revisions, supplementary protection certificates, continuations, continuations-in-part, renewals, extensions, substitutes, re-issues and re-examinations; (c) confidential or proprietary trade secrets, inventions, discoveries, ideas, improvements, information, know-how, data and databases, including proprietary or confidential processes, schematics, business methods, formulae, drawings, specifications, prototypes, models, designs, customer lists and supplier lists (collectively, "**Trade Secrets**"); (d) published and unpublished works of authorship, whether copyrightable or not (including all rights in Software, website and mobile content, data, databases and other compilations of information), copyrights therein and  thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof; (e) Internet domain names and URLs; and (f) any other intellectual property, industrial or proprietary rights.

DocuSign Envelope ID: 51BB5614-C908-42D8-9818-6A199498E97B

"**Law**" or "**Laws**" means any law, statute, ordinance, common law, rule, regulation, order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"**Lien**" means any lien, charge, pledge, mortgage, easement, hypothecation, usufruct, deed of trust, security interest, claim, pre-emptive right, right of first refusal, right of first offer or similar right of a third party or other transfer restrictions or other encumbrance or adverse claim, irrespective of whether such Lien arises under any agreement or by operation of statutory law.

"**Loss**" means all costs, losses, liabilities, debts, obligations, duty or liability of any nature, damages, claims, demands proceedings, expenses, penalties and other legal and other professional fees.

"**Material Adverse Event**" means any change, event, violation, inaccuracy, circumstance or effect that is materially adverse to the business, financial conditions, capitalization, assets, liabilities, operations, or results of operations of the Company and its Subsidiaries, taken as a whole.

"**Order**" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or write of any arbitrator, mediator, Self-Regulatory Organization or Governmental Entity.

"**Permit**" means all permits, licenses, franchises, variances, exemptions, orders, certifications, registrations and other authorizations, consents and approvals of all Governmental Entities and Self-Regulatory Organizations necessary to conduct business.

"**Person**" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"**Self-Regulatory Organization**" means any domestic or foreign securities exchange, commodities exchange (including, for the avoidance of doubt, cryptocurrency exchanges or exchanges relating to derivatives thereon), registered securities association, and any other board or body, in any jurisdiction , that is charged with the supervision or regulation of brokers, dealers, securities exchanges, commodity pool operators, commodity trading advisors, designated contract market or other board of trade, futures exchange, futures commission merchants, electronic communication networks, investment companies or investment advisers.

"**Taxes**" means all tax liabilities, including income taxes (personal or corporate), capital taxes, stamp duties (both on the issuance and on the transfer or securities), withholding taxes, value added taxes, social security contributions or payments of equivalent nature, unemployment and similar taxes, pension or similar benefit contributions and all other taxes payable to any competent Governmental Entity in any jurisdiction, as well as any interest, penalties, costs and expenses reasonably related thereto.

DocuSign Envelope ID: 51BB5614-C908-49D8-9818-6A199498E97B

"**Tax Return**" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

**Exhibit D – Form of Employment Agreement**