# Tab 9

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-23-50437 (JTD) |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

### DECLARATION OF CRAIG JACAS

I, CRAIG L. JACAS, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.    I am an Attorney-at-Law, licensed to practise law in both Antigua and Barbuda, as well as Jamaica. Currently, I serve as the Managing Partner of Stapleton Chambers, a specialised law firm located in Antigua and Barbuda.

2.    I was retained by The Daley Law Firm LLC, counsel for Patrick Gruhn ("**Gruhn**"), Robin Matzke ("**Matzke**"), and Lorem Ipsum UG, to provide an opinion regarding the law of Antigua and Barbuda, including the Antiguan International Business Corporations Act ("**IBCA**"), applicable to claims asserted in the *Complaint for Avoidance and Recovery of Transfers and Obligations Pursuant to 11 U.S.C. §§ 105, 547, 548, And 550, Breach of Fiduciary Duty Pursuant*

*to Antiguan Common Law and the Antigua International Business Corporations Act, and for Disallowance of Claims Pursuant to 11 U.S.C. § 502(D)* [A.P. No. 1/ D.I. No. 1866] ("**Complaint**"), filed in the above-captioned adversary proceeding ("**Adversary Proceeding**") by Plaintiffs FTX Trading Ltd. ("**FTXT**") and Maclaurin Investments Ltd ("**Maclaurin**," together with FTXT, each a "**Plaintiff**" and jointly "**Plaintiffs**") on July 12, 2023. To that end, I submit this declaration ("**Declaration**"). Specifically, I was asked to address, under Antiguan law, the fiduciary duties owed to an Antiguan company such as FTXT, and specifically, from whom those duties are owed.

A.    <u>Personal Background and Antiguan Courts</u>

3.    As for my educational background, I obtained my Bachelor of Laws (LLB) with First Class Honours from the University of the West Indies, Mona Campus, in 2013. Thereafter, I obtained a Legal Education Certificate (LEC) in 2015 from the Norman Manley Law School, Mona, Jamaica, and a Master of Laws (Commercial & Corporate Law), with Distinction also from the University of the West Indies, Mona Campus, in September 2023.

4.    I am a fully qualified attorney-at-law and advocate licensed to practice in Antigua and Barbuda, including before the Eastern Caribbean Supreme Court ("**ECSC**") and the Eastern Caribbean Court of Appeal ("**Court of Appeal**"). Historically, the jurisdictions within CARICOM received the English common law within their legal systems upon attaining independence.

5.    Consequently, all formal training and certification at the LLB and LEC levels is focused on the common law. As a consequence, a considerable part of my legal training and experience is in the English common law. Therefore, I have the requisite qualifications to assist the Court and provide expert opinions on the laws of Antigua and Barbuda, as well as the effect

and operation of the common law. Attached to this Declaration as <u>Exhibit A</u> is my curriculum vitae. As a trial attorney, I have acted as lead counsel on several High Court and Court of Appeal matters over the years of my practice, including matters of a foreign element similar to the instant matter.

6.      It is my understanding that United States courts generally apply the law of the state of incorporation to claims involving the internal affairs of corporations. FTXT, as alleged by the Plaintiffs in the Complaint (Complaint, ¶ 14), incorporated in Antigua; and, thus Antiguan law governs matters of its corporate governance and internal affairs.

7.      Under Antiguan law, the IBCA governs the relationship between an Antiguan corporation, the corporation's directors and officers, and the corporation's shareholders. This means that all claims between these parties related to the internal affairs of the corporation arise under the IBCA. The common law (including English common law) does not supplant the IBCA; rather, the common law compliments and supplements the IBCA in the case of any ambiguity.

8.      Though English common law may be used for interpretative guidance in instances of ambiguity, the causes of action between an Antiguan corporation, its directors and officers, and the corporation's shareholders arise under the IBCA, not common law. Thus, where a cause of action does not arise under the IBCA, ***it is not cognizable under Antiguan law***.

9.      The salient principles in this Declaration are derived from the laws of Antigua and Barbuda, and, where applicable, English or Commonwealth case law and legal treatises. By way of relevant background, the hierarchical structure of the ECSC is comprised of the High Court and the Court of Appeal. The first Superior Court available for redress under the IBCA is the High Court.

10.     A party aggrieved by a decision of the High Court may appeal to the second superior court, the Court of Appeal. Further, a party aggrieved by the decision of the ECSC may appeal the decision to Antigua's final appellate court, the United Kingdom Privy Council.

11.     Where no binding authority exists from the United Kingdom Privy Council on any point of law, decisions of superior courts of other Commonwealth jurisdictions or the United Kingdom may provide persuasive guidance to High Court judges in Antigua and Barbuda. The Superior Courts of the other Commonwealth jurisdictions are the High Court of the Commonwealth of Dominica, the Supreme Court of Grenada, the High Court of Saint Kitts and Nevis, the High Court of Saint Lucia, and the High Court of Saint Vincent & the Grenadines.

12.     In preparing this declaration, I have consulted the IBCA, the Interpretation Act (codifying statutory interpretation principles), case law, and scholarly works related to the relevant statutes. Additionally, I have also reviewed and considered relevant pleadings and motions filed in this matter. My conclusions are set forth below.

**B.     FIDUCIARY DUTIES – FROM WHOM IS THE DUTY OWED**

13.     Plaintiffs allege Gruhn and Matzke breached fiduciary duties owed to FTXT. Specifically:

a.     Plaintiffs allege FTXT was incorporated in Antigua and engaged in international trade or business as defined by the IBCA. (Complaint, ¶¶ 14, 136.)

b.     Plaintiffs further allege that "[b]eginning in September 2021 and November 2021, respectively, Gruhn and Matzke owed fiduciary duties to [FTXT] under Antiguan common law, including the duties to act in good faith, honestly, fairly, and with due regard to [FTXT's] interests, and to use their officer powers only for purposes which benefited FTX Trading. Gruhn and Matzke were required to act in [FTXT's] best interests, and not for their personal benefit." (*Id.*, ¶ 137).

c.     Similarly, Plaintiffs contend that "[d]uring the same period, Gruhn and Matzke owed fiduciary duties to [FTXT] under Section 95 of the [IBCA],

including the duties 'to act honestly and in good faith with a view to the best interest of the corporation; and exercise the care, diligence, and skill that a reasonably prudent person would exercise in comparable circumstances.'" (*Id.*, ¶ 138.)

    d.    Plaintiffs *do not allege* Gruhn or Matzke were ever directors or officers of FTXT.

## C.    THE IBCA GOVERNS PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIMS

14.    Section 95(1) of the IBCA provides as follows:

    (1)    Every <u>director</u> and <u>officer</u> of a corporation in exercising his powers and discharging his duties must

    (a)    act honestly and in good faith with a view to the best interests of the corporation; and

    (b)    exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

IBCA, § 95(1).[1]

15.    This provision, it has been stated,[2] represents codification of the common law fiduciary duty that has been described as including: a duty not to have a conflict of interest, not to make a secret profit and the duty to act in the best interest of the corporation, and not for an improper purpose.[3]

16.    The provision is clear insofar as it concerns who owes the duties; namely, directors and officers. It follows that if a person does not fall into either of these categories, the law does not (and cannot) impose upon such persons a fiduciary duty in respect of the relevant corporation.

---

[1]    Relevant excerpts of the IBCA are attached as <u>Exhibit B</u>.

[2]    S Ffolkes-Goldson, '*The Reform of the Law Relating to Duties of Directors in the Commonwealth Caribbean*' (2002) The Company Lawyer 378–384, attached as <u>Exhibit C</u>.

[3]    *Ibid*.

17.    The limitation by the law on who owes a fiduciary duty is justified. The courts have defined a "fiduciary" as someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty.[4] This is so in most cases of agency, since the agent has duties to perform which involve the placing of confidence in him by the principal. On the same footing are directors and promoters of companies.[5]

18.    Moreover, as it relates to Section 95(1)(a) of the IBCA the Court must give effect to its clear and unambiguous words. In the absence of anything further the Court cannot import fiduciary duties to any additional persons or entities not identified in the statute.[6]

19.    In relation to the claim for breach of fiduciary duties here, the case of *Bristol and West Building Society v Mothew*[7] (that was cited with approval in the Eastern Caribbean Court of Appeal Decision of *Hope-Ross v Martin Dinning et al*)[8] is instructive on the meaning and applicability of fiduciary duties. At page 710, Millett LJ explained as follows: "[t]he expression 'fiduciary duty' is properly confined to those duties which are peculiar to fiduciaries and the breach of which attracts legal consequences differing from those consequent upon the breach of other duties." At pages 711-712, Millett LJ continued:

---

[4]    *Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1998] (Ch 1 at 18), attached as Exhibit D.

[5]    Halsbury, *Halsbury's Laws of England Equitable Jurisdiction* (Volume 47 (2021))7. Equitable Relief in Cases of Fiduciary Relationship (1) Trustees and Other Persons in Fiduciary Positions. Persons in a fiduciary position, attached as Exhibit E.

[6]    *Allemagne v Abbott [2018] ECSCJ No. 240 per Drysdale M as she then was* at para 33, attached as Exhibit F.

[7]    [1997] 2 WLR 436, attached as Exhibit D.

[8]    [2021] ECSCJ No. 540, attached as Exhibit G.

6

> A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary.

Millett LJ, p. 711-712.

20.    Based on the foregoing, in my opinion, under Antiguan law, neither Gruhn nor Matzke owed fiduciary duties to FTXT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 26, 2023.

Craig L. Jacas
Stapleton Chambers
Stapleton House, Suite #2
P.O. Box 2891
St. John's, Antigua

# Exhibit A

# CRAIG L. JACAS

St. John's, Antigua and Barbuda |+1(268) 562-7185 | craig.jacas@stapletonchambers.com
www.stapletonchambers.com

## PROFESSIONAL HISTORY

**Partner (Managing)**, *01/06/2023 - present*

**Stapleton Chambers** – St. John's, Antigua and Barbuda

- Provided outstanding service in corporate and commercial law to entities and individuals, promoting effective and lasting business relationships.

- Oversaw firm's day-to-day administrative operations, provided guidance to support staff, and enforced compliance with local regulations.

- Chaired partner meetings to drive discussion of matters important to firm operations, keeping discourse on-topic and moving at an efficient pace.

- Spoke with peers to verify task completion, meeting tight deadlines and schedules.

- Conducted legal research and conferred with colleagues with subject matter expertise to develop strategies and arguments in preparation for presentation of cases.

**Legal Officer**, *03/2021 to 05/2022*

**The University of the West Indies (on secondment)** – Kingston, Jamaica

- Handled complex legal issues using sound judgment, integrity, business acumen and decisiveness. Monitored new legislation and regulatory changes that impacted the University and Corporate and Commercial Law, to advise the Vice-Chancellery accordingly.

- Managed and supervised document database to maintain litigation records.

- Reviewed legal publications and performed database searches to identify laws and court decisions relevant to pending cases.

- Negotiated and drafted bilateral and multilateral MOUs.

- Coordinated and collaborated with Counsel in the Legal Unit by working together on important legal issues.

- Translated complex legal issues into understandable terms.

- Met tight deadlines and effectively managed multiple priorities using strong organizational skills.


**Contributing Author**, *05/2020 to present*

**William H. Byrnes & Robert J. Munto, International Trust Laws and Analysis**

- Applied established research and organizational skills, writing and reviewing comprehensive content on trust and company laws of Antigua and Barbuda.

- Conducted exhaustive research to support arguments and generate substantial content for publications.

- Managed multiple deadlines, working directly with publication leadership to reach quarterly goals.


**Legal Consultant**, *11/2017 to 12/2018*

**Local Organising Committee, WWT20 2018 Cricket Tournament** – St. John's, Antigua and Barbuda

- Minimized risk exposure through careful advice on business operations and strategic plans.

- Apprised Committee of potential risks and costs associated with each course of action.

- Vetted and negotiated multilateral MOU on all elements of the tournament including matters related to Intellectual Property, Safety, and Data Protection among others.


**Associate Attorney**, *09/2015 to 05/2022*

**Stapleton Chambers** – St. John's, Antigua and Barbuda

- Advocated for clients before court in oral argument by presenting facts and evidence in most favourable light.

- Conducted legal research and conferred with colleagues with subject matter expertise to develop strategies and arguments in preparation for presentation of cases.

- Developed strategies to resolve cases in client's best interest.

- Filed timely case pleadings to meet firm deadlines.


**Adjunct Tutor**, *09/2013 to 07/2015*

**The University of the West Indies** – Kingston, Jamaica

- Evaluated and revised lesson plans and course content to achieve student-centered learning.

- Arranged syllabus, developed schedule, and determined reading list for varied courses simultaneously, giving students appropriate time to complete assignments and absorb information.

- Contributed to staff and administrative meetings to discuss course progress and scheduling. Assisted students to develop effective study skills and techniques.

- Courses taught: Law of Corporate Management, Company Law, and General Principles of Private International Law, Equitable Remedies, Real Property Law and Criminal Law.


<u>**EDUCATION**</u>

- **LLM (Corporate & Commercial Law), with Distinction (09/2023)**
  The University of The West Indies - Mona, Jamaica

- **Legal Education Certificate: Law (09/2015)**

  Norman Manley Law School - Kingston, Jamaica

- **Bachelor of Laws (First Class Honours): (11/2013)**

  The University of The West Indies - Kingston, Jamaica

<u>**CERTIFICATIONS**</u>

**Corporate Governance**

The University of the West Indies (Mona), LLM Course, 2021

Focused, at an advanced level, on the principal legal and economic questions facing corporations in light of the recent scandals involving high profile corporations.

Among the topics considered were:

- The theories of corporate governance and the justification for good governance against the background of recent financial scandals;
- The allocation of powers within a company vis-a-vis the powers and duties of directors; Corporate Control;
- Governance of corporate groups and small businesses; The Company and its constituencies i.e. shareholders, creditors etc.; and
- The role of auditors.

<u>**PROFESSIONAL ORGANISATIONS AND MEMBERSHIPS**</u>

- **CARIBONO** - a network of professionals offering pro bono services for underserved communities across the Caribbean.
- **Antigua and Barbuda Bar Association**
  **Jamaica Bar Association**

<u>**BAR ADMISSIONS**</u>

- Antigua and Barbuda
- Jamaica

# Exhibit B

# CHAPTER 222

## THE INTERNATIONAL BUSINESS CORPORATIONS ACT

Arrangement of Sections
Section

1. Short title.
2. Interpretation.
3. Proscribed enterprises.
4. International trade or business.

### Part I — Constitution of Corporations

### Division A: Incorporation

5. Incorporation.
6. Formalities.
7. Required votes.
8. Documentation.
9. Certificate of incorporation.
10. Effective date.
11. Corporate name.
12. Reserved name.
13. Name change.
14. Continued name.
15. Name revocation.
16. Assigned name.
17. re-incorporation contracts.

### Division B: Corporate Capabilities

18. Capacity and powers.
19. Powers reduced.
20. Validity of acts.
21. Notice not presumed.
22. No disclaimer allowed.

Section

23. Contracts of corporation.
24. Bills, notes.
25. Power of attorney.
26. Coporate seal.

## Division C: Share Capital

27. Nature of shares.
28. If only one class.
29. Share classes.
30. Share issue.
31. Consideration.
32. Stated capital accounts.
33. Series shares.
34. Pre-emptive rights.
35. Conversion privileges.
36. Reserve shares.
37. Own shares.
38. Exceptions.
39. Acquisition of own shares.
40. Other acquisition.
41. Redeemable shares.
42. Donated shares.
43. Voting thereon.
44. Stated capital reduction.
45. Stated capital adjustment.
46. Cancellation of shares.
47. Presumption re own shares.
48. Changing share class.
49. Debt obligations.
50. Share purchase contract.
51. Prohibited dividend.
52. Payment of dividend.
53. Illicit loans by corporation.
54. Permitted gifts.
55. Prejudicial circumstances.
56. Permitted loans.
57. Enforcement of illicit loans.
58. Immunity of shareholders.
59. Lien on shares.

## Division D: Management of Corporations

Section

60. Duty to manage corporation.
61. Number of directors and residence
62. Restricted powers.
63. By-law powers.
64. Organisational meeting.
65. Disqualified directors.
66. No qualification required.
67. Election of directors.
68. Termination of office.
69. Resignation of director.
70. Removal of director.
71. Right to notice.
72. Filling vacancy.
73. Numbers changed.
74. Notice of change.
75. Directors' meetings.
76. Notice and waiver.
77. Adjourned meeting.
78. One director board.
79. Telephone participation.
80. Delegation of powers.
81. Validity of acts.
82. Meeting by resolution.
83. Liability for share issue.
84. Liability for other acts.
85. Contribution for judgment.
86. Recovery by action.
87. Defence to liability.
88. Time limit on liability.
89. Interests in contracts.
90. Interest declaration.
91. Avoidance of nullity.
92. Setting aside contract.
93. Designation of offices, etc.
94. Borrowing powers.
95. Duty of care.
96. Dissenting to resolutions.
97. Indemnifying director, etc.
98. For derivative actions.
99. Right to indemnity.

*(2)* Notwithstanding subsection *(2)* of section *80* and paragraph *(a)* of section *93,* unless the articles or by-laws of, or any unanimous shareholder agreement relating to, a corporation otherwise provide, the directors of the corporation may by resolution delegate the powers mentioned in subsection *(1)* to a director, a committee of directors or an officer of the corporation.

*(3)* For the purposes of this Act "security interest" means any interest in or charge upon any property of a corporation, by way of mortgage, bond, lien, pledge or other means, that is created or taken to secure the payment of an obligation of the corporation.

## DUTY OF DIRECTORS AND OFFICERS

**Duty of care.**      **95.** (1) Every director and officer of a corporation in exercising his powers and discharging his duties must

> *(a)* act honestly and in good faith with a view to the best interests of the corporation; and

> *(b)* exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

*(2)* Every director and officer of a corporation must comply with this Act and the regulations and with the articles and by-laws of the corporation and any unanimous shareholder agreement relating to the corporation.

*(3)* Subject to subsection **(3)** of section *124,* no provision in a contract, the articles of a corporation, its by-laws or any resolution, relieves a director or officer of the corporation from the duty to act in accordance with this Act or the regulations, or relieves him from liability for a breach of this Act or the regulations.

**Dissenting to resolutions.**      **96.** *(1)* A director of a corporation who is present at a meeting of the directors or of a committee of directors of the corporation consents to any resolution passed or action taken at that meeting, unless

> *(a)* he requests that his dissent be or his dissent is entered in the minutes of the meeting,

# Exhibit C

Jacas, Craig 10/25/2023
For Educational Use Only

Comp. Law. 2003, 24(12), 378-384

**Company Lawyer**

2003

The Commonwealth Caribbean territories: the reform of the law relating to the duties of directors

Suzanne Ffolkes Goldson

© 2022 Sweet & Maxwell and its Contributors

**Subject:** Company law

**Keywords:** Barbados; Conflict of interest; Directors' liabilities; Duty of care; Fiduciary duty; Indemnities; Insider dealing; Jamaica; Minority shareholders; Shadow directors;

**Legislation:**

Banking Act (Netherlands)

Companies Act (Singapore)

Financial Institutions Act (Jamaica)

Insurance Act (Singapore)

Companies Bill 2001 (Jamaica)cl.191(7)

Insolvency Act 1986 (c.45)

Companies Act 1985 (c.6)s.741

Companies Act 1965 (Malaysia)s.196, s.203, s.301(3), s.372

Companies Act 1948 (c.38)s.210, s.222, s.328

**\*378**  In the last 15 years, many of the Commonwealth Caribbean territories (hereinafter referred to as "the territories") have been involved in a radical reform of their company law.[1]  This reform has mimicked much of the reform made in Canada in the mid-1970s.[2]  One of the most radical changes has been in the area of the duties of directors of a company, where, at the most fundamental level, the common law has been altered in favour of an increase in the duties, responsibilities and liabilities of directors.

This article will focus attention on the fundamental changes made by legislation in the Commonwealth Caribbean region.

The common law: fiduciary duties

Jacas, Craig 10/25/2023
For Educational Use Only

The fiduciary duties of directors include a duty on the part of directors not to have a conflict of interest and duty, not to make a secret profit, and to act bona fide in the interest of the company and not for a collateral purpose. [3] These strict trust principles have been rigorously applied against directors of companies. [4]

Recently, in the Jamaican case involving the failed Century National Bank of Jamaica Ltd, [5] trust principles were applied to facts where the Chairman and other directors of the bank were found liable for breach of fiduciary duty where they had obtained large loans from the bank on behalf of companies formed by them (which companies were insolvent), which were guaranteed by the bank.

The judgment speaks to various aspects of the fiduciary duties of directors being breached resulting in the personal liability (joint and several), of the directors. [6]

### Legislation: fiduciary duties

The territories which have reformed their companies legislation (the "reformed territories"), have now adopted an approach to fiduciary duties which may be encapsulated as follows:

"Every director and officer of a company, in exercising his powers and discharging his duties shall--

(a) act honestly and in good faith with a view to the best interests of the company." [7]

This "catch-all" standard encompasses the various fiduciary duties established at common law.

It has been stated in the province of British Columbia in Canada, that the wording of the legislation imposing fiduciary duties on directors is "*in addition to* and not in derogation of, any enactment or rule of law or equity relating to the duties and liabilities of directors of a company" [emphasis added] [8] and in the province of Ontario, that the legislation "is *in addition to* any other liability that is by law imposed upon him" [emphasis added]. [9] It is therefore safe to assume that the duties and liabilities imposed by the legislation is, at the very least, a codification of the position found at common law and incorporates the no secret profit, no-conflict of interest and the proper purpose rules, with room for additional duties to be implied.

### Conflict of interest: pre-reformed legislation (the exception)

Conflict of interest is addressed under pre-reformed legislation which follows the UK 1948 Companies Act and creates a limited exception to the no-conflict rule.

These provisions in the older legislation, provide that a director who is directly or indirectly interested in a contract, (or proposed contract) with the company is to declare the nature and extent of his interest at a meeting of the directors of the company; a proposed contract shall be disclosed at the meeting of the directors at the first opportunity; a general notice shall be given to the other directors of a company by a director, that he is a member of a specified company or firm and is to be regarded as interested in any contract which may, after the date of the notice, be made with that company or firm shall be deemed to be a sufficient declaration of interest if the nature and extent of the contract is stated; the extent of the interest is not greater than stated in the notice at the time the question of confirming or entering into the contract; the notice is given at a meeting of the directors or all reasonable steps have been taken to have the notice brought up and read at the next meeting of directors. [10]

Jacas, Craig 10/25/2023
**For Educational Use Only**

The Commonwealth Caribbean territories: the reform of the..., Comp. Law. 2003,...

Conflict of interest: reformed legislation (the exception)

Most of the reformed territories make the following changes to the pre-reform legislation: [11]

A director or officer who is a party to a material contract or proposed material contract or who is a director or an officer of any body, or has a material interest in any body that is a party to a material contract (or proposed material) contract with the company must disclose in writing to the company or request to have entered in the minutes of the meetings of directors the nature and extent of his interest.

The reformed law now includes officers of the company and qualifies those contracts which need to be disclosed as "material" contracts. The disclosure must, under reformed legislation be made in writing to the company or be entered in the minutes of the meetings of directors. It is surprising that an additional section states that a general notice to the directors of a company that he is a director, officer of or that he has a material interest in another body, and is to be regarded as interested in any contract with that body is a sufficient declaration of that kind of interest. The requirement for written notice or request to enter material interest in the minutes is therefore nullified. The position as to how notice is to be given is therefore not an improvement on the pre-reform legislation where the director or officer of the company is a director or officer of, or has a material interest in another body which has an interest in a contract with the company. [12]

The pre-reformed law speaks to "indirect" interest in a contract whereas the reformed law speaks instead of any person who is a director or an officer of any body who has a  **\*379**  material interest in any body that is a party to a material or proposed material contract with the company. It is submitted that "indirect" interest is much wider, albeit the reformed law is thankfully, much clearer.

"Material" contract is not defined in the reformed legislation, but it has been argued, at least in Canada, that this does no violence and can easily be ascertained by a court of law. [13]  In any event, when in doubt, a director should disclose. This formulation, it is submitted, demands transparency.

In the United Kingdom, the relevant section applies to any contract and not necessarily a "material" one and the provision applies equally to "shadow directors". [14]  It is submitted that, from a practical point of view, limiting disclosure to "material" contracts (even without a definition of "material") is the better approach because it is highly unlikely that immaterial contracts with the company will affect the wellbeing of the company and ultimately the shareholder. Further, it may be impractical and a waste of time, in that context, to devote board meetings to the consideration of contracts, involving directors with the company, where the company is a large one and has a large number of directors.

The section is limited to "contracts" and does not involve other types of transactions with the directors. [15]  Perhaps some further attention should be brought to this aspect of the law where the mischief of lack of transparency, may still exist where directors are involved in "material" transactions with the company but which do not strictly fall within the category of "contract" and will therefore escape the disclosure requirement. One could argue, however, that a director could, in the long run, be liable for a breach of his fiduciary duty under the "no-conflict" rule, and be held liable to account for any "secret profits" made in connection with it.

The section describing the circumstances in which directors should make disclosure is similar to s.188(2) of the Jamaica Companies Act (above) but an additional subsection states that, "where a person who is interested in a contract later becomes a director of the company in the reformed legislation, the disclosure must be made at the first meeting after he becomes a director". [16]

Jacas, Craig 10/25/2023
For Educational Use Only

Under the reformed law, a director may vote on any resolution to approve a contract if the contract:

(a) is an arrangement by way of security, for money loaned to or obligations undertaken by him, for the benefit of the company or an affiliate of the company;

(b) relates to his remuneration;

(c) is a contract of indemnity or insurance;

(d) is a contract with an affiliate of the company; and

(e) is a contract other than one referred to in (a) to (d) where the resolution is approved by not less than two-thirds of the votes of the shareholders of the company to whom notice of the nature and extent of the director's interest in the contract is declared.

It is noteworthy that the Trinidad and Tobago Companies Act [17] does not include (e). It appears therefore that in Trinidad and Tobago, directors will not be able to vote on any other contracts except those stated in (a) to (d) in the previous paragraph. It is submitted that this stricter approach is of no moment, as the safeguard in (e), ensures that any possibility of abuse, is in check.

Under the pre-reformed law, it appears that a director would not be allowed to vote on a contract in which he has an interest, and this was supported by way of *dicta* in the *Telecommunications of Jamaica Ltd* case [18] .

Under the Jamaica Companies Bill 2001("The Bill"), [19] the director's contract with the company is subject to the approval of the board of directors and notification to the shareholders of the existence of the contract. The director is not allowed to vote on contracts with the company except in the circumstances stated as (a) to (d) above as in Trinidad and Tobago. The requirement of shareholder notifications and the absence of (e) as an exception appears to be overkill in the context of the Bill. The intention of the Jamaican Parliament appears to be to introduce much more transparency in the context of director dealings with the company. However, the requirement for shareholder notification is again defeated by s.191(7) of the Bill which states that a general notice to the directors of the company is a sufficient declaration of interest where he is a director, officer of or he has a material interest in another body is to be regarded as interested in any contract with that body is a sufficient declaration of that kind of interest. Furthermore, any mischief in the voting by directors on contracts in which they are interested, in circumstances other than (a) to (d) above, is sufficiently safeguarded by having an approval of two-thirds majority of shareholders as found in the reformed legislation referred to above.

The result of non-disclosure by directors, under the pre-reformed legislation, is that the director would pay a nominal fine and the contract would be voidable, but not void. [20] Under reformed legislation, however, the contract may be set aside at the instance of the court, on an application of the company or a shareholder of the company, on such terms as the court thinks fit. [21] It would appear also that other remedies against the directors for breach of fiduciary duty [22] and possibly disqualification for being unfit to be the director of a company [23] could arise where there is a conflict of interest and duty and no declaration of an interest in a contract with the company is disclosed, in accordance with the Jamaica Companies Act.

The common law: duty of care, diligence and skill

Jacas, Craig 10/25/2023
**For Educational Use Only**

The classic statement of the common law relating to a director's duty of care, diligence and skill was made in *Re City Equitable Fire Insurance Co Ltd* [24] by Romer J. where he stated the law as follows:

(i) a director need not exhibit a greater degree of skill than may reasonably be expected from a person of his knowledge and experience;

(ii) a director is not liable for errors in judgment, as his primary function is to use his own particular talents in advocating corporate risk-taking; and

(iii) a director is not bound to give continuous attention to the affairs of the corporation. In the absence of grounds for suspicion he is fully justified in trusting corporate officials to be honest.

In that case, directors were exculpated where the receiver of a company sued the directors of the company, to account for losses to the company, where one of their number had committed a fraud on the company, on the basis that the directors were negligent in not apprehending and preventing the fraud. [25]

The subjective standard inherent in the statement of the law has for some time been a vexed issue. The notion that directors ought not to be held liable for "mere errors of judgment" or even negligence which was not considered "gross" in nature, has underscored the reality that directorships were reserved for the privileged and that the office of director held with it a certain status symbol. Bruce  **\*380**  Welling has stated with reference to the common law duty of care and skill, that "although ignorance of the law is no excuse, stupidity almost always is". [26]

## Legislation: duty of care, diligence and skill

The Canadian response to the criticism that the common law duty of care, diligence and skill has been far too low and indulgent of negligent directors, was to introduce a partially objective standard in the following terms:

"Every director and officer of a corporation, in exercising his powers and discharging his duties shall … exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances." [27]

The reformed territories have a similar if not identical expression in their company law statutes. [28] There has been much debate as to whether the statement is purely objective or retains some of the subjective element found at common law. In the light of much criticism, it is submitted that this question has been settled in Canada, in the case of *Soper v Queen* [29] in favour of a partially objective test, with the subjective element being "in comparable circumstances", for purposes of Canadian tax legislation.

The fear of the section being interpreted solely as an objective standard, has led the Jamaican legislature to adopt provisions proposed by the Task Force on Corporate Governance in Canada [30] to ameliorate such an effect. The Bill states as follows:

"Every director and officer of a company, in exercising his powers and discharging his duties shall … exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances, including but not limited to the general knowledge, skill and experience of the director or officer." [31]

This formulation, it is submitted, has the effect of confirming the subjective element of the test. The section continues as follows:

Jacas, Craig 10/25/2023
For Educational Use Only

"(2) A director or officer of a company shall not be in breach of his duty under this section if the director or officer exercised due care, diligence and skill in the performance of the duty or believed in the existence of facts that, if true, would render the director's or officer's conduct reasonably prudent.

(3) For the purposes of this section, a director or officer shall be deemed to have acted with due care, diligence and skill where, in the absence of fraud or bad faith, the director or officer reasonably relied in good faith on documents relating to the company's affairs, including financial statements, reports of experts or on information presented by other directors or, when appropriate, other officers and professionals."

The standard is therefore further tempered, under the proposed Jamaican legislation by subss.(2) and (3). It is submitted that this approach has the effect of providing a retreat to the subjective test found at common law. The due diligence defence in subs.(2), when coupled with the defence of reasonable reliance on advice (subs.(3)) results in a highly subjective standard. This is to be regretted, as one of the main purposes of new companies legislation in the Commonwealth Caribbean is to modernise as well as harmonise the law in the region. This section achieves neither of those goals. In addition, the reform of the law, as it relates to directors' duties, requires that the archaic approach of rewarding "stupidity" on the part of directors, is to be rejected in favour of a more rigid standard coupled with transparency. As discussed above, this has been seen throughout the Commonwealth, although different approaches have been taken. [32]  The Jamaican scenario, if enacted, will closely resemble the "business judgment rule" found in the United States of America, which is a much lower standard. The "business judgment rule" presumes, in the absence of fraud or bad faith, that in making business decisions, the director has (a) acted on an informed basis, (b) in good faith, and (c) in the honest belief that the action taken is in the best interest of the company. Under the business judgment rule, the no- conflict rule and the responsibility to be fully informed should be adhered to.

It may be argued, however, that the introduction of other provisions relating to directors, namely disqualification and increased remedies for company investors against directors, addresses the mischief created by a low standard of care, diligence and skill as in the United Kingdom. This will be discussed in more detail below.

The common law: to whom duties are owed

The duties owed by directors at common law are owed to the company alone and not to shareholders or any other interested group. [33]  Exceptions to this rule have emerged at common law (a) to shareholders, where the director has held himself out as a fiduciary to that group, [34] (b) to shareholders in a hostile takeover bid, [35] or (c) to investors (creditors, shareholders, debenture holders) where the company is insolvent, near insolvent or of doubtful solvency. [36]

Legislation: to whom duties are owed

The reformed territories have established that:

"In determining what are the best interests of the company, a director shall have regard to the interests of the company's shareholders and employees and the community in which the company operates.

The duty imposed by subs.(1) on the directors of a company is owed by them to the company alone." [37]

This formulation deserves criticism although the intention is laudable.

Jacas, Craig 10/25/2023
For Educational Use Only

Firstly, taking the interests of other groups into account is mandatory (the word "shall" or "must" is used). This provision is followed by the provision that the duty owed by directors is to the company alone. The coupling of these provisions creates uncertainty at best, unless it is assumed that in taking into account the interests of the shareholders, employees and the community in which the company operates the interests of the company is always served. It is submitted that this is not always the case. Indeed, what may be beneficial for the company as a whole may very well run counter to the interests of a community (where for example the existence of a company in a certain community poses undesirable risk to that community, or where the interests of minority shareholders may have to be compromised for the benefit of the company as a whole in the long run, or where "right-sizing" will benefit the company but will not benefit employees who are the subject of massive layoffs). The better approach, it is submitted, is to leave the responsibility of directors and companies to the public and employees to legislation which touches and concerns those groups, such as environmental legislation and labour laws.

Secondly, where there is a discretion to take into account the interests of other groups ("may" is used), [38] nothing is added, as the duty is always to the company alone. In fact, a director may put himself in the invidious position of defending the exercise of that discretion in the light of the requirement  **\*381**  where the legislation clearly states that his duty is to the company alone. It would appear to be safer not to take into account the interests of the named groups unless the director was prepared to defend himself on the ground that, in doing so, the interest of the company was best served.

The common law approach seems to be the most reasonable and indeed the preferred, where, depending on the circumstances, the director may or may not be required to take into account the interests of groups outside of the company.

### Reformed legislation: insider trading

Insider trading developed as a statutory offence where "insiders" including directors, officers, members and others, deal with securities of the company, with inside information, which affects their value. [39]

The offence with regard to insider trading may be civil [40] or criminal as well as civil. [41] These may be found in Companies or Securities Legislation.

The Barbados Companies Act, [42] for example, states that an insider who in connection with a transaction in a share of the company or any of its affiliates, makes use of any specific confidential information for his own benefit or advantage that, if generally known, might reasonably be expected to affect materially the value of the share is liable to compensate any person for any direct loss incurred by that person as a result of the transaction and is accountable to the company for any direct benefit or advantage received or receivable by the insider as a result of the transaction.

The insider will not be liable to the person who has suffered loss, if the information was known or in the exercise of reasonable diligence should have been known, to that person at the time of the transaction.

Guyana and Trinidad and Tobago include debentures for purposes of transactions. Instead of "affiliates", Guyana uses the words "any company in the same group of companies as the company". "Affiliates" appears to be wider and therefore more desirable. In Trinidad, "specific unpublished information" is used instead of "specific confidential information". It is arguable that "unpublished" suggests more certainty as to which information cannot be used.

Legislation on insider trading addresses an area where the common law would not tread, mainly because of the reluctance to extend the duties of directors beyond that of the company, save in limited circumstances. [43]

Jacas, Craig 10/25/2023
For Educational Use Only

Pre-reformed legislation: fraud

Pre-reform company legislation in the Commonwealth Caribbean followed closely the 1948 UK Companies Act. As a result, many of the territories had legislation which addressed fraudulent trading by directors in certain circumstances.

The Jamaica Companies Act imposes criminal liability on officers of a company which is subsequently wound up, where the officer has by false pretences or by means of any other fraud, induced any person to give credit to the company, with intent to defraud creditors has made or caused to be made any gift or transfer of or charge to be made, or has caused or connived at the levying of any execution against, the property of the company or has concealed or removed any part of the property of the company since or within two months before, the date of any unsatisfied judgment or order for payment of money obtained against the company. [44]

It also provides that there will be personal liability and the possibility of criminal liability where, in the course of the winding-up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose. [45]

Further, the Jamaican Act states that any person who has taken part in the formation or promotion of a company, or any past or present officer or liquidator of a company, may be personally liable to compensate the company, where he has misapplied or retained or become liable or accountable for any money or property of the company, or been guilty of any misfeasance or breach of trust in relation to the company. [46]

Reformed legislation: fraud

Many of the provisions on fraud by directors in the reformed territories, are similar to the pre-reform provisions. [47]

An early draft of the Jamaica Companies Bill flirted with the inclusion of "wrongful trading" as an additional wrong which a director could do against a company. This addition to fraudulent trading has its genesis in the UK Insolvency Act [48] and states that a director or former director, may be personally liable where (a) the company has gone into insolvent liquidation, (b) at some time before the commencement of the winding-up of the company the person knew or ought to have known that there was no reasonable prospect that the company would avoid going into insolvent liquidation, and (c) that person was a director at that time. The defence stipulated in the section is where the director or former director took every step, with a view to minimising the potential loss to the company's creditors as he ought to have taken. The facts that a director ought to know or ascertain, the conclusions which he ought to reach and the steps which he ought to take are both objective and subjective in nature. [49] This is described in the section as those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that director in relation to the company, and the general knowledge, skill and experience that director has.

The fact that this provision has disappeared from the final draft of the Jamaican Companies Bill, suggests that there may be an argument that the increased duty of care, diligence and skill, such that it is, is able to encompass "wrongful trading". This remains to be seen.

Jacas, Craig 10/25/2023
For Educational Use Only

The Commonwealth Caribbean territories: the reform of the..., Comp. Law. 2003,...

Common law and pre-reformed legislation: minority shareholders' rights

At common law the minority shareholders' rights have been stifled by the notorious rule in *Foss v Harbottle.* [50] The two-pronged rule states that:

(1) the courts will not ordinarily interfere in the internal matters of a company where the company is competent to settle it itself, or, in the case of an irregularity, to ratify; and

(2) the only proper plaintiff, where a wrong has been done to the company, is the company itself.

The purpose of the rule was to prevent shareholders from bringing frivolous and vexatious actions against directors of companies, and to ensure that any actions brought were on behalf of the company and not the shareholders.

The rule has, however, made it almost impossible for many shareholders to obtain redress where the wrongdoers are the directors or at least, in control of the company. Further, it is arguable that the "exceptions" to the rule are in fact not really **\*382** exceptions but in fact instances in which the rule cannot apply.

Relief for minority shareholders emerged in the UK 1948 Companies Act in the form of an alternative remedy under s.210. The intention of Parliament was to relieve minority shareholders from the limitations of the rule in *Foss v Harbottle* in circumstances where the affairs of the company were being operated in a manner which was oppressive (harsh, burden-some and wrongful) to some part of the members, and the circumstances would justify the making of a winding-up order on just and equitable grounds.

The section, however, failed miserably in its application, due to the fact, *inter alia,* that shareholders were required to show a course of conduct which demonstrated oppression and that they could only sue *qua* shareholders and not *qua* directors or in any other capacity. [51] A much improved version appears in s.196 of the Jamaica Companies Act 1965 which allows a member of a company who complains that the affairs of the company are being conducted in a manner oppressive to some part of the members (including himself), to obtain an order, by petition to the court. The court is entitled to make such order as it thinks fit to bring the matters complained of, to an end. The word "oppressive" includes any instance of oppression whether constituted by a single act or by a course of conduct.

This section, however, is cold comfort for a minority shareholder who cannot prove outright oppression as defined in the Act. The Jamaican *Telecommunications of Jamaica Ltd* case [52] illustrates the point, where an action against the Chairman of the board and directors of the Telecommunications Company of Jamaica was a non-starter, where it was alleged that the Chairman had sold lands owned by a company in which he held an interest, to the Jamaica Telephone Company for a premium to the detriment of the company. The judge there made it clear that the rule in *Foss v Harbottle,* precluded the minority shareholders from bringing the action on behalf of the company.

Remedies for "oppressed" shareholders have also been codified under s.222(f) of the UK Companies Act 1948, and therefore still exist in the unreformed territories, where this legislation has been copied. In Jamaica, for example, s.203 states, *inter alia,* that:

"A company may be wound up by the Court if … the Court is of opinion that it is just and equitable that the company should be wound up."

The famous *Ebrahimi* case [53] has proved useful in the application of this provision.

Jacas, Craig 10/25/2023
For Educational Use Only

Reformed legislation: minority shareholders' rights

The reformed territories have adopted the Canadian response to (a) the menace of the rule in *Foss v Harbottle,* and (b) the restrictive oppression provisions of old.

The rule in *Foss v Harbottle* is abolished and derivative actions may be brought by shareholders, former shareholders, directors and officers of the company, former directors and officers of the company, debenture holders and former debenture holders and any person the court thinks is a proper person to make an application. This radical approach is tempered by the requirement that the "complainant" give reasonable notice to the directors; bring the action in good faith; and it appears to the court, that it is in the interest of the company or its subsidiary that the action be brought, prosecuted or defended or discontinued. [54]

The court may make any order it thinks fit, including, but not limited to:

(i) authorising the complainant, the Registrar or any other person to control the conduct of the action;

(ii) giving directions for the conduct of the action;

(iii) directing that any amount adjudged payable by a defendant in the action be paid, in whole or in apart, directly to former and present shareholders or debenture holders of the company, or its subsidiary, instead of to the company or its subsidiary; or

(iv) requiring the company or its subsidiary to pay reasonable legal fees incurred by the complainant in connection with the action. [55]

Legislative reform has widened the scope for oppression by defining it as any act or omission of the company or any of its affiliates, or the carrying on or conducting of the business or affairs of the company or any of its affiliates, or the exercising of the powers of the directors of the company or any of its affiliates, in a manner that is "oppressive, or unfairly prejudicial to, any shareholder or debenture holder, creditor, director or officer of the company". [56]

The final draft of the Jamaica Companies Bill unfortunately has not included provisions for oppression as found in the other reformed Commonwealth Caribbean territories, and indeed as found in an earlier draft of the Bill. It is submitted that this must have been an oversight and should be rectified after the Senate has had an opportunity to address this omission.

Pre-reformed legislation: insurance and indemnity

The 1948 UK Companies Act had extensive provisions on indemnity for directors but, however, these were limited generally to instances where directors had successfully defended proceedings against him. The costs that directors were entitled to be indemnified against were those which they were entitled to at common law an express indemnity clause.

Pre-reform Commonwealth Caribbean Legislation reflects this inadequacy. [57] The pre-reformed law states that any provision, whether contained in the articles of a company or in any contract with a company or otherwise, for exempting any director, or other officer of the company, or any person (whether an officer of the company or not) employed by the company as auditor from, or indemnifying him against, any liability which by virtue of any rule of law would otherwise attach to him in respect of any negligence, default, breach of duty or breach of trust of which he may be guilty in relation to the company shall be void. [58]

Jacas, Craig 10/25/2023
For Educational Use Only

The Commonwealth Caribbean territories: the reform of the..., Comp. Law. 2003,...

The proviso states, *inter alia,* that a company may, in pursuance of an such provision, indemnify any such director, etc., against liability incurred by him in defending any proceedings, whether civil or criminal, in which judgment is given in his favor or in which he is acquitted or in connection with any application under s.372 of the Jamaica Companies Act which provides the court with the power to grant relief in certain cases.

In addition, insurance for directors and officers of the company could not be paid by companies under pre-reformed legislation. This has proven to be more than a mere inconvenience where companies would indirectly achieve the result by paying directors enough money, to cover them-selves.

Reformed legislation: insurance and indemnity

In the light of the increased duties and responsibilities of **\*383** directors and officers of the company under reformed legislation, provisions were embodied to (a) widen the indemnity provisions under the pre-reformed law, and (b) stipulate that companies could purchase and maintain insurance for directors, officers, former directors, former officers or any person who acts or acted at the company's request as a director or officer of a body corporate of which the company is or was a shareholder or creditor and their legal representatives. [59]

The reformed law states that a company may indemnify a director or officer, former director or officer of the company or a person who acts or acted at the company's request as a director or officer of a body corporate of which the company is or was a shareholder or creditor, and his legal representatives against all costs, charges and expenses costs, charges and expenses (including an amount paid to settle an action or satisfy a judgment) reasonably incurred by him in respect of any civil, criminal, or administrative action or proceeding to which he is made a party by reason of being, or having been, a director or officer of that company or body corporate.

Indemnification is only possible, where the director or officer to be so indemnified acted honestly and in good faith with a view to the best interests of the company, and in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, had reasonable grounds for believing that his conduct was lawful. [60]

A person is also entitled to indemnity from the company in respect of all costs, charges and expenses reasonably incurred by him in connection with the defence of any civil, criminal or administrative action or proceeding to which he is made a party by reason of being, or having been, a director or officer of the company or body corporate, if the person seeking indemnity was substantially successful on the merits in his defence of the action or proceeding, qualified in accordance with the standards set out, and is fairly and reasonably entitled to indemnity.

The reformed law also facilitates the purchase and maintenance of insurance for the benefit of any person entitled to indemnity against any liability which he could be indemnified against, in his capacity as a director of officer of the company.

These provisions acknowledge the risk which directors face in serving on boards, but it may be argued, however, that the provisions fall short in the following respects:

(1) the provisions do not allow for advancement of defence costs. The argument against this is that there is no guarantee that the director would win his case. This concern may be overcome by requiring that the director produce a written undertaking to repay the advance his defence fails; and

(2) the scope of insurance coverage is too limited. It may be argued that the provision should be wider than the scope for indemnification and be based on what the market place determines.

Jacas, Craig 10/25/2023
**For Educational Use Only**

The Commonwealth Caribbean territories: the reform of the..., Comp. Law. 2003,...

Further reform in this area therefore, ought to be considered.

Reformed legislation: shadow directors

Under the UK Companies Act 1985, s.741, "shadow director" is defined as a person in accordance with whose directions or instructions the directors of the company are accustomed to act. A person is not deemed to be a shadow director by reason only that the directors act on advice given by him in a professional capacity. "Shadow director" is a new name for an old concept. The UK Companies Act of 1948, acknowledged this concept in s.328(3), in the context of offences antecedent to or in the course of winding-up. The carbon-copy of this provision is found in s.301(3) of the Jamaica Companies Act which states that, for the purposes of offences by officers of companies in liquidation, the expression "officer" shall include any person in accordance with whose directions or instructions the directors of a company have been accustomed to act.

Under the Jamaica Financial Institutions Act, the Banking Act and the Insurance Act, a person shall be deemed to be a director of a body corporate if he occupies the position of a director by whatever name called or is a person in accordance with whose directions or instructions (not in a professional capacity) the directors and the body corporate or any of them act.

The enlargement of the concept as well as the applicability to a wider number of circumstances, under the present United Kingdom law, is consistent with the United Kingdom style of reform in respect of an increase in the duties and responsibilities and attendant liabilities of directors. Since most of the reformed territories have adopted the Canadian model, there is no reference to "shadow directors". In Jamaica, however, under the Companies Bill, the United Kingdom concept of "shadow director" is adopted. This inclusion of the "shadow director" will broaden the scope of liability for directors in Jamaica.

Conclusion

It is unfortunate that the Commonwealth Caribbean as a whole has taken, and is taking a long time to modernise and harmonise its company law in general, and in particular, in respect of directors. That said, however, the approach that has been taken in adopting Canadian company legislation, in raising the bar of standards for directors, by increasing duties and potential liability, is welcome. This approach reflects a more conservative approach than an alternative United States approach, while rejecting the slow and less impressive piecemeal approach of the United Kingdom.

The adoption of corporate governance principles through legislation and corporate culture, acts as a safe harbour for directors faced with increased expectations and gives rise to investor confidence, both locally and abroad. This is of increasing importance in a globalised economy, where the more sophisticated markets demand that they be able to relate and have confidence in the developing markets. Further, the Caribbean economic community is much more effective where the corporate and commercial laws are harmonised.

The role and responsibilities of directors are dynamic, and the laws should reflect that reality. The Commonwealth Caribbean, as a region, should therefore continue to assess the changes made in the context of economic growth and efficiency.

**Suzanne Ffolkes Goldson** B.A. (Econ.) (York); LL.B. (Hons.) (UWI); B.C.L. (Oxon) *Lecturer in Law, Faculty of Law, University of the West Indies and Attorney at Law*

The Commonwealth Caribbean territories: the reform of the..., Comp. Law. 2003,...

# Footnotes

| | |
|---|---|
| 1 | Barbados Companies Act 1982, Cap.308 ("Barbados"); The Republic of Guyana Companies Act No.29 of 1991 ("Guyana"); Commonwealth of Dominica Companies Act No.21 of 1994 ("Dominica"); The Republic of Trinidad and Tobago Companies Act No.35 of 1995 ("Trinidad and Tobago"); Antigua and Barbuda Companies Act No.18 of 1995 ("Antigua and Barbuda"); St Lucia Companies Act 1996 ("St Lucia"). See also the Jamaica Companies Bill 2001. |
| 2 | Canada Business Corporations Act (R.S.C.) 1985 (c.C-44). |
| 3 | *Regal (Hastings) Ltd v Gulliver* [1942] 1 All E.R. 378; [1967] 2 A.C. 134n, HL; *Hogg v Cramphorn* [1967] 1 Ch. 254; *cf. Howard Smith Ltd v Ampol Petroleum Ltd* [1974] A.C. 821. |
| 4 | In the celebrated House of Lords case of *Regal (Hastings) Ltd v Gulliver,* trust principles were invoked with full rigour where the directors acquired shares in a subsidiary company where the subsidiary company could not satisfy the demands of a landlord to have a certain amount of paid up capital, before the subsidiary company could obtain and then sell the property, which it leased. Eventually, all the shares in the holding company and the subsidiary were sold at a profit, including the shares owned by the directors. The directors had acted in good faith all along for the benefit of the company alone. The directors also owned the majority of shares and could easily have had the sale ratified by the company in general meeting, but unfortunately, did not see it necessary to do so. The no-profit rule was invoked by the House of Lords, and the new owners of the company shares were held to be entitled to any profit made by the directors, as they had breached their fiduciary duties in law. |
| 5 | *Financial Institutions Services Ltd v CNB Holdings Ltd, Century National Development Ltd, Donovan Crawford, Valton Caple Williams, Balmain Brown, Regardless Ltd, Fordix Ltd, Spring Park Farms, Alma Crawford,* unreported, May 25, 1999, *per* Wolfe C.J., No.CL1996/C330, Supreme Court of Judicature of Jamaica; and *Financial Institutions Services Ltd v CNB Holdings Ltd, Donovan Crawford, Balmain Brown, Valton Caple Williams, Regardless Ltd, Debroc Ltd,* unreported, May 25, 1999, *per* Wolfe C.J., No.CL1997/C050, Supreme Court of Judicature of Jamaica. |
| 6 | *ibid.* Wolfe C.J. spoke specifically to the breach of the duty to act bona fide in the interest of the company (p.70 of the Judgment) and a conflict of interest and duty and the making of secret profits (p.77 of the Judgment) and entering into contracts without full disclosure of all material facts to the Board of the company (p.84 of the Judgment). |
| 7 | Barbados, s.95(1)(a); Guyana, s.96(1)(a); Dominica, s.97(1)(a); Trinidad and Tobago, s.99(1)(a); Antigua and Barbuda, s.97(1)(a); St Lucia, s.97(1)(a). |
| 8 | British Columbia, Company Act (R.S.B.C.) 1979 (c.59), subs.141(2). |
| 9 | Ontario, Business Corporations Act (S.O.) 1982 (c.4), subs.138(2). |
| 10 | See, *e.g.* Jamaica Companies Act 1965, s.188. |
| 11 | Barbados, s.89; Guyana, s.91; Dominica, s.91; St Lucia, s.91; Antigua and Barbuda, s.91; Trinidad and Tobago, s.93; Jamaica Companies Bill 2001, s.191. |
| 12 | See the UK case of *Neptune (Vehicle Washing Equipment) Ltd v Fitzgerald* [1996] Ch. 274. |
| 13 | B.L. Welling, *Corporate Law in Canada: The Governing Principles* (2nd ed., 1991), pp.452-453. |
| 14 | UK Companies Act 1989, s.317. |
| 15 | *cf.* UK Companies Act 1989, s.317(5), (6) which includes "transactions" other than "contracts". |
| 16 | Barbados, s.89(2)(d); Guyana, s.90(2)(d); Dominica, s.91(2)(d); St Lucia, s.91(2)(d); Antigua and Barbuda, s.91(2)(d); Trinidad and Tobago, s.93(2)(d). |
| 17 | Trinidad and Tobago, s.93(2)(d). |
| 18 | *Telecommunications of Jamaica Ltd (Defendant/Appellant) v Hector Bernard, Sonia Mills, Martin Mordecai, Wellesley Powell, Ann Saunders, Gordon Wells, Richard Wells,(Plaintiffs/Repondents) The Attorney General, Cable and Wireless (W.I.) Ltd, Horace Barber, Douglas C. Buck, Wentworth Charles, Tom Chellew, Alston Douglas, David Mais, Fred Phillips, Hosford Scott, Paul Skey, Mayer Matalon, Telecommunications of Jamaica Ltd (Defendants/Respondents),* unreported, Supreme Court Civil Appeal No.88/90, P. Carey (Ag.), January 28, 29, 30, 31, February 1, 4 and May 20, 1991, pp.45 and 55. |
| 19 | s.191(6). |

The Commonwealth Caribbean territories: the reform of the..., Comp. Law. 2003,...

20  L.C.B. Gower, *Gower's Principles of Modern Company Law* (4th ed., Stevens & Sons, 1979), p.587; *Hely, Hutchinson v Brayhead* [1968] 1 Q.B. 549.

21  Barbados, s.92; Guyana, s.93; Dominica, s.94; St Lucia, s.94; Antigua and Barbuda, s.94; Trinidad and Tobago, s.96.

22  Presumably, the company would sue the directors for breach of their fiduciary duty to the company not to have a conflict of interest and duty, or the shareholders (or any other "complainant" under reformed legislation), could sue in a derivative action (*i.e.* on behalf of the company).

23  Barbados, s.64; Guyana, s.65; Dominica, s.67; St Lucia, s.67; Antigua and Barbuda, s.67; Trinidad and Tobago, s.69

24  [1925] Ch. 407 at 428 *et seq.,* CA.

25  The directors in the Century National Bank Case in Jamaica were found liable for breach of duty of care, diligence and skill where they were held to be negligent in allowing loans and guarantees to be made "fraudulently", see n.5 above.

26  B.L. Welling, *op.cit.,* n.13 above, p.331.

27  C.B.C.A., s.122(1)(b).

28  Barbados, s.95(1)(b); Guyana, s.96(1)(b); Dominica, s.97(1)(b); St Lucia, s.97(1)(b); Antigua and Barbuda, s.97(1)(b); Trinidad and Tobago, s.99(1)(b).

29  [1997] 149 D.L.R. 4th 297; S. Ffolkes Goldson, "The Corporate Director's Duty of Care, Diligence and Skill: *Soper v The Queen*" in (November 1997) 2 Carib. L.B. No.2, 53.

30  D. Pekarsky, "Note 57: Proceedings of the Task Force on Corporate Governance", Issue No.1 (February 14, 1996) 1:64.

31  s.170(1)(b); (2); (3).

32  See n.29 above.

33  *Percival v Wright* [1902] 2 Ch. 421.

34  *Coleman v Myers* [1977] N.Z.L.R. 225; *Dawson International Plc v Coats Paton* [1989] B.C.L.C. 233; aff'd [1990] B.C.L.C. 560.

35  More so in North America, *e.g.,* *Teck Corp Ltd v Millar* (1973) 33 D.L.R. (3d) 288 and *Unocal v Mesa Petroleum Co* (1985) 493 A(2d) 946. See also Walcott, "Poison Pills in the Commonwealth Caribbean: *Stena Finance BV v Sea Containers Ltd*" in [1996] J.B.L. 201; Bernard McCabe, "Roles and Responsibilities of Company Directors in a Takeover" in (1994) 4 *Australian Journal of Corporate Law 36*.

36  *West Mercia Safetywear Ltd v Dodd* [1988] B.C.L.C. 250, CA. It is submitted that the duty owed under these circumstances is not owed to the creditors individually but to the creditors as a group. See P.L.Davies (ed.), *Gower's Principles of Modern Company Law* (6th ed., Sweet and Maxwell, 1997), p.603.

37  Barbados, s.95(2)(3); Guyana, s.96(2), (3), where the word "must" is used instead of "shall"; Dominica, s.97(2), (3); St Lucia, s.97(2), (3); Antigua and Barbuda, s.97(2), (3); Trinidad and Tobago, s.99(2), (3).

38  Jamaica Companies Bill 2001, s.170(4), (5).

39  *Gower, op.cit.,* n.36 above, p.631.

40  Barbados, s.310; Guyana, s.309; Dominica, s.324; Antigua and Barbuda, s.324.

41  Trinidad and Tobago, s.305.

42  Barbados, s.310.

43  See avove. See also B. Welling, *op. cit.,* n.13 above, p.359.

44  Jamaica, s.303.

45  *ibid.,* s.304.

46  *ibid.,* s.306.

47  Guyana, ss.442-448; Dominica, ss.465-471; St Lucia, ss.465-471; Antigua and Barbuda, ss.465-471; Trinidad and Tobago, ss.443-449.

48  UK Insolvency Act 1986, s.214.

49  This is the same test that is applied in the reformed territories for the duty of care, diligence and skill of directors.

50  (1843) 2 Hare 461.

51  See *Re Jermyn Street Turkish Baths Ltd* [1970] 1 W.L.R. 1194; *Re Westbourne Galleries Ltd* [1970] 1 W.L.R. 1378.

52  See n.19 above.

53  *Ebrahimi v Westbourne Galleries Ltd and others* [1973] A.C. 360, HL.

**Jacas, Craig 10/25/2023**
**For Educational Use Only**

**The Commonwealth Caribbean territories: the reform of the..., Comp. Law. 2003,...**

| | |
|---|---|
| 54 | Barbados, ss.225, 226; Guyana, ss.221, 222; Dominica, ss.238, 239; St Lucia, ss.238, 239; Trinidad and Tobago, ss.239, 240; Antigua and Barbuda, ss.238, 239. |
| 55 | Barbados, s.227; Guyana, s.223; Dominica, s.240; St Lucia, s.240; Trinidad and Tobago, s.241; Antigua and Barbuda, s.240. |
| 56 | Barbados, s.228; Guyana, s.224; Dominica, s.241; St Lucia, s.241; Trinidad and Tobago, s.242; Antigua and Barbuda, s.241. |
| 57 | Jamaica, s.191. |
| 58 | *ibid.* |
| 59 | Barbados, ss.97-100; Guyana, ss.99-103; Dominica, ss.99-103; St Lucia, ss.99-103; Trinidad and Tobago, ss.101-105; Antigua and Barbuda, ss.99-104. |
| 60 | ## |

© 2022 Sweet & Maxwell and its Contributors

Comp. Law. 2003, 24(12), 378-384

 © 2023 Thomson Reuters.

 © 2023 Thomson Reuters.

# Exhibit D

A                              **CASES**

determined by the

## CHANCERY DIVISION

B                              and the

## COURT OF PROTECTION

and on appeal therefrom in the

C                         ## COURT OF APPEAL

———————

D                        [COURT OF APPEAL]

### BRISTOL AND WEST BUILDING SOCIETY v. MOTHEW

1996   May 21, 22;                    Staughton, Millett and Otton L.JJ.
       July 24

E   *Solicitor—Negligence—Incorrect advice or information—Mortgage*
    *transaction—Solicitor acting for borrowers and lender—Solicitor*
    *negligently giving lender incorrect information—Lender suffering*
    *loss—Whether lender merely having to prove reliance on*
    *information—Whether necessary to show loss attributable to*
    *negligence—Whether breach of trust or fiduciary duty*

            In 1988 the defendant solicitor acted for a husband and wife
F    in the purchase of a house for £73,000 and also for the plaintiff
     to whom the purchasers had applied for a loan of £59,000 to
     finance the purchase. The plaintiff offered to advance the money
     on the express condition that the balance of the purchase price
     was provided by the purchasers without resort to further
     borrowing, and it instructed the solicitor to report, prior to
     completion, any proposal that the purchasers might create a
     second mortgage or otherwise borrow in order to finance part of
G    the purchase price. The solicitor knew that the purchasers were
     arranging for an existing bank debt of £3,350 to be secured by a
     second charge on the new property but, due to an oversight, he
     stated in his report to the plaintiff that the balance of the
     purchase price was being provided by the purchasers without
     resort to further borrowing. The plaintiff advanced the loan and
     the purchase was completed. When the purchasers defaulted on
H    their mortgage repayments the plaintiff enforced its security and
     the house was sold at a loss. The plaintiff sought to recover the
     whole of its loss on the transaction from the solicitor, alleging
     breach of contract, negligence and breach of trust. The district
     judge gave the plaintiff summary judgment for damages to be

2

assessed for breach of contract and negligence and for damages    A
of £59,000 less the amount received on the sale of the property
for breach of trust. The judge affirmed those decisions.

On appeal by the solicitor:—

*Held,* allowing the appeal, (1) that, where a client sued his
solicitor for negligently giving him incorrect advice or information,
the client did not have to show that he would not have acted as
he did if he had been given the proper advice or correct
information but merely that he had relied on the incorrect advice    B
or information; that the evidence showed that the plaintiff had
relied on the solicitor's report in advancing the loan and,
therefore, the necessary causal link between the solicitor's
negligence and the loan was proved; but that the plaintiff had still
to establish what, if any, loss was attributable to the solicitor's
negligence and, as there was an issue as to what loss was
occasioned by the existence of the second charge and the    C
purchasers' indebtedness to the bank, damages remained to be
assessed (post, pp. 11D–E, F–H, 13B–C, 24E–F, 25E–F, 28A).

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co.
Ltd.* [1997] A.C. 191, H.L.(E.) and *Downs v. Chappell* [1997]
1 W.L.R. 426, C.A. applied.

(2) That the solicitor's conduct in providing the plaintiff with
the wrong information, although a breach of duty, was neither
dishonest nor intentional but due to an oversight and was    D
unconnected to the fact that he was also acting for the purchasers;
that, accordingly, his conduct and subsequent application of the
money advanced by the plaintiff to complete the purchase was
not a breach of trust or fiduciary duty; and that the order for
damages for breach of trust would therefore be set aside (post,
pp. 15H–16A, 19E, 20G, 22A–C, 24E–F, 25E–F, 26C–E, 28A).

Decision of Chadwick J. reversed.
                                                                      E

The following cases are referred to in the judgments:

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997]
    A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R.
    801
*Clark Boyce v. Mouat* [1994] 1 A.C. 428; [1993] 3 W.L.R. 1021; [1993] 4 All    F
    E.R. 268, P.C.
*Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453
*Coomber, In re; Coomber v. Coomber* [1911] 1 Ch. 723, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717
*Girardet v. Crease & Co.* (1987) 11 B.C.L.R. (2d) 361
*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145; [1994] 3 W.L.R. 761;    G
    [1994] 3 All E.R. 506, H.L.(E.)
*Kelly v. Cooper* [1993] A.C. 205; [1992] 3 W.L.R. 936, P.C.
*LAC Minerals Ltd. v. International Corona Resources Ltd.* (1989) 61 D.L.R.
    (4th) 14
*Lewis v. Hillman* (1852) 3 H.L.Cas. 607, H.L.(E.)
*Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992]
    4 All E.R. 512, H.L.(E.)                                                    H
*Moody v. Cox and Hatt* [1917] 2 Ch. 71, C.A.
*Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836, C.A.
*Nocton v. Lord Ashburton* [1914] A.C. 932, H.L.(E.)
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109

A   *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113;
      [1970] 3 W.L.R. 273; [1970] 2 All E.R. 471, C.A.
   *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
      3 All E.R. 785, H.L.(E.)
   *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
      [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)

B   The following additional cases were cited in argument:

   *Alliance & Leicester Building Society v. Edgestop Ltd.* (unreported), 18 January
      1991, Hoffmann J.
   *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465, P.C.
   *Canson Enterprises Ltd. v. Boughton & Co.* (1991) 85 D.L.R. (4th) 129
   *Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653
   *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1
C   *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
   *Wan v. McDonald* (1992) 105 A.L.R. 473
   *Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141

   The following cases, although not cited, were referred to in the skeleton
   arguments:

D   *Attorney-General for Hong Kong v. Reid* [1994] 1 A.C. 324; [1993] 3 W.L.R.
      1143; [1994] 1 All E.R. 1, P.C.
   *Bishopsgate Investment Management Ltd. v. Maxwell (No. 2)* [1994] 1 All
      E.R. 261, C.A.
   *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
      Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
   *Dawson, decd., In re; Union Fidelity Trustee Co. Ltd. v. Perpetual Trustee Co.
      Ltd.* [1966] 2 N.S.W.R. 211
E   *Farrington v. Rowe McBride & Partners* [1985] 1 N.Z.L.R. 83
   *McPherson v. Watt* (1877) 3 App.Cas. 254, H.L.(Sc.)
   *Miller's Deed Trusts, In re* (1978) 75 L.S.G. 454
   *Nelson v. Rye* [1996] 1 W.L.R. 1378; [1996] 2 All E.R. 186
   *Nestlé v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260; [1994] 1 All
      E.R. 118, C.A.

F   INTERLOCUTORY APPEAL from Chadwick J.
      On 21 June 1995 Deputy District Judge Raskin granted the plaintiff,
   Bristol and West Building Society, summary judgment pursuant to R.S.C.,
   Ord. 14 of its claims against the defendant solicitor, Anthony Paul
   Mothew (trading as Stapley & Co.), for damages to be assessed for breach
   of contract and negligence and damages for breach of trust. On 27 July
G   1995 Chadwick J. dismissed the defendant's appeal against that order.
      Pursuant to leave granted by Nourse L.J. on 29 December 1995 and
   by a notice of appeal dated 5 January 1996 the defendant sought to set
   aside the orders and be granted unconditional leave to defend on the
   grounds that the judge had erred in holding (1) that money paid to the
   defendant by the plaintiff was impressed with a constructive trust in
   favour of the plaintiff; (2) that the money was paid to the defendant under
H   a mistake of fact or had been induced by the defendant's misrepresentation,
   when no such allegations were made in the statement of claim; (3) that it
   was not necessary for the plaintiff to establish that it had sustained loss
   and damage as a result of the defendant's alleged breach of trust; (4) that

4

the defendant had no arguable defence to the claim for breach of trust    A
based upon acquiescence or affirmation by the plaintiff; and (5) that the
defendant had no arguable defence to the allegation that the plaintiff had
sustained loss and damage as a result of the breach of contract and
negligence.

By a respondent's notice dated 25 January 1996 the plaintiff contended
that it was entitled to judgment for the sum claimed in respect of its
claims for breach of contract and negligence.    .    B

The facts are stated in the judgment of Millett L.J.


*Jonathan Sumption Q.C.* and *Glenn Campbell* for the defendant.
A breach of a solicitor's conveyancing duty which makes no difference to
the lender's decision and has no impact on the value of the security cannot
result in the solicitor becoming the underwriter of the transaction when    C
the security is later sold at a loss: see *Target Holdings Ltd. v. Redferns*
[1996] A.C. 421. Although a solicitor has a number of fiduciary obligations
to his client, not every duty which is owed in the context of a fiduciary
relationship is a fiduciary duty: see *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362; *LAC Minerals Ltd. v. International Corona
Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 and *In re Coomber; Coomber*    D
*v. Coomber* [1911] 1 Ch. 723, 728. A solicitor's duty to report to his client
the outcome of conveyancing and allied inquiries is the ordinary
contractual duty of a professional to comply with his instructions and to
do so with reasonable skill.

*Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465 does
not assist the plaintiff as it was concerned only with a breach by a
fiduciary of his obligation to disclose to his principal his own personal    E
interest in the transaction. [Reference was also made to *Nocton v. Lord
Ashburton* [1914] A.C. 932.] The principle that relief is granted for such a
breach, without regard to what the plaintiff would have done if disclosure
had been made reflects the rule of equity that where a fiduciary has dealt
personally with the plaintiff without full disclosure to him the latter's
relief is not compensatory at all. He has, irrespective of his loss, an    F
absolute right to set aside the transaction or to claim an account of
profits. The compensation awarded to him is simply the financial
equivalent of setting aside: see *Gray v. New Augarita Porcupine Mines Ltd.*
[1952] 3 D.L.R. 1, 12–15. Compensation cannot be awarded for breach of
a duty as to the manner in which work should be carried out: see
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 164–165.
[Reference was also made to *Canson Enterprises Ltd. v. Boughton & Co.*    G
(1991) 85 D.L.R. (4th) 129; *Wan v. McDonald* (1992) 105 A.L.R. 473;
*Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141 and *Target Holdings Ltd.
v. Redferns* [1996] A.C. 421.]

There is no distinction between a solicitor who breaches his duty by
failing to report in accordance with his instructions before the mortgage
advance cheque is received and a solicitor who fails to deal with the
advance in accordance with his instructions after it is received. In neither    H
case does the breach of duty have the effect of terminating the solicitor's
retainer and his authority to complete the transaction. Equally, the
argument that the solicitor held the advance as soon as it was received on

A  a constructive trust to return it forthwith to the plaintiff cannot be supported. There cannot be a constructive trust inconsistent with the existing express trust to apply the loan moneys in completing the transaction, unless the solicitor's authority and obligation to complete the transaction are first brought to an end. [Reference was made to *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669; *Sinclair v. Brougham* [1914] A.C. 398 and *Lipkin Gorman*
B  *v. Karpnale Ltd.* [1991] 2 A.C. 548.]

If the plaintiff is to be awarded the amount of the advance money (less actual recoveries) it must be on the basis that that money has been misapplied. If the defendant had no authority to pay out the money to the vendor the payment was a breach of trust: see *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 and *Alliance & Leicester Building Society v.*
C  *Edgestop Ltd.* (unreported), 18 January 1991.

The plaintiff's loss on the loan transaction is due to the default of the purchasers and the fact that the security was not sufficient to cover the loan when it came to be realised, neither of which is the responsibility of the solicitor. The loss is not due to the existence or non-disclosure of a second mortgage.

*Nicholas Patten Q.C.* and *Timothy Higginson* for the plaintiff. The
D  relationship between a solicitor and his client gives rise to fiduciary obligations on the part of the solicitor in the handling of his client's affairs. A failure to perform those obligations gives rise to a remedy in equity regardless of whether the acts complained of also constitute a breach of contract with a right to damages: see *Nocton v. Lord Ashburton* [1914] A.C. 932, 956–957. The underlying contractual relationship between
E  the parties cannot dictate or limit the scope of the concurrent fiduciary duties, as the defendant was expressly required to report any proposal for further borrowing before releasing the plaintiff's mortgage advance: see *Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145, 205–206.

A solicitor who acts for both lender and borrower in the same transaction has an unrestricted obligation to each client to act in his own best interests, including an obligation to disclose to the lender information
F  about the borrower which is material to the transaction: see *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437. [Reference was also made to *Lewis v. Hillman* (1852) 3 H.L.Cas. 607; *Kelly v. Cooper* [1993] A.C. 205; *Moody v. Cox and Hatt* [1917] 2 Ch. 71 and *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, 817–818.]

The non-disclosure of the proposed further borrowing was a breach of
G  trust. In addition, the release of the advance by the defendant when he had failed to disclose the proposed further borrowing in breach of his express instructions was made without authority and was itself a breach of trust. The right of the plaintiff to recover its advance is unaffected by *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 because the payment of the advance to the defendant (and therefore the creation of his agency to hold the money for the purpose of the intended transaction) was the direct
H  result of the reliance by the plaintiff upon the contents of the defendant's report on title. Therefore the defendant's ability to utilise the payment for the benefit of the borrowers in breach of trust was caused by the report on title.

6

Breaches of trust or fiduciary duty must cause the loss complained of    A
but the test of causation is not the common law test. The inquiry is not to
determine what position the plaintiff would have been in had the contract
been performed but rather whether the loss would have been sustained
but for the breach of trust. The non-disclosure in the report on title caused
the loss because it induced the plaintiff to advance the funds in reliance
on the report. To inquire as to what the plaintiff would have done had
disclosure been made is to apply the common law test and is wrong in    B
principle: see *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R.
465, 469; *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1,
15; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453 and
*Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653.

*Sumption Q.C.* replied.

C

*Cur. adv. vult.*

July 24.   The following judgments were handed down.

MILLETT L.J.   This is an appeal brought by the defendant with the
leave of the single Lord Justice from an order for summary judgment
given initially by the district judge and affirmed (for different reasons) by    D
Chadwick J. It raises important questions of principle in relation to a
claim by a mortgagee to recover from the solicitor who was acting for
both mortgagor and mortgagee the loss arising from the mortgagor's
subsequent default.

The collapse in the property market which accompanied the recession
at the beginning of the present decade caused mortgage lenders to suffer    E
serious losses. Unable to recover their advances from the borrowers or by
the enforcement of their security they have sought to recover them from
the valuers or solicitors on whose valuations or advice they have relied. In
some cases they have been the victims of a fraud to which the valuers and
solicitors have been parties. In other cases, such as the present, they have
been unable to accuse their solicitor of anything more serious than
negligence. Believing that the common law rules of causation and    F
remoteness of damage might not enable them to recover the whole amount
of their loss they have turned to equity and alleged breach of trust or
fiduciary duty. We have thus been concerned to decide just what is
involved in these concepts.

*The facts*                                                                    G

The facts are not in dispute. The defendant is a solicitor. In August
1988 he acted for a Mr. and Mrs. Towers in the purchase of 17, Thameshill
Avenue, Romford for £73,000. In accordance with the usual practice he
also acted for the Bristol and West Building Society ("the society") to
which the purchasers had applied for an advance of £59,000 in order to
finance the purchase. (This was the Cheshunt Building Society, but its
rights have since vested in the society.) In their application form the    H
purchasers had stated that the balance of the purchase price of £14,000
was being provided by them personally and that they were not applying
elsewhere for financial assistance towards the purchase price.

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A       The society offered to advance to the purchasers £59,000 on the security of a first mortgage of the property on the express condition that unless otherwise agreed in writing the balance of the purchase price was to be provided by the purchasers personally without resort to further borrowing and that no second mortgage or other loan was being arranged or contemplated in connection with the purchase. The defendant was provided with the offer of advance (but not with the purchasers' application).

B
        The society's standing instructions to solicitors acting for the society required them to report to the society prior to completion, inter alia:

        "(viii) Any proposal that the applicant may create a second mortgage or enter into a promissory note or otherwise borrow in order to finance part of the purchase price. (ix) Any incorrect information given in the solicitor's instructions. (x) Any other matters which ought to be brought to the notice of the society . . ."

C

        The solicitor was required to submit a report on title and request for advance cheque to the society at least five clear working days before the cheque was required. This was done on a form by which the solicitor was asked to confirm, inter alia, that the title was good and marketable and might safely be accepted by the society, that to the best of his knowledge and belief the balance of the purchase money was being provided by the applicant personally without resort to further borrowing, and that the special conditions attached to the offer of advance had been, or would be, complied with.

D

        Mr. and Mrs. Towers intended to provide the balance of the purchase price from the net proceeds of sale of their existing property after discharging a subsisting mortgage. As it happens, they owed money to Barclays Bank which was secured by a second charge on that property. They arranged with the bank to allow a small part of the debt (£3,350) to remain outstanding after the sale of the existing property and to be secured by a second charge on the new property. The defendant was informed of these arrangements and gave an undertaking to the bank to hold the title deeds to its order pending registration. Unfortunately, he either failed to appreciate that, although they related to old borrowing, they were a matter which he was required to report to the society, or he had forgotten or overlooked them when he made his report.

E

F

        By his report dated 2 August 1988 the defendant confirmed that to the best of his knowledge and belief the balance of the purchase money was being provided by the applicants personally without resort to further borrowing and that the special conditions attached to the offer of advance had been or would be complied with. He failed to disclose the fact that Mr. and Mrs. Towers were making arrangements for a second mortgage in connection with the purchase.

G

        It is conceded by the defendant that his statements were untrue and that his failure to report the purchasers' arrangements for a second mortgage was a breach of his instructions. The society alleges that the defendant acted negligently and in breach of contract, and this is admitted. There is no allegation of dishonesty or bad faith, and if any such allegation were made it would be strongly resisted. The society does not allege that

H

8

Millett L.J.        Bristol and West Building Society v. Mothew (C.A.)          [1998]

the defendant made the statements in question knowing them to be untrue. **A**
It alleges only that he "knew or ought to have known" that they were
untrue, and this is consistent with oversight.

Following the receipt of the report the society forwarded a cheque for
the amount of the advance to the defendant in readiness for completion
on 30 August. Completion took place on that date when the mortgage
advance was released to the vendor's solicitors as part of the purchase
price for the property. Mr. and Mrs. Towers executed a first charge in   **B**
favour of the society and a second charge in favour of the bank. On
25 November the defendant applied to the society for its consent to the
registration of the second charge in favour of the bank. The society
granted its consent on 10 March 1989. It does not appear that the society
was aware of the date of the bank's charge (and so was aware that it
constituted a breach of the conditions of the advance) when it gave its   **C**
consent, but it is alleged that the society must have learnt of it shortly
afterwards and nevertheless took no action.

The purchasers defaulted after making only small repayments and the
society enforced its security. The property was sold on 6 February 1991
and realised net proceeds of a little under £53,000. The society claimed to
recover the whole of its net loss on the transaction from the defendant,
alleging breach of contract, negligence and breach of trust. As I have   **D**
already indicated, breach of contract and negligence are admitted; breach
of trust is denied.

It has always been the defendant's case that the society would not have
been concerned by the purchasers' proposal to grant a second charge to
the bank if this had been disclosed to it in August 1988, that it would still
have proceeded with the transaction and that it would have suffered   **E**
precisely the same loss in that event. It is alleged that, in the heady days
of 1988, when the property market was at its height and mortgage lenders
were falling over themselves to advance money to house purchasers, the
society would not have been concerned by a proposal to grant a second
charge to secure a relatively trivial indebtedness which did not even
represent fresh borrowing; and it is contended that this is demonstrated
by the lack of concern shown by the society when it was asked to give its   **F**
consent to the registration of a second charge in March 1989. Despite the
submissions of the society to the contrary, I am satisfied that, if legally
relevant, these allegations raise a triable issue.

*The course of the proceedings below*
                                                                          **G**
It was common ground below that no damages would be recoverable
at common law for breach of contract or tort unless the society could
show that it would not have proceeded with the transaction if it had been
informed of the facts. The society, however, submitted that the position
was different in equity. It alleged that the defendant had committed a
breach of trust or fiduciary duty, and submitted that common law
principles of causation and remoteness of damage have no application in   **H**
such a case so that it was not necessary for the society to show that it
would not have proceeded with the transaction if it had been informed of
the facts.

A    The district judge accepted these arguments. In respect of the common law claims for breach of contract and negligence she gave summary judgment for damages to be assessed. This was apparently on the basis that the judgment would leave it open to the defendant to contend that no loss was caused by the breach.

B    The district judge also gave summary judgment for the society for breach of trust for the sum of £59,000 less the sums received by the society on the sale of the property, and this was affirmed by the judge, who was satisfied that there was no question or issue to be tried in the action and dismissed the appeal.

*The course of the appeal*

C    In the course of the appeal the defendant submitted that, by consenting to the registration of the second charge, the society waived the breaches of which complaint is made; and that this raises a triable issue on liability which entitles him to unconditional leave to defend in relation to all the pleaded causes of action. In the absence of any evidence or reason to suppose that the society was aware of the date of the second charge when it gave its consent to its registration, I am not persuaded that there is a

D    triable issue on waiver, and I would not disturb the order below on this ground.

    When the appeal was first argued before us it was still conceded by the society that it could not recover damages at common law for breach of contract or negligence unless it could show that it would not have proceeded with the mortgage advance if it had been informed of the facts.

E    The society, however, maintained that it could escape this principle because the defendant was also guilty of a breach of trust and that common law rules of causation and remoteness of damage have no application in such a case. The critical questions, therefore, appeared to be whether the defendant was guilty of a breach of trust or fiduciary duty and if so whether the society needed to prove that it would not still have proceeded with the transaction if it had been told of the facts.

F    After we had reserved judgment on the appeal, however, the society informed us that it wished to resile from its concession. Relying on the recent decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426, the society submitted that it was entitled to recover the whole of its net loss on the transaction by way of damages for negligence at common law without having to establish that it would not have proceeded with the

G    transaction if it had been informed of the facts. If correct, it submitted, this would be determinative of the case, and it would not be necessary for the society to rely on any breach of trust or fiduciary duty. Before the defendant's advisers could respond to this, speeches were delivered in the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. These were relevant to the common law position. For the reasons given by Staughton L.J., however, we decided that it was

H    not necessary to restore the appeal for further argument. This was because the assessment of damages at common law is still pending. They will have to be assessed in conformity with the decision of the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* and not

10

with any gloss which, in the absence of argument, we may inadvertently    A
have put upon that decision.

*The claims at common law*

    The society has served a respondent's notice, in which it contends that
it is entitled to judgment for the sum claimed, and not merely for damages
to be assessed, in respect of its common law claims. If this is correct, then    B
the society does not need to establish that the defendant was guilty of a
breach of trust or fiduciary duty.

    This question depends upon an alleged difference between the tests of
causation and remoteness of damage at common law and in equity. In a
case of the present kind, however, two different questions of causation are
involved and it is necessary to distinguish between them. Where a plaintiff
claims that he has suffered loss by entering into a transaction as a result    C
of negligent advice or information provided by the defendant, the first
question is whether the plaintiff can establish that the defendant's
negligence caused him to enter into the transaction. If he cannot his claim
must fail. But even if he can, it is not sufficient for him to establish that
the transaction caused him loss. He must still show what (if any) part of
his loss is attributable to the defendant's negligence. This is usually treated    D
as a question of the measure of damages rather than causation, and for
convenience I shall so treat it in this judgment, but it must be
acknowledged that it involves questions of causation.

    In *Downs v. Chappell* [1997] 1 W.L.R. 426 the plaintiffs bought a small
business in reliance on trading figures contained in a letter from
the vendor's accountants which was forwarded to them by the vendor.
The vendor knew that the figures contained in the letter were false. The    E
plaintiffs sued the vendor for deceit and the accountants for negligence.
The judge accepted the plaintiffs' evidence that they would not have
contracted to purchase the business without verification of the figures by
the accountants. But he was not satisfied that they would not still have
bought the business even if the correct figures had been supplied, and
dismissed the action against both defendants.

    This court allowed the plaintiffs' appeal against both defendants.    F
Hobhouse L.J. gave the only reasoned judgment. In relation to the vendor,
he pointed out that for a plaintiff to succeed in the tort of deceit it was
necessary for him to prove (1) a fraudulent representation, (2) materiality
and (3) inducement. All three elements had been proved. The judge had
found that the representations did induce the plaintiffs to enter into the
transaction: they would not have done so without them. This was sufficient    G
proof of causation. Whether the plaintiffs would have entered into the
transaction if they had been told the truth was irrelevant.

    We are not concerned with this part of the decision, since the present
case is not one of fraud. But Hobhouse L.J. held that the position was the
same in relation to the accountants, who were charged with negligence
only. Here the question was not inducement but reliance. The relevant
question was simply whether the plaintiffs had entered into the contract    H
in reliance upon the figures contained in the accountants' letter. The judge
had answered that question in the affirmative: the plaintiffs would not
have entered into the contract if they had not been provided with the

CRITICAL

A letter. The causal relationship between the accountants' negligence and the plaintiffs' purchase was established. It was not necessary to consider whether the plaintiffs would have purchased the business if they had been supplied with the correct figures.

In the present case the society's claim is not for misrepresentation. Accordingly, questions of inducement and materiality are not relevant. Its claim lies in negligence, and the relevant concept is reliance. In considering

B the issue of causation in an action for negligence brought by a client against his solicitor it appears from *Downs v. Chappell* that it is necessary to distinguish between two different kinds of case.

Where a client sues his solicitor for having negligently failed to give him proper advice, he must show what advice should have been given and (on a balance of probabilities) that if such advice had been given he would

C not have entered into the relevant transaction or would not have entered into it on the terms he did. The same applies where the client's complaint is that the solicitor failed in his duty to give him material information. In *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113, which was concerned with a failure to give proper advice, the plaintiff was unable to establish this and his claim to damages for negligence failed. In *Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836,

D which was concerned with a failure to convey information, the plaintiff was able to establish that if it had been given the information it would have withdrawn from the transaction and its claim succeeded.

Where, however, a client sues his solicitor for having negligently given him incorrect advice or for having negligently given him incorrect information, the position appears to be different. In such a case it is

E sufficient for the plaintiff to prove that he relied on the advice or information, that is to say, that he would not have acted as he did if he had not been given such advice or information. It is not necessary for him to prove that he would not have acted as he did if he had been given the proper advice or the correct information. This was the position in *Downs v. Chappell* [1997] 1 W.L.R. 426.

In the present case the society makes complaints of both kinds. It

F alleges that the defendant negligently and in breach of his instructions failed to report the purchasers' proposed arrangements with the bank prior to completion. This is a claim of the first kind, and if it were all the society would have to establish that if it had been informed of those arrangements it would not have proceeded with the mortgage advance. But the defendant went further than this. He did not merely fail to report

G the arrangements to the society; he expressly represented to the society that no such arrangements existed. That brings the case within the second category. It follows from the decision of this court in *Downs v. Chappell* that it is sufficient for the society to prove that it relied on the representations in the report. Although the judge spoke in terms of inducement, he plainly found reliance. The society's procedures were designed to ensure that no cheque would be issued in the absence of a

H satisfactory report from its solicitor.

In my judgment we are bound by the decision in *Downs v. Chappell* to hold that the necessary causal link between the defendant's negligence and the mortgage advance was proved.

12

*Measure of damages*                                                    A

It does not, however, follow from the fact that the defendant's negligent statements caused the society to make the mortgage advance that the whole of the society's loss is attributable to his negligence. Having regard to the date of the advance, some part at least of the society's loss may well be attributable to the fall in property values which had occurred by the time that it was able to sell the property.                    B

In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191 the House of Lords ruled definitively on the correct measure of damages for the negligent provision of information on which the plaintiff relied in entering into a transaction from which loss resulted. The only speech was delivered by Lord Hoffmann. He distinguished between the measure of damages for (1) breach of a contractual warranty and (2) breach of a duty (whether contractual or tortious) to take care    C
(i) to give proper advice and (ii) to provide accurate information.

In the case of breach of warranty, the comparison is between the plaintiff's position as a result of entering into the transaction and what it would have been if the facts had been as warranted. The measure of damages is the extent to which the plaintiff would have been better off if the information had been right. In the case of a breach of duty to take    D
care the measure of damages is the extent to which the plaintiff is worse off because the information was wrong. Since he entered into the transaction in reliance on the advice or information given to him by the defendant, the starting point is to compare his position as a result of entering into the transaction with what it would have been if he had not entered into the transaction at all.

But that is only the starting point. Lord Hoffmann distinguished    E
between a duty to advise someone as to what course of action he should take and a duty to provide information for the purpose of enabling someone else to decide upon his course of action. In the former case, the defendant is liable for all the foreseeable consequences of the action being taken. In the latter case, however, he is responsible only for the consequences of the information being wrong. The measure of damages is    F
not necessarily the full amount of the loss which the plaintiff has suffered by having entered into the transaction but only that part if any of such loss as is properly attributable to the inaccuracy of the information. If the plaintiff would have suffered the same loss even if the facts had actually been as represented the defendant is not liable.

Accordingly, in this class of case the plaintiff must prove two things: first, that he has suffered loss; and, secondly, that the loss fell within the    G
scope of the duty he was owed. In the present case the society must prove what (if any) loss was occasioned by the arrangements which the purchasers had made with the bank.

The society was told that Mr. and Mrs. Towers had no other indebtedness and that no second charge was contemplated. The existence of the second charge did not affect the society's security. The absence of any indebtedness to the bank would not have put money in the purchasers'    H
pocket; it would merely have reduced their liabilities. Whether their liability to the bank affected their ability to make mortgage repayments to the society has yet to be established, but given the smallness of the liability

13

Ch.    **Bristol and West Building Society v. Mothew (C.A.)**    Millett L.J.

A    its effect on the purchasers' ability to meet their obligations to the society may have been negligible. It may even be, for example, that the purchasers made no payments at all to the bank at the relevant time, and if so it is difficult to see how any part of the loss suffered by the society can be attributable to the inaccuracy of the information supplied to it by the defendant. It would have occurred even if the information had been correct.

B

*Conclusion*

The society has proved the causal link between the defendant's negligence and the making of the mortgage advance but it has not yet established the amount of its loss (if any) which is properly attributable C    to the defendant's negligence. Damages remain to be assessed. We are bound by the decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426 to hold that the society will not have to prove that it would not have made the mortgage advance if it had known the true facts; but it will be required to establish what it has lost as a result of the existence of the second charge and the purchasers' indebtedness to the bank. It can maintain the money judgment which it has obtained below only if it can D    invoke equitable principles.

*The claims in equity*

*The judge's reasoning*

The judge found that, in the events which happened, the defendant E    committed a breach of trust by applying the mortgage advance in the purchase of the property, that he was accordingly liable to restore the trust property, viz. the £59,000 with interest less receipts, that no question of damages at common law or of compensation for loss arose, and that it was irrelevant whether, had it been told of the position, the society might still have chosen to make the advance notwithstanding the arrangements F    which had been made with the bank. Accordingly the judge concluded that there was no question or issue to be tried in the action and gave summary judgment for the whole of the society's claim.

The judge's conclusion that the defendant had committed a breach of trust in applying the mortgage advance in the purchase of the property was based on the fact that he had obtained payment of the mortgage advance by misrepresentation. The judge said:
G

"it seems to me beyond argument that [the defendant] received the cheque . . . for £59,000 as a direct result of the misleading report which he had supplied to the society on 2 August 1988. The money was paid to the defendant . . . as a result of a misrepresentation made to the society by the defendant. . . . *The effect, in my judgment, was that from the moment when [the] cheque for £59,000 was received* H    *by [the defendant] he held it upon a constructive trust to return it forthwith to the society, unless authorised by the society to retain, or dispose of, it after a full knowledge of the facts had been disclosed."* (My emphasis.)

14

Millett L.J.        **Bristol and West Building Society v. Mothew (C.A.)**        **[1998]**

In the judge's opinion it necessarily followed that the defendant's
subsequent application of the mortgage money in the purchase of the
property constituted a breach of trust. He said:

> "In making that payment there is, in my view, no doubt that the
> defendant acted in breach of the trust which had been imposed upon
> him by the circumstances in which he had received the society's
> cheque. That trust required him to return the £59,000 to the society.
> Any payment of that £59,000 to a third party, albeit to the vendors
> of the property, was a breach of that trust."

The judge dismissed the submission that the society had to establish that
it would not have made the advance if it had known the facts. He said:

> "But that point affords no defence to the [society]'s claim. It is
> nihil ad rem that if the true position had been disclosed to the society,
> the society might or might not have issued an amended offer of
> advance. Liability to repay arises in this case because [the defendant]
> received money from the society as a result of his own
> misrepresentation. He cannot be heard to say that he could retain
> that money against the society, or dispose of it to the vendors,
> because, in other circumstances, the society might have chosen to
> make the advance notwithstanding the borrowing from [the bank]."

The judge did not explain why the consequence of the defendant's
misrepresentation was that he held the mortgage advance on a constructive
trust for the society, or why the defendant's authority to apply the money
in accordance with the society's instructions was determined, but he took
the opportunity to do so when he revisited these questions a few months
later in *Bristol and West Building Society v. May May & Merrimans* [1996]
2 All E.R. 801 after two county court judges had declined to follow his
decision in the present case. The later case involved a number of
transactions in which the same society had made mortgage advances and
suffered loss when the borrowers defaulted which it sought to recover
from the solicitors who had acted for both parties to the lending
transactions. In some cases the solicitor knew nothing, prior to the receipt
of the cheque for the mortgage advance, which ought to have led him to
qualify his report, though he discovered the facts afterwards and before
he disbursed the money on completion. In other cases the solicitor's
breach of his instructions preceded his receipt of the mortgage advance,
as it did in the present case.

The judge distinguished between the two groups of cases. In relation
to the first group he reluctantly felt compelled by the decision in *Target
Holdings Ltd. v. Redferns* [1996] A.C. 421 to conclude that, at least for the
purpose of an application for summary judgment, it was necessary for the
society to show that it would not have proceeded with the transaction if it
had known the facts. In relation to the second group, however, where the
society paid the cheque for the mortgage advance to the solicitor in
response to a request based upon a warranty or representation which (as
the judge put it) the solicitor "knew or must be taken to have known" to
be misleading, he confirmed his previous decision in the present case. He
held that the society was entitled to succeed in such cases whether or not
it would have still made the advance if it had known the facts.

Ch.                **Bristol and West Building Society v. Mothew (C.A.)**                Millett L.J.

A     In the course of his judgment the judge explained how the constructive trust in question arose. It was, he said, because the solicitor had given misleading information to his client. This constituted a breach of fiduciary duty which enabled the court to impose a constructive trust on the property acquired as a result of the breach of duty. He said [1996] 2 All E.R. 801, 818:

B     "where moneys have been received by the solicitor from the society following a request based upon a warranty or representation which he knew, or must be taken to have known, to be misleading in some material respect, equity will give a remedy in respect of any loss which the society may suffer as a result of its payment in reliance upon that request. That will be a remedy based upon breach of fiduciary duty and may, where necessary, take the form of the

C     imposition of a constructive trust on those moneys to enforce the solicitor's obligation to return them to the society forthwith. The constructive trust imposed by equity to enforce the obligation to make immediate restitution overrides any express or implied trust which might otherwise arise out of any instructions given by [the society] when the money is paid to the solicitor. No reliance can be

D     placed on . . . those instructions, because they are vitiated by the breach of duty by which they were obtained. . . . In the absence of some fresh instructions, given by the society after full disclosure of the matters in respect of which it has been misled, the only course properly open to the solicitor is to repay the moneys to the society with interest."

E     The judge evidently considered himself to be imposing a remedial constructive trust as the appropriate remedy for a prior breach of fiduciary duty.

    The judge's references to the solicitor having made a representation which "he knew, or must be taken as having known" to be misleading is not an accurate description of the facts of the present case. It is not alleged that the defendant "knew or must be taken to have known" the

F     facts, but only that he "knew or ought to have known" them, which is a very different matter. In explaining his decision in the present case the judge said that the defendant's misrepresentation could not be described as innocent because he "clearly had the knowledge which made the representation false:" see [1996] 2 All E.R. 801, 832. That confuses knowledge with the means of knowledge. On the society's pleaded case

G     the defendant must be taken to have known the facts at one time but to have forgotten or overlooked them so that they were not present to his mind when he came to complete his report to the society.

    It is not alleged that the defendant deliberately concealed the arrangements which the purchasers had made with their bank from the society or that he consciously intended to mislead it. Nothing in this judgment is intended to apply to such a case. My observations are

H     confined to the case like the present where the provision of incorrect information by a solicitor to his client must be taken to have been due to an oversight. In such a case his breach of duty is unconscious; he will ex hypothesi be unaware of the fact that he has committed a breach of his

16
Millett L.J.          **Bristol and West Building Society v. Mothew (C.A.)**          **[1998]**

instructions; and if this means that his subsequent application of the        A
mortgage money constitutes a breach of trust then it will be a breach of a
trust of which he is unaware. I would not willingly treat such conduct as
involving a breach of trust or misapplication of trust money unless
compelled by authority to do so, and in my judgment neither principle
nor authority compels such a conclusion.

Before us the defendant submits that, while he was guilty of negligence
and breach of contract, he was not guilty of a breach of trust or fiduciary        B
duty. It is convenient to take first the question of fiduciary duty, and then
to consider the question of breach of trust.

*Breach of fiduciary duty*

Despite the warning given by Fletcher Moulton L.J. in *In re Coomber;*
*Coomber v. Coomber* [1911] 1 Ch. 723, 728, this branch of the law has        C
been bedevilled by unthinking resort to verbal formulae. It is therefore
necessary to begin by defining one's terms. The expression "fiduciary
duty" is properly confined to those duties which are peculiar to fiduciaries
and the breach of which attracts legal consequences differing from those
consequent upon the breach of other duties. Unless the expression is so
limited it is lacking in practical utility. In this sense it is obvious that not        D
every breach of duty by a fiduciary is a breach of fiduciary duty. I would
endorse the observations of Southin J. in *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362:

> "The word 'fiduciary' is flung around now as if it applied to all
> breaches of duty by solicitors, directors of companies and so
> forth. . . . That a lawyer can commit a breach of the special duty [of
> a fiduciary] . . . by entering into a contract with the client without        E
> full disclosure . . . and so forth is clear. But to say that simple
> carelessness in giving advice is such a breach is a perversion of
> words."

These remarks were approved by La Forest J. in *LAC Minerals Ltd. v.*
*International Corona Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 where
he said: "not every legal claim arising out of a relationship with fiduciary        F
incidents will give rise to a claim for breach of fiduciary duty."

It is similarly inappropriate to apply the expression to the obligation
of a trustee or other fiduciary to use proper skill and care in the discharge
of his duties. If it is confined to cases where the fiduciary nature of the
duty has special legal consequences, then the fact that the source of the
duty is to be found in equity rather than the common law does not make        G
it a fiduciary duty. The common law and equity each developed the duty
of care, but they did so independently of each other and the standard of
care required is not always the same. But they influenced each other, and
today the substance of the resulting obligations is more significant than
their particular historic origin. In *Henderson v. Merrett Syndicates Ltd.*
[1995] 2 A.C. 145, 205 Lord Browne-Wilkinson said:

> "The liability of a fiduciary for the negligent transaction of his duties        H
> is not a separate head of liability but the paradigm of the general
> duty to act with care imposed by law on those who take it upon
> themselves to act for or advise others. Although the historical

17

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A    development of the rules of law and equity have, in the past, caused
different labels to be stuck on different manifestations of the duty, in
truth the duty of care imposed on bailees, carriers, trustees, directors,
agents and others is the same duty: it arises from the circumstances
in which the defendants were acting, not from their status or
description. It is the fact that they have all assumed responsibility for
the property or affairs of others which renders them liable for the
B    careless performance of what they have undertaken to do, not the
description of the trade or position which they hold."

I respectfully agree, and endorse the comment of Ipp J. in *Permanent
Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 157:

"It is essential to bear in mind that the existence of a fiduciary
C    relationship does not mean that every duty owed by a fiduciary to the
beneficiary is a fiduciary duty. In particular, a trustee's duty to
exercise reasonable care, though equitable, is not specifically a
fiduciary duty . . ."

Ipp J. explained, at p. 158:

"The director's duty to exercise care and skill has nothing to do
D    with any position of disadvantage or vulnerability on the part of the
company. It is not a duty that stems from the requirements of trust
and confidence imposed on a fiduciary. In my opinion, that duty is
not a fiduciary duty, although it is a duty actionable in the equitable
jurisdiction of this court. . . . I consider that Hamilton owed P.B.S. a
duty, both in law and in equity, to exercise reasonable care and skill,
and P.B.S. was able to mount a claim against him for breach of the
E    legal duty, and, in the alternative, breach of the equitable duty. For
the reasons I have expressed, in my view the equitable duty is not to
be equated with or termed a 'fiduciary' duty."

I agree. Historical support for this analysis may be found in Viscount
Haldane L.C.'s speech in *Nocton v. Lord Ashburton* [1914] A.C. 932, 956.
F    Discussing the old bill in Chancery for equitable compensation for breach
of fiduciary duty, he said that he thought it probable that a demurrer for
want of equity would always have lain to a bill which did no more than
seek to enforce a claim for damages for negligence against a solicitor.

In my judgment this is not just a question of semantics. It goes to the
very heart of the concept of breach of fiduciary duty and the availability
of equitable remedies.

G    Although the remedy which equity makes available for breach of the
equitable duty of skill and care is equitable compensation rather than
damages, this is merely the product of history and in this context is in my
opinion a distinction without a difference. Equitable compensation for
breach of the duty of skill and care resembles common law damages in
that it is awarded by way of compensation to the plaintiff for his loss.
There is no reason in principle why the common law rules of causation,
H    remoteness of damage and measure of damages should not be applied by
analogy in such a case. It should not be confused with equitable
compensation for breach of fiduciary duty, which may be awarded in lieu
of rescission or specific restitution.

18

Millett L.J.        **Bristol and West Building Society v. Mothew (C.A.)**        [1998]

    This leaves those duties which are special to fiduciaries and which    A
attract those remedies which are peculiar to the equitable jurisdiction and
are primarily restitutionary or restorative rather than compensatory.
A fiduciary is someone who has undertaken to act for or on behalf of
another in a particular matter in circumstances which give rise to a
relationship of trust and confidence. The distinguishing obligation of a
fiduciary is the obligation of loyalty. The principal is entitled to the single-
minded loyalty of his fiduciary. This core liability has several facets.    B
A fiduciary must act in good faith; he must not make a profit out of his
trust; he must not place himself in a position where his duty and his
interest may conflict; he may not act for his own benefit or the benefit of
a third person without the informed consent of his principal. This is not
intended to be an exhaustive list, but it is sufficient to indicate the nature
of fiduciary obligations. They are the defining characteristics of the    C
fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations*
(1977), p. 2, he is not subject to fiduciary obligations because he is a
fiduciary; it is because he is subject to them that he is a fiduciary.

    (In this survey I have left out of account the situation where the
fiduciary deals with his principal. In such a case he must prove
affirmatively that the transaction is fair and that in the course of the
negotiations he made full disclosure of all facts material to the transaction.    D
Even inadvertent failure to disclose will entitle the principal to rescind the
transaction. The rule is the same whether the fiduciary is acting on his
own behalf or on behalf of another. The principle need not be further
considered because it does not arise in the present case. The mortgage
advance was negotiated directly between the society and the purchasers.
The defendant had nothing to do with the negotiations. He was instructed    E
by the society to carry out on its behalf a transaction which had already
been agreed.)

    The nature of the obligation determines the nature of the breach. The
various obligations of a fiduciary merely reflect different aspects of his
core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore,
connotes disloyalty or infidelity. Mere incompetence is not enough.
A servant who loyally does his incompetent best for his master is not    F
unfaithful and is not guilty of a breach of fiduciary duty.

    In the present case it is clear that, if the defendant had been acting for
the society alone, his admitted negligence would not have exposed him to
a charge of breach of fiduciary duty. Before us counsel for the society
accepted as much, but insisted that the fact that he also acted for the
purchasers made all the difference. So it is necessary to ask: "Why did the    G
fact that the defendant was acting for the purchasers as well as for
the society convert the defendant's admitted breach of his duty of skill
and care into a breach of fiduciary duty?" To answer this question it is
necessary to identify the fiduciary obligation of which he is alleged to have
been in breach.

    It is at this point, in my judgment, that the society's argument runs
into difficulty. A fiduciary who acts for two principals with potentially    H
conflicting interests without the informed consent of both is in breach of
the obligation of undivided loyalty; he puts himself in a position where
his duty to one principal *may* conflict with his duty to the other: see *Clark*

19

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A    *Boyce v. Mouat* [1994] 1 A.C. 428 and the cases there cited. This is sometimes described as "the double employment rule." Breach of the rule automatically constitutes a breach of fiduciary duty. But this is not something of which the society can complain. It knew that the defendant was acting for the purchasers when it instructed him. Indeed, that was the very reason why it chose the defendant to act for it. The potential conflict was of the society's own making: see *Finn, Fiduciary Obligations*, p. 254
B    and *Kelly v. Cooper* [1993] A.C. 205.

It was submitted on behalf of the society that this is irrelevant because the defendant misled the society. It did not know of the arrangements which the purchasers had made with their bank, and so could not be said to be "fully informed" for the purpose of absolving the defendant from the operation of the double employment rule. The submission is
C    misconceived. The society knew all the facts relevant to its choice of solicitor. Its decision to forward the cheque for the mortgage advance to the defendant and to instruct him to proceed was based on false information, but its earlier decision to employ the defendant despite the potentially conflicting interest of his other clients was a fully informed decision.

D    That, of course, is not the end of the matter. Even if a fiduciary is properly acting for two principals with potentially conflicting interests he must act in good faith in the interests of each and must not act with the intention of furthering the interests of one principal to the prejudice of those of the other: see *Finn*, p. 48. I shall call this "the duty of good faith." But it goes further than this. He must not allow the performance of his obligations to one principal to be influenced by his relationship with
E    the other. He must serve each as faithfully and loyally as if he were his only principal.

Conduct which is in breach of this duty need not be dishonest but it must be intentional. An unconscious omission which happens to benefit one principal at the expense of the other does not constitute a breach of fiduciary duty, though it may constitute a breach of the duty of skill and
F    care. This is because the principle which is in play is that the fiduciary must not be inhibited by the existence of his other employment from serving the interests of his principal as faithfully and effectively as if he were the only employer. I shall call this "the no inhibition principle." Unless the fiduciary is inhibited or believes (whether rightly or wrongly) that he is inhibited in the performance of his duties to one principal by reason of his employment by the other his failure to act is not attributable
G    to the double employment.

Finally, the fiduciary must take care not to find himself in a position where there is an *actual* conflict of duty so that he cannot fulfil his obligations to one principal without failing in his obligations to the other: see *Moody v. Cox and Hatt* [1917] 2 Ch. 71; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453. If he does, he may have no
H    alternative but to cease to act for at least one and preferably both. The fact that he cannot fulfil his obligations to one principal without being in breach of his obligations to the other will not absolve him from liability. I shall call this "the actual conflict rule."

20
Millett L.J.        Bristol and West Building Society v. Mothew (C.A.)        [1998]

In the present case the judge evidently thought that the defendant was    A
in breach of both the duty of good faith and the actual conflict rule. In
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All
E.R. 801, 817–818 he said:

> "there can be no doubt that the requirement of unconscionable
> conduct is present where a solicitor who is acting for both borrower
> and lender misrepresents to the lender some fact *which he knows, or*    B
> *must be taken to know,* will or may affect the lender's decision to
> proceed with the loan. In those circumstances the solicitor *is abusing*
> *his fiduciary relationship with one client, the lender, to obtain an*
> *advantage for his other client, the borrower.* It is as much 'against the
> dictates of conscience' for a solicitor *knowingly to prefer the interests*
> *of one client over those of another client* as it is for him to prefer his
> own interests over those of his client." (My emphasis.)    C

I respectfully agree; but no such allegation is made in the present case.
As to the actual conflict rule, the judge said, at p. 832:

> "First, in *Mothew,* the 'agent' was a fiduciary who had put himself in
> a position in which his duty to the lender *was* in conflict with the
> interests of his other client, the borrower." (My emphasis.)    D

I do not accept this. By instructing him to act for them, the purchasers
must be taken to have authorised the defendant to complete the report
without which the mortgage advance would not have been forthcoming;
and to complete it truthfully. The defendant was required by the society
to report on the purchasers' title as well as to confirm the absence of any
further borrowing. The two stood in exactly the same case. The defendant    E
would not have been in breach of his duty to the purchasers if he had
disclosed the facts to the society any more than if he had reported a defect
in their title.

This proposition can be tested by considering what the defendant's
position would have been if he had acted for the purchasers and another
solicitor had been instructed to act for the society. He would have been    F
required to deduce the purchasers' title to the satisfaction of the society's
solicitor, and to confirm to him that no further borrowing or second
charge was in contemplation. His duty to the purchasers would have
required him to ascertain the facts from them and to report them to
the society. Unless they told him the facts and instructed him to lie to the
society, instructions which he would be bound to refuse, his duty to the
purchasers would not inhibit him in providing full and truthful information    G
to the solicitor acting for the society.

In my judgment, the defendant was never in breach of the actual
conflict rule. It is not alleged that he acted in bad faith or that he
deliberately withheld information because he wrongly believed that his
duty to the purchasers required him to do so. He was not guilty of a
breach of fiduciary duty.

The judge relied on *Nocton v. Lord Ashburton* [1914] A.C. 932 and    H
*Commonwealth Bank of Australia v. Smith,* 102 A.L.R. 453 to hold that a
party who pays money to his solicitor in reliance on a representation
*known* by the solicitor to be false has a remedy for breach of fiduciary

Case 23-50437-JTD    Doc 33-9    Filed 10/27/23    Page 56 of 139

21
Ch.        Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A    duty. Neither case is authority for the proposition (though its correctness is not in issue); certainly neither is authority for the proposition that a party who pays money to a solicitor in reliance on a representation which the solicitor *ought to have known* to be false has such a remedy.

     In *Nocton v. Lord Ashburton* [1914] A.C. 932 a solicitor had an undisclosed personal interest in a transaction on which he gave his client

B   advice which was to his own advantage and the disadvantage of his client. The plaintiff pleaded breach of the duty of good faith. In fact this was unnecessary; the existence of the defendant's undisclosed interest was enough: see *Lewis v. Hillman* (1852) 3 H.L.Cas. 607. The plaintiff was entitled to receive, and thought that he was receiving, the disinterested advice of a solicitor with no other interest in the transaction.

C   *Commonwealth Bank of Australia v. Smith,* 102 A.L.R. 453 involved a breach of the actual conflict rule. The defendant, who was acting for both parties to a proposed transaction, placed himself in an impossible position by undertaking to advise one of them on the merits of the transaction.

     In *Moody v. Cox and Hatt* [1917] 2 Ch. 71 a solicitor, who was acting for both vendor and purchaser, was in possession of valuations which showed that the property was not worth the price which the purchaser

D   had agreed to pay. He did not disclose them to the purchaser, and claimed that his duty to the vendor precluded him from doing so. The purchaser was allowed to rescind. The case bears a superficial resemblance to the present but there are two crucial differences: (i) the vendor was under no obligation to disclose the valuations to the purchaser and did not wish his solicitor do so; and (ii) the vendor and the solicitor tacitly agreed to

E   conceal the valuations from the purchaser. The solicitor was in breach of both the duty of good faith and the actual conflict rule; his defence fell foul of the no inhibition principle.

     That was a case of deliberate concealment. Non-disclosure and concealment are two very different things. This has been a truism of the law from the time of Cicero (De Officiis, lib. 3, c. 12, 13 citing Diogenes

F   of Babylon). It is even enshrined, like other such truisms, in a Latin tag: aliud est celare, aliud tacere.

     The society placed much reliance on a dictum by Lord Jauncey of Tullichettle in *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437 where he said:

> "Another case of breach [of fiduciary duty] is where a solicitor acts for both parties to a transaction without disclosing this to one of
G   them *or where having disclosed it he fails, unbeknown to one party, to disclose to that party material facts relative to the other party of which he is aware.*" (My emphasis.)

     But I do not think that Lord Jauncey meant to include an inadvertent failure which owes nothing to the double employment. Where such failure

H   is to the advantage of the other party, the court will jealously scrutinise the facts to ensure that there has been nothing more than inadvertence, but there can be no justification for treating an unconscious failure as demonstrating a want of fidelity.

22

Millett L.J.        Bristol and West Building Society v. Mothew (C.A.)        [1998]

In my judgment the distinction drawn by Ipp J. in *Permanent Building*    A
*Society v. Wheeler*, 14 A.C.S.R. 109 is sound in principle and is decisive
of the present case. On the society's pleaded case the fact that the
defendant was acting for the purchasers played no part in his failure to
report the true state of affairs to the society. It did not inhibit him from
fulfilling his obligations to the society. It is consistent with its pleaded case
that the defendant would have done so but for a negligent oversight. It
would have been exactly the same if he had failed to notice and report the    B
existence of a defect in the purchasers' title. To characterise either such
failure as a breach of fiduciary duty because he was acting for both parties
in a situation where that fact did not contribute to his failure is, in my
opinion, to substitute a verbal formula for principle.

In my judgment the judge's conclusion that the defendant was in
breach of fiduciary duty cannot be supported. It follows that it cannot be    C
sustained as a ground for holding the defendant in breach of a constructive
trust of the mortgage money.

### Breach of trust

It is not disputed that from the time of its receipt by the defendant the
mortgage money was trust money. It was client's money which belonged    D
to the society and was properly paid into a client account. The defendant
never claimed any beneficial interest in the money which remained
throughout the property of the society in equity. The defendant held it in
trust for the society but with the society's authority (and instructions) to
apply it in the completion of the transaction of purchase and mortgage of
the property. Those instructions were revocable but, unless previously
revoked, the defendant was entitled and bound to act in accordance with    E
them.

The society's instructions were not revoked before the defendant acted
on them, and in my judgment there was no ground upon which the judge
could properly conclude that his authority to apply the money in
completing the transaction had determined.

If his judgment in the present case is considered without the benefit of    F
his later explanation in *Bristol and West Building Society v. May May*
*& Merrimans* [1996] 2 All E.R. 801, it would appear that the judge was of
opinion that the defendant's authority to deal with the money was
automatically vitiated by the fact that it (and the cheque itself) was
obtained by misrepresentation. But that is contrary to principle.
Misrepresentation makes a transaction voidable not void. It gives the
representee the right to elect whether to rescind or affirm the transaction.    G
The representor cannot anticipate his decision. Unless and until the
representee elects to rescind the representor remains fully bound. The
defendant's misrepresentations merely gave the society the right to elect to
withdraw from the transaction on discovering the truth. Since its
instructions to the defendant were revocable in any case, this did not
materially alter the position so far as he was concerned, though it may
have strengthened the society's position in relation to the purchasers.    H

The right to rescind for misrepresentation is an equity. Until it is
exercised the beneficial interest in any property transferred in reliance on
the representation remains vested in the transferee. In *El Ajou v. Dollar*

Case 23-50437-JTD    Doc 33-9    Filed 10/27/23    Page 58 of 139

23
Ch.                    Bristol and West Building Society v. Mothew (C.A.)              Millett L.J.

A  *Land Holdings Plc.* [1993] 3 All E.R. 717, 734 I suggested that on rescission the equitable title might revest in the representee retrospectively at least to the extent necessary to support an equitable tracing claim. I was concerned to circumvent the supposed rule that there must be a fiduciary relationship or retained beneficial interest before resort may be had to the equitable tracing rules. The rule would have been productive of the most extraordinary anomalies in that case, and its existence continually threatens

B  to frustrate attempts to develop a coherent law of restitution. Until the equitable tracing rules are made available in support of the ordinary common law claim for money had and received some problems will remain incapable of sensible resolution.

But all that is by the way. Whether or not there is a retrospective vesting for tracing purposes it is clear that on rescission the equitable title

C  does not revest retrospectively *so as to cause an application of trust money which was properly authorised when made to be afterwards treated as a breach of trust.* In *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 Lord Goff of Chieveley said, at p. 573:

"Of course, 'tracing' or 'following' property into its product involves a decision by the owner of the original property to assert his title to

D  the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it, but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. *Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, 307, *per* Cotton L.J.: 'an act lawful at the time of its performance [cannot]

E  be rendered unlawful, by the application of the doctrine of ratification.')"

In *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669 Lord Browne-Wilkinson expressly rejected the possibility that a recipient of trust money could be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, he was ignorant

F  of the existence of any trust. He said, at p. 705:

"Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case of an express or implied trust or, in the case of a constructive trust,

G  of the factors which are alleged to affect his conscience."

Mutatis mutandis that passage is directly applicable in the present case. The defendant knew that he was a trustee of the money for the society; but he did not realise that he had misled the society and could not know that his authority to complete had determined (if indeed it had). He could

H  not be bound to repay the money to the society so long as he was ignorant of the facts which had brought his authority to an end, for those are the facts which are alleged to affect his conscience and subject him to an obligation to return the money to the society.

Before us the society put forward a more sophisticated argument. The    A
defendant's instructions, it pointed out, expressly required him to report
the arrangements in question "to the society prior to completion." This, it
was submitted, made it a condition of the defendant's authority to
complete that he had complied with his obligation. Whether he knew it or
not, he had no authority to complete. It was not necessary for the society
to revoke his authority or withdraw from the transaction. I do not accept
this. The society's standing instructions did not clearly make the    B
defendant's authority to complete conditional on having complied with
his instructions. Whether they did so or not is, of course, a question of
construction, and it is possible that the society could adopt instructions
which would have this effect. But it would in my judgment require very
clear wording to produce so inconvenient and impractical a result. No
solicitor could safely accept such instructions, for he could never be    C
certain that he was entitled to complete.

In my judgment the defendant's authority to apply the mortgage
money in the completion of the purchase was not conditional on his
having first complied with his contractual obligations to the society, was
not vitiated by the misrepresentations for which he was responsible but of
which he was unaware, had not been revoked, and was effective to prevent
his payment being a breach of trust. Given his state of knowledge (and,    D
more importantly, that his authority had not been revoked), he had no
choice but to complete.

*Conclusion*

In my judgment the defendant was not guilty of breach of trust or
fiduciary duty. This makes it unnecessary to consider what the    E
consequences of such a breach would have been. I would allow the appeal
and set aside the money judgment. I would leave undisturbed the
judgments for damages to be assessed for breach of contract and
negligence, but make it clear that it does not follow that the society will
establish any recoverable loss.

OTTON L.J.  I have read with advantage the judgments of Staughton    F
and Millett L.JJ. I agree with the analysis and reasoning regarding breach
of trust and of fiduciary duty. I wish only to add a few words on the
extant common law claims.

I am satisfied that there was sufficient evidence before the judge to
establish negligence on the part of the defendant. There was the requisite
proximity between the parties, and there was foreseeability of damage.    G
Thus a duty of care arose. This duty included answering correctly such
questions as were posed by the proposed lender and which it was
reasonable for him to be required to answer. The answer sought was one
of fact and not opinion. The fact sought could have been supplied
accurately by information which was within his knowledge. If it was not
at his fingertips the information was either on file or could easily have
been obtained by direct inquiry of the intending purchaser. His breach of    H
duty occurred when he conveyed the inaccurate information to the
plaintiff. The duty was not simply a duty not to act carelessly; it was a
duty not to inflict damage carelessly. Damage is the gist of the action.

A    The more complex issues are whether the inaccurate information given was causative of damage, and if so what measure. To my mind it is not necessary to adopt a particular procedural path to find the answer. I appreciate that Lord Hoffmann suggests that it is first necessary to decide the kind of loss to which the plaintiff is entitled. This may be appropriate in most cases where negligence/causation is involved. From a practical point of view in some cases it may be more expedient to establish

B    the causal link between the negligent act or omission and the reliance by the plaintiff or the course of action which he was induced to take. The judge may find as a fact that there was no reliance or that the plaintiff would have behaved in the same or substantially the same manner if he had been given accurate information; in either event the negligence had no causative potency. That is the end of the matter. The chain is broken,

C    there is no loss at all and there is no need to consider or determine the kind of loss.

    In other cases it may be appropriate to identify the type or particular head of damage claimed. This may identify damage which is too remote and for which no remedy lies (e.g. economic loss), and the claim in respect of it fails in limine. As I concur that the damages award must now be set aside the issue of the measure of damage, if any, is now at large. I regard

D    the evidence (in particular the hearsay evidence of Ms Samantha Bennett at paragraph 29 of Mr. Prees's affidavit) as falling short of resolving the issues of causation or damage. It does not (for example) address the possibility of a revised offer if the accurate and full position had been explained to the plaintiff.

    I do not think it necessary to conclude whether there was a breach of

E    contract. This cause of action probably adds nothing to the case in negligence. It is unlikely that there is any practical difference between a breach of the duty of care and a breach of contract, or in the issues arising on causation, or the measure of damages. If there is any issue it can be determined by the trial judge. I also consider that there was no waiver.

    For these reasons I consider that there are triable issues and they should be determined by a judge at first instance.

F    I would therefore allow the appeal and remit the assessment of damages as proposed by Staughton L.J. and dismiss the respondent's notice.


    STAUGHTON L.J.  Mr. Mothew made his report to the Cheshunt

G    Building Society on 2 August 1988. In it he answered one of the questions asked as follows:

        "Q. Please confirm that (to the best of your knowledge and belief) the balance of the purchase money is being provided by the applicant(s) personally without resort to further borrowing. If not please give details. A. Confirmed."

H    That was untrue. There were other aspects of the same error, but I need not go into them in detail. Although Mr. Mothew had the means of knowledge in his possession, which could have brought the error to his attention, it is not said that he acted fraudulently or in bad faith.

26

Staughton L.J.        Bristol and West Building Society v. Mothew (C.A.)        [1998]

The ordinary remedy of a client who has received wrong information    A
or advice from his solicitor is to claim damages for negligence, whether as
a breach of contract or as a tort. For such a claim to give rise to
substantial damages the building society would have to show that the
breach of contract or negligence caused them loss. By their respondent's
notice they seek to say that, if they had known the true facts, they would
not have lent any money to Mr. and Mrs. Towers.

The judge regarded that point as immaterial, since the building society    B
succeeded on other grounds. If it is material, in my opinion it raises a
triable issue. According to Samantha Bennett of the society's advances
department, the offer of advance would have immediately been withdrawn
if the society had known that even £3,350 was being borrowed elsewhere.
In the nature of things Mr. Mothew is unlikely to have evidence which
directly controverts that statement. But there are grounds for supposing    C
that it may be open to question. I would not give judgment under R.S.C.,
Ord. 14 on the basis that it is true. If it is critical, the case must go to
trial, perhaps with the aid of interrogatories and discovery of documents.

However in this particular case the building society were not the sole
clients of Mr. Mothew; he was also the solicitor acting for Mr. and
Mrs. Towers. That is said to make all the difference, because Mr. Mothew    D
then became under a fiduciary duty to the building society. And the
argument is that for breach of fiduciary duty the remedy does not depend
on causation or remoteness; all that is necessary is that the loss would not
have occurred *but for* the breach of duty.

It seems to me wrong that a breach of contract or tort should become
a breach of fiduciary duty in that way. I am glad to find that the
authorities relied on by Millett L.J. show that it is wrong. In my judgment    E
Mr. Mothew was in breach of a duty of care and nothing more. True he
was in a situation where he owed duties to two clients, and those duties
might conflict with each other. But he did not prefer the interest of one
client to that of another; at most he was guilty of negligence which had
that unintended effect.

Alternatively it is said that Mr. Mothew was in breach of trust because    F
he paid away the trust fund contrary to his instructions. He did indeed
hold the £59,000 in trust; it was not his own money. There was in my
opinion an express or implied trust, and not (as the judge held) a
constructive trust. But he did not pay it away contrary to the society's
instructions. The cheque reached Mr. Mothew with a letter dated
23 August 1988, which in effect instructed him to use it for completion of    G
the proposed purchase. That was what he did.

There being in my opinion no breach of fiduciary duty or breach of
trust, it is unnecessary to consider what remedy such a breach might have
afforded.

Thus far the appeal succeeds, but there remains judgment on the cause
of action at common law for damages to be assessed. Mr. Sumption says
that even that must go, since there is a triable issue as to waiver by the    H
building society. The problem that he faces is that, although the building
society readily agreed when they were asked to consent to the registration
of the second charge, they are not shown to have known that the second

A  charge was contemplated and intended at the time of Mr. Mothew's report. There has been ample opportunity to produce evidence that they knew, if indeed they did. In my judgment there was no waiver.

When the argument before us was concluded on 21 May that was all that we had to decide. But we have since been asked to consider the judgment of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426 and B  the speech of Lord Hoffmann in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. Such has been the volume of litigation on the topic of loss to lenders following negligent professional advice and the collapse of the property market that judges risk being overtaken by new authority.

C  The Court of Appeal in the *Banque Bruxelles* case began with a reference to the well known principle that damages should be as nearly as possible the sum which would put the plaintiff in the position in which he would have been if he had not been injured. That would lead to two possible answers in the present case. (1) If there had been no report from Mr. Mothew to the building society, the money would not have been lent; the society would still have their £59,000. There would have been no transaction, a phrase which I use not as a label for anything but as a D  description of the fact. (2) If Mr. Mothew had provided an accurate report to the building society, then they might have been content to proceed on the terms previously proposed, or they might have made a revised offer, or they might have proceeded as in (1) above. There is a triable issue as to that. Left to myself, I would have ruled that (2) was the appropriate situation for the judge to consider in assessing the damages. E  But I have to acknowledge that Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426, with the agreement of Butler-Sloss and Roch L.JJ., preferred method (1), both for fraudulent misrepresentation and for negligence.

Lord Hoffmann, in the *Banque Bruxelles* case [1997] A.C. 191, 211, as it seems to me, considered that either method was the wrong place to F  begin:

> "Before one can consider the principle on which one should calculate the damages to which a plaintiff is entitled as compensation for loss, it is necessary to decide for what kind of loss he is entitled to compensation."

G  There follows an exposition of the problem and the answer to it, as set out in the judgment of Millett L.J.

For my part I feel that we should not at this stage purport to instruct the judge who has to assess the damages by a paraphrase or interpretation of that decision, for a number of reasons. First, we have not heard argument on it, and our judgment is already long delayed by intervening H  material. I am told it would be impractical for us to have a further hearing before October. Secondly, the judge has yet to find the facts relating to the assessment of damages. Thirdly, the judge must be guided by what Lord Hoffmann has said and not by any gloss of ours.

28

Staughton L.J.        Bristol and West Building Society v. Mothew (C.A.)        [1998]

I would allow the appeal and remit the assessment of damages, either          A
to Chadwick J. or to another judge of the Chancery Division as the
exigencies of business may require. The cross-appeal should be dismissed.

*Appeal allowed.*
*Cross-appeal dismissed.*

Solicitors: *Wansbroughs Willey Hargrave; Osborne Clarke, Bristol.*          B

[Reported by JILL SUTHERLAND, Barrister]

———————                                            C

[COURT OF APPEAL]

TURNER v. STEVENAGE BOROUGH COUNCIL                     D

1997  March 6                              Staughton, Pill and Mummery L.JJ.

*Arbitration—Arbitrator—Misconduct—Application to remove arbitra-*
*tor—Lengthy correspondence and preliminary proceedings—Arbitra-*
*tor proposing interim payment of fees and expenses—Payment*
*by one party only—Subsequent return of payment—Whether*        E
*misconduct—Whether arbitrator to be removed—Arbitration Act*
*1950 (14 & 15 Geo. 6, c. 27), s. 23*

In February 1993 an arbitrator was appointed to conduct
arbitration proceedings relating to a rent review between the
council, as landlords of a shop, and the tenant. The arbitrator's
terms of appointment contained no express provision for payment
of interim fees or expenses. The parties contemplated that the          F
arbitration would be concluded within about three months and
the arbitrator stated that the award would be made by 30 June
1993. In May 1994, after lengthy correspondence and five
preliminary hearings, the arbitration had still not concluded and
the arbitrator wrote to both parties suggesting a timetable for the
hearing and requesting payment by each party of half his interim
fees and expenses. The tenant objected and asked whether, if          G
payment were not made, the arbitrator would not hear the
arbitration. The arbitrator replied that the first priority was to fix
the hearing and to resolve the dispute, but that he hoped the
parties would agree that it was reasonable that he should receive
interim payment for time expended on the matter. The council
paid the sum to the arbitrator, but three months later, after
taking legal advice, he returned it. The tenant applied for the
arbitrator to be removed for misconduct under section 23 of the          H
Arbitration Act 1950[1] on the ground that he had no power to

[1] Arbitration Act 1950, s. 23: "(1) Where an arbitrator or umpire has misconducted
himself or the proceedings, the High Court may remove him."

# Exhibit E



## 229. Express trusts.

Halsbury's Laws of England  >  Equitable Jurisdiction (Volume 47 (2021))  >  7. Equitable Relief in Cases of Fiduciary Relationship  >  (1) Trustees and Other Persons in Fiduciary Positions

# 7.    Equitable Relief in Cases of Fiduciary Relationship

# (1)    TRUSTEES AND OTHER PERSONS IN FIDUCIARY POSITIONS

# 229.    Express trusts.

Trusts may arise either by act of parties or by operation of law[1]. An express trust as regards land is a trust expressly declared by a deed, will or other written instrument[2]; as to personalty, other than leaseholds, an express trust may be created orally[3].

To constitute an express trust three matters must be defined:

    (1)    the property subject to the trust;

    (2)    the persons or objects to be benefited; and

    (3)    the interests which they are to take[4].

It is not necessary to use the word 'trust'[5]; and the trust is express even if it has to be made out from all the terms of the instrument[6], although the courts are less ready now than formerly to construe words of recommendation as creating a precatory trust[7]. It is usually sufficient, to establish the relation of trustee and beneficiary, to prove that the legal title is in one person and the equitable title in another[8].

An express trust of real estate must, by statute[9], be manifested and proved by some writing signed by the person creating it, but, on the principle that equity will not allow a statute to be used as an instrument of fraud[10], where a person fraudulently denies that land was conveyed to him as a trustee, oral evidence is admissible to show that he holds upon a trust and to show the trust upon which he holds[11].

---

    1       As to express trusts see  **trusts and powers** vol 98 (2019) para 59 et seq.

    2       *Petre v Petre* (1853) 1 Drew 371 at 393; *Cunningham v Foot* (1878) 3 App Cas 974 at 984. The effect of the Land Transfer Act 1897 ss 1, 2 (repealed) was to impose an express trust on the personal representatives in respect of real estate: *Toates v Toates* [1926] 2 KB 30. As regards the present law see *Re Ponder, Ponder v Ponder* [1921] 2 Ch 59; *Re Yerburgh, Yerburgh v Yerburgh* [1928] WN 208; *Harvell v Foster* [1954] 2 QB 367, [1954] 2 All ER 736, CA; *Re*

## 229. Express trusts.

*Cockburn's Will Trusts, Cockburn v Lewis* [1957] Ch 438, [1957] 2 All ER 522. See also **deeds and other instruments**; **wills and intestacy**.

**3**    *Harris v Truman* (1881) 7 QBD 340 at 356 (on appeal (1882) 9 QBD 264, CA); *Sands v Thompson* (1883) 22 ChD 614.

**4**    *Malim v Keighley* (1794) 2 Ves 333 at 335 (on appeal (1795) 2 Ves 529); *Knight v Knight* (1840) 3 Beav 148 at 173 (on appeal sub nom *Knight v Boughton* (1844) 11 Cl & Fin 513).

**5**    *Charitable Donations and Bequests Comrs v Wybrants* (1845) 2 Jo & Lat 182 at 189.

**6**    *Re Williams, Williams v Williams* [1897] 2 Ch 12 at 27, CA. A precatory trust is sometimes regarded as an example of an implied trust.

**7**    *Lambe v Eames* (1871) 6 Ch App 597 at 599; cf *Re Hanbury, Hanbury v Fisher* [1904] 1 Ch 415, CA (revsd sub nom *Comiskey v Bowring-Hanbury* [1905] AC 84, HL); *Re Steele's Will Trusts, National Provincial Bank Ltd v Steele* [1948] Ch 603, [1948] 2 All ER 193.

**8**    *Hardoon v Belilios* [1901] AC 118 at 123, PC. The trustee may himself have only an equitable interest, as where eg a trust fund is settled by the beneficiary by way of derivative settlement: see *Stephens v Green, Green v Knight* [1895] 2 Ch 148, CA; and **trusts and powers** vol 98 (2019) para 1.

**9**    Ie under the Law of Property Act 1925 s 53(1)(b) (replacing the Statute of Frauds (1677) s 7): see **trusts and powers** vol 98 (2019) para 59.

**10**    See PARA 117.

**11**    *Rochefoucauld v Boustead* [1897] 1 Ch 196, CA; *Hodgson v Marks* [1971] Ch 892, [1970] 3 All ER 513 per Ungoed-Thomas J (revsd but not on this point [1971] Ch 892 at 918, [1971] 2 All ER 684, CA); but see *Bannister v Bannister* [1948] 2 All ER 133, CA; *Re Densham (a bankrupt), ex p Trustee of the Bankrupt v Densham* [1975] 3 All ER 726 at 732, [1975] 1 WLR 1519 at 1525 per Goff J; *Ashburn Anstalt v Arnold* [1989] Ch 1, [1988] 2 All ER 147, CA (overruled on a different point by *Prudential Assurance Co Ltd v London Residuary Body* [1992] 2 AC 386, [1992] 3 All ER 504, HL). See further **trusts and powers** vol 98 (2019) para 116.

---

**End of Document**



# 230. Constructive trusts.

A constructive trust arises when, although there is no express trust affecting specific property, equity considers that the legal owner should be treated as a trustee of an interest in it for another[1]. This happens, for example, where one who is already a trustee takes advantage of his position to obtain a new legal interest in the property[2], as where a trustee of leaseholds takes a new lease in his own name[3], or acquires the freehold reversion[4]. It also happens where a fiduciary has profited in breach of fiduciary duty, where the profit is held on constructive trust for the principal[5]. Under a contract for the sale of land the vendor is a constructive trustee for the purchaser from exchange of contracts until completion[6].

The term 'constructive trust' has also been used to describe two other entirely different situations[7]. The first applies to cases where the defendant, though not expressly appointed as trustee, has assumed the duties of a trustee by a lawful transaction which was independent of and preceded the breach of trust and is not impeached by the claimant, who asserts that the circumstances in which the defendant obtained control make it unconscionable for him thereafter to assert a beneficial interest in the property. In these cases the constructive trustee really is a trustee. The second class of case arises when the defendant is implicated in a fraud. Equity has always given relief against fraud by making any person sufficiently implicated in the fraud accountable in equity. Such a person is traditionally called a 'constructive trustee' though he is not in fact a trustee at all, even though he may be liable to account as if he were. If he receives the property at all it is adversely to the claimant by an unlawful transaction which is impugned by the claimant. The expression 'constructive trust' in this situation has been judicially described as nothing more than a formula for equitable relief[8]. Well-established cases relate to the liability of a person as a knowing recipient of trust property or its traceable proceeds[9], or where a stranger dishonestly assisted a trustee's breach of trust or a fiduciary's breach of fiduciary duty[10].

---

1    *Hussey v Palmer* [1972] 3 All ER 744 at 747, [1972] 1 WLR 1286 at 1290, CA, per Lord Denning MR. See also *Binions v Evans* [1972] Ch 359, [1972] 2 All ER 70, CA (trust imposed on a purchaser to protect the rights of a contractual licensee where the sale is subject to the licence); *Ashburn Anstalt v Arnold* [1989] Ch 1, [1988] 2 All ER 147, CA (overruled on a different point by *Prudential Assurance Co Ltd v London Residuary Body* [1992] 2 AC 386, [1992] 3 All ER 504, HL); *Melbury Road Properties 1995 Ltd v Kreidi* [1999] 3 EGLR 108, [1999] 43 EG 457, West London county court. The rule has been said to be based on public policy: *Griffin v Griffin* (1804) 1 Sch & Lef 352 at 354; *Blewett v Millett* (1774) 7 Bro Parl Cas 367. As to constructive trusts see **trusts and powers vol 98 (2019) para 114** et seq.

2    See *Pickering v Vowles* (1783) 1 Bro CC 197; *James v Dean* (1805) 11 Ves 383; subsequent proceedings (1808) 15 Ves 236.

230. Constructive trusts.

**3**    *Keech v Sandford* (1726) Cas *temp* King 61; *Rawe v Chichester* (1773) Amb 715 at 719.

**4**    *Protheroe v Protheroe* [1968] 1 All ER 1111, [1968] 1 WLR 519, CA; *Thompson's Trustee in Bankruptcy v Heaton* [1974] 1 All ER 1239, [1974] 1 WLR 605. Cf *Savage v Dunningham* [1974] Ch 181, [1973] 3 All ER 429.

**5**    See *A-G for Hong Kong v Reid* [1994] 1 AC 324, [1994] 1 All ER 1, PC (a fiduciary who accepts a bribe holds the bribe on constructive trust for the person injured by his breach of duty) (adopted in *FHR European Ventures LLP v Mankarious* [2014] UKSC 45, [2015] AC 250, [2014] 4 All ER 79); and PARA 236.

**6**    See eg *Green v Smith* (1738) 1 Atk 572 at 573 per Lord Hardwicke LC (the rule is 'that the vendor of the estate is, from the time of his contract, considered as a trustee for the purchaser'); *Shaw v Foster and Pooley* (1872) LR 5 HL 321 at 338per Lord Cairns; and  **conveyancing** vol 23 (2016) **paras** 190–191.

Since the real property legislation of 1925 a tenant for life of settled land is often a trustee and, by virtue of the legal estate being vested in him on trusts or by virtue of the Settled Land Act 1925 s 107 (see  **settlements** vol 91 (2019) **para 574**), an express trustee of the real estate or of his powers. As to the position before 1 January 1926 see *Re Biss, Biss v Biss* [1903] 2 Ch 40, CA (and the cases there cited). As to the relationship between tenant for life and remainderman see *Dicconson v Talbot* (1870) 6 Ch App 32; *Hickman v Upsall* (1876) 4 ChD 144, CA; and as to the fiduciary position of a person who enters on land belonging to a mentally disordered person, with knowledge of his rights and of his condition, see *Smyth v Byrne* [1914] 1 IR 53, CA. Subject to certain exceptions, no settlement created on or after 1 January 1997 is a settlement for the purposes of the Settled Land Act 1925: see the Trusts of Land and Appointment of Trustees Act 1996 ss 2, 27; and  **real property and registration** vol 87 (2022) **para 103**;  **settlements** vol 91 (2019) **para 475**.

**7**    See *Paragon Finance plc v DB Thakerar & Co (a firm)* [1999] 1 All ER 400 at 408–409, CA, per Millet LJ, who said it was regrettable that the same term is used to describe two different situations. See also *JJ Harrison (Properties) Ltd v Harrison* [2001] EWCA Civ 1467, [2002] 1 BCLC 162, [2001] All ER (D) 160 (Oct).

**8**    See *Selangor United Rubber Estates Ltd v Cradock (No 3)* [1968] 2 All ER 1073 at 1097, [1968] 1 WLR 1555 at 1582per Ungoed-Thomas J.

**9**    See *Bank of Credit and Commerce International (Overseas) Ltd (in liquidation) v Akindele* [2001] Ch 437, [2000] 4 All ER 221, CA; *Arthur v A-G of the Turks & Caicos Islands* [2012] UKPC 30, [2012] All ER (D) 164 (Aug).

**10**    See *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 at 382, [1995] 3 All ER 97 at 99–100, PC, per Lord Nicholls of Birkenhead, citing *Barnes v Addy* (1874) 3 Ch App 244; *Satnam Investments Ltd v Dunlop Heywood & Co Ltd* [1999] 3 All ER 652, [1999] 1 BCLC 385, CA; *Group Seven Ltd (a company incorporated under the laws of Malta) v Notable Services Ltd* [2019] EWCA Civ 614, [2020] Ch 129. See also  **trusts and powers** vol 98 (2019) **para 125**.

---

**End of Document**



# 231. Resulting trusts.

Halsbury's Laws of England  >  Equitable Jurisdiction (Volume 47 (2021))  >  7. Equitable Relief in Cases of Fiduciary Relationship  >  (1) Trustees and Other Persons in Fiduciary Positions

A resulting trust may arise solely by operation of law, as where, upon a purchase of land, one person provides the purchase money and the conveyance is taken in the name of another; there is then a presumption of a resulting trust in favour of the person providing the money, unless from the relation between the two, or from other circumstances, it appears that a gift was intended[1]. There is likewise a presumption of a resulting trust where there is a voluntary transfer of pure personalty into the name of another[2] or into the joint names of the grantor and another[3], but probably not in the case of a voluntary conveyance of land[4]. These two categories of purchase in the name of another and voluntary transfer into the name of another have been classified as 'presumed resulting trusts' because they depend upon the presumed intention of the grantor[5]. There is also another class of resulting trust, classified as an 'automatic resulting trust' because it does not depend on any intentions or presumptions, where the creation of a trust is express, although, in the events which happen, the beneficial destination of the property is undetermined. This is the case when there is an entire or partial failure of the objects of the trust, and then, to the extent of the failure, the benefit of the trust results automatically to the settlor or his representatives[6]. Where money is transferred to someone on agreement that it is to be used for a particular purpose and it is accepted that they will not be using it as their own, equity presumes the money is held on a resulting trust for the transferor if the purpose fails ('Quistclose trust')[7].

---

1   *Dyer v Dyer* (1788) 2 Cox Eq Cas 92 at 93 per Eyre CB; 2 White & Tud LC (9th Edn) 789; and see *Fung Ping Shan v Tong Shun* [1918] AC 403, PC; *Savage v Dunningham* [1974] Ch 181, [1973] 3 All ER 429 (A, B and C had shared the rent of a flat and A acquired a 62-year lease for which he paid a premium; A did not hold that lease on a resulting trust). As to resulting trusts see **trusts and powers** vol 98 (2019) **para 131** et seq.

2   *Fowkes v Pascoe* (1875) 10 Ch App 343 at 348; *Vandervell v IRC* [1967] 2 AC 291, [1967] 1 All ER 1, HL.

3   *Re Vinogradoff, Allen v Jackson* [1935] WN 68.

4   See the Law of Property Act 1925 s 60(3); and *Lohia v Lohia* [2001] EWCA Civ 1691, [2001] All ER (D) 375 (Oct).

5   *Re Vandervell's Trusts (No 2), White v Vandervell Trustees Ltd* [1974] Ch 269 at 287 et seq, [1974] 1 All ER 47 at 63 et seq per Megarry J; revsd without discussing this classification [1974] Ch 269 at 308, [1974] 3 All ER 205, CA.

6   *Salter v Cavanagh* (1838) 1 Dr & Wal 668; *Patrick v Simpson* (1889) 24 QBD 128. In *Vandervell v IRC* [1967] 2 AC 291, [1967] 1 All ER 1, HL, the beneficial trusts of an option to purchase shares were not defined and the option was held on a resulting trust for the settlor.

7   See *Barclays Bank Ltd v Rolls Razor Ltd* [1970] AC 567, *sub nom Barclays Bank v Quistclose Investments Ltd* [1968] 3 All ER 651, HL; *Twinsectra Ltd v Yardley* [2002] UKHL 12, [2002] 2 AC 164; and **trusts and powers** vol 98 (2019) **para 137**.

231. Resulting trusts.

End of Document



# 232. Persons in a fiduciary position.

Apart from the creation of trusts of specific property, the position held by a person may itself involve confidence so as to impress him with a fiduciary character. A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty[1]. This is so in most cases of agency, since the agent has duties to perform which involve the placing of confidence in him by the principal[2]. On the same footing are directors[3] and promoters[4] of companies. A receiver and a trustee in bankruptcy hold property received by them in a fiduciary capacity[5], but a partner does not receive the assets of the partnership on account of himself and his partners in a fiduciary capacity[6], although he may be a trustee of particular assets when the partnership has ceased[7]. A banker is not usually in a fiduciary position as regards his customer[8], but he may assume that position[9]; and, where there is a relationship of confidentiality between banker and customer, the court may intervene to prevent the relationship from being abused[10].

Not all duties owed by a fiduciary are fiduciary duties. The expression 'fiduciary duty' is properly confined to those duties which are peculiar to fiduciaries and the breach of which attracts legal consequences differing from those consequent upon the breach of other duties. It is inappropriate to apply the expression to the obligation of a trustee or other fiduciary to use proper skill and care in the discharge of his duties[11]. Thus a director's duty to exercise care and skill is not a fiduciary duty although it is a duty actionable in the equitable jurisdiction of the court[12], and a claim for an account brought by a principal against his agent is based on a contractual duty not a fiduciary duty and is accordingly barred by the statutes of limitation unless the agent is more than a mere agent but is a trustee of the money which he has received[13]. The core liability of the fiduciary arises from the single-minded loyalty of the fiduciary to which his principal is entitled. Thus, inter alia, the fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict[14]; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. Breach of any of these duties attracts those remedies which are peculiar to the equitable jurisdiction. They are primarily restitutionary or restorative, though exceptionally equitable compensation may be awarded in lieu[15]. A profit made in breach of fiduciary duty can be held on constructive trust for the principal[16].

---

**1**    *Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1998] Ch 1 at 18, [1996] 4 All ER 698 at 711–712, CA, per Millett LJ; *Satnam Investments Ltd v Dunlop Heywood & Co Ltd* [1999] 3 All ER 652, [1999] 1 BCLC 385, CA; *Tulip Trading Ltd (a Seychelles company) v Van der Laan* [2023] EWCA Civ 83, [2023] All ER (D) 27 (Feb) (at least arguable that developers looking after cryptocurrency owe fiduciary duties to cryptocurrency owner). See *Caterpillar*

232. Persons in a fiduciary position.

*Logistics Services (UK) Ltd v Huesca de Crean* [2012] EWCA Civ 156, [2012] 3 All ER 129, [2012] FSR 885 (no fiduciary relationship between employee and employer in absence of special circumstances). See **trusts and powers vol 98 (2019) paras 122**–**124**.

**2**    *Burdick v Garrick* (1870) 5 Ch App 233; *Lyell v Kennedy, Kennedy v Lyell* (1889) 14 App Cas 437 at 463; and see *Friend v Young* [1897] 2 Ch 421 at 432. As to the fiduciary nature of an agent's employment see *Morison v Moat* (1851) 9 Hare 241 at 255 (affd (1852) 21 LJ Ch 248); *Padwick v Stanley* (1852) 9 Hare 627; *Crowther v Elgood* (1887) 34 ChD 691, CA; *Lamb v Evans* [1893] 1 Ch 218, CA; *Robb v Green* [1895] 2 QB 315, CA; and **agency vol 1 (2022) paras 74, 77, 90**; but an agency is not necessarily fiduciary. A solicitor or other agent who receives money merely for transmission to his principal is not trustee of it (*Re Hindmarsh* (1860) 1 Drew & Sm 129); to become such he must have duties to perform in the disposition of the property, eg to invest or manage it (*Gray v Bateman* (1872) 21 WR 137; *Power v Power, Mulcahy's Claim* (1884) 13 LR Ir 281; *Dooby v Watson* (1888) 39 ChD 178). As to whether a broker owes a fiduciary duty to his clients see *Brandeis (Brokers) Ltd v Herbert Black* [2001] 2 All ER (Comm) 980, [2001] 2 Lloyd's Rep 359. A person agreeing to negotiate the purchase of a freehold on behalf of a group of tenants of whom he was one was held to have assumed fiduciary obligations to the other members of the group in *Hooper v Gorvin* [2000] All ER (D) 2165. See also *John Youngs Insurance Services Ltd v Aviva Insurance Service UK Ltd* [2011] EWHC 1515 (TCC), [2012] 1 All ER (Comm) 1045 (claims handling service owed a fiduciary duty to an insurance company when deciding whether the claim under an insurance policy was valid).

**3**    *Re Exchange Banking Co, Flitcroft's Case* (1882) 21 ChD 519, CA; and see *Re Forest of Dean Mining Co* (1878) 10 ChD 450 at 453; *Cook v Deeks* [1916] 1 AC 554 at 563; *JJ Harrison (Properties) Ltd v Harrison* [2001] EWCA Civ 1467, [2002] 1 BCLC 162, [2001] All ER (D) 160 (Oct). As to directors as agents of a company see **companies vol 14 (2023) para 273**. See also **companies vol 14A (2023) para 577**. As to the position of a director as trustee of company property see **companies vol 14A (2023) para 581**.

**4**    *Erlanger v New Sombrero Phosphate Co* (1878) 3 App Cas 1218 at 1236.

**5**    *Seagram v Tuck* (1881) 18 ChD 296; *Re Gent, Gent-Davis v Harris* (1888) 40 ChD 190. A person who receives money on behalf of another, and retains and has the benefit of it, may be charged in equity with interest: see *Barclay v Harris and Cross* (1915) 112 LT 1134. As to default by a trustee or person acting in a fiduciary capacity see the Debtors Act 1869 s 4 para 3; and **contempt of court vol 24 (2019) para 86**.

**6**    *Piddocke v Burt* [1894] 1 Ch 343 (decided under the Debtors Act 1869 s 4 para 3). As to stockbrokers see PARA 239. As to the relationship between partners see **partnership vol 79 (2020) para 105** et seq.

**7**    See *Gordon v Gonda* [1955] 2 All ER 762 at 767, [1955] 1 WLR 885 at 895, CA (an invention which was a partnership asset was sold by one partner to a company; the other partner was held to be beneficially entitled to a proportion of the shares acquired as a result of the sale and subsequent exchange of shares).

**8**    *Foley v Hill* (1848) 2 HL Cas 28.

**9**    *Woods v Martins Bank Ltd* [1959] 1 QB 55, [1958] 3 All ER 166.

**10**    See PARAS 18, 29; and **financial institutions vol 48 (2021) para 103** et seq.

**11**    See *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145 at 205, [1994] 3 All ER 506 at 543, HL, per Lord Browne-Wilkinson; *Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1998] Ch 1, [1996] 4 All ER 698, CA (where the position of a fiduciary properly acting for two principals with potentially conflicting interests is discussed); *Paragon Finance plc v DB Thakerar & Co (a firm)* [1999] 1 All ER 400 at 415–416, CA, per Millett LJ, disapproving *Nelson v Rye* [1996] 2 All ER 186, [1996] 1 WLR 1378; *Coulthard v Disco Mix Club Ltd* [1999] 2 All ER 457, [2000] 1 WLR 707; *Cia de Seguros Imperio v Heath (REBX) Ltd (formerly CE Heath & Co (North America) Ltd)* [2000] 2 All ER (Comm) 787, [2001] 1 WLR 112, CA.

**12**    See *Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1998] Ch 1 at 17, [1996] 4 All ER 698 at 711, CA, per Millett LJ, indorsing the comments of Ipp J in *Permanent Building Society (in liquidation) v Wheeler* (1994) 14 ACSR 109 at 157–158, W Aust SC. As to directors' duties of skill and care see **companies vol 14A (2023) para 590**.

**13**    *Paragon Finance plc v DB Thakerar & Co (a firm)* [1999] 1 All ER 400, CA.

**14**    See PARA 233.

232. Persons in a fiduciary position.

**15**    *Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1998] Ch 1, [1996] 4 All ER 698, CA. See also *Ward v Brunt* [2000] All ER (D) 586 (partners had tenancy in farm; one partner, S, acquired freehold reversion at tenanted value pursuant to an option granted to her in the owner's will; held that S was not profiting from her position as a fiduciary when she acquired the reversion).

**16**    See *FHR European Ventures LLP v Mankarious* [2014] UKSC 45, [2015] AC 250, [2014] 4 All ER 79; and  **trusts and powers** vol 98 (2019) para 124.

---

**End of Document**



# 233. Breach of confidence.

Halsbury's Laws of England  >  Equitable Jurisdiction (Volume 47 (2021))  >  7. Equitable Relief in Cases of Fiduciary Relationship  >  (1) Trustees and Other Persons in Fiduciary Positions

A person who has confidential information belonging to another may be restrained by injunction from using it without the owner's consent[1]; but the court will act only at the instance of the party to whom the duty of confidence is owed[2]. The right can arise out of a contract whereby one party ('the confidant') undertakes that he will maintain the confidentiality of information directly or indirectly made available to him by the other party ('the confider') or acquired by him in a situation, for example his employment, created by the confider[3]. It can also arise as a necessary or traditional incident of a relationship between the confidant and the confider[4]; and the Crown, as the embodiment of the nation as a whole, has an enforceable right to the maintenance of confidentiality over information relating to national security. It has been said that, in restraining an employee from making use of or communicating confidential information which he has gained in the course of his employment, the court rests its jurisdiction upon the ground of implied contract and breach of trust or confidence[5], but it is now clear that, with regard to such information, the person who possesses it is under an obligation binding his conscience and existing quite apart from contract[6], the law on the protection of confidential information depending on the broad principle of equity that he who has received information in confidence must not take unfair advantage of it[7]. The obligation does not exist where there has been misconduct of such a nature that it ought in the public interest to be disclosed to others[8]; and equity will not grant an injunction to restrain the publication of information that is perfectly useless[9] or of pernicious nonsense[10]. Once confidential information is no longer secret, for example, because it has been made public by an application for a patent, disclosure of it cannot necessarily be protected by an injunction[11]; it will depend on the circumstances of the particular case[12]. Where, however, confidential information has been made public by the person under the obligation of confidence, the person to whom the obligation is owed may still be entitled to protection by way of injunction[13]. Information which is merely 'know-how' will not be protected[14]; and it has been held that there is no requirement of confidentiality in relation to poll votes[15]. A third party who comes into possession of confidential information may come under a duty to respect that confidence[16].

Breach of confidence is a developing area of the law, the boundaries of which are not immutable, but may change to reflect changes in society, technology and business practice[17]. There is no watertight division between it and a right of privacy; indeed, it has been held that in the great majority of situations, if not all situations, where the protection of privacy is justified, relating to events after the Human Rights Act 1998 came into force[18], a claim for breach of confidence will, where this is appropriate, provide the necessary protection[19]. A duty of confidence arises whenever the party alleged to be subject to the duty is in a situation where he either knows or ought to know that the other person can reasonably expect his privacy to be protected. If there is an intrusion in such a situation it will be capable of giving rise to liability in a claim for breach of confidence unless the intrusion can be justified[20].

233. Breach of confidence.

The question whether a duty of confidentiality which has been expressly assumed under contract carries more weight, when balanced against the restriction of the right to freedom of expression, than a duty of confidentiality that is not buttressed by express agreement is not suitable for summary determination[21].

---

1    *Yovatt v Winyard* (1820) 1 Jac & W 394; *Evitt v Price* (1827) 1 Sim 483; *Morison v Moat* (1851) 9 Hare 241 at 255; *Gartside v Outram* (1856) 26 LJ Ch 113 at 114; *Amber Size and Chemical Co Ltd v Menzel* [1913] 2 Ch 239; *Gunston v Winox Ltd* (1920) 37 TLR 74 (revsd on another ground [1921] 1 Ch 664 ⧉, CA); *Cranleigh Precision Engineering Ltd v Bryant* [1964] 3 All ER 289, [1965] 1 WLR 1293; and see *Beer v Ward* (1821) Jac 77 (injunction refused); *Philip v Pennell* [1907] 2 Ch 577 at 587; *X v Y* [1988] 2 All ER 648 (disclosure of hospital records to reveal identity of AIDS patients); *R v Department of Health, ex p Source Informatics Ltd* [2001] QB 424, [2000] 1 All ER 786, CA (in a case involving personal confidences, the disclosure of information by the confidant would not constitute a breach of confidence provided that the confider's identity was protected). See also PARA 76 et seq; and **civil procedure vol 12 (2020) paras 1183**–1187.

    As to the use of confidential information see further **confidence and informational privacy vol 19 (2011) para 1** et seq.

2    *Fraser v Evans* [1969] 1 QB 349, [1969] 1 All ER 8, CA. The confidential communication of an idea which has never been reduced to writing is protected by the law of confidence, provided the idea is original, clearly identifiable, has potential commercial merit and is sufficiently well developed to be capable of realisation: *Fraser v Thames Television Ltd* [1984] QB 44, [1983] 2 All ER 101.

3    *A-G v Jonathan Cape Ltd, A-G v Times Newspapers Ltd* [1976] QB 752, [1975] 3 All ER 484; *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 233, sub nom *A-G v Guardian Newspapers (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545, HL. Cf *Burmah Oil Co Ltd v Governor and Company of the Bank of England* [1980] AC 1090, [1979] 3 All ER 700, HL; *Intelsec Systems Ltd v Grech-Cini* [1999] 4 All ER 11, [2000] 1 WLR 1190. See also *De Maudsley v Palumbo* [1996] FSR 447, [1996] EMLR 460 (no breach of confidence in relation to ideas for nightclub, as ideas were too vague to constitute original or confidential information, and were imparted on a social occasion). As to the creation of confidence see further **confidence and informational privacy vol 19 (2011) para 14** et seq.

4    Eg priest and penitent, doctor and patient, lawyer and client, husband and wife: see **confidence and informational privacy vol 19 (2011) para 19**. See *Bunn v BBC* [1998] 3 All ER 552, [1998] 28 LS Gaz R 31 (statement made under caution by accused to police is confidential). See also *A v B* [2000] IP & T 1368, [2000] EMLR 1007, where a husband took copies of private and confidential entries in his wife's diary without her knowledge or consent; it was held that since the matter fell within the equitable jurisdiction the court must have a discretion whether to order up delivery of copies taken.

5    *Tipping v Clarke* (1847) 8 LTOS 554; *Prince Albert v Strange* (1849) 1 Mac & G 25 at 44–45; *Morison v Moat* (1851) 9 Hare 241 (affd (1852) 21 LJ Ch 248); *Tuck & Sons v Priester* (1887) 19 QBD 629, CA; *Pollard v Photographic Co* (1888) 40 ChD 345; *Merryweather v Moore* [1892] 2 Ch 518; *Lamb v Evans* [1893] 1 Ch 218, CA; *Robb v Green* [1895] 2 QB 315, CA. The statement of Eve J in *Kirchner & Co v Gruban* [1909] 1 Ch 413 at 422, that the real principle upon which the court acted was that of implied contract, must, in view of *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* [1963] 3 All ER 413n, CA and later cases, be treated as too limited. As to obligations of confidence implied in contract and equity see **confidence and informational privacy vol 19 (2011) para 16**.

6    *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* [1963] 3 All ER 413n at 414n, CA, per Lord Greene MR; *Cranleigh Precision Engineering Co Ltd v Bryant* [1964] 3 All ER 289 at 301, [1965] 1 WLR 1293 at 1317–1319 per Roskill J; *Terrapin Ltd v Builders' Supply Co (Hayes) Ltd* [1960] RPC 128, CA; and see *Peter Pan Manufacturing Corpn v Corsets Silhouette Ltd* [1963] 3 All ER 402, [1964] 1 WLR 96; *Industrial Furnaces Ltd v Reaves* [1970] RPC 605; *Baker v Gibbons* [1972] 2 All ER 759 at 764, [1972] 1 WLR 693 at 699; *New Zealand Netherlands Society Oranje Inc v*

233. Breach of confidence.

Kuys [1973] 2 All ER 1222, [1973] 1 WLR 1126 ☐, PC; *Faccenda Chicken Ltd v Fowler; Fowler v Faccenda Chicken Ltd v Percy* [1987] Ch 117, [1986] 1 All ER 617, CA. It is, however, doubtful whether in the absence of any contract, express or implied, damages can be awarded for breach of confidence except in lieu of an injunction: *Nichrotherm Electrical Co Ltd v Percy* [1957] RPC 207 at 213–214, CA. In *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 233, sub nom *A-G v Guardian Newspapers Ltd (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545, HL, Lord Goff of Chieveley explained at 286 and at 662 the availability of damages as alternative to an account despite the equitable nature of the wrong as a result of a beneficent interpretation of the Chancery Amendment Act 1858 (Lord Cairns's Act). Damages are assessed on the market value of the information as between a willing buyer and a willing seller: *Seager v Copydex (No 2)* [1969] 2 All ER 718, [1969] 1 WLR 809, CA, distinguished in *Dowson & Mason Ltd v Potter* [1986] 2 All ER 418, [1986] 1 WLR 1419, CA. See also *De Maudsley v Palumbo* [1996] FSR 447, [1996] EMLR 460: **damages** vol 29 (2019) **para 416**; and **employment** vol 39 (2021) **para 69** et seq.

7  *Seager v Copydex Ltd* [1967] 2 All ER 415 at 417, [1967] 1 WLR 923 at 931, per Lord Denning MR; *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 233, sub nom *A-G v Guardian Newspapers Ltd (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545, HL. See also *Schering Chemicals Ltd v Falkman Ltd* [1982] QB 1, *A-G v Times Newspapers Ltd* [1988] 2 All ER 321, CA (journalist obtaining confidential information during employment as professional adviser under a fiduciary obligation not to use it for his own purposes): *Stephens v Avery* [1988] 2 All ER 477 [1988] Ch 449 (information relating to sexual conduct may be the subject of legally enforceable duty of confidentiality): *De Maudsley v Palumbo* [1996] FSR 447, [1996] EMLR 460. Employment cases include *Printers and Finishers Ltd v Holloway* [1964] 3 All ER 731, [1965] 1 WLR 1; *Coco v AN Clark (Engineers) Ltd* [1969] RPC 41; *AT Poeton (Gloucester Plating) Ltd v Horton* [2000] IP & T 1064, [2001] FSR 169, CA; *Cranez Anstalt v Hayek* [2002] 1 BCLC 693, [2001] Ch 448; [2003] 1 BCLC 278, [2002] All ER (D) 377 (Nov)). Persons who disclose documents (on discovery, now known as 'disclosure': see **civil procedure** vol 12 (2021) **para 614** et seq) are entitled to the court's protection against any use of the documents otherwise than in the proceedings in which they were disclosed: *Distillers Co (Biochemicals) Ltd v Times Newspapers Ltd* [1975] 1 All ER 41. See also *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31, [2013] 4 All ER 781, [2013] 1 WLR 1556; and **confidence and information privacy** vol 19 (2011) **para 63**.

8  *Initial Services Ltd v Putterill* [1968] 1 QB 396 at 405, [1967] 3 All ER 145 at 148, CA, per Lord Denning MR. There is no confidence as to the disclosure of iniquity': *Gartside v Outram* (1856) 26 LJ Ch 113 at 114 per Sir William Page-Wood V-C. See also *Fraser v Evans* [1969] 1 QB 349 at 362, [1969] 1 All ER 8 at 11, CA, per Lord Denning MR; *Butler v Board of Trade* [1971] Ch 680 at 690, [1970] 3 All ER 593 at 599 per Goff J; *Hubbard v Vosper* [1972] 2 QB 84, [1972] 1 All ER 1023, CA; *Beloff v Pressdram Ltd* [1973] 1 All ER 241; *Church of Scientology of California v Kaufman* [1973] RPC 635; *Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133 at 140–141, [1972] 3 All ER 813 at 818, CA, per Lord Denning MR (on appeal [1974] AC 133 at 152, [1973] 2 All ER 943, HL); *Francome v Mirror Group Newspapers Ltd* [1984] 2 All ER 408, [1984] 1 WLR 892, CA; applied in *Lion Laboratories v Evans* [1985] QB 526, [1984] 2 All ER 417, CA; *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 233, sub nom *A-G v Guardian Newspapers Ltd (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545, HL; *Re a Company's Application* [1989] Ch 477, [1989] 2 All ER 248 (no injunction to restrain employee from disclosing confidential information to regulatory authorities or Inland Revenue): *Price Waterhouse (a firm) v BCCI Holdings (Luxembourg) SA* [1992] BCLC 583, (1991) Times, 30 October (declaration in favour of auditors wishing to disclose confidential information to inquiry set up to review Bank of England's past performance of supervisory functions; overruled on the question of legal professional privilege by *R (on the application of Morgan Grenfell & Co Ltd) v Special Comr of Income Tax* [2002] UKHL 21, [2003] 1 AC 563, [2002] 3 All ER 1). There are, however, some cases of breach of confidence which are regulatory where the court might intervene, even though the defendant says that he intends to justify: *Fraser v Evans* [1969] 1 QB 349 at 362, [1969] 1 All ER 8 at 11, CA, per Lord Denning MR; and see **defamation** vol 32 (2019) **para 506**. Negligence does not constitute an exception to the need to protect confidentiality: *Distillers Co (Biochemicals) Ltd v Times Newspapers Ltd* [1975] QB 613 at 622, [1975] 1 All ER 41 at 49–50 obiter per Talbot J. As to the defences to disclosure of confidential information (including injunctive disclosure in the public interest and in the interests of national security) see **confidence and information privacy** vol 19 (2011) **para 73** et seq.

6  *McNicol v Sportsman's Book Stores* (1930) Mac G Cop Cas (1928–1935) 116; cited in *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 149, sub nom *A-G v Guardian Newspapers Ltd (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545 at 574 per Scott J (affd [1988] 1 AC 109, [1988] 3 All ER 545, CA and HL).

233. Breach of confidence.

**10**   *Church of Scientology of California v Kaufman* [1973] RPC 635.

**11**   *O Mustad & Son v S Allcock & Co Ltd and Dosen* [1963] 3 All ER 416, sub nom *Mustad & Son v Dosen* [1964] 1 WLR 109n, HL. Cf *Exchange Telegraph Co Ltd v Central News Ltd* [1897] 2 Ch 48; *Schering Chemicals Ltd v Falkman Ltd* [1982] QB 1, [1981] 2 All ER 321, CA. See *Bunn v BBC* [1998] 3 All ER 552, [1998] 28 LS Gaz R 31 (confidentiality of a statement made under caution by an accused at an end because the contents of the statement were already in the public domain having been read in open court by the judge. There is no distinction between a document which the judge reads and a document which is read to the judge). As to the duration of the obligation of confidence see further **confidence and informational privacy** vol 19 (2011) **para** 62.

**12**   See *Franchi v Franchi* [1967] RPC 149 at 152–153 per Cross J; *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 233, sub nom *A-G v Guardian Newspapers Ltd (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545, HL. See also *ABK Ltd v Foxwell* [2002] EWHC 9 (Ch), [2002] All ER (D) 103 (Jan) (relevant disclosures of information did not amount to breach of confidence as they all related to matters in the public domain); *Inline Logistics Ltd v UCI Logistics Ltd* [2001] EWCA Civ 1613, [2002] IP & T 444, [2001] All ER (D) 166 (Oct).

**13**   *Speed Seal Products Ltd v Paddington* [1986] 1 All ER 91, [1985] 1 WLR 1327, CA. Cf *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 233, sub nom *A-G v Guardian Newspapers Ltd (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545, HL.

**14**   *Amway Corpn v Eurway International Ltd* [1974] RPC 82; *Faccenda Chicken Ltd v Fowler, Fowler v Faccenda Chicken Ltd* [1987] Ch 117, [1986] 1 All ER 617, CA; and see **confidence and informational privacy** vol 19 (2011) **para** 23.

**15**   *Haarhaus & Co GmbH v Law Debenture Trust Corpn plc* [1988] BCLC 640.

**16**   *Schering Chemicals Ltd v Falkman Ltd* [1982] QB 1, [1981] 2 All ER 321, CA; *Fraser v Thames Television Ltd* [1984] QB 44, [1983] 2 All ER 101; *A-G v Observer Ltd, A-G v Times Newspapers Ltd* [1990] 1 AC 109 at 233, sub nom *A-G v Guardian Newspapers Ltd (No 2), A-G v Times Newspapers Ltd* [1988] 3 All ER 545, HL. Cf *R v Tompkins* (1977) 67 Cr App Rep 181, CA. As to third party recipients of confidential information see further **confidence and informational privacy** vol 19 (2011) **para** 21.

As to the extent to which the police owe a duty of confidence (1) to the owners of seized documents see *Marcel v Metropolitan Police Comr* [1992] Ch 225, [1992] 1 All ER 72, CA; and (2) to an offender photographed in police custody see *Hellewell v Chief Constable of Derbyshire* [1995] 4 All ER 473, [1995] 1 WLR 804.

**17**   See *Douglas v Hello! Ltd* [2001] QB 967 at 1011, [2001] 2 All ER 289 at 329, CA, per Keene LJ; and **confidence and informational privacy** vol 19 (2011) **para** 8.

**18**   Ie on 2 October 2000: see the Human Rights Act 1998 (Commencement No 2) Order 2000, SI 2000/1851, art 2.

**19**   See *A v B (a company)* [2002] EWCA Civ 337 at [4], [2003] QB 195 at [4], [2002] 2 All ER 545 at [4] per Lord Woolf CJ giving the judgment of the court; and **confidence and informational privacy** vol 19 (2011) **para** 5.

**20**   See *A v B (a company)* [2002] EWCA Civ 337 at [11], [2003] QB 195 at [11], [2002] 2 All ER 545 at [11] (guidelines to apply in dealing with claims such as the claim in that case, where a footballer with a Premier League club sought an injunction preventing a national newspaper from publishing stories about his adulterous affairs; the court has to balance the two potentially conflicting provisions of the Convention for the Protection of Human Rights and Fundamental Freedoms (Rome, 4 November 1950; TS 71 (1953) Cmd 8969), as set out in the Human Rights Act 1998 s 1(3), Sch 1, ie Sch 1 Pt I art 8 (right to respect for private and family life) and Sch 1 Pt I art 10 (right to freedom of expression)) (see **rights and freedoms** vol 88A (2018) **para** 381 et seq, 351 et seq, 398 et seq). The court also considered the impact of s 12 which provides, inter alia, that an injunction to restrain publication before trial should not be granted unless the court is satisfied that the applicant is likely to establish that publication should not be allowed (see s 12(3); and **rights and freedoms** vol 88A (2018) **para** 492). On the facts the appeal against the interim injunction which had been awarded was allowed. See further **confidence and informational privacy** vol 19 (2011) **para** 5.

See also *Venables v News Group Newspapers Ltd, Thompson v News Group Newspapers Ltd* [2001] Fam 430, [2001] 1 All ER 908; *Campbell v Mirror Group Newspapers Ltd* [2002] EWCA Civ 1373, [2003] QB 633, [2003] 1 All ER 224; and see generally **confidence and informational privacy** vol 19 (2011) **para** 4.

233. Breach of confidence.

21    See *Campbell v Frisbee* [2002] EWCA Civ 1374, [2003] ICR 141, [2003] IP & T 86.

**End of Document**



# 234. Conflict of duty and interest.

Halsbury's Laws of England  >  Equitable Jurisdiction (Volume 47 (2021))  >  7. Equitable Relief in Cases of Fiduciary Relationship  >  (1) Trustees and Other Persons in Fiduciary Positions

A court of equity imposes special liabilities and duties upon persons who stand in a fiduciary relationship to others; and it is a principle of equity that no person having duties of a fiduciary nature to discharge should be allowed to place himself in a situation where he has, or can have, a personal interest conflicting, or which may possibly conflict, with the interest of those whom he is bound to protect[1]. The principle extends not only to the relationship between trustee and beneficiary[2], but to all kinds of fiduciary relationships[3] where a real[4] conflict of duty and interest occurs; it is not dependent on fraud or absence of good faith[5].

It is essentially a rule for the protection of the person to whom the duty is owed, who may relax it if he is of full age and capacity and understands what his legal rights are and that he is surrendering them[6]. The court may relax it if the beneficiaries are not of full age and capacity or are not ascertained, and it is expedient to do so[7]. It seems that an agreement contravening the rule is not in itself unlawful or void and that the person owing the duty is not entitled to the benefit of the rule[8].

---

1    *Aberdeen Rly Co v Blaikie Bros* (1854) 1 Macq 461 at 471, HL, per Lord Cranworth LC; *Broughton v Broughton* (1855) 5 De GM & G 160; *Bray v Ford* [1896] AC 44 at 51, HL, per Lord Herschell; *Cook v Deeks* [1916] 1 AC 554, PC; *Regal (Hastings) Ltd v Gulliver* [1967] 2 AC 134n, [1942] 1 All ER 378, HL; *Boulting v Association of Cinematograph, Television and Allied Technicians* [1963] 2 QB 606, [1963] 1 All ER 716, CA. The principle is broad and flexible, but that does not undermine the strict nature of the liability where it applies: *Premier Waste Management Ltd v Towers* [2011] EWCA Civ 923, [2012] 1 BCLC 67. See also *Saltri III Ltd v MD Mezzanine SA Sicar* [2012] EWHC 3025 (Comm), [2013] 1 All ER (Comm) 661, [2013] BCLC 217. Where trustees apply for court approval of their actions, they must make full and frank disclosure to the court: see *Tamlins v Edgar* (2012) Times, 23 February.

2    See PARAS 235–237.

3    Eg between an agent and his principal (see **agency vol 1 (2022) para 74**), a company and its directors (see *Horcal Ltd v Gatland* [1983] IRLR 459, [1983] BCLC 60; affd [1984] IRLR 288, [1984] BCLC 549, CA; and **companies vol 14A (2023) para 577**), and a solicitor and his client (see **legal professions vol 66 (2020) para 565** et seq).

4    *Boulting v Association of Cinematograph, Television and Allied Technicians* [1963] 2 QB 606 at 638, [1963] 1 All ER 716 at 730, CA, per Upjohn LJ.

5    *Aberdeen Rly Co v Blaikie Bros* (1854) 1 Macq 461 at 471, HL, per Lord Cranworth LC; *Boulting v Association of Cinematograph, Television and Allied Technicians* [1963] 2 QB 606 at 635, [1963] 1 All ER 716 at 729, CA, per Upjohn LJ.

6    *Kregor v Hollins* (1913) 109 LT 225, CA; *Boulting v Association of Cinematograph, Television and Allied Technicians* [1963] 2 QB 606 at 636, [1963] 1 All ER 716 at 729, CA, per Upjohn LJ.

234. Conflict of duty and interest.

7    *Re Macadam, Dallow v Codd* [1946] Ch 73 at 82, [1945] 2 All ER 664 at 672.

8    *Boulting v Association of Cinematograph, Television and Allied Technicians* [1963] 2 QB 606 at 637, [1963] 1 All ER 716 at 730, CA, per Upjohn LJ.

---

**End of Document**



# 235. Purchase of trust property by trustee.

Halsbury's Laws of England  >  Equitable Jurisdiction (Volume 47 (2021))  >  7. Equitable Relief in Cases of Fiduciary Relationship  >  (1) Trustees and Other Persons in Fiduciary Positions

The principle of equity that a trustee may not purchase part of the trust estate rests on two reasons:

    (1)    that a person may not be both vendor and purchaser; and

    (2)    that there must not be a conflict of duty and interest[1].

In a case where the reasons underlying the rule do not exist, it will not, however, necessarily be applied[2]. At all events, a purchase by a trustee of trust property is not void, but only voidable at the instance of a beneficiary under the trust, who will be able to have the transaction set aside only on terms as to repayment[3].

Nor is the rule absolute with regard to a purchase by the trustee after he has ceased to be a trustee, or when he purchases with the consent of his beneficiary. He may retire from being a trustee and divest himself of that character in order to qualify himself to become a purchaser[4]; and the sale will then be good if he has taken this step sufficiently long before the sale to avoid the possibility of his making use of special information acquired by him as trustee[5]; or, without ceasing to be trustee, he may enter into a contract of sale with the beneficiary. Such a contract will be looked at with jealousy, but it will be supported if it is distinct and clear, if it appears that the beneficiary intended that the trustee should buy, and if there is neither fraud, concealment nor advantage taken by the trustee of information acquired by him in his character of trustee[6].

A provision in the trust instrument authorising a purchase by a trustee will be effective according to its terms[7].

---

1    See PARA 234; and **trusts and powers** vol 98 (2019) paras 365 et seq, 378. The principle applies also to other persons in a fiduciary position, such as agents (see **agency** vol 1 (2022) paras 74, 90), auctioneers (see **auction** vol 4 (2020) para 17 et seq) and solicitors (see **legal professions** vol 66 (2020) para 565 et seq).

2    *Holder v Holder* [1968] Ch 353 at 392, [1968] 1 All ER 665 at 672, CA, per Harman LJ.

3    *Holder v Holder* [1968] Ch 353 at 398, [1968] 1 All ER 665 at 677, CA, per Danckwerts LJ; and see **trusts and powers** vol 98 (2019) para 377.

4    *Downes v Grazebrook* (1817) 3 Mer 200 at 208.

5    *Ex p James* (1803) 8 Ves 337 at 352; and see *Re Boles and British Land Co's Contract* [1902] 1 Ch 244.

6    *Coles v Trecothick* (1804) 9 Ves 234 at 247; and see **trusts and powers** vol 98 (2019) para 383 et seq.

235. Purchase of trust property by trustee.

**7**   *Sargeant v National Westminster Bank plc* (1990) 61 P & CR 518, CA; *Edge v Pensions Ombudsman* [1998] Ch 512, [1998] 2 All ER 547; affd [2000] Ch 602, [1999] 4 All ER 546, CA. See also **trusts and powers** vol 98 (2019) para 414.

End of Document



# 236. Trustee not allowed to make a profit.

Halsbury's Laws of England > Equitable Jurisdiction (Volume 47 (2021)) > 7. Equitable Relief in Cases of Fiduciary Relationship > (1) Trustees and Other Persons in Fiduciary Positions

It follows from the rule that a person will not be allowed to put himself in a position where his interest and duty conflict that a person in a fiduciary position is not allowed, unless otherwise expressly provided, to make a profit out of his trust[1]. This rule obliges him to account for any advantages which he has obtained by reason of his ownership of the trust property. Benefits acquired by him as the owner of the property cannot be retained, but must be surrendered for the advantage of those beneficially interested[2]. Thus, if the trustee retains trust money in his own hands, he is charged with interest[3]; and, if he mixes it with his own money and employs it in his business, the beneficiary is entitled to take a proportionate share of the profit of the business instead of interest[4].

A fiduciary who accepts a bribe or secret commission is taken to have acquired it for the beneficiary, thus giving the beneficiary the right to elect between pursuing a proprietary remedy in respect of the trust property and a personal remedy against the fiduciary for an account for the profit by way of equitable compensation[5].

---

1   *Bray v Ford* [1896] AC 44 at 51, HL, per Lord Herschell; and see *Parker v McKenna* (1874) 10 Ch App 96 at 118; *Re North Australian Territory Co, Archer's Case* [1892] 1 Ch 322, CA; *Regal (Hastings) Ltd v Gulliver* [1967] 2 AC 134n, [1942] 1 All ER 378, HL. See also *Boardman v Phipps* [1967] 2 AC 46, [1966] 3 All ER 721, HL. A person who in the course of employment obtains a contract for himself is liable to account to his employer for the profit which he makes, even if it can be shown that the employer would never have obtained the contract: *Industrial Development Consultants Ltd v Cooley* [1972] 2 All ER 162, [1972] 1 WLR 443; *Horcal Ltd v Gatland* [1983] IRLR 459, [1983] BCLC 60 (affd [1984] IRLR 288, [1984] BCLC 549, CA); cf *New Zealand Netherlands Society Oranje Inc v Kuys* [1973] 2 All ER 1222, [1973] 1 WLR 1126 ⬚, PC (special arrangement displacing duty); and see **companies vol 14A (2023) para 581**. The rule applies as much to a custodian trustee as to an ordinary trustee: *Re Brooke Bond & Co Ltd's Trust Deed, Brooke v Brooke Bond & Co Ltd* [1963] Ch 357, [1963] 1 All ER 454. As to trustees' duties not to profit from the trust see **trusts and powers vol 98 (2019) paras 124**, 365 et seq, 378, 415.

2   *Aberdeen Town Council v Aberdeen University* (1877) 2 App Cas 544 at 549, HL, per Lord Cairns. Upon this consideration is based the constructive trust raised where the trustee renews a lease in his own favour: see *Smyth v Byrne* [1914] 1 IR 53, CA. The purpose of imposing a proprietary remedy is not to compensate the beneficiary but to ensure that the fiduciary does not profit from his breach of duty: *United Pan-Europe Communications NV v Deutsche Bank AG* [2000] 2 BCLC 461, CA. Profits are recoverable by the person to whom fiduciary duties are owed even where the loss falls on a third party: *Parr v Keystone Healthcare Ltd* [2019] EWCA Civ 1246, [2019] 4 WLR 99, [2019] 2 BCLC 701.

3   *A-G v Alford* (1855) 4 De GM & G 843.

4   *Docker v Somes* (1834) 2 My & K 655; *Edinburgh Corpn v Lord Advocate* (1879) 4 App Cas 823, HL. The principle applies also where a person who is not expressly a trustee has bought or trafficked with another's money: *Docker v*

236. Trustee not allowed to make a profit.

*Somes* above at 665. In such a case the constructive trustee is, however, entitled to an allowance for his time and care: *Brown v Litton* (1711) 1 P Wms 140; and see **trusts and powers** vol 98 (2019) para 376.

5    *FHR European Ventures LLP v Cedar Capital Partners LLC* [2014] UKSC 45, [2015] AC 250, [2014] 4 All ER 79, adopting *A-G for Hong Kong v Reid* [1994] 1 AC 324, [1994] 1 All ER 1, PC. See also *Daraydan Holdings Ltd v Solland International Ltd* [2004] EWHC 622 (Ch) at [77]–[86], [2005] Ch 119 at [77]–[86], [2005] 4 All ER 73 at [77]–[86]; and **trusts and powers** vol 98 (2019) para 124.

---

**End of Document**



# 237. Trustee not entitled to remuneration under the equitable rules.

Until its modification by the Trustee Act 2000, [1] the rule was inflexibly established that, in the absence of a remuneration clause, an express order of the court or an express stipulation on the subject which a trustee made with the beneficiary before he accepted the trust[2], a trustee was to have no allowance for his time and care[3], although he was entitled to his expenses[4], for which he had a first charge on the trust estate[5].

The rule applied even where the trustee acted as a solicitor or in some other professional capacity[6], and extended to the professional trustee's firm and his individual partners unless the partner employed was alone entitled to the remuneration[7]; and it extended to a trade or business for the benefit of the trust[8]. It did not, however, apply to the costs of a solicitor-trustee acting in legal proceedings for himself and his co-trustees jointly, or for himself and his beneficiary[9].

Where the equitable rules apply, the court will exercise its jurisdiction to grant remuneration to trustees only sparingly and in exceptional cases[10].

---

**1**    See PARA  238.

**2**    See  **trusts and powers** vol 98 (2019) para 369 et seq. As to express declarations as to the remuneration of professional trustees see  **trusts and powers** vol 98 (2019) paras 373–374. Where the court appoints a corporation to be a trustee, either solely or jointly with another person, the court may authorise the corporation to charge such remuneration for its services as trustee as the court may think fit: Trustee Act 1925 s 42. As to fees charged by the Public Trustee see  **trusts and powers** vol 98 (2019) paras 229–230.

**3**    *Robinson v Pett* (1734) 3 P Wms 249 at 251; and see *Moore v Frowd* (1837) 3 My & Cr 45 at 50 per Lord Cottenham LC. The rule applied where trustees were directors of a company in respect of shares belonging to the trust (*Re Francis, Barrett v Fisher* (1905) 74 LJ Ch 198), but not where a director represented the company as director of another company, shares being transferred to him as his qualification (*Re Dover Coalfield Extension Ltd* [1908] 1 Ch 65, CA). Where a trustee has acquired a position in respect of which he draws remuneration by virtue of his position as trustee, he will not be entitled to retain the remuneration: *Re Macadam, Dallow v Codd* [1946] Ch 73, [1945] 2 All ER 664 (trustee becoming company director by exercising a discretionary power); cf *Re Dover Coalfield Extension Ltd* above. As to accountability see also *Re Gee, Wood v Staples* [1948] Ch 284, [1948] 1 All ER 498; *Re Brooke Bond & Co Ltd's Trust Deed, Brooke v Brooke Bond & Co Ltd* [1963] Ch 357, [1963] 1 All ER 454 (custodian trustee); and see *Boardman v Phipps* [1967] 2 AC 46, [1966] 3 All ER 721, HL.

**4**    *A-G v Norwich Corpn* (1837) 2 My & Cr 406 at 424.

**5**    *Re Exhall Coal Co Ltd, Re Bleckley* (1866) 35 Beav 449; and see  **trusts and powers** vol 98 (2019) para 343 et seq.

237. Trustee not entitled to remuneration under the equitable rules.

**6**   *Re Worthington, ex p Leighton v Macleod* [1954] 1 All ER 677, [1954] 1 WLR 526.

**7**   *Re Gates, Arnold v Gates* [1933] Ch 913. As to a solicitor-trustee's remuneration clause see *Re Fish, Bennett v Bennett* [1893] 2 Ch 413, CA; *Re Chalinder and Herington* [1907] 1 Ch 58; and see *Re Gates, Arnold v Gates* above; *Re Hill, Claremont v Hill* [1934] Ch 623, CA; *Re Worthington, ex p Leighton v Macleod* [1954] 1 All ER 677, [1954] 1 WLR 526; and **legal professions vol 66 (2020) para 562**. As to a bank-trustee's charging clause see *Re Waterman's Will Trusts, Lloyds Bank v Sutton* [1952] 2 All ER 1054; and **financial institutions vol 48 (2021) para 105**.

**8**   See **trusts and powers vol 98 (2019) paras 373**–374.

**9**   *Cradock v Piper* (1850) 1 Mac & G 664; and see *Re Doody, Fisher v Doody* [1893] 1 Ch 129, CA.

**10**   *Re Worthington, ex p Leighton v Macleod* [1954] 1 All ER 677, [1954] 1 WLR 526; *Re Barbour's Settlement, National Westminster Bank Ltd v Barbour* [1974] 1 All ER 1188 at 1192, [1974] 1 WLR 1198 at 1203 per Megarry J; *Re Duke of Norfolk's Settlement Trusts, Earl of Perth v Fitzalan-Howard* [1982] Ch 61, [1981] 3 All ER 220, CA. However, these authorities must now be read in the light of PARA 238.

---

**End of Document**



## 238. Professional trustees; statutory modification of the equitable rules.

Halsbury's Laws of England  >  Equitable Jurisdiction (Volume 47 (2021))  >  7. Equitable Relief in Cases of Fiduciary Relationship  >  (1) Trustees and Other Persons in Fiduciary Positions

The Trustee Act 2000[1] introduced new rules for the construction of express charging clauses where the trustee is a trust corporation or is acting in a professional capacity[2], except to the extent to which the trust instrument makes inconsistent provision[3]. The trustee is to be treated as entitled under the trust instrument to receive payment in respect of services even if they are services which are capable of being provided by a lay trustee[4]. Further, any payments to which a trustee is entitled in respect of services are to be treated[5] as remuneration for services and not as a gift[6].

The Trustee Act 2000 also contains provisions[7] which apply where there is no provision, either for or against, about the entitlement of a trustee to remuneration in the trust instrument or in any enactment or any provision of subordinate legislation[8]. A trustee who is a trust corporation but is not a trustee of a charitable trust is entitled to receive reasonable remuneration[9] out of trust funds[10] for any services that the trust corporation provides to or on behalf of the trust[11]. A trustee who acts in a professional capacity, but is not a trust corporation, a trustee of a charitable trust or a sole trustee, is likewise entitled provided that each other trustee has agreed in writing that he may be remunerated for the service[12]. A trustee is thus entitled to remuneration even if the services in question are capable of being provided by a lay trustee[13].

The provisions described above are discussed in more detail elsewhere in this work[14].

***

1    See the Trustee Act 2000 s 28; and **trusts and powers vol 98 (2019) para 370**.

2    As to when a trustee acts in a professional capacity for these purposes see the Trustee Act 2000 ss 28(5), 39(2); and **trusts and powers vol 98 (2019) para 370**.

3    See the Trustee Act 2000 s 28(1). As to the application of s 28 to a trustee of a charitable trust who is not a trust corporation see s 28(3).

4    Trustee Act 2000 s 28(2). As to when a person acts as a lay trustee for these purposes see s 28(6).

5    Ie for the purposes of the Wills Act 1837 s 15 (gifts to an attesting witness to be void) and of the Administration of Estates Act 1925 s 34(3) (order in which estate to be paid out): see **wills and intestacy vol 102 (2021) para 79**; **wills and intestacy vol 103 (2021) paras 652, 1001**.

6    Trustee Act 2000 s 28(4).

7    See the Trustee Act 2000 s 29; and **trusts and powers vol 98 (2019) para 371**.

8    Trustee Act 2000 s 29(5).

238. Professional trustees; statutory modification of the equitable rules.

9    As to the meaning of 'reasonable remuneration' for these purposes see the Trustee Act 2000 s 29(3); and **trusts and powers** vol 98 (2019) **para** 371.

10    Ie out of the income or capital funds of the trust: see the Trustee Act 2000 s 39(1).

11    Trustee Act 2000 s 29(1).

12    Trustee Act 2000 s 29(2).

13    Trustee Act 2000 s 29(4). For these purposes, a person acts as a lay trustee if he is not a trust corporation and does not act in a professional capacity: see ss 28(6), 39(2); and **trusts and powers** vol 98 (2019) **para** 370.

14    See **trusts and powers** vol 98 (2019) **paras** 370–371.

---

**End of Document**

# Exhibit F

# IN THE EASTERN CARIBBEAN SUPREME COURT
## IN THE HIGH COURT OF JUSTICE

**Antigua and Barbuda**

**Claim No: ANUHCV2017/0266**

**BETWEEN:**

### MASSIMO ALLEMAGNE

**By his Attorney Alessandra Allemagne**

**Claimant**

**and**

### MCALLISTER  ABBOTT

**1st Defendant**

### EUGENE ABBOTT

**2nd Defendant**

### SIR EUSTACE FRANCIS

**3rd Defendant**

### MICHAEL PIGGOTT

**4th Defendant**

**Before:**

Master Jan Drysdale

**Appearances:**

Kendrickson Kentish and Cherise Archibald of counsel for the claimant

Hugh Marshall of counsel for the first and second defendants

Jacqueline Walwyn of counsel for the fourth defendant

_____

2018:   June 18th

August 24th

_____

## DECISION

[1]  **Drysdale, M.**: For consideration are two applications for summary judgment filed on 10th and 11th October 2017 respectively by the fourth defendant and subsequently by the first and second defendants.

**Background**

[2]    In these proceedings which were filed on 23rd May 2017 and subsequently amended on 25th May 2017 the claimant claims damages for the alleged negligent management of an offshore bank by the defendants all of whom were directors. The claimant contends that as a result the bank became insolvent and now is in winding up proceedings.

[3]    The claimant also founds his claim on breach of fiduciary duty which the claimant claims the directors owed to depositors like himself of the bank. Finally the claimant avers that the defendants were fiduciaries of his assets which were in the control of the bank at the material time.

[4]    The defendants each filed defences in the instant matter. Thereafter the various applications for summary judgments were filed. The substance of the defences are repeated in the applications and as such a summary of each application will be undertaken hereunder.


**The first application**

[5]    By notice of application the fourth defendant sought an order that judgment be entered in its favour pursuant to CPR15. The fourth defendant submits that the claimant's claim filed herein had no realistic prospect of success.  A summary of the grounds of the application is contained hereunder:

[i]    That the amended statement of claim discloses no cause of action in negligence.

[ii]    That the amended statement of claim pleads damage which the claimant is yet to suffer.

[iii]    The amended statement of claim does not disclose any facts as it relates to the alleged wrongful conduct of the fourth defendant.

[iv]    The amended statement of claim is an abuse of the process of the court and is likely to obstruct the just disposal of proceedings.

[6]    The fourth defendant filed an affidavit in support which amplified and explained the grounds advanced for the application.  In it the fourth defendant deposes that he resigned as on the director 25th July 2011 which became effective 5th September 2011. This was at least six

2

months prior to the bank going into liquidation on 12th February 2012. Moreover the fourth defendant contends that at no time during his tenure as director did the regulatory authority or any qualified person or body ever allege that he as a director acted negligently or unlawfully in the fulfilment of his functions as a director.

[7]    The fourth defendant deposes further that the pleadings of the claimant simply lists conclusions of the receiver-manager without there being any nexus to any negligent or intentional act during his tenure as director. The fourth defendant also argues that the claim against him is statute barred as in accordance with the International Business Corporation Act a claim against a director cannot be sustained after a period of two years from the date of alleged act or omission.

[8]    The fourth defendant also submits that the liquidation process is still ongoing. Accordingly the claimant is incapable of demonstrating that he has no chance of the return of his deposit in the circumstances.

**The second application**

[9]    The second application for summary judgment was filed by the first and second defendants. A summary of the grounds of the application are as follows:

    [i]    That the claimant has no real prospect of succeeding on the claim.

    [ii]    The defendants are sued in the capacity as directors of the bank.

    [iii]    The defendants as directors owed a duty of care to the bank only and not to the claimant and or any depositor of the bank.

    [iv]    The defendants have made no promise or representation to the claimant.

    [v]    That the law does not impose any duty of care as alleged by the claimant on a director of the bank to its depositors.

    [vi]    The claimant is seeking to circumvent the liquidation process as provided for under the International Business Corporation Act.

[10]    In the evidence of the first and second defendants, they dispute that they owed a duty of care to the claimant and submit that the claim in negligence is misconceived.

3

[11] The first and second defendants deny the existence of any fiduciary relationship as alleged by the claimant. They depose that there was no obligation to act in the best interests of the depositors of the bank.

[12] They deny that they were ever trustees of the claimant's moneys deposited with the bank. Further they state that at no time did they mishandle, misappropriate, poorly invest or dissipate the claimant's deposits and therefore cannot be deemed to have breached any duty to the claimant.

[13] The first and second defendants more importantly state that they were never in advisory relationship with the claimant and did not make any representations to him concerning his money.

[14] Finally they state that these proceedings are an attempt to circumvent the liquidation process. They assert that this would result in the opening of the floodgates and as a matter of public policy must fail.


**The Claimant's response to the applications**

[15] The claimant by affidavit filed on 21st November 2017 opposes the applications for summary judgment. The affidavit purports to be a response to the summary judgment applications as well as an affidavit in support of an application for the further amendment of the statement of claim.

[16] The affidavit simply refers to a further amended statement of claim which the claimant avers is an attempt to clarify the case against the defendants. The various reports of the receiver-manager are also exhibited to the affidavit.


**ANALYSIS**

**Summary Judgment Principles**

[17]   CPR 15.2 provides that the court may give summary judgment on the claim if it considers that the claimant has no real prospect of succeeding on the claim or issue.

[18]    A realistic prospect of success is not tantamount to actual success. In the often quoted case of **Swain v Hillman**[1] Lord Woolf expounded:

> 'The words "no real prospect of succeeding" do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success or..... they direct the Court to the need to see whether there is a "realistic" as opposed to "fanciful" prospect of success.'

[19]    In order to determine whether this threshold for summary judgment has been met Pereira CJ in the case of **Didier et al v Royal Caribbean Cruises**[2] advised that the court should:

> 'consider the legal issues in the case, determine, on a balance of probabilities and in light of the affidavit evidence adduced by the parties, whether one party or the other has no real prospect of succeeding on the claim.'

[20]    In this regard the court is also mindful of that in reaching a conclusion the court should not conduct a mini trial[3] but should engage in an analysis of the pleadings and the evidence to determine whether the claim should be dispensed with summarily as having no realistic prospect of success.

[21]    Having regard to the above the court will identify the legal issues extrapolated from the claim and thereafter make a determination as to whether summary judgment may be entered either against the claim in whole or on a particular issue.

[22]    The claimant asserts that the defendants are liable to him under the tort of negligence. The tort of negligence has three component parts comprising of a duty of care owed by the defendant to the claimant, a breach of that duty and loss or damage directly attributed to the breach. All of these must be satisfied in order for the tort to exist.

---

[1] [2001] 1 All E.R. 91
[2] [2016] ECSCJ No. 105
[3] Swain v Hillman [2001] 1 All E.R. 91

[23]    The claimant claims that the directors of the bank were under a legal obligation to act in the best interests of both the bank and its depositors. He rationalises that the defendants owed a duty of care to depositors, 'the latter being persons whom it would have been reasonable to foresee might suffer harm from any breach of duty by the defendants.'

[24]    The test for determining whether a duty of care will be deemed to exist is derived from the case of **Caparo Industries Plc v Dickman and Others**.[4] Here the court set out three principles which must be found in order for the tort of negligence to exist. These principles are as follows:

   (1) The relationship between the parties must be one of sufficient proximity.

   (2) It must be reasonably foreseeable that the actions of the defendant will cause harm or loss to the claimant.

   (3) The court must consider it to be fair just and reasonable to impose a duty of care on the defendant.

[25]    Having regard to the above the court must first seek to determine what relationship if any exists between the defendants and the claimant. In the instant matter the claimant has sued the defendants on the basis that they are directors of the bank responsible for the management of the banks affairs. The relationship between the defendants and the bank is therefore contractual.

[26]    The bank also has a contractual relationship with the claimant as its customer. The effect of that relationship is such that when a customer deposits money into an account that customer becomes the lender and the bank becomes the debtor of the customer. Once moneys are deposited by the customer, it ceases to belong to the customer and becomes the property of the bank whom can use the same as it sees fit. The customer as creditor becomes entitled to the repayment of any sum deposited upon demand. As far back as 1948

---

[4]  11 LDAB 563

the House of Lords in the case of **Foley v Hill and others**[5] endorsed this view and stated:

> 'Money, when paid into a bank, ceases altogether to be the money of the principal; it is by then the money of the banker, who is bound to return an equivalent by paying a similar sum to that deposited with him when he is asked for it. The money paid into a banker's is money known by the principal to be placed there for the purpose of being under the control of the banker; it is then the banker's money; he is known to deal with it as his own; he makes what profit of it he can, which profit he retains to himself, paying back only the principal, according to the custom of bankers in some places, or the principal and a small rate of interest, according to the custom of bankers in other places. The money placed in custody of a banker is, to all intents and purposes, the money of the banker, to do with it as he pleases; he is guilty of no breach of trust in employing it; he is not answerable to the principal if he puts it into jeopardy, if he engages in a hazardous speculation; he is not bound to keep it or deal with it as the property of his principal; but he is, of course, answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into his hands.
>
> That has been the subject of discussion in various cases, and that has been established to be the relative situation of banker and customer. That being established to be the relative situations of banker and customer, the banker is not an agent or factor, but he is a debtor.'

[27]    Having regard to the above it is pellucid that there exists two contractual relationships, one with the bank and the defendants as directors on the one hand and the bank and the claimant as customer on the other. These two contractual relationships are separate and distinct from each other. There is no privity of contract between the

---

[5] [1848] 9 ER 1002

directors of the bank and the customer of the bank in any of the contractual agreements.

[28]    In addition to there being no contractual relationship between the claimant and the defendants, there also appears to be no agency relationship between or concerning the parties and none has been pleaded.

[29]    It is a well-known principle that a company is a separate and distinct entity to its directors. The exception to this sacrosanct principle is where the company is a sham or is being used for an unlawful purpose. In such circumstances an application will be made to pierce the corporate veil to establish that the directors and the company are in effect one and the same and thereby at least on the face of it create a nexus between the parties. The claimant has however not made any such submission and in fact the bank has not been joined as a party.

[30]    Further the fact that the defendants worked for the bank does not automatically translate into there being a relationship of proximity between themselves and the claimant as customer of the bank, with whom they have no direct dealings, agreement and or involvement.

[31]    Accordingly in light of the above the claimant has failed to establish the proximity of relationship required for the duty of care to arise.

[32]    In addition to the above, the claimant has also failed the third limb of the Caparo test, that is whether it is fair just and reasonable to impose a duty of care on the defendants. The claimant has acknowledged that the bank is currently in liquidation proceedings. Based on the contractual relationship with the bank the claimant would be entitled to recover any sums due as payable to him if any upon the conclusion of the same. Parliament intentionally created a detailed statutory regime to deal with creditor entitlements upon the insolvency of an entity. The attempt to recover all moneys deposited with the now insolvent bank by virtue of these proceedings is tantamount to an attempt to circumvent the statutory process. Moreover I accept that the claimant as one of many depositors of the bank would by virtue of these proceedings attempt to open the floodgates by these

proceedings. Public policy will thereby preclude the tort of negligence from being extended in these circumstances.

[33]   The claimant also claimed an action against the defendants as directors for breach of fiduciary duty. A director as a fiduciary owes a duty to act honestly, in good faith and with regard to the best interest of the company. This common law duty has also been encapsulated in both the Company Act of Antigua section 97 as well as section 95[1][b] of the International Business Corporations Act Cap. 222 of the Laws of Antigua and Barbuda. As it relates to the statute the court must give effect to its clear and unambiguous words. In the absence of anything further the court cannot import any additional persons or entities to extend this duty to the claimant.

[34]   With respect to the common law duty of care, the interest of a director being only to the company has been explored in a multiplicity of cases including the case of **Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Service Ltd.**[6] In that case Dillon LJ expressed that the fiduciary duty was owed to the company and not to a shareholder or creditor. He stated:

> 'The directors indeed stand in a fiduciary relationship to the company as they are appointed to manage the affairs of the company and they owe fiduciary duties to the company though not to the creditors, present or future or to individual shareholders.'

[35]   In light of the above the claimant is unable to prove that he is a proper party to whom a statutory and or common law fiduciary duty owed.

[36]   The final cause of action of the claimant concerns the assertion of breach of trust. In support of this contention the claimant relies on the report of the receiver-manager which details the financial position of the bank. Once again the claimant relies on his status as a depositor and customer of the bank to seek to establish this relationship. However as previously indicated the deposit of money gives rise to the relationship of debtor and creditor. Halsbury's Laws of

---

[6] [1983] Ch 258

England/Trusts and Powers (Volume 98 (2013))/1 affirms this and debunks the idea that a trust relationship is created. It states:

> 'The deposit of money with a bank normally gives rise to a loan (a debtor-creditor relationship) and not to a trust. This remains the case where a bank that is a trustee holding trust money banks the money with itself pursuant to an authority in that behalf in the trust instrument, so that the money can be used as normal in the bank's business (for example lending money). If the bank becomes insolvent the beneficiaries, merely having a thing in action against the bank, rank only as unsecured creditors.'

[37]    I adopt this posture and find that the relationship of the claimant and the bank does not create a trust. Further there is no trust agreement which was entered into by the claimant and the defendants, neither did the defendants purport to act for the claimant in any advisory or any capacity concerning the funds deposited with the bank. The claimant therefore also fails on the issue of there being a breach of trust.

## ORDER

[38]    Based on the foregoing I make the following order:

1. That the applications for summary judgment are both granted. Judgment is entered for the first, second and fourth defendants against the claimant.
2. The claimant shall pay the first and second defendants cost in the sum of $1,500.00.
3. The claimant shall pay the fourth defendant costs in the sum of $1,500.00.

**Jan Drysdale**

**Master**

**By The Court**

**Registrar**

# Exhibit G

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE COURT OF APPEAL**

**ANGUILLA**

**AXAHCVAP2020/0005**

**BETWEEN:**

**IAN HOPE-ROSS**

Appellant

**and**

[1]   **MARTIN DINNING**
[2]   **HUDSON CARR**
[3]   **SHAWN WILLIAMS**
[4]   **ROBERT MILLER**
[5]   **EASTERN CARIBBEAN CENTRAL BANK**

Respondents

**CONSOLIDATED WITH:**

**AXAHCVAP2020/0006**

**BETWEEN:**

[1]   **CHRISTOPHER LISS**
[2]   **KATHY LISS**
[3]   **YELLOW WOOD HOUSES LTD.**
[4]   **TIRDEO DHARAMRAJ**
[5]   **SUMMER BREEZE LTD.**
[6]   **OCEAN INVESTMENT**
[7]   **NORTH EASTERN INSURANCE SERVICES**
[8]   **NIVEK LIMITED**
[9]   **ERMANNO GALLI**
[10] **SUNIL PISHU KHATNANI**
[11] **MARTIN OLIVER**
[12] **IAN GURR**
[13] **RENDEZVOUS TOUR COMPANY LTD.**
[14] **WILLIAM DORSEY**
[15] **DOTTY DORSEY**
[16] **LONGWALL INVESTMENTS N.V.**
[17] **DWS GROUP LIMITED**
[18] **JURGEN KURT SCHWIRTLICH**
[19] **WINCHESTER CORP. LIMITED**
[20] **DR. AHMET BAYDAR**

1

**[21]  TERI BAYDAR**
**[22]  KENNETH R. LANG**
**[23]  TOMAZ SLIVNIK**
**[24]  MONIQUE BAUSSAN**
**[25]  RICHARD HOLUBOWICZ**
**[26]  LITTLE BAY VENTURE CAPITAL LTD**
**[27]  KEVIN GAVIN**
**[28]  LENA GAVIN**
**[29]  DANIEL GAVIN**
**[30]  DARLENE SPICER**
**[31]  MARIE THERESE ROBERT**
**[32]  MARY VAN DEN BERG**
**[33]  ROBERT HORVATH**
**[34]  DANIELLE HORVATH**
**[35]  ROACH MERLE**
**[36]  JUDETT BLACK**
**[37]  DR. CATHERINE VUALA**
**[38]  JOSETTE SOPHIA PETERSON**
**[39]  INTERNATIONAL MORTGAGES LTD.**

Appellants

**and**

**[1]  MARTIN DINNING**
**[2]  HUDSON CARR**
**[3]  SHAWN WILLIAMS**
**[4]  ROBERT MILLER**
**[5]  EASTERN CARIBBEAN CENTRAL BANK**

Respondents

**CONSOLIDATED WITH:**

**AXAHCVAP2020/0007**

**BETWEEN:**

**[1]  SATAY LIMITED**
**[2]  UNITED DUTY FREE CONCESSIONARIES LTD.**
**[3]  HELEN  BAYER  CONSTABLE,  PATRICK CONSTABLE AND WALTER BAYER II.**
**[4]  HELEN  BAYER  CONSTABLE,  TERESA  BAYER AND WALTER BAYER II**
**[5]  CADIZ HOLDINGS LTD**
**[6]  CHANTAL CLOUTIER**
**[7]  CMS MANAGEMENT LTD**

2

[8]    DAVID CROWLEY
[9]    D.N.A. PATENTS, INC
[10]   DCIPHER INC.
[11]   VODACO LIMITED
[12]   DIAMONT COMPANY N.V.
[13]   DUNA HOLDING LIMITED
[14]   EQUIPMENT LEASING LTD
[15]   VAN VEEN CARIBBEAN HOLDINGS
[16]   JASON FREEMAN
[17]   HBM(ANGUILLA) LTD
[18]   HEIDI HOBGOOD
[19]   HOPE-ROSS AND THOMPSON
[20]   IHATSU FUDOSAN CAPITAL LIMITED
[21]   SEAN KENNELLY
[22]   A & A LIMITED
[23]   EDOUARD LEDEE
[24]   ANTHONY MARINI
[25]   MARS EXPLORATION INC
[26]   LISA MARSHALL
[27]   LATIN RETREATS
[28]   DOMINIQUE NOIRE
[29]   FRANK OLIVIERO
[30]   COLIN PERCY
[31]   FRANCIS RAINEAU
[32]   NECOL LIMITED
[33]   RHINO LLC
[34]   FSC MANAGEMENT ATTORNEY LLC
[35]   CANON LIMITED
[36]   SUNNY DAYS MANAGEMENT CORPORATION
[37]   SYNETICS CAPITAL CORP LIMITED
[38]   GLENYS TAILLON
[39]   TSS LLC
[40]   ROBERT VELASQUEZ
[41]   ANNETTE KRABBE
[42]   SIMON DRAKE
[43]   JOHN MICHAEL VICTORY
[44]   LORRAINE TYSON
[45]   STEPHEN JOSEPH CAVAGNARO
[46]   GARY CHARKHAM
[47]   SUNSHINE PROPERTIES LIMITED
[48]   LAURA F. E. VAN HOEVE
[49]   VANITA MIRCHANDANI
[50]   SHARRON YUAN-SAM
[51]   GILLIAN LOOSER
[52]   ANGELA TYLER
[53]   THE LITTLE SHIP COMPANY LTD
[54]   JERRI-LYN ZIMMERMAN

3

[55]    **RAYMOND LONGBOTTOM**
[56]    **MANNING KONG**
[57]    **PAMELA YEE LAWRENCE**
[58]    **ISABELLE PATRY**
[59]    **MARIA INES ALMEIDA**
[60]    **MARLAM LTD.**
[61]    **DARLINE DESTEPHENS**
[62]    **HOLLY HAVEN, LTD**
[63]    **HABIB JIHA**
[64]    **MENAVIA LANGLAIS**
[65]    **HIROKO YOSHIDA**

Appellants

**and**

[1]    **MARTIN DINNING**
[2]    **HUDSON CARR**
[3]    **SHAWN WILLIAMS**
[4]    **ROBERT MILLER**
[5]    **EASTERN CARIBBEAN CENTRAL BANK**

Respondents

**Before:**
The Hon. Mr. Mario Michel                    Justice of Appeal
The Hon. Mr. Gerard St. C. Farara            Justice of Appeal [Ag.]
The Hon. Mde. Esco Henry                     Justice of Appeal [Ag.]

**Appearances:**
Mr. Ian Benjamin, SC with him, Ms. Rayana Dowden for the Appellants
Mr. Paul Dennis, QC with him, Mrs. Nadine Whyte-Laing and Ms. Navine Fleming
for the Respondents

_____

2021:   January 28;
April 30.

_____

*Interlocutory appeal – Case management powers under rule 26.3 of Civil Procedure Rules 2000 – Rule 26.3(1)(b) of Civil Procedure Rules 2000 – Striking out of statement of claim – Reasonable grounds for bringing the claim – Whether pleadings disclosed reasonable grounds for bringing claims – Negligence – Breach of fiduciary duty – Breach of trust – Exercise of judicial discretion – Approach of appellate court to exercise of case management discretion – Whether the master erred in law by concluding that the appellants' statements of claim disclosed no reasonable grounds for bringing the claims against the respondents*

4

*for negligence, breach of fiduciary duty and breach of trust – Whether the master erred in failing to properly consider matters pleaded in the appellants' statements of claim – Amendments to statements of claim in lieu of striking out – Whether the master ought to have granted leave to appellants to amend statement of claim in lieu of exercising his discretion to strike them out*

The appellants in these consolidated appeals were depositors either with the National Bank of Anguilla (Private Banking and Trust) Limited ("PBT") or the Caribbean Commercial Investment Bank Limited ("CCIB") (collectively referred to as "the Banks"). The Banks are companies licensed to carry on offshore banking business in Anguilla and are regulated by the Anguilla Financial Services Commission. PBT is wholly owned by the National Bank of Anguilla Limited ("NBA") and CCIB is wholly owned by the Caribbean Commercial Bank (Anguilla) Limited ("CCB Anguilla"). In August 2013, the Eastern Caribbean Central Bank (the "ECCB"), as the monetary authority and regulator of domestic banking in Anguilla, exercised its powers under article 5B of the Eastern Caribbean Central Bank Agreement Act ("the ECCB Act") to place NBA and CCB Anguilla under conservatorship. During the period August 2013 to April 2016, the ECCB appointed the 1st to 4th respondents variously as conservators over NBA and CCB Anguilla ("the Conservators"). On 22nd April 2016, the assets of PBT and CCIB were transferred to a new legal entity, the National Commercial Bank of Anguilla ("NCBA").

The appellants commenced three claims against the ECCB and against the Conservators as *de facto* directors of PBT and CCIB. The claims were for breach of fiduciary duty, breach of trust, and knowing assistance occasioned by the alleged conduct of the Conservators and the ECCB in relation to the monies deposited by the individual appellants with the Banks. The 1st, 2nd, 3rd and 5th respondents sought to strike out the appellants' statements of claim on the basis that the statements of claim did not disclose any reasonable ground for bringing the claims; alternatively, that the appellants had no reasonable prospect of succeeding on their claims and there was no reason why the claims should be disposed of by way of a trial. The learned master granted the strike out application and held that two contractual relationships may exist in this case: one between the Banks and the 1st, 2nd, 3rd and 4th respondents as directors and another between the Banks and the appellants as customers. The learned master found that there was no duty of care owed to the appellants by the respondents and that no fiduciary duties could be made out on the pleadings. The learned master found further that the deposit of money by the appellants gave rise solely to a debtor and creditor relationship and did not give rise to a trustee relationship capable of giving rise to a breach of trust.

Being dissatisfied with the learned master's decision, the appellants appealed. The following issues arise for this Court's determination: (i) whether the master erred in law by concluding that the appellants' statements of claim disclosed no reasonable grounds for bringing the claims against the respondents for negligence, breach of fiduciary duty and breach of trust; (ii) whether the master erred in failing to properly consider the appellants' pleaded case in their statements of claim in relation to the alleged breach of article 5B of the ECCB Act; the alleged breach of section 7 of the Constitution; and the 'knowing assistance' allegation at paragraph 30 of the statements of claim; and (iii) whether the learned master ought to have

granted leave to the appellants to amend their statements of claim in lieu of exercising his discretion to strike them out.

**Held:** dismissing the appeals and ordering the appellants to pay the respondents' costs, to be assessed by a judge or master of the High Court at no more than two-thirds of the costs in the court below, if not agreed within 21 days, that:

1.  The court, in the exercise of its case management powers under CPR 26.3(1)(b), has a discretion to strike out a statement of claim or any part thereof where it is shown that the statement of claim discloses no reasonable ground for bringing the claim. It is settled that an appellate court will not lightly interfere with the exercise of a discretionary case management power. In order to successfully challenge the exercise of the court's discretion, the appellants must therefore discharge the heavy burden of showing that the learned master was wrong in the exercise of his discretion to strike out the appellants' claims in the sense that the decision to strike out the claims was plainly wrong or falls outside the generous ambit within which reasonable disagreement is possible.

    Rules 1.2 and 26.3(1)(b) of the **Civil Procedure Rules 2000** applied; **Michel Dufour and others v Helenair Corporation Limited and others** [2002] ECSCJ No. 243 (delivered 2nd August 2002) considered **Peter Toussaint et al v Martine Johnson (Representative of the Estate of Peter Michael Barnard)**, SLUHCVAP2018/0024 (delivered 16th September 2020, unreported) considered; **America 2030 Capital Limited et al v Sunpower Business Group PTE Ltd et al** [2020] ECSCJ No. 361 (delivered 26th October 2020) considered.

2.  In this case, the master's decision to strike out the claims for breach of fiduciary duty and breach of trust cannot be impeached. This is because the relationship between banker and customer does not ordinarily give rise to a fiduciary relationship or to a trustee/beneficiary relationship. The relationship between banker and customer is purely one of debtor and creditor. Accordingly, the monies deposited by a customer with a bank gives rise to a debt as between the depositor and the bank, and not a right or interest over any property held by the bank. The deposit gives rise to a chose in action, namely the right of the depositor, on request, to payment by the bank of the whole or any part of the aggregate amount of principal and interest which has been credited or ought to be credited to the depositor's account at the bank.

    **Foley v Hill and Others** (1848) 2 HLC 28 applied; **Hirschhorn v Evans (Barclays Bank Ltd garnishees)** [1938] 2 KB 801 considered; **Space Investments Ltd v Canadian Imperial Bank of Commerce and others** [1986] 1 WLR 1072 applied.

3.  In this case, the master's finding that the appellants had no reasonable grounds in law for bringing their claims against the respondents cannot be impugned. This is so because a party seeking to establish that a fiduciary relationship or a trustee/beneficiary relationship (and therefore questions of breach of fiduciary duties, or a breach of trust) can arise in the context of a bank/customer relationship, must specifically plead and prove that such a relationship and duty exists. The facts

relied on in the appellants' pleaded cases must be sufficient to establish a viable claim for breach of fiduciary duty and breach of trust, outside the mere existence of the banker/customer relationship. In the present case, however, the pleadings do not go further than relying on the usual parameters of the bank/customer relationship in seeking to establish that a fiduciary relationship or a trustee/beneficiary relationship existed. Accordingly, the learned master did not err in the exercise of his discretion in striking out the appellants' claims.

**National Commercial Bank (Jamaica) Ltd v Hew and others** [2003] UKPC 5 considered; **Fahad Al Tamimi v Mohamad Khodari** [2009] EWCA Civ 1109 considered; **Bartlett v Barclays Bank Trust Co Ltd** [1980] 1 All ER 139 considered; **Tiger v Barclays Bank Ltd** [1952] 1 All ER 85 considered; **Bristol and West Building Society v Mothew** [1997] 2 WLR 436 applied; **Williams v Central Bank of Nigeria** [2014] AC 1189 applied.

4.  In the present case, the appellants' claim is one against the Banks for recovery of the debts owed to them (the chose in action) in the sum of their deposits plus any interest due to them in accordance with the terms of their banking contracts. Therefore, while it is arguable on certain pleaded facts that a parent company may owe a common law duty of care to individuals who suffer harm as a result of their subsidiary's dangerous activities, the appellants' pleaded case on the issue of negligence, fails on the basis that the appellants' monies, once deposited with the Banks, were no longer the property of the appellants.  Accordingly, the master rightly found that the appellants are not permitted to claim against the Conservators as *de facto or de jure* directors for their deposits with the Banks.

**Williams v Natural Life Health Foods Ltd** [1998] WLR 830 considered; **White v Jones** [1995] 2 AC 205 considered; **Lungowe v Vedanta Resources** [2019] UKSC 20 considered; **Okpabi and others v Royal Dutch Shell Plc and another** 2021] UKSC 3 considered.

5.  It is not open to the appellants to transform their claim for breach of fiduciary duties, breach of trust and negligence, into a claim for deprivation of property under the Constitution or into a challenge to the nature and exercise by the ECCB of powers under the ECCB Act, where it is clear that the claims were not instituted for that purpose or on that basis. The appellants' claims clearly sought to establish the respondents' liability for negligence, breach of fiduciary duty and breach of trust. The appellants' claims were neither in form nor substance claims for deprivation of property under the Constitution nor did they seek relief under the Constitution or pursuant to CPR Part 56. Moreover, the claim at paragraphs 27 and 29 respectively of the appellants' statements of claim asserts a breach of section 7 of the Constitution as a consequence of the transfer of the deposits made by the appellants in PBT and CCIB to NCBA, with respect to which deposits the appellants have no legal or proprietary interest.  Further, by logical extension, there could be no viable claim against the respondents, as pleaded, for knowingly assisting the Government of Anguilla with depriving the appellants of their monies, even if such a cause of action exists in law or in equity.  Accordingly, the learned master's

decision to treat with the matter as a claim engaging the causes of action set out in the claim forms, was correct and cannot be a basis upon which this Court may interfere with the said decision.

**The Attorney General of Anguilla et al v Bernice Lake et al** Anguilla Civil Appeal No. 4 of 2004 (delivered 4th April 2005, unreported) distinguished; **Gulf Insurance Ltd v The Central Bank of Trinidad and Tobago** [2005] UKPC 10 distinguished.

6.   When called upon to strike out a statement of claim or part thereof, the court ought to consider whether it is in the interests of justice to permit an amendment to the impugned statement of claim in lieu of striking out.  In this case, there were several defects in the appellants' claims as pleaded, principal among which is that the claims seek relief of the court in relation to the money deposited with the Banks by the appellants.   To permit an amendment in these circumstances would be to grant leave for the appellants to transform their claims into something that it was clearly never intended to be, this would be overwhelmingly and disproportionately unfair to the respondents and accordingly inimical to the overriding objective.

**Real Time Systems Limited v Renraw Investments Limited and Others** [2014] UKPC applied.

## JUDGMENT

[1]    **FARARA JA [AG.]**:  By a written judgment dated 20th March 2020, a learned master struck out three claims brought by 105 claimants against the Eastern Caribbean Central Bank and the four conservators of two banks located in Anguilla, on the basis that there were no reasonable grounds for bringing the claims; and made an order for costs against the appellants.  The claims in the court below were for breach of fiduciary duty, breach of trust, and knowing assistance occasioned by alleged conduct of the conservators and the Eastern Caribbean Central Bank in relation to the monies deposited by the individual claimants with the offshore banks.  By this consolidated appeal, the appellants (the claimants in the court below) seek to have the decision of the learned master set aside in its entirety and the claims restored on the grounds that the learned master failed to properly consider the circumstances of each case in arriving at his decision, and in so doing misapplied the test for striking out a statement of claim pursuant to rule 26.3(1)(b) of the **Civil Procedure Rules 2000** (the "CPR").

**Background**

[2]     The appellants were depositors either with the National Bank of Anguilla (Private Banking and Trust) Limited ("PBT") or the Caribbean Commercial Investment Bank Limited ("CCIB").  I shall refer to PBT and CCIB collectively as "the Banks".  PBT and CCIB are companies incorporated under the laws of Anguilla, licensed to carry on offshore banking business in Anguilla and are regulated by the Anguilla Financial Services Commission.  PBT is wholly owned by the National Bank of Anguilla Limited ("NBA") and CCIB is wholly owned by the Caribbean Commercial Bank (Anguilla) Limited ("CCB Anguilla").

[3]     On 12th August 2013, the 5th respondent, the Eastern Caribbean Central Bank (the "ECCB") as the monetary authority and regulator of domestic banking in Anguilla, exercised its powers under article 5B of the **Eastern Caribbean Central Bank Agreement Act**[1] ("the ECCB Act") to place NBA and CCB Anguilla under conservatorship.  Article 5B of the ECCB Agreement on its face permits the ECCB, in certain circumstances, to take control of the property and undertakings of a financial institution licensed under the **Banking Act**.[2]  In the cases of NBA and CCB Anguilla, this included taking control of the rights attached to their shareholdings in the Banks.   During the period 12th August 2013 to 22nd April 2016, the ECCB appointed Martin Dinning, Hudson Carr, Shawn Williams and Robert Miller (the 1st to 4th respondents) as the conservators over NBA and CCB Anguilla.  I hereafter refer to the 1st to 4th respondents as "the Conservators".

[4]     As at the date of their appointment, the Conservators continued the management of the day-to-day operations of the Banks in accordance with management agreements between the Banks on the one hand and NBA and CCB Anguilla on the other, while a resolution plan was being formulated and funding was being sourced for the resolution.  On 22nd February 2016, Mr. William Tacon was appointed as administrator and took control of the Banks.  On 22nd April 2016, the ECCB

---

[1] Revised Statutes of Anguilla, c.E5.
[2] Revised Statutes of Anguilla, c. B11.

relinquished control of NBA and CCB Anguilla and, on that date, NBA and CCB Anguilla were placed in receivership and ceased to carry on banking business in Anguilla.

**The claims**

[5]     The appellants, in their capacities as depositors of the Banks, commenced three claims against the ECCB, as the monetary authority for Anguilla and against the Conservators, as *de facto* directors of PBT and CCIB. These claims respectively are AXAHCV2016/0051, AXAHCV2019/0035 and AXAHCV2019/0039.  Both in the court below, and before this Court, it is common ground that the pleaded cases in each of the claims are materially identical, save for the quantum of damages sought on each claim.

[6]     The claims allege that the appellants, who held personal savings accounts, personal chequing accounts and deposit accounts with the Banks, were able to transact normal banking business with the Banks from April 2005 to 12th August 2013. Thereafter, the appellants were granted limited access to their funds.  From October 2013, the appellants who had personal savings accounts or certificates of deposits were unable to access their funds, and from 19th April 2016 to present, the appellants have been unable to access any funds deposited into their respective accounts before 24th March 2016.

[7]     The appellants, by their claims, attribute this state of affairs to the intervention of the ECCB and the Conservators.

[8]     In relation to the ECCB, the appellants claimed that article 5B of the ECCB Agreement does not give the ECCB the power to take control of the affiliates of the financial institutions which it perceives to be in financial difficulty. The Notice of Intervention gazetted on 22nd August 2016, pursuant to article 5B, states that the ECCB was taking control of the property and affairs of NBA and CCB Anguilla. This notice did not and could not extend to the Banks which are separate legal entities not regulated by the ECCB. In the premises, during the period 12th August 2013 to

10

24ᵗʰ March 2016, the appellants claimed that the respondents had no authority to take control of the Banks and intermeddle with its property.

[9]     The appellants claimed that by providing oversight and management of the Banks, the Conservators and the ECCB acted as de facto directors of the Banks and owed a fiduciary duty of care to the appellants, as creditors, to act in good faith and with due diligence when they assumed the custody and administration of the property of the Banks, including deposits made by the appellants since 2005.  This duty of care to consider the interest of the appellants as creditors was paramount, as the respondents were aware or ought to have known that the Banks and their respective parent companies were insolvent, on the brink of insolvency, at risk of insolvency or of doubtful solvency.   The respondents therefore acted negligently in their management of the Banks and in breach of trust, which resulted in loss to the appellants.

[10]    The appellants further pleaded that, on 22ⁿᵈ April 2016, a 'resolution plan' was effected with the full knowledge of the ECCB.  As part of this plan, the assets of the Banks, including the deposits made by the appellants, were transferred to a new legal entity, the National Commercial Bank of Anguilla ("NCBA"), in breach of section 7 of the **Anguilla Constitution Order, 1982**[3] ("the Constitution"); and of the European Convention on Human Rights, which was extended to Anguilla in 1988. The respondents, being aware of the details of the 'resolution plan' and its consequences, knowingly assisted the Government of Anguilla in depriving the appellants of their monies.

[11]    The appellants claimed that, as of the date of the claims, they were still unable to access their funds deposited in the Banks, and sought damages in the following sums:

(i)   in AXAHCV2016/0051, USD $13,028,846.17.

[3] S.I. No. 334 of 1982.

(ii)  in AXAHCV2019/0035, USD $17,328,419.81, GBP 25,681.25 and Euro €42,990.89; and

(iii)  in AXAHCV2019/0039, USD $472,743.83; plus, interest in accordance with the term of the accounts for the period August 2013 to present.

[12]    Learned Senior Counsel, Mr. Benjamin who appeared for the appellants (but who did not appear for the appellants in the court below) apprised the Court of his instructions that the respondents filed a defence only in AXAHCV2016/0051 and therefore that the pleadings in that claim are closed, whereas no defence was filed in AXAHCV2019/0035 or AXAHCV2019/0039. A copy of the respondents' defence in AXAHCV2016/0051 had not been included in the record of appeal.

**The application to strike and the master's decision**

[13]    On 27th September 2019, the 1st, 2nd, 3rd and 5th respondents filed an application ("the strike out application") seeking, in the main, orders that the appellants' statements of claim be struck out pursuant to CPR 26.3(1)(b) and/or that summary judgment be granted to the defendant pursuant to CPR 15.2(a), on the basis that the statements of claim did not disclose any reasonable ground for bringing the claims; alternatively, that the appellants had no reasonable prospect of succeeding on their claim and there is no other reason why the claims should be disposed of by way of trial. The application centred principally on the grounds that the relationship between the appellants on the one hand, and the Banks on the other hand, was contractual and was that of creditor and debtor and therefore could not give rise to a breach of trust or duty of care as between the Banks (and by extension the Conservators as *de facto* directors) and the appellants. The respondents contended that as the funds deposited with the Banks by the appellants were not held in trust by the Banks on behalf of the appellants, and therefore the respondents could not have acted in breach of trust. Further, the directors of a company have a duty to consider the interest of creditors when the company is insolvent or when there is a real risk of insolvency. However, that duty is owed to the company and not to its

creditor. The Conservators therefore, whether as *de facto* or *de jure* directors could owe no fiduciary duty or duty of care to the appellants as creditors of the Banks.

[14]  In a written judgment dated 20th March 2020, the learned master granted the strike out application, having accepted the respondents' submissions in their entirety.  The master accepted that the test for determining whether a duty of care exists under the tort of negligence is derived from **Caparo Industries Plc. v Dickman and others**,[4] which established that a duty of care will only exist in law where the relationship between the parties is one of sufficient proximity, it is reasonably foreseeable that the actions of the defendant will cause harm or loss to the claimant, and where the court considers it to be fair, just and reasonable to impose a duty of care on the defendant.  On the footing of **Caparo v Dickman**, the learned master opined that the court must seek to determine what relationship, if any, exists between the defendants and the claimants.  In determining whether a duty of care was owed, the learned master was guided by the decision of the House of Lords in **Foley v Hill and Others**.[5] He reasoned that two contractual relationships may exist in this case – one between the Banks and the 1st, 2nd, 3rd and 4th  respondents, as directors, and another between the Banks and the appellants, as customers.[6]  The learned master found, on the basis of **Foley v Hill**, that there was no duty of care owed to the appellants by the respondents.

[15]  On the question of whether the appellants had a real prospect of succeeding on their claims for breach of fiduciary duties, the master accepted the submissions of the respondents which were founded on the decision of **BTI 2014 LLC v Sequana SA and Others**.[7] The learned master accepted that **BTI** established the principle that the directors of a company will only have a duty to regard the creditors of the company in circumstances where the company is insolvent, and the assets of the insolvent company are, in a practical sense, the assets of the creditors pending

---

[4] [1990] UKHL 2.
[5] (1848) 2 HLC 28.
[6] See paragraph 66 of the judgment below.
[7] [2019] EWCA Civ 112.

liquidation or return to solvency.  Once it is established that directors are under a duty to have regard to the interest of creditors, a breach of that duty will entitle only the company to recover compensation for loss caused to the company.  Without making any such finding expressly, it is clear that the learned master did not consider that any fiduciary duties could be made out on the pleadings, on the basis that the pleadings in this case did not fall within the parameters of **BTI**.

[16]     On the question of breach of trust, the master accepted the respondents' submission that the deposit of money by the appellants solely gave rise to a debtor and creditor relationship and did not give rise to a trustee relationship capable of giving rise to a breach of trust.   In this regard the learned master relied on a passage from **Halsbury's Laws of England Trust and Powers**[8] which states:

> "The deposit of money with a bank normally gives rise to a loan (a debtor – creditor) and not a trust. This remains the case where a bank that is a trustee holding trust money, banks the money with itself pursuant to an authority in that behalf in the trust instrument, so that the money can be used as normal in the bank's business (for example lending money). If the bank becomes insolvent the beneficiaries, merely having a taking in action against the bank, mark only as unsecured creditors."

[17]     The learned master accordingly ordered:

> "1.  The [appellants'] claim forms and statements of claim are struck out.
>  2. The [appellants] are to pay the [respondents'] cost[s] of this application to be assessed in default of agreement."

**The Appeal**

[18]     The appellants now appeal the decision of the learned master on grounds which challenge, as blatantly wrong, the learned master's conclusions that the statements of claim did not disclose any reasonable grounds for bringing the claim and that respondents could not in law owe the appellants, in their capacities as creditors of the Banks, a duty of care either in equity or at common law.   From the grounds of appeal, the oral arguments and the written submissions and authorities on both sides, the following issues arise for this Court's determination:

---

[8] Halsbury's Laws of England, Vol. 98 (2013).

(i)     Whether the master erred in law by concluding that the appellants' statements of claim disclosed no reasonable grounds for bringing the claims against the respondents for negligence, breach of fiduciary duty and breach of trust.

(ii)     Whether the master erred in failing to properly consider the appellant's pleaded case in their statement of claim in relation to: (i) the alleged breach of article 5B of the ECCB Act; (ii) the alleged breach of section 7 of the Constitution; and (iii) the 'knowing assistance' allegation at paragraph 30 of the statements of claim.

(iii)     Whether the master ought to have granted leave to the appellants to amend their statements of claim in lieu of exercising his discretion to strike them out.

[19]     As a background to these issues, I will now briefly discuss the law applicable to applications to strike pursuant to rule 26.3(1)(b) of the CPR.

**Law Applicable to Strike Out Applications**

[20]     CPR 26.3(1)(b) confers on the court a discretion to strike out a statement of claim or any part thereof where it is shown that the statement of claim or part of it does not disclose any reasonable ground for bringing or defending a claim. CPR 26.3(1)(b) states as follows:

> "(1) In addition to any other power under these Rules, the court may strike out a statement of case or part of a statement of case if it appears to the court that –
> …
> (b) the statement of case or the part to be struck out does not disclose any reasonable ground for bringing or defending a claim…".

[21]     As with every discretion conferred upon the court by the CPR, the discretion to strike out must be exercised in accordance with law and with a view to furthering the

overriding objective.[9]  The central principles which undergird the court's jurisdiction to strike out all or part of a statement claim are now settled, have been consistently cited and applied by this Court, and need not be extensively recited.  In brief, these principles are as follows:

(i)    The court must be persuaded either that a party is unable to prove the allegations made against the other party; or that the statement of claim is incurably bad; or that it discloses no reasonable ground for bringing or defending the case in the sense that it has no real prospect of succeeding at trial.[10]

(ii)    A statement of claim is not suitable for striking out if it raises a serious live issue of fact which can only be determined by hearing oral evidence. Further, a statement of claim should not be struck out where the dispute between the parties involves a substantial point of law which does not admit of a plain and obvious answer, or the law is in a state of development, or where the strength of the case may not be clear because it has not been fully investigated. [11]

(iii)    On hearing an application to strike pursuant to CPR 26.3(1)(b), the pleadings alone are to be examined.  The trial judge should assume that the facts alleged in the statement of claim are true unless they are manifestly incapable of proof.[12]

(iv)    Striking out is a draconian step or "nuclear option" and ought only to be deployed sparingly, in the clearest of cases. The reason for proceeding cautiously is that the exercise of the jurisdiction to strike out deprives a party of its right to a trial and of its ability to strengthen its case through the

---

[9] See rule 1.2 of the Civil Procedure Rules 2000.

[10] CITCO Global Custody NV v Y2K Finance Inc [2009] ECSCJ No. 165 (delivered 19th October 2009).

[11] Ian Peters v Robert George Spencer [2009] ECSCJ No. 212 (delivered 22nd December 2009), per Pereira CJ; Tawney Assets Limited v East Pine Management Limited and others [2012] ECSCJ No. 284 (delivered 17th September 2012) per Gordon JA [Ag].

[12] CITCO Global Custody NV v Y2K Finance Inc [2009] ECSCJ No. 165 (delivered 19th October 2009) per Edwards JA at para. 13, and Martin Didier G.C et al v Royal Caribbean Cruises Ltd. SLUCVAP consolidated appeals 2014/0024 and 2014/0004 (delivered 6th June 2016, unreported) per Pereira CJ at para. 28.

process of disclosure, the filing of witness statements or witness summaries and other procedures such as requests for further information.[13]

(v) As striking out is a draconian step, the court must consider whether the interests of justice are better served by permitting an amendment, to pleadings or deploying some other sanction, instead of striking out the statement of claim.[14]

[22]    Again, the power to strike out a statement of claim or part of a statement of claim is one of the discretionary tools in the artillery of the court in the exercise of its case management powers under CPR 26.3(1)(b).  This appeal therefore engages the well-known principles set out in cases such as **Michel Dufour and others v Helenair Corporation Limited and others**,[15] **Peter Toussaint et al v Martine Johnson (Representative of the Estate of Peter Michael Barnard)**,[16] and **America 2030 Capital Limited et al v Sunpower Business Group PTE Ltd et al**[17] which underpin this Court's jurisdiction to review a lower court's exercise of a case management discretion.  An appellate court will not lightly interfere with the exercise of a discretionary case management power.   Therefore, in order to successfully challenge the exercise of the court's discretion, the appellants must therefore discharge the heavy burden of showing that the learned master was wrong in the exercise of his discretion to strike out the appellants' claims in the sense that the decision to strike out the claims was plainly wrong or falls outside the generous ambit within which reasonable disagreement is possible.

---

[13] Ian Peters v Robert George Spencer ANUHCVAP2009/0016 (delivered 22nd December 2009) per Creque JA; see also HRH Prince Abdulaziz Bin Mishal Bin Abdulaziz Al Saud v Apex Global Management Ltd and another [2014] EWCA Civ 1106.

[14] Pereira CJ in The Attorney General of Saint Lucia v Darrel Montrope [2020] ECSCJ No. 235. (delivered 9th July 2020); See also Peerless Limited v Gambling Regulatory Authority and others [2015] UKPC 29 and Real Time Systems Limited v Renraw Investments Limited and Others [2014] UKPC 6.

[15] [2002] ECSCJ No. 243 (delivered 2nd August 2002).

[16] SLUHCVAP2018/0024 (delivered 16th September 2020, unreported).

[17] [2020] ECSCJ No. 361 (delivered 26th and 30th October 2020); See also Nilon Limited and another v Royal Westminster Investments S.A. and others [2015] 3 All ER  372; HRH Prince Abdulaziz Bin Mishal Bin Abdulaziz Al Saud v Apex Global Management Ltd and another [2014] UKSC 64 and Marinor  Enterprises  Limited  et al  v  First Caribbean  International  Bank  (Barbados)  Ltd. DOMHCVAP2013/0003 (delivered  6th July 2016, unreported).

**Issue 1: Whether the master erred in law by concluding that the appellants' statements of claim disclosed no reasonable grounds for bringing the claims against the respondents for negligence, breach of fiduciary duty and breach of trust?**

[23]    The appellants argue that in reaching his decision to strike out, the master relied solely on the propositions that because the relationship between a banker and a bank will usually be one of creditor and debtor, rather than trustee and beneficiary, and that the so-called "creditors' interests duty" is owed only to the company and not to creditors, it followed that no duty of care (either at common law, or of a fiduciary nature in equity) could be owed by the respondents to the appellants.  This finding by the master in relation to the creditors' interest duty has not been challenged in this appeal.[18]

[24]    The appellants contend however that the nature of the "creditors' interests duty" is a separate question from whether the directors of a company or, for that matter any other person, may have assumed a duty of care to another, including to a creditor or customer of a company of which they are the director/controller, so as to attract liability in negligence.  By failing to consider this, the master failed to address the appellants' case which positively asserted that the respondents acted in breach of duty of care and/or fiduciary duties, having assumed fiduciary duties in the particular circumstances of this case.  He therefore wholly misunderstood the nature of the appellants' case in concluding that it should be struck out because it was unsustainable as a matter of law.

[25]    The appellants further contend that whether a party owes fiduciary duties to another is a fact-sensitive question for the court, which will not seek to impose rigid categories of fiduciary relationship on the situation given that the categories of fiduciary relationships are not closed.  Indeed, in appropriate circumstances banks and those through whom they act may owe fiduciary duties to a bank's customers.

---

[18] See paragraphs 33 and 34, and 71 to 73 of the supplemental submissions filed by the appellant on 12th December 2020.

In principle, this includes the directors of a bank.  Thus, it is perfectly possible for a bank and those controlling its affairs to owe fiduciary duties to the bank's customers in appropriate circumstances which, if breached, would give rise to liability for breach of fiduciary duty.  The appellants contend that by their words and/or conduct, including by sending letters and intermeddling in the relationship between the Banks and their customers (and indeed doing so beyond the powers granted to the ECCB under ECCB Act), the respondents assumed a duty of care in negligence and/or fiduciary duties to the appellants.  The respondents then singularly failed to take reasonable care to safeguard the appellants' interests, causing them significant loss in circumstances where they had relied upon the respondents' words and/or conduct by not seeking to withdraw their funds from the Banks in the meantime and continuing to operate them as normal.

[26]    I shall first turn to the claim for breach of fiduciary duty and breach of trust.

**Discussion**

**(i) Claims for breach of fiduciary duty and breach of trust**

[27]    The courts have to a large extent clarified the nature of the legal relationship between a banker and a depositor.  It has been consistently held that the relationship between banker and customer does not ordinarily give rise to a fiduciary relationship or to a trustee/beneficiary relationship.  The most oft cited case on this point is **Foley v Hill** which establishes that the relationship between banker and customer is purely one of debtor and creditor.  This relationship excludes any element or suggestion of trusteeship on the part of or fiduciary relationship with the banker with regard to a current account.  As Lord Brougham stated:

> "The trade of a banker is to receive money and use it as if it were his own he becoming debtor to the person who has lent or deposited with him the money to use as his own... That being the trade of a banker, and that being the nature of the relation in which he stands to his customer ... I cannot confound the situation of a banker with that of a trustee and conclude that the banker is a debtor with a fiduciary character."

[28]    **Foley v Hill** has been followed, applied and restated in several cases including **Joachimson v Swiss Bank Corporation**,[19] where the Court described the relationship as follows:

> "The bank undertakes to receive money and to collect bills for its customer's account. The proceeds so received are not to be held in trust for the customer, but the bank borrows the proceeds and undertakes to repay them. The promise to repay is to repay at the branch of the bank where the account is kept, and during banking hours."[20]

[29]    As a corollary, it is also well established that at the heart of the banker/depositor relationship is a debt in the sum of monies deposited.  The depositor holds no interest in the money that was itself deposited with the bank.  As the learned Lord Chancellor, in **Foley v Hill**, stated at paragraph 36:

> "Money, when paid into a bank, ceases altogether to be the money of the principal … it is then the money of the banker, who is bound to return an equivalent by paying a similar sum to that deposited with him when he is asked for it. The money paid into the banker's, is money known by the principal to be placed there for the purpose of being under the control of the banker; it is then the banker's money; he is known to deal with it as his own; he makes what profit of it he can, which profit he retains to himself, paying back only the principal, according to the custom of bankers in some places, or the principal and a small rate of interest, according to the custom of bankers in other places. The money placed in the custody of a banker is, to all intents and purposes, the money of the banker, to do with it as he pleases; he is guilty of no breach of trust in employing it; he is not answerable to the principal if he puts it into jeopardy, if he engages in a hazardous speculation; he is not bound to keep it or deal with it as the property of his principal, but he is of course answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into, his hands."

[30]    Further, the credit balance created by the deposit of money into a bank does not give rise to a question of property or to any proprietary interest in an asset being held by the bank on behalf of the depositors but to a chose in action that is to a contractual right to the repayment of a debt in the value of the deposited sum.  This was confirmed as early as the case of **Hirschhorn v Evans (Barclays Bank Ltd**

---

[19] [1921] 3 KB 110 at 127.
[20] See also Duggan v Governor of Full Sutton Prison and another [2004] 2 All ER 966 at para. 35.

garnishees).[21]    More recently, the Privy Council in its decision in **Space Investments Ltd v Canadian Imperial Bank of Commerce Trust Co. and others**[22] stated that:

> "<u>A customer who deposits money with a bank authorises the bank to use that money for the benefit of the bank in any manner the bank pleases. The customer does not acquire any interest in or charge over any asset of the bank or over all the assets of the bank</u>. The deposit account is an acknowledgment and record by the bank of the amount from time to time deposited and withdrawn and of the interest earned. <u>The customer acquires a chose in action, namely the right on request to payment by the bank of the whole or any part of the aggregate amount of principal and interest which has been credited or ought to be credited to the account</u>. If the bank becomes insolvent the customer can only prove in the liquidation of the bank as unsecured creditor for the amount which was, or ought to have been, credited to the account at the date when the bank went into liquidation." (Underlining supplied)

[31]    Accordingly, in **Space Investments** the Board went on to express that:

> "When a customer deposited money with [a bank] and the amount of the customer's money was credited to a customer's deposit account, the customer did not become entitled to any interest in any asset or in all the assets of [the bank]. The sole right of the customer was to be paid at his request a sum equal to the amount standing to the credit of his deposit account. There was nothing to trace."

[32]    The clear position, evidenced in the cases above, is therefore that there is no automatic fiduciary relationship or trustee/beneficiary relationship existing between the Banks (and therefore by extension the Conservators – whether as *de jure* or *de facto* directors) and the appellants.  Rather, the relationship between the appellants on the one hand, and the Banks on the other hand, is primarily that of debtor and creditor. The monies deposited by a customer with a bank gives rise to a debt as between the depositors and the bank, and not a right or interest over any property held by the bank. The deposit gives rise to a chose in action, namely the right of the depositor, on request, to payment by the bank of the whole or any part of the aggregate amount of principal and interest which has been credited or ought to be

---

[21] [1938] 2 KB 801 at 815.
[22] [1986] 1 WLR 1072.

credited to the depositor's account at the bank.    There is therefore no traceable asset created or maintained by the act of the appellants' depositing sums of money with the Banks.

[33]    It has been recognised that a party seeking to establish that a fiduciary relationship or a trustee/beneficiary relationship (and therefore questions of breach of fiduciary duties, or a breach of trust) can arise in the context of a bank/customer relationship, must specifically plead and prove that such a relationship and duty exists.   In **National Commercial Bank (Jamaica) Ltd v Hew and others**,[23] for example, the Privy Council reasoned that although the relationship of banker and customer is not a relationship presumed to generate the influence of trust and confidence or of ascendancy and dependency, such a relationship can exist but must be proved as a fact in a particular case. Similarly, in **Fahad Al Tamimi v Mohamad Khodari**,[24] the Court of Appeal of England observed that: '[t]he relationship between a lender and a borrower is not in principle a fiduciary relationship.  The relationship <u>between a bank manager and a customer may in certain circumstances acquire a fiduciary character</u>.' (Underlining supplied) Further, cases such as **Bartlett and others v Barclays Bank Trust Co Ltd**[25] and **Tiger v Barclays Bank Ltd**,[26] show that a trustee/beneficiary relationship will exist where the banker assumes the office of trustee of property owned by a depositor/customer.  The narrow question here, therefore, is whether the facts relied on in the appellants' pleaded case must be sufficient to establish viable claims for breach of fiduciary duty and breach of trust, outside the mere existence of the banker/customer relationship.

[34]    In relation to the claim for breach of fiduciary duties, the case of **Bristol and West Building Society v Mothew**[27] is instructive on the meaning and applicability of fiduciary duties. At page 710, Millett LJ explained as follows: 'The expression

---

[23] [2003] UKPC 51.
[24] [2009] EWCA Civ 1109.
[25] [1980] 1 All ER 139.
[26] [1952] 1 All ER 85 at 88.
[27] [1997] 2 WLR 436.

"fiduciary duty" is properly confined to those duties which are peculiar to fiduciaries and the breach of which attracts legal consequences differing from those consequent upon the breach of other duties.' At pages 711-712, Millett LJ continued:

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary."

[35]    Indeed, as the appellants have argued, the question of whether fiduciary duties are owed is by nature a fact-sensitive question.  As with any other pleaded cause of action, a party seeking to establish that such a relationship and duty exists, is required to particularise the facts and circumstances attendant on their case which give rise to the relationship and duty.   In the words of **Bristol** therefore, the appellants' statements of claim must have disclosed viable allegations that the respondents undertook to act for or on behalf of the appellants in relation to the monies deposited in the Banks in circumstances which give rise to a relationship of trust and confidence, outside the usual customer/banker relationship which, the law clearly states, does not give rise to such a relationship.

[36]    The pleadings central to the assertion that the respondents owed fiduciary duties to the appellants are paragraphs 24, 25, 26 and 27 of the statements of claim.  Those paragraphs read as follows:

> "24. In providing oversight and management of PBT and CCIB, the [respondents] acted as de facto directors of PBT and CCIB and owed a fiduciary duty of care to the [appellants], as creditors, to act in good faith and with due diligence when they took upon themselves the custody and administration of the property of PBT and CCIB, including deposits the Claimants made since 2005.

25. This duty of care to consider the interest of the [appellants] as creditors was paramount, as the [respondents] were aware or ought to have known that PBT and CCIB and their respective parent companies were insolvent, on the brink of insolvency, at risk of insolvency or of doubtful solvency.

26. The [respondents] acted negligently in their management of [the Banks] in breach of trust, which has resulted in loss to the [appellants].

27. Particulars of Breach of Trust and Negligence
     (a) The [respondents] failed to establish a policy which <u>ensured the safety of deposits</u>;

     (b) The [respondents] failed to procure and ensure that all property of PBT was secure and under their control;

     (c) The [respondents] failed to take reasonable steps to recoup <u>any property or assets or deposits</u> which were placed with NBA and CCB prior to their involvement in PBT and CCIB respectively;

     (d) The [respondents] knew or ought to have known that NBA and CCB were not financially sound, as the ECCB had taken control of these entities with a view to establishing financial stability;

     (e) The [respondents] <u>failed to insure the deposits received by PBT and CCIB respectively</u>;

     (f) Despite the precarious financial state of NBA and CCB <u>the [respondents] allowed or were reckless to the fact that the [appellants'] monies were placed in those financial institutions by PBT and CCIB respectively for safe keeping without due regard to NBA and CCB's ability to repay those deposits upon demand</u>;

     (g) The [respondents] failed to take reasonable steps to minimize the potential loss to the [appellants] as creditors; and

     (h) The 1st [respondent] represented to the [appellants] <u>that their deposits were safe</u> and they could continue to trade with their accounts which were not affected by the intervention of ECCB in NBA and CCB." (Underlining supplied)

[37]    Having examined these pleadings, in the context of the remainder of the appellants' pleaded cases, I agree with the learned master that it was appropriate to strike out the appellants' claims in this regard for two main reasons. First, the pleadings, in my

view, do not go further than relying on the usual parameters of the bank/customer relationship in seeking to establish that a fiduciary duty was owed by the Banks (and therefore, by extension, the Conservators and the ECCB) or by the Conservators independent of the Banks. No factual basis has been asserted which could possibly found a relationship of trust and confidence, or an obligation of loyalty on the part of the Banks or the Conservators to the appellants. Without these specifically pleaded facts, the appellants' case fell squarely within the confines of the usual parameters of the **Foley v Hill** line of cases, and there therefore could be no basis, in law, upon which to assert that a fiduciary duty existed in the circumstances.

[38]     Secondly, the appellants' pleaded cases centre on the Conservators' treatment of the monies deposited into the Banks.   **Foley v Hill**, and the **Hirschhorn** and **Space Investments Ltd** cases make plain that the appellants' monies, once deposited with the Banks, were no longer the property of the appellants.   The appellants instead acquired choses in action in the form of debts owed by the Banks to the creditors. The appellants' claim against the Conservators (as *de facto* or *de jure* directors) and the ECCB, framed with specific reference to the deposits is not and cannot, in law, be construed to be a claim for recovery of the debts, against the Banks who are, in law, the debtors.   Therefore, even if there was a sustainable allegation that the Conservators assumed fiduciary duties, no duties could be owed in relation to their treatment of the monies deposited.  It is therefore in my view ineluctable to conclude that there were no reasonable grounds on which the appellants could bring their claims for breach of fiduciary duties.

[39]     As to the claims for breach of trust set out in the statements of claim at paragraphs 26 and 27 (quoted above), it is clear that these pleadings, or any other part of the statement of claim, do not assert a trustee/beneficiary relationship or any facts surrounding an assumption of a trust relationship as between the appellants and the Banks (and therefore by extension the Conservators). Further, in the absence of any express pleaded trust relationship, there can also be no sustainable argument that the respondents were trustees de son tort – that is constructive trustees by

virtue of intermeddling with trust property as defined by Lord Neuberger in **Williams v Central Bank of Nigeria**.[28] The statements of claim therefore do not present any legal basis outside of the fact of the banker/depositor relationship on which a legal trustee/beneficiary relationship could exist. No trust relationship has been pleaded or demonstrated on the statements of claim. Accordingly, these pleadings therefore similarly fall within the direct purview of the general position articulated in the **Foley v Hill** line of authorities. The appellants had no reasonable grounds for bringing a claim for breach of trust against the respondents, and the learned master was therefore correct to so conclude.

[40]    Further a fiduciary relationship or a trustee/beneficiary relationship must first exist before there can be a breach. The pleaded claims did not seek to establish any such relationships. There was therefore no reasonable basis upon which the appellants could have brought the claims for breach of fiduciary duty and breach of trust against the Conservators, and the learned master did not err in so concluding.

### (ii) Negligence

[41]    The appellants contend that a director, or indeed any person involved in a company, may owe a duty of care to those dealing with that company if, on the facts, they act in such a way as to assume such a duty of care. In support of this argument, the appellants rely on **Williams v Natural Life Health Foods Ltd**[29] and **White v Jones**[30] which, in essence, establish that a duty of care in negligence may be owed by one person to another where there is an assumption of responsibility in circumstances where the law deems it appropriate to extend a duty of care.

[42]    The appellants further rely on the recent decisions of the United Kingdom Supreme Court in **Lungowe v Vedanta Resources**[31] and **Okpabi and others v Royal Dutch**

---

[28] [2014] UKSC 10.
[29] [1998] WLR 830.
[30] [1995] 2 AC 205.
[31] [2019] UKSC 20.

**Shell Plc and another**[32] where the court accepted that depending on the facts, a parent company may owe a duty of care to persons who suffer harm as a result of the dangerous operations of its overseas subsidiary; that in certain factual situations a parent company may owe a common law duty of care to individuals who suffer harm as a result of their subsidiary's dangerous activities; and that:

> "... the parent may incur the relevant responsibility to third parties if, in published materials, it holds itself out as exercising that degree of supervision and control of its subsidiaries, even if it does not in fact do so. In such circumstances its very omission may constitute the abdication of a responsibility which it has publicly undertaken."[33]

The appellants contend, on the basis of the above, that it is a triable issue whether a duty at common law in negligence can properly be owed only to the company of which the *de facto* director is a fiduciary.

[43]  While it is arguable, on certain pleaded facts, that a parent company may owe a common law duty of care to individuals who suffer harm as a result of their subsidiary's dangerous activities, the appellants' pleaded case on the issue of negligence, fails on the basis that the appellants' monies, once deposited with the Banks, were no longer the property of the appellants. Therefore, although the cases of **Williams**, **White**, **Lungowe** and **Okpabi** all tend to the possibility of there being some duty of care as between the respondents and the appellants, the law simply does not permit the appellants to claim against the Conservators, as *de facto or de jure* directors, for their deposits with the Banks.  The appellants' claim is one properly made against the Banks for recovery of the debts owed to them (the chose in action) in the sum of their deposits plus any interest due to them in accordance with the terms of their banking contracts.  This is not a matter simply of form but goes to the heart of the claims and their validity.

[44]  For the sake of completeness, at the hearing of the appeal, Mr. Benjamin relied on letters sent to the appellants by Mr. Martin Dinning, as Conservator for CCB, and by

---

[32] [2021] UKSC 3.
[33] Paragraph 53 of Lungowe, and paragraph 148 of Okpabi.

Mr. Hudson Carr, as the ECCB Officer in Charge,[34] and argued that the said letters bolster the appellants' claims that the respondents had in fact assumed responsibility over the appellants' deposits so as to create a duty of care in relation to the deposits, and that the respondents had breached that duty of care by causing their deposits to be co-mingled with other funds. I however agree with the arguments of Mr. Dennis, QC that the letters do not offer the support sought by the appellants.

[45]    The letters outline the circumstances under which the ECCB assumed control of the Banks, and the steps being taken pursuant to the conservatorship to safeguard the stability of the banking system in Anguilla and the interests of the depositors and creditors of the Banks, including the imposition of new guidelines for withdrawals and the payment of interest. In his letter, Mr. Carr states that '…both institutions are operating as normal, all services are in place and their employees remain ready and willing to provide the excellent service which you have enjoyed' and further that "[w]e wish to reaffirm out pledge to continue to provide our customers with the best banking products and services to meet your needs and express our appreciation for your continued loyalty'. The letter from Mr. Dinning is in almost identical terms. The letters simply do not support the assumption of any responsibility or duty of care by the respondents in relation to the appellants' deposits, and do not further their case that such a duty was breached by the respondents' alleged co-mingling of funds.

[46]    Furthermore, and for what it is worth, I note that in their written submissions on this point, the appellants cite the following excerpt from the American text **Individual Personal Liability of Bank Directors for Negligent and Excess Loans**[35] at page 187, which says:

> "The rule that the depositor cannot bring an action at law in his own right against the directors of the bank for negligence, is not without its exceptions, and there are a few cases that hold a contrary opinion. In those instances, the actions have been maintained on the theory that the directors are trustees for creditors. Notable among those decisions is the case of

---

[34] See for example the letter dated 24th September 2013 to Maria Ines Almeda, the 56th Appellant and letter dated 17th October 2013 to Walter Bayer II, the 3rd and 4th appellants in AXAHCVAP2020/0007.
[35] John A. Skiles, Individual Personal Liability of Bank Directors for Negligent and Excess Loans, Notre Dame L. Rev. 185 (1932).

Delano v Case[517 Ill App 531 (1835) which] was an action by a general depositor against the directors of the bank for negligence. The court stated in opinion:

> "For the ordinary negligence of directors, they are responsible alone to their principal, but, for such gross negligence or incompetency as shows a reckless disregard of their duty to care for and protect the funds committed to their charge, we think they are directly responsible to the depositor.'"

[47]    Relying on the above, the appellants have argued that the common law in the Commonwealth is ready for further development to allow for the initiation of claims by creditors of an insolvent bank against directors who are negligent and/or grossly negligent, incompetent and/or show a reckless disregard of their duty of care, especially in circumstances such as the present case.

[48]    The US common law position, so far as it is evidenced by the excerpt above, is premised on the imputation of a trustee relationship as between the directors of a bank and the depositors, in circumstances of gross negligence or incompetency rising to the level of reckless disregard by the directors of their duty to protect the funds committed to their charge.  In my view, the consistency with which the courts of England and the courts of the Eastern Caribbean, have stated, restated and applied the principles contained in **Foley v Hill** is such that any court should hesitate to chart a different path or develop the law along a new artery in this area, and to do so only in the clearest of cases and after the fullest of assistance on the applicable law.  As recently as 2004, the English Court of Appeal in the case of **Duggan v Governor of Full Sutton Prison and another**[36] has stated that '…it is trite law that the relationship between banker and customer is that of debtor/creditor, not that of trustee/beneficiary (see *N Joachimson* (*a firm*) *v Swiss Bank Corp* [1921] 3 KB 110 at 127, [1921] All ER Rep 92 at 100).' In my view, there is very little scope in this case to expand these principles that are well-established as a part of the common law of both England and this jurisdiction. Accordingly, and for these reasons the Court respectfully declines the invitation by the appellants to do so.

---

[36] [2004] 2 All ER 966.

**Issue 2: Whether the master erred in failing to properly consider pleas in the appellants' statement of claim in relation to: (i) the alleged breach of section 7 of the Constitution; (ii); the alleged breach of article 5B of the ECCB Act and (iii) the 'knowing assistance' allegation**

**(i) Breach of section 7 of the Constitution**

[49]    The appellants complain that the learned master did not consider the allegations pertaining to the breach of section 7 of the Constitution.  The statements of claim only advert to the alleged breach of section 7 of the Constitution very briefly in the following terms at paragraph 27 of the statements of claim:

> "On 22 April, 2016 assets of PBT, including the deposits made by the claimant, were transferred to a new legal entity, National Commercial Bank of Anguilla ("NCBA"), in breach of Section 7 of the Constitution of Anguilla in 1988."

[50]    In my judgment, this pleading does not advance the appellants' claims in any way. The appellants' claims clearly sought to establish the respondents' liability for negligence, breach of fiduciary duty and breach of trust.  The claim forms, which provide a précis of the nature of the relief sought by the appellants make plain that the claims against the respondents are 'for breach of fiduciary duty…in respect of loss and damage suffered by the Claimants and a result of the Defendants' negligence and/or breach of trust'.  This is borne out by the statements of claim which set out in detail the particulars of breach of fiduciary duty and negligence, and the corollary claim for breach of trust. It is clear that the appellants' claims were neither in form nor substance claims for deprivation of property under the Constitution nor did they seek relief under the Constitution or pursuant to CPR Part 56. Moreover, the claim at paragraphs 27 and 29 respectively of the appellants' statements of claim asserts a breach of section 7 of the Constitution as a consequence of the transfer of the deposits made by the appellants in PBT and CCIB to NCBA, with respect to which deposits the appellants have no legal or proprietary interest.  Also, the Attorney General on behalf of the Government of Anguilla, was not joined as the appropriate party against whom one seeks relief under the Constitution.  In substance, the claims were clearly for negligence, breach of fiduciary duty and breach of trust as set out in the appellants' claim form and

particularised in their statements of claim.  It is simply not open to the appellants, at this stage, and by way of argument, to transform their claims, by sidewind, into claims for deprivation of property under the Constitution where it is clear that the claims were not instituted for that purpose or on that basis.

[51]     In their written submissions, the appellants sought to rely on the case of **The Attorney General of Anguilla et al v Bernice Lake et al**,[37] where this Court struck down by way of severance, certain provisions of the **Land Acquisition Act**.[38] The appellants argue that challenges to deprivation of property are familiar to all Caribbean courts, and therefore the master erred in failing to consider whether 'the question of the unconstitutional deprivation of property in the context of the question of vires was also a triable issue'.[39]   Reliance on the **Bernice Lake** case by the appellants is clearly misplaced in these circumstances. The claimants in **Bernice Lake** frontally attacked the constitutionality of the **Land Acquisition Act** and the **Crown Proceedings Act**.[40] This is made clear in the judgment of the High Court delivered by Baptiste J (as he then was).[41]   **Bernice Lake** is in no way comparable to the appellants' claims in this case and provides no basis for the appellants' claims to be construed as one for deprivation of property under the Constitution.

[52]     In any event, even if paragraph 27 of the statements of case properly invoked the court's jurisdiction to adjudicate on a constitutional claim for deprivation of property, it suffers from the same defects identified in relation to the remainder of the claims. Paragraph 27 asserts a breach of the constitution as a consequence of the transfer by the Conservators of the deposits made by the appellants to the NCBA. The property to which paragraph 27 refers is the deposits made by the appellants into the Banks.  The law is clear. The appellants have no legal interest in the deposits which were made to the Banks, but rather have a right to recover the choses in

---

[37] Anguilla Civil Appeal No. 4 of 2004 (delivered 4th April 2005, unreported).
[38] Revised Statues of Anguilla, c.L10.
[39] See paragraph 51 of the appellants' supplemental bundle.
[40] Revised Statutes of Anguilla, C160.
[41] See paragraph 3 of the judgment of the High Court in Bernice Lake QC et al v The Attorney General of Anguilla et al AXAHCV2003/0074 (delivered 5th April 2004, unreported), per Baptiste J.

action (the debts) created by the deposits in the context of the bank/customer relationship. In their written submissions on appeal, the appellants have referred to the claim at paragraph 27 as a claim for 'the choses of action which the debt represents'. Unfortunately, the pleadings were not framed with regard to the debts owed to the appellants but were focused on the recovery of the said deposits flowing from the respondents' alleged treatment of the deposits. There is simply therefore no scope to argue that the pleadings which refer to section 7 of the Constitution in any way advanced the appellants' claim.

[53]    For these reasons, the learned master's decision to treat with the matter solely as a claim engaging the causes of action set out in the claim form, was correct and cannot be a basis upon which this Court may interfere with the said decision.

**(ii) Breach of article 5B of the ECCB Act**

[54]    The aspect of the statements of claim which refer to a possible breach of article 5B was also not addressed by the learned master. The statements of claim advert to the alleged breach of article 5B of the ECCB Act at paragraphs 21, 22 and 23 in the following terms:

> "21. Article 5 B of the ECCB Act enacted as of 24 March, 2016 does not give the ECCB the power to take control of the affiliates of the financial institutions it perceives to be financial difficulty.
>
> 22. The notice of intervention gazetted on 22 August, 2016 clearly states that the ECCB was taking control of the property and affairs of NBA This notice did not and could not extend to PBT which is a separate legal entity not regulated by the ECCB.
>
> 23. In the premises, during the period 12 August 2013 to 24 March, 2016 the [respondents] had no authority to take control of [the Banks] and intermeddle with its property."

[55]    In relation to this aspect of the pleaded case, I respectfully adopt the following response levied by the respondents at paragraph 8 of their further written submissions:

> "It is clear that the averments in the Statement of Claim in relation to Article 5B are simply a part of the narrative to establish that in managing [the

Banks], the Conservators were acting as de facto directors and not Regulators. The Appellants' pleaded case is based solely on the fact that the Conservators took control of [the Banks] as directors/de facto directors of those banks and in doing so acted in breach of fiduciary duty and negligently. There is therefore no real issue between the parties as to whether the ECCB or the Conservators acted in breach of Article 5 B when it intervened in the management of [the Banks]."

[56]    The appellants rely on the decision of the Privy Council in **Gulf Insurance Ltd v The Central Bank of Trinidad and Tobago**,[42] and contend that the master, by virtue of the pleadings on article 5B of the ECCB Act, was required to consider the challenge to the vires of the acts of the ECCB and the Conservators.  Again, I respectfully agree with the respondents on this point. **Gulf Insurance** concerned a frontal challenge to the powers of the Central Bank of Trinidad and Tobago 'to assume the additional powers and to transfer the assets and undertaking of' two banks. In my view, and in similar stead to my findings on the section 7 point made above, it is not open to the appellant in these circumstances to transform by sidewind and by argument at this stage, a claim for breach of fiduciary duties, breach of trust and negligence, into a challenge to the nature and exercise by the ECCB of powers under the ECCB Act, especially in circumstances where such a challenge was clearly not contemplated, having not been undertaken pursuant to the peculiar procedure for what is properly an claim for administrative orders under Part 56 of the CPR.

[57]    The arguments on this point therefore fail.

**(iii) Knowing assistance**

[58]    The learned master likewise did not expressly address the appellants' claims for knowing assistance. The claim for knowing assistance was set out at paragraph 30 as follows: 'The Defendants, being aware of the details of the 'Resolution Plan' and its consequences, knowingly assisted the Government of Anguilla in depriving the [appellants] of their monies.'  I observe that in their written submissions, the

---

[42] [2005] UKPC 10.

appellants refer to this pleading as a claim for knowing or dishonest assistance in relation to the alleged breach of fiduciary duties and breach of trust committed by the respondents.[43]  Paragraph 30 however is not framed along those lines, that is, in a way that seeks to establish breaches of trust or fiduciary duties, and is rather concerned with establishing the knowing assistance on the part of the respondents vis-à-vis the actions of the Government of Anguilla in 'depriving the [appellants] of their monies'.  In the context of the claims in their entirety, this pleading can only be a reference to knowing assistance with the alleged deprivation of property in breach of section 7 of the Constitution, discussed above.  For reasons already expressed, the appellants' statements of claim did not disclose viable claims for deprivation of property under section 7 of the Constitution. By logical extension, there could be no viable claim against the respondents, as pleaded, for knowingly assisting the Government of Anguilla with depriving the appellants of their monies, even if such a cause of action exists in law or in equity.

[59]     Even if the statements of claim were framed with reference to the knowing assistance vis-à-vis the alleged breaches of fiduciary duty or trust, there would similarly have been no sustainable claim in that regard.  It is trite law that a claim for knowing or dishonest assistance is made out in circumstances where a person dishonestly assists another with committing a breach of trust or fiduciary duty. As the English Court of Appeal stated in **Novoship (UK) Limited and others v Yuri Nikitin and others**:[44]

> "Where a person is not himself a fiduciary, he may become mixed up in a breach by another of a fiduciary duty. He may be liable in one of two ways:
>> i) As a knowing recipient of trust property or its traceable proceeds or
>> ii) As a dishonest accessory to the fiduciary's breach of duty.
> The former is now known by the shorthand "knowing receipt" and the second by the shorthand 'dishonest assistance.'"

[60]     A successful claim for knowing assistance is clearly parasitic on a viable claim for breach of fiduciary duty or breach of trust, in the sense that a knowing assistance

---

[43] See paragraphs 52 to 59 of the appellants' supplemental written submissions.
[44] [2014] EWCA Civ 908 at 67.

claim depends on the existence of either of such breaches on the part of a defendant.  There therefore could never have been a viable claim for knowing assistance in this case, where there was no viable claim for breach of fiduciary duty or breach of trust.  As I have already reasoned, the claims for breach of fiduciary duty and breach of trust were wholly unsustainable and the learned master correctly concluded that the appellants had no reasonable grounds for pursuing them. As a result, the claims for knowing assistance, if properly pleaded, would also have been unstainable as a matter of law. The learned master's decision to strike out the appellants' claims cannot therefore be impugned on the basis of his failure to expressly consider the claims for knowing assistance. Any such consideration could not have affected, one way or the other, the outcome of the respondents' application to strike.

### Issue 3: The possibility of amendment

[61]   Mr. Benjamin argued that the learned master was duty bound, when faced with the application to strike, to consider whether it would have been in the interests of justice to permit the appellants to amend their statements of claim as an alternative to deploying the nuclear option of striking out. This point does not appear to have been argued by learned counsel who appeared for the appellants in the court below, and the learned master did not give express consideration to it in his judgment.

[62]   The law is now clear that when called upon to strike out a statement of claim or part thereof, the court ought to consider whether it is in the interests of justice to permit an amendment to the impugned statement of claim in lieu of striking out.  This is evidenced by the approach of the Privy Council in **Real Time Systems Limited v Renraw Investments Limited and Others**[45] where Lord Mance stated at paragraph 17, that:

> "As the editors of The Caribbean Civil Court Practice (2011) state at Note 23.6, correctly in the Board's view, the court may under this sub-rule make orders of its own initiative. There is no reason why the court, faced with an application to strike out, should not conclude that the justice of the particular

---

[45] [2014] UKPC 6.

> case militates against this nuclear option, and that the appropriate course
> is to order the claimant to supply further details, or to serve an amended
> statement of case including such details, within a further specified period."

This approach is necessitated by the obligation placed on the court by the overriding objective to deal with cases justly and is consistent with the court's usual preference to avoid shutting out a litigant on account of an easily remediable error and to deal with matters on their merits.

[63]    In my view, the learned master's failure to expressly address this matter in his written judgment does not provide a basis on which to set aside his decision to strike out the claims, as an amendment to the appellants' claims in the circumstances would not be in keeping with the overriding objective.  I have already discussed the several defects in the appellants' claims as pleaded, principal among which is that the claims seek relief of the court in relation to the money deposited with the Banks by the appellants.  This is a fundamental defect in the pleadings given the consistent legal position evidenced in **Foley v Hill**, **Hirschhorn** and by the Privy Council in **Space Investments Ltd** that a depositor is not legally entitled to and has no proprietary interest in the monies he deposited with a bank, but is entitled to recover, from the bank, the debt owed to them in the sum deposited, subject to any further stipulations contained in the banking contract.  The appellants by their pleaded cases are not in any way concerned with any effect which the respondents' actions have had on the debts due to them.  As already stated, the appellants' pleadings show that their real concern is with the Conservator's treatment of the very monies deposited with the Banks by the appellants. In the words of paragraph 27(h) of the statements of claim, their concern was with the 'safety of the deposits'.  To permit an amendment in these circumstances would be to grant leave for the appellants to transform their claims into something that it was clearly never intended to be.  Such permission, in my view, would be overwhelmingly and disproportionately unfair to the respondents and accordingly inimical to the overriding objective. It would therefore not be appropriate in the circumstances to permit an amendment to the

appellants' pleaded claims and further, the fact that the learned master did not give this his express consideration does not impugn his decision.

**Conclusion**

[64]    It is clear from the above conclusions that I take the view that the learned master did not err in the exercise of his discretion in striking out the appellants' claims in the court below. The appellants had no reasonable grounds in law for bringing their claims against the respondents. Further, it would not, in my view, have been in keeping with the overriding objective for the learned master to have granted leave to the appellants in this case to amend their statements of claim and, in any event, were he minded to not strike out their pleaded cases as disclosing no reasonable grounds for bringing the claims they did not urge this consideration upon him or posit in their submissions what types of amendments they would wish to make. There is therefore no basis upon which this Court ought to interfere with the learned master's decision, and the appeal should be dismissed.

**Costs**

[65]    The general rule is that costs follow the event. In other words, a successful party will ordinarily be entitled to its costs.  In my view, there is no reason to depart from the general rule in the circumstances of this case.  The respondents, therefore, having successfully resisted the appeal, are entitled to their costs in the proceedings before this Court.

**Order**

[66]    For all the above reasons, I would make the following orders:

    (i)    The appeal is dismissed.

    (ii)    The appellants shall pay the respondents' costs in the appeal, to be assessed by a judge or master of the High Court at no more than two-thirds of the costs in the court below, if not agreed within 21 days.

I concur.
**Mario Michel**
Justice of Appeal

I concur.
**Esco Henry**
Justice of Appeal [Ag.]

**By the Court**

**Chief Registrar**
