**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | Adv. Pro. No. 23-50437 (JTD) |
| -against- | |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

**OPENING BRIEF IN SUPPORT OF MOTION**
**FOR A PROTECTIVE ORDER STAYING DISCOVERY**

Lawrence J. Gebhardt (*pro hac vice pending*)
Gregory L. Arbogast (No. 6255)
GEBHARDT & SMITH LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801
T: (302) 295-5038
F: (443) 957-4325
Garbogast@gebsmith.com

*Attorneys for Defendant,*
*Brandon Williams*

# TABLE OF CONTENTS

I.    Statement of the Nature and Stage of the Proceeding ......................................................... 1

    A.    The nature of this proceeding. ................................................................................ 1

    B.    The stage of the proceeding. ................................................................................... 1


II.    Summary of the Argument ...................................................................................................... 3

    A.    This Court lacks subject matter jurisdiction to adjudicate this Adversary
        Proceeding or the FTX Trading and Maclaurin Investments bankruptcy
        cases. ........................................................................................................................ 3

    B.    Fed. R. Civ. P. 26(c) authorizes a court for good cause to enter a protective
        order protecting a party from undue burden or expense in discovery
        proceedings. ............................................................................................................. 3

    C.    A protective order should issue .............................................................................. 4


III.    A Concise Statement of the Facts ......................................................................................... 5

    A.    DAAG was formed on July 1, 2020, as a European issuer of derivatives for the
        crypto market. ......................................................................................................... 5

    B.    FTX Trading was interested in acquiring access to European licenses and
        regulatory approvals so that it could lawfully both continue and expand its
        operations in the European market. ......................................................................... 7

    C.    FTX Trading became a DAAG partner while DAAG was in its infancy. ............... 9

    D.    Alameda, on behalf of FTX Trading, increased its equity stake in DAAG to
        20% and later transferred this interest to FTX Trading. ...................................... 10

    E.    FTX Trading desired to acquire one hundred percent of the equity in DAAG
        to increase its business and operations .................................................................. 11

    F.    BDO appraised DAAG at the request of FTX Trading. ........................................ 13

    G.    FTX Trading was fully solvent at the time it acquired all the share interests in
        DAAG and afterward. ........................................................................................... 14

    H.    The acquisition of DAAG was not for the purposed of enriching Samuel
        Bankman-Fried. .................................................................................................... 17


IV.    Law and Argument ............................................................................................................... 18

    A.    Fed. R. Bankr. P. 7026 and Fed. R. Civ. P. 26(c) authorize the Court to issue a
        protective order pending a decision on a dispositive motion to dismiss .............. 18

        1.    The granting of a protective order staying discovery pending a ruling
            on a motion to dismiss requires the defendant to show that good cause
            exists for the stay. ...................................................................................... 18

2.      Various considerations go into the determination of whether good cause exists for the issuance of a stay of discovery. ................................ 19

B.      Good cause for the issuance of a protective order staying discovery clearly exists. .......................................................................................................... 21

1.      Williams' motion to dismiss for lack of subject matter jurisdiction is undeniably meritorious. ........................................................................ 21

2.      The Plaintiffs will suffer no prejudice from a stay. ................................. 23

3.      The expense the discovery in this case will require is unlimited and burdensome. ........................................................................................... 23

V.      Conclusion ..................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Advanced Exterior, Inc. v. Liberty Mut. Grp., Inc.*, 568 F. Supp. 3d 1144 (D. Colo. 2021) ........ 18

*Chavous v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 201 F.R.D. 1 (D.D.C. 2001) ................. 20

*Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 236 F.R.D. 113 (E.D.N.Y. 2006) ....... 19

*Cuhaci v. Kouri Grp., LP*, 540 F. Supp. 3d 1184 (S.D. Fla. 2021) ........................................ 18, 19

*Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75 (S.D.N.Y. 2020).................................... 4, 18, 21

*Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787 (Fed. Cir. 1984) ........... 20, 21

*Gilbert v. Ferry*, 401 F.3d 411 (6th Cir. 2005) ................................................................. 21

*Hachette Distribution, Inc. v. Hudson Cnty. News Co.*, 136 F.R.D. 356 (E.D.N.Y. 1991).... 19, 20

*Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67 (E.D.N.Y. 2006).............................................. 19

*Hong Leong Fin. Ltd. (Singapore) v. Pinnacle Performance Ltd.*, 297 F.R.D. 69 (S.D.N.Y. 2013) .................................................................................................................. 19, 21

*In re Al-Wyn Food Distributors, Inc.*, 8 B.R. 42 (Bankr. M.D. Fla. 1980) ................................ 22

*In re Moni-Stat, Inc.*, 84 B.R. 756 (Bankr. D. Kan. 1988) ....................................................... 22

*In re Radnor Holdings Corp.*, 564 B.R. 467 (D. Del.), aff'd, 706 F. App'x 94 (3d Cir. 2017)..... 20

*In re Runaway II, Inc.*, 159 B.R. 537 (Bankr. W.D. Mo. 1993) ................................................. 22

*In re: Voyager Digital Holdings, Inc. et al.* Case No.22-10943(MEW), United States Bankruptcy Court for the Southern District of New York....................................................... 15

*Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020) ........................................ 20

*Lawrence v. Governor of Georgia*, 721 F. App'x 862 (11th Cir. 2018) ..................................... 20

*Lazar v. Kroncke*, 862 F.3d 1186 (9th Cir. 2017)................................................................. 21

*Levey v. Brownstone Inv. Grp.*, LLC, 590 F. App'x 132 (3d Cir. 2014)............................... 18, 21

*Mann v. Brenner*, 375 F. App'x 232 (3d Cir. 2010)........................................................... 19, 21

*Matter of Giggles Rest., Inc.*, 103 B.R. 549 (Bankr. D.N.J. 1989) ........................................... 22

*Ministerio Roca Solida v. U.S. Dep't of Fish & Wildlife*, 288 F.R.D. 500 (D. Nev. 2013) .... 20, 21

*PlayUp, Inc. v. Mintas*, 2023 WL 6859193 (D. Nev. Oct. 18, 2023) ........................................ 18

*Price v. Gurney*, 324 U.S. 100 (1945) .................................................................................. 4, 22

*Rae v. Union Bank*, 725 F.2d 478 (9th Cir. 1984) ............................................................ 20, 21

*Republic of Turkey v. Christie's, Inc.*, 316 F. Supp. 3d 675 (S.D.N.Y. 2018)........................... 19

*Rich v. KIS California, Inc.*, 121 F.R.D. 254 (M.D.N.C. 1988) ................................................ 20

*Rivas v. The Bank of New York Mellon*, 676 F. App'x 926 (11th Cir. 2017)......................... 20, 21

*Roberts v. FNB S. of Alma, Georgia*, 716 F. App'x 854 (11th Cir. 2017) ................................. 21

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 206 F.R.D. 367 (S.D.N.Y. 2002) .................................................................................................................. 19, 21

**Statutes**

11 U.S.C. § 344 .................................................................................................... 24
18 U.S.C. § 6003 .................................................................................................. 24
11 U.S.C. § 548 ............................................................................................... 1, 23
11 U.S.C. § 550 ...................................................................................................... 1

**Rules**

Fed. R. Bankr. P. 7026 .................................................................................. 2, 3, 18
Fed. R. Civ. P. 26(a) ............................................................................................. 2
Fed. R. Civ. P. 26(c) ...................................................................................... 3, 18

## I.
## Statement of the Nature and Stage of the Proceeding

### A.    The nature of this proceeding.

Plaintiffs, FTX Trading Ltd. and Maclaurin Investments, Ltd. (previously known as "Alameda Ventures"), have sued Defendant, Brandon Williams, in Counts One and Two of the Complaint to recover the amounts he received for selling his interest in Digital Asset Group AG ("DAAG") to them in two negotiated, arms-length transactions in July and November 2021.  The Plaintiffs allege that the purpose of the purchase was to hinder, delay, or defraud the creditors of FTX Trading and constituted either an actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) or constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

FTX Trading Ltd. and Maclaurin Investments also sued Patrick Gruhn, Robin Matzke, and Lorem Ipsum UF (collectively, the "LI Defendants") in Counts One and Two and in Count Three (alleging preferential transfers), Count Four (alleging property recovery under Bankruptcy Code §550(a)(1), which is against all Defendants but which has no possible application to Williams), Count Five (alleging disallowance of claims under Bankruptcy Code §550(a)(1) against all Defendants but which has no possible application to Williams, who has not filed a claim), and Count Six (against Gruhn and Matzke, alleging breach of fiduciary duty under Antiguan law).

### B.    The stage of the proceeding.

In response to the Complaint, Brandon Williams filed a motion to dismiss or for summary judgment as to Counts One and Two, which are the only Counts that possibly pertain to him, in contrast to the LI Defendants.  (D.I. 23).  After the LI Defendants moved to dismiss the bankruptcy cases of FTX Trading and Maclaurin Investments for lack of subject matter jurisdiction (D.I. 3399, 3400) and included this ground as a basis for their motion to dismiss in this Adversary Proceeding (D.I. 31), Brandon Williams filed a motion to dismiss this Adversary Proceeding for lack of subject

matter jurisdiction (D.I. 34) and a motion joining the motion of the LI Defendants to dismiss the FTX Trading and Maclaurin Investments bankruptcy cases for lack of subject matter jurisdiction. (D.I. 3657, 3658).  The Plaintiffs have not yet responded to any of these motions.  The Plaintiffs' responses to the motions to dismiss filed in this Adversary Proceeding are due December 1, 2023. Plaintiffs' responses to the motions to dismiss the two bankruptcy cases filed by the LI Defendants are due November 10, 2023, and to Williams' joinder in these motions, November 18, 2023.

Prior to the filing of this Motion, the parties entered into a Case Management Plan and Scheduling Order calling for the completion of discovery by May 17, 2024, service of expert reports and completion of expert discovery by October 2, 2024, and the filing of summary judgment motions by October 16, 2024. (D.I. 9).  All parties have made the initial disclosures required by Fed. R. Civ. P. 26(a), as made applicable by Fed. R. Bank. P. 7026.[1]  *See* App. 0005, App. 0019, and App. 0027.  The Plaintiffs have served document requests on the Defendants, with both responses and productions requested by November 13, 2023 (30 days from service). App. 0041, App. 0060, and App. 0079.  No responses to the Plaintiffs' document requests have yet been made by any of the Defendants.  The LI Defendants as of October 26, 2023, have served Plaintiffs with interrogatories, a document request, and request for admissions, with no response as yet having been made by Plaintiffs. App. 0097, 0109, and 0135.  Williams has not yet served discovery upon the Plaintiffs, pending a ruling on this motion, Williams understands that a document subpoena has been served by Plaintiffs upon Kephas Corporation, a non-party associated with Defendant, Patrick Gruhn.

Despite a request for an agreement to stay discovery pending a ruling on the motions to

---

[1]        Because discovery papers are not filed with the Clerk, Williams has included copies in an Appendix. *See* Local Bankruptcy Rule 7026-2.

dismiss for lack of subject matter jurisdiction, Plaintiffs insist that discovery in this Adversary Proceeding go forward full bore and refuse to stay discovery until the Court rules. This motion has been filed due to Plaintiffs' refusal to stay discovery pending a ruling by the Court and resolution of the issue of whether subject matter jurisdiction exists.

**II.**
**Summary of the Argument**

**A.      This Court lacks subject matter jurisdiction to adjudicate this Adversary Proceeding or the FTX Trading and Maclaurin Investments bankruptcy cases.**

A federal court must have subject matter jurisdiction to adjudicate cases before it. When a corporation files bankruptcy without first having the bankruptcy filing authorized and approved under its organizational documents and local law, the bankruptcy filing is without authorization and the bankruptcy court, without subject matter jurisdiction to adjudicate any matters in the case. Lacking subject matter jurisdiction, bankruptcy court must dismiss the case. *Price v. Gurney*, 324 U.S. 100, 106 (1945).

**B.      Fed. R. Civ. P. 26(c) authorizes a court for good cause to enter a protective order protecting a party from undue burden or expense in discovery proceedings.**

Fed. R. Civ. P. 26(c), as made applicable by Fed. R. Bankr. P. 7026, authorizes this Court for good cause shown to issue a protective order that protects a party from undue burden or expense in the discovery process in an adversary proceeding. The decision to issue a protective order lies within the discretion of the bankruptcy court and requires the moving party to show good cause for the entry of the order, including details of the reason undue burden or expense is likely.

A motion to dismiss does not inherently justify or require the entry of a protective order staying discovery until a ruling is issued. Three factors generally must be considered by the court in ruling on a motion for a protective order based on a pending motion to dismiss: 1) the strength

of the motion; 2) any prejudice that would result to the stayed party; and 3) breadth of the discovery sought. *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 79 (S.D.N.Y. 2020). Other factors are the likelihood that motion if granted will end the case and whether the discovery sought is relevant to the motion. Here, granting the motion to dismiss will end the case, and no discovery is needed for a resolution of the motion.

### C.   A protective order should issue.

A protective order delaying discovery until this Court has ruled on the subject matter jurisdiction challenge should be issued. The reasons are numerous. The discovery will be both burdensome and costly to both sides, given the anticipated number of documents involved, the number of witnesses, most of whom reside outside the United States and are entitled to invoke the data protection laws of their country, and some of whom are involved in criminal proceedings, implicating the Fifth Amendment and requiring access to facilities in which they are incarcerated.

If a protective order is entered, no prejudice will accrue to the Plaintiffs, who do not need discovery to respond to the motion to dismiss. If the motion is denied, discovery can commence and should be concluded by the dates specified in the parties' Case Management Plan, with any minor modifications agreed to by the parties. A delay in commencing full-on discovery will have no adverse effect on the Plaintiffs' purported case.

The merits of the motion to dismiss are strong. The FTX Trading and Maclaurin Investments bankruptcy cases were filed without proper authorization under their organizational documents and local law, such that the filings could not provide subject matter jurisdiction to this Court. Dismissal of the bankruptcy case is mandated. *Price v. Gurney*, 324 U.S. 100, 106 (1945) ("If the District Court finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, **it has no alternative but to dismiss the petition**.").

**III.**
**A Concise Statement of the Facts**

This Concise Statement of the Facts repeats in large part (but not entirely) the Concise Statement of Facts set forth in Williams' Motion to Dismiss Or For Summary Judgment (D.I. 23) and shows the breadth and scope of the discovery that this Adversary Proceeding will require if the motion to dismiss for lack of subject matter jurisdiction is not granted.   All the matters discussed and referenced will be the subject of both document (including ESI) and deposition discovery.  The citations are to the Complaint (D.I. 1) and the Appendix to the Motion To Dismiss of For Summary Judgment (which includes the Williams Affidavit) (the "MTD, App.") (D.I. 23; 24; 25; 29).

**A.      DAAG was formed on July 1, 2020, as a European issuer of derivatives for the crypto market.**

DAAG was formed on July 1, 2020, as a Swiss corporation. DAAG was owned equally by Patrick Gruhn, Robin Matzke (through his solely owned company, Lorem Ipsum UG), and Brandon Williams.  Compl. ¶ 20; MTD, App. 190 (Williams Aff. ¶ 3).

DAAG's business focused on the design, structure, and issuance of novel digital products and derivatives, such as free-floating tokenized securities, perpetual futures, a crypto spot derivative (SPOT+), and other financial instruments.  MTD, App. 190 (Williams Aff. ¶ 4).

DAAG created all the know-how, processes, documents, procedures, and regulatory documents etc. required to enable DAAG, working with a licensed investment firm via a tied agency agreement, to enter the mass-retail business market in a regulatorily compliant way. DAAG dealt in over 50 tokenized stocks, including Facebook, Google, Tesla, and Netflix.  DAAG offered an alternative to other exchanges that were restricted to a single exchange or blockchain and only gave users the option to open or close positions.  DAAG was also the only company in

Europe capable of offering true perpetual futures contracts, which is the most important trading product in the crypto currency space.  MTD, App. 190-191 (Williams Aff. ¶ 5).

At the time of its acquisition by FTX Trading in November 2021, DAAG's most valuable asset was the proprietary know-how, knowledge, and expertise (collectively, "know-how") that it had developed and implemented.  This proprietary know-how is what enabled DAAG to become licensed and regulatorily compliant in the various markets in which it operated at the time of the FTX Trading acquisition and that would enable it (or FTX Trading after the acquisition) to become licensed and regulatorily compliant in numerous additional markets going forward.  This proprietary know- how was reflected in and evidenced by over 200,000 pages of documents and materials.  These documents and materials included business processes and operational rules and procedures, product approvals (including an endorsed Security Prospectus), product governance documents, and IT implementation requirement documents (which would allow DAAG to implement regulatory compliant IT-Systems to support or automate those developed processes).  This proprietary know-how would enable any licensed investment firm (such as CM-Equity AG) to start operating in the new and unique crypto-related tokenized derivatives business launched by DAAG, as previously described.  MTD, App. 191-192 (Williams Aff. ¶ 6).

 Once DAAG completed its planned acquisition of the Cypriot investment firm, K-DNA Financial Services Ltd (which occurred shortly after the FTX Trading acquisition, as reflected in Complaint ¶¶ 85-95), and using DAAG's proprietary know-how, DAAG (or FTX Trading after the acquisition) would be able to service customers in the thirty countries in the European Economic Area, as well as in Argentina, British Virgin Islands (BVI), Brunei, Cayman Islands, China, Egypt, Georgia, Indonesia, Jordan, Kazakhstan, Kuwait, Lebanon, Malaysia, Mongolia, Montenegro, Panama, Philippines, Qatar, South Korea, South Africa, Switzerland, Thailand,

Turkey, UAE, Ukraine. These licenses and approvals enabled FTX Trading upon the acquisition

of DAAG and the subsequent acquisition of K-DNA to operate in these markets and use the

proprietary know-how that FTX Trading acquired in its acquisition of DAAG.  MTD, App. 192

(Williams Aff. ¶ 7); *See* MTD, App. 113 (BDO Valuation at 6) (listing the various licenses that

were available to DAAG and provided value); (BDO Valuation at 21-22) (describing what each of

the licenses enabled DAAG to do and why they provided value).

While FTX Trading mischaracterizes DAAG as having limited business and no intellectual

property beyond a business plan, DAAG was a licensed and regulatorily compliant operating entity

that generated substantial revenue from its inception and was projected to generate substantially

increasing revenue in future years.  For the year ending December 31, 2021, and as referenced in

the BDO Valuation, DAAG's gross revenue was $11.9 million, an amount that was projected by

BDO to grow to $205.7 million by the year ending December 31, 2026. The projected growth in

DAAG's revenue was attributed to the "rising need for tokenized public securities in the

cryptocurrency environment." MTD, App. 114 (BDO Valuation at 7.); MTD, App. 192 (Williams

Aff. ¶ 8).

> **B.     FTX Trading was interested in acquiring access to European licenses and
> regulatory approvals so that it could lawfully both continue and expand its
> operations in the European market.**

FTX Trading desired to both continue and expand its operations in Europe and the Middle

East and to access fully these marketplaces but do so in a lawful and properly licensed manner.

Compl.  ¶¶ 3,37, 52; MTD, App. 112 (BDO Valuation at 5). DAAG presented FTX Trading with

an opportunity to fully accomplish this objective.[2] Complaint ¶¶ 85-95.

---

[2]      FTX Trading already had substantial customers in the market in which DAAG was
licensed and relied on the "reverse solicitation" exception to the regulatory requirements to
continue its operations. Reverse solicitation refers to investment in funds by investors in the
European Union on the exclusive initiative of those investors. But the continuation of FTX's

In May 2020, Brandon Williams unsuccessfully requested Bankman-Fried to hire his advisory firm, Cosima Capital.[3] Compl. ¶ 50. Despite his lack success in convincing Bankman-Fried to retain Cosima Capital, Brandon Williams in August 2020 proposed to Bankman-Fried a business opportunity for FTX Trading in the form of an investment in DAAG. As proposed, FTX Trading could fly under the wings of the fully licensed and legal DAAG by making an initial investment and utilizing a "tied agent arrangement" with the German brokerage, CM-Equity AG,[4] with which DAAG has a relationship.  FTX Trading, through Bankman-Fried, its CEO, responded that FTX Trading was "def interested."[5]  Compl. at ¶ 52; MTD, App. 193 (Williams Aff. ¶10).

---

operations was potentially in jeopardy due to its absence of regulatory compliance and reliance on the reverse solicitation exception. This, for example, happened recently to Binance, which relied, as did FTX Trading prior to the acquisition of DAAG, on the regulatory "reverse solicitation" exception and saw its operations in the Netherlands terminated. *See* https://www.cnbc.com/2023/06/16/binance-to-exit-the-netherlands-as-it-fails-to-get-regulatory-approval.html),

[3]    The communications between Williams and Bankman-Fried were primarily via Telegraph, a messaging application commonly used in the crypto-currency community.

[4]    CM-Equity AG is a fully licensed European securities and investment broker located principally in Germany, analogous to Charles Schwaab in the United States. *See* CM-EQUITY GLOBAL INVESTMENT SOLUTIONS, *https://cm-equity.de/en/*

[5]    FTX Trading and Bankman-Fried's abiding interest in acquiring regulatorily compliant exchanges motivated the acquisition in October 2021 of Ledger X, which became FTX US Derivatives. *See https://www.coindesk.com/business/2021/10/25/ftx-crypto-exchange-finalizes-ledgerx-acquisition/* In *Forkast News*, Bankman-Fried is attributed to the following quote:

FTX Trading's interest in DAAG was piqued by the opportunity to "'use the liability umbrella of a firm that has all the licenses' to provide 'users of crypto . . . smooth access to buying and selling fractional shares' of securities through 'crypto channels." As Williams confirmed, FTX Trading would become a tied agent and granted 100% usage and the protection of DAAG's liability umbrella in which DAAG would take all responsibility for the exchange in the eyes of the regulators." Compl.¶52; MTD, App. 193(Williams Aff. ¶ 10).

**C.    FTX Trading became a DAAG partner while DAAG was in its infancy.**

Negotiations for FTX Trading to make an initial investment ensued, with term sheets and proposed documents being exchanged between Williams, Matzke, and Gruen and Bankman-Fried and other representatives of FTX Trading, which was being represented by Daniel Friedberg, an attorney formerly with Fenwick & West LLP and FTX Trading's general counsel.  Compl. ¶¶ 52-55; MTD, App. 193(Williams Aff. ¶ 11).

---

In an interview with Forkast News earlier this year, FTX CEO Sam Bankman-Fried said that while there was guidance from a lot of global regulators on spot cryptocurrency products, this was less true for derivatives. "We're excited for governments to start building out regulatory frameworks and licensing regimes for us to be able to offer that we can acquire for crypto derivatives," Bankman-Fried said. "That's going to play a big role in where we shift a lot of our resources to and we're having a lot of conversations behind the scenes right now and scoping places."

https://forkast.news/ftx-us-acquires-ledgerx-crypto-derivatives/ This quote exemplifies FTX Trading and Bankman-Fried's motivation in the DAAG transaction. *See also* https://markets.businessinsider.com/news/currencies/ftx-us-buys-ledgerx-crypto-derivatives-exchange-sam-bankman-fried-2021-08.   Sullivan & Cromwell represented FTX Trading in the Ledger X acquisition and represents FTX Trading in this adversary proceeding and should be well-aware of FTX Trading's intentions to become regulatorily compliant.

On October 26, 2020, Alameda Ventures,[6] as an affiliate of FTX Trading, invested $700,000 in DAAG in exchange for a 5% interest in the company pursuant to a Share Purchase Agreement of that date. *See* MTD, App. 001(SPA 1). Brandon Williams was not a direct transferee or recipient of any of the $700,000 purchase price. Compl. ¶¶ 56-57; MTD, App. 193 (Williams Aff. ¶ 12).

The parties executed three agreements in the original transaction: 1) SPA 1 in which Alameda Ventures purchased a 5% interest in DAAG for $700,000, 2) A Joint Venture Agreement between DAAG, CM-Equity, AG (the German brokerage), and FTX Trading Gmbh (FTX Trading's German special purpose vehicle) in which FTX Trading would be able to exclusively offer through DAAG tokenized equities to end users for a four month period, and 3) a Tied Agency Agreement with CM-Equity in which FTX Trading GmbH could utilize CM-Equity's BaFin licenses by referring customers to CM-Equity's brokerage services. Compl. ¶ 56; MTD, App. 193-194 (Williams Aff. ¶ 13).

**D.    Alameda, on behalf of FTX Trading, increased its equity stake in DAAG to 20% and later transferred this interest to FTX Trading.**

After six months of observing the development of the DAAG startup, FTX Trading wanted to increase its equity stake in DAAG, again through its affiliate, Alameda Ventures. Compl. ¶60. On July 2, 2021, Alameda Ventures, as buyer, and Brandon Williams, Patrick Gruhn, and Robin Matzke (through Lorem Ipsum UG), as sellers, executed and closed on a Stock Purchase Agreement for 15% of the equity in DAAG. *See* Exhibit 2 (SPA 2). Compl. ¶¶ 60, 61; MTD, App. 194 (Williams Aff. ¶ 14).

Pursuant to SPA 2, Alameda Ventures acquired an additional fifteen percent interest in

---

[6]    Alameda Ventures Ltd. is not Alameda Research LLC, the hedge fund that had allegedly improper access to FTX Trading's customer funds. The Complaint does not make clear this important distinction.

DAAG, raising its ownership percentage to 20%, for a price of $55,500,000. Each of the three shareholders (including Brandon Wiliams), was paid $18.5 million for their respective 5% share interests. While Alameda Ventures was the signatory to SPA 2, the purchase was done by Alameda Ventures on behalf of FTX Trading. As evidence of this fact, after the execution of SPA 3 in November, Alameda Ventures transferred its 20% equity in DAAG to FTX Trading for $62.5 million, which was its then value.  Compl. ¶ 70; MTD, App. 194 (Williams Aff. ¶ 15); MTD, App. 112 (BDO Valuation at 5)

**E.**     **FTX Trading desired to acquire one hundred percent of the equity in DAAG to increase its business and operations.**

Four and a half months after the execution of SPA 2 (July 2, 2021) and more than a year after the initial investment in DAAG (October 20, 2020), FTX Trading decided to acquire complete ownership of DAAG through the purchase of all of its stock not already owned by Alameda Ventures. FTX Trading had been a client and minority shareholder of DAAG for roughly one year prior to its final DAAG acquisition and had in-depth familiarity with DAAG and its operations, financials, and regulatory setup. Compl. ¶ 63; MTD, App. 194 (Williams Aff. ¶ 14).

 Negotiations over valuations, payment models, and terms began and continued over several months. FTX Trading in the negotiations was represented by in house lawyers Daniel Friedburg and Can Sun. MTD, App. 194-195(Williams Aff. ¶ 17).  FTX Trading ultimately retained a Swiss law firm to also represent its interests in the transaction. Compl. ¶¶ 72,73. Since Gruhn and Matzke were to remain employed by DAAG after the acquisition and receive incentive compensation (including stock ownership in FTX Trading) based on achieving certain goals, they primarily did the negotiating.  Brandon Williams was not invited to remain with the company after the acquisition or to ultimately obtain an ownership interest in FTX Trading. For this reason, while he was kept fully informed, he relied upon Gruhn and Matzke to do the negotiating on their and

his behalf.  MTD, App. 194 (Williams Aff. ¶ 15).

When the negotiations had been completed, FTX Trading and Brandon Williams, Patrick Gruhn, and Robin Matzke (through Lorem Ipsum UG) entered into a Stock Purchase Agreement (SPA 3) on November 14, 2021, in which FTX Trading would acquire all stock of DAAG not owned by Alameda.  Compl. ¶ 63; MTD, App. 019 (SPA 3); MTD, App. 194 (Williams Aff. ¶ 16).

Pursuant to SPA 3, FTX Trading acquired the remaining share interests in DAAG for a gross purchase price of $320,000,000, consisting of:

(a)  an up-front cash payment of $166,666,656.26, payable to Williams ($83,333,312.50), Gruhn ($41,666,671.88), and Matzke, through Lorem Ipsum UG ($26,666,671.88) and

(b)    contingent and bonus cash and FTX Trading stock payments to Gruhn and Matzke (but not Williams) for the balance of the purchase price ($153,333,343.74) dependent upon the future achievement of certain specified milestones and goals, which focused upon obtaining additional licensing and regulatory approvals not then possessed by DAAG but which it was in line and fully able to obtain through the acquisition of the Cyprus licensed investment firm, K-DNA. These contingency payments were owed only to Gruhn and Matzke, who were to remain employed by the company, Gruhn as Gruhn as chief executive officer and Matzke as general counsel, but not Williams, who was not invited to remain with DAAG after the sale. MTD, App. 019 (SPA 3); Compl. ¶ 63,65; MTD, App. 195 (Williams Aff. ¶ 19).

On November 21, 2021, Williams received a lump sum, one-time payment of $83,333,312.50 for his stock interest. Gruhn and Matzke, on the other hand, received $68,333,343.76 ($41,666,671.88 and $26,666,671.88, respectively), for their shares plus the right to earn the contingent future cash and stock payments upon achievement of the defined licensing and regulatory goals. Compl. ¶67; MTD, App. 019 (SPA 3); MTD, App. 196 (Williams Aff. ¶ 20).

Williams was not permitted to remain with or be employed by DAAG or participate in the future contingent money and stock payments. Once his share interest was acquired, Brandon Williams had no further relationship with the acquired DAAG or its business or activities. In substance, the amount of cash Williams received above the cash paid to each of Gruhn and Matzke was equivalent to a severance payment.  MTD, App. 195-196 (Williams Aff. ¶¶19, 20). All of the factual allegations of the Complaint describing the post-acquisition activities and license acquisitions is irrelevant to the claim against Brandon Williams, who was no longer with the company.

After the closing on SPA 3 and prior to the bankruptcy, FTX Trading, operating as DAAG but under the name "FTX Europe" (Compl. ¶20), was able to realize its initial goal. The objective was for FTX Europe to receive all regulatory approvals needed for it to actively solicit and actually provide to retail and professional customers in the European Economic Area (including Germany), under the FTX brand, all futures and other crypto derivatives products.  Compl. at ¶¶68, 95-96. The realization of these post-acquisition goals had nothing to do with Williams, who was no longer with or active in the company. Any post-acquisition payments of money or stock went solely to Gruhn and Matzke (through Lorem Ipsum) and not to Williams, who received nothing.

**F.      BDO appraised DAAG at the request of FTX Trading.**

On April 7, 2022, BDO USA, LLP issued to Jen Chan, FTX Trading's Chief of Staff and a resident of Hong Kong, its estimation of the fair value DAAG on an on-going concern basis as of November 14, 2021, the date FTX Trading became the 100% owner of DAAG pursuant to SPA 3.  MTD, App. 107 (BDO Valuation). BDO expressed the opinion that the fair value of the 80% interest in DAAG that FTX Trading acquired was, as of November 14, 2021, $153,500,000, with a value of the future cash (but not stock), contingencies (license acquisitions) of $83,479,000, for a total value of $236,979,000.  The 20% minority interest acquired by Alameda Ventures and

transferred to FTX Trading was valued at $62.5 million, the amount FTX Trading paid Alameda Ventures. Thus, the total value of FTX Trading's 100% ownership interest in DAAG as of November 14, 2021, on a going concern basis, in the opinion of BDO, was $299,479,000, which compares to the $166.7 million in cash paid and the cash contingencies of $93.3 million (exclusive of FTX Trading stock) for the 80% interest, plus the $56.2 million paid by Alameda for the 20% interest, for a total cash price of $316.2 million.

Hence, as evidenced by the BDO valuation opinion, FTX Trading received "reasonably equivalent value" ($299,479,000) for the cash price it paid ($316.2 million) to acquire the 100% interest in DAAG.

**G.   FTX Trading was fully solvent at the time it acquired all the share interests in DAAG and afterward.**

Prager Metis, a well-recognized international firm of public accountants, audited FTX Trading for the years ending December 31, 2021 and 2020 and issued an unqualified audit opinion accompanying the financial statements. MTD, App. 042 (Consolidated Statement). The audit opinion, without qualification, showed that FTX Trading was fully solvent as of December 31, 2021 and 2020. Furthermore, the statements reflected FTX Trading's positive net worth after it acquired DAAG and reflected the fair value ascribed FTX Trading in the BDO Valuation.

Underscoring FTX Trading's unquestionable solvency at the time it acquired DAAG, the financial information presented by John J. Ray III in his First Day Declaration shows that as of September 30, 2022, FTX Trading had consolidated assets of $2,258,734 and liabilities of $465,656, and a net worth of $1,793,078 and was fully solvent as of September 30, 2022. First Day Declaration Doc 24 ¶¶ 36-38; MTD, App. 071. While Ray questioned the reliability of the financial information he was presenting, he has not presented in the Complaint or elsewhere any information indicating that FTX was balance sheet insolvent as of November 23, 2021, the day

FTX Trading closed the SPA 3 transaction, or that contradicted the financial information in his Declaration.

Even more telling, in the Voyager Digital Holdings, Inc. bankruptcy, FTX Trading and its affiliates, represented by Andrew Dieterich and Sullivan & Cromwell, was the successful bidder in the two-week auction sale. FTX Trading was vetted and approved by both the debtors and the creditors' committee, including their investment banker consultant, Moelis, LLC, and was approved by the Court on October 20, 2022. *See In re: Voyager Digital Holdings, Inc. et al.* Case No.22-10943(MEW), United States Bankruptcy Court for the Southern District of New York. *See* MTD, App. 198 (FTX Joint Proposal), MTD, App. 218 (Debtor's Motion excerpt), MTD, App. 227 (Section 4.4 from Asset Purchase Agreement), MTD, App. 228 (Order approving sale), MTD, App. 106 (Dietderich email). In the Voyager bankruptcy proceeding, FTX Trading, represented by Andrew Dieterich and Sullivan & Cromwell, made representations about its financial condition and ability to close the transaction. *See* MTD, App. 198 (FTX Joint Proposal) and MTD, App. 227 (Section 4.4). After questions arose about FTX Trading's financial situation and liquidity, Mr. Dietderich, emailed the creditors' committee counsel, Darren Azman, on November 7, 2022, just before the bankruptcy filing on November 11, 2022, and stated that FTX Trading's financial condition was "rock solid." MTD, App. 106 (Email). Now, FTX Trading, represented by the same Sullivan & Cromwell, alleges that a year earlier, on November 2021, FTX was insolvent (but, apparently, remarkably became solvent by the time of the Voyager auction sale).

FTX Trading filed bankruptcy, not because it was insolvent within the meaning of the definition of "insolvent" in Bankruptcy Code §101, but because it faced a "severe liquidity crisis that developed just before the bankruptcy filing [that] necessitated the filing of [the] Chapter 11 Cases on an emergency basis." Compl. ¶ 33. The bankruptcy filing was not based on FTX

Trading's liabilities exceeding the value of its assets or an inability eventually to pay its creditors (customers) but its inability to respond to a torrent of customer requests to withdraw deposits precipitated by a publicly announced sale by a rival exchange of all of its FTT tokens, which were tokens issued by FTX Trading.

As explained by NBC News, Binance, the largest crypto currency platform and a rival of FTX Trading, and its chairman, Changpeng Zhou ("CZ"), were instrumental in causing FTX Trading's bankruptcy.  Binance, which held a huge quantity of FTT tokens, publicly announced on November 6, 2022, that it was selling off all of its FTT tokens. This public announcement caused the price of FTT to drop sharply.  The abrupt price drop resulted in FTX Trading customers, in the context of other crypto currency exchange collapses that had occurred, wanting to immediately withdraw their deposits.  Exacerbating the problem, Binance publicly announced after its sale of the FTT tokens that it was going to purchase FTX Trading and then almost immediately publicly announced that it decided against the acquisition. This public announcement by Binance caused even more depositors to attempt to withdraw their assets from the FTX platform. FTX Trading suffered what resembled a classic bank run spurred on by customer solvency concerns and worries about their ability to make withdrawals before the bank runs out of cash.  *See* https://www.nbcnews.com/tech/crypto/sam-bankman-fried-crypto-ftx-collapse-explained-rcna57582.  *See also*  https://fortune.com/crypto/2023/10/05/binance-ceo-changpeng-zhao-trapped-bankman-fried-ftx/amp/; Zeke Faux, *Number Go Up*, Penguin Random House LLC, Chapter 23, pages 213-16 (describing the events leading to the run on the exchange and actions of CZ, who is described as the operator of one of the shadiest operations in Crypto). The situation is analogous to the failure of Silicon Valley Bank when the Federal Reserve raised interest rates and caused a bank run.

In the context of the liquidity crisis and the looming bankruptcy filing, Bankman-Fried turned over total and absolute control of FTX Trading to John J. Ray III, as new Chief Executive Officer, and to Sullivan & Cromwell, as FTX Trading's existing counsel and new bankruptcy counsel.

### H.    The acquisition of DAAG was not for the purposed of enriching Samuel Bankman-Fried.

According to the Complaint, Samuel Bankman-Fried spent **"FTX Group assets lavishly on,** among other things, private homes and jets, political and "charitable" contributions, and *dubious investments designed to enrich themselves.  FTX Group's acquisition of DAAG was one such investment*." Compl. ¶ 34 (emphasis added).  The inapplicability of this assertion to the FTX Trading bankruptcy is obvious:  DAAG was acquired by FTX Trading, not Samuel Bankman-Fried or anyone in his personal orbit.  If the acquisition was to benefit in any way Samuel Bankman-Fried, the benefit was entirely derivative and would only occur because the transaction benefited FTX Trading.

Further, the Complaint falsely alleges that the purchase was motivated by Bankman-Fried's desire to financially benefit Brandon Williams, with whom he supposedly had a close personal relationship.[7] This allegation is not correct.  Bankman-Fried and Brandon Williams knew each other but only through electronic communications about business and matters related to business, never met in person, and never spoke one-on-one on the phone.  Their principal interaction was

---

[7]    The situation can be contrasted with that of FTX Trading's investment of over $400+ million in Modulo Capital, Inc. and related entities, a complete start up owned by persons living with Bankman-Fried in his penthouse in the Bahamas. *See* https://www.nytimes.com/2023/01/24/business/ftx-sbf-modulo-capital.html ("The fledgling firm, which was founded in March and operated out of the same Bahamian compound where Mr. Bankman-Fried lived, had no track record or public profile. One of the founders, Duncan Rheingans-Yoo, was only two years out of college. His business partner, Xiaoyun Zhang, known as Lily, was a former Wall Street trader who had previously been romantically involved with Mr. Bankman-Fried, according to four people with knowledge of their relationship.")

Brandon William's unsuccessful attempt to secure FTX Trading as a client of his consulting firm, Cosima Capital, and the FTX Trading/DAAG transactions.  Bankman-Fried's lack of a personal relationship with Brandon Williams is conclusively shown by his affidavit and Williams not being permitted to remain with DAAG after the acquisition or participate in the contingent future payments or potential stock ownership of FTX Trading.  Williams Aff. ¶¶ 22, 23.

**IV.**
**Law and Argument**

**A.    Fed. R. Bankr. P. 7026 and Fed. R. Civ. P. 26(c) authorize the Court to issue a protective order pending a decision on a dispositive motion to dismiss.**

Fed. R. Civ. P. 26(c)(1), as made applicable to this Adversary Proceeding by Fed. R. Bankr. P. 7026, authorizes this Court to grant the relief sought by Williams and states:

> The court may, for good cause, issue an order **to protect a party** or person **from** annoyance, embarrassment, oppression, or **undue burden or expense**, …

Good cause for the relief sought by Williams exists under the case law dealing with this Rule in the context of a motion to dismiss a complaint.

**1.    The granting of a protective order staying discovery pending a ruling on a motion to dismiss requires the defendant to show that good cause exists for the stay.**

The filing of a motion to dismiss does not inherently entitle the moving party to a stay of discovery pending a ruling on the motion. *PlayUp, Inc. v. Mintas*, 2023 WL 6859193, at *3 fn.7 (D. Nev. Oct. 18, 2023); *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 79 (S.D.N.Y. 2020). A defendant moving for a protective order to stay discovery has the burden to show affirmatively that good cause for the granting of the motion exists. *Cuhaci v. Kouri Grp., LP*, 540 F. Supp. 3d 1184, 1187 (S.D. Fla. 2021). The court considering the motion then exercises its discretion to determine if the facts asserted by the defendant establish the necessary good cause and the reasonableness of the requested stay.  *Levey v. Brownstone Inv. Grp.*, LLC, 590 F. App'x 132, 137

(3d Cir. 2014); *Advanced Exterior, Inc. v. Liberty Mut. Grp., Inc.*, 568 F. Supp. 3d 1144, 1146 (D. Colo. 2021) ("Whether to stay discovery is a matter left to the sound discretion of the trial court.").

**2.    Various considerations go into the determination of whether good cause exists for the issuance of a stay of discovery.**

The New York federal courts have enumerated three factors that a court should consider when ruling on a motion to stay discovery based on a motion to dismiss.  These factors are 1) whether the defendant has made a strong showing that the motion to dismiss is meritorious, 2) any unfair prejudice to the plaintiff in delaying discovery, and 3) breadth of discovery and the burden and expense of responding to it.  *See Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 79 (S.D.N.Y. 2020);  *Republic of Turkey v. Christie's, Inc.*, 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018); *Hong Leong Fin. Ltd. (Singapore) v. Pinnacle Performance Ltd.*, 297 F.R.D. 69, 73 (S.D.N.Y. 2013); *Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 78 (E.D.N.Y. 2006); *Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 236 F.R.D. 113, 115 (E.D.N.Y. 2006);  *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002).

The nature and complexity of the plaintiff's claims also may be taken into account by the Court in deciding the motion. *Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 236 F.R.D. 113, 115 (E.D.N.Y. 2006).

A stay of discovery pending a decision on the motion to dismiss is appropriate in situations in which the motion will dispose of the entire case against the moving defendant.[8] *Mann v. Brenner*, 375 F. App'x 232, 239 (3d Cir. 2010) ("In certain circumstances it may be appropriate to stay discovery while evaluating a motion to dismiss where, if the motion is granted, discovery

---

[8]    Another factor to consider in a multi-defendant case is whether the other defendants join in the motion for a protective order. *Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 236 F.R.D. 113, 115 (E.D.N.Y. 2006), citing *Hachette Distribution, Inc. v. Hudson Cnty. News Co.*, 136 F.R.D. 356, 358 (E.D.N.Y. 1991).  Here, the LI Defendants have indicated that they intend to do so.

would be futile."); *Cuhaci v. Kouri Grp.*, LP, 540 F. Supp. 3d 1184, 1187 (S.D. Fla. 2021).

A motion should be granted if discovery is not needed to decide the motion to dismiss, as when there are no factual issues and the only issue is one of law, not requiring any fact discovery for resolution. *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1984);*Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984); *Rich v. KIS California, Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("When plaintiff can show that discovery is necessary in order to meet defendant's challenge to personal jurisdiction, a court should ordinarily permit discovery on that issue unless plaintiff's claim appears to be clearly frivolous."); *Hachette Distribution, Inc. v. Hudson Cnty. News Co.*, 136 F.R.D. 356, 358 (E.D.N.Y. 1991) ("Discovery should be stayed, however, only when there are no factual issues in need of further immediate exploration, and the issues before the Court are purely questions of law that are potentially dispositive."). *See also Ministerio Roca Solida v. U.S. Dep't of Fish & Wildlife,* 288 F.R.D. 500, 506 (D. Nev. 2013).

When a complaint lacks facial plausibility, the plaintiff is not entitled to discovery. *In re Radnor Holdings Corp*., 564 B.R. 467, 487–88 (D. Del.), aff'd, 706 F. App'x 94 (3d Cir. 2017) ("Because the Complaint fails to state a claim, Kennedy's argument that he was entitled to discovery fails"); *Rivas v. The Bank of New York Mellon*, 676 F. App'x 926, 932 (11th Cir. 2017). This same rule should apply when subject matter jurisdiction is clearly absent and is not dependent on the development of disputed factual issues.

A contrary result may obtain if the plaintiff needs discovery to defend the motion to dismiss, as may occur when issues of personal jurisdiction arise in contrast to issues of subject matter jurisdiction. *Chavous v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 3 (D.D.C. 2001) ("A trial court "ordinarily should not stay discovery which is necessary to gather facts in order to defend against [a] motion [to dismiss].'").

There are numerous decisions affirming the grant or granting protective orders delaying discovery until a motion to dismiss has been decided in the exercise of the trial court's discretion. *See e.g. Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1308 (11th Cir. 2020); *Lawrence v. Governor of Georgia*, 721 F. App'x 862, 864–65 (11th Cir. 2018) ("Many other issues were apparent from the face of the complaint, such as the district court's likely lack of subject matter jurisdiction … ."); *Rivas v. The Bank of New York Mellon*, 676 F. App'x 926, 932 (11th Cir. 2017); *Lazar v. Kroncke*, 862 F.3d 1186, 1203 (9th Cir. 2017); *Roberts v. FNB S. of Alma, Georgia*, 716 F. App'x 854, 857 (11th Cir. 2017); *Gilbert v. Ferry*, 401 F.3d 411, 415 (6th Cir. 2005) (holding that a stay of discovery was appropriate after filing of motion to dismiss for lack of subject matter based on *Rooker-Feldman* doctrine.); *Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014); *Mann v. Brenner*, 375 F. App'x 232, 239 (3d Cir. 2010); *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984). *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 797 (Fed. Cir. 1984); *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 79 (S.D.N.Y. 2020); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002); *Hong Leong Fin. Ltd. (Singapore) v. Pinnacle Performance Ltd.*, 297 F.R.D. 69, 73 (S.D.N.Y. 2013) (challenge to diversity subject matter jurisdiction involving foreign defendants); *Ministerio Roca Solida v. U.S. Dep't of Fish & Wildlife*, 288 F.R.D. 500, 507 (D. Nev. 2013).

**B.      Good cause for the issuance of a protective order staying discovery clearly exists.**

**1.      Williams' motion to dismiss for lack of subject matter jurisdiction is undeniably meritorious.**

A bankruptcy petition may not be filed on behalf of a corporation without being authorized by the corporation's organizational documents and the local law to which the corporation is subject.  The Plaintiffs ignored this longstanding and well recognized principle and proceeded as though they were not limited by the law and the jurisdictional principles that bind this Court.

Samuel Bankman-Fried, while the chief executive officer, a director, and the principal shareholder of FTX Trading and Maclaurin Investments, lacked any power to unilaterally approve the two corporations filing bankruptcy petitions or to grant John J. Ray III the power to do so, together with unlimited, indeed omnipotent, power over the two corporations, in the Omnibus Corporate Authority drafted by Sullivan & Cromwell and filed with each corporation's bankruptcy petition. Both Andrew Dietderich of Sullivan & Cromwell and John J. Ray III had to know that this document was ineffective and essentially void for lack of authorization.   This awareness is underscored by the Omnibus Corporate Authority qualifying its grant of authority with the phrase "with plenary authority to exercise all powers and authority **capable of delegation to an officer under applicable law** … ." [D.I. 1] (emphasis added). This phrase no doubt was added by Mr. Dieterich, the draftsman, because he recognized that Bankman-Fried lacked the authority under the corporate documents and local law to do what the Omnibus Corporate Power purported to have him do. But Mr. Diederich proceeded, apparently, because he believed he did not have time to do what the law and the various corporate documents required be done if he was going to get Mr. Ray appointed as CEO and Sullivan & Cromwell selected as bankruptcy counsel.  Expediency overrode the law.

The Supreme Court in *Price v. Gurney*, 324 U.S. 100, 106 (1945) ineluctably ruled that a corporate bankruptcy case must be dismissed if not properly unauthorized.  Numerous bankruptcy court have concurred in this result and applied its mandate.  *See e.g. In re Runaway II, Inc*., 159 B.R. 537 (Bankr. W.D. Mo. 1993); *Matter of Giggles Rest., Inc.*, 103 B.R. 549, 553 (Bankr. D.N.J. 1989); *In re Moni-Stat, Inc.*, 84 B.R. 756, 757 (Bankr. D. Kan. 1988); *In re Al-Wyn Food Distributors, Inc.*, 8 B.R. 42, 43 (Bankr. M.D. Fla. 1980).  The merit in Brandon Williams' motion not only is strong, but is overwhelming.

**2.      The Plaintiffs will suffer no prejudice from a stay.**

A slight delay in proceeding with discovery, pending a decision by this Court on the motion to dismiss, will not prejudice the Plaintiffs or the preparation of their case for trial. The Plaintiffs do not need discovery to respond to the motion to dismiss for lack of subject matter jurisdiction. In actuality, as demonstrated by Williams co-pending Motion To Dismiss Or For Summary Judgment, the Plaintiffs' claims in this Adversary Proceeding are without substantive merit. Delaying discovery on meritless claims will not impair the bankruptcy estate but will only prevent its resources from being squandered on senseless discovery.

**3.      The expense the discovery in this case will require is unlimited and burdensome.**

The Plaintiffs contend the purchase of DAAG was a fraudulent transfer in violation of Bankruptcy Code §548, both as an actual and a constructive fraudulent transfer. Willams and the LI Defendants deny the claims of actual and constructive fraudulent transfer, particularly those allegations based FTX Trading and Maclaurin investments having an actual intent to hinder, delay, or defraud their creditors as the motivation for the acquisition of DAAG, and the allegations of a lack of solvency of FTX Trading in 2021, and the lack of reasonable equivalence between the price paid and the value of DAAG.  These allegations will require the production of all of the documents related to the three DAAG purchases, as well as related transactions, such as the attempt by FTX to purchase the Voyager exchange just before filing bankruptcy.

This case involves the purchase by FTX Trading and Maclaurin Investments of DAAG, Swiss company, in July and August 2021, that operated in the European Economic Area and not the United States.  FTX Trading's purpose in purchasing DAAG, which operated predominately outside the United States, was to acquire DAAG's licenses and regulatory compliances and thereby to enable FTX Trading to expand its business in the European Economic Areas in a licensed and

regulatorily compliant manner. DAAG was an operating business that was both profitable and expected to increase its revenue at the time of the acquisition. FTX Trading operated DAAG as "FTX Europe" after the acquisition. FTX Europe was operating at the time of the bankruptcy filings.

Discovery in this case will not be primarily focused on the United States but will involve persons in Europe (which implicates its complex data European data protection regulations), the Caribbean, and Hong Kong. Deposition discovery will require travel to the witness's country. Expert testimony will be required, both as part of the factual matrix and to establish points of defense, such as solvency and equivalence of value. The required e-discovery will be extensive, especially because much of the communications between parties was via encrypted messaging services. Several of the key witnesses have criminal charges pending or recently concluded (such as Samuel Bankman Fried) and discovery from them can be expected to implicate the Fifth Amendment and the need for the Court to grant immunity in compliance with 11 U.S.C. § 344 and 18 U.S.C. § 6003. If a witness is incarcerated, arrangements will have to be made with the facility in which the person is incarcerated to enable a deposition to occur. Members of Sullivan & Cromwell and members of other law firms representing FTX Trading in the United States and Europe, both in the DAAG transaction and others (such as Voyager), will need to be subpoenaed to produce documents and provide deposition testimony and can be expected to resist disclosing their relevant information.

Needless to say, this discovery will be inordinately expensive, complex, and time consuming. It will be burdensome, both procedurally and logistically. This expense and this burden should not be required of the Defendants if the case will end with a ruling on the motion to dismiss for lack of subject matter jurisdiction.

## V.
## Conclusion

FTX Trading and Maclaurin Investments have brought an adversary proceeding over which this Court lacks subject matter jurisdiction. There is no need for discovery prior to or pending a ruling by this Court on the motion to dismiss for lack of subject matter jurisdiction. The granting of the motion should put an end to this ill-conceived case. This Court should issue the protective order so that the Brandon Williams is not subjected to burdensome and expensive discovery that is unnecessary and an abuse. This Court also should grant Brandon Williams' motion so the bankruptcy estate is not unnecessarily depleted by the abusive expense of multi-country discovery that this case will entail.

The granting of the motion for a protective order delaying discovery until the subject matter jurisdiction issue is resolved will prejudice no one but will benefit all.

*/s/ Gregory L. Arbogast*
Lawrence J. Gebhardt (*pro hac vice pending*)
Gregory L. Arbogast (No. 6255)
GEBHARDT & SMITH LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801
T: (302) 295-5038
F: (443) 957-4325
Garbogast@gebsmith.com

*Attorneys for Defendant,*
*Brandon Williams*