iii.  The image cross-reference file is needed to link the images to the database. It is a comma-delimited file consisting of seven fields per line. There must be a line in the cross-reference file for every image in the database.

i.  Text must be produced as separate document-level text files, **not** as fields within the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production.  The TEXTPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the ProdBeg.  <u>PLEASE DO NOT include the text in the .DAT file</u>.

j.  If any Document responsive to any Document Request is no longer in Your possession, custody, control or care, state whether the Document:  (a) is missing or lost; (b) has been destroyed; (c) has been transferred voluntarily or involuntarily to others; or (d) has been otherwise disposed of or discarded. In each such situation, set forth the facts surrounding such disposition, identify the person(s) directing or authorizing the disposition, and list the disposition date.

9.  All Documents shall be produced with metadata, including

PRODBEG
PRODEND
PRODBEGATT (BegAtt and EndAtt fields must be two separate fields.)
PRODENDATT (BegAtt and EndAtt fields must be two separate fields.)
CUSTODIAN
ALL CUSTODIANS
DOCTYPE
PARENT DATE/TIME – this field is an aggregated date field which is
harmonized and carried down through all attachments and family members.
FROM
TO
PARTICIPANTS
CC
BCC
SUBJECT
SENT DATE/TIME
RECEIVED DATE/TIME
CREATED DATE/TIME
LAST MODIFIED DATE/TIME
BEGIN DATE – Populated for any short messages produced
END DATE – Populated for any short messages produced
CHAT TYPE
TIMEZONE
FILENAME
ORIGINAL FILE PATH
FILE EXT

A.0119

AUTHOR
REDACTED – Populated with a value (i.e. Redacted, Has Redactions or Y) when
the document has a redaction
FILESIZE
MD5HASH
MESSAGEID
ConversationThreadID
PageCount
PROD_VOLUME

10.     If any Document responsive to any Document Request has been lost, removed,
destroyed, or altered prior to the service of this Request, produce for each such Document:  (a) a
description of the Document to the extent known, and the last time and location that the Document
is known or believed to have existed; (b) the date, sender, recipient and other Person(s) to whom
copies were sent, subject matter, present location, and location of any copies; and (c) the identity
of any Person authorizing or participating in any removal, destruction, or alteration of the
Document, and the method and circumstances of such removal, destruction, or alteration.

11.     Any Document withheld from production based on privilege or any similar claim
shall be identified by:  (a) the type of document; (b) the general subject matter of the Document;
(c) the date of the Document; and (d) such other information as is sufficient to identify the
Document, including the author of the Document, the addressee of the Document, other recipients
of the Document, and, where not apparent, the relationship of the author and the addressee to each
other.  The nature of each claim of privilege shall be set forth.

12.     If You object to any part of any Document Request, You shall state fully the nature
of the objection.  Notwithstanding any objections, You shall nonetheless comply fully with the
other parts of the Document Request not objected to.

13.     If at any time additional Documents responsive to any Document Request comes
into Your possession, custody, or control or are brought to Your attention, prompt supplementation
of Your response to the Document Request is required.

**A.0120**

14.     You are required to preserve and maintain any Documents that are related to the subject matter of the Document Requests, regardless of whether You deem them responsive to the Document Requests.  You shall instruct Your employees, contractors, Professionals, and agents to do the same and shall take steps to ensure that they fulfill these obligations.

15.     The Demanding Defendants reserve the right to request additional Documents, as needed, and to submit additional or supplemental requests, provided, further, that it expressly reserves its rights to supplement or amend the Document Requests.

16.     The Document Requests are continuing in nature and Plaintiffs are required to supplement their responses as they obtain further information relating to their answers.

17.     Unless otherwise specified, the relevant period for the Document Requests shall be from January 1, 2020 through the present.

## REQUESTS FOR PRODUCTION

1.     Documents and communications regarding the finances, solvency, or insolvency of all entities in the DotCom Silo.

2.     Documents and communications regarding the finances, solvency, or insolvency of FTXT, including but not limited to documents and communications supporting the allegations in the Complaint that:

a.  "Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made" (Complaint ¶ 106.v);

b.  "Each of the Plaintiffs: (i) was insolvent on the date that each transfer was made; (ii) became insolvent as a result of the transfers and obligations; (iii) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (iv) intended to incur, or believed that it

**A.0121**

would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured" (Complaint ¶ 114); and/or

    c.   "The transfers were made while Plaintiffs were insolvent" (Complaint ¶ 124).

3.    Documents and communications regarding the finances, solvency, or insolvency of Maclaurin, including but not limited to documents and communications supporting the allegations in the Complaint that:

    a.   "Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made" (Complaint ¶ 106.v);

    b.   "Each of the Plaintiffs: (i) was insolvent on the date that each transfer was made; (ii) became insolvent as a result of the transfers and obligations; (iii) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (iv) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured" (Complaint ¶ 114); and/or

    c.   "The transfers were made while Plaintiffs were insolvent" (Complaint ¶ 124).

4.    Documents and communications regarding FTXT's October 2021 Series B financing and January 2022 Series C financing, including but not limited to, any and all formal or informal valuations performed in connection therewith, or any prospectuses created in connection with or to obtain such financing.

5.    Documents and communications regarding the investments in, or the receivables owed from, each entity identified in your response to Interrogatory No. 6.

6.    Documents and communications regarding the investments in, or the receivables owed from, each entity identified in your response to Interrogatory No. 7.

A.0122

7.      Documents and communications regarding the transfers identified in your response to Interrogatory No. 11, including but not limited to all bank statements, wallet statements, wire transfers or confirmations, book entries, or any other proof and source of each transfer.

8.      Documents and communications regarding the potential or actual acquisition and/or sale of LedgerX LLC, LedgerX Holdings Inc., Liquid Group (later known as FTX Japan), ZUBR Exchange Ltd. (later known as FTX (Gibraltar) Limited), and AZA Finance/BTC Africa SA, and any related entities, including but not limited to any due diligence and/or any informal or formal valuations performed in connection with those transactions.

9.      Documents and communications with, about, or regarding DAAG and/or Defendants.

10.     Documents and communications regarding any services offered by DAAG and/or Defendants.

11.     Documents and communications regarding DAAG's shareholders, directors, officers, and/or employees.

12.      Documents and communications regarding any and all regulatory and operating licenses held by DAAG, K-DNA, and CM-Equity, including applications therefor.

13.     Documents and communications regarding any and all formal or informal valuations of DAAG.

14.     Documents and communications regarding or concerning the allegation in Paragraph 36 of the Complaint that "[o]stensibly, the FTX insiders pursued the DAAG acquisition to benefit from the regulatory set-up which the DAAG founders claimed they could provide."

A.0123

15.    Documents and communications supporting or concerning the allegation in Paragraph 37 of the Complaint that Sam Bankman-Fried had a "pre-existing relationship with Gruhn."

16.    Documents and communications supporting or concerning the allegation in Paragraph 39 of the Complaint that Sam Bankman-Fried had a "history of doing favors for Gruhn and Williams," including but not limited to the referenced communications regarding "a simple handshake deal."

17.    Documents and communications supporting or concerning the allegation in Paragraph 106(vii) of the Complaint that the "transfers arose out of a close relationship between an officer of the Debtors, Sam Bankman-Fried, and transferees, including Brandon Williams and Robin Matzke."

18.    Documents and communications regarding SPA 1 and the other transactions and documents described in Paragraphs 53-56 of the Complaint, including any internal or external communications or negotiations preceding or leading to such agreements, documents, or transactions, and any due diligence in connection with such agreements, documents, or transactions.

19.    Documents and communications regarding the price and valuation described in Paragraph 58 of the Complaint, including but not limited to all documents and communications concerning how such figures were derived.

20.    Documents and communications regarding SPA 2 and the other transactions and documents described in Paragraph 61 of the Complaint, including any internal or external communications or negotiations preceding or leading to such agreements, documents, or

A.0124

transactions, and any due diligence in connection with such agreements, documents, or transactions.

21.     Documents and communications regarding the price and valuation described in Paragraph 61 of the Complaint, including but not limited to all documents and communications concerning how such figures were derived.

22.     Documents and communications regarding SPA 3 and the other transactions and documents described in Paragraphs 63-70 of the Complaint, including any internal or external communications or negotiations preceding or leading to such agreements, documents, or transactions, and any due diligence in connection with such agreements, documents, or transactions.

23.     Documents and communications regarding the price and valuation described in Paragraph 63 of the Complaint, including but not limited to all documents and communications concerning how such figures were derived.

24.     Documents and communications regarding other parties, individuals, or entities that were interested in, or that were involved in discussions or negotiations concerning, actually or potentially investing or purchasing DAAG in or around 2021, including but not limited to Binance, Kraken, and Gregory Landegger of The Whittemore Collection.

25.     Documents and communications regarding any data room and/or presentation materials provided to parties, individuals, or entities that were interested in, or that were involved in discussions or negotiations concerning actually or potentially investing in or purchasing DAAG in or around 2021.

26.     Documents and communications supporting or regarding the allegation in Paragraph 96 of the Complaint that Gruhn and Matzke received 1,373,247 of shares of FTXT

A.0125

common stock and that such shares had a value of $50,000,000, including but not limited to:  a) any corporate resolution or similar corporate action approving the issuance or the transfer of such shares; b) any relevant share certificates; c) any record entries of such issuance or transfers; d) any relevant FTXT shareholder lists or cap tables.

27.    Documents and communications regarding the transaction referred to in Paragraph 66 of the Complaint.

28.    The source and all transfer records of cash, tokens, or other forms of consideration for any purchase, merger, or acquisition of DAAG, its shares, or any other transaction described in Paragraphs 49-70 of the Complaint.

29.    Documents and communications relating to any cash, tokens, or other forms of consideration for any purchase, merger, or acquisition of DAAG, its shares, or any other transaction described in Paragraphs 49-70 of the Complaint.

30.    Documents and communications supporting the allegation in Paragraph 35 of the Complaint that DAAG was acquired by Plaintiffs with "misappropriated FTX Group funds."

31.    Documents and communications regarding FTXT's acquisition of Maclaurin's 20% ownership in DAAG, as referenced in Paragraph 70 of the Complaint.

32.    Documents and communications supporting the allegation in Paragraph 71 of the Complaint that the "FTX Group performed no meaningful due diligence in connection with the three SPAs that resulted in the complete acquisition of DAAG."

33.    Documents and communications regarding any "due diligence in connection with the three SPAs that resulted in the complete acquisition of DAAG" that were performed by individuals or entities other than the "FTX Group."

34.     Documents and communications regarding any "due diligence in connection with the three SPAs that resulted in the complete acquisition of DAAG" that were not considered "meaningful," as referenced in Paragraph 71 of the Complaint.

35.     Documents and communications concerning the "FTX Group's" potential or actual retention of Swiss counsel in connection with the transactions and acquisitions described in the Complaint, including but not limited to:  the decision to hire or not hire Swiss counsel; the recommendations of outside counsel to hire Swiss counsel described in Paragraph 72 of the Complaint; the documents and communications described in Paragraphs 73-75 of the Complaint; and any documents and communications about such documents and communications.

36.     Documents and communications between any person or entity within the FTX Group and the Swiss counsel referred to in Paragraph 72 of the Complaint.

37.     Documents and communications supporting the allegations in Paragraph 76-77 of the Complaint including all subparts, including but not limited to the basis for the FTX Group's General Counsel's comments referenced in those two paragraphs.

38.     Documents and communications regarding the total outstanding shares of FTXT common stock prior to and after the DAAG Acquisition, up to the initiation of the Bankruptcy Proceeding

39.     Communications with BDO USA, LLP ("**BDO**") regarding DAAG.

40.     Documents and communications regarding BDO's April 7, 2022 report titled *ASC 805 Valuation of Certain Assets of FTX Trading Ltd.* ("**BDO Report**").

41.     Documents and Communications with BDO preceding or leading to the BDO Report, including but not limited to any documents or other information provided to BDO in connection with or in preparation of the BDO Report.

**A.0127**

42.   Any other valuation of DAAG's assets and liabilities besides the BDO Report.

43.   Documents and communications regarding the "2021 audited financial statement of FTX Trading Ltd." referenced in Plaintiffs' Initial Disclosures.

44.   Documents and communications with or regarding Silicon Valley Accountants regarding the "valuation of DAAG's goodwill and tangible assets and liabilities" as described in Plaintiffs' Initial Disclosures.

45.   Documents and communications with or regarding Moorehead PLLC regarding the "valuation of DAAG" as described in Plaintiffs' Initial Disclosures.

46.   Documents and communications with or regarding Taylor Wessing LLP regarding the decision to acquire DAAG, Plaintiffs' contemporaneous valuation of DAAG, negotiations with Defendants in connection with the acquisition, and Plaintiffs' due diligence in connection with the acquisition, as described in Plaintiffs' Initial Disclosures.

47.   Documents and communications with or regarding MLL Legal AG regarding the decision to acquire DAAG, Plaintiffs' contemporaneous valuation of DAAG, negotiations with Defendants in connection with the acquisition, and Plaintiffs' due diligence in connection with the acquisition, as described in Plaintiffs' Initial Disclosures.

48.   Documents and communications with or regarding Annerton Rechtsanwaltsgesellschaft GmbH regarding the decision to acquire DAAG, Plaintiffs' contemporaneous valuation of DAAG, negotiations with Defendants in connection with the acquisition, and Plaintiffs' due diligence in connection with the acquisition, as described in Plaintiffs' Initial Disclosures.

49.   Documents and communications regarding the Earn-Out Payments, including but not limited to the qualification for and the payment of, any Earn-Out Payments.

A.0128

50.     Documents and communications regarding K-DNA, including those regarding:

    a.      Communications with or about K-DNA,

    b.      Services offered by K-DNA;

    c.      Any valuation of K-DNA;

    d.      Any diligence prior to any acquisition of K-DNA;

    e.      Regulatory and operating licenses held by K-DNA, including applications thereof;

    f.      The K-DNA SPA;

    g.      Whether K-DNA would or not be "included by name in SPA 3" as described in Paragraph 87 of the Complaint, including but not limited to the communications referred to in Paragraph 87;

    h.      Any due diligence or research regarding K-DNA prior to any potential or actual acquisition of K-DNA;

    i.      The documents and transactions described in Paragraphs 89-96 and 102 of the Complaint; and

    j.      The change of K-DNA's trade name to FTX Europe.

51.     Documents and communications regarding Kephas, including those regarding:

    a.      Communications with or about Kephas;

    b.      Payments to Kephas;

    c.      Services offered or provided by Kephas, including services offered or provided to DAAG or FTX Switzerland;

    d.      IP owned by Kephas;

    e.      Loans entered into or guaranteed by Kephas;

    f.      Any potential acquisition of Kephas and negotiations thereof;

    g.      Any potential acquisition of the "services and technology provided by Kephas" described in Paragraph 81 of the Complaint; and

    h.      The exclusion of the "services and technology provided by Kephas" described in Paragraph 81 of the Complaint.

52.     Documents and communications regarding CM-Equity, including those regarding:

    a.      Communications with or about CM-Equity;

    b.      Services offered or provided by CM-Equity, including services offered or provided to DAAG or DAAG's customers;

A.0129

      c.      The Joint Venture Agreement and a Tied Agency Agreement referred to in Paragraph 23 of the Complaint, including any negotiations thereof;

      d.      The potential "exclusivity agreement under which DAAG and CM-Equity would provide exclusive services to [FC Interface Solutions Ltd] in return for 138,000 FTT," as referred to in Paragraph 55 of the Complaint; and

      e.      Any potential or actual acquisition of CM-Equity and negotiations thereof.

53.      Documents and communications regarding Cosima Capital, including but not limited to documents and communications regarding:  Cosima Capital providing services to Plaintiffs and/or Debtors, payments from Plaintiffs and/or Debtors to Cosmia Capital, and the allegation in Paragraph 50 of the Complaint that "Williams pitched Bankman-Fried to hire his advisory firm, Cosima Capital."

54.      Documents and communications regarding Crypto Lawyers, including but not limited to documents and communications regarding: Crypto Lawyers providing services to Plaintiffs and/or Debtors, payments from Plaintiffs and/or Debtors to Crypto Lawyers, and the allegation in Paragraph 50 of the Complaint that "Williams pitched Bankman-Fried to hire . . . Gruhn's law firm, Crypto Lawyers."

55.      Documents and communications regarding or supporting the allegation in Paragraph 98 of the Complaint that the "FTX Trading bank account that transferred cash to Gruhn and Lorum Ipsum/Matzke in connection with the purchase of DAAG pursuant to SPA 3, as well as the cash earn-out payments, contained commingled funds, *i.e.*, funds that had been deposited by customers of the FTX.com exchange as well as corporate funds."

56.      Documents and communications regarding or supporting the allegations in Paragraph 106 of the Complaint that:  1) "[n]umerous material facts relating to the transfers were concealed, including the process by which K-DNA was acquired and the source of funds used to acquire DAAG and K-DNA"; and 2) "[t]he FTX Insiders removed or concealed Plaintiffs' assets, including funds transferred to acquire DAAG and K-DNA."

57.     Documents and communications regarding Mohammad Hans Dastmaltchi, including but not limited to any agreements with or payments to Dastmaltchi, and any services provided by Dastmaltchi.

58.     Documents and communications regarding DAAG's operations and performance following the DAAG Acquisition.

59.     Documents and communications regarding any potential or actual sale of DAAG following the DAAG Acquisition.

60.     Documents and communications regarding any data room and/or presentation materials provided to "potentially interested parties," as described in Paragraph 104 of the Complaint, including but not limited to the actual data room and/or presentation materials, the identity of the "potentially interested parties," and any communications with such "potentially interested parties."

61.     Documents and communications regarding or supporting the allegation in Paragraph 104 of the Complaint that "it became apparent to the Debtors that there was no realistic prospect of a successful sale of FTX Europe," including but not limited to documents and communications supporting the allegations contained in the subparts of Paragraph 104 of the Complaint.

62.     Documents and communications regarding or supporting the conclusion described in Paragraph 105 of the Complaint.

63.     Documents and communications regarding or supporting the facts and figures contained in Exhibit A to the Complaint.

64.     To the extent not otherwise produced, documents and communications regarding or supporting the allegations in the Complaint.

**A.0131**

65.     To the extent not otherwise produced, documents and communications relied upon, referred to, or related to Your responses to the First Set of Interrogatories by Defendant Lorem Ipsum UG to Plaintiffs FTX Trading Ltd. and Maclaurin Investments Ltd.

66.     To the extent not otherwise produced, documents and communications concerning or supporting the "Subjects" contained in the chart in Section "A" of Plaintiffs' Initial Disclosures.

67.     To the extent not otherwise produced, documents and communications concerning or supporting the categories contained in Section "B" of Plaintiffs' Initial Disclosures.

68.     FTXT's transaction database, including ledgers of transaction information, detailed transaction data, customer information, and tables setting forth raw data and summary statistics derived from the transaction data in the database (the database has variously been referred to as the FTX transaction database, FTX's accounting database, the AWS database (a reference to the database being hosted by Amazon Web Service), the Postgres database, or the PostgreSQL database).

69.     The personnel file for Matzke.

70.     The personnel file for Gruhn.

71.     Documents and communications regarding FTXT's customer relationship with DAAG prior to the DAAG Acquisition.

72.     Copies of Matzke's and Gruhn's email mailboxes for any of their FTX-related email addresses.

73.     Statements for all bank accounts, trust accounts, financial institution accounts, trading accounts, and cryptocurrency wallets for the Plaintiffs and each entity in the DotCom Silo.

**A.0132**

74.     All documents and communications between You and/or Debtors on one hand and Professor Peter Easton on the other hand, or related to Professor Easton's work in *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

75.     Documents and communications regarding Plaintiffs' decision and authority to file for Chapter 11 relief, including communications between (a) Debtors' counsel or other representatives and (b) Sam Bankman-Fried and/or his counsel related to the Omnibus Corporate Authority executed by Sam Bankman-Fried on or about November 10, 2022.

76.     All Documents identifying, relating to or concerning fee income received from each of the EEA Countries and each of the Other Authorized Countries, broken out by country.

77.     Documents and Communications regarding or with Julie Schoening.

**A.0133**