# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-50437 (JTD) |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS PATRICK GRUHN, ROBIN MATZKE, AND
LOREM IPSUM UG's MOTION TO DISMISS AND DEFENDANT BRANDON
WILLIAMS'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

GLOSSARY ................................................................................................................... xi

INTRODUCTION .............................................................................................................1

BACKGROUND ...............................................................................................................5

LEGAL STANDARD ........................................................................................................8

ARGUMENT ....................................................................................................................9

I.      SECTIONS 547 AND 548 OF THE BANKRUPTCY CODE APPLY
        EXTRATERRITORIALLY, AND THE CONDUCT RELEVANT TO THE
        TRANSFERS AT ISSUE IS DOMESTIC IN ANY EVENT ...........................9

        A.      The Fraudulent and Preferential Transfer Statutes Apply Extraterritorially .........10

        B.      Plaintiffs' Claims Require Only a Domestic Application of the Avoidance
                Statutes ................................................................................................14

II.     THE COMPLAINT ADEQUATELY PLEADS TRANSFERS OF PROPERTY
        OF THE DEBTOR TO THE LI DEFENDANTS ................................................17

        A.      The Complaint Alleges Adequate Facts Concerning the Transfers .....................17

        B.      FTX Trading Ltd. Had a Property Interest in the Transferred Common
                Stock ................................................................................................21

        C.      The Complaint Adequately Alleges that the Plaintiffs Are Transferors and
                Defendants Are Initial Transferees ........................................................22

        D.      Affirmative Defenses Are Not Appropriate Grounds for Dismissal at This
                Stage ................................................................................................26

III.    THE COMPLAINT ADEQUATELY PLEADS INSOLVENCY AT THE TIME
        OF THE TRANSFERS ........................................................................................27

IV.     THE COMPLAINT ADEQUATELY PLEADS INTENTIONAL FRAUDULENT
        TRANSFERS ........................................................................................................30

        A.      The Complaint Adequately Alleges Actual Fraudulent Intent ............................31

        B.      The Complaint Adequately Alleges Badges of Fraud to Support an
                Inference of Fraudulent Intent ................................................................36

V.      THE COMPLAINT ADEQUATELY PLEADS CONSTRUCTIVELY
        FRAUDULENT TRANSFERS .......................................................................................38

VI.     THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY
        DUTY UNDER ANTIGUAN LAW .................................................................................39

VII.    THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND THE
        COMPLAINT IF IT GRANTS DEFENDANTS' MOTIONS TO DISMISS ...................43

VIII.   THE COURT SHOULD DENY WILLIAMS'S MOTION FOR SUMMARY
        JUDGMENT ...................................................................................................................45

CONCLUSION...........................................................................................................................52

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023) .............................................................................9, 14, 15

*Acosta* v. *DeVilbiss Landscape Architects, Inc.*,
  2018 WL 5033757 (D. Del. Oct. 17, 2018) .............................................46

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ....................................................................26

*Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*,
  2007 WL 1202760 (W.D. Pa. Apr. 12, 2007) ..........................................22

*Anderson* v. *Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................................9

*In re Aphton Corp.*,
  423 B.R. 76 (Bankr. D. Del. 2010) ..........................................................38

*In re Art. Inst. Of Philadelphia*,
  2022 WL 18401591 (Bankr. D. Del. June 13, 2023) ...............................35

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2000) ...................................................................................8

*In re Bayou Steel BD Holdings, L.L.C.*,
  642 B.R. 371 (Bankr. D. Del. 2022) ........................................................42

*Begier* v. *I.R.S.*,
  496 U.S. 53 (1990) .............................................................................12, 15

*In re Bernard L. Madoff Inv. Sec. LLC*,
  12 F.4th 171 (2d Cir. 2021) ................................................................3, 26

*Black* v. *Montgomery Cnty.*,
  835 F.3d 358 (3d Cir. 2016) ................................................................8, 41

*Blackberry Ltd.* v. *PCS Wireless LLC*,
  2016 WL 1313161 (D.N.J. Apr. 4, 2016) ................................................41

*In re BMT-NW Acquisition, LLC*,
  582 B.R. 846 (Bankr. D. Del. 2018) ........................................................38

*In re The Brown Schs.*,
    368 B.R. 394 (Bankr. D. Del. 2007) ................................................................26

*Buck* v. *Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006).............................................................................5

*In re Bullion Rsrv. of N. Am.*,
    836 F.2d 1214 (9th Cir. 1988) ........................................................................24

*In re Burlington Coat Factory*,
    114 F.3d 1410 (3d Cir. 1997)..........................................................................28

*Carpenter* v. *Roe*,
    10 N.Y. 227 (1851) ........................................................................................35

*In re Cath. Diocese of Wilmington, Inc.*,
    432 B.R. 135 (Bankr. D. Del. 2010) ...............................................................24

*In re Centaur, LLC*,
    2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) ........................................29

*In re Charys Hldg. Co., Inc.*,
    443 B.R. 628 (Bankr. D. Del. 2011) ...............................................................38

*In re Cred Inc.*,
    650 B.R. 803 (Bankr. D. Del. 2023) ...............................................................39

*In re Daily Bread Winddown, LLC*,
    2022 Bankr. LEXIS 3078 (Bankr. D. Del. Nov. 1, 2022) .......................................45

*In re DBSI, Inc.*,
    2011 WL 1810632 (Bankr. D. Del. May 5, 2011) ...........................................32

*In re DBSI, Inc.*,
    447 B.R. 243 (Bankr. D. Del. 2011) ...................................................4, 27, 29

*In re DBSI, Inc.*,
    477 B.R. 504 (Bankr. D. Del. 2012) ...............................................................34

*Diaz-Barba* v. *Kismet Acquisition, LLC*,
    2010 WL 2079738 (S.D. Cal. May 20, 2010)..................................................10

*In re Direct Response Media, Inc.*,
    466 B.R. 626 (Bankr. D. Del. 2012) ...............................................................29

*Doe* v. *Abington Friends Sch.*,
    480 F.3d 252 (3d Cir. 2007)....................................................................46, 47

*Drivetrain, LLC* v. *X. Commerce, Inc.*,
  2023 WL 1804627 (Bankr. D. Del. February 7, 2023)....................................................33, 36

*In re DSI Renal Holdings*,
  574 B.R. 446 (Bankr. D. Del. 2017) ...............................................................................36, 37

*In re DVI, Inc.*,
  2008 WL 4239120 (Bankr. D. Del. Sept. 16, 2008) ................................................................9

*In re Enron Corp.*,
  2005 WL 3873897 (Bankr. S.D.N.Y. Aug. 10, 2005) ..........................................................46

*In re Enron Corp.*,
  328 B.R. 58 (Bankr. S.D.N.Y. 2005)............................................................................18, 30

*In re Factory 2-U Stores, Inc.*,
  2007 WL 2698207 (Bankr. D. Del. Sept. 11, 2007) ..............................................................25

*In re FAH Liquidating Corp.*,
  572 B.R. 117 (Bankr. D. Del. 2017) .................................................................10, 11, 14, 15

*In re FBI Wind Down, Inc.*,
  581 B.R. 387 (Bank. D. Del. 2018) .............................................................................23, 24

*In re Fedders N. Am., Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ............................................................................18, 30

*Foman* v. *Davis*,
  371 U.S. 178 (1962)....................................................................................................43, 44

*In re French*,
  440 F.3d 145 (4th Cir. 2006) ..........................................................................10, 11, 14, 15

*In re Giant Gray, Inc.*,
  629 B.R. 814 (Bankr. S.D. Tex. 2020) ..................................................................................21

*In re Glencoe Acquisition, Inc.*,
  2015 WL 3777972 (Bankr. D. Del. June 16, 2015)...............................................................27

*Glob. Crossing Est. Representative* v. *Winnick*,
  2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006).........................................................................21

*Global Network Commc'ns., Inc.* v. *City of New York*,
  458 F.3d 150 (2d Cir. 2006)....................................................................................................8

*Graber* v. *Dales*,
  511 F. Supp. 3d 594 (E.D. Pa. 2021) ....................................................................................48

*Great Lakes Reinsurance (UK) SE* v. *Herzig*,
   2023 WL 3560578 (S.D.N.Y. May 18, 2023) ........................................................48

*In re Green Field Energy Services, Inc.*,
   2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) ....................................3, 18, 19

*In re GYPC, Inc.*,
   2020 WL 13421284 (Bankr. S.D. Ohio Aug. 4, 2020).........................................20

*Hart* v. *City of Philadelphia*,
   779 F. App'x 121 (3d Cir. 2019) .........................................................................47

*Humana, Inc.* v. *Indivior, Inc.*,
   2022 WL 17718342 (3d Cir. Dec. 15, 2022) ........................................................19

*In re The IT Grp., Inc.*,
   313 B.R. 370 (Bankr. D. Del. 2004) .....................................................................19

*Kane* v. *Chester County Dep't of Children, Youth & Families*,
   10 F. Supp. 3d 671 (E.D. Pa. 2014) ...................................................................5, 8

*In re Kaiser Aluminum Corp.*,
   456 F.3d 328 (3d Cir. 2006)...................................................................................13

*In re Khan*,
   2023 WL 3746537 (Bankr. W.D. Mich. May 30, 2023) .......................................20

*In re Liberty Brands, LLC*,
   476 B.R. 443 (Bankr. D. Del. 2012) .......................................................................9

*In re Liquid Holdings Grp., Inc.*,
   2018 WL 2759301 (Bankr. D. Del. June 6, 2018) .............................................3, 21

*In re Live Well Fin., Inc.*,
   2023 WL 3995900 (Bankr. D. Del. June 13, 2023).........................................35, 36

*In re Live Well Fin., Inc.*,
   652 B.R. 699 (Bankr. D. Del. 2023) ............................................................. *passim*

*In re LTC Holdings, Inc.*,
   596 B.R. 797 (Bankr. D. Del. 2019) .....................................................................46

*In re Lyondell Chemical Company*,
   543 B.R. 127 (Bankr. S.D.N.Y. 2016)....................................................10, 12, 14

*In re Manhattan Inv. Fund*,
   397 B.R. 1 (S.D.N.Y. 2007)............................................................................32, 33

*In re MarketXT Holdings Corp.*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ...................................................................35

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) .......................................................10, 15, 35

*In re MDIP Inc.*,
    332 B.R. 129 (Bankr. D. Del. 2005) ......................................................................50

*In re Meadows*,
    396 B.R. 485 (B.A.P. 6th Cir. 2008).....................................................................23

*In re Midway Games Inc.*,
    428 B.R. 303 (Bankr. D. Del. 2010) ......................................................................30

*In re Millennium Lab Holdings II, LLC*,
    2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ..............................................30

*Miller* v. *Beneficial Mgmt. Corp.*,
    977 F.2d 834 (3d Cir. 1992).................................................................................46

*In re Miller* v. *Mott*,
    2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) .................................................27

*Moe* v. *Seton Hall Univ.*,
    2010 WL 1609680 (D.N.J. Apr. 20, 2010) ............................................................41

*Morrison* v. *Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010).............................................................................................11

*In re NWL Holdings, Inc.*,
    2013 WL 2436667 (Bankr. D. Del. June 4, 2013) .................................................27

*In re Oakwood Homes Corp.*,
    340 B.R. 510 (Bankr. D. Del. 2006) ......................................................................20

*In re Opus East, LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015) ........................................................................21

*In re Our Alchemy LLC*,
    2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) ........................................19, 27

*In re Our Alchemy, LLC*,
    642 B.R. 155 (Bankr. D. Del. 2022) ......................................................................45

*In re PennySaver USA Publishing, LLC*,
    602 B.R. 256 (Bankr. D. Del. 2019) ................................................18, 21, 27, 37

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
917 F.3d 85 (2d Cir. 2019) .................................................................16

*In re Pitt Penn Holding Co., Inc.*,
2011 WL 4352373 (Bankr. D. Del. Sept. 16, 2011) ............................21, 22

*In re Qimonda Richmond, LLC*,
467 B.R. 318 (Bankr. D. Del. 2012) .....................................................48

*RJR Nabisco, Inc.* v. *European Community*,
579 U.S. 325 (2016) ...........................................................................15

*Robinson* v. *Beckles*,
2012 WL 13206064 (D. Del. Mar. 20, 2012) .........................................44

*In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*,
311 F.3d 198 (3d Cir. 2002) .................................................................18

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012) .......................................10, 12, 15

*In re Select Tree Farms, Inc.*,
534 B.R. 494 (Bankr. W.D.N.Y. 2015) ..................................................25

*In re Sentinel Mgmt. Grp., Inc.*,
728 F.3d 660 (7th Cir. 2013) ...............................................................33

*Shelton* v. *Bledsoe*,
775 F.3d 554 (3d Cir. 2015) .................................................4, 9, 46, 47

*In re Simon*,
153 F.3d 991, 996 (9th Cir. 1998) ........................................................14

*In re Southmark Corp.*,
49 F.3d 1111 (5th Cir. 1995) ...............................................................24

*In re Student Fin. Corp.*,
335 B.R. 539 (D. Del. 2005) ..............................................................8, 9

*In re Syntax-Brillian Corp.*,
2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ..................26, 33, 34, 37

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) .....................................................34

*TWA Inc. PostConfirmation Estate* v. *Marsh USA Inc.*,
305 B.R. 228 (Bankr. D. Del. 2004) .....................................................21

*In re United States Diversified Prods.*,
    100 F.3d 53 (7th Cir. 1996) ........................................................23

*United States* v. *Bankman-Fried*,
    22-cr-00673 (S.D.N.Y. 2022) ............................................ *passim*

*United States* v. *Ellison*,
    22-cr-00673 (S.D.N.Y. 2022) .................................5, 38, 29

*United States* v. *Singh*,
    22-cr-00673 (S.D.N.Y. 2022) ..........................................................5

*United States* v. *Wang*,
    22-cr-00673 (S.D.N.Y. 2022) ..........................................................5

*United States* v. *Whiting Pools, Inc.*,
    462 U.S. 198 (1983) ........................................................22

*In re Universal Mktg., Inc.*,
    541 B.R. 259 (Bankr. E.D. Pa. 2015) ........................................25

*In re Valley Media, Inc.*,
    288 B.R. 189 (Bankr. D. Del. 2003) ..................................19, 21

*WesternGeco LLC* v. *ION Geophysical Corp.*,
    138 S. Ct. 2129 (2018) ........................................................15

*Yegiazaryan* v. *Smagin*,
    599 U.S. 533 (2023) ........................................................16

*In re Zetta Jet USA, Inc.*,
    624 B.R. 461 (Bankr. C.D. Cal. 2020) ..................................11, 12

*In re Zohar III, Corp.*,
    631 B.R. 133 (Bankr. D. Del. 2021) ..................................36, 37

**Statutes and Rules**

11 U.S.C. § 101(32) ........................................................27

11 U.S.C. § 541 ................................................ *passim*

11 U.S.C. § 547 ................................................ *passim*

11 U.S.C. § 548 ................................................ *passim*

11 U.S.C. § 550 ................................................ *passim*

International Business Corporations Act ........................................39

**Other Authorities**

Fed. R. Bankr. P. 7009 ................................................................................................30

Fed. R. Bankr. P. 7015 ................................................................................................43

Fed. R. Civ. P. 8 ............................................................................................... *passim*

Fed. R. Civ. P. 9 ............................................................................................... *passim*

Fed. R. Civ. P. 12 ...............................................................................5, 8, 26, 35

Fed. R. Civ. P. 15 ................................................................................................43

Fed. R. Civ. P. 44.1 ................................................................................................40

Fed. R. Civ. P. 56 ...............................................................................9, 46, 47

Fed. R. Evid. 801 ................................................................................................46

# GLOSSARY

| | |
|---|---|
| **BW Br.** | Brief in support of Defendant Brandon Williams's Motion to Dismiss or for Summary Judgment in the above-captioned action [ECF No. 23]. |
| **Chapter 11 Cases** | The jointly administered Chapter 11 cases filed by FTX Trading Ltd. and its affiliated entities pending before the United States Bankruptcy Court for the District of Delaware under lead Case No. 22-11068. |
| **Complaint** | The complaint filed in the above-captioned action [ECF No. 1]. |
| **DAAG** | Digital Assets DA AG, now known as FTX Europe AG. |
| **DAAG Acquisition** | The acquisition of DAAG by Maclaurin Investments Ltd. and FTX Trading Ltd. via three share purchase agreements on October 25, 2020 (SPA 1), July 2, 2021 (SPA 2) and November 14, 2021 (SPA 3). |
| **Debtors** | The above-captioned debtors and debtors-in-possession |
| **FTX.com** | The trade name of FTX Trading Ltd. |
| **FTX Insiders** | (1) Samuel Bankman-Fried, co-founder of, *inter alia*, Plaintiff Alameda Research Ltd. and Debtor FTX Trading, Ltd.; (2) Caroline Ellison, former co-CEO of Alameda Research LLC; (3) Nishad Singh, former director of engineering of, *inter alia*, Debtor FTX Trading, Ltd.; and (4) Zixiao "Gary" Wang, co-founder and former chief technology officer of, *inter alia*, Debtor FTX Trading, Ltd. |
| **K-DNA** | K-DNA Financial Services Ltd., now known as FTX EU Ltd., a Cypriot company acquired by FTX Trading Ltd. |
| **LI Br.** | Brief in support of Defendants Lorem Ipsum UG, Patrick Gruhn, and Robin Matzke's Motion to Dismiss in the above-captioned action [ECF No. 32]. |
| **LI Defendants** | Lorem Ipsum UG, Patrick Gruhn, and Robin Matzke. |
| **Main Case** | Chapter 11 Cases |
| **Plaintiffs** | FTX Trading Ltd. and Maclaurin Investments Ltd., formerly known as Alameda Ventures Ltd. |

## INTRODUCTION

On November 2, 2023, Samuel Bankman-Fried, co-founder of Debtor FTX Trading, Ltd. and majority owner of the Debtors, was convicted of seven counts of fraud and conspiracy for orchestrating one of the largest frauds in history.  Bankman-Fried and other FTX Insiders misappropriated billions of dollars of FTX Group funds while they were in control of the Debtors. They commingled customer deposits with other FTX Group funds and used those funds to purchase lavish homes and private jets, and to expand their personal wealth and sphere of influence through, among other things, political and "charitable" contributions, and to make "investments" wholly unrelated to the operations of the FTX Group.  Aware that FTX and Alameda owed significant amounts of money they did not have to investors, lenders, and customers, these FTX Insiders sought ever new ways to cultivate the appearance that FTX was a successful and growing enterprise by expanding FTX to new markets in order to attract new investment capital and new customers—whose deposits could again be commingled with FTX Group funds and used to cover obligations FTX had already incurred.

As detailed in the Complaint, the FTX Insiders caused Plaintiffs to transfer vast sums of commingled funds to Defendants to acquire Digital Assets DA AG ("DAAG"), a Swiss company that the FTX Insiders recognized had no "active business" or "much IP" and was not even "up and running."  (Compl. ¶ 77.)  The FTX Insiders acquired DAAG as part of their "scheme to enrich and otherwise benefit the FTX Insiders by expanding their fraudulent scheme to the European Economic Area, which would enable them to continue misappropriating assets of the FTX Group." (*Id.* ¶ 106(i).)  Put simply, the FTX Insiders were attempting to make FTX appear like a successful company in order to grow the pot of assets they could misappropriate and in turn prevent their

Ponzi-like scheme from crumbling.  Plaintiffs seek to avoid and recover all transfers to the Defendants for the DAAG Acquisition as fraudulent and/or preferential transfers.

Although the FTX Insiders have admitted to or been convicted of myriad crimes, Defendants Patrick Gruhn, Robin Matzke, and Lorem Ipsum UG (together, the "LI Defendants") and Defendant Brandon Williams continue to pretend that the DAAG Acquisition was entirely above board and involved the purchase of a valuable, legitimate business.  Defendants have moved to dismiss, and Williams also has moved for summary judgment.[2]  Both briefs ask the Court to ignore common sense and the Complaint's well-pled allegations regarding the FTX Insiders' fraudulent scheme, Plaintiffs' extraordinary overpayment in the DAAG Acquisition, and Plaintiffs' insolvency.  These motions are without merit and should be denied.

*First*, the LI Defendants argue that this Court lacks authority to avoid transfers to Matzke and Lorem Ipsum UG because Sections 547 and 548 of the Bankruptcy Code cannot be applied extraterritorially.  Defendants are wrong, and *every* court in this Circuit to address the issue has held to the contrary.  Further, even if Plaintiffs were not wrong as a matter of law, it would make no difference: the Complaint adequately pleads that avoidance of the transfers at issue would require only a domestic application of avoidance statutes.

---

[2] The LI Defendants' motion to dismiss argues in part that the Court lacks subject matter jurisdiction over this avoidance action. (LI Br. at 10–11.) Without seeking leave of the Court, Brandon Williams submitted an untimely and supplemental motion to dismiss for lack of subject matter jurisdiction, raising the same argument raised in the LI Defendants' motion.  (*See* Suppl. Mot. to Dismiss Adversary Proceeding, Nov. 3, 2023, ECF No. 34.)  These motions are identical to motions filed by the LI Defendants, which Brandon Williams has joined, in the main Chapter 11 case. (*See* LI Defendants' Mots. to Dismiss, *In re FTX Trading Ltd.*, 22-11068 (Bankr. D. Del. Oct. 27, 2023), ECF Nos. 3399, 3400; Williams's Joinder to Mots. To Dismiss of the LI Parties, *In re FTX Trading Ltd.*, 22-11068 (Bankr. D. Del. Nov. 3, 2023), ECF Nos. 3657, 3658.)  Rather than ask the Court to decide the same motions twice, Plaintiffs will not address them here, and the Debtors will respond on the agreed schedule in the Chapter 11 case and Plaintiffs hereby adopt that response.

*Second*, the LI Defendants contend that the Complaint fails to allege adequate detail concerning the transfers, complaining of a series of imaginary factual gaps. But this Court has explicitly rejected the standard the LI Defendants rely on as "unduly restrictive," and Plaintiffs have pled all that they need to comply with Federal Rules of Civil Procedure 8 and 9, including the transferor, transferee, amount of each transfer, and when the transfers occurred. *In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at *13 (Bankr. D. Del. Aug. 31, 2015).

*Third*, the LI Defendants argue that Plaintiff FTX Trading Ltd. had no property interest in its common stock transferred as part of the DAAG Acquisition. That is wrong as a matter of law: "this Court does permit stock to constitute property of the debtor." *In re Liquid Holdings Grp., Inc.*, 2018 WL 2759301, at *18 (Bankr. D. Del. June 6, 2018).[3]

*Fourth*, the LI Defendants argue that they were merely subsequent transferees who received the transfers in good faith. This mischaracterizes the allegations of the Complaint, which alleges that Plaintiffs transferred funds from bank accounts containing commingled funds—not that Plaintiffs were mere conduits or intermediate transferees. Moreover, the LI Defendants' good faith defense is a fact-intensive inquiry that cannot be resolved on a motion to dismiss. *See In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 195 (2d Cir. 2021).

*Fifth*, Defendants argue that Plaintiffs do not adequately plead insolvency at the time of the transfers or shortly thereafter. This is baseless. The Complaint sufficiently pleads facts from which this Court may reasonably infer insolvency at all relevant times, including that the FTX Insiders looted "several billion dollars" from the exchange operated by Plaintiff FTX Trading, Ltd. using special trading privileges granted to Alameda Research LLC in 2019. (Compl. ¶ 42–43.)

---

[3] Unless otherwise stated, all internal citations, brackets, and quotation marks are omitted from quotations.

And in any event, Defendants' argument is premature because "insolvency is generally a factual determination not appropriate for resolution in a motion to dismiss." *In re DBSI, Inc.*, 447 B.R. 243, 248 (Bankr. D. Del. 2011).

*Sixth*, Defendants contend that Plaintiffs have not alleged facts sufficient to show that the relevant transfers were intentionally or constructively fraudulent. They are wrong. The Complaint pleads more than enough detail to show that the DAAG Acquisition was intended to hinder, delay, or defraud creditors. As the Complaint alleges, multiple FTX Insiders have pled guilty to misappropriating funds from FTX and Alameda, which were used to finance acquisitions like DAAG that were intended to expand the pool of capital available for misappropriation. The FTX Insiders performed no due diligence and overpaid to purchase DAAG from Bankman-Fried's close associates in the hopes of gaining access to more deposits to keep the scheme alive. After Debtors commenced these Chapter 11 Cases, they discovered that DAAG was worth next to nothing. These allegations are more than enough to support claims of intentional and constructive fraud.

*Seventh*, the LI Defendants argue that Plaintiffs' breach of fiduciary duty claims under Antiguan law against Gruhn and Matzke fail because Gruhn and Matzke owed no duty to FTX Trading Ltd., and if Gruhn and Matzke had a fiduciary duty, they did not breach it by allowing a $5 million side-payment to Mohamad Dastmaltchi or millions in payments to Kephas for purported "services." This argument is wrong as a matter of Antiguan law, under which the officer of a wholly owned subsidiary can owe fiduciary duties to a parent company, and which correctly applied here would support a finding of breach of those duties.

*Lastly*, Williams's motion for summary judgment is premature. A district court is "rarely justified" in granting summary judgment where, as here, discovery is incomplete. *Shelton* v. *Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015). Indeed, Williams's motion relies on his own self-

serving affidavit, on which he has not yet been subject to cross-examination.  In addition, summary judgment is plainly inappropriate because the record on Williams's own motion makes clear that there are numerous genuine issues of material fact in dispute, including those regarding fraudulent intent, valuation, and insolvency, among other issues.

## BACKGROUND[4]

The FTX Insiders perpetrated a massive fraud by causing Alameda and FTX Trading to misappropriate billions of dollars from the FTX exchanges in order to enable the FTX Insiders to spend lavishly on "philanthropic" and political causes, and on scheme-perpetuating "investments" like the DAAG Acquisition.  (Compl. ¶¶ 1–2).  The FTX Insiders sought to acquire DAAG in order to "expand[] their fraudulent scheme to the European Economic Area" by "overpaying their close associates . . . in order to acquire required licenses" to operate within Europe.  (*Id.* ¶ 106(i).) This would allow "the FTX Group to expand its customer base, in turn enabling the FTX Insiders to expand their fraudulent scheme and misappropriation of FTX Group funds."  (*Id.* ¶ 3.)  Indeed,

---

[4] In connection with their brief, Plaintiffs submit the concurrently filed *Declaration of Stephen Ehrenberg* and the exhibits attached thereto (the "Ehrenberg Decl."). For purposes of Rule 12(b)(6), "the court relies on the complaint, exhibits attached to the complaint, and matters of public record, including other judicial proceedings." *Kane* v. *Chester Cnty Dep't of Child., Youth & Fams.*, 10 F. Supp. 3d 671, 680 (E.D. Pa. 2014); *see also Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (on a motion to dismiss, the Court is permitted to consider "matters of public record, orders, [and] items appearing in the record of the case"). Accordingly, the Court may consider documents referred to throughout the Complaint or other record items in the case, including (1) *Notice of Proposed Amendment to Cash Management Order*, *In re FTX Trading Ltd.*, 22-11068 (Bankr. D. Del. June 12, 2023), ECF No. 1615; (2) *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* ("First Day Declaration"), *In re FTX Trading Ltd.*, 22-11068 (Bankr. D. Del. Nov. 17, 2022), ECF No. 24; (3) *Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com* ("Second Interim Report"), *In re FTX Trading Ltd.*, 22-11068 (Bankr. D. Del. June 26, 2023), ECF No. 1704; and (4) proofs of claims submitted by Defendants, including (i) Defendant Matzke's Customer Proof of Claim, No. 50116 (Sept. 10, 2023) ("Matzke Proof of Claim"), Defendant Lorem Ipsum UG's Proof of Claim, No. 4476 (June 30, 2023) ("Lorem Ipsum UG Proof of Claim"), and Defendant Patrick Gruhn's Proof of Claim, No. 4831 (June 30, 2023) ("Gruhn Proof of Claim").  The Court can also consider the transcripts of judicial proceedings relied on in the Complaint, including *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022).

the FTX Insiders pursued the DAAG acquisition after Brandon Williams claimed to Bankman-Fried that Williams and his colleagues "know global regulators extremely well." (*Id.* ¶ 37.) The FTX Insiders acquired DAAG at a final valuation of nearly $400 million because they needed access to further FTX Group funds to misappropriate, and they hoped that the Defendants would be able to obtain the requisite licenses from European regulators. (*Id.* ¶¶ 2, 106(i).)

The DAAG Acquisition was conducted as a three-part transaction between October 2020 and November 2021, with little to no due diligence and minimal involvement of outside counsel. (*Id.* ¶¶ 71–76.) DAAG's purported valuation sharply increased with each successive share purchase agreement ("SPA")—from $14 million in SPA 1, to $370 million in SPA 2, (only 8 months later), and finally to almost $400 million in SPA 3 (4 months after SPA 2)—for no apparent reason. (*Id.* ¶¶ 58, 61, 63.) The FTX Insiders pressed on with the acquisition, despite knowing that DAAG was "not up and running," and did not have "any active business" or "much IP." (*Id.* ¶ 77.) With this knowledge, the FTX Insiders caused Alameda and FTX Trading to pay or commit to pay over $376 million in consideration for DAAG. (*Id.* ¶ 6.)

Despite this extraordinary purchase price, Defendants withheld key intellectual property from the acquisition. (*Id.* ¶ 81.) Kephas, a company incorporated in Delaware with corporate filings in Oregon, Montana, and Texas, is or was controlled by Gruhn, provided IT services to DAAG, and purportedly owns intellectual property used by DAAG. (*Id.* ¶¶ 24, 79.) After the DAAG Acquisition, FTX Europe continued to pay Kephas, even though it had no contract with Kephas. (*Id.* ¶ 82.) Between May 2021 and February 2023, Kephas received at least $4 million from FTX Europe and its subsidiaries, although Kephas's invoices only totaled $1.65 million. (*Id.*)

DAAG did not possess a securities license it hoped to use to operate a cryptocurrency exchange when the final share purchase agreement was executed. (*Id.* ¶ 38.) Instead, SPA 3

contemplated that Gruhn and Matzke would receive over $93 million in additional contingent compensation if they could acquire for FTX Europe a contract for differences broker licensed in the European Economic Area. (*Id.* ¶ 68.) To help them achieve these irrational and baseless payouts, Gruhn and Matzke caused DAAG to agree to pay $5 million to Mohammad Dastmaltchi, an individual who had been previously investigated by Liechtenstein regulators and ordered to leave his role as director and controlling shareholder of Union Bank for bringing in customers with ties to international corruption. (*Id.* ¶¶ 99–100.) This payment was tied to an agreement DAAG signed with Dastmaltchi one month before SPA 2 was executed—in which DAAG agreed to pay Dastmaltchi in exchange for helping the company find a CySEC-licensed firm to acquire. (*Id.* ¶ 99.) DAAG ultimately acquired K-DNA—a company with connections to an Israeli binary options scandal—for just €2 million, or less than half of what Dastmaltchi was paid for "introducing" K-DNA, and a fraction of the earn-out payments to Gruhn and Matzke (via Matzke's ownership of Lorem Ipsum UG) that the K-DNA acquisition triggered. (*Id.* ¶¶ 86, 88, 89–95.) In addition to these inflated earn-out payments, the K-DNA acquisition triggered Gruhn and Matzke's entitlement to an additional $30 million, to be paid in eight equal installments over four years. (*Id.* ¶ 96(iv).)

After these Chapter 11 proceedings commenced, the Debtors attempted to organize a sale process for FTX Europe without success. (*Id.* ¶ 104–05.) Such efforts failed because FTX Europe has no value or meaningful saleable assets and, because Defendants held back Kephas's intellectual property during the DAAG acquisition, little to no proprietary technology or intellectual property. (*Id.*)

Each of the LI Defendants have filed a proof of claim. Gruhn and Lorem Ipsum have filed proofs of claim seeking "[n]o less than $33,402,312.50" and "[n]o less than $62,011,656.25,"

respectively, from FTX Trading Ltd. for its purported failure to pay consideration due under SPA 3, including the value of FTX Trading Ltd. stock purportedly owed to Gruhn and Lorem Ipsum, as well as other unidentified "Relationship Documents." (Ehrenberg Decl. Ex. 1 at 6, 11, 16; Ehrenberg Decl. Ex. 2 at 6, 11, 16.) Matzke has filed a proof of claim to recover from FTX Trading Ltd. $34,814,823 in fiat and cryptocurrencies in his FTX exchange account. (Ehrenberg Decl. Ex. 3 at 3–8.)

Plaintiffs have brought suit to avoid and recover the funds that were fraudulently and preferentially transferred to the Defendants in connection with the DAAG Acquisition. The Complaint also seeks disallowance of Defendants' claims. Plaintiffs have additionally brought breach of fiduciary duty claims against Gruhn and Matzke in connection with their actions in causing FTX Trading and its subsidiaries to transfer funds to Kephas and Dastmaltchi.

## LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2000) (plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

For purposes of Rule 12(b)(6), "the court relies on the complaint, exhibits attached to the complaint, and matters of public record, including other judicial proceedings." *Kane*, 10 F. Supp. 3d at 680. It is not permissible on a Rule 12(b)(6) motion to rely on material outside the complaint to "make a finding of fact that controvert[s] the plaintiff's own factual assertions set out in its complaint." *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006); *see also In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005) (stating the "purpose

-8-

of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case"). Nor should a 12(b)(6) motion be granted based on an affirmative defense predicated on disputed facts. *See In re DVI, Inc.*, 2008 WL 4239120, at \*11 (Bankr. D. Del. Sept. 16, 2008).

"If discovery is incomplete, a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law." *Shelton*, 775 F.3d at 568. A party moving for summary judgment has the burden to establish that "no genuine issue of material fact" exists. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256 (1986). The Court should only grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "must view the inferences from the record in the light most favorable to the non-moving party." *In re Liberty Brands, LLC*, 476 B.R. 443, 448 (Bankr. D. Del. 2012).

## ARGUMENT

**I. SECTIONS 547 AND 548 OF THE BANKRUPTCY CODE APPLY EXTRATERRITORIALLY, AND THE CONDUCT RELEVANT TO THE TRANSFERS AT ISSUE IS DOMESTIC IN ANY EVENT**

Courts use a two-step framework to determine if a statute applies extraterritorially. *See Abitron Austria GmbH* v. *Hetronic Int'l, Inc.*, 600 U.S. 412, 417–18 (2023). A court first must determine if "Congress has affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct." *Id.* If Congress has not done so, a court must determine if the particular claims at issue seek a permissible domestic application of the provision by "identifying the focus of congressional concern underlying the provision at issue," looking to "the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and

interests it seeks to protect or vindicate," and asking "*whether the conduct relevant to that focus occurred*" in the United States.  *Id.* at 418.

The LI Defendants contend that Plaintiffs' claims for fraudulent and preferential transfers under 11 U.S.C. §§ 547 and 548 against Robin Matzke (a German citizen) and Lorem Ipsum UG (a German company) must fail because these provisions cannot be exercised extraterritorially. The LI Defendants are wrong as a matter of law, and even if they were not, it would make no difference.  The Complaint adequately pleads that the conduct relevant to the focus of the statutes occurred in the United States.

### A.      The Fraudulent and Preferential Transfer Statutes Apply Extraterritorially

Relying entirely on cases from outside this Circuit, the LI Defendants contend that Sections 547 and 548 do not apply extraterritorially.  (LI Br. at 16–17 & n.20.)  The LI Defendants fail to note that *every* case in this Circuit and the only Circuit Court to have considered the issue have held to the contrary.  *See In re French*, 440 F.3d 145, 152 (4th Cir. 2006); *In re Maxus Energy Corp.*, 641 B.R. 467, 561 n.358 (Bankr. D. Del. 2022); *In re FAH Liquidating Corp.*, 572 B.R. 117, 125 (Bankr. D. Del. 2017).[5]  The law in this Circuit is clear: "Congress' intent was to extend the scope of [the avoidance statutes] to cover extraterritorial conduct."  *In re FAH Liquidating Corp.*, 572 B.R. at 124.

Cases adopting this rule have reasoned that although the text of sections 547 and 548 do not explicitly state that they apply extraterritorially, the "surrounding provisions of the Bankruptcy Code" clearly evidence that "Congress nevertheless intended that statute to apply

---

[5] Other courts have held that the avoidance statutes have extraterritorial application, even some of the courts the LI Defendants rely on.  *See, e.g.*, *In re Lyondell Chem. Co.*, 543 B.R. 127, 155 (Bnkr. S.D.N.Y. 2016); *Sec. Inv. Protect. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 480 B.R. 501, 528 (Bankr. S.D.N.Y. 2012); *Diaz-Barba* v. *Kismet Acquisition, LLC*, 2010 WL 2079738, at *10 (S.D. Cal. May 20, 2010).

extraterritorially." *Id.* at 125; *see also Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010) ("Assuredly context can be consulted as well" in evaluating Congressional intent for extraterritorial application). The Bankruptcy Code defines the bankruptcy estate to be composed of specified categories of property "wherever located and by whomever held," including "[a]ny interest in property that the trustee recovers" under Section 550, which authorizes recovery of transfers avoided under Sections 547 and 548. 11 U.S.C. §§ 541(a) & (a)(3). "Through this incorporation" of Section 541's definitions of "property" the Trustee can recover under the Trustee's avoidance powers into Sections 547 and 548, "Congress made manifest its intent that [these provisions] apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located." *In re French*, 440 F.3d at 152.[6] Indeed, it is difficult to imagine a broader statutory definition of estate property than property "wherever located and by whomever held." 11 U.S.C. § 541(a).

The LI Defendants urge the Court to adopt the holding of *In re Zetta Jet USA, Inc.*, 624 B.R. 461 (Bankr. C.D. Cal. 2020), arguing that (1) if Congress intended that Sections 547 and 548 apply extraterritorially, it would have "expressed its intent in a clear way," (2) Sections 547 and 548 do not contain the "wherever located" language of Section 541(a), and (3) under Section 541(a)(3), property transferred by a debtor prepetition becomes estate property "only *after* it has been recovered" under Section 550, and thus the "wherever located" language of Section 541(a) is inapplicable to avoidance actions. (LI Br. at 17 & n.21.) These arguments lack merit.

---

[6] Courts have often addressed whether either Section 547 or 548 apply extraterritorially, but not always both. Regardless, as LI Defendants concede, the reasoning for why both have extraterritorial reach applies equally to both provisions. *See* LI Br. at n.21.

"Because the purpose of the avoidance provision[s] is to preserve the property includable within the bankruptcy estate—the property available for distribution to creditors—'property of the debtor' subject to the [the avoidance] provision[s] is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier* v. *I.R.S.*, 496 U.S. 53, 58 (1990). Section 541 details what such property includes. *See id.* at 58–59. By defining estate property to include property "wherever located and by whomever held," including property subject to avoidance, Congress clearly expressed its intent for Section 547 and Section 548 to have extraterritorial application. Thus, it is irrelevant that Congress did not repeat itself in the text of Sections 547 and 548 themselves. *See Madoff Inv. Sec. LLC*, 480 B.R. at 528 (Sections 547 and 548's "reference to the 'interest of the debtor in property'—the same term used in Section 541—is not coincidental."). This Court and others have explicitly rejected the LI Defendants' argument that Section 541 and Sections 547 and 548 should be read independently, reasoning that because Section 541(a)(3) "provides that any interest in property that the trustee recovers under section 550 becomes property of the estate," and Congress could not have intended "that property located anywhere in the world could be property of the estate once recovered under section 550, but [] a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the United States." *In re Lyondell Chem. Co.*, 543 B.R. at 154–55.[7]

---

[7] The LI Defendants attempt to make much of *In re Zetta*'s criticism of *In re French* as "hard to follow." (LI Br. at 17 (citing *In re Zetta Jet USA, Inc.*, 624 B.R. at 478).) But *In re Zetta* and the cases it relied on "misunderstand *French*'s holding" in construing *In re French* to hold that Section 541 alone "form[ed] the basis for the extraterritorial application of the avoidance and recovery sections in the Code because under Second Circuit precedent, fraudulently transferred assets are not property of the estate until they are actually recovered." *Madoff Inv. Sec. LLC*, 480 B.R. at 528. In actuality, *In re French* reasoned that Sections 547 and 548's "reference to Section 541 expressed congressional intent to grant the Trustee

The LI Defendants' position is not just wrong, but if adopted, it would be obstructive and damaging to the Bankruptcy Code's avoidance, claims, and distribution process in a way that Congress could not possibly have intended.  Lorem Ipsum UG has filed a proof of claim to recover the value of FTX Trading Ltd. stock transferred to it as part of the fraudulent DAAG Acquisition.  (*See* Ehrenberg Decl. Ex. 2.)  Matzke has filed a proof of claim to recover the value of the balance of his FTX.com exchange account, the same account to which Plaintiffs transferred funds.[8]  (*See* Ehrenberg Decl. Ex. 3.)  Plaintiffs commenced these Chapter 11 proceedings in the United States, Matzke and Lorem Ipsum UG have filed proofs of claim in the United States, thereby submitting to the jurisdiction of this Court.  Plaintiffs are seeking to avoid transfers to these Defendants and disallow their claims.  Congress could not have intended to exclude fraudulent transfers to foreign persons from the reach of the avoidance statutes, but simultaneously intended to allow such persons to collect the value of those fraudulent transfers pursuant to the claim process to the obvious detriment of other creditors.  *See also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006) ( "A basic tenet of statutory construction is that courts should interpret a law to avoid absurd or bizarre results.").

Moreover, the LI Defendants' preferred rule would undermine the *in rem* jurisdiction of the Bankruptcy Court by removing from its jurisdiction "assets that Congress has declared become property of the estate when recovered under section 541(a)(3)," including fraudulently

---

authority to avoid and recover all transfers that, but for a fraudulent transfer, would have been property of the estate, even if not currently property of the estate.  This grant of authority includes assets fraudulently transferred overseas because but for the fraudulent transfer, assets located overseas would undeniably be property of the estate." *Id.*

[8] If necessary, Plaintiffs are prepared to amend their Complaint to allege that the assets in Matzke's FTX account are the proceeds of the transfers to his FTX.com exchange account he received as part of the fraudulent DAAG Acquisition.

transferred assets. *In re FAH Liquidating Corp.*, 572 B.R. at 126; *see also In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) ("The court's exercise of 'custody' over the debtor's property, via its exercise of in rem jurisdiction, essentially creates a fiction that the property—regardless of actual location—is legally located within the jurisdictional boundaries of the district in which the court sits."). Indeed, it could do so *in this case* because both foreign defendants have filed proofs of claim to recover the value of transfers, which Plaintiffs now seek to avoid or disallow but which the LI Defendants erroneously contend are outside the Court's statutory power.

There is simply no reason to think, as the LI Defendants do, that "property not in the estate as of the commencement of the case cannot be brought into the estate because it is in a foreign locale." *In re Lyondell Chem. Co.*, 543 B.R. at 154. This view is inconsistent with common sense, the plain text of Sections 541(a) and (a)(3), and with "the purpose of the Bankruptcy Code's avoidance provisions, which is to prevent debtors from illegitimately disposing of property that should be available to their creditors." *In re French*, 440 F.3d at 152.

### B.   Plaintiffs' Claims Require Only a Domestic Application of the Avoidance Statutes

The LI Defendants contend that the transfer of $18.5 million in stablecoin from Maclaurin to Matzke's FTX exchange account in connection with SPA 2, the transfers of $50.4 million in cash and stablecoin from FTX Trading Ltd. to the bank and FTX exchange accounts of Matzke and Lorem Ipsum UG in connection with SPA 3, and the issuance of FTX Trading Ltd. stock to Matzke via Lorem Ipsum in connection with SPA 3 have no "domestic connection." (LI Br. at 12–13.) They are wrong: Plaintiffs have adequately plead facts to show that the conduct relevant to the transfers at issue was domestic, not foreign.

"[T]o prove that a claim involves a domestic application of a statute, plaintiffs must establish that the conduct relevant to the statute's focus occurred in the United States." *Abitron*,

600 U.S. at 418.  "The focus of a statute is the object of its solicitude, which can include the
conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate."
*WesternGeco LLC* v. *ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018).  The focus of the
avoidance statutes is the "preserv[ation]" of "the property includable within the bankruptcy
estate . . . for distribution to creditors," *Begier*, 496 U.S. at 58, and to "protect creditors by
preserving the bankruptcy estate against illegitimate depletions" via fraudulent and preferential
transfers, *In re French*, 440 F.3d at 154; *see also In re Maxus Energy Corp.*, 641 B.R. at 561
(avoidance provisions "allow[] a trustee, for the protection of an estate and its creditors, to avoid
a debtor's fraudulent, hindersome, or delay-causing property transfer that depletes the estate.").
Accordingly, the Court must determine if the conduct relevant to the depletion of the estate
through the transfers at issue occurred in the U.S., "even if other conduct occurred abroad." *RJR
Nabisco, Inc.* v. *European Community*, 579 U.S. 325, 337 (2016).

 The LI Defendants misunderstand this inquiry, focusing almost exclusively on Plaintiffs'
countries of incorporation (the Seychelles and Antigua), Matzke's citizenship in Germany, and
Lorem Ipsum UG's incorporation in Germany.  But the Supreme Court has cautioned that the
"ultimate question regarding permissible domestic application turns on the location of the
*conduct* relevant to the focus." *Abitron*, 600 U.S. at 422 (emphasis added).  Accordingly, courts
regularly look to considerations other than the citizenship or country of incorporation of
transferors and transferees to evaluate whether the relevant conduct was domestic or not. *See,
e.g.*, *Madoff Inv. Sec. LLC*, 480 B.R. at 525 (application of avoidance statutes domestic in part
because "the depletion of the [debtor] estate" and the "[Madoff] Ponzi scheme was operated in
the United States"); *In re FAH Liquidating Corp.*, 572 B.R. at 124 (Court can "consider all
component events of the transfers, including whether the participants, acts, targets, and effects

-15-

involved in the transaction at issue are primarily foreign or primarily domestic"); *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 100 (2d Cir. 2019) ("When a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United States"); *see also Yegiazaryan* v. *Smagin*, 599 U.S. 533, 544 (2023) (rejecting an analysis of the domestic application of the RICO statute that looks only to the "location of the plaintiff 's residence" in favor of "a case-specific inquiry" that "look[s] to the circumstances surrounding the alleged injury to assess whether it arose in the United States").

Reading the facts in Plaintiffs' favor, as the Court must, the Complaint adequately alleges that the conduct relevant to the transfers occurred in the United States, not Germany.  The Complaint alleges a fraudulent scheme designed and executed by U.S. citizens (the FTX Insiders) to acquire a company from a combination of U.S. persons (Williams, who lived in Maryland, and Gruhn, who lived in Montana and Oregon) and a German citizen (Matzke), who worked with those U.S. persons.  (Compl.  ¶¶ 1, 17–19.)  These U.S. persons and Matzke "negotiated and executed [the SPAs] with representatives from [the] FTX Group based in the United States."  (*Id.* ¶ 31(iii).)  Matzke's DAAG co-sellers are residents of the U.S., and they "negotiated and executed [the SPAs] with representatives from [the] FTX Group based in the United States," including FTX's counsel based in Seattle.  (*Id.* ¶ 31, 53.)  After the DAAG Acquisition closed, the head of FTX Europe continued to live in the U.S., splitting time between Montana and Oregon.  (*Id.* ¶ 17.)

The Complaint does not allege which banks Plaintiffs used to transfer funds to Matzke and Lorem Ipsum UG, but this Court is aware that both Plaintiffs had accounts with U.S. banks. (*See Notice of Proposed Amendment to Cash Management Order*, *In re FTX Trading Ltd.*, 22-

11068 (Bankr. D. Del. June 12, 2023), ECF No. 1615 at 20.)[9]  On a motion to dismiss, the Court

must read the Complaint in Plaintiffs' favor, and disregard the LI Defendants' attempt to reverse

that sound presumption by injecting into the Complaint that Plaintiffs transferred funds to

Matzke's German bank account, which is nowhere alleged in the Complaint.[10]  (LI Br. at 19.)  In

short, the depletion of the estate at issue here occurred in the U.S., pursuant to a scheme

developed by U.S. persons, and executed by buying a company primarily owned by U.S.

persons.  This is not extraterritorial conduct.

## II.  THE COMPLAINT ADEQUATELY PLEADS TRANSFERS OF PROPERTY OF THE DEBTOR TO THE LI DEFENDANTS

The LI Defendants dedicate a lengthy portion of their brief to challenging the level of

detail presented regarding the transfers, solvency, and evidence of fraudulent intent.  These

challenges ignore the Complaint's well-pled allegations, misapply controlling law, and raise

premature affirmative defenses not appropriate for resolution on a motion to dismiss.

### A.  The Complaint Alleges Adequate Facts Concerning the Transfers

The LI Defendants first argue that the Court should dismiss the Complaint's Section 547

and 548 claims because it "fail[s] to provide specific factual information as to many of the

---

[9] In actuality—and as Plaintiffs are prepared to amend the Complaint to state, if needed—the USD transferred to Matzke in connection with SPA 3 came from Plaintiffs' account at Signature Bank, a U.S. bank.  Further, although the Complaint alleges that USDC stablecoin was transferred to Matzke's FTX.com exchange account, as discussed above *infra* n.7, Plaintiffs are prepared to amend the Complaint to plead explicitly that most of this stablecoin was not withdrawn to a cryptocurrency wallet maintained in Germany but instead remained in Matzke's account, and thus as a part of the bankruptcy estate.

[10] Similarly, the LI Defendants impermissibly inject new facts into the Complaint by asserting that because "FTX.com only did business in non-U.S. jurisdictions and was only available to foreign customers," the transfers of USDC had no U.S. connection.  (LI Br. at 19.)  Whether FTX Trading Ltd. accepted U.S. customers is irrelevant to whether any cryptocurrency FTX Trading Ltd. transferred to foreign persons originated in the U.S.

transfers they seek to avoid." (LI Br. at 20.) Plaintiffs misstate the applicable legal standard, and imagine gaps in the Complaint where there are none.

Plaintiffs' preferential transfer claims under Section 547 and constructive fraud claims under Section 548 are governed by Federal Rule of Civil Procedure 8, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also In re PennySaver USA Publishing, LLC*, 602 B.R. 256, 266 (Bankr. D. Del. 2019) ("This Court evaluates claims of constructive fraud under the notice pleading standard of Fed. R. Civ. Pro. 8(a)(2)."). Plaintiffs' intentional fraudulent transfer claims under Section 548 must satisfy Rule 9(b), which requires that a party "state with particularity the circumstances constituting fraud," although "intent . . . may be alleged generally." Fed. R. Civ. P. 9(b). While allegations of "date, place or time" satisfy Rule 9's heightened pleading requirements, "nothing in the rule requires them"; rather, "[p]laintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *In re Green Field Energy Services, Inc.*, 2015 WL 5146161, at *5; *see also In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) ("Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time."). Because an independent debtor-in-possession (as Plaintiffs are here) is a third-party outsider to the debtor's prior transactions, "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where [an independent debtor-in-possession] . . . is asserting the fraudulent transfer claims." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009); *see also In re Enron Corp.*, 328 B.R. 58, 73–74 (Bankr. S.D.N.Y. 2005) (independent debtors-in-possession are subject to relaxed application of Rule 9(b)).

Defendants invoke a stringent pleading standard set out in *In re Valley Media, Inc.*, which held that to adequately plead a Section 547 claim in compliance with Rule 8(a), the plaintiff in

that case had to plead "(a) an identification of the nature and amount of each antecedent debt and

(b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor,

(iii) name of transferee and (iv) the amount of the transfer." 288 B.R. 189, 192 (Bankr. D. Del.

2003). But this Court has repeatedly (and correctly) recognized that the standard set out in *In re*

*Valley Media* is "unduly restrictive," and it is not controlling here. *In re Green Field Energy*

*Services, Inc.*, 2015 WL 5146161, at *13; *see also, e.g.*, *In re Our Alchemy LLC*, 2019 WL

4447545, at *13 (Bankr. D. Del. Sept. 16, 2019) (collecting cases).[11] Regardless, as set forth

below, the Complaint alleges all facts necessary to comply with Rule 8(a) as the court in *In re*

*Valley Media* construed it.

Setting the LI Defendants' legal error aside, the Complaint pleads more than enough

factual detail to satisfy the requirements of Rules 8 and 9. The LI Defendants contend that

Exhibit A to the Complaint, which identifies property transferred or contractually obligated to be

transferred to the Defendants, is inadequate because it does not provide the "exact amount,"

"specific dates," or transferor of the transfers. (LI Br. at 22.) This is nonsense.[12]

---

[11] The stringent *Valley Media* standard is inconsistent with the notice pleading standard of Rule 8(a)(2), and would have the "unintended effect of cutting off valid claims prematurely" because—as is the case here—debtors frequently "fail to maintain complete books and records" or such books and records are difficult to interpret. *In re The IT Grp., Inc.*, 313 B.R. 370, 373 (Bankr. D. Del. 2004). Indeed, Third Circuit case law suggests that the *In re Valley Media* standard is more stringent than is required for the more exacting requirements of Rule 9(b). *See, e.g.*, *Humana, Inc.* v. *Indivior, Inc.*, 2022 WL 17718342, at *3 (3d Cir. Dec. 15, 2022) (Allegations of "date, location, and time" not required under Rule 9(b)).

[12] The LI Defendants provide the Court with their own chart with purportedly "missing" information that is replete with errors and omissions. (LI Br. at 23.) Puzzlingly, the chart also cites to the portions of the Complaint that contain the very same information that Defendants claim is "unknown." (*Compare* LI Br. at 23 (citing Compl. ¶¶ 96–97 to say that the amounts of the earn-out payments are "unknown") *with* Compl. ¶¶ 96–97 (stating the amounts of the earn-out payments).) It ignores the date range provided for the transfers made under the Bonus Component, Stock Component, Extra Bonus Component, and Additional Cash Component. It also ignores the amounts of each transfer paid under the Extra Bonus Component and Additional Cash Component. Moreover, the LI Defendants' chart, in one row, lists a Bonus Component of $33,333,337.50 paid to Gruhn, but just three rows down states that the amount of this Bonus Component is "unknown."

The body of the Complaint provides the exact amount of each transfer that Defendants claim to be unable to find. (*See* Compl. ¶¶ 61 (amounts transferred under SPA 2), 67 (amounts transferred under SPA 3's Cash Component), 96–97 (amounts transferred under SPA 3's Bonus Component, Stock Component, Extra Bonus Component, and Additional Cash Component).) The Complaint also specifies each transferor that Defendants claim to be unable to find. (*See* Compl. ¶¶ 61 (as to SPA 2, Alameda, now known as Maclaurin), 97–98 (as to SPA 3, FTX Trading Ltd.).) Lastly, the body of the Complaint also details the dates of each transfer made under SPA 2, and each transfer made as part of the Cash Component under SPA 3. (*See* Compl. ¶¶ 61 (dates of the transfers under SPA 2), 67 (dates of the transfers for SPA 3's Cash Component).) Although the Complaint does not list the specific dates of each of the Bonus Component, the Stock Component, the Extra Bonus Component, and the first installments of the Cash Component were paid, it plainly alleges that each of these were paid "between January 1, 2022 and October 5, 2022." (Compl. ¶ 97.)

These facts are more than enough to satisfy Rules 8 and 9. *See, e.g.*, *In re GYPC, Inc.*, 2020 WL 13421284, at *5 (Bankr. S.D. Ohio Aug. 4, 2020) (pleading date range for transfers satisfied pleading standards); *In re Khan*, 2023 WL 3746537, at *8 (Bankr. W.D. Mich. May 30, 2023) (same); *In re Oakwood Homes Corp.*, 340 B.R. 510, 522 (Bankr. D. Del. 2006) (complaint that did not precisely identify the transferors' names still gave "fair notice as to their identities"). Although Defendants make much of the Complaint's allegation of the specific date range when certain transfers were made, they fail to point to a single case in which a court dismissed a Section 547 or Section 548 claim where the complaint alleged all of the transferor, transferee, specific amounts, and the range of dates in which the transfers took place. Despite the LI

Defendants' attempts to concoct them, there are no factual deficiencies in the Complaints' allegations as to the transfers at issue here.[13]

### B.    FTX Trading Ltd. Had a Property Interest in the Transferred Common Stock

Citing admittedly "older" out of circuit case law, LI Defendants incorrectly assert that the transfers of FTX Trading common stock to the LI Defendants were not transfers of "an interest in property" of the Debtors as Sections 547 and 548 require.  (LI Br. at 26–30.)  The LI Defendants fail to mention that *this Court* has already rejected that argument, concluding that it "blinks economic reality."  *In re Pitt Penn Holding Co., Inc.*, 2011 WL 4352373, at *6 (Bankr. D. Del. Sept. 16, 2011) ("[F]or the purpose of considering a motion to dismiss, the Plaintiff has adequately alleged that [debtor] had a property interest in its unissued stock."); *In re Liquid Holdings Grp., Inc.*, 2018 WL 2759301 at *18 ("[T]his Court does permit stock to constitute property of the debtor.").[14]

LI Defendants incorrectly assert that "[t]he Bankruptcy Code does not define the phrase 'an interest of the debtor in property,'" but that based on Supreme Court precedent interpreting the purpose of the avoidance provision, the phrase is "best understood" to exclude stock transfers.  (LI Br. at 28.)  Not true.  "The Bankruptcy Code defines the debtor's property broadly

---

[13] None of the pleading deficiencies identified in the cases the LI Defendants cite are present here.  For example, in *In re Valley Media, Inc.*, the complaint only contained "a rough estimate of the total amount of the preferential transfers."  288 B.R. at 192.  In *In re Pennysaver*, the complaint failed to specify which debtor entity and which defendant were involved in each of the transfers.  602 B.R. at 266.  By contrast, the Complaint here specifies the transferor, transferee, and the exact amount of each transfer.  Similarly, the preference claims in *In re Opus East, LLC* were dismissed because the plaintiff only provided the "total amount of transfers per Defendant" instead of each specific transfer.  528 B.R. 30, 93 (Bankr. D. Del. 2015).  That is not the case here.  Likewise, in *TWA Inc. PostConfirmation Estate* v. *Marsh USA Inc.*, the complaint only alleged "one aggregated payment amount."  305 B.R. 228, 233 (Bankr. D. Del. 2004).

[14] Other courts have adopted this rule as well.  *See In re Giant Gray, Inc.*, 629 B.R. 814, 840 (Bankr. S.D. Tex. 2020); *Glob. Crossing Est. Representative* v. *Winnick*, 2006 WL 2212776, at *8 (S.D.N.Y. Aug. 3, 2006).

as 'all legal or equitable interests of the debtor.'" *In re Pitt Penn Holding Co.*, 2011 WL 4352373 at *5–6 & n.10 (quoting 11 U.S.C. § 541(a)(1), and explaining that "[t]he Supreme Court has held that property of the debtor, as it applies to avoidance actions, is to be construed in the same way as property of the estate within the meaning of § 541").[15]  Indeed, "[t]he Supreme Court has explained that Congress intended a broad range of property to be included." *Id.* at *5 (quoting *United States* v. *Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983)).  Supreme Court jurisprudence thus requires the opposite conclusion to the one arrived at by LI Defendants.

### C.    The Complaint Adequately Alleges that the Plaintiffs Are Transferors and Defendants Are Initial Transferees

Under section 550(a) of the Bankruptcy Code, Plaintiffs may recover an avoided transfer either from an "initial transferee" or from "any immediate or mediate transferee of such initial transferee."  11 U.S.C. § 550(a).

The LI Defendants again attempt to rewrite the allegations of the Complaint by variously arguing that (1) Plaintiffs cannot avoid and recover the transferred funds because they were misappropriated from FTX customers, and (2) the LI Defendants were subsequent, not initial, transferees and therefore can assert the affirmative defense of good faith under 11 U.S.C. § 550(b).  (LI Br. at 25–26.)  The Court should reject these arguments as contrary to the allegations of the Complaint, which must be accepted as true on a motion to dismiss.  *See Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*, 2007 WL 1202760, at *3 n.4 (W.D. Pa. Apr. 12, 2007) ("Allowing the Defendants to reformulate [plaintiff]'s causes of action . . . would be inconsistent

---

[15] LI Defendants' argument that Antiguan law should apply because there is an "absence of any controlling federal law" fails for the same reason.  (LI Br. at 30 n.25.)

with both, (a) the rule that the Plaintiff is the master of its complaint, and (b) the court's obligation to take [plaintiff]'s allegations as true and construe facts in its favor.").

The Complaint alleges that the funds were misappropriated from the FTX Group, including from Plaintiffs' bank accounts containing commingled funds. (*See* Compl. ¶¶ 5 ("The FTX Insiders obtained the funds to acquire DAAG by misappropriating them from the FTX Group"), 42 ("[T]he FTX Insiders frequently caused Alameda Research LLC to misappropriate funds from the FTX exchanges for their own benefit, including to make acquisitions like DAAG."), 98 (bank account that "transferred cash . . . in connection with the purchase of DAAG pursuant to SPA 3, as well as the cash earn-out payments, contained commingled funds").)[16] That the money originated from Plaintiffs' bank accounts is fatal to the LI Defendants' arguments:  It is "well-settled case law" that "any bank accounts under the legal title of the debtor, as well as any deposits in such accounts credited to the debtor, are presumptively considered property of the debtor's estate."  *In re FBI Wind Down, Inc.*, 581 B.R. 387, 400 (Bank. D. Del. 2018); *see also In re Meadows*, 396 B.R. 485, 490 (B.A.P. 6th Cir. 2008) (holding that funds in a debtor's checking account are property of the estate); *In re United States Diversified Prods.*, 100 F.3d 53, 55 (7th Cir. 1996) ("Property of the debtor is defined to include all legal or equitable interests of the debtor . . . and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account.").

---

[16] Ignoring these allegations, Defendants attempt to rely on the Second Interim Report of John Ray for their fabrication that the Complaint alleges that the FTX Insiders sent customer funds directly to the DAAG sellers.  This misreads the Second Interim Report, however, which actually explains that "customer and corporate funds were commingled in" various bank accounts held in the name of the companies.  *See* Second Interim Report at 9.

Further, the presumption that funds held in a debtor's bank account are the property of the debtor "holds even in cases where the account contains commingled funds." *In re FBI Wind Down, Inc.*, 581 B.R. at 400; *see also In re Southmark Corp.*, 49 F.3d 1111, 1117 (5th Cir. 1995); *In re Bullion Rsrv. of N. Am.*, 836 F.2d 1214, 1217–18 (9th Cir. 1988) (generally, where debtor funds are commingled with customers' assets, all are presumptively estate property). As this Court has recognized, because "[c]ash is fungible, . . . in reality, there is simply no way to trace" funds after they are commingled in the same account. *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. 135, 151 (Bankr. D. Del. 2010) (emphasis omitted); *see also* Tr. of November 15, 2023 Omnibus Hearing at 55:5–12 ("THE COURT: . . . [O]nce fungible assets are consolidated into another account, then there's all kinds of legal ramifications to that that require unwinding of the issues and sometimes it's not even possible to trace."). Accordingly, that Plaintiffs wired funds from their bank accounts establishes Plaintiffs' interest in those funds for purposes of their fraudulent transfer claims, even if Plaintiffs' bank accounts contained commingled funds.[17]

The LI Defendants also argue that Plaintiffs were not the initial transferors of the funds, as—the LI Defendants claim—the funds came either from other FTX Group entities or FTX customers. The Court need not reach the issue of whether the LI Defendants are initial or subsequent transferees. This issue is only arguably relevant to the LI Defendants' premature good faith defense, which should be rejected as shown below. Regardless, the LI Defendants again mischaracterize the Complaint, which plainly alleges that the funds were transferred by

---

[17] Moreover, the LI Defendants' apparent position that Plaintiffs cannot bring suit to avoid and recover the DAAG Acquisition transfers if these transfers contained any commingled customer and corporate funds would effectively bar avoidance actions to recover transfers in connection with *any* Ponzi scheme. The nature of Ponzi schemes entail robbing Peter to pay Paul. The LI Defendants' view that the avoidance statutes preclude recovery of Peter's funds from Paul because a debtor is—according to the LI Defendants—neither transferor nor transferee is self-evidently wrong.

Plaintiffs to Debtors.  *See* Compl. ¶¶ 61, 98 (explaining that Alameda and FTX Trading Ltd. transferred the funds pursuant to SPA 2 and SPA 3, respectively).[18]

Moreover, it makes no difference to the LI Defendants' purported good faith defense if the funds transferred from Plaintiffs began in the bank account of another FTX entity or were commingled with customer funds.  As discussed, Plaintiffs have an enforceable property interest in funds in their bank accounts.  Further, contrary to the LI Defendants' magical thinking, even if the funds the LI Defendants received began in the bank account of Debtor entities not named as a Plaintiff here, the LI Defendants would remain initial transferees.  This would mean only that Plaintiffs were "mere conduit[s]" for the transfers—making the LI Defendants initial transferees, *not* subsequent transferees.  *In re Universal Mktg., Inc.*, 541 B.R. 259, 298 n.47 (Bankr. E.D. Pa. 2015) ("An entity that receives a transfer may not be a 'transferee' at all, but only a 'mere conduit' if the transfer is for the limited purpose of allowing the entity to pass the asset through to another party."); *In re Select Tree Farms, Inc.*, 534 B.R. 494, 497 (Bankr. W.D.N.Y. 2015) ("To the extent that an entity serves as a mere conduit of funds, the initial transferee is deemed to be the recipient of funds from that conduit.").

---

[18] Confusingly, the LI Defendants argue that the LI Defendants do not qualify as "transferee[s]," and derive the standard for such classification from *In re Factory 2-U Stores, Inc.*, which held that to be a transferee for purposes of Section 550, a person must have "dominion over the money or other asset," that is, "the legal right to use the funds to whatever purpose he or she wishes."  2007 WL 2698207, at *3 (Bankr. D. Del. Sept. 11, 2007).  This argument is a red herring:  the LI Defendants had control over the account to which the assets were transferred, and could have withdrawn them at any time.  These transfers were fraudulent and/or preferential, however, and Plaintiffs now seek to avoid and recover the transfers from the LI Defendants, as the Bankruptcy Code expressly authorizes.  This distinguishes the instant case from *In re Factory 2-U Stores*, where the defendant never received or controlled the transferred funds and thus could not be considered transferees under the Bankruptcy Code.  *Id.* at *1, 3.

### D.    Affirmative Defenses Are Not Appropriate Grounds for Dismissal at This Stage

The LI Defendants ask the Court to dismiss the claims under Sections 548 and 550 against them because "nowhere in the Complaint do Plaintiffs allege that the LI Defendants had knowledge of the voidability of any transfers" nor "acted in bad faith for taking the transfers." (LI Br. at 26.)  But "[i]t is the intent of the transferor, not the transferee, that must be established" for Plaintiffs' fraudulent transfer claims.  *In re Live Well Fin., Inc.*, 652 B.R. 699, 704–05 (Bankr. D. Del. 2023).  The LI Defendants' mental state in accepting the transfers is an element of their purported good faith defense, *not* an element of Plaintiffs' claims.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th at 196 ("[G]ood faith is an affirmative defense under [both] Sections 548 and 550" of the Bankruptcy Code."); *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *3 (Bankr. D. Del. Feb. 8, 2016) (once a transfer is deemed avoidable, "the burden is on the defendant-transferee to plead and establish facts to prove the [good faith] defense"); *see also* 5 COLLIER ON BANKRUPTCY 550.03[05] (16th ed. 2018) ("[O]nce the trustee has avoided a transfer. . . the transferee has the burden to show that it took . . . for value, in good faith and . . . without knowledge of the voidability of the transfer.").  The LI Defendants provide no legal support for the proposition that it is Plaintiffs' burden to show the LI Defendants' "knowledge of the voidability of any transfers," because it is not.[19]

---

[19] Moreover, the LI Defendants' invocation of a potential good faith defense is procedurally improper, fails to marshal a single fact in support, and is plainly not a basis to dismiss the Complaint.  *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("[A]n affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."); *In re The Brown Schs.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) ("[T]he determination of the viability of [an affirmative] defense is not proper" on motion to dismiss).

## III.    THE COMPLAINT ADEQUATELY PLEADS INSOLVENCY AT THE TIME OF THE TRANSFERS

A corporation is insolvent if "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation," with certain exclusions.  11 U.S.C. § 101(32)(A). Defendants argue that the Complaint's allegations as to insolvency are inadequate.  (LI Br. at 24; BW Br. at 14–17.)  Defendants are wrong.[20]

Courts in this Circuit hold that "[w]hether a debtor was insolvent at a point in time is highly fact-specific and should be based on seasonable appraisals or expert testimony." *In re Miller* v. *Mott*, 2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023).  "Specific findings of insolvency are best determined following discovery and should not be generally decided on a motion to dismiss." *In re Miller*, 2023 WL 6467368, at *6; *see also In re DBSI, Inc.*, 447 B.R. at 248 ("[I]nsolvency is generally a factual determination not appropriate for resolution in a motion to dismiss.").  Defendants offer no reason for why the Court should depart from this rule here.

Here, the Complaint more than adequately pleads insolvency at the time of the DAAG Acquisition.  Debtors are "not required to include precise calculations evidencing balance sheet insolvency," *In re Glencoe Acquisition, Inc.*, 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015), and "a close analysis of insolvency is not necessary at this stage in the proceeding." *In re Our Alchemy, LLC*, 2019 WL 4447545, at *6.  In addition to the allegation that "Plaintiffs were insolvent when, or became insolvent shortly after, the [transfers] were made" (Compl. ¶¶ 106,

---

[20] Pursuant to 11 U.S.C. § 547(f), "for the purposes of preferential transfers, it is presumed that the debtor is insolvent for the 90–day period before the date of filing." *In re NWL Holdings, Inc.*, 2013 WL 2436667, at *4 (Bankr. D. Del. June 4, 2013).  While the LI Defendants dispute Plaintiffs' insolvency generally, rather than in the context of Plaintiffs' preferential transfer claims against them, it is still the case that "insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss." *In re PennySaver USA Publishing, LLC*, 602 B.R. at 270.

114), Plaintiffs have alleged numerous facts to support that Plaintiffs' obligations exceeded their

assets, including the following:

- "***FTX Group faced a severe liquidity crisis*** that necessitated the filing of emergency Chapter 11 Cases on November 11 and 14, 2022." (Compl. ¶ 33 (emphasis added).)

- Alameda Ventures Ltd., now known as Plaintiff Maclaurin Investments Ltd., is wholly-owned by Alameda Research Ltd., which, in turn, is wholly owned by Alameda Research LLC. (*Id.* ¶ 15.)

- FTX Insider Gary Wang admitted that in 2019 he made changes to FTX.com's code "to give Alameda Research LLC 'special privileges on the FTX platform,' including to allow Alameda Research LLC unfettered use of assets on the FTX.com exchange, even while ***Alameda Research LLC maintained negative balances*** in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies." (*Id.* ¶ 42 (emphasis added).)

- The FTX Insiders ***routinely***, and secretly, used Alameda Research LLC to loot "***several billion dollars***" from FTX.com [that is, the exchange operated by Plaintiff FTX Trading Ltd.] using the "special privileges," thereby defrauding FTX.com's creditors, including customers and investors. (*Id.* ¶ 43 (emphasis added).)

- "[B]y approximately July 2022, [Ellison] had conspired with Bankman-Fried to 'provide ***materially misleading financial statements to Alameda's lenders,*** 'such as 'balance ***sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made*** to FTX executed and to related parties.'" (*Id.* ¶ 46 (emphasis added) (quoting Ehrenberg Decl. Ex. 4 at 28:9–16).

- The FTX Insiders were aware at all relevant times, including from 2019 to 2022, of the "special privileges on the FTX platform" that allowed Alameda Research LLC to "borrow" (*i.e.*, loot) billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to the FTX Insiders. (*Id.* ¶ 47.)

Additionally, the documents "explicitly relied upon in the [Complaint]," which this court

may consider, *In re Burlington Coat Factory*, 114 F.3d 1410, 1426 (3d Cir. 1997), provide

further support for Plaintiffs' allegations that it was insolvent at the time of the Transactions. In

particular, the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day

Pleadings* ("First Day Decl.") [ECF No. 24], cited by the Complaint (Compl. ¶ 33), states:

- "The FTX Group did not maintain centralized control of its cash." (First Day Decl. at 18 (emphasis added).)

- "Because of historical cash management failures, *the Debtors do not yet know the exact amount of cash that the FTX Group held as of the Petition Date*."  (*Id.* at 19 (emphasis added).)

- "[T]he main companies in *the Alameda Silo . . . did not keep complete books and records of their investments and activities*."  (*Id.* at 24 (emphasis added).)[21]

These improper accounting practices are probative of insolvency.  *See In re DBSI*, 447 B.R. at 248.

Courts have routinely found plaintiffs to have adequately pled insolvency in avoidance actions on the basis of similar allegations.  For example, in *In re Centaur, LLC*, plaintiffs alleged that (i) the debtor had "incurred massive debt prior to making the" allegedly fraudulent transfers, (ii) the value of the debtor's assets was "grossly overestimated," and (iii) the debtor incurred additional debt to execute an allegedly fraudulent transfer.  2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013).  Similarly, Plaintiffs plead that (i) "Alameda" generally was "permitted" to "maintain[] negative balances" (Compl. ¶ 42), (ii) Alameda's investors were provided "materially misleading financial statements" (Compl. ¶ 46), and (iii) Plaintiffs intended to incur debts that would be beyond their ability to repay as such debts matured (Compl. ¶ 114; *see also* Ehrenberg Decl. Ex. 4 at 27:19–28:2 (explaining that in June 2022 Alameda had to incur more debt to pay off its existing lenders)).

These "factual allegations, taken as true, provide enough detail of insolvency upon which to base the avoidance claims."  *In re Direct Response Media, Inc.*, 466 B.R. 626, 655–56 (Bankr. D. Del. 2012) (finding plaintiffs adequately pleaded insolvency because of allegations that the debtor "was unable to pay its obligations" and had sought a loan to pay debts); *see also In re*

---

[21] The "Alameda Silo" refers to "a group composed of Debtor Alameda Research LLC and its Debtors subsidiaries," including Plaintiff Maclaurin Investments Ltd. (First Day Decl. at 3, 30.)

*Midway Games Inc.*, 428 B.R. 303 (Bankr. D. Del. 2010) (finding plaintiffs adequately pleaded

insolvency because of allegations that the debtor was "not paying its debts," "had large trade

debt," and had informed its board that it "was running out of cash").

## IV.    THE COMPLAINT ADEQUATELY PLEADS INTENTIONAL FRAUDULENT TRANSFERS

To state a claim for intentional fraudulent transfer under 11 U.S.C. § 548(a)(1)(A),

Plaintiffs need only allege that the transfers were made with the actual intent to hinder, delay, or

defraud their present or future creditors.  *See In re Live Well Fin., Inc.*, 652 B.R. at 704.

Although Rule 9(b), made applicable here by Federal Rule of Bankruptcy Procedure 7009,

requires a party to "state with particularity the circumstances constituting fraud or mistake," such

as by pleading the factual circumstances of the transfers themselves, "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P.

9(b); *see also In re Live Well Fin., Inc.*, 652 B.R. at 705; *In re Millennium Lab Holdings II, LLC*,

2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019).  This standard is relaxed where, as

here, criminal investigations and the personnel departures force the new management of a debtor

to operate from "second-hand knowledge."  *In re Enron Corp.*, 328 B.R. at 73.  "Because direct

evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence

to infer fraudulent intent," including various "badges of fraud."  *In re Fedders N. Am., Inc.*, 405

B.R. at 545.

Defendants argue that the Complaint fails to adequately allege actual fraudulent intent or

to support the inference of fraudulent intent using the "badges of fraud."  (LI Br. at 20, 24–25;

BW Br. at 19–24.)  Mischaracterizing the Complaint, they disclaim any connection between the

FTX Insiders' criminal scheme and the DAAG Acquisition.  They are wrong:  the Complaint's

allegations as to actual fraudulent intent in the DAAG Acquisition are manifest, and even if they

-30-

were not, the Complaint's allegations as to several badges of fraud are clearly sufficient to satisfy Rule 9(b).

### A.    The Complaint Adequately Alleges Actual Fraudulent Intent

As alleged in the Complaint, the FTX Insiders committed a massive fraud in which they misappropriated FTX Group funds, which they had commingled with funds from FTX customers and investors, and used them for their own purposes.  (Compl. ¶¶ 2, 5, 98.)  As a consequence of their scheme, the FTX Insiders caused the FTX exchanges and Alameda to incur billions in liabilities to customers, investors, and lenders (to say nothing of other liabilities, such as to government authorities) which they had insufficient assets to repay.  (Compl. ¶¶ 43, 45–47.) Accordingly, the FTX Insiders used commingled funds to finance scheme-perpetuating investments that were designed to project the appearance that FTX was a successful and growing company, which would attract further investment capital, and expand their customer base, in order to continue misappropriating the assets of the FTX Group.  (Compl. ¶¶ 2, 6, 76–77.)  The DAAG Acquisition was "part of [this] scheme to enrich and otherwise benefit the FTX Insiders by expanding their fraudulent scheme to the European Economic Area, which would enable them to continue misappropriating assets of the FTX Group, including by overpaying their close associates whom they perceived to have access to European regulators in order to acquire required licenses."  (Compl. ¶ 106(i).)  The FTX Insiders hastily moved ahead with the acquisition without any meaningful due diligence, negotiations, or legal advice, and despite DAAG's lack of operations or intellectual property beyond a "business plan."  (Compl. ¶¶ 2, 6, 76–77.)

Under well-established case law, this is more than enough to plead several theories of actual fraudulent intent.  *First*, the Complaint adequately alleges that the FTX Insiders' fraudulent scheme operated as a *de facto* Ponzi scheme, thus giving rise to a presumption of

actual intent to hinder, delay, or defraud creditors. *See In re DBSI, Inc.*, 2011 WL 1810632, at *4 (Bankr. D. Del. May 5, 2011) ("It is well-established that where a Ponzi scheme exists, there is a presumption that transfers were made with the intent to hinder, delay and defraud creditors."). Although "there is no precise definition of a Ponzi scheme and courts look for a general pattern, rather than specific requirements," a Ponzi scheme exists where there is "any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *In re Manhattan Inv. Fund*, 397 B.R. 1, 12 (S.D.N.Y. 2007)); *see also In re Live Well Fin., Inc.*, 652 B.R. at 706 (presuming fraudulent intent where debtor's business was "a *de facto* Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims").

The Complaint's well-pled allegations establish that the FTX Insiders entered into the DAAG Acquisition in furtherance of a Ponzi-like scheme.  As the Complaint alleges, the FTX Insiders misappropriated billions of dollars in FTX Group funds for their own purposes.  (Compl. ¶¶ 1, 5, 7, 35, 42.)  To cover up the shortfall, they falsified financial statements, misrepresented revenues, and concealed true intra-company relationships.  (Compl. ¶¶ 45–47.)  Having depleted the misappropriated funds, FTX Insiders needed new capital to satisfy their pre-existing obligations.  Accordingly, the FTX Insiders conceived the DAAG Acquisition to expand the scheme into Europe.  (Compl. ¶¶ 3–4, 106(i).)  They were "indifferent to" DAAG's lack of operations or intellectual property because the mere appearance of an expansion to Europe was enough to attract new investment capital, and DAAG's purported access to regulators was enough to suggest DAAG could attract new customers.  (Compl. ¶ 40.)  As customer withdrawals accelerated and their scheme unraveled, Ellison expressed guilt and relief to Bankman-Fried, acknowledging that she "had an increasing dread of this day that was weighing

on me for a long time." (Compl. ¶ 48.)  These allegations are enough to establish that the Ponzi presumption of actual fraudulent intent applies here.  *See, e.g.*, *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 12 (Ponzi scheme found where fund manager "sought to cover losses . . . with deposits made by new investors," "falsified records to attract new investors," and "concealed the Fund's true state from its auditors"); *In re Live Well Fin., Inc.*, 652 B.R. at 706 (Ponzi presumption applied where debtor's business "required finding new victims to pay off []debts owed to earlier victims," "could not pay its obligations," and where "any failure" to secure financing to meet the demand would "result in the entire scheme collapsing.").

*Second*, it is well-established that transfers "driven by a desire to stay in business," *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 664, 667 (7th Cir. 2013), or made to "create a façade that [the] Debtor was running a successful business," *Drivetrain, LLC* v. *X. Commerce, Inc.*, 2023 WL 1804627, at *1, *4 (Bankr. D. Del. February 7, 2023), support an inference of actual fraud.  Such is the case here.  The FTX Insiders needed constant access to new capital to satisfy customer withdrawal requests, fund their insatiable spending on pet projects, and repay loans— including billions of dollars in "loans" made by Alameda to the FTX Insiders.  (Compl. ¶¶ 46– 47.)  To expand and prolong the fraud, the FTX Insiders caused the FTX Group to acquire DAAG to create the appearance of growth and profitability and to expand the scope of the fraud into new markets.  (Compl. ¶¶ 2–3.)  The FTX Insiders privately acknowledged that they were keeping up a charade of the FTX Group's legitimacy and had been doing so "for a long time." (Compl. ¶ 48.)

*Third,* it is well-established that "Debtors are presumed to intend the natural consequences of their acts."  *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6.  "If the natural consequence of a debtor's actions is that its creditors were hindered, delayed or

defrauded, a court is more likely to find that an intentional fraudulent transfer occurred." *In re Tribune Co.*, 464 B.R. 126, 162 (Bankr. D. Del. 2011).  As alleged in the Complaint, despite recognizing that the FTX Group owed billions it did not have, the FTX Insiders nevertheless caused Plaintiffs to use vast sums of misappropriated funds to make an investment in DAAG, a company which FTX's own lawyers recognized consisted of little more than a business plan. (Compl. ¶¶ 76–77.)  Because the Complaint thus adequately alleges facts to show that the natural consequence of the DAAG Acquisition was to hinder, delay, or defraud creditors, actual fraudulent intent is established here.  *See, e.g.*, *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 (fraudulent intent established where the "natural consequence of [the Debtor] incurring" large secured obligations would "at a minimum[] delay or hinder distributions to the creditor body.").

Ignoring much of the Complaint, Defendants argue that the Court should disregard the FTX Insiders' scheme as unrelated to the DAAG Acquisition.  (LI Br. at 24–25; BW Br. at 19–20.)  They rely on language from *In re DBSI, Inc.* stating that, where—as here—a plaintiff seeks to rely on the presumption of fraudulent intent applicable to Ponzi schemes, they must show "that the transfers at issue were related to or in furtherance of the fraudulent scheme."  477 B.R. 504, 511 (Bankr. D. Del. 2012).[22]  The Complaint provides more than enough facts to show that the transfers in connection with the DAAG Acquisition were "related to or in furtherance of" the FTX Insiders' scheme.  The *third paragraph* of the Complaint alleges that the FTX Insiders

---

[22] Although unclear, Defendants' selective quotations from case law can be read to suggest that Defendants think *In re DBSI* held that allegations as to a broader scheme must be ignored when evaluating if allegations of fraudulent intent for a specific transfer satisfy Rule 9(b), whether a plaintiff relies on a Ponzi theory or not.  If this is what Defendants think, they are profoundly wrong.  *In re DBSI* merely recognized that, to rely on the Ponzi scheme presumption of fraudulent intent, a plaintiff must also allege the allegedly fraudulent transfer was "related to or in furtherance of" the Ponzi scheme.  477 B.R. at 511–12.  Allegations concerning the fraudulent scheme are obviously relevant for that purpose.  *See id.* (concluding the Trustee had adequately alleged that the transfers were in furtherance of a Ponzi scheme after discussing *both* the scheme and the transfers).

pursued the DAAG Acquisition to access regulatory licenses in the European Economic Area,
which "would have allowed the FTX Group to expand its customer base, in turn enabling the
FTX Insiders to expand their fraudulent scheme and misappropriation of FTX Group funds."
(Compl. ¶ 3; *see also id.* ¶ 106(i) & *supra* pp. 31–33.) The Complaint thus thoroughly describes
not only the nature of the FTX Insiders' scheme to misappropriate funds but also how the FTX
Insiders' investment in DAAG related to and furthered their scheme.[23]

Defendants also argue that Plaintiffs have failed to show actual fraudulent intent for the
DAAG Acquisition, which Williams contends was for a legitimate business purpose, not fraud.
(LI Br. at 24–25; BW Br. at 30–22.) This argument attempts to reverse the presumption in Rule
12(b)(6) that the allegations in the Complaint are true. As the Complaint alleges, DAAG was
acquired in furtherance of a scheme to misappropriate FTX Group assets. (*See* Compl. ¶¶ 3, 36–
38, 76–77, 106(i).) Even if the FTX Insiders hoped that DAAG also would let FTX operate a
legitimate business in Europe, that in no way negates their intent to defraud creditors. *See In re
Maxus Energy Corp.*, 641 B.R. at 529 ("[M]ixed intents are sufficient to find actual intent to
defraud, hinder, or delay."); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 408 (Bankr.
S.D.N.Y. 2007) ("[A]n admitted intention to delay creditors is not immunized by the transferor's
conviction that it is for the creditors' good and the debtor, if only given time, will be able to
recover enough to pay them all."); *Carpenter* v. *Roe*, 10 N.Y. 227, 231–32 (1851) (debtor

---

[23] Each case Williams cites is inapposite. (*See* BW Br. at 19–20.) The Court in *In re Art. Inst. Of
Philadelphia* found that the Complaint failed to adequately allege fraudulent intent because the Complaint
only alleged a "theme" of fraud, not "specific factual allegation[s]." 2022 WL 18401591, at *17 (Bankr.
D. Del. June 13, 2023). In *In re Live Well Fin., Inc.*, the Court faulted the plaintiffs for failing to
adequately allege that "the specific transaction sought to be avoided was in furtherance of the Ponzi
scheme." 2023 WL 3995900, at *17. Plaintiffs have done so here, repeatedly. (*See* Compl. ¶¶ 3, 106(i).)

engaged in fraudulent conveyance by using creditor money to place bets, "cast[ing] upon his creditors the hazard of his speculation.").

> **B.** **The Complaint Adequately Alleges Badges of Fraud to Support an Inference of Fraudulent Intent**

Even if it were necessary to look beyond direct evidence of intentional fraud to consider circumstantial evidence, Plaintiffs' well-pled allegations substantiate several badges of fraud that this Court has found sufficient to plead intent to defraud. *See In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 (Bankr. D. Del. June 13, 2023) ("[T]he confluence of several [badges] in one transaction generally provides conclusive evidence of an intent to defraud."). Of course, "the presence or absence of any one badge of fraud is not dispositive and courts are free to consider additional factors as well as other allegations in the complaint." *Id.*; *see also Drivetrain, LLC*, 2023 WL 1804627, at *3 ("Neither the presence nor absence of any particular badge is dispositive.").

*First*, as set forth above and below, Plaintiffs were insolvent and did not receive reasonably equivalent value in exchange for the transfers at issue. *See In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 (insolvency and lack of reasonably equivalent value are badges of fraud); *see also supra* Section III and *infra* Section V). The FTX Insiders did not conduct a proper due diligence process for the DAAG Acquisition to determine a reasonable price for DAAG; they instead spent extraordinary funds in order to expand their fraudulent scheme to Europe. (Compl. ¶¶ 74–75, 106.)

*Second*, the FTX Insiders and Defendants concealed multiple facts about the DAAG Acquisition, which was executed on a hasty timeline. *See In re DSI Renal Holdings*, 574 B.R. 446, 465 (Bank. D. Del. 2017) ("[A] secret and hasty transfer not in the usual course of business" is a badge of fraud); *In re Zohar III, Corp.*, 631 B.R. 133, 174 (Bankr. D. Del. 2021) ("[S]ecrecy

or concealment" of a transaction is a badge of fraud).  Although the FTX Insiders and Defendants contemplated the acquisition of K-DNA at the time SPA 3 was drafted, they avoided mentioning it by name in SPA 3 to avoid regulatory review.  (Compl. ¶ 87.)  Despite Matzke purchasing K-DNA in his personal capacity, DAAG secretly financed this purchase via a loan agreement, which Gruhn and Matzke revised to exclude the actual details of the acquisition plan because, as Matzke noted in writing, it would in his view "be illegal."  (Compl. ¶¶ 90–91.)

*Third*, the FTX Insiders used commingled funds misappropriated from the FTX Group to acquire DAAG and K-DNA.  *See In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *5 ("[H]ow much of the debtor's estate was transferred" is a badge of fraud).  The bank account that FTX Trading Ltd. used to send funds for SPA 3 and the subsequent earn-out payments contained commingled funds, *i.e.*, both corporate funds and funds that had been deposited by customers of the FTX.com exchange.  (Compl. ¶ 98.)  Multiple FTX Insiders admitted in their plea allocutions that the FTX Insiders "misappropriate[d] funds from the FTX exchanges for their own benefit." (Compl. ¶¶ 42–44, 47.)  This included making acquisitions like DAAG that were intended to keep the scheme from collapsing.

*Fourth*, there was "a close relationship among the parties to the transaction."  *In re DSI Renal Holdings*, 574 B.R. at 465; *In re PennySaver USA Publishing, LLC*, 602 B.R. at 272.  The FTX Insiders overpaid for DAAG because they wanted to benefit Bankman-Fried's associates, Gruhn and Williams.  Bankman-Fried had a history of doing favors for Gruhn and Williams, and providing them and the other DAAG sellers with special treatment on the FTX platform. (Compl. ¶ 39.)

## V. THE COMPLAINT ADEQUATELY PLEADS CONSTRUCTIVELY FRAUDULENT TRANSFERS

"[A]ll that is needed" to plead a constructive fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B) "is an allegation that there was a transfer for less than reasonably equivalent value at a time when the [Debtors were] insolvent." *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 856 (Bankr. D. Del. 2018). Williams argues that Plaintiffs' constructive fraudulent transfer claims fail because Plaintiffs do not adequately allege that they received less than a reasonably equivalent value. (BW Br. at 25–26.)

As a threshold matter, this argument should be summarily rejected as premature. Assessing "reasonably equivalent value requires a factual determination that cannot be made on a motion to dismiss." *In re Qimonda Richmond, LLC*, 467 B.R. 318, 327 (Bankr. D. Del. 2012); *see also, e.g.*, *In re Charys Holding Co., Inc.*, 443 B.R. 628, 638 (Bankr. D. Del. 2011) ("[R]easonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

Regardless, Plaintiffs have alleged more than enough to state a plausible claim that they did not receive reasonably equivalent value for the DAAG Acquisition. "[A] party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave," looking to the "totality of the circumstances of the transfer," including "the fair market value of the benefit received as a result of the transfer" and "the existence of an arm's-length relationship between the debtor and the transferee." *In re Aphton Corp.*, 423 B.R. 76, 89 (Bankr. D. Del. 2010). Here, Plaintiffs acquired DAAG from Bankman-Fried's close business associates at a valuation of $400 million without due diligence, when Plaintiffs' own lawyer recognized that DAAG lacked intellectual property "other than a business plan," did "not have any active business," and was "not up and running yet." (Compl. ¶ 76.) The Complaint also alleges that there was no basis for

the dramatic increase in the valuation of DAAG from a valuation of $14 million at SPA 1 to the $400 million valuation applied in SPA 3.  (Compl. ¶¶ 61, 63.)  SPA 3 inexplicably paid Gruhn and Matzke more than $93 million in earn-out payments as a result of acquiring K-DNA for only €2 million.  (Compl. ¶¶ 86, 95–96.)  And, after good faith efforts to assess the sale potential for FTX Europe, the Debtors concluded that there was no realistic prospect of a successful sale because FTX Europe "had no meaningful saleable assets, no proprietary technology and insufficient rights under poorly documented intellectual property licenses," among other reasons. (Compl. ¶ 104.)  These allegations are more than enough to claim that Plaintiffs did not receive reasonably equivalent value.[24]

## VI.   THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER ANTIGUAN LAW

The LI Defendants incorrectly contend that FTX Trading Ltd.'s breach of fiduciary duty claims against Defendants Gruhn and Matzke under Section 95 of the International Business Corporations Act (the "IBCA") and Antiguan common law must be dismissed because (i) under Antiguan law, Gruhn and Matzke did not owe any fiduciary duties to FTX Trading Ltd. and (ii) the Complaint fails to allege facts sufficient to show that they breached their duties by causing the Kephas and Dastmaltchi payments.  (LI Br. at 32–38.)

The LI Defendants are wrong on Antiguan law.  They rely on the declaration of their foreign law expert, Mr. Craig Jacas (the "Jacas Declaration"), to argue that, under Antiguan law, "only officers and directors owe fiduciary duties to an Antiguan company," and as Gruhn and

---

[24] The only case Williams cites in support of his argument that Plaintiffs did not receive reasonably equivalent value, *In re Cred Inc.*, 650 B.R. 803 (Bankr. D. Del. 2023), is distinguishable.  In that case, the Court concluded that lack of reasonably equivalent value had not been sufficiently alleged because the Trustee also alleged, among other countervailing facts, that the acquired company had been "crucial" to the Debtors "early success" in gaining customers.  *Id.* at *836.  There are no such allegations here.

Matzke were not officers or directors of FTX Trading Ltd., they owed no duties.  (LI Br. at 33–34.)  But the Jacas Declaration rests on two erroneous propositions:  First, under Antiguan law common law may only be used "for interpretive guidance in instances of ambiguity"; and second, Section 95 of the IBCA is the exclusive source of law defining who can owe a fiduciary duty.  (Jacas Decl. ¶¶ 8, 18.)  As the declaration of Plaintiffs' foreign law expert, Stephen Houseman KC (the "<u>Houseman Declaration</u>") explains, both of these are wrong.[25]  First, common law "has full force in Antigua" and "is not relegated to some residual aid to construction" or supplanted by the IBCA.  (*Houseman Decl.* ¶¶ 31, 35.)  Second, it is incorrect for Jacas to argue that Section 95 of the IBCA precludes the added protection of fiduciary duties found at common law, as "there is nothing on the face of [Section 95] or elsewhere in the IBCA which supports this assertion."  (*Id.* ¶ 46.)

In actuality, "[w]hether the circumstances of a particular case justify the imposition of fiduciary duties is a heavily fact-dependent question" under Antiguan law.  (*Id.* ¶ 52(v).)  "It is the nature and circumstances of [an individual's] engagement and assumed responsibility on behalf of the company that operates to justify imposition of fiduciary duties at common law." (*Id.* ¶ 47.)  Relying solely on the Jacas Declaration's incorrect statements of law, Defendants fail to address the ample facts in the Complaint that plausibly plead that Matzke and Gruhn owed

---

[25] Courts may look to "any relevant material or source" in deciding questions of foreign law on a motion to dismiss, including affidavits from foreign lawyers.  *See* Fed. R. Civ. P. 44.1; *Blackberry Ltd.* v. *PCS Wireless LLC*, 2016 WL 1313161, at *3 (D.N.J. Apr. 4, 2016).  Plaintiffs submit the Declaration of Stephen Houseman KC, who is an English barrister and member of Essex Court Chambers in London since 1997.  (Houseman Decl. ¶ 4.)  Houseman has also been King's (formerly, Queen's) Counsel since 2013.  (Houseman Decl. ¶ 1.)  He was appointed a Deputy Judge of the High Court in November 2019, covering both the Chancery Division and King's Bench Division.  (Houseman Decl. ¶ 14.)  Houseman specializes in international commercial and modern chancery disputes and has been admitted in the Eastern Caribbean Supreme Court in Antigua since 2018, when he argued a leading case regarding the interpretation of the IBCA.  (Houseman Decl. ¶ 6–13.)

fiduciary duties to FTX Trading Ltd.  As the Complaint alleges, Gruhn was employed as the

Head of FTX Europe beginning in September 2021, and Matzke was the Head of Legal at FTX

Europe beginning in November 2021.  (Compl. ¶¶ 17, 18.)[26]  Both reported directly to Bankman-

Fried, the CEO and beneficial owner of FTX Trading Ltd.  (*Id.* ¶ 97.)  Both were also entrusted

to forge relationships on behalf of FTX to obtain European regulatory licenses.  (*Id.* ¶¶ 68(i), 90,

99.)  Indeed, the whole fraudulent scheme relied in part on Matzke and Gruhn successfully

expanding FTX Trading Ltd.'s business into Europe.  (*Id.* ¶ 3.)

The LI Defendants' arguments that the Dastmaltchi and Kephas payments do not

constitute a breach of fiduciary duties are also wrong.  As a preliminary matter, the Jacas

Declaration does not address breach of fiduciary duties under Antiguan law, and the LI

Defendants cite no legal authority whatsoever for their arguments as to breach.  This alone is

fatal to their arguments.  *See, e.g.*, *Moe* v. *Seton Hall Univ.*, 2010 WL 1609680, at *5 (D.N.J.

Apr. 20, 2010) (denying motion to dismiss where defendants cited no law to support argument

that plaintiffs did not plead sufficient allegations).  Further, "[p]roof of breach involves a factual

inquiry according to the requisite civil standard of proof."  (Houseman Decl. ¶ 61.)  Because the

application of Antiguan law to Plaintiffs' breach of fiduciary duty claims will require evidence

not yet available prior to discovery, the LI Defendants' motion to dismiss Count 6 of the

Complaint should be denied.  *See Blackberry*, 2016 WL 1313161 at *3 ("Discovery and

---

[26] The LI Defendants claim that Gruhn was "never an employee of FTXT or any affiliate," and Matzke's employment "was not with FTX Europe, but with its wholly-owned subsidiary, FTX Germany."  (LI Br. at 34 n.27.)  For purposes of deciding a motion to dismiss, the Court must accept the Plaintiffs' allegations regarding Defendants Gruhn and Matzke's employment with FTX Europe as true, despite the LI Defendants' attempts to ignore the Rules of Civil Procedure.  *See Black*, 835 F.3d at 364.

marshaling of evidence on summary judgment are required before this Court can focus the issue of how [foreign] law applies to a settled factual scenario.").

Further, Plaintiffs have alleged adequate facts concerning breach.  Fiduciary duties under Antiguan law include, for example, "a duty not to place oneself (or allow oneself to remain) in a position in which one's personal interest may conflict with the interests of the principal," as well as a "duty not to act for one's own benefit (i.e. make an unauthorised profit) without the fully-informed consent of the principal."  (Houseman Decl. ¶ 57.)  Plaintiffs have alleged sufficient facts in the Complaint to indicate that Gruhn and Matzke have breached these duties in relation to their improper payments to Kephas and Dastmaltchi.

With regards to Kephas, the Complaint has plausibly alleged that Matzke caused or permitted the Kephas transfers.  In support of that allegation, the Complaint alleges facts to show that Matzke was in a position of authority at FTX Europe and was intimately involved with Kephas.  For example, Matzke was the Head of Legal at FTX Europe and a close business associate of Gruhn, and Kephas was the guarantor of DAAG's loan to Matzke for the K-DNA acquisition.  (Compl. ¶¶ 18, 90.)  Matzke will have opportunity to prove otherwise.  While the LI Defendants attempt to argue that Defendant Gruhn also had no power to control payments to Kephas (despite being the top executive at both Kephas *and* FTX Europe), they cite to a purported amendment to SPA 3 contained in the appendix to their motion.  This document, whatever it turns out to be once subject to discovery, is extrinsic to the Complaint and cannot be considered on a motion to dismiss.  *See In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 382 (Bankr. D. Del. 2022).  Rather, the Court must accept as true the Complaint's allegations that Gruhn, as Head of FTX Europe, allowed FTX Europe to make millions of dollars in

misappropriated transfers to Kephas, a corporation owned and controlled by Gruhn himself. (Compl. ¶¶ 7, 82.)

Finally, the LI Defendants claim that Defendants Gruhn and Matzke did not owe fiduciary duties to FTX Trading Ltd. at the time of the contract with Mohammad Dastmaltchi on June 5, 2021.  (LI Br. at 37.)  But that is irrelevant.  Dastmaltchi was *paid* for his purported services after Matzke and Gruhn owed fiduciary duties to FTX Trading Ltd.  (Compl. ¶¶ 17, 18, 99, 137.)  The LI Defendants offer no support for their facially implausible argument that causing an improper payment to be made pursuant to an improper contract breaches no fiduciary duty under Antiguan law because the alternative would violate the improper contract.  At a minimum, the circumstances of the Dastmaltchi payment—in which Matzke and Gruhn caused a large sum to be paid from corporate resources in order to facilitate the acquisition of K-DNA for an asset worth less than half the cost of the Dastmaltchi payment so that they themselves could achieve contractual objectives worth tens of millions of dollars—is sufficient to plausibly allege a breach.  (*See* Houseman Decl. ¶ 57 ("The scope of the duties owed by one person to another are dependent upon the circumstances in which those duties arise.").)

## VII.   THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND THE COMPLAINT IF IT GRANTS DEFENDANTS' MOTIONS TO DISMISS

For the reasons discussed above, the Court should deny Defendants' motions in their entirety.  If, however, the Court grants the motions in whole or in part, the Court should grant Plaintiffs leave to amend the Complaint.

Federal Rule of Civil Procedure 15(a)(2), made applicable by Federal Bankruptcy Rule 7015, provides that where a party seeks leave to amend, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This reflects the "principle that the purpose of pleading is to facilitate a proper decision on the merits."  *Foman* v. *Davis*, 371 U.S. 178, 182

(1962).  "The Third Circuit has adopted a liberal approach to the amendment of pleadings to

ensure that 'a particular claim will be decided on the merits rather than on technicalities.'"

*Robinson* v. *Beckles*, 2012 WL 13206064, at *1 (D. Del. Mar. 20, 2012).  "If the underlying facts

or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be

afforded an opportunity to test his claim on the merits."  *Foman*, 371 U.S. at 182.

Since the filing of the Complaint in this action, the Debtors have continued to investigate

the wide-ranging fraudulent scheme that led to the FTX Group's collapse and the Chapter 11

Cases, including Bankman-Fried's decision to cause Plaintiffs to make a large illiquid

investment in FTX Europe and the FTX Insiders' intent to use the DAAG Acquisition to hinder,

delay, or defraud creditors.  Evidence adduced at the recent criminal trial of Bankman-Fried also

bears heavily on these matters.  If given leave to amend, Plaintiffs could plead additional facts in

an amended complaint on various subjects, including the following:

- In support of fraudulent intent, that Ellison testified that Bankman-Fried had made it a "big priority" to "figur[e] out ways to get more loans" to let him make more "investments or acquisitions," that Alameda "did not have enough liquid assets to repay all of our lenders" due to insider loans and those investments, and that she had long "dread[ed]" the day customers tried to withdraw their missing funds.  (Ehrenberg Decl. Ex. 5 at 652:15–25, 762:06–763:12.)

- In further support of fraudulent intent and insolvency, that Bankman-Fried stated in September 2022 that he had been worried about a "hole" in company finances "since before the last year"—that is, since *before* the DAAG Acquisition was complete—and that FTX would have to "grow" its way out of the hole.  (Ehrenberg Decl. Ex. 6 at 1401:08–1408:04; *see also* Ehrenberg Decl. Ex. 7 at 1965:02–05 ("Sam told [Nishad Singh] back then that it is what it is and there is nothing we can do about it.  The only thing we can do is grow the company and fill in the hole.").)

- In support of the domestic application of the avoidance statutes, that the transfers of the cash to Matzke on November 23, 2021, originated from Signature Bank, a U.S. bank.

- To further support allegations regarding fraudulent transfers, the dates of the transfers in connection with the Cash Component (November 19 and 23, 2021), Stock Component (January 1, 2022), Bonus Component (April 13 and May 5, 2022), Additional Cash Component (May 27, 2022) and Extra Bonus Component (September 9 and October 5, 2022).

- In support of the lack of reasonably equivalent value for the DAAG Acquisition, that:

  o Defendants Gruhn and Matzke were unsuccessful in meeting the deadline as set in SPA 3 to receive the Extra Bonus Component but nevertheless received bonuses totaling $5,000,000 each.

  o FTX Europe faced inquiries from foreign regulators concerning FTX Europe's operations, and in July 2022, Defendants Gruhn and Matzke collaborated to obscure from Cypriot regulators an apparent $19 million deficit in customer balances by "reflect[ing] these balances" in internal systems as a different cryptocurrency so they would "not see all the amount as balance."

  o Defendant Gruhn corresponded with other FTX Europe employees concerning how to communicate to FTX Europe customers that they might evade rigorous EU KYC requirements by opening accounts with FTX Digital Markets instead.

  o Despite management projections created in March 2022 stating that FTX Europe could generate exchange commissions of nearly $82 million by the end of 2022 and $98.1 million in 2023, FTX Europe earned, in its entire history, less than $4 million in fill fees from FTX Europe exchange customers.

- In support of breach of fiduciary duty, that invoices from Kephas to FTX Europe were sent directly to Patrick Gruhn's FTX Europe e-mail account.

Plaintiffs expect that they could cure any pleading deficiencies identified by the Court in its decision on Defendants' motions, and therefore request leave to file an amended Complaint if the Court dismisses any of their claims.[27]

## VIII. THE COURT SHOULD DENY WILLIAMS'S MOTION FOR SUMMARY JUDGMENT

Williams moves for summary judgment on each of Plaintiffs' claims against him on the basis of purported evidence he has submitted via affidavit at the very outset of discovery,

---

[27] Plaintiffs are mindful of this Court's recent decisions holding that requests for leave to amend made in opposition briefs may be procedurally improper in some circumstances. *See In re Our Alchemy, LLC*, 642 B.R. 155, 172 (Bankr. D. Del. 2022); *In re Daily Bread Winddown, LLC*, 2022 Bankr. LEXIS 3078, at *12–13 (Bankr. D. Del. Nov. 1, 2022). If, upon dismissal of any of Plaintiffs' claims, the Court prefers that Plaintiffs file a separate motion for leave to amend stating the particular grounds on which amendment is sought and attaching the proposed amended complaint, Plaintiffs are prepared to do so promptly.

essentially arguing that because the "facts" he asserts are the only ones in the record so far, they are therefore "undisputed," and summary judgment is appropriate.  (BW Br. at 21–22, 26.) Williams makes no effort to explain how the out-of-court statements relied upon for their truth throughout his brief (*i.e.*, the documents contained in his Appendix) can be considered at the summary judgment stage.  *See* Fed. R. Evid. 801(c)(2); *In re LTC Holdings, Inc.*, 596 B.R. 797, 802 (Bankr. D. Del. 2019) (moving party must show that "the facts would be presented in a form admissible at the time of trial for them to be used at the summary judgment phase").

Neither courts nor the Rules of Civil Procedure permits this pointless gamesmanship because the summary judgment process "presupposes the existence of an adequate record."  *Doe* v. *Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007); *see also, e.g.*, *Miller* v. *Beneficial Mgmt. Corp.,* 977 F.2d 834, 845 (3d Cir. 1992) ("[I]ncomplete state of discovery alone should have precluded summary judgment on the merits."); *Acosta* v. *DeVilbiss Landscape Architects, Inc.*, 2018 WL 5033757, at *3 (D. Del. Oct. 17, 2018) ("[S]ummary judgment motion [is] more appropriately filed after discovery.").  "If discovery is incomplete, a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law."  *Shelton*, 775 F.3d at 568.  Discovery is especially appropriate where "the overall conduct alleged in [the] bankruptcy case includ[es] allegations of massive fraud and undocumented side deals."  *In re Enron Corp.*, 2005 WL 3873897, at *12 (Bankr. S.D.N.Y. Aug. 10, 2005) (denying pre-discovery summary judgment motion because "Enron should be afforded the opportunity to further investigate its allegations").

Pursuant to Rule 56(d), if the party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition,"

the court can "defer considering the motion or deny it," or "allow time to . . . take discovery." Fed. R. Civ. P. 56(d). "If discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting the motion." *Doe*, 480 F.3d at 257; *see also Hart* v. *City of Philadelphia*, 779 F. App'x 121, 128 (3d Cir. 2019) (finding District Court abused discretion in granting pre-discovery summary judgment where nonmovant "specified the facts he wanted to explore through discovery and explained why he otherwise lacked access to that information"). Plaintiffs submit herewith the *Rule 56(d) Declaration of Stephen Ehrenberg* ("Rule 56(d) Decl.") setting forth the discovery Plaintiffs intend to take that will bear on the factual issues in this case. Due in no small part to Williams's dilatory tactics, discovery in this case has barely begun.[28] Defendants have not yet begun to produce documents, no depositions have been taken or even scheduled, no expert reports have been exchanged, and the factual record is in its infancy. *See* Rule 56(d) Decl. at 5–6. The Court should deny the motion and permit discovery to unfold in the ordinary course. *See Hart*, 779 F. App'x at 128; *Doe*, 480 F.3d at 257; *Shelton*, 775 F.3d at 568.

In any event, even just on the basis of documents Plaintiffs have produced in this action and documents that Williams purports to rely upon, material disputes of fact plainly preclude entry of summary judgment in Williams's favor on any claim.[29] As a threshold matter, the Court

---

[28] Williams filed a motion for a protective order to stay discovery on November 8, 2023. (ECF No. 35.) In flagrant violation of both the Federal Rules of Civil Procedure and this proceeding's Case Management Order, Williams effectively granted himself a stay by refusing to produce any documents pending the outcome of his motion. Despite this Court denying Williams's motion on November 15, Williams has produced no discovery to Plaintiffs to date, despite Plaintiffs' prompt request for the production of documents on October 13, 2023. (*See* Notice of Service Regarding The Debtors' First Request for Production of Documents to Defendant Brandon Williams, ECF No. 14.)

[29] Plaintiffs need not address Williams's arguments regarding Williams's status as an "insider." (BW Br. at 28–29.) Insider status is relevant only to preferential transfer claims, which Plaintiffs have not asserted against Williams.

should afford Williams's self-serving affidavit no weight, given that Williams has not yet sat for a deposition. *See Great Lakes Reinsurance (UK) SE* v. *Herzig*, 2023 WL 3560578, at *19 (S.D.N.Y. May 18, 2023) (stating no weight should be afforded to the declarations of "interested parties [who], at the time of the motion for summary judgment . . . had not been subject to deposition"); *see also Graber* v. *Dales*, 511 F. Supp. 3d 594, 600 (E.D. Pa. 2021) ("It would be wholly inequitable to permit Defendant to rely upon affidavits and communications to which he, and not Plaintiff, has access, and deny Plaintiff the ability to request additional relevant documents or test the declarations through depositions."). For that reason alone, the Williams affidavit is not capable of creating any "undisputed" facts.

For his first purportedly undisputed fact, Williams contends that the DAAG Acquisition transfers were not intentionally fraudulent because Plaintiffs acquired DAAG for a legitimate business purpose or without regard to benefiting Williams. (BW Br. at 20–22.) Plaintiffs dispute each point. Sworn testimony in Bankman-Fried's criminal trial establishes that Bankman-Fried stated in September 2022 that he had been worried about a "hole" in company finances "since before the last year"—that is, since *before* the DAAG Acquisition was complete—and that FTX would have to "grow" its way out of the hole. (Ehrenberg Decl. Ex. 6 at 1401:08–1408:04; Ehrenberg Decl. Ex. 7 at 1965:02–05.) This testimony corroborates Plaintiffs' allegation that the purpose of the acquisition was to expand the customer base to Europe and grow the pool of FTX Group funds available for misappropriation by the FTX Insiders. Further, despite Williams's claims to have had no personal relationship with Bankman-Fried (*see Affidavit of Brandon Williams* at ¶ 22), Williams and Bankman-Fried corresponded one-on-one from 2019 to 2022, and Williams asked Bankman-Fried for a loan in January 2021 after his wife received personal health-related news. (*See* Ehrenberg Decl. Ex. 8 at 36.)

-48-

Accordingly, even without the benefit of depositions, facts revealed during the Bankman-Fried criminal trial and documents that have or will be produced in this action create a genuine dispute of material fact regarding the FTX Insiders' fraudulent intent. These disputes preclude summary judgment on Plaintiffs' intentional fraudulent conveyance claims.

For his second purportedly undisputed fact, Williams contends that DAAG was worth what Plaintiffs paid for it because of its "know-how," which he describes as DAAG's "most valuable asset." (BW Br. at 4–7.) But documents produced by Plaintiffs in discovery confirm that DAAG did not possess the necessary knowledge or expertise to "operat[e] in the new and unique crypto-related tokenized derivatives business" (BW Br. at 6), and failed to deliver on its promise to do just that. For instance:

- The company has explained that "[t]he rationale behind acquiring DAAG" was "to acquire operating licenses that allow the Group to sell public securities as tokens on the blockchain." (Ehrenberg Decl. Ex. 9 at 10.) Consistent with that goal, Williams touted DAAG's "license to operate proprietary [middle market] firm" in conversations with Bankman-Fried as early as 2019, noting that under a tied-agent agreement, Defendants would "take ALL the responsibility for the exchange in the eyes of the regulators." (Ehrenberg Decl. Ex. 8 at 9.) Yet the BaFin regulatory requirements nonetheless posed an insurmountable obstacle to that arrangement, and the setup was ultimately changed to rely on a Cyprus entity's license. (Ehrenberg Decl. Ex. 10 at 3.)

- Not only did this delay the "go live" date of FTX Europe by over a year and a half (the parties initially contemplated that infrastructure would be "fully operational" by October 2020 (Ehrenberg Decl. Ex. 11 at 4), and FTX EU did not go live until March 2022 (Ehrenberg Decl. Ex. 12 at 12), but notably, the crucial operating license held by K-DNA was not even owned by DAAG at the time of the acquisition, and was not owned by DAAG for another ten months after SPA 3 was executed. K-DNA was subsequently acquired for only €2 million. (Compl. ¶¶ 85–103.)

- Although DAAG never delivered, as it promised, a successful tokenized stocks business, it was not for a lack of trying by FTX employees. As internal "kyc-turbo" Slack threads demonstrate, FTX employees were "chasing" Defendants to assist with processing KYC for applicants of tokenized stock trading, and Defendants "never got back to" them. (Ehrenberg Decl. Ex. 10 at 2–3.)

- The Complaint also alleges that Defendants Matzke and Gruhn received a $5 million "Extra Bonus Component" payment in connection with DAAG's acquisition of a CFD broker that receives all regulatory approvals within one month after the execution of

SPA 3.  (Compl. ¶¶ 68, 96.)  Yet initial discovery revealed that this milestone was not met, and Matzke and Gruhn were only paid to avoid their becoming "very noisy." (Ehrenberg Decl. Ex. 13 at 2–3.)

For his third purportedly undisputed fact, Williams contends that *ASC 805 Valuation of Certain Assets of FTX Trading Ltd. for Financial Reporting Purposes*, which BDO USA LLP prepared nearly six months after SPA 3, expressed a definitive "opinion" as to the fair market value of the DAAG Acquisition.  (BW Br. at 14.)  The face of the BDO report itself makes clear that it is not a fair market valuation, but rather is a "valuation analysis . . . conducted for financial reporting purposes in connection with [Accounting Standards Codification] 805, Business Combinations," and that it "is not valid for any other purpose or use."  (Williams App'x at A110–11.)  Indeed, the document expressly states that BDO *presumed* that the purchase price represents fair value because the transaction was conducted on an arm's-length basis:

> The Transaction was consummated in an arm's-length basis by knowledgeable, unrelated parties.  As such, it is reasonable to presume that the Transaction consideration represents fair value as viewed by a typical market participant.

(*Id.* at A112.)  Rather than a fair market valuation based upon fundamentals and comparable transactions in the market, the report reflects that BDO performed a purchase accounting analysis for financial reporting purposes, which seeks to allocate the presumed fair market purchase price among tangible assets and intangible assets, including trade name and operating licenses, and residual goodwill.  (*Id.* at A165.)  These disputes preclude summary judgment on Plaintiffs' constructive fraudulent conveyance claims.  *See, e.g.*, *In re MDIP Inc.*, 332 B.R. 129, 133 (Bankr. D. Del. 2005) (denying summary judgment where factual disputes existed concerning reasonably equivalent value in constructive fraudulent conveyance claim).

For his third purportedly undisputed fact, Williams contends that FTX Trading Ltd. was "fully solvent" when it acquired DAAG.  (Williams Br. at 14.)  Plaintiffs dispute this.  As a threshold matter, solvency is a matter for expert opinion, and expert discovery does not begin

until May 17, 2024.  At that time, Plaintiffs will submit expert reports in support of their

solvency analysis.  But even on the early record in this action, there are material disputes of fact.

For example, evidence adduced at the Bankman-Fried trial shows that FTX customer balances

far outweighed FTX's available crypto wallet funds at least as early as January 2021, prior to

SPA 2 and SPA 3.  (*See* Ehrenberg Decl. Ex. 14; Ehrenberg Decl. Ex. 15 (illustrating FTX

customer fiat liability balances as billions of dollars greater than FTX's fiat bank balances at

least as far back as March 2021).)  Williams nevertheless claims that two documents—the First

Day Declaration and the audited financial statement of FTX Trading Ltd. for the years 2020 to

2021 prepared by Prager Metis—"conclusively show that FTX Trading was not insolvent at any

relevant time."  (BW Br. at 26.)[30]  These are mischaracterizations.

The First Day Declaration states explicitly that the calculation of FTX Trading Ltd.'s

liabilities did not incorporate liabilities to FTX customers, that it relies on balance sheets

produced "while the Debtors were controlled by Mr. Bankman-Fried," and that it would not be

"appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable

indication of the financial circumstances" of FTX entities, such as FTX Trading Ltd.  (First Day

Decl. at ¶¶ 36, 38, 56.)  Plaintiffs also dispute that the Prager Metis financial statement, which

was created when the FTX Insiders controlled the FTX Group, accurately reflects the financial

condition of FTX Trading Ltd. for any period of time.  The face of the Prager Metis financial

statement shows that it does not include liabilities owed to FTX customers.  Indeed, Caroline

---

[30] Williams also attempts to rely on the contemplated acquisition of the Voyager exchange and associated
representations made during the sale process to claim that FTX was solvent at the time of the Voyager
sale in October and early November 2022.  (BW Br. at 15.)  This argument ignores the obvious:  the
contemplated acquisition and associated representations pre-date the discovery of the FTX Insiders'
fraud, and thus cannot possibly be premised on an accurate understanding of the financial condition of the
FTX Group.

Ellison testified that Bankman-Fried told her that he wanted FTX to have the image of being "safe, reliable, audited, and highly regulated, like other US exchanges," (Ehrenberg Decl. Ex. 5 at 861:16–23), and further testified that she ultimately discovered that "FTX had loaned money that it had raised from investors totaling $1.6 billion to Alameda and that that had been concealed from FTX's auditors," (*id.* at 937:12–14).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss and Brandon Williams's motion for summary judgment in their entirety.  If the Court grants Defendants' motions in whole or in part, Plaintiffs respectfully request leave to replead.

Dated: December 15, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467–4400
Facsimile: (302) 467–4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558–4000
Facsimile: (212) 558–3588
E-mail: ehrenbergs@sullcrom.com
       holleys@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com

*Counsel for Plaintiffs*