# Exhibit 1

# FTX Non Customer Proof of Claim Form

## Electronic Proof of Claim ID

If you have an EPOC ID please enter it below and select next to proceed with your claim submission.  EPOC IDs can be located on the pre-printed proof of claim forms sent via first-class mail.

EPOC ID

EPOC IDs are not required to submit a claim.  If you cannot locate your EPOC ID or do not have an EPOC ID, please select next to continue with your claim submission.

## Instructions

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

☐ Check here to see further instructions on completing your claim form:

**Claim Number: 4631**

## Debtor Selection

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

- ◉ FTX Trading Ltd. (Case No. 22-11068)
- ○ Alameda Aus Pty Ltd (Case No. 22-11104)
- ○ Alameda Global Services Ltd. (Case No. 22-11134)
- ○ Alameda Research (Bahamas) Ltd (Case No. 22-11105)
- ○ Alameda Research Holdings Inc. (Case No. 22-11069)
- ○ Alameda Research KK (Case No. 22-11106)
- ○ Alameda Research LLC (Case No. 22-11066)
- ○ Alameda Research Ltd (Case No. 22-11067)
- ○ Alameda Research Pte Ltd (Case No. 22-11107)
- ○ Alameda Research Yankari Ltd (Case No. 22-11108)
- ○ Alameda TR Ltd (Case No. 22-11078)
- ○ Alameda TR Systems S. de R. L. (Case No. 22-11109)
- ○ Allston Way Ltd (Case No. 22-11079)
- ○ Analisya Pte Ltd (Case No. 22-11080)
- ○ Atlantis Technology Ltd. (Case No. 22-11081)
- ○ Bancroft Way Ltd (Case No. 22-11082)
- ○ Blockfolio, Inc. (Case No. 22-11110)
- ○ Blue Ridge Ltd (Case No. 22-11083)
- ○ Cardinal Ventures Ltd (Case No. 22-11084)
- ○ Cedar Bay Ltd (Case No. 22-11085)
- ○ Cedar Grove Technology Services, Ltd. (Case No. 22-11162)
- ○ Clifton Bay Investments LLC (Case No. 22-11070)
- ○ Clifton Bay Investments Ltd (Case No. 22-11111)
- ○ Cottonwood Grove Ltd (Case No. 22-11112)
- ○ Cottonwood Technologies Ltd (Case No. 22-11136)
- ○ Crypto Bahamas LLC (Case No. 22-11113)
- ○ DAAG Trading, DMCC (Case No. 22-11163)
- ○ Deck Technologies Holdings LLC (Case No. 22-11138)
- ○ Deck Technologies Inc. (Case No. 22-11139)
- ○ Deep Creek Ltd (Case No. 22-11114)
- ○ Digital Custody Inc. (Case No. 22-11115)
- ○ Euclid Way Ltd (Case No. 22-11141)
- ○ FTX (Gibraltar) Ltd (Case No. 22-11116)
- ○ FTX Canada Inc (Case No. 22-11117)
- ○ FTX Certificates GmbH (Case No. 22-11164)
- ○ FTX Crypto Services Ltd. (Case No. 22-11165)
- ○ FTX Digital Assets LLC (Case No. 22-11143)
- ○ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118)
- ○ FTX EMEA Ltd. (Case No. 22-11145)
- ○ FTX Equity Record Holdings Ltd (Case No. 22-11099)
- ○ FTX EU Ltd. (Case No. 22-11166)
- ○ FTX Europe AG (Case No. 22-11075)
- ○ FTX Exchange FZE (Case No. 22-11100)
- ○ FTX Hong Kong Ltd (Case No. 22-11101)
- ○ FTX Japan Holdings K.K. (Case No. 22-11074)
- ○ FTX Japan K.K. (Case No. 22-11102)
- ○ FTX Japan Services KK (Case No. 22-11103)
- ○ FTX Lend Inc. (Case No. 22-11167)
- ○ FTX Marketplace, Inc. (Case No. 22-11168)
- ○ FTX Products (Singapore) Pte Ltd (Case No. 22-11119)
- ○ FTX Property Holdings Ltd (Case No. 22-11076)
- ○ FTX Services Solutions Ltd. (Case No. 22-11120)
- ○ FTX Structured Products AG (Case No. 22-11122)
- ○ FTX Switzerland GmbH (Case No. 22-11169)
- ○ FTX Trading GmbH (Case No. 22-11123)
- ○ FTX US Services, Inc. (Case No. 22-11171)
- ○ FTX US Trading, Inc. (Case No. 22-11149)
- ○ FTX Ventures Ltd. (Case No. 22-11172)
- ○ FTX Zuma Ltd (Case No. 22-11124)
- ○ GG Trading Terminal Ltd (Case No. 22-11173)
- ○ Global Compass Dynamics Ltd. (Case No. 22-11125)
- ○ Good Luck Games, LLC (Case No. 22-11174)
- ○ Goodman Investments Ltd. (Case No. 22-11126)

FTX Non Customer Proof of Claim Form

- ○ Hannam Group Inc (Case No. 22-11175)
- ○ Hawaii Digital Assets Inc. (Case No. 22-11127)
- ○ Hilltop Technology Services LLC (Case No. 22-11176)
- ○ Hive Empire Trading Pty Ltd (Case No. 22-11150)
- ○ Innovatia Ltd (Case No. 22-11128)
- ○ Island Bay Ventures Inc (Case No. 22-11129)
- ○ Killarney Lake Investments Ltd (Case No. 22-11131)
- ○ Ledger Holdings Inc. (Case No. 22-11073)
- ○ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177)
- ○ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155)
- ○ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156)
- ○ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157)
- ○ LedgerPrime LLC (Case No. 22-11158)
- ○ LedgerPrime Ventures, LP (Case No. 22-11159)
- ○ Liquid Financial USA Inc. (Case No. 22-11151)
- ○ Liquid Securities Singapore Pte Ltd (Case No. 22-11086)
- ○ LiquidEX LLC (Case No. 22-11152)
- ○ LT Baskets Ltd. (Case No. 22-11077)
- ○ Maclaurin Investments Ltd. (Case No. 22-11087)
- ○ Mangrove Cay Ltd (Case No. 22-11088)
- ○ North Dimension Inc (Case No. 22-11153)
- ○ North Dimension Ltd (Case No. 22-11160)
- ○ North Wireless Dimension Inc. (Case No. 22-11154)
- ○ Paper Bird Inc (Case No. 22-11089)
- ○ Pioneer Street Inc. (Case No. 22-11090)
- ○ Quoine India Pte Ltd (Case No. 22-11091)
- ○ Quoine Pte Ltd (Case No. 22-11161)
- ○ Quoine Vietnam Co. Ltd (Case No. 22-11092)
- ○ Strategy Ark Collective Ltd. (Case No. 22-11094)
- ○ Technology Services Bahamas Limited (Case No. 22-11095)
- ○ Verdant Canyon Capital LLC (Case No. 22-11096)
- ○ West Innovative Barista Ltd. (Case No. 22-11097)
- ○ West Realm Shires Financial Services Inc. (Case No. 22-11072)
- ○ West Realm Shires Inc. (Case No. 22-11183)
- ○ West Realm Shires Services Inc. (Case No. 22-11071)
- ○ Western Concord Enterprises Ltd. (Case No. 22-11098)
- ○ Zubr Exchange Ltd (Case No. 22-11132)

## Part 1: Identify the Claim

### 1. Who is the current Creditor?
Name of the current creditor (the person or entity to be paid for this claim)

Is the current Creditor an Individual?

- ○ No
- ● Yes

First Name

| Patrick |

Middle Name

| |

Last Name

| Gruhn |

Other names the creditor used with the debtor

| |

Email the creditor used with the debtor

| |

FTX Non Customer Proof of Claim Form

**2. Has this claim been acquired from someone else?**

◉ No

○ Yes

From whom?

[                                                                    ]

**3. Where should notices and payments to the Creditor be sent?**

[Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)]

**Where should notices to the Creditor be sent?**

Name:

[ Patrick Gruhn                                                      ]

Address 1 (Street address, "Care of:", or "Attention To:"):

[ Attention To: Morrison Cohen LLP, Attn: Heath D. Rosenblat, Esq. , Jason P. Gottlieb, Esq. ]

Address 2:

[ 909 Third Avenue, 27th Floor                                       ]

Address 3:

[                                                                    ]

Address 4:

[                                                                    ]

City:

[ New York                                                           ]

State or Province (use 2-letter abbreviation if US or Canada):

[ New York                                                           ]

Zip Code | Postal Code:

[ 10022                                                              ]

**Is the creditor address outside of the US?**

◉ No

○ Yes

Contact phone:

[ 212-735-8600                                                       ]

Contact email:

[ hrosenblat@morrisoncohen.com                                       ]

**Should payments go to a different address?**

○ No

◉ Yes

Name:

[ Patrick Gruhn                                                      ]

Address 1 (Street address, "Care of:", or "Attention To:"):

[ 1460 Lower Valley Road                                             ]

Address 2:

[                                                                    ]

Address 3:

[                                                                    ]

Address 4:

City:

Kalispell

State or Province (use 2-letter abbreviation if US or Canada):

MO

Zip Code | Postal Code:

59901

Is the creditor address outside of the US?

◉ No
◯ Yes

Contact phone:

212-735-8600

Contact email:

hrosenblat@morrisoncohen.com

**Would you like to add any additional noticing addresses?**

◉ No
◯ Yes

**4. Does this claim amend one already filed?**

◉ No
◯ Yes

Claim number on court claims registry (if known)

**5. Do you know if anyone else has filed a Proof of Claim for this claim?**

◉ No
◯ Yes

Who made the earlier filing?

## Part 2a: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

◉ No
◯ Yes

Last 4 digits of the debtor's account or any number you use to identify the debtor:

## If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**

| $ | No less than $33,402,312.50 (See Supplement) |

Does this amount include interest or other charges?

◯ No
◯ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide:**

(i) the currency type:

FTX Non Customer Proof of Claim Form

(ii) the amount in such currency

(iii) a conversion rate to U.S. dollars

**7b. List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

Please use only numerals and decimals in the Count fields, up to a maximum of 21 digits or 20 digits and 1 decimal.

| Coin List | Count | Coin List | Count |
|---|---|---|---|
|  |  |  |  |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
|  |  |  |  |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
|  |  |  |  |

## Part 2b: Give Information About the Claim as of the Date the Case Was Filed

**8. What is the basis of the claim?**

See Supplement

**9. Is all or part of the claim secured?**

◉ No

○ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate

☐ Motor vehicle

☐ Other

Describe:

**Basis for perfection:**

**Value of property (all amounts in US $ dollars):**

**Amount of the claim that is secured (all amounts in US $ dollars):**

**Amount of the claim that is unsecured (all amounts in US $ dollars):**

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars):**

Annual Interest Rate (when case was filed) % -

○ Fixed

○ Variable

Annual Interest Rate (when case was filed) %:

**10. Is this claim based on a lease?**

◉ No

○ Yes

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars).**

<div style="border:1px solid #000; height:2em;"></div>

**11. Is this claim subject to a right of setoff?**

◉ No
◯ Yes

Identify the property.

<div style="border:1px solid #000; height:2em;"></div>

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

◉ No
◯ Yes

☐ Domestic support obligations (including alimony and child support) under 11 U.
S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or
services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before
the bankruptcy petition is filed or the debtor's business ends, whichever is earlier.
11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

◉ No
◯ Yes.

**Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions above on what further information is required.**

<div style="border:1px solid #000; height:2em;"></div>

FTX Non Customer Proof of Claim Form

## Part 3: Electronic Signature

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**

**18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

- ◉ I am the creditor.
- ○ I am the creditor's attorney or authorized agent.
- ○ I am the trustee, or the Debtor, or their authorized agent. Bankruptcy Rule 3004.
- ○ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

## Executed on date (Calculated in UTC)

06/30/2023

Signature



I certify that I have completed my Proof of Claim form on the Kroll Restructuring Administration Portal. I hereby agree that my electronic signature herein complies with the ESIGN Act, and accordingly shall have the same legal effect as my original signature.

☑ I agree

**Name of the person who is completing and signing this claim:**

First Name/Middle Name/Last Name:

Patrick Gruhn

Title/Company:

Address 1:

1460 Lower Valley Road

Address 2:

City:

Kalispell

State or Province (use 2-letter abbreviation if US or Canada):

MO

Zip Code | Postal Code:

55901

Is this address outside of the US?

◉ No
◯ Yes

Contact phone:

212-735-8600

Contact email:

hrosenblat@morrisoncohen.com

## Supporting Documentation

**Attach Support Documentation (limited to a single PDF attachment that is less than 5 megabytes in size):**

◉ I have supporting documentation
◯ I do not have supporting documentation

**Attach a single PDF attachment that is less than 5 megabytes in size**

| | |
|---|---|
| 📄  FTX POC w Supplement.pdf | 375 KB |

**Attachment Filename**

FTX POC w Supplement.pdf

## United States Bankruptcy Court, District of Delaware

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☑ FTX Trading Ltd. (Case No. 22-11068) | ☐ Alameda Aus Pty Ltd (Case No. 22-11104) | ☐ Alameda Global Services Ltd. (Case No. 22-11134) | ☐ Alameda Research (Bahamas) Ltd (Case No. 22-11105) |
| ☐ Alameda Research Holdings Inc. (Case No. 22-11069) | ☐ Alameda Research KK (Case No. 22-11106) | ☐ Alameda Research LLC (Case No. 22-11066) | ☐ Alameda Research Ltd (Case No. 22-11067) |
| ☐ Alameda Research Pte Ltd (Case No. 22-11107) | ☐ Alameda Research Yankari Ltd (Case No. 22-11108) | ☐ Alameda TR Ltd (Case No. 22-11078) | ☐ Alameda TR Systems S. de R. L. (Case No. 22-11109) |
| ☐ Allston Way Ltd (Case No. 22-11079) | ☐ Analisya Pte Ltd (Case No. 22-11080) | ☐ Atlantis Technology Ltd. (Case No. 22-11081) | ☐ Bancroft Way Ltd (Case No. 22-11082) |
| ☐ Blockfolio, Inc. (Case No. 22-11110) | ☐ Blue Ridge Ltd (Case No. 22-11083) | ☐ Cardinal Ventures Ltd (Case No. 22-11084) | ☐ Cedar Bay Ltd (Case No. 22-11085) |
| ☐ Cedar Grove Technology Services, Ltd. (Case No. 22-11162) | ☐ Clifton Bay Investments LLC (Case No. 22-11070) | ☐ Clifton Bay Investments Ltd (Case No. 22-11111) | ☐ Cottonwood Grove Ltd (Case No. 22-11112) |
| ☐ Cottonwood Technologies Ltd (Case No. 22-11136) | ☐ Crypto Bahamas LLC (Case No. 22-11113) | ☐ DAAG Trading, DMCC (Case No. 22-11163) | ☐ Deck Technologies Holdings LLC (Case No. 22-11138) |
| ☐ Deck Technologies Inc. (Case No. 22-11139) | ☐ Deep Creek Ltd (Case No. 22-11114) | ☐ Digital Custody Inc. (Case No. 22-11115) | ☐ Euclid Way Ltd (Case No. 22-11141) |
| ☐ FTX (Gibraltar) Ltd (Case No. 22-11116) | ☐ FTX Canada Inc (Case No. 22-11117) | ☐ FTX Certificates GmbH (Case No. 22-11164) | ☐ FTX Crypto Services Ltd. (Case No. 22-11142) |
| ☐ FTX Digital Assets LLC (Case No. 22-11143) | ☐ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118) | ☐ FTX EMEA Ltd. (Case No. 22-11145) | ☐ FTX Equity Record Holdings Ltd (Case No. 22-11099) |
| ☐ FTX EU Ltd. (Case No. 22-11166) | ☐ FTX Europe AG (Case No. 22-11075) | ☐ FTX Exchange FZE (Case No. 22-11100) | ☐ FTX Hong Kong Ltd (Case No. 22-11101) |
| ☐ FTX Japan Holdings K.K. (Case No. 22-11074) | ☐ FTX Japan K.K. (Case No. 22-11102) | ☐ FTX Japan Services KK (Case No. 22-11103) | ☐ FTX Lend Inc. (Case No. 22-11167) |
| ☐ FTX Marketplace, Inc. (Case No. 22-11168) | ☐ FTX Products (Singapore) Pte Ltd (Case No. 22-11119) | ☐ FTX Property Holdings Ltd (Case No. 22-11076) | ☐ FTX Services Solutions Ltd. (Case No. 22-11120) |
| ☐ FTX Structured Products AG (Case No. 22-11122) | ☐ FTX Switzerland GmbH (Case No. 22-11169) | ☐ FTX Trading GmbH (Case No. 22-11123) | ☐ FTX US Services, Inc. (Case No. 22-11171) |
| ☐ FTX US Trading, Inc. (Case No. 22-11149) | ☐ FTX Ventures Ltd. (Case No. 22-11172) | ☐ FTX Zuma Ltd (Case No. 22-11124) | ☐ GG Trading Terminal Ltd (Case No. 22-11173) |
| ☐ Global Compass Dynamics Ltd. (Case No. 22-11125) | ☐ Good Luck Games, LLC (Case No. 22-11174) | ☐ Goodman Investments Ltd. (Case No. 22-11126) | ☐ Hannam Group Inc (Case No. 22-11175) |
| ☐ Hawaii Digital Assets Inc. (Case No. 22-11127) | ☐ Hilltop Technology Services LLC (Case No. 22-11176) | ☐ Hive Empire Trading Pty Ltd (Case No. 22-11150) | ☐ Innovatia Ltd (Case No. 22-11128) |
| ☐ Island Bay Ventures Inc (Case No. 22-11129) | ☐ Killarney Lake Investments Ltd (Case No. 22-11131) | ☐ Ledger Holdings Inc. (Case No. 22-11073) | ☐ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177) |
| ☐ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155) | ☐ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156) | ☐ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157) | ☐ LedgerPrime LLC (Case No. 22-11158) |
| ☐ LedgerPrime Ventures, LP (Case No. 22-11159) | ☐ Liquid Financial USA Inc. (Case No. 22-11151) | ☐ Liquid Securities Singapore Pte Ltd (Case No. 22-11086) | ☐ LiquidEX LLC (Case No. 22-11152) |
| ☐ LT Baskets Ltd. (Case No. 22-11077) | ☐ Maclaurin Investments Ltd. (Case No. 22-11087) | ☐ Mangrove Cay Ltd (Case No. 22-11088) | ☐ North Dimension Inc (Case No. 22-11153) |
| ☐ North Dimension Ltd (Case No. 22-11160) | ☐ North Wireless Dimension Inc. (Case No. 22-11154) | ☐ Paper Bird Inc (Case No. 22-11089) | ☐ Pioneer Street Inc. (Case No. 22-11090) |
| ☐ Quoine India Pte Ltd (Case No. 22-11091) | ☐ Quoine Pte Ltd (Case No. 22-11161) | ☐ Quoine Vietnam Co. Ltd (Case No. 22-11092) | ☐ Strategy Ark Collective Ltd. (Case No. 22-11094) |
| ☐ Technology Services Bahamas Limited (Case No. 22-11095) | ☐ Verdant Canyon Capital LLC (Case No. 22-11096) | ☐ West Innovative Barista Ltd. (Case No. 22-11097) | ☐ West Realm Shires Financial Services Inc. (Case No. 22-11072) |
| ☐ West Realm Shires Inc. (Case No. 22-11183) | ☐ West Realm Shires Services Inc. (Case No. 22-11071) | ☐ Western Concord Enterprises Ltd. (Case No. 22-11098) | ☐ Zubr Exchange Ltd (Case No. 22-11132) |

# Modified Form 410
## Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Patrick Gruhn

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

Email(s) the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Morrison Cohen LLP
Attn: Heath D. Rosenblat, Esq.
Attn: Jason P. Gottlieb, Esq.
909 Third Avenue, 27th Floor
New York, New York 10022

Contact phone   212-735-8600

Contact email   hrosenblat@morrisoncohen.com

Where should payments to the creditor be sent? (if different)

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.   Claim number on court claims registry (if known) _____

Filed on _____
          MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**

$ No less than $33,402,312.50

Does this amount include interest or other charges?

☐ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide (i) the currency type _____; (ii) the amount in such currency _____; and (iii) a conversion rate to U.S. dollars _____.

**7b.  List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| | | | |
| | | | |

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |

## See Supplement

_____

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a _Mortgage Proof of Claim Attachment_ (Official Form 410-A) with this _Proof of Claim._

    ☐ Motor vehicle

    ☐ Other. Describe: _____

    **Basis for perfection:**

    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:**          $_____

    **Amount of the claim that is secured:**    $_____

    **Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:**  $_____

    **Annual Interest Rate** (when case was filed)_____%

    ☐ Fixed

    ☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. _Check one:_

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(  ) that applies. | $_____ |

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions below on what further information is required.**  $_____

| Part 3: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___06/30/2023___
                  MM / DD / YYYY

_/s/ Patrick Gruhn_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Patrick Gruhn |
| --- | --- |
| | First name          Middle name          Last name |
| Title | |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1460 Lower Valley Road |
| | Number          Street |
| | Kalispell                          Mo          59901 |
| | City                              State          ZIP Code |
| Contact phone | 212-735-8600                Email    hrosenblat@morrisoncohen. |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### SUPPLEMENT TO PROOF OF CLAIM OF PATRICK GRUHN

Patrick Gruhn ("**PG**") submits the following supplement (this "**Supplement**") to its proof of claim ("**Proof of Claim**") against FTX Trading Ltd. ("**FTXTL**") and further states as follows:

### A.     The Debtors' Chapter 11 Filings

1.      On November 11, 2022 and November 14, 2022 (collectively, "**Petition Date**"), FTXTL and 101 affiliated debtors (collectively, "**Debtors**")[1] each commenced, in the United States Bankruptcy Court for the District of Delaware (this "**Bankruptcy Court**"), a voluntary case under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 ("**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures and an order [ECF No. 128] of this Bankruptcy Court, the Debtors' cases ("**Chapter 11 Cases**") have been consolidated for procedural purposes only and are being jointly administered.

---

[1]     The last four digits of FTXTL and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

3.      By order [ECF No. 1519], dated May 19, 2023, of the Bankruptcy Court, the last day by which non-customers can file claims against the Debtors is June 30, 2023.

### B.      PG, the Debtors, and the Claim

4.      PG was a seller under that certain *Share Purchase Agreement*, dated November 14, 2021 ("**Agreement**"), by and among, PG, Lorem Ipsum RM UG (haftungsbeschränkt), and Brandon Williams, as sellers, and FTXTL, as purchaser. The Agreement, and any amendments, supplements, or modifications thereto (including, but not limited to that certain *Amendment to Share Purchase Agreement*, dated November 15, 2021, and the Offer of Employment described therein), and other related materials and documents (collectively, "**Relationship Documents**") setting forth PG's claim are too voluminous to attach and, upon information and belief, already in the possession of the Debtors. Copies of the Relationship Documents will be made available to either the Debtors or the Bankruptcy Court upon request.

5.      Under the Agreement, FTXTL was a purchaser of certain shares owned by PG in an entity named Digital Asset DA AG, in return for which FTXTL promised to pay various forms of consideration to PG. FTXTL did not and has not paid the consideration due under the Agreement and the Relationship Documents.

6.      As of the Petition Date, due to FTXTL's failure to pay the consideration due under the Agreement and Relationship Documents, PG has a claim against FTXTL of no less than $33,402,312.50[2], ***plus*** all additional actual and consequential damages including, but not limited

---

[2]     Included in this amount is the value of 228,874 common shares of FTXTL owed to PG under the Agreement that it is unclear if FTXTL transferred, assigned, and properly registered them to PG or not. PG will also assert these amounts in a proof of interest out of an abundance of caution.

2

to, reputational damage, loss of business, loss of goodwill, or loss of profits. In addition, PG has various other claims against FTXTL in connection with, related to, or arising from FTXTL's breach of the Relationship Documents, including, but not limited to, breach of contract, fraud, or fraudulent inducement *plus* all costs and attorney's fees in connection therewith (collectively, "**Claim**").

C.    **General Provisions**

7.    This Supplement and the Proof of Claim represent all currently known claims of PG against FTXTL. To the extent there are additional claims that subsequently become known to PG arising from the Agreement, the Relationship Documents, or otherwise, such claims are deemed included in the Claim and this Supplement and any other supplements or amendments hereto.

8.    The Proof of Claim and this Supplement serve, and are intended to serve, as a notice of a claim for any amount due or to become due from FTXTL under the Agreement or any of the Relationship Documents, whether or not summarized or identified specifically in the Proof of Claim and/or this Supplement, and all interested parties are on notice thereof.

9.    In filing the Proof of Claim and this Supplement, PG does not waive his right, title or interest to any other amounts that PG may be entitled to receive under the Agreement or the Relationship Documents, applicable law, in equity, or otherwise.

10.    PG reserves the right to amend or supplement the Proof of Claim and this Supplement at any time and in any and all respects, including, without limitation, for the purpose of:    (a) asserting additional, supplementary or amended proofs of claim based on events, information and/or documents obtained through discovery or otherwise of changing the basis or

3

the amount of the Claim described in this Supplement, including, without limitation, professional fees, expenses and other costs that PG incurred in connection with the filing of the Proof of Claim and this Supplement; (b) further describing the Claim; and (c) providing further evidence of the Claim.

11.     The Proof of Claim and this Supplement are not intended and shall not be construed to be an election of remedies, waiver of any past, present or future breaches, defaults, or events of default, or a limitation of any rights, remedies, claims, or defenses of PG, including, but not limited to, PG's right:  (a) to have final orders in non-core matters entered only after *de novo* review by the District Court; (b) to trial by jury in any proceeding so triable in the Chapter 11 Cases or any case, controversy, or proceeding related to the Chapter 11 Cases or to invoke the dispute resolutions provision of the Agreement; (c) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or (d) to any other rights, claims, actions, set-offs, or recoupments to which PG are or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, set-offs, and recoupments PG expressly reserves and preserves.

12.     The Proof of Claim and this Supplement do not encompass claims that PG may have that arose after the Petition Date and that are entitled to an administrative expense priority, and PG expressly reserves and preserves his rights to file such claim or any similar claim at the appropriate time.

*[Text Continued On Next Page]*

13.    All notices concerning the Proof of Claim shall be sent to:

> Morrison Cohen LLP
> Attn: Heath D. Rosenblat, Esq.
> Attn: Jason P. Gottlieb Esq.
> 909 Third Avenue, 27th Floor
> New York, New York  10022
>
> Telephone:  (212) 735-8600
> E-mail:  hrosenblat@morrisoncohen.com
> E-mail:  jgottlieb@morrisoncohen.com

5

Confirmation of Submission

**Your Form has been successfully submitted...**

DOCUMENT ID

b3f37602fe6647d4c7c418c38daf76d6138575ec

Submitted Date Time

2023-06-30T17:49:58.791Z

Status

Submitted

CONFIRMATION ID

3265-69-UBTAT-429666170

Submission Information

When you press "Submit" you will receive an email from "noreply.efiling@ra.kroll.com." Please add this email to your allowed senders list. This email will have a PDF copy of your claim filing (with your supporting documents as a separate attachment), as well as your Confirmation ID.

Orbeon Forms 2022.1.3.202304130216 PE

# Exhibit 2

## FTX Non Customer Proof of Claim Form

Electronic Proof of Claim ID

If you have an EPOC ID please enter it below and select next to proceed with your claim submission.  EPOC IDs can be located on the pre-printed proof of claim forms sent via first-class mail.

EPOC ID

EPOC IDs are not required to submit a claim.  If you cannot locate your EPOC ID or do not have an EPOC ID, please select next to continue with your claim submission.

Instructions

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

☐ Check here to see further instructions on completing your claim form:

**Claim Number: 4476**

## Debtor Selection

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

- ◉ FTX Trading Ltd. (Case No. 22-11068)
- ○ Alameda Aus Pty Ltd (Case No. 22-11104)
- ○ Alameda Global Services Ltd. (Case No. 22-11134)
- ○ Alameda Research (Bahamas) Ltd (Case No. 22-11105)
- ○ Alameda Research Holdings Inc. (Case No. 22-11069)
- ○ Alameda Research KK (Case No. 22-11106)
- ○ Alameda Research LLC (Case No. 22-11066)
- ○ Alameda Research Ltd (Case No. 22-11067)
- ○ Alameda Research Pte Ltd (Case No. 22-11107)
- ○ Alameda Research Yankari Ltd (Case No. 22-11108)
- ○ Alameda TR Ltd (Case No. 22-11078)
- ○ Alameda TR Systems S. de R. L. (Case No. 22-11109)
- ○ Allston Way Ltd (Case No. 22-11079)
- ○ Analisya Pte Ltd (Case No. 22-11080)
- ○ Atlantis Technology Ltd. (Case No. 22-11081)
- ○ Bancroft Way Ltd (Case No. 22-11082)
- ○ Blockfolio, Inc. (Case No. 22-11110)
- ○ Blue Ridge Ltd (Case No. 22-11083)
- ○ Cardinal Ventures Ltd (Case No. 22-11084)
- ○ Cedar Bay Ltd (Case No. 22-11085)
- ○ Cedar Grove Technology Services, Ltd. (Case No. 22-11162)
- ○ Clifton Bay Investments LLC (Case No. 22-11070)
- ○ Clifton Bay Investments Ltd (Case No. 22-11111)
- ○ Cottonwood Grove Ltd (Case No. 22-11112)
- ○ Cottonwood Technologies Ltd (Case No. 22-11136)
- ○ Crypto Bahamas LLC (Case No. 22-11113)
- ○ DAAG Trading, DMCC (Case No. 22-11163)
- ○ Deck Technologies Holdings LLC (Case No. 22-11138)
- ○ Deck Technologies Inc. (Case No. 22-11139)
- ○ Deep Creek Ltd (Case No. 22-11114)
- ○ Digital Custody Inc. (Case No. 22-11115)
- ○ Euclid Way Ltd (Case No. 22-11141)
- ○ FTX (Gibraltar) Ltd (Case No. 22-11116)
- ○ FTX Canada Inc (Case No. 22-11117)
- ○ FTX Certificates GmbH (Case No. 22-11164)
- ○ FTX Crypto Services Ltd. (Case No. 22-11165)
- ○ FTX Digital Assets LLC (Case No. 22-11143)
- ○ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118)
- ○ FTX EMEA Ltd. (Case No. 22-11145)
- ○ FTX Equity Record Holdings Ltd (Case No. 22-11099)
- ○ FTX EU Ltd. (Case No. 22-11166)
- ○ FTX Europe AG (Case No. 22-11075)
- ○ FTX Exchange FZE (Case No. 22-11100)
- ○ FTX Hong Kong Ltd (Case No. 22-11101)
- ○ FTX Japan Holdings K.K. (Case No. 22-11074)
- ○ FTX Japan K.K. (Case No. 22-11102)
- ○ FTX Japan Services KK (Case No. 22-11103)
- ○ FTX Lend Inc. (Case No. 22-11167)
- ○ FTX Marketplace, Inc. (Case No. 22-11168)
- ○ FTX Products (Singapore) Pte Ltd (Case No. 22-11119)
- ○ FTX Property Holdings Ltd (Case No. 22-11076)
- ○ FTX Services Solutions Ltd. (Case No. 22-11120)
- ○ FTX Structured Products AG (Case No. 22-11122)
- ○ FTX Switzerland GmbH (Case No. 22-11169)
- ○ FTX Trading GmbH (Case No. 22-11123)
- ○ FTX US Services, Inc. (Case No. 22-11171)
- ○ FTX US Trading, Inc. (Case No. 22-11149)
- ○ FTX Ventures Ltd. (Case No. 22-11172)
- ○ FTX Zuma Ltd (Case No. 22-11124)
- ○ GG Trading Terminal Ltd (Case No. 22-11173)
- ○ Global Compass Dynamics Ltd. (Case No. 22-11125)
- ○ Good Luck Games, LLC (Case No. 22-11174)
- ○ Goodman Investments Ltd. (Case No. 22-11126)

- ○ Hannam Group Inc (Case No. 22-11175)
- ○ Hawaii Digital Assets Inc. (Case No. 22-11127)
- ○ Hilltop Technology Services LLC (Case No. 22-11176)
- ○ Hive Empire Trading Pty Ltd (Case No. 22-11150)
- ○ Innovatia Ltd (Case No. 22-11128)
- ○ Island Bay Ventures Inc (Case No. 22-11129)
- ○ Killarney Lake Investments Ltd (Case No. 22-11131)
- ○ Ledger Holdings Inc. (Case No. 22-11073)
- ○ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177)
- ○ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155)
- ○ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156)
- ○ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157)
- ○ LedgerPrime LLC (Case No. 22-11158)
- ○ LedgerPrime Ventures, LP (Case No. 22-11159)
- ○ Liquid Financial USA Inc. (Case No. 22-11151)
- ○ Liquid Securities Singapore Pte Ltd (Case No. 22-11086)
- ○ LiquidEX LLC (Case No. 22-11152)
- ○ LT Baskets Ltd. (Case No. 22-11077)
- ○ Maclaurin Investments Ltd. (Case No. 22-11087)
- ○ Mangrove Cay Ltd (Case No. 22-11088)
- ○ North Dimension Inc (Case No. 22-11153)
- ○ North Dimension Ltd (Case No. 22-11160)
- ○ North Wireless Dimension Inc. (Case No. 22-11154)
- ○ Paper Bird Inc (Case No. 22-11089)
- ○ Pioneer Street Inc. (Case No. 22-11090)
- ○ Quoine India Pte Ltd (Case No. 22-11091)
- ○ Quoine Pte Ltd (Case No. 22-11161)
- ○ Quoine Vietnam Co. Ltd (Case No. 22-11092)
- ○ Strategy Ark Collective Ltd. (Case No. 22-11094)
- ○ Technology Services Bahamas Limited (Case No. 22-11095)
- ○ Verdant Canyon Capital LLC (Case No. 22-11096)
- ○ West Innovative Barista Ltd. (Case No. 22-11097)
- ○ West Realm Shires Financial Services Inc. (Case No. 22-11072)
- ○ West Realm Shires Inc. (Case No. 22-11183)
- ○ West Realm Shires Services Inc. (Case No. 22-11071)
- ○ Western Concord Enterprises Ltd. (Case No. 22-11098)
- ○ Zubr Exchange Ltd (Case No. 22-11132)

## Part 1: Identify the Claim

### 1. Who is the current Creditor?

Name of the current creditor (the person or entity to be paid for this claim)

Is the current Creditor an Individual?

- ⦿ No
- ○ Yes

Creditor Name

| Lorem Ipsum RM UG |
| --- |

Other names the creditor used with the debtor

|  |
| --- |

Email the creditor used with the debtor

|  |
| --- |

### 2. Has this claim been acquired from someone else?

- ⦿ No
- ○ Yes

From whom?

|  |
| --- |

**3. Where should notices and payments to the Creditor be sent?**

[Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)]

**Where should notices to the Creditor be sent?**

Name:

> Lorem Ipsum RM UG

Address 1 (Street address, "Care of:", or "Attention To:"):

> Attention To: Morrison Cohen LLP, Attn; Heath D. Rosenblat, Esq. , Jason P. Gottlieb, Esq.

Address 2:

> 909 Third Avenue, 27th Floor

Address 3:

Address 4:

City:

> New York

State or Province (use 2-letter abbreviation if US or Canada):

> New York

Zip Code | Postal Code:

> 10022

**Is the creditor address outside of the US?**

○ No
◉ Yes

Country (if outside of the US):

> Germany

Contact phone:

> 212-735-8600

Contact email:

> hrosenblat@morrisoncohen.com

**Should payments go to a different address?**

○ No
◉ Yes

Name:

> Lorem Ipsum RM UG

Address 1 (Street address, "Care of:", or "Attention To:"):

> Care Of: Lambda Law

Address 2:

> Bergstrasse 23

Address 3:

Address 4:

City:

Berlin

State or Province (use 2-letter abbreviation if US or Canada):

Germany

Zip Code | Postal Code:

10115

Is the creditor address outside of the US?

○ No
⦿ Yes

Country (if outside of the US):

Germany

Contact phone:

212-735-8600

Contact email:

hrosenblat@morrisoncohen.com

**Would you like to add any additional noticing addresses?**

⦿ No
○ Yes

**4. Does this claim amend one already filed?**

⦿ No
○ Yes

Claim number on court claims registry (if known)

**5. Do you know if anyone else has filed a Proof of Claim for this claim?**

⦿ No
○ Yes

Who made the earlier filing?

## Part 2a: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

⦿ No
○ Yes

Last 4 digits of the debtor's account or any number you use to identify the debtor:

## If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**

| $ | No less than $62,011,656.25 (See Supplement) |

Does this amount include interest or other charges?

○ No
○ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide:**

(i) the currency type:

(ii) the amount in such currency

(iii) a conversion rate to U.S. dollars

**7b. List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

Please use only numerals and decimals in the Count fields, up to a maximum of 21 digits or 20 digits and 1 decimal.

| Coin List | Count | Coin List | Count |
|-----------|-------|-----------|-------|
|           |       |           |       |

| Coin List | Count | Coin List | Count |
|-----------|-------|-----------|-------|
|           |       |           |       |

| Coin List | Count | Coin List | Count |
|-----------|-------|-----------|-------|
|           |       |           |       |

## Part 2b: Give Information About the Claim as of the Date the Case Was Filed

**8. What is the basis of the claim?**

See Supplement

**9. Is all or part of the claim secured?**

◉ No
○ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate

☐ Motor vehicle

☐ Other

Describe:

**Basis for perfection:**

**Value of property (all amounts in US $ dollars):**

**Amount of the claim that is secured (all amounts in US $ dollars):**

**Amount of the claim that is unsecured (all amounts in US $ dollars):**

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars):**

Annual Interest Rate (when case was filed) % -

○ Fixed
○ Variable

Annual Interest Rate (when case was filed) %:

**10. Is this claim based on a lease?**

◉ No
○ Yes

FTX Non Customer Proof of Claim Form

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars).**

**11. Is this claim subject to a right of setoff?**

◉ No
◯ Yes

Identify the property.

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

◉ No
◯ Yes

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

◉ No
◯ Yes.

**Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions above on what further information is required.**

FTX Non Customer Proof of Claim Form

## Part 3: Electronic Signature

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**

**18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

- ⦿ I am the creditor.
- ○ I am the creditor's attorney or authorized agent.
- ○ I am the trustee, or the Debtor, or their authorized agent. Bankruptcy Rule 3004.
- ○ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

### Executed on date (Calculated in UTC)

| 06/30/2023 |
|---|

Signature



I certify that I have completed my Proof of Claim form on the Kroll Restructuring Administration Portal. I hereby agree that my electronic signature herein complies with the ESIGN Act, and accordingly shall have the same legal effect as my original signature.

☑ I agree

**Name of the person who is completing and signing this claim:**

First Name/Middle Name/Last Name:

| Robin Matzke |
|---|

Title/Company:

| Managing Director of LI |
|---|

Address 1:

> Bergstrasse 23

Address 2:

>

City:

> Berlin

State or Province (use 2-letter abbreviation if US or Canada):

> Germany

Zip Code | Postal Code:

> 110115

Is this address outside of the US?

○ No
◉ Yes

Country (if outside of the US):

> Germany

Contact phone:

> 212-735-8600

Contact email:

> hrosenblat@morrisoncohen.com

## Supporting Documentation

**Attach Support Documentation (limited to a single PDF attachment that is less than 5 megabytes in size):**

◉ I have supporting documentation
○ I do not have supporting documentation

**Attach a single PDF attachment that is less than 5 megabytes in size**

| 📄 FTX POC w Supp.pdf | 375 KB |
|---|---|

**Attachment Filename**

> FTX POC w Supp.pdf

## United States Bankruptcy Court, District of Delaware

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☑ FTX Trading Ltd. (Case No. 22-11068) | ☐ Alameda Aus Pty Ltd (Case No. 22-11104) | ☐ Alameda Global Services Ltd. (Case No. 22-11134) | ☐ Alameda Research (Bahamas) Ltd (Case No. 22-11105) |
| ☐ Alameda Research Holdings Inc. (Case No. 22-11069) | ☐ Alameda Research KK (Case No. 22-11106) | ☐ Alameda Research LLC (Case No. 22-11066) | ☐ Alameda Research Ltd (Case No. 22-11067) |
| ☐ Alameda Research Pte Ltd (Case No. 22-11107) | ☐ Alameda Research Yankari Ltd (Case No. 22-11108) | ☐ Alameda TR Ltd (Case No. 22-11078) | ☐ Alameda TR Systems S. de R. L. (Case No. 22-11109) |
| ☐ Allston Way Ltd (Case No. 22-11079) | ☐ Analisya Pte Ltd (Case No. 22-11080) | ☐ Atlantis Technology Ltd. (Case No. 22-11081) | ☐ Bancroft Way Ltd (Case No. 22-11082) |
| ☐ Blockfolio, Inc. (Case No. 22-11110) | ☐ Blue Ridge Ltd (Case No. 22-11083) | ☐ Cardinal Ventures Ltd (Case No. 22-11084) | ☐ Cedar Bay Ltd (Case No. 22-11085) |
| ☐ Cedar Grove Technology Services, Ltd. (Case No. 22-11162) | ☐ Clifton Bay Investments LLC (Case No. 22-11070) | ☐ Clifton Bay Investments Ltd (Case No. 22-11111) | ☐ Cottonwood Grove Ltd (Case No. 22-11112) |
| ☐ Cottonwood Technologies Ltd (Case No. 22-11136) | ☐ Crypto Bahamas LLC (Case No. 22-11113) | ☐ DAAG Trading, DMCC (Case No. 22-11163) | ☐ Deck Technologies Holdings LLC (Case No. 22-11138) |
| ☐ Deck Technologies Inc. (Case No. 22-11139) | ☐ Deep Creek Ltd (Case No. 22-11114) | ☐ Digital Custody Inc. (Case No. 22-11115) | ☐ Euclid Way Ltd (Case No. 22-11141) |
| ☐ FTX (Gibraltar) Ltd (Case No. 22-11116) | ☐ FTX Canada Inc (Case No. 22-11117) | ☐ FTX Certificates GmbH (Case No. 22-11164) | ☐ FTX Crypto Services Ltd. (Case No. 22-11165) |
| ☐ FTX Digital Assets LLC (Case No. 22-11143) | ☐ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118) | ☐ FTX EMEA Ltd. (Case No. 22-11145) | ☐ FTX Equity Record Holdings Ltd (Case No. 22-11099) |
| ☐ FTX EU Ltd. (Case No. 22-11166) | ☐ FTX Europe AG (Case No. 22-11075) | ☐ FTX Exchange FZE (Case No. 22-11100) | ☐ FTX Hong Kong Ltd (Case No. 22-11101) |
| ☐ FTX Japan Holdings K.K. (Case No. 22-11074) | ☐ FTX Japan K.K. (Case No. 22-11102) | ☐ FTX Japan Services KK (Case No. 22-11103) | ☐ FTX Lend Inc. (Case No. 22-11167) |
| ☐ FTX Marketplace, Inc. (Case No. 22-11168) | ☐ FTX Products (Singapore) Pte Ltd (Case No. 22-11119) | ☐ FTX Property Holdings Ltd (Case No. 22-11076) | ☐ FTX Services Solutions Ltd. (Case No. 22-11120) |
| ☐ FTX Structured Products AG (Case No. 22-11122) | ☐ FTX Switzerland GmbH (Case No. 22-11169) | ☐ FTX Trading GmbH (Case No. 22-11123) | ☐ FTX US Services, Inc. (Case No. 22-11171) |
| ☐ FTX US Trading, Inc. (Case No. 22-11149) | ☐ FTX Ventures Ltd. (Case No. 22-11172) | ☐ FTX Zuma Ltd (Case No. 22-11124) | ☐ GG Trading Terminal Ltd (Case No. 22-11173) |
| ☐ Global Compass Dynamics Ltd. (Case No. 22-11125) | ☐ Good Luck Games, LLC (Case No. 22-11174) | ☐ Goodman Investments Ltd. (Case No. 22-11126) | ☐ Hannam Group Inc (Case No. 22-11175) |
| ☐ Hawaii Digital Assets Inc. (Case No. 22-11127) | ☐ Hilltop Technology Services LLC (Case No. 22-11176) | ☐ Hive Empire Trading Pty Ltd (Case No. 22-11150) | ☐ Innovatia Ltd (Case No. 22-11128) |
| ☐ Island Bay Ventures Inc (Case No. 22-11129) | ☐ Killarney Lake Investments Ltd (Case No. 22-11131) | ☐ Ledger Holdings Inc. (Case No. 22-11073) | ☐ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177) |
| ☐ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155) | ☐ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156) | ☐ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157) | ☐ LedgerPrime LLC (Case No. 22-11158) |
| ☐ LedgerPrime Ventures, LP (Case No. 22-11159) | ☐ Liquid Financial USA Inc. (Case No. 22-11151) | ☐ Liquid Securities Singapore Pte Ltd (Case No. 22-11086) | ☐ LiquidEX LLC (Case No. 22-11152) |
| ☐ LT Baskets Ltd. (Case No. 22-11077) | ☐ Maclaurin Investments Ltd. (Case No. 22-11087) | ☐ Mangrove Cay Ltd (Case No. 22-11088) | ☐ North Dimension Inc (Case No. 22-11153) |
| ☐ North Dimension Ltd (Case No. 22-11160) | ☐ North Wireless Dimension Inc. (Case No. 22-11154) | ☐ Paper Bird Inc (Case No. 22-11089) | ☐ Pioneer Street Inc. (Case No. 22-11090) |
| ☐ Quoine India Pte Ltd (Case No. 22-11091) | ☐ Quoine Pte Ltd (Case No. 22-11161) | ☐ Quoine Vietnam Co. Ltd (Case No. 22-11092) | ☐ Strategy Ark Collective Ltd. (Case No. 22-11094) |
| ☐ Technology Services Bahamas Limited (Case No. 22-11095) | ☐ Verdant Canyon Capital LLC (Case No. 22-11096) | ☐ West Innovative Barista Ltd. (Case No. 22-11097) | ☐ West Realm Shires Financial Services Inc. (Case No. 22-11072) |
| ☐ West Realm Shires Inc. (Case No. 22-11183) | ☐ West Realm Shires Services Inc. (Case No. 22-11071) | ☐ Western Concord Enterprises Ltd. (Case No. 22-11098) | ☐ Zubr Exchange Ltd (Case No. 22-11132) |

**Proof of Claim**

# Modified Form 410
## Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Lorem Ipsum RM UG

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

Email(s) the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Morrison Cohen LLP
Attn: Heath D. Rosenblat, Esq.
Attn: Jason P. Gottlieb, Esq.
909 Third Avenue, 27th Floor
New York, New York 10022

Contact phone  212-735-8600

Contact email  hrosenblat@morrisoncohen.com

Where should payments to the creditor be sent? (if different)

Lorem Ipsum RM UG
c/o Lambda Law
Bergstrasse 23,
10115 Berlin, Germany

Contact phone  212-735-8600

Contact email  hrosenblat@morrisoncohen.com

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.  Claim number on court claims registry (if known)_____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____

If filing a claim for cryptocurrency, please fill in 7b.

Does this amount include interest or other charges?

**7a. How much is the claim?**

$ No less than $62,011,656.25 (See Supplement)

☐ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide (i) the currency type _____; (ii) the amount in such currency _____; and (iii) a conversion rate to U.S. dollars _____.

**7b.  List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

| Coin List | Count | Coin List | Count |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |
|---|---|

### See Supplement

---

| 9. **Is all or part of the claim secured?** | ☒ No |
|---|---|

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                      $_____

**Amount of the claim that is secured:**       $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed
☐ Variable

---

| 10. **Is this claim based on a lease?** | ☒ No |
|---|---|

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

---

| 11. **Is this claim subject to a right of setoff?** | ☒ No |
|---|---|

☐ Yes. Identify the property: _____

---

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☒ No |
|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Yes. *Check one:*

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |

---

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No |
|---|---|

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions below on what further information is required.**      $_____

---

| Part 3: | Sign Below |
|---------|------------|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  06/30/2023
                MM  /  DD  /  YYYY

/s/ Robin Matzke
    Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Robin Matzke | | |
| | First name | Middle name | Last name |
| Title | Managing Director of LI | | |
| Company | Lorem Ipsum RM UG | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | Bergstrasse 23 | | |
| | Number      Street | | |
| | 10115 Berlin, Germany | | |
| | City | State | ZIP Code |
| Contact phone | 212-735-8600 | Email | hrosenblat@morrisoncohen.com |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### SUPPLEMENT TO PROOF OF CLAIM OF LOREM IPSUM RM UG

Lorem Ipsum RM UG (haftungsbeschränkt) ("**LI**") submits the following supplement (this "**Supplement**") to its proof of claim ("**Proof of Claim**") against FTX Trading Ltd. ("**FTXTL**") and further states as follows:

### A.    The Debtors' Chapter 11 Filings

1.    On November 11, 2022 and November 14, 2022 (collectively, "**Petition Date**"), FTXTL and 101 affiliated debtors (collectively, "**Debtors**")[1] each commenced, in the United States Bankruptcy Court for the District of Delaware (this "**Bankruptcy Court**"), a voluntary case under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 ("**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures and an order [ECF No. 128] of this Bankruptcy Court, the Debtors' cases ("**Chapter 11 Cases**") have been consolidated for procedural purposes only and are being jointly administered.

---

[1]    The last four digits of FTXTL and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

#12214004 v2 \099997 \1122

#12220610v3\031263\0001

3.      By order [ECF No. 1519], dated May 19, 2023, of the Bankruptcy Court, the last day by which non-customers can file claims against the Debtors is June 30, 2023.

   **B.    LI, the Debtors, and the Claim**

4.      LI is a non-US based entity that was a seller under that certain *Share Purchase Agreement*, dated November 14, 2021 ("**Agreement**"), by and among, Patrick Gruhn, LI, and Brandon Williams, as seller, and FTXTL, as purchaser. The Agreement, and any amendments, supplements, or modifications thereto, and other related materials and documents (collectively, "**Relationship Documents**") setting forth LI's claim are too voluminous to attach and, upon information and belief, already in the possession of the Debtors. Copies of the Relationship Documents will be made available to either the Debtors or the Bankruptcy Court upon request.

5.      Under the Agreement, FTXTL was a purchaser of certain shares owned by LI in an entity named Digital Asset DA AG, in return for which FTXTL promised to pay various forms of consideration to LI. FTXTL did not and has not paid the consideration due under the Agreement and the Relationship Documents.

6.      As of the Petition Date, due to FTXTL's failure to pay the consideration due under the Agreement and Relationship Documents, LI has a claim against FTXTL of no less than $62,011,656.25[2], ***plus*** all additional actual and consequential damages including, but not limited to, reputational damage, loss of business, loss of goodwill, or loss of profits. In addition, LI has various other claims against FTXTL in connection with, related to, or arising from FTXTL's breach of the Relationship Documents, including, but not limited to, breach of contract, fraud, or

---

[2]    Included in this amount is the value of 1,144,373 common shares of FTXTL owed to LI under the Agreement that it is unclear if FTXTL transferred, assigned, and properly registered them to LI or not. LI will also assert these amounts in a proof of interest out of an abundance of caution.

2

fraudulent inducement **plus** all costs and attorney's fees in connection therewith (collectively, "**Claim**").

C.  **General Provisions**

7.      This Supplement and the Proof of Claim represent all currently known claims of LI against FTXTL. To the extent there are additional claims that subsequently become known to LI arising from the Agreement, the Relationship Documents, or otherwise, such claims are deemed included in the Claim and this Supplement and any other supplements or amendments hereto.

8.      The Proof of Claim and this Supplement serve, and are intended to serve, as a notice of a claim for any amount due or to become due from FTXTL under the Agreement or any of the Relationship Documents, whether or not summarized or identified specifically in the Proof of Claim and/or this Supplement, and all interested parties are on notice thereof.

9.      In filing the Proof of Claim and this Supplement, LI does not waive his right, title or interest to any other amounts that LI may be entitled to receive under the Agreement or the Relationship Documents, applicable law, in equity, or otherwise.

10.     LI reserves the right to amend or supplement the Proof of Claim and this Supplement at any time and in any and all respects, including, without limitation, for the purpose of:   (a) asserting additional, supplementary or amended proofs of claim based on events, information and/or documents obtained through discovery or otherwise of changing the basis or the amount of the Claim described in this Supplement, including, without limitation, professional fees, expenses and other costs that LI incurred in connection with the filing of the Proof of Claim and this Supplement; (b) further describing the Claim; and (c) providing further evidence of the Claim.

11.     The Proof of Claim and this Supplement are not intended and shall not be construed to be an election of remedies, waiver of any past, present or future breaches, defaults, or events of default, or a limitation of any rights, remedies, claims, or defenses of LI, including, but not limited to, LI's right:  (a) to have final orders in non-core matters entered only after *de novo* review by the District Court; (b) to trial by jury in any proceeding so triable in the Chapter 11 Cases or any case, controversy, or proceeding related to the Chapter 11 Cases or to invoke the dispute resolutions provision of the Agreement; (c) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or (d) to any other rights, claims, actions, set-offs, or recoupments to which LI are or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, set-offs, and recoupments LI expressly reserves and preserves.

12.     The Proof of Claim and this Supplement do not encompass claims that LI may have that arose after the Petition Date and that are entitled to an administrative expense priority, and LI expressly reserves and preserves his rights to file such claim or any similar claim at the appropriate time.

[*Text Continued On Next Page*]

4

13.     All notices concerning the Proof of Claim shall be sent to:

> Morrison Cohen LLP
> Attn: Heath D. Rosenblat, Esq.
> Attn: Jason P. Gottlieb Esq.
> 909 Third Avenue, 27th Floor
> New York, New York  10022
>
> Telephone:  (212) 735-8600
> E-mail:  hrosenblat@morrisoncohen.com
> E-mail:  jgottlieb@morrisoncohen.com

5

Confirmation of Submission

**Your Form has been successfully submitted...**

DOCUMENT ID

5c0ab0ec7a56b92181db137e7c2c30ba192dc2a6

Submitted Date Time

2023-06-30T15:32:26.784Z

Status

Submitted

CONFIRMATION ID

3265-69-OESTC-677377750

Submission Information

When you press "Submit" you will receive an email from "noreply.efiling@ra.kroll.com." Please add this email to your allowed senders list. This email will have a PDF copy of your claim filing (with your supporting documents as a separate attachment), as well as your Confirmation ID.

Orbeon Forms 2022.1.3.202304130216 PE

# Exhibit 3

Customer Claim Form

## Customer Claim Form

### FTX Details

| FTX Email | FTX AccountID | Scheduled ID | FTX Debtor |
|---|---|---|---|
| pourcette@gmail.com | 4978795 | 221106806851001 | |

### Scheduled Claim Information

**You have been redirected from FTX website.  Please check your scheduled information below.**

**If you do NOT agree with any of 1) the amount or quantity of fiat, coins or NFT; 2) the FTX Exchange against whom the Customer Claim is asserted; or 3) the type or nature of the Customer Claim set forth below, assert the quantity of fiat or coins you held as of the date the case was filed in the rightmost column of the below charts.**

**You will also have an opportunity to add any NFTs not listed.  Only complete this section where you DISAGREE with the component of your Scheduled Customer Claim.  You will also have an opportunity to assert a Customer Claim arising out of or related to any other investment or trading activity.**

**Schedule**

| F-2 |
|---|

**Contingent, Unliquidated or Disputed Status**

| Contingent |
|---|

Debtor FTX Trading Ltd. has listed your claim on Schedule E/F, Part 2 as an Contingent General Unsecured claim in an Undetermined amount. You must timely file a proof of claim or be forever barred from recovery.

**Provide Information About the Customer Claim as of the Date the Case was Filed (as of November 11, 2022). Please identify the FTX Exchange with respect to where the below cryptocurrency and fiat in Question 7 is held.  If you have accounts at more than one FTX Exchange, please file one proof of claim per FTX Exchange.  Each such Customer Entitlement Claim pursuant to Question 7 below shall be deemed to have been filed as an identical Customer Entitlement Claim in the same amount against all other Debtors. Accordingly, you do not need to file separate proofs of claim against each Debtor for your Customer Entitlement Claim (Question 7).  Please see Question 8 for additional instructions for asserting claims related to Other Activity.**

- ◉ FTX Trading Ltd. (d/b/a "FTX") (Case No. 22-11068)
- ○ FTX EU Ltd. (f/k/a K-DNA Financial Services Ltd. d/b/a "FTX EU") (Case No. 22-11166)
- ○ FTX Japan K.K. (aka "FTX Japan") (Case No. 22-11102)
- ○ Quoine Pte Ltd (d/b/a Liquid Global) (Case No. 22-11161)
- ○ West Realm Shires Services Inc. (d/b/a "FTX US") (Case No. 22-11071)

**List the quantity of each type of cryptocurrency ("Crypto") or fiat currency ("Fiat") held in your account(s) as of November 11, 2022. List any Non-Fungible Tokens ("NFTs") held in your account (s) along with the unique identification code.**

- Note that the "USD Rate" is the ratio of the Local Currency to U.S. Dollars.
- If your Crypto or Fiat were part of the peer-to-peer ("P2P") margin lending program, please populate the Loaned Quantity column.

### Fiat

**ASSERTED QUANTITY FIAT**

**Claim Number: 50116**

Customer Claim Form

| Fiat (Ticker / Abbreviation) | | Total Scheduled Quantity of Fiat (Local Currency) | Total Scheduled Quantity of Fiat (Converted to USD) | Do you agree with the Scheduled Quantity? | If you do not agree, Please provide the Asserted Quantity of Fiat here |
|---|---|---|---|---|---|
| USD | | 34,814,823.148663740 | 34,814,823.15 | ○ No <br> ◉ Yes | |

**Do you want to add any other fiat not previously listed?**

◉ No
○ Yes

## Loaned Fiat

| | | LOANED QUANTITY FIAT | | | |
|---|---|---|---|---|---|
| Fiat (Ticker / Abbreviation) | | Loaned Quantity of Fiat (Local Currency) | Total Loaned Quantity of Fiat (Converted to USD) | Do you agree with the Scheduled Loaned Quantity? | If you do not agree, Please provide the Loaned Quantity of Fiat here |
| USD | | 30,014,921.216380000 | | ◉ No <br> ○ Yes | 0.000000000 |

**Do you want to add any other fiat not previously listed?**

◉ No
○ Yes

## Asserted Crypto

| | Asserted Quantity of Crypto Tokens | | |
|---|---|---|---|
| Crypto (Ticker / Abbreviation) | Scheduled Quantity of Crypto | Do you agree with the Scheduled Quantity? | If you do not agree, Please provide the Asserted Quantity of Crypto here. |
| UNISWAP-PERP | 0.000000000 | ○ No <br> ○ Yes | |
| USDT | 0.0000000076876355 | ○ No <br> ○ Yes | |
| USTC-PERP | 0.000000000 | ○ No <br> ○ Yes | |
| WAVES-PERP | 0.000000000 | ○ No <br> ○ Yes | |
| XEM-PERP | 0.000000000 | ○ No <br> ○ Yes | |
| XLM-PERP | 0.000000000 | ○ No <br> ○ Yes | |
| XRP-PERP | 0.000000000 | ○ No <br> ○ Yes | |

Customer Claim Form

| | | | |
|---|---|---|---|
| XTZ-PERP | -0.000000000001819 | ○ No<br>○ Yes | |
| YFI | 0.00000000514213 | ○ No<br>○ Yes | |
| YFII-PERP | 0.000000000 | ○ No<br>○ Yes | |
| YFI-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ZEC-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ZRX-PERP | 0.000000000 | ○ No<br>○ Yes | |
| 1INCH-PERP | 0.000000000 | ○ No<br>○ Yes | |
| AAVE | 0.00000000003884 | ○ No<br>○ Yes | |
| AAVE-PERP | 0.0000000000000568 | ○ No<br>○ Yes | |
| ADABULL | 0.000000004 | ○ No<br>○ Yes | |
| ADA-PERP | 0.000000000 | ○ No<br>○ Yes | |
| AGLD-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ALGO-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ALICE-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ALPHA-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ANC-PERP | 0.000000000 | ○ No<br>○ Yes | |
| APE-PERP | -0.0000000000009095 | ○ No<br>○ Yes | |
| APT | 0.060800000 | ○ No<br>○ Yes | |
| APT-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ATLAS-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ATOM-PERP | 0.000000000 | ○ No<br>○ Yes | |
| AUDIO-PERP | 0.000000000003638 | ○ No<br>○ Yes | |
| AVAX-PERP | -0.000000000001819 | ○ No<br>○ Yes | |
| AXS-PERP | -0.0000000000009095 | ○ No<br>○ Yes | |
| BAL | 0.000000005 | ○ No<br>○ Yes | |

Customer Claim Form

| | | | |
|---|---|---|---|
| BAL-PERP | 0.000000000 | ○ No<br>○ Yes | |
| BAND-PERP | -0.0000000000002274 | ○ No<br>○ Yes | |
| BCH-PERP | 0.0000000000000426 | ○ No<br>○ Yes | |
| BNB | 0.00601013733353 | ○ No<br>○ Yes | |
| BNB-PERP | -0.0000000000004547 | ○ No<br>○ Yes | |
| BTC | 0.0000000082032046 | ○ No<br>○ Yes | |
| BTC-PERP | 0.0000000000000426 | ○ No<br>○ Yes | |
| BTTPRE-PERP | 0.000000000 | ○ No<br>○ Yes | |
| C98-PERP | 0.000000000 | ○ No<br>○ Yes | |
| CELO-PERP | 0.000000000 | ○ No<br>○ Yes | |
| CHR-PERP | 0.000000000 | ○ No<br>○ Yes | |
| CHZ-PERP | 0.000000000 | ○ No<br>○ Yes | |
| CLV-PERP | -0.000000000003638 | ○ No<br>○ Yes | |
| COMP-PERP | -0.0000000000001137 | ○ No<br>○ Yes | |
| CRO-PERP | 0.000000000 | ○ No<br>○ Yes | |
| CRV-PERP | 0.000000000 | ○ No<br>○ Yes | |
| DASH-PERP | 0.000000000 | ○ No<br>○ Yes | |
| DENT-PERP | 0.000000000 | ○ No<br>○ Yes | |
| DODO-PERP | -0.000000000003638 | ○ No<br>○ Yes | |
| DOGE-PERP | 0.000000000 | ○ No<br>○ Yes | |
| DOT-20210326 | 0.000000000 | ○ No<br>○ Yes | |
| DOT-PERP | 0.000000000 | ○ No<br>○ Yes | |
| DYDX-PERP | -0.0000000000004547 | ○ No<br>○ Yes | |
| EGLD-PERP | 0.000000000 | ○ No<br>○ Yes | |
| ENJ-PERP | 0.000000000 | ○ No<br>○ Yes | |

Customer Claim Form

| | | | |
|---|---|---|---|
| ENS-PERP | 0.0000000000002274 | ○ No ○ Yes | |
| EOS-PERP | 0.0000000000145519 | ○ No ○ Yes | |
| ETC-PERP | -0.0000000000009095 | ○ No ○ Yes | |
| ETH | 0.0000019617634242 | ○ No ○ Yes | |
| ETH-20210625 | 0.000000000 | ○ No ○ Yes | |
| ETH-PERP | -0.0000000000010232 | ○ No ○ Yes | |
| ETHW | 0.0000000098948582 | ○ No ○ Yes | |
| FIDA-PERP | 0.000000000 | ○ No ○ Yes | |
| FIL-PERP | 0.000000000 | ○ No ○ Yes | |
| FLM-PERP | 0.000000000 | ○ No ○ Yes | |
| FLOW-PERP | -0.0000000000004547 | ○ No ○ Yes | |
| FTM-PERP | 0.000000000 | ○ No ○ Yes | |
| FTT | 6,837.543294296502 | ○ No ◉ Yes | |
| FTT-PERP | -0.0000000000040927 | ○ No ○ Yes | |
| GALA-PERP | 0.000000000 | ○ No ○ Yes | |
| GAL-PERP | 0.000000000 | ○ No ○ Yes | |
| GMT-PERP | 0.000000000 | ○ No ○ Yes | |
| GRT-PERP | 0.000000000 | ○ No ○ Yes | |
| HNT-PERP | 0.000000000 | ○ No ○ Yes | |
| ICP-PERP | 0.0000000000007958 | ○ No ○ Yes | |
| ICX-PERP | 0.000000000 | ○ No ○ Yes | |
| IOTA-PERP | 0.000000000 | ○ No ○ Yes | |
| JASMY-PERP | 0.000000000 | ○ No ○ Yes | |
| KAVA-PERP | 0.000000000 | ○ No ○ Yes | |
| KIN-PERP | 0.000000000 | ○ No ○ Yes | |

Customer Claim Form

| | | | |
|---|---|---|---|
| KLUNC-PERP | 0.000000000 | ○ No ○ Yes | |
| KNC-PERP | -0.000000000003638 | ○ No ○ Yes | |
| KSHIB-PERP | 0.000000000 | ○ No ○ Yes | |
| LINA-PERP | 0.000000000 | ○ No ○ Yes | |
| LINK-PERP | -0.000000000007276 | ○ No ○ Yes | |
| LTC-PERP | 0.0000000000000568 | ○ No ○ Yes | |
| LUNA2 | 261.143064300 | ○ No ○ Yes | |
| LUNA2_LOCKED | 609.333816600 | ○ No ○ Yes | |
| LUNC | 0.00000000906609 | ○ No ○ Yes | |
| LUNC-PERP | -0.0000000000945874 | ○ No ○ Yes | |
| MANA-PERP | 0.000000000 | ○ No ○ Yes | |
| MATIC-PERP | 0.000000000 | ○ No ○ Yes | |
| MKR-PERP | 0.000000000 | ○ No ○ Yes | |
| NEAR-PERP | 0.000000000003638 | ○ No ○ Yes | |
| NEO-PERP | 0.000000000 | ○ No ○ Yes | |
| OMG-PERP | 0.000000000 | ○ No ○ Yes | |
| ONT-PERP | 0.000000000 | ○ No ○ Yes | |
| OP-PERP | 0.000000000 | ○ No ○ Yes | |
| OXY-PERP | 0.000000000 | ○ No ○ Yes | |
| QTUM-PERP | 0.000000000 | ○ No ○ Yes | |
| RAY | 0.873970000 | ○ No ○ Yes | |
| RAY-PERP | 0.000000000 | ○ No ○ Yes | |
| REEF-PERP | 0.000000000 | ○ No ○ Yes | |
| REN-PERP | 0.000000000 | ○ No ○ Yes | |
| ROSE-PERP | 0.000000000 | ○ No ○ Yes | |

Customer Claim Form

| | | | |
|---|---|---|---|
| RUNE-PERP | 0.000000000 | ○ No ○ Yes | |
| SAND-PERP | 0.000000000 | ○ No ○ Yes | |
| SC-PERP | 0.000000000 | ○ No ○ Yes | |
| SHIB-PERP | 0.000000000 | ○ No ○ Yes | |
| SKL-PERP | 0.000000000 | ○ No ○ Yes | |
| SLP-PERP | 0.000000000 | ○ No ○ Yes | |
| SNX-PERP | -0.0000000000013642 | ○ No ○ Yes | |
| SOL | 0.0000000293088 | ○ No ○ Yes | |
| SOL-PERP | -0.0000000000088676 | ○ No ○ Yes | |
| SRM | 8.265083950 | ○ No ○ Yes | |
| SRM_LOCKED | 1,886.634442130 | ○ No ○ Yes | |
| SRM-PERP | 0.000000000 | ○ No ○ Yes | |
| STMX-PERP | 0.000000000 | ○ No ○ Yes | |
| STORJ-PERP | 0.000000000 | ○ No ○ Yes | |
| SUSHI | 0.00000000970023 | ○ No ○ Yes | |
| SUSHI-PERP | 0.000000000 | ○ No ○ Yes | |
| SXP-PERP | 0.000000000 | ○ No ○ Yes | |
| THETA-PERP | 0.000000000 | ○ No ○ Yes | |
| TLM-PERP | 0.000000000 | ○ No ○ Yes | |
| TOMO-PERP | -0.000000000001819 | ○ No ○ Yes | |
| TRX | 3,386,386.000000000 | ○ No ● Yes | |
| TRX-PERP | 0.000000000 | ○ No ○ Yes | |
| UNI-PERP | -0.0000000000009095 | ○ No ○ Yes | |

**Do you want to add any coin not previously listed?**

● No
○ Yes

## Loaned Crypto

### Loaned Quantity of Crypto

| Crypto (Ticker / Abbreviation) | Loaned Quantity of Crypto | Do you agree with the Loaned Quantity? | If you do not agree, Please provide the Loaned Quantity of Crypto here. |
|---|---|---|---|
|  |  | ○ No<br>○ Yes |  |

**Do you want to add any coin not previously listed?**

◉ No
○ Yes

## NFTs

### NFTs (non-fungible tokens)

| NFT Identifier | Do you agree with the data in NFT Identifier? | If you do not agree, please provide the NFT quantity here. |
|---|---|---|
|  | ○ No<br>○ Yes |  |

**Do you want to add any NFTs not previously listed?**

◉ No
○ Yes

## Customer Claims related to any Other Activity on the FTX Exchanges

**Do you have Customer Claims related to any Other Activity on the FTX Exchanges? Other Activity would not include quantities of crypto, fiat or NFTs listed in Box 7 above.**

◉ No
○ Yes

## File a Proof of Claim

To file a proof of claim electronically, please enter the creditor's name and an email address (where filing confirmation will be sent) in the fields below.

Creditor Name

Robin Matzke

Email Address

pourcette@gmail.com

## EPOC Agreement

The information requested on the proof of claim form is being collected for the purposes of facilitating a voluntary petition for relief under the Bankruptcy Code and processing any claim you may have against the Debtors.

Customer Claim Form

**YOUR PROOF OF CLAIM FORM <u>MUST NOT CONTAIN</u> ANY OF THE FOLLOWING:** (i) medical records, (ii) complete social security numbers or tax identification numbers, (iii) a complete birth date, (iv) the name of a minor or (v) a financial account number. The information requested on the proof of claim form is being collected for the purposes of facilitating a debtor's voluntary petition for relief under the U.S. Bankruptcy Code and processing any claim you may have against such debtor. When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services to avoid the disclosure of confidential health care information.

**SOME OR ALL OF THE INFORMATION YOU PROVIDE ON THE PROOF OF CLAIM FORM WILL BE PUBLICLY DISPLAYED AND/OR ACCESSIBLE ON THE DEBTOR'S CASE WEBSITE HOSTED BY KROLL RESTRUCTURING ADMINISTRATION (FORMERLY KNOWN AS PRIME CLERK) PURSUANT TO APPLICABLE LAW AND/OR COURT ORDER.** Additionally, such information may be shared with certain third parties affiliated with this matter in furtherance of the bankruptcy case and process. Although you may have certain rights relating to the information provided on the proof of claim form under certain laws, applicable law or court order may prohibit the amendment or erasure of such information once it is submitted, including information displayed and/or accessible at the case website.

**PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM.**

**ALL DOCUMENTS SUBMITTED, INCLUDING ANY MEDICAL RECORDS, WILL BE MADE PUBLICLY AVAILABLE ON THE DEBTOR'S CASE WEBSITE AND/OR THE BANKRUPTCY COURT'S CLAIMS REGISTER.**

The information you provide on the proof of claim form will be retained by or on behalf of the Bankruptcy Court, the debtor and Kroll Restructuring Administration for as long as necessary for the purposes described above, as needed to resolve disputes or protect legal rights as they relate to such claim, or as otherwise required by law. Some or all of the information you provide on the proof of claim form will be displayed and/or accessible on the debtor's case website hosted by Kroll Restructuring Administration pursuant to applicable law and/or court order. Additionally, such information may be shared with certain third parties affiliated with this matter in furtherance of the bankruptcy case and process. Although you may have certain rights relating to the information provided on the proof of claim form under certain laws, applicable law or court order may prohibit the amendment or erasure of such information once it is submitted, including information displayed and/or accessible at the case website.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Kroll Restructuring Administration and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Kroll Restructuring Administration and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Kroll Restructuring Administration or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Kroll Restructuring Administration and the Clerk of the Court are authorized but not obligated, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

<u>Submission of Claim Data</u>

By using this Site and loading any information to the Site, you agree to release us from any claim or liability with respect to the public display of personal or private information, including but not limited to the types of information listed above.

Claims and creditor information ("Claim Data") must be submitted by a human being and not a script, program, or other method that may be construed as a "bot." Claim Data must be submitted by the creditor or someone authorized to submit such Claim Data on behalf of the creditor. Claim Data must be correct to the best of the creditor's/submitter's knowledge. Filing Claim Data on this Site grants no guarantee of payment.

You represent and warrant that Claim Data submitted by you:

• shall be true, accurate, and complete;
• shall not contain any personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) or other sensitive or potentially embarrassing information, including health care information;
• shall not violate the rights of any third party, including, but not limited to, other proprietary and/or intellectual property rights, or rights of publicity or privacy; shall not violate any law; shall not contain any viruses, Trojan horses, worms, time bombs, bots, or other computer programming routines that are intended to damage, interfere with, or expropriate any system or information; and
• shall not create liability for us or interfere with the operation of the Site.

All information, including information relating to your Claim Data, that is filed electronically, including through this Site, is subject to the same conditions and restrictions as paper based proofs of claim filed with a Bankruptcy Court and are subject to court orders, rules, procedures and applicable law relating to the bankruptcy case in which Claims Data are filed.

<u>Not Legal Advice</u>

WE CANNOT PROVIDE ANY LEGAL ADVICE REGARDING CLAIM DATA OR ON ANY OTHER TOPIC. IF YOU REQUIRE ADVICE REGARDING YOUR RIGHTS OR ANY BANKRUPTCY CASE YOU MAY WISH TO SEEK LEGAL COUNSEL FROM A LICENSED ATTORNEY. USERS OF THIS SITE SHOULD NOT TAKE OR REFRAIN FROM TAKING ANY ACTION BASED UPON CONTENT INCLUDED IN THE SITE. KROLL RESTRUCTURING ADMINISTRATION IS NOT IN THE BUSINESS OF PROVIDING PROFESSIONAL OR LEGAL ADVICE AND INFORMATION CONTAINED ON THIS SITE SHOULD NOT BE RELIED ON AS A SUBSTITUTE FOR FINANCIAL, LEGAL OR OTHER PROFESSIONAL ADVICE. ANY RELIANCE ON THE INFORMATION CONTAINED ON THIS SITE IS SOLELY AT YOUR RISK.

<u>Electronic Signatures</u>

When you submit Claim Data or other information to us, you may be asked to electronically "sign" a form that will set forth certain terms and conditions related to such submission. You hereby agree that your electronic signature in respect of any such submission complies with the U.S. federal ESIGN Act of 2000, and accordingly shall have the same legal effect as your original signature.

For our Terms of Use please click [Terms of Use](Terms of Use).

<u>Filing Fraudulent Claims</u>

<u>FILING A FRAUDULENT CLAIM IS PUNISHABLE BY A FINE UP TO $500,000 AND/OR IMPRISONMENT FOR UP TO 5 YEARS (18 U.S.C. 152, 157, AND 3571).</u>

**BY SELECTING "I AGREE", YOU CONSENT TO ALL INFORMATION SUBMITTED BEING PUBLICLY DISPLAYED AND/OR ACCESSIBLE ON THE CASE WEBSITE AND THE BANKRUPTCY COURT'S CLAIMS REGISTER.**

**By selecting I agree below, I confirm that I have read, understand and agree to be bound by the foregoing as well as the Terms of Use.**

◉ I Agree
○ Reject

## Instructions

## Claim Information

**1. Who is the current Creditor?**
Name of the current creditor (the person or entity to be paid for this claim)

Is the current Creditor an Individual?

○ No
◉ Yes

First Name

| Robin |

Middle Name

| |

Last Name

| Matzke |

Other names the creditor used with the debtor (if any)

| |

Do you know the creditor's FTX customer main account number?

◉ No
○ Yes

Do you know the creditor's FTX customer email address that
was used at sign up?

○ No
◉ Yes

FTX customer email address used at account sign up:

pourcette@gmail.com

**2. Has this claim been acquired from someone else?**

◉ No
○ Yes

**3. Where should notices and payments to the creditor be sent?**
[Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)]

Name:

Robin Matzke

Address 1 (Street address, "Care of:", or "Attention To:"):

c/o The Daley Law Firm, attention to Darrell Daley

Address 2:

4845 Pearl E Cir # 101

Address 3:

Address 4:

City:

Boulder

State or Province (use 2-letter abbreviation if US or Canada):

Colorado

Zip Code | Postal Code:

80301

**Is the creditor address outside of the US?**

◉ No
○ Yes

Contact phone:

Contact email:

Should payments go to a different address?

◉ No
○ Yes

**Would you like to add any additional addresses for
receiving notices about this proof of claim?**

◉ No
○ Yes

**4. Does this claim amend one already filed?**

◉ No
○ Yes

**5. Do you know if anyone else has filed a proof of claim for this claim?**

◉ No
○ Yes

## Additional Claim Information

### 6. Did you participate in the FTX Earn program (available via Blockfolio app) as of November 11, 2022?

◉ No
○ Yes

**7. Please refer to the 'Scheduled Claim Information' section above for information on question 7.**

**8.** Do you have Customer Claims related to any Other Activity on the FTX Exchanges? Other Activity would not include quantities of crypto, fiat or NFTs listed in Box 7 above.

◉ No
○ Yes

## E-Sign

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

◉ I am the creditor.
○ I am the creditor's attorney or authorized agent.
○ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
○ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date (Calculated in UTC)

09/10/2023

**Name of the person who is completing and signing this claim:**

First Name/Middle Name/Last Name:

| Robin Matzke |
|---|

E-Signature:

Robin Matzke

I certify that I have completed my Proof of Claim form on the
Kroll Restructuring Administration Portal. I hereby agree that
my electronic signature herein complies with the ESIGN Act,
and accordingly shall have the same legal effect as my original
signature.

☑ I agree

Title/Company:

| |
|---|

Address 1:

| Bergstrasse 23 |
|---|

Address 2:

| |
|---|

City:

| Berlin |
|---|

State or Province (use 2-letter abbreviation if US or Canada):

| Germany |
|---|

Zip Code | Postal Code:

| 10115 |
|---|

Is this address outside of the US?

○ No
◉ Yes

Country (if outside of the US):

| Germany |
|---|

Contact phone:

| |
|---|

Contact email:

| |
|---|

## Attachments

**Attach Support Documentation (limited to a single PDF
attachment that is less than 5 megabytes in size):**

◉ I have supporting documentation
○ I do not have supporting documentation

**Attach a single PDF attachment that is less than 5
megabytes in size**

| 📄  Proof of nonlending as of petition date.pdf | 493 KB |
|---|---|

**File Name**

| Proof of nonlending as of petition date.pdf |
|---|

## Submission Information

When you press "Submit" you will receive an email from "noreply.efiling@ra.kroll.com." Please add this email to your allowed senders list. This email will have a PDF copy of your claim filing (with your supporting documents as a separate attachment), as well as an identification number confirming receipt of your claim ("Confirmation ID").

## Confirmation of Submission

**Your Form has been successfully submitted...**

| DOCUMENT ID | Submitted Date Time |
|---|---|
| 1bbbabfe4effc447e5da485c0b61a61c421620bc | 2023-09-10T14:56:42.698Z |

| Status | CONFIRMATION ID |
|---|---|
| Submitted | 3265-70-HOAJC-590156894 |

DATENSCHUTZ    FAQ    SUPPORT    文A De

Konto-ID4
E-Mail po
Plattform F

**EINSTE**

**ABMEL**

## STEP 1
✓ Authentifizierung des Kontoinhabers einleiten

## STEP 2
✓ Überprüfen der Identität des ursprünglichen FTX-Kontoinhabers ›

## STEP 3
↻ KYC ›

## STEP 4
◉ Kontosalden überprüfen ›

Einsicht in Ihr FTX-Konto - Sie können Ihren Kontostand zum Antragsdatum (sofern nicht anders angegeben) und Ihre bisherigen Aktivitäten einsehen.

## STEP 5
◉ Einreichung eines elektronischen Forderungsnachweises ›

## STEP 6
◉ Bereitschaft für nächste Schritte

# Portfolio 🔒

HAUPTKONTO ▾

‹ rweisungenAirdropsRabatte für EmpfehlungenSaldoanpassungenAndere

FTX App EarnSpot Margin LeihgabenSpot Margin LeihgabenFinanzierung

## Spot Margin Leihgaben ☁

| Zeit ↓ | Währung | Size | Erlöse | Erlöse in USD |
|---|---|---|---|---|
| 3.11.2022, 14:00:00 | BNB | 719,28711100 BNB | 0,00811356 BNB | 2,643544 $ |
| 3.11.2022, 14:00:00 | USD | 5.000.000,00000000 USD | 21,70000000 USD | 21,7 $ |
| 3.11.2022, 13:00:00 | BNB | 719,28711100 BNB | 0,00811356 BNB | 2,669214 $ |
| 3.11.2022, 13:00:00 | USD | 5.000.000,00000000 USD | 22,15000000 USD | 22,15 $ |
| 3.11.2022, 12:00:00 | BNB | 719,28711100 BNB | 0,00812794 BNB | 2,703014 $ |
| 3.11.2022, 12:00:00 | USD | 5.000.000,00000000 USD | 28,55000000 USD | 28,55 $ |
| 3.11.2022, 11:00:00 | BNB | 719,28711100 BNB | 0,00812794 BNB | 2,72577 $ |
| 3.11.2022, 11:00:00 | USD | 5.000.000,00000000 USD | 22,85000000 USD | 22,85 $ |
| 3.11.2022, 10:00:00 | BNB | 719,28711100 BNB | 0,00812794 BNB | 2,719353 $ |
| 3.11.2022 | | 5.000.000,00000000 | 22,85000000 | |

# Exhibit 4

MCJGellP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              22 Cr. 673 (RA)

CAROLINE ELLISON,

                                      Plea
             Defendant.

------------------------------x

                                  New York, N.Y.
                                  December 19, 2022
                                  4:30 p.m.

Before:

                    HON. RONNIE ABRAMS,

                                  District Judge

                      APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
DANIELLE SASSOON
NICOLAS ROOS
    Assistant United States Attorney

ANJAN SAHNI
PETER G. NEIMAN
STEPHANIE AVAKIAN
NICK WERLE
    Attorneys for Defendant

Also Present:

Lea Harmon, Pretrial Services Officer

1    THE COURT:   With respect to Count Three, conspiracy to

2  commit wire fraud on lenders, how do you plead?

3    THE DEFENDANT:   Guilty.

4    THE COURT:   With respect to Count Four, wire fraud on

5  lenders, how do you plead?

6    THE DEFENDANT:   Guilty.

7    THE COURT:   With respect to Count Five, conspiracy to

8  commit commodities fraud, how do you plead?

9    THE DEFENDANT:   Guilty.

10    THE COURT:   With respect to Count Six, conspiracy to

11  commit securities fraud, how do you plead?

12    THE DEFENDANT:   Guilty.

13    THE COURT:   With respect to Count Seven, conspiracy to

14  commit money laudering, how do you plead?

15    THE DEFENDANT:   Guilty.

16    THE COURT:   Now, tell me in your own words what you

17  did that makes you believe that you are guilty of these crimes.

18    THE DEFENDANT:   Yeah, so from approximately March 2018

19  through November 2022 --

20    THE COURT:   I'm going to ask you to speak very slowly,

21  please.  Thank you.

22    THE DEFENDANT:   From approximately March 2018 through

23  November 2022, I worked at Alameda Research, a cryptocurrency

24  trading firm principally owned by Sam Bankman-Fried.  At

25  Alameda Research, I first worked as a cryptocurrency trader and

MCJGellP

1    was later appointed by Mr. Bankman-Fried as the co-CEO and

2    eventually CEO of Alameda Research Ltd., the subsidiary that

3    housed the firm's main trading and market making operations.

4    In those roles, I reported to Mr. Bankman-Fried.

5            From 2019 through 2022, I was aware that Alameda was

6    provided access to a borrowing facility on FTX.com, the

7    cryptocurrency exchange run by Mr. Bankman-Fried.  I understood

8    that FTX executives had implemented special settings on

9    Alameda's FTX.com account that permitted Alameda to maintain

10   negative balances in various fiat currencies and crypto

11   currencies.  In practical terms, this arrangement permitted

12   Alameda access to an unlimited line of credit without being

13   required to post collateral, without having to pay interest on

14   negative balances and without being subject to margin calls or

15   FTX.com's liquidation protocols.  I understood that if

16   Alameda's FTX accounts had significant negative balances in any

17   particular currency, it meant that Alameda was borrowing funds

18   that FTX's customers had deposited onto the exchange.

19           While I was co-CEO and then CEO, I understood that

20   Alameda had made numerous large illiquid venture investments

21   and had lent money to Mr. Bankman-Fried and other FTX

22   executives.  I also understood that Alameda had financed these

23   investments with short-term and open-term loans worth several

24   billion dollars from external lenders in the cryptocurrency

25   industry.  When many of those loans were recalled by Alameda's

A000929

MCJGellP

1  |  lenders in and around June 2022, I agreed with others to borrow

2  |  several billion dollars from FTX to repay those loans.  I

3  |  understood that FTX would need to use customer funds to finance

4  |  its loans to Alameda.  I also understood that many FTX

5  |  customers invested in crypto derivatives and that most FTX

6  |  customers did not expect that FTX would lend out their digital

7  |  asset holdings and fiat currency deposits to Alameda in this

8  |  fashion.

9  |          From in and around July 2022 through at least

10 |  October 2022, I agreed with Mr. Bankman-Fried and others to

11 |  provide materially misleading financial statements to Alameda's

12 |  lenders.  In furtherance of this agreement, for example, we

13 |  prepared certain quarterly balance sheets that concealed the

14 |  extent of Alameda's borrowing and the billions of dollars in

15 |  loans that Alameda had made to FTX executives and to related

16 |  parties.  I also understood that FTX had not disclosed to FTX's

17 |  equity investors that Alameda could borrow a potentially

18 |  unlimited amount from FTX, thereby putting customer assets at

19 |  risk.  I agreed with Mr. Bankman-Fried and others not to

20 |  publicly disclose the true nature of the relationship between

21 |  Alameda and FTX, including Alameda's credit arrangement.

22 |          I also understood that Mr. Bankman-Fried and others

23 |  funded certain investments in amounts more than $10,000 with

24 |  customer funds that FTX had lent to Alameda.  The investments

25 |  were done in the name of Alameda instead of FTX in order to

A000930

MCJGellP

1   conceal the source and nature of those funds.

2           I am truly sorry for what I did.  I knew that it was

3   wrong.  And I want to apologize for my actions to the affected

4   customers of FTX, lenders to Alameda and investors in FTX.

5   Since FTX and Alameda collapsed in November 2022, I have worked

6   hard to assist with the recovery of assets for the benefit of

7   customers and to cooperate with the government's investigation.

8   I am here today to accept responsibility for my actions by

9   pleading guilty.

10          THE COURT:    You mentioned that you knew that what you

11  were doing was wrong.  Did you also know that it was illegal?

12          THE DEFENDANT:    Yes.

13          THE COURT:    Does the government want to make a proffer

14  with respect to venue?

15          MS. SASSOON:    Yes.

16          With respect to venue and wires, your Honor, if the

17  case proceeded to trial, the government would prove that

18  certain acts in furtherance of each of the counts took place in

19  the Southern District of New York, including communications

20  with investors who were in New York, Tweets that were viewed by

21  customers and investors who were in the Southern District of

22  New York.  Among other things, that FTX had an office in the

23  Southern District of New York.  And in addition to that, that

24  the defendant has agreed to waive venue with respect to the

25  charges.

A000931

# Exhibit 5

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6              Defendant.                Trial
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       October 10, 2023
                                         9:30 a.m.
 9

10   Before:

11
                         HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                            APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
```

1    A.  He was still the CEO.

2    Q.  Was Alameda a customer on the FTX exchange?

3    A.  Yes, we were.  Initially we were the largest trader on the

4    FTX exchange.  Our market share decreased gradually over time.

5    Q.  As a customer on the exchange, what types of things did

6    Alameda do on FTX?

7    A.  We did trading; we provided on all of the markets on FTX

8    and did our normal sort of arbitrage-type trading there.

9    Q.  Did Alameda buy Bitcoin on FTX?

10   A.  Yes, we bought Bitcoin.

11   Q.  Did that include purchases of spot Bitcoin?

12   A.  Yes.

13   Q.  And what about Bitcoin futures?

14   A.  Yeah, Bitcoin futures too.

15   Q.  How would you describe the relationship between FTX and

16   Alameda when FTX was created?

17   A.  Initially they were very integrated, they were both run by

18   the same teams; eventually they became more separate over time,

19   though still remained fairly integrated.

20   Q.  If Alameda made money on FTX, who was the beneficiary of

21   those profits?

22   A.  Sam, because he owned Alameda.

23   Q.  When you started working at Alameda, where did the company

24   get its money from to buy cryptocurrency and to trade?

25   A.  Initially we were funded primarily by loans from—from

1   acquaintances and friends of friends.

2   Q.  And you touched on this, but what happened to some of the

3   loans that Alameda had after you started working there?

4   A.  The majority of them were recalled, like a few weeks after

5   I started working there.

6   Q.  Can you explain what you mean by "recalled."

7   A.  What I mean is that the lenders asked for their money back.

8   Q.  And these lenders were these third-party lenders?

9   A.  Yes.

10  Q.  What's a third-party lender?

11  A.  A lender who's separate from us, so not FTX or Alameda.

12  Q.  So after a number of these loans were recalled, how would

13  you describe Alameda's ability to borrow from third parties

14  when you were working there as a trader?

15  A.  It was initially not very good.  This was something Sam

16  talked about a lot as a big priority for the company, figuring

17  out ways to get more loans.

18  Q.  You said it was a big priority for the defendant to get

19  more loans.  What did he describe about why he wanted to borrow

20  more money for Alameda?

21  A.  In order to do more trades or just have the ability to do

22  whatever valuable things came up.

23  Q.  When you say "valuable things," what kinds of things are

24  you talking about?

25  A.  Things like investments or acquisitions.

1    Q.  And what kinds of things would the defendant say to you

2    about trying to borrow money?

3    A.  He said that we should be——

4            MR. COHEN:  Your Honor, might we have a time frame.

5    Q.  While you were working as a trader at Alameda.

6    A.  Yeah, he said that we should be trying really hard to find

7    new sources of money.

8    Q.  Were there times that Alameda did not have enough money to

9    do all the things that the defendant wanted to do in terms of

10   spending and trading?

11   A.  Yes, definitely.

12   Q.  Did there come a time while you were working at Alameda

13   that Alameda began using money that belonged to FTX customers

14   as a source of capital?

15           MR. COHEN:  Objection, leading.

16           THE COURT:  Sustained.  Form.

17   Q.  You said the defendant wanted to be borrowing from various

18   sources.  While you worked as a trader, what was one of the

19   sources that Alameda began using?

20   A.  When we began borrowing from third-party crypto lenders as

21   well as borrowing customer funds that were deposited on FTX.

22   Q.  What was the defendant's involvement in using FTX customer

23   money as a source of funds for Alameda in FTX's early days?

24           MR. COHEN:  Same objection.

25           THE COURT:  Overruled.

NAB1BAN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          22 CR 673 (LAK)

5    SAMUEL BANKMAN-FRIED,

6                Defendant.               Trial
     ------------------------------x
7
                                         New York, N.Y.
8                                        October 11, 2023
                                         9:35 a.m.
9

10   Before:

11
                         HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                            APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist

NAB1BAN1                    Ellison - Direct

1    working with us on this.  Unsurprisingly have been getting

2    loans called from everyone across the board but obviously want

3    to help you guys out assuming we can get all our other

4    obligations squared away."

5    Q.  And when you said "have been getting loans called from

6    everyone across the board," what are you referring to?

7    A.  I'm referring to our open-term loans with other lenders.

8    Q.  And what was happening with those?

9    A.  They were getting called in addition to the Genesis loans.

10             MS. SASSOON:  We can take that down.

11   Q.  What was your reaction to third-party lenders all asking

12   for their money back around the same time in mid-June?

13   A.  I was very stressed out, and we were talking about billions

14   of dollars, and I knew that Alameda had lost a lot of money in

15   the cryptocurrency market downturn and we didn't have the

16   liquid assets to pay all of the money back and that we would

17   have to be taking money from FTX.

18   Q.  When you say "we would have to be taking money from FTX,"

19   what do you mean?

20   A.  I mean in order to repay all of our loans, we would have to

21   borrow money using our FTX line of credit.

22   Q.  And whose funds would that be?

23   A.  That would be coming from customer funds.

24   Q.  During this time did you attempt to calculate whether

25   Alameda had the ability to repay its lenders with the money

1    that Alameda had?

2    A.   Yeah, I did.  I was regularly making updated balance sheets

3    in similar calculations.

4    Q.   And what did your calculations show about whether Alameda

5    could repay its lenders?

6    A.   They showed that we did not have enough liquid assets to

7    repay all of our lenders.

8    Q.   And why didn't Alameda have enough liquid assets to repay

9    its lenders?

10   A.   Because we had used a lot of them for loans and

11   investments, and a lot of our assets had gone down in value

12   with the cryptocurrency market downturn.

13   Q.   When you say you had used some of it for loans, I just want

14   to clarify, what loans are you talking about?

15   A.   I'm talking about loans to—to Sam, Gary, Nishad, and other

16   entities owned by Sam.

17   Q.   How would you describe your mental state when you realized

18   that Alameda had billions of dollars to repay and it didn't

19   have the money?

20             MR. COHEN:  Objection.

21             MS. SASSOON:  Your Honor, her mental state is

22   relevant.

23             THE COURT:  Why isn't it, Mr. Cohen?

24             MR. COHEN:  I thought we were talking about the mental

25   state of the defendant in this case, your Honor.

1              THE COURT:  Well, we are, of course.

2              MS. SASSOON:  Your Honor, there are charges of

3    conspiring with others.

4              THE COURT:  Do you have an answer to that, Mr. Cohen?

5              MR. COHEN:  Your Honor, other than my prior objection,

6    I have nothing further on that.

7              THE COURT:  Overruled.

8    BY MS. SASSOON:

9    Q.  Ms. Ellison, I'll ask you again:  What was your mental

10   state when you realized that Alameda had billions of dollars in

11   loans to repay and that it didn't have the money?

12   A.  I was in sort of a constant state of dread at that point.

13   I—I knew that we would have to take the money from our FTX

14   line of credit and I knew that that was money that could be

15   called at any time, and every day, I mean, I was worrying about

16   the possibility of customer withdrawals from FTX and the

17   possibility of this getting out and what would happen to people

18   that would be hurt by that.

19   Q.  When you say you would have to take money from the line of

20   credit and that could be called at any time, can you just

21   explain what you meant by that, "called at any time."

22   A.  What I mean that, when we were taking money from this FTX

23   line of credit, this was coming from FTX customers, and FTX

24   customers had the ability to withdraw their money at any time,

25   so I knew that if a large number of customers decided to

1   withdraw their funds all at once, that FTX wouldn't have enough

2   money to cover that.

3   Q.  At this time did you share information with the defendant

4   that showed that Alameda did not have the money to repay its

5   lenders?

6            MR. COHEN:  Objection.

7            THE COURT:  Sustained.  Form.

8   Q.  You just described calculating Alameda's balances, which I

9   believe you testified showed Alameda did not have money to

10  repay its lenders.

11  A.  Yes.

12  Q.  Were you sharing this information about Alameda's balances

13  with the defendant?

14  A.  Yes, I was.

15  Q.  What did you share with him?

16  A.  I shared updated balance sheets whenever he asked for them

17  and information about things like Alameda's account balances on

18  FTX, which he asked for.

19  Q.  So was he asking for this information?

20  A.  Yes.

21  Q.  And why were the two of you sharing this type of

22  information around mid-June?

23  A.  Because, I mean, he was my boss; he was the owner of

24  Alameda.  This was a time of crisis for Alameda; this was an

25  extremely big problem for us; it was an important thing for us

1  relations, what image of himself was the defendant cultivating?

2  A.  He was trying to cultivate an image of himself as sort of a

3  very smart, competent, somewhat eccentric founder.

4  Q.  Were you cultivating a personal image of yourself?

5  A.  Not to the same extent.  For a while I mostly tried——stayed

6  off Twitter and tried to avoid all media.  Eventually I did get

7  a Twitter once Sam Trabucco started stepping back more from the

8  company.  And Sam said he thought it was necessary for someone

9  from Alameda to be on Twitter.

10  Q.  Based on your conversations with the defendant about public

11  relations, what image was he cultivating about FTX?

12           MR. COHEN:  Objection, relevance.

13           MS. SASSOON:  Your Honor, this goes to

14  misrepresentations that were made to the public.

15           THE COURT:  Sustained.

16  Q.  What, if anything, did the defendant tell you about how he

17  was trying to portray FTX publicly?

18           MR. COHEN:  Same objection.

19           THE COURT:  Overruled.

20  A.  He said that he wanted FTX to have the image of being a,

21  you know, exciting, innovative place to trade on, similar to

22  offshore exchanges, but also being safe, reliable, audited, and

23  highly regulated, like other US exchanges.

24  Q.  You mentioned Twitter.  What, if anything, did the

25  defendant say about his use of Twitter?

1  the terms of the cooperation agreement.

2          MS. SASSOON:  And if we could go back to the first

3  page.

4  Q.  Under this agreement you pleaded guilty to wire fraud and

5  wire fraud conspiracy on customers of FTX, as well as

6  commodities fraud conspiracy.  Does that relate to what you've

7  described in your testimony about Alameda using FTX customer

8  money?

9  A.  Yes, it does.

10 Q.  And under this agreement you pleaded guilty to wire fraud

11 and wire fraud conspiracy against Alameda's lenders.  What does

12 that relate to?

13 A.  That relates to what I testified about regarding the false

14 balance sheets that we provided to lenders.

15 Q.  And when you say "we," who do you mean?

16 A.  Sam and me.

17 Q.  You also pleaded guilty to securities fraud conspiracy.

18 What does that relate to?

19 A.  That relates to the investors in FTX.

20 Q.  And in what ways did you participate in a conspiracy to

21 defraud the investors in FTX?

22 A.  I was aware that FTX was not disclosing Alameda's borrowing

23 and line of credit to FTX investors, and I made false

24 statements on, you know, Twitter and in this Bloomberg article

25 that I knew FTX investors were one of the audiences of those

1  statements.

2  Q.  Were you directly involved in communicating directly with

3  FTX's equity investors in 2021?

4  A.  No.

5  Q.  You testified some time ago about an FTX audit.  Were you

6  aware of any other information that was being concealed from

7  FTX's auditors besides customer balances?

8           MR. COHEN:  Objection, leading.

9           THE COURT:  Rephrase.

10  Q.  What, if anything, did you learn about information that was

11  concealed from FTX's auditors?

12  A.  I learned that FTX had loaned money that it had raised from

13  investors totaling $1.6 billion to Alameda and that that had

14  been concealed from FTX's auditors.

15  Q.  Did you discuss with the defendant that $1.6 billion of FTX

16  investor money had been transferred to Alameda?

17  A.  Yes, I did.

18  Q.  And in what forum was that discussed?

19  A.  We discussed it over Signal and in in-person conversations.

20  Q.  And what, if anything, were you told about why $1.6 billion

21  of FTX investor money had been transferred to Alameda?

22  A.  That it would be useful for Alameda's trading.

23  Q.  And what, if anything, did you learn about how this

24  $1.6 billion of FTX investor money transferred to Alameda, how

25  it was accounted for in FTX's records?

1  A.  So there was money that was transferred from FTX's bank

2  accounts to Alameda's bank accounts, and then to offset that,

3  there were negative ledger entries in Alameda's main account on

4  FTX, but then there were also, offsetting to that, positive

5  ledger entries in a subaccount that Alameda had on FTX.

6  Q.  And what did you understand was the purpose of these

7  offsetting entries?

8  A.  I was told that it was for FTX auditing purposes.

9           THE COURT:  Where did you get this information from?

10          THE WITNESS:  I believe it was Nishad Singh who told

11  me this, your Honor.

12  Q.  And was this——

13          MR. COHEN:  Objection.

14          THE COURT:  Ground?

15          MR. COHEN:  Speculation.

16          MS. SASSOON:  Your Honor——

17          THE COURT:  What's the speculation?

18          MR. COHEN:  I think she just said she believes, she

19  didn't know.

20          MS. SASSOON:  Your Honor, this is admissible under

21  801(d)(2)(E).

22          THE COURT:  I believe this is Wednesday.

23          MR. COHEN:  I didn't hear your Honor.

24          THE COURT:  I believe this is Wednesday.  That's not

25  speculation.

1        MR. COHEN:  Okay.  All right.

2        THE COURT:  Overruled.

3        MR. COHEN:  Your Honor, withdrawn.

4        THE WITNESS:  Yes, sorry.  I recall that it was Nishad

5   Singh who told me.  I'm sorry if I misspoke.

6   BY MS. SASSOON:

7   Q.  And when you were looking into the accounting for this FTX

8   investor money, did you discuss that with the defendant?

9   A.  Yes, I did.

10  Q.  Were you aware of any FTX losses that—

11       THE COURT:  I'm sorry.  You discussed it with the

12  defendant.  What did he say?

13       THE WITNESS:  We discussed—it was a discussion where

14  we were trying to reconcile Alameda's and FTX's records.  Sam

15  was present as well as me and people from FTX, and we all went

16  over our versions of what had happened and eventually agreed

17  on—that we all were on the same page about what had happened.

18       THE COURT:  Thank you.

19  BY MS. SASSOON:

20  Q.  And did Alameda ultimately repay to FTX the FTX investor

21  money that had been transferred to Alameda?

22  A.  We repaid some of it but not all.

23  Q.  What, if any, other information were you aware of that was

24  concealed from FTX investors?

25  A.  I was aware that in 2021, FTX suffered a large loss—around

# Exhibit 6

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          22 CR 673 (LAK)

5  SAMUEL BANKMAN-FRIED,

6              Defendant.              Trial
   ------------------------------x
7
                                       New York, N.Y.
8                                      October 16, 2023
                                       9:40 a.m.
9

10 Before:

11
                       HON. LEWIS A. KAPLAN,
12
                                       District Judge
13
                            APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  DANIELLE R. SASSOON
        NICOLAS ROOS
17      DANIELLE KUDLA
        SAMUEL RAYMOND
18      THANE REHN
        Assistant United States Attorneys
19
   COHEN & GRESSER, LLP
20      Attorneys for Defendant
   BY:  MARK S. COHEN
21      CHRISTIAN R. EVERDELL
        SRI K. KUEHNLENZ
22      DAVID F. LISNER

23 Also Present:
   Luke Booth, FBI
24 Kristin Allain, FBI
   Arjun Ahuja, USAO Paralegal Specialist
25 Grant Bianco, USAO Paralegal Specialist

1    came, we saw, we researched."  It laid out a case for shutting

2    down Alameda, citing that Sam didn't have faith in its—the

3    competency of its leadership without him more involved, and

4    that the PR cost with both FTX and Alameda coexisting was high.

5    Q.   What type of document was this, just to be clear?

6    A.   A Google Doc.

7    Q.   Did it have a title?

8    A.   "We came, we saw, we researched."

9    Q.   Did you read the Google Doc about shutting down Alameda?

10   A.   I read most but not all of it.

11   Q.   After reading the document what, if any, proposals did you

12   make with respect to Alameda?

13   A.   It occurred to me that the cost, the cost that Sam cited

14   was Alameda and FTX coexisting; really the cost is Alameda

15   existing on FTX, and so I proposed shutting down Alameda on FTX

16   as opposed to shutting down Alameda entirely.

17   Q.   What would be required to shut down Alameda on FTX?

18   A.   I remember I listed out what I believed the requirements

19   would be in the chat.  We'd have to close a bunch of illiquid

20   markets that Alameda was primarily market making on.  They were

21   not a significant market maker overall, but there were some

22   markets where nobody else bothered to trade.  We'd have to

23   revamp how the OTC system worked—over-the-counter trading.

24   Alameda was sort of plugged in as the only provider for those

25   trades, but that could have been—that could have been, you

1  know, given to a pool of market makers.  We'd have to have

2  Alameda close out all of its accounts, return everything that

3  it was negative in, like that main account that was negative

4  2.8 billion, withdraw everything that it was positive in.

5  Maybe a few other things.  But those are some big ones.

6  Q.  So let me ask you a few questions about closing out Alameda

7  on FTX.

8         For starters, by this time, September 2022, to what

9  extent was Alameda's presence on FTX necessary for market

10  making?

11  A.  Not very.

12  Q.  What do you mean by that?

13  A.  There was a time when Alameda was in some 20, 30 percent of

14  trades.  By 2022, or at least by a point in 2022, Alameda was

15  only a party to like some 2 percent of trades or thereabouts.

16  Alameda was not nearly as significant a player as it used to be

17  on the platform.  The ways in which it was involved that still

18  provided value to the exchange were replaceable for——or not so

19  important that it was necessary.

20  Q.  And by 2022, did Alameda need the "Allow Negative" feature

21  to do market making?

22  A.  I don't know all the details of how it did its market

23  making, and it's possible that it like availed of "Allow

24  Negative" in some way, but fundamentally, no, I don't think

25  that to perform the duties that were more important of it, it

1  needed all the things that "Allow Negative" granted.

2  Q.  By 2022, was Alameda needed for stablecoin conversion?

3  A.  They were never needed for it.  My belief is that they were

4  doing it out of convenience in the beginning.  Certainly once

5  FTX had grown, it had enough staff, those staff could just

6  manage the stablecoin creations and redemptions.

7  Q.  You mentioned that Alameda would need to close out its

8  accounts.  What did you mean by that?

9  A.  Alameda had many accounts on FTX.  Like we'd seen with that

10  other spreadsheet, some of them were big positive numbers, some

11  of them big negative numbers.  Each of those has underlying

12  numbers for, you know, balances of specific coins.  Closing out

13  means making every one of those numbers zero, by depositing any

14  amounts that are negative and withdrawing any amounts that are

15  positive.

16  Q.  So after you proposed shutting down Alameda on FTX, what,

17  if anything, did the defendant say?

18  A.  I first proposed it inside the chat with myself, Gary, and

19  him, and asked if I could share it with Caroline to talk about

20  its viability.  Sam said "not crazy."  His way of—

21          THE COURT:  He said what?

22          THE WITNESS:  "Not crazy."  He used "not crazy" to

23  greenlight a proposal without fully endorsing it.

24  Q.  Did you ask Caroline Ellison about the viability of

25  shutting down Alameda trading on FTX?

1    A.  I did.  I sent a message inside the hashtag organization

2    Signal group, which had me, Gary, Caroline, and Sam.  I said:

3    *The PR costs of having Alameda on FTX seem really steep.  I'm*

4    *thinking about if it's possible to have Alameda shut down on*

5    *FTX.  Here are some six things I think that would take.*

6    Q.  You mentioned PR costs.  What were you referring to?

7    A.  Public relations cost, that there was a lot of worry and

8    fear in the crypto ecosystem about conflicts of interest

9    between Alameda and FTX.

10   Q.  So how did Caroline Ellison respond to your message?

11   A.  She said——and I believe verbatim——"That's impossible."

12   Q.  How did you respond to that?

13   A.  I said:  *Which part of it?*  I was pretty alarmed.  And I

14   was hoping it wasn't the part about closing out accounts.

15   Q.  What did she say?

16   A.  That it was the part about closing out accounts.

17   Q.  Just to be clear, who was on this hashtag organization

18   Signal chat?

19   A.  Me, Gary, Sam, Caroline.

20   Q.  What, if anything, did Gary Wang say in the conversation at

21   this point?

22   A.  At this point Gary said Alameda is borrowing 13 billion

23   from FTX.

24   Q.  What did you say in response to that?

25   A.  I was really hoping that I misunderstood, and I called for

1  a meeting immediately.

2  Q.  What was your reaction about hearing Alameda owed

3  $13 billion?

4  A.  I was really afraid.

5  Q.  What do you mean?

6  A.  The June exercise, I thought Alameda had positive balances

7  on FTX, that it was borrowing lots in some places but that

8  overall they had more money than they didn't.  This suggested

9  an entirely different reality.  I was hoping that I didn't

10  really understand what Gary meant by borrowing, but if I did,

11  this was absolutely devastating.

12  Q.  And how, if at all, did Alameda's borrowing $13 billion

13  from FTX affect FTX customer funds?

14  A.  The borrowing had to have been from customer funds in large

15  part because FTX itself didn't have—like, didn't own that much

16  money.

17  Q.  How, if at all, did the defendant react when Caroline

18  Ellison said Alameda has—I'm sorry—when Gary Wang said

19  Alameda was borrowing 13 billion from FTX?

20  A.  I was sitting next to Sam at the time.  We were in the

21  office.  So I got some real sense.  He seemed unsurprised and

22  made up what I understood to be a false excuse for dodging the

23  meeting.

24  Q.  So you mentioned the meeting.  Did you in fact meet?

25  A.  Yes.

1  Q.  Okay.  And then who did you meet with?

2  A.  Just Gary and Caroline because Sam didn't come.

3  Q.  What was your belief at this point as to whether Alameda

4  could repay the $13 billion it owed?

5  A.  Before the meeting I was really hoping that I misunderstood

6  what had been said and that Alameda could in fact close out and

7  repay what it owned.  After the meeting I was significantly

8  less hopeful.

9  Q.  Now did there come a time when you spoke to the defendant

10  about this topic?

11  A.  That evening.

12  Q.  And where did you speak with the defendant?

13  A.  On the balcony of the Orchid 6 penthouse where we lived.

14  Q.  Why did you meet on the balcony?

15  A.  Sam and I almost never met; very, very rarely.  I knew this

16  needed to be really private.  I figured that if we went to our

17  two most common spaces to talk, which were my room or in the

18  office, that both of those were very frequently used by other

19  people for meetings and that others could stumble in on us, and

20  I knew that there was something really serious going on and I

21  didn't want people stumbling in.

22  Q.  What time of day was this?

23  A.  Evening into night.

24          MR. ROOS:  Could we please publish Government

25  Exhibit 1554, which is in evidence.

1  Q.  Mr. Singh, what's this?

2  A.  This is the balcony that we met on.

3  Q.  Where were you located on this balcony when you spoke with

4  the defendant?

5  A.  I was pacing behind where these baskets on the left are.

6  Sam was reclined on one of the white like chaise chairs behind

7  that.

8  Q.  How long was your conversation with the defendant on the

9  balcony?

10  A.  Hour, hour and a half.

11  Q.  Let me ask you a few questions about the conversation.

12       First, how did the conversation begin?

13  A.  I said:  *Caroline's really freaked out about the NAV*

14  *situation and so am I.*  NAV, by the way, means net asset value,

15  which was—I wasn't very fluent in financial terms.  This was

16  my crude way of referring to the hole.

17  Q.  What do you mean by the hole?

18  A.  The fact that Caroline had suggested that Alameda couldn't

19  return its borrows, that meant that there was, in my lingo, a

20  hole, a deficit of customer funds.

21  Q.  What, if anything, did the defendant say in response to

22  your initial comment that you and Caroline Ellison were

23  freaking out?

24  A.  He said:  *I'm not sure what there is to worry about.  NAV*

25  *is fantastic by almost any measure.  It was super positive even*

1   *if you don't include FTX and FTX.US equity.*

2   Q.   Did you speak to the defendant directly about the hole?

3   A.   Yes.

4   Q.   And what did you discuss?

5   A.   I said next:  *Well, what about what Caroline said today and*

6   *Gary said today, that there's 13 billion borrowed and we can't*

7   *pay it all?*  Sam said:  *Right, that.  We are a little short on*

8   *deliverable.*

9   Q.   What do you mean by deliverable?

10  A.   Assets that can be delivered to customers as opposed to

11  illiquid assets.

12  Q.   Did he say by how much FTX was short on deliverable assets?

13  A.   I asked:  *How much is it short by?*  Sam said:  *That is the*

14  *wrong question to be asking.  The right question is how much*

15  *can we deliver, and in 24 hours, if pressed, I think we could*

16  *deliver around $5 billion; given some more weeks, substantially*

17  *more; given some more weeks after that, substantially more.*

18  Q.   Now what, if anything, did the defendant say about how this

19  had been affecting him over the prior year?

20  A.   He did describe it.  I said something like "Jesus F'ing

21  Christ."  Sam said:  *Yeah, this has been taxing me some 5 to*

22  *10 percent of my productivity for*—and he either said for this

23  year or like for this calendar year or since before the last

24  year.  I said:  *I think this is going to be doing a lot more*

25  *damage to me, hitting me a lot harder.*  Sam said:  *Yeah, I was*

1   *worried about this.  In hindsight, it might have been a mistake*

2   *for me to circulate that document this morning.  People are*

3   *thus going to freak out.*  I said:  *I understand it's not*

4   *productive to respond emotionally.*

5   Q.  What, if anything, did you discuss about a plan for

6   addressing Alameda's negative balance?

7   A.  I asked what the hell the plan was, what are we going to

8   do.  Sam said he's not too worried and he described a number of

9   sort of strategies that we could pursue in parallel going

10  forward.

11  Q.  What kind of strategies did he describe?

12  A.  He described selling off Alameda's illiquid but, according

13  to his estimation, valuable assets, and properties; he

14  described, for the ones that weren't sellable but generated

15  revenue, making sort of low-hanging changes to make them more

16  profitable; he discussed raising from investors, selling FTX

17  equity; and he discussed making FTX——oh, he said that FTX.US

18  futures, which we believed would come online, you know, any day

19  now, would be a boon to the company, and would be great for

20  revenue and for its valuation, and that there were many

21  engineering projects that were crucial and were themselves very

22  valuable.

23  Q.  Did you have any discussions about expenses?

24  A.  Yes.

25  Q.  What did you discuss?

# Exhibit 7

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                        22 CR 673 (LAK)

5  SAMUEL BANKMAN-FRIED,

6              Defendant.             Trial
   ------------------------------x
7
                                      New York, N.Y.
8                                     October 19, 2023
                                      9:32 a.m.
9

10 Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                      District Judge
13
                            APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  DANIELLE R. SASSOON
        NICOLAS ROOS
17      DANIELLE KUDLA
        SAMUEL RAYMOND
18      THANE REHN
        Assistant United States Attorneys
19
   COHEN & GRESSER, LLP
20      Attorneys for Defendant
   BY:  MARK S. COHEN
21      CHRISTIAN R. EVERDELL
        SRI K. KUEHNLENZ
22      DAVID F. LISNER

23 Also Present:
   Luke Booth, FBI
24 Kristin Allain, FBI
   Arjun Ahuja, USAO Paralegal Specialist
25 Grant Bianco, USAO Paralegal Specialist
   Anthony Imperato, USAO Paralegal Specialist

1     MR. COHEN:  Objection.

2     THE COURT:  Couldn't hear the answer.

3  A.  No.

4     THE COURT:  Overruled, Mr. Cohen.

5  Q.  During this discussion, what, if any, of his own

6  justifications did the defendant provide?

7  A.  I do not recall any.

8  Q.  That same day did you have any conversations with Nishad

9  Singh?

10 A.  Yes.

11 Q.  What do you recall about that?

12 A.  It was later that evening, around 11 p.m., Nishad pulled me

13 aside, and we went for a quick walk around the building as

14 well.  Nishad basically asked me about his personal exposure,

15 about the loans he had taken from FTX, about the bonuses that

16 he had received.  The one thing he had mentioned as well is

17 that the no-liquidation mechanism that Alameda had is also the

18 same mechanism by which Alameda was able to withdraw customer

19 assets from the exchange.

20 Q.  Had you known that before this conversation with Nishad?

21 A.  No, I did not.

22 Q.  What, if anything, did Nishad tell you about his prior

23 conversations with the defendant?

24 A.  Yes.  He said that he found out about the hole, basically

25 that Alameda was taking FTX customer assets in late summer of

1   '22, so August or September of 2022.  He said that he talked

2   to -- he confronted Sam directly about it, and Sam told him

3   back then that it is what it is and there is nothing we can do

4   about it.  The only thing we can do is to grow the company and

5   fill in the hole.

6   Q.  When did you leave FTX?

7   A.  The next day.

8   Q.  Under what circumstances?

9   A.  I resigned.

10          MS. SASSOON:  At this time the government offers

11  Government Exhibit 923B, which the parties have stipulated is

12  an excerpt from a Good Morning America interview with Sam

13  Bankman-Fried, dated December 1, 2022.

14          THE COURT:  Received.

15          (Government Exhibit 923B received in evidence)

16          MS. SASSOON:  Mr. Imperato, if you can please play

17  this interview excerpt from December 1, 2022 for the jury.

18          (Video played)

19  Q.  Mr. Sun, the demeanor of the defendant that you observed on

20  this video, how does that compare to your interactions with

21  him?

22          MR. COHEN:  Objection.

23          THE COURT:  Sustained.

24  Q.  How would you generally describe the defendant's demeanor

25  during your interactions with him?

 1              MR. COHEN:  Same objection.

 2              THE COURT:  Overruled.

 3   A.  Very confident.

 4   Q.  And on this video did you hear the defendant mention a

 5   borrow-lend facility on FTX?

 6   A.  Yes.

 7   Q.  And was the borrow-lend facility one of the potential

 8   justifications you had discussed --

 9              MR. COHEN:  Objection.  Leading.

10              THE COURT:  Overruled.

11   Q.  Was the borrow-lend facility a potential justification that

12   you had discussed with the defendant on November 7, 2022?

13   A.  Yes.

14   Q.  And what had you said to the defendant about that?

15   A.  It was not supported by the facts.

16   Q.  And what was his response?

17   A.  He acknowledged it.

18              MS. SASSOON:  No further questions.

19              THE COURT:  Thank you.

20              We will take a 15-minute break.

21              (Recess)

22              (Continued on next page)

23

24

25

# Exhibit 8

C

21:59
Cosima
Hey Sam

SB

22:31
Sam Bankman-Fried
hey!

C

22:39
Cosima
We met previously via Binance
22:48
I just want to give you a heads up - someone was hacked and it looks like a lot of your information is being doxxed.

SB

22:50
Sam Bankman-Fried
yup
22:50
we see :p

C

22:51
Cosima
oh ok, just want to make sure you knew

SB

22:52
Sam Bankman-Fried
thanks!
24 July 2019

C

20:26
Cosima
Hey Sam- are you raising capital via a token sale?

SB

21:53
Sam Bankman-Fried
yes
21:53
FTX is

C

21:55
Cosima
Where can I learn more?

CONFIDENTIAL

SB

21:55
Sam Bankman-Fried
https://ftx.com/ftt-listing

C

22:07
Cosima
Thx
5 August 2019

C

13:55
Cosima
hey sam
13:55
do you trade across bittrex pairs?

SB

14:02
Sam Bankman-Fried
yes

C

14:03
Cosima
We are helping them with an exchange token offering - holders get discounted fees, use of margin etc etc
14:03
Should go live by end of month - I'll send you the details to review

SB

14:04
Sam Bankman-Fried
�
11 September 2019

C

15:46
Cosima
You interested in trading CNHT pairs?
25 September 2019

C

20:09
Cosima

W

WhaleBot Alerts � 25.09.2019 20:09:07
New Listing on #Bittrex!

BTC/CNHT
29 September 2019

FTX_EU_000064316

C
18:22
Cosima
How goes it
18:23
You ever cross paths with the Austin's in your OTC hunts?
30 September 2019

SB
01:18
Sam Bankman-Fried
nope
1 November 2019

C
14:24
Cosima
Have you thought about accepting fiat?
2 November 2019

SB
06:20
Sam Bankman-Fried
We can take USD on the OTC side; we're working on adding lots of currencies

C
13:23
Cosima
Mercury Digital Assets and UniCrypt Group have teamed up to create one of the largest compliant liquidity venues in Europe providing an end to end solution for retail and institutional customers alike. The liquidity pool will focus primarily on cryptocurrencies and fiat, but will explore adding other asset backed tokens and security tokens as the market develops. Aggregating liquidity into one venue helps to maximize the network effect as quickly as possible, something very challenging for fledging exchanges to accomplish. The centralized liquidity will not only benefit users to get filled at the best execution, but should also minimize settlement times regardless of the blockchain or trading pairs.

https://www.businesswire.com/news/home/20191031005238/en/Mercury-Digital-Assets-UniCrypt-Group-Announce-New
13:24
We will continue to publish press releases thru out remainder of the year around our Licensing-as-a-service offering - I think there could be a great opportunity here to discuss further with you/FTX - Do you have a Biz Dev guy, or is that primarily you?
14 November 2019

C
20:12
Cosima
Yo do you have The Man Who Solved the Market book yet about Jim Simons and Renaissance? I have it on PDF if not

C
21:58
Cosima

C
Cosima 13.11.2019 13:47:17

CONFIDENTIAL

Not included, change data exporting settings to download.
9.2 MB

C

21:59
Cosima
Maybe you'll be the next Jim Simons
18 November 2019

C

13:03
Cosima
Can you bid for BTC in euros?
19 November 2019

SB

05:27
Sam Bankman-Fried
In reply to this message
yup

C

11:16
Cosima
Do you have an OTC rep I can speak with to get more info and make a decision with whom I will liquidate thru at your convenience?

Thanks
BW

SB

12:16
Sam Bankman-Fried
In reply to this message
Yup! Ryan Salame, @rsalame7926

C

12:16
Cosima
ty
23 November 2019

C

15:37
Cosima
Hey Sam - Do you have a business development contact I could speak with? We are providing various institutions and exchanges with reliable, cost efficient and regulatory compliant fiat and banking on/off ramp solutions and I think we could add tremendous value to FTX.
24 November 2019

SB

03:04
Sam Bankman-Fried

FTX_EU_000064318

Sure! Same guy as above - Ryan handles most of the fiat :)

C

03:09

Cosima

Also, maybe you Already provide it somewhere but I think the market would appreciate reading your trading commentary - especially during weeks like this

C

21:51

Cosima

Whats the Oracle of Alameda think of this price action? What are the important levels to watch?
12 May 2020

C

19:25

Cosima

Hey Sam have you given any thought to how you will become compliant in the EU? We are working with other exchanges in doing so and can do it for you too.
19:27
Photo
Not included, change data exporting settings to download.
591×1280, 116.3 KB
19:27
We can legalize all this for you
19:27
Set you up with a bafin registered entity

C

20:12

Cosima

Is Ryan your compliance guy?

SB

20:14

Sam Bankman-Fried
he's our head of OTC

C

20:18

Cosima

We are helping one of the largest exchanges navigate the EU right now - perhaps you want to consider connecting us with your compliance guy at some point-

Ill tell you BitMEX is already being investigated - hell the largest financial law magazine just published an entire article on Bitmex last week - you could swoop in for the kill/right after the kill and take their entire customer base instantly - but you have to be ready yourself

C

22:27

Cosima

Are you ready to tackle the EU?
22:28
I also have a broker dealer for sale in the US you might want to consider

FTX_EU_000064319

C
22:43
Cosima
https://www.crypto-lawyers.ch/team.html


Our lawfirm

We also developed an excellent KYC/AML software to accommodate new AML5D/fatf etc all automated and compliant - developed over the past two years with the input of various regulators
17 May 2020


C
23:12
Cosima
how much of btc market would you say is algo trading?
23:14
and what is the best performing trading algo youve ever seen?
19 May 2020


C
22:36
Cosima
In reply to this message
We could get you registered with the Bafin immediately - you could then open subsidiaries also registered at the bafin and get bank accts any where / be approved to acquire any thing, any where. Truly game changing for FTX because the entire EU/EEA will adopt Germany's definitions and regulations toward crypto by the end of the year and Germany considers BTC a security (all crypto is considered a security) and you would literally be head and shoulders above EVERYONE not to mention you can trade apple shares and tokenize anything to be legally sold across all of europe while your cmopetition will be wondering what the fuck just happened- how did FTX just become #1 in the world for ALL asset trading
25 May 2020


C
10:39
Cosima
Can you liquidate a large position of digital bits for me


C
21:07
Cosima
In reply to this message
Hey
21:07
Seriously is this something you could do? It's a material amount
21:08
I rather avoid GSR if I can
21:08
XDB on kucoin is 1 market
27 May 2020


C
21:33
Cosima
Do you want to buy a US broker dealer?

C
08:05
Cosima
In reply to this message
https://www.binance.com/en/blog/421499824684900780/Binance-and-German-Investment-Firm-CMEquity-Announce-Partnership-to-Expand-Crypto-Asset-Trading-Services-in-Europe
31 July 2020

C
11:04
Cosima
We finalized a turn key offering allowing crypto exchanges to offer actual fractional equity shares; all they need to do is create and list the trading pair, IE Tesla/BTC, AMZN/USDt.

And an operation like you will literally print money arbing the spread.
11:09
I honestly think FTX makes the most sense to partner with here, however we have begun discussing it with other exchanges. We have a completely regulatory compliant solution too but its not necessary.

Once the first exchange announces this and starts to pull all Robinhood's users to their platforms - look out.. Imagine how much higher TESLa or AMAZON could trade if all the users of crypto had smooth access to buying and selling fractional shares of tsla and amzn via their crypto channels ...

SB
11:11
Sam Bankman-Fried
In reply to this message
what's the regulatory status of that?

C
11:11
Cosima
these are NOT CFD's
11:11
its is a fin product tho, they are the actual shares
11:13
you can do it compliantly or not-compliantly -

compliant route we create a tied agent agreement;f if unfamiliar, basically a tied agent agreement allows you to use the liability umbrella of a firm that has all the licenses etc. I think bitstamp and kraken do this with solaris bank and others etc but its expensive as hell and highly restrictive
11:13
whereas the deal with structed with binance above is a masterpiece
11:13
ill send you a deck here to peruse, cool?

SB
11:13
Sam Bankman-Fried
sure!

C
11:16

Cosima

other thing is you can just operate a market maker on whichever exchange launches this first -

also, from an exchange standpoint, you could market "BUY APPLE SHARES FOR $100 HERE!" and even have the exchanges users commit to an indication of interest up front, use that $1 million for example to then buy the inventory of apple shares - and we can accept payment for the apple shares etc in crypto, which will really create huge arb ops for you to exploit

SB

11:25

Sam Bankman-Fried

so to clarify we'd be hopping on your guys' security licenses or something?

C

11:35

Cosima

Correct, if you want to be compliant - you will be come a tied agent which grants you 100% useage and protection under our liability umbrella. 'Tied agent' is the actual terminology. Basically we take ALL the responsibility for the exchange in the eyes of the regulators

11:36

AND we have license to operate proprietary MM firm

SB

11:38

Sam Bankman-Fried

cool!

11:38

yeah we're def interested then

5 August 2020

SB

05:26

Sam Bankman-Fried

Hey! Would love to start this process :)

C

05:58

Cosima

Sounds good! What time zone are you?

SB

05:58

Sam Bankman-Fried

HKT

6 August 2020

C

02:41

Cosima

This would be for FTX.com property right?

SB

02:45

Sam Bankman-Fried

FTX_EU_000064322

C
10:23
Cosima
Who would you like for us to start conversations with re: fractional equity business from your side

SB
10:56
Sam Bankman-Fried
sure!

C
21:12
Cosima
Ryan? You? Someone else?

SB
21:13
Sam Bankman-Fried
ryan + me + @burglol

C
21:14
Cosima
Perhaps you could provide some times for a quick 15-30 min call for Tuesday or weds this week?

SB
21:27
Sam Bankman-Fried
sure — I'm fairly flexible, what time zone are you in/
10 August 2020

C
00:49
Cosima
I too am pretty flexible and am located EST / NYC; my partners are PST (Oregon) and CET ( Germany) .
00:50
So maybe something around HK noon/morning

SB
00:52
Sam Bankman-Fried
sounds reasonable
11 August 2020

C
10:14
Cosima
Congrats on SRM raise!

SB

10:47

Sam Bankman-Fried

thanks :)

15 August 2020

C

19:50

Cosima

Lets get on the phone and talk about these fractional shares

19:50

We just developed a bespoke method of market making for those pairs too

25 August 2020

C

22:01

Cosima

Congrats on block folio! Nice! Adding fractional share trading will be a game changer! Let's do this! There is still time to be first mover but not much..

26 August 2020

SB

14:57

Sam Bankman-Fried

def agree — when's good to chat?

27 August 2020

C

01:21

Cosima

In reply to this message

Ryan made a group. I added myself and my partners which should cover all timezones - and we can all speak on the subject matter. Myself= brandon and my partners Patrick and Robin, both fantastic crypto attorneys

3 September 2020

C

12:20

Cosima

https://www.wsj.com/articles/robinhood-faces-sec-probe-related-to-deals-with-high-speed-traders-11599074891

7 September 2020

C

08:21

Cosima

So robinhood traditional finance that will slowly add crypto

Blockfolio is crypto that will slowly add traditional finance

I assume you have given thought to adding FTX trading to blockfolio app - then offer the trading of fractional equity via my company and you will dominate. ;-)

08:27

My attorney mentioned exclusivity for ftx. One idea I suggested is ftx controlling 20% with a call for another 31% in case you wanted full majority control (especially if building it into blockfolio) We don't really need cash - and we want to build this out especially with its market making potential that will throw off a lot of cash

CONFIDENTIAL

C

08:46

Cosima

Also, depending on daily liquidity we may be able to accept ftt as payment for your purchases of equity. Just need to identify all pools of FTT liquidity

C

12:42

Cosima

Thoughts?

8 September 2020

C

08:46

Cosima

Am i in the right ballpark or no?

C

10:54

Cosima

Can I get some sort of feedback, please?

10 September 2020

C

12:29

Cosima

Gate.io may have been "raided" by local police, fyi

23 September 2020

C

03:38

Cosima

Hey

SB

06:20

Sam Bankman-Fried

hey!

24 September 2020

C

18:17

Cosima

Thanks for the term,sheet

SB

18:37

Sam Bankman-Fried

�

25 September 2020

C

CONFIDENTIAL

21:53
Cosima
Have you heard anything about Kucoin?

SB
22:38
Sam Bankman-Fried
yeah not looking good :P

C
22:38
Cosima
fuck
6 October 2020

C
17:46
Cosima
Hi sam
17:46
what are your thoughts on tokenizing equity like AirBNB for example while its still private and listing that pre IPO? We can do that too

SB
21:07
Sam Bankman-Fried
ooh interesting
21:07
one of the tough parts is the lack of a real market price to compare it to
7 October 2020

C
08:42
Cosima
I've got a client with a block of Ripple Labs equity as another example - and would be open to listing around a $10 billion valuation; (people have paid up to $30 billion valuation for that stock �)

There are firm that specialize in sourcing and transacting in private tech company stock so not abnormally difficult to source and reference a third party's quote/last completed txn
13 October 2020

C
19:03
Cosima
I need some Serum/Solana developers ...

SB
22:41
Sam Bankman-Fried
In reply to this message
yeah taht could be super interesting
22:41
in a few cases would be really cool, for the hottest or most relevant ones
22:42

CONFIDENTIAL

22:42
In reply to this message
what for? happy to introduce you to our team for help, though that won't get you a full time builder :P

C

23:07
Cosima
In reply to this message
Exactly

C

23:58
Cosima
In reply to this message
Happy to pay. Just trying to decide which blockchain to use to build my automated market maker on
14 October 2020

SB

02:40
Sam Bankman-Fried
got it — well at least let me create a group!
15 October 2020

C

01:55
Cosima
Could we include in our termsheet an acct at FTX for our market maker algo with little to no fees?

SB

07:02
Sam Bankman-Fried
In reply to this message
sure!
07:02
could get you VIP fees

C

08:15
Cosima
Perfect!
08:20
Have you guys decided which trading pairs you want to launch with and how ? IE with a presale of sorts or some other strategy?

SB

08:46
Sam Bankman-Fried
starting to chat about it, keep pinging :)

C

08:50
Cosima
Yup yup

CONFIDENTIAL

08:53
One way could be to offer Apple or Amazon or Tesla - we have entered q3 earning season so volatility Is coming. Also election. And get people to deposit stablecoin and indicate for how much they want up to $10,000 for example and then you know definitively that you have $10 million to buy Apple shares with. Buy apple from us tokenized and deposit into their accts for trading

SB

09:17
Sam Bankman-Fried
oh BTW — how do dividends work?
09:17
do you collect them and redistribute?
17 October 2020

C

08:46
Cosima
Maybe a usdt airdrop equivalent to?
18 October 2020

C

19:50
Cosima
In reply to this message
Maybe start with some stocks from FAANG - Facebook Apple Amazon Netflix Google - since they already have they're own "marketing" - most investors are familiar with the FAANG stocks (and of course Tesla!)
19 October 2020

SB

00:15
Sam Bankman-Fried
agreed

C

20:10
Cosima
Any other updates?
29 October 2020

C

09:20
Cosima
Congrats on announcement Sam!

SB

09:26
Sam Bankman-Fried
�
30 October 2020

C

14:11
Cosima
I've got another idea

SB
14:17
Sam Bankman-Fried
mhm?

C
14:21
Cosima
This is what I was referring to when I asked you about Solana blockchain previously but Either create a governance token that is farmed by ftx users locking assets into liquidity pools for the various stock/crypto trading pairs and then subsequently requiring the gov tokens to be staked in order to vote on which stock/crypto trading pair should be listed next...

OR...

Require users to stake FTT in order to vote / farm. Making FTT value melt up

Option one could also participate in the fees generated by the auto-market maker

SB
14:24
Sam Bankman-Fried
hmmm
14:24
yeah there's something there'
14:24
let me think about it
14:24
if nothing else
14:24
we can have something like https://ftx.com/vote to vote on equities listings, which requires having FTT

C
14:51
Cosima
In reply to this message
Interesting
14:52
We will also be able to list and trade privates shares too. I was very active in that space prior to crypto and still have my contacts with pockets of airbnb spaceX wish.com ripple labs etc etc
14:54
In reply to this message
A liquidity pool to farm would be nice because user would deposit a lot of stablecoin due to the reputation behind the pool - and the fact we arent going to rug pool
2 November 2020

C
09:46
Cosima
Have you heard anything?

C
09:46
Cosima

S
Symphony Confidential 02.11.2020 09:35:16
Photo
Not included, change data exporting settings to download.
967×1280, 128.7 KB
Something wrong with Huobi Exchange �

Let's see if we can get any official clarification on this situation.

SB
09:48
Sam Bankman-Fried
yeah, our info makes it seem probably fake
09:48
but not 100% sure

C
09:49
Cosima
Ty

C
14:03
Cosima

C
CryptoQuant Alerts 02.11.2020 12:07:18
Photo
Not included, change data exporting settings to download.
1280×1022, 103.6 KB
Looking at #Huobi netflow, $BTC outflow has soared in the last eight hours.

View Chart | @cryptoquant_alert

C
14:03
Cosima
better safe then sorry i guess

SB
14:05
Sam Bankman-Fried
yuuuup
14:05
lots of withdrawals
14:05
and def some chance it's real

C
14:05
Cosima
just another day in crypto
14:06

FTX_EU_000064330

Just got word from Goldman to watch traditional market liquidity over the next few weeks. Lots of traders have not taken their required vacations and will be forced to do so before the end of the year.

C

15:24
Cosima
Can I get a higher VIP/Lower fee account for FTX.us? If so, I'll trade more on it... �
15:24
Photo
Not included, change data exporting settings to download.
591×1280, 87.2 KB

SB

15:33
Sam Bankman-Fried
heh
15:34
what's your email there?

C

15:34
Cosima
thelong1@protonmail.com

SB

15:41
Sam Bankman-Fried
I can give you 5bp taker fees for a month and see how it goes!

C

15:41
Cosima
thank you sir

SB

15:41
Sam Bankman-Fried
that should be live :)

C

15:42
Cosima
youre awesome!
5 November 2020

C

12:07
Cosima
https://www.theblockcrypto.com/linked/83695/us-seizure-silk-road-bitcoins-report

SB

12:35
Sam Bankman-Fried
yuuuup

CONFIDENTIAL

C

13:34

Cosima

Well the govt isn't going to hodl lol

C

13:34

Cosima

C

Cosima Research 05.11.2020 13:21:14

https://www.courtlistener.com/docket/18607888/1/united-states-v-approximately-69370-bitcoin-btc-bitcoin-gold-btg/

7 November 2020

C

18:31

Cosima

https://twitter.com/trylolli/status/1325166606490726400

12 November 2020

C

14:48

Cosima

hi sam

14:49

i need a favor if possible

SB

14:49

Sam Bankman-Fried

sup?

C

14:49

Cosima

I need a defi expert, some one who thoroughly understands yearn finance / YFI token

14:50

Patrick @pgruhn is tasked by Lichtenstein regulators to determine whether or not it is a security token or not

SB

14:50

Sam Bankman-Fried

happy to see if I could help

14:50

aaaah

C

14:50

Cosima

another law firm dropped the ball and he has to provide his opinion by friday

SB

CONFIDENTIAL

what tests/conditions does Lichtenstein usually use to determine whether something is a security?

C
14:50
Cosima
Do you have ten minutes to talk to him by chance?

SB
14:50
Sam Bankman-Fried
sure!

C
14:54
Cosima
as usual, you are the man, thank you very much, HUGE help

SB
14:54
Sam Bankman-Fried
�
18 November 2020

C
19:42
Cosima
anything worthwhile coming up for SUSHIswap?

SB
23:21
Sam Bankman-Fried
In reply to this message
eh a bunch of moderately big stuff — margin trading, etc.
23:21
it's been a loooong time coming
19 November 2020

C
15:43
Cosima
Would you buy sushi 1.60 and ride to $2 or wait for a dip
15:44
Sushi and yfi. I sold too damn soon.
20 November 2020

SB
05:20
Sam Bankman-Fried
In reply to this message
meh prob wait for a dip but idk for sure
05:21
I've always thught sushi was undervalued, but then it just went down more, so �⚲

CONFIDENTIAL

C

06:35
Cosima
I don't understand it so � �⚣
06:36
I sold everything too early this rally
26 November 2020

C

12:34
Cosima
You see cb stopping US margin trading?

SB

14:39
Sam Bankman-Fried
yuuup
27 November 2020

C

16:55
Cosima
Are your familiar with Cronje's new project, deriswap?
30 November 2020

C

03:23
Cosima
Any truth to rumor of cronje's deriswap and sushi joining forces? �

C

10:12
Cosima
Did I get highest fill on ftx

C

10:12
Cosima

C

Cosima 30.11.2020 09:48:43
Photo
Not included, change data exporting settings to download.
591×1280, 81.3 KB

SB

10:21
Sam Bankman-Fried
oooh nice

C

10:23

CONFIDENTIAL

Cosima
Photo
Not included, change data exporting settings to download.
591×1280, 73.0 KB
10:23
Photo
Not included, change data exporting settings to download.
591×1280, 94.6 KB
10:24
Much better than last time we hit 193xx. I literally wasnt allowed to sell via your ftx.us mobile app. As you can see above I have 5.7629 spot owned btc
10:24
And yet when trying to sell it says Size too large
10:25
I've already alerted Sina but it scared the shit out of me
10:25
Especially since the next move to come was a death drop to $16xxx ◆

C
16:37
Cosima
You ever see anything like this happen before?
1 December 2020

C
03:04
Cosima
In reply to this message
Guess so ◆

SB
03:04
Sam Bankman-Fried
man
03:04
I actually didn't have ny hints about it
03:04
it was news to me!

C
03:04
Cosima
Haha
03:17
"Sushiswap will be involved in a stealth project following Deriswap release with Yearn" ◆ ◆ ◆

C
05:50
Cosima
Are your aware of any way / anywhere to execute genuine actual buy-write / converted cash options on BTC?

C
12:38
Cosima
Good shit amigo! Congrats!

FTX_EU_000064335

12:38
Photo
Not included, change data exporting settings to download.
719×1032, 113.3 KB
12:47
https://ct.com/960g
2 December 2020

C

21:51
Cosima
How high do you think YFI is going?
3 December 2020

SB

00:35
Sam Bankman-Fried
eh could get up to 40k, my guess is not higher than that but idk for sure, and it could just start drifting down at any point

C

00:51
Cosima
K3PR just doubled. Wtf �
5 December 2020

C

14:54
Cosima
https://www.coindesk.com/hong-kong-crypto-exchange-founder-taken-amid-chinas-crackdown-on-fraudulent-bank-accounts

SB

18:38
Sam Bankman-Fried
In reply to this message
pretty sure they're not actually Hong Kong, they're mainland
18:38
but looking into it

C

22:27
Cosima
Does ftx or alameda publish any sort of market commentary?
6 December 2020

C

16:24
Cosima
This might be of interest to you

C

16:24
Cosima

CONFIDENTIAL

C

Cosima 06.12.2020 16:22:48
Blockchain_Legislation_Summary_R.pdf
Not included, change data exporting settings to download.
226.3 KB
Did I send you this, yet?

SB

18:29
Sam Bankman-Fried
In reply to this message
eh nothing great
18:29
there are monthly newslettrs which are sometimes good
18:29
the best probably is Trabucco's twitter
18:30
https://twitter.com/AlamedaTrabucco

he's one of our head traders
18:30
In reply to this message
interesting!
7 December 2020

C

01:51
Cosima
https://t.co/zfF0Ag1OYC
01:51
This is paywalled - do you have a copy of it by chance?
01:52
In reply to this message
Thank you - I have been looking in to more and more on chain analysis services. I decided to try out an AI trading bot named JARVIS that allegedley trades off of on chain data and behavior.

Also, looking in to cryptoquant, skew., santiment and glassnode subscriptions. Any comment?

SB

01:58
Sam Bankman-Fried
In reply to this message
yup!
02:00
In reply to this message
https://docs.google.com/document/d/1pELjfGQR0lgW0IysPK3wPL_hjwSepv95XhlFEyAQQGo/edit?usp=sharing

C

02:07
Cosima
Thank you Sam!

C

10:31

CONFIDENTIAL

Cosima
https://www.businesswire.com/news/home/20201207005356/en/Bittrex-Global-Launches-Tokenized-Stock-Trading
9 December 2020

C

00:58
Cosima
You find some airbnb?
00:59
Photo
Not included, change data exporting settings to download.
1280×720, 62.5 KB

C

05:04
Cosima
https://news.bitcoin.com/another-asian-crypto-exchange-suspends-withdrawals-as-china-detains-one-of-its-founders/

C

10:13
Cosima

C

Cosima Research 09.12.2020 10:02:12
https://cryptobriefing.com/bitwise-grayscale-crypto-index-institution/
10 December 2020

C

07:54
Cosima

C

Cosima Research 10.12.2020 07:52:57
https://taibbi.substack.com/p/pandemic-villains-robinhood

C

16:13
Cosima
How much volume does bitcoin.com do?
12 December 2020

C

04:55
Cosima
Pre ipo contracts are like a pretty sweet hack
04:55
Personally coming from traditional finance and knowing how hard allocations for hottest ipos are-this is pretty wild.

C

13:59
Cosima
Does alameda manage outside money?
13 December 2020

                                                    FTX_EU_000064338

SB

02:54

Sam Bankman-Fried

In reply to this message

it has lines of credit, but no external LPs/GPs/equity holders


C

02:59

Cosima

do you want to buy a broker dealer in the US?


SB

03:27

Sam Bankman-Fried

In reply to this message

in the process of doing that :)


C

07:27

Cosima

Ahh bummer

07:28

I sold one to Binance. Wanted to sell one to you too


C

11:17

Cosima

In reply to this message

At least we will be able to connect to CM-E and work on some pretty cool stuff


SB

15:43

Sam Bankman-Fried

In reply to this message

heh


C

19:22

Cosima

In reply to this message

I'm serious

19:23

US regulators are tough. My team is tier 1 though. Already got approved change of ownership into our possession. Now to try and get it in Binance's even tho.. well.. you know how Binance is I'm sure

19:23

Do you know guys from 100x?

15 December 2020


C

04:14

Cosima

Is it possible I can get a ref link discount to encourage people to sign up for your tokenized stocks?

SB

05:10

Sam Bankman-Fried

In reply to this message

what sort of think are you thinking of?

05:10

by default there's the standard one

C

07:09

Cosima

I don't want any kickback. Just a straight discount

C

16:04

Cosima

I have some dcr decred to sell. Do you know of any buyers?

C

19:34

Cosima

could you do me a favor?

C

20:06

Cosima

Could you provide us (DAAG) wiith a quote that we can put on our website?

16 December 2020

SB

03:11

Sam Bankman-Fried

In reply to this message

yeah! about the equities trading?

22 December 2020

C

09:48

Cosima

Yeah- you guys gotta make sure DAAG is on your press releases too

09:48

https://www.theblockcrypto.com/post/88851/ftx-lists-coinbase-pre-ipo-futures-contracts

09:48

Articles like This and we aren't even mentioned

SB

10:17

Sam Bankman-Fried

ahh yeah sorry totally can do!

10:17

FWIW this wasn't a press release from us—they wrote it on their own

C

CONFIDENTIAL                                                              FTX_EU_000064340

14:08
Cosima
In reply to this message
Yeah I figured.
25 December 2020

C

22:49
Cosima
Who else do you think will do an airdrop? Dydx? Matcha?
26 December 2020

SB

12:43
Sam Bankman-Fried
In reply to this message
guessing a lot will

C

16:49
Cosima
I want to make sure I've interacted with any you think might do an airdrop - can you speculate as to a few? I missed uni and 1 inch
16:51
Honestly defi is so full of scams and eth is so costly and inefficient - I can't believe so many people ($15+ billion) hVe locked up and/or used th various protocols. I sold - eth on dydx and it n charged me 4.5% - $42 on a $630 sale is fucking insane
28 December 2020

C

22:59
Cosima
Why are stables trading at a premium
30 December 2020

C

08:29
Cosima
Are you more involved in solana or serum?
31 December 2020

SB

00:42
Sam Bankman-Fried
In reply to this message
serum
00:42
I'm moderately involved in solana and very involved in serum

C

05:12
Cosima
we need a blockchain to start launching tokenized stocks on
1 January 2021

FTX_EU_000064341

SB
01:07
Sam Bankman-Fried
In reply to this message
would be excited to do it on Solana!
01:07
what are the requirements?
01:07
KYC?
01:08
would it need to stay within the same KYC walled garden as the FTX ones?

C
22:12
Cosima
no
22:12
thats the beauty of this one... no kyc ... whatsoever
22:13
well, only redeem if someone ever wanted to redeem for some reason with CM-E directly but I don't know why any one would want to do that, as it will be costly to do
22:14
Photo
Not included, change data exporting settings to download.
1280×657, 61.0 KB
this looks pretty interesting
2 January 2021

SB
00:40
Sam Bankman-Fried
In reply to this message
interesting — so CM-E and DAG would be ok with them being transfered on-chain?
00:41
where would they come from — could FTX allow withdrawals? Would they come from DAG?

C
02:14
Cosima
In reply to this message
Yeah. There's two options we are considering.

One, partner with someone like FTX and you guys say "hey- how much Tesla would you like?" To your clients - and your clients commit X amount of stablecoin - like an ipo or ico and then DAAG takes the stable coin - buys Tesla and issues the tokens on Solana blockchain for FTX to distribute to its clients and then your clients can trade or withdraw or do what ever.

The other option is DAAG just does it all ourselves. We set up a website where clients can visit and interact with a contract by sending stablecoin to the contract and in exchange receiving erc20 tokens (or solana, DOT, cosmos) backed by Tesla shares. And then client can do whatever they want with tokens - send them to participating exchanges that list the token or put in cold storage etc or swap back to stablecoin.

Second option maybe require a liquidity pool with AMM and a gov token that could be used to decide which equities to tokenize and share In mint/redeem fees etc

FTX_EU_000064342

C

13:31

Cosima

^

3 January 2021

SB

00:14

Sam Bankman-Fried

Re: the first option — what if FTX just allowed SPL withdrawals for customers of their stock positions?

00:14

which is roughly the same thing you suggested, just separating that step out from the (previous) buying step

C

00:37

Cosima

SPL?

00:42

https://ambcrypto.com/exploit-discovered-on-andre-cronjes-latest-project-ycredit/

SB

02:48

Sam Bankman-Fried

In reply to this message

SPL — solana token

C

06:21

Cosima

In reply to this message

Yes

SB

06:23

Sam Bankman-Fried

In reply to this message

are we able to do that? If so is there anything we need to do first?

06:24

we could have them trading on a DEX tomorrow if there were no regulatory issues with freely allowing withdrawals from FTX

C

06:27

Cosima

In reply to this message

Good to know. We have to file prospectus (which Robin just finished) just to cover the primary issuance. But secondary trading = "decentralized" so no regs. Technically we don't even need to do kyc to issue etc. only redemption which can be avoided by simply selling in secondary markets

SB

06:36

Sam Bankman-Fried

In reply to this message

FTX_EU_000064343

what is the prospectus for? do you mean for new companies, or something for existing flows too?
06:36
e.g. what would need to happen for FTX to open up deposits/withdrawals for tokenized TSLA?
06:37
would we need to file a prospectus with each token minting or something?


C

07:00
Cosima
In reply to this message
Noooo
07:01
In reply to this message
You wouldn't have to do anything at all


SB

07:02
Sam Bankman-Fried
nice — so we could just do it?


C

07:03
Cosima
Yes. Once the Tesla-SPL token is created any one any where can do any thing with it
07:07
FTT looking good btw


SB

07:11
Sam Bankman-Fried
:)


C

20:43
Cosima
{
"channel": "Vip channel Scalping",
"entry": [
0.4017
],
"stop": [
0.41900000000000004
],
"target": [
0.399,
0.395,
0.39,
0.383,
0.37
],
"text": "ZRXUSDT short below 4017\nTargets 3990-3950-3900-3830-3700 \nLeverage 50x\nStop 4190",
"size": 100.0,
"base": "ZRX",

"quote": "USDT",
"side": "SHORT"
}
20:43
Can your capitalize.ai bot read this?
4 January 2021

C
04:47
Cosima
What's your take on the infamous tether fud?

SB
07:06
Sam Bankman-Fried
In reply to this message
hehehe
07:06
95% FUD 5% real
07:07
basically:

1) they might be ~$500m short b/c of frozen funds
2) they're still > 95% backed
3) they have some legal issues, probably from early AML/KYC failures or something like that
4) b/c of (3) they're semi-permanently cut off from US banks, which makes it annoying to use
5) it takes ~10bps and ~3 days to create/redeem USDT often which is a huge pain and makes it less liquid in primary markets
6) but it's still way closer to $1 than to $0

C
11:48
Cosima
Good to know. Thanks. From my side. USA and Singapore are discussing a case re: securities offering violation. Under Dods-Frank USDT is almost undoubtedly a "swap" by definition
11:49
Do you want an ftx stablecoin?

SB
11:51
Sam Bankman-Fried
In reply to this message
we've thought about it — it seems like USDC is frankly perfectly decent and not a huge amount of room to improve on it which is why we haven't

C
11:52
Cosima
We could do one more like a "Dai" though blah blah decentralized should you ever want to -

Binance is launching BUSD futures
11:54
In reply to this message
Problem is tether has like $20 billion outstanding no? And deltec/Bahamas as a whole banking system don't have that - so hopefully some other bank does

I know Reggie Fowler/ crypto capital money is seized but they sold that LeO token to make up for that.

Which by the way - have you heard from Zhao Dong? He's still "detained"

SB

13:30
Sam Bankman-Fried
In reply to this message
pretty sure they do — we've wired them like 5b of that :P
13:30
In reply to this message
I think he's going to be "detailed" for a looooooong time
13:30
pretty sad story

C

13:32
Cosima
In reply to this message
why would you choose to use USDT over USDC, - just on the basis alone that USDT costs 10 bps and 3 days to mint/redeem sounds costly, inefficient and a pain in the ass

SB

13:32
Sam Bankman-Fried
In reply to this message
yuuuup — but sometimes it's trading over $1 in markets :P
13:33
not always, but there have been periods where it consistently trades 25bps above $1
13:33
and so you still make 15bps creating it
13:33
(also we've gotten it down from 3 days to ~instant, but only because we've put a ton of time into that relationship)

C

14:06
Cosima
Photo
Not included, change data exporting settings to download.
549×285, 13.2 KB
10% the highest discount possible?

SB

15:00
Sam Bankman-Fried
yup!
5 January 2021

C

15:19
Cosima
In reply to this message
Extremely rare that this happens

CONFIDENTIAL

SB

15:28
Sam Bankman-Fried
you'd be surprised!
15:28
e.g. right now as we talk USDT is trading at about $1.0024 globally
15:28
so 14bps over the 10bp creation cost

C

15:52
Cosima
How wow

SB

15:53
Sam Bankman-Fried
BTC/USD buyers on coinbase + BTC/USD synthetic buyers on futures —> BTC/USD > BTC/USDT —> USDT > $1
15:53
that's my best guess

C

17:59
Cosima
Hmm
18:00
Ftx damn near $9 � I wonder if we should.hedge some while waiting for FTX milestone payment

SB

23:28
Sam Bankman-Fried
hehe
6 January 2021

C

12:16
Cosima
In reply to this message
Think it keeps going to $10? Or do you want to release some of our milestone payment early so we can feed our familia's sir

SB

12:28
Sam Bankman-Fried
In reply to this message
heh
12:28
so
12:28
obv I'm biased
12:28
but
12:28
well

CONFIDENTIAL

12:28
really idk ant it depends on whether volumes remain high
12:28
if you put a gun to my head and asked me if it's cheap or ich
12:28
I would say it's cheap
12:28
and will go higher
12:28
but I'm not confident in that
12:28
I think maybe my opinion would change around 15-20?
12:29
unless it got to 15-20 because of new positive info
12:29
that being said — happy to buy it back at a discount if you want :P


C

12:32
Cosima
Rising tide lifts all boats
12:33
Arrest CZ and watch this whole industry's market cap get cut In half
12:42
Maybe a loan against FTT as collateral
12:43
Ahhh I guess its not a big deal - it's only 3 or so more weeks


C

21:03
Cosima
Is there a way to take a loan against the FTT as collateral from FTX the exchange / kind of like a margin loan... would only make sense if the interest rate was near zero though.
21:04
only 3500 to 7000 tokens out of 34500 I think


SB

22:16
Sam Bankman-Fried
er for unlocked FTT there is
22:16
though interest rates might be nontrivial right now
7 January 2021


C

03:38
Cosima
Photo
Not included, change data exporting settings to download.
1024×769, 80.8 KB
03:38
"Organic growth" ;-)
8 January 2021


C

CONFIDENTIAL

10:33
Cosima
Would you consider giving us a loan against our locked FTT due Feb 15? Not all of it but Ernest is buying a house, Robin just had his first born, my wife just had a positive preggo test and Patrick, well, Patrick is already rich so :-) and it would help us since we haven't taken any compensation yet and loaned DAAG the entire amount of all received capital thus far. And any time an asset 2-3x it's prudent to take something off the table... even if it's likely to double again

SB
11:26
Sam Bankman-Fried
how much FTT is it again?

C
11:28
Cosima
34500 unlocked on feb 15 and than another 34500 unlocks over the next two years.
11:29
Lol you rekt so many SOL shorts
11:29
I was short and then I saw your tweet and I said fuckkkkkk that
11:30
SBF seems like the type of person to buy every single SOL token under $2 just to win a bet

C
11:41
Cosima

PG
Patrick Gruhn 08.01.2021 11:40:41
what Sam should do is the same what the SAP founder did (https://en.wikipedia.org/wiki/Hasso_Plattner_Institute)
11:41
setup an university für blockchain releated research and influence the politic thru this

C
11:42
Cosima
and get Marcel to teach there as well
11:42
^ we know global regulators extremely well, Patrick went to law school with him

C
13:42
Cosima
In reply to this message
So Ideally a $200k loan

SB
14:29
Sam Bankman-Fried
In reply to this message
heeeeh
14:29
In reply to this message
could do that

C
14:49
Cosima
awesome!

C
16:06
Cosima
How do you want to handle it? Simple handshake agreement or do you prefer Patrick/Robin draft some sort of legal document?

C
16:31
Cosima
we are fine with a simple handshake deal - and confirmation via email (for our tax reasons)

C
22:39
Cosima
Photo
Not included, change data exporting settings to download.
1280×532, 65.3 KB
YFI to 70k if it follows BTC fractal
9 January 2021

SB
01:30
Sam Bankman-Fried
In reply to this message
works for me!

C
02:25
Cosima
Ok. Let's agree to terms and I'll have Ernest follow up by sending an email to reply to.

C
06:00
Cosima
What terms do you want?

C
11:16
Cosima
And what Stablecoin do you prefer

C
12:22
Cosima
In reply to this message
if it doesnt matter, we'd prefer USDC
12:23
https://twitter.com/lightcrypto/status/1347953571426308096?s=20

CONFIDENTIAL

12:23
any idea who's $1 billion profit on eth this is?

C

13:27
Cosima
In reply to this message
0x1a20a62965586d4cbcc65c4045867a113e421440
10 January 2021

C

03:57
Cosima
Glad you added sushi yearn UNi and chain link to ftxus! Was that just recently?
11 January 2021

SB

04:46
Sam Bankman-Fried
In reply to this message
works for me!
04:46
In reply to this message
yup just added them :)
04:46
loooong conversations on listings for the US, but making progress there!
04:46
need it in the rampup to Blockfolio trading
04:50
In reply to this message
sent a test
12 January 2021

C

10:00
Cosima
I have a research channel with - 800 followers and a trading chat with about 900 members - was hoping to get them as big a discount as possible for FTX ref link.

https://ftx.com/#a=1266168

Is the one tied to one of my accts. Could I bother you guys to make sure it's as high a discount for my followers as possible. If it can be higher as a result of my forfeiting any kickback - that is actually ideal- I prefer to eliminate as many conflicts of interest as possible.
10:00
Photo
Not included, change data exporting settings to download.
591×1280, 76.7 KB

C

13:56
Cosima
So I can send USDC-spl within trust waletapp now?

SB

CONFIDENTIAL

17:52
Sam Bankman-Fried
In reply to this message
for now 5% is the max but we'll introduce something soon that allows for 10% based on staking etc.!
17:52
In reply to this message
seems like it!
13 January 2021

C

06:35
Cosima
In reply to this message
Will users be able to trade within Blockfolio app or still need an acct elsewhere and api?

SB

10:42
Sam Bankman-Fried
In reply to this message
within app
10:43
internal testing going on now
10:43
hoping to go live in the next couple weeks!

C

20:55
Cosima
Awesome
20:55
That's ducking huge
20:55
Looks like ftt headed to $11.50
14 January 2021

C

08:34
Cosima
Should I be loading up on serum?

C

11:00
Cosima
In reply to this message
1 usdc well received

C

12:07
Cosima
thanks!

SB

14:39
Sam Bankman-Fried

CONFIDENTIAL

In reply to this message
hopefully :)
14:39
In reply to this message
we'll see — hoping that the Maps etc. release will help a lot there!
14:39
In reply to this message
cool — 200k right?

C

15:09
Cosima
In reply to this message
Yes, please
15:09
In reply to this message
Maps? Trying to google it and just find the road map for serum

SB

17:02
Sam Bankman-Fried
In reply to this message
HEHE
17:03
maps.me
17:08
https://etherscan.io/tx/0x922797768499762748347af2f021be227835bfd0a4ad6ff31c411ae3a8af819d
15 January 2021

C

03:20
Cosima
In reply to this message
Thanks! I think ftt is around $9.50.

Which is about 21053 ftt @ $200k.

Are we basically able to sell 21053 of our 34500 ftt now ? Or are we just talking a loan against our holdings or whatever
terms you'd like? Just want to clarify now so no misunderstanding come feb 15.

We do greatly appreciate your flexibility though sam. Thank you for working with us. �

C

05:30
Cosima
https://cryptobriefing.com/german-firm-brought-google-tesla-stocks-crypto/

SB

10:00
Sam Bankman-Fried
In reply to this message
so far loan — but if you want, would be happy to buy @ $9

C

10:12

FTX_EU_000064353

Cosima
In reply to this message
Ok. Selling 22,223 FTT @ $9
10:13
Leaving 12,277 left of the 34500 from the restricted to be unlocked feb 15

SB
10:59
Sam Bankman-Fried
In reply to this message
done!
10:59
did we ever credit your FTX account with the FTT?

C
11:00
Cosima
No

SB
11:00
Sam Bankman-Fried
kk
11:00
so you can keep the $200k and then the FTT is down to 12.277

C
11:00
Cosima
In reply to this message
Thank you!
11:00
Yes sir
11:01
I'll write this in an email now if that's ok ?
11:01
What's your best email address?

SB
11:01
Sam Bankman-Fried
info@alameda-research.com works!
20 January 2021

C
13:13
Cosima
Can I run an Idea by you
13:14
It's a crazy one but you're just crazy enough to pull it Off
13:15
Ultimate action: buy CM-Equity;

The how; if not outright, then via a SPAC �
24 January 2021

CONFIDENTIAL

C

09:17

Cosima

To compete against coinbase - than list shares / go public in US

C

10:04

Cosima

Hey

C

21:07

Cosima

Can you help convert BNB to btc

25 January 2021

C

17:51

Cosima

Hey Sam

17:51

I got something else for you

26 January 2021

C

15:00

Cosima

I also think I have a pathway to offer futures options and swaps in USA

27 January 2021

C

17:52

Cosima

Hey Sam

C

19:11

Cosima

Sam Bankman-Fried

Missed

1 February 2021

C

19:00

Cosima

Hi Sam

19:03

Should you be looking for some absolute miracle workers in the animal rescue 501c3 realm to donate to then look no further than https://www.noahs-arks.net/. They take in the worst of the worst, and unfortunately down south there is a lot of "the worst, sadly". I donate as much and as often as I can. Anything not covered by the charity is covered by the founder personally put of pocket. She is nothing short of an angel for animals.

All the best,

CONFIDENTIAL

Brandon
19:03
If I can help facilitate any sort of donation, I'd be happy to.
9 February 2021

C

02:34
Cosima
Going to raise some capital for more compliance peeps etc for cme-

C

10:46
Cosima
Might you be interested?

SB

18:51
Sam Bankman-Fried
yeah!
18:51
what are the details?
14 February 2021

C

16:47
Cosima
I believe we are creating a data room
16:48
Overall growth has been very strong for CM-E and only expect it to continue, increase at a faster rate. $4-5 million for 10% is what I offered

C

20:01
Cosima
Do you want to go public?
24 February 2021

SB

14:02
Sam Bankman-Fried
In reply to this message
def interested
14:03
In reply to this message
potentially!

C

17:35
Cosima
In reply to this message
If so, would love to help
17:41
In reply to this message
9.9% would be the most you could acquire while having to do the least amount of regulatory work

C

21:30
Cosima
Are there any Solana ecosystem project's presales I may be able to get into ?
21:30
Ill gladly hodl verus flipping
25 February 2021

SB

03:29
Sam Bankman-Fried
In reply to this message
we'd be up for that!
03:29
In reply to this message
let me check :)
03:30
In reply to this message
awesome! we're starting the DD —

a) getting an audit for FTX
b) put together investment docs

C

10:56
Cosima
In reply to this message
Awesome- how can I help?
26 February 2021

C

10:19
Cosima
Could DAAG/CM-E be a SoLana validator?
10:20
How much SoL would we need
27 February 2021

C

10:48
Cosima

C

Cosima Research 27.02.2021 10:48:30
https://cryptopotato.com/kraken-to-double-its-valuation-to-10-billion-via-funding-round/
28 February 2021

C

12:21
Cosima
We devised a perfect way to buy a bank
1 March 2021

SB

07:08
Sam Bankman-Fried
oh man what is it?
07:09
In reply to this message
yeah would love htat?
07:09
we could also stake some there


C

09:50
Cosima


C

Cosima Research 01.03.2021 09:49:52
Citi-Cosima.pdf
Not included, change data exporting settings to download.
8.3 MB
5 March 2021


C

19:33
Cosima
https://decrypt.co/60326/kraken-seeks-20-billion-valuation-in-new-funding-round
19:34
We have the ability to tokenize FTX equity and allow it to be traded via decentralized exchanges - could just tokenize a portion of it


SB

19:45
Sam Bankman-Fried
In reply to this message
true!


C

20:56
Cosima
We've made some incredible changes to our project, could I send you my 1-2 pager and get your opinion?
7 March 2021


C

13:08
Cosima
Can I sue solflare wallet to stake ray on raydium?


C

14:31
Cosima
ANy idea what i am doing wrong? Can't stake my ray at raydium.io


C

14:31

                                                    FTX_EU_000064358

Cosima

C

Cosima 07.03.2021 14:28:19
Photo
Not included, change data exporting settings to download.
1280×670, 61.6 KB

SB

21:17
Sam Bankman-Fried
In reply to this message
looks like just sollet for now
21:17
In reply to this message
hm not sure, let me check if it works for me
21:20
hm worked for me just now

C

21:31
Cosima
I figured it out. Thx
10 March 2021

C

22:20
Cosima
https://www.bloomberg.com/news/articles/2021-03-05/coinbase-coin-ipo-ceo-could-get-over-1-million-a-day-from-crypto-exchange
12 March 2021

C

07:32
Cosima
Could you give a follow to @AssetsAG please?

SB

22:14
Sam Bankman-Fried
done!

C

22:14
Cosima
ty sir
22:29
Animation
Not included, change data exporting settings to download.
519.3 KB
13 March 2021

C

16:05

FTX_EU_000064359

Cosima
Photo
Not included, change data exporting settings to download.
903×682, 145.0 KB

SB

16:41
Sam Bankman-Fried
hopefully!

C

16:42
Cosima
Very cool man!
16:44
We are narrowing down our choices of lead dev/project manager for our token for ethereum and solana - did you have any reccomendations ?
17 March 2021

C

12:10
Cosima

C

Cosima Research 17.03.2021 12:09:48
The Case for Cryptocurrency 3-17-21.pdf
Not included, change data exporting settings to download.
2.4 MB

C

14:58
Cosima

C

Cosima Research 17.03.2021 14:58:15
Deutsche Bank - Digital Currencies Feb 2021- COSIMA.pdf
Not included, change data exporting settings to download.
4.5 MB
20 March 2021

C

21:51
Cosima
Any interest in selling a chunk of FTX to Morgan Stanley?
21 March 2021

SB

05:08
Sam Bankman-Fried
In reply to this message
yeah totally, if they're interested!
25 March 2021

C

05:13
Cosima
Miami's got some great sports teams - and weather -

But Chicago has great sports teams and traders � what do you think of Chicago?

SB
05:15
Sam Bankman-Fried
I mean, I'm down!
26 March 2021

C
22:51
Cosima
Hey Sam - I just wanted to make sure you saw this message - should you ever be looking for charities that are truly making a difference - I wholeheartedly standby and recommend Noahs Arks
22:51
Should you be looking for some absolute miracle workers in the animal rescue 501c3 realm to donate to then look no further than https://www.noahs-arks.net/. They take in the worst of the worst, and unfortunately down south there is a lot of "the worst, sadly". I donate as much and as often as I can. Anything not covered by the charity is covered by the founder personally put of pocket. She is nothing short of an angel for animals.

All the best,
Brandon
22:52
Id be happy to connect your or facilitate any donation should that be of help to you. The founder pays for everything herself even if there aren't enough donations - and they take the absolute worst of the worst, which unfortunately down south, presents itself way to often.
27 March 2021

SB
01:41
Sam Bankman-Fried
❤
29 March 2021

C
11:11
Cosima
In reply to this message
Do you have a ball park valuation in mind?
31 March 2021

C
12:47
Cosima
Here is an example of the craziness this woman faces on a daily basis to save these animals others aren't willing to...
12:47
https://www.noahs-arks.net/animal/view/luna-boston-mix/1170#.YGSnUiX3YlR
8 April 2021

C
02:55
Cosima

FTX_EU_000064361

Hi Sam- we would like to update our Digital Assets AG website with a few quotes / testimonials from a few our tokenized stock customers. If I write something and post it here could you approve it- or would you prefer to write something / have something written from your side directly?
9 April 2021

C

09:46
Cosima
https://www.bloomberg.com/news/features/2021-04-08/how-bill-hwang-of-archegos-capital-lost-20-billion-in-two-days
13 April 2021

C

16:03
Cosima
We could do an instrument like we did for coinbase for FTX and it's market cap to get you a great valuation on FTX equity and then tokenize your stock and offer it / ipo it
24 April 2021

C

16:20
Cosima
Photo
Not included, change data exporting settings to download.
875×1280, 234.3 KB
1 May 2021

SB

21:08
Sam Bankman-Fried
hey!

a few things:

1) we'd love to have your token on Solana, and happy to pay for it and for eclusivity etc.
2) happy to coordinate launch etc. on all the solana chain stuff and on FTX, and MMing the token
3) also — what would you guys think about us investing in you guys?
3 May 2021

C

00:22
Cosima
Awesome! Great news! We ALWAYS welcome and appreciate your support and involvement
11 May 2021

C

23:22
Cosima
It would be really powerful to be able to freely move tokenized stocks on the blockchain, but as of now FTX and [German financial services firm] CM-Equity do not support that. They remain on FTX, a tied agent to CM-Equity," indicated FTX's Bankman-Fried.
23:22
We are ready!

SB

CONFIDENTIAL

23:46
Sam Bankman-Fried
In reply to this message
!!!!!!!
23:46
awesome!!!
23:46
you got the Bafin approval/etc.?

C

23:48
Cosima
Yes. Prospectus approval in hand
23:50
CoA AT_DE DAAG 20210511.pdf
Not included, change data exporting settings to download.
1.6 MB
12 May 2021

C

16:04
Cosima
In reply to this message
So we can issue the first ever approved securities prospectus on Solana

And exclusivity of using FTX as on off ramp for the decentralized / withdrawable stock tokens, also on Solana blockchain

C

18:15
Cosima
And be the first token issued On Solana blockchain with an ISIN number
13 May 2021

SB

10:13
Sam Bankman-Fried
+++
10:14
that would be awesome!!!
10:14
how long would the exclusivity last?

C

12:26
Cosima
In reply to this message
2 months

SB

15:23
Sam Bankman-Fried
sounds good!

C

FTX_EU_000064363

16:14
Cosima
Thanks Sam! As always, appreciate all the support. Thank you.
2 June 2021

C

15:35
Cosima
Do you envision a day when ftx.us offers Securities token offerings or stock tokens?
5 June 2021

C

14:55
Cosima
Congrats on renaming TSM FTX and miami heat's stadium!!!!

C

17:10
Cosima
In reply to this message
We have identified two potential acquisitions, one very promising for the US market. We can build the global Goldman Sachs of crypto/blockchain for FTX if there is interest from you. I assume with the capital investment in miami FTX stadium that you'll ultimately want to take over the USA market

C

17:16
Cosima

PG

Patrick Gruhn 08.02.2021 18:09:49
https://en.wikipedia.org/wiki/Hasso_Plattner
17:16
Also in 1998, Plattner founded the Hasso Plattner Institute[3] for software systems engineering based at the University of Potsdam, and in Palo Alto, California, its sole source of funding being the non-profit Hasso Plattner Foundation for Software Systems Engineering. Plattner has pledged €50 million of his personal fortune over a period of 20 years. Since its foundation, Plattner's commitment to the HPI has quadrupled to over €200 million. He not only fully finances the HPI, but is also actively involved as a director and lecturer in Enterprise Platforms and Integration Concept

C

17:17
Cosima
We can do the same for you as well^ form a university and fund it via your foundation, which we can also form
If any interest
9 June 2021

C

10:31
Cosima
Cointelegraph Security Token Report-Cosima.pdf
Not included, change data exporting settings to download.
7.7 MB

C

15:33

    FTX_EU_000064364

Cosima
https://twitter.com/coindesk/status/14026963659190640068?s=21
10 June 2021

SB
01:57
Sam Bankman-Fried
In reply to this message
Yup looks like a purge there
01:58
Political
01:58
He's not the only one
20 July 2021

C
19:16
Cosima
Damn Sam! Congrats on the capital raise, Very impressive, man!

SB
20:23
Sam Bankman-Fried
Thanks :)
21 July 2021

C
08:07
Cosima
Let me know when you want to tokenize some of that FTX equity :)
08:09
If/when you do- your new investors could basically post those ftx shares as equity with daag to tokenize and than ftx extend them margin against it as collateral to trade crypto on FTX. Kind of like what 3AC wanted to do with their deribit equity

SB
08:12
Sam Bankman-Fried
yuup

C
11:40
Cosima
We are extremely glad to be a part of such a revolutionary company during such a crazy time in the world. Thank you for giving us such an incredible opportunity to change the world of finance as we all know it!

We have some awesome developments to announce next month, FYI We call them, Barrier Tokens- but they are basically structured products including tokenized leveraged options trading.

For example, you buy b20TSLA600 for $10. And you get 20x leverage on the upside move in tesla stock, but if it trades at $599.99 the token is instantly worthless. We can do crypto too, and any leverage. Great for speculation and maximizing efficiency of hedging.

By natural extension we can, for what we think is the first time, add stop losses to any Dex- that will guarantee execute at the price you expect regardless of liquidity or volatility.

CONFIDENTIAL                                                                                          FTX_EU_000064365

I can buy b1BTC30000 for $30000 and will participate d-1 in btc's price action above $30,000 but the first time it trades below $30,000 the token is worthless. AND we can even link the knockout price to the closing price - so instead of the token becoming worthless the first trade below $30,000, it'll stay open until the closing price of btc is below $30,000, eliminating scam-wick to exposure. Or link it to a moving avg. Anything. It's pretty wild.

27 July 2021


C

10:51

Cosima

Do you know Sandy Pentland from MIT? �

30 July 2021


C

22:36

Cosima

In reply to this message

https://blog.kraken.com/post/10280/kraken-commits-300k-to-the-university-of-wyoming/

22:36

We can set up something similar and with an even more prestigious university in Europe for you / FTX

22:37

In reply to this message

https://www.donau-uni.ac.at/en

22:37

Patrick earned his Masters here as well as some of our colleagues that are current global regulators...

31 July 2021


SB

10:27

Sam Bankman-Fried

In reply to this message

nice!!!

10:27

In reply to this message

nope

10:27

In reply to this message

oh that would be sweet

1 August 2021


C

18:12

Cosima

Looking for anything else I should keep my eye out for ?

6 August 2021


C

17:44

Cosima

We can trade carbon credits too for FTX /alamedA

17:44

Photo

Not included, change data exporting settings to download.

884×484, 47.9 KB


SB

CONFIDENTIAL

19:07
Sam Bankman-Fried
ooh nice, which ones?
7 August 2021

C

01:13
Cosima

PG

Patrick Gruhn 06.08.2021 22:00:26
https://www.eex.com/en/markets/environmental-markets
01:13
I would use:
01:13
https://misc.interactivebrokers.com/cstools/contract_info/v3.10/index.php?action=Conid%20Info&wlId=IB&conid=378517354&lang=en&ib_entity=
01:13
(Old future, expired but as example)
01:13
https://www.theice.com/products/197/EUA-Futures
01:13
If we don't need to hedge them, also every other one is fine (then FTX/Alameda must provide both sides of the trade), we can just use European Union Allowance (EUA) in the KID as underlying for example
01:13
I also have two other clients that trade carbon instruments and they are also planting trees in case that is interesting
13 August 2021

C

20:06
Cosima
I think we should create and issue our proprietary DAAG token soon; especially given the success Mango just had with their raise... anything you like to personally see in the tokenomics?
31 August 2021

C

17:54
Cosima
Awesome aquisition of LedgerX. Congrats! You're killin' it!
1 September 2021

SB

05:04
Sam Bankman-Fried
thanks!
18 October 2021

C

10:19
Cosima
Hi Sam!
Do you happen to have any US tax accountants that you like enough to recommend?

C

FTX_EU_000064367

12:28
Cosima
I'd like to lend my stablecoin on FTX via the traditional margin lending that's set up. Is the only way to accomplish that via a non-USA entity?

SB
12:30
Sam Bankman-Fried
In reply to this message
hmmm— ours are pretty decent but idk if they're exceptional
12:30
also we might be hiring them
12:30
In reply to this message
1) FTX US has it for ECPs globally
2) FTX International has it for non-US residents and non-US entities

C
13:25
Cosima
Thank you
21 October 2021

C
08:35
Cosima
Nice raise! Congrats �

C
22:10
Cosima
love the 42069 lol
30 October 2021

C
13:25
Cosima
Are you planning on attending any F1 races?
6 November 2021

C
17:28
Cosima
FTX baby!!
17:28
Photo
Not included, change data exporting settings to download.
1280×960, 234.0 KB
8 November 2021

C
11:33
Cosima
FTX sponsorship is looking good �

CONFIDENTIAL

C
20:02
Cosima
FINMA meeting in the AM.

Think we have a great alternative, less restrictive, and faster to market solution for leveraged products in Europe too…
10 November 2021

SB
08:30
Sam Bankman-Fried
In reply to this message
interesting, what?
10 March 2022

C
07:37
Cosima
Hey Sam! I've got a very good friend who's family office was very early to crypto- original investor in DCG, Ledger wallets, and about a dozen others stemming back to 2014.

Here is his CV- he is actively invested in gaming too (epic games, Ubisoft, etc) I think he would be a huge asset to FTX ventures / FTX's gaming efforts. He's in NY; maybe after perusing his CV you might want to meet or have someone else talk to him.

His name is Greg Landeggor and his family off is Parsons & Whittemore / The Whittemore Collection
07:37
Gregory_Landegger_CV.pdf
Not included, change data exporting settings to download.
229.6 KB

# Exhibit 9

Message

| | |
|---|---|
| **From**: | Patrick Gruhn [patrick@ftx.com] |
| on behalf of | Patrick Gruhn <patrick@ftx.com> [patrick@ftx.com] |
| **Sent**: | 7/10/2022 10:38:24 PM |
| **To**: | can@ftx.com |
| **Subject**: | Fwd: Gesuch |
| **Attachments**: | Project Bellevue - Business Plan NPB.pdf |

FYI, haven't read it yet

Best regards,

Patrick Gruhn, LL.M., MBA
**Head of FTX Europe**

**T** +41 71 588 01 92 | www.ftx.com

---

**From:** Adrian Heuermann (CH) <adrian.heuermann@pwc.ch>
**Sent:** Sunday, July 10, 2022, 3:25 AM
**To:** christian.stambach@bratschi.ch <christian.stambach@bratschi.ch>
**Cc:** thomas.peter@bratschi.ch <thomas.peter@bratschi.ch>; christian.beutter@bratschi.ch
<christian.beutter@bratschi.ch>; martin.liebi@ftx.com <martin.liebi@ftx.com>; Michael Hunziker
<michael.hunziker@5001.ch>; Markus Ruffner <markus.ruffner@icloud.com>; Christoph Baertz (CH)
<christoph.baertz@pwc.ch>; Marielle Margue (CH) <marielle.m.margue@pwc.ch>; Robin Matzke <robin@ftx.com>;
Patrick Gruhn <patrick@ftx.com>
**Subject:** RE: Gesuch

Guten Tag Zusammen,

anbei sende ich gerne wie unten erwähnt den Business Plan als Anlage zum FINMA Gesuch. Bei Rückfragen stehen wir
gerne zur Verfügung.

Herzlichen Dank und beste Grüsse

Adrian Heuermann


**Adrian Heuermann**
PwC | Advisory Deals
Office: +41 58 792 15 17 | Mobile: +41 76 464 99 54
Email: adrian.heuermann@pwc.ch
PricewaterhouseCoopers AG
Birchstrasse 160, 8050 Zurich
http://www.pwc.ch


---

**From:** Markus Ruffner <MRuffner@npb-bank.ch>
**Sent:** Sonntag, 10. Juli 2022 08:58
**To:** christian.stambach@bratschi.ch
**Cc:** thomas.peter@bratschi.ch; christian.beutter@bratschi.ch; martin.liebi@ftx.com; Adrian Heuermann (CH)
<adrian.heuermann@pwc.ch>; Michael Hunziker <michael.hunziker@5001.ch>; Markus Ruffner

CONFIDENTIAL

\<markus.ruffner@icloud.com>
**Subject:** WG: Gesuch

Guten Morgen Herr Stambach

Dies ist das eigentliche (Rahmen-)Gesuch, das wir wohl auf NPB Papier drucken lassen sollten (werde Ihnen Papier mit NPP Letter head zukommen lassen)?

Herr Liebi wird Ihnen (@Martin Liebi: bitte separat an Herrn Stambach und Herrn Beutter) alle Beilagen noch mit Google drive zukommen lassen (vielleicht müssen wir wegen besserer Lesbarkeit für die FINMA ein ZIP-file erstellen)

Wir können noch entscheiden, ob wir vorerst alles ohne Unterschrift senden oder das Gesuch und einzelne Beilagen unterzeichnen (ich kann organisieren, dass Herr Kraemer als VR-Vize und ich nächsten Donnerstag eine physische Unterschrift leisten)

Es fehlt noch der Business Plan, der von PWC erstellt wird (ist schon weit fortgeschritten und sollte in den nächsten Tagen erhältlich sein); werde diesen allen zuschicken, sobald ich diesen von Herrn Heuermann erhalten habe

Die Legal Opinion zur konsolidierten Aufsicht von PWC haben ich den Anwälten von Bratschi schon separat zugeschickt.

Das Gesuch sollte gehen an:


**Rahel Ebneter**
BSc FH in Wirtschaftsrecht
Bewilligungen
Geschäftsbereich Banken

Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

Laupenstrasse 27, CH-3003 Bern
Tel. +41 31 327 96 72
Fax +41 31 327 91 01

rahel.ebneter@finma.ch
www.finma.ch

Ich bin ab heute Nachmittag in Abu Dhabi/Dubai und am Donnerstagnachmittag zurück (kann sowohl auf meiner privaten als (etwas weniger häufig) auf meiner NPB Mail-Adresse erreicht werden)

Meine Handy-Nummer: 079 433 58 50


Beste Grüsse

Markus Ruffner

Prof. Dr. Dr. Markus Ruffner
CEO, Partner

NPB Neue Privat Bank AG
Limmatquai 1 / am Bellevue
P.O.Box
CH-8024 Zürich
Phone    +41 44 265 11 88 / 73
Fax      +41 44 265 11 90

CONFIDENTIAL

------------------------------ DISCLAIMER ------------------------------
---
This message (including any attachments) is confidential and may be privileged. If you have received it by mistake please notify the sender by return e-mail and delete this message from your system. Any unauthorized use or dissemination of this message in whole or in part is strictly prohibited. Please note that e-mails are susceptible to change. NPB Neue Privat Bank AG shall not be liable for the improper or incomplete transmission of the information contained in this communication nor for any delay in its receipt or damage to your system. NPB Neue Privat Bank AG does not guarantee that the integrity of this communication has been maintained nor that this communication is free of viruses, interceptions or interference.
------------------------------
---

**Von:** Martin Liebi <martin.liebi@ftx.com>
**Gesendet:** Freitag, 8. Juli 2022 18:44
**An:** Markus Ruffner <MRuffner@npb-bank.ch>
**Betreff:** Gesuch

--
FTX Europe
Dr. Martin Liebi LL.M. attorney-at-law
Member of Management / Head of Switzerland
+41 76 341 65 43

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. The preservation of your privacy and the protection of your personal information is our priority. You can find out more about how PwC processes your personal data in our privacy policy at https://www.pwc.ch/en/site-information/privacy-statement.html

CONFIDENTIAL



# Project Bellevue

# Business Plan – NPB Neue Privat Bank AG

**presented to**

Eidgenössische Finanzmarktaufsicht FINMA

**prepared by**

NPB Neue Privat Bank AG

**for the purpose of**

Regulatory approval process

for the acquisition of 100% share capital of

NPB Neue Privat Bank AG by FTX Europe AG

Limmatquai 1

8024 Zürich

Switzerland

Neue Privat Bank AG       Telefon +41 44 265 11 88       info@npb-bank.ch
Limmatquai 1 am Bellevue  Fax +41 44 265 11 89          www.npb-bank.ch
Postfach
CH-8024 Zürich

1



# Business Plan – NPB Neue Privat Bank AG

*Contents*

1. Rationale behind the envisaged acquisition of NPB Neue Privat Bank AG ................................. 3

2. FTX ............................................................................................................................................ 4

    2.1    Group .................................................................................................................................... 4

    2.2    FTX EMEA Ltd - Cyprus holding company ........................................................................ 6

    2.3    FTX Europe .......................................................................................................................... 6

    2.4    Future entities held by NPB ................................................................................................ 7

3. NPB ........................................................................................................................................... 9

    3.1    Main activities ..................................................................................................................... 9

    3.2    Legal structure ..................................................................................................................... 9

4. Board of Directors and Management ....................................................................................... 10

    4.1    Board of Directors .............................................................................................................. 10

    4.2    Management ........................................................................................................................ 11

    4.3    Organisational structure .................................................................................................... 11

5. Target Products & Markets ...................................................................................................... 12

6. Information Technology ........................................................................................................... 13

7. Financial Forecast of NPB ...................................................................................................... 13

    7.1    General Approach and Philosophy .................................................................................... 13

    7.2    Income Statement .............................................................................................................. 14

    7.3    Balance Sheet ..................................................................................................................... 21

    7.4    Regulatory Capital ............................................................................................................. 23

Appendixes ...................................................................................................................................... 26

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

2

CONFIDENTIAL



### 1.  Rationale behind the envisaged acquisition of NPB Neue Privat Bank AG

FTX Europe AG ("FTX Europe") acting as prospective acquirer of NPB Neue Privat Bank AG ("NPB", "Bank", "we" or "us") is a subsidiary of FTX Trading Ltd. and a member firm of the larger FTX Group ("Group" or "FTX"). The Group's main activity is the operation of a cryptocurrency exchange with a daily average trading volume of circa USD 10 billion.

With the acquisition of NPB by FTX Europe, we intend to bring services related to digital assets and traditional banking services closer together, all while being fully regulated. We believe that via FTX, we will be in a position to extend the scope and service offering currently available to our clients and facilitate amongst others the trading of cryptocurrencies for both retail and institutional clients.

The business plan that is described in more detail in section 7 is based on the following main assumptions:

(i)   **Grow NPBs current business model in line with its past development:**
      NPB is an owner-led private bank established in 2001 with a focus on private banking and asset management services. Due to our small size, we are able to offer a personalised and independent approach to provide services that can be tailored to the individual objectives and needs of each client. FTX is fully committed to grow the Bank's private banking activities in line with its past development and with the same values of honesty, stability, reliability and respect for privacy as in the past.

(ii)  **Extend our digital and crypto-related offering:**
      We have undertaken various measures to grow and diversify our business over the past years. Our new partnership with ALMHA Limited in the Middle East that we entered in 2021 also includes an extended digital service offering. As such, NPB has recently received the approval to trade crypto assets, whereby each order is recorded, saved and archived in Finnova's core banking system. FTX plans to build on NPB's skills and affinity for digital assets to extend this type of offering and combine it with their expertise and an own offering of crypto assets.

(iii) **Enter new markets and acquire new customers throughout Europe:**
      Ideally positioned in the heart of Europe and being regulated by one of the most renowned market supervisory authorities in Europe and the world, we intend to initially continue to serve the Swiss market, but plan to also enter new markets and offer our services abroad later on. While both NPB and FTX are present in the Middle East – NPB via its partnership with ALMHA Limited and FTX via its exchange – the plan is to further expand the offering into other European countries.

Furthermore, we want to emphasize that we intend to continue to reduce our risk profile with respect to our trading portfolio and do not plan to engage in any business relationships of more risky nature (e.g., unsecured Lombard loans). Moreover, after having fulfilled all of the requirements with respect to the investigation by the US Department of Justice, we as NPB are now well positioned to fully concentrate again on growing the business.

Neue Privat Bank AG          Telefon +41 44 265 11 88     info@npb-bank.ch          3
Limmatquai 1 | am Bellevue   Fax +41 265 11 89            www.npb-bank.ch
Postfach
CH-8024 Zürich

CONFIDENTIAL                                                              FTX_EU_000030596

# NPB | Neue Privat Bank

For a better understanding of why we believe that the acquisition of NPB by FTX will be beneficial for both parties as well as how we intend to operate the business going forward, we will first provide you with an overview of FTX' current structure and operations, followed by a description of our current service offering. Next, we will express our ambitions in terms of product offering and target markets as well as our intentions in terms of personnel that we believe are best suited to successfully drive those initiatives. Finally, section 7 of the report outlines the financial forecast and its main assumptions in more detail.

## 2. FTX

### 2.1 Group

FTX is one of the leading and fastest-growing digital asset businesses in the world. The Groups' main operations are in the brokerage of bilateral OTC derivatives and cryptocurrency loans between customers (peer-to-peer), as well as in the area of payment transactions. Those operations are mainly carried out via FTX Trading Ltd that was incorporated in Antigua in 2019. While the Group primarily operates in the Bahamas, its activities extend across the US, Switzerland, Turkey and Australia. Via FTX Trading, the Group has already the necessary licenses and can sell public securities as tokens on the blockchain in a broad geographic area. Following the acquisition of NBP, the Group would furthermore offer asset management services. To be noted that FTX Trading Ltd does not provide any services to US customers or customers in restricted jurisdictions.

As of now, FTX mainly serves institutional clients which are, for the majority, regulated companies with a professional treasury. The Group also serves retail clients, but to a lesser extent. The controlling and ultimate shareholder is Samuel Bankman-Fried, a US citizen domiciled in Bermuda.

At the top level and as can be seen in Figure 1 below, the Group splits into two distinct arms, being Paper Bird Inc. and West Realm Shires Inc. They are separated ("ring-fenced") in terms of personnel, organization and logistics and their only unifying element is the controlling shareholder Samuel Bankman-Fried. To be noted that West Realm Shires Inc holds all entities which are located in the United States. FTX Trading Limited (Antigua) ("FTX Trading") which is a direct subsidiary of Paper Bird Inc, deals with all the activities outside the US and in turn currently fully owns FTX Europe AG. Paper Bird owns 65% of FTX Trading on a fully diluted basis. In fact, 15% of equity consists of own-shares which are available for issuance under the employee stock ownership plan. The remaining equity is owned by Mr Nisha Singh who has a 6.1% stake as well as 339 other investors who all own less than 1%. Mr. Nisha Singh is Head of Engineering at FTX.

In the future, it is planned that FTX Europe AG will be held by a Cypriot intermediate holding company (FTX EMEA Ltd.) as can be seen in Figure 1. The Cypriot holding company will initially also own NPB. However, it is subsequently planned that, soon after Closing, the Bank will be shifted down under FTX Europe and directly hold all licensed entities for its non-US operations.

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 265 11 89

info@npb-bank.ch
www.npb-bank.ch

4

CONFIDENTIAL





**Figure 1: Simplified target legal chart**

Figure 1 reflects the Group's target structure for its operations outside the US. Several of these entities are only in the process of being signed or still need to be closed. Hence figure 1 shows the future structure once all currently envisaged acquisitions have been completed. For more details on the activities of the different entities, please refer to the end of section 2 on page 8.

FTX EMEA Ltd. will be fully owned by FTX Trading Ltd. While FTX has signed to acquire NPB on 22nd June 2022, they are currently also envisaging the acquisition of Klarpay AG, a company based in Switzerland for which FTX EMEA Ltd. would also act as acquirer. Moreover, on 1st March 2022, FTX has signed a share purchase agreement to acquire BTC Africa that reunites a large number of UK and Africa-based entities.

---

[1] Other participations under FTX Switzerland GmbH not depicted in graph:
**Inactive entities:** JP Process Systems GmbH; LODE (Switzerland) AG;
**Liquidated entities:** Bcoin Technology AG & Co KG; Binary Tech AG & Co KG; LODE (Austria) AG & Co KG

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefax +41 44 265 11 88
Fax +41 265 11 89

info@npb-bank.ch
www.npb-bank.ch

CONFIDENTIAL



Following the closing of all three acquisitions the Group will have roughly 450 employees spread across various regions in the world excluding the US-activities.

### 2.2 FTX EMEA Ltd - Cyprus holding company

For tax optimisation purposes, FTX decided to set up a Cyprus-based holding company, namely FTX EMEA Ltd. which, in the first step, is the legal entity acquiring NPB as well as most likely Klarpay. An injection of roughly USD 200 million of debt and USD 100 million of equity into this HoldCo is envisaged to have the necessary cash at hand for the planned acquisitions of BTC Africa, NPB and Klarpay. As mentioned before, in a second step, NPB will then be moved under FTX Europe so that FTX Europe, itself 100% directly owned by FTX EMEA Ltd, will be the sole and direct owner of NPB. At the same time, all licensed entities of the Group having operations outside the US will be shifted under NPB as shown in Figure 1.

### 2.3 FTX Europe

In November 2021, FTX Trading Ltd acquired Digital Asset DA AG that was later renamed to FTX Europe AG. FTX Europe is a Swiss technology and financial company that issues structured and tokenized financial products. It was acquired by FTX Trading in a two-step process. Initially owning 20% of DAAG, FTX Trading Ltd. purchased the remaining 80% in November 2021. The rationale behind acquiring DAAG was to acquire operating licenses that allow the Group to sell public securities as tokens on the blockchain. DAAG is authorized to operate in a broad geographic area including Cyprus, Switzerland and Dubai all of which represent target markets of FTX.

As per a valuation carried out by BDO, DAAG was valued at USD 312 million at the time of the acquisition and included a cash consideration of USD 229 million in addition to contingent considerations of roughly USD 90 million.

With respect to FTX Europe's operations, the firm is generating revenues by lending USD 100 million on a quarterly basis at an annualised interest rate of 7% to a single client. This USD 100 million is composed of 65% of cash owned by an independent third-party and 35% of cash from the ultimate beneficial owner of the Group, Samuel Bankmann-Fried.

The Board of Directors of FTX Europe is composed of following members:

| Board of Directors of FTX Europe | Function |
| --- | --- |
| Robin Matzke | Chairman |
| Martin Liebi | Member |
| Jürg Bavaud | Member |

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

6

FTX_EU_000030599



### 2.4 Future entities held by NPB

Below we provide an overview of the entities that NPB is envisaged to hold in the future. For an overview of other Group entities located under the Paperbird Inc arm, please refer to the Appendix.

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

7

FTX_EU_000030600



**Table 1: Entities hold in the future by NPB in addition to its current participation in NPB Middle East**

*All entities are hold at 100% except if otherwise indicated*

| Entity | Country of domicile | Status (signed/closed) | Activity | # of FTE | Currency | Total balance sheet size (in million) | Shareholders' equity (in million) | Gross revenues (in million) | Net income (in million) |
|---|---|---|---|---|---|---|---|---|---|
| NPB Middle East Holding Ltd (participation of 40%) | United Arab Emirates | Closed | Private wealth advisory company. | 3 | USD | 1.6 *(30Jun22)* | 1.6 *(30Jun22)* | 1.0 *(01Jul21 to 30Jun22)* | 0.2 *(01Jul21 to 30Jun22)* |
| Kentouch (participation of 35%) | Switzerland | Closed | Asset Management firm | n/a | CHF | 0.8 *(31Dec21)* | 0.8 *(31Dec21)* | 0.1 *(FY21)* | 0.1 *(FY21)* |
| FTX Trading DMCC | United Arab Emirates | Closed | *Inactive* | | | | | | |
| Altalix Limited | United Kingdom | Not yet signed | Virtual asset service provider. | 1 | GBP | 0.2 *(19May22)* | 0.2 *(19May22)* | 0.4 *(01Nov21 – 19May22)* | 0.3 *(01Nov21 – 19May22)* |
| FTX Exchange FZE | United Arab Emirates | Not yet fully completed | Licensed and prudentially supervised as a Virtual Asset Exchange and Clearing House in the United Arab Emirates by the Virtual Asset Regulatory Authority (VARA). | 3 | USD | 4.7 *(Based on business plan projections - Year 1)* | 1.6 *(Based on business plan projections - Year 1)* | 13.5 *(Based on business plan projections - Year 1)* | (2.5) *(Based on business plan projections - Year 1)* |
| Tigerwit Limited | United Kingdom | Signed, but not yet closed. | Broker with UK-broker license. | 13 | GBP | 2.1 *(31Mar22)* | 1.9 *(31Mar21)* | 1.7 *(01Apr21to 31Mar22)* | (0.7) *(01Apr21to 31Mar22)* |
| FTX Switzerland GmbH | Switzerland | Closed | Provides financial intermediary and custody services in Switzerland and certain other jurisdictions as a member of FINMA SRO Treuhand Suisse and Finanzombudsstelle Schweiz. | 2 | CHF | 1.6 *(30Jun21)* | 1.6 *(30Jun21)* | 0.1 *(01Jan21to 30Jun21)* | (0.6) *(01Jan21to 30Jun21)* |
| Klarpay AG | Switzerland | About to be signed | Swiss fintech that offers businesses access to multi-currency IBAN accounts, global payment acceptance and digital disbursement solutions. | 14 | CHF | 1.5 *(31Dec21)* | 0.5 *(31Dec21)* | 0.0 *(FY21)* | (0.4) *(FY21)* |
| K-NDA Financial Services Ltd | Cyprus | Signed, but not yet closed | Provision of investment services, including the reception and transmission of orders in relation to one or more financial instruments, execution of orders on behalf of clients, portfolio management and provision of investment advice. | 15 | EUR | 0.3 *(31Dec21)* | 0.2 *(31Dec21)* | 0.3 *(FY21)* | (1.2) *(FY21)* |
| Concedus Digital Assets GmbH (participation of 10%) | Germany | Signed, but not yet closed. | IT-Consulting, software development and IT-training provider as well as development of product and software solutions. | n/a | EUR | 4.4 *(31Dec21)* | 2.7 *(31Dec21)* | - *(FY21)* | (0.2) *(FY21)* |

8

CONFIDENTIAL


NPB | Neue Privat Bank

## 3. NPB

### 3.1 Main activities

NPB is a limited liability company under Swiss law, founded in 2001. Our main service offering comprises private banking and asset management services. We serve private clients, independent asset managers as well as institutional clients. As of 31 December 2021, we had assets under management ("AuM") of CHF 1.8 billion. As part of our asset management business and for our own account, we conduct securities trading and related transactions. Our loan book which is entirely composed of Lombard loans amounted to CHF 50.4m as of year-end 2021 and had an unsecured exposure of CHF 1.5m as of 26 March 2022. This unsecured exposure is an exception for the Bank, which is the result of adverse market movements at the beginning of the pandemic in 2020 that negatively impacted one client. As a consequence, we set up a new repayment schedule with the client so that the amount of unsecured exposure has continuously been within an acceptable range since then. Going forward, we intend to continue to minimize the amount of unsecured loans.

NPB conducts trading for its own account in bonds, shares and related derivative financial instruments. As of 31 December 2021, the trading portfolio consists mainly of debt and money market securities and to some extent also comprises a hedged amount of equity exposure. Going forward, we plan to keep the trading book but without engaging in any disproportionately risky transactions.

NPB also acts as paying agent for 800 to 900 funds domiciled in Switzerland for which the onboarding, due diligence, monitoring and invoicing process are highly automated. We intend to keep the current offering in place, however, without actively seeking to increase this type of service offering.

### 3.2 Legal structure



Neue Privat Bank AG
Limmatquai 1 am Bellevue
Postfach
CH-8024 Zürich

Telefax +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

9

CONFIDENTIAL


NPB | Neue Privat Bank

NPB is owner-led, whereby 76% of the shareholding is held by Management or the board. Management is composed of the following members:

| Management of NPB | Function |
| --- | --- |
| Prof. em. Dr. Dr. Markus Ruffner | CEO, Head Asset Management / Institutions |
| M.A. HSG Bruno Zürcher | Head Private Banking |
| Peter Albinsson, CFA | Head Private Banking International / UHNW |
| Stefan Tschopp | Head Legal & Compliance |

Please find the CVs of the current Management in Appendix 1.

In January 2021, NPB and ALMHA Limited ("ALMHA") signed a joint venture agreement to establish a Middle East regional private wealth advisory company in the United Arab Emirates (UAE), called "NPB Middle East Holding Ltd" ("NPB ME"), whereby NPB owns 40% of the entity with the remaining 60% owned by ALMHA Limited. NPB ME has 3 employees, of which two are client advisors and one is an investment advisor. NPB ME which in turn fully owns NPB (Middle East) Limited in Abu Dhabi, was granted a Category 4 license as an advisory company by the Abu Dhabi Global Markets Authority in September 2021. In FY21, NPB acquired AuM of c. CHF 800m via the new partnership, all of which are booked under custody at the Bank in Zurich.

We also have a 35% participation in KenTouch which functions as a strategic advisor to two Asian funds domiciled in Luxembourg, each with AuM of ca. USD 11.0m. The AuM are managed by Pheim Asset Management in Malaysia. Going forward, it is planned that KenTouch will no longer act as strategic advisor.

## 4. Board of Directors and Management

### 4.1 Board of Directors

Currently the Board of Directors of NPB and NPB ME respectively are composed as follows:

| Board of Directors of NPB | Function |
| --- | --- |
| Dr. Michael Hunziker | Chairman |
| Xavier F. Kraemer | Vice Chairman |
| Dr. Helena Braxator Manzione | Member |

| Board of Directors of NPB ME | Function |
| --- | --- |
| Hareb Al Darmaki | Chairman |
| Amjed Al Jaffery | Member |
| Prof. Dr. Dr. Markus Ruffner | Member |
| Peter Albinsson | Member |

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

10

FTX_EU_000030603



NPB | Neue Privat Bank

Following closing of the transaction and to ensure continuity, FTX would like to have at least two out of the current board members remain in the board of directors of NPB. Though no direct decision has yet been taken, discussions are planned for the weeks to come on the exact composition. As a new external member, it is foreseen that Marcel Lötscher will join the board. We have included his CV in Appendix 2.

After the departure of NPB's current CEO in the course of next year and following a cool-off period, FTX would be keen to onboard Prof. Dr. Dr. Ruffner additionally as member of the board of directors.

### 4.2 Management

Prof. Dr. Dr. Markus Ruffner has fulfilled the role of CEO of NPB since 2009 and until he retires, which is foreseen to be mid-2023, he will continue to serve as CEO of NPB. We are currently in the process to determine an appropriate successor and will inform you promptly once we have found an agreement with the future CEO. We envisage that, before Mr Ruffner leaves his role as CEO of the Bank, both the current and future CEO will closely work together to ensure a smooth transition. No changes are foreseen for the remaining Management team.

### 4.3 Organisational structure



As of 31 December 2021, NPB had 16 employees equivalent to 13.9 FTE located in Zurich and additionally 3 employees based in the Middle East.

According to our business plan, we forecast the number of FTE to increase from 16.9 as of year-end 2021 to 28.9 by the end of 2026. This is based on the premise of keeping the entire workforce in place in order to continue with the current operations and avoid any disruption. To grow the business, we furthermore plan to modestly increase the workforce over the years to come.

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

11

FTX_EU_000030604



Given that CHF 0.8bn of AuM had been sourced via the Middle East partnership as of 31Dec21, we believe that the capacity is given to increase business volume without the need of hiring additional employees in this respect. On the other hand, the Private Banking segment in Zurich sees the largest increase, increasing from 2.6 FTE as of 31Dec21 to 8.6 FTE as of 31Dec26. We emphasize however that this increase comprises 2 Junior Private Bankers that have already started employment right in the beginning of FY22. In addition, we foresee a steady growth of one additional employee in the Private Banking team in each year between FY22 and FY25 included. This comprises amongst others one employee to be hired in FY22 that shall specifically drive the Bank's digital offering and gain new clients for this type of product.

Within back-office, Other includes functions in relation to risk management, accounting and administrative work. Their number will increase by 3 up to 6.9 by the end of FY26. This comprises amongst others, one new IT employee joining the Bank in FY22 and whose responsibilities include rolling out the Bank's new Incore application. In addition, we plan to hire one employee who will specifically take care of anything related to the controlling and consolidation of the entities under NPB.

For compliance, we believe that 2 new hires will be adequate to deal with the increased business volume forecast for the years to come.

## 5. Target Products & Markets

At the beginning of 2022, NPB had +400 client mostly comprised of private individuals as well as institutional clients and asset managers. Going forward, we will continue to serve these same types of clients, but increase the share of institutional clients given the predominantly institutional client base of FTX.

Today, NPB clients already have the possibility to exchange fiat money into cryptocurrencies due to our partnership with Incore Bank. We intend to extend this offering by including trading of cryptocurrencies on behalf of clients and in our own name. The orders would then be executed at the Group's regulated entity, namely FTX Exchange FZE, based in Dubai, United Arab Emirates. Due to this set-up, we will be able to offer the service at highly competitive rates and hence differentiate from competitors.

Furthermore, we intend to include exchange traded products ("ETPs") in the product portfolio. In fact, market participants in the spot market are exposed to a number of risks. This includes that initial "clean" digital assets may turn "dirty" from a chain-analysis perspective and hence lose value and may even become non-tradable. In addition, a number of jurisdictions do not provide for an adequate legal setting and therefore increase the issuer risk faced by the cryptocurrency purchaser. As a solution, we plan to offer products, such as futures that will be traded on a regulated exchange. It turns out that this is particularly important for institutional participants in Switzerland and the European Economic Area. As those leveraged ETPs will be traded on stock exchanges such as SIX or BX SIX with dual listing on the Börse Stuttgart, Deutsche Börse, Euronext, LSE, OMX and ADX, this will be both capital efficient and bypass the disadvantages that similar transactions

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

12



present on the spot market. We foresee that we would offer those type of products as part of our investment advisory services.

Concerning our target markets, we intend to continue to serve the Swiss and Middle Eastern market, but later on also enter new European countries.

## 6. Information Technology

Implementing our vision to position the bank as a key player for banking services in the cryptocurrency ecosystem will require continuous IT investments and updates of the existing IT infrastructure. We have considered additional expenditures for the IT landscape in the business plan in the years 2022 and 2023, which makes IT expenses the major cost component within other operating expenses. To successfully transform the bank into a valuable and reliable partner for the tech-driven cryptocurrency industry, it will be crucial that we have cutting-edge IT interfaces in place (including mobile APPs), so that an efficient connection with potential crypto partners is ensured. A modern IT structure is therefore the foundation on which this business plan is built.

In addition to strengthening the bank's inhouse capabilities, we plan to continue and/or intensify our commercial relationships with our current third-party providers which are Incore Digital Asset Banking Services and Swissquote Group Holding SA:

- With the **Incore Digital Asset Banking Services** ("Incore") that we currently use, we have the possibility to expand this offering by easily subscribing to additional products. In fact, going forward, we envisage to roll out the Incore application to our customers so that they can access their e-banking via their smartphone and tablet and conduct all their banking activities in an easy and seamless way. Additional IT costs in this respect are reflected accordingly in the general and administrative expenses in the business plan.
- **Swissquote Group Holding SA** ("Swissquote") is a Swiss Banking group, which is specialized in providing trading services (online and offline) and crypto-assets solutions. Going forward, we plan to continue the partnership with Swissquote.

## 7. Financial Forecast of NPB

### 7.1 General Approach and Philosophy

The financial forecast ("business plan") of NPB comprises the mid-term projection of the income statement and balance sheet as well as the development of the regulatory capital and adequacy of NPB. The business plan of NPB covers a five-year planning period up until fiscal year 2026. The projection of the financials is mainly based on historical figures of NPB realized in the fiscal years 2019, 2020 sand 2021 as well as considering material year-to-date 2022 developments. Thus, the financial projection already includes the new

Neue Privat Bank AG
Limmatquai 1 am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

13

CONFIDENTIAL

FTX_EU_000030606



**NPB** | Neue Privat Bank

business realized in 2021 as well as future opportunities in connection with the joint venture with ALMHA Limited for the Middle East business. Moreover, the business plan of NPB reflects new off-balance sheet business opportunities starting from fiscal year 2023 which is expected through access to the FTX group network (so called NPB Digital Asset business). Lastly, the business plan of NPB reflects envisaged changes to the group structure, whereby several group entities will be reorganized as subsidiaries of NPB. Against this background, a capital injection of CHF 50m from FTX group into NPB is intended in 2022 to strengthen the capital basis of NPB. We want to highlight that the financial forecast for NPB is generally based on a fair and realistic view and hence, is designed to reflect both opportunities and risks in a balanced-out manner.

### 7.2 Income Statement

#### 7.2.1 Overview

**Income Statement**

| Income Statement - NPB | | Historical Figures | | | Plan Figures | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Position | Unit | FY19 Act | FY20 Act | FY21 Act | FY22 Plan | FY23 Plan | FY24 Plan | FY25 Plan | FY26 Plan |
| Net Interest Income | CHFmn | 0.9 | 0.8 | 0.6 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Net Commission Income - CH | CHFmn | | | | 6.7 | 6.8 | 6.9 | 7.1 | 7.2 |
| Net Commission Income - UAE | CHFmn | | | | 2.1 | 2.2 | 2.3 | 2.3 | 2.4 |
| Net Commission Income - NPB DA | CHFmn | | | | - | 0.5 | 1.5 | 3.1 | 6.1 |
| Net Commission Income | CHFmn | 5.7 | 5.1 | 6.3 | 8.8 | 9.5 | 10.7 | 12.5 | 15.8 |
| Net Trading Income | CHFmn | 1.5 | (0.2) | 1.1 | (0.6) | 0.6 | 0.6 | 0.6 | 0.6 |
| Other Ordinary Income | CHFmn | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Operating Income** | **CHFmn** | **8.1** | **5.7** | **8.0** | **9.2** | **11.1** | **12.4** | **14.1** | **17.5** |
| Personnel Expenses | CHFmn | (2.8) | (2.5) | (2.9) | (5.4) | (6.5) | (6.2) | (6.8) | (7.1) |
| General and Administrative Expenses | CHFmn | (3.2) | (3.0) | (3.1) | (3.6) | (4.1) | (4.2) | (4.2) | (4.2) |
| **Operating Expenses** | **CHFmn** | **(6.1)** | **(5.5)** | **(6.0)** | **(9.0)** | **(10.6)** | **(10.4)** | **(11.0)** | **(11.4)** |
| **Gross Operating Profit** | **CHFmn** | **2.0** | **0.2** | **2.1** | **0.2** | **0.5** | **2.0** | **3.1** | **6.1** |
| Depreciation & Amortisation | CHFmn | - | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Change Provisions | CHFmn | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| **Operating Result** | **CHFmn** | **2.0** | **0.1** | **2.0** | **0.2** | **0.5** | **1.9** | **3.1** | **6.1** |
| Extraordinary Result | CHFmn | 0.5 | (0.1) | (0.1) | | | | | |
| **Operating Result after Extraordinary Result** | **CHFmn** | **2.5** | **0.1** | **1.9** | **0.2** | **0.5** | **1.9** | **3.1** | **6.1** |
| Income Taxes | CHFmn | (0.2) | (0.0) | (0.4) | (0.0) | (0.1) | (0.4) | (0.7) | (1.3) |
| **Net Income** | **CHFmn** | **2.3** | **0.0** | **1.5** | **0.1** | **0.4** | **1.5** | **2.4** | **4.8** |

| KPIs Income Statement: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *AuM Development* | | | | | | | | | |
| Total Net New Money Inflows | CHFmn | (164) | (39) | 828 | 27 | 133 | 133 | 240 | 455 |
| Total AuM (eop) | CHFmn | 855 | 826 | 1'848 | 1'893 | 2'045 | 2'199 | 2'461 | 2'941 |
| Ø Total AuM | CHFmn | | 840 | 1'337 | 1'871 | 1'969 | 2'122 | 2'330 | 2'701 |
| Ø Client Loans (CH) | CHFmn | | 33 | 44 | 51 | 52 | 53 | 54 | 55 |
| *Development Key Line Items* | | | | | | | | | |
| Change Total Operating Income | % | | (30%) | 41% | 15% | 20% | 11% | 14% | 24% |
| Change Operating Expenses | % | | (9%) | 8% | 51% | 18% | (2%) | 6% | 3% |
| Change Operating Result | % | | (93%) | 1289% | (91%) | 153% | 308% | 59% | 96% |
| Change Net Income | % | | (99%) | 6718% | (90%) | 153% | 308% | 59% | 96% |
| *Profitability* | | | | | | | | | |
| NII Margin (in % of Ø Client Loans) | bps | | 241 | 139 | 190 | 190 | 190 | 190 | 190 |
| Commission Income Margin (in % of Ø Total AuM) | bps | | 61 | 47 | 47 | 48 | 51 | 53 | 58 |
| Gross Margin (in % of Ø Total AuM) | bps | | 68 | 60 | 49 | 57 | 58 | 61 | 65 |
| Cost Income Ratio | % | 74.9% | 97.0% | 74.3% | 97.7% | 95.5% | 84.1% | 78.0% | 65.1% |
| Return on Ø Equity | % | | 0.1% | 5.5% | 0.3% | 0.5% | 1.9% | 3.0% | 5.7% |
| *Personnel Information* | | | | | | | | | |
| Total FTEs eop | # | 12 | 13 | 14 | 19 | 22 | 24 | 26 | 26 |
| Ø FTE | # | | 13 | 14 | 16 | 20 | 23 | 25 | 26 |
| Ø Total AuM per Ø FTE | CHFmn | | 66 | 96 | 114 | 97 | 93 | 94 | 104 |
| Personnel Expenses per Ø FTE | CHFk | | 200 | 211 | 330 | 319 | 272 | 274 | 275 |

Main driver for future revenue growth is the net commission income which corresponds to the off-balance sheet business. The net commission income is expected to grow especially due to new business opportunities arising in the region Middle East (joint venture with ALMHA Limited) as well as new business opportunities

Neue Privat Bank AG
Limmatquai 1 am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

14



in connection with future access to the FTX group network (NPB Digital Asset). Relevant off-balance sheet assets under management are expected to grow by CHF 1.1bn from CHF 1.8bn (year-end 2021) to CHF 2.9bn (year-end 2026). The net interest income and trading income correspond to balance sheet business and are both forecasted to grow slowly in line with the anticipated moderate development of the customer loans and trading portfolio assets. However, in 2022 the negative year-to-date 2022 performance of the trading portfolio is reflected in the forecast. Overall, total operating income is expected to grow by ca. 17% per year (CAGR 2021-2026) over the planning period.

Operating expenses comprise personnel and general and administrative expenses. Personnel expenses are budgeted with an annual increase of ca. 20% per year (CAGR 2021-2026). Besides inflation-driven salary adjustments, this increase is mainly the result of new employee hires to cope with the envisaged business growth and expansions, the consideration of additional costs in 2022 and 2023 to retain employees as well as the envisaged reorganisation of the group structure. New hires are planned in the areas of asset management, relationship management, compliance, group consolidation, IT as well as digital assets. General and administrative expenses are mainly driven by additional expenditures of CHF 0.5m in each of the first two planning years (2022 and 2023) to cover technology enhancements (e.g. Incore App development) as well as professional consulting fees in connection with the entrance into new markets.

Income tax expenses are calculated with the statutory corporate income tax rate applicable for companies domiciled in Zurich, Switzerland (21.4%). In the long run, the net income of NPB is budgeted to grow from CHF 1.5m (achieved in 2021) to CHF 4.8m (forecast for fiscal year 2026) which is reasonable in light of realizing economies of scale over the planning horizon. However, due to the negative year-to-date 2022 trading performance as well as near-term increased expenditures for employees and G&A expenses, the net income in the years 2022-2024 is expected to stay behind the fiscal year 2021 result. Moreover, it is anticipated to fully retain annual profits within the company (i.e. no distribution of dividends to shareholders planned) which further strengthens the capital basis of NPB over the planning horizon (refer also to the regulatory capital section).

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

15

FTX_EU_000030608


NPB | Neue Privat Bank

### 7.2.2  Detailed Assumptions

**Business Volume**

**Assets under Management (AuM)**

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Switzerland (CH): | | | | | | | | | |
| AuM bop - CH | CHFmn | 898.1 | 854.8 | 825.5 | 1'032.3 | 1'053.0 | 1'074.0 | 1'095.5 | 1'117.4 |
| Net New Money - CH | CHFmn | (164.3) | (39.3) | 12.0 | 10.3 | 10.5 | 10.7 | 11.0 | 11.2 |
| *Net New Money Growth (in % AuM)* | *%* | *-18.3%* | *-4.6%* | *1.5%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* |
| Performance - CH | CHFmn | 87.0 | 8.9 | 70.0 | 10.3 | 10.5 | 10.7 | 11.0 | 11.2 |
| *Performance (in % AuM)* | *%* | *9.7%* | *1.0%* | *8.5%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* |
| Other - CH | CHFmn | 34.1 | 1.1 | 124.8 | | | | | |
| *Other (in % of AuM)* | *%* | *3.8%* | *0.1%* | *15.1%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| **AuM eop - CH** | **CHFmn** | **854.8** | **825.5** | **1'032.3** | **1'053.0** | **1'074.0** | **1'095.5** | **1'117.4** | **1'139.8** |
| Middle East (UAE): | | | | | | | | | |
| AuM bop - UAE | CHFmn | | | | 816.0 | 840.5 | 865.7 | 891.7 | 918.4 |
| Net New Money - UAE | CHFmn | | | 816.0 | 16.3 | 16.8 | 17.3 | 17.8 | 18.4 |
| *Net New Money Growth (in % AuM)* | *%* | | | | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* |
| Performance - UAE | CHFmn | | | - | 8.2 | 8.4 | 8.7 | 8.9 | 9.2 |
| *Performance (in % AuM)* | *%* | | | | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* |
| Other - UAE | CHFmn | | | | | | | | |
| *Other (in % of AuM)* | *%* | | | | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| **AuM eop - UAE** | **CHFmn** | | **-** | **816.0** | **840.5** | **865.7** | **891.7** | **918.4** | **946.0** |
| NPB Digital Asset: | | | | | | | | | |
| AuM bop - NPB DA | CHFmn | | | | | | 105.3 | 211.6 | 425.4 |
| Net New Money - NPB DA | CHFmn | | | | | 105.3 | 105.3 | 211.6 | 425.4 |
| *Net New Money Growth (in % AuM)* | *%* | | | | | | *100.0%* | *100.0%* | *100.0%* |
| Performance - NPB DA | CHFmn | | | | | - | 1.1 | 2.1 | 4.3 |
| *Performance (in % AuM)* | *%* | | | | | | *1.0%* | *1.0%* | *1.0%* |
| Other - NPB DA | CHFmn | | | | | | | | |
| *Other (in % AuM)* | *%* | | | | | | *0.0%* | *0.0%* | *0.0%* |
| **AuM eop - NPB DA** | **CHFmn** | | | | **-** | **105.3** | **211.6** | **425.4** | **855.1** |
| **AuM eop - Total** | **CHFmn** | **854.8** | **825.5** | **1'848.3** | **1'893.0** | **2'045.0** | **2'198.8** | **2'461.2** | **2'940.8** |
| *Growth AuM eop - Total* | *%* | | *-3%* | *124%* | *2%* | *8%* | *8%* | *12%* | *19%* |

The projection of the assets under management (AuM) which relate to the off-balance sheet business was performed per business segment (CH, UAE and NPB Digital Asset). Generally, the projection of future AuM is uncertain due to the fluctuating nature of money in- and outflows as well as the future performance of the asset base. The growth of net new money inflows as well as asset performance (in % of AuM) for segment Switzerland (CH) is budged with 1.0% per year aligned to the long-term inflation rate projection for Switzerland[2]. For segment Middle East (UAE), the future asset performance is aligned to Switzerland (1.0%). However, assets under management for Middle East are expected to exhibit a moderately higher year-on-year growth (2.0%) compared to Switzerland. It is anticipated that NPB starts building up an AuM base as from 2023 due to its embedment in the FTX Group (so called NPB Digital Asset segment). Initial AuM inflows for NPB Digital Asset in fiscal year 2023 are expected to be ten times the size of the corresponding annual net inflows for segment Switzerland (ca. CHF 105m). In the following years, additional high net inflows in NPB Digital Asset are anticipated. Asset performance for NPB Digital Asset is also aligned to Switzerland (1.0%). Note that no other AuM growth is assumed for all three segments due to its highly unpredictable nature.

---

[2] According to IMF projection for 2026 (average consumer prices, April 2022)

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich
Telefon +41 44 265 11 88
Fax +41 44 265 11 89
info@npb-bank.ch
www.npb-bank.ch

16

FTX_EU_000030609



**Balance Sheet Business (Customers/ Banks)**

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Customer Loans: | | | | | | | | | |
| Due from Customers (eop) | CHFmn | 29.0 | 37.6 | 50.4 | 51.4 | 52.4 | 53.4 | 54.5 | 55.6 |
| Loans in % AuM | % | 3.4% | 4.6% | 4.9% | 4.9% | 4.9% | 4.9% | 4.9% | 4.9% |
| Deposits: | | | | | | | | | |
| Due to Customers (eop) | CHFmn | 61.8 | 113.1 | 177.0 | 180.5 | 184.1 | 187.8 | 191.6 | 195.4 |
| Deposits in % AuM | % | 7.2% | 13.7% | 17.1% | 17.1% | 17.1% | 17.1% | 17.1% | 17.1% |
| Amounts due from Banks: | | | | | | | | | |
| Due from Banks (eop) | CHFmn | 14.6 | 19.6 | 20.1 | 21.1 | 21.6 | 22.0 | 22.4 | 22.9 |
| In % of AuM | % | 1.7% | 2.4% | 1.9% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Amounts due to Banks: | | | | | | | | | |
| Due to Banks (eop) | CHFmn | 0.8 | 4.3 | 3.9 | 3.5 | 3.6 | 3.7 | 3.7 | 3.8 |
| In % of AuM | % | 0.1% | 0.5% | 0.4% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |

The projection of customer loans and deposits as well as amounts due from and to banks is based on their relationships to total AuM for segment Switzerland (CH). It is not anticipated that NPB will conduct comparable business activities with customers/ banks for the segments Middle East (UAE) and/ or NPB Digital Asset. Customer loans and deposits are forecasted based on the ratio of 2021 as the ratio shows an increasing trend from 2019 to 2021, whereas the ratio for amounts due from and to banks is determined based on the average ratio between 2019 and 2021.

**Income Statement - Revenues**
**Net Result from Interest Operations**

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Ø Client Loans | CHFmn | | 33.3 | 44.0 | 50.9 | 51.9 | 52.9 | 54.0 | 55.1 |
| Net Interest Margin (in % of Ø Client Loans) | % | | 2.4% | 1.4% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% |
| **Net Result from Interest Operations** | **CHFmn** | 0.9 | 0.8 | 0.6 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |

The net interest income is projected based on the net interest margin (in percent of client loans) that averaged 1.9% in fiscal years 2020 and 2021. It is expected that the current increase in market interest rates will lead to once again higher net interest margins in future years as opposed to the 2021 margin.

**Net Commission Income**

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Ø AuM - CH | CHFmn | | 840.2 | 928.9 | 1'042.6 | 1'063.5 | 1'084.8 | 1'106.5 | 1'128.6 |
| Commission Margin (in % of Ø AuM - CH) | % | | 0.6% | 0.7% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| **Net Commission Income - CH** | **CHFmn** | 5.7 | 5.1 | 6.3 | 6.7 | 6.8 | 6.9 | 7.1 | 7.2 |
| Ø AuM - UAE | CHFmn | | | 408.0 | 828.2 | 853.1 | 878.7 | 905.0 | 932.2 |
| Commission Margin (in % of Ø AuM - UAE) | % | | | | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| Net Commission Income - UAE (100%) | CHFmn | | | | 5.3 | 5.5 | 5.6 | 5.8 | 6.0 |
| NPB Share of Comission Income | % | | | | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
| **Net Commission Income - UAE (40%)** | **CHFmn** | | | | 2.1 | 2.2 | 2.3 | 2.3 | 2.4 |
| Ø AuM - NPB DA | CHFmn | | | | 52.6 | 158.5 | 318.5 | 640.2 | |
| Commission Margin (in % of Ø AuM - NPB DA) | % | | | | 1.0% | 1.0% | 1.0% | 1.0% | |
| **Net Commission Income - NPB DA** | **CHFmn** | | | | 0.5 | 1.5 | 3.1 | 6.1 | |
| **Net Commission Income - Total** | **CHFmn** | 5.7 | 5.1 | 6.3 | 8.8 | 9.5 | 10.7 | 12.5 | 15.8 |

The forecast of the net commission income is performed on business segment level (CH, UAE and NPB Digital Asset) based on the margin in percent of average AuM. Historically, the realized net commission income exclusively corresponded to the asset base of Switzerland, as first AuM inflows to segment Middle East occurred in late fiscal year 2021. Moreover, first NPB Digital Asset inflows are anticipated in fiscal year

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

CONFIDENTIAL

FTX_EU_000030610


NPB | Neue Privat Bank

2023. The net commission income for Switzerland was determined based on the historical average commission margin of the years 2020 and 2021 (0.6%). The margin for Switzerland was also applied for segment Middle East due to the lack of historical data for Middle East. However, only 40.0% of the total net commission income from Middle East is ultimately considered in the income statement projections of NPB as NPB only has an equity interest of 40.0% in the joint venture together with ALMHA Limited. The commission margin for the NPB Digital Asset business is expected to be 50% higher compared to the margin of Switzerland.

**Result from Trading Operations**

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Trading Assets | CHFmn | 24.4 | 23.9 | 27.4 | 35.0 | 35.4 | 35.7 | 36.1 | 36.4 |
| *Growth Trading Assets* | *%* | | *-2.0%* | *14.4%* | *27.9%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* |
| Ø Trading Assets | CHFmn | | 24.2 | 25.6 | 31.2 | 35.2 | 35.5 | 35.9 | 36.2 |
| *Trading Margin (in % of Ø Trading Assets)* | *%* | | *-0.8%* | *4.4%* | *-1.8%* | *1.8%* | *1.8%* | *1.8%* | *1.8%* |
| **Result from Trading Operations** | **CHFmn** | **1.5** | **(0.2)** | **1.1** | **(0.6)** | **0.6** | **0.6** | **0.6** | **0.6** |

From 2022 to 2026, the trading result is determined based on the average trading margin in percent of the average trading portfolio assets realized in 2020 and 2021 (1.8%). However, the overall trading result in 2022 is expected to be negative due to the latest negative year-to-date 2022 performance. Note that the projection of the trading result initially requires future projections of the trading assets. Trading assets for year-end 2022 are estimated at CHF 35.0m. This forecast factors in the significant increase that incurred until YTD 2022. As from 2023, the annual growth rate of the trading assets is aligned with the long-term inflation rate projection for Switzerland (1.0%). Note that the projection of trading income is generally highly uncertain.

**Other Ordinary Income**

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Other Ordinary Income | CHFmn | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

The other ordinary income realized in the past was marginal. Hence, this position is forecasted based on the amount realized in fiscal year 2021 due to materiality reasons.

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 265 11 89

info@npb-bank.ch
www.npb-bank.ch

18

CONFIDENTIAL

FTX_EU_000030611


**NPB** | Neue Privat Bank

## Income Statement - Expenses
### Personnel Expenses

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| **Executive Management:** | | | | | | | | | |
| Ø Salary | CHFk | 278 | 229 | 257 | 263 | 268 | 271 | 274 | 276 |
| *FTE eop* | # | 2.0 | 3.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| *Ø FTE* | # | | 2.5 | 3.5 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| **Executive Management Expenses** | CHFmn | | 0.6 | 0.9 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 |
| **Asset Management:** | | | | | | | | | |
| Ø Salary | CHFk | 235 | 143 | 245 | 251 | 255 | 258 | 261 | 263 |
| *FTE eop* | # | 0.6 | 1.2 | 1.6 | 0.6 | 1.6 | 1.6 | 1.6 | 1.6 |
| *Ø FTE* | # | | 0.9 | 0.9 | 0.6 | 1.1 | 1.6 | 1.6 | 1.6 |
| **Asset Management Expenses** | CHFmn | | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 | 0.4 |
| **Trading:** | | | | | | | | | |
| Ø Salary | CHFk | 164 | 141 | 154 | 158 | 160 | 162 | 164 | 166 |
| *FTE eop* | # | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| *Ø FTE* | # | | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| **Trading Expenses** | CHFmn | | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Private Banking:** | | | | | | | | | |
| Ø Salary (old personnel) | CHFk | 109 | 100 | 148 | 152 | 154 | 156 | 158 | 159 |
| Ø Salary (new hires) | CHFk | | | | 251 | 255 | 258 | 261 | 263 |
| Ø Salary (blended) | CHFk | | | | 205 | 215 | 223 | 230 | 232 |
| *FTE eop* | # | 0.8 | 0.8 | 2.6 | 5.6 | 6.6 | 7.6 | 8.6 | 8.6 |
| *Ø FTE* | # | | 0.8 | 1.7 | 4.1 | 6.1 | 7.1 | 8.1 | 8.6 |
| **Private Banking Expenses** | CHFmn | | 0.1 | 0.3 | 0.8 | 1.3 | 1.6 | 1.9 | 2.0 |
| **Back Office:** | | | | | | | | | |
| Ø Salary | CHFk | 143 | 138 | 142 | 146 | 148 | 150 | 151 | 153 |
| *FTE eop* | # | 5.5 | 5.4 | 4.7 | 6.7 | 7.7 | 8.7 | 9.7 | 9.7 |
| *Ø FTE* | # | | 5.5 | 5.1 | 5.7 | 7.2 | 8.2 | 9.2 | 9.7 |
| **Back Office Expenses** | CHFmn | | 0.8 | 0.7 | 0.8 | 1.1 | 1.2 | 1.4 | 1.5 |
| **EAM:** | | | | | | | | | |
| Ø Salary | CHFk | 138 | 137 | - | - | - | - | - | - |
| *FTE eop* | # | 1.0 | 1.0 | - | - | - | - | - | - |
| *Ø FTE* | # | | 1.0 | 0.5 | - | - | - | - | - |
| **EAM Expenses** | CHFmn | | 0.1 | - | - | - | - | - | - |
| **UAE (Middle East):** | | | | | | | | | |
| Ø Salary | CHFk | | | | 251 | 255 | 258 | 261 | 263 |
| *FTE eop* | # | | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| *Ø FTE* | # | | | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| UAE (Middle East) Expenses (100%) | CHFmn | | | | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| *NPB Share of Expenses* | % | | | | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
| **UAE (Middle East) Expenses (40%)** | CHFmn | | | | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| **Employee Retention:** | | | | | | | | | |
| Retention costs | CHFmn | | | | 0.8 | 0.8 | | | |
| **Other Personnel Expenses:** | | | | | | | | | |
| Total Salary Expenses | CHFmn | | 2.0 | 2.4 | 4.3 | 5.2 | 4.9 | 5.4 | 5.6 |
| *Other in % of Total Salary Expenses* | % | | 28.7% | 23.7% | 26.2% | 26.2% | 26.2% | 26.2% | 26.2% |
| **Other Personnel Expenses** | CHFmn | | 0.6 | 0.6 | 1.1 | 1.4 | 1.3 | 1.4 | 1.5 |
| **Total Personnel Expenses** | CHFmn | 2.8 | 2.5 | 2.9 | 5.4 | 6.5 | 6.2 | 6.8 | 7.1 |

Personnel expenses are planned per key function based on the development of average salaries and full-time equivalents (FTEs) required to adequately manage and run the business of NPB. Annual salary increases are aligned to the mid-term inflation rate projections for Switzerland (according to IMF April 2022 projections). Salary levels for employees in region Middle East as well as new hires for private banking are aligned to the asset management salaries. Additional FTEs are factored in to support future business growth (including new markets entries). Additional FTEs comprise one asset manager hired in 2023, two relationship managers hired in 2022 that have already started employment, one private banker hired in 2025, one IT employee in 2022, one employee for group consolidation purposes in 2022, one employee for the digital assets space in 2022 as well

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

19



as two compliance specialists hired in 2023 and 2025, respectively. The Middle East business is expected to be run with the three existing FTEs in the mid-term. Personnel expenses related to the Middle East business are only considered with 40.0% in the business plan of NPB in line with its respective equity stake in the Middle East joint venture together with ALMHA Limited. Moreover, additional costs to retain employees are factored in with CHF 0.8m per year in 2022 and 2023. Other personnel expenses (mainly comprising social and pension costs) are budgeted as a fixed percentage of the total salary expenses each year, whereby the average ratio of the fiscal years 2020 and 2021 is applied.

### General and Administrative Expenses

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| IT Expenses | CHFmn | 1.5 | 1.5 | 1.6 | 1.9 | 2.1 | 2.1 | 2.1 | 2.2 |
| Premises & Building Expenses | CHFmn | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Professional Fees | CHFmn | 0.8 | 0.7 | 0.7 | 0.9 | 1.2 | 1.2 | 1.2 | 1.2 |
| Other Expenses | CHFmn | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 |
| **General and Administrative Expenses** | **CHFmn** | **3.2** | **3.0** | **3.1** | **3.6** | **4.1** | **4.2** | **4.2** | **4.2** |

General and administrative expenses are expected to increase over the planning horizon in line with mid-term inflation rate projections for Switzerland (according to IMF April 2022 projections). Moreover, IT expenses as well as professional fees are estimated to increase both by CHF 0.25m in the years 2022 and 2023. These additional expenses are required mainly for the Incore App development as well as for consultancy, legal and research fees in conjunction with the entrance into new markets (i.a. Middle East and new business through access to the FTX group network).

### Other Line Items

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Depreciation and Amortisation | CHFmn | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Change in Provisions | CHFmn | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Extraordinary Result | CHFmn | 0.5 | (0.1) | (0.1) | - | - | - | - | - |

Historically, the other line items of the income statement were immaterial (D&A and change in provisions) or were unpredictable and/ or unsustainable in case of extraordinary effects. Hence, the line items D&A and change in provisions are forecasted based on their respective amounts incurred in fiscal year 2021. No extraordinary effects are factored in due to their unpredictability.

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 265 11 89

info@npb-bank.ch
www.npb-bank.ch

CONFIDENTIAL

FTX_EU_000030613



## 7.3 Balance Sheet

### 7.3.1 Overview

**Balance Sheet**

| Balance Sheet - NPB | | Historical figures | | | Plan figures | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Position | Unit | 31Dec19 Act | 31Dec20 Act | 31Dec21 Act | 31Dec22 Plan | 31Dec23 Plan | 31Dec24 Plan | 31Dec25 Plan | 31Dec26 Plan |
| Liquid Assets | CHFmn | 22.5 | 63.7 | 111.6 | 95.7 | 98.1 | 101.4 | 105.8 | 112.4 |
| Amounts due from Banks | CHFmn | 14.6 | 19.6 | 20.1 | 21.1 | 21.6 | 22.0 | 22.4 | 22.9 |
| Amounts due from Customers | CHFmn | 29.0 | 37.6 | 50.4 | 51.4 | 52.4 | 53.4 | 54.5 | 55.6 |
| Trading Assets | CHFmn | 24.4 | 23.9 | 27.4 | 35.0 | 35.4 | 35.7 | 36.1 | 36.4 |
| Derivative Financial Instruments | CHFmn | 5.6 | 0.9 | 1.4 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 |
| Participations (non-controlling stake) | CHFmn | 0.2 | 0.2 | 0.8 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| Participations (controlling stake) | CHFmn | - | - | - | 55.4 | 55.4 | 55.4 | 55.4 | 55.4 |
| Tangible Fixed Assets | CHFmn | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Accrued Income and prepaid Expenses | CHFmn | 0.6 | 0.4 | 0.8 | 0.7 | 0.9 | 1.0 | 1.1 | 1.4 |
| Other Assets | CHFmn | 0.5 | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Total Assets** | **CHFmn** | **97.4** | **146.7** | **212.8** | **266.3** | **270.6** | **275.9** | **282.2** | **291.0** |
| | | | | | | | | | |
| Amounts due to Banks | CHFmn | 0.8 | 4.3 | 3.9 | 3.5 | 3.6 | 3.7 | 3.7 | 3.8 |
| Amounts due to Customers | CHFmn | 61.8 | 113.1 | 177.0 | 180.5 | 184.1 | 187.8 | 191.6 | 195.4 |
| Derivative financial Instruments | CHFmn | 5.6 | 1.1 | 1.4 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| Accrued Expenses and deferred Income | CHFmn | 0.7 | 0.5 | 2.2 | 1.7 | 2.1 | 2.0 | 2.1 | 2.2 |
| Other Liabilities | CHFmn | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| **Total Liabilities** | **CHFmn** | **69.1** | **119.1** | **184.7** | **188.7** | **192.7** | **196.4** | **200.4** | **204.3** |
| | | | | | | | | | |
| Bank's capital | CHFmn | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 |
| Statutory Reserve | CHFmn | 1.2 | 1.3 | 1.3 | 1.4 | 1.4 | 1.5 | 1.5 | 1.6 |
| Additional paid-in capital | CHFmn | - | - | - | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| Own Capital Shares | CHFmn | (0.4) | (0.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) |
| Retained Earnings | CHFmn | 2.0 | 3.6 | 3.6 | 4.4 | 4.5 | 4.9 | 6.3 | 8.6 |
| Net Profit / (Loss) | CHFmn | 2.3 | 0.0 | 1.5 | 0.1 | 0.4 | 1.5 | 2.4 | 4.8 |
| **Total Equity** | **CHFmn** | **28.2** | **27.6** | **28.1** | **77.6** | **77.9** | **79.5** | **81.9** | **86.7** |
| | | | | | | | | | |
| **Total Liabilities and Equity** | **CHFmn** | **97.4** | **146.7** | **212.8** | **266.3** | **270.6** | **275.9** | **282.2** | **291.0** |
| | | | | | | | | | |
| Supplemental | | | | | | | | | |
| Distribution of Dividend | CHFmn | 0.8 | - | 0.7 | - | - | - | - | - |
| Capital Injection | CHFmn | - | - | - | 50.0 | - | - | - | - |
| KPIs | | | | | | | | | |
| Ø Total Equity | CHFmn | | 27.9 | 27.8 | 52.8 | 77.8 | 78.7 | 80.7 | 84.3 |
| Total Equity in % of Total Assets | % | 29.0% | 18.8% | 13.2% | 29.1% | 28.8% | 28.8% | 29.0% | 29.8% |
| Statutory Reserve in % of Bank's Capital | % | 5.3% | 5.9% | 5.9% | 6.2% | 6.2% | 6.3% | 6.6% | 7.2% |

Total assets (or total liabilities and equity) are expected to increase by 6.5% per year from CHF 213m to CHF 291m until 31 December 2026 (CAGR 2021-2026). Balance sheet business positions such as customer loans and deposits as well as amounts due from and to banks are projected to increase only by moderate levels over the planning horizon. Contrary to the distribution of dividends linked to the fiscal year 2019 and 2021 earnings, projected profits are expected to be fully retained within the company (i.e. no distribution of dividends to shareholders planned). Moreover, a CHF 50m capital injection into NPB from FTX group is planned in 2022 to strengthen the capital basis of NPB against the background that several group entities will be reorganized as subsidiaries of NPB. Overall, the capital injection mainly drives the increase of the total equity to total assets ratio up to 29.8% until 31 December 2026.

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

CONFIDENTIAL



**NPB** | Neue Privat Bank

### 7.3.2   Detailed Assumptions

**Balance Sheet**
**Selected Line Items**

| Position | Unit | 31Dec19 Act | 31Dec20 Act | 31Dec21 Act | 31Dec22 Plan | 31Dec23 Plan | 31Dec24 Plan | 31Dec25 Plan | 31Dec26 Plan |
|---|---|---|---|---|---|---|---|---|---|
| Assets: | | | | | | | | | |
| Derivative financial Instruments | CHFmn | 5.6 | 0.9 | 1.4 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 |
| Accrued Income and prepaid Expenses | CHFmn | 0.6 | 0.4 | 0.8 | 0.7 | 0.9 | 1.0 | 1.1 | 1.4 |
| *In % of Total Operating Income* | % | 7.0% | 6.9% | 10.3% | 8.1% | 8.1% | 8.1% | 8.1% | 8.1% |
| Participations (existent as per 31Dec21) | CHFmn | 0.2 | 0.2 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Concedus Digital Assets GmbH | CHFmn | | | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Participations (non-controlling stake) | CHFmn | 0.2 | 0.2 | 0.8 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| FTX Trading DMCC | CHFmn | | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Klarpay AG | CHFmn | | | | 24.0 | 24.0 | 24.0 | 24.0 | 24.0 |
| Altalix Limited | CHFmn | | | | 20.3 | 20.3 | 20.3 | 20.3 | 20.3 |
| FTX Exchange FZE | CHFmn | | | | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| Tigerwit Limited | CHFmn | | | | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| FTX Switzerland GmbH | CHFmn | | | | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| K-DNA Financial Services Ltd | CHFmn | | | | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Participations (controlling stake) | CHFmn | | | | 55.4 | 55.4 | 55.4 | 55.4 | 55.4 |
| Tangible fixed assets | CHFmn | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other assets | CHFmn | 0.5 | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Liabilities: | | | | | | | | | |
| Derivative financial Instruments | CHFmn | 5.6 | 1.1 | 1.4 | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 |
| Accrued Expenses and deferred Income | CHFmn | 0.7 | 0.5 | 2.2 | 1.7 | 2.1 | 2.0 | 2.1 | 2.2 |
| *In % of Operating Expenses* | % | 12.3% | 9.5% | 36.2% | 19.3% | 19.3% | 19.3% | 19.3% | 19.3% |
| Other Liabilities | CHFmn | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Equity: | | | | | | | | | |
| Bank's Capital | CHFmn | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 | 23.0 |
| Statutory Reserve | CHFmn | 1.2 | 1.3 | 1.3 | 1.4 | 1.4 | 1.5 | 1.5 | 1.6 |
| Addition to Statutory Reserve | CHFmn | 0.12 | 0.00 | 0.08 | 0.01 | 0.02 | 0.08 | 0.12 | 0.24 |
| *Statutory Reserve in % of Bank's Capital* | % | 5.3% | 5.9% | 5.9% | 6.2% | 6.2% | 6.3% | 6.6% | 7.2% |
| Additional paid-in capital | CHFmn | | | | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| Own Capital Shares | CHFmn | (0.4) | (0.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) | (1.4) |
| Retained Earnings | CHFmn | 2.0 | 3.6 | 3.6 | 4.4 | 4.5 | 4.9 | 6.3 | 8.6 |
| Net Profit / (Loss) | CHFmn | 2.3 | 0.0 | 1.5 | 0.1 | 0.4 | 1.5 | 2.4 | 4.8 |
| Supplemental: | | | | | | | | | |
| Distribution of Dividend | CHFmn | 0.8 | - | 0.7 | - | - | - | - | - |

Derivative financial instruments (assets and liabilities) that were volatile positions in the last three historical years are forecasted based on the average amount (end of period) in these years. Accrued income and prepaid expenses are projected based on the historical relationship to the operating income. In this context, the average ratio between fiscal year 2019 and 2021 is applied. A similar forecasting method is applied for the position accrued expenses and deferred income, whereby the historical relationship to operating expenses is considered. Immaterial line items such as tangible fixed assets as well as other assets and liabilities are forecasted based on their respective amounts as per 31 December 2021. Items that are not expected to change such as the bank's capital and own capital shares (treasury stock) are also kept constant with their amounts as per 31 December 2021. As mentioned before a CHF 50m capital injection into NPB from FTX group is planned in 2022 to strengthen the capital basis of NPB due to the envisaged group structure reorganisation. Entities that will become subsidiaries of NPB in 2022 lead to an increase of the book value of participations (distinguished between controlling and non-controlling participations). These entities are included with their currently expected purchase prices over the planning years or in case of FTX Exchange FZE, where a purchase price has not yet been determined, with the respective book value of equity. Purchase prices or book value of equity denominated in a foreign currency (EUR, USD or GBP) were translated to CHF with a current

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

22

CONFIDENTIAL

FTX_EU_000030615



foreign exchange rate applicable as per 30 June 2021. Note that it is not anticipated to distribute profits from these subsidiaries to NPB. The contributions to the statutory reserve are projected in line with the Swiss Code of Obligations (article 671-674). Remaining profits (after contributions to the statutory reserve) are retained within the company as no dividend distributions are envisaged during the planning horizon. Thus, retained earnings increase continuously over the planning period. Finally, liquid assets constitute the balancing position to match both sides of the balance sheet.

Note that the method to forecast customer loans and deposits, amounts due from and to banks as well as trading portfolio assets (together representing the balance sheet business) is described under the income statement section (refer to 7.2.2).

## 7.4    Regulatory Capital

### 7.4.1    Overview

**Regulatory Capital**

| Regulatory Capital - NPB | | Historical figures | | | Plan figures | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Position | Unit | 31Dec19 Act | 31Dec20 Act | 31Dec21 Act | 31Dec22 Plan | 31Dec23 Plan | 31Dec24 Plan | 31Dec25 Plan | 31Dec26 Plan |
| **Risk Weighted Assets (RWAs):** | | | | | | | | | |
| Credit Risk | CHFmn | 34.9 | 45.1 | 18.4 | 19.0 | 19.3 | 19.7 | 20.1 | 20.5 |
| Market Risk | CHFmn | 57.8 | 57.1 | 43.5 | 55.7 | 56.3 | 56.8 | 57.4 | 58.0 |
| Operational Risk | CHFmn | 14.4 | 11.8 | 13.6 | 14.3 | 17.7 | 20.5 | 23.5 | 27.5 |
| Below threshold value for deductions | CHFmn | - | 0.6 | 1.9 | 9.3 | 9.3 | 9.3 | 9.3 | 9.3 |
| **Total RWAs** | **CHFmn** | **107.0** | **114.6** | **77.5** | **98.3** | **102.6** | **106.3** | **110.3** | **115.2** |
| **Minimum Capital Requirements:** | | | | | | | | | |
| Credit Risk | CHFmn | 2.8 | 3.6 | 1.5 | 1.5 | 1.5 | 1.6 | 1.6 | 1.6 |
| Market Risk | CHFmn | 4.6 | 4.6 | 3.5 | 4.5 | 4.5 | 4.5 | 4.6 | 4.6 |
| Operational Risk | CHFmn | 1.2 | 0.9 | 1.1 | 1.1 | 1.4 | 1.6 | 1.9 | 2.2 |
| Below threshold value for deductions | CHFmn | - | 0.0 | 0.2 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |
| **Minimum Capital Requirements** | **CHFmn** | **8.6** | **9.2** | **6.2** | **7.9** | **8.2** | **8.5** | **8.8** | **9.2** |
| **Total Eligible Capital:** | | | | | | | | | |
| Tier 1 - Core Capital (eop) | CHFmn | 27.5 | 27.6 | 27.4 | 77.6 | 77.9 | 79.5 | 81.9 | 86.7 |
| Tier 2 - Supplementary Capital (eop) | CHFmn | - | - | - | - | - | - | - | - |
| Less Participations (controlling stake) | CHFmn | - | - | - | (55.4) | (55.4) | (55.4) | (55.4) | (55.4) |
| **Total Eligible Capital** | **CHFmn** | **27.5** | **27.6** | **27.4** | **22.1** | **22.5** | **24.0** | **26.4** | **31.2** |
| **Capital Adequacy** | | | | | | | | | |
| Total Capital Adequacy Ratio - Target (in % of RWA) | % | 10.5% | 10.5% | 10.5% | 10.5% | 10.5% | 10.5% | 10.5% | 10.5% |
| Total Capital Adequacy Ratio - Actual (in % of RWA) | % | 25.7% | 24.1% | 35.4% | 22.5% | 21.9% | 22.6% | 24.0% | 27.1% |
| Δ Target & Actual Capital Adequacy Ratio | % | 15.2% | 13.6% | 24.9% | 12.0% | 11.4% | 12.1% | 13.5% | 16.6% |

Regulatory capital requirements and eligible capital of NPB is projected in addition to the income statement and balance sheet of NPB to assess the capital adequacy of NPB at the end of the planning horizon. Risk weighted assets (RWAs) are expected to increase from CHF 77.5m as per year-end 2021 to CHF 115.2m as per year-end 2026. RWAs are mainly driven by the balance sheet business (customer loans, amounts due from banks and trading assets), whereas off-balance sheet business (reflected in net commission income) is only reflected in the RWAs related to operational risk. Note that RWAs in conjunction with amounts below the threshold value for deductions are attributable to participations with non-controlling interests. Minimum capital requirements constitute 8.0% of the RWAs and hence, grow in line with the development of RWAs. Minimum capital requirements need to be covered or exceeded by the existing common equity tier 1 (CET1) capital. The CET1 capital as well as the total eligible capital of NPB simply constitute the total equity of the

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

23

FTX_EU_000030616



projected balance sheet (while considering dividend distributions) less the book value of participations with controlling stakes that result from the envisaged group reorganization. Supplementary regulatory capital such as subordinated debt does not exist for NPB. The total capital adequacy ratio (in percent of RWAs) of NPB is assumed to decrease from 35.4% (31 December 2021) to 27.1% as per year-end 2026 mainly due to the increase in the book value of participations as from 2022, where this effect is almost fully offset by the planned capital injection of CHF 50m in 2022 from FTX group. Hence, the current circumstance that the capital adequacy ratio of NPB exceeds the internal target capital ratio of 10.5% by a significant margin is expected to fall off over the planning horizon. However, the projected capitalization level of NPB can still be considered as strong.

### 7.4.2    Detailed Assumptions

**Risk Weighted Assets (RWAs)**

| Position | Unit | 2019 Act | 2020 Act | 2021 Act | 2022 Plan | 2023 Plan | 2024 Plan | 2025 Plan | 2026 Plan |
|---|---|---|---|---|---|---|---|---|---|
| **Credit Risk:** | | | | | | | | | |
| Amounts due from Customers | CHFmn | 29.0 | 37.6 | 50.4 | 51.4 | 52.4 | 53.4 | 54.5 | 55.6 |
| Amounts due from Banks | CHFmn | 14.6 | 19.6 | 20.1 | 21.1 | 21.6 | 22.0 | 22.4 | 22.9 |
| Amounts due from Customers & Banks | CHFmn | 43.6 | 57.2 | 70.5 | 72.5 | 74.0 | 75.4 | 76.9 | 78.5 |
| *Weighting Factor (blended)* | % | 80.1% | 78.9% | 26.1% | 26.1% | 26.1% | 26.1% | 26.1% | 26.1% |
| **RWA - Credit risk** | **CHFmn** | **34.9** | **45.1** | **18.4** | **19.0** | **19.3** | **19.7** | **20.1** | **20.5** |
| **Market Risk:** | | | | | | | | | |
| Trading Assets | CHFmn | 24.4 | 23.9 | 27.4 | 35.0 | 35.4 | 35.7 | 36.1 | 36.4 |
| *Weighting Factor* | % | 237% | 239% | 159% | 159% | 159% | 159% | 159% | 159% |
| **RWA - Market Risk** | **CHFmn** | **57.8** | **57.1** | **43.5** | **55.7** | **56.3** | **56.8** | **57.4** | **58.0** |
| **Operational Risk:** | | | | | | | | | |
| Net Interest Income | CHFmn | 0.9 | 0.8 | 0.6 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Net Commission Income | CHFmn | 5.7 | 5.1 | 6.3 | 8.8 | 9.5 | 10.7 | 12.5 | 15.8 |
| Net Trading Income | CHFmn | 1.5 | (0.2) | 1.1 | (0.6) | 0.6 | 0.6 | 0.6 | 0.6 |
| Other Ordinary Income | CHFmn | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Operating Income | CHFmn | 8.1 | 5.7 | 8.0 | 9.2 | 11.1 | 12.4 | 14.1 | 17.5 |
| Ø Operating Income (last 3 years) | CHFmn | | | | 7.3 | 7.7 | 9.5 | 10.9 | 12.5 | 14.7 |
| *RWA Factor* | % | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| *Factor Operational Risk* | x | 12.5x | 12.5x | 12.5x | 12.5x | 12.5x | 12.5x | 12.5x | 12.5x |
| **RWA - Operational Risk** | **CHFmn** | **14.4** | **11.8** | **13.6** | **14.3** | **17.7** | **20.5** | **23.5** | **27.5** |
| **Below threshold value for deductions:** | | | | | | | | | |
| Participations | CHFmn | | 0.2 | 0.8 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| *Weighting Factor* | % | | 250% | 250% | 250% | 250% | 250% | 250% | 250% |
| **RWA - below threshold value for deductions** | **CHFmn** | | **0.6** | **1.9** | **9.3** | **9.3** | **9.3** | **9.3** | **9.3** |
| **Total RWAs** | **CHFmn** | **107.0** | **114.6** | **77.5** | **98.3** | **102.6** | **106.3** | **110.3** | **115.2** |

Risk weighted assets (RWAs) are projected per type of risk (with market risk being the main driver). The weighting factors to forecast credit and market risk RWAs are determined based on the actual weighting factors implied as per year-end 2021. The method to derive credit risk RWAs was changed in 2021 to a comprehensive approach which led to significant lower credit risk RWAs (and weighting factor respectively). The application of the comprehensive approach is assumed going-forward. Market risk RWAs are determined with the standard approach. A recently higher allocation to short-term bonds in the trading portfolio led to a lower overall market risk weighting factor in 2021. No further change in the trading portfolio risk appetite is assumed going-forward. Operational risk RWAs are projected with the basic indicator approach. RWAs in conjunction with amounts below the threshold value for deductions (attributable to participations with non-

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

24

FTX_EU_000030617



controlling stakes) are expected to increase in 2022 due to the envisaged group reorganisation. The weighting factor of 250% remains unchanged over the planning horizon.

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

CONFIDENTIAL

FTX_EU_000030618



# Appendixes

**Appendix 1: Curriculum Vitae of Management of NPB**

### Prof. em. Dr. Dr. Markus Ruffner - CEO, Head Asset Management / Institutions

<u>Professional experience</u>

| | |
|---|---|
| 2009 - present: | NPB Neue Privat Bank AG, Zurich; *CEO* |
| 2001 - 2008: | NPB Neue Privat Bank AG, Zurich; *CIO and Head of Asset Management* |
| 1999 - 2000: | IBI Bank AG, Zurich; *CIO and Head of Asset Management* |
| 1998 - 2006: | Naegeli & Streichenberg Rechtsanwälte, Zurich; *Legal Consultant* |
| 1996 - 1997: | Bär & Karrer Rechtsanwälte, Zurich; *Legal Consultant* |
| 1991 - 1995: | Schweizerische Kreditanstalt, Zurich; *Senior Economist* |
| 1990 - 1991: | Neue Zürcher Zeitung, Zurich; *Business Editor* |
| 1987 - 1990: | GrischaPlast AG, Maienfeld; *Deputy CEO* |
| 1984 - 1987: | University Zurich, Zurich; *Assistent Prof. Linder and Prof. Hauser* |

<u>Education</u>

| | |
|---|---|
| 2003: | University St.Gallen (Switzerland); Habilitation |
| 1980 - 1984: | University Zurich (Switzerland); Law |
| 1974 - 1979: | University Zurich (Switzerland); Economics |

<u>Other teaching and scientific activities:</u>

| | |
|---|---|
| 1998 - present: | University of St. Gallen, (Switzerland); *Lecturer, Associate Professor in Law and Economics* |
| 1998 - 2006: | Institut für Finanzdienstleistungen (IGZ), Zug; *Lecturer in Corporate Finance and Pension Fund Management* |

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

26

CONFIDENTIAL



# Bruno Zürcher - Head Private Banking

## Professional experience

| | |
|---|---|
| 2009 - present: | NPB Neue Privat Bank Ltd., Zurich; *Partner, Member of Executive Management and Head of Private Banking* |
| 2005 - 2008: | NPB Neue Privat Bank Ltd, Zurich; *Senior Relationship Manager* |
| 2011 - 2005: | Marecama Alternative Investments Ltd. (Hedge Fund startup), Zug; *Co-Founder and CEO* |
| 1996 - 2001: | Credit Suisse Ltd., Zurich; *Relationship Manager for independent asset managers/family offices and private banking international* |
| 1992 – 1996: | Suissetec Association, Zurich; *Deputy Manager / CFO* |
| 1988 – 1991: | Abegglen & Partners, Management Consultants, Zurich & Winchester; *Project- Manager, Management Consultant and Assistant* |

## Education

| | |
|---|---|
| 1989 | University St. Gallen (Switzerland) – Master in Business Administration (MBA HSG) |
| 1987: | Université d'Aix-en Provence (France) – One term |

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 265 11 89

info@npb-bank.ch
www.npb-bank.ch

CONFIDENTIAL

FTX_EU_000030620



# Peter Albinsson, CFA – Head Private Banking

**Professional experience:**

| | |
|---|---|
| 2020 - present: | NPB Neue Privat Bank AG, Zurich; *Head Private Banking International/UHNW* |
| 2018 – 2020: | EFG International AG, Zurich; *Head of Special Projects, Continental Europe & Middle East* |
| 2014 - 2018: | Abu Dhabi Commercial Bank PJSC, Abu Dhabi; *Head-Strategy, Business Development and Performance* |
| 2012 - 2014: | Falcon Private Bank, Abu Dhabi/ Dubai; *COO MENA Region and Head of Investment Solutions/ CEO of Falcon Private Financial Advisory LLC* |
| 2010 - 2012: | EFG International AG, London; *Special Project for the CEO* |
| 2007 - 2010: | Santeum Partners AG, Zurich; *Co-Founder and President* |
| 2002 - 2007: | EFG International, AG, London; *Chief Healthcare Analyst, Capital Markets Funding, Special Project for the CEO* |

**Education:**

| | |
|---|---|
| 2004: | Chartered Financial Analyst (CFA) |
| 1998 - 2001: | European Business School, London (UK) - First Class BA (Hons) degree in International Business Studies (Major: Finance). |
| 1996 - 1997: | Swedish Royal Navy, military service, Berga (Sweden) |

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

28

FTX_EU_000030621



## Stefan Tschopp  - Head Legal & Compliance

Professional experience

| | |
|---|---|
| 2021 – present: | NPB Neue Privat Bank AG, Zurich; *Head Legal & Compliance* |
| 2019 – 2021: | EFG Bank AG, Zurich; *Head Financial Crime Compliance* |
| 2016 – 2019: | VP Bank Liechtenstein AG; *Head Group Compliance* |
| 2014 – 2015: | Bros Partners AG; *Risk and compliance project manager* |
| 2010 – 2014: | Kendris AG; *Risk and compliance manager* |
| 2009 – 2010: | LGT Bank Schweiz AG; *Risk and compliance manager* |
| 1999 – 2008: | UBS AG |

Education

| | |
|---|---|
| 2015 - 2016: | Universität St. Gallen (Switzerland); CAS Compliance Management |
| 2000 - 2002: | HWV Zürich (Switzerland); BSc Business Administration |
| 1994 - 1999: | Universität Zürich (Switzerland); Law |

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

29

CONFIDENTIAL



## Appendix 2: Curriculum Vitae of future member of the Board of Directors of NPB

## Marcel Lötscher

**Professional experience**

| | |
|---|---|
| 2012 – 2022: | Financial Market Authority (FMA), Liechtenstein; *Head of Asset Management and Markets Division and Member of the Executive Board* |
| 2011: | Privatinvest AG, Lucerne; *Founding Partner, Financial planning projects* |
| 2007: | Lawconsult AG, Lucerne; *Founding Partner, Legal and compliance projects* |
| 2006 – 2010: | Plenum Holdings AG, Zug; *COO and Group Legal Counsel and Member of the Group Executive Board of Plenum* |

**Education**

| | |
|---|---|
| 2016 – 2020: | Catholic University Eichstätt-Ingolstadt, Germany; Doctorate. Dissertation: Principles of Catholic Investment – Ethical and sustainable investment principles in the area of conflicting interests of religion and economy |
| 2013 – 2015: | Danube University Krems, Austria; Master of Business Administration (MBA) |
| 2012 – 2014: | University of Liechtenstein; Master of Law |
| 2010 – 2013: | UFL-Private University Liechtenstein; Doctorate |
| 2006: | Admitted to the bar – Canton of Lucerne |
| 2001 – 2004: | University of Berne; Legal studies |

Neue Privat Bank AG
Limmatquai 1 | am Bellevue
Postfach
CH-8024 Zürich

Telefon +41 44 265 11 88
Fax +41 44 265 11 89

info@npb-bank.ch
www.npb-bank.ch

30

CONFIDENTIAL

FTX_EU_000030623



## Appendix 3: FTX Group entities

### Entities hold by the Cypriot HoldCo

*All entities are hold at 100% except if otherwise indicated*

| Entity | Country of domicile | Status (signed/closed) | Activity | # of FTE | Currency | Total balance sheet size (in million) | Shareholders' equity | Gross revenues | Net income |
|---|---|---|---|---|---|---|---|---|---|
| FTX Europe AG | Switzerland | Closed | Loan to one client | 1 | CHF | 121.8 *(31Dec21)* | 5.9 *(31Dec21)* | 11.0 *(01Jul20 to 31Dec21)* | 5.8 *(01Jul20 to 31Dec21)* |
| FTX Trading GmbH | Germany | Closed | Acts as service provider for all European Group entities and carries out all administrative work. There is a consulting/management agreement between FTX Europe AG and FTX Trading GmbH. | 4 | EUR | 0.1 *(31Dec21)* | 0.0 *(31Dec21)* | 0.1 *(23Oct20 to 31Dec21)* | 0.0 *(23Oct20 to 31Dec21)* |
| FTX Certificates | Switzerland | Closed | Has an approved base prospectus for various tokenized financial instruments, which is valid in Switzerland and is passported across the EEA | 0 | CHF | 0.1 *(31Dec21)* | (0.0) *(31Dec21)* | / *(FY21)* | (0.0) *(FY21)* |
| BTC Africa S.A. | Luxembourg | Signed, not yet closed | Global financial services firm that offers a platform for internal payments, foreign exchange and treasury activities for Africa-based companies | 220 | USD | 12.74 *(31Dec21)* | 8.9 *(31Dec21)* | 11.2 *(FY21)* | (15.1) *(FY21)* |

31

CONFIDENTIAL



## Entities hold by FTX Europe AG

*All entities are hold at 100% except if otherwise indicated*

| Entity | Country of domicile | Status (signed/closed) | Activity | # of FTE | Currency | Total balance sheet size (in million) | Shareholders' equity | Gross revenues | Net income |
|---|---|---|---|---|---|---|---|---|---|
| NPB Neue Privat Bank AG | Switzerland | Signed, not yet closed | Private Banking and Asset Management services | 16.9 | CHF | 212.8 (31Dec21) | 28.1 (31Dec21) | 8.0 (FY21) | 1.5 (FY21) |
| DAAG Capital LLC | Liechtenstein | Closed | *Inactive* | | | | | | |
| CM-Equity (participation of 9.9%) | Germany | Closed | Securities trader recognized by BAFIN | 33 | EUR | 32.8 (31Dec21) | 12.0 (31Dec21) | 3.8 (FY21) | 11.0[3] (FY21) |

**FTX Switzerland holds participations in following entities some of which are in the process of liquidation and some inactive:**

- FTX General partners (Switzerland) – *inactive*

- JP Process Systems (Germany) – *inactive*

- LODE (Switzerland) AG (Switzerland) – *inactive*

- FTX Derivatives GmbH (Switzerland) – *inactive*

- Bcoin Digital Assets Ltd (Ireland) – *inactive*

- Bcoin Technology AG & Co KG (Austria) – *was liquidated in January 2022; liquidation period ending beginning of 2023*

- Binary Tech AG & Co (Austria) – *was liquidated in January 2022; liquidation period ending beginning of 2023*

- Lode (Austria) AG & Co. KG (Austria) - *was liquidated in January 2022; liquidation period ending beginning of 2023*

---

[3]The Company generated EUR 11.0 million from participations in other companies, not included in gross revenues.

32

# Exhibit 10

**kyc-turbo**

Chat Filters    ☑ Events    ☑ History    ☑ Disclaimers

| ☑ | Participant | Entity | Login | Email | 💬 | 📎 |
|---|---|---|---|---|---|---|
| ☑ | Mary Lam | | U0223CGBNG4 | | 0 | 0 |
| ☑ | Adrian Ciaffoncini | | U01CAEF9VGD | | 0 | 0 |
| ☑ | Freya Hu | | U01JRU87KGR | | 1 | 0 |

Matt Burgess                                                                 2021-12-15 12:39:01.187 AM

- user claiming they didn't receive the additional requirements via email

Brandon Chui                                                                 2021-12-15 01:49:12.187 AM

It is Lv 3 already

David Chiu                                                                   2021-12-15 01:50:53.187 AM



David Chiu                                                                   2021-12-15 01:51:17.187 AM

@Brandon Chui what does this mean?

David Chiu                                                                   2021-12-15 02:38:34.187 AM

@Martin Pang?

Keith Lennox                                                                 2021-12-15 03:07:26.190 AM

@Adaa Jarso or @Michelle Chan can you review the DAG KYC

Keith Lennox                                                                 2021-12-15 03:07:40.190 AM

message_changed by - @

Adaa Jarso                                                                   2021-12-15 03:20:56.190 AM

@Freya Hu this account is verified as individual, but should be institutional, could you please review.

Adaa Jarso                                                                   2021-12-15 03:23:23.190 AM

message_changed by - @Adaa Jarso Original Text:- @Louis Ng this account is verified as individual, but should be institutional, could you please review.

Freya Hu                                                                     2021-12-15 03:26:15.190 AM

@Adaa Jarso Done, is verified as entity, just wrong KYC type.

Adaa Jarso                                                                   2021-12-15 03:30:09.190 AM

Thank you @Freya Hu DAG is institutional @Louis Ng can you help

Adaa Jarso                                                                   2021-12-15 03:30:35.190 AM

message_changed by - @Adaa Jarso Original Text:- @Louis Ng this account is verified as individual, but should be institutional, could you please review.

Louis Ng                                                                     2021-12-15 04:01:23.190 AM

No reply from the 3 emails sent last month. Heard that we're currently buying their company. If so, that may be the reason. For now, cant do anything with DAG. Will keep you posted.

Michael Newett                                                               2021-12-15 04:03:19.190 AM

bump

David Chiu                                                                                                    2021-12-15 04:09:44.190 AM

@Louis Ng what email did we send it to? they're in our slack now, i will follow up directly

David Chiu                                                                                                    2021-12-15 04:10:48.190 AM

message_changed by - @David Chiu Original Text:- @Louis Ng what email did we send it to?

Louis Ng                                                                                                      2021-12-15 04:44:20.190 AM

I mean no reply from CME/ DAGG. We need to send DAG our client information to complete the application for tokenized stock trading

David Chiu                                                                                                    2021-12-15 04:45:32.190 AM

@Keith Lennox is there a way to escalate?

Keith Lennox                                                                                                  2021-12-15 04:48:41.193 AM

@Louis Ng is DAG not responding to us happening overall or something specific to this case?

Hang Truong                                                                                                   2021-12-15 04:49:34.193 AM

@Hang Truong has joined the channel

Nishad Singh                                                                                                  2021-12-15 04:56:03.193 AM

have we collected all the right docs from the user and sent them to DAG? or what are we waiting on from DAG?

Louis Ng                                                                                                      2021-12-15 05:03:49.193 AM

DAG has changed their portal twice. For the first time, I sent them the KYC of some of the very first applicant for tokensied stock trading but it didn't work. For the second time, they've a new portal. I sent half of the KYC to them. Again, it seemed not working. In October, Patrick told me to email him instead. And he mentioned in the email they are changing the setup for Europe to their Cyprus Investment Firm - because of the BaFin regulatory requirement - and will provide a new portal and API in late October. But he never got back to me. Since then I've been chasing him.

Louis Ng                                                                                                      2021-12-15 05:04:24.193 AM

message_changed by - @Louis Ng Original Text:- DAG has changed their portal twice. For the first time, I sent them the KYC of some of the very first applicant for tokensied stock trading but it didn't work. For the second time, they've a new portal and send half of the KYC to them. Again, it seemed not working. In October, Patrick told me to email him instead. And he mentioned in the email they are changing the setup for Europe to their Cyprus Investment Firm - because of the BaFin regulatory requirement - and will provide a new portal API in October. But he never got back to me. Since then I've been chasing him.

Keith Lennox                                                                                                  2021-12-15 05:05:35.193 AM

yikes and for this specific client does everything look correct for what we normally expect to pass their KYC in the past when it was working?

Louis Ng                                                                                                      2021-12-15 05:10:50.193 AM

I am not sure since even the very first case for DAG application which was submitted February this year is still waiting for approval

Louis Ng                                                                                                      2021-12-15 05:11:15.193 AM

And I've never got a feedback from them regarding their KYC requirement

David Chiu                                                                                                    2021-12-15 05:11:25.197 AM

😊 Thank you so much chasing this down @Louis Ng 🙏

Keith Lennox                                                                                                  2021-12-15 05:16:11.197 AM

wait does that mean 0 institutions got verified for tokenised stocks since feb or are there other pathways that don't rest on DAG responding to us?

Louis Ng                                                                                                      2021-12-15 05:18:35.197 AM

My understanding is 0. There shouldn't be any other pathways as we've to send them the KYC information through their portal

Michael Newett                                                                                                2021-12-15 08:37:13.197 AM

user seems to have two accounts

Roy Fong                                                                                                      2021-12-15 09:03:19.197 AM

rejected

| | |
|---|---|
| Boris Kim | 2021-12-15 01:05:19.197 PM |
| Afonso Belice | 2021-12-15 02:13:23.197 PM |
| Ashish Suvarna | 2021-12-15 02:46:45.197 PM |
| Ashish Suvarna | 2021-12-15 02:47:04.197 PM |

message_deleted by - @Ashish Suvarna Original Text:-

| | |
|---|---|
| Ashish Suvarna | 2021-12-15 02:51:37.197 PM |

message_deleted by - @Ashish Suvarna Original Text:-

| | |
|---|---|
| Reynaldo Ramirez | 2021-12-15 03:12:20.197 PM |

@Delaney Ornelas / @Jen Chan

| | |
|---|---|
| Delaney Ornelas | 2021-12-15 03:12:23.197 PM |

@Delaney Ornelas has joined the channel

CONFIDENTIAL

# Exhibit 11

Message
_____

**From**:           Robin Matzke [rm@lambda.law]
on behalf of        Robin Matzke <rm@lambda.law> [rm@lambda.law]
**Sent**:           9/30/2020 7:07:41 PM
**To**:             Daniel Friedberg [dan@ftx.com]
**CC**:             Patrick Gruhn [pg@kglawyers.ch]; Ernest Ukaj [eu@kglawyers.ch]; Brandon Williams [bw@kglawyers.ch]
**Subject**:        Re: Term Sheet FTX x DAAG x CM-E
**Attachments**:    Term Sheet FTX x DAAG_Sept 30_2020.FC.docx; ATT00002.bin


Dan,

Please find the amended TS attached.

Best
Robin

CONFIDENTIAL

*DAAG Draft dated September 30, 2020*

**Term Sheet**

**among**

**FC Interface Solutions Ltd**
A company organized under the laws of Ireland

- hereinafter referred to as **"FC"** -

**Digital Assets DA AG**
A company organized under the laws of Switzerland

- hereinafter referred to as **"DAAG"** -

**CM-Equity**
A company organized under the laws of Germany

- hereinafter referred to as "**CM-E**" -
- FC, DAAG and CM-E hereinafter collectively referred to as the "**Parties**" -

| Subject | The Parties will offer brokerage products and services from CM-E to end-users of the website ftx.com. |
|---------|---|
| | **Services by FC:**<br>- FC has rights from ftx.com for referrals of ftx.com end-users to its transmission portal<br>- FC will operate the transmission portal allowing end-users referred from ftx.com to transmit brokerage instructions to CM-E<br>- The portal shall permit end-users to purchase equities to be traded against crypto assets, including USDT or USDC (ie USDT/tesla pair) ("**Spot Equity**")<br>- The portal shall permit end-users to purchase leveraged derivatives of equities (ie USDT/bull (3x) tesla pair) secured by eligible collateral ("**Leveraged Contracts**")<br>- FC will be tied agent to CM-E to refer CM-E's brokerage services to the retail and wholesale end-users referred by ftx.com<br>- Spot Equity and Leveraged Contracts may be transferred between end-users on the secondary market and CM-E will act as intermediary ("**Secondary Transactions**")<br><br>**Services by CM-E:**<br>- CM-E will provide brokerage services and be the counterparty to the end-users referred by ftx.com<br>- CM-E will mirror the Spot Equity and Leveraged Contracts with Collateral Contracts by DAAG<br>- For each Spot Equity or Leveraged Contract sold, CM-E will purchase a Collateral Contract from DAAG<br>- CM-E will issue or redeem Spot Equity as required<br>- CM-E will issue Leveraged Contracts as required<br>- Each Spot Equity position CM-E enters into will be fully collateralized by DAAG (as set forth below) |

FTX_EU_000000137

*DAAG Draft dated September 30, 2020*

| | |
|---|---|
| | - The Leveraged Contracts to be backed by eligible collateral held by ftx.com for benefit of the user.<br>- Purchases will be made primarily with USDC<br><br>**Services by DAAG:**<br>- DAAG will buy and sell Collateral Contracts to or from CM-E as required<br>- For Spot Equity Leveraged Contracts, DAAG will buy and sell a full collateral for each full Spot Equity Collateral Contract with CM-E<br>- For Spot Equity Leveraged Contracts, DAAG will custody collateral (actual equities) with a third party custodian, e.g. Interactive Broker or comparable institutions<br>- DAAG will buy and sell a full collateral for each full Spot Equity Collateral Contract with CM-E<br>- DAAG may use the Collateral in order to generate revenue by securities lending against cash collateral (the "**DAAG Revenue**") |
| **Go Live** | October 15, 2020<br><br>"**Go Live**" means that the services have commenced (e.g. end-users can buy or sell Equities Contracts to and from CM-E via FC). |
| **Limited Exclusivity** | CM-E and DAAG will grant FC an exclusivity period of 4 months starting 15 October 2020 (the "**Exclusivity Period**"). This Exclusivity Period is not applicable to Bittrex Global. Bittrex Global may list and launch the services by CM-E and DAAG starting from 1 December 2020.<br><br>For the two years following Go Live (the "**Restricted Period**"). CM-E and DAAG will:<br>- Allow ftx.com to provide all Leveraged Contracts offered by CM-E and DAAG<br>- Put forth best efforts to allow primary market maker used in FC trades to act as primary market maker with respect to all DAAG Spot Equity and Leveraged Contracts |
| **Compensation** | FC to be issued 5% of DAAG authorized common shares (on fully diluted basis) in exchange for a capital contribution of US$500,000, payable in USDC, subject to following:<br><br>- FC to have the right to participate in future financings of DAAG in order to avoid dilution<br><br>- FC to have tag-along rights in event of future stock sales by DAAG founders<br><br>- Additions to Authorized Shares shall require preapproval of FC (not to be unreasonably withheld) except for additions to accomodate equity financings that have at least a |

FTX_EU_000000138

*DAAG Draft dated September 30, 2020*

| | |
|---|---|
| | $10,000,000 pre-money valuation<br><br>- Payments to DAAG founders moving forward from DAAG should generally be dividends except for reasonable salary.<br><br>- Capital contribution to be paid one-third on signing Definitive Agreements; one-third seven (7) days after the Go Live, and one-third 45 days after the Go Live (depending upon continued inimpaired service offering on such dates).<br><br>In exchange for the exclusivity described above, FC to pay ~~138,000~~USD 200,000 ~~FTT~~ to DAAG or its designees, ~~out of which 69,000 FTT are~~ payable upon end of exclusivity period and 69,000 FTT ~~are payable one year after signing~~that will be locked for six (6) months after singing and will ratably unlock over the period of two years after signing. |
| **Commercials** | The Parties will not charge each other license fees or any remuneration for their respective services. However, there might be a spread to cover the costs of operation. Costs incurred by third parties (e.g. custodians or marketplaces) will be factored in that spread. Parties to work together to minimize third party costs (brokerage fees and costs). No fees on Secondary Transactions.<br><br>CM-E and DAAG may not solicit end-users referred by ftx.com for any reason other than under the Tied Agent Agreement without prior written consent of FC. |
| **Public Announcement** | Announcements prior to the Go Live require approval by all Parties. |
| **Supplementary Agreements** | - Tied Agent Agreement between CM-E and FC<br><br>- End User Agreement with CM-E - Terms for Spot Equity and Leveraged Contracts<br><br>- Terms for Collateral Contracts between DAAG and CM-E<br><br>- NDA |
| **Audit** | CM-E is required to periodically report on its positions on a daily basis at 1pm CET on banking days.<br><br>DAAG is required to periodically report on its positions with CM-E and the status of the Collateral on a daily basis at 1pm CET on banking days.<br><br>The Definitive Documents to describe audit processes and procedures. |
| **Term & Termination** | Term is indefinite, termination with prior notice of 6 months.<br>FTX.com may curtail the referral service to FC in its discretion. |

CONFIDENTIAL

*DAAG Draft dated September 30, 2020*

| | |
|---|---|
| | Termination for cause remains unaffected. |
| **Confidentiality** | The parties entered a separate NDA. |
| **Invalidity of clauses** | Should a provision of this Term Sheet or a provision later on included in this Term Sheet be or become invalid as a whole or in part, or should a gap in this Term Sheet become evident, such invalidity or gap shall not affect the validity of the remaining provisions of this Term Sheet. Instead of the invalid provision, or in order to fill the gap, a valid and practicable provision is deemed to be agreed with effect ex tunc that in legal and economic terms comes closest to what the Parties intended or would have intended in accordance with the purpose of this Term Sheet if they had considered the point at the time of execution of this Term Sheet. |
| **Choice of Law** | German law for this Term Sheet, Equities Contracts and Tied Agent Agreement.<br><br>Swiss law for Collateral Contracts.<br><br>All disputes settled by private arbitration under ICC in Antigua. Each Party to bear own attorney fees and costs (no reimbursement to prevailing party). |
| **Indemnity** | Parties to provide indemnification with respect all costs (including attorneys' fees) resulting from  third party or regulatory claims arising from violations or allegations of violations of laws, contractual breaches, misconduct, or gross negligence. |
| **Non Binding** | This Term Sheet is non-binding and for discussion purposes only and remains subject to the potential execution of Definitive Agreements. |

CONFIDENTIAL

# Exhibit 12

# FTX Continues Global Expansion with the Establishment of FTX Europe

USA - English ▾

### FTX Europe has received approval in Cyprus



NEWS PROVIDED BY
**FTX Trading Ltd.** ➝
07 Mar, 2022, 03:00 ET

HERISAU, Switzerland, March 7, 2022 /PRNewswire/ -- FTX Trading Limited ("FTX") a leading global cryptocurrency exchange, today announced the establishment of FTX Europe ("FTX Europe" or "the Company"), marking the next phase of the Company's global expansion, by extending its presence into Europe and the Middle East. The Company has secured the approval from the Cyprus Financial Market Regulator CySEC through its ftx.com/eu domain.

FTX Europe will now start offering FTX's leading products and services to European clients via a licensed investment firm with passportable licenses across the European economic area. Users in these regions will be able to trade a variety of cryptocurrency products powered by FTX's industry-leading trading technology and digital asset offerings.

Sam Bankman-Fried, CEO & Founder of FTX, commented on the news, "We're excited to launch our European operations in a regulated fashion to better serve those within the continent. As we continue to grow, we are constantly looking at opportunities to become appropriately licensed and regulated in every market we enter. We'll be interacting with regulators in various countries across Europe to continue to provide a safe and secure environment for people to trade crypto."

FTX Europe is currently headquartered in Switzerland, with an additional regional headquarter in Cyprus. Additionally, the Company will be devoting significant resources towards developing a strong working relationship with the appropriate regulatory authorities.

Patrick Gruhn, Head of FTX Europe, concluded, "We're excited to bring FTX's innovative offerings to the European markets and that CySEC officially approved our domain. Europeans will now be able to use FTX's best-in-class trading platform to invest in a wide range of cryptocurrencies derivatives thru a regulated investment firm."

Cyprus is a highly reputed jurisdiction for Investment Firms and provides regulated Firms access to the entire European Economic Area (which includes the European Union plus three countries). The approval of FTX's domain by the Cyprus CySEC to provide derivative services to European users also sets a new standard for Crypto Currency Exchanges in Europe.

**About FTX Europe**

FTX Europe with it's holding company in Switzerland, is the European and Middle East division of FTX, a cryptocurrency exchange built by traders, for traders.  Through FTX Europe, users in the European Economic Area and the Middle East can access FTX's innovative products, including industry-leading derivatives, options and volatility products, tokenized stocks, and other services and products.

To learn more about FTX Europe & MENA, please visit: https://ftx.com/eu

**About FTX.COM**

FTX is a cryptocurrency exchange built by traders, for traders. It offers innovative products, including industry-leading derivatives, options and volatility products, tokenized stocks, prediction markets, leveraged tokens and an OTC desk. FTX strives to be an intuitive yet powerful platform for all kinds of users, and to be the most innovative exchange in the industry.

To learn more about FTX.COM, please visit: https://ftx.com/

FTX.COM is not available to US residents or residents of other prohibited jurisdictions, as set out in its Terms of Service.

Pete Padovano

M Group Strategic Communications (for FTX)

+1 646 859 5953

ftx@mgroupsc.com

SOURCE FTX Trading Ltd.



## PRN Top Stories Newsletters

Sign up to get PRN's top stories and curated news delivered to your inbox weekly!

Enter Your Email

Select Country

**Submit**

By signing up you agree to receive content from us.
Our newsletters contain tracking pixels to help us deliver unique content based on each subscriber's engagement and interests. For more information on how we will use your data to ensure we send you relevant content please visit our PRN Consumer Newsletter Privacy Notice. You can withdraw your consent at any time in the footer of every email you'll receive.

# Exhibit 13

FRIEDBERG ATTORNEY BONUS RECOMMMENDATIONS – S1 2002

**COMPARATIVE STRENGTH TABLE (SBF Requested)**

| | |
|---|---|
| Can Sun | 500 |
| Ashley Stirrup | 7 |
| Patrick Gruhn | 70 |
| Robin Matzke | 70 |
| T'Shae Cooper | 60 |
| Lavar Ferguson | 1 |
| Claire Zhang | 50 |
| Chris Chen | 25 |
| Ben Spitz | 20 |
| Ryne Miller | 100 |
| Trevor Levine | 40 |
| Karista Vaeth | 40 |
| Brian Mulherin | 70 |
| Rahul Sharma | 5 |
| Kelly Yamashita | 5 |

\*\* Note – wide variance in salary & current holdings (see table at bottom) so suggested bonus amounts reflect total compensation

**CAN SUN –**

1. Can is most valuable lawyer by far.
2. Management feedback truly extraordinary

*Recommendation*: Extraordinary Compensation for Can. He didn't get that much stock of ftx.com and deserves more.

*Assessment*: Incredible 6 months of hard work. Suggested Bonus – Forgive loan on Bahamas house ($2.3M); $500k; plus 1 million FTX.com options

**ASHLEY STIRRUP**

3. fits in well, is kind and cares
4. Work Summary –
   a. has competently completed paralegal administrative duties such as work permits
   b. has worked somewhat on Bahamas securities and regulatory with success and is liked by regulators;
5. several members of management noted that she is improving and is timely.

*Assessment* - She is developing and will have a role here. Suggested bonus - $50k in cash plus 1,000 FTX.com options

**PATRICK & ROBIN**

1. they run the EU regulatory
2. They do drop ball on customer stuff and business side stuff, but are good at legal and very important to us

[ PAGE  \* MERGEFORMAT ]

CONFIDENTIAL

*Recommendation-* FTX needs to take business side stuff away from them

*Missed Acquisition Incentive –* They each had a $5M bonus tied to implementing EU by definitive date which was missed by 4 weeks and not paid. They say that it is because of our tech team delays.

*Assessment -* They are good at managing the EU legal; not great at business stuff. Suggest we pay the acquisition bonus ($5M each) but over 5 month period ($1M per month each). It will be very noisy if we don't pay this.

**T'SHAE COOPER**

1. good personality; hasn't integrated with others outside of Alameda team
2. Work Summary –
   a. Has taken over many Alameda matters
   b. Worked with outside counsel on subpoenaes
3. Has demonstrated good judgment
4. When things are stuck, she makes noise and gets them going
5. Caroline has given her high remarks, noting that she is prompt

*Recommendation –* Promotion to be Legal Counsel at Alameda (move from FTX)

*Assessment –* An excellent 6 months; possibly can be Alameda general counsel with further development. Suggested Bonus - $250k cash plus 20,000 FTX.com options

**LEVAR FERGUSON**

1. Good personality
2. Not great work ethic
3. Helpful in coordinating stock ledger items – paralegal type duties

*Assessment –* Decent start and we need to train him better. Suggested Bonus - $10k cash plus 100 FTX.com options

**CLAIRE ZHANG**

1. Great personality match; loyal
2. Helps on Ventures and supports Can Sun
3. Very hard worker and diligent and smart
4. Excellent management feedback
5. Needs to better develop confidence

*Assessment –* An excellent 6 months. Suggested Bonus - $100,000 plus 10,000 FTX.com options

**CHRIS CHEN**

1. Handles Australia regulatory & legal
2. Diligent

*Assessment –* Good start with us. Suggested Bonus - $70,000 plus 1,000 FTX.com options

CONFIDENTIAL

**BEN SPITZ**

1. General Counsel for Japan legal and regulatory
2. Has other lawyers helping
3. Do need to keep him on for awhile through transition

*Assessment* – Necessary for us. Suggested Bonus - $50k

**RYNE MILLER**

1. Has done a great job running most FTX.US matters with his team
2. Proved very helpful on US lobbying and CFTC regulatory advice
3. Received high management reviews applauding work ethic and responsiveness
4. Is continuing to learn other areas (corporate)
5. Sometimes can be a bit combative with third parties; Rarely is over aggressive in legal decisions

*Assessment* – Had an excellent 6 months. He is looking for cash based incentive – his house is $1.5M mortgage and he pays 50-% tax rate and he hopes to pay off soon. Suggested bonus - $1.5M cash

**TREVOR LEVINE**

1. Has run a number of regulatory tasks successfully
2. Is a hard worker and great contributor

*Assessment* – Excellent 6 months. Suggested bonus - $100k plus 200,000 FTX.US options

**KARISTA VAETH**

1. Has run a trademark project successfully
2. Has shown good contractual drafting skills
3. Is a hard worker and good contributor

*Assessment* – Excellent 6 months. Suggested bonus - $100k plus 200,000 FTX.US options

**BRIAN MULHERIN**

1. Independently works on Ledgerx matters which I think is overall going very well

*Assessment* - Insufficient information for feedback. I'd guess like 1x – 2x salary?

**RAHUL SHARMA**

1. Rahul assists Brian at LedgerX

*Recommendation*: Move Rahul over to more FTX & FTX.US duties – don't see why 2 lawyers needed at ledger

*Assessment* – Insufficient information. I'd guess like $50k?

**KELLY YAMASHITA**

1. Kelly has been helping with sick mother at home and mainly checked out
2. She is being given fresh chance for this 6-months to prove herself or decide if not a good fit.

*Assessment*--$50k bonus suggested.


## ATTORNEYS - CURRENT COMPENSATION TABLE

| Name | Salary (USD) | FTX US options | FTX.com options | SRM | MAPS | OXY | Other Compensation |
|---|---|---|---|---|---|---|---|
| T'Shae Cooper | $ 500,000.00 | None | 1,000 | 1,000,000 | None | None | Signing bonus of $100,000; 100% salary target bonus annually |
| Ashley Sturrup | $ 100,000.00 | None | 500 | None | None | None | |
| Lavar Ferguson | $ 50,000.00 | None | None | None | None | None | |
| Chris Chen | $ 103,000.00 | None | None | None | None | None | |
| Patrick Gruhn | $ 500,000.00 | 500,000 | 30,000 | 1,000,000 | None | None | Entitled to $3.75M every 6 months under SPA for 4 years (total $30M); seeking a one-time $5M bonus for launching FTX EU (original milestone was last December). |
| Robin Matzke | $ 500,000.00 | 500,000 | 30,000 | 1,000,000 | None | None | Entitled to $3.75M every 6 months under SPA for 4 years (total $30M); seeking a one-time $5M bonus for launching FTX EU (original milestone was last December). |
| Ben Spitz | $ 160,000.00 | None | None | None | None | None | |
| Timothy Kwa Liang Jing | $ 77,000.00 | None | None | None | None | None | |
| Ryne Miller | $1,000,000.00 | 15,105,000 | 105,910 | 2,000,000 | 1,000,000 | 1,000,000 | Signing bonus of $250,000 |
| Trevor Levine | $ 300,000.00 | 234,000 | 1,880 | None | None | None | Signing bonus of $85,000 |
| Karista Vaeth | $ 300,000.00 | 234,000 | 1,880 | None | None | None | Signing bonus of $85,000 |
| Can Sun | $ 350,000.00 | 5,172,000 | 128,820 | 2,000,000 | 500,000 | 500,000 | Signing bonus of $1,000,000; borrowed $2.3M from Alameda for purchase of house in Bahamas; received $300k advance for housing renovations. |
| Claire Zhang | $ 300,000.00 | None | None | None | None | None | Guaranteed $125,000 bonus per year |
| Kelly Yamashita | $ 200,000.00 | 36,000 | 6,060 | None | None | None | |
| Brian Mulherin | $ 250,000.00 | 1,047,000 | None | None | None | None | |
| Rahul Sharma | $ 225,000.00 | 113,000 | None | None | None | None | |

CONFIDENTIAL

# Exhibit 14



# Exhibit 15



# Exhibit 16

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-50437 (JTD) |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

## THE DEBTORS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT BRANDON WILLIAMS

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable by Federal Rules of Bankruptcy Procedure 7026, 7034, and 9014 (the "Bankruptcy Rules") and the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules" and together with the Bankruptcy Rules, the "Rules"), the Debtors (as defined below) submit this request for the production of documents (the "Requests") to Defendant Brandon Williams in connection with the above-captioned Adversary Proceeding. The Debtors request

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX [cases.ra.kroll.com]. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

that the documents and electronic information responsive to the Requests identified in the attached **Exhibit A** be produced to Stephen Ehrenberg, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, counsel for the Debtors, no later than November 13, 2023.

Please take further notice that the Debtors reserve their rights under title 11 of the United States Code (the "Bankruptcy Code"), the Rules, and any applicable law regarding the subject matter of these Requests to amend, supplement, and/or modify **Exhibit A** attached hereto, or serve additional discovery requests.

Dated: October 13, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: ehrenbergs@sullcrom.com
      holleys@sullcrom.com
      gluecksteinb@sullcrom.com
      dunnec@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

# EXHIBIT A

## DEFINITIONS

For purposes of the Document Requests, the following terms shall apply:

1.      The term "**Acquisition of Digital Assets AG**" refers to the purchase by Alameda Research Ltd. and FTX Trading Ltd. of the shares of Digital Assets AG, now known as FTX Europe AG, and its affiliates and subsidiaries, via three Share Purchase Agreements executed in October 2020, July 2021, and November 2021.

2.      The term "**Affiliate**" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

3.      The terms "**and**" and "**or**" in Definitions and Requests shall be construed conjunctively or disjunctively as necessary to bring within the scope of the Requests all Documents or information that might otherwise be construed as outside their scope.

4.      The term "**any**" means "each and every," "any and all," and "any one."

5.      The term "**ASC 805 Accounting Analysis**" shall refer to the report issued by BDO USA LLP dated April 7, 2022, entitled "ASC 805 Valuation of Certain Assets of FTX Trading Ltd. for Financial Reporting Purposes," and all versions thereof, as well as to all services performed under the Statement of Work executed by FTX Trading Ltd. and BDO USA LLP dated February 22, 2022, concerning the purchase accounting analysis of Digital Assets AG.

6.      The term "**Auditing and Accounting Companies**" means Prager Metis CPAs, LLC, Robert Lee & Associates LLP, Rivers & Moorehead PLLC, and Silicon Valley Accountants, which were involved in the preparation of the FTX Trading Ltd. Audited Financial Statement, as defined below, or of materials relied upon in preparing the FTX Trading Ltd. Audited Financial Statement.

7.      The term "**communication**," or any variant thereof, means any contact between two or more persons by which any information or knowledge is transmitted or conveyed, or attempted to be transmitted or conveyed, and shall include, without limitation, written contact by means such as letters, memoranda, telecopies, text messages, instant messages, Slack messages, Signal messages, Telegram messages, emails, social media, or any other document, and oral contact, such as face-to-face meetings, videoconference or telephone conversations, or social media.  The term "Communication" is not limited to internal Communications but includes Communications between the Debtors and third parties and Communications between or among third parties.

8.      The term "**concerning**" is to be understood in its broadest sense and means concerning, constituting, identifying, evidencing, summarizing, commenting upon, referring to, relating to, arising out of, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating, manifesting, containing, or comprising the subject matter identified.

9.      The term "**Debtors**" means, collectively, FTX Trading Ltd., Maclaurin Investments Ltd., and their affiliated entities, as debtors-in-possession, as applicable, which filed voluntary chapter 11 petitions under the Bankruptcy Code commencing these chapter 11 cases.

10.     The term "**Digital Assets AG**" means Digital Assets AG, later known as FTX Europe AG, as well as any Affiliates, agents, assigns, directors, employees, officers, parents, partners, representatives, subsidiaries, or any other Persons acting or purporting to act on their behalf, and any predecessor or successor of the foregoing.

11.     The term "**document**" has the meaning prescribed by Rule 7034 of the Bankruptcy Rules, including, without limitation, any tangible thing upon which any expression,

Communication or representation has been recorded by any means including, but not limited to, handwriting, printing, photographing, videotaping, magnetic impulse, computer disks, computer storage drives, computer tapes, or mechanical, electronic or digital recording or information storage of any kind, and any nonidentical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, memoranda, electronic mail, charts notes, records of any sort of meetings, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

12.    The term "**FTX Entities**" means collectively all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

13.    The term "**FTX Group**" means collectively the Debtors and the FTX Entities.

14.    The term "**FTX Trading Ltd. Audited Financial Statement**" refers to the audited financial statement dated April 2, 2022, entitled "FTX Trading Ltd. Consolidated Financial Statements as of December 31, 2021 and 2020 and for the years ended December 31, 2021 and 2020," and all versions thereof, prepared or facilitated by the Auditing and Accounting Companies.

15.    The term "**identify**," or any variant thereof, means:  (i) in relation to a natural person, to establish a person's identity such that the identity of the person will be ascertainable distinctly from all other like persons, and to provide the person's current or last known employer, current or last known mailing address, and current or last known telephone number; or (ii) in relation to a document or item, to establish the document or item's identity such that the identity of the document or item will be ascertainable distinctly from all other like documents or items, and

to state the name and address of the custodian of the document or item, the location of the document or item, and a general description of the document or item.

16.     The term "**including**" means "including, but not limited to" and "including, without limitation." It shall not be construed to limit the scope of any definition or Request herein.

17.     The term "**Irrevocable Fee Agreement**" means the agreement titled "Irrevocable Fee Agreement" dated June 5, 2021, between Mohammad Hans Dastmaltchi and Digital Assets AG.

18.     The term "**Kephas**" means collectively Kephas Stiftung gemeinnützige GmbH, Kephas TV Corporation, Kephas Corporation, any of their predecessors, successors, or affiliates, and all representatives, agents, advisors, and all other Persons or entities acting or purporting to act on behalf of any of those entities.

19.     The term "**Person**" includes both the singular and the plural, and means any natural Person, business entity, corporation, cooperative, bureau, public corporation, partnership, joint venture, firm, trust, estate, group, club, association, institute, society, office, organization, and any governmental entity or department, agency, bureau, or political subdivision thereof, or any other organization or entity.

20.     The terms "**relating to**," "**related to**" or "**concerning**," or any variant thereof, means, without limitation, referring to, concerning, pertaining to, discussing, mentioning, containing, reflecting, constituting, describing, displaying, showing, identifying, proving, disproving, consisting of, arising out of, supporting or contradicting.

21.     The term "**Wallet**" refers to any device, program or network address that holds any cryptocurrency or cryptocurrency key.

22.     The term "**You**" or "**Your**" shall refer to Brandon Williams.

## INSTRUCTIONS

1.      Unless otherwise specified, the responsive period for each Request is from January 1, 2020, through the present (the "**Relevant Period**").

2.      All discovery in connection with these Requests shall be subject to and conducted in accordance with the terms of the Stipulation and Protective Order [D.I. 832] in these chapter 11 cases or the terms of any other protective order issued in this case.

3.      You are instructed to respond separately to each Request and to produce all Documents responsive to the Requests that are within Your possession, custody, or control, or in the possession, custody, or control of any other Person or entity acting or purporting to act on Your behalf.

4.      If You cannot fully respond to the following one or more of the Requests after exercising due diligence to secure the information requested thereby, so state, and specify (a) the portion of each Request that cannot be responded to fully and completely, (b) what efforts were made to obtain the requested information, (c) the facts relied upon that support Your contention that the Request(s) cannot be answered fully and completely, and (d) any knowledge, information or belief You have concerning the unanswered portion of any such Request(s).

5.      If there are no Documents responsive to any particular Request, Your response shall state so in writing.

6.      Unless instructed otherwise, each Request shall be construed independently and not by reference to any other Request for the purpose of limitation or exclusion.

7.      You must answer each Request separately and fully, unless it is objected to, in which event the objection(s) should be specifically stated.

8. If any information requested in a Request is claimed to be privileged or otherwise immune from discovery, or if any Document is withheld from production based on a claim of privilege, immunity, or other ground, furnish a list specifying: (a) the nature of the privilege, immunity, or other ground claimed; (b) the authors of the Document; (c) all persons who received copies of the Document, including the Document's indicated and blind copy recipients; (d) the date of the Document; (e) the type of Document withheld (*e.g.*, memorandum, letter, report, email); and (f) the general subject matter of the Document sufficient to enable the Debtors to assess the applicability of the claimed privilege, immunity, or other ground for refusal to produce the Document. For each item of information or Document You withhold based on a claim of privilege, immunity, or other ground, identify such information or Document with sufficient particularity for purposes of a motion to compel.

9. If a portion of an otherwise responsive Document contains information subject to a claim of privilege, only that portion of the Document subject to the claim of privilege shall be deleted or redacted from the Document following the instructions in the preceding paragraph and the rest shall be produced.

10. You shall produce Documents in the following manner and form:

*E-mails*. E-mails shall be produced as single-page TIFF images with accompanying full text and load file (.DAT). E-mail attachments shall be handled according to the provisions below applicable to loose electronic Documents and shall not be separated from the e-mails to which they are attached. Native files for e-mails shall be maintained, and such files shall be produced upon request.

*Electronic Documents*. Word and other electronic Documents shall be produced as single-page TIFF images with accompanying full text and load file (.DAT). The processed native

for all spreadsheets, except for those requiring redactions, shall be produced as native. Audio, video, and other files that cannot be converted to image shall also be produced as native. Native files shall be linked to the database by the metadata field "NativeLink." Native files for all other electronic Documents shall be maintained, and such files shall be produced upon request.

*Hard-Copy Documents.* Hard-copy Documents shall be produced as single-page TIFF images with accompanying full OCR text and load file (.DAT). All hard copy documents should be unitized to the smallest physical boundary.

*TIFF Images Generally.* Documents should be produced as single-page, black and white, group IV TIFFs imaged at 300 dpi. The document's original orientation should be maintained (*i.e.*, portrait-to-portrait and landscape-to-landscape). Bates numbers, confidentiality designations (in accordance with the terms of the Protective Order), and redactions (to the extent they are necessary) should be burned into the image. TIFF image files should be provided in an "Images" folder. All speaker notes, comments, track changes, and hidden text should be expanded, extracted, and rendered in the TIFF file.

*TIFF Images for Electronic Messaging Applications and Services.* Documents collected from electronic messaging applications and services, including but not limited to Signal, Telegram, SMS, WhatsApp, Facebook Messenger, and iMessage, should be produced as TIFF images as specified in the foregoing, but should be produced in color. Slack messages and e-mails, however, should be produced in black and white.

*Extracted Text Files.* The full text of native files should be extracted directly from the native file (not OCR) and should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. Text files should be provided in a "Text" folder. To the extent that a document is redacted, the document should undergo OCR after

the text has been redacted in order to remove the redacted text.

*Data Load Files.*  Database load files should consist of: (1) a comma-delimited value ("".DAT"") file containing the metadata fields identified in the following paragraph; and (2) an Opticon (""".OPT""") file to facilitate the loading of TIFF images.  The first line of the .DAT file shall be the header with field names, and each subsequent line shall contain the fielded data for each Document.  All load files should be named to match the production volume name.  Bates numbers and production volume names must not be duplicated and should run consecutively throughout the entirety of the production(s).

The following metadata should be supplied, where available:

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|---|---|---|---|---|
| Bates Number Begin | Beginning page Bates number | x | x | x |
| Bates Number End | Ending page Bates number | x | x | x |
| Attachment Begin | Beginning page of attachment range | x | x | x |
| Attachment End | Ending page of attachment range | x | x | x |
| Custodian | Names of custodian who possessed the document. For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be provided. | x | x | x |
| All Custodians | Names of all individuals or repositories who possessed the document. | x | x | x |
| File Name | File name of document | | x | |
| File Extension | File extension of document | | x | |

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|---|---|---|---|---|
| E-mail Outlook Type | Type of Outlook item, e.g. e-mail, calendar item, note, task | x | | |
| Page Count | For documents produced in TIFF form, number of pages in the document.  For documents produced in native, page count will be 1 (for placeholder). | x | x | x |
| E-mail Subject | Subject of e-mail | x | x | |
| Author | Document author | | x | |
| From | E-mail author | x | x | |
| To | E-mail recipients | x | x | |
| CC | E-mail copyees | x | x | |
| BCC | E-mail blind copyees | x | x | |
| Date Sent | Date sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Time Sent | Time sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date Received | Date received (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Time Received | Time received (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date Created | Date created | | x | |
| DateLastModified | Last modification date (mm/dd/yyyy hh:mm:ss format) | | x | |
| Hash Value (MD5 or SHA-1) | Unique electronic signature of e-mail or electronic file | x | x | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order | x | x | x |
| Redacted | Descriptor for documents that have been redacted (<yes> or | x | x | x |

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|-------|-------------|--------|------------------------------|-----------|
|       | <no>)       |        |                              |           |
| NativeLink | Logical path to native file |    | x | x |
| Text Path | Logical path to text file | x | x | x |

11.    You shall produce all Documents in the manner in which they are maintained in the usual course of Your business.

12.    A Request shall be deemed to include a request for the entire Document requested, including any and all file folders within which the Document was contained, transmittal sheets or memoranda, cover letters, exhibits, enclosures, comments or attachments to the Document in addition to the Document itself.  In the case of e-mail attachments, if either the e-mail or any of its attachments is responsive, produce the e-mail and all of the corresponding attachments.

13.    All Documents shall be produced in such fashion as to identify the custodian or department in whose possession the Document was found and the business address of each Document's custodian(s).

14.    The fact that a Document is produced by another party does not relieve You of the obligation to produce Your copy of the same Document, even if the two Documents are identical.

15.    If You claim any ambiguity in interpreting either a Request or a definition or instruction, You should not use that claim as a basis for refusing to respond, but shall set forth as part of Your response the language deemed to be ambiguous.

16.    Each Request shall be deemed to be continuing in nature.  If at any time additional Documents or information come into Your possession, custody or control or are brought to Your attention, prompt supplementation of Your response to these Requests is required.

## DOCUMENT REQUESTS

1.      All Documents concerning the Acquisition of Digital Assets AG, including but not limited to all Documents concerning the purpose of the acquisition, Documents reflecting negotiations concerning the acquisition, due diligence materials prepared or provided in connection with the acquisition, the drafting of share purchase agreements or any adjacent or ancillary agreements, and communications concerning what entities, assets, or intellectual property would or would not be transferred in connection with the acquisition.

2.      All Documents concerning the acquisition by Digital Assets AG, You, Robin Matzke, Lorem Ipsum UG, or Patrick Gruhn of a contract for difference broker that was licensed to service customers in the European Economic Area, including but not limited to Documents concerning the acquisition of K-DNA Financial Services Ltd., negotiations over or due diligence performed in connection with the acquisition of K-DNA Financial Services Ltd., and the drafting of agreements executed in connection with the acquisition of K-DNA Financial Services Ltd.

3.      All Documents concerning Robin Matzke's purchase of shares of K-DNA Financial Services Ltd., including but not limited to Documents concerning the financing of Robin Matzke's purchase of shares in K-DNA Financial Services Ltd., the negotiation and execution of the Share Purchase Agreement governing Robin Matzke's purchase of shares of K-DNA Financial Services Ltd., and Robin Matzke's assignment of rights to purchase shares of K-DNA Financial Services Ltd. to Digital Assets AG.

4.      All Documents concerning K-DNA Financial Services Ltd.'s application for or receipt of regulatory approvals to solicit and provide financial products to customers in the European Economic Area.

5.      All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and the FTX Group and FTX Entities.

6.      Documents sufficient to show Your ownership or any other beneficial interest, directly or indirectly, in all companies that are incorporated, domiciled, operate within, or provide services to the United States, including Kephas.

7.      For the period November 1, 2018, to the present, Documents sufficient to show the relationship between You and Cosima Capital.

8.      The names of all owners, whether direct or indirect, and employees of Cosima Capital.

9.      All Documents concerning the relationship between or among Cosima Capital and the FTX Group, FTX Entities, or Digital Assets AG, including but not limited to any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between Cosima Capital and the FTX Group, FTX Entities, or Digital Assets AG, and all communications between employees of Cosima Capital and employees of the FTX Group, FTX Entities, or Digital Assets AG.

10.      Documents sufficient to show the nature of your employment by or services to or any other relationship with Digital Assets AG, including any ownership or other beneficial interest.

11.      All Documents concerning the ASC 805 Accounting Analysis, including but not limited to any communications about the ASC 805 Accounting Analysis, materials prepared to share with BDO USA LLP in connection with the ASC 805 Accounting Analysis, and notes of meetings held in connection with the ASC 805 Accounting Analysis.

12.     All Documents concerning any valuation of Digital Assets AG, whether formal or informal.

13.     All Documents concerning the FTX Trading Ltd. Audited Financial Statement, including but not limited to materials prepared to disclose to the Auditing and Accounting Companies in connection with the FTX Trading Ltd. Audited Financial Statement, notes of meetings held in connection with the preparation of the FTX Trading Ltd. Audited Financial Statement, and communications with the Auditing and Accounting Companies.

14.     All Documents concerning the business model of Digital Assets AG, including but not limited to Documents concerning Digital Asset AG's business strategy, model, or plan either pre- or post-acquisition by the FTX Group, any internal business plans, intellectual property possessed, licensed, and/or developed by Digital Asset AG, Documents concerning current or future products or cryptocurrency offerings, Documents concerning the acquisition of or creation of Digital Assets AG subsidiaries.

15.     All Documents concerning the finances of Digital Assets AG, including but not limited to Documents containing information relating to the revenue, financial state, and solvency of Digital Assets AG or the liquidity of its assets, such as its balance sheets, audit statements, profit and loss statements, bank account statements, and loan information.

16.     All Documents concerning the customers of Digital Assets AG, including but not limited to the number of customers Digital Assets AG had pre- and post-acquisition, the services provided to such customers, the revenue derived from such customers, and Digital Assets AG's liabilities to such customers.

17.     All Documents concerning regulatory licenses and approvals within the European Economic Area that were anticipated or proposed in connection with the acquisition, including but

not limited to all communications with regulators, Documents concerning the relationship of Yourself, Robin Matzke, or Patrick Gruhn with European regulators, and Documents concerning the acquisition of or application for such regulatory licenses and approvals.

18.    All Documents concerning the Irrevocable Fee Agreement, including but not limited to the creation, negotiation, and purpose of the Irrevocable Fee Agreement and all duties performed by any party to the Irrevocable Fee Agreement pursuant to the Irrevocable Fee Agreement.

19.    All Documents concerning Digital Assets AG's hiring of Mohammad Hans Dastmaltchi.

20.    All Documents concerning any assets or funds You received from the FTX Group, or any officer, director, contractor, or employee of the FTX Group, as compensation or otherwise.

21.    Documents sufficient to identify all of Your e-mail addresses, including but not limited to e-mail addresses used to create cryptocurrency exchange accounts on Your behalf.

22.    All Documents reflecting public addresses of any Wallet held by You.

23.    All Documents concerning the post-petition sale process for FTX Europe AG or its subsidiaries, including but not limited to communications with purported potential purchasers of FTX EU Ltd., such as Trek Labs and Global Commerce Technologies Pte. Ltd. (d/b/a Coins.ph), documents sufficient to show Your relationship to, ownership or other beneficial interest in Trek Labs and Global Commerce Technologies Pte. Ltd., and all Documents concerning plans to find potential buyers for FTX EU Ltd.

24.    For the period November 24, 2018, until the present, all Communications between You and any of the following individuals:

- Samuel Bankman-Fried

- Caroline Ellison

- Daniel Friedberg

- Ryan Salame

- Nishad Singh

- Can Sun

- Zixiao "Gary" Wang

25.    All Communications between You and any of the following individuals:

- Asher Afriat

- Ramnik Arora

- Joseph Bankman

- Benjamin Baruh

- Jürg Bavaud

- Mohammad Hans Dastmaltchi

- Patrick Gruhn

- Brett Harrison

- Robin Matzke

- Ryne Miller

- Max Rhotert

- Stephen Stephens

- John Samuel Trabucco

- Ernest Ukaj

# Exhibit 17

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-50437 (JTD) |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

### THE DEBTORS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS ROBIN MATZKE AND LOREM IPSUM UG

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable by Federal Rules of Bankruptcy Procedure 7026, 7034, and 9014 (the "Bankruptcy Rules") and the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules" and together with the Bankruptcy Rules, the "Rules"), the Debtors (as defined below) submit this request for the production of documents (the "Requests") to Defendants Robin Matzke and Lorem Ipsum UG in connection with the above-captioned Adversary Proceeding.

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX [cases.ra.kroll.com].  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

The Debtors request that the documents and electronic information responsive to the Requests identified in the attached **Exhibit A** be produced to Stephen Ehrenberg, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, counsel for the Debtors, no later than November 13, 2023.

Please take further notice that the Debtors reserve their rights under title 11 of the United States Code (the "Bankruptcy Code"), the Rules, and any applicable law regarding the subject matter of these Requests to amend, supplement, and/or modify **Exhibit A** attached hereto, or serve additional discovery requests.

Dated: October 13, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
    mcguire@lrclaw.com
    brown@lrclaw.com
    pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: ehrenbergs@sullcrom.com
    holleys@sullcrom.com
    gluecksteinb@sullcrom.com
    dunnec@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

**EXHIBIT A**

**DEFINITIONS**

For purposes of the Document Requests, the following terms shall apply:

1.      The term "**Acquisition of Digital Assets AG**" refers to the purchase by Alameda Research Ltd. and FTX Trading Ltd. of the shares of Digital Assets AG, now known as FTX Europe AG, and its affiliates and subsidiaries, via three Share Purchase Agreements executed in October 2020, July 2021, and November 2021.

2.      The term "**Affiliate**" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

3.      The terms "**and**" and "**or**" in Definitions and Requests shall be construed conjunctively or disjunctively as necessary to bring within the scope of the Requests all Documents or information that might otherwise be construed as outside their scope.

4.      The term "**any**" means "each and every," "any and all," and "any one."

5.      The term "**ASC 805 Accounting Analysis**" shall refer to the report issued by BDO USA LLP dated April 7, 2022, entitled "ASC 805 Valuation of Certain Assets of FTX Trading Ltd. for Financial Reporting Purposes," and all versions thereof, as well as to all services performed under the Statement of Work executed by FTX Trading Ltd. and BDO USA LLP dated February 22, 2022, concerning the purchase accounting analysis of Digital Assets AG.

6.      The term "**Auditing and Accounting Companies**" means Prager Metis CPAs, LLC, Robert Lee & Associates LLP, Rivers & Moorehead PLLC, and Silicon Valley Accountants, which were involved in the preparation of the FTX Trading Ltd. Audited Financial Statement, as defined below, or of materials relied upon in preparing the FTX Trading Ltd. Audited Financial Statement.

7.      The term "**communication**," or any variant thereof, means any contact between two or more persons by which any information or knowledge is transmitted or conveyed, or attempted to be transmitted or conveyed, and shall include, without limitation, written contact by means such as letters, memoranda, telecopies, text messages, instant messages, Slack messages, Signal messages, Telegram messages, emails, social media, or any other document, and oral contact, such as face-to-face meetings, videoconference or telephone conversations, or social media.  The term "Communication" is not limited to internal Communications but includes Communications between the Debtors and third parties and Communications between or among third parties.

8.      The term "**concerning**" is to be understood in its broadest sense and means concerning, constituting, identifying, evidencing, summarizing, commenting upon, referring to, relating to, arising out of, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating, manifesting, containing, or comprising the subject matter identified.

9.      The term "**Debtors**" means, collectively, FTX Trading Ltd., Maclaurin Investments Ltd., and their affiliated entities, as debtors-in-possession, as applicable, which filed voluntary chapter 11 petitions under the Bankruptcy Code commencing these chapter 11 cases.

10.      The term "**Digital Assets AG**" means Digital Assets AG, later known as FTX Europe AG, as well as any Affiliates, agents, assigns, directors, employees, officers, parents, partners, representatives, subsidiaries, or any other Persons acting or purporting to act on their behalf, and any predecessor or successor of the foregoing.

11.      The term "**document**" has the meaning prescribed by Rule 7034 of the Bankruptcy Rules, including, without limitation, any tangible thing upon which any expression,

Communication or representation has been recorded by any means including, but not limited to, handwriting, printing, photographing, videotaping, magnetic impulse, computer disks, computer storage drives, computer tapes, or mechanical, electronic or digital recording or information storage of any kind, and any nonidentical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, memoranda, electronic mail, charts notes, records of any sort of meetings, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

12.     The term "**FTX Entities**" means collectively all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

13.     The term "**FTX Group**" means collectively the Debtors and the FTX Entities.

14.     The term "**FTX Trading Ltd. Audited Financial Statement**" refers to the audited financial statement dated April 2, 2022, entitled "FTX Trading Ltd. Consolidated Financial Statements as of December 31, 2021 and 2020 and for the years ended December 31, 2021 and 2020," and all versions thereof, prepared or facilitated by the Auditing and Accounting Companies.

15.     The term "**identify**," or any variant thereof, means:  (i) in relation to a natural person, to establish a person's identity such that the identity of the person will be ascertainable distinctly from all other like persons, and to provide the person's current or last known employer, current or last known mailing address, and current or last known telephone number; or (ii) in relation to a document or item, to establish the document or item's identity such that the identity of the document or item will be ascertainable distinctly from all other like documents or items, and

to state the name and address of the custodian of the document or item, the location of the document or item, and a general description of the document or item.

16.    The term "**including**" means "including, but not limited to" and "including, without limitation."  It shall not be construed to limit the scope of any definition or Request herein.

17.    The term "**Irrevocable Fee Agreement**" means the agreement titled "Irrevocable Fee Agreement" dated June 5, 2021, between Mohammad Hans Dastmaltchi and Digital Assets AG.

18.    The term "**Kephas**" means collectively Kephas Stiftung gemeinnützige GmbH, Kephas TV Corporation, Kephas Corporation, any of their predecessors, successors, or affiliates, and all representatives, agents, advisors, and all other Persons or entities acting or purporting to act on behalf of any of those entities.

19.    The term "**Person**" includes both the singular and the plural, and means any natural Person, business entity, corporation, cooperative, bureau, public corporation, partnership, joint venture, firm, trust, estate, group, club, association, institute, society, office, organization, and any governmental entity or department, agency, bureau, or political subdivision thereof, or any other organization or entity.

20.    The terms "**relating to**," "**related to**" or "**concerning**," or any variant thereof, means, without limitation, referring to, concerning, pertaining to, discussing, mentioning, containing, reflecting, constituting, describing, displaying, showing, identifying, proving, disproving, consisting of, arising out of, supporting or contradicting.

21.    The term "**Wallet**" refers to any device, program or network address that holds any cryptocurrency or cryptocurrency key.

22.    The term "**You**" or "**Your**" shall refer to Lorem Ipsum UG and Robin Matzke.

## INSTRUCTIONS

1.      Unless otherwise specified, the responsive period for each Request is from January 1, 2020, through the present (the "**Relevant Period**").

2.      All discovery in connection with these Requests shall be subject to and conducted in accordance with the terms of the Stipulation and Protective Order [D.I. 832] in these chapter 11 cases or the terms of any other protective order issued in this case.

3.      You are instructed to respond separately to each Request and to produce all Documents responsive to the Requests that are within Your possession, custody, or control, or in the possession, custody, or control of any other Person or entity acting or purporting to act on Your behalf.

4.      If You cannot fully respond to the following one or more of the Requests after exercising due diligence to secure the information requested thereby, so state, and specify (a) the portion of each Request that cannot be responded to fully and completely, (b) what efforts were made to obtain the requested information, (c) the facts relied upon that support Your contention that the Request(s) cannot be answered fully and completely, and (d) any knowledge, information or belief You have concerning the unanswered portion of any such Request(s).

5.      If there are no Documents responsive to any particular Request, Your response shall state so in writing.

6.      Unless instructed otherwise, each Request shall be construed independently and not by reference to any other Request for the purpose of limitation or exclusion.

7.      You must answer each Request separately and fully, unless it is objected to, in which event the objection(s) should be specifically stated.

8.      If any information requested in a Request is claimed to be privileged or otherwise immune from discovery, or if any Document is withheld from production based on a claim of privilege, immunity, or other ground, furnish a list specifying: (a) the nature of the privilege, immunity, or other ground claimed; (b) the authors of the Document; (c) all persons who received copies of the Document, including the Document's indicated and blind copy recipients; (d) the date of the Document; (e) the type of Document withheld (*e.g.*, memorandum, letter, report, email); and (f) the general subject matter of the Document sufficient to enable the Debtors to assess the applicability of the claimed privilege, immunity, or other ground for refusal to produce the Document.    For each item of information or Document You withhold based on a claim of privilege, immunity, or other ground, identify such information or Document with sufficient particularity for purposes of a motion to compel.

9.      If a portion of an otherwise responsive Document contains information subject to a claim of privilege, only that portion of the Document subject to the claim of privilege shall be deleted or redacted from the Document following the instructions in the preceding paragraph and the rest shall be produced.

10.     You shall produce Documents in the following manner and form:

*E-mails*.    E-mails shall be produced as single-page TIFF images with accompanying full text and load file (.DAT).  E-mail attachments shall be handled according to the provisions below applicable to loose electronic Documents and shall not be separated from the e-mails to which they are attached.  Native files for e-mails shall be maintained, and such files shall be produced upon request.

*Electronic Documents*.  Word and other electronic Documents shall be produced as single-page TIFF images with accompanying full text and load file (.DAT).  The processed native

for all spreadsheets, except for those requiring redactions, shall be produced as native.  Audio, video, and other files that cannot be converted to image shall also be produced as native.  Native files shall be linked to the database by the metadata field "NativeLink."  Native files for all other electronic Documents shall be maintained, and such files shall be produced upon request.

*Hard-Copy Documents.*  Hard-copy Documents shall be produced as single-page TIFF images with accompanying full OCR text and load file (.DAT).  All hard copy documents should be unitized to the smallest physical boundary.

*TIFF Images Generally.*  Documents should be produced as single-page, in black and white, group IV TIFFs imaged at 300 dpi.  The document's original orientation should be maintained (*i.e.*, portrait-to-portrait and landscape-to-landscape).  Bates numbers, confidentiality designations (in accordance with the terms of the Protective Order), and redactions (to the extent they are necessary) should be burned into the image.  TIFF image files should be provided in an "Images" folder.  All speaker notes, comments, track changes, and hidden text should be expanded, extracted, and rendered in the TIFF file.

*TIFF Images for Electronic Messaging Applications and Services.*  Documents collected from electronic messaging applications and services, including but not limited to Signal, Telegram, SMS, WhatsApp, Facebook Messenger, and iMessage, should be produced as TIFF images as specified in the foregoing, but should be produced in color.  Slack messages and e-mails, however, should be produced in black and white.

*Extracted Text Files.*  The full text of native files should be extracted directly from the native file (not OCR) and should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document.  Text files should be provided in a "Text" folder.  To the extent that a document is redacted, the document should undergo OCR after

the text has been redacted in order to remove the redacted text.

      *Data Load Files.*  Database load files should consist of: (1) a comma-delimited value (".DAT") file containing the metadata fields identified in the following paragraph; and (2) an Opticon (".OPT") file to facilitate the loading of TIFF images.  The first line of the .DAT file shall be the header with field names, and each subsequent line shall contain the fielded data for each Document.  All load files should be named to match the production volume name.  Bates numbers and production volume names must not be duplicated and should run consecutively throughout the entirety of the production(s).

      The following metadata should be supplied, where available:

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|---|---|---|---|---|
| Bates Number Begin | Beginning page Bates number | x | x | x |
| Bates Number End | Ending page Bates number | x | x | x |
| Attachment Begin | Beginning page of attachment range | x | x | x |
| Attachment End | Ending page of attachment range | x | x | x |
| Custodian | Names of custodian who possessed the document. For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be provided. | x | x | x |
| All Custodians | Names of all individuals or repositories who possessed the document. | x | x | x |
| File Name | File name of document | | x | |
| File Extension | File extension of document | | x | |

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|---|---|---|---|---|
| E-mail Outlook Type | Type of Outlook item, e.g. e-mail, calendar item, note, task | x | | |
| Page Count | For documents produced in TIFF form, number of pages in the document.  For documents produced in native, page count will be 1 (for placeholder). | x | x | x |
| E-mail Subject | Subject of e-mail | x | x | |
| Author | Document author | | x | |
| From | E-mail author | x | x | |
| To | E-mail recipients | x | x | |
| CC | E-mail copyees | x | x | |
| BCC | E-mail blind copyees | x | x | |
| Date Sent | Date sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Time Sent | Time sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date Received | Date received (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Time Received | Time received (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date Created | Date created | | x | |
| DateLastModified | Last modification date (mm/dd/yyyy hh:mm:ss format) | | x | |
| Hash Value (MD5 or SHA-1) | Unique electronic signature of e-mail or electronic file | x | x | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order | x | x | x |
| Redacted | Descriptor for documents that have been redacted (<yes> or | x | x | x |

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|-------|-------------|--------|------------------------------|-----------|
|  | <no>) |  |  |  |
| NativeLink | Logical path to native file |  | x | x |
| Text Path | Logical path to text file | x | x | x |

11.     You shall produce all Documents in the manner in which they are maintained in the usual course of Your business.

12.     A Request shall be deemed to include a request for the entire Document requested, including any and all file folders within which the Document was contained, transmittal sheets or memoranda, cover letters, exhibits, enclosures, comments or attachments to the Document in addition to the Document itself.  In the case of e-mail attachments, if either the e-mail or any of its attachments is responsive, produce the e-mail and all of the corresponding attachments.

13.     All Documents shall be produced in such fashion as to identify the custodian or department in whose possession the Document was found and the business address of each Document's custodian(s).

14.     The fact that a Document is produced by another party does not relieve You of the obligation to produce Your copy of the same Document, even if the two Documents are identical.

15.     If You claim any ambiguity in interpreting either a Request or a definition or instruction, You should not use that claim as a basis for refusing to respond, but shall set forth as part of Your response the language deemed to be ambiguous.

16.     Each Request shall be deemed to be continuing in nature.  If at any time additional Documents or information come into Your possession, custody or control or are brought to Your attention, prompt supplementation of Your response to these Requests is required.

## DOCUMENT REQUESTS

1.      All Documents concerning the Acquisition of Digital Assets AG, including but not limited to all Documents concerning the purpose of the acquisition, Documents reflecting negotiations concerning the acquisition, due diligence materials prepared or provided in connection with the acquisition, the drafting of share purchase agreements or any adjacent or ancillary agreements, and communications concerning what entities, assets, or intellectual property would or would not be transferred in connection with the acquisition.

2.      All Documents concerning the acquisition by Digital Assets AG, You, Patrick Gruhn, or Brandon Williams of a contract for difference broker that was licensed to service customers in the European Economic Area, including but not limited to Documents concerning the acquisition of K-DNA Financial Services Ltd., negotiations over or due diligence performed in connection with the acquisition of K-DNA Financial Services Ltd., and the drafting of agreements executed in connection with the acquisition of K-DNA Financial Services Ltd.

3.      All Documents concerning Your purchase of shares of K-DNA Financial Services Ltd., including but not limited to Documents concerning the financing of Your purchase of shares in K-DNA Financial Services Ltd., the negotiation and execution of the Share Purchase Agreement governing Your purchase of shares of K-DNA Financial Services Ltd., and you're your assignment of rights to purchase shares of K-DNA Financial Services Ltd. to Digital Assets AG.

4.      All Documents concerning K-DNA Financial Services Ltd.'s application for or receipt of regulatory approvals to solicit and provide financial products to customers in the European Economic Area.

5.      All Documents concerning the business model of Digital Assets AG, including but not limited to Documents concerning Digital Asset AG's business strategy, model, or plan either

pre- or post-acquisition by the FTX Group, any internal business plans, intellectual property possessed, licensed, and/or developed by Digital Asset AG, Documents concerning current or future products or cryptocurrency offerings, or Documents concerning the acquisition of or creation of Digital Assets AG subsidiaries.

6.      All Documents concerning the finances of Digital Assets AG, including but not limited to Documents containing information relating to the revenue, financial state, and solvency of Digital Assets AG or the liquidity of its assets, such as its balance sheets, audit statements, profit and loss statements, bank account statements, and loan information.

7.      All Documents concerning the customers of Digital Assets AG, including but not limited to the number of customers Digital Assets AG had pre- and post-acquisition, the services provided to such customers, the revenue derived from such customers, and Digital Assets AG's liabilities to such customers.

8.      All Documents concerning regulatory licenses and approvals within the European Economic Area that were anticipated or proposed in connection with the acquisition, including but not limited to all communications with regulators, Documents concerning the relationship of Yourselves, Patrick Gruhn, or Brandon Williams with European regulators, and Documents concerning the acquisition of or application for such regulatory licenses and approvals.

9.      All Documents concerning the Irrevocable Fee Agreement, including but not limited to the creation, negotiation, and purpose of the Irrevocable Fee Agreement and all duties performed by any party to the Irrevocable Fee Agreement pursuant to the Irrevocable Fee Agreement.

10.     All Documents concerning Digital Assets AG's hiring of Mohammad Hans Dastmaltchi.

11.     All Documents concerning any valuation of Digital Assets AG, whether formal or informal.

12.     All Documents concerning the ASC 805 Accounting Analysis, including but not limited to any communications about the ASC 805 Accounting Analysis, materials prepared to share with BDO USA LLP in connection with the ASC 805 Accounting Analysis, and notes of meetings held in connection with the ASC 805 Accounting Analysis.

13.     All Documents concerning the FTX Trading Ltd. Audited Financial Statement, including but not limited to materials prepared to disclose to the Auditing and Accounting Companies in connection with the FTX Trading Ltd. Audited Financial Statement, notes of meetings held in connection with the preparation of the FTX Trading Ltd. Audited Financial Statement, and communications with the Auditing and Accounting Companies.

14.     All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and the FTX Group or the FTX Entities.

15.     All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and Digital Assets AG.

16.     All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and Kephas.

17.     All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and Cosima Capital.

18.     All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and Brandon Williams.

19.     All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and Patrick Gruhn.

20.     Documents sufficient to show the relationship between Lorem Ipsum UG and Robin Matzke.

21.     Documents sufficient to identify the ownership, directly or indirectly, of Lorem Ipsum UG.

22.     Documents sufficient to identify all employees of Lorem Ipsum UG.

23.     For the period November 1, 2018, to the present, Documents sufficient to show the relationship between You and Cosima Capital.

24.     Documents sufficient to show the nature of your employment by or services to or any other relationship with Crypto Lawyers GmbH and Crypto Lawyers LLC, including any ownership or other beneficial interest.

25.     Documents sufficient to show Your ownership, or any other beneficial interest, directly or indirectly, in all companies that are incorporated, domiciled, operate within, or provide services to the United States or its territories, or that own or control assets within the United States or its territories.

26.     Documents sufficient to identify all bank accounts You have or control within the United States or its territories.

27.     Documents sufficient to identify all real property You own or control within the United States or its territories.

28.     Documents sufficient to show the dates of Robin Matzke's travel to the United States or its territories, if any.

29.     All Documents concerning any assets or funds You received from the FTX Group, or any officer, director, contractor, or employee of the FTX Group, as compensation or otherwise.

30.     Documents sufficient to identify all of Your e-mail addresses, including but not limited to e-mail addresses used to create cryptocurrency exchange accounts on Your behalf.

31.     All Documents reflecting public addresses of any Wallet held by You.

32.     All Documents concerning the post-petition sale process for FTX Europe AG or its subsidiaries, including but not limited to communications with purported potential purchasers of FTX EU Ltd., such as Trek Labs and Global Commerce Technologies Pte. Ltd. (d/b/a Coins.ph), documents sufficient to show Your relationship to, ownership or other beneficial interest in Trek Labs and Global Commerce Technologies Pte. Ltd., and all Documents concerning plans to find potential buyers for FTX EU Ltd.

33.     For the period November 24, 2018, until the present, all Communications between You and any of the following individuals:

- Samuel Bankman-Fried

- Caroline Ellison

- Daniel Friedberg

- Ryan Salame

- Nishad Singh

- Can Sun

- Zixiao "Gary" Wang

34.     All Communications between You and any of the following individuals:

- Asher Afriat

15

- Ramnik Arora

- Joseph Bankman

- Benjamin Baruh

- Jürg Bavaud

- Mohammad Hans Dastmaltchi

- Patrick Gruhn

- Brett Harrison

- Ryne Miller

- Max Rhotert

- Stephen Stephens

- John Samuel Trabucco

- Ernest Ukaj

- Brandon Williams

# Exhibit 18

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-50437 (JTD) |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

### THE DEBTORS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT PATRICK GRUHN

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable by Federal Rules of Bankruptcy Procedure 7026, 7034, and 9014 (the "Bankruptcy Rules") and the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules" and together with the Bankruptcy Rules, the "Rules"), the Debtors (as defined below) submit this request for the production of documents (the "Requests") to Defendant Patrick Gruhn in connection with the above-captioned Adversary Proceeding. The Debtors request that the

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX [cases.ra.kroll.com]. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

documents and electronic information responsive to the Requests identified in the attached

**Exhibit A** be produced to Stephen Ehrenberg, Sullivan & Cromwell LLP, 125 Broad Street,

New York, New York 10004, counsel for the Debtors, no later than November 13, 2023.

Please take further notice that the Debtors reserve their rights under title 11 of the

United States Code (the "Bankruptcy Code"), the Rules, and any applicable law regarding the

subject matter of these Requests to amend, supplement, and/or modify **Exhibit A** attached

hereto, or serve additional discovery requests.

Dated: October 13, 2023
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: ehrenbergs@sullcrom.com
       holleys@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

## EXHIBIT A

## DEFINITIONS

For purposes of the Document Requests, the following terms shall apply:

1.      The term "**Acquisition of Digital Assets AG**" refers to the purchase by Alameda Research Ltd. and FTX Trading Ltd. of the shares of Digital Assets AG, now known as FTX Europe AG, and its affiliates and subsidiaries, via three Share Purchase Agreements executed in October 2020, July 2021, and November 2021.

2.      The term "**Affiliate**" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

3.      The terms "**and**" and "**or**" in Definitions and Requests shall be construed conjunctively or disjunctively as necessary to bring within the scope of the Requests all Documents or information that might otherwise be construed as outside their scope.

4.      The term "**any**" means "each and every," "any and all," and "any one."

5.      The term "**ASC 805 Accounting Analysis**" shall refer to the report issued by BDO USA LLP dated April 7, 2022, entitled "ASC 805 Valuation of Certain Assets of FTX Trading Ltd. for Financial Reporting Purposes," and all versions thereof, as well as to all services performed under the Statement of Work executed by FTX Trading Ltd. and BDO USA LLP dated February 22, 2022, concerning the purchase accounting analysis of Digital Assets AG.

6.      The term "**Auditing and Accounting Companies**" means Prager Metis CPAs, LLC, Robert Lee & Associates LLP, Rivers & Moorehead PLLC, and Silicon Valley Accountants, which were involved in the preparation of the FTX Trading Ltd. Audited Financial Statement, as defined below, or of materials relied upon in preparing the FTX Trading Ltd. Audited Financial Statement.

7.     The term "**communication**," or any variant thereof, means any contact between two or more persons by which any information or knowledge is transmitted or conveyed, or attempted to be transmitted or conveyed, and shall include, without limitation, written contact by means such as letters, memoranda, telecopies, text messages, instant messages, Slack messages, Signal messages, Telegram messages, emails, social media, or any other document, and oral contact, such as face-to-face meetings, videoconference or telephone conversations, or social media.  The term "Communication" is not limited to internal Communications but includes Communications between the Debtors and third parties and Communications between or among third parties.

8.     The term "**concerning**" is to be understood in its broadest sense and means concerning, constituting, identifying, evidencing, summarizing, commenting upon, referring to, relating to, arising out of, describing, digesting, reporting, listing, analyzing, studying, discussing, stating, setting forth, reflecting, interpreting, concerning, recording, including, negating, manifesting, containing, or comprising the subject matter identified.

9.     The term "**Debtors**" means, collectively, FTX Trading Ltd., Maclaurin Investments Ltd., and their affiliated entities, as debtors-in-possession, as applicable, which filed voluntary chapter 11 petitions under the Bankruptcy Code commencing these chapter 11 cases.

10.     The term "**Digital Assets AG**" means Digital Assets AG, later known as FTX Europe AG, as well as any Affiliates, agents, assigns, directors, employees, officers, parents, partners, representatives, subsidiaries, or any other Persons acting or purporting to act on their behalf, and any predecessor or successor of the foregoing.

11.     The term "**document**" has the meaning prescribed by Rule 7034 of the Bankruptcy Rules, including, without limitation, any tangible thing upon which any expression,

Communication or representation has been recorded by any means including, but not limited to, handwriting, printing, photographing, videotaping, magnetic impulse, computer disks, computer storage drives, computer tapes, or mechanical, electronic or digital recording or information storage of any kind, and any nonidentical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, memoranda, electronic mail, charts notes, records of any sort of meetings, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, and all other writings and recordings of every kind that are in your actual or constructive possession, custody, or control.

12.     The term "**FTX Entities**" means collectively all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

13.     The term "**FTX Group**" means collectively the Debtors and the FTX Entities.

14.     The term "**FTX Trading Ltd. Audited Financial Statement**" refers to the audited financial statement dated April 2, 2022, entitled "FTX Trading Ltd. Consolidated Financial Statements as of December 31, 2021 and 2020 and for the years ended December 31, 2021 and 2020," and all versions thereof, prepared or facilitated by the Auditing and Accounting Companies.

15.     The term "**identify**," or any variant thereof, means:  (i) in relation to a natural person, to establish a person's identity such that the identity of the person will be ascertainable distinctly from all other like persons, and to provide the person's current or last known employer, current or last known mailing address, and current or last known telephone number; or (ii) in relation to a document or item, to establish the document or item's identity such that the identity of the document or item will be ascertainable distinctly from all other like documents or items, and

to state the name and address of the custodian of the document or item, the location of the document or item, and a general description of the document or item.

16.     The term "**including**" means "including, but not limited to" and "including, without limitation."  It shall not be construed to limit the scope of any definition or Request herein.

17.     The term "**Irrevocable Fee Agreement**" means the agreement titled "Irrevocable Fee Agreement" dated June 5, 2021, between Mohammad Hans Dastmaltchi and Digital Assets AG.

18.     The term "**Kephas**" means collectively Kephas Stiftung gemeinnützige GmbH, Kephas TV Corporation, Kephas Corporation, any of their predecessors, successors, or affiliates, and all representatives, agents, advisors, and all other Persons or entities acting or purporting to act on behalf of any of those entities.

19.     The term "**Person**" includes both the singular and the plural, and means any natural Person, business entity, corporation, cooperative, bureau, public corporation, partnership, joint venture, firm, trust, estate, group, club, association, institute, society, office, organization, and any governmental entity or department, agency, bureau, or political subdivision thereof, or any other organization or entity.

20.     The terms "**relating to**," "**related to**" or "**concerning**," or any variant thereof, means, without limitation, referring to, concerning, pertaining to, discussing, mentioning, containing, reflecting, constituting, describing, displaying, showing, identifying, proving, disproving, consisting of, arising out of, supporting or contradicting.

21.     The term "**Wallet**" refers to any device, program or network address that holds any cryptocurrency or cryptocurrency key.

22.     The term "**You**" or "**Your**" shall refer to Patrick Gruhn.

## INSTRUCTIONS

1.      Unless otherwise specified, the responsive period for each Request is from January 1, 2020, through the present (the "**Relevant Period**").

2.      All discovery in connection with these Requests shall be subject to and conducted in accordance with the terms of the Stipulation and Protective Order [D.I. 832] in these chapter 11 cases or the terms of any other protective order issued in this case.

3.      You are instructed to respond separately to each Request and to produce all Documents responsive to the Requests that are within Your possession, custody, or control, or in the possession, custody, or control of any other Person or entity acting or purporting to act on Your behalf.

4.      If You cannot fully respond to the following one or more of the Requests after exercising due diligence to secure the information requested thereby, so state, and specify (a) the portion of each Request that cannot be responded to fully and completely, (b) what efforts were made to obtain the requested information, (c) the facts relied upon that support Your contention that the Request(s) cannot be answered fully and completely, and (d) any knowledge, information or belief You have concerning the unanswered portion of any such Request(s).

5.      If there are no Documents responsive to any particular Request, Your response shall state so in writing.

6.      Unless instructed otherwise, each Request shall be construed independently and not by reference to any other Request for the purpose of limitation or exclusion.

7.      You must answer each Request separately and fully, unless it is objected to, in which event the objection(s) should be specifically stated.

8.      If any information requested in a Request is claimed to be privileged or otherwise immune from discovery, or if any Document is withheld from production based on a claim of privilege, immunity, or other ground, furnish a list specifying: (a) the nature of the privilege, immunity, or other ground claimed; (b) the authors of the Document; (c) all persons who received copies of the Document, including the Document's indicated and blind copy recipients; (d) the date of the Document; (e) the type of Document withheld (*e.g.*, memorandum, letter, report, email); and (f) the general subject matter of the Document sufficient to enable the Debtors to assess the applicability of the claimed privilege, immunity, or other ground for refusal to produce the Document.   For each item of information or Document You withhold based on a claim of privilege, immunity, or other ground, identify such information or Document with sufficient particularity for purposes of a motion to compel.

9.      If a portion of an otherwise responsive Document contains information subject to a claim of privilege, only that portion of the Document subject to the claim of privilege shall be deleted or redacted from the Document following the instructions in the preceding paragraph and the rest shall be produced.

10.     You shall produce Documents in the following manner and form:

*E-mails*.   E-mails shall be produced as single-page TIFF images with accompanying full text and load file (.DAT).  E-mail attachments shall be handled according to the provisions below applicable to loose electronic Documents and shall not be separated from the e-mails to which they are attached.  Native files for e-mails shall be maintained, and such files shall be produced upon request.

*Electronic Documents*.  Word and other electronic Documents shall be produced as single-page TIFF images with accompanying full text and load file (.DAT).  The processed native

for all spreadsheets, except for those requiring redactions, shall be produced as native. Audio, video, and other files that cannot be converted to image shall also be produced as native. Native files shall be linked to the database by the metadata field "NativeLink." Native files for all other electronic Documents shall be maintained, and such files shall be produced upon request.

*Hard-Copy Documents.* Hard-copy Documents shall be produced as single-page TIFF images with accompanying full OCR text and load file (.DAT). All hard copy documents should be unitized to the smallest physical boundary.

*TIFF Images Generally.* Documents should be produced as single-page, in black and white, group IV TIFFs imaged at 300 dpi. The document's original orientation should be maintained (*i.e.*, portrait-to-portrait and landscape-to-landscape). Bates numbers, confidentiality designations (in accordance with the terms of the Protective Order), and redactions (to the extent they are necessary) should be burned into the image. TIFF image files should be provided in an "Images" folder. All speaker notes, comments, track changes, and hidden text should be expanded, extracted, and rendered in the TIFF file.

*TIFF Images for Electronic Messaging Applications and Services.* Documents collected from electronic messaging applications and services, including but not limited to Signal, Telegram, SMS, WhatsApp, Facebook Messenger, and iMessage, should be produced as TIFF images as specified in the foregoing, but should be produced in color. Slack messages and e-mails, however, should be produced in black and white.

*Extracted Text Files.* The full text of native files should be extracted directly from the native file (not OCR) and should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. Text files should be provided in a "Text" folder. To the extent that a document is redacted, the document should undergo OCR after

the text has been redacted in order to remove the redacted text.

*Data Load Files.*  Database load files should consist of: (1) a comma-delimited value ("DAT") file containing the metadata fields identified in the following paragraph; and (2) an Opticon (".OPT") file to facilitate the loading of TIFF images.  The first line of the .DAT file shall be the header with field names, and each subsequent line shall contain the fielded data for each Document.  All load files should be named to match the production volume name.  Bates numbers and production volume names must not be duplicated and should run consecutively throughout the entirety of the production(s).

The following metadata should be supplied, where available:

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|---|---|---|---|---|
| Bates Number Begin | Beginning page Bates number | x | x | x |
| Bates Number End | Ending page Bates number | x | x | x |
| Attachment Begin | Beginning page of attachment range | x | x | x |
| Attachment End | Ending page of attachment range | x | x | x |
| Custodian | Names of custodian who possessed the document. For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be provided. | x | x | x |
| All Custodians | Names of all individuals or repositories who possessed the document. | x | x | x |
| File Name | File name of document | | x | |
| File Extension | File extension of document | | x | |

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|---|---|---|---|---|
| E-mail Outlook Type | Type of Outlook item, e.g. e-mail, calendar item, note, task | x | | |
| Page Count | For documents produced in TIFF form, number of pages in the document.  For documents produced in native, page count will be 1 (for placeholder). | x | x | x |
| E-mail Subject | Subject of e-mail | x | x | |
| Author | Document author | | x | |
| From | E-mail author | x | x | |
| To | E-mail recipients | x | x | |
| CC | E-mail copyees | x | x | |
| BCC | E-mail blind copyees | x | x | |
| Date Sent | Date sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Time Sent | Time sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date Received | Date received (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Time Received | Time received (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date Created | Date created | | x | |
| DateLastModified | Last modification date (mm/dd/yyyy hh:mm:ss format) | | x | |
| Hash Value (MD5 or SHA-1) | Unique electronic signature of e-mail or electronic file | x | x | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order | x | x | x |
| Redacted | Descriptor for documents that have been redacted (<yes> or | x | x | x |

| Field | Description | E-mail | Files and E-mail Attachments | Hard Copy |
|---|---|---|---|---|
| | <no>) | | | |
| NativeLink | Logical path to native file | | x | x |
| Text Path | Logical path to text file | x | x | x |

11.     You shall produce all Documents in the manner in which they are maintained in the usual course of Your business.

12.     A Request shall be deemed to include a request for the entire Document requested, including any and all file folders within which the Document was contained, transmittal sheets or memoranda, cover letters, exhibits, enclosures, comments or attachments to the Document in addition to the Document itself.  In the case of e-mail attachments, if either the e-mail or any of its attachments is responsive, produce the e-mail and all of the corresponding attachments.

13.     All Documents shall be produced in such fashion as to identify the custodian or department in whose possession the Document was found and the business address of each Document's custodian(s).

14.     The fact that a Document is produced by another party does not relieve You of the obligation to produce Your copy of the same Document, even if the two Documents are identical.

15.     If You claim any ambiguity in interpreting either a Request or a definition or instruction, You should not use that claim as a basis for refusing to respond, but shall set forth as part of Your response the language deemed to be ambiguous.

16.     Each Request shall be deemed to be continuing in nature.  If at any time additional Documents or information come into Your possession, custody or control or are brought to Your attention, prompt supplementation of Your response to these Requests is required.

## DOCUMENT REQUESTS

1.     All Documents concerning the Acquisition of Digital Assets AG, including but not limited to all Documents concerning the purpose of the acquisition, Documents reflecting negotiations concerning the acquisition, due diligence materials prepared or provided in connection with the acquisition, the drafting of share purchase agreements or any adjacent or ancillary agreements, and communications concerning what entities, assets, or intellectual property would or would not be transferred in connection with the acquisition.

2.     All Documents concerning the acquisition by Digital Assets AG, You, Robin Matzke, Lorem Ipsum UG, or Brandon Williams of a contract for difference broker that was licensed to service customers in the European Economic Area, including but not limited to Documents concerning the acquisition of K-DNA Financial Services Ltd., negotiations over or due diligence performed in connection with the acquisition of K-DNA Financial Services Ltd., and the drafting of agreements executed in connection with the acquisition of K-DNA Financial Services Ltd.

3.     All Documents concerning Robin Matzke's purchase of shares of K-DNA Financial Services Ltd., including but not limited to Documents concerning the financing of Robin Matzke's purchase of shares in K-DNA Financial Services Ltd., the negotiation and execution of the Share Purchase Agreement governing Robin Matzke's purchase of shares of K-DNA Financial Services Ltd., and Robin Matzke's assignment of rights to purchase shares of K-DNA Financial Services Ltd. to Digital Assets AG.

4.     All Documents concerning K-DNA Financial Services Ltd.'s application for or receipt of regulatory approvals to solicit and provide financial products to customers in the European Economic Area.

5.      All Documents concerning any agreements, whether formal or informal, or drafts of any unexecuted agreements that were discussed or considered, between You and the FTX Group and FTX Entities.

6.      All Documents concerning the ASC 805 Accounting Analysis, including but not limited to any communications about the ASC 805 Accounting Analysis, materials prepared to share with BDO USA LLP in connection with the ASC 805 Accounting Analysis, and notes of meetings held in connection with the ASC 805 Accounting Analysis.

7.      All Documents concerning any valuation of Digital Assets AG, whether formal or informal.

8.      All Documents concerning the FTX Trading Ltd. Audited Financial Statement, including but not limited to materials prepared to disclose to the Auditing and Accounting Companies in connection with the preparation of the FTX Trading Ltd. Audited Financial Statement, notes of meetings held in connection with the FTX Trading Ltd. Audited Financial Statement, and communications with the Auditing and Accounting Companies.

9.      All Documents concerning the business model of Digital Assets AG, including but not limited to Documents concerning Digital Asset AG's business strategy, model, or plan either pre- or post-acquisition by the FTX Group, any internal business plans, intellectual property possessed, licensed, and/or developed by Digital Asset AG, Documents concerning current or future products or cryptocurrency offerings, Documents concerning the acquisition of or creation of Digital Assets AG subsidiaries.

10.     All Documents concerning the finances of Digital Assets AG, including but not limited to Documents containing information relating to the revenue, financial state, and solvency

of Digital Assets AG or the liquidity of its assets, such as its balance sheets, audit statements, profit and loss statements, bank account statements, and loan information.

11.    All Documents concerning the customers of Digital Assets AG, including but not limited to the number of customers Digital Assets AG had pre- and post-acquisition, the services provided to such customers, the revenue derived from such customers, and Digital Assets AG's liabilities to such customers.

12.    All Documents concerning regulatory licenses and approvals within the European Economic Area that were anticipated or proposed in connection with the acquisition, including but not limited to all communications with regulators, Documents concerning the relationship of Yourself, Robin Matzke, or Brandon Williams with European regulators, and Documents concerning the acquisition of or application for such regulatory licenses and approvals.

13.    All Documents concerning the Irrevocable Fee Agreement, including but not limited to the creation, negotiation, and purpose of the Irrevocable Fee Agreement and all duties performed by any party to the Irrevocable Fee Agreement pursuant to the Irrevocable Fee Agreement.

14.    All Documents concerning Digital Assets AG's hiring of Mohammad Hans Dastmaltchi.

15.    Documents sufficient to show Your ownership or any other beneficial interest, directly or indirectly, in all companies that are incorporated, domiciled, operate within, or provide services to the United States, including Kephas.

16.    All Documents concerning any agreements, whether formal or informal, executed or unexecuted, between Kephas and You.

17.     All Documents concerning any agreements, whether formal or informal, executed or unexecuted, between Kephas and the FTX Group or FTX Entities.

18.     All Documents showing goods or services Kephas provided to the FTX Group and FTX Entities, including but not limited to requests for proposals, proposals, term sheets, contracts (whether executed or unexecuted), invoices, or communications concerning the scope and provision of services.

19.     All Documents concerning any licensing, utilization, and/or customization of software, including but not limited to the Odoo system, that Kephas provided to the FTX Group and FTX Entities.

20.     All Documents concerning any transfer of assets or the provision of services, or any other item of value, from Kephas to You.

21.     Documents sufficient to show the relationship between You and WIB Technologies.

22.     For the period November 1, 2018, to the present, Documents sufficient to show the relationship between You and Cosima Capital.

23.     Documents sufficient to show the nature of your employment by or any other relationship with Crypto Lawyers GmbH and Crypto Lawyers LLC, including any ownership or other beneficial interest.

24.     For the period September 1, 2019, to the present, all Documents concerning any investigation of You, Robin Matzke, Mohammad Hans Dastmaltchi, or Max Rhotert by the Liechtenstein Public Prosecutor's Office.

25.     Any Documents concerning proceedings involving You, Robin Matzke, Mohammad Hans Dastmaltchi, or Max Rhotert in the Princely Courts of Liechtenstein.

26.     All Documents concerning any assets or funds You received from the FTX Group, or any officer, director, contractor, or employee of the FTX Group, as compensation or otherwise.

27.     Documents sufficient to identify all of Your e-mail addresses, including but not limited to e-mail addresses used to create cryptocurrency exchange accounts on Your behalf.

28.     All Documents reflecting public addresses of any Wallet held by You.

29.     All Documents concerning the post-petition sale process for FTX Europe AG or its subsidiaries, including but not limited to communications with purported potential purchasers of FTX EU Ltd., such as Trek Labs and Global Commerce Technologies Pte. Ltd. (d/b/a Coins.ph), documents sufficient to show Your relationship to, ownership or other beneficial interest in Trek Labs and Global Commerce Technologies Pte. Ltd., and all Documents concerning plans to find potential buyers for FTX EU Ltd.

30.     For the period November 24, 2018, until the present, all Communications between You and any of the following individuals:

- Samuel Bankman-Fried

- Caroline Ellison

- Daniel Friedberg

- Ryan Salame

- Nishad Singh

- Can Sun

- Zixiao "Gary" Wang

31.     All Communications between You and any of the following individuals:

- Asher Afriat

- Ramnik Arora

- Joseph Bankman

- Benjamin Baruh

- Jürg Bavaud

- Mohammad Hans Dastmaltchi

- Brett Harrison

- Robin Matzke

- Ryne Miller

- Max Rhotert

- Stephen Stephens

- John Samuel Trabucco

- Ernest Ukaj

- Brandon Williams

# Exhibit 19

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | Adv. Pro. No. 23-50437 (JTD) |
| Defendants. | |

**DEFENDANT, BRANDON WILLIAMS'S,
INITIAL RULE 26(a)(1) DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, as made applicable by

Rule 7026 of the Federal Rules of Bankruptcy Procedure and the Scheduling Order (D.I. 8) entered

in this case, Defendant, Brandon Williams, provides the following Initial Rule 26(a)(1) Disclosures

to Plaintiffs, FTX Trading Ltd. and Maclaurin Investments Ltd. The information provided in these

Disclosures is preliminary only and shall not be considered to constitute admissions by Defendant.

1.     **Individuals likely to possess discoverable information.**

Brandon Williams
c/o Gebhardt & Smith LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801

Brandon Williams has knowledge surrounding the initiation of Digital Assets AG's

relationship with FTX Trading Ltd. and Maclaurin Investments Ltd. (collectively, "FTX"); the formation and growth of DAAG; DAAG's unique business plan; the value of DAAG at the time of the disputed transfers; the negotiations and consummation of the disputed transactions; the value of DAAG to FTX; and other offers and interest that third parties had in DAAG.

> Patrick Gruhn
> c/o Heath D. Rosenblat
> Morrison Cohen LLP
> 909 Third Avenue, 27th Floor
> New York, NY 10022

Patrick Gruhn has knowledge surrounding the initiation of DAAG's relationship with FTX; the formation and growth of DAAG; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the tech stack employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and consummation of the disputed transactions; the value of DAAG to FTX; other offers and interest that third parties had in DAAG; and the success of DAAG after its acquisition by FTX.

> Robin Matzke
> c/o Heath D. Rosenblat
> Morrison Cohen LLP
> 909 Third Avenue, 27th Floor
> New York, NY 10022

Robin Matzke has knowledge surrounding the initiation of DAAG's relationship with FTX; the formation and growth of DAAG; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the tech stack employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and consummation of the disputed transactions; the value of DAAG to FTX; other offers and interest that third parties had in DAAG; and the success of DAAG after its acquisition by FTX.

Ernest Ukaj
Chairman of the Board of Directors
Money Key AG
Industriestrasse 28
CH-9100 Herisau, Switzerland

Ernest Ukaj has knowledge surrounding of the formation and growth of DAAG; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the tech stack employed by DAAG; DAAG's relationship with various crucial regulators; and the value of DAAG at or around the time of the disputed transfers.

Sam Bankman-Fried
Metropolitan Detention Center
80 29th St.
Brooklyn, NY 11232

Sam Bankman-Fried has knowledge of the fraudulent schemes in which he conspired at FTX and their inapplicability to DAAG; FTX's general business operations and plans; FTX's finances and solvency; FTX's intention with respect to the investment in and acquisition of DAAG and a similarly situated company, Ledger X; information surrounding the initiation of DAAG's relationship with FTX; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the tech stack employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and consummation of the disputed transactions; the value of DAAG to FTX; other offers and interest that third parties had in DAAG; and the success of DAAG after its acquisition by FTX.

Ryan Salame
c/o Jason Linder
Mayer Brown LLP
333 S. Grand Avenue, Ste 47th Floor
Los Angeles, CA 90071

Ryan Salame has knowledge of the fraudulent schemes in which he conspired at FTX and their inapplicability to DAAG; FTX's general business operations and plans; FTX's finances and solvency; FTX's intention with respect to the investment in and acquisition of DAAG and a similarly situated company, Ledger X; information surrounding the initiation of DAAG's relationship with FTX; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the tech stack employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and consummation of the disputed transactions; the value of DAAG to FTX; other offers and interest that third parties had in DAAG; and the success of DAAG after its acquisition by FTX.

Nishad Singh
c/o Russell Capone
Cooley LLP
55 Hudson Yards
New York, NY 10001

Nishad Singh has knowledge of the fraudulent schemes perpetrated by FTX and their inapplicability to DAAG.  Nishad Singh also oversaw operations at FTX Europe post acquisition of DAAG and has knowledge of the value that the DAAG acquisition brought to FTX.

Gary Wang
c/o Ilan Tuviah Graff
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004

Gary Wang has knowledge of the fraudulent schemes perpetrated by FTX and their inapplicability to DAAG and the solvency of FTX at the time of the disputed transfers.

Caroline Ellison
c/o Stephanie Avakian
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

4

Caroline Ellison has knowledge of the fraudulent schemes perpetrated by FTX and their inapplicability to DAAG and the solvency of FTX at the time of the disputed transfers.

Daniel Friedberg
1133 Bigelow Avenue North
Seattle, WA 98109

Daniel Friedberg, a former attorney with Fenwick & West LLP, (which represented FTX and Alameda) served as counsel for FTX and was involved in the negotiations between FTX and DAAG with respect to the investment in and ultimate acquisition of DAAG. Daniel Friedberg also ran point on the due diligence that FTX conducted in connection with its investment in and acquisition of DAAG.

Can Sun
FTX Trading Ltd.
27 Veridian Corporate Center
New Providence, Bahama Islands

Can Sun, a former Corporate Associate and Blockchain Industry Co-chair at Fenwick & West, LLP, served as counsel for FTX and was involved in the negotiations between FTX and DAAG with respect to the investment in and ultimate acquisition of DAAG. Can Sun had significant involvement in the due diligence conducted by FTX for the ultimate acquisition of DAAG. Can Sun also oversaw operations of FTX Europe after FTX's acquisition of DAAG and has knowledge of the value that the DAAG acquisition brought to FTX.

Professionals with BDO USA, LLP:

Evlon Charles
BDO Houston Office
2929 Allen Parkway, 20th Floor
Houston, TX 77019

Matthew Goldberg
BDO Denver Office
303 E. 17th Avenue, Suite 600
Denver, CO 80203

On April 7, 2022, BDO conducted an appraisal of the value of DAAG on the date of the ultimate acquisition of DAAG by FTX and found that FTX paid fair market value for DAAG in consummating the transaction.

> Jen Chan
> Former CEO of FTX
> Current address and phone number unknown.

Ms. Chan commission BDO to do the appraisal of DAAG after its  acquisition by FTX.

> Professionals with Prager Metis
> 14 Penn Plaza, Suite 1800
> New York, NY 10122

The Certified Public Accountants with Prager Metis issued an audited statement of FTX's financials as of December 31, 2021 and have knowledge of FTX's solvency at or around the time of the disputed transactions.

> Andrew G. Dietderich,
> c/o Stephen Ehrenberg
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004

Andrew Dietderich is lead bankruptcy attorney for FTX et al and represented the company prior to the Chapter 11 filing. Mr. Dietderich has personal knowledge that FTX's financial condition was "rock solid" and that FTX did not use customer funds or take credit risks and did not have liquidity issues. Mr. Dietderich has personal knowledge that FTX's acquisition of DAAG did not involve a fraudulent transfer in violation of Bankruptcy Code §548. Mr. Dietderich has knowledge that FTX did not make a good-faith, legitimate attempt to sell FTX Europe to a third party after the bankruptcy petition was filed.

Darren Azman,
McDermott, Will & Emory, LLP
One Vanderbilt Avenue
New York, New York 10017
1-212-547-5615

Mr. Azman has knowledge of the assurances given by Andrew Dieterich that FTX and

Alameda were financially sound and did not use customer funds or take credit risks and did not

have a liquidity crisis.

Martha Lambrianou
K-DNA Financial Services Ltd
56 Griva Digeni Avenue, Anna Tower, Floor 1
CY-02, 3063 Limassol, Cyprus

Martha Lambrianou served as the CEO of K-DNA, which became affiliated with FTX

Europe.  Martha Lambrianou has knowledge of the value that the DAAG acquisition brought to

FTX.

Marios Athinodorou
Address and phone number unknown

Marios Athinodorou served as the Executive Director of FTX Europe and has knowledge

of the value that the DAAG acquisition brought to FTX.

Max Rhotert
Managing Director
Alpina Film GmbH
Wülfeler Str. 63
30539 Hanover, Germany

Max Rhotert served as the Chief Operating Officer of Crypto Lawyers, an entity affiliated

with Patrick Gruhn, and served as the Chief Operating Officer of FTX Europe.  Max Rhotert has

knowledge of the licenses held by DAAG; the value of those licenses in the marketplace; and the

value that the DAAG acquisition brought to FTX.

John Ray III
c/o Stephen Ehrenberg
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

John Ray has knowledge of FTX's solvency at the time of the disputed transfers and the value that the DAAG acquisition brought to FTX. Mr. Ray has personal knowledge that FTX's acquisition of DAAG did not involve a fraudulent transfer in violation of Bankruptcy Code §548. Mr. Ray has knowledge that FTX did not make a good-faith, legitimate attempt to sell FTX Europe to a third party after the bankruptcy petition was filed.

Michael Kott
CM-Equity AG
Kaufingerstrasse 20
80331, Munich, Germany

Michael Kott has knowledge of the ability of DAAG to tokenize real world assets, including securities; the licenses possessed by DAAG; and the value of the licenses and business of DAAG.

Marcel Lotscher
Burghaldenstrasse 22
5400 Baden, Switzerland

Marcel Lotscher served as a regulator in Lichenstein and has knowledge of the approved tokenized stock prospectus of DAAG. After FTX's acquisition of DAAG, FTX hired Marcel Lotscher to work for FTX Europe. Marcel Lotscher has knowledge of DAAG's licensure; the value of that licensure in the marketplace; and the benefits that DAAG rendered to FTX after the acquisition.

Regulators with CySEC
P.O. Box 24996
1306 Nicosia, Cyprus

The Cyprus regulators have knowledge of DAAG's licensure; the value of that licensure

in the marketplace; and the benefits that DAAG rendered to FTX after the acquisition.

> Employees with the Dubai Virtual Assets Regulatory Authority
> P.O. Box 9292
> Dubai, UAE

The Dubai regulators have knowledge of DAAG's licensure; the value of that licensure in

the marketplace; and the benefits that DAAG rendered to FTX after the acquisition.

> P.C. Vriend
> Head of Department of Financial Crime Supervision
> DeNederlandscheBank N.V.
> Postbus 98
> 1000 AB Amsterdam, Netherlands
> +31 20 524 91 11

Ms. Vriend has knowledge of DAAG's licensure; the value of that licensure in the

marketplace; and the benefits that DAAG rendered to FTX after the acquisition.  DeNederlandsche

Bank conducted an audit of DAAG and determined it to be in compliance with applicable laws.

> Regulators with BaFin
> Postfach 1253
> 53002 Bonn, Germany

The regulators with BaFin have knowledge of DAAG's licensure; the value of that

licensure in the marketplace; and the benefits that DAAG rendered to FTX after the acquisition.

> Dr. Anna L. Izzo-Wagner, LL.M. Eur.
> Annerton
> Rechtsanwaltsgesellschaft mbH
> 60323 Frankfurt a.M. Germany
> +49 69 2043 689-0

Dr. Izzo-Wagner has knowledge of DAAG's regulatory compliance and licensure and the

resultant value of DAAG. Annerton served as counsel for FTX in its acquisition of DAAG.

> Gregory Landegger
> Chief Investment Officer
> The Whittemore Collection
> 4 International Drive, Suite 300
> Rye Brook, NY 10573

Gregory Landegger served as the Chief Investment Officer of the Whittemore Collection at or around the time of FTX's investment in and acquisition of DAAG. Gregory Landegger has knowledge of discussions with DAAG pertaining to a potential transaction between the Whittemore Collection and DAAG; the value of DAAG at or around the time of FTX's acquisition of DAAG; and the market potential of DAAG.

> Wei Zhou, former CFO of Binance
> Current Coins.ph CEO
> 12F Centerpoint Building,
> Julia Vargas cor Garnet St., Ortigas Center,
> 1605, Pasig City, Philippines
>
> and
>
> David Koa, head of Binance (Singapore)
> Address and phone number unknown

Wei Zhou served as the Chief Financial Officer of Binance and David Koa served as the head of Binance (Singapore) at or around the time of FTX's acquisition of DAAG. Messrs. Zhou and Koa have knowledge of discussions with DAAG pertaining to a potential transaction between DAAG and Binance; the value of DAAG at or around the time of FTX's acquisition of DAAG; and the market potential of DAAG.

> Various employees of Kraken
> Payward Ventures, Inc.
> 100 Pine St, Suite 1250
> Office 6, PMB A188
> San Francisco, CA 94111

Kraken engaged in discussions with DAAG pertaining to a potential transaction between DAAG and Kraken. The individuals employed by Kraken have knowledge of those discussions;

the value of DAAG at or around the time of FTX's acquisition of DAAG; and the market potential of DAAG.

> William Shihara
> Former CEO of Bittrex
> c/o Jeremy O. Bressman
> Kobre & Kim LLP
> 800 Third Ave., 6th Floor
> New York, NY 10022

William Shihara served as the CEO for Bittrex at or around the time of FTX's initial investment in DAAG. William Shihara has knowledge of discussions with DAAG pertaining to a potential transaction between DAAG and Bittrex; the value of DAAG at or around the time of FTX's investment in DAAG; and the market potential of DAAG.

> Ryne Miller
> Former General Counsel of FTX
> Former Partner with Sullivan & Cromwell LLP
> Current Managing Partner of Miller Strategic Partners LLP
> New York, NY

Ryne Miller served as counsel to FTX at or around the time of FTX's investment in and acquisition of DAAG. Mr. Miller had knowledge of the European regulatory scheme for cryptocurrency exchanges and provided FTX with legal advice with respect to such regulatory schemes in connection with FTX's DAAG investment and acquisition. At or around the same time, Ryne Miller served as counsel for FTX in connection with the acquisition of Ledger X, a similarly situated company to DAAG in the United States, and Ryne Miller provided due diligence services in connection with the Ledger X transaction. Ryne Miller has knowledge of the value that a licensed company with the ability to tokenize real world assets could provide to FTX.

> Sequoia Capital
> 2800 Sand Hill Rd
> Menlo Park, CA 94025

Sequoia Capital was a significant investor in FTX. As owner of a significant equity stake in FTX, Sequoia Capital continually pushed FTX to secure the appropriate licenses and regulatory approval for its operations. Sequoia Capital has knowledge of the value that FTX's acquisition of DAAG brought to FTX in connection with regulatory and licensing legitimacy.

> Mariana Gospodinova
> Executive Vice President of Operations
> Crypto.com
> Address and phone number unknown.

Ms. Gospodinova inquired in mid-June 2023 on behalf of Crypto.com about the possible purchase of FTX Europe after FTX filed bankruptcy who inquired about a potential acquisition in mid-June.

> Samuel Tracubbo
> Current address and phone number unknown.

Mr. Tracubbo is a former Co-CEO of Alameda.

> Arthur Thomas
> Current address and phone number unknown.

Mr. Thomas has served as a director of FTX along with Bankman-Fried and Sing.

> Franco Lorandi
> Current address and phone number unknown.

Mr. Lorandi served as FTX Europe administrator.

**2.      Description of the Location of Discoverable Documents.**

A.      Telegram chats.

Brandon Williams principally communicated with the individuals at FTX, DAAG, and other individuals in the crypto currency space via an app known as Telegram. The chats on Telegram can be exported to HTML files and contain discoverable documents.

B.      Email.

In addition to communication via Telegram, Brandon Williams communicated with individuals at FTX, DAAG, and other individuals in the crypto currency space via two email addresses:  b.williams@cosimacapital.co and thelong1@protonmail.com.   Both email accounts have emails retained on the cloud through Proton Mail.

C.      Laptop Computer.

Brandon Williams saved certain significant documents, such as the transaction documents, DAAG's business plan, and DAAG presentation materials, locally on his laptop.

**3.      Damages.**

Brandon Williams is not the Plaintiff and is not seeking a damages claim.

**4.      Insurance Agreements.**

There exist no applicable insurance agreements.

<div style="text-align: right">

*/s/ Gregory L. Arbogast*
Lawrence J. Gebhardt (*pro hac vice*)
Gregory L. Arbogast (No. 6255)
GEBHARDT & SMITH LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801
T: (302) 295-5038
F: (443) 957-4325
Garbogast@gebsmith.com

*Attorneys for Defendant, Brandon Williams*

</div>

## **Certificate of Service**

I HEREBY CERTIFY that on this 27th day of September, 2023, I caused the foregoing

Initial Rule 26(a)(1) Disclosures to be sent, via first class mail, postage pre-paid, to:

Matthew B. McGuire
Landis Rath & Cobb LLP
P.O. Box 2087
919 Market Street, Suite 1800
Wilmington, DE 19899

Andrew G. Dietderich
James L. Bromley
Brian D. Glueckstein
Alexa J. Kranzley
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Laura Davis Jones
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street
17th Floor P.O. Box 8705
Wilmington, DE 19899-8705

Heath D. Rosenblat
Morrison Cohen LLP
Joseph T. Moldovan
Jason P. Gottlieb
909 Third Avenue, 27th Floor
New York, New York 10022

Darrell M. Daley
Samantha Neal
The Daley Law Firm
4845 Pearl East Circle, Suite 101
Boulder, Colorado 80301

*/s/ Gregory L. Arbogast*
Gregory L. Arbogast (Bar No. 6255)

# Exhibit 20

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | Adv. Pro. No. 23-50437 (JTD) |
| Defendants. | |

**INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(A)(1) OF**
**DEFENDANTS LOREM IPSUM UG, PATRICK GRUHN, AND ROBIN MATZKE**

Defendants Lorem Ipsum UG, Patrick Gruhn, and Robin Matzke ("**Defendants**"), through undersigned counsel, make these initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i).

**PRELIMINARY STATEMENT**

These disclosures were prepared after a reasonable inquiry and are complete and correct as of this date. Defendants will supplement or modify these disclosures as appropriate if and when additional information becomes available.

By producing any documents or identifying any persons likely to have relevant knowledge, Defendants do not waive any objection that they now have or may hereafter have as to: (a) the production of documents; (b) the admissibility in evidence at any proceeding of any documents identified herein; or (c) the knowledge of any witness or testimony disclosed or identified herein. Defendants also object to the production of, and do not disclose, documents or other information to the extent the disclosures might otherwise call for attorney-client privileged information or attorney work product, or otherwise privileged information.

## I.    DISCLOSURE OF INDIVIDUALS PURSUANT TO FRCP 26(a)(1)(A)(i).

The following are individuals likely to have discoverable information that Defendants may use to support their claims and defenses in the above-captioned adversary proceeding ("**Adversary Proceeding**"), unless solely for impeachment:

1.    Patrick Gruhn, c/o The Daley Law Firm LLC, 4845 Pearl East Circle, Suite 101, Boulder CO 80301, 303-479-3500. Mr. Gruhn may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Patrick Gruhn has knowledge surrounding the initiation of the relationship between Digital Assets DA AG ("**DAAG**") and Alameda Ventures Ltd. (which is now known as Maclaurin Investments Ltd.) and FTX Trading Ltd.; the formation and growth of DAAG; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the technology employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and ultimate consummation of the disputed transactions; the value of DAAG to Maclaurin Investments Ltd. and FTX Trading, Ltd.; other offers and interest that third parties had in DAAG; and the success of DAAG after its ultimate acquisition by FTX Trading, Ltd.

2.    Robin Matzke, c/o The Daley Law Firm LLC, 4845 Pearl East Circle, Suite 101, Boulder CO 80301, 303-479-3500. Mr. Matzke may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Robin Matzke has knowledge surrounding the initiation of DAAG's relationship with Maclaurin Investments Ltd. and FTX Trading Ltd.; the formation and growth of DAAG; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the technology employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and ultimate consummation of the disputed transactions; the value of DAAG to Maclaurin Investments Ltd. and FTX Trading, Ltd.; other offers and interest that third parties had in DAAG; and the success of DAAG after its ultimate acquisition by FTX Trading, Ltd.

3.    Brandon Williams, c/o Gebhardt & Smith LLP, One South Street, Suite 2200 Baltimore, MD 21202, 410-752-5830. Mr. Williams may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Brandon Williams has knowledge surrounding the initiation of DAAG's relationship with FTX Trading Ltd. and Maclaurin Investments Ltd.; the formation and growth of DAAG; DAAG's unique business plan; the value of DAAG at the time of the disputed transfers; the negotiations and ultimate consummation of the disputed transactions; the value of DAAG to Maclaurin Investments Ltd. and FTX Trading, Ltd.; and other offers and interest that third parties had in DAAG.

4.    Ernest Ukaj, address and phone number unknown to Defendants. Mr. Ukaj may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Ernest Ukaj has knowledge surrounding of the formation and growth of DAAG; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the technology employed by DAAG; DAAG's relationship with various crucial regulators; and the value of DAAG at or around the time of the disputed transfers.

5.      Samuel Bankman-Fried, Metropolitan Detention Center, 80 29th St., Brooklyn, NY 11232, phone number unknown to Defendants. Mr. Bankman-Fried may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Sam Bankman-Fried has knowledge of the allegedly fraudulent schemes in which he conspired at FTX Trading, Ltd. and/or its affiliates and the inapplicability of same to DAAG; FTX Trading, Ltd.'s general business operations and plans; FTX Trading, Ltd.'s and Maclaurin Investments Ltd.'s finances and solvency; FTX Trading Ltd.'s intention with respect to the investment in and acquisition of DAAG and the group of companies FTX Trading, Ltd. or its affiliates required to provide similar services in the U.S., e.g., Ledger X, FTX US and Embed; information about the market share of existing clients of FTX Trading, Ltd. from Europe; information about the comparable market share in the U.S.; information surrounding the initiation of DAAG's relationship with FTX Trading, Ltd.; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the technology employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and ultimate consummation of the disputed transactions; the value of DAAG to FTX Trading, Ltd.; other offers and interest that third parties had in DAAG; and the success of DAAG after its acquisition by FTX Trading, Ltd.

6.      Nishad Singh, address and phone number unknown to Defendants. Mr. Singh may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Nishad Singh has knowledge of the allegedly fraudulent schemes perpetrated by FTX Trading, Ltd. and/or its affiliates and the inapplicability of same to DAAG; and the capabilities of FTX Europe AG to fulfill regulatory technology requirements through its relationship with Kephas Corp., without the need to use FTX Trading, Ltd.'s technology.

7.      Can Sun, address and phone number unknown to Defendants. Can Sun may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Can Sun served as counsel for FTX and was involved in the negotiations between Maclaurin Investments Ltd. and FTX Trading Ltd. and DAAG with respect to the investment in and ultimate acquisition of DAAG. Can Sun has knowledge about the market share of Europe and the risk of losing existing clients in Europe if FTX Trading, LTD had no license; the risk of "reverse-solicitation"; the value of being able to actively solicit clients in Europe; and the roles and duties of the individual Defendants.

8.      Daniel Friedberg, address and phone number unknown to Defendants. Mr. Friedberg may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Daniel Friedberg served as counsel for FTX Trading, Ltd. and was involved in the negotiations between Maclaurin Investments Ltd., FTX Trading, Ltd. and DAAG with respect to the investment in and ultimate acquisition of DAAG.

9.      Martha Labranou, former CEO of K-DNA Financial Services Ltd., address and phone number unknown to Defendants. Martha Labranou may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Martha Labranou served as the CEO of K-DNA, which became affiliated with FTX Europe AG. Martha Labranou has knowledge of the value that the DAAG acquisition brought to FTX Trading, Ltd..

10.     Marios Athinodorou, former Executive Director of FTX Europe AG, address and phone number unknown to Defendants. Marios Athinodorou may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Marios Athinodorou has knowledge of the value that the DAAG acquisition brought to FTX Trading, Ltd..

11.     Max Rhotert, former COO of Crypto Lawyers GmbH (aka Canco GmbH and FTX Switzerland GmbH), and COO of FTX Europe AG, address and phone number unknown to Defendants. Max Rhotert has knowledge regarding the negotiations with Binance; Max Rhotert might also possess documents relevant to FTX Switzerland GmbH and FTX Europe AG; Max Rhotert has knowledge of the licenses held by DAAG; the value of those licenses in the marketplace; and the value that the DAAG acquisition brought to FTX Trading, Ltd.

12.     Michael Kott, CM-Equity AG, Kaufingerstrasse 20, 80331, Munich, Germany, phone number unknown to Defendants. Michael Kott may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Michael Kott has knowledge about the ability of DAAG to enable investment firms to enter mass retail business for derivatives, including securities; the value of the DAAG option agreement to acquire CM-Equity; the licenses possessed by DAAG; and the value of the licenses and business of DAAG.

13.     Marcel Lotscher, address and phone number unknown to Defendants. Marcel Lotscher may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Marcel Lotscher served as a regulator in Lichenstein for ten years. After FTX Trading, Ltd.'s acquisition of DAAG, FTX Europe AG hired Marcel Lotscher to work for FTX EU AG. Marcel Lotscher has knowledge of DAAG's licensure; the value of that licensure in the marketplace; and the benefits that DAAG rendered to FTX Trading Ltd. after the acquisition.

14.     Caroline Ellison, address and phone number unknown to Defendants. Caroline Ellison may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Caroline Ellison has knowledge of the allegedly fraudulent schemes perpetrated by FTX Trading, Ltd. and/or its affiliates and the inapplicability of same to DAAG; and the solvency of FTX Trading Ltd. and Maclaurin Investments Ltd. at the time of the disputed transfers.

15.     Gary Wang, address and phone number unknown to Defendants. Gary Wang may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Gary Wang has knowledge of the allegedly fraudulent schemes perpetrated by FTX Trading, Ltd. and/or its affiliates and the inapplicability of same to DAAG; and the solvency of FTX Trading Ltd. and Maclaurin Investments Ltd. at the time of the disputed transfers.

16.     Zach Dexter, former CEO of LedgerX, address and phone number unknown to Defendants. Zach Dexter may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Zach Dexter has knowledge about the value of LedgerX compared to DAAG, the market share of FTX US compared to FTX Trading, Ltd. and FTX Europe AG in Europe, and the negotiations of the acquisition of LedgerX by FTX Trading, Ltd..

17.     Brett Harrison, former CEO of FTX US, address and phone number unknown to Defendants. Brett Harrison may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Brett Harrison has knowledge about the value of offering SPOT+ throughout the European Economic Area, the market share of FTX US compared to Europe, and the negotiations of the acquisition by FTX Trading, Ltd.

18.     Michael Giles former CEO of Embed Financial Technologies Inc., address and phone number unknown to Defendants. Michael Giles may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Michael Giles has knowledge about the value of offering shares through FTX Trading, Ltd., the market share of FTX US compared to Europe, and the negotiations of the acquisition of Embed by FTX.

19.     William Shihara, former CRO of Bittrex, address and phone number unknown to Defendants. Mr. Shihara may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. William Shihara served as the CEO for Bittrex at or around the time of Maclaurin Investments Ltd.'s initial investment in DAAG. William Shihara has knowledge of discussions with DAAG pertaining to a potential transaction between DAAG and Bittrex; the value of DAAG at or around the time of FTX Trading Ltd. and/or Maclaurin Investments Ltd.'s investment in DAAG; and the market potential of DAAG.

20.     Ryne Miller, Miller Strategic Partners LLP, former General Counsel of FTX Trading, Ltd. and former partner with Sullivan & Cromwell LLP, address and phone number unknown to Defendants. Mr. Miller may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Ryne Miller served as counsel to FTX Trading, Ltd. at or around the time of FTX Trading Ltd. and/or Maclaurin Investments Ltd.'s  investment in and acquisition of DAAG. Mr. Miller had knowledge of the European regulatory scheme for cryptocurrency exchanges and provided FTX Trading, Ltd. with legal advice with respect to such regulatory schemes in connection with FTX Trading Ltd.'s and Maclaurin Investments Ltd.'s DAAG investment and acquisition. At or around the same time, Ryne Miller served as counsel for FTX Trading, Ltd. in connection with the acquisition of Ledger X, a similarly situated company to DAAG in the United States, and Ryne Miller provided due diligence services in connection with the Ledger X transaction. Ryne Miller has knowledge of the value that a licensed company with the ability to service Europe legally to FTX Trading, Ltd.

21.     Gregory Landegger, Chief Investment Officer, The Whittemore Collection, address and phone number unknown to Defendants. Gregory Landegger may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Gregory Landegger served as the Chief Investment Officer of the Whittemore Collection at or around the time of FTX Trading, Ltd.'s investment in and acquisition of DAAG. Gregory Landegger has knowledge of discussions with DAAG pertaining to a potential transaction between the Whittemore Collection and DAAG; the value of DAAG at or around the time of FTX Trading's acquisition of DAAG; and the market potential of DAAG.

22.     Wei Zhou, former CFO of Binance, address and phone number unknown to Defendants. Wei Zhou may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Wei Zhou served as the Chief Financial Officer of Binance

at or around the time of FTX Trading, Ltd.'s acquisition of DAAG. Wei Zhou has knowledge of discussions with DAAG pertaining to a potential transaction between DAAG and Binance; the value of DAAG at or around the time of FTX Trading, Ltd.'s acquisition of DAAG; and the market potential of DAAG.

23.     David Koa, former head of Binance (Singapore), address and phone number unknown to Defendants. David Koa may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. David Koa served as the head of Binance (Singapore) at or around the time of FTX Trading Ltd.'s acquisition of DAAG. David Koa have knowledge of discussions with DAAG pertaining to a potential transaction between DAAG and Binance; the value of DAAG at or around the time of FTX Trading, Ltd.'s acquisition of DAAG; and the market potential of DAAG.

24.     Ryan Salame, address and phone number unknown to Defendants. Ryan Salame may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Ryan Salame has knowledge of the allegedly fraudulent schemes in which he conspired at FTX Trading, Ltd. and/or its affiliates and the inapplicability of same to DAAG; FTX Tradng Ltd.'s general business operations and plans; FTX Trading Ltd.'s finances and solvency; FTX Trading, Ltd.'s intention with respect to the investment in and acquisition of DAAG and a similarly situated company, Ledger X; information surrounding the initiation of DAAG's relationship with FTX Trading, Ltd.; DAAG's unique business plan; the licensure pursued and obtained by DAAG; the technology employed by DAAG; DAAG's relationship with various crucial regulators; the value of DAAG at the time of the disputed transfers; the negotiations and ultimate consummation of the disputed transactions; the value of DAAG to FTX Trading, Ltd.; other offers and interest that third parties had in DAAG; and the success of DAAG after its acquisition by FTX Trading, Ltd.

25.     Dan Chapsky, address and phone number unknown to Defendants. Dan Chapsky may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Dan Chapsky was Head of Data Science at FTX Trading, Ltd. and has knowledge about the existing clients and fee income generated from Europe; the market share of clients from the European Economic Area and the third countries Argentina, British Virgin Islands (BVI), Brunei, Cayman Islands, China, Egypt, Georgia, Indonesia, Jordan, Kazakhstan, Kuwait, Lebanon, Malaysia, Mongolia, Montenegro, Panama, Philippines, Qatar, South Korea, South Africa, Switzerland, Thailand, Turkey, UAE, Ukraine; the relationship with Kephas Corp.;  and the capabilities of FTX Europe AG and Kephas to fulfill  regulatory technology requirements.

26.     Swiss Administrator, Professor Franco Lorandi, Holenstein Brusa Ltd Utoquai 29/31, 8008 Zurich Switzerland, lorandi@hol-law.ch, +41 44 251 84 09. Franco Lorandi may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding, including the Swiss administrative proceedings against FTX Europe, AG.

27.     Dr. Kiliam Scharli, LLM, Partner, MLL Legal, Grabenstrasse 2 CH-6340 Baar, Switzerland, +41 58 552 03 50, kilian.schaerli@mll-legal.com. Dr. Scharli may possess discoverable information relating to the claims and defenses alleged in the Adversary Proceeding. Dr. Scharli was counsel to FTX Trading, Ltd. for the acquisition of DAAG.

28.     All persons identified by Plaintiffs.

29.     All persons identified by defendant Brandon Williams.

30.     Any additional persons about whom Defendants become aware during the course of discovery. Defendants reserve the right to supplement the foregoing list.

## II.    DISCLOSURE OF DOCUMENTS PURSUANT TO FRCP 26(a)(1)(A)(ii).

Defendants are in the process of collecting, reviewing, and organizing documents in their possession that they intend to use in support of their claims and defenses, and intend to produce such responsive documents in accordance with the discovery schedule approved and ordered by the Bankruptcy Court. However, Defendants are aware that the following categories of documents in their possession are likely to be relevant to disputed facts in this Adversary Proceeding. The categories of documents, electronically stored information and tangible things that are in the possession, custody or control of Defendants that they may use to support their defenses in this matter, except those that may be used solely for impeachment, include the following:

1.     Term sheets, agreements, communications, and payment information related to the DAAG investments and acquisition;

2.     Communications between Defendants and Samuel Bankman-Fried;

3.     Term sheets and agreement related to DAAG and CM-Equity business dealings;

4.     Communications, agreements, payment confirmations, approval letters, curriculum vitae of relevant executives, business plans, organization structure documents related to the K-DNA acquisition;

5.     Kephas corporate records, employee and contractor reports, and cloud services agreements;

6.     BDO Assessment of DAAG, pitch deck, and communications regarding DAAG valuation;

7.     Lorem Ipsum company documents;

8.     Employment Agreement between Robin Matzke and FTX Trading GmbH;

9.     Termination Agreement between Robin Matzke and FTX Trading GmbH;

10.    Fixed Term Employment Agreement between Robin Matzke and FTX EU LTD;

11.    Communications between Brandon Williams and Ryan Salame;

12.    Communications regarding Coinbase and FTX Europe AG;

13.    Payment confirmations;

14.    Irrevocable Fee Agreement between DAAG and Mohammad Hans Dastmaltchi;

15.    FTX Exchange FZE Virtual Asset Service Provider License;

16.    FTX Exchange FZE Virtual Assets MVP Provisional Approval letter;

7

17.     Any documents identified, disclosed or produced by any other party; and

18.     All rebuttal documents, as necessary.

Defendants' investigation into this matter is ongoing, and Defendants reserve the right to supplement these disclosures as discovery proceeds.

### III.      COMPUTATION OF DAMAGES PURSUANT TO FRCP 26(a)(1)(A)(iii).

Defendants do not seek damages at this time, but reserve the right to update this response.

### IV.      DISCLOSURE OF INSURANCE PURSUANT TO FRCP 26(a)(1)(A)(iv).

There is no insurance agreement that may satisfy all or part of a judgment in this action.

Dated: September 27, 2023

**THE DALEY LAW FIRM, LLC**

By: ___*/s/ Darrell M. Daley*_____
    Darrell M. Daley
    Samantha Neal

4845 Pearl East Circle, Suite 101
Boulder, CO 80301
Tel:  (303) 479-3500
E-mail:  darrell@daleylawyers.com
       samantha@daleylawyers.com

**MORRISON COHEN LLP**

By:___*/s/ Heath D. Rosenlat*_____
    Heath D. Rosenblat
    Joseph T. Moldovan
    Michael Mix

909 Third Avenue, 27th Floor
New York, New York 10022
Telephone:     (212) 735-8600
Facsimile:     (212) 735-8708
E-mail:        hrosenblat@morrisoncohen.com
        jmoldovan@morrsioncohen.com
        mmix@morrisoncohen.com

*Co-Counsel for Lorem Ipsum UG, Patrick Gruhn, and Robin Matzke*

8

# Exhibit 21

| **From:** | Rosenblat, Heath D. <hrosenblat@morrisoncohen.com> |
| **Sent:** | Tuesday, November 7, 2023 2:10 PM |
| **To:** | Lawrence J. Gebhardt; Ehrenberg, Stephen; Mix, Michael; Gregory L. Arbogast; Drayden Peters; Darrell Daley; Moldovan, Joseph T.; Gottlieb, Jason; Samantha Neal; Laura Davis Jones; Peter J. Keane |
| **Cc:** | landis@lrclaw.com; mcguire@lrclaw.com; brown@lrclaw.com; pierce@lrclaw.com; Rosenfeld, Jared H.; Goldman, Jessica H.; Mazumdar, Aneesa; De Vries, Saskia E.L.; Mazzarelli, Samantha M.; Dunne, Christopher J.; Brandon Williams (b.williams@cosimacapital.co); Brandon Williams (b.williams@cosimacapital.co); Glueckstein, Brian D. |
| **Subject:** | [EXTERNAL] RE: FTX Trading Ltd. and Maclaurin Investments Ltd. v. Loren Ipsum UG, et al.; Adv. Pro. No. 23-50437 (JTD) |
| **Attachments:** | Confidentiality Agreement and Stipulated Protective Order (FTX Europe) (4879-3632-7048.1)-12542766-v3.docx; Litera Compare Redline - Confidentiality Agreement and Stipulated Protective Order (FTX Europe) (4879-3632-7048.1)-12542766-v1 and Confidentiality Agreement and.pdf |

All,

Please find attached a revised-clean version of the Protective Order and a redline reflecting our proposed revisions to the version S&C sent over Thursday.  The attached remains subject to client review and approval, but we wanted to get you our thoughts and keep things moving forward.

As for the exchange below, for completeness of the record, we believe there to be a number of inaccurate statements.  Regardless, the LI Defendants continue work on their discovery obligations and will work consistent with and to comply with the CMO.

Be well,
Heath



**Heath D. Rosenblat**
Partner
*he/him/his*

**D** 212.735.8757  |  **M** 917.972.4255
hrosenblat@morrisoncohen.com

vCard [morrisoncohen.com]  |  Bio [morrisoncohen.com]  |  LinkedIn [linkedin.com]

Morrison Cohen LLP
909 Third Avenue, New York, NY 10022-4784
212.735.8600  |  morrisoncohen.com

---

**From:** Lawrence J. Gebhardt <lgebh@gebsmith.com>
**Sent:** Tuesday, November 7, 2023 6:50 AM
**To:** Ehrenberg, Stephen <EhrenbergS@sullcrom.com>; Rosenblat, Heath D. <hrosenblat@morrisoncohen.com>; Mix, Michael <mmix@morrisoncohen.com>; Gregory L. Arbogast <garbogast@gebsmith.com>; Drayden Peters <epeters@gebsmith.com>; Darrell Daley <darrell@daleylawyers.com>; Moldovan, Joseph T. <jmoldovan@morrisoncohen.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Samantha Neal

<samantha@daleylawyers.com>; Laura Davis Jones <ljones@pszjlaw.com>; Peter J. Keane <pkeane@pszjlaw.com>
**Cc:** landis@lrclaw.com; mcguire@lrclaw.com; brown@lrclaw.com; pierce@lrclaw.com; Rosenfeld, Jared H.
<rosenfeldj@sullcrom.com>; Goldman, Jessica H. <goldmanj@sullcrom.com>; Mazumdar, Aneesa
<mazumdara@sullcrom.com>; De Vries, Saskia E.L. <devriess@sullcrom.com>; Mazzarelli, Samantha M.
<mazzarellis@sullcrom.com>; Dunne, Christopher J. <Dunnec@sullcrom.com>; Brandon Williams
(b.williams@cosimacapital.co) <b.williams@cosimacapital.co>; Brandon Williams (b.williams@cosimacapital.co)
<b.williams@cosimacapital.co>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>
**Subject:** RE: FTX Trading Ltd. and Maclaurin Investments Ltd. v. Loren Ipsum UG, et al.; Adv. Pro. No. 23-50437 (JTD)

---

**CAUTION:** External sender. Verify before continuing.

---

Steve:

Let me acknowledge your talent for verbosity. I will try to respond more concisely to the points raised you raise.

I intended to wait the standard 24 hours for your return call but your email to Heath Rosenblat clearly indicated that nothing would be accomplished in a call and, as your email indicates, your position was unchangeable as to any stay of discovery. You also indicated to Darrell Daley that you would not agree to any stay of discovery in your call with him in which you requested additional time to respond the LI Defendants subject matter jurisdiction motions (not Brandon Williams's motion to dismiss or for summary judgment, as you incorrectly state). The extensive authority for the stay of discovery will be set forth in the brief in support of our motion for a protective order.

Brandon Williams never advocated for any extension of the dates when we all discussed the CMO. Brandon Williams was prepared to file a motion to dismiss in September and had a motion and brief prepared and ready for filing. We then received copies of the BDO appraisal and Prager Metis audit and decided to convert what we had prepared to a motion to dismiss or for summary judgment, which we timely filed.

Peter Gruhn *et al*, after extensive research, raised the issue of lack of subject matter jurisdiction for the bankruptcy filing in their motions. Brandon Williams promptly joined in these motions upon their since the lack of subject matter jurisdiction can be raised at any time. The lack of subject matter jurisdiction is the basis for a motion for protective order. There does not seem to be any possible factual dispute that S&C botched the bankruptcy filing last November. Had this issue not been raised by the other Defendants, we would have timely responded to your discovery, produced documents, and served our own extensive discovery. But if the Court lacks subject matter jurisdiction because the bankruptcy was improperly filed without authorization, then all this would be a waste of time and money.

Finally, I see no need for a confidentiality order and will not agree to one. I do not regard entry of a confidentiality order as a standard, routine procedure in litigation and see no reason why a bankruptcy debtor needs one. So proceed with filing whatever you believe appropriate and, as always, we will respond within the time frame set by the court rules.

Larry Gebhardt

---

**From:** Ehrenberg, Stephen <EhrenbergS@sullcrom.com>
**Sent:** Monday, November 6, 2023 10:31 PM
**To:** Lawrence J. Gebhardt <lgebh@gebsmith.com>; Rosenblat, Heath D. <hrosenblat@morrisoncohen.com>; Mix, Michael <mmix@morrisoncohen.com>; Gregory L. Arbogast <garbogast@gebsmith.com>; Drayden Peters <epeters@gebsmith.com>; Darrell Daley <darrell@daleylawyers.com>; Moldovan, Joseph T.

<jmoldovan@morrisoncohen.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Samantha Neal <samantha@daleylawyers.com>; Laura Davis Jones <ljones@pszjlaw.com>; Peter J. Keane <pkeane@pszjlaw.com>
**Cc:** landis@lrclaw.com; mcguire@lrclaw.com; brown@lrclaw.com; pierce@lrclaw.com; Rosenfeld, Jared H. <rosenfeldj@sullcrom.com>; Goldman, Jessica H. <goldmanj@sullcrom.com>; Mazumdar, Aneesa <mazumdara@sullcrom.com>; De Vries, Saskia E.L. <devriess@sullcrom.com>; Mazzarelli, Samantha M. <mazzarellis@sullcrom.com>; Dunne, Christopher J. <Dunnec@sullcrom.com>; Brandon Williams (b.williams@cosimacapital.co) <b.williams@cosimacapital.co>; Glueckstein, Brian D. <gluecksteinb@sullcrom.com>
**Subject:** RE: FTX Trading Ltd. and Maclaurin Investments Ltd. v. Loren Ipsum UG, et al.; Adv. Pro. No. 23-50437 (JTD)

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Larry,

Thanks for your response. First, let me apologize for not immediately returning your phone call from 1:40 pm this afternoon, I was otherwise engaged and had every intention of returning your call within 24 hours.

As to your comment that I was seeking an extension of time, I am confused by that. Plaintiffs have sought no extension of time to respond to your motion dismiss this adversary proceeding. Plaintiffs are proceeding on the basis of the CMO in this action.

In any event, you are correct that Plaintiffs will not agree to a stay of discovery. Neither the Federal Rules of Civil Procedure, nor the Federal Rules of Bankruptcy Procedure provide that discovery should begin after the disposition of motions to dismiss. Indeed, Plaintiffs' position on a stay of discovery has not changed since Defendants first asked for a stay of discovery during our August 3 call. That call followed Plaintiffs sending a draft CMO to Defendants that reflected Plaintiffs' agreement to Defendants' request for over 100 days from service of the complaint to move or answer. In response to Defendants' request for a stay, Plaintiffs unequivocally declined to agree to a stay, and stated in no uncertain terms that they intended to move discovery forward in this case. Defendants indicated no intention to move for a stay on a contested basis. The parties then set about negotiating, ostensibly in good faith, a case management order that comprehensively dealt with discovery deadlines, including dates by which requests could be served on third parties, dates by which requests could be served on parties, a substantial completion of productions deadline, dates for completion of depositions, expert testimony, and motions for summary judgment. The parties carefully calibrated each period to provide sufficient time to complete the necessary tasks, taking into consideration the need to compromise Plaintiffs' desire for a shorter schedule against Defendants' desire for a longer schedule. The parties met again on August 11, and Defendants said nothing about a stay. The agreed CMO was then jointly submitted to the Court and entered by Judge Dorsey. Again, Defendants registered no intent to seek a stay of discovery. Instead, Defendants enjoyed the over 100 days they requested to draft their motions to dismiss without a hint of disagreement as to how the schedule in this case would unfold.

Plaintiffs on the other hand expressed again their intent to move discovery forward in a timely manner by letter dated September 21, which described in great detail the steps Plaintiffs were taking to prepare to meet their discovery obligations in this case, including collecting, processing and reviewing data for potential production. Plaintiffs asked Defendants to confirm that they too were preparing to respond to discovery requests, *or to state why they were not*. Once again, Defendants said nothing about seeking a stay of discovery. Rather, Defendants failed entirely to respond in any way, leaving Plaintiffs to believe that the carefully negotiated CMO remained intact.

Defendants have now revealed, only days before their responses to Plaintiffs' discovery requests are due, more than three months after having requested an agreed stay of discovery (and having been rebuffed), after carefully negotiating a CMO to cover all discovery deadlines, and enjoying a lengthy schedule for preparing their motions to dismiss, that they are seeking a stay of discovery. It appears to Plaintiffs that Mr. Williams has intended all along to hinder and delay this litigation, and rather than seek a stay of discovery at the outset after knowing Plaintiffs' position (and knowing that it had little chance of success), Mr. Williams has instead held his motion until now to cause maximum delay, and to try to

disrupt the carefully negotiated deadlines in the CMO.  Plaintiffs will oppose any such motion, and reserve all rights, including to seek fees and other sanctions in connection with Defendants' vexatious efforts to obstruct this litigation.  Given Heath's stated intention to comply with the CMO, Plaintiffs will assume until told otherwise that the other Defendants do not intend to join Mr. Williams' frivolous motion.

As to the confidentiality order, Plaintiffs fail to see how the order is "procedurally burdensome."  It is a standard order modeled on the confidentiality order already entered in the main bankruptcy case, has been entered in other avoidance actions, and serves to protect sensitive information being revealed by either party and/or third parties, as is the generally accepted practice in federal court.  If you identify any objections you have, we are of course open to discussing them.  But a flat objection to a standard confidentiality order appears to Plaintiffs to be a further effort to delay and needlessly complicate this litigation.  Please let us know promptly if there are any changes to the draft that would lead to your agreement so that we may move in a timely manner for entry of the order.

Regards,

Steve

___
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-3269

---

**From:** Lawrence J. Gebhardt <lgebh@gebsmith.com>
**Sent:** Monday, November 6, 2023 7:24 PM
**To:** Ehrenberg, Stephen <EhrenbergS@sullcrom.com>; Rosenblat, Heath D. <hrosenblat@morrisoncohen.com>; Mix, Michael <mmix@morrisoncohen.com>; Gregory L. Arbogast <garbogast@gebsmith.com>; Drayden Peters <epeters@gebsmith.com>; Darrell Daley <darrell@daleylawyers.com>; Moldovan, Joseph T. <jmoldovan@morrisoncohen.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Samantha Neal <samantha@daleylawyers.com>; Laura Davis Jones <ljones@pszjlaw.com>; Peter J. Keane <pkeane@pszjlaw.com>
**Cc:** landis@lrclaw.com; mcguire@lrclaw.com; brown@lrclaw.com; pierce@lrclaw.com; Rosenfeld, Jared H. <rosenfeldj@sullcrom.com>; Goldman, Jessica H. <goldmanj@sullcrom.com>; Mazumdar, Aneesa <mazumdara@sullcrom.com>; De Vries, Saskia E.L. <devriess@sullcrom.com>; Mazzarelli, Samantha M. <mazzarellis@sullcrom.com>; Dunne, Christopher J. <Dunnec@sullcrom.com>; Brandon Williams (b.williams@cosimacapital.co) <b.williams@cosimacapital.co>
**Subject:** [EXTERNAL] RE: FTX Trading Ltd. and Maclaurin Investments Ltd. v. Loren Ipsum UG, et al.; Adv. Pro. No. 23-50437 (JTD)

Steve:

     Let me respond to your email on behalf of Brandon Williams.

     I called you today to discuss discovery and the pending motions asserting lack of subject matter jurisdiction, but you did not return my call. I assume this means that you will steadfastly maintain your refusal to agree to a stay of discovery that you conveyed to Darrell Daley (when you were asking for an extension of time to respond to the motions to dismiss) and that speaking in person would be a futile waste of time. Hence, we will file Brandon Williams motion for a protective order tomorrow and will certify that despite good faith efforts to resolve the disagreement, resolution was not possible.

     This said, let me state clearly Brandon Williams's position:

1.  Brandon Williams will not agree to you proposed confidentiality protective order.

It appears to be a procedurally burdensome obligation, and we do not understand why FTX or Maclaurin needs confidentiality. Brandon Williams does not.

2. We will respond to your document request and indicate which document productions are acceptable and which are not but will not produce any
documents until the Court rules on the motion for a protective order or the motion to dismiss. We will be positioned to promptly respond with document productions if and when required but will not do so unless and until so required.

We are certainly prepared to have good faith discussions regarding discovery, but we will not simply accede to your demands. We are fully prepared to litigate out position if necessary or to have discussions if such has any chance of being productive.

Larry Gebhardt

---

**From:** Ehrenberg, Stephen <EhrenbergS@sullcrom.com>
**Sent:** Monday, November 6, 2023 6:52 PM
**To:** Rosenblat, Heath D. <hrosenblat@morrisoncohen.com>; Mix, Michael <mmix@morrisoncohen.com>; Lawrence J. Gebhardt <lgebh@gebsmith.com>; Gregory L. Arbogast <garbogast@gebsmith.com>; Drayden Peters <epeters@gebsmith.com>; Darrell Daley <darrell@daleylawyers.com>; Moldovan, Joseph T. <jmoldovan@morrisoncohen.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Samantha Neal <samantha@daleylawyers.com>; Laura Davis Jones <ljones@pszjlaw.com>; Peter J. Keane <pkeane@pszjlaw.com>
**Cc:** landis@lrclaw.com; mcguire@lrclaw.com; brown@lrclaw.com; pierce@lrclaw.com; Rosenfeld, Jared H. <rosenfeldj@sullcrom.com>; Goldman, Jessica H. <goldmanj@sullcrom.com>; Mazumdar, Aneesa <mazumdara@sullcrom.com>; De Vries, Saskia E.L. <devriess@sullcrom.com>; Mazzarelli, Samantha M. <mazzarellis@sullcrom.com>; Dunne, Christopher J. <Dunnec@sullcrom.com>
**Subject:** RE: FTX Trading Ltd. and Maclaurin Investments Ltd. v. Loren Ipsum UG, et al.; Adv. Pro. No. 23-50437 (JTD)

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Heath,

Thanks for your response.  We certainly assumed that your clients would comply with the CMO, which provides for a substantial completion deadline.  But I asked a different question, which is when will you *begin* making productions.  As you know, the CMO also provides that the parties "will produce responsive materials on a rolling basis in advance of such date."  When a party expects to begin making productions is, at least in our experience, a fairly typical subject for meet & confer discussions among parties to a litigation.  In case there was any misunderstanding, I'll ask again when we can expect to begin receiving document productions from Defendants.  If you disagree that such matters are a proper subject for meet & confer discussions, by all means please let us know.

I also note that our phone conversation which you reference below was not contemporaneous to the September 21 letter, but rather, was a conversation we had on October 20, a month after our letter.  Our letter requested that you either confirm that Defendants were engaging in appropriate preparations to produce responsive and unobjectionable materials promptly upon receipt of Plaintiffs' document requests or advise us as to the basis for not doing so.  The lack of any response from Defendants, and your apparent present inability to state when Defendants will begin producing appears to confirm that Defendants were not preparing in the same way that Plaintiffs have prepared to meet their discovery obligations, and that the rules contemplate.  As noted below, Plaintiffs are prepared to begin making productions as soon as we have a signed protective order.

We look forward to hearing from you on the timing of your productions, and remain available to meet and confer on any objections or other matters relating to discovery.

Regards,

Steve

**Stephen Ehrenberg** (Bio)
**SULLIVAN & CROMWELL LLP**
125 Broad Street | New York, NY 10004-2498
+1 212 558 3269 (T)
ehrenbergs@sullcrom.com | www.sullcrom.com

---

**From:** Rosenblat, Heath D. <hrosenblat@morrisoncohen.com>
**Sent:** Friday, November 03, 2023 1:42 PM
**To:** Ehrenberg, Stephen <EhrenbergS@sullcrom.com>; Mix, Michael <mmix@morrisoncohen.com>; lgebh@gebsmith.com; Gregory L. Arbogast <garbogast@gebsmith.com>; epeters@gebsmith.com; Darrell Daley <darrell@daleylawyers.com>; Moldovan, Joseph T. <jmoldovan@morrisoncohen.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Samantha Neal <samantha@daleylawyers.com>; Laura Davis Jones <ljones@pszjlaw.com>; Peter J. Keane <pkeane@pszjlaw.com>
**Cc:** landis@lrclaw.com; mcguire@lrclaw.com; brown@lrclaw.com; pierce@lrclaw.com; Rosenfeld, Jared H. <rosenfeldj@sullcrom.com>; Goldman, Jessica H. <goldmanj@sullcrom.com>; Mazumdar, Aneesa <mazumdara@sullcrom.com>; De Vries, Saskia E.L. <devriess@sullcrom.com>; Mazzarelli, Samantha M. <mazzarellis@sullcrom.com>; Dunne, Christopher J. <Dunnec@sullcrom.com>
**Subject:** [EXTERNAL] RE: FTX Trading Ltd. and Maclaurin Investments Ltd. v. Loren Ipsum UG, et al.; Adv. Pro. No. 23-50437 (JTD)

Steve,

Thank you for the proposed protective order; we will review and provide comments.

With respect to production, we intend on compiling with the terms of the CMO the parties negotiated and the Court entered.  And as for the reference to the letter and the characterization regarding response, we do not contest that you sent a September 21 letter or that there was no *written* response, because as you and I discussed by phone, there is nothing to respond to in the letter.  You set forth your view of things and we appreciate your thoughts, but will be guided by the rules and the CMO.

Thanks again for the proposed protective order and we will be back to you.

Be well,
Heath

**Heath D. Rosenblat**
Partner
he/him/his

**D** 212.735.8757  |  **M** 917.972.4255
hrosenblat@morrisoncohen.com

vCard [morrisoncohen.com]  |  Bio [morrisoncohen.com]  |  LinkedIn [linkedin.com]

Morrison Cohen LLP
909 Third Avenue, New York, NY 10022-4784
212.735.8600  |  morrisoncohen.com

**From:** Ehrenberg, Stephen <EhrenbergS@sullcrom.com>
**Sent:** Thursday, November 2, 2023 6:55 PM
**To:** Mix, Michael <mmix@morrisoncohen.com>; lgebh@gebsmith.com; Gregory L. Arbogast <garbogast@gebsmith.com>; epeters@gebsmith.com; Rosenblat, Heath D. <hrosenblat@morrisoncohen.com>; Darrell Daley <darrell@daleylawyers.com>; Moldovan, Joseph T. <jmoldovan@morrisoncohen.com>; Gottlieb, Jason <jgottlieb@morrisoncohen.com>; Samantha Neal <samantha@daleylawyers.com>; Laura Davis Jones <ljones@pszjlaw.com>; Peter J. Keane <pkeane@pszjlaw.com>
**Cc:** landis@lrclaw.com; mcguire@lrclaw.com; brown@lrclaw.com; pierce@lrclaw.com; Rosenfeld, Jared H. <rosenfeldj@sullcrom.com>; Goldman, Jessica H. <goldmanj@sullcrom.com>; Mazumdar, Aneesa <mazumdara@sullcrom.com>; De Vries, Saskia E.L. <devriess@sullcrom.com>; Mazzarelli, Samantha M. <mazzarellis@sullcrom.com>; Dunne, Christopher J. <Dunnec@sullcrom.com>
**Subject:** FTX Trading Ltd. and Maclaurin Investments Ltd. v. Loren Ipsum UG, et al.; Adv. Pro. No. 23-50437 (JTD)

**CAUTION:** External sender. Verify before continuing.

All:

Consistent with our letter of September 21, Plaintiffs are prepared to begin making productions as soon as we have a signed protective order.  I attach a draft protective order that we propose to use that is based upon the main case order we previously sent, but has been modified to better fit an adversary proceeding.  This form was accepted by the UST in the Embed litigation and we have no reason to think it wouldn't be accepted here.  It also reflects some edits requested by the Embed defendants.

Please let us know when we can expect to begin receiving document productions from Defendants.  We are available to meet and confer on any questions or objections.  As we noted in our letter, to which we received no response or disagreement, productions of documents that are not objectionable or privileged should commence without waiting for written objections or any meet and confer process, as Plaintiffs are prepared to do.

Regards,

Steve

**Stephen Ehrenberg** (Bio)
**SULLIVAN & CROMWELL LLP**
125 Broad Street | New York, NY 10004-2498
+1 212 558 3269 (T) | [Optional (M)]
ehrenbergs@sullcrom.com | www.sullcrom.com

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com [mimecast.com]

**This is an external message from:** hrosenblat@morrisoncohen.com **

This transmittal and/or attachment (s) may be a confidential attorney-client communication or may otherwise be privileged or confidential. If you are not the intended recipient, you are hereby notified that you have received this transmittal in error; any review, dissemination, distribution or copying of this transmittal is strictly prohibited. If you have received this transmittal and/or attachment(s) in error, please notify us immediately by reply or by telephone (call us collect at 212-735-8600) and immediately delete this message and all of its attachments. Thank you. We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com [mimecast.com]