**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD. and MACLAURIN INVESTMENTS LTD., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-50437 (JTD) |
| LOREM IPSUM UG, PATRICK GRUHN, ROBIN MATZKE, and BRANDON WILLIAMS, | |
| Defendants. | |

### DECLARATION OF STEPHEN HOUSEMAN KC

I, Stephen Houseman KC, state as follows:

Introduction

1.      I am a barrister and one of His Majesty's Counsel in independent practice in England & Wales.  I was Called to The Bar in November 1995 and took silk (Queen's Counsel) in March 2013, becoming King's Counsel upon the accession of King Charles III upon the death of The Late Queen Elizabeth II in September 2022.

2.      I have been requested by Sullivan & Cromwell LLP to provide this declaration containing my opinion on aspects of Antiguan law (as defined below) in light of and in

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

response to the Declaration of Craig L. Jacas dated 26 October 2023 ("**Jacas Declaration**").  The Jacas Declaration has been filed in support of the Defendants' motion to dismiss some or all allegations made against them in the Complaint filed on 12 July 2023 ("**Complaint**").

3.      I set out below my professional experience which is relevant to my qualification to opine on such matters.

Professional Experience

4.      I have been a member of Essex Court Chambers in London for my entire professional life, commencing on 1 January 1997.  My practice involves a broad range of international commercial and modern chancery disputes as summarised in my current curriculum vitae attached as **Exhibit A**.  I have a separate profile for other specialist injunctive and arbitral challenge work which I do not exhibit.

5.      I have been admitted or registered as advocate in a number of jurisdictions around the world, including: British Virgin Islands, Cayman Islands, St. Lucia, Antigua & Barbuda, Singapore International Commercial Court (SICC), Dubai International Financial Centre (DIFC), and Isle of Man.  For simplicity I refer to Antigua & Barbuda as 'Antigua' and hence refer to 'Antiguan law' as shorthand.

6.      I was admitted as an Attorney-at-Law in the Eastern Caribbean Supreme Court ("**ECSC**") in Antigua in 2018.  The admission was licensed in order that I could act as lead advocate representing the claimant (minority shareholder) in an action against a company in the High Court in the case of *1Globe Capital LLC v. Sinovac Biotech Limited* (ANUHVC 2018/0120) ("***Sinovac***").  That action was brought pursuant to s.122 of the International Business Corporations Act (Cap.122) Revised Laws of Antigua & Barbuda 1992 ("**IBCA**").

7. The *Sinovac* case remains pending before the Judicial Committee of the Privy Council ("**JCPC**") in the United Kingdom.  This follows a decision of the Eastern Caribbean Court of Appeal ("**ECCA**") in December 2021 dismissing my client's appeal, then ECCA's own grant of (conditional, which became unconditional) leave to appeal in February 2022 and subsequent grant of special leave to appeal on separate issues by the JCPC.  I no longer represent the appellant/claimant after a change of instructing solicitors and hence leading counsel during 2022.

8. I represented the claimant at trial and on appeal before the ECCA in the *Sinovac* case during mid-2018 to mid-2022, leading Lenworth Johnson and Andreen Vanriel of the Antiguan Bar.  I note that Mr Jacas attended in person on a "*watching brief*" on behalf of certain identified Interested Parties both at first instance (December 2018) and the substantive appeal hearing (September 2019).  I am not aware of whether he was permitted to attend the contested leave to appeal motion that was determined at a further contested oral hearing in February 2022.

9. I attach a copy of each judgment for reference: see **Exhibit B** ("**Trial Judgment**") and **Exhibit C** ("**Appeal Judgment**").  A summary of the ECCA's grant of leave to appeal in February 2022 is publicly available by searching the name "*Sinovac*" on my chambers' website (*www.essexcourt.com*); but is not exhibited hereto.

10. The *Sinovac* case marked the first time that important sections of the IBCA had been considered judicially in Antigua: see Trial Judgment [16]; Appeal Judgment [25], [30].  The IBCA is modelled closely on the Canadian equivalent legislation.

11. The main issues in *Sinovac* concerned the interplay between common law and statute in the context of notification of shareholder meetings and amendments to motions for (re-)election of directors of a company registered in Antigua.  Certain issues engaged provisions of the International Business Corporation Regulations 1985 (S.I. No.43 of

1985) ("**IBCR**") made pursuant to delegated legislative power contained in the IBCA. The main issue, however, concerned the effect of s.71 IBCA.

12. These central issues were certified by the Court of Appeal, comprising the Chief Justice of the ECSC (The Hon. Dame Janice Periera, DBE) and two other Justices of Appeal, as being of "*great general or public importance*" in accordance with s.122(2)(a) of the Constitution.  I understand that it is very rare for leave to be granted on this ground in respect of a dispute about company or commercial law.  The JCPC itself later granted special leave to appeal on a distinct challenge to the validity of the board's adoption of a defensive shareholder rights plan - known as a 'poison pill' - by reference to the IBCA and by-laws or articles of the company.

13. I understand that *Sinovac* is one of the leading authorities on the approach to interpretation of the IBCA, including the relationship between its provisions and common law (including equitable) principles as applicable to companies and corporate contexts.  I am aware of international media interest in that litigation - some of which concerns the fact that the company itself developed one of the most widely-used vaccinations for Covid-19.  There was parallel litigation in Delaware concerning the disputed effect of the 'poison pill' rights plan.

14. In addition to my practice as a barrister, I was appointed as a Deputy Judge of the High Court in November 2019 by the Lord Chief Justice of England & Wales.  My appointment covers both the Chancery Division, where I have sat in the Business List, Insolvency & Companies Court, Property Trusts & Probate List; and (what is now) the King's Bench Division, where I am authorised by the Lord Chancellor and Lord Chief Justice to sit in the Commercial Court.  I sit regularly in this capacity as well as taking appointments in international arbitration.

15.     One of the cases I heard and decided sitting as a Deputy High Court Judge is *Wang v. Darby* [2021] EWHC 3054 (Comm); [2022] Bus LR 121.  That case was the first contested hearing in the jurisdiction as to whether a trust exists in respect of cryptocurrency.  I am aware that the reported decision has been cited and followed in different jurisdictions, including Isle of Man and Hong Kong.  Paragraphs [62] and [95]-[98] of the judgment deal with the circumstances in which a fiduciary duty may be imposed upon a party to a contractual relationship pursuant to which property may pass, i.e. independent of the existence of any trust.  I note that my summary of the principles covering imposition of fiduciary duties was cited with approval by Ellenbogen J in *Executive Authority for Air Cargo & Special Flights v. Prime Education Limited (In Liquidation) & others* [2023] EWHC 1634 (KB) in a section entitled "*The fiduciary relationship*" at [47]-[51].  Other cases cited in this section include *Bristol & West Building Society v. Matthew* [1998] Ch.1. which is addressed in and exhibited to the Jacas Declaration.

16.     I attach a copy of *Wang v. Darby* (**Exhibit D**) and relevant extracts from *Prime Education* (**Exhibit E**) purely for reference purposes.  My analysis of fiduciary duties below does not depend on what is said in my own decision, or by another High Court Judge about it, for the avoidance of doubt.

17.     I believe that my close familiarity with the IBCA and IBCR from involvement as lead advocate in *Sinovac* in Antigua, as well as my experience over 26 years in practice and over four years sitting as a Deputy High Court Judge in London, qualify me to give this opinion on Antiguan law.

18.     A key point to note in this context is that English common law applies (i.e. "*is in force*") in Antigua "*so far as it stands unaltered by any written Laws of these Islands, or some of them*" according to section 2 of the Common Law (Declaration of Application) Act

1705, Cap.92 ("**1705 Act**"): see **Exhibit F**.  In the modern context, common law includes principles of equity after the judicature legislation of the late nineteenth century.  I refer to 'common law' in this modern fused sense.

19.     I give this opinion on identified aspects of Antiguan law on behalf of the plaintiffs in these proceedings.  One of those plaintiffs is FTX Trading Limited ("**FTXT**") which is a company incorporated and registered in Antigua and therefore subject to the IBCA and IBCR.  (Although the IBCA refers to a "*corporation*", I use the phrase 'Antiguan company' to mean the same thing.)  I have assumed for present purposes that Antiguan law is applicable for such purposes, this being a matter for the Court applying its own private international law rules and principles: cf. Jacas Declaration, paragraph 6.

20.     It is not clear from Mr Jacas's exhibited CV whether he has acted as an attorney or undertaken academic research or published writing concerning the IBCA.

Substantive Claims: Summary

21.     I do not repeat the substantive allegations which are the subject of the relevant motion to dismiss to which both the Jacas Declaration and this Declaration relate.

22.     By way of summary, it is alleged *inter alia* that Patrick Gruhn ("**PG**") and Robin Matzke ("**RM**") breached fiduciary duties owed to FTXT as a matter of Antiguan law.  It is alleged and assumed for present purposes, so far as may be legally relevant, that at the material time or times both PG and RM were co-founders, directors and/or other office-holders of a Swiss-incorporated entity originally called Digital Assets DA AG and later called "FTX Europe", and that such entity ("**FTXE**") became a direct and wholly-owned subsidiary of FTXT in circumstances set out in the Complaint.  PG was styled as "Head of FTX Europe" for or at FTXE.  RM was styled "Head of Legal" for or at FTXE.

23. Two specific (sets of) transactions or transfers are impugned in this context, both said to have been caused ("*by causing*") by PG and/or RM - namely:

    (i)     the transfer of money from FTXE to (or for the benefit of) Kephas Corporation, a Delaware entity founded by PG and of which he was President ("**Kephas**"): paragraphs 78 to 84 (especially paragraph 82) and 139 of the Complaint; and

    (ii)    the transfer of money from FTXE to (or for the benefit of) Mohammad Hans Dastmaltchi during 2021-2022 ("**Dastmaltchi**"): paragraphs 85 to 103 (especially paragraph 99) and 140 of the Complaint.

For convenience, I refer to these respective sets of transfers as the "**Kephas Transfers**" and "**Dastmaltchi Transfers**" below.

24. As I understand the allegations, the existence of fiduciary duties owed by PG or RM to FTXT as a matter of Antiguan law is not based juridically upon their (assumed) capacity as directors or officers of a foreign-registered subsidiary (FTXE). That corporate capacity isn't said to be the exclusive legal source of their fiduciary responsibility under Antigua law. Rather, it is the occupation or execution or exploitation of power enjoyed by virtue of such corporate capacity that is said to justify the imposition of fiduciary duties owed to or for the benefit of FTXT. This is a fact-specific inquiry as a matter of Antiguan law, as explained further below.

25. It appears to be common ground that neither PG nor RM was a statutory director or other appointed officer of FTXT at any material time: see paragraph 13.d. of the Jacas Declaration.

26. It is also common ground, or certainly should be, that fiduciary duties are imposed in equity - i.e. they are equitable obligations, violation of which may engage monetary or non-monetary equitable remedies such as equitable compensation, equitable forfeiture or account of profits and/or specific performance or injunctive relief. For present

purposes, they can be characterised as part of the common law save in so far as enshrined or codified (and hence subsumed) into statute.

Jacas Declaration: Summary

27.   Mr Jacas opines that neither PG nor RM owed any fiduciary duties to or for the benefit of FTXT as a matter of Antiguan law.  This conclusion is set out in paragraph 20 of the Jacas Declaration, which is the culmination of Section C (paragraphs 14 to 20).

28.   This conclusion is premised on two central propositions set out in paragraphs 7, 8, 16 and 18 of the Jacas Declaration, namely:

   (i)   a general assertion or assumption that the common law is only admissible or applicable where an Antiguan statute is ambiguous; and

   (ii)   a specific assertion or assumption that the IBCA creates some kind of exhaustive or universal code for who can owe fiduciary duties to an Antiguan company - namely, its directors or officers, as provided for by s.95 IBCA, and no other person.

29.   As explained below, I disagree with both of these legal propositions as well as the ultimate conclusion expressed by Mr Jacas.  I do, however, accept what Mr Jacas says about the general purpose of the IBCA itself being to govern the relationships between an Antiguan company, its directors and officers and its shareholders: first sentence of paragraph 7 of Jacas Declaration.  We differ as to what this means in practice according to Antiguan law.

Analysis of Antiguan Law

30.   I start by addressing the two foundational propositions which underpin Mr Jacas' analysis of Antigua law.  The broader first proposition appears to underpin the specific second proposition from what I can tell.

*Mr Jacas's Broad Proposition: Admissibility of Common Law*

31.   As noted in paragraph 18 above, the common law of England & Wales, and by analogy that of Commonwealth jurisdictions, has full force in Antigua save in so far as altered by local legislation.   This is the simple and clear effect of s.2 of the 1705 Act (**Exhibit F**).

32.   I note that Mr Jacas does not mention the 1705 Act or identify it as a statutory source he has reviewed: cf. paragraph 12 of Jacas Declaration (referring to "*the relevant statutes*").   This is unexplained.

33.   The phrase "*stands unaltered by any written Laws*" means what it says.   The concept of *altering* the common law arises where a local statute either (i) expressly abrogates or supplants the common law; (ii) provides for a legal consequence that is sufficiently different from the effect of common law; or (iii) subsumes the common law at a certain date and makes clear that there is no scope for reflecting its subsequent evolution into the statutory definition or codification.   Short of this being done on the face of a statute, it must be taken to leave the relevant principles of common law intact.   There is no scope for implied *general* prohibition or preclusion arising from an instance of *specific* positive prescription.   To construe s.2 otherwise would be a charter for legal uncertainty, contrary to the expressed purpose of the 1705 Act.

34.   This approach was applied or assumed by the JCPC, as apex appellate court for Antigua, in *Re Stanford International Bank* [2019] UKPC 45 (**Exhibit G**).   The bank had been run as part of a massive Ponzi scheme.   Its liquidators sought to recover funds from those depositors who had been paid out before the bank ceased trading, i.e. on the basis that such payments constituted fraudulent preferences according to insolvency principles.   It was common ground that the IBCA does not contain any provision for the avoidance of fraudulent or wrongful preferences; there was no explanation available for why this was the case.   The JCPC stated that "*the common law about fraudulent*

*preference is applicable in the insolvent winding up of an [Antiguan company], in default of any statutory provision which replaces it…*" (see [21], my emphasis added). This is a clear indication of highest authority to the effect that the common law remains in full force in Antigua absent a statute that replaces it.

35.    It follows from this elemental and indeed constitutional analysis, that there is no basis for Mr Jacas' assertion or assumption (in his paragraphs 7-8 and baked into paragraphs 16 & 18) that common law is merely "*interpretative guidance in instances of ambiguity*".  On the contrary, where a statute is ambiguous it falls to be construed by reference to its express or implied legislative purpose: a single and clear meaning of Parliament must be ascertained.  The common law is not relegated to some residual aid to construction in such circumstances.  It is an independent and incrementally evolving source of jurisprudence which exists *in addition to* primary or secondary statute.  That is what the 1705 Act provides and ensures.

36.    Illustrating the above by reference to s.71 IBCA as considered in the *Sinovac* case, there was no finding that this provision is ambiguous.  Despite this, both the trial judge and appellate court considered Canadian common law cases, including those which brought in general notions of 'shareholder fairness' or 'full and fair disclosure' from other contexts including 'proxy war' scenarios not regulated by the statute.  Furthermore, no submission was even made (by Sinovac) to the effect that the IBCA or IBCR created an <u>exclusive</u> code governing notice to directors of a shareholders' meeting or the use of proxy ballots at such meetings or amendments to motions at such meetings.  On the contrary, the 111-year old English High Court (Chancery Division) case of *Betts & Co Limited v. Macnaughton* [1910] 1 Ch. 430 was addressed in great detail at trial and on appeal - albeit distinguished on its facts in both judgments - on the basis that English common law <u>did</u> apply to such matters.  This was so even though they avowedly

concern "*the relationship between an Antiguan corporation, [its] directors and officers, and [its] shareholders*" (to quote paragraph 7 of the Jacas Declaration): see Trial Judgment [19]-[23]; Appeal Judgment [42]-[52].

37.   In this context, it is noteworthy that the ECCA in *Sinovac* upheld the trial judge's approach based upon there being "*nothing in the IBCA or [IBCR] prohibiting an amendment to an ordinary resolution being proposed by shareholders attending an annual general meeting*" (emphasis added).  This approach supports my analysis in paragraph 33 above to the effect that the phrase "*unaltered by*" in s.2 of the 1705 Act requires something clear on the face of a statute to displace or disapply the common law.  The 1705 Act was cited to and well in the mind of the appellate court in that case. The fact that s.71 IBCA governs notice to directors of their proposed (re-)election, and hence potential non-election or replacement, at a shareholder meeting does not preclude the operation of the common law.

38.   Put simply, the decision in *Sinovac* proceeds on the contrary assumption than that made or asserted by Mr Jacas.  The fact that a statutory provision covers an aspect of the relationship between an Antiguan company and its directors or shareholders does not oust the common law.  The statute must do and say much more in order to achieve this significant outcome.  Mr Jacas materially understates the admissibility and applicability of common law without reference to the 1705 Act.

39.   I should add that nothing in the Eastern Caribbean Supreme Court Act (Cap. 143) alters the effect of the 1705 Act.  This statute concerns procedural law and the 'carry over' effect or impact of English legislation in the prescribed jurisdictions.

40.   For the reasons I have set out above, it is clear that English common law continues to apply in Antigua pursuant to the 1705 Act unless expressly abrogated by Antiguan statute.  I am further reinforced in that view by the following:

(i)    In *Niyazov v. Maples & Calder* [2019] BVI 561 at [31]-[32], the ECCA (BVI) recognised that "*by virtue of [the 1705 Act], the [British] Virgin Islands adopted the English common law, subject to any modifications thereof, enacted either locally or by extension of English enactments.*" (**Exhibit H**)

(ii)    In a series of judgments in other legal contexts, the JCPC has applied English equitable doctrines to Antiguan cases, including (a) the equitable doctrine (developed in English law) of proprietary estoppel (*Gordon v. Havener* [2021] UKPC 26 at [15]); (b) the developing equitable doctrine in English law of an implied constructive trust of property as between unmarried partners, which was applied to divorced spouses in the absence of any specific Antiguan statute providing for property adjustment orders in such situations (*Abbott v. Abbott* [2007] UKPC 53); and (c) equitable principles by which a vendor or mortgagor can contradict a receipt clause in a deed (*Creque v. Penn* [2007] UKPC 44).

(**Exhibits I, J & K**)

41.    For these reasons, based on cases concerning the IBCA itself and other local legislation, I regard Mr Jacas' first proposition as incorrect as a matter of Antiguan law.

*Mr Jacas's Narrow Proposition: Effect of s.95 IBCA*

42.    As noted above, it seems unlikely that Mr Jacas would make his second more specific proposition without the foundation of his first broad proposition.  Be that as it may, I disagree with the second proposition on its own terms as well as by reference to the first broad proposition.

43.    Section 95 may well codify part of the common law in the sense that it enshrines or imports into statute <u>some</u> duties owed by corporate officers; although some care needs to be taken around this proposition: see paragraph 60 below.  In this sense, the IBCA and its Canadian legislative progenitor resemble or resonate with the Companies Act

2006 and its predecessors in English law: they enshrine certain of the responsibilities of statutory office-holders. This is a matter of policy. The duties are so well-established and so essential to the function of a corporate office-holder that they are put on a statutory footing. This way they are mandatory beyond doubt and there can be no issue as to standing to enforce such obligations.

44.    It does not begin to follow from this position, however, that no other person can owe a (non-statutory) fiduciary duty to the relevant Antiguan company. This applies to a person who happens to be a director or officer of a foreign-registered subsidiary company.

45.    There is a fatal *non sequitur* appearing in paragraphs 7, 8, 16 and 18 of the Jacas Declaration. It assumes that because s.95 identifies capacities in which a person owes (i.e. must owe / cannot not owe) a duty to the company, therefore no other person can owe - and hence any other person cannot owe - such duty at common law. This just has to be stated to be seen as illogical.

46.    There is nothing on the face of s.95 or elsewhere in the IBCA which supports this assertion or assumption made by Mr Jacas. There is no prohibitory or exclusory language in s.95 or elsewhere to the contended effect. Nor is there any basis for interpreting the IBCA has having such prohibitory or exclusory effect as a matter of necessary implication or purposive construction. Nor could there be, in my view. There is no rational motive for a legislature to remove or preclude the <u>added</u> protection which a company may enjoy, and indeed may legitimately expect, from a person to whom it has entrusted its corporate property/interests or in whom it has reposed a degree of trust and confidence over an aspect of its affairs such as to justify imposition of fiduciary duties at general law: see also paragraph 53 below.

47. Obvious examples spring to mind of where a company may entreat or appoint someone in such a position of trust and responsibility that it would be contrary to personal conscience and legal policy to alleviate them from fiduciary obligations. A trustee or nominee, to state the obvious; or anyone performing a treasury or custodian or representative role on behalf of the company pursuant to a private mandate (such as an agent or a lawyer). These individuals need not be statutory directors or officers. It is the nature and circumstances of their engagement and assumed responsibility on behalf of the company that operates to justify imposition of fiduciary duties at common law: see below.

48. Mr Jacas' conclusion is, with respect, premised on unsound logic. It conflates the positive imposition of mandatory duties upon statutory office-holders with an unarticulated (and unwarranted) prohibition or preclusion of the existence of equivalent duties by any other individual. This is said to be so even if such duties would otherwise be capable of being found to be owed by such other person(s) towards the relevant Antiguan company in all the factual and behavioural circumstances.

49. For these reasons, I disagree with Mr Jacas's second and more specific proposition regarding the effect of s.95 IBCA.

*Imposition of Fiduciary Duties*

50. In light of the above analysis, it is not clear whether Mr Jacas would seek to maintain his conclusion in paragraph 20 of the Jacas Declaration. The foundation for such conclusion falls away completely, in my opinion.

51. As a matter of English law there are two principles which it is important to separate. First, as a general rule the directors of a company owe fiduciary duties to the company and not to the shareholders. Second, the categories or circumstances in which an individual may owe fiduciary duties to another are not fixed, and the courts have

consistently refused to provide an exhaustive definition of the circumstances in which fiduciary duties arise: see *Snell's Equity (*34th ed. 2022) at 7-005 (**Exhibit L**).

52.     Accordingly and despite the general rule as to the class of fiduciary obligees or beneficiaries, an individual who is a director of a company <u>may</u> owe duties to third parties such as the company's shareholders (including a 100% parent company).  As to this analysis:

(i)     The starting point is to consider whether the individual has "*undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence*": *Bristol & West v. Mothew* [1998] Ch. 1 at 18 per Millet LJ (**Exhibit M**).  This classic statement was recently endorsed by Lady Arden in the UK Supreme Court in *Children's Investment Fund Foundation (UK) v. Attorney General* [2022] A.C. 155 at [44]: *"So the "distinguishing obligation" of a fiduciary is that he must act only for the benefit of another in matters covered by his fiduciary duty. That means he cannot at the same time act for himself."* (**Exhibit N**).

(ii)    It follows from that description of fiduciary duties that an individual "*is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary*": *Mothew* (above).  In other words, it is the *circumstances* in which an individual undertakes to act for another that impose upon him fiduciary duties.  The test is an *objective* one and does not depend upon whether the individual considered, subjectively, that they owed fiduciary duties of loyalty to another: see *Tulip Trading v. Bitcoin Association* [2023] 4 WLR 16 (CA) at [48] per Birss LJ (**Exhibit O**).

(iii)   *Tulip Trading* is a stark example of the flexible way in which equity will treat circumstantial relationships as generative of fiduciary obligations.  The claimant

claimed that, as a result of a computer hack, it had lost the private keys to two Bitcoin addresses.  It claimed that the defendant developers which controlled the Bitcoin network owed the claimant a fiduciary obligation which included a duty to implement the necessary software to give the claimant access to its Bitcoin assets.  The Court of Appeal held that the case was arguable: the defendants exercised a level of control and had undertaken a role in which they held power over other people's (digital) assets, such that it was arguable that they owed a duty of loyalty and a positive duty to safeguard the claimant's assets.

(iv)    Against that background, it is unsurprising that as a matter of principle a director may, depending on the circumstances, owe fiduciary duties to the shareholder(s) of the company of which they are a director.  Those fiduciary duties arise because the director has undertaken to act for the shareholder(s) and not as a facet of his role *qua* director.  After a thorough review of the English and Commonwealth authorities, the position was summarised in *Sharp v Blank* [2017] BCC 187 per Nugee J (as he then was) at [12]-[13] (**Exhibit P**):

> 12.  I take it therefore to be established law, binding on me, that although a director of a company can owe fiduciary duties to the company's shareholders, he does not do so by the mere fact of being a director, but only where there is on the facts of the particular case a "special relationship" between the director and the shareholders. It seems to me to follow that this special relationship must be something over and above the usual relationship that any director of a company has with its shareholders. It is not enough that the director, as a director, has

16

more knowledge of the company's affairs than the shareholders have: since they direct and control the company's affairs this will almost inevitably be the case. Nor is it enough that the actions of the directors will have the potential to affect the shareholders—again this will always, or almost always, be the case. On the decided cases the sort of relationship that has given rise to a fiduciary duty has been where there has been some personal relationship or particular dealing or transaction between them.

13.  I do not find this surprising. A fiduciary, as explained by Millett LJ in his classic judgment in Bristol & West Building Society v Mothew [1998] Ch. 1 at 18A–F, is someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust and confidence. That is why the distinguishing obligation of a fiduciary is the obligation of loyalty: someone who has agreed to act in the interests of another has to put the interests of that other first. But the relationship between directors and shareholders is not in general like that. A director is a fiduciary for his company: by agreeing to act as director, he necessarily agrees to act in the interests of the company. But he does not have, by virtue of his appointment as director, any direct relationship with the shareholders: no doubt the interests of the shareholders and the company are in general aligned but this does not mean that a director has agreed to act for the individual shareholders or has

a direct relationship with them—his relationship is with the company. If he is to be held to owe fiduciary duties to the individual shareholders, there must be something unusual in the nature of the relationship which gives rise to it. That no doubt explains why the cases where such a duty has been held to exist mostly concern companies which are small and closely held, where there is often a family or other personal relationship between the parties, and where, in almost all cases, there is a particular transaction involved in which directors are dealing with the shareholders, from which the directors often stand to benefit personally…

(v)     As the summary above indicates, establishing that an individual owes fiduciary duties to another outside the paradigm relational categories - vis. trustee/beneficiary; lawyer/client; agent/principal - generally requires the individual to show special circumstances which justify the imposition of such duties.  Whether the circumstances of a particular case justify the imposition of fiduciary duties is a heavily fact-dependent question.  It would be true to say that those decided cases in which a director has been held to owe fiduciary duties to a shareholder have involved small, often family-owned companies in which a particular transaction for the purchase or sale or the shareholders' shares was contemplated and the shareholders were vulnerable to an abuse of power by the director who had greater knowledge about the prospective transaction and/or the value of the shareholders' shares: see e.g. *Platt v. Platt* [1999] BCLC 745 (**Exhibit Q**).  In *Vald. Nielsen v. Baldorino* [2019] EWHC 1926 (Comm) at

[746]**,** Jacobs J summarised the cases as follows: "*the cases where such a duty has been held to exist mostly concern companies which are small and closely held, where there is often a family or other personal relationship between the parties, and where, in almost all cases, there is a particular transaction involved in which directors are dealing with the shareholders.*"  (**Exhibit R**)

(vi)    Having said that, these cases do not lay down a settled or inflexible rule that a director may only owe duties to a shareholder if the company is family-owned, or in the context of a potential purchase of shares by the director from the shareholder.   An individual may be found to owe fiduciary duties in a commercial context: see e.g. *Ross River v. Waverly* [2013] EWCA Civ 910 at [51]-[59] (**Exhibit S**).   In *Peskin v. Anderson* [2001] BCC 874 at [34] (**Exhibit T**), Mummery LJ indicated that the following may give rise to a fiduciary obligation owed by a director to shareholders:

> …instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside

> knowledge acquired by them to take improper or unfair advantage of the shareholders.

(vii)   It is also important to acknowledge that the circumstances of a case may justify (a) the imposition of particular fiduciary duties on an individual which are less extensive than those which would be owed by a trustee to a beneficiary or an agent to his principal and/or (b) the imposition of particular fiduciary duties quoad part of an individual's activities and not quoad other parts: see *New Zealand Netherlands Society "Oranje" Inc. v. Kuys* [1973] 1 W.L.R. 1126 at 1130 (**Exhibit U**).

53.   There are other situations in which an individual may owe fiduciary duties to a company even if he has not been appointed as a *de jure* (including statutory) director of that company:

(i)   <u>*De facto* directors</u>.  A *de facto* director is an individual who, although not appointed as a *de jure* director, forms part of the corporate governance system of the company and assumes the status and function of a director so as to make himself or herself responsible <u>as if</u> they were a director: see *Smithton v. Naggar* [2015] 1 WLR 189 (CA) at [33]-[45] (**Exhibit V**).  An individual who is found to be a *de facto* director will owe fiduciary duties to the company like any other director.   I note that s.2(1)(k) IBCA provides that an "*officer*" of a body corporate means "(*i) the chairman, deputy chairman, president or vice-president; (ii) the managing director, the general manager, comptroller, the secretary or the treasurer; or (iii) any other individual who performs for the body corporate functions similar to those normally performed by the holder of any office specified in subparagraph (i) or (ii)*."  The IBCA therefore envisages that a person who performs the functions of (for example) the managing director

of a company will be treated as an officer and, therefore, owe duties to the company including those under s.95(1).

(ii)   Shadow directors.  Where the *de jure* directors are accustomed to act on the instructions of an individual who is not themselves a director, that individual may be characterised in law as a 'shadow director' of the company and owe certain fiduciary duties to the company.  The concept of a shadow director is enshrined in terms the English Companies Act 2006 s.251.  It has existed in English statute since at least the Companies Act 1928.  It may also be said to reside in the wording of s.2(1)(k)(iii) IBCA (set out above): an individual who "*performs for the body corporate functions similar to those performed by* [the managing director, etc]" could be treated as a shadow director.  At least as a matter of English law, an individual who may be described as a 'shadow director' is unlikely to owe the full range of fiduciary duties owed by a *de jure* director (e.g. a duty not to allow their personal interests to conflict with the interests of the company): *see Instant Access Properties v. Rosser* [2018] EWHC 756 (Ch) at [259]-[275] (**Exhibit W**).

(iii)  I should note that, typically, an individual is alleged to be a *de facto* or shadow director of a subsidiary where the individual is a *de jure* director of the parent - as was the case in *Smithton v. Naggar*, referred to above. But that does not mean that an individual who is a *de jure* director of a subsidiary cannot also be a *de facto* or shadow director of its parent and (therefore or otherwise) owe fiduciary duties to that parent in (or by operation of) such functional capacity.

(iv)   Agency & other doctrines.  I note for completeness that there are other bases on which an individual who is a director of a subsidiary might owe fiduciary duties to the parent company, most obviously if the individual was appointed as agent,

custodian or representative of the parent in circumstances which gave rise to such duties. This is a contextual objective test based upon the relevant circumstances.

54.  As I have explained above, the test for imposition of a fiduciary duty at common law, which here means according to principles of equity, is an objective one: it is impossible to set out exhaustively the circumstances in which the courts would treat an individual as owing fiduciary duties to another.

55.  The Antiguan courts would examine all the facts of the case to determine whether an individual has undertaken to act for another in a particular matter in circumstances which ought to give rise to the imposition of fiduciary duties. In this regard, it is fair to note that it has been said: "*Anyone outside the normal established categories [of fiduciary relationship] is going to have to work harder to establish that the necessary relationship exists. The question in any given case is whether that relationship is established…*": see *Fisher v. Dinwoodie* [2023] EWHC 1279 (Ch) at [37] (**Exhibit X**).

56.  What can be stated at a level of generality is that equity does not <u>automatically</u> (i.e. as a rule of law) exclude particular relationships from generating fiduciary obligations. As the cases above make clear:

(i)  The fact that the parties are in a commercial relationship does not automatically prevent one of them owing fiduciary duties to another (*Ross River v. Waverly*). Equally, the fact that the parties are *prima facie* on opposing sides of a transaction such (e.g. a share sale and purchase) does not preclude the imposition of fiduciary duties (*Platt v. Platt*).

(ii)  The fact that an individual is a director of a company does not automatically prevent them from <u>also</u> owing fiduciary duties to the company's shareholder(s) (*Peskin v. Anderson; Sharp v. Blank*).

(iii)    The fact that a particular relationship has not been recognised in the past as one in which equity would impose fiduciary duties on one party does not automatically mean that no such duties will be imposed in any particular circumstances (*Tulip Trading v. Bitcoin*).

(iv)    It must follow, in my view, that the fact that an individual is a director of a foreign-registered subsidiary would not automatically preclude them from owing fiduciary duties to an Antiguan-registered parent.

57.    Further, and as I have set out above, the scope of the duties owed by one person to another are dependent upon the circumstances in which those duties arise. Accordingly, it is not possible to prescribe in a vacuum the extent of the duties owed by a person outside the established categories of fiduciary relationship. What can be said is that the core fiduciary obligations are generally proscriptive (i.e. duties *not* to take particular action) and consist of the following, which are facets of the overarching obligation of single-minded loyalty to the principal:

(i)    a duty not to place oneself (or allow oneself to remain) in a position in which one's personal interest may conflict with the interests of the principal – known colloquially as the 'no conflict' duty; and

(ii)    a duty not to act for one's own benefit (i.e. make an unauthorised profit) without the fully-informed consent of the principal – known colloquially as the 'no profit' duty.

58.    Added to these might be a duty to act honestly, in good faith and in the best interests of the principal - as codified for directors and officers of an Antiguan company in s.95(1)(a) IBCA. This may be said to be a prescriptive (rather than a proscriptive) duty; and, indeed, there is some debate as to whether this is a fiduciary duty at all. Nevertheless, it is at least arguably a fiduciary obligation owed by certain fiduciaries to

their principals.  It is best understood as an obligation on the fiduciary to act in what they consider - i.e. subjectively - to be the best interests of their principal.  Put another way, a breach of the duty to act honestly and in good faith may well require proof that the fiduciary acted consciously in bad faith, or at least without any genuine or honest belief that what they did was in the best interests of their principal.

59. I consider that the duty identified in s.95(1)(b) IBCA (i.e. to "*exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances*") is not necessarily fiduciary in nature.  It is much closer to a common law duty of care.  Put succinctly: "*Not every breach of duty by a fiduciary is a breach of fiduciary duty*": *Snell's Equity* (above) at 7-009 (**Exbibit L**).  By analogy, the English Companies Act 2006 makes it clear that breach of the equivalent provision (s.174) would not be treated as a breach of fiduciary duty (s.178).

60. I note for the sake of completeness that paragraph 15 of the Jacas Declaration asserts that s.95(1) IBCA codifies common law fiduciary duties including the 'no conflict' and 'no profit' duties identified in paragraph 57 above, as well as the duty not to act for an improper purpose ('improper purpose' duty) and the duty to act in the best interests of the corporation ('best interests' duty).  However, I do not see how s.95(1) can have the effect that Mr Jacas contends for, as explained more generally above.  Further and specifically:

(i)     If Parliament had intended to codify the 'no conflict' and 'no profit' duties - as well as the 'improper purpose' duty - it could have done so in clear language as in other jurisdictions which have sought to codify directors' duties, such as ss.175-177 of the English Companies Act 2006.  In my view, the absence of any express reference to the 'no conflict' and 'no profit' duties in s.95 IBCA, plus the fact that s.95(1) is limited to duties which may be considered to be non-

fiduciary in nature (the 'best interests' duty in s.95(1)(a); the duty of care in s.95(1)(b)) provides a solid basis to argue that Antiguan directors' core fiduciary duties, including their 'no conflict' and 'no profit' duties, remain governed by common law equitable principles rather than by the statute.

(ii)     Put another way, s.95(1) codified certain duties the status of which was at least debateable in the absence of a statutory footing, while leaving the core equitable duties arising under general law untouched and (therefore) subject to incremental evolution in the common law tradition.  That further reinforces my view that s.95(1) is not intended as a complete codification of the fiduciary duties owed to companies: it does not identify <u>all</u> the possible individuals who may owe such duties, and it does not even identify the core duties of loyalty which are the hallmarks of a fiduciary relationship.

*Breach of Fiduciary Duties*

61.     It is beyond the scope of this expert opinion to consider the prospects of FTXT proving at trial that either PG or RM breached any fiduciary duty found to be owed by them to it in the ways that have been alleged in the Complaint.  Proof of breach involves a factual inquiry according to the requisite civil standard of proof.

62.     As I have set out above, the core fiduciary duties are proscriptive (or negative) duties which are most obviously breached when a fiduciary takes active steps which, viewed objectively, constitute a breach their duty or duties.  For example, a breach of the 'no profit' duty would typically involve the fiduciary causing or procuring the principal to transfer property or funds to the ultimate benefit of the fiduciary; or the payment of a bribe or secret commission to the fiduciary in exchange for them procuring their principal to enter into a transaction; or the fiduciary diverting a corporate opportunity

from a company of which they are a director to themselves (or, as often occurs, another entity within their control) thereby depriving the principal of such opportunity.

63.    The question then arises whether a fiduciary can breach their duty or duties by failing to take particular steps - for example, by failing to prevent a particular transaction taking place.  That is undoubtedly the case where a fiduciary owes positive obligations; for example, a *de jure* director's obligation to act in good faith and the in furtherance of the best interests of the company could be breached by failing to report a breach of duty either by himself or one of his fellow directors: see e.g. *Item Software v. Fassihi* [2004] BCC 994 (CA) (**Exhibit Y**).  An express trustee likewise has positive duties to ensure the trust property is preserved and invested so that (for example) failure to pay the premiums on an insurance policy, or failure to get in trust assets generally, will likely constitute a breach of duty.

64.    As is apparent from those examples, whether a particular duty can be breached by omission can only be determined having regard to the scope of the duty itself.  Likewise, an omission is rarely pure or isolated; it very occurs in the context of positive behaviour or decision-making forming part of the necessary contextual inquiry at trial.

65.    It may be that the question of breach by omission will not arise in this case, as the Complaint alleges that PG and/or RM caused the Kephas Transfers and the Dastmaltchi Transfers, as summarised above.

*Conclusion*

66.    I do not summarise my opinion set out above, save to reiterate that I disagree with the conclusion in the Jacas Declaration and the reasoning that is said to support it (see paragraphs 27 to 49 above).  In my opinion, PG and RM could be found to owe fiduciary duties to FTXT as a matter of Antiguan law on the basis of the factual matters alleged in the Complaint (see paragraphs 50 to 60 above); and each could be found to have

breached any duty they owed in the circumstances alleged (see paragraphs 61 to 65 above).  These are fact-sensitive inquiries as a matter of general equitable principles forming an essential part of Antiguan law.

I declare under penalty of perjury of the laws of the United States of America that the foregoing in true and correct to the best of my knowledge, information, and belief.

/s/  S. T. Houseman
Stephen Houseman KC
Essex Court Chambers
24-28 Lincoln's Inn Fields
London WC2A 3EG
England, United Kingdom