## APPENDIX TO THE DECLARATION OF STEPHEN HOUSEMAN KC

| Exhibit No. | Description |
|:---:|:---|
| **A** | Curriculum Vitae of Stephen Houseman KC |
| **B** | *1Globe Capital LLC v. Sinovac Biotech Limited* (ANUHVC 2018/0120) [Trial Judgment] |
| **C** | *1Globe Capital LLC v. Sinovac Biotech Limited* (ANUHVC 2018/0120) [Appeal Judgment] |
| **D** | *Wang v. Darby* [2021] EWHC 3054 (Comm); [2022] Bus LR 121 |
| **E** | *Executive Authority for Air Cargo & Special Flights v. Prime Education Limited (In Liquidation) & others* [2023] EWHC 1634 (KB) |
| **F** | Common Law (Declaration of Application) Act 1705, Cap.92 |
| **G** | *Re Stanford International Bank* [2019] UKPC 45 |
| **H** | *Niyazov v. Maples & Calder* [2019] BVI 561 |
| **I** | *Gordon* v *Havener (Antigua and Barbuda)* [2021] UKPC 26 |
| **J** | *Abbott v. Abbott* [2007] UKPC 53 |
| **K** | *Creque v. Penn* [2007] UKPC 44 |
| **L** | *Snell's Equity* (34th ed. 2022) |
| **M** | *Bristol & West Building Society v. Motthew* [1998] Ch.1 |
| **N** | *Children's Investment Fund Foundation (UK) v. Attorney General* [2022] A.C. 155 |
| **O** | *Tulip Trading v. Bitcoin Association* [2023] 4 WLR 16 (CA) |
| **P** | *Sharp v Blank* [2017] BCC 187 |
| **Q** | *Platt v. Platt* [1999] BCLC 745 |
| **R** | *Vald. Nielsen v. Baldorino* [2019] EWHC 1926 (Comm) |
| **S** | *Ross River v. Waverly* [2013] EWCA Civ 910 |
| **T** | *Peskin v. Anderson* [2001] BCC 874 |
| **U** | *New Zealand Netherlands Society "Oranje" Inc. v. Kuys* [1973] 1 W.L.R. 1126 |
| **V** | *Smithton v. Naggar* [2015] 1 WLR 189 (CA) |
| **W** | *Instant Access Properties v. Rosser* [2018] EWHC 756 (Ch) |
| **X** | *Fisher v. Dinwoodie* [2023] EWHC 1279 (Ch) |
| **Y** | *Item Software v. Fassihi* [2004] BCC 994 (CA) |

# Exhibit A

# ESSEX COURT CHAMBERS
## BARRISTERS



# STEPHEN HOUSEMAN KC

Call: 1995 | Silk: 2013
shouseman@essexcourt.com

24 Lincoln's Inn Fields, London WC2A 3EG, UK
T +44 (0)20 7813 8000 | F +44 (0)20 7813 8080
DX 320 Chancery Lane
E clerksroom@essexcourt.com

## PROFESSIONAL PRACTICE

Described as the "*complete package*" and "*the best barrister I have seen on his feet*", the "*highly commercial*" and "*savvy*" Stephen Houseman KC handles a wide range of international commercial and corporate disputes across the spectrum of business and financial sectors. His silk practice has a focus on banking, finance & investment, shareholder & company disputes as well as specialist arbitration-related injunction work. Many of his cases are substantial and complex in nature, often involving multi-jurisdictional contexts or foreign law elements or interplay between arbitration and court. The international profile of Stephen's practice means he appears regularly in courts and tribunals around the world. He is admitted/registered in offshore jurisdictions including the Isle of Man, the Cayman Islands, St Lucia, Antigua & Barbuda, the British Virgin Islands, the Dubai International Financial Centre (DIFC) and the Singapore International Commercial Court (SICC) and their respective appellate courts.

As well as frequent engagement in interlocutory, jurisdictional and injunctive matters, for which he is so well-known, Stephen has been involved in heavyweight trials in the Commercial Court and Chancery Division throughout his 26 years in practice. He was lead advocate, instructed by Clifford Chance on behalf of a principal defendant, in a seven-week fraud trial in *Yukos Finance v. Lynch & others* during 2019. He leads a multi-set team of silk and junior counsel acting for the claimant in *ENRC v SFO & others (No.2)* which is set down for a seven-week trial in the Commercial Court in 2024.

Stephen sits as a Deputy Judge of the High Court in London, King's Bench Division (Commercial Court) and Chancery Division (Business List, Insolvency & Companies Court,

Property Trusts & Probate). He also acts as arbitrator in commercial disputes and has provided

expert evidence, including oral testimony, on English law in proceedings in foreign jurisdictions including Switzerland, Ukraine, USA and Canada.

Stephen has been recognised in the main legal directories in several practice areas: Commercial Dispute Resolution / Commercial Litigation; Banking & Finance; International Arbitration; Energy & Utilities; Insurance & Reinsurance; Offshore. He has attracted praise for his "*superb judgment*" as well as "*technical excellence … on complex points of law and contractual elucidation*". He is known for being "*very bright*", "*talented*" and "*strategically superb*"; an "*extremely clever*" all-rounder who "*focuses on the real issues, handles the client well and has a good sense of humour*".

Clients and observers have consistently praised Stephen for his abilities both inside and outside the courtroom. He is described as an "*exceptional advocate*", "*terrific cross-examiner*", "*great courtroom* advocate", "*a master of the courtroom*" with "*an extremely strong reputation in the commercial arena*"; an "*uber competent advocate*" who is "*very quick to spot the most pertinent points*" and who has an "*assertive and to-the-point approach*" when presenting cases on behalf of his clients. His style on his feet ensures that "*judges trust him*" and that he in turn "*can be trusted with the most difficult and sensitive of cases*". He is also recognised for his "*good strategic sense*" and "*exemplary judgement*" when advising and guiding on tactical aspects of complex proceedings. On a more personal level, market commentators describe Stephen as a "*delight to work with*", "*thorough and charming to deal with*" and "*utterly reliable*", reflecting his "*down-to-earth*" and "*good–humoured*" manner with judges, tribunals, clients and fellow professionals. He is acknowledged as a "*real team player*".

---

## SUMMARY OF PRACTICE

Stephen commenced practice in 1997. He took silk 16 years later in 2013 after taking two extended periods of paternity leave (amounting to a year) as a senior junior. His work over the last 26 years has evolved through a broad spectrum of international commercial disputes with a current emphasis on banking, finance & investment, shareholder & corporate disputes as well as specialist arbitration-related injunction work. His portfolio of reported and decided cases speaks for itself: it can be found online and is not summarised in this CV. Further details of specific experience in any particular practice area, economic market/sector or legal/procedural context can be provided upon request.

Stephen has noted and extensive experience of interlocutory, appellate and injunctive work, in particular arbitration-related anti-suit injunctions. Prominent recent cases have considered the arbitrability of foreign insolvency-related claims or procedures: see *Nori Holding v. PJSC Bank Otkritie Financial* Corp [2018] 2 Lloyd's Rep. 80 (Males J); *RiverRock Securities v. International Bank of St. Petersburg JSC* [2020] 2 Lloyd's Rep. 591 (Foxton J); *Louis Dreyfus Company*

*Suisse SA v. International Bank of St. Petersburg JSC* [2021] Costs L.R. 441 (Calver J). Others such as *C v. D* and *Sulamerica* (both Court of Appeal) are well-known to international arbitration practitioners. A separate up-to-date profile of Stephen's anti-suit and related injunction experience is available here.

Stephen's appellate work includes recent or pending cases in the Court of Appeal on substantive appeals from both Chancery Division (e.g. *Dinglis Management Ltd. & another v. Dinglis Property Ltd.* [2019] EWCA Civ 127) and Commercial Court (e.g. *Vale SA v. Steinmetz* [2021] EWCA Civ 1087); the Singapore Court of Appeal (*Singapore Airlines v. CSDS* [2022] SGCA (I) 3 in January 2022, on appeal from trial judgment [2021] SICC(I) 3); the Eastern Caribbean Court of Appeal (*1Globe Capital v. Sinovac* during 2019-2022 – appeal pending in Privy Council); *Xin Gang Power Investments v. Kenworth Industrial* (appeal from BVI Commercial Court in May 2023); and the Privy Council (e.g. *Airport Authority v. Western Air* [2020] UKPC 29).

In terms of 'big trial' experience, Stephen has been involved throughout his practice in high-profile and heavyweight battles. These include, as junior counsel, *ICS v. West Bromwich* (Chancery Division, 1998; equity release mortgages / lender's duty of care), *Society of Lloyd's v. Jaffray* (Commercial Court, 2000; asbestos-related liabilities / fraud claim), *Digicel v. Cable & Wireless* (Chancery Division, 2009) (interconnection of telecoms networks / conspiracy claim); and then, as junior silk together with David Foxton KC (now Mr Justice Foxton) in *BVG v. JP Morgan* (Commercial Court, 13 weeks during 2013; alleged mis-selling of credit default swaps) and *Dar Al Arkan* (Commercial Court, 10 weeks during 2015; conspiracy / misuse of confidential information in Islamic financing context). Stephen acted as lead counsel, instructed by Clifford Chance and leading Sebastian Isaac (appointed silk in 2022) on behalf of a principal defendant, in a seven-week fraud trial in the Commercial Court during 2019 in *Yukos Finance BV v. Lynch & others* (judgment of Sir Michael Burton GBE [2019] EWHC 2621 (Comm), one of The Lawyer's Top 20 Trials of the Year, rejecting all claims against the defendants relating to participation in an allegedly rigged auction of Yukos assets by the Russian State during 2007). He leads a multi-set team of silk and junior counsel acting for the claimant in *ENRC v SFO & others (No.2)* which is set down for a seven-week trial in the Commercial Court in 2024.

Stephen has been involved in a wide range of banking, finance and investment-related disputes with particular experience in bondholder/noteholder and trustee disputes: e.g. *Concord Trust v. Law Debenture Trust Corporation* [2005] 1 WLR 1591 (House of Lords); recent arbitral proceedings on behalf of note trustee (MadPac) in *Madison Pacific Trust Ltd. v. JSC Commercial Bank Privatbank* [2020] EWHC 610 (Ch); rectification claim concerning security instrumentation acting on behalf of defendant security agent in *FSHC Group Holdings Ltd. v. Barclays Bank plc* [2018] EWHC 1558 (Ch).

A noted trend within Stephen's silk practice has been increasing demand for his involvement in shareholder disputes, both onshore and offshore, court or arbitration, as well as what may be called 'corporate misappropriation' disputes following the breakdown of a contractual arrangement (e.g. joint venture / quasi-partnership) or failed merger or acquisition or consolidation. These cases often involve allegations of misuse of confidential information or intellectual property infringement as well as economic torts such as conspiracy and/or unfair prejudice to shareholders. A separate summary of this type of work can be provided upon request. Current or recent examples include: *Trappit SA v. American Express Europe LLC* [2021] EWHC 1344 (Ch) (airfare re-booking system); *Crypton Digital Assets v. Blockchain Luxembourg SA & others* [2021] EWHC 3194 (Ch) (cryptocurrency exchange/platform); *MedImpact v. Dimensions Healthcare* (pharmaceutical dispensary software: DIFC-LCIA arbitration and now winding up proceedings in the Cayman Islands); and a high-value shareholder dispute relating to the market-leading food delivery service in the Kingdom of Saudi Arabia (DIFC-LCIA arbitration).

In both his silk practice and sitting as a Deputy Judge of the High Court, Stephen increasingly handles disputes involving cryptocurrency and other digital property – for example, giving judgment in *Wang v. Darby* [2021] EWHC 3054 (Comm); [2022] Bus LR 121 which was the first contested hearing in this jurisdiction concerning trusts over cryptocurrency.

---

## CAREER

**2023** Admission to the High Court of the Isle of Man

**2021** Admission to the Bar of the British Virgin Islands

**2021** Full registration as a foreign lawyer in the Singapore International Commercial Court (SICC)

**2020** Admission to Grand Court of the Cayman Islands

**2019** Registration as a foreign lawyer in the Dubai International Financial Centre (DIFC)

**2018** Admission to the Eastern Caribbean Supreme Court (Antigua & Barbuda; St .Lucia)

**2013** Appointed Queen's Counsel

**2006** Appointed Junior Counsel to the Crown ('B' Panel)

**1998** Attorney at Walkers, Cayman Islands (2 months)

**1997** Joined Essex Court Chambers

**1995** Lecturer in Public & Administrative Law, Hertford College, Oxford University (until 2000)

**1995** Called to the Bar (Inner Temple)

---

## EDUCATION

1995 Inns of Court School of Law

1994 Bachelor of Civil Law (First Class), Oxford University

1992 BA Jurisprudence (First Class), Oxford University

---

## AWARDS

1994 Major Scholarship, Inner Temple

1992 Martin Wronker Prize (joint), Oxford University

1990 College Scholarship, Hertford College

# Exhibit B

**IN THE EASTERN CARIBBEAN SUPREME COURT**
**ANTIGUA AND BARBUDA**

**IN THE HIGH COURT OF JUSTICE**

ANUHCV 2018/0120

BETWEEN:

### 1 GLOBE CAPITAL, LLC.

Claimant

**and**

### SINOVAC BIOTECH LTD.

Defendant

**Interested Parties:**
Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li

**APPEARANCES:**
Mr. Stephen Houseman QC, Mr. Lenworth Johnson and Ms. Andreen Vanriel for the Claimant
Mr. Stewart Alford QC, Mr. Rushaine Cunningham and Ms. Yoshi Rampersad for the Defendant
Mr. Craig Jacas holding watching brief for the Interested Parties

---

2018:    December 3rd, 4th 5th
December 19th

---

### JUDGMENT

[1]    **SMITH J:**  This case is about a fight to control the board of directors of the defendant, Sinovac Biotech Ltd, a China-based, biopharmaceutical company, with about 3,300 shareholders and a market capitalization of US$447.3 million, listed on the Nasdaq stock exchange (the "Company"). The Company is registered under the **International Business Companies Act[1]** ("IBCA") of Antigua and Barbuda.

[2]    The claimant, 1 Globe Capital LLC, a Delaware limited liability company and shareholder in the Company, has applied pursuant to section 122 of the IBCA, for

---

[1] Chapter 222, Laws of Antigua and Barbuda.

1

the Court to determine a controversy with respect to an election of directors at an annual general meeting ("AGM") of the Company. The claimant seeks certain declarations and orders.

[3]     The controversy may be stated shortly.  On 6th February 2018, the Company held an AGM in Beijing, China.  The claimant contends that, at that AGM, Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li were duly elected as directors of the Company ("the New Directors").  The Company disputes this and says that Weidong Yin, Simon Anderson, Kenneth Lee, Yuk Lam Lo and Meng Mei ("the Incumbent Directors") are the valid directors of the Company. The Incumbent Directors remained in control of the Company following the disputed election.

### The section 122 Claim

[4]     Section 122 provides as follows:

"(1) A corporation or a shareholder or director thereof may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.

(2) Upon an application made under this section, the court may make any order it thinks fit including, without limiting the generality of the foregoing -

(a) an order restraining a director or auditor whose election or appointment is challenged from acting pending determination of the dispute;

(b) an order declaring the result of the disputed election or appointment;

(c) an order requiring a new election or appointment and including in the order directions for the management of the business and affairs of the corporation until a new election is held or appointment made; and

(d) an order determining the voting rights of shareholders and of persons claiming to own shares." (Underlining supplied)

[5]     The claimant sought the following declarations and orders under section 122:

"1. A declaration that the following persons were duly elected at the AGM: Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li

2. An order that Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pingfei Li be installed as the Company's Board of Directors.
3. A declaration that Weidong Yin, Simon Anderson, Kenneth Lee, and Meng Mei are no longer the Company's directors, and an order that any actions taken on behalf of the Company at their direction after the AGM are null and void."

[6]     The Company resists the claim and contends that the votes cast by those shareholders ("the Dissenting Shareholders") in favor of the New Directors were not valid because:

1. Their method of nominating individuals to the Company's board of directors, the proxy forms they used and the ballots they voted on did not conform to Antiguan law;
2. There was no full, fair and plain disclosure to shareholders, in breach of section 71(2) of the IBCA, to enable them to make a fully informed decision regarding the election of the Company's board of directors;
3. A Rights Agreement, governed by Delaware Law, was triggered by the conduct of the Dissenting Shareholders prior to, during and after the AGM, which affected the vote at the AGM by dilution of the shareholding of a significant proportion, if not all, of the Dissenting Shareholders who voted to elect the New Directors;
4. The claimant, and other shareholders, breached United States securities laws by failing to make appropriate filings and, as a result, the business purportedly conducted at the AGM and/or the votes cast by those shareholders have been invalidated.

Issues

[7]     The parties agreed, in a pre-trial memorandum, that the following issues arise for determination:

1. Was section 71(2) of the IBCA complied with in relation to notices of the AGM? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace the Incumbent Directors?

2. Was the vote to remove and replace the Incumbent Directors in conformity with Antigua and Barbuda law? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace them?

3. Is the Rights Agreement valid and effective as a matter of Antigua and Barbuda law? If so, could the Rights Agreement, if triggered, affect the vote at the AGM?

4. Was there a breach of the US Securities laws, namely, section 13 of the United States **Securities Exchange Act 1934**, by the claimant? If so, what is the relevance, if any, to the outcome of the vote at the AGM?

[8]     At the commencement of the trial, the claimant applied to adduce two fresh affidavits and to be relieved from sanctions. The Court refused the application and promised to provide the reasons for so doing in this judgment. Firstly, the claimant had failed to file its affidavits in accordance with the deadlines set in the Court's case management directions. On 23rd November 2018, at the pre-trial review of this matter, the claimant applied for permission to file those affidavits on 20th November 2018. The Court therefore ordered those affidavits to be deemed properly filed and served on 20th November 2018. At that pre-trial review, the claimant gave no indication that it wished to file further evidence. Secondly, the Court is satisfied that the fresh evidence in one of the affidavits sought to be adduced has been available to the claimant for some time and, in fact, is already before the Court in another document. Thirdly, I am satisfied that the application is not being made promptly and that no prejudice whatsoever will befall the claimant if it is not permitted to rely on this fresh evidence.

**Proceedings of the AGM**

[9]     The Company issued formal notice of the AGM on 28th December 2017. That notice identified three items of business, namely: (1) the re-election of the existing board of directors; (2) approval of the audited, consolidated financial statements of the Company for 2017; and (3) the appointment of Ernst & Young Hua Ming LLP as independent auditor for 2017. The AGM took place in Beijing at 9 am (local time) on 6th February 2018. A transcript of those proceedings, translated from Mandarin

to English, was produced to the Court based on an audio recording of the AGM. At the trial, both parties accepted and relied on that transcript which I shall therefore treat as part of the *res gestae*.

[10]    Given that much turns on what transpired at the AGM, I cannot avoid burdening the judgment with a lengthy extract from those proceedings:

"119.    James Chang: Everyone of us needs to sign in.

120.    James Chang: We need two, because he is together with me.

121.    Yang Guang: But, you have one legal proxy. One proxy, one ballot.

122.    Yang Guang: Yes, I will collect all the ballots and legal proxies I have given you, and then they will be placed on file.

123.    James Chang: But I have a question. If you collect all the present shareholders' legal proxies, you should have known the corresponding number of ballots who attend the meeting in person, right? And you also know the share numbers for online [vote]. Could you please tell us the quorum?

124.    Yang Guang: Certainly. Now let's go to the result. As of December 26th, 2017, by far the aggregate shares held by all registered shareholders are 57,269,861. Let me project this data on the computer.

125.    Yang Guang: Well this is the date for our meeting and this represents the number of total share outstanding. Our record date is December 26th, 2017.

126.    James Chang: They are all outstanding shares, right?

127.    Yang Guang: Yes, all issued and outstanding shares as of the date of the record day of December 26, 2017. We have 21,000,000 shares who voted online. The number on site has 28,900,000 shares.

128.    James Chang: You mean the ones [who attend AGM] in person, right?

129.    Yang Guang: Yes, at presence. So here we have over 50-million in total, [i.e.] more than 50,000,000 shares participated in the vote. <u>And that represents 87% of the total shares, exceeding the quorum of 50% as required in the company's rules of procedures. Therefore, the legitimacy of this meeting is justified and we are allowed to proceed on the next step.</u> Now here is what we are going to do. Please fill out your ballots and then I will count the papers and declare the result.

130.    James Chang: Okay, thank you very much. On behalf of shareholders, I'd like to ask for your permission to say something. Please allow me, Mr. Chairman.

131.    James Chang: Thank you very much. Let me introduce myself first. I am James Chang, the proxy of JPMorgan, and I hold voting rights representing 118,000 shares of common stocks of the company.

First of all, I would like to point out to all of you that we are offered three options in the ballots provided by the company: For All, Withhold all and For All Except. According to what our lawyers in Antigua suggested, the "Withhold All" means abstaining from voting, so it is not quite the equivalent of a "vote against". Given this, our first request is to change the current voting model and add an option named "Against All" next to the existing "For All" option. Second, on behalf of JP Morgan, I propose that, all of you, as shareholders, consider removing the incumbent board members, and I mean all of them except Lo Yuk Lam. Last but not least, I would like to nominate the following four candidates to board member positions and they are Wang Guowei, Qiu Haifeng, Cao Jianzeng and Li Pengfei. And that is the request from me as the proxy of JP Morgan. In short, that is all I want to say as a speaking shareholder. What I have proposed is just for your reference. So here is my question, is there anyone present who seconds me? Anyone?

132. Zhang Yue: Yes, I second. Dear Mr. Chairman, my name is Zhang Yue and I am the proxy of Citibank, holding 856,000 shares of common stocks. As far as I am concerned, most of the incumbent board members are no longer qualified for their positions. Therefore, here I second the nominations proposed by that shareholder and agree to the new candidates proposed by him. Thank you.

133. James Chang: Mr. Chairman, Mme. Secretary, actually, we have prepared our own ballots. And we will distribute them to the shareholders if you have no objection. We also ask for a voting by ballot instead of by hand this time.

134. Yang Guang: Well, this meeting is held in accordance with the law in Antigua and our company's procedure rules. Your suggestion will be taken down and sent to our lawyers later. But right now, I'm afraid I cannot give you any answer for sure. Since the directors' election is one of the three subject matters of this meeting, you are free to express your opinions on that and fill out your ballot or just abstain. We will take down your suggestions and responses will be made after our discussion with lawyers in Antigua.

135. James Chang: According to Articles 114 and 109 of Antigua law, shareholders have a constitutional right to replace board members and can propose the matter on any annual general meeting. This does not need the confirmation by the company's counsel. This is our inalienable right.

136. Yang Guang: That is true. But as our procedure, we should comply with the laws in this meeting. Since you mentioned that in accordance with the Antigua law, we also need to check that before we can finish this process. And that is why we will write down your words in details.

137.    James Chang: As required by Antigua law, we will hand in our legal proxies and ballots to the company's scrutineer, that is you. If you are not willing to accept, actually we also bring our own scrutineer to accept these documents. In which case, I assure you, it is in complete compliance with the legal process. If you refer to your company's articles and Antigua's International Business Corporation Act, it is clear that a shareholder has the right to raise a proposal, after the proposal, if someone else seconds it, the proposal must be decided by vote. Must be decided by vote.

138:    Yang Guang: It is a regret that we did not bring a lawyer here to attend this meeting. Since I do not have Antigua's law [background] myself, nor do you, I suppose. We will take down your request. According to Antigua law, we invite you here to vote and then collect the ballots. If the number of attendees reaches quorum, which means we can proceed with the procedure, we will count the result to see whether the matter is approved by vote and announce the result. According to the company's procedure rules, if a matter is not approved, there will be some follow-up procedures. For example, if we all choose the "withhold" option instead of voting for incumbent directors or others, we will record that. And if the quorum and the vote approval rate are met, we will proceed and give announcements in an open manner as required by law of the country, that is, the home country, and procedure rules of our company.

139.    Wang Nan: I agree. Like we said before, we will send it to our company's lawyers in Antigua and we will request their instructions as to what to do next.

140.    James Chang: No problem. If it helps, my colleague the lawyer Li will send a ballot to each shareholder. The filled ballots will be given to you for your lawyers' reference. Lawyer Li, please.

141.    James Chang: Did management personnel vote online or do you have a legal proxy to vote at this meeting?

142.    Wang Nan: We all voted online.

143.    James Chang: Everyone finished, I see. Thank you. Actually, our ballot has two copies. We hope that you can cast your vote with your genuine information and opinions.

144.    Yang Guang: Then, I would like to make clear with you that please give me your legal proxies and the ballots provided by our company after you have filled out. According to the current legal process of the company, if you abstain, we may need to confirm each final ballot of the vote.

145.    James Chang: We suggest, of course, it is only a suggestion of our own, that you change the "Withhold" option provided to you by the company into "Against" option. Then you can fill it out one. Lawyer Li will assist in this regard.

146.  Yang Guang: <u>As to any modification to the ballots, we are no experts, and I remind you, that we need to confirm its validity if the current ballot is modified</u>.

147.  James Chang: <u>Let me be noted on the record that we provided our own ballot</u>. So in case of any disagreement, please refer to our ballots which shall control.

148.  Yang Guang: <u>We might need our lawyer to eventually confirm this. I think you are free to make your own statements. But I would like to confirm to everyone that he is not our lawyer, after all. If he has any law enforcement qualification of Antigua, I suggest he present it to us so that we can follow your suggestion. If not, then please do not forget to consider the validity of the ballot.</u>

149.  James Chang: Or if there is any concern, please feel free to leave a blank ballot provided by the company. But if you ask us, <u>we suggest to the company filling out the ballot provided by us and filling out two copies</u>.

150.  Yang Guang: <u>I'm sorry, I'm afraid it's unacceptable to the company. We have distributed ballots to some shareholders before and those ballots have the same effect with these we distribute today. All the ballots we have distributed before are valid</u>.

151.  James Chang: <u>I only ask you one question today. Do you accept my ballot or not?</u>

152.  Yang Guang: <u>If you fill in the ballot we provide, I will accept it. Then, I would like to confirm with you that.</u>

153.  James Chang: <u>Not the company's ballots, but our own ballots. Do you accept or not?</u>

154.  Yang Guang: You listen to my question, you listen to my question is that as for the ballots you provide, you want to know how to submit and confirm them and you want to give them to me, right?

155.  James Chang: <u>We will give them to you after all stockholders have filled in the ballots because you are the scrutineer today. Meanwhile, we will give another copy to our own scrutineer.</u>

156.  Wang Nan: <u>If you are willing to formally submit the ballots to the company, no matter the ballots are provided by us or by you, we will accept and record them. We can also submit them to the lawyer. However, we cannot use the ballots you provide as [the basis] in counting valid ballots under the guidance of our lawyer.</u>

157.  James Chang: The law has its own judgment.

158.  Yang Guang: OK, I will collect the ballots provided by the company. Will you give me back a filled ballot or unfilled one?

159.  James Chang: Every participant has the right to decide whether to fill in or not. If you will fill in, I suggest that you change the "Withhold" option to "Against". [The spelling is] against.

160.  Yang Guang: The meeting will end at ten o'clock shortly, because we have other arrangement after the meeting.

161.  Unidentified male speaker]: it will be definitely before 10:00.

162.  Yang Guang: You must have made your decision. So I can take it back.

163.  James Chang: If you want to fill in the company's ballots, we still suggest changing "Withhold" to "Against", and then choose "Against All" or "Against All Except". We think Lu Yulin can remain, but if you feel troublesome, you can consider [not filling in], this is our personal suggestion.

164.  James Chang: <u>Mme Secretary, as far as we know, this meeting should be held in Beijing and Antigua at the same time in theory. The meeting in Antigua is held at the address of your company's law firm, so if you arrange the meeting according to the proxy statement you have provided, the door of Antigua's law firm should be open now and there should be an Antiguan lawyer on the spot. So, I require to record these matters and I ask you to communicate with the Antiguan lawyer now. This is the first point.</u>

165.  Yang Guang: <u>I will try.</u>

166.  James Chang: Secondly, I request that you accept the ballots we provide and record the percentage of our ballots in the present voting on the record.

167.  Yang Guang: <u>Then, that is to say, I personally have no way to confirm whether I can accept the ballots provided by you, but I can collect the ballots and then count them with the lawyer.</u>

168.  James Chang: But I request you to tell us the percentage of our ballots in the total number of present voting.

169.  Yang Guang: You mean the total ballots?

170.  James Chang: Yes, exactly. Thank you.

171.  Yang Guang: That's OK.

172.  James Chang: Great. Thank you.

173.  [Unidentified Female Speaker]: do you give all of your ballots back?

174.  James Chang: We will give on copy to the scrutineer.

175.  Yang Guang: <u>The filled ballots provided by JP Morgan that I have collected have 26,103,784 shares, representing 45.58% of the total share outstanding.</u>

176.  James Chang: How about the present and voting, please?

177.  Yang Guang: Are you talking about the results of the election of directors?

178.  James Chang: Present and voting is a fraction whose denominator is the number of persons present in the meeting and whose numerator is us, what is it?

179.  Yang Guang: Those who attend the meeting in person today?

180.  James Chang: not in person today, I mean the numbers both from online and in person.

181.  Yang Guang: Including the numbers online?

182.  James Chang: Yes. present and voting.

183.  Yang Guang: <u>55.19%.</u>

184.  James Chang: Thank you.

185.  Yang Guang: <u>Then I can only record the ballots you provided. I really have no qualification to judge whether they are valid or not. We will raise this issue and confirm it again.</u>

186.  James Chang: The law will judge whether they are valid or not. Thank you.

187.  Yang Guang: <u>And today, for the emergence of the new ballots, we can't declare the outcome of the meeting now. Please give us some time to consult the lawyer to determine the outcome. We will publish the outcome of the meeting through information announcements.</u> What does everyone think about it. The main subject matter on our side should be.

188.  James Chang: Can you find an Antigua lawyer? Theoretically, there should be at least a lawyer at the meeting in Antigua, I think.

189.  Yang Guang: We used to communicate with the lawyer to transfer the meeting. This was what we used to do in earlier years. However, he said, in recent years, we do not need this practice anymore, so we held the meeting in Beijing.

190.  Yin Weidong: We used to have teleconferences.

191.  Yang Guang: They used to make a call and he gave us the seat of the chairman. If you have any requirement, we will consult with the Antigua lawyer. We can fix a time to discuss it if necessary.

192.  James Chang: I think we should respect the opinions of the shareholders on the spot.

193.  Yang Guang: Or I have a suggestion. Now that I have given my business card, you are welcome to contact me anytime on any questions in this regard. We will respond positively, no matter you want to communicate with the lawyer or with the company, including any person at any level from our company. Ok?

194.  James Chang: Ok.

195.  Yang Guang: That's all for the meeting agenda today. Thank you.

196.  Yin Weidong: The meeting is over. (Underlining supplied)

[11]  From the above transcript, the Court makes the following factual findings:

(1)  No one at the AGM disputed the validity of the notice issued for the convening of the AGM;

(2)  A quorum was declared by, Guang Yang (Helen Yang), the scrutineer/inspector of the election at the AGM;

(3)  A motion to (a) amend the ballot to include the option of voting against the Incumbent Directors and (b) to nominate four directors to the board, was moved and seconded;

(4)  The Dissenting Shareholders cast their vote on an amended version of the ballots provided by the Company;

(5) Guang Yang collected the Dissenting Shareholders' ballots but repeatedly stated that she had to confirm the validity of those ballots with the Company's Antigua attorneys;

(6) There was a tabulation of the votes cast which showed that the New Directors had obtained the majority of votes, but there was no declaration of the results of the election. Guang Yang repeatedly stated that she needed to confirm the validity of the votes cast with Antigua counsel.

### The Notice Point

[12]     Mr. Houseman's argument can be stated succinctly.   It is that, on a proper construction of the language of section 71 of the IBCA, the only notice required is the notice of the AGM to be given to directors which, in the instant case, had been provided.  Mr. Alford, on the other hand, pitched his argument more broadly.  He contends that section 71 must be construed against the contextual framework that shareholders should receive full, fair and plain disclosure to have a reasonable opportunity to express their will on company matters.   The shareholders were deprived of this opportunity because the Dissenting Shareholders, acting in secret and colluding in breach of a Rights Agreement entered into by the Company and in breach of United States Securities law, hijacked the AGM and nominated an alternative board of directors without any notice whatsoever.  This, he says, is conduct for which the Court, in the exercise of its broad powers under section 122, should refuse their claim.

[13]     Section 71 provides:

> "(1) A director of a corporation is entitled to receive notice of, and to attend and be heard at, every meeting of shareholders.
> (2) A director
>    (a) who resigns,
>    (b) who receives a notice or otherwise learns of a meeting of shareholders called for the purpose of removing him from office, or
>    (c) who receives a notice or otherwise learns of a meeting of directors or shareholders at which another person is to be

appointed or elected to fill the office of director, whether because of his resignation or removal or because his term of office has expired or is about to expire, may submit to the corporation a written statement giving the reasons for his resignation or the reasons why he opposes any proposed action or resolution.

(3) The corporation shall forthwith send a copy of the statement referred to in subsection (2) to the Director and to every shareholder entitled to receive notice of any meeting referred to in subsection (1).

(4) No corporation or person acting on its behalf incurs any liability by reason only of circulating a director's statement in compliance with subsection (3)."

[14]    Mr. Houseman submitted that: (1) the Company complied with section 71 (1) as each of the Incumbent Directors was given notice of and permitted to attend the AGM; (2) section 71 (1) contains the <u>only</u> notification obligation in the whole of section 71; (3) section 71 (2) contains no additional or specific obligation to provide notice to any director; rather, it assumes that no such notification may have been given because sub-sections (b) and (c) both say "or otherwise learns of"; (4) section 71 (2) confers upon a director <u>an opportunity</u> to submit a written statement giving reasons as to why he opposes the proposed resolution; (5) sub-section (3) imposes an ancillary or contingent obligation on the Company to provide copies of any such written statement to shareholders; and (6), in any event, section 71 is silent as to the consequences, if any, of non-compliance with its obligations and therefore it cannot be said that non-compliance would somehow vitiate the conduct or outcome of a shareholders' meeting. Clear statutory language would be needed to create such legal effect. In these circumstances, it is difficult to see how the Incumbent Directors were entitled to any additional or specific notification of their proposed removal at the AGM, other than notice under section 71 (1).

[15]    Mr. Alford submitted that, at the AGM, the claimant and the Dissenting Shareholders, without prior warning, proposed a motion to amend the ballot paper; impose a cap on the number of director candidates that members could vote in favour of; and to add four new candidates. Shareholders who did not attend the AGM had no advance notice of any of these proposals and so were unable to

consider, let alone vote on, them.   At previous AGMs, very few shareholders attended in person and the routine business was dealt with largely through proxy voting online in advance of the meeting and that, knowing this, the claimant and the Dissenting Shareholders ambushed the meeting with the result that the shareholders:

(a) Had no advance warning that the AGM was going to consider anything other than the routine re-appointment of the Incumbent Directors;

(b) Had no advance warning that a group of shareholders were planning to take control of the board;

(c) Had no advance warning that alternative director candidates were to be proposed for election on the day of the AGM;

(d) Had no advance warning as to identity, abilities or qualifications of any of the alternative slate;

(e) Had no opportunity to decide, with the benefit of knowing the full facts, whether to participate in the meeting, either in person or online; and

(f) Had no ability to exercise proxy votes against any of the alternative slate.

[16]    It does not appear that the Eastern Caribbean Supreme Court has previously considered the interpretation of sections 71 or 122 of the IBCA. Mr. Alford assisted the Court with extracts from the **Canada Business Corporations Act**, the **Canada Non-Profit Corporations Act** and the **Ontario Business Corporations Ac**t. From an examination of these various pieces of legislation, it appears that the IBCA is indeed based on what might be termed as the Canadian model. Section 122 of the IBCA, for example, mirrors section 145 of the **Canada Business Corporations Act**, while section 71 (2) of the IBCA mirrors section 123 of the **Business Corporations Act**. In this regard, I consider Canadian authorities dealing with similar sections to be helpful.

[17]    Mr. Alford relied on **Kluwak v Pasternak**,[2] a decision of the Ontario Superior Court, as authority for the proposition that shareholders are entitled to full, fair and plain

---

[2] [2006] CanLII 41292.

disclosure to make an informed decision on affairs of the company which call for a vote. In **Kluwak**, the applicant spearheaded the dissident shareholders in a proxy fight for control of the board of directors of the respondent corporation. The respondent, Pasternak, chaired the annual general meeting at which he disallowed the dissident proxies on the basis of what he viewed as material misrepresentations in the dissident proxy circular. As a result, he declared the management's slate of directors elected. In that judgment, Mesbur J stated:

> "[14]    The author of *Shareholder Remedies in Canada* makes the comment that 'case law requires that <u>all information be disclosed that a reasonable investor would consider important in deciding whether to vote.</u>' He refers to the philosophy and standard of disclosure discussed as long ago as 1934 in *In re Dorman, Long and Co.* where Maugham J noted: 'It is perhaps not unfair to say that in nearly every big case not more than five percent of the interest involved are present in person at the meeting. It is for this reason that the Court takes the view that it is essential to see explanatory circulars sent out by the board of the company are perfectly fair and, <u>as far as possible, give all information reasonably necessary to enable the recipients to determine how to vote.</u>' What is true for a board circular is equally applicable to a dissident information circular. Shareholders must have all the information they need in order to make an informed decision about voting.
> ...
> [16]    In essence, then, an information circular must contain <u>full, fair and plain disclosure, that has sufficient information concerning the pertinent matters set out 'in sufficient detail to permit shareholders to form a reasoned judgment concerning the matter.'</u>" (Underlining supplied)"

[18]    I consider the reasoning of Mesbur J in **Kluwac** to be sound, logical and persuasive. It stands for the unobjectionable principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. In the instant case, it is not in dispute that: (1) the company has about 3,300 shareholders located in various parts of the world; (2) the board of directors had been re-elected, unopposed, at every AGM for many years and there had never been alternative candidates proposed; (3) shareholders typically voted online and by proxy in advance of the AGM; those who

voted online or by proxy card in advance of the AGM would only have known of the Incumbent Directors, there being no indication of alternate candidates; and (5) a number of shareholders did not vote at all.  Based on those facts, it is a reasonable inference that shareholders who voted in advance of the AGM, or those who chose not to vote, had no reason to think that anything would be different at the 2017 AGM. If they knew that an alternate slate was to be proposed, that might have determined whether and how some shareholders voted at the AGM.  In these circumstances, can it be said that the shareholders had full, fair and plain disclosure on the important matter of the election of the board of directors of a valuable international company to permit them to make an informed decision?

[19]    Mr. Houseman relied on **Betts & Co Limited v Macnaughten**.[3]  In that case, the notice of the annual general meeting of a company stated that its purpose was the passing of certain resolutions, one of which was the appointment of three named individuals as directors. At the meeting, an amendment was carried that, in addition to those three, two additional named directors should be appointed.  The company's articles of association provided that the notice of an ordinary general meeting, at which special business was to be transacted, should specify the general nature of such special business.  It also provided that the number of directors should be no more than seven or less than three.

[20]    Eve J, in concluding that the business transacted at the meeting was within the scope of the special business indicated in the notice, stated:

> "Ought I to hold that the amendment which purported to reappoint the three gentlemen named in the notice as directors for the ensuing twelve months and to add two other gentlemen as additional directors was an amendment so inconsistent with the object of the meeting as stated in the notice and so irregular as to be beyond the power of the meeting? Was it, in short, such an amendment as no reasonable man would have regarded as competent to be put forward at a meeting so convened? … I think I must assume that the shareholders who received this notice were alive to this possible contingency, and, further, were aware that in the matter of electing directors the only restriction on the power of the company is to be found in the article

---

[3] [1910] 1 Ch. 430.

which limits the maximum number to seven. With these facts present in his mind I think a reasonable man reading this notice must have appreciated that those present at the meeting would regard themselves as empowered to make such appointments to the board for the ensuing year as they thought fit so long as they did not do anything contrary to the company's regulations. No one could have thought that the meeting was convened to appoint the three named individuals without the power to substitute other qualified persons for all or any of such individuals, and there is nothing in the notice to indicate that the company will not, if they fit so to do, exercise their power of increasing the number of directors under ...The special business indicated in the notice being the election of directors for the ensuing year, I think a recipient of the notice must be taken to have known that the company in general meeting might make any appointments within the limit imposed by their regulations..." (Underlining supplied)

[21]    Extrapolating the **Betts** principle to the instant case, Mr. Houseman argues that the shareholders, reading the notice of the AGM that there would be an election, were alive to the possibility that an amendment could be proposed resulting in the election of a different board of directors than the one proposed. Indeed, there appears to be nothing in the IBCA, the IBCA Regulations, the bye-laws of the Company or its articles of association that prohibit or restrict the proposing of amendments to resolutions or motions at an AGM. I think, however, that the instant case is materially distinguishable from **Betts** for the following reasons:

(1) In **Betts**, two additional directors were nominated in addition to the three proposed for nomination while, in the instant case, the proposed amendment was for the replacement of the proposed nominees, except for one;

(2) In **Betts**, the proposed amendment for two additional nominees to the board was within the articles of association which limited the board to a maximum of seven. In the instant case, the Dissenting Shareholders proposed a cap on the number of elected directors that was below the fifteen member limit prescribed in the articles of association.

(3) **Betts**, a 1910 case, was in a different era. The internet had not yet been invented and so the concept and possibility of voting online, in advance of the AGM, did not exist. The instant case involves a company (with multi-national investors, incorporated in Antigua, doing business in China, listed on Nasdaq and regulated by US securities law) whose shareholders routinely voted online

in advance of an AGM and therefore had no notion that an entirely different slate from that on which they voted would have materialized at the AGM.

[22]     I accept, in principle, that shareholders who receive notice of an AGM for the election of directors must be alive to the possibility that an amendment to the motion can be proposed, resulting in a different board of directors.   But the globally accepted, modern practice of voting online in advance of an election introduces a new dimension to the hitherto conventional practice of proposing amendments to motions on the floor of the AGM.   That practice might be unobjectionable where the shareholders of a company are all situated in the same jurisdiction and attend AGMs in person.   In today's world, however, where technology allows for internet voting and thousands of shareholders of a company are spread across the globe, physical attendance at meetings is an effete convention.   This Court therefore finds itself at the intersection of two corporate cultures.   One the one hand, there is the practice of moving amendments to motions on the floor of the AGM. On the other hand, there is the modern practice of shareholders voting online in advance of an AGM and not physically attending, which closes them off from what transpires at the AGM.

[23]     Where the company's articles of association and the governing law are silent as to how one might reconcile online voting in advance of an AGM with the right to move an amendment to a motion at an AGM, the best that the Court can do is to insist on a minimum standard of basic fairness.   Those shareholders who voted online in advance of the AGM were following a routine practice, voting for one slate that had been re-elected for many years, had no reason or warning to expect anything different and certainly had no idea that a different slate of candidates would have been proposed at the convention.   They, as well as those who chose not to vote, did not have an opportunity to make an informed decision.   The Dissenting Shareholders, as will be seen later in this judgment, had been planning in secret to propose an alternate slate and therefore had no good reason for not giving advance notice of their intended amendment.   This undermines basic fairness to which the shareholders, as a whole, were entitled.

[24]    Returning to the language of section 71, I accept that it does not state that notice must be given to directors (or shareholders) where it is proposed to elect another person to the office of director.  However, in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is to be contested ought to be given some kind of notice.  If a director receives no notice, he cannot submit the written statement referred to in section 71(2), in which case the Company cannot send a copy of such statement to the shareholders as required by section 71(3).  The shareholders would therefore not have received full and fair disclosure to make an informed decision on an important company matter.  Shareholders in a valuable, publicly traded company surely would be interested in reading what an incumbent director, whose position is challenged, might have to say about the qualifications and experience of a proposed nominee for his seat on the board of directors.  As stated above, there was no good reason for failing to give effect to the spirit and intent of section 71 (2) and (3).

[25]    In my view, the spirit and intent of section 71 was breached and while the section is silent as to the effect, if any, of non-compliance on the election or the AGM, it is certainly a factor for this Court to weigh in deciding whether or not to grant relief.

### Validity of Amended Motion, Ballots & Proxy Forms

[26]    As the transcript of the proceedings of the AGM shows, the Dissenting Shareholders voted to amend the Company ballot paper to include the option of voting against the Incumbent Directors.  Their votes were therefore cast on an amended version of the Company's ballot paper.  The Company submits that their ballot was not validly amended because, firstly, the Dissenting Shareholders did not allow any review or consideration of the written terms of the proposed ballot by Weidong Yin, the Chairman of the AGM, or Guang Yang as inspector of the AGM.  Secondly, the Company ballot (setting out the motions in the AGM notice) had already been distributed, therefore the shareholders present at the AGM had two contradictory ballots with no clarity as to how many should be completed and in which order,

18

resulting in procedural confusion.  Those shareholders who voted by proxy never got to see the alternative ballot at all.  Thirdly, the Dissenting Shareholders did not allow any opportunity for debate on why the number of directors that could be voted for was limited to five when the articles of association allowed for fifteen, or on the identity and qualifications of the proposed new slate.  Fourthly, the first two matters proposed at the AGM by the Dissenting Shareholders (to amend the Company ballot and to propose a vote for not more than five of nine nominees including the alternative) were not validly proposed or voted on.  Fifthly, the proxy form used by the Dissenting Shareholders at the AGM did not comply with the requirements of section 15 of the IBCA Regulations, rendering those votes invalid.   In these circumstances, the Company submits, the claimant is not entitled to the declaratory relief sought.

[27]     There is nothing in either the IBCA or the IBCA Regulations that prohibits an amendment to an ordinary resolution being proposed by shareholders attending an AGM.  Section 109 of the IBCA, read together with section 370, suggests that the business of election of directors is an ordinary motion or resolution carried by a simple majority of the votes cast by shareholders voting on that resolution:

> "108 (1) Notice of the time and place of a meeting of shareholders must be sent not less than twenty-one days nor more that fifty days before the meeting…
> …
> 109 (1) All business transacted at a special meeting of shareholders and all business transacted at an annual meeting of shareholders is special business, except
>     (a)  the consideration of the financial statements,
>     (b)  the auditor's report,
>     (c)  the election of directors, and
>     (d)  the re-appointment of the incumbent auditor
> ….
> 370(l)   "ordinary resolution" means a resolution passed by a majority of the votes cast by the shareholders who voted in respect of that resolution."

[28]     Section 7.4 of the Company's bye-laws is to the same effect as section 109 (1) of the IBCA.  It is therefore clear that the election of directors at the AGM was not special business; it was an ordinary resolution that could have been passed by a

majority of the votes cast by the shareholders who voted in respect of that resolution. It does not appear that there were any technical breaches, if I might put it like that, of Antiguan law in proposing the amendments to the motion at the AGM.   The matter cannot, however, be analyzed in isolation from the Court's earlier finding that the shareholders as a whole were entitled to full and fair disclosure.   Amending the company's motion to include an alternate slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the Court to consider in deciding whether or not to grant relief under section 122.

[29]    I now turn to the question of the validity of the proxy form used by the Dissenting Shareholders. The claimant complains that it would be procedurally unfair to permit the defendant to rely on this point because the defendant only gave notice, on Friday, 30th November 2018, that it intended to take this point at the trial on Monday, 1st December 2018. I do not think the claimant is prejudiced for two reasons. Firstly, as pointed out by the defendant, it was the claimant which first referred to sections 13-15 of the IBCA Regulations in its written submissions. Having done so, it could not now complain if the defendant introduced an argument based on section 15. Secondly, at the claimant's request, the Court consented to the filing of post-hearing submissions on this point to allow the claimant time to research and submit a full response on this issue. The claimant filed eight pages of written submissions on this issue. There can therefore be no serious allegation of procedural unfairness.

[30]    On the matter of proxies, the IBCA Regulations provide as follows:

> "14.   A form of proxy may confer discretionary authority in respect of amendments to matters that properly come before the meeting and that were not identified in the notice of meeting.
> 15.    A form of proxy must not confer authority to vote in respect of an auditor or the election of a director unless a bona fide proposed nominee for the appointment or election is named in the form of proxy."

[31]    The Company argues that the proxy forms conferring authority upon representatives of the Dissenting Shareholders at the AGM failed to comply with regulation 15 and,

consequently, the votes cast pursuant to those proxies should be ignored or rendered invalid. The claimant submitted that regulation 15 applies <u>only</u> to proxy forms issued by or on behalf of the company when it gives notice of the AGM, namely, the so-called 'proxy card'. The Company says that it applies to <u>all</u> proxy forms used to enable shareholders to cast their vote.

[32]   I am of the view that the object and intent of regulation 15 is clear and unmistakable: it is to ensure that, on important matters such as the appointment of an auditor and the election of directors, the will of the shareholder (the proxy-giver) is effected and that all shareholders have been provided with full information concerning the election of directors. Such a requirement has greater relevance and consequences for a publicly traded company with thousands of shareholders who vote online and through brokers, than, for example, a small family-run company. On the evidence of Mr. Pengfei Li, given on behalf of the claimant, neither the claimant as beneficial shareholder nor TD Ameritrade Clearing Inc. as registered shareholder, knew that the alternative slate was to be put forward at the AGM at the time the registered shareholder granted the proxy to Mr. Li. Mr. Li, who was himself nominated to the board by the Dissenting Shareholders, said he had no idea that he was going to be nominated. This is not full, fair and plain disclosure. It appears to be an ambush.

[33]   The claimant says that the company waived any procedural defect in the Dissenting Shareholders' proxy forms by counting them at the AGM for the purposes of declaring a quorum and then by counting them in favour of the amended motion. It is clear, however, from the transcript of the proceedings at the AGM, that Guang Yang was at pains to point out that, while she would <u>collect</u> the ballots, she could not pronounce on the validity of the ballots that had been amended by the Dissenting Shareholders until the matter had been reviewed by Antiguan counsel. Guang Yang did not say anything about the proxy forms at the AGM, but her reserving any declaration on the result of the election meant that it was open to the Company's Antigua counsel to review the validity of the process. I am therefore of the view that the defect in the proxy forms was not waived by the Company.

[34]     Both sides relied on **Ambassador Industries Ltd v Camfrey Resources Ltd.**[4] In this case, the dissident shareholder's proxy form was upheld by the Court because both rival information circulars sent to all the shareholders had a full list of all the proposed director candidates.    Each information circular listed out the rival candidates for appointment and explained the rival positions. The court therefore had no difficulty upholding the form of proxy in that case.  The court in **Ambassador** stated:

> "These [rival circulars] make very clear to all concerned who is running and whether that candidate is part of the management slate or the dissident slate. I also bear in mind that the petitioner's information circulars expressly refer to the circulars being sent out by Camfrey management.
> I find that in deciding whether or not this proxy is valid, the test I have to apply is whether under the circumstances of the information circulars sent out by the petitioner referring, as they do, to the circulars sent out by Camfrey, it can be said that there is sufficient information to conclude that a shareholders is in a position to come to an intelligent decision as to whether he should vote for or against the directors on their respective slates."

[35]     I am of the view that **Ambassador** is persuasive authority for the proposition that, where a proxy form is called into question, the Court is concerned to examine the position of all the shareholders, not just those who signed the proxy in question.  In the instant case, none of the Dissenting Shareholders provided any advance notice to the Company or the shareholders, as a whole, prior to the AGM, of a proposal to replace the board or of the identity of their nominees for election, nor did their proxy form name any nominee for election.

[36]     The Court, in the final analysis, must weigh the right of the shareholders to full information to be able to come to an intelligent decision against the right of shareholders who voted not to be unfairly disenfranchised.  For this reason, I will not make any ruling on the validity of the proxy form but consider it as a factor, in the round, when exercising the Court's discretion under section 122.

---

4 [1991] CanLii 593 (BC SC)

**Conduct of the Claimant**

[37]   The Company invites this Court to conclude that the claimant and the Dissenting Shareholders colluded and orchestrated a secret plan to elect a new board, without notice to the Incumbent Directors or the shareholders as whole.  As evidence of this, the Company relies on the following:

(1)  The year-end personal work summary of Tao Fuwu dated 12th January 2017;

(2)  A draft Amended and Restated Consortium Agreement;

(3)  The transcript of teleconference held on 8th January 2018;

(4)  An open letter from Sinobioway to all shareholders of Sinovac Biotech Limited; and

(5)  An email from "one shareholder Tang".

*Personal Work Summary of Tao Fuwu*

[38]   In this document, authored by Mr. Tao Fuwu, on the letterhead of Peking University V-Ming (Shanghai) Investment Holdings Co. Ltd, he set out his role as "one of the supervisors" in the matter of the privatization of the defendant and summarized his main work in 2017 to include:

> "...prepare to hold Sinovac special shareholders' conference and demonstration (including without limitation, repeated discussion and persuasion of 1G, especially assistance in analysis of poison pill plan, meeting order, analysis of the barriers and plans, shareholder proxies handling, and hiring of intermediary agent) preparation and opining on Sinovac's annual shareholders conference participation and change of the board of directors (repeatedly opine of plan risks, discuss rivals' obstructionism and opine on an appropriate response, opine on procedures, coordination among shareholders and documentation of authorized agent); the related media public relations work.
> …
> worked with 1G to achieve substantial progress and signed cooperation agreement and framework agreement…We are fundamentally prepared for changing the board of directors of Sinovac at the shareholders' conference."

[39]   Mr. Pengfei Li was the only witness of fact for the claimant.  During cross-examination, he stated that he was delegated by the claimant to manage its

investment risk regarding the Company when the Company started being privatized. He described his role as being to understand the situation, the processes and the risks involved in the privatization. He stated, repeatedly, that the claimant entrusted him with full authority so he did not have to report to anyone there, even though the claimant had over a million shares in the defendant valued at between US $50-60 million dollars. He was free, he said, to make any decision, in consultation with the claimant's United States lawyers since the Company was listed in the United States. He stated that most of the strategic advice in relation to the Company came from him and he did not need advice from anyone at the claimant. He flatly denied, however, knowing anything about what was contained in the work summary and said he was puzzled by it. He questioned whether, in fact, Mr. Tao Fuwu had really written it. He stated that competing groups in the privatization process would say anything to gain support but that the claimant had remained neutral and had not sided with the Sinobioway Consortium as alleged by the defendant.

*Draft Amended and Restated Consortium Agreement*

[40]     This is a draft consortium agreement which lists 1 Globe Capital LLC and PKU-Ming (Shanghai) Investment Holdings Co. Ltd, among others, as parties to it. This document suggests that the claimant was part of the Sinobioway Consortium to attempt to purchase the Company. Under cross-examination, Mr. Pengfei Li said he was really surprised to see this document and had never seen it before. He expressed doubt as to its authenticity since any communication would have to have been through him as the claimant's designated representative in this matter. He said he believed that that so-called consortium agreement might be forged or fabricated, but declined Mr. Alford's invitation to say who might have forged it. He said he had his suspicions about the placing of that document before this Court.

*Transcript of Teleconference*

[41]     This document is under the heading "Peking University V-MING (Shanghai) Investment Holdings Co. Ltd." and is a teleconference among Tao Fuwu, James Chang (called "Attorney Zhang"), "Attorney Chen" and "Attorney Bao" in which,

among other things, the AGM is discussed and the eventuality of changing the board of directors. These plans included a rehearsal to prepare shareholder representatives for potential issues which the Dissenting Shareholders might face at the AGM and a media strategy to turn shareholders against the Incumbent Directors in the days before the AGM.

[42]     Mr. Pengfei Li, during cross-examination, denied that he knew anything about that teleconference and said that it was the first time he was seeing this document. He stated that each group seeking to purchase the Company would say that it had the claimant's support, but the claimant had remained neutral throughout.

*Open Letter from Sinobioway*

[43]     In this document dated 31st January 2018, it is alleged that Mr. Weidong Yin, chairman and CEO of the defendant, bribed a senior official of the China Food and Drug Administration and was not qualified to serve as a director of the defendant; the defendant is accused of incompetence, not acting in the best interest of shareholders and infringing the voting rights of shareholders through the voting card prepared for the AGM. It ended by recommending that shareholders attend the AGM and oppose the re-election of the current board. Mr. Pengfei Li, again, denied any knowledge of involvement in this document.

*Email from Tang*

[44]     In this email to the defendant, the sender, describing himself as "one shareholder Tang", points out that the voting card prepared by the Company provided no option to vote "against" the re-election of the Incumbent Directors and requested the inclusion of the option to vote "against" on the voting card. The sender's email address was 2300721606@qq.com. On 8th February, a press release was sent out from Shandong Sinobioway Biomedicine Co. Ltd announcing the defeat of the Incumbent Directors and the election of the New Directors at the AGM. The release was sent from the email address 2300721606@qq.com. Under cross-examination,

Mr. Li admitted that Tang, whose real name was Joyce, was a younger colleague of his who worked at the claimant. He admitted that the email was written, at his request, by Joyce but did not know why she used the name "Tang" instead of her real name. He speculated that maybe if Guang Yang knew whom it was she would not have answered the email. He was perplexed as to why the email of Joyce matched that of Sinobioway.

[45]    Mr. Pengfei Li maintained under cross-examination that he never knew James Chang, even though it was Mr. Chang who nominated him to be a director on the Company's board. He said he was surprised to have been nominated and did not know the other three individuals who were nominated to replace the Incumbent Directors. He had remained silent throughout the AGM. The next day he chaired a meeting of the Company despite the fact that Guang Yang clearly had not declared the results of the election. I find it difficult to believe that Mr. Li did not know that he was going to be nominated. I find it equally difficult to believe that he did not need the claimant's approval to accept the nomination and did not need to consult the claimant on anything having to do with the Company. He was at a loss to explain why the email address from which his junior colleague sent an anonymous email to the Company matched the email address of Sinobioway which, on the evidence, had been involved in planning to oust the Incumbent Directors and spreading negative publicity about them. The haste with which he took charge of the Company, even before an official election result was declared, suggests that he knew of the plan to oust the Incumbent Directors. He said that Weidong Yin had called him to urge him to attend the meeting yet, instead of raising concerns with Mr. Yin, he instructed his junior colleague to send an email under a fictitious name. Taken in the round, I do not find the evidence of Mr. Pengfei Li to be at all credible. I am convinced, on a balance of probabilities, that there was a secret plan to take control of the Company and that the claimant, through Mr. Li, knew of and acquiesced in this plan.

[46]     When I consider the scale and detail of the secret plan, the absence of full and fair information which deprived shareholders of the opportunity to make an informed and intelligent decision and the defective proxy forms, I am obliged to conclude that this was not conduct that should be rewarded with relief under section 122. The claimant says that the defendant is not blameless and that the Incumbent Directors ran the Company in an undemocratic fashion by not preparing ballots that allowed for shareholders to vote "against" them. While there was no option of voting "against" on the ballot, shareholders had the option of "withholding" their votes. If the majority of votes were withheld from the Incumbent Directors, they could not have been deemed elected and therefore a fresh election would have to be called. In any event, a complaint about the Company's ballot was not good reason to keep secret an intention to propose an alternate slate.

[47]     In **Dumont v Manitoba Metis Federation**[5], the Court of Appeal of Manitoba, in considering section 139 of the **Corporations Act** (the equivalent of section 122 of the IBCA), stated that the court is free to exercise a discretion to make the order it thinks fit. The Court, at paragraph 56 of its judgment, stated that evidence of wrongdoing and the essential fairness of the electoral process are factors that might influence the exercise of judicial discretion. I therefore conclude that the claimant's knowledge of the secret plan, and the unfairness to other shareholders of the execution of that plan at the AGM, is enough for this Court to refuse the relief sought by the claimant. While that conclusion is sufficient to fully dispose of this claim, I will go on to consider the validity of the Rights Agreement since both sides considered that this Court's declaration will be of practical utility to the parties in other proceedings.

**Validity of Rights Agreement**

[48]     It is common ground between the parties that: (1) the Company entered into a Rights Agreement governed by Delaware law designed to "guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain

---

[5] [2004] MBCA 149.

control of the Company"; (2) the Rights Agreement provides that certain conduct of shareholders of the Company can trigger the dilution of their shareholding; (3) the question of whether the conduct of the claimant and others prior to the AGM constituted a "triggering event" entitling the Company to dilute their shareholding is currently pending before a Delaware court; (4) the Delaware court is the proper court to determine whether there was a "trigger event" under the Rights Agreement and whether that trigger event operated to dilute the Dissenting Shareholders' shareholding; (5) the Delaware Court has stated that it would benefit from a judgment of the Antiguan Court regarding the validity of the Rights Agreement as a matter of Antiguan law; and (6) this Court should indeed make a declaration on the validity of the Rights Agreement under Antiguan law.

[49]    The claimant argues, firstly, that Antigua, which applies English law, does not allow defensive shareholder rights plans without stockholder consent (and there was no such consent).  Secondly, the Rights Agreement was not validly adopted under Antigua law because the provisions of the IBCA were not complied with.  The defendant, in reply, relies on the Bermuda case of **Stena Finance BV v Sea Containers**[6] which upheld the validity of a rights plan, and contends that the Rights Agreement in the instant case was validly adopted under Antigua law.

[50]    In **Stena**, Astwood CJ held that the distribution of rights to existing shareholders in anticipation of a possible hostile takeover bid is not unlawful, provided that the directors have the requisite powers under the company's bye-laws to issue such rights, that they exercise those powers bona fide (i.e. not for the purpose of entrenching the existing management of the company) and fairly as between shareholder.  Astwood CJ stated:

> "The directors stated the purpose for adopting the plan in the letter of 9 May 1988.  On review, their purpose appears to be legitimate and I have no reason to differ from them. The principles expounded by the Privy Council in *Howard Smith Ltd. v Ampol Petroleum* [1974] AC 821, have not, in my opinion, been breached. The plan seems to be favourable to all shareholders of record at the date of adoption of the plan, and those who

---

[6] (1989) 39 WIR 83.

became shareholders after that date did so knowing what the terms of the plan were. Therefore, they cannot now be heard to say that the plan is unfavorable to their aspirations in making a bid to take over the company.

On a review of the plan, I tend to agree with Mr. Steinfeld that the plan did not do any of the following things: (a) it did not in any way alter or purport to alter (pending the exercise of the rights) the existing share capital of the company or the votes attached to the common shares; and (b) it, without in any way intending to penalize any existing shareholders (that would indeed have been expropriatory and improper), operated quite indiscriminately between all existing shareholders."

[51]    I agree with Mr. Alford that, in the instant case, there is no allegation of any *mala fides* on the part of the Company's board or any suggestion that it entered into the Rights Agreement other than in accordance with its fiduciary duties.  There is in evidence minutes of the board meeting approving the Rights Agreement which record the board's belief that it would "contribute to the preservation of the Company's long-term value."

[52]    Corporate hostile takeovers are not a usual feature in the company law landscape of the Eastern Caribbean.  Several jurisdictions within the Eastern Caribbean (like the British Virgin Islands, Anguilla, Saint Christopher and Nevis and Antigua and Barbuda) have, however, introduced international business company legislation, resulting in the incorporation of some large companies with multi-national shareholders. These companies, as in the instant case, cannot carry on business in the jurisdiction of incorporation but are domiciled there to take advantage of tax advantages and other benefits and features available under the legislation.  It seems to me that, if Antigua wishes to attract international business to companies to incorporate in the jurisdiction, it has to recognize that defensive shareholder rights plans are part of that corporate landscape.  I would therefore adopt the approach taken by Chief Justice Astwood in **Stena** and say that, provided the Rights Agreement is not contrary to the IBCA or the Company's articles and bye-laws, and provided it was not entered into to entrench the Incumbent Directors, it should be considered as valid.  I would add that it should perhaps not be contrary to Antiguan laws or public policy.

[53]    I must therefore examine both the IBCA as well as the articles of association of the Company to see whether the company could lawfully enter into the Rights Agreement.

[54]    The articles of association of the Company provides as follows:

"**ARTICLE III. CAPITAL**

1. The Corporation is authorized to issue 100,000,000 bearer or registered shares of US$0.0001 each par value common stock which shall be designated "Common Shares" and 50,000,000 Preferred shares of US$0.0001 par value which shall be designated "Preferred Shares".

2. No pre-emptive rights shall attach to the shares to be issued in respect of any class.

3. Both classes of shares may be issued in series and <u>the directors shall have the authority to fix the number of shares in, or to determine the designation of, and the rights, privileges, restrictions and conditions attaching to the shares of each series. (Underlining supplied)</u>

4. The Corporation shall have the power to increase or reduce said capital, and to issue any part of its capital, original or increased, with or without any preference, priority, or special privilege, or subject to any postponement of rights, or to any conditions or restrictions, and so that, unless the conditions of issue shall otherwise expressly declare, every issue of shares, whether declared to be preference or otherwise shall be subject to the power herein contained.

**ARTICLE IV. BOARD OF DIRECTORS**

<u>The powers of the Corporation shall be exercised by the Board of Directors of the Corporation</u> which shall be empowered to name one or more officers as President and Vice-President of the Corporation, subject to any restrictions in the appointing resolution an act of a President shall bind the Corporation as if the said act had been approved by the Board of Directors. The Corporation shall have a minimum of one and a maximum of fifteen directors. (Underlining supplied)

**ARTICLE V. CORPORATE PURPOSE**

The objects for which the Company is established are:

1. To conduct any and all business activities permitted by the laws of the State of Antigua and Barbuda as an International Business Corporation.

2. To acquire and deal with any property, real or personal, to erect any buildings, and generally to do all acts and things which, in the opinion

of the Company or the Directors, may be conveniently, or profitably, or usefully, acquired and dealt with, carried on, erected or done by the Company in connection with said property.

3. To generally have and exercise all powers, rights and privileges necessary and incident to carrying out properly the objects herein under the International Business Corporation Act.

The Company shall not engage in International banking, Trust, Insurance, Betting and Bookmarking or any other activity which requires a License under the International Business Corporation Act.

The Company shall be primarily engaged in research, development and commercialization of human vaccines for infectious diseases."

[55]    Paragraph 8.9 of the bye-laws of the Company provides that the Board may exercise all such powers of the Corporation as are not by the Act or by the bye-laws required to be exercised by the corporation in an AGM. It would therefore appear to me that the power to make distributions, as contemplated by the Rights Agreement, is not reserved to the members and is therefore exercisable by the Board. I note as well that, under section 35 of the IBCA, the power of the Company to grant conversion privileges, options or rights to acquire shares of the corporation is exercisable by the board and not its members.

[56]    Mr. Houseman relies on sections 161 and 163 of the IBCA to support his contention that Rights Agreement could not be adopted without amending the Company's articles of association. Those sections are as follows:

"(1) Subject to sections 162 and 163, the articles of a corporation may, by special resolution, be amended -
   (a) to change its name;
   (b) to add, change or remove any restriction upon the business that the corporation can carry on;
   (c) to change any maximum number of shares that the corporation is authorised to issue;
   (d) to create new classes of shares;
   (e) to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued; (underlining supplied)

(f) to change the shares of any class or series, whether issued or unissued, into a different number of shares of the same class or series or into the same or a different number of shares of other classes or series;"

[57]    Section 163 provides as follows:

"(1) The holders of shares of a class or, subject to subsection (2), of a series are, unless the articles otherwise provide in the case of an amendment described in paragraph (a) or (b), entitled to vote separately, as a class or series, upon a resolution to amend the articles -

...

(c)

(iv) to add, remove or change prejudicially conversion privileges, options, voting, transfer or pre-emptive rights, or rights to acquire shares or debentures of a corporation, or sinking fund provisions."

[58]    I do not view the distribution of shares, triggered by the Rights Agreement, resulting in a dilution of a shareholders' shareholding, as changing the designation of or removing any rights or privileges attaching to or in respect of any shares. Neither do I see the applicability of section 163 of the IBCA.  I therefore conclude that the Rights Agreement is valid under Antigua law.

[59]    Finally, it is accepted between the parties that the question of whether the claimant acted in breach of US securities laws is a matter for the United States Courts; consequently, I will make no findings on this matter.

[60]    I therefore make the following orders:

(1) The Claimant's claim is dismissed.

(2) It is declared that the Rights Agreement was validly adopted as a matter of Antigua law.

Godfrey P. Smith
High Court Judge

By the Court
Registrar

# Exhibit C

## THE EASTERN CARIBBEAN SUPREME COURT
## IN THE COURT OF APPEAL

**ANTIGUA AND BARBUDA**

**ANUHCVAP2019/0005**

**BETWEEN:**

### 1GLOBE CAPITAL LLC

Appellant

**and**

### SINOVAC BIOTECH LTD.

Respondent

**Before:**

|  |  |
|---|---|
| The Hon. Mr. Davidson Kelvin Baptiste | Justice of Appeal |
| The Hon. Mde. Louise Esther Blenman | Justice of Appeal |
| The Hon. Mde. Gertel Thom | Justice of Appeal |

**Appearances:**

Mr. Stephen Houseman QC, with him Mr. Lenworth Johnson for the Appellant
Mr. Stuart Alford QC, with him Mr. Rushaine Cunningham for the Respondent
Mr. Craig Jacas holding a watching brief

_____

2019:   September 18
2021:   December 9.

_____

_Civil appeal – Validity and effect of vote to determine company's directors at shareholders' annual general meeting - Power of court to determine any controversy surrounding an election or appointment of directors - Section 122 of the International Business Corporations Act – Whether the learned judge's refusal to grant relief under section 122 plainly wrong - Whether specific notice required to directors whose re-election is contested at forthcoming annual general meeting - Section 71 of the International Business Corporations Act – Shareholders' right to full and fair information - Whether court may insist on a basic standard of fairness being afforded to shareholders to reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting – Whether learned judge erred in his interpretation of regulation 15 of the International Business Corporation Regulations 1985 – Regulation 15 of the International Business Corporation Regulations 1985 - Whether the learned judge erred in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders – Conduct of party seeking section 122 relief - Whether the learned judge erred_

1

*by considering 1Globe's knowledge of the secret plan to oust the incumbent directors of Sinovac in refusing to grant relief under section 122 – Whether the learned judge erred in finding that the rights agreement between 1Globe and Sinovac was valid under Antiguan law*

1Globe Capital LLC ("1Globe") is a shareholder in Sinovac Biotech Ltd. ("Sinovac"), a China based company registered in Antigua and Barbuda under the International Business Corporations Act ("the IBCA"). On 28th December 2017, Sinovac issued formal notice of an annual general meeting to be held on 6th February 2018 ("the AGM"). Among the items of business listed for the meeting was the re-election of the existing board of directors. In advance of the AGM, shareholders who sought to oust the existing board ("the dissenting shareholders") formed a secret plan to take control of Sinovac. 1Globe knew of and acquiesced in this plan. Neither the board nor the other shareholders knew of the secret plan. At the AGM, without prior warning, the dissenting shareholders proposed alternative resolutions in order to secure the election of their own slate of directors. 1Globe contended that the new directors were validly elected whereas Sinovac maintained that the incumbent directors remained in control of Sinovac. As a result of the contested election, 1Globe applied under section 122 of the IBCA for the court to determine the controversy surrounding the validity of the election of the new directors. 1Globe sought, inter alia, a declaration that the new directors were validly elected at the AGM and an order that they be installed as Sinovac's new directors. Sinovac resisted the claim.

The learned judge dismissed 1Globe's claim and refused to grant relief under section 122. He found that there was a secret plan by the dissenting shareholders to oust the incumbent directors which 1Globe knew of and acquiesced in. The incumbent directors and other shareholders were given no notice of this secret plan and shareholders were effectively deprived of the opportunity to make an informed and intelligent decision on an important matter affecting Sinovac. The learned judge considered these factors, as well as the defective proxy forms and 1Globe's conduct, in coming to his decision to refuse to grant relief under section 122.

1Globe, being dissatisfied with the learned judge's decision, appealed. 1Globe argued, inter alia, that the learned judge (i) erred in his interpretation of section 71 of the IBCA, (ii) erred in finding that the principle permitting amendments to motions at shareholders' meetings, as laid down in Betts & Co. Ltd. v Macnaghten, was inapplicable to a modern corporate context, (iii) erred in finding that the proxy forms used by the dissenting shareholders were non-compliant with regulation 15 of the International Business Corporation Regulations 1985 ("the IBC Regulations"), (iv) erred in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders, by counting such votes as present for the purposes of declaring a quorum at the AGM (v) erred in considering 1Globe's conduct and knowledge of the secret plan to refuse to grant relief under section 122, (vi) erred in finding that the rights agreement between 1Globe and Sinovac was valid under Antiguan law and (vii) erred in the interpretation and exercise of his discretion under section 122 of the IBCA.

**Held:** dismissing the appeal; affirming the order of the learned judge and awarding prescribed costs to the respondent in the court below and costs in the appeal in the sum of 2/3 of the prescribed costs in the court below, that:

1. Absent local authority and case law on the interpretation of a particular section in legislation, authorities from another jurisdiction on corresponding legislative provisions are instructive. The learned judge found that the IBCA was modelled on corresponding Canadian legislation and section 71 mirrored section 110 of the Canada Business Corporations Act. Whilst section 71 of the IBCA had never been considered by the Eastern Caribbean Supreme Court, the corresponding legislative provisions had been the subject of judicial decision in Canada. Consequently, the learned judge did not err when he relied on and sought guidance from Canadian authorities dealing with similar provisions.

2. In construing legislation, the court's task is to give effect to Parliament's purpose. Provisions should be read in light of the statute as a whole, which, in turn, should be read in light of its historical context. The IBCA was modelled on Canadian legislation and Canadian authorities showed that the appropriate model was for full and fair disclosure of information to all shareholders. Thus, where shareholders are called to vote on important company matters, they are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. Whilst section 71 of the IBCA did not make it mandatory to give notice to the incumbent directors that there was a proposal by the dissenting shareholders to elect other persons in their place, in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is contested must be given some kind of notice. If no notice is given, then he would not be able to submit a written statement of his objections as per section 71(2) and the company would not be able to send that statement to the shareholders as per section 71(3). Consequently, shareholders would not have received full and fair disclosure to make an informed decision on an important company matter. The learned judge therefore did not err in his interpretation of section 71 in holding that the spirit and intention of the section had been breached by the dissenting shareholders' failure to give notice of the proposal to elect the new directors.

   Section 71 of the **International Business Corporations Act** Cap. 222, Revised Laws of Antigua and Barbuda 1992 applied; **Kluwak v Pasternak** 2006 CanLII 41292 (ON SC) applied; **Regina (Quintavalle) v Secretary of State for Health** [2003] UKHL 13 applied.

3. Where a company's articles of association and the governing law are silent as to how one may reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting, the court will insist on a minimum standard of basic fairness being afforded to all shareholders. Whilst there was nothing in the IBCA, the IBC Regulations or Sinovac's articles of association prohibiting an amendment to an ordinary resolution being proposed by the dissenting shareholders attending the AGM, by amending

3

the company's motion to include their alternative slate without notice to the other shareholders and after so many had voted in advance of the AGM, this undermined the basic fairness to which the shareholders, as a whole, were entitled. It would generally be in the company's best interests for shareholders to make fully informed decisions regarding the election of directors. The learned judge therefore did not err when he distinguished the case of Betts & Co. Ltd. v Macnaghten from the present facts since that was a 1910 case, before the internet had been invented and the possibility of voting online and in advance of the annual general meeting did not exist.

**Betts & Co. Ltd. v Macnaghten** [1910] 1 Ch. 430 distinguished.

4. Where a proxy form is called into question the court is concerned with examining the position of all shareholders and not just those who signed the proxy in question. A plain reading of regulation 15 of the IBC Regulations reveals that it applies to all proxies and that its object is to ensure that on important matters such as the election of directors, the will of the proxy giver, the shareholder, is effected and that all shareholders have been provided with full information concerning the election of directors. The learned judge therefore did not err in his interpretation of regulation 15. Furthermore, contrary to 1Globe's assertion, the learned judge expressly declined to make a ruling on the validity of the proxy forms. Instead, he considered the defective proxy forms as a factor to be considered when exercising the court's discretion under section 122.

Regulation 15 of the **International Business Corporation Regulations 1985** S.I. No. 43 of 1985 applied; **Ambassador Industries Ltd. v Camfrey Resources Ltd.** [1991] CanLII 593 (BC SC) applied.

5. Waiver refers to a voluntary, informed and unequivocal election by a party not to claim a right or raise an objection which it is open to that party to raise or claim. The words voluntary, informed, and unequivocal capture the essence of what is needed for a waiver of any kind to be valid. The learned judge found that at the AGM, the inspector of the election said nothing about the proxy forms and reserved a declaration as to result of the election. The inspector's evidence as well as the fact that the dissenting shareholders had a secret plan which neither the other shareholders nor the incumbent directors knew of, meant that the criteria for a valid waiver were not met. Consequently, Sinovac did not waive any technical deficiency in the proxy forms used by the dissenting shareholders by counting such votes as present for the purposes of declaring a quorum at the AGM.

**Millar v Dickson** [2002] 1 WLR 1615 applied; **McGowan v B** [2011] UKSC 54 applied.

6. An appellate court is constrained in interfering with findings of fact by a trial judge and must not interfere with such findings unless compelled to do so. This applies not only to findings of primary facts but also to the evaluations of those facts and to inferences to be drawn from them. Appellate interference requires a finding that

there was no evidence to support the challenged factual finding or that the finding was one which no reasonable trial judge could have made. Further, an appellate court is rarely justified in overturning findings of fact made by a trial judge which turn on the credibility of a witness. On the facts, the trial judge listed the items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan, and the documents were put to 1Globe's sole witness. The trial judge set out the witness' evidence in relation to each item and concluded that on the facts, the witness was not credible and there was a secret plan to take control of Sinovac which 1Globe knew of and acquiesced in. Such findings were open to the learned judge based on the evidence. Further, the court's exercise of its discretion under section 122 involves consideration of the facts and circumstances of the case at hand, with the conduct of the parties being one of the factors relevant to the exercise of the court's discretion.

**Fage UK Ltd. and another v Chobani UK Ltd. and another** [2014] EWCA Civ. 5 applied; **Mutual Holdings (Bermuda) Limited and others v Diane Hendricks and others** [2013] UKPC 13 applied.

7. For a rights agreement to have been validly entered into, it ought not be contrary to the governing law or the company's constitution. In coming to his decision that the rights agreement was valid under Antiguan law, the learned judge found that the rights agreement was not contrary to the IBCA or Sinovac's articles of association and bye-laws and that it was not entered into to entrench the incumbent directors. The learned judge did not err is his decision and the agreement was validly entered into since it was within the powers afforded to the directors under Sinovac's constitution and the IBCA.

**Stena Finance BV and Another v Sea Containers Ltd. and Others** (1989) 39 WIR 83 applied.

8. An appellate court will not interfere with the exercise of a discretion entrusted to a trial judge unless the judge has misdirected himself in law, taken account of irrelevant matters, failed to take account of relevant matters, or has made a decision which has exceeded the generous ambit within which reasonable disagreement is possible. Section 122 of the IBCA confers a very broad discretion in determining any controversy and on its plain wording, the court has a broad remedial discretion to make any order it sees fit. The exercise of the court's discretion in granting relief under section 122 and the form of that relief are inextricably linked to the facts of the particular case. Such facts necessarily include equitable principles such as the conduct of the party seeking relief. In refusing to grant relief under section 122, the learned judge considered the relevant factual context including 1Globe's conduct, the scale and detail of the secret plan and the absence of full and fair information to shareholders. Consequently, the learned judge did not err in his interpretation and exercise of discretion under section 122 in refusing to grant the section 122 relief.

**Dumont v Manitoba Metis Federation** [2004] MBCA 149 applied.

5

**JUDGMENT**

[1]   **BAPTISTE JA**:  This appeal stems from Smith J's dismissal of a claim brought by 1Globe Capital LLC ("1Globe") against Sinovac Biotech Ltd. ("Sinovac") under the remedial provision, section 122 of the **International Business Corporations Act**[1] ("**IBCA**"). The claim emanated from a dispute between 1Globe and Sinovac concerning a contested annual general meeting of Sinovac held in Beijing on 6th February 2018 ("the AGM"). 1Globe is a Delaware limited liability company and a shareholder in Sinovac, a China based company registered under the **IBCA**. Smith J described the case before him as a fight to control the board of directors of Sinovac, a company with about 3,300 shareholders, a market capitalization of US$447.3 million and listed on the Nasdaq stock exchange.

**Background**

[2]   The primary focus of the section 122 claim and the appeal concerned the validity and effect of the vote at the AGM whereby a vote was taken to remove the former directors of Sinovac ("the incumbent directors") and replace them with a new board of directors ("the new directors"). 1Globe contends that the new directors were duly elected as directors of Sinovac. Sinovac disputes this and posits that the incumbent directors, who had remained in control of Sinovac following the disputed election, are the valid directors of Sinovac.

[3]   In the court below, 1Globe sought a declaration that the new directors were validly elected at the AGM, an order that the new directors be installed as Sinovac's board of directors, a declaration that the incumbent directors are no longer Sinovac's directors, and an order that any action taken on behalf of Sinovac at their direction after the AGM are null and void.

[4]   Sinovac resisted the claim, contending that the votes cast by those shareholders in favour of the new directors ("the dissenting shareholders") were not valid because:

---

[1] Cap.222, Revised Laws of Antigua and Barbuda 1992.

(1) Their method of nominating individuals to Sinovac's board of directors, the proxy form used and the ballots they voted on did not conform to Antigua and Barbuda law ("Antiguan law").

(2) There was no full, fair, and plain disclosure to the shareholders in breach of section 71(2) of the **IBCA**, to enable them to make a fully informed decision regarding the election of Sinovac's board of directors.

(3) A right's agreement governed by Delaware law, was triggered by the conduct of the dissenting shareholders prior to, during and after the AGM, which affected the vote at the AGM by dilution of the shareholding of a significant proportion, if not all, of the dissenting shareholders who voted to elect the new directors.

(4) 1Globe and other shareholders, breached United States' securities laws by failing to make appropriate filings and, as a result, the business purportedly conducted at the AGM and/or the votes cast by those shareholders have been invalidated.

[5]     The issues before Smith J were:

(1) Was section 71(2) of the **IBCA** complied with in relation to the notices of the AGM? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace the incumbent directors?

(2) Was the vote to remove and replace the incumbent directors in conformity with Antiguan law? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace them?

(3) Is the rights agreement valid and effective as a matter of Antiguan law? If so, could the rights agreement, if triggered, affect the vote at the AGM?

(4) Was there a breach of section 13 of the United States **Securities Exchange Act of 1934**[2], by 1Globe? If so, what is the relevance, if any, to the outcome of the vote at the AGM?

[6]     Sinovac issued formal notice of the AGM on 28[th] December 2017, indicating three items of business, namely (1) the re-election of the existing board of directors, (2) approval of the audited consolidated financial statements of the company for 2017 and (3) the appointment of an independent auditor. This form of notice had been

---

[2] 15 U.S.C. 78a.

used by Sinovac and the relevant resolutions passed at the annual general meetings during the previous four years.

[7]     The court found that, in advance of the AGM, the dissenting shareholders formed a secret plan to take control of Sinovac by ousting the incumbent board. This plan involved ambushing the AGM on the day and attempting to secure the election, without notification to other shareholders or the board, of their own slate of directors, in place of the incumbent board. Smith J found that 1Globe had known of and acquiesced in the plan.

[8]     Shareholders holding shares constituting 82.5% of the issued share capital were present either in person or by proxy at the AGM. Almost half of those had voted in advance of the AGM by proxy or electronic voting. Critically, 17.4% of the issued shares were not voted. Both the advance proxy votes and those who had not voted were unaware of the proposal to elect the alternate slate of directors.

[9]     At the AGM, 1Globe and other dissenting shareholders, without prior warning, proposed resolutions to amend the ballot paper provided by Sinovac, impose a cap on the number of director candidates that shareholders could vote in favour of, and add four new candidates ("the alternative slate"), no information in respect of which had been provided to Sinovac or the other shareholders.

[10]    Smith J recognised that much turned on what transpired at the AGM and made the following factual findings from the transcript of the meeting:

> (1)   No one at the AGM disputed the validity of the notice issued for the convening of the AGM.
>
> (2)   A quorum was declared by Guang Yang, the scrutinizer/inspector of the election at the AGM.
>
> (3)   A motion to (a) amend the ballot to include the option of voting against the incumbent directors and (b) to nominate four directors to the board, was moved and seconded.

(4) The dissenting shareholders cast their vote on an amended version of the ballots provided by Sinovac.

(5) Guang Yang collected the dissenting shareholders' ballots but repeatedly stated that she had to confirm the validity of those ballots with Sinovac's Antiguan attorneys.

(6) There was a tabulation of the votes cast which showed that the new directors had obtained the majority of votes, but there was no declaration of the results of the election. Guang Yang repeatedly stated that she needed to confirm the validity of the votes cast with the Antiguan counsel.

[11]    Smith J stated that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. In Smith J's view, the spirit and intent of section 71 of the **IBCA** was breached and while the section is silent as to the effect, if any, of non-compliance on the election or the AGM, it is certainly a factor for the court to weigh in deciding whether or not to grant relief.

[12]    The learned judge recognised that there was nothing in the **IBCA** or the **International Business Corporation Regulations 1985**[3] ("**the IBC Regulations**") prohibiting an amendment to an ordinary resolution being proposed by shareholders attending an annual general meeting, and that, it did not appear that there were any technical breaches of Antiguan law in proposing the amendments to the motion at the AGM. However, he reasoned that the matter could not be analyzed in isolation from the court's earlier finding that the shareholders, as a whole, were entitled to full and fair disclosure. Smith J further reasoned that amending the company's motion to include an alternative slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the court to consider in deciding whether or not to grant relief under section 122.

---

[3] S.I. No. 43 of 1985.

[13]    While Smith J did not make any ruling on the validity of the proxy form, he considered it as a factor, in the round, when exercising the court's discretion under section 122. He also considered Sinovac's invitation to conclude that 1Globe, and the dissenting shareholders colluded and orchestrated a secret plan to elect a new board without notice to the incumbent directors or the shareholders as a whole. After reviewing the evidence, Smith J found that there was a secret plan to take control of Sinovac and that 1Globe through Mr. Pengfei Li, 1Globe's only witness of fact and who the judge did not find to be credible, knew of and acquiesced in the plan.

[14]    Smith J concluded at paragraph 46 of his judgment that:

> "When I consider the scale and detail of the secret plan, the absence of full and fair information which deprived shareholders of the opportunity to make an informed and intelligent decision and the defective proxy forms, I am obliged to conclude that this was not conduct that should be rewarded with relief under section 122."

He dismissed the claim and declared that the rights agreement was validly adopted as a matter of Antiguan law.

**The appeal**

[15]    Being aggrieved by the judge's order and declaration, 1Globe filed nine grounds of appeal contending, among other things, that Smith J made numerous and material errors of fact and law. From a general level, 1Globe submits that the AGM vote claim/appeal is predominantly, if not entirely, a legal question governed by Antiguan law as the corporate seat. There was little, if any, factual dispute that is material to the determination of this central issue, yet the trial judge made factual findings which have no legal relevance to the proper determination of the pure legal issues underpinning the AGM vote analysis.

[16]    1Globe argues that an obvious and fundamental legal error vitiating the judgment is the judge's invocation of the discretionary remedial functions of section 122 of the **IBCA** to obfuscate pure questions of law and/or influence his determination of the section 122 claim by reference to extraneous findings of fact as to 1Globe's

knowledge of a "secret plan" to hijack the AGM. 1Globe further contends that the error of analysis by reference to the literal wording of section 122 appears to have allowed the learned judge to run distinct legal issues together into some kind of 'mix' rather than disposing of them on their own terms. 1Globe invites this Court to conduct the legal analysis afresh by reference to the discrete issues of company law involved.

[17]     For its part, Sinovac contends that the appeal is misconceived and lacks merit. In that regard, it asserts that 1Globe seeks to ignore factual findings based on Smith J's assessment of witnesses, notably, his rejection of 1Globe's sole witness, Mr. Li, as not "at all credible". Further, 1Globe seeks to ignore the fact that the judge's refusal to grant relief under section 122 of the **IBCA** involved the exercise of discretion and there is no basis for finding that the court exceeded the generous ambit of that discretion. Additionally, in circumstances where all the relevant Antiguan statutory provisions are derived from Canadian legislation, which differs significantly from English legislation in relation to the election of directors, it was entirely appropriate that Smith J had regard to Canadian authorities. Extensive Canadian case law shows that the appropriate model is for full disclosure by dissenting shareholders to allow all shareholders to make fully informed decisions. Sinovac also submits that the plain wording of section 122 confers a judicial discretion whether to grant relief and in what form. It gives the court a power to "determine any controversy …" and to "make any order it thinks fit …". The court has a broad discretion to make a just order under the circumstances in determining "any controversy".

**Ground 1**

[18]     I now consider the grounds of appeal. Ground one alleges that the learned judge erred in law in interpreting the words "make any order it thinks fit" in section 122 of the **IBCA** to confer upon the court a broad or general discretion as to the proper legal analysis of the validity of a vote taken at a meeting of shareholders including an annual general meeting. Section 122 provides that:

"(1) A corporation or a shareholder or director thereof may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.

(2) Upon an application made under this section, the court may make any order it thinks fit including, without limiting the generality of the foregoing,

    (a) an order restraining a director or auditor whose election or appointment is challenged from acting pending determination of the dispute;

    (b) an order declaring the result of the disputed election or appointment;

    (c) an order requiring a new election or appointment and including in the order directions for the management of the business and affairs of the corporation until a new election is held or appointment made; and

    (d) an order determining the voting rights of shareholders and of persons claiming to own shares."

[19]    Sinovac submits that on the plain wording of section 122 of the **IBCA** there is a clear judicial discretion whether to grant relief and in what form. It gives the court the power to "determine any controversy …" and to "make any order it thinks fit …". Sinovac posits that it is self-evident that such an exercise of discretion involves a consideration of the facts and circumstances of the case, and points to the heavy burden cast upon 1Globe in seeking to disturb the exercise of the judge's discretion. 1Globe must show that Smith J exceeded the generous ambit within which reasonable disagreement is possible. Sinovac submits that there is no basis for interfering with the exercise of Smith J's discretion.

[20]    It would be prudent to defer further consideration of this ground to later in the judgment.

**Ground 2**

[21]    Ground 2 alleges that the judge erred in law in concluding that (a) section 71 of the **IBCA** contains a specific obligation to notify directors that their re-election is to be

contested at a forthcoming meeting and (b) the "spirit and intent" of section 71 was breached in the present case and (c) notions of "basic fairness" to shareholders entitled to vote at meetings should inform or condition the proper meaning and effect of section 71, concerning notice to directors.

[22]    Section 71 states:

> "(1) A director of a corporation is entitled to receive notice of, and to attend and be heard at every meeting of shareholders.
>
> (2) A director
> > (a) who resigns,
> >
> > (b) who receives a notice or otherwise learns of a meeting of shareholders called for the purpose of moving him from office, or
> >
> > (c) who receives a notice or otherwise learns of a meeting of directors or shareholders at which another person is to be appointed or elected to fill the office of director, whether because of his resignation or removal or because his term of office has expired or is about to expire,
>
> may submit to the corporation a written statement giving the reasons for his resignation or the reasons why he opposes any proposed action or resolution.
>
> (3) The corporation shall forthwith send a copy of the statement referred to in subsection (2) to the Director and to every shareholder entitled to receive notice of any meeting referred to in subsection (1).
>
> (4) No corporation or person acting on its behalf incurs any liability by reason only of circulating a director's statement in compliance with subsection (3)."

[23]    1Globe asserts that Smith J erred in law in his interpretation of section 71 of the **IBCA** and argues that the proper meaning and effect of section 71 is a pure question of law, that is, statutory construction, and there is no room for factual circumstances to influence the answer. Section 71 is concerned with protecting a director's legitimate expectations in advance of a meeting where his tenure of office may be brought to an end. Further, section 71 did not impose a specific obligation upon Sinovac to give advance notice to the incumbent directors of any specific contest

for their re-election, and that the statutory requirement for notice was complied with in the AGM notice. 1Globe further submits that the learned judge erred in law by augmenting the statutory language under the influence of his own erroneous and extraneous factual findings and/or broad propositions of company law that have no bearing on the distinct point of statutory interpretation.

[24]     Further, 1Globe argues that Smith J erred in construing section 71 by reference to his own adopted concept of "full and fair disclosure" gleaned from Canadian case law, and what he called the "spirit and intent" of the provision. 1Globe submits that in so far as this amounts to the imposition by implication of a specific obligation of notification to a director of a meeting "called for the purpose of removing him from office", at which another person is to be appointed or elected to fill the office of director, then such construction is illegitimate as it contradicts the language and scheme of the provision which is unjustified. 1Globe invites this Court to construe section 71 properly and find that it was not breached, and further, even if breached, that it would not vitiate the outcome of the vote held at the AGM, it would, at most, give the incumbent directors a potential claim against Sinovac for damages for breach of statutory duty.

[25]     Sinovac posits that section 71 provides a right in favour of an existing director, where it is sought to elect a person in his place, to have a written statement circulated to all shareholders in advance of the meeting giving reasons why he opposes that proposal. Sinovac noted that while section 71 of the **IBCA** has not been considered by the Eastern Caribbean Supreme Court, it has been the subject of judicial consideration in Canada. Sinovac referred to the case of **Kaiser v Borillia Holdings Inc.**[4] Sinovac submits that Smith J's conclusion that, in order to give meaningful effect to section 71 of the **IBCA**, the director must be given advanced notice of a proposal to elect another person in his place, is consistent with the section and its legislative purpose.

---

[4] [2007] CanLII 18144 (ON SC).

[26]     Sinovac contends that 1Globe's failure to explain why the dissenting shareholders gave no notice of their intention to seek the election of the alternative slate spoke volumes, particularly given that:

(a) Smith J found that the dissenting shareholders had been taking covert steps to seek the replacement of the incumbent board with the alternative slate for many weeks prior to the AGM; and

(b) Sinobioway, acting in conjunction with the dissenting shareholders, had published an open letter by newswire targeted at Sinovac's shareholders, calling on them to vote against the re-election of the incumbent board at the upcoming AGM, though, significantly, not indicating that they would be seeking the election of the alternative slate, or anyone would be seeking the election of any alternative directors.

[27]     Sinovac asserts that the dissenting shareholders did not give notice of their intention to seek the election of the alternative slate precisely because they did not want the shareholders or the directors to know what they were up to. In addition, this meant that the incumbent board was deprived of the opportunity to provide a written statement to all shareholders, and to make the decision on whether to attend the AGM because of the proposed motion. In advance of the meeting, shareholders had no idea that alternative candidates were being proposed, let alone any information about the alternative slate proposed on the day of the AGM.

[28]     Smith J considered the parties' competing submissions on section 71 of the **IBCA**. He noted 1Globe's position that on a proper construction of the language of section 71, the only notice required is the notice of the annual general meeting to be given to directors which, in the instant case, had been provided. Each of the incumbent directors was given notice of and permitted to attend the AGM. 1Globe argued that it is difficult to see how the incumbent directors were entitled to any additional or

specific notification of their proposed removal at the AGM, other than notice under section 71.

[29]     Also considered was Sinovac's contention that section 71 must be construed against the contextual framework that shareholders should receive full, fair, and plain disclosure to have a reasonable opportunity to express their will on company matters. The shareholders were deprived of this opportunity. Smith J also noted Sinovac's submission that at the AGM, 1Globe and the dissenting shareholders, without prior warning, proposed a motion to amend the ballot paper, impose a cap on the number of director candidates that members could vote in favour of, and add four new candidates. Shareholders who did not attend the AGM had no advanced notice of any of these proposals and so were unable to consider, let alone, vote on them.

[30]     Smith J approached section 71 of the **IBCA** against the backdrop that the Eastern Caribbean Supreme Court had not previously considered its interpretation and that the **IBCA** was based on what he termed "the Canadian model". The learned judge noted that section 71(2) of the **IBCA** mirrors section 110(2)[5] of the **Canada Business Corporations Act**[6] ("**the Canadian Act**") and section 122 of the **IBCA** mirrors section 145 of **the Canadian Act**. In this regard, he considered Canadian authorities dealing with similar sections to be helpful.

[31]     There is nothing in my view that is exceptional about considering the relevant Canadian authorities. Absent local authority on the interpretation of section 71, Canadian authorities on corresponding legislative provisions are undoubtedly instructive. In the circumstances, Smith J's reliance on those authorities cannot be faulted. It was certainly permissible for him to rely on or seek guidance from them.

---

[5] In the judgment of Smith J, it was stated erroneously that section 71(2) of the IBCA mirrored section 123 of the Canadian Act.
[6] R.S.C., 1985, c. C-44.

[32]     Smith J properly accepted the reasoning in **Kluwak v Pasternak**,[7] a case relied on
by Mr. Alford QC, for Sinovac, as authority for the principle that shareholders who
are called upon to vote on an important company matter are entitled to expect a
process that is fair, transparent and democratic, and in which all the information
necessary to make an informed decision has been provided to them.

[33]     In **Kluwak**, there was a proxy fight for the control of the board of directors of the
Griffin Corporation. Kluwak spearheaded the dissident shareholders in the fight. The
respondent, Pasternak chaired the annual general meeting at which he disallowed
the dissident proxies on the basis of what he viewed as material misrepresentations
in the dissident proxy circular. As a result, he declared the management's slate of
directors elected. Kluwak sought relief under sections 107 and 248 of the **Ontario
Business Corporations Act**[8] ("**OBCA**") wishing the court to declare the board
proposed by the dissident shareholders elected instead. Sub-sections (1) and (2) of
section 107 of the **OBCA** are in terms identical to section 122 of the **IBCA** of Antigua
and Barbuda. The court determined that section 107 gives the court an extremely
broad discretion in determining any controversy regarding an election.

[34]     At paragraph 14 of **Kluwak**, Mesbur J stated:

> "The author of *Shareholder remedies in Canada* makes the comment that
> "case law requires that all information be disclosed that a reasonable
> investor would consider important in deciding whether to vote". He refers to
> the philosophy and standard of disclosure discussed as long ago as 1934
> in *In re Dorman, Long and Co. [Ltd.]* where Maugham J noted: "It is perhaps
> not unfair to say that in every nearly big case not more than five percent of
> the interests involved are present in person at the meeting. It is for this
> reason that the Court takes the view that it is essential to see that
> explanatory circulars sent out by the board of the company are perfectly fair
> and, as far as possible, give all information reasonably necessary to enable
> the recipients to determine how to vote." What is true for a board circular is
> equally applicable to a dissident information circular. Shareholders must
> have all the information they need in order to make an informed decision
> about voting."

---

[7] 2006 CanLII 41292 (ON SC).
[8] R.S.O. 1990, c. B.16.

Mesbur J continued at paragraph 16:

> "In essence, then, an information circular must contain full, fair and plain disclosure, that has sufficient information concerning the pertinent matters set out "in sufficient detail to permit shareholders to form a reasoned judgment concerning the matter"."

At paragraph 31 Mesbur J found:

> "When looking generally at the best interests of the company, it must be that it is in the company's interests for shareholders to make a fully informed decision regarding the election of directors."

[35]   Smith J described the reasoning of Mesbur J as sound, logical and persuasive, stating that it stands for the unobjectionable principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. I agree. There is no basis to differ from that position.

[36]   Smith J found that (1) Sinovac has about 3,300 shareholders located in various parts of the world, (2) the board of directors had been re-elected un-opposed, at every annual general meeting for many years and there had never been alternative candidates proposed, (3) shareholders typically voted online and by proxy in advance of the annual general meeting, (4) those who voted by proxy in advance of the AGM would only have known of the incumbent directors, there being no indication of alternate candidates, and (5) a number of shareholders did not vote at all. Those facts led Smith J to draw the reasonable inference that shareholders who voted in advance of the AGM, or those who chose not to vote, had no reason to think that anything would be different at the 2018 AGM. In these circumstances, Smith J posed the question, "…. can it be said that the shareholders had full, fair, and plain disclosure on the important matter of the election of the board of directors of a valuable international company to permit them to make an informed decision?"

[37]   Smith J accepted that section 71 does not say that notice must be given to directors where it is proposed to elect another person to the office of director. He however

reasoned that in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is to be contested ought to be given some kind of notice. If a director receives no notice, he cannot submit the written statement referred to in section 71(2), in which case the company cannot send a copy of such statement to the shareholders as required by section 71(3). The shareholders would therefore not have received full and fair disclosure to make an informed decision on an important company matter. Smith J opined that a shareholder in a valuable, publicly traded company would be interested in reading what an incumbent director, whose position is challenged, might have to say about the qualifications and experience of a proposed nominee for his seat on the board of directors. He found that there was no good reason for failing to give effect to the spirit and intent of sections 71(2) and (3).

[38]    In my judgment, Smith J clearly reasoned how he arrived at his conclusion, and it cannot be said that he was wrong. The learned judge found that the spirit and intent of section 71 was breached and while the section is silent as to the effect of any non-compliance on the election or the AGM, it is certainly a factor for the court to weigh, in deciding whether or not to grant relief. I agree. Although 1Globe criticizes Smith J's interpretation and effect of section 71, I am of the view that such criticism is not merited. As stated by Lord Bingham of Cornhill in **Regina (Quintavalle) v Secretary of State for Health**[9] at paragraph 8:

> "The court's task, within the permissible bounds of interpretation, is to give effect to Parliament's purpose. So, the controversial provisions should be read in the context of the statute as a whole, and the statute as a whole should be read in the historical context of the situation which led to its enactment."

In my judgment, Smith J's interpretation of section 71 was consistent with that position.

[39]    Smith J was cognizant of the absence of authorities from the Eastern Caribbean Supreme Court and noting that the **IBCA** was modelled on corresponding Canadian

---

[9] [2003] UKHL 13.

legislation, quite properly considered and applied the relevant Canadian authorities. It was quite legitimate for him to so do. Further, Smith J was alive to the historical context, the legislative purpose, and the philosophy and standard of disclosure discussed as long ago as 1934, as referred to by Mesbur J in **Kluwak**.

[40]    I agree with Sinovac that Smith J's approach entailed an entirely orthodox application of the overarching legal principles governing the Antiguan court's supervision of company meetings, which is also consistent with Canadian law. Canadian case law shows that the appropriate model is for full disclosure by dissenting shareholders to allow all shareholders to make fully informed decisions. The overarching requirements are that shareholders be provided with full and fair information so as to allow them to determine whether to attend a meeting in person, by voting in advance, or by proxy, and how to vote. Shareholders who are called to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision is provided to them.

[41]    For the reasons advanced, ground 2 accordingly fails.

**Grounds 3, 4 and 5**

[42]    Ground 3 asserts that the judge erred in law in finding that the common law principle permitting amendments to motions at shareholders meetings, as exemplified in **Betts & Co. Ltd. v Macnaghten**,[10] was inapplicable and inappropriate in a modern corporate context or was otherwise distinguishable from the present case.

[43]    Smith J stated that there was nothing in the **IBCA** or the **IBC Regulations** prohibiting an amendment to an ordinary resolution being proposed by shareholders attending an annual general meeting and it does not appear that there were any technical breaches of Antiguan law in proposing the amendments to the motion at the AGM. He however reasoned that the matter could not be analyzed in isolation

---

[10] [1910] 1 Ch. 430.

from the court's earlier finding that the shareholders as a whole were entitled to full and fair disclosure. Amending the company's motion to include an alternative slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the court to consider in deciding whether or not to grant relief under section 122.

[44]    1Globe submits that there are no applicable statutory or corporate constitutional provisions governing the process of amendments to motions at shareholders' meetings. In the absence of specific provisions in a company's bye-laws or articles, the common law position regulates amendments to motions at shareholders' meetings, including motions to re-elect directors. 1Globe's position is that a motion at a shareholders' meeting may be amended by a proposal made from the floor of the meeting itself so long as the amendment falls within the subject matter of the original motion. 1Globe asserts that it cannot be disputed that the amended motion, calling for the election of four new directors and the re-election of one existing director, fell comfortably within the parameters of the original motion as notified to shareholders in the AGM notice.

[45]    1Globe argues that Smith J sought to distinguish **Betts** on spurious or immaterial factual grounds and erroneously described **Betts** as "in a different era" and invoked notions of "corporate cultures" in order to depart from such well-established common law principles. 1Globe submits that there is no basis for distinguishing **Betts** on the facts. The fact that the amendment to the motion in **Betts** increased the number of directors from three to five, is immaterial.

[46]    1Globe posits that notice given to shareholders of a meeting, such as an annual general meeting at which the re-election of incumbent directors is a matter of business, necessarily informs or warns shareholders that something may change in the meantime or at the meeting which means that "some or all of" those incumbent directors are not re-elected. That change or risk may come about because, pursuant to common law principles as exemplified in the **Betts** decision, amendments are

proposed to such motion which create a contest for election to the board of directors. Armed with this information/warning at the outset, a shareholder can mitigate the risk by voting in advance in favour of re-election of the incumbent board. There is no prejudice.

[47]     Smith J referred to 1Globe's reliance on **Betts**. In **Betts**, the notice of the annual general meeting of a company stated that the purpose was the passing of certain resolutions, including the appointment of three named individuals as directors. At the meeting, an amendment was carried that, in addition to those three, two additional named directors should be appointed. The company's articles of association provided that the notice of an ordinary general meeting, at which special business was to be transacted, should specify the general nature of such special business. It also provided that the number of directors should be no more than seven or less than three. Eve J concluded that the business transacted at the meeting was within the scope of the special business indicated in the notice.

[48]     Eve J posed the questions:

> "Ought I to hold that the amendment which purported to reappoint the three gentlemen named in the notice as directors for the ensuing twelve months and to add two other gentlemen as additional directors was an amendment so inconsistent with the object of the meeting as stated in the notice and so irregular as to be beyond the power of the meeting? Was it in short, such an amendment as no reasonable man would have regarded as competent to be put forward at a meeting so convened.?.....I think I must assume that the shareholders who received this notice were alive to this possible contingency, and, further, were aware that in the matter of electing directors the only restriction on the power of the company is to be found in the article which limits the maximum number to seven. With these facts present in mind I think a reasonable man reading this notice must have appreciated that those present at the meeting would regard themselves as empowered to make such appointments to the board for the ensuing year as they thought fit so long as they did not do anything contrary to the company's regulations. No one could have thought that the meeting was convened to appoint the three named individuals without the power to substitute other qualified persons for all or any of such individuals, and there is nothing in the notice to indicate that the company will not, if they see fit so to do, exercise their power of increasing the number of directors under article 83. The special business indicated in the notice being the election of directors

22

> for the ensuing year, I think a recipient of the notice must be taken to have known that the company in general meeting might make any appointment within the limit imposed by their regulations…."

[49]    Smith J noted that 1Globe extrapolated the **Betts** principle to the present case and its argument that the shareholders, reading the notice of the AGM that there would be an election, were alive to the possibility that an amendment could be proposed, resulting in the election of a different board of directors than the one proposed. He however found that the instant case was materially distinguishable from **Betts** for the following reasons:

(1) In **Betts**, two additional directors were nominated in addition to the three proposed for nomination while, in the present case, the proposed amendment was for the replacement of the proposed nominees, except for one.

(2) The proposed amendment in **Betts** for two additional nominees to the board was within the articles of association which limited the board to a maximum of seven. In the instant case, the dissenting shareholders proposed a cap on the number of elected directors that was below the fifteen-member limit prescribed in the articles of association.

(3) **Betts**, a 1910 case, was in a different era. The internet had not yet been invented and so the concept and possibility of voting online, in advance of the annual general meeting, did not exist. The instant case involves a company, with multi-national investors, incorporated in Antigua, doing business in China, listed on Nasdaq and regulated by US securities law, whose shareholders routinely voted online in advance of an annual general meeting and therefore had no notion that an entirely different slate from that on which they voted would have materialized at the AGM.

[50]    Smith J accepted in principle, that shareholders who received notice of an annual general meeting for the election of directors must be alive to the possibility that an

amendment to the motion can be proposed, resulting in a different board of directors. He however stated that the globally accepted modern practice of voting online in advance of an election, introduces a new dimension to the hitherto conventional practice of proposing amendments to motions on the floor of the annual general meeting. That practice might be unobjectionable where the shareholders of a company are all situated in the same jurisdiction, and they attend annual general meetings in person. In today's world, however, where technology allows for internet voting and thousands of shareholders of a company are spread across the globe, physical attendance at meetings is an effete convention. The court therefore finds itself at the intersection of two corporate cultures. On the one hand, there is the practice of moving amendments to motions on the floor of the annual general meeting. On the other hand, there is the modern practice of shareholders voting online in advance of an annual general meeting and not physically attending, which closes them off from what transpires at the annual general meeting.

[51]     Smith J reasoned that where the company's articles of association and the governing law are silent as to how one might reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting, the best that the court can do is to insist on a minimum standard of basic fairness. He found that those shareholders who voted online in advance of the AGM were following a routine practice, voting for one slate that had been re-elected for many years, had no reason or warning to expect anything different and certainly had no idea that a different slate of candidates would have been proposed at the convention. They, as well as those who chose not to vote, did not have an opportunity to make an informed decision. The dissenting shareholders had been planning in secret to propose an alternative slate and therefore had no good reason for failing to give advanced notice of their intended amendment. This undermines basic fairness to which the shareholders, as a whole, were entitled.

[52]     In my judgment, Smith J properly explained the bases on which he distinguished the instant case from **Betts**. He did so in clear and easily understandable terms.

Looking at the matter in the round, the reasons advanced for distinguishing the case, cannot be properly described as spurious. Further, having regard to the reasoning which led Smith J to his conclusion as a whole, I am not of the view that Smith J applied an incorrect legal test. His insistence on a minimum standard of basic fairness is consistent with the relevant Canadian authorities.

[53]    Ground 4 asserts that Smith J erred in law by imposing a novel test of "good reason" for shareholders in a publicly traded company to justify not giving advanced notice of an intention to propose amendments to a motion, concerning the re-election of directors at a meeting such as an annual general meeting. I am not of the view that Smith J was imposing a test of "good reason." The context in which Smith J made his statement does not admit such a test being laid down by him. Essentially, Smith J was addressing the issue of basic fairness to which shareholders as a whole were entitled, in the circumstances of the case.

[54]    Ground 5 alleges that Smith J misdirected himself in law in finding that the reasoning of Mesbur J in **Kluwak** was "sound, logical and persuasive" relative to the instant proceedings. In my view, this ground cannot be sustained. Mesbur J recognised that when looking generally at the best interests of the company, it must be that it is the company's interests for shareholders to make a fully informed decision regarding the election of directors. To my mind, that proposition is unassailable and there is no basis to differ.

[55]    For the reasons indicated, grounds 3, 4 and 5 fail.

**Ground 6**

[56]    Ground 6 asserts that the judge erred in law in finding that the proxy forms used by the dissenting shareholders to vote their shares at the AGM on 6th February were non-compliant with Antiguan law, specifically regulation 15 of the **IBC Regulations**. Sinovac points out, and I agree, that Smith J made no such finding. In fact, he

expressly declined to make a ruling on the validity of the proxy form. Thus, at paragraph 36, Smith J specifically stated:

> "….I will not make any ruling on the validity of the proxy form but consider it as a factor, in the round, when exercising the Court's discretion under section 122."

[57]   Regulation14 provides that:

> "A form of proxy may confer discretionary authority in respect of amendments to matters that properly come before the meeting and that were not identified in the notice of meeting."

Regulation 15 states:

> "A form of proxy must not confer authority to vote in respect of an auditor or the election of a director unless a bona fide proposed nominee for the appointment is named in the form of proxy."

[58]   At the trial, Smith J considered 1Globe's submission that regulation 15 applies only to proxy forms issued by or on behalf of Sinovac itself when it gives notice of the annual general meeting, namely, the so-called 'proxy card', while Sinovac's position was that it applied to all proxy forms used to enable shareholders to cast their vote. In support of its position Sinovac relies on Canadian authorities, which it states indicates that the equivalent Canadian rule applies to all proxies and not just those issued on behalf of the company or existing management. Sinovac also contends that its position is also consistent with the plain wording of regulation 15 which is stated to apply to "a form of proxy" and is not limited to "a form of proxy issued by the company itself, or by third parties acting under instructions from the company". I agree with Sinovac's position.

[59]   Smith J noted that both sides relied on the Canadian authority of **Ambassador Industries Ltd. v Camfrey Resources Ltd.**.[11] He held that **Ambassador** is persuasive authority for the proposition that where a proxy form is called into question, the court is concerned to examine the position of all shareholders, not just those who signed the proxy in question. The learned judge noted that none of the

---

[11] [1991] CanLII 593 (BC SC).

dissenting shareholders provided any advanced notice to Sinovac or the shareholders, as a whole, prior to the AGM, of a proposal to replace the board or of the identity of their nominees for election, nor did their proxy form name any nominee for election.

[60] Smith J held that the object and intent of regulation 15 is clear and unmistakable. It is to ensure that, on important matters such as the appointment of an auditor and the election of directors, the will of the shareholder, the proxy giver, is effected and that all shareholders are provided with full information concerning the election of directors. Such a requirement has greater relevance and consequences for a publicly traded company with thousands of shareholders who vote online and through brokers, than, for example, a small family-run company.

[61] Sinovac submits and I agree, that in view of the authorities and the plain wording of regulation 15, and the scheme of the **IBCA** generally, including section 71, Smith J's conclusion regarding the object and intent of regulation 15 was entirely appropriate.

[62] Smith J concluded that in the final analysis, the court must weigh the right of the shareholders to full information to be able to come to an intelligent decision against the right of shareholders who voted not to be unfairly disenfranchised. For this reason, Smith J made no ruling on the validity of the proxy form but regarded it as a factor in the round, in the exercise of his discretion under section 122.

[63] I also agree with Sinovac that 1Globe's suggestion, that Smith J's conclusion as to the object and intent of regulation 15 renders the regulation ultra vires the enabling provision, section 351 of the **IBCA**, is also wrong. The power to make regulations under section 351 is provided "for the better administration of this Act" and the relevant sub paragraphs are expressly stated to be "without limiting the generality of the foregoing".

[64]   1Globe complains that regulation 15 is inconsistent with the common law position relating to amendments to ordinary resolutions, that is, **Betts**. Sinovac, rejects this complaint and submits that regulation 15 is consistent with Canadian case law, and in any event, it is a creature of statute, modelled on well-established Canadian provisions in respect of which there is a body of supportive case law. I agree.

[65]   For the reasons given, ground 6 also fails.

**Ground 7**

[66]   Ground 7 deals with waiver. It asserts that Smith J erred in fact and in law in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders at the AGM, in particular, after having counted their shares, on the basis of such proxy forms, as present for the purposes of declaring quorum at the AGM.

[67]   Smith J dealt with the issue at paragraph 33 of his judgment. He recited 1Globe's complaint that Sinovac waived any procedural defect in the dissenting shareholders' proxy forms by counting them at the AGM for the purposes of declaring a quorum and then counting them in favour of the amended motion. Smith J reasoned that it was clear from the transcript of the proceedings at the AGM, that Guang Yang was at pains to point out that, while she would collect the ballots, she could not pronounce on the validity of the ballots that had been amended by the dissenting shareholders until the matter had been reviewed by Antiguan counsel. Smith J also observed that Guang Yang did not say anything about the proxy forms at the AGM. He however concluded that Guang Yang, in reserving any declaration on the result of the election, meant that it was open to Sinovac's Antiguan counsel to review the validity of the process. In the circumstances, the learned judge found that the defect in the proxy forms was not waived by Sinovac. In my view, it was a conclusion that was properly open to him.

[68]     1Globe, however, posits that Smith J only dealt with the point about Sinovac's reliance upon or acceptance of the relevant proxy forms at the AGM for the purpose of counting of the vote. It argues that Smith J did not consider the real thrust of the waiver case, that is, that by counting and accepting the votes of the relevant shareholders, attending by proxies, for the purpose of establishing quorum at the AGM, Sinovac thereby waived any formal legal defect in the relevant proxy forms.

[69]     Sinovac submits that 1Globe's argument regarding the waiver of defects in the dissenting shareholders' proxy forms is moot in circumstances where Smith J, expressly declined to make any findings regarding the validity, or otherwise, of these proxy forms. There is, accordingly, no issue in relation to the quorum of the AGM. Further, Sinovac submits that even if there were an issue, this would not assist 1Globe. In that regard, Sinovac refers to regulation 8 of its bye-laws which provides that:

> "… Each director shall hold office unless removed as provided in these presents, until the next Annual Shareholders' meeting and until his successor shall have been elected."

Sinovac also utilizes section 67(4) of the **IBCA** which states that:

> "Notwithstanding subsection (2) of section 65 or subsections (1) and (3) of this section, if directors are not elected at a meeting of shareholders, the incumbent directors continue in office until their successors are elected."

[70]     Sinovac also submits that if the AGM had been inquorate, neither slate of directors could have been elected with the result that, pursuant to regulation 8.1 and section 67 of the **IBCA**, the incumbent board remained in office.

[71]     In considering the arguments of the parties, it is instructive to point out that in most litigious situations the expression 'waiver' is used to describe a voluntary, informed and unequivocal election by a party not to claim a right or raise an objection which

it is open to that party to raise or claim as per Lord Bingham of Cornhill in **Millar v Dickson**.[12] As noted in **McGowan v B**[13] at paragraph 17:

> "The words "voluntary, informed and unequivocal" captures the essence of what is needed for a waiver of any kind to be valid."

[72]   Given that the essence of a valid waiver and Smith J's conclusion with respect to the evidence of Guang Yang, I am not of the view that the criteria for a valid waiver were met. In the circumstances, Sinovac did not waive any technical deficiency in the relevant proxy forms, inter alia, by counting such votes as present for the purposes of declaring quorum at the AGM. This ground accordingly fails.

**Ground 8**

[73]   Ground 8 alleges that the learned judge erred in fact and in law in concluding that (a) 1Globe had knowledge of a "secret plan" in advance of the AGM and (b) such knowledge and/or consequent "unfairness to other shareholders" constituted a sufficient reason for the court to refuse its power under section 122 of the **IBCA**.

[74]   1Globe contends that the key point in this context is the extent to which the learned judge allowed his views as to the motives of 1Globe or other shareholders to influence his determination of distinct questions of law throughout the judgment.

[75]   At paragraph 37 of his judgment, Smith J dealt with Sinovac's invitation to conclude that 1Globe and the dissenting shareholders colluded and orchestrated a secret plan to elect a new board, without notice to the incumbent directors or the shareholders as a whole. Smith J listed the five items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan to elect a new board. These were:

> (1) The year-end personal work summary of Tao Fuwu dated 12th January 2017.

---

[12] [2002] 1 WLR 1615.
[13] [2011] UKSC 54.

(2)  A draft amendment and restated consortium agreement.

(3) The transcript of a teleconference held on 8[th] January 2018.

(4) An open later from Sinobioway to all shareholders of Sinovac; and

(5) An email from "one shareholder Tang".

[76]    Each document was put to 1Globe's witness, Mr. Li, in cross-examination. Smith J set out Mr. Li's evidence in relation to each. Having done that Smith J set out his conclusion, regarding that on the evidence, there had indeed been a plan and that Mr. Li's evidence was not credible.

[77]    The personal work summary was authored by Tao Fuwu, who set out his role as "one of the supervisors" in the matter of the privatisation of Sinovac and summarised his main work in 2017 to include:

> " … prepare to hold Sinovac special shareholders' conference and demonstration  (including without limitation, repeated discussions and persuasion of 1G[lobe], especially assistance in analysis of poison pill plan, meeting order, analysis of the barriers and plans, shareholder proxies handling, and hiring of intermediary agent) preparation and opining on Sinovac's annual shareholders conference  participation and change of the board of directors (repeatedly opine of plan risks, discuss rivals' obstructionism, opine on an appropriate response, opine on procedures, coordination among shareholders and documentation of authorized agent); the related media public relations work……worked with 1G[lobe] to achieve substantial progress and signed cooperation agreement and framework agreement…..We are fundamentally prepared for changing the board of directors of Sinovac at the shareholders' conference."

[78]    Smith J referred to Mr. Li's evidence in cross-examination that he was delegated by 1Globe to manage its investment risk when it started being privatised. He was entrusted with full authority and he was free to make any decision in consultation with 1Globe's United States lawyer. Most of the strategic advice in relation to 1Globe came from him and he did not need advice from anyone at 1Globe. He flatly denied, however, knowing anything about what was contained in the work summary and

said he was puzzled by it and questioned whether in fact Mr. Fuwu had really written it.

[79]     The draft consortium agreement suggests that 1Globe was part of the Sinobioway Consortium to attempt to purchase Sinovac. Under cross–examination, Mr. Li expressed surprise at the document and said that he had never seen it before, expressing doubt as to its authenticity, since any communication would have to come through him as 1Globe's designated representative in the matter. He stated that the consortium agreement might be forged or fabricated but declined to say who might have forged it.

[80]     With respect to the transcript of the teleconference, the AGM was discussed and the eventuality of changing the board of directors. These plans included a rehearsal to prepare shareholder representatives for potential issues which the dissenting shareholders might face at the AGM and a media strategy to turn shareholders against the incumbent directors in the days before the AGM. Smith J noted that during cross-examination, Mr. Li denied knowing anything about that teleconference and said that it was the first time he was seeing the document.

[81]     The open letter from Sinobioway dated 31st January 2018, alleged that the chairman and CEO of Sinovac, bribed a senior official of the China Food and Drug Administration and was not qualified to serve as a director of Sinovac. Sinovac was accused of incompetence, not acting in the best interests of shareholders and infringing the voting rights of shareholders through the voting card prepared for the AGM. It ended by recommending that shareholders attend the AGM and oppose the re-election of the current board. Smith J noted that Mr. Li again denied any knowledge of involvement in this document.

[82]     Lastly, Smith J referred to the email to Sinovac from a sender named Tang, who described himself as "one shareholder Tang". The email points out that the voting card prepared provided no option to vote "against" the re-election of the incumbent

directors and requested the inclusion of the option to vote "against" on the voting card. Under cross-examination Mr. Li admitted that Tang, whose real name was Joyce, was a younger colleague of his who worked at 1Globe and admitted that the email was written at his request by "Joyce" but did not know why she used the name "Tang" instead of her real name.

[83]    Smith J stated that Mr. Li maintained under cross-examination that he never knew James Chang, even though it was Chang who nominated him to be a director on Sinovac's board. He said he was surprised to have been nominated and did not know the other three individuals who were nominated to replace the incumbent directors. He had remained silent throughout the AGM.

[84]    Smith J found it difficult to believe that Mr. Li did not know that he was going to be nominated and found it equally difficult to believe that he did not need 1Globe's approval to accept the nomination and did not need to consult 1Globe on anything having to do with Sinovac. Smith J found that Mr. Li was at a loss to explain why the email address from which his junior colleague sent an anonymous email to Sinovac matched the email address of Sinobioway which, on the evidence, had been involved in planning to oust the incumbent directors and spreading negative publicity about them. The haste with which he took charge of Sinovac even before the official election result was declared, suggests that he knew of a plan to oust the incumbent directors. Smith J concluded:

> "Taken in the round, I do not find the evidence of Mr. Pengfei Li to be at all credible. I am convinced, on a balance of probabilities, that there was a secret plan to take control of the Company [Sinovac] and that the claimant [1Globe], through Mr. Li, knew of and acquiesced in this plan."

[85]    An appellate court is constrained in interfering with findings of fact by a trial judge and must not interfere with such findings unless compelled to do so. This applies not only to findings of primary facts but also to the evaluations of those facts and to inferences to be drawn from them as had been noted in **Fage UK Ltd. and another**

**v Chobani UK Ltd. and another**.[14] Appellate interference requires a finding that there was no evidence to support the challenged factual finding or that the finding was one which no reasonable trial judge could have made. On the issue of credibility, an appellate court is rarely justified in overturning a finding of fact by a trial judge which turns on the credibility of a witness as had been noted at paragraph 28 in **Mutual Holdings (Bermuda) Limited and others v Diane Hendricks and others**.[15]

[86]    As indicated, Smith J listed the items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan to elect a new board. The documents were put to Mr. Li, 1Globe's witness, in cross-examination and the learned judge set out his evidence in relation to each item. He then set out his conclusion that there was a secret plan to take control of Sinovac and that 1Globe, through Mr. Li, knew of and acquiesced in the plan. Smith J had also found that Mr. Li was not credible. It cannot be said that there was no evidence to support the factual findings, or that the findings were ones which no reasonable judge could have reached. The findings were clearly open to him on the evidence. 1Globe has not met the high threshold for appellate interference in the judge's factual findings. This ground of appeal accordingly fails.

[87]    1Globe asserts, incorrectly, in my view, that these findings of fact have no proper bearing on the determination of the legal issues impacting the determination of the section 122 claim and should not have been allowed to otherwise influence its outcome. Sinovac submits correctly, in my judgment, that the court's exercise of its discretion involves consideration of the facts and circumstances of the case at hand. This is supported by Canadian case law dealing with the equivalent to section 122 of the **IBCA**, which demonstrates that the conduct of the parties is one of the factors relevant to the exercise of the court's discretion.

---

[14] [2014] EWCA Civ. 5.
[15] [2013] UKPC 13.

**Ground 9**

[88]     The subject of Ground 9, a discrete ground of appeal, is the validity of the rights agreement between 1Globe and Sinovac. 1Globe asserts that the learned judge erred in law in finding that the rights agreement is valid as a matter of Antiguan Law.

[89]     The rights agreement was entered into to "guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain control of the company [Sinovac]". It provides that certain conduct of shareholders of Sinovac can trigger the dilution of their shareholding.

[90]     1Globe disputes the validity of the rights agreement on two bases. First, Antiguan law does not allow defensive shareholder rights plans absent stockholder consent and there was no such consent. Secondly, the rights agreement was not validly adopted under Antiguan law because the provisions of the **IBCA**, sections 161 and 163, were not complied with in respect thereof. Sinovac relies on the Bermuda case of **Stena Finance BV and Another v Sea Containers Ltd. and Others**,[16] which upheld the validity of a rights plan, and contends that the rights agreement was validly adopted under Antiguan law.

[91]     Smith J considered and rejected 1Globe's both arguments for disputing the validity of the rights agreement. He also noted Sinovac's reliance, in reply, on **Stena**, which upheld the validity of a rights plan and its contention that the rights agreement was validly adopted under Antiguan Law.

[92]     In **Stena**, Astwood CJ held that the distribution of rights to existing shareholders in anticipation of a possible hostile takeover bid is not unlawful, provided that the directors have the requisite powers under the company's bye-laws to issue such rights, that they exercise those powers bona fide (that is, not for the purpose of entrenching the existing management of the company) and fairly as between shareholders. Astwood CJ stated:

---

[16] (1989) 39 WIR 83.

35

"The directors stated the purpose for adopting the plan in the letter of 9[th] May 1988. On review, their purpose appears to be legitimate, and I have no reason to differ from them. The principles expounded by the Privy Council in *Howard Smith Ltd. v Ampol Petroleum* Limited [1974] AC 821, have not, in my opinion, been breached. The plan seems to be favourable to all shareholders of record at the date of adoption of the plan, and those persons who became shareholders after that date did so knowing what the terms of the plan were. Therefore, they cannot now be heard to say that the plan is unfavourable to their aspirations in making a bid to take over the company.

On a review of the plan, I tend to agree … that the plan did not do any of the following things: (a) it did not in any way alter or purport to alter (pending the exercise of the rights) the existing share capital of the company or the votes attached to the common shares; and (b) it, without in any way intending to penalize any existing shareholders (that would indeed have been expropriatory and improper), operated quite indiscriminately between all existing shareholders."

[93]   Smith J agreed with Sinovac that there was no allegation of any mala fides on the part of its board or any suggestion that it had entered into the rights agreement other than in accordance with its fiduciary duties. There is, in evidence, minutes of the board meeting approving the rights agreement which record the board's belief that it would "contribute to the preservation of the company's long-term value".

[94]   Smith J proceeded to say that:

"….if Antigua wishes to attract international business…..to incorporate in the jurisdiction, it has to recognize that defensive shareholder rights plans are part of that corporate landscape."

Smith J adopted the approach taken in **Stena** and stated that:

"….provided the Rights Agreement is not contrary to the **IBCA** or the Company's articles and bye-laws, and provided it was not entered into to entrench the Incumbent Directors, it should be considered as valid."

His Lordship went on to examine both the **IBCA** as well as Sinovac's articles of association to see whether Sinovac could lawfully enter into the rights agreement.

[95]     1Globe submits that Smith J erred in adopting and applying the reasoning of Astwood CJ in **Stena**, as the rights plan in that case dealt with a different corporate scenario, that is, hostile takeover bids, and fell to be construed against a different statutory regime than applicable in Antigua and Barbuda. Further, Smith J erroneously assumed that permitting defensive shareholder agreements was an intrinsically desirable thing "if Antigua wishes to attract international business … to incorporate in the jurisdiction".

[96]     1Globe asserts that the factual premise for Smith J's analysis was the assumption, in favour of Sinovac, that the rights agreement was adopted by the former directors in March 2016 in the "best interests of the shareholders as a whole". 1Globe described this as dubious. A further complaint was that Smith J made no attempt to analyze section 163 of the **IBCA**, but simply stated "[n]either do I see the applicability of section 163 of the **IBCA**", in reaching his conclusion as to the non-applicability of sections 161 and 163 to the rights agreement. Further, in reaching his conclusion as to the non-applicability of sections 161 and 163 to the rights agreement, Smith J made a fundamental misapprehension as to the legal effect of a 'trigger event' upon the legal rights attaching to shares held by 'acquiring persons', that is, the relevant shareholders, which involves the removal of voting rights and/or acquisition rights attaching to shares in Sinovac. It is difficult, 1Globe argues, to see how neither section 161 nor 163(1)(c)(iv) could be engaged.

[97]     As indicated, 1Globe criticized Smith J's reliance on **Stena**. In my judgment, Smith J was right in adopting and applying the reasoning in **Stena**. Although 1Globe sought to distinguish **Stena** on the ground that it dealt with a different corporate scenario, I agree with Sinovac's contention that there is no meaningful difference between the two cases. The rights plan in **Stena** was adopted in the context of competing takeover bids, while the rights agreement in the present case was adopted in the context of competing going private proposals. A distinction without a difference. Further, 1Globe's assertion that the rights plan in **Stena** fell to be

construed against a different statutory regime, is devoid of details as to the differences.

[98]     1Globe's attack on the bona fides of Sinovac's board in entering into the rights agreement is not justified. There was no pleaded allegation of mala fides on the part of Sinovac's board. Also, that was not a ground of appeal. I also note that there is no challenge to Smith J's finding that "there is no allegation of any mala fides on the part of the company's [Sinovac] board or any suggestion that it entered into the rights agreement other than in accordance with its fiduciary duties".

[99]     Smith J examined both the **IBCA** and the articles of association in considering whether Sinovac could lawfully enter into the rights agreement. He took cognizance of the class of shares Sinovac was allowed to issue, the directors' authority to fix the number of shares or to determine the designation of, and the rights privileges, restrictions and conditions attaching to the shares of each series, and that the powers of the corporation shall be exercised by its board of directors. Smith J also referred to paragraph 8.9 of the bye-laws which provides that the board may exercise all such powers of the corporation as are not by the **IBCA** or bye-laws required to be exercised by the corporation in an annual general meeting. He opined that the power to make distributions, as contemplated by the rights agreement, is not reserved to the members and is therefore exercisable by the board.

[100]   Smith J noted 1Globe's reliance on sections 161 and 163 of the **IBCA** to support the contention that the rights agreement could not be adopted without amending the Sinovac's articles of association. Section 161 states:

> "Subject to sections 162 and 163, the articles of a corporation may, by special resolution, be amended -
> (a)  to change its name;
>
> (b)  to add, change or remove any restriction upon the business that the corporation can carry on;
>
> (c)  to change any maximum number of shares that the corporation is authorized to issue;

(d)  to create new classes of shares;

(e)  to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued;

(f)  to change the shares of any class or series, whether issued or unissued, into a different number of shares of the same class or series or into the same or a different number of shares of other classes or series;"

Section163(1)(c)(iv) provides:

"(1) The holders of shares of a class or, subject to subsection (2), of a series are, unless the articles otherwise provide in the case of an amendment described in paragraph (a) or (b), entitled to vote separately, as a class or series, upon a resolution to amend the articles:
(c) to add, change or remove the rights, privileges, restrictions or conditions attached to the shares of that class and, in particular, without limiting the generality of the foregoing,
(iv) to add, remove or change prejudicially conversion privileges, options, voting, transfer or pre-emptive rights, or rights to acquire shares or debentures of a corporation, or sinking fund provisions."

[101]  Smith J did not view the distribution of shares, triggered by the rights agreement, resulting in a dilution of a shareholders' shareholding, as changing the designation of/or removing any rights or privileges attaching to, or in respect of any shares. Neither did he see the applicability of section 163 of the **IBCA**. He therefore declared that the rights agreement was valid under Antiguan law.

[102]  1Globe submits that in determining the applicability of sections 161 and 163 of the **IBCA,** Smith J made a "fundamental misapprehension" in failing to appreciate that the rights agreement involved "the removal of voting rights and/or the acquisition rights attaching to shares in the company". I do not accept that submission. I am persuaded by Sinovac's position, that the rights agreement is similar to that in **Stena**, where the court found that entering into a rights plan was within the directors' powers. Further, as in **Stena**, the rights agreement did not involve (a) the alteration

of the rights attaching to the company's common stock rather, it involved the distribution of a right to acquire shares, that is, an option, to all holders of the company's common stock, (b) the removal of voting rights rather, it is an acquiring person's rights, not its voting rights in its existing shares, which, under the original terms of the rights agreement, are avoided upon the happening of a trigger event.

[103]    As in **Stena**, in the present case, neither the adoption nor the implementation of the rights agreement involved or required an amendment to the articles of association, nor any other step requiring shareholder consent. In that regard:

> (a) article iii (3) of the articles of association permits Sinovac to issue shares in series and the directors are authorized to fix the number of shares in, and to determine the designation of, and the rights, privileges, restrictions and conditions attaching to shares of each series;

> (b) article iv provides that the powers of Sinovac are exercised by the board;

> (c) by virtue of bye–law 8.9 the board may exercise all such powers of Sinovac as are not by the **IBCA** or by the bye-laws required to be exercised by Sinovac in an annual general meeting;

> (d) the power to make distributions is not reserved to the members and is therefore exercisable by the board;

> (e) likewise, the power granted to Sinovac pursuant to section 35 of the **IBCA** to grant conversion privileges, options or rights, to acquire shares of the corporation is also not reserved to the members and is therefore exercisable by the board.

[104]    In the premises, the board was empowered to grant options or rights to acquire shares, and to fix the rights, privileges, restrictions and conditions attaching to shares, and also to make distributions. The rights agreement was validly entered into. It was within the powers afforded to the directors under Sinovac's constitution and the **IBCA**. This ground of appeal accordingly fails.

[105]    I return to the issue of the court's discretion under section 122 of the **IBCA**, which provides for a corporation, shareholder or director thereof to apply to the court with respect to any controversy with respect to the election of a director. Section 122 gives the court a very broad discretion in determining any controversy. On its plain wording, the section confers on the court, a broad remedial discretion to make any order it thinks fit and enumerates examples of permissible orders. The exercise of the discretion whether or not to grant relief and in what form, is inextricably linked to the facts of the particular case. In **Dumont v Manitoba Metis Federation**,[17] the court noted that the power to grant declaratory relief (under the equivalent section to section 122) entitled it to take account of equitable principles such as the conduct of the party seeking the relief.

[106]    1Globe's contention that the conduct of the parties "lack[s] any legal relevance" to the section 122 claim is unmeritorious and wrong in law. The court cannot exercise its discretion in a vacuum. The factual context is important. The reasons for the judge's exercise of discretion in refusing relief under section 122 of the **IBCA** are clearly set out in his judgment. Included therein are breach of the spirit and intent of section 71, amending the Sinovac's motion to include an alternative slate without notice to shareholders and after many had voted online in advance of the AGM, the right of the shareholders to full information and the absence of full and fair information depriving the shareholders of the opportunity to make an informed and intelligent decision, the conduct of 1Globe and the scale and detail of the secret plan to take control of Sinovac which 1Globe knew of and acquiesced in.

[107]    Smith J stated that in **Dumont**, the court stated that the evidence of wrongdoing and essential unfairness of the electoral process are factors that might influence the exercise of discretion. He therefore concluded that 1Globe's knowledge of the secret plan and the unfairness to other shareholders of the execution of the plan at the AGM, is enough for the court to refuse the relief sought by 1Globe.

---

[17] [2004] MBCA 149.

[108]    Is there a proper basis for disturbing the judge's exercise of discretion? There are well established principles governing appellate interference with the exercise of a judicial discretion. An appellant has a high hurdle to surmount when challenging the exercise of a judicial discretion. This court will not interfere with the exercise of a discretion entrusted to a trial judge unless the judge has misdirected himself in law, taken into account irrelevant matters, failed to take account of relevant matters or has made a decision which has exceeded the generous ambit within which reasonable disagreement is possible. Even if an appeal court would have preferred a different answer, unless the decision was plainly wrong, it will be left undisturbed.

[109]    Given the law regarding appellate interference with the exercise of the discretion of a judge, I am satisfied that there is no proper basis warranting such interference. It cannot be said that the learned judge's decision refusing relief to 1Globe under section 122 of the **IBCA** exceeded the generous ambit within which reasonable disagreement is possible or was plainly wrong.

**Order**

[110]    It is ordered that:

(1)  The appeal is dismissed.

(2)  The order of Smith J dismissing 1Globe's claim is thus affirmed, so also is the declaration that the rights agreement was validly adopted as a matter of Antiguan law.

(3)  The respondent, Sinovac, having succeeded in the court below and also in resisting the appeal, is entitled to prescribed costs in the court below and costs on the appeal being, 2/3 of the prescribed costs in the court below.

<div align="right">

I concur.
**Louise Esther Blenman**
Justice of Appeal

</div>

<div align="right">

I concur.
**Gertel Thom**
Justice of Appeal

</div>

<div align="right">

**By the Court**

**Chief Registrar**

</div>

# Exhibit D

121

*A*

Queen's Bench Division

# Wang *v* Darby

## [2021] EWHC 3054 (Comm)

*B*  2021  Nov 9, 10; 17          Stephen Houseman QC sitting as a deputy High Court
judge

*Trusts — Formation — Cryptocurrency — Parties swapping cryptocurrencies for
agreed period — Defendant failing to return tokens of Tezos cryptocurrency
to claimant — Claimant issuing proprietary claim alleging existence of trust
in respect of Tezos transferred — Whether trust arising in respect of Tezos
transferred*

*C*

The claimant and defendant cryptocurrency traders entered into two contracts
by which the claimant transferred two separate parcels of 200,000 Tezos to the
defendant's digital wallet in return for 13 and 17 Bitcoins, on terms as to reciprocal
restoration of the same amounts of each currency upon or after an agreed period
*D*  of two years. The parties expected the 400,000 Tezos to be used by the defendant
for "baking" and/or "stake bonding", with the defendant agreeing to account to
the claimant for the rewards or profits from such activities and to return 400,000
Tezos to the claimant at the end of the agreed period upon restoration to the
defendant of 30 Bitcoins. "Baking" involved individual tokens of Tezos being used
to yield additional tokens credited to the account holder by the global issuer. "Stake
*E*  bonding" was the process by which an account holder transferred their Tezos into
the account of another account holder to undertake baking. After a falling out
between the parties and the defendant's refusal to return 400,000 Tezos, the claimant
issued, inter alia, a proprietary claim based on the non-return of 400,000 Tezos. The
defendant applied for strike out, alternatively reverse summary judgment, of that
claim. A question arose on the application as to the proper legal characterisation of
the two contracts. The key issue was whether some form of trust arose in respect
*F*  of the 400,000 Tezos transferred. The parties agreed that, as a matter of English
law, a unit or token of Tezos constituted property which could in principle be the
subject of a trust. The claimant contended that there was an express, resulting,
or constructive trust in respect of the 400,000 Tezos in the digital wallet of the
defendant, notwithstanding that the claimant had received in return 30 Bitcoins from
the defendant and was free to use or dispose of them over the period of the contracts
and that, at the end of the contracts, the parties agreed to re-transfer the respective
*G*  currencies back to one another. The defendant asserted that such a claim lacked
any real or reasonable prospect of success, the arrangement being described by both
parties in contemporaneous correspondence and their pleadings as one of sale and
buy-back, which precluded any trust arising.

On the defendant's application—

*Held*, granting the application and dismissing the proprietary claim based on
the existence of a trust, that the essential economic reciprocity of the transactions,
*H*  whereby the claimant would become entitled to the return of 400,000 Tezos only if
he returned corresponding value in Bitcoins to the defendant, precluded any trust;
that the claimant's own characterisation, in contemporaneous correspondence and
in his particulars of claim, of the transaction as a sale and purchase back was also
fatal to any trust analysis; that the sale and purchase structure logically precluded a
trust; that nor was a trust over 400,000 Tezos necessary to give effect to the parties'

legitimate expectations or commercial interests, which was a contra-indication for the   A
existence of a trust; that the fact that the parties, in informal dialogue, at times used
possessive or proprietary language to describe the 400,000 Tezos did not dislodge
that legal characterisation of the transactions; that the use of a non-segregated wallet
for the transfer in of the 400,000 Tezos and the defendant's strict obligation to return
the second tranche of the Tezos also tended to contra-indicate a trust; that, for those
reasons, the case that an express, resulting, or constructive trust was created in respect
of the 400,000 Tezos upon receipt by the defendant had no real or reasonable prospect   B
of success at trial; and that given it was accepted that cryptocurrency constituted
property under English law, alleged jurisprudential novelty in the form of the case
being the first contested hearing in England and Wales to deal with the question
of whether a trust existed over cryptocurrency did not provide a good let alone
compelling reason for the claims to proceed to trial absent threshold substantive
prospects (post, paras 54, 78–80, 81, 82–84, 85, 86, 88, 90, 91, 92, 93, 94, 109).

Dicta of Briggs J in *In re Lehman Brothers International (Europe) Ltd (in*   C
*administration) (No 4)* [2010] EWHC 2914 (Ch) at [225] applied.

*Per curiam.* The unilateral transfer of tokens of the Tezos cryptocurrency from
one account holder to another for the purpose of baking or stake bonding, with
no reciprocal transfer in the other direction, could involve or constitute a trust,
depending on all the circumstances, including whether a loan or sale was the more
appropriate characterisation to give effect to the parties' commercial objectives (post,   D
para 89).


The following cases are referred to in the judgment:

*AA v Persons Unknown* [2019] EWHC 3556 (Comm); [2020] 4 WLR 35; [2020] 2
    All ER (Comm) 704
*Andoro Trading Corpn v Dolfin Financial (UK) Ltd* [2021] EWHC 1578 (Comm)   E
*Bieber v Teathers Ltd* [2012] EWCA Civ 1466; [2013] 1 BCLC 248, CA
*Easyair Ltd (trading as Openair) v Opal Telecom Ltd* [2009] EWHC 339 (Ch)
*First City Monument Bank plc v Zumax Nigeria Ltd* [2019] EWCA Civ 294; [2019]
    2 P&CR DG 2, CA
*Ion Science Ltd v Persons Unknown* (unreported) 21 December 2020, Butcher J
*Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203; [2020] 2 All ER
    (Comm) 359, CA                                                              F
*Lehman Brothers International (Europe) Ltd (in administration) (No 4), In re* [2010]
    EWHC 2914 (Ch); [2011] EWCA Civ 1544; [2012] 2 BCLC 151, CA
*Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567; [1968] 3 WLR 1097;
    [1968] 3 All ER 651, HL(E)
*Ruscoe v Cryptopia Ltd (in liquidation)* [2020] NZHC 728
*Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] AC 164; [2002] 2 WLR 802;
    [2002] 2 All ER 377, HL(E)                                                  G

The following additional cases were cited in argument or referred to in the
claimant's skeleton argument:

*Hunter v Moss* [1994] 1 WLR 452; [1994] 3 All ER 215, CA
*JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWHC 3263 (Ch)
*Kea Investments Ltd v Watson* [2020] EWHC 472 (Ch)
*Mediterranea Raffineria Siciliana Petroli SpA v Mabanaft GmbH* (unreported)   H
    1 December 1978, CA
*Parvalorem v Oliveira* [2013] EWHC 4195 (Ch)
*Public Institution for Social Security v Amouzegar* [2020] EWHC 1220 (Comm)
*Ward (AC) & Son Ltd v Catlin (Five) Ltd* [2009] EWCA Civ 1098; [2010] Lloyd's
    Rep IR 301, CA

© 2022. The Incorporated Council of Law Reporting for England & Wales

A  **APPLICATIONS**

The claimant, Zi Wang, brought, inter alia, a proprietary claim against the defendant, Graham Darby, contending that certain crypto coin assets transferred to the defendant under two agreements and not returned were held by him on trust. By an application dated 6 September 2021 the defendant sought summary judgment/strike out of the claimant's proprietary claim on the ground that the contention that a trust had arisen lacked any real or reasonable prospect of success.

B

By applications dated 3 August 2021 and 25 October 2021 the claimant applied (1) to continue a worldwide freezing order and proprietary injunction granted by Judge Pelling QC at a without notice hearing on 2 August 2021, and (2) to vary the defendant's expenditure allowance under the worldwide freezing order.

C       The facts are stated in the judgment, post, paras 1–2, 13–50.

*James Collins QC* and *Philip Jones* (instructed by *Mackrell.Solicitors*) for the defendant.
*Tim Penny QC* and *Daniel Scott* (instructed by *Curzon Green Solicitors*) for the claimant.

D

The court took time for consideration.

17 November 2021. **STEPHEN HOUSEMAN QC** handed down the following judgment.

E  *Introduction*

**1** The present dispute concerns two related contracts entered into by the claimant ("Mr Wang") and the defendant ("Mr Darby"): the first on 28 December 2018 as allegedly varied on or about 10 January 2019 ("First Contract") and the second on 24–25 January 2019 ("Second Contract") coinciding with or comprising a further alleged variation of the First Contract.

F

**2** Broadly speaking both contracts involved the individual parties exchanging specified quantities of respective cryptocurrencies, namely Tezos and Bitcoin, on terms as to reciprocal restoration of the same amounts of each currency upon or after an agreed period of two years, i e on/after 28 December 2020 and 25 January 2021, respectively. The parties' cases as to the correct legal characterisation of the transactions, and their proprietary consequences for the Tezos transferred by Mr Wang to Mr Darby, are diametrically opposed. This central issue was fully and forcefully contested at the present hearing.

G

**3** There are three separate applications before the court:

(i) Mr Wang's application dated 3 August 2021 to continue a worldwide freezing order ("WFO") and proprietary injunction (together, "Injunction Order") granted by Judge Pelling QC at a without notice hearing on 2 August 2021 ("WFO Continuation Application" and "PI Continuation Application", respectively; together, "Continuation Application").

H

(ii) Mr Darby's application dated 6 September 2021 seeking to strike out or enter reverse summary judgment in respect of the "proprietary claims" pleaded against him in this action ("SJ Application").

(iii) Mr Wang's application dated 25 October 2021 seeking to vary the    A
terms of the WFO in the Injunction Order as regards Mr Darby's expenditure
allowance, which is necessarily contingent upon Mr Wang's prior success on
the WFO Continuation Application ("WFO Variation Application").

4 A further application dated 2 November 2021 was made by Mr Wang
seeking permission to refer to a second expert report dated 21 October 2021
in connection with the Continuation Application and the SJ Application.
Such report was served in support of the WFO Variation Application and was    B
out of time in respect of the other applications, Mr Wang having previously
obtained a series of extensions resulting in a final extension for service of his
reply evidence on the Continuation Application. Mr Wang sought relief from
sanctions in this context and for this purpose. Mr Darby did not contend that
he would be prejudiced by the admission of this second expert report for such
purposes, even though first intimated on behalf of Mr Wang at a hearing on    C
29 October 2021, at any rate so long as he (Mr Darby) was entitled to rely
upon his own fourth witness statement dated 5 November 2021.

5 I gave permission to both sides to refer to all such evidence in relation
to all applications before the court. The contested admissibility of the second
expert report had been stood over to the present hearing from the hearing
before Judge Pelling QC on 29 October 2021 at which a separate application    D
by Mr Darby dated 13 October 2021 seeking variation of the Injunction
Order to permit use of funds for legal expenditure was dismissed. Mr Darby
was ordered to pay Mr Wang's costs of that application and hearing,
assessment of which was reserved to the present hearing.

6 Mr Darby has not served any expert evidence. The nature and uses of
Tezos are explained in the expert evidence served on behalf of Mr Wang,
in particular the first report of Mr Sanders. This general background is not    E
disputed.

7 The SJ Application concerns the proper legal characterisation of the
relevant contracts pursuant to which Mr Wang transferred two separate
parcels of 200,000 Tezos to Mr Darby in return for 13 Bitcoins (First
Contract, concerning the "First 200k" as it was known) and 17 Bitcoins
(Second Contract, concerning the "Second 200k" as it was known)    F
transferred by Mr Darby to Mr Wang by way of simultaneous digital
exchange. The key issue is whether some form of trust arose in respect of the
400,000 Tezos transferred by Mr Wang to Mr Darby. Both sides contend
that *both* contracts were of the *same* essential nature and structure as one
another: the core dispute concerns their proper legal characterisation as a
matter of objective common intention.

8 It is common ground that whether cryptocurrency such as Tezos is    G
regarded as property which can be the subject of a trust is to be determined
by English law for present purposes. English law is also assumed to govern
the relevant contracts and any fiduciary duties arising in connection with
such transactions. It is further agreed that, as a matter of English law, a unit
or token of Tezos constitutes property which can in principle be the subject
of a trust. This is so notwithstanding its entirely fungible character and non-
identifiable status: no single unit bears any unique serial number or means    H
of identification.

9 Mr Wang contends that there was an express or resulting or constructive
trust in respect of the 400,000 Tezos in the hands (i e digital wallet) of
Mr Darby and/or that Mr Darby owed fiduciary duties in respect of such

A   digital assets, notwithstanding that Mr Wang himself was free to use or dispose of the 30 Bitcoins he received from Mr Darby. Hence the proprietary claim against Mr Darby in respect of the Tezos. Mr Darby says such claim lacks any real or reasonable prospect of success: the bilateral exchange and obligatory re-exchange (upon demand after two years) of different cryptocurrencies constituted a sale and buy-back arrangement akin to a "repo" transaction which, by definition, precluded any trust arising in respect

B   of the Tezos.

10 A notable feature of the present case is that the only evidence said to contain or demonstrate both contracts is comprised within the parties' private dialogue via an online communications platform called Telegram ("Telegram Transcript"). The parties communicated extensively through this platform between late December 2018 and early March 2019 predominantly

C   in writing but with occasional voice messages left by Mr Wang. Mr Darby controlled the underlying Telegram account and blocked Mr Wang from it on 6 March 2019. The Telegram Transcript was, however, produced by Mr Wang and underwent modifications from its native format (including removal of voice messages) as described further below. There is a separate transcript of the deleted voice messages ("Voice Message Transcript") which

D   augments the Telegram Transcript in a limited way so far as material.

11 This judgment deals with the SJ Application and the WFO Continuation Application. The PI Continuation Application was stood over to await the outcome of the SJ Application. The WFO Variation Application was stood over to await the outcome of the WFO Continuation Application.

12 I am grateful to counsel on both sides for the high quality of their oral and written submissions, including additional focused written submissions

E   requested by me as to the formation and content of the contracts.

*Relevant background*

13 The relevant background is of two kinds: general background about Tezos and specific background relating to the parties, their mutual dealings and other circumstances relevant to the determination of the SJ Application

F   and WFO Continuation Application.

14 As regards Tezos, the following summary suffices for present purposes:

(1) Tezos (XTZ) is one of the estimated 2,000+ cryptocurrencies now in existence, the best known of which is Bitcoin (BTC). Tezos underwent its Initial Coin Offering (ICO) in mid-2017. Tezos is a so-called "altcoin" denoting the fact that due to its scale it is not commonly used as a primary

G   trading currency, in contrast to Bitcoin.

(2) As noted above, individual units or tokens lack any unique identification. Their functional identification is achieved by reference to the unique digital wallet (i e account) in which they are held at any given time. They are readily transferable and completely fungible. They can be traded, i e bought and sold, in return for e g other cryptocurrency and/or traditional (so-called "fiat") currency. They can in principle be held on trust by one

H   account holder for and on behalf of another account holder.

(3) Tezos offers what is known as a "baking" option whereby individual tokens are utilized so as to yield rewards in the form of additional tokens credited to the relevant account holder by the global issuer. The underlying activity which constitutes baking involves the signing and publishing of a new block in the blockchain, thereby validating transactions and growing

A

the digital system organically so as to increase its capital base. It is akin to "mining" in other crypto contexts. Baking requires the relevant holder—known as the "baker"—to run a blockchain node with appropriate software and to keep it online and current. There is, in effect, a minimum capital margin requirement for this activity which requires that the baker holds at least 8.74% of the currency being baked by them at any given time. This is known as a "bond".

B

(4) An account holder may simply designate or delegate the voting rights associated with some or all of their Tezos to another account holder for baking without any transfer of currency: this is a form of personal mandate or authorisation known as "delegation" between delegator (principal/owner) and delegate (agent/baker). It involves a private arrangement between account holders that will ordinarily determine the baking service fee or any baking reward split. Depending on usage of terminology, the delegator in this scenario is "staking" their Tezos by authorising another account holder to bake them without receiving or holding such units. This is akin to "farming" in other crypto contexts.

C

(5) Alternatively, an account holder may transfer currency into the account of another to undertake baking through what is sometimes known as a "bond pool", i e a mixed account or wallet. The principal account holder in this scenario ordinarily loans or entrusts their currency to another to undertake third party baking known as "stake bonding" (as distinct from "staking" simpliciter). The additional currency in the latter's wallet/account enables them to undertake a higher volume of baking for other third party delegators by reference to the 8.74% bond margin requirement described above. This may be reflected in enhanced economic benefits to the staking party (i e transferor) as compared with delegation, depending on the terms of the parties' private arrangements.

D

E

(6) Tezos experienced some post-ICO delays before becoming fully live and operational. It began to trade and bake about a year later in mid-2018 which is when Mr Wang first made contact with Mr Darby via Telegram.

(7) The value of Tezos rose significantly from around the time the parties entered into their contracts in late 2018/early 2019. It had effectively trebled in price by April 2019.

F

15 Mr Wang is an Australian national who has been a cryptocurrency trader for a number of years. He obtained 400,000 Tezos through its ICO. He was 21 or 22 years old during the key period in late 2018 to early 2019.

16 Mr Darby is a UK national who held himself out as an experienced cryptocurrency trader offering baking and equivalent services. His evidence explains that he suffers from mental health issues resulting in memory impairment. He has no independent recollection of the details of the relevant communications and circumstances. The expert evidence suggests that Mr Darby is or was a sophisticated cryptocurrency trader and registered baker of Tezos who operated an extensive and complex web of digital accounts/wallets, although the precise extent of his current or prospective ability to do so is a matter of doubt given his mental health condition.

G

H

17 Mr Wang first contacted Mr Darby via Telegram in early July 2018. Both he and Mr Darby held Tezos acquired through its ICO a year earlier. The precise amount held by Mr Darby then or at any given time is not known, save for glimpses into the digital wallet referred to as his OTC ("over the

[2022] Bus LR

Wang v Darby (QBD)
Stephen Houseman QC

A  counter", i e trading) account ("OTC Account") at different dates in the crucial period.

18 Discerning the precise terms or basis of the parties' dealings from the Telegram Transcript, as augmented or clarified by the Voice Message Transcript, requires some effort, not least in order to disregard the immaterial aspects of the parties' extensive and at times intensive or repetitive dialogue. The written messaging on some days exceeds 14 pages of text. One person's B  response to a single message forming part of a sequence of messages (e g a single composite message in terms of coherent meaning) appears on the page in a way that makes it difficult at first glance to follow the flow of the conversation between them. The Telegram Transcript runs to 175 pages. I refer to pages in this transcript as "TT" for convenience.

19 Each communication bears a time marker (hour:minute:second) by C  reference to an unspecified time zone assumed to be the location of Mr Wang in Australia. It appears that Mr Wang communicated extensively through the night and often initiated contact after any gaps in communication. The dialogue was conversational in tone, somewhat disjointed in places and included occasional colourful or even abrasive language on the part of Mr Wang.

D  20 Mr Wang's negotiating technique is somewhat idiosyncratic. He was given to asserting something as already agreed which was obviously not or seeking to re-open a settled and executed position within a matter of days. Nothing turns on this for present purposes. It is common ground that the two contracts and their respective alleged variations are contained within the four corners of the Telegram Transcript, as augmented in one material respect by a deleted voice message at the point of concluding the First Contract on E  28 December 2018.

21 It is clear from the Telegram Transcript that Mr Wang was keen to get Bitcoins from Mr Darby. Mr Wang initiated and advocated both transactions and expressed a desire to obtain Bitcoins on an urgent basis from Mr Darby. Mr Wang's underlying purpose in obtaining Bitcoins, or what he did with the 30 BTC which he received from Mr Darby pursuant to these two swapping F  transactions, is not explained and does not ultimately matter. It may be inferred that Mr Wang wanted Bitcoins to trade and that is what he did with them, hence him subsequently insisting or requesting that his own counter-restoration obligation under both contracts be pegged to a USD equivalent value (see below). Mr Wang contends that he was ready, willing and able to transfer 30 Bitcoins or USD equivalent to Mr Darby at/after the relevant maturity dates—28 December 2020 and 25 January 2021, respectively—and G  when he made formal demand on 15 February 2021 and at all times since then.

22 There was some discussion at the hearing as to the role of factual matrix in ascertaining the proper meaning and effect, including the proper legal characterisation, of the two transactions as recorded in the Telegram Transcript. Beyond a presumed knowledge of how Tezos worked, as H  summarised in para 14 above, and the fact that Mr Darby held himself out publicly online (including through social media) as a trader and baker of cryptocurrency, it is difficult to see how any factual matrix could impact the analysis of what they agreed or their commercial objectives or, therefore, the correct legal characterisation of their transactions. No material dispute exists as to any fact said to be admissible as matrix for present purposes.

**Wang v Darby (QBD)**                                               **[2022] Bus LR**
Stephen Houseman QC

A

23 The First Contract was concluded on 28 December 2018 (TT p 30) and the relevant cryptocurrency exchanges executed the same day (TT pp 32–35). This contract was later varied on 10 January 2019, according to Mr Wang, as to the terms of Mr Wang's counter-restoration obligation and the profit share split (TT pp 84–85). The Second Contract was concluded on 24 or 25 January 2019 on the same basis save for Mr Wang's enhanced entitlement to baking rewards and stake bonding profits, also said to have further varied the First Contract, and the relevant cryptocurrency exchanges executed on 25 January 2019 (TT pp 128, 132, 134 and 140–141).

B

24 The particulars of claim ("POC"), which were in draft form at the time of Mr Wang's first affidavit sworn in support of his application for the Injunction Order, include the following allegations:

(1) As regards the First Contract it is alleged that Mr Darby was under an obligation to "transfer the First 200k back to" Mr Wang after a two year period "*in consideration* for transfer [by Mr Wang to Mr Darby] of 13 bitcoins" (para 8.5.1) (emphasis added).

C

(2) As regards the variation of the First Contract, which is not said to have altered the basis or nature of such transaction, it is alleged that Mr Wang asked Mr Darby "to vary the said *obligation to sell the First 200k back* to [Mr Wang]" for 13 bitcoins" (emphasis added) so as to allow Mr Wang to perform his counter-obligation in terms of an agreed figure in US dollars (para 12.1) and that this was agreed at US$50,000 (para 13.2). The reference to "said obligation to sell" is to the obligation pleaded in para 8.5.1 as quoted in (1) above. Para 13.2 speaks of "in consideration for the transfer back to [Mr Wang] of the First 200k" in the same way as para 8.5.1.

D

(3) As regards the Second Contract it is alleged that Mr Darby was under an obligation to "*sell back* to [Mr Wang] the Second 200k *in consideration for* the bitcoin equivalent of US$60,000" (emphasis added) after a two-year period (para 15.5.1). Para 15.6 alleges a specific term whereby Mr Wang could "require the return of 100,000 Tezos in return for payment of the then equivalent of US$30,000" in defined circumstances within two years. Para 15.7 alleges a further specific term whereby Mr Darby was strictly liable "to transfer 200,000 Tezos back to [Mr Wang]" after the two-year period, even if his account was hacked and the Tezos taken from him. The primary obligation of re-delivery or restoration on the part of Mr Darby is pleaded as one to "sell back" the Second 200k.

E

F

(4) Para 22 pleads the existence of a constructive trust in respect of all 400,000 Tezos based upon a "specifically enforceable agreement between the parties that after two years the 400k would be *sold back* by [Mr Darby] to [Mr Wang] *for a consideration* of the bitcoin equivalent of the sum of US $110,000" (emphasis added). Leaving aside that this allegation fuses two separate contracts into a single composite contract, it is conspicuous that Mr Darby's primary obligation of re-delivery or restoration is pleaded as one of re-sale, consistent with paras 12.1 and 15.5.1 (quoted in (2) and (3) above).

G

(5) Likewise, Mr Wang alleges in para 28 that he was "required to pay the sum (or bitcoin equivalent) of US$110,000 for the *purchase back* of the 400K" (emphasis added).

H

25 Thus, it is Mr Wang's own pleaded case that both contracts involved a sale and buy-back of 400,000 Tezos. Mr Wang's sworn evidence confirms this expressly in relation to the Second Contract and, therefore, impliedly

A  in relation to the First Contract. Para 31 of his first affidavit confirms the draft pleaded case and then sets out his own "understanding of those terms" in a series of sub-paragraphs. Sub-para (e) says: "After the expiry of the two-year period [Mr Darby] would *sell back to me* the Second 200k *in consideration for* the Bitcoin equivalent of US$60,000 …" (emphasis added). Para 23 is in a similar format in respect of the First Contract, save that the language is the neutral or descriptive version: "transfer the First 200k back

B  to me"/"transfer him back the 13 Bitcoins". It is unlikely that Mr Wang used "transfer back" and "sell back" in any different way. As noted above, the pleaded case does not. This language is used interchangeably. The pleaded claim for constructive trust presupposes a valid and binding contract or option of re-sale.

    26 As noted already, it is accepted by both sides that the proper legal

C  characterisation of the two transactions is the same and, as part of this, that there was no change to the basis or nature of the First Contract after it was concluded. The subsequent alleged variations to the First Contract and the additional specific terms agreed for the Second Contract are not said to alter the legal characterisation of the First Contract or (therefore) the Second Contract or vice versa. The parties appear to have regarded them as a single composite transaction (albeit distinct "trades" or "deals") in various

D  communications.

    27 Mr Wang's sworn evidence endorsing the pleaded case, as identified above, is itself based on his stated review of the Telegram Transcript. He makes no reference in his first affidavit to the Voice Message Transcript.

    28 The crucial exchange between the parties for present purposes took place at around 8:10–8:12 on the morning of Friday, 28 December 2018 (TT

E  p 30). This is accepted to be the point of conclusion of the First Contract.

    29 By way of immediate context to this, Mr Wang had requested Bitcoins from Mr Darby the day before on the basis of a collateralised loan arrangement, i e borrowing Bitcoins in exchange for his Tezos as collateral (TT p 14 at 4:10:41 am). Mr Darby instead proposed that Mr Wang just sell some Tezos to him in return for Bitcoins to which Mr Wang replied "I don't

F  wanna sell … I wanna bake" and suggested "You can add the tezos I have to your baking pool" (TT p 15 at 4:19:43 am–4:22:17 am). Mr Darby reverted within the hour rejecting the idea of a loan arrangement (TT p 19 at 5:09:27 am) to which Mr Wang said: "It's not even a loan/Just a temporary swap" (5:11:52 am/5:11:56 am).

    30 Mr Wang chased five minutes later for Bitcoins ("Come on please"/"Help me out") (TT p 20 at 5:16:14 am/5:16:16 am). Mr Darby

G  suggested a sale and buy-back as an alternative to Mr Wang trading through an exchange: "You can sell it to me and then buy back that would keep things simple and you wouldn't need to deal with exchanges" (5:18:53 am). Mr Wang then revived or repeated his prior request to "just do a loan" (TT p 21 at 5:20:11 am). With a loan having already been flatly ruled out by Mr Darby, Mr Wang pressed further: "I need the btc ASAP" (5:25:49 am)

H  and then, "I really need the btc today though can you like *sell it* to [me] at the price you'll *buy it back for*" (TT p 22 at 5:27:19 am–5:27:30 am) (emphasis added).

    31 Mr Darby reiterated overnight that he wasn't interested in any loan arrangement due to his accounting position: "only looking to buy or sell at the moment" (TT p 28 at 12:01:25 am–12:01:39 am). Mr Wang confirmed

130
Wang v Darby (QBD)                                               [2022] Bus LR
Stephen Houseman QC

the following morning that the proposed swap would not be a loan, that he    A
wished to "bake together" and offered 300,000 Tezos to Mr Darby at around
5:20–5:25 am on 28 December (TT p 28).

    **32** After exploring other baking options, Mr Wang then made his
revised offer at 08:10 am (TT p 30): "I'll give you 200k tezos just give me
50%"/"And the profits from staking we can share 5050 even though I'm          B
contributing more" (8:10:09/8:11:32 am). (The latter was a reference to
baking profit share, on the basis that the additional 200k would represent
more than 50% of the Tezos in the OTC Account, i e 200,000 out of
356,000 at that time.) Mr Darby agreed to this in principle offering 12 BTC
on the basis that Mr Wang "wouldn't want [the First 200k] back for at
least one year so I can increase my delegates without the risk of being over
delegated"—a reference to using the First 200k for stake bonding in his
account—adding: "I'd be happy to give you 50% and then you could of          C
course *buy them back* for 12 BTC" (8:16:43 am) (emphasis added). (The
reference here and above to 50% reflected the fact that Mr Darby would be
transferring Bitcoins of half the current value of 200,000 Tezos.) Mr Darby
gave Mr Wang the link to the OTC Account for transferring 200,000 Tezos
(8:17:32 am). The parties then agreed a minimum term of *at least* two years
for this swapping arrangement (8.18:16 am–8.18:43 am) and struck on an
exchange price of 13 BTC for the First 200k (8:18:54 am–8:20:43 am). The    D
First Contract was thereby concluded, as is common ground.

    **33** Without more, the crucial exchange summarised above would suggest
that the basis of the swapping arrangement was a sale and buy-back. It was
not intended to be a loan arrangement given the prior discussion. Nor was
it a unilateral transfer by principal to agent solely for the purposes of stake
bonding. Both parties used the word "give"; Mr Wang used the word "sell"    E
and the phrase "buy it back"; Mr Darby used the phrase "buy them back".
The proper characterisation of the First Contract—and, hence, the Second
Contract as is common ground—was set at this point.

    **34** It is here that the integrity of the Telegram Transcript becomes
material. It shows in places that there was a "Cancelled Call" but all
references to voice messages have been removed, evidently by Mr Wang when
creating the transcript from the original native format. The existence of voice   F
messages within the chain of communication is only revealed by a separate
transcript prepared by Mr Wang in which he had changed Mr Darby's name
from "tezosotc" (being an abbreviation for Tezos OTC) to "Tezos Scammer
400k" after falling out with and being blocked by Mr Darby. Page 30 of this
separate edited transcript shows that there were three voice messages—all of
them left by Mr Wang—between 5:32 and 8:11 on the morning of Friday,        G
28 December 2018.

    **35** The third of these voice messages from Mr Wang lasted 23 seconds
and was sent at 8:11:35 am. That was three seconds after Mr Wang
finished the messages comprising his revised offer (TT p 30 at 8:10:46 am–
8:11:32 am) and, therefore, five minutes or so before Mr Darby responded
(8:16:43 am), both as described above. According to the Voice Message       H
Transcript, Mr Wang suggested that Mr Darby just tally the trade in his
own internal record or accounts "as you just *bought under market* … and
then when you *sell me back the Tezos for Bitcoins*, you can tally it as a loss
… or something like that when we trade back. So just tally it as if you're
trading with me" (emphasis added). Mr Wang uses "bought", "sell me back"

A  and "trade back" to describe the counter-restoration of 200,000 Tezos under
the proposed transaction. Mr Darby's response five minutes later, as noted
above, was framed on the basis that Mr Wang would "buy them back" for
the relevant number of Bitcoins.

36 Pausing here, and as addressed further in the context of the SJ
Application below, a sale and buy-back is legally and logically preclusive of
a trust arrangement in respect of either the First 200k or Second 200k. When
B  confronted with this proposition based on Mr Wang's own pleaded case and
sworn evidence at the beginning of the hearing, Mr Penny QC indicated
that Mr Wang may wish to amend his pleaded case to remove references to
"sale" and "buy back" or equivalent—and, by logical extension, the claim
for constructive trusteeship. No such application has been made. Nor is it
easy to see how it could succeed in light of Mr Wang's own sworn evidence
C  based, as it is, upon the Telegram Transcript, as quoted in para 25 above.
The Voice Message Transcript makes that position even harder for Mr Wang,
in my view.

37 A conspicuous feature of the parties' dialogue throughout the
Telegram Transcript—as illustrated by Mr Darby's own use of "buy *them*
back" (different emphasis added) when concluding the First Contract—is
D  what might be called possessive or proprietary language to describe the Tezos
(to be) transferred by Mr Wang and/or re-transferred by Mr Darby after the
applicable two year period in each case. (No similar language was used in
respect of the Bitcoins (to be) transferred to Mr Wang, it seems.) Mr Wang
repeatedly referred to the First 200k and/or Second 200k as "my" or "mine"
and Mr Darby was prone to using the correlative "your" or "yours" to
describe such currency. Perhaps the best example of this is when Mr Wang
E  looked at the OTC Account on 24 January 2019 and saw that its balance
had reduced from 356,000 to 259,000 Tezos. Mr Darby responded: "The
200k in there is yours and the 59k mine" (TT p 131 at 11:30:12 am).

38 In a similar way, Mr Wang referred to the 17 Bitcoins (to be)
transferred to him under the Second Contract as "borrowed" (e g TT p 129
at 11:15:01 am). This was said notwithstanding the fact that the transactions
F  were agreed not to be loans (and neither side contends that they are) and on
Mr Wang's own case he took full ownership of both tranches of Bitcoins from
the moment of receipt. There are numerous references to "trust" both in the
context of the mutual trust required when digitally executing the currency
swaps and by reference to Mr Darby accounting to Mr Wang at the end of the
day for baking rewards and stake bonding profits referable to the 400,000
Tezos.

G  39 This type of language, used by laypersons during conversational
online messaging, does not dictate the proper legal characterisation of their
transactions as a matter of objective common intention. The same might be
said about the language of "sale" and "buy-back" at the time of concluding
the First Contract, although one obvious difference is that Mr Wang's
pleaded case, settled by leading and junior counsel, uses the language of
H  sale/purchase back in relation to the Tezos, as set out above. The use of
possessive or proprietary connotations to describe entirely fungible digital
assets such as Tezos is, in any event, somewhat ambiguous. In the early
stages of negotiation, Mr Wang suggested that Mr Darby could trade Tezos
and "buy the amount of tezos back at the end of the day so you don't lose
*my* tezos" (emphasis added). This suggests that possessive or proprietary

terminology was being used as a means of identification or description, in particular given the use of a mixed wallet.

40 The Second Contract was concluded on 24–25 January 2019. This followed an alleged variation of the First Contract on or about 10 January 2019 as regards profit share for baking the First 200k during the applicable minimum period and the terms upon which Mr Wang could perform his counter-restoration obligation in order to get the First 200k back upon maturity. In the course of that dialogue, Mr Wang reiterated that "I need to stake that's the whole point" (TT p 82 at 9:45:45 am). The agreed minimum term of the First Contract was reiterated as "at least two years" on 10 January 2019 (TT p 85 at 10:11:49 am–10:12:27 am) and (therefore) offered as "for two years +" when negotiating the Second Contract on 24 January 2019 (TT p 127 at 11:04:30 am).

41 It is clear from the totality of the exchanges that Mr Wang wished to remain invested in Tezos (as pleaded) and expected the 400,000 Tezos (or their fungible equivalent) to be used by Mr Darby during the applicable minimum period in each case for baking and/or stake bonding.

42 As to the former, Mr Darby appears to have undertaken a strict obligation to return the same number of Tezos to Mr Wang following the minimum contract period, which formed part of the Second Contract (but not apparently a further variation of the First Contract) (TT p 130 at 11:28:25 am–11:29:05 am). It was understood at all material times that Mr Wang's entitlement to return of Tezos was conditional upon him restoring to Mr Darby the corresponding number of Bitcoins—13 for the First 200k; 17 for the Second 200k—with discussion around how that counter-restoration obligation would or could be performed at the relevant time. The nucleus of this reciprocal arrangement is reflected in an exchange between the parties on 25 January 2019 in which Mr Darby assented ("Yes") to Mr Wang's recap as follows: "so 110k usd yeah?"/"Upon returning that I get 400k"/"Plus all the staking rewards?" (TT p 135 at 5:55:13 am–5:55:36 am). When Mr Darby informed Mr Wang on 12 February 2019 that he had "hedged the XTZ now on exchanges", Mr Wang immediately sought confirmation that "My tezos will still be returned even if it goes up yeah?" to which Mr Darby replied, "Yes, for the $110,000 BTC" (TT pp 148–149 at 7:55:58 p m–7:57:45 pm).

43 As to the latter aspect, and putting it neutrally for now, it is clear that the contractual arrangements contemplated that Mr Darby would bake or stake-bond the 400,000 Tezos during the applicable minimum period for each tranche and account to Mr Wang upon reciprocal restoration for the rewards or profits from such activities. The precise content of any obligation to do so, as distinct from unilateral option or discretion on the part of Mr Darby, is not for me to determine. The parties apparently reached agreement on 25 January 2019 to revise the profit share so that Mr Wang would receive 100% of the baking/staking profits from the use of the 400,000 Tezos during the applicable minimum periods (TT p 135 at 5:15:08 am–5:15:43 am) as reflected in Mr Wang's uncontroversial recap at 5:55 am quoted above. On several occasions, Mr Wang sought to persuade Mr Darby to reduce his commission charged to third party delegators so as to attract more stake bonding business, demonstrating his (perceived) interest in Mr Darby's use of the 400,000 Tezos to generate profit from third party delegation.

© 2022. The Incorporated Council of Law Reporting for England & Wales

*A*   44 Thus, in a very real sense, Mr Wang wished to remain and did remain invested in Tezos. The transactions guaranteed the return to him of 400,000 Tezos after the applicable minimum period in each case, so long as he restored (the agreed value of) 30 Bitcoins to Mr Darby; plus profits from baking or stake bonding performed by Mr Darby using such currency volume in the meantime.

*B*   45 There was a measure of fluidity in the parties' dealings as well as informality. As can be seen, certain terms especially concerning profit share and Mr Wang's counter-restoration obligations were the subject of discussion and apparent revision. In so far as occurring in the context of concluding the Second Contract on 24–25 January 2019, the same dialogue may also have varied relevant aspects of the First Contract. Nothing seems to turn on this for present purposes. It is common ground that nothing said or done after

*C*   28 December 2018 could alter the proper legal characterisation of the First Contract or, therefore, the Second Contract. The latter replicated the former as to its nature and structure.

      46 Mr Darby told Mr Wang on several occasions that he would return the 400,000 Tezos to him at any time in return for the corresponding Bitcoin or US$110,000, i e effectively cancelling the contracts if Mr Wang so wanted (e g TT p 143 at 7:25:44 pm on 4 February 2019). This was framed in terms

*D*   of Mr Wang buying back the 400,000 Tezos (e g TT p 151 at 6:29:37 am on 16 February 2019). Mr Wang accused Mr Darby of scamming him on 4 March 2019 by reference to the level of fees charged by Mr Darby to third parties for his baking services. Mr Darby responded: "I am not scamming as said you are welcome to buy the tezos back" (TT p 160 at 7:40:30 am). (Mr Wang didn't dispute the notion of having to "buy" the 400,000 Tezos

*E*   back from Mr Darby.)

      47 Matters came to a head two days later on 6 March 2019. Mr Wang appears to have reiterated a request he had made the previous day for yet more Bitcoins (TT p 167 at 3:14:29 am). This prompted Mr Darby to say: "I'm going to be shutting the baking service down, but continuing the OTC for Tezos" (3:28:19 am). (The reference to OTC is to currency trading.)

*F*   Mr Wang's reaction prompted Mr Darby once again to offer to cancel and unwind both transactions: "I'm happy to return the Tezos and you return the BTC" (3:29:30 am). Mr Wang became suspicious. His tone became more aggressive. He demanded compensation and asked at a minimum to be given five additional Bitcoins (TT p 169 at 3.36:06 am). Mr Darby offered to compensate Mr Wang for "any real world" losses he had suffered, but stated that none yet existed (3:37:39 am). He reiterated his standing offer to unwind

*G*   the transactions: "Better to just send XTZ to you and you send BTC" (TT p 170 at 3:41:02 am).

      48 The dialogue ends at 03:54 am that day when Mr Darby blocked Mr Wang from his Telegram account. Mr Wang subsequently made contact with Mr Darby on Telegram from another device, demanding the return of his 400,000 Tezos on 15 February 2021. Mr Darby blocked him again.

*H*   Mr Darby then blocked Mr Wang a third time when contact was made by other means a month or so later. Mr Darby did not return any Tezos to Mr Wang.

      49 From around March 2019, when the value of Tezos started to rise, Mr Darby transferred the 400,000 Tezos out of his OTC Account into a deposit address at the Kraken exchange, a centralised global cryptocurrency

exchange based in the USA. Mr Darby removed his social media presence    A
at around the same time, according to forensic/digital investigative evidence
served on behalf of Mr Wang. It is assumed that Mr Darby traded the
400,000 Tezos. He had told Mr Wang on several occasions during their
dialogue that he made significantly more return (i e for himself) from OTC
than he did from baking or stake bonding Tezos. He described baking and
bond staking as a bit of fun.
                                                                        B
50 None of the above narrative contains or constitutes any findings by
me for present or any other purposes. It is the impression formed on a close
reading of key passages in the Telegram Transcript.

*SJ Application*

  *Legal framework*
                                                                        C
51 The proper approach to applications seeking (reverse) summary
judgment is summarised by Lewison J (as he then was) in *Easyair Ltd (trading
as Openair) v Opal Telecom Ltd* [2009] EWHC 339 (Ch) at [15] in seven
numbered propositions (i) to (vii). There was no material difference between
the parties as to this approach. Mr Collins QC for Mr Darby gave emphasis
to the final proposition whereby a court faced with a short point or law or    D
construction should "grasp the nettle" and decide it on a final basis. This
approach can be appropriate where the court is assured that no additional
evidence is likely to turn up that could affect the outcome of the particular
issue or claim.

52 As regards the circumstances in which an express trust will be found
to exist in a commercial transaction or relationship, the guiding principles
are summarised by Briggs J (as he then was) in *In re Lehman Brothers*    E
*International (Europe) Ltd (in administration) (No 4)* [2010] EWHC 2914
(Ch) at [225] in ten numbered propositions (i) to (x). (This exposition of
the relevant test is not affected by the judgment of the Court of Appeal in
the same case: [2012] 2 BCLC 151.) I do not set out the ten propositions
here, save to observe that the guiding principle is one of objective common
intention assuming the foundational requirements of certainty are met in the    F
first place (propositions (i) to (v)). The parties' language is not determinative:
it is a matter of substance not form (proposition (vi)). Special care is
needed in a business or commercial context, such that: (a) a trust will be
imposed where the parties' commercial objective calls for it; but (b)
the law should not unthinkingly impose a trust where purely personal
rights between the contracting parties sufficiently achieve their commercial
objective (proposition (ix)).                                           G
53 Briggs J went on to give commentary on these ten propositions at paras
226–262. In relation to the two limbs of proposition (ix), he commented at
para 261 that (a) the law should not be hidebound by traditional rules about
trusts derived from their origins in family settlements; and (b) the parties'
commercial agreements and arrangements should be interpreted purposively
in order to ascertain their commercial objective.                      H
54 There was some discussion at the hearing before me as to whether
proposition (ix)(b) in the *Lehman* case involved a test of necessity, as might
appear to be suggested by some of the language when Briggs J came to apply
the legal principles to the various positions presented in that case (see e g para
277). Mr Collins for Mr Darby did not go so far as to say that the test was

A    one of necessity, but where purely personal rights between the contracting parties sufficiently achieve their commercial objective that is a powerful contra-indication as to the creation of a trust. Stepping back slightly, it seems the overriding approach in the context of a commercial transaction or arrangement is to ask whether a trust makes sense by furthering (rather than frustrating) the parties' commercial objectives.

B    55 As noted above, it is common ground that fungible and non-identifiable digital assets such as Tezos constitute property that is capable of being bought and sold as well as held on trust as a matter of English law. This reflects the position at first instance in this jurisdiction: see *AA v Persons Unknown* [2020] 4 WLR 35, paras 55–61 (Bryan J) and *Ion Science Ltd v Persons Unknown* (unreported) 21 December 2020, Butcher J. In both those cases the Commercial Court granted (interim) proprietary injunctions against

C    the defendants in respect of cryptocurrencies that had been fraudulently extracted or misappropriated from the claimant or the traceable proceeds of such digital assets. The relevant hearings in both cases took place on an uncontested basis, the defendant not appearing or being represented in either matter as the case titles suggest.

56 The High Court of New Zealand in *Ruscoe v Cryptopia Ltd (in liquidation)* [2020] NZHC 728 held that a cryptocurrency trading exchange,

D    known as Cryptopia, held the digital assets of its customers (i e account holders) on express trust. Cryptopia operated as a form of depository and trading exchange/platform. The accounts of its customers were operated through so-called "hot" wallets that were live and interconnected rather than so-called "cold" wallets. Cryptopia's own web-based instruction pages and live customer interfaces made it clear that account holders would be

E    depositing, trading and owning their own cryptocurrency in return for certain fees charged by Cryptopia. The possessive or proprietary language used to describe this position (e g "your" cryptoassets) was consistent with the existence of an express trust, rather than determinative of its creation (see para 172 under "Additional matters").

57 Moving from express trusts to the position with *Quistclose*-resulting

F    trusts (*Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567), the relevant principles are summarised by the Court of Appeal in *Bieber v Teathers Ltd* [2013] 1 BCLC 248, para 14 endorsing the first instance judge's seven propositions based on the House of Lords decision in *Twinsectra Ltd v Yardley* [2002] AC 164. The touchstone, as always, is objective intention —specifically, that the relevant money should not become part of the general assets of the recipient but should be used *exclusively* to effect

G    certain payments only. Where such trust arises, the beneficial interest in the transferred money remains in the transferor/payor (beneficiary) who mandates the transferee/payee (trustee) to apply the money paid for a particular purpose which is identifiable with sufficient certainty.

58 Patten LJ added for emphasis at para 15 that in deciding whether particular arrangements involve the creation of a trust and with it the

H    retention by the paying party of beneficial control of the monies, proper account needs to be taken of the structure of the arrangements and the contractual mechanisms involved. The most common structure to preclude the creation of such a trust was identified as a sale/purchase transaction under which advance payment would not ordinarily be impressed with any trust in favour of the purchaser/payor. Transfer of ownership in the sale/purchase

context is inimical to the creation or imposition of a trust. This is inherent   *A*
in the concept of consideration.

**59** No case has been identified in which a *Quistclose*-resulting trust has
arisen in the context of a transaction involving reciprocal exchange (and
re-exchange) of assets or economic value. A trust of this kind involves an
asymmetrical transaction whereby one party transfers money to another for
a specific use or purpose. In a sale/purchase or other transaction involving   *B*
reciprocal economic exchange, the money is paid by way of consideration
for the counter-benefit rather than being paid for future or onward use by the
payee. Hence the focus, if not strict requirement, on circumstances such as
payment into a segregated bank account: see *First City Monument Bank plc v
Zumax Nigeria Ltd* [2019] EWCA Civ 294 at [35].

**60** A constructive trust of the kind said to be relevant in the present case
can arise when a specifically-enforceable contract of sale is concluded, such   *C*
that beneficial ownership passes to the buyer and the seller is constituted a
trustee on behalf of the buyer pending completion. This illustrates the maxim
that Equity deems as done that which ought to be done. The best known
example is, of course, sale of land; but this principle applies to other unique
or sufficiently rare pieces or parcels of personal property such as unquoted
shares or volumes of quoted shares that are not readily obtainable in the   *D*
market. No constructive trust arises if the relevant sale contract is conditional
(in the sense of requiring fulfilment of a condition outside the control of the
buyer, such as third party or public authority approval) or is a mere option as
yet unexercised. The trusteeship, if otherwise constituted, may cease through
the conduct of the beneficiary/purchaser. See generally *Lewin on Trusts*, 20th
ed (2020), paras 4-003 to 4-010.

**61** Echoing some of the principles applicable to express trusts and   *E*
resulting trusts summarised above, it is equally important not to rush to
pigeonhole a transaction into a familiar category (e g loan, sale, swap,
agency, etc) if that does not give optimum or proper effect to the parties'
commercial objectives. The process of characterisation, being a product of
the more general process of contractual construction, is not necessarily the
same thing as categorisation. Taxonomy is a helpful guide, but no more.   *F*
Where the parties reach their own agreements through informal online
dialogue, without legal advice or formal documentation, the process of
characterisation needs to be sensitive to those features of the consensual
dynamic.

**62** As regards the existence or imposition of fiduciary duties on a party
to a commercial contract absent the existence of a trust, i e non-trustee or
independent fiduciary duties, it is possible for these to arise where there is   *G*
a relationship of trust and confidence that justifies such equitable duties in
conjunction with and consistent with the relevant contractual framework.
A contractual obligation to use certain property (i e belonging to the obligor,
in the absence of any trust) for a particular economic purpose and account
to the contractual counterparty (i e seller) for the rewards of such promised
endeavour is theoretically capable of being conditioned or augmented by   *H*
fiduciary duties in so far as consistent with such contractual scheme. The
precise scope of any fiduciary duties must be moulded to the nature of the
particular relationship and facts of the case so as to ensure that any fiduciary
duties are consistent with non-fiduciary (i e contractual) duties: see *Snell's
Equity*, 34th ed (2019), paras 7-009 and 7-012.

A    63 A constructive trust may arise where a fiduciary receives a bribe or secret commission in breach of fiduciary duty. A constructive trust in this context gives effect to the fiduciary's obligation to account to their principal for profit generated in such capacity: see *Snell's Equity*, para 7-057. The same does not apply in respect of equitable compensation for breach of fiduciary duty: para 7-058.

B    64 With these principles in mind, I turn to the proprietary claim pleaded against Mr Darby in the present case. I deal first with the trust claims and then, so far as relevant in this context, the claim based on breach of fiduciary duty.

*Present case*

C    65 The SJ Application targets the "proprietary claims" by reference to a series of paragraphs in the POC identified in the attached draft order, some of which are included only to the extent or for the purpose identified. Broadly speaking this covers all allegations as to the existence or breach of any form of trust or fiduciary duty on the part of Mr Darby *to transfer back to* Mr Wang the same digital assets comprising the First 200k or the Second 200k. This is said to include the pleaded claim for equitable compensation by reference to
D    POC para 40 and para (3) of the prayer, as well as the claim for an account of profits at para (4) of the prayer. It is not clear to me that these latter claims for relief are proprietary in nature.

66 As regards the pleaded case, the claim form makes no mention of fiduciary duties at all, i e independent from (breach of) trust as a matter of necessary implication. It contains a claim for "damages and other relief including proprietary remedies for breach of contract and/or breach of
E    trust in relation to a series of agreements between the parties concerning cryptocurrencies".

67 The POC were attached to the claim form. They contain a claim based on dishonest breach of fiduciary duty which extends beyond the claim based on the existence (and hence alleged dishonest breach of) trust: see para 20. The precise scope and content of such alleged independent fiduciary duties is
F    said to arise from the "nature and terms of the contracts" as pleaded; none of them is said to have required Mr Darby to preserve any of the 400,000 Tezos in his wallet (including the OTC Account) or prohibit him from dealing with or disposing of any of them—in contrast to the so-called "trustee duties" pleaded at para 24. (The fact that the alleged trustee duties pleaded at sub-paras 24.1 to 24.4 are different in kind is further reflected by the fact that
G    sub-para 24.5 pleads a further duty "[to] comply with the fiduciary duties set out above", i e in para 20.)

68 The pleaded case of (dishonest) breach of fiduciary duty is at POC para 38. It fails to distinguish between which conduct is said to have been a (dishonest) breach of the pleaded fiduciary duties (or which specific duty), on the one hand, and a (dishonest) breach of the pleaded trustee duties (or which specific duty), on the other hand. The gist of the complaint is nevertheless
H    improper use or disposal of the 400,000 Tezos and failure to return them to Mr Wang, plus a separate and standalone complaint about failure to provide information about dealings with the Tezos (POC para 38.3(iv)).

69 The claim for equitable compensation is at POC para 40. It pleads three separate heads of loss and damage, namely: (i) loss of the value of the 400,000 Tezos (minus credit for the "consideration" of US$110,000 required

to obtain their return); (ii) loss of baking rewards during the applicable      A
contractual periods; and (iii) loss of opportunity to earn third party baking
profits through stake bonding during the applicable contractual periods. The
only relief claimed by reference to (dishonest) breach of fiduciary duty is
equitable compensation and an account of profits (paras (3) & (5) of the
prayer, as noted above).

70 Leaving aside the fact that the claim form did not mention (breach of)
fiduciary duty independent from (breach of) trust, my reading of the pleaded      B
case is that the claim based on such independent (i e non-trustee) fiduciary
duty does not concern the allegations based upon Mr Darby's disposal of and/
or failure to return the 400,000 Tezos. That is, in a sense, a "capital" claim,
as distinct from a "profit" or "accounting" (i e "non-capital") claim, and it
is made by reference to the existence of a trust over 400,000 Tezos—either
an express trust, *Quistclose*-resulting trust or constructive trust. Para 36 of      C
Mr Penny's skeleton argument for the present hearing asserts that Mr Wang
"puts his proprietary claims in three different ways" by reference to the
three trust variants (addressed in paras 37, 38 and 39, respectively). This is
consistent with the prayer for relief, which at para (1) asserts a proprietary
claim by way of declarations of beneficial interest by reference only to trust.

71 The case based on independent (i e non-trustee / non-capital) fiduciary      D
duties concerns the failure to generate and/or account for any generated
baking rewards or stake bonding profits during the applicable contractual
periods, coupled (perhaps) with the distinct complaint about failure to
provide information described in para 68 above. This pleaded case is
theoretically consistent with the absence of any trust, i e on the basis
that Mr Darby assumed such duties in respect of the 400,000 Tezos
notwithstanding that he owned them from the point of transfer in each case.      E

72 This distinction is important given that the SJ Application targets the
pleaded claim for breach of fiduciary duty under the blanket description of
"proprietary claims" as noted above. On my reading of the pleaded case,
any independent claim for breach of fiduciary duty does not give rise to
any proprietary claim. The basis for asserting beneficial ownership over the
400,000 Tezos or their traceable proceeds is said to be trust and only trust      F
(POC, paras 21–24 and 39; declarations sought at para (1) of the prayer).
A claim for equitable compensation or account of profits for (dishonest)
breach of a fiduciary duty of a "non-capital" nature and scope is not, without
more, a proprietary claim: cf para 63 above as regards secret profit.

73 With that survey of the pleaded case in mind, I turn to the analysis
of the SJ Application.

74 The existence of any trust or fiduciary duties on the part of Mr Darby      G
arising out of the relevant contracts involves a self-contained question of
contractual construction or characterisation based upon a closed set of
potentially relevant evidence, namely the Telegram Transcript (augmented
as necessary by the Voice Message Transcript) and the limited undisputed
factual matrix identified above. None of this is controversial, save in the sense
that Mr Darby does not accept the veracity or integrity of the transcripts for      H
all purposes. The SJ Application proceeds on the basis that such transcripts
nevertheless show that Mr Darby is obviously correct and the proprietary
claims are bound to fail.

75 I am satisfied that this is a case in which the court should "grasp the
nettle" and determine the viability of the proprietary claims on a final basis.

© 2022. The Incorporated Council of Law Reporting for England & Wales

[2022] Bus LR                                                    Wang v Darby (QBD)
                                                                Stephen Houseman QC

A    The issues have been fully analysed and argued before me by reference to
what is accepted to be the entirety of the evidence that matters or could
realistically matter for such purposes.

(i) Trust claims

76 Mr Wang's pleaded case as reflected in Mr Penny's skeleton argument
B    for this hearing is that the 400,000 Tezos were held on trust for him by
Mr Darby in one of three ways: express trust, *Quistclose*-resulting trust or
constructive trust. The same is said to apply to the traceable proceeds of such
digital assets.

77 Mr Penny conspicuously did not press the constructive trust analysis
during the hearing, notwithstanding its inclusion in his skeleton argument.
It is, after all, premised upon a valid and binding contract of sale or, more
C    accurately, conditional option to re-purchase (see para 36 above). It is
difficult to see how a constructive trust as pleaded could arise in respect
of entirely fungible and non-identifiable digital assets. There is no obvious
analogy to a specifically-enforceable contract for the sale of land or some
unique or sufficiently rare piece or parcel of personal property: see para 60
above.

D    78 The fundamental problem with the existence or imposition of any kind
of trust over the 400,000 Tezos is the essential economic reciprocity of the
transactions, as described above. In order for Mr Wang to become entitled
to the return of the 400,000 Tezos, assuming identification were possible or
guaranteed for such purposes, he had to return corresponding value in (or
equivalent to) Bitcoins to Mr Darby so as to reverse the swap. Whether or
not this is characterised as a sale and re-purchase, still less a repo transaction,
E    may not ultimately matter for present purposes. It is the essential economic
reciprocity that precludes any trust, in my judgment.

79 No case was identified in which a beneficiary under a trust is obliged to
transfer or indeed re-transfer economic value to the trustee in order to obtain
the trust property. This transactional element is inimical to the concept of a
trust on both sides, let alone a trust on one side only. A beneficiary has an
F    interest in and right to receive the trust property, not an option to (re-)acquire
it for value or indeed (re-)purchase it for consideration. The analogy to the
position of a purchaser of land is inapt. As noted above, Mr Penny did not
press the constructive trust analysis at the hearing.

80 If Mr Wang had defaulted on his own restoration obligation at the
relevant time, Mr Darby would have been entitled to keep the 400,000 Tezos
according to Mr Wang's own case. How is that consistent with a trust? At
G    what point does the trust expire or dissolve in light of Mr Wang's own default
or insolvency? None of this is accommodated by Mr Wang's asymmetrical
trust analysis.

81 If the essential economic reciprocity of the transactions were not in
itself enough to preclude the creation of a trust, the pleaded characterisation
of Mr Wang's restoration obligation as one of sale or purchase back is fatal
H    to any trust analysis. A sale/purchase back of an asset (akin to the "off
leg" in a repo transaction) presupposes its original or prior sale/purchase in
the other direction (akin to the "on leg" in a repo transaction). Each sale/
purchase transfers ownership from transferor/seller to transferee/purchaser.
This is anathema to the existence of a trust over the relevant property arising
upon or from the original outward transfer. It is the antithesis of a trust.

82 As already noted, Mr Wang accepts and in fact avers (as he has to)    A
that the transfer of Bitcoins to him from Mr Darby was a full transfer of
ownership and concomitant freedom to deal with such property as he saw
fit. This is consistent with Mr Wang's persistent requests to modify the terms
of his counter-restoration obligation under the First Contract and to seek
the same modified obligation for the Second Contract, recognising that he
may or would not have the relevant currency to give back and may not
be able to obtain a substitute for it at the required time. A trust over the    B
400,000 Tezos would impose a stark asymmetry in this reciprocal capital-
swapping arrangement. Mr Wang himself recognised the possibility (at least)
that Mr Darby might trade and therefore need to acquire other Tezos with
which to perform his own restoration obligation when called upon to do so:
see para 39 above.

83 If Mr Wang's analysis is correct, such that the 400,000 Tezos    C
were held on trust for him, what would that make the other side of the
transaction involving 30 Bitcoins? The obvious and perhaps only available
characterisation is a loan. It would be an interest-free loan of 30 Bitcoins
for the minimum contractual period. That is the very thing which Mr Wang
sought initially, which Mr Darby ruled out as a possibility and which
Mr Wang accepted was not available or desirable (see paras 29 to 31 above).    D
Neither party contends that the proper characterisation for these capital-
swapping transactions was a loan.

84 There is no bootstrapping involved in this approach to
characterisation. The sale/purchase structure logically precludes a trust, and
vice versa. The court is entitled to rely on the pleaded characterisation of
sale/purchase, consistent with Mr Wang's own sworn evidence based upon
his review of the Telegram Transcript and, of course, the contracting parties'    E
use of such notorious or iconic transactional language when concluding their
transactions: see para 39 above.

85 A trust over the 400,000 Tezos is not necessary to give effect to the
parties' legitimate expectations or commercial interests, in the sense that they
are sufficiently served by the existence of personal rights and obligations
(see para 54 above). On the contrary, a trust would subvert or frustrate the    F
essence of their bargain. Whatever specific obligations Mr Darby may have
assumed to keep the 400,000 Tezos in the OTC Account for the minimum
applicable period or use them for baking or stake bonding are *personal* in
nature and comfortably consistent with Mr Darby having become full owner
of such digital assets when transferred to him. There is nothing objectionable
in a purchaser undertaking to a seller in this way so long as the obligations
are clear and enforceable. It is a personal obligation albeit capable of being    G
conditioned by fiduciary duties where trust and confidence underpins the
relationship. The existence of such post-transfer obligations does not alter
or presuppose a contrary basis for the underlying proprietary position.

86 The fact that the parties used possessive or proprietary language at
times to describe the 400,000 Tezos does not come close to dislodging this
legal characterisation of the transactions, in my judgment. Such    H
language used by laypersons in an informal dialogue such as this one is consistent
with description and identification, especially in the context of a mixed
account/wallet held by the transferee (Mr Darby) that remains visible to the
transferor (Mr Wang). Such language is not enough to create a trust where

A    none is appropriate to give effect to their commercial objectives or chosen
transactional structure.

87    The absence of a trust does not mean that Mr Wang ceased to be
invested in Tezos: he had a personal right or option to buy back 400,000
Tezos after a minimum period and an additional personal right to receive
any baking rewards and stake bonding profits generated in respect of such
currency volume during that minimum period. He was not selling up or
B    selling out altogether. He remained vested in Tezos, despite having sold his
holding to Mr Darby on terms as to future re-acquisition. In return for this
he got his hands on Bitcoins. That was the primary driver on his side for
proposing and concluding these swapping transactions in the first place.

88    Other matters are of lesser importance. The fact that the 400,000
Tezos were transferred into a non-segregated account/wallet, namely the
C    OTC Account, is not determinative although tends to contra-indicate the
existence of a trust. Likewise the fact that Mr Darby may have undertaken
a strict obligation to return the Second 200k come what may, in contrast to
the usual duty of a trustee to exercise care to preserve trust assets, is a further
contra-indication of trusteeship, but not a big point in the scheme of things.

89    I do not need to decide the proper characterisation of a pure, i e
D    unilateral or asymmetrical, stake bonding relationship between two account
holders. This is not relevant in the present case due to the reciprocal
currency-swapping structure of their transactions. There is limited utility in
embarking upon a hypothetical discussion of the non-reciprocal scenario,
save to observe that the transfer of digital assets from one account holder
to another for the purpose of baking or stake bonding could involve or
constitute a trust. That would depend on all the circumstances, including
E    whether a loan or sale was the more appropriate characterisation to give
effect to the parties' commercial objectives.

90    As regards the case that an express trust was created in respect of
the 400,000 Tezos upon receipt by Mr Darby, I conclude that such case
has no real or reasonable prospect of success at trial and there is no other
compelling reason for such allegation to proceed to trial. As indicated above,
F    I am satisfied nevertheless that this issue is capable of being determined by
me on a final basis given the evidential matrix peculiar to this case. I conclude
that there was no express trust.

91    As regards the case that the 400,000 Tezos were subject to a resulting
trust in accordance with *Quistclose* principles, I reach the same conclusion
and for the same essential reasons. No case has been identified in which
such a trust arose over property transferred as part of reciprocal exchange of
G    assets and on terms whereby its re-transfer was expressly conditional upon a
reciprocal or equivalent re-transfer of value from beneficiary to trustee. It is
that obligatory economic reciprocity that precludes a trust of any kind, in
my judgment.

92    As regards the case that the 400,000 Tezos were subject to a
constructive trust, in so far as this variant was advanced on behalf of
H    Mr Wang at the hearing, I reach the same conclusion as above and for the
same essential reasons. It is impossible to say that Mr Darby's conditional
obligation to return 400,000 Tezos after the minimum contractual period
would be enforceable by decree of specific performance given the entirely
fungible and non-identifiable nature of such digital currency. There is no

A

meaningful analogy with a seller's obligation to convey title to land following exchange of contracts.

93 The only circumstance advanced as a compelling reason for the trust claim to proceed to trial absent threshold substantive prospects was said to be jurisprudential novelty, this being the first contested hearing in this jurisdiction (so far as counsel could discern) to deal with the question of whether a trust exists over cryptocurrency: cf *Andoro Trading Corpn v Dolfin Financial (UK) Ltd* [2021] EWHC 1578 (Comm) concerning an arguable trust over money paid as an investment in cryptocurrency. If there were serious controversy as to whether cryprocurrency constitutes property under English law, that submission may have more force. But that juridical substratum is common ground. The task of this court is to apply well-known principles of English private law to an ultra-bespoke set of facts in which all relevant evidence is contained within the four corners of verbatim transcripts. My conclusions on the relevant issues are such that I do not consider there to be any good let alone compelling reason for such claims to proceed to trial.

94 It follows from the conclusions set out above that the proprietary claim based on the existence of a trust should be dismissed.

(ii) Fiduciary duty

95 As explained in paras 65 to 72 above, I read the pleaded claim for breach of fiduciary duty absent or beyond any trust to be limited to what I call non-capital and hence non-trustee obligations, i e using 400,000 Tezos to generate rewards/profits during and accounting for such rewards/profits after the applicable contractual periods. This may carry with it the correlative obligation not to use such currency to trade for personal profit. The only remedies claimed for (dishonest) breach of such independent fiduciary duties are equitable compensation and account of profits. These are not proprietary in nature and do not without more constitute proprietary claims such as to justify the grant of a proprietary injunction against Mr Darby.

96 In so far as I am wrong about the meaning of the pleaded case, and the claim for (dishonest) breach of fiduciary duty overlaps with the pleaded trustee duties such as to impose a capital obligation upon Mr Darby—i e to return the same 400,000 Tezos when his conditional obligation to do so crystallised—then I find that such claim has no real or reasonable prospect at trial and there is no other compelling reason for such allegation to proceed to trial. Even if properly pleaded, such claim would in substance amount to the imposition of trustee duties in the absence of any trust. It would, in effect, introduce a trust by the back door. That conclusion is precluded by my finding as to the impossibility of any trust arising through the conclusion or execution of the transactions. Put another way, there is no room for a non-trustee fiduciary duty to restore the relevant assets given the essential economic reciprocity of the parties' bargain. Such fiduciary duties would be inconsistent with the contractual structure.

97 Any surviving claim based on fiduciary duty which could proceed to trial is, therefore, personal in nature, in the sense that it concerns only non-capital duties and supports only personal claims for equitable compensation and account of profits as matters stand. The profits which are the subject of this claim could be those generated by Mr Darby by baking or stake bonding the 400,000 Tezos (i e direct or authorised gains) or any profits he made from trading the 400,000 Tezos (ie indirect or unauthorised gains)

B

C

D

E

F

G

H

[2022] Bus LR

Wang v Darby (QBD)
Stephen Houseman QC

A  instead of generating such direct or authorised gains as contemplated. Such claim if properly pleaded could have a real or reasonable prospect of success consistent with the position on the other personal claims pleaded against Mr Darby for breach of contract. These personal claims underpin the WFO.

98 I say no more at this stage as regards the merits of the personal claims against Mr Darby for breach of contract and/or breach of fiduciary duty. The precise terms of the parties' contracts, including any variations as alleged, and breach of such terms are all matters for the trial judge. That said, and so far as relevant in light of my conclusions above on the proprietary claims, I regard it as unarguable that either contract was for a fixed term of two years. The Telegram Transcript is tolerably clear that the applicable period in each case was a minimum of two years. The precise mechanism for bringing it to an end, so as to trigger any conditional option to re-acquire 400,000
C  Tezos or Mr Darby's accounting or related obligations to account for baking rewards or stake bonding profits, is a matter for trial.

99 Mr Darby concedes a good arguable case against him on all pleaded personal claims for the purposes of the WFO, to which I now turn.

*WFO Continuation Application*

D  100 I can deal with this briefly in light of Mr Darby's sensible concession as to threshold substantive prospects on the personal claims against him.

101 The key issue concerns the existence of a real risk of unjustified dissipation of assets by Mr Darby that might render enforcement of any future judgment against him more difficult or less effective. There is no dispute between the parties as to the applicable principles, summarised by the Court of Appeal in *Lakatamia Shipping Co Ltd v Morimoto* [2020] 2 All ER
E  (Comm) 359, para 34.

102 I conclude without serious hesitation that such risk of dissipation exists in the present case. The position before Judge Pelling QC at the without notice hearing for injunctive relief on 2 August 2021 has become more difficult for Mr Darby as a result of (i) his own incomplete and inconsistent asset disclosure pursuant to the Injunction Order, (ii) his own evidence
F  (including conspicuous omissions) contained in four witness statements served in the meantime, and (iii) the expert evidence of Mr Sanders on behalf of Mr Wang, including the second report served in support of the WFO Variation Application and admitted for the purposes of the other applications at this hearing.

103 The available evidence shows that Mr Darby is an experienced and sophisticated cryptocurrency trader with current or potential means of
G  control over many digital wallets and access to different trading exchanges or platforms. The two reports of Mr Sanders demonstrate that Mr Darby holds or held substantial quantities of Bitcoins worth, at current values, far in excess of his disclosed net worth. I make allowance for Mr Darby's mental state and memory impairment, said to have resulted in loss of passwords and inaccessibility of digital wallets or platforms. The inconsistencies, omissions
H  and conspicuous obscurities in some of his explanations raise justifiable doubts about whether the correct or complete position has been disclosed or explained. No application has yet been made for contempt of court, but Mr Darby must know by now that this is in prospect.

104 The precise terms of the contracts and any breach by Mr Darby are for trial, as explained above. It seems likely, however, that Mr Darby must

have appreciated—at the very least—that by transferring the 400,000 Tezos
out of the OTC Account (which Mr Wang could view online) into a wallet
at the Kraken exchange in mid-March 2019 and proceeding to trade such
currency, rather than keep it in its original and visible wallet and use it to
generate baking rewards or stake bonding profits for Mr Wang's benefit, he
was not honouring the spirit or purpose of the swapping transactions. The
minimum applicable periods had a long way to run when he did this: it was
less than three months into the staking term for the First 200k and less than
two months into the staking term for the Second 200k. Mr Darby appears
to have decided not to use the 400,000 Tezos for baking or stake bonding
at all, and instead to trade them for his own gain. Whether or not this
was dishonest, and whether or not dishonesty forms an essential part of the
personal claims remaining in these proceedings, it was manifestly arguably
dishonourable or commercially colourable behaviour.

105 It is not necessary for me to form a view, still less make any findings,
about the circumstances in which Mr Darby ex-communicated Mr Wang
without notice on 6 March 2019 and subsequently. He says this was because
Mr Wang became abusive. Mr Wang was clearly angered at being informed
by Mr Darby on 6 March 2019 that he was ceasing baking Tezos: that must
have felt like a wholesale repudiation of their mutual arrangement, so his
reaction was understandable even if his tone and choice of language was not
appreciated by Mr Darby. Mr Wang demanded compensation and accused
Mr Darby of defrauding him.

106 What matters for present purposes is that Mr Darby immediately
or very soon moved the 400,000 Tezos elsewhere and traded them for his
own gain. He took advantage of the rising value of Tezos. The trading profit
he made was at the expense of Mr Wang in so far as Mr Darby was under
an obligation to seek to generate baking rewards or stake bonding profits
for Mr Wang's benefit from the 400,000 Tezos. Mr Darby also removed
his social media presence at about the same time, according to forensic
investigative evidence served by Mr Wang.

107 No point was taken before me about delay in seeking the WFO.
This aspect was broached properly and fairly before Judge Pelling QC at the
without notice injunction hearing on 2 August 2021. For the reasons given
by the court on that occasion, any delay on the part of Mr Wang is explicable
and not such as to undermine or preclude the inference as to a real risk of
unjustified dissipation on the part of Mr Darby.

108 I conclude without serious hesitation that there is, at least, a real
risk of unjustified dissipation by Mr Darby if not restrained by continuation
of the WFO. Such risk existed at the time of grant of the Injunction Order.
It persists today. Mr Wang deserves asset-freezing protection to the extent
of his personal claims against Mr Darby. There is no manifest injustice or
inconvenience to Mr Darby in continuing the WFO at this level, given the
evidence as to his ownership of Bitcoins with a value far in excess of such
frozen sum. The grant and continuation of such relief is and remains just and
convenient in all the circumstances.

*Disposition*

109 In summary:
(i) The SJ Application is granted save for the pleaded claim for equitable
compensation and account of profits based upon alleged (dishonest) breach

145

A   of fiduciary duty independent of any trust. Mr Wang's proprietary claims are struck out, save in so far as a viable claim can be maintained for a constructive trust in respect of any direct or indirect gains made by Mr Darby and not accounted for by him to Mr Wang (see paras 63 and 97 above) on the basis of alleged (dishonest) breach of fiduciary duty independent of any trust.

    (ii) In light of (i) above, the proprietary injunction contained in the Injunction Order should be set aside given its current pleaded basis.
B   The further hearing of the PI Continuation Application will provide an opportunity for Mr Wang to persuade the court that a proprietary injunction is appropriate in some form by reference to any viable residual claim for constructive trusteeship as outlined in (i) above. That is very different and much smaller than the original pleaded proprietary claim based on capital deprivation, i e non-return of the 400,000 Tezos. It is not yet clear whether
C   any such claim exists or, even if it does, whether any proprietary injunction is appropriate.

    (iii) The WFO Continuation Application is granted on the basis of the personal claims made against Mr Darby such that the WFO will continue until further Order of the court.

    (iv) The WFO Variation Application will be heard in light of (iii) above.
D    (v) The assessment of costs reserved from the hearing on 29 October 2021 and the costs associated with the ancillary application described in paras 4 and 5 above will be dealt with at the further hearing consequential upon issuance of this judgment.

    **110** I will direct that a draft amended POC is provided on behalf of Mr Wang in time for it to be considered at the consequentials hearing. That way I can deal with any pleading disputes arising out of this judgment and
E   give permission for amendments as required, whilst also determining whether any new proprietary injunction ought to be granted and making appropriate costs orders by reference to the new pleaded position.

*Order accordingly.*

F                                    LOUISE HOPSON, Solicitor

G

H

# Exhibit E



<u>Neutral Citation Number: [2023] EWHC 1634 (KB)</u>

<u>Case No: QB-2018-000676</u>

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 30 June 2023</u>

**Before** :

**<u>MRS JUSTICE ELLENBOGEN</u>**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **Executive Authority for Air Cargo and Special Flights** | **<u>Claimant</u>** |
| - and - | |
| **(1) Prime Education Limited (In Liquidation)** | |
| **(2) Tevfik Sekerci** | |
| **(3) Sera Jane Sekerci** | |
| **(4) Prime Education Havacilik Limited Sitketi** | |
| **(5) York Property Suites Limited (Dissolved)** | **<u>Defendants</u>** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**George Davies** (instructed by **MS Legal Solicitors**) for the **Claimant**
**The First Defendant did not appear**
**The Second and Third Defendants appeared in person**
**The Fourth Defendant did not appear**
**The Fifth Defendant was represented by the Third Defendant**

Hearing dates: 7, 8, 15, 16, 17 & 20 December 2021
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 14:00 on 30 June 2023 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

..............................
MRS JUSTICE ELLENBOGEN

*unlawful means out of simple disinterested malice. It is usually to achieve the further end of securing an economic advantage to themselves...*

43. *On the other hand, if the breach of contract is neither an end in itself nor a means to an end, but merely a foreseeable consequence, then in my opinion it cannot for this purpose be said to have been intended. That, I think, is what judges and writers mean when they say that the claimant must have been "targeted" or "aimed at"...*

44. *Finally, what counts as a breach of contract?... I think that one cannot be liable for inducing a breach unless there has been a breach. No secondary liability without primary liability...'*

*Dishonest assistance of a breach of fiduciary duty*

46. This is a form of accessory liability having a number of elements. For a person to be held liable for dishonest assistance of a breach of a fiduciary duty: (a) there must have been such a duty in existence at the material time; (b) the fiduciary must have committed a breach of that duty; (c) the defendant must have assisted the trustee to commit that breach of duty; and (d) the defendant's assistance must have been  dishonest: *Group Seven Limited v Notable Services LLP & others* [2020] Ch. 129, CA [29]. So far as material to this case, I address the principles relating to each of those elements below.

*(1) The fiduciary relationship*

47. In *Bristol & West Building Society v Mothew* [1998] Ch. 1, CA, Millett LJ held (page 18):

*'...A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of*

*loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work Fiduciary Obligations (1977), p. 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary.*

*...*

*The nature of the obligation determines the nature of the breach. The various obligations of a fiduciary merely reflect different aspects of his core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore, connotes disloyalty or infidelity. Mere incompetence is not enough. A servant who loyally does his incompetent best for his master is not unfaithful and is not guilty of a breach of fiduciary duty.'*

48. In *Lehtimäki and others v Cooper* [2020] UKSC 33 [42] to [48] and [51], Lady Arden held:

'*42. The question whether a person is a fiduciary is important because of the duties which follow...*

*43. Equity imposed stringent duties on persons who were appointed trustees of trusts: Lord Eldon is said to have held that these duties were imposed with "relentless jealousy" in order to ensure that trustees fulfilled their duties, and that trustees had to be "watched with infinite and the most guarded jealousy" (see Ex p Lacey (1802) 6 Ves Jnr 625, 626; 31 ER 1228 and note 2 to the report). The words "infinite" and "relentless" aptly indicate the capacity of equity to develop to meet new challenges. Over the years these duties were also imposed on directors, agents, solicitors and others. The*

term *"fiduciary"* is used to cover all persons subject to these duties, including trustees, and it is therefore a wider term than that of trustee.

44. There has been considerable debate as to how to define a fiduciary, but it is generally accepted today that the key principle is that a fiduciary acts for and only for another. He owes essentially the duty of single-minded loyalty to his beneficiary, meaning that he cannot exercise any power so as to benefit himself. In *Bristol and West Building Society v Mothew [1998] Ch 18* Millett LJ described the duties of a fiduciary as follows:

"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary."

45. So "the distinguishing obligation" of a fiduciary is that he must act only for the benefit of another in matters covered by his fiduciary duty. That means that he cannot at the same time act for himself.

46. If a person is a fiduciary then, as part of his core responsibility, he must not put himself into a position where his interest and that of the beneficiary conflict ("the no-conflict principle") and he must not make a profit out of his trust ("the no-profit principle"). The fiduciary is likely to owe other fiduciary duties as well, such as the duty to act in the best interests of the person to whom the duty is owed. Section 178(2) of the 2006 Act expressly makes this a fiduciary duty in the case of company directors. It is not necessary to consider whether these duties are fiduciary duties in all cases.

> *It is not enough that a person has agreed to perform certain duties by agreement. As the Privy Council held in In re Goldcorp Exchange Ltd [1995] 1 AC 74, 98 "The essence of a fiduciary relationship is that it creates obligations of a different character from those deriving from the contract itself".*

47. The Court of Appeal adopted the following test put forward by Finn J, sitting in the Federal Court of Australia, in Grimaldi v Chameleon Mining NL (No 2) (2012) 287 ALR 22, para 177:

> *"... a person will be in a fiduciary relationship with another when and in so far as that person has undertaken to perform such a function for, or has assumed such a responsibility to, another as would thereby reasonably entitle that other to expect that he or she will act in that other's interest to the exclusion of his or her own or a third party's interest ..."*

48. This formulation introduces the additional concept of reasonable expectation of abnegation of self-interest. Reasonable expectation may not be appropriate in every case, but it is, with that qualification, consistent with the duty of single-minded loyalty…

…

51. A person can be a fiduciary in relation to another party with whom he has a contractual relationship in respect of some only of his contractual obligations: see, for example, F & C Alternative Investments (Holdings) Ltd v Barthelemy (No 2) [2012] Ch 613, especially at paras 212-216 and 223 per Sales J (as he then was). This is only one of the situations in which a fiduciary duty may arise. It is important to examine the very specific context in which it is said that a fiduciary duty arises. This point was made by Sales J:

> *"The touchstone is to ask what obligations of a fiduciary character may reasonably be expected to apply <u>in the particular context</u>, where the contract*

*between the parties will usually provide the major part of the contextual framework in which that question arises." (para 223) (Emphasis added)'.*

49.  Consistent with the citation at paragraph 51 of *Lehtimäki*, in *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145, at 206A− 206D, Lord Browne-Wilkinson held*:*

*"The phrase 'fiduciary duties' is a dangerous one, giving rise to a mistaken assumption that all fiduciaries owe the same duties in all circumstances. That is not the case. Although, so far as I am aware, every fiduciary is under a duty not to make a profit from his position (unless such profit is authorised), the fiduciary duties owed, for example, by an express trustee are not the same as those owed by an agent. Moreover, and more relevantly, the extent and nature of the fiduciary duties owed in any particular case fall to be determined by reference to any underlying contractual relationship between the parties. Thus, in the case of an agent employed under a contract, the scope of his fiduciary duties is determined by the terms of the underlying contract...The existence of a contract does not exclude the co-existence of concurrent fiduciary duties (indeed, the contract may well be their source); but the contract can and does modify the extent and nature of the general duty that would otherwise arise."*

50.  In *F & C Alternative Investments* itself [249], Sales J considered that, *'...the proper approach here is to analyse what precise fiduciary obligations could reasonably be expected to apply in the particular context created by the agreement, without making any assumption at the outset what they should be.'*

51.  In *Wang v Darby* [2021] EWHC 3054 (Comm), Stephen Houseman QC, sitting as a Deputy Judge of the High Court, held [62]:

*'As regards the existence or imposition of fiduciary duties on a party to a commercial contract absent the existence of a trust, i.e. non-trustee or independent fiduciary duties, it is possible for these to arise where there is a relationship of trust and confidence that justifies such equitable duties in conjunction with and consistent with the relevant contractual framework. A*

*contractual obligation to use certain property (i.e. belonging to the obligor, in the absence of any trust) for a particular economic purpose and account to the contractual counterparty (i.e. seller) for the rewards of such promised endeavour is theoretically capable of being conditioned or augmented by fiduciary duties in so far as consistent with such contractual scheme. The precise scope of any fiduciary duties must be moulded to the nature of the particular relationship and facts of the case so as to ensure that any fiduciary duties are consistent with non-fiduciary (i.e. contractual) duties: see Snell's Equity (34th ed. 2019) at 7-009 & 7-012.'*

*(2) Assistance*

52. On behalf of EACS, Mr Davies submitted that actionable assistance of a breach of fiduciary duty could be effected by way of act or omission, citing as authority for that proposition *Madoff Securities International Ltd (in liquidation) v Raven* [2013] EWHC 3147 (Comm), per Popplewell J, at [326] and [351]. In fact, the first of those paragraphs is concerned with a deliberate breach of trust by the trustee and the second (concerned with acts of assistance) does not itself support the proposition which Mr Davies advanced. Indeed, it contains the following dictum, *'So accessory liability on the part of a dishonest assistant requires no more from his point of view than the actus reus of assisting by participation in the transaction, and the mens rea of dishonesty.'* The assistance identified in that case, at [352], was constituted in a series of identified acts. That is consistent with the following *dicta* in *Tan* [387] (with emphasis added), indicating that mere omission to act would not suffice, inasmuch as some form of deliberate intervention, or intentional intrusion, is required:

*'...Beneficiaries are entitled to expect that those who become trustees will fulfil their obligations. They are also entitled to expect, and this is only a short step further, that those who become trustees will be permitted to fulfil their obligations <u>without deliberate intervention</u> from third parties. They are entitled to expect that third parties will refrain from <u>intentionally intruding</u> in the trustee-beneficiary relationship <u>and thereby hindering a beneficiary</u> from receiving his entitlement in*

*accordance with the terms of the trust instrument. There is here a close analogy with breach of contract. A person who knowingly procures a breach of contract, or knowingly interferes with the due performance of a contract, is liable to the innocent party. The underlying rationale is the same.'*

53. It must be shown that the conduct in question in fact assisted the breach of fiduciary duty and that the loss directly resulted from that latter breach. The assistance given must have been more than minimal. A claimant must, at least, show that the defendant's actions have made the fiduciary's breach of duty easier than it would otherwise have been. But the causation requirement for dishonest assistance is no stronger than that, and it is no answer to a claim, for example, that the claimant's loss would have occurred anyway, because the wrongdoing fiduciary would have committed the breach even if the defendant had not assisted him: *Group Seven* [110(1)].

*(3) Dishonesty*

54. In *Royal Brunei Airlines Sdn Bhd v Tan* [1995] AC 378, PC [178], Lord Nicholls, giving the judgment of the Court, held:

   '*...their Lordships' overall conclusion is that dishonesty is a necessary ingredient of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly. "Knowingly" is better avoided as a defining ingredient of the principle.'*

55. Addressing the meaning of dishonesty for those purposes, Lord Nicholls observed:

   '*Before considering this issue further it will be helpful to define the terms being used by looking more closely at what dishonesty means in this context. Whatever may be the position in some criminal or other contexts ... in the context of the accessory liability principle acting dishonestly, or with a lack of probity, which is*

*synonymous, means simply not acting as an honest person would in the circumstances. This is an objective standard. At first sight this may seem surprising. Honesty has a connotation of subjectivity, as distinct from the objectivity of negligence. Honesty, indeed, does have a strong subjective element in that it is a description of a type of conduct assessed in the light of what a person actually knew at the time, as distinct from what a reasonable person would have known or appreciated. Further, honesty and its counterpart dishonesty are mostly concerned with advertent conduct, not inadvertent conduct. Carelessness is not dishonesty. Thus for the most part dishonesty is to be equated with conscious impropriety. However, these subjective characteristics of honesty do not mean that individuals are free to set their own standards of honesty in particular circumstances. The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values according to the moral standards of each individual. If a person knowingly appropriates another's property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour.*

*In most situations there is little difficulty in identifying how an honest person would behave. Honest people do not intentionally deceive others to their detriment. Honest people do not knowingly take others' property. Unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it involves a misapplication of trust assets to the detriment of the beneficiaries. Nor does an honest person in such a case deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless. However, in the situations now under consideration the position is not always so straightforward. This can best be illustrated by considering one particular area: the taking of risks.*

*Taking risks*

*All investment involves risk. Imprudence is not dishonesty, although imprudence may be carried recklessly to lengths which call into question the honesty of the*

# Exhibit F

**LAWS OF ANTIGUA AND BARBUDA**

| *Common Law (Declaration of Application)* | **(CAP.** *92* | 1 |

# CHAPTER *92*

## THE COMMON LAW (DECLARATION OF APPLICATION) ACT

Arrangement of Sections
Section

1. Short title.
2. How far the Common Law of England is in force here, etc.

————————

COMMON LAW (DECLARATION OF APPLICATION)

(20th *June,* 1705.)      **31/1705.**

AN ACT FOR PREVENTING TEDIOUS AND CHARGEABLE LAWSUITS, AND FOR DECLARING THE RIGHTS OF PARTICULAR TENANTS.

WHEREAS Law Suits and Controversies frequently arise between the Inhabitants of these Islands, principally occasioned by the different Nature and Circumstances of our Estates from those in England, whereby it sometimes hath happened, through the Partiality of some, and Ignorance of others, that contradictory Judgments have been given in cases founded on the same Rules and Principles of Law and Reason; for the redressing of which Mischiefs, and establishing a constant and certain Uniformity in the Proceedings of the Courts of the several Islands under this Government, and for declaring the Rights of particular Tenants in these Islands.

LAWS OF ANTIGUA AND BARBUDA

*2*       *CAP. 92)      Common Law (Declaration of*
                          *Application)*

Short title.          **1.**   This Act may be cited as the Common Law
(Declaration of Application) Act.

How far the
Common Law of
**England is in**
force **here, etc.**

**2.**   We your Majesty's most dutiful and loyal Subjects,
the Commander in Chief of your Majesty's Leeward Charib-
bee Islands, the General Council, and General Assembly of
the said Islands, now met at Nevis, do humbly pray your
Majesty that it may be declared, and it is hereby declared
by the Authority aforesaid, That the Common Law of
England, as far as it stands unaltered by any written Laws
of these Islands, or some of them, confirmed by Your
Majesty, or some of your Royal Predecessors in Council,
or by some Act or Acts of Parliament of the Kingdom of
England, extending to these Islands, is in force in each of
these your Majesty's Leeward Charibbee Islands, and is the
certain Rule whereby the Rights and Properties of your
Majesty's good Subjects inhabiting these Islands, are and
ought to be determined; and that all Customs or pretended
Customs, or Usages, contradictory thereunto, are illegal, null,
and void.

**3.**

**4.**

**5.**

**6.**

**7.**

# Exhibit G



**Michaelmas Term**
[2019] UKPC 45
**Privy Council Appeal No 0075 of 2018**

# JUDGMENT

# In the matter of Stanford International Bank Ltd (In Liquidation) (Acting by and through its Joint Liquidators Mark McDonald and Hugh Dickson) (Antigua and Barbuda)

## From the Court of Appeal of the Eastern Caribbean Supreme Court (Antigua and Barbuda)

**before**

**Lord Wilson**
**Lord Carnwath**
**Lord Briggs**
**Lady Arden**
**Sir Andrew Longmore**

## JUDGMENT GIVEN ON

## 16 December 2019

**Heard on 23 and 24 July 2019**

*Appellant*
Justin Fenwick QC
Nicole Sandells QC
(Instructed by Gowling
WLG (UK) LLP)

*Respondent*
Prof Mark Watson-Gandy
Lenworth Johnson
(Instructed by Edwin Coe
LLP)

**LORD BRIGGS: (with whom Lord Wilson and Sir Andrew Longmore agree)**

*Introduction*

1.    This appeal is about the rights of creditors, under the laws of Antigua and Barbuda, who have suffered loss by investing, through an Antiguan bank, in what turned out to have been a Ponzi scheme. Giving the advice of the Board in *Fairfield Sentry Ltd v Migani* [2014] UKPC 9, Lord Sumption said this, at para 3:

> "It is inherent in a Ponzi scheme that those who withdraw their funds before the scheme collapses escape without loss, and quite possibly with substantial fictitious profits. The loss falls entirely on those investors whose funds are still invested when the money runs out and the scheme fails."

2.    This uneven (some might say capricious) distribution of the loss occasioned to the victims of what might be described as a common misfortune has given rise to anxious consideration by the courts of Antigua and by the Board as to the remedies which might be available to the joint liquidators of the vehicle for this Ponzi scheme, namely Stanford International Bank ("SIB"), so as to enable them to achieve a re-adjustment of that loss among the bank's depositors which would accord with the liquidators' perception of fairness, justice and equity. They achieved limited success at first instance but suffered a comprehensive defeat in the Court of Appeal.

3.    Central to the analysis of the relevant legal issues is the fact that SIB was incorporated as an Antiguan International Business Corporation ("IBC") under the Antiguan International Business Corporations Act ("the IBC Act"). As will be explained in more detail below, the IBC Act prescribes a rather unusual insolvency regime for the winding up of an IBC but it also contains, at section 204, a generously worded provision of discretionary remedies which may be sought from the court, both by shareholders and creditors, where there has been oppressive or unfairly prejudicial conduct, in order to rectify the matters complained of. This may conveniently be labelled "section 204 relief".

4.    Three main issues have emerged from this litigation, which was initiated by an application to the court by the joint liquidators for directions. The first, which only emerged in the Court of Appeal, but which takes logical precedence over the others, is whether section 204 relief is available at all in respect of the affairs of an IBC in liquidation. The second issue, which arises only if (contrary to the judgment of the Court

of Appeal) the first is answered in the affirmative, is whether section 204 provides a realistic basis for a claim by the joint liquidators to recover, for the benefit of the creditors generally, amounts paid by SIB to depositor creditors before its liquidation ("claw-back claims"). The third issue is whether section 204 provides a basis for the liquidators to re-adjust the claims of creditors in the liquidation so as to allocate the net proceeds of recoveries in favour of those depositors who have not been paid at all, as against those who have been partly paid prior to liquidation, otherwise than as would be achieved by a pari passu distribution of the proceeds of the liquidation in accordance with the insolvency scheme applicable to SIB. The judge's directions to the liquidators effectively answered the second issue in the negative and the third in the affirmative.

5.       By way of summary, the Board has concluded:

(a)      by a majority, that section 204 relief is not available in relation to an IBC in liquidation, so that this appeal should be dismissed;

(b)      unanimously that, if section 204 relief had in principle been available, the judge was right to conclude that claw-back claims should not be pursued;

(c)      unanimously, that re-adjustment of creditors' claims in the liquidation should not have been permitted, even if section 204 relief was in principle available.

6.       While it may be said that the first of those three conclusions is sufficient to dispose of this appeal, the other issues were very fully argued and the Board thinks it appropriate to deal with them, out of respect for the quality of the competing submissions, the careful judgment of the judge, and because of the general importance of the legal issues at stake.

*The Facts*

7.       SIB started operations in Antigua under the IBC Act in 1990, having moved from Montserrat, where it was called Guardian Bank. Throughout its operations in Antigua it was controlled by Robert Allen Stanford. The liquidators say that Mr Stanford ran SIB throughout its operations in Antigua as a Ponzi scheme, so that it was probably insolvent for the whole of the period from 1990 onwards. Mr Stanford is now serving a 110 year prison sentence in the United States of America.

8.       SIB's modus operandi was to seek investments by the sale of certificates of deposit ("CDs"), promising repayment of capital together with contractual interest upon

maturity, with provision for early redemption at a discount. The relationship thereby created between SIB and its depositors was therefore that of debtor and unsecured creditor rather than, for example, trustee and beneficiary.

9.    From about September 2008 there began a run on SIB, during which depositors sought to recover capital and interest, to the extent that US$1.3 billion of withdrawals were made prior to SIB being placed in receivership, and its operations being suspended, by the Antiguan Financial Services Regulatory Commission in February 2009. The appointment of receiver-managers was confirmed by the High Court of Antigua on 26 February 2009 and, on 15 April, the High Court converted the receivership into a liquidation, re-appointing the receiver-managers as liquidators. There have been some changes in the identity of the liquidators since then, but they are immaterial.

10.    Since for many years Mr Stanford had been misappropriating incoming payments from depositors rather than investing them in appropriate securities, there was by early 2009 only a fraction of the funds within SIB required to repay creditors in full. Leaving aside trade creditors, the depositors in SIB may, from a viewpoint in February 2009, broadly be divided into three classes. First, those who had been paid their contractual entitlements (capital and interest) in full prior to the onset of liquidation. Secondly those who had been paid part of their contractual entitlement before liquidation, who could therefore claim as creditors for the unpaid balance in the liquidation. Thirdly, those depositors who had received no part of their contractual entitlement.

11.    The liquidators applied to the court for directions in October 2013 and in May 2014 sought the appointment of the first respondent as amicus curiae, to present all arguments which might reasonably be advanced by creditors who would stand to be disadvantaged by the claims which the liquidators sought authority to pursue. In summary, the steps which the liquidators invited the court to authorise them to take were as follows:

(a)    The pursuit of claims, without limit of time, for disgorgement by depositors of any sums received from SIB in excess of their respective capital deposits. This sought disgorgement of amounts paid out as contractual interest from a class which the liquidators labelled "net winners". This was said to be justified on the basis that those amounts could only have been taken from other depositors' capital, since at no time had SIB generated any investment profits sufficient to pay interest. Some US$200m was estimated to have been paid out in this way.

(b)    Claims against all depositors who had received payments during the run on the bank from September 2008 until it ceased trading. These payments were estimated to have amounted to US$1.3 billion. The basis upon which a claw-back of these payments was said to be justified was that, if SIB had been placed in liquidation before the run on the bank commenced, then these payments would not have been made, and they ought to be regarded as having amounted to wrongful preferences. The depositors thereby repaid were labelled by the liquidators "preference creditors".

(c)    Re-adjustment of depositors' claims within the liquidation, so as to disallow the claims of partly paid depositors in favour of depositors who had not been paid at all. This claim did not involve any element of claw-back. Rather, it sought to treat part-payments prior to liquidation as having been wrongful so that the amount of them could be, in effect, set off against what those depositors might otherwise have received from the liquidation proceeds on account of that part of their debts which remained unpaid.

12.    With one exception, all these proposed claims were put forward by the liquidators upon the basis that they could be acceded to by the court as a form of section 204 relief for oppressive or unfairly prejudicial conduct, namely the conduct of SIB's affairs as a Ponzi scheme to the detriment of its depositors generally. The exception relates to claim (b), against the preference creditors. In addition to being put forward as a form of section 204 relief, it was also pursued as a common law preference claim, upon the basis (which will be explained in more detail below) that because the IBC Act excluded the statutory regime for avoiding fraudulent preferences applicable to companies generally, a common law preference claim was all that could be advanced, outside the confines of section 204.

13.    It is not the function of the court, on an application of this kind for directions by liquidators, to determine whether or not particular kinds of claim will definitely succeed. Rather, and in much the same way as a judge hearing a *In re Beddoe* application by trustees seeking authority to commence proceedings, the court has to exercise a discretion whether to grant or refuse authority upon the basis of a judgment about the likely merits of such a claim, set against the drain upon the funds in the hands of the liquidators likely to be incurred by pursuing it.

14.    In a thorough and careful judgment handed down in November 2015, Wallbank J (Ag) declined to authorise the pursuit of claims (a) or (b), that is claw-back claims in relation to payments made to depositors prior to liquidation. But he authorised the liquidators to pursue the re-adjustment claims of type (c). His reasoning may be summarised as follows. First, it was not submitted to him by the amicus that section 204 relief was, in principle, unavailable in relation to an IBC in liquidation. After a review of some of the relevant authorities, he concluded that it was available. Secondly, he

concluded that the evidence about the operation of SIB as a Ponzi scheme disclosed a sufficient prima facie case of oppression and unfair prejudice as against those of the bank's depositors who lost money as a result. But thirdly, he concluded that there was no sufficient prospect that claw-back claims (types (a) and (b) above) would succeed, principally because depositors who had been paid all or part of their contractual entitlements had a reasonable expectation that they would be able to hold on to them, sufficient to make it unfair to require them to disgorge by way of relief under section 204. Fourthly he concluded that the alternative claim against the preference creditors under the common law of fraudulent preference disclosed too many obstacles for it to have a reasonable prospect of success. Fifthly, he concluded that re-adjustment of claims within the liquidation was capable of amounting to a form of section 204 relief which, depending on particular facts about the depositors who would lose thereby, disclosed a sufficient prospect of success. Finally, he concluded that the liquidators were "proper persons" to make the application under section 204, within the meaning of section 200(b)(iv) of the IBC Act.

15.    On the liquidators' appeal and a cross-appeal by the amicus the Court of Appeal (Pereira CJ, Thom and Webster JJA) dealt with the matter on the simple basis that section 204 relief could not be sought in relation to the affairs of an IBC in liquidation. The judge's refusal to permit the alternative (within claim (b)) based upon common law preference was not the subject of any appeal to the Court of Appeal. The result therefore was that the liquidators were refused the relief sought in its entirety.

*The Legal Framework*

16.    This appeal is all about the interrelationship between two distinct forms of legal framework. The first, which may be labelled the insolvency scheme, is that which is applied to a company when it goes into insolvent liquidation. The second, which may be labelled the oppression/unfair prejudice regime, is that which enables the court to provide discretionary remedies for dealing with oppressive or unfairly prejudicial conduct. Most legal systems in the common law world provide some form of each of these two frameworks, and Antigua is no exception. In the present case it is necessary to focus not merely upon the general law of Antigua, but the specific versions of each of those frameworks applicable in relation to an IBC, under the IBC Act.

17.    Speaking generally, most insolvency frameworks establish a form of code or set of rules by which the competing claims of stakeholders in the company are valued as at the onset of the insolvency process (often called the cut-off date) and the then realisable assets of the company are collected in by the liquidators and distributed pari passu among unsecured creditors, subject to the proprietary claims of those with security, with the surplus (in the unlikely event there is any) distributable among shareholders, or any other class of stakeholder whose rights are postponed to those of the unsecured creditors. Transactions following the cut-off date are in general avoided and specific

statutory provision is usually made for the avoidance or unwinding of certain pre-cut off date transactions such as, typically, wrongful preferences and transactions at an undervalue. In some jurisdictions, such as England, the insolvency scheme is now almost entirely statutory. In others, such as Antigua (and indeed England before 1986) the scheme consists of a mixture of statutory and judge-made rules. Invariably the insolvency scheme is recognised as serving not merely the private interests of the stakeholders in the company but also the public interest: see the recent judgment of the Board in *Scandinaviska Enskilda Banken AB v Conway* [2019] UKPC 36, paras 104-117.

18.    Another feature of insolvency schemes generally is that the application of a system of rules founded on the pari passu principle by no means always produces perfect justice or equity as between different stakeholders or classes of stakeholders. At best, it may be said to produce a form of rough justice, constrained in particular by the fact that the liquidators have recourse only to the assets of the company still in its possession at the cut-off date, save where limited provisions for re-opening past transactions such as preferences are successfully deployed. In short, the tree lies where it falls. A feature of most insolvency schemes, including that generally in force in Antigua, is that they operate by reference to detailed rules which leave limited room for judicial discretion. Nor does the typical insolvency scheme leave room for special treatment to mitigate injustice to particular stakeholders. On the contrary, the essence of the pari passu principle is that all stakeholders within a particular priority class (whether unsecured creditors or contributories) should have the provisions of the scheme applied to them equally.

19.    The statutory part of the insolvency scheme which applies to Antiguan companies generally is to be found in the Companies Act 1995. For present purposes it is the provision about fraudulent preference which deserves attention. Section 458(1) provides that:

> "458.(1)  Any conveyance, mortgage, delivery of goods, payment, execution, or other act relating to property which would, if made or done by or against an individual, be deemed in his bankruptcy a fraudulent preference, or a fraudulent conveyance, assignment, transfer, sale or disposition, shall, if made or done by or against a company, be deemed in the event of its being wound up, a fraudulent preference of its creditors, or a fraudulent conveyance, assignment, transfer, sale or disposition, as the case may be, and be invalid accordingly."

That cross-reference to the bankruptcy scheme leads to section 44 of the Bankruptcy Act which provides in subsection (1) as follows:

"Every conveyance or transfer of property, or charge thereon made, every payment made, every obligation incurred, and every judicial proceeding taken or suffered by any person unable to pay his debts as they become due from his own money in favour of any creditor, or any person in trust for any creditor, with a view of giving such creditor a preference over the other creditors, whether the giving of such preference is his sole view, or one view among others, shall, if the person making, taking, paying or suffering the same is adjudged bankrupt on a bankruptcy petition presented within six months after the date of making, taking, paying, or suffering the same, be deemed fraudulent and void as against the trustee in the bankruptcy."

20.    No statutory part of the general Antiguan insolvency scheme is applicable to an IBC. This is because section 372(2)(c) of the IBC Act completely dis-applies the Companies Act in relation to IBCs. Nonetheless there are, in Part IV of the IBC Act, a range of provisions governing the winding-up and dissolution of an IBC and conferring the requisite powers both on liquidators and upon the court. Provision is made in sections 289 and 290 for the priorities of claims in a winding up, which apply the pari passu principle among all the claimants with the same priority.

21.    Conspicuous by its absence is any statutory provision for the avoidance of fraudulent or wrongful preferences. Counsel on this appeal could offer no explanation for that apparent omission, nor even a reliable indication whether it was deliberate or accidental. But they were in agreement (and it has been common ground at all stages in this litigation) that the common law about fraudulent preference is applicable in the insolvent winding up of an IBC, in default of any statutory provision which replaces it.

22.    Fraudulent (now generally called wrongful) preference was originally a judge-made principle and therefore a creature of the common law. As is explained in the *Scandinaviska* case, at paras 61 and 64, it was originally developed in England in the 18th century in response to a perception, best explained by Lord Mansfield in *Alderson v Temple* (1768) 4 Burr 2235, 2240 that a fraudulent preference "is defeating the equality that is introduced by the Statutes of Bankruptcy". That originally common law doctrine was almost universally replaced by express statutory provisions in common law countries by the end of the 19th century, first in relation to bankruptcy and then, as in Antigua, by cross-reference, in relation to corporate insolvency.

23.    It is unnecessary to describe the precise parameters of the common law doctrine in detail, still less to speculate how it might have developed if it had not been almost universally overtaken by statute. For present purposes it is sufficient to note that, as was common ground between counsel, the common law doctrine posed certain burdens upon a liquidator seeking to rely upon it which were alleviated to some extent by section 44

of the Bankruptcy Act of Antigua. It was because of those difficulties in pursuing the common law remedy that Wallbank J concluded that there was no sufficient prospect of success in the pursuit of a common law preference claim to make it appropriate to authorise the liquidators to do so. The particular difficulty drawn to the Board's attention was that in *Nunes v Carter* (1866) LR 1 PC 342, at 348, Lord Westbury said that payment pursuant to a demand on the part of the creditor was not a fraudulent preference. This part of Wallbank J's analysis has not been the subject of an appeal.

*Oppression and Unfair Prejudice*

24.     The IBC Act contains, at section 204, a modern and broadly expressed provision for the grant by the court of relief in relation to oppression or unfairly prejudicial conduct, under the heading "Restraining Oppression". Before describing it in detail, it is appropriate to begin with a summary of its antecedents. In England, before 1948, the main remedy of a shareholder in a company who complained that its affairs had been conducted unfairly as against him was to petition for a just and equitable winding up: see generally *In re Westbourne Galleries Ltd* [1973] AC 360. A more flexible response to the same complaint than this draconian remedy was provided to the English courts by section 210 of the Companies Act 1948, and substantially modernised and expanded, in sections 459-461 of the Companies Act 1985.

25.     Speaking of section 459, in *O'Neill v Phillips* [1999] 1 WLR 1092, 1098-1101, Lord Hoffmann said:

> "In section 459 Parliament has chosen fairness as the criterion by which the court must decide whether it has jurisdiction to grant relief. It is clear from the legislative history (which I discussed in *In re Saul D Harrison & Sons Plc* [1995] 1 BCLC 14, 17-20) that it chose this concept to free the court from technical considerations of legal right and to confer a wide power to do what appeared just and equitable. But this does not mean that the court can do whatever the individual judge happens to think fair. The concept of fairness must be applied judicially and the content which it is given by the courts must be based upon rational principles. As Warner J said in *In re J E Cade & Son Ltd* [1992] BCLC 213, 227: 'The court … has a very wide discretion, but it does not sit under a palm tree'.
>
> Although fairness is a notion which can be applied to all kinds of activities, its content will depend upon the context in which it is being used. Conduct which is perfectly fair between competing businessmen may not be fair between members of a family. In

some sports it may require, at best, observance of the rules, in others ('it's not cricket') it may be unfair in some circumstances to take advantage of them. All is said to be fair in love and war. So the context and background are very important.

In the case of section 459, the background has the following two features. First, a company is an association of persons for an economic purpose, usually entered into with legal advice and some degree of formality. The terms of the association are contained in the articles of association and sometimes in collateral agreements between the shareholders. Thus the manner in which the affairs of the company may be conducted is closely regulated by rules to which the shareholders have agreed. Secondly, company law has developed seamlessly from the law of partnership, which was treated by equity, like the Roman societas, as a contract of good faith. One of the traditional roles of equity, as a separate jurisdiction, was to restrain the exercise of strict legal rights in certain relationships in which it considered that this would be contrary to good faith. These principles have, with appropriate modification, been carried over into company law.

The first of these two features leads to the conclusion that a member of a company will not ordinarily be entitled to complain of unfairness unless there has been some breach of the terms on which he agreed that the affairs of the company should be conducted. But the second leads to the conclusion that there will be cases in which equitable considerations make it unfair for those conducting the affairs of the company to rely upon their strict legal powers. Thus unfairness may consist in a breach of the rules or in using the rules in a manner which equity would regard as contrary to good faith.

This approach to the concept of unfairness in section 459 runs parallel to that which your Lordships' House, in *In re Westbourne Galleries Ltd* [1973] AC 360, adopted in giving content to the concept of 'just and equitable' as a ground for winding up. After referring to cases on the equitable jurisdiction to require partners to exercise their powers in good faith, Lord Wilberforce said, at p 379:

> 'The words ["just and equitable"] are a recognition of the fact that a limited company is more than a mere legal entity, with a personality in law of its own: that there is room in

company law for recognition of the fact that behind it, or amongst it, there are individuals, with rights, expectations and obligations inter se which are not necessarily submerged in the company structure. That structure is defined by the Companies Act [1948] and by the articles of association by which shareholders agree to be bound. In most companies and in most contexts, this definition is sufficient and exhaustive, equally so whether the company is large or small. The "just and equitable" provision does not, as the respondents [the company] suggest, entitle one party to disregard the obligation he assumes by entering a company, nor the court to dispense him from it. It does, as equity always does, enable the court to subject the exercise of legal rights to equitable considerations; considerations, that is, of a personal character arising between one individual and another, which may make it unjust, or inequitable, to insist on legal rights, or to exercise them in a particular way.'

I would apply the same reasoning to the concept of unfairness in section 459. The Law Commission, in its Report on Shareholder Remedies (1997) (Law Com No 246) (Cm 3769), para 4.11, p 43 expresses some concern that defining the content of the unfairness concept in the way I have suggested might unduly limit its scope and that 'conduct which would appear to be deserving of a remedy may be left unremedied. …'. In my view a balance has to be struck between the breadth of the discretion given to the court and the principle of legal certainty. Petitions under section 459 are often lengthy and expensive. It is highly desirable that lawyers should be able to advise their clients whether or not a petition is likely to succeed. Lord Wilberforce, after the passage which I have quoted, said that it would be impossible 'and wholly undesirable' to define the circumstances in which the application of equitable principles might make it unjust, or inequitable (or unfair) for a party to insist on legal rights or to exercise them in a particular way. This of course is right. But that does not mean that there are no principles by which those circumstances may be identified. The way in which such equitable principles operate is tolerably well settled and in my view it would be wrong to abandon them in favour of some wholly indefinite notion of fairness.

I should make it clear that the parallel I have drawn between the notion of 'just and equitable' as explained by Lord Wilberforce in *In re Westbourne Galleries Ltd* and the notion of fairness in section 459 does not mean that conduct will not be unfair unless it would

have justified an order to wind up the company. There was such a requirement in section 210 of the Companies Act 1948 but it was not repeated in section 459. As Mummery J observed in *In re A Company* (No 00314 of 1989), *Ex p Estate Acquisition and Development Ltd* [1991] BCLC 154, 161, the grant of one remedy will not necessarily require proof of conduct which would have justified a different remedy:

> 'Under sections 459 to 461 the court is not … faced with a death sentence decision dependent on establishing just and equitable grounds for such a decision. The court is more in the position of a medical practitioner presented with a patient who is alleged to be suffering from one or more ailments which can be treated by an appropriate remedy applied during the course of the continuing life of the company.'

The parallel is not in the conduct which the court will treat as justifying a particular remedy but in the principles upon which it decides that the conduct is unjust, inequitable or unfair.

An example of such equitable principles in action is *Blisset v Daniel* (1853) 10 Hare 493 to which Lord Wilberforce referred in *In re Westbourne Galleries Ltd* [1973] AC 360, 381. Page Wood V-C held that upon the true construction of the articles, two-thirds of the partners could expel a partner by serving a notice upon him without holding any meeting or giving any reason. But he held that the power must be exercised in good faith. He said, 10 Hare 493, 523, that 'the literal construction of these articles cannot be enforced' and, after citing from the title 'De Societate' in Justinian's *Institutes*, went on at pp 523-524:

> 'It must be plain that you can neither exercise a power of this description by dissolving the partnership nor do any other act for purposes contrary to the plain general meaning of the deed, which must be this - that this power is inserted, not for the benefit of any particular parties holding two-thirds of the shares but for the benefit of the whole society and partnership …'

In the Australian case of *In re Wondoflex Textiles Pty Ltd* [1951] VLR 458, 467, Smith J also contrasted the literal meaning of the articles with the true intentions of the parties:

> 'It is also true, I think, that, generally speaking, a petition for winding up, based upon the partnership analogy, cannot succeed if what is complained of is merely a valid exercise of powers conferred in terms by the articles. … To hold otherwise would enable a member to be relieved from the consequences of a bargain knowingly entered into by him. … But this, I think, is subject to an important qualification. Acts which, in law, are a valid exercise of powers conferred by the articles may nevertheless be entirely outside what can fairly be regarded as having been in the contemplation of the parties when they became members of the company; and in such cases the fact that what has been done is not in excess of power will not necessarily be an answer to a claim for winding up. Indeed, it may be said that one purpose of [the just and equitable provision] is to enable the court to relieve a party from his bargain in such cases.'

I cite these references to 'the literal construction of these articles' contrasted with good faith and 'the plain general meaning of the deed' and 'what the parties can fairly have had in contemplation' to show that there is more than one theoretical basis upon which a decision like *Blisset v Daniel* can be explained. 19th century English law, with its division between law and equity, traditionally took the view that while literal meanings might prevail in a court of law, equity could give effect to what it considered to have been the true intentions of the parties by preventing or restraining the exercise of legal rights. So Smith J speaks of the exercise of the power being valid 'in law' but its exercise not being just and equitable because contrary to the contemplation of the parties. This way of looking at the matter is a product of English legal history which has survived the amalgamation of the courts of law and equity. But another approach, in a different legal culture, might be simply to take a less literal view of 'legal' construction and interpret the articles themselves in accordance with what Page Wood VC called 'the plain general meaning of the deed'. Or one might, as in Continental systems, achieve the same result by introducing a general requirement of good faith into contractual performance. These are all different ways of doing the same thing. I do not suggest there is any advantage in abandoning the traditional English theory, even though it is derived from arrangements for the administration of justice which were

abandoned over a century ago. On the contrary, a new and unfamiliar approach could only cause uncertainty. So I agree with Jonathan Parker J when he said in *In re Astec (BSR) Plc* [1998] 2 BCLC 556, 588:

> 'in order to give rise to an equitable constraint based on "legitimate expectation" what is required is a personal relationship or personal dealings of some kind between the party seeking to exercise the legal right and the party seeking to restrain such exercise, such as will affect the conscience of the former.'

> This is putting the matter in very traditional language, reflecting in the word 'conscience' the ecclesiastical origins of the long-departed Court of Chancery."

26.     What emerges from this compelling analysis is that the essential basis of the remedy for oppression or unfairly prejudicial conduct, although entirely statutory, is derived from principles of equity, as Wallbank J correctly observed. A provision very similar to section 204, in section 241 of the Canada Business Corporations Act RSC 185, was described by the Supreme Court of Canada as providing an equitable remedy, in *BCE Inc v 1976 Debenture holders* [2008] SCJ No 37, 301 DLR (4th) 80, para 58.

27.     Building on the Canadian model, section 204 expands upon the English section 459 (now section 994 of the Companies Act 2006) in a number of significant respects. Its text is as follows:

> "**RESTRAINING OPPRESSION**

> 204(1) A complainant may apply to the court for an order under this section.

> (2)     If, upon an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates,

> > (a)     any act or omission of the corporation or any of its affiliates effects a result,

(b)     the business or affairs of the corporation or any of its affiliates are or have been carried on or conducted in a manner, or

(c)     the powers of the directors of the corporation or any of its affiliates are or have been exercised in a manner,

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any shareholder or debenture holder, creditor, director or officer of the corporation, the court may make an order to rectify the matters complained of.

(3)     In connection with an application under this section, the court may make any interim or final order it thinks fit, including without limiting the generality of the foregoing,

(a)     an order restraining the conduct complained of;

(b)     an order appointing a receiver or receiver-manager;

(c)     an order to regulate a corporation's affairs by amending its articles or by-laws or creating or amending a unanimous shareholder agreement;

(d)     an order directing an issue or exchange of securities;

(e)     an order appointing directors in place of or in addition to all or any of the directors then in office;

(f)     an order directing a corporation, subject to subsection (6), or any other person, to purchase shares or debentures of a holder thereof;

(g)     an order directing a corporation, subject to subsection (6), or any other person, to pay to a security holder any part of the moneys paid by him for his securities;

(h)     an order varying or setting aside a transaction or contract to which a corporation is a party and compensating the corporation or any other party to the transaction or contract;

(i)     an order requiring a corporation, within a time specified by the court, to produce to the court or an interested person financial statements in the form required by section 142 or an accounting in such other form as the court may determine;

(j)     an order compensating an aggrieved person;

(k)     an order directing rectification of the registers or other records of a corporation under section 207;

(l)     an order liquidating and dissolving the corporation; or

(m)     an order requiring the trial of any issue.

(4)     If an order made under this section directs the amendment of the articles or by-laws of a corporation,

(a)     the directors must forthwith comply with subsection (4) of section 174; and

(b)     no other amendment to the articles or by-laws may be made without the consent of the court, until the court otherwise orders.

(5)     A shareholder is not entitled under section 191 to dissent if an amendment to the articles is effected under this section.

(6)     A corporation shall not make a payment to a shareholder under paragraph (f) or (g) of subsection (3) if there are reasonable grounds for believing that

(a)    the corporation is unable or would, after that payment, be unable to pay its liabilities as they become due, or

(b)    the realisable value of the corporation's assets would thereby be less than the aggregate of its liabilities.

(7)    An applicant under this section may apply in the alternative for an order under section 301."

28.    Section 301 of the IBC Act, referred to in section 204(7) provides as follows:

"301(1)  The court may order the liquidation and dissolution of a corporation or any of its affiliated corporations upon the application of a shareholder

(a)    if the court is satisfied that, in respect of a corporation or any of its affiliates,

(i)    any act or omission of the corporation or any of its affiliates,

(ii)    the business or affairs of the corporation or any of its affiliates are or have been carried on or conducted in a manner, or

(iii)    the powers of the directors of the corporation or any of its affiliates are or have been exercised in a manner,

that is oppressive or unfairly prejudicial to or that unfairly disregards the interest of any security holder, creditor, director or officer; or

(b)    if the court is satisfied that

(i)    any unanimous shareholder agreement entitles a complaining shareholder to demand

dissolution of the corporation after the occurrence of a specified event and that event has occurred; or

    (ii)    it is just and equitable that the corporation be liquidated and dissolved.

(2)    Upon an application under this section, the court may make such order under this section or section 204 as it thinks fit.

(3)    Sections 205 and 206 apply to an application under this section."

29.    Section 204, like everything else in the IBC Act, is to be purposively construed. Section 371 provides as follows:

**"PURPOSES OF ACT**

371(1) This Act is to receive such fair, large and liberal construction and interpretation as will best ensure the attainment of its purposes.

(2)    The purposes of this Act are

    (a)    to encourage the development of Antigua and Barbuda as a responsible off-shore financial, trade and business centre;

    (b)    to provide incentives by way of tax exemptions and benefits for off-shore business carried on from within Antigua and Barbuda; and

    (c)    to enable the citizens of Antigua and Barbuda to share in the ownership, management and rewards of any business activity resulting therefrom."

30.    The word "complainant" in section 204 is defined in section 200 in the following way:

"200.  In this Part,

(a)    'action' means an action under this Act;

(b)    'complainant' means, in relation to a corporation,

(i)    a security holder, or a former holder of a security of the corporation or any of its affiliates;

(ii)    a director or an officer or former director or officer of the corporation or any of its affiliates;

(iii)    the Director; or

(iv)    any other person who, in the discretion of the court, is a proper person to make an application under this Part."

Finally, "officer" within the meaning of section 200 is defined in section 2(1)(j) in a way which does not include a liquidator. It follows that for a liquidator to be able to bring a complaint under section 204 (if otherwise available) it would be necessary for the court to decide, in the exercise of its discretion, that the liquidator was the proper person to make the application: see section 200(b)(iv).

31.    Section 204 builds out from its English predecessor, section 459, in three main respects. First, it includes oppression and unfair disregard of the interests of the relevant complainant in addition to unfairly prejudicial conduct, as a trigger for the exercise of the jurisdiction. Secondly, it includes among those who may be identified as victims of unfair prejudice or oppression, debenture holders, creditors, directors and officers rather than just members of the company. Thirdly, it sets out a more comprehensive, but still non-exclusive, list of remedies to which the court may have recourse.

*The First Issue: Does section 204 apply in relation to a company in insolvent liquidation?*

32.    Arguments that section 204 relief should be available in relation to a company in insolvent liquidation include the following:

(a)    There is nothing in the language of section 204 to exclude its application in that context, where the requisite oppressive or unfairly prejudicial conduct is demonstrated.

(b)    Section 204 is most closely aligned with its Canadian equivalent and some authority there supports its application during liquidation.

(c)    Section 204 relief would help fill the gap left by the failure of the legislator to incorporate the statutory part of the Antiguan insolvency scheme into the provisions applicable to an IBC.

(d)    The extension of the remedy to complaining creditors sets it apart from its English predecessor.

(e)    As the representative of the interests of creditors, the liquidator is a proper person to act as complainant, within the meaning of section 200(b)(iv).

Pausing there, Wallbank J was impressed by arguments (b) (d) and (e), although the absence of any submission that section 204 was inapplicable in a liquidation context meant that the issue was not a matter of contention before him.

33.    Arguments against the availability of section 204 relief in relation to a company in insolvent liquidation include the following:

(f)    The general thrust of the non-exhaustive list of remedies provided under section 204 is consistent with their being available as an alternative to, rather than during, a liquidation.

(g)    The relationship between section 204 and section 301, treating section 204 relief as an alternative to liquidation points in the same direction.

(h)    The general thrust of the Canadian jurisprudence about its similar relief for oppression is to the same effect, save only for one case (referred to below) which is distinguishable.

(i)    Section 204 cannot, in any event, be used by a liquidator, who represents all the creditors, as a means of obtaining relief for one group of creditors, at the expense of another group of creditors.

(j)    It would be an abuse of section 204 to use it to obtain relief for what is alleged to be a preference, where the applicable insolvency scheme would not deliver that result.

34.    All those contrary arguments were relied upon by the Court of Appeal in reaching its conclusion that section 204 relief was not available in a liquidation. It may be that points (i) and (j) above inclined the Court of Appeal to an alternative, slightly narrower, conclusion that even if possibly available for some purposes, section 204 could not be invoked by liquidators for the purposes for which the appellants seek to use it in the present case.

35.    It is convenient to address some of the above arguments separately, before expressing an overall conclusion. Starting with the arguments in favour, it is certainly true that there is, literally speaking, nothing in the language of section 204 which in terms renders it inapplicable to a company in insolvent liquidation. But it might be said that, if it had been intended to be widely available for the benefit of creditors in a liquidation, then the liquidator might naturally have been specifically included among the class of potential applicants identified in section 200. Furthermore, if the only constraint upon the use of section 204 within the context of liquidation is that the enabling condition, namely proof of some relevant oppressive or unfairly prejudicial conduct, is satisfied, then it will be very widely available in liquidation. This is because it is a commonplace that the conduct of a company's affairs which leads to its insolvent liquidation treats one or more groups of its stakeholders, and unsecured creditors in particular, unfairly. Some get paid in full, because they receive payment before the onset of the liquidation process, while others get little or nothing. The conduct of a bank's affairs as a Ponzi scheme is merely an extreme example of that otherwise common type of event.

36.    There is indeed one Canadian authority on its similarly worded oppression jurisdiction which does, in terms, conclude that relief of this statutory kind is available during a liquidation, on the application of the office-holder. It is *Olympia and York Developments Ltd (Trustee of) v Olympia & York Realty Corpn* [2001] Can LII 28269 (ON SC), a decision of Farley J sitting in the Ontario Superior Court, upon the almost identically worded section 248 of the Ontario Business Corporations Act. But the judge departed, for reasons given, with a decision to the contrary by Houlden JA, also sitting at first instance in Ontario, in *Attorney General of Canada v Standard Trust Co* 5 OR (3d) 660, [1991] OJ No 1946. It is difficult to treat either decision as affording convincing binding precedent, even in Canada. The Board thinks it better to weigh the opposed reasoning in the two cases for their intrinsic merit.

37.    In the *Standard Trust* case, Houlden JA gave two reasons for his negative conclusion. The first was that:

> "A trustee in bankruptcy takes the property of a bankrupt as he finds it. Subject to statutory provisions, such as those dealing with fraudulent preferences and settlements, he only succeeds to the rights of the bankrupt and has no higher or greater rights."

His second reason was that:

> "If the trustee in bankruptcy were permitted to bring the application under section 247, it would be attacking as oppressive a transaction which was unanimously approved by the board of directors of the bankrupt corporation … if Trustco were not insolvent, could it have attacked the transaction as oppressive? Clearly, in my opinion, it could not. The remedy given by section 247 of the Business Corporations Act, 1982 is a personal remedy; it belongs to the person who has been oppressed by the actions of the corporation or its affiliate: … The trustee in bankruptcy, as I have said, has no higher rights than the bankrupt corporation, and consequently, it cannot bring the application under section 247."

38.    In the *Olympia and York* case, Farley J's reasoning may be taken from para 30 of his judgment as follows:

> "It seems to me that while the bankrupt's trustee takes the property of the bankrupt as he finds it and that the trustee stands in the shoes of the bankrupt, the trustee has, as his primary obligation, the protection of the creditors of the estate of the bankrupt … Since it would seem that a creditor could bring such an oppression action, then it would seem to me that the *Margaritis* characterization of the trustee in bankruptcy as the creditors' representative should be recognized as allowing the trustee in bankruptcy to bring a 'representative' oppression action on behalf of the creditors in a proper case. Certainly the bankruptcy legislation generally encourages such a collective action on the part of the trustee as being the effective and efficient way of proceeding."

39.    In the Board's view the first of Houlden JA's reasons for declining to permit the office-holder to bring oppression proceedings is persuasive, and was not squarely addressed by Farley J in the *Olympia and York* case. The thrust of the point is that a liquidator takes the company's property and rights as he finds them, on the cut-off date when liquidation commences, and can only take steps to augment the company's property to the extent that the relevant insolvency scheme permits him to do so, for

example by seeking to avoid prior transactions on the grounds of fraudulent preference or undervalue.

40.    The submission that relief under section 204 in relation to an IBC in liquidation fills an unsatisfactory gap in the liquidator's armoury under the applicable insolvency scheme is tempting but, in the Board's judgment, misconceived. The applicable insolvency scheme may be good, bad or indifferent, but the liquidator takes it as he finds it, and his statutory duty is to apply it, both for the purpose of getting in the company's assets, and for the purpose of deciding how they should be allocated among those, including creditors, with a claim in the liquidation. It is simply not the liquidator's job to seek to achieve some other outcome which he may perceive to be more equitable than that which is prescribed by the applicable insolvency scheme, still less to act as the standard bearer for creditors who have been the victims of oppression, in seeking to obtain for their benefit property, and in particular property clawed back from other creditors, which could never have been the company's property, save where the applicable insolvency code otherwise provides, as it may do in relation to preferences.

41.    It is of course the case that the extension in Canada and then in Antigua of the remedy for oppression to creditors, rather than merely to shareholders, is an important broadening of the jurisdiction beyond the scope of its English predecessor. Again, it is tempting to think that this was done specifically for the benefit of creditors in a liquidation context, but the Board considers that this is not a necessary conclusion to be drawn from their inclusion within the range of stakeholders entitled to complain. Creditors or groups of creditors may commonly find themselves the subject of allegedly oppressive conduct by those responsible for the conduct of the affairs of a company which is by no means in, or even approaching, liquidation. Companies may seek to improve their financial standing by, for example, cramming down the rights of classes of bond holders: see eg *Assenagon Asset Management SA v Irish Bank Resolution Corpn Ltd* [2012] EWHC 2090 (Ch), where a statutory remedy for oppression may be a useful adjunct to, or replacement of, equitable relief. Accordingly, while the extension of relief for oppression to creditors undoubtedly raises the possibility of its availability in the context of a liquidation, it does not, of itself, demonstrate that an extension of that jurisdiction into the insolvency context was positively intended.

42.    The question whether section 204 relief could ever be available in the context of a liquidation is not quite the same as the question whether the liquidator could ever be a proper party to bring the claim. If the only basis upon which he could is that he is the representative or standard bearer for the creditors as a class, then it is worth asking whether the individual creditors or groups of creditors could be permitted to bring a claim once the company was in insolvent liquidation. It is conceivable in theory that the liquidators could be accused, while in control of the affairs of the company in liquidation, of acting oppressively or unfairly prejudicially as against one or a group of creditors. But it is unnecessary for creditors with such a grievance to have to pursue it under section 204. If a liquidator has acted contrary to his duties as such (and oppressive

conduct would prima facie at least be an example of such a breach of duty) then the creditor has the simple remedy of issuing a summons in the liquidation, seeking appropriate directions from the court as to the future conduct of the liquidators.

43.    That aside, it seems inherently improbable that the court could properly entertain a claim for section 204 relief by a group of aggrieved creditors based upon the conduct of the company's affairs prior to its liquidation, brought with a view to adjust their rights as against those of other creditors or stakeholders in the liquidation. The onset of liquidation operates as a watershed, prior to which such individual rights and grievances may be pursued but, following which, all stakeholders with equal priority in a liquidation, such as the entirety of the unsecured creditors, are to be treated equally, by the application of the pari passu principle. A fundamental purpose of the liquidation process is to bring to an end contests between stakeholders designed to improve the position of one or more as against the others, such as the traditional rush to judgment.

44.    That leaves only the possibility of the oppression claim which is made by all the creditors, as a class, for which it might be said that the liquidator could be an appropriate representative. It would have to be a claim solely against persons who were not in any way stakeholders in the liquidation, ie a claim against "pure" third parties. But then, again, the principle that the liquidator takes the company's property as he finds it, subject to statutory exceptions, would appear to preclude the use of an oppression remedy for the purpose of doing better against such third parties than can be achieved by the application of the applicable insolvency scheme with its strictly confined provisions for the setting aside of prior transactions.

45.    All the claims which the liquidators seek permission to pursue appear to the Board to fall foul of that difficulty. The claw-back claims seek to obtain accretions to the liquidation fund mainly on the basis of alleged preferences which the liquidators expressly acknowledge would not succeed under the common law preference jurisdiction applicable to the liquidation of an IBC. The claims to re-adjust entitlements among proving depositors are, on their face, an attempt to alter the pari passu distribution of the company's property among those entitled to prove in the liquidation, contrary to the applicable insolvency scheme.

46.    Turning to the arguments against recognising a role for section 204 relief in the context of a liquidation, the Court of Appeal was persuaded, simply as a matter of construction of section 204 and of its relationship with section 301, that relief under section 204, otherwise than in the form of an order for the winding up of the company, was an alternative to winding up rather than something which could be pursued in the context of a winding up. The Board regards that analysis as persuasive but not, on its own, conclusive. It is true that very few of the different forms of relief listed in sub-paras (a) to (m) of section 204(3) would be capable of being deployed in the context of a liquidation. But section 204(3)(h) gives the court a general power to vary or set aside

a transaction or contract to which the corporation is a party and to compensate the corporation or any other party to the transaction or contract. That is not inherently unusable during a liquidation, and bears some resemblance to the court's powers to re-open preferences, even at common law. Similarly, there is nothing inherently incompatible with liquidation in an order under section 204(3)(j) compensating an aggrieved person, save in the sense that compensation for a member of a class of persons entitled to prove in a liquidation would be a departure from the pari passu principle, and its ordinary application under the insolvency scheme.

47.    The main reason why this analysis is not conclusive is that the list of orders in section 204(3) is not exclusive. The court has jurisdiction to make any interim or final order it thinks fit.

48.    Both the appellants and the respondent sought to draw comfort from the relationship between sections 204 and 301. In the Board's view the respondent's reliance upon it is the more persuasive, since it tends to show that, notwithstanding its expansion to include complaints of oppression against creditors, the type of relief headed "Restraining Oppression" under section 204 has retained its essential characteristic as an alternative to liquidation that was plainly true about its predecessors, in particular the English antecedent reflected in sections 459, and 994. But again, this pointer is not, of itself, conclusive.

49.    An attempt was made to counter the Court of Appeal's view that the balance of Canadian authority was against recognising the applicability of relief for oppression in a liquidation context, by a submission that even English authority was disposed to accept that some use of an oppression remedy in a liquidation might be appropriate.

50.    The appellant liquidators relied upon *Maidment v Attwood* [2012] EWCA Civ 998, a decision of the English Court of Appeal. It concerned a petition under section 994 of the Companies Act 2006 by a shareholder in relation to the affairs of a company, Tobian Properties Ltd ("Tobian") which was in creditors voluntary liquidation by the time that the petition was presented. The judge had decided that the three elements of conduct relied upon by the petitioner were not unfairly prejudicial in the relevant sense, but the Court of Appeal took a different view. Giving the leading judgment Arden LJ (as she then was) recognised that the fact that the petitioner was a shareholder in a company in insolvent liquidation presented a difficulty, unless there was a real prospect that the company might end up solvent as the result of an order that the allegedly delinquent director should compensate the company for his misconduct (which included taking excessive remuneration), so that the petitioner's shares would then have some value. In addition, (at para 11) Arden LJ noted that prejudice to a petitioner in his capacity as a member might not be limited strictly to a fall in the value of his shares, relying for that purpose upon *Gamlestaden Fastigheter AB v Baltic Partners Ltd* [2007] 4 All ER 164, a decision of the Board. At para 44 she continued:

> "We have seen that the content of fairness is contextual. It is also flexible and open-textured. It is capable of application to a large number of different situations. The courts are also given wide powers to fashion relief to meet the circumstances of a particular case. Parliament clearly intended the courts to adopt a flexible approach to proceedings under section 994, and to be flexible in the exercise of their powers in relation to these proceedings. This is confirmed by the approach that the Privy Council took in *Gamlestaden*."

51.    It is fair comment that this English decision appears at least to recognise the possibility that relief for oppression or unfairly prejudicial conduct may be pursued in relation to the affairs of a company in insolvent liquidation, even in a jurisdiction which does not provide protection to creditors.

52.    It is not clear however whether the issue now before the Board was squarely addressed in that case or whether submissions made about it were of the kind which persuaded the Court of Appeal in this case to the opposite view, or the further submissions which had been made to the Board. In any event, the predicate for the English Court of Appeal's conclusion that an oppression remedy might be appropriate was that a remedy for the matters complained of might leave the company solvent, after payment in full of all creditors' claims. That is of course not even a remote possibility in the present case. Even if the relief which the liquidators seek permission to pursue by way of claw-back and re-adjustment were to be wholly successful, that would simply swell the class of creditors entitled to prove in the liquidation. By way of a simple example, if a fully paid creditor is required to disgorge his payment, he becomes an unpaid creditor entitled to prove in the liquidation.

53.    The liquidators also relied upon the judgment of the Board in *Galantis v Alexiou* [2019] UKPC 15. In that case a complaint of oppressive conduct was made against a company's directors, but the company was dissolved before it came to be heard. The relevant jurisdiction, in section 280 of the Bahamian Companies Act 1992, was also modelled closely on the Canadian remedy. There are pointers both ways about the applicability of that remedy after a company has been dissolved, but they are of little assistance here, because no insolvency process relating to the company preceded, or was triggered by, the dissolution.

*Conclusion on Issue One*

54.    The Board is persuaded, by a majority, that the Court of Appeal was right to conclude that relief under section 204 is not available in relation to the affairs of an Antiguan IBC in insolvent liquidation. The Board's reasons follow. Entry into insolvent

liquidation is a watershed event for an IBC, as it is for any other company. Prior to that date (the cut-off date) the company's affairs are entrusted to its directors, officers and, to some extent, shareholders in general meeting, subject to the terms of its constitution, and its rights and liabilities as against third parties are governed by the general law. Those responsible for the control of the company's affairs are expected to act fairly vis a vis a company's stakeholders, that is, not oppressively or unfairly prejudicially, or in a way which unfairly disregards their interests. Section 204 provides to a wide body of the company's stakeholders a remedy for breach of those obligations by those in control of the company's affairs, and affords to the court a broad discretionary jurisdiction to do what is just and equitable in order to rectify the matters complained of.

55.    In sharp contrast, following entry into insolvent liquidation, the affairs and property are taken out of the hands of the company's directors, officers and shareholders and entrusted to a court-appointed office-holder, the liquidator, whose duties are laid down by statute and whose conduct may be regulated and directed by the court as part of the liquidation process. The getting in of the company's property and its distribution to stakeholders are governed by an insolvency scheme (in Antigua partly statutory and partly judge-made) which defines the priorities as between different classes of stakeholders and requires that, within each class, stakeholders' claims are to be met by a pari passu distribution from the available resources. Those resources are limited to those assets, rights and claims which the company enjoyed as at the cut-off date, subject to augmentation by the use by the liquidators of specific powers to re-open prior transactions. The company's claims as at the cut-off date of course include claims against the company's fiduciary directors and managers to recover assets misappropriated, or to seek redress for breach of fiduciary duty committed by their wrongful disposal.

56.    There is nothing in section 204, construed as part of the IBC Act, which compels a conclusion that it provides relief in the context of insolvent liquidation. The breadth of the discretionary power given to the court and the broad range of stakeholders for whose benefit those powers may be exercised is perfectly consistent with an intention that they are designed and intended to be used entirely in the pre-liquidation context. Although it is difficult to discern a clear statutory prohibition of the use of those powers in an insolvency context, it is, in the Board's view, fundamentally inappropriate that they should be so used.

57.    This is mainly because relief from oppression or unfairly prejudicial conduct is conferred on essentially broad discretionary and equitable principles which simply cannot be made to fit within the implementation of the applicable insolvency scheme. The two frameworks (relief from oppression and the insolvency scheme) as described earlier in this judgment are simply incompatible with each other. They serve different objectives. One of them (the insolvency scheme) serves a recognised public interest whereas the other does not or, if it does at all, only to a much lesser extent, being

concerned more with justice and equity as between stakeholders in the company's affairs. The two frameworks are like chalk and cheese.

58.     If the jurisdiction to relieve from oppression is, as a literal reading of section 204 suggests, engaged wherever the requisite oppressive or unfairly prejudicial conduct can be demonstrated, then the scope for its deployment in the context of insolvent liquidation is wide indeed, because so many corporate liquidations will have come about following, or because of, misconduct of that kind. If any stakeholder can seek to intervene in an insolvent liquidation by seeking a bespoke remedy for some prior act of oppression or unfairly prejudicial conduct against him, by showing no more than that the relevant misconduct has occurred, then the scope for rearranging, altering or even subverting the ordinary application of the insolvency scheme for the purposes of achieving the desired pari passu distribution of the remaining assets among all stakeholders will be virtually limitless.

59.     While it may be said that the court would be astute not to allow the section 204 jurisdiction to be abused in the context of a liquidation, neither the section itself nor the equitable principles upon which the court's intervention is based offer any sound basis for enabling the court to decide what types of intervention in or rearrangement of the applicable insolvency scheme are or are not to be regarded as appropriate. The animating principles behind the two frameworks are very different and there is no jurisprudence of which the Board is aware which would assist the court in deciding, in any particular case, which should prevail.

60.     The better view is that once a company has crossed the threshold into insolvent liquidation, the framework for granting relief from oppression is wholly displaced. This is not a conclusion based simply upon the construction of section 204, and its relationship with section 301. Nor does the provision for purposive construction in section 371 offer any real help, not least because it is far from clear that treating section 204 relief as available in the context of a liquidation would encourage the development of Antigua and Barbuda as a responsible off-shore financial, trade and business centre. It is better to say that the deployment of section 204 relief in the context of an insolvent liquidation is simply inappropriate, even if technically it is not prohibited as a matter of jurisdiction. There are plenty of statutory provisions in the common law world which confer an apparently limitless jurisdiction to grant certain forms of relief, but where it is well established that there are circumstances where it could never appropriately be granted. For example, section 37(1) of the English Senior Courts Act provides that an injunction may be granted wherever the court thinks it just and convenient to do so. But it is established beyond question that an injunction will not be appropriate, where damages provide a sufficient remedy.

61.     Even if there may be cases, of a type which the Board cannot at present envisage, where section 204 relief may have some appropriate role to play in the context of an

insolvent liquidation, the present case is plainly not one of them. It is no exaggeration to say that the whole purpose of the liquidators in seeking permission to pursue claims under section 204 is precisely to transform their powers to set aside prior transactions, contrary to the applicable insolvency scheme, and to rearrange the distribution of assets as between competing stakeholders having the same priority otherwise than on a pari passu basis. In short, the liquidators seek a bespoke regime for the conduct of the liquidation of SIB, contrary to that which the law otherwise provides, by the invocation of an equitable discretionary power which, they claim, enables the judge to achieve whatever form of outcome he or she considers equitable in the circumstances. This would represent an invasion by equity into the business and banking sphere which is both unprincipled and unconstrained by any clear or proper limits, against which the court should set its face.

*Issue Two: Claw-Back Claims*

62.    Even if there had not been a majority of the Board of the view that section 204 relief was unavailable in relation to an IBC in insolvent liquidation, the Board is unanimously of the view that the judge was right to refuse permission to the liquidators to pursue either of the two types of claw-back claim. These were claims to recover (a) without limit of time, any payments to depositors in excess of their invested capital and (b) all payments to depositors from September 2008 until SIB ceased trading in early 2009.

63.    The judge's reasoning was that relief from oppression should not be granted if it would constitute an instrument of oppression against those required to make repayment, and that such a requirement would contravene the reasonable expectation of those receiving payment from a regulated bank like SIB that they could keep the money, where there was no basis within the applicable insolvency scheme upon which they could be treated as having been preferred.

64.    The Court of Appeal did not address this issue at all, having concluded that section 204 relief was not available. The liquidators sought before the Board to have the judge's determination of this issue reversed on the following grounds.

65.    First, the liquidators submitted that the depositors who received payments from SIB in excess of their capital had no contractual entitlement to the excess, because it did not represent profits earned by SIB by the re-investment of their money. Rather it represented payments made by later depositors under the Ponzi scheme. As to the payments made in and after September 2008, the liquidators submitted, again, that the depositors had no contractual right to receive those payments, because their entitlement was limited to payments which SIB could afford to make. In the result, it was submitted

that the liquidators could recover both types of payments by a restitutionary claim based on unjust enrichment.

66.    In the Board's view, this analysis is completely misconceived. Depositors had a contractual entitlement to receive capital and interest by virtue of the simple terms of the Certificates of Deposit used by SIB, either upon redemption or by way of early redemption subject to a discount. There is no suggestion in the liquidators' evidence that depositors against whom it is proposed to advance claw-back claims were paid in excess of those entitlements as stated in the Certificates of Deposit. But Mr Justin Fenwick QC for the liquidators submitted that the Certificates of Deposit conferred express entitlements subject to the bank's general terms and conditions, and that those conditions included warnings to investors about the risk that, upon maturity, the bank might be unable to pay capital or interest to depositors.

67.    In the Board's view those risk warnings did not form part of the bank's general terms and conditions so as to detract in any way from the clear contractual entitlement to payment of principal and interest stated on the face of the Certificates of Deposit. The result is that the depositors received no more and no less than their contractual entitlement. There can be no claim to recover money paid pursuant to a contractual entitlement on the basis of unjust enrichment: see the *Fairfield Sentry* case (supra) at para 18 and *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349 at 408B per Lord Hope.

68.    In relation to the payments from September 2008 onwards to the preference creditors, the liquidators submit in the alternative that the court should treat the recipients as having been wrongly preferred, applying section 458 of the Antiguan Companies Act and section 44 of the Bankruptcy Act, quoted above, on the basis that it would afford a better discretionary form of relief for the unfair prejudice caused to the general body of creditors by the Ponzi scheme than the limited relief available under the common law in relation to preferences.

69.    The Board's unanimous view is that, even if in principle the court had jurisdiction to do so, it would not be a proper exercise of discretion to grant relief from oppression, both for the reasons given by Wallbank J and for this additional reason. Relief from oppression under section 204 is, as the judge acknowledged, essentially equitable in origin. Depositors who were paid by SIB prior to its ceasing to trade received the money as bona fide purchasers for value without notice. They were bona fide because no suggestion was made that they were aware either of the bank's insolvency or of the underlying Ponzi scheme. They were purchasers for value because they were paid pursuant to a contractual entitlement: see *Snell's Equity* (33rd ed) para 4-022; *Thorndike v Hunt* (1859) 3 De G & J 563 and *Taylor v Blacklock* (1886) 32 Ch D 560 at 568, 570. They were purchasers without notice because it is not suggested that

any of them knew or ought to have known the facts giving rise to a claim based on section 204.

70.    Equity has a special fondness for bona fide purchasers for value without notice. That is why they are called equity's darlings. There is a stark difference between a claim based upon equitable principles, which will not in general lie against equity's darling, and a claim to avoid a transaction as a wrongful preference. A preference claim will lie, and is very commonly brought, against equity's darlings, because the targets are usually creditors of the company, and it is no part of a claim in wrongful preference that the recipient creditor is party to or even aware of the requisite intention to prefer.

71.    In the present case, the liquidators are seeking by reference to an equitable jurisdiction to replace one (common law) scheme for recovering preferential payments which does not serve their purposes with another one, not applicable by statute to this liquidation, which they think does, and to do so by the invocation of a form of essentially equitable relief, against persons all of whom are equity's darlings. It is impossible to think, in those circumstances, that such a claim is anything other than unprincipled.

*The Re-Adjustment Claims*

72.    This proposed claim is to re-adjust the distributions which would otherwise be made to proving creditors in the liquidation by requiring partly paid creditors to have the part payments of their debt prior to the cut-off date brought into account, not merely to ascertain the amount of their debt, but to reduce the amount of any distribution to them. It looks at first sight less invasive of depositors' reasonable expectations, less oppressive and less inequitable than claw-back claims. This is how it must have appeared to Wallbank J because he permitted them to be brought.

73.    The purpose of the proposed re-adjustment is to bring about an element of convergence between the misfortune suffered by partly paid depositors, and those who have received no payment at all prior to the cut-off date. Nonetheless the Board is not persuaded that this proposed claim proceeds from any more principled application of equitable relief under section 204 than the claw-back claims, even though its immediate effect is less draconian, because it requires no depositor to disgorge money actually received. What it does do is to require a partly paid depositor to bring his part payment into account against the amount which, as a creditor for the balance of his debt, he would otherwise receive from distributions made in the course of the liquidation. It therefore achieves, by a process of accounting, a similar effect to that achieved by a claw-back. In particular, it requires him to give a form of credit for that which he has received as equity's darling, against that which the insolvency scheme applicable to SIB would otherwise generate for him in the liquidation.

74.    Furthermore, this proposed re-adjustment would operate in a strangely counter-intuitive way as between depositors who have been partly paid, and those who have been paid in full, before the cut-off date. Those receiving payment in full escape scot-free. Those only receiving part payment are required to bring the whole of their amount received into account. For those reasons the Board considers that they should not have been authorised.

*Common Misfortune*

75.    At the prompting of the Board, recourse was made by the liquidators during oral submissions to a principle which has developed in cases about the distribution of trust funds to beneficiaries, which may be labelled the common misfortune principle. It has been used to regulate the distribution to contributors to a common fund which has incurred a shortfall to ameliorate what would otherwise be the injustice of a "first in-first out" methodology generally known as the rule in *Clayton's* case, in favour of a rateable distribution of the funds to all those contributing to it. Its origin may be said to derive from the following scathing condemnation of the rule in *Clayton's* case by Judge Learned Hand in *In re Walter J Schmidt & Co, Ex p Feuerbach* (1923) 298 F 314, 316:

> "When the law adopts a fiction, it is, or at least it should be, for some purpose of justice. To adopt [the fiction of first in, first out] is to apportion a common misfortune through a test which has no relation whatever to the justice of the case."

76.    The common misfortune principle was applied to the distribution of a common investment fund in *Barlow Clowes International Ltd (in liquidation) v Vaughan* [1992] 4 All ER 22, by the English Court of Appeal. Money paid into the common fund had been misappropriated by the trustee in unauthorised investments, including the purchase of a yacht. At p 46 Leggatt LJ said:

> "The court goes by what must be presumed to have been the intention of the investors. If I am right, they contributed to what they thought was a collective investment fund. It matters not, once the contributions had become mixed whether the depredations were committed on a small or large scale, systematically or sporadically, according to a plan or on the spur of the moment: what matters is that the combined fund was depleted. Misconduct by Barlow Clowes is relevant as explaining why the fund was depleted. But it would make no difference if Barlow Clowes was conducting its business in a lawful manner which gave effect to the general intention of its investors. The investors did not expect that their money would be kept in a bank account or used for the

> purchase of a yacht, or of anything other than gilts. Whatever the reason why losses were suffered by the fund, it accords with what presumably would have been the intention of the contributors that they should share rateably in what remains of it."

77.     In the present case the liquidators say that this principle ought to inform the exercise of discretion by the judge under section 204 in prescribing a scheme for distribution of recoveries made by the liquidators among depositors in a way which, as nearly as possible, inflicts equal loss among them from the common misfortune of having invested in a Ponzi scheme.

78.     The Board considers that, even if section 204 relief were otherwise available, it would not be in accordance with principle to transplant the concept of common misfortune from its place of origin into the insolvent liquidation of a bank. The deep dividing line which separates the two types of case is that depositors in a bank have a creditor debtor relationship with the bank where nothing is held by the bank on trust in a common fund or otherwise, whereas the common misfortune principle has emerged and, thus far, only been applied where there is indeed a common fund held on trust in which all contributors have a beneficial interest, but where a shortfall requires them to receive less than what would otherwise have been their expected entitlement. The creditor debtor relationship which depositors have with a bank is, of course, to be resolved in accordance with the insolvency scheme if the bank goes into liquidation, and that produces a form of rough justice in which outstanding claims of equivalent priority are all dealt with pari passu. It would be a recipe for uncertainty in the law if that form of rough justice were liable to be supplanted by another form of, perhaps, less imperfect justice, wherever the liquidation in question can be said to have been a consequence of some form of unfair prejudice or oppression capable of being viewed as a common misfortune.

79.     For those reasons, the Board will humbly advise Her Majesty that this appeal ought to be dismissed.

**LADY ARDEN: (with whom Lord Carnwath agrees)**

80.     This judgment is concerned principally with the question whether a liquidator may bring proceedings for unfair prejudice under the laws of Antigua and Barbuda. As part of that question I need to start by explaining how I see the context to these proceedings.

*Achieving equal distribution in insolvency among investors past and present*

81.    Stanford International Bank Ltd (in liquidation) ("SIB") operated a collective, or pooled, investment scheme (a "CIS"), under which investors bought certificates of deposit. The scheme was also a Ponzi scheme. SIB used a company formed in Antigua and Barbuda under its International Business Corporations Act ("IBC Act") to operate its scheme, and that company entered insolvent compulsory liquidation in Antigua and Barbuda in 2009. The appellant liquidators are its liquidators.

82.    A number of Ponzi schemes have come to light in different jurisdictions since the global financial crisis in 2008. Such schemes usually involve investors and assets located in many different jurisdictions. Faced with a massive insolvency, as in this case, some courts have sought to make, and in some cases have gone on to make, orders to facilitate an equal distribution between private investors, past and present. For example, in the United States courts have made orders that the claims of private investors are admitted to prove in the liquidation, not for the amount that the scheme declared to be the amount of their investment but according to the amount of their cash investment less amounts repaid ("the net investment method") (see, for example, *In re Bernard L Madoff Inc Sec*, (2011) 654 F 3d 229). Other methods to achieve equal distribution have also been used. In the United States, at least, this appears to have been achieved under special legislation, the Securities Investor Protection Act ("SIPA"), which requires a trustee to distribute the property of "customers" and otherwise satisfy the net equity claims of investors in a process that operates in combination with a liquidation process but to the exclusion of certain dealers in securities who are creditors in the liquidation.

83.    The high level of protection given to private investors in the United States may not be uncontroversial, but it is easy to see that there may be thought to be merit in treating investors, past and present, in a Ponzi scheme consistently. The difficulty, however, is that, unlike the position in the US, there is as I understand it no special legislation in Antigua and Barbuda applying to this liquidation and the liquidators of SIB have therefore sought to find a way within existing legislation applying to IBC liquidations generally. The liquidators are of the view that it is mere happenstance whether an investor made a request for repayment of his investment before the date of the winding up which resulted in his becoming a winner.

84.    This appeal concerns whether SIB's liquidators can under the law of Antigua and Barbuda achieve an equal distribution as between those persons whose investment has not been repaid (known in these proceedings as "the losers") and those more fortunate persons (known as "winners") whose investment was repaid before the liquidation and is not repayable, and also received profits or at least were so repaid in part so that they remain creditors of SIB for their outstanding investments.

85.     It is of course a cardinal feature of a liquidation in Antigua and Barbuda as in the UK that creditors of the same rank should be treated on the same footing. This is the pari passu principle. Under this principle, dealers and private investors are (unless the law otherwise provides) treated in the same way and without distinction. The principle is not universal because it is subject to major exceptions (for example, set-off). It is different from a principle of equal distribution because not all creditors of the same description, for example private investors, are treated in the same way. On the face of it, investors who have been repaid are entitled to retain their repayments unless the transaction can be impeached under one of the reach-back provisions such as fraudulent preference whereas losers can only prove in the liquidation and may recover only a small dividend on their investment.

86.     In this case, the liquidators seek to bring a claim in respect of a liability which has been repaid before the date of the liquidation, and such a claim has been referred to in these proceedings as a "claw-back" claim. Under the law of England and Wales, at least, a claw-back claim cuts across another cardinal principle of liquidation, namely the principle that the line is drawn at the date of the liquidation. It is discussed in *In re Lines Bros Ltd (in liquidation)* [1983] Ch 1, *M S Fashions Ltd v Bank of Credit and Commerce International SA (in liquidation)* [1993] Ch 425, 432-3 where Hoffmann LJ referred to it as "the retroactivity principle" and *Pearson v Primeo Fund* [2017] UKPC 19, paras 20-22.

87.     There are some exceptions to the "retroactivity principle" (to use Hoffmann LJ's term) and these apply principally where the law allows the liquidator to make a claim for fraudulent preference or a fraudulent conveyance, but in each case, there is a special law for this purpose. Unless an exception to the principle applies (which is assumed not to be the case for the purposes of this appeal), only the assets as at the date of the liquidation, including intangible assets such as claims, form part of the estate in liquidation. Those, therefore, are the assets, and the only assets, which the liquidators have a statutory duty to collect in.

88.     The liquidators can only achieve their particular objective of equal distribution if the applicable law of Antigua and Barbuda, namely the IBC Act, can be used to achieve it. The liquidators have therefore looked to section 204 of the IBC Act, which is concerned with acts which are "oppressive" and "unfairly prejudicial".

*Do the liquidators have standing to bring proceedings under section 204 to achieve equal distribution among investors?*

89.     I would answer this question: yes. In material part, section 204 provides:

"RESTRAINING OPPRESSION

204(1) A complainant may apply to the court for an order under this section.

(2)      If, upon an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates

(a)      any act or omission of the corporation or any of its affiliates effects a result,

(b)      the business or affairs of the corporation or any of its affiliates are or have been carried on or conducted in a manner, or

(c)      the powers of the directors of the corporation or any of its affiliates are or have been exercised in a manner,

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any shareholder or debenture holder, creditor, director or officer of the corporation, the court may make an order to rectify the matters complained of."

90.    Section 204(3) provides an unlimited number of orders which the court can make to restrain oppression or unfair prejudice, once found:

"(3)    In connection with an application under this section, the court may make any interim or final order it thinks fit, including without limiting the generality of the foregoing,

(a)      an order restraining the conduct complained of;

(b)      an order appointing a receiver or receiver-manager;

(c)      an order to regulate a corporation's affairs by amending its articles or by-laws or creating or amending a unanimous shareholder agreement;

(d)    an order directing an issue or exchange of securities;

(e)    an order appointing directors in place of or in addition to all or any of the directors then in office;

(f)    an order directing a corporation, subject to subsection (6), or any other person, to purchase shares or debentures of a holder thereof; …

(k)    an order directing rectification of the registers or other records of a corporation under section 207; …"

91.    Because section 204(3) confers very wide powers to grant relief, a complainant may very well choose to use section 204 even if he has a perfectly good alternative cause of action at law. It is a well-established principle of law that, if a person has more than one cause of action, he is entitled to choose which one to pursue.

92.    The required feature of the act or omission under section 204 is that it is

"oppressive or unfairly prejudicial to or that unfairly disregards the interests of any shareholder or debenture holder, creditor, director or officer of the corporation"

93.    The UK was probably the first jurisdiction to adopt a remedy for oppression and unfair prejudice in its companies legislation. It was enacted in the UK in response to the recommendations of the Report of the Committee on Company Law Amendment (the Cohen Committee) (1945, Cmd 6659), para 60, under the chairmanship of the Rt Hon Lord Cohen, and amended in response to the recommendations made in the Report of the Company Law Committee (the Jenkins Committee) (1962, Cmd 1749) paras 199-212 under the chairmanship of the Rt Hon Lord Jenkins. In the UK, the remedy was initially for conduct amounting to oppression, but this was replaced by the concept of unfair prejudice by section 75 of the Companies Act 1980.

94.    The oppression/unfair prejudice remedy has been expanded beyond its initial UK concept in other jurisdictions, including that of Antigua and Barbuda. Unlike the UK, where the remedy has only ever applied to members, section 204 of the IBC Act extends beyond members. This can be seen from the definition of the term "complainant" in section 200 of the IBC Act, which is as follows:

"200.  In this Part,

…

(b)    'complainant' means, in relation to a corporation,

(i)    a security holder, or a former holder of a security of the corporation or any of its affiliates;

(ii)    a director or an officer or former director or officer of the corporation or any of its affiliates;

(iii)    the Director; or

(iv)    any other person who, in the discretion of the court, is a proper person to make an application under this Part."

95.    For completeness, under section 2(1)(m), a "security" is defined as:

"a share of any class or series of shares of a corporation or a debt obligation of a corporation and includes a certificate evidencing any such share or debt obligation;"

96.    So, in Antigua and Barbuda the remedy for oppression and unfair prejudice extends to a creditor, secured or unsecured. However, notably, no duty has been cast on directors to have fair regard to any set of creditors or class of creditors. Likewise, no such duty has been placed on liquidators. That is a clear indication that it is not the primary purpose of section 204 to create new duties, merely to provide a remedy to redress existing wrongs at law.

97.    In my judgment, section 204 was designed in part to provide a statutory basis for the wrong known as fraud on the minority. As is well known, it is a principle of company law that a majority must vote in the interests of the entire class and that if they procure a transaction at the expense of the minority the minority may contend that their actions constituted a fraud on the minority (see generally, *Greenhalgh v Arderne Cinemas* [1951] Ch 486 and *In re Holders Investment Trust Ltd* [1971] 1 WLR 583). The same principle applies to meetings of classes of creditors, such as creditors holding debentures of a particular issue (*Allen v Gold Reefs of West Africa, Ltd* [1900] 1 Ch 656,

671). This would account for the fact that the persons who are complainants under section 200(b)(i) as of right are security holders. Such persons are likely to be holders of a security, such as a loan note, of a series or class.

98.     That leads to the next point, which is this: that in origin section 204 was in part not intended to create a new remedy but to provide a statutory basis for the enforcement of an existing right. Of course, the section may have been extended beyond the purpose for which it was originally intended but it remains the case that it is available for a wrong for which some other remedy exists. On the basis that it was designed originally as I have indicated, section 204 provides a remedy in respect of matters actionable by some other proceeding: there is an overlap between section 204 and the general law.

99.     If that is so, then, in my judgment, there is no reason why a liquidator should not be able to seek approval to his acting as a complainant within section 200(b)(iv) in order, for example, to obtain a remedy for the benefit of unsecured creditors.

100.    Independently of that point, at a purely textual level, there is nothing in the wording of section 204 which disqualifies a liquidator from being a complainant. A complainant does not have to be, or represent, a member of the company. Moreover, there is nothing in section 204 to limit the award of relief to members of SIB. Section 204 does not require the company to be solvent where the claim is brought on behalf of a creditor.

101.    Of course, in the normal way of things, unsecured creditors take the risk that a company may be mismanaged and become insolvent. But that does not mean that they will never be able to contend through the liquidator that the actions of the directors have unfairly prejudiced unsecured creditors. Take the case where the directors of a company authorise the payment of a dividend without making proper provision for its actual and foreseeable liabilities and so in breach of duty (see *Peter Buchanon v McVey* [1955] AC 516), and the company enters liquidation as a result. In that situation, unsecured creditors are prejudiced. The liquidator may be able to bring a misfeasance claim, but there would seem to be no reason why he should not also, if his status as a complainant is approved by the court, bring proceedings under section 204.

102.    In the shortly-reported Canadian case of *Prime Computer of Canada Ltd v Jeffrey* 6 OR (3d) 733, an unpaid judgment creditor brought a claim under the Canadian equivalent to section 204 against director/shareholders who had paid themselves excessive remuneration and the court made an order for the payment of compensation directly to the creditor who had been unfairly prejudiced. The company was insolvent in that case but not in a formal insolvency proceeding. It is difficult to see why if there had been a liquidator a liquidator could not have brought a claim for unfair prejudice on behalf of the unfairly prejudiced unsecured creditors.

103.    I accept that when the courts of Antigua and Barbuda come to interpret section 200(b)(iv) they may interpret that provision as one which requires the court to be satisfied at some level as to the liquidator's prospects of success. But we do not have to decide that point on these appeals. It is enough to say that it appears that the liquidator can proceed under section 200(b)(iv) and leave open that further point.

104.    So, in my judgment the liquidators in this case have standing to bring proceedings under section 200(b)(iv).

*Can the claw-back claims be brought under section 204 in this case?*

105.    I have already made the point that the Companies Law of Antigua and Barbuda has not imposed any duty on the company or any officer of the company to have fair regard for the interests of unsecured creditors. The imposition of such a duty would be a radical departure from the normal contract-based approach to the position of unsecured creditors.

106.    The expectation of the unsecured creditors of a company is contract-based: their expectation is that the company will perform their contract with it, no less and no more. The position of members is, as Lord Briggs has explained, altogether different because members frequently owe equitable obligations to each other, and thus the notion of unfair prejudice can be applied to disputes between members without any difficulty.

107.    There is no indication in the IBC Act that section 204 was intended to alter the normal basis of the relationship between a company and unsecured creditors. The IBC Act imposes a statutory scheme under Part IV of the IBC Act for the distribution of the assets of a company in its winding up. The statutory scheme ring-fences the assets and liabilities of the company in liquidation. The liquidator must collect in those assets (section 307) and subject to the payment of the expenses of the winding up and priority debts, he must pay the debts and the liabilities of the company pari passu (see section 289(3)). If the company is insolvent, he needs the court's directions: section 307(g).

108.    As explained in paras 22 and 23 above, a meaning can be found for section 204 which does not involve any incompatibility with the mandatory statutory scheme under Part IV of the IBC Act for the distribution of the assets of a company on its winding up.

109.    That mandatory scheme means, in my judgment, that section 204 cannot be used by the liquidators on behalf of the creditors as the springboard for claw-back claims against the winners in favour of the losers where the creditors have no cause of action for such disgorgement apart from section 204. It follows that, if the legal rights of investors in a winding up are to be adjusted otherwise than voluntarily and without the

individual consents of the investors concerned, there must be a scheme of arrangement: see *In re Trix Ltd* [1970] 1 WLR 1421, where in the absence of a scheme of arrangement Plowman J refused to sanction a compromise with creditors proposed to be made by a liquidator which might not have given creditors their entitlement in a liquidation; and see also *In re Calgary and Edmonton Land Co Ltd (in liquidation)* [1975] 1 WLR 355, where Megarry J refused to sanction a stay of a liquidation to which not all members had consented. These cases demonstrate the rigour with which the statutory scheme in winding up is required to be followed. In addition, there are safeguards in the statutory provisions relating to schemes of arrangement: there must be meetings convened by the court, a special majority and the sanction of the court. But these provisions cannot be used to bind the winners, who are no longer creditors and against whom SIB has no claim.

110.    There have been some specific submissions which I should address. Professor Watson Gandy, for the amicus curiae, argues that the list of forms of relief in section 204(3) which the court may give is to be interpreted eiusdem generis. The list already includes power to order a liquidation and so, submits Professor Watson Gandy, it does not anticipate that the company will already be in winding up. In my judgment, it is clear that Parliament did not intend the list in section 204(3) to limit the forms of relief that might be given. The section expressly uses the words: "without limiting the generality of the foregoing".

111.    Counsel submitted that Parliament deliberately chose not to amend section 204 when it amended the law to include a provision for preferences in relation to banks. In my judgment there could be many reasons why the legislature decided not to amend section 204, including that advanced by Mr Justin Fenwick QC, for the liquidators, namely that the section was already in force and Parliament did not wish to make any amendment which might prejudice existing proceedings, and affect the interpretation of the Act for other purposes without seeing first an authoritative interpretation by the courts.

112.    It was also submitted that the liquidators do not control the company. However, there is nothing in section 204 which limits the complainant to a person who actually controls the company. The complainant could be a national agency which decided to bring proceedings within its competence for the purpose of assisting those who were not able to help themselves.

113.    Subject to my different conclusion on the status of a liquidator to bring a claim under section 204, on which I agree with Wallbank J, and subject as otherwise appears in this judgment, I agree with the judgment of Lord Briggs and with his proposal as to the humble advice to be given to Her Majesty.

**LORD CARNWATH:**

114.    Save that I agree with Lady Arden that there is no reason in principle to exclude a liquidator from the scope of section 204(b)(iv), I agree with the judgment of Lord Briggs and the advice proposed by him.

# Exhibit H

British Virgin Islands

# Niyazov v Maples and Calder and another

COURT OF APPEAL OF THE EASTERN CARIBBEAN SUPREME COURT
PEREIRA CJ, WEBSTER AND ELLIS JJA (Ag)
19 JULY 2019, 12 OCTOBER 2020

*Costs – Self-represented litigant – Legal practitioner – Exception to common law rule permitting litigant in person to recover only out of pocket expenses (Chorley exception) – Whether exception including barristers – Whether exception inconsistent with right to equality before law – Virgin Islands Constitution Order 2007, SI 2007/1678, ss 12.*

The respondents were two law firms which acted as litigants in person, represented by employed barristers, in proceedings brought by the appellant. The appellant's application for a wasted costs order against the respondents was dismissed and he was ordered to pay costs to the respondents. Following the grant of leave to appeal, the appellant then failed to serve the notice of appeal on time and failed to serve his written submission or bundle of documents to support the notice of appeal. The Eastern Carribbean Supreme Court dismissed the appellant's application for an extension of time on the ground, inter alia, that the appeal had no prospects of success and then went on to dismiss the substantive appeal itself. The court then had to consider whether any further orders ought to be made in relation to the issue of costs and the parties were asked to address the court on the question of whether a legal practitioner's law firm was entitled to recover legal costs for acting for itself in proceedings in the Virgin Islands. Having regard to the *Chorley* exception (*London Scottish Benefit Society v Chorley* (1884) 13 QBD 872), the court had to consider, inter alia (i) whether there was any remaining distinction between solicitors and barristers in the Virgin Islands, at least in so far as the question of costs was concerned, and (ii) the constitutional implications in relation to s 12[a] (equality before the law) of the Virgin Islands Constitution Order 2007, SI 2007/1678.

**HELD:** Finding the *Chorley* exception inconsistent with the right to equality of all persons before the law.

   (1) Civil practice and procedure in the Virgin Islands was regulated both by the common law and by statute. The CPR which provided the procedural framework made it clear that costs were in the discretion of the court. A court had full power to determine by whom, to whom and to what extent costs were to be paid. The relevant provisions of the CPR did not reflect any

---

a  Section 12, so far as material, is set out at [72], below.

distinction between barristers and solicitors and were therefore clearly inconsistent with the limited application of the *Chorley* exception. The Virgin Islands had never, as a matter of law or practice, recognised a distinction between solicitors and barristers in so far as the recovery of costs was concerned. Although different professional duties attached to barristers and solicitors, historically, there was considerable overlap. Given the peculiar historical context and the evolving and peculiar legislative framework which currently operated in the Virgin Islands, there was no proper basis to refrain from extending the *Chorley* exception so as to enable self-represented barristers to recover their costs in respect of work undertaken, as if they had been retained as counsel (see [39]–[42], [44], below); *London Scottish Benefit Society v Chorley* (1884) 13 QBD 872 considered.

(2) The court had an obligation to apply and develop the common law in a manner which was consistent with the fundamental values enshrined in the Constitution. The law had to guarantee that no individual or group of individuals was privileged or discriminated against, whether by prescribing legislative distinctions or by applying other measures that would treat a group of persons as second-class citizens. The principle of equality and non-discrimination guaranteed that those in equal circumstances were dealt with equally in law and practice. However, not every distinction in treatment would amount to discrimination. In general, a violation of the principle of non-discrimination arose if (a) equal cases were treated in a different manner, (b) a difference in treatment did not have an objective and reasonable justification, or (c) if there was no proportionality between the aim sought and means employed. The rationales which underpinned the *Chorley* exception did not meet the relevant threshold. To act upon a principle that evidence enabling the quantification of the value of the time of non-solicitor litigants in person should not be received or acted upon by the courts was to exalt the position of solicitors in the administration of justice to an extent that was an affront to equality before the law. Practical difficulties could not, without more, justify the continued application of the *Chorley* exception. In the absence of legislative intervention and in circumstances where the rationale for allowing the costs of a solicitor acting for himself was so unconvincing, the logical answer would be to abandon the exception in favour of the general principle. Once the rationales for the purported *Chorley* exception were convincingly debunked, the only logical conclusion which remained was that the exception was grounded in privilege. There could be no doubt that the so-called *Chorley* exception would therefore be inconsistent with the equality of all persons before the law (see [72], [74]–[76], [78]–[81], below); *Bell Lawyers Pty Ltd v Pentelow* [2019] 5 LRC 589, *McEwan v A-G of Guyana* [2019] 1 LRC 608, *Skidmore v Blackmore* (1995) 122 DLR (4th) 330, *Fong v Chan* (1999) 46 OR (3d) 330 and *London Scottish Benefit Society v Chorley* (1884) 13 QBD 872 considered.

(3) In the Eastern Caribbean the common law had continued to evolve such that there now appeared to be no reason to continue to maintain a common law distinction adumbrated in the *Chorley* line of authorities. There was authority at the highest appellate level in which a lay litigant was awarded his costs incurred in legal proceedings before the Antiguan courts and up to the

Privy Council. The modern approach was one which fully remedied the constitutional dilemma fostered by *Chorley* and its disparate treatment of self-represented lay litigants. It also effectively erased any lingering doubts about the continued application of this exception in the Virgin Islands (see [92]–[94], below); *Horsford v Bird* [2007] 2 Costs LR 245 applied.

**Cases referred to**

*Bell Lawyers Pty Ltd v Pentelow* [2018] NSWCA 150, NSW CA; *affd* [2019] HCA 29, [2019] 5 LRC 589, Aus HC.

*Brownie Wills v Shrimpton* [1999] Lloyd's Rep PN 39, NZ CA.

*Buckland v Watts* [1969] 2 All ER 985, [1970] 1 QB 27, [1969] 3 WLR 92, UK CA.

*Cachia v Hanes* [1994] HCA 14, (1994) 179 CLR 403, Aus HC.

*Coshott v Spencer* [2017] NSWCA 118, NSW CA.

*CSR Ltd v Eddy* (2005) 226 CLR 1, (2005) 222 ALR 1, (2005) 80 ALJR 59, Aus HC.

*Dillane v Ireland* [1980] ILRM 167, Ir SC.

*Fong v Chan* (1999) 46 OR (3d) 330, Ont CA.

*Guss v Veenhuizen (No 2)* [1976] HCA 57, (1976) 136 CLR 47, Aus HC.

*Halborg v EMW Law LLP* [2017] EWCA Civ 793, [2017] 2 BCLC 442, [2018] 1 WLR 52, UK CA.

*Halliwel Assets Inc v Hornbeam Corporation* [2015] ECSCJ No 212, EC SC CA.

*Henderson BC v Auckland Regional Authority* [1984] 1 NZLR 16, NZ CA.

*Hetherington, Re, Gibbs v McDonnell* [1989] 2 All ER 129, [1990] Ch 1, [1989] 2 WLR 1094, UK Ch D.

*Horsford v Bird* (17 November 2008, unreported), Ant & Barb CA.

*Horsford v Bird* [2006] UKPC 55, [2007] 2 Costs LR 245, [2006] All ER (D) 20 (Dec), Ant & Barb PC.

*Husbands v Warefact Ltd* [2003] UKPC 23, [2003] 3 LRC 648, 62 WIR 53, St Lucia PC.

*Husbands v Warefact Ltd* [2006] ECSCJ No 141, ECSC CA.

*Kendall v Hunt* (1979) 106 DLR (3d) 277, BC CA.

*Kennedy v Broun* (1863) 13 CB (NS) 677, (1863) 143 ER 268.

*Khan v Lord Chancellor* [2003] EWHC 12 (QB), [2003] 2 All ER 367, [2003] 1 WLR 2385, [2003] 2 Costs LR 228.

*London Scottish Benefit Society v Chorley* (1884) 13 QBD 872, [1881–5] All ER Rep 1111, UK CA.

*Malkinson v Trim* [2002] EWCA Civ 1273, [2003] 2 All ER 356, [2003] 1 WLR 463, [2002] 40 LS Gaz R 33.

*McEwan v A-G of Guyana* [2018] CCJ 30 (AJ), [2019] 1 LRC 608, 94 WIR 332, CCJ.

*McGuire v Secretary for Justice* [2018] NZSC 116, NZ SC.

*Mostyn v Mostyn* (1870) LR 5 Ch App 457, UK CA.

*National Enterprises Ltd v Racal Communications Ltd* [1974] 3 All ER 1010, [1975] Ch 397, [1975] 2 WLR 222, [1975] 1 Lloyd's Rep 225, UK CA.

*R (on the application of Bar Standards Board) v Disciplinary Tribunal of the Council*

*of the Inns of Court* [2016] EWCA Civ 478, [2016] 1 WLR 4506, [2016] 3 Costs LR 633, UK CA.

*R v Boswell, R v Halliwell* [1987] 2 All ER 513, [1987] 1 WLR 705, UK QBD.

*R v Stafford Stone and Eccleshall Magistrates' Court, ex p Robinson* [1988] 1 All ER 430, [1988] 1 WLR 369, UK QBD.

*R v Warner* (1661) 1 Keb 66, (1661) 83 ER 814, UK Ct of KB.

*Rondel v Worsley* [1967] 3 All ER 993, [1969] 1 AC 191, [1967] 3 WLR 1666, UK HL.

*Skidmore v Blackmore* (1995) 122 DLR (4th) 330, BC CA.

*Soia v Bennett* [2014] WASCA 27, (2014) 46 WAR 301.

*Westford Special Situations Fund Ltd v Barfield Nominees Ltd* [2011] ECSCJ No 61, ECSC.

**Legislation referred to**

*British Virgin Islands*
Civil Procedure Rules 2000.
Common Law (Declaration of Application) Act 1705.
Eastern Caribbean Supreme Court (Virgin Islands) Act 1969.
Legal Profession Act 2015.
Legal Profession (Amendment) Act No 1 of 2016.
Virgin Islands Constitution Order 2007.

*Ireland*
Constitution of Ireland 1937.
District Court Rules.

*Guyana*
Constitution.

*United Kingdom*
Administration of Justice Act 1985.
Civil Procedure Rules.
Interpretation Act 1978.
Litigants in Person (Costs and Expenses) Act 1975.
Legal Services Act 2007.
Statute of Gloucester.
Virgin Islands Constitution Order 2007, SI 2007/1678.

**Other sources referred to**

Inter-American Court of Human Rights *Proposed Amendment to the Political Constitution of Costa Rica related to Naturalization*.

**Appeal**

Following the dismissal by the Eastern Caribbean Supreme Court of Vladimir Niyazov's appeal in proceedings brought against two law firms, Agon Litigation and Maples and Calder ('the respondents'), the court considered the issue of costs where the respondents had acted as litigants in person during the course of the proceedings. The facts are set out in the judgment of Ellis JA (Ag).

*Jonathan Crystal* for the appellant.
*David Welford* for the first respondent.
*Michael Fay QC* for the second respondent.

12 October 2020. The following judgments were delivered.

**ELLIS JA (Ag).**

[**1**] The appeal in this matter arose out of an ex tempore judgment by Wallbank J ('the learned judge') in which he dismissed the appellant's application for a wasted costs order against Agon Litigation and Maples and Calder (referred to collectively as 'the respondents'), and ordered the appellant to pay in total $25,000.00 in costs ($18,000.00 to Agon Litigation; $7,000.00 to Maples and Calder).

[**2**] The appellant was granted leave to appeal that decision on 22 January 2019. However, the appellant did not serve the notice of appeal within the period prescribed by the order which granted leave to appeal and also failed to file and serve his written submissions or the bundle of documents in support of the notice of appeal in accordance with r 62.10(1) of the Civil Procedure Rules 2000 ('the CPR').

[**3**] By notice of application filed 20 June 2019, the appellant sought relief from sanctions and an extension of time to file his written submissions in support of his appeal. On 19 July 2019, this Court dismissed the appellant's application for an extension of time inter alia on the ground that the appeal had no prospects of success. In light of this finding, the Court went on to dismiss the substantive appeal. The Court then had to consider whether any further orders should be made in relation to the issue of costs.

[**4**] Both respondents submitted that costs should follow the event and so the appellant should be ordered to pay their costs of the appeal and the costs of the application for an extension. However, during the course of these proceedings, the respondents, being law firms, acted as litigants in person and so the Court was compelled to consider the application of the common law rule which permits a litigant in person to recover only his out of pocket expenses.

[**5**] The parties were asked to address the Court on the question of whether a legal practitioner's law firm is entitled to recover legal costs for acting for itself in proceedings in the Virgin Islands, and in particular, whether it can do so when acting for itself in a wasted costs application.

[**6**] When it became clear that the matter could not be resolved at the hearing, the parties were asked to address the issue in written submissions. These written submissions reveal significant common ground between the parties. All parties relied on the English appellate decision in *London Scottish Benefit Society v Chorley*.[1] In that case, an action was brought against the defendants, who were solicitors. The result of the litigation was in the defendants' favour, and they recovered costs against the claimants. The defendants sought to have their costs taxed as if they were acting as solicitors

---

1  (1884) 13 QBD 872, [1881–5] All ER Rep 1111.

for another person, and the court had to consider whether this contention could be maintained. It was argued on the one side, that with regard to taxation of costs, there is no difference between a solicitor and any other party to an action who sues or defends in person; and, on the other side, that a solicitor who sues or defends in person and is successful is entitled to the same costs as if he were acting for a client.

[7] The English Court of Appeal expressly rejected the assertion that a solicitor embarking upon litigation and seeking his costs should be treated the same as a litigant in person doing the same. The court held that when an ordinary party to a suit appears for himself, he is not indemnified for loss of time but where an action is brought against a solicitor who defends in person and obtains judgment, he is entitled upon taxation to the same costs as if he had employed a solicitor, except in respect of items which the fact of his acting directly renders unnecessary. In other words, a solicitor who acted for himself as a party to litigation is entitled to recover not only his out-of-pocket expenses but also his profit costs. However, he could not recover for anything which his acting in person has made unnecessary.

[8] In *Halborg v EMW Law LLP*,[2] Etherton MR summed up the common law position from *Chorley* in the following terms:

> 'The common law principle established by the *Chorley* case ("the *Chorley* principle") may be summarised as being that: (1) a solicitor who acts for himself as a party to litigation can recover not only his out-of-pocket expenses but also his profit costs, but he cannot recover for anything which his acting in person has made unnecessary; (2) the reason is not because of some special privilege but on the purely pragmatic grounds that (a) there has actually been an expenditure of professional skill and labour by the solicitor party, (b) that expenditure is measurable, (c) the solicitor party would otherwise employ another solicitor and, if successful, would be entitled to recover the costs of that other solicitor, and (d) since he cannot recover for anything which his acting in person has made unnecessary, the unsuccessful party will have the benefit of that disallowance and so would pay less than if the solicitor party had instructed another solicitor.'

[9] In the United Kingdom, the so-called *Chorley* exception has been applied by the English Court of Appeal in *Malkinson v Trim*[3] (even after the introduction of the English Civil Procedure Rules) which made clear that partners facing legal action can reclaim the costs their firms incurred in successfully defending them.[4] In *Trim*, a solicitor had successfully defended proceedings brought against him personally, by employing his own firm to represent him. He sought his costs. The claimant disputed his right to costs. The court held that in serving a notice of discontinuance of the action, the

---

2  [2017] EWCA Civ 793, [2017] 2 BCLC 442, [2018] 1 WLR 52.

3  [2002] EWCA Civ 1273, [2003] 2 All ER 356, [2003] 1 WLR 463.

4  The Times 11 October 2002; also in *Halborg v EMW Law LLP* [2017] EWCA Civ 793, [2017] 2 BCLC 442, [2018] 1 WLR 52 the English Supreme Court held that the common law principle established in 1884 that a solicitor who acts for himself can recover his profit costs, continued to hold good.

claimant had made himself liable for costs. The court further held that there should be no difference between work done by an employee of a solicitor, and work done by a partner. The UK Civil Procedure Rules had not changed the position.

[**10**] The dictum in *Chorley* has been approved and applied in the Eastern Caribbean. In the Court of Appeal decision of *Husbands v Warefact Ltd*[5] the learned Barrow JA made the following observation:

> 'This accords with the principle that a litigant in person who is a solicitor holding a valid practising certificate is entitled to the same costs as if he had employed a solicitor, except in respect of items which the fact of his acting directly renders unnecessary; see *London Scottish Benefit Society v Chorley* and *Buckland v Watts*.'

[**11**] No doubt that the dictum in *Chorley* would similarly permit a solicitor acting as a litigant in person in the Virgin Islands to seek and obtain an award of costs. However, the position with regard to self-represented barristers is not as clear and requires closer examination because of the old common law position that formerly applied in England which prohibited barristers, but not solicitors, from suing for fees. This position was based on the old common law rule that the relationship between a barrister and client is not contractual and would give rise to no enforceable claim for reward.[6]

[**12**] In the Eastern Caribbean, this Court has extended the *Chorley* exception in favour of self-represented barristers on the basis of the fusion of the legal profession. In *Husbands v Warefact*,[7] the facts disclose that Mr Husbands was a Queen's Counsel who acted as a litigant in person in his appeal before the Privy Council. In the judgment rendered in that case, the Board decided that because the legal profession in Saint Lucia is fused, the appellant was not precluded, although he was a Queen's Counsel, from suing for legal fees. After examining the legislative framework regulating the legal profession in Saint Lucia, the Board concluded:[8]

> 'As is evident from these provisions (and subject to the special position of Queen's Counsel, which calls for separate consideration), legal practice in St Lucia differed from that in the United Kingdom in four significant ways. First, there was a fused legal profession, since barristers were entitled to practise as solicitors and notaries. The historic divide between barristers and advocates on the one hand and solicitors on the other did not obtain. Secondly, barristers were not required (in all but a few exceptional cases) to act only on the instructions of a solicitor. Since barristers were also solicitors, such a rule would make no sense. Thirdly, barristers were entitled to practise in partnership with other barristers, no doubt because they were entitled to practise as solicitors and solicitors in

---

5  [2006] ECSCJ No 141.

6  *Kennedy v Broun* (1863) 13 CB (NS) 677, (1863) 143 ER 268; *Mostyn v Mostyn* (1870) LR 5 Ch App 457; and *Rondel v Worsley* [1967] 3 All ER 993 at 1001, 1004–1006, 1019–1021, 1030–1032, 1037, [1969] 1 AC 191 at 232, 236–240, 260–263, 277–279, 287–288.

7  [2003] UKPC 23, [2003] 3 LRC 648.

8  *Husbands v Warefact Ltd* [2003] UKPC 23, [2003] 3 LRC 648 (at [15]).

the United Kingdom have always been entitled to practise in partnership. Fourthly, barristers were entitled to sue for their fees. This is because all lawyers were entitled to sue for their fees, as solicitors in the United Kingdom have always been entitled to do. The rule (to which fuller reference is made in para [20], below) that the relationship between barrister and client is not contractual and that barristers cannot enforce a claim for professional remuneration by action has never been extended to solicitors.'

[**13**] Critically, at para [4] of *Husbands v Warefact*, Barrow JA concluded:

'In light of the decision in the applicant's case before the Privy Council, that a barrister in the fused legal profession in St Lucia is entitled to sue for his fees in the same way as a solicitor, it seems that the rule that a solicitor acting in person may be awarded costs should equally apply to a barrister acting in person.'[9]

[**14**] In addressing the position in the Virgin Islands, the first respondent originally submitted that by virtue to the Legal Profession Act, 2015[10] ('the LPA'), barristers and solicitors are deemed, for all intents and purposes, one and the same in the Virgin Islands and are collectively referred to as 'legal practitioners'. Counsel argued therefore that the principles espoused by the English Court of Appeal in *Chorley* and applied by the Eastern Caribbean Court in *Husbands* should therefore translate to cover all legal practitioners in the jurisdiction of the Virgin Islands. The second respondent[11] and the appellant also advanced similar arguments.[12]

[**15**] However, the parties failed to recognise a critical distinguishing factor.

[**16**] The Virgin Islands has long recognised the need to reform the regulation of the legal profession, and the LPA[13] represented the culmination of diligent efforts. The LPA put beyond any doubt that the legal profession in the Virgin Islands is fused so that all persons who are admitted to practise law in the BVI would be known as 'legal practitioners'. Sections 13(1) and (2) of the LPA provides as follows:

'(1) Every person whose name is entered on the Roll in accordance with this Act shall be known as a legal practitioner and,
  (a) subject to subsection (2), is entitled to practise law and sue for and recover his or her fees for services rendered in that respect;
  (b) subject to subsection (2), has the right of audience before any court;
  (c) is an officer of the Supreme Court.
  (2) No person may practise Virgin Islands law unless his or her name is entered on the Roll in accordance with this Act.'

---

9  [2006] ECSCJ No 141 Saint Lucia Civil Appeal No 7 of 1997 (delivered 17 March 2006).

10  No 13 of 2015, Laws of the Virgin Islands.

11  Paragraph 6 of the Written Submissions.

12  Paragraph 2 of the Written Submissions.

13  Legal Profession Act No 13 of 2015 of the Laws of the Virgin Islands enacted 11 May 2015.

[**17**] However, while fusion may have been the Legislature's original intention, by January 2016, two amendments to the LPA were introduced in quick succession which disapplied certain provisions of the LPA[14] and which introduced transitional provisions aimed at allowing time for the necessary supporting regulations to be introduced. One critical amendment was the reversal of the provision that all legal practitioners had an automatic right of audience before the BVI Court.[15] Section 11(6) of the LPA now makes it clear that a solicitor who does not have the right of audience before the superior court of record in the jurisdiction where they qualified as a solicitor, does not have the right of audience before the courts of the Virgin Islands. More importantly, s 13 of the LPA was specifically disapplied by s 67(1) of the LPA which provides as follows:

> '(1) Until the list of jurisdictions, regulatory bodies, institutions, courses of study and professional training in law specified in section 11(4) have been published
>> (a) sections 10 to 13 and sections 45 to 47 shall not have effect; and
>> (b) any application for admission to practise shall continue to be dealt with under Part IV of the Eastern Caribbean Supreme Court (Virgin Islands) Act as if that Part was not repealed.'

[**18**] It follows that until the specified list of jurisdictions, regulatory bodies, institutions, courses of study and professional training in law have been published, s 13 of the LPA has no effect. As at the date of this judgment, the relevant publication has not been realised.

[**19**] The Court therefore sought to determine whether this would have any impact on the original positions adopted by the parties and so they were invited to provide further or supplemental submissions to address this issue.

[**20**] Counsel for the appellant, Mr Jonathan Crystal, submitted that the LPA created the new profession of 'legal practitioner' and made it clear that existing solicitors, barristers and attorneys at law, entitled to practise before the High Court, became, subject to conditions, legal practitioners. Counsel did not however go on to identify these so called conditions. Instead, counsel cursorily asserted that all barristers and solicitors practising before the High Court of the Virgin Islands effectively became legal practitioners on the coming into force of the 2015 Act and he concluded that in law, there are no longer practising barristers or solicitors in the Virgin Islands.

[**21**] The written submissions of the second respondent urged the Court to consider the provisions of s 67 in conjunction with the interpretation and definition section set out in s 2 of the LPA. According to Mr Michael Fay QC, this conjunctive reading leads to a number of conclusions. First, he submitted that the LPA did not create a new category of the legal profession. Rather, the LPA merely uses this expression for the purpose of describing the persons to whom the LPA relates. He concluded that the term legal practitioner is an umbrella term for someone who is registered as a legal practitioner on the roll kept by the Registrar in accordance with s 8 of the LPA.

---

14  Legal Profession (Amendment) Act No 1 of 2016.

15  Section 11(6) of the Legal Profession (Amendment) Act No 1 of 2016.

[**22**] Mr Fay also referred the Court to s 11 of the LPA which sets out the qualification requirements for admission to practise as a legal practitioner. He submitted that in as much as that section refers to barristers and solicitors who are entitled to practice law in the United Kingdom, the section does not purport to alter or enhance the rights of any such barrister or solicitor upon being admitted to practice in this jurisdiction.

[**23**] Mr Fay further submitted that there are a number of authorities in England which demonstrate that there is no impediment to a barrister claiming for his profit costs on the same basis as a solicitor where he successfully represents himself in litigation. He referred to the judgment in *Khan v Lord Chancellor*,[16] in which Mitchell J held that the *Chorley* exception applied to barristers as much as it did to solicitors. At paras [70] and [71] of *Khan*, the learned judge held:

'[70] It is submitted in the alternative that even if the true ratio of *Boswell's* case does not incorporate [*Chorley*] principle, that principle can properly be extended to a barrister in Mr Khan's position. It is rightly accepted that the fact of expenditure by him of his skill and labour in his own defence does not change the capacity in which either he appears in court or performs the preparatory work. Throughout he is and remains a defendant/appellant. None the less, so it is submitted, his expenditure, subject to proof and reasonableness, is to be indemnified in accordance with the principle. If the true ratio of *Boswell's* case is narrower than that contended for on behalf of Mr Khan, then in my judgment this alternative submission is sound. In short, in my judgment no provision in the Code of Conduct is an answer to Mr Khan's claim nor should his position be equated to that of a lay litigant in person.

[71] Given then, that in my judgment, Mr Khan's circumstances fall four square within the *London Scottish Benefit Society* principle (as explained in *Malkinson v Trim* [2003] 2 All ER 356, [2003] 1 WLR 463) does that principle enable him to be indemnified having regard to the provisions of s 16(6) and reg 7? In my judgment it plainly does. Under s 16(6) he is entitled to reasonably sufficient compensation for "any expenses properly incurred by him in the proceedings". The relevant head of expense, (and "expenses" includes "expense"— see s 6 of the Interpretation Act 1978), is the work he performed—namely the professional skill and labour expended by him on his own defence to the allegation of criminal conduct and thereafter, having been convicted, in lawful pursuit of his various statutory rights relating to the challenging of the conviction. It is difficult to see how in principle this head of expense was not "properly incurred" because had the work being performed by another barrister on behalf of Mr Khan it is not suggested, nor could it be, that such a barrister would not have been entitled to remuneration for it, and that such remuneration would properly have been an item in a bill of costs submitted for taxation in pursuance of an order under s 16. The fact that

---

16   *Khan v Lord Chancellor* [2003] EWHC 12 (QB), [2003] 2 All ER 367 (at [69]); applied by the English Court of Appeal in *R (on the application of Bar Standards Board) v Disciplinary Tribunal of the Council of the Inns of Court* [2016] EWCA Civ 478, [2016] 1 WLR 4506, [2016] 3 Costs LR 633.

here the necessary work involving the exercise of professional skill was performed by Mr Khan himself does not remove this work from the ambit of compensation provided for in the words "any expenses properly incurred by him in the proceedings". The argument that such work falls outside the ambit was advanced and rejected in *R v Stafford Stone and Eccleshall Magstrates' Court, ex p Robinson* [1988] 1 All ER 430, [1988] 1 WLR 369.'

[**24**] Relying on this dictum, counsel concluded that whether Agon Litigation is represented by Michael Fay QC (a barrister) or by Arabella di Iorio (a solicitor) has no impact on the Court's ability to apply the *Chorley* principle because the *Chorley* principle applies both to barristers and solicitors and it applies where a solicitor is represented by another solicitor in the same firm. Mr Fay submitted that Agon Litigation is and remains the firm, irrespective of which of the partners represents it. Accordingly, the Court should not be concerned with extending the *Chorley* exception to barristers since the second respondent is neither a barrister nor a solicitor but a firm of barristers and solicitors with the two partners, Michael J Fay QC a barrister, and Arabella di Iorio, a solicitor with a higher rights certificate. Counsel submitted that the second respondent firm seeks to recover its own costs of defending the application made against it – it did not engage outside counsel and work undertaken by the firm in defending itself is a loss of profit and not merely time.

[**25**] In the event that this Court decides that the legal profession has not been fused in this jurisdiction (which the second respondent denies), counsel submitted that the principle in *Chorley* should apply no less to legal practitioners, who thereby encompass barristers, than it should to solicitors simpliciter.

[**26**] Turning next to the written submissions of Maples and Calder, Mr David Welford quite correctly submitted that the legal profession was fused in the Virgin Islands long before the enactment of the LPA. Mr Welford referred the Court to s 70 of the Eastern Caribbean Supreme Court (Virgin Islands) Act,[17] ('the Supreme Court Act') which provides:

'Subject to the provisions of section 71, every person enrolled as a barrister shall be entitled to practise as a solicitor, and to sue for and receive his or her taxed costs as such, but if he or she practises as a solicitor, he or she shall be subject to all the liabilities which attach by law to a solicitor.'

[**27**] Mr Welford noted that s 13 of the LPA endorsed the already fused nature of the profession in the BVI, by providing that every person entered onto the roll is to be known as a legal practitioner, is entitled to practise law and sue for their fees, has rights of audience before any court and is an officer of the court. Counsel submitted that these provisions cut across the historic distinctions between barristers and solicitors. In attempting to reconcile legislative quandary presented by the LPA's transitional provisions, counsel submitted that:

---

17  Cap 80 of the Revised Laws of the Virgin Islands 1991.

'It is an oddity of the transitional provisions of the LPA that, whilst Part IV of the Supreme Court Act (which includes s. 71) has been repealed (s. 66 of the LPA), s. 13 of the LPA shall have "no effect" until certain steps are taken by the Legal Council (s. 67(1)(a) of the LPA). It is submitted that this does not impact upon the above analysis. In particular, ss. 66(3) and 67(3) of the LPA make it tolerably clear that the scheme of the LPA is still to apply to those admitted to practise law. Furthermore, it would be a startling outcome if the effect of the enactment and transitional provisions of the LPA were to reverse the fusion of the professions effected by the Supreme Court Act, when it is clear from the wording of s. 13 that the Legislature's intention was to further cement [the fusion of the] two professions.'[18]

[**28**] I have no doubt that there is no small degree of legislative inadvertence operating here. Section 13 of the LPA was clearly intended to fully merge the profession, removing any doubt or lingering distinction between barristers and solicitors and thus entitling persons who are admitted to the roll, now referred to as legal practitioners, to practise law and sue for and recover their fees for services rendered. However, this purported reform may have been superfluous because, in reality, the legal profession in the Virgin Islands has been somewhat fused with barristers being entitled to practise as solicitors and entitled to sue for and receive their taxed costs as such since 1969.

[**29**] While the LPA was no doubt intended to foster clarity, unfortunately it created a muddle; in that, although s 67(1)(b) of the transitional provisions of the LPA provides some measure of life support to Pt IV of the Supreme Court Act by providing that an application for admission to practise shall continue to be dealt with under Pt IV of the LPA as if that Part was not repealed, the remaining sections of Pt IV (which include s 70), apparently remained repealed.

[**30**] In repealing s 70 of the Supreme Court Act[19] without enacting a corresponding provision in the new legislative regime, the Legislature has effectively deprived barristers of rights which they clearly would have had for some time. The result is that while there was no doubt of the application of the *Chorley* exception in the Virgin Islands, what is now unsettled, is whether and to what extent the ambit of the *Chorley* exception can be extended to self-represented barristers. Without the benefit of extant and specific legislative intervention, what then is the position?

[**31**] It is now well established that in the absence of any local legislation or case law to direct its approach, the Virgin Islands courts will look to the common law of England which was extended to the Virgin Islands by the Common Law (Declaration of Application) Act, 1705[20] which provides:

'That the Common Law of England, as far as it stands unaltered by any writ[t]en Laws of these Islands, or some of them, confirmed by Your Majesty … is in force in each of these your Majesty's Leeward Charibee

---

18  Paragraph 16 of the Further Supplemental Submissions of the Second Respondent.

19  Section 66(1) of the LPA.

20  Cap 13, Revised Laws of the Virgin Islands 1991.

Islands, and is the certain Rule whereby the Rights and Properties of your Majesty's good Subjects inhabiting these Islands, are and ought to be determined; and all Customs or pretended Customs or Usages, contradictory thereunto, are illegal, null, and void.'

[**32**] By virtue of the Common Law (Declaration of Application) Act, 1705 the Virgin Islands adopted the English common law, subject to any modifications thereof, enacted either locally or by extension of English enactments. It is therefore clear that *Chorley* has been a part of the Virgin Islands' legal landscape since 1884. The principles and practice relating to a claim for costs by self-represented solicitors, which is now decades old, was expressly brought into force in the Virgin Islands by virtue of the Common Law (Declaration of Application) Act, 1705.

[**33**] However, where the admission to practise law is not uniform for both barristers and solicitors and there is doubt as to whether the profession is now fused, I must consider the position at common law. Such analysis may conveniently commence with the English Court of Appeal judgment in *Buckland v Watts*[21] in which that court held that a successful plaintiff in person (who was not a solicitor) was not entitled to claim costs in respect of the time which he had expended in preparing his case. Sir Gordon Willmer had this to say ([1969] 2 All ER 985 at 987, [1970] 1 QB 27 at 37):

'What a successful party, who has got an order for costs, is entitled to recover falls, as is well known, under two headings. One heading covers his disbursements, that is to say, money which he has actually had to pay out to other people, such as witnesses, counsel, professional advisers, and so forth. The other heading is described as "costs". That is intended to cover remuneration for the exercise of professional legal skill. That, I think, is in accordance with the views expressed by Bowen LJ, in the judgment which Danckwerts LJ has already read. It is because there has been an exercise of professional legal skill that a solicitor conducting his own case successfully is treated differently from any other successful litigant conducting his own case in person. We are not concerned with the exercise of other professional skills. **Other professional people, who become involved in litigation and conduct their own case, may recover something in respect of their own professional skill, insofar as they qualify as witnesses and are called as such. But nobody else, except a solicitor, has ever been held entitled to make any charge, as I understand it, in respect of the exercise of professional legal skill**; and it is that which the plaintiff has sought to do in the present case.' (My emphasis.)

[**34**] This appears to be consistent with the practice and custom of the English Bar which at the time did not entitle a barrister to claim a fee when he appears on his own behalf and it is clear that the question of whether a self-represented solicitor should be entitled to claim costs was decided against that backdrop.

---

21  [1969] 2 All ER 985, [1970] 1 QB 27.

[**35**] Within the United Kingdom, however, there have been cases where the courts have held that self-represented barristers are entitled to their fees. In *R v Boswell*,[22] junior counsel had appeared for himself and senior counsel before a taxing master in relation to their costs in other proceedings. On appeal from the taxing master, junior and senior counsel had engaged other counsel to appear for them. Leggatt J ([1987] 2 All ER 513 at 517, [1987] 1 WLR 705 at 710–711), after referring to the *Chorley* exception, accepted as correct a submission that 'costs recoverable where one counsel instructs another must be the same in principle as where one solicitor instructs another'. His Honour added:

> 'Indisputably an appellant solicitor or counsel can conduct his own appeal. An attempt to equate such a professional person with a litigant in person is unhelpful because the [1982] regulations do not limit the scope of the remuneration recoverable by an appellant, and such an appellant brings to bear professional skill and labour, the value of which can as readily be assessed as if they were performed for him by another lawyer.'

[**36**] In *R (on the application of Bar Standards Board) v Disciplinary Tribunal of the Council of the Inns of Court*,[23] a barrister successfully defended herself in disciplinary proceedings brought by the Bar Standards Board. She was, at all times, self-represented before the disciplinary tribunal. The Court of Appeal (UK) held that the tribunal had wrongly applied the English Civil Procedure Rules in relation to costs and that, under the Bar's Disciplinary Tribunals Regulations, which applied, the tribunal had a broad discretion as to costs. McCombe LJ (King LJ agreeing) held, at [19], that if the Civil Procedure Rules did not apply, 'the best guidance for the tribunal in assessing costs remains the common law as stated in [Chorley]'.

[**37**] In coming to this conclusion, the Court of Appeal approved the decision in *Khan v Lord Chancellor*,[24] in which a barrister who had represented himself in criminal proceedings was held to be entitled to his professional costs on the basis of the *Chorley* exception. At paras [51]–[53] of the judgment, Mitchell J considered that the *Chorley* exception properly extended to a self-represented barrister and that there were no policy objections to the extension of the rule.

[**38**] In my view, this line of cases (which were referenced by the respondents) provides only limited clarity for the Virgin Islands as they were decided against the backdrop of different statutory regimes which do not operate in the Virgin Islands.[25] However, I cannot ignore the actual backdrop in the Virgin Islands which reveals that the strict historic divide between barristers on the one hand and solicitors on the other has never really obtained in the Virgin Islands. Barristers were not required (in all but a few exceptional cases) to act only on the instructions of a solicitor. Further,

---

22  [1987] 2 All ER 513, [1987] 1 WLR 705.

23  *R (on the application of Bar Standards Board) v Disciplinary Tribunal of the Council of the Inns of Court* [2016] 1 WLR 4506, [2016] 3 Costs LR 633.

24  [2003] 2 All ER 367.

25  Litigants in Person (Costs and Expenses) Act 1975 (UK) and CPR 48(6).

barristers routinely practise in partnership with other barristers and have always been entitled to practise as a solicitor carrying out functions which are routinely carried out by solicitors. It is also clear that barristers have always been entitled to sue for their fees.

[**39**] I also cannot ignore the operating procedural regime which covers the award and assessment of costs in the Virgin Islands. Civil practice and procedure in the Virgin Islands is regulated both by the common law and by statute. Part 64 of the CPR which provides the procedural framework makes it clear that costs are in the discretion of the court. A court has full power to determine by whom, to whom and to what extent costs are to be paid. Rule 64.2 defines costs as including:

'… a legal practitioner's charges and disbursements, fixed costs, prescribed costs, budgeted costs or assessed costs.'[26]

[**40**] Importantly, r 2.4 of the CPR defines the term legal practitioner as including—

'a Queen's or Senior Counsel, a barrister at law, a solicitor, an attorney at law and a notary royal.'

[**41**] These provisions do not reflect any distinction between barristers and solicitors and are therefore clearly inconsistent with the limited application of the *Chorley* exception. Ultimately, this may well provide the complete answer to the question as to whether there is any remaining distinction between solicitors and barristers in the Virgin Islands at least in so far the question of costs are concerned.

[**42**] I am prepared to accept that these legislative provisions enacted against the background of the long held common law exception in *Chorley* removed any distinction. No doubt the drafters recognised that notwithstanding the lack of formal fusion in the Virgin Islands, the work performed by solicitors and barristers contains significant crossover such as the drafting of pleadings and affidavits. Indeed, the reality is that the fact that a litigant may have instructed solicitors has never precluded claims for work performed by barristers including solicitor advocates and Queen's Counsel and they have routinely been entitled to recover their own costs. The Virgin Islands has never, as a matter of law or practice recognised a distinction between solicitors and barristers in so far as the recovery of costs is concerned.

[**43**] It is this historical context which has convinced me that the legislators in drafting the relevant transitional provisions to the LPA may not have fully appreciated that in partly repealing Pt IV of the Supreme Court Act, while delaying the coming into force of s 13 of the LPA, they have effectively deprived barristers of a previously held right. I have no doubt that the legislators did not intend to repeal s 70 of the Supreme Court Act without replacing it with an equivalent legislative protection. It is hoped that the Legislature will take immediate steps to put the position beyond doubt – making clear that the relevant provisions under the Supreme Court Act which, since 1969 have entitled barristers to sue for their fees remain in force.

---

26  ECSC CPR Pt 64.2(1).

[**44**] In construing the application and the ambit of *Chorley*, I note that although different professional duties attach to barristers and solicitors, historically, there is and has been considerable overlap. Given the peculiar historical context and the evolving and peculiar legislative framework which currently operates in the Virgin Islands, I can see no proper basis to refrain from extending the *Chorely* exception so as to enable self-represented barristers to recover their costs in respect of work undertaken, as if they had been retained as counsel.

**CONSTITUTIONALITY OF THE CHORLEY EXCEPTION**

[**45**] There is however a more fundamental issue at play here which the Court cannot ignore. This issue has been highlighted in judgments delivered in other parts of the Commonwealth such as New Zealand, Australia and Canada where the *Chorley* exception has not found favour.

[**46**] Until recently, the ratio in *Chorley* was applied in Australia, most notably, in the High Court's decision of *Guss v Veenhuizen (No 2)*[27] which was then accepted as binding authority in most Australian jurisdictions.[28] This decision was followed in *Bell Lawyers Pty Ltd v Pentelow*,[29] where the Supreme Court of New South Wales also confirmed that the *Chorley* exception also applied to barristers.

[**47**] In that case, Ms Pentelow, a barrister who brought proceedings in both the local court and Supreme Court of New South Wales, sought to recover unpaid fees following a dispute with her client (who had been her instructing solicitors). Although the Supreme Court awarded costs in Ms Pentelow's favour in respect of both proceedings, the costs assessor later rejected in its entirety that part of the costs claimed by Ms Pentelow for preliminary work that she had undertaken herself prior to engaging legal representation, such as drafting the originating process and her affidavit of evidence. During a subsequent review by the costs review panel, Ms Pentelow's claim for costs relating to work that she had undertaken was again disallowed on the basis that, relevantly, the *Chorley* exception did not extend to barristers. Ms Pentelow subsequently appealed to the District Court of New South Wales. However, she was unsuccessful on the same basis and thus sought judicial review of the decision.

[**48**] In the New South Wales Court of Appeal, Beazley ACJ (with whom MacFarlan JA agreed) held that the *Chorley* exception extended to the work undertaken by a self-represented barrister, so long as that work was not expressly proscribed by the Bar Rules. Significant in Beazley ACJ's reasoning was the fact that there was now significant overlap in the work undertaken by both solicitors and barristers and the costs of each may be assessed under the same costs assessment processes.

[**49**] The apparent bases for this exception included the view that solicitors should not be encouraged to employ another solicitor to do legal work which they could themselves do (and that it would be absurd for costs to be

27 [1976] HCA 57, (1976) 136 CLR 47.

28 *Coshott v Spencer* [2017] NSWCA 118 and *Soia v Bennett* [2014] WASCA 27, (2014) 46 WAR 301.

29 [2018] NSWCA 150.

recoverable in the former situation but not the latter); as well as the idea that the value of solicitors' time was capable of being measured in a way that the value of a lay-person's time could not be. However, in December 2018, Bell Lawyers were granted special leave to appeal the decision to the High Court of Australia. The High Court was requested to consider whether the *Chorley* exception extends to barristers and more fundamentally whether the exception should be recognised as part of the common law of Australia at all.

[**50**] In September 2019, the Australian High Court found in favour of the Bell Lawyers and allowed the appeal, overturning the decision of the New South Wales Court of Appeal. In doing so, the High Court effectively abolished the *Chorley* exception in Australia. In a major decision delivered on 4 September 2019, the High Court of Australia in *Bell Lawyers Pty Ltd v Pentelow*[30] ended the right of lawyers to claim costs when they are self-represented litigants, saying that the special rule was an anomaly and 'an affront to the fundamental value of equality of all persons before the law' which could not be justified by the considerations of policy which are said to support it.

[**51**] The learned judges, Keifel CJ, Bell, Keane and Gordon JJ determined that they had a responsibility to address the proper effect of the relevant local legislative provisions in the context of the broader question of whether the *Chorley* exception should be recognised as part of the common law of Australia. They then considered the rationale expressed to underlie the *Chorley* exception. First, the learned judges considered the contention that it benefits the other side if a solicitor acts for himself because the expense to be borne by the losing party can be expected to be less than if an independent solicitor were engaged. Quite rightly, the learned judges noted that there is an obvious flaw in the argument because it fails to take into account that a self-representing solicitor, lacking impartial and independent advice expected of officers of the court, may also lack objectivity due to his self-interest. This may well result in higher costs being passed on the other party.

[**52**] When considering an award for costs to be a partial indemnity for professional costs incurred during litigation, the learned judges questioned whether an award of costs to a self-represented practitioner could be considered more akin to compensation for a loss of earnings or as a reward for success, rather than partially indemnifying the successful party for monies out laid during the litigation. At para [33] of the judgment, the court observed:

> 'It has never been thought that any of the ubiquitous statutory provisions empowering courts to order costs are available to compensate a litigant for his or her time and trouble in participating in litigation. That is because costs are awarded by way of indemnity; they are not awarded as compensation for lost earnings, much less as a reward for a litigant's success. The courts have long regarded the statutory power to make an order for costs as confined by the concern to provide the successful party

---

30  [2019] HCA 29, [2019] 5 LRC 589.

with a measure of indemnity against the expense of professional legal costs actually incurred in the litigation. Thus, the majority in *Cachia* said:

> "It has not been doubted since 1278, when the *Statute of Gloucester* introduced the notion of costs to the common law, that costs are awarded by way of indemnity (or, more accurately, partial indemnity) for professional legal costs actually incurred in the conduct of litigation. They were never intended to be comprehensive compensation for any loss suffered by a litigant." '

[**53**] The High Court considered the rationale adopted by the court in *Chorley*, that the professional skill and labour exercised by a solicitor litigant may be measured by the law, whereas the 'private expenditure of labour and trouble by a layman cannot be measured'. The Court did not put much store in this argument. At para [24] of the judgment, the Court observed:

> 'The notion that the "private expenditure of labour and trouble by a layman cannot be measured" is not the basis for the general rule. The general rule that a self-represented litigant may not obtain any recompense for his or her time spent on litigation is not based on a concern about the difficulty of valuing the appropriate amount of recompense, but, as was explained by the majority in *Cachia v Hanes*, because "costs are awarded by way of … partial indemnity … for professional legal costs actually incurred in the conduct of litigation". Accordingly, to say that the value of legal services rendered by a solicitor to himself or herself can be measured is not to justify an exception to the general rule.'

[**54**] Later, the Court went on to observe:

> '[T]here is no reason why, in principle, the reasonable value of the time of any litigant cannot be measured. The courts regularly value the provision of labour or services in the context of quantum meruit claims. To act upon a principle that evidence enabling the quantification of the value of the time of non-solicitor litigants in person should not be received or acted upon by the courts is to exalt the position of solicitors in the administration of justice to an extent that is an affront to equality before the law. To say that practical difficulties may arise in taking evidence to value the time of non-lawyers spent in the course of litigation is merely to identify a reason why, as a matter of policy, the general rule should not be abolished. No doubt such practical difficulties as might be expected to arise in that event could be addressed in legislation for the abolition of the general rule. The need to address practical questions of this kind is one reason why the abolition of the general rule is properly a matter for the legislature rather than the courts. The point to be made here, however, is that to suggest that practical difficulties may attend the abolition of the general rule is not to identify a reason that supports the *Chorley* exception.'

[**55**] The learned judges were therefore not persuaded by Fry LJ's assertion in *Chorley* that '[t]his is not a question as to a solicitor's privilege'. After

considering that the exception is inconsistent with the underlying principle upon which costs rules have developed, it is not surprising that the learned judges concluded that—

> 'there is an air of unreality in the view that the *Chorley* exception does not confer a privilege on solicitors in relation to the conduct of litigation … A privilege of that kind is inconsistent with the equality of all persons before the law.'

[**56**] The result is that the *Chorley* exception is no longer recognised as a part of the common law of Australia. A self-represented solicitor or barrister is no longer able to recover his or her own professional costs incurred for acting on his or her own behalf in any litigation.

[**57**] In Canada, the courts have also considered how the principles for awarding costs should be applied to those who come to court as their own representative. Rather than disapplying the *Chorley* exception, the courts in Canada have adopted a more inclusive approach. In *Skidmore v Blackmore*[31] the Court of Appeal of British Columbia overturned earlier decisions and found that successful self-represented litigants are entitled to be compensated for their time in the same way that a legal practitioner would be. The Court began by acknowledging that the former Canadian practice closely followed English common law (*Chorley* and *Buckland v Watts*). At paras [38]–[41] of the judgment, the court noted as follows:

> 'Under the old English practice, which was implicitly accepted as the law in this province in *Kendall* [(1979) 106 DLR (3d) 277], the self-represented lay litigant is in the unenviable position of being unable to take advantage of the cost provisions of the Rules of Court while, at the same time, being liable to pay costs to his or her solicitor-represented opponent if the opponent is entitled to costs. The only justification found in the case law for denying costs to a successful self-represented lay litigant is because of the difficulty in valuing the efforts of that person in preparing the case.
>
> This was a larger problem in the United Kingdom, where a successful litigant is usually entitled to full solicitor and client costs. When the British Parliament passed legislation to reverse the effect of *Buckland*, it resolved this problem by setting costs of a self-represented lay litigant as two-thirds of the amount the taxing officer considered to be reasonable solicitor and client costs.
>
> As previously mentioned, in this province costs are assessed under a tariff in Appendix B of the Rules. Thus, the difficulty in valuing the time and effort which a self-represented lay litigant expends in the preparation of his or her case would be avoided by making an order that costs are to be assessed by the Registrar. The Registrar can then determine what those costs ought to be, as is done where the successful litigant is represented by counsel. The concern in the United Kingdom, that a self-represented lay litigant may be over-compensated, does not arise in

---

31   *Skidmore v Blackmore* (1995) 122 DLR (4th) 330 (BC CA).

this province because the tariff provides significantly less than the amount actually payable by a party to his or her solicitor. Also, the tariff is flexible enough to allow the Registrar to find a proper balance between the amount required to indemnify for solicitor's services and those things done by lay litigants. The tariff is flexible in providing for different scales of costs, and for minimum and maximum units. Also, the trial judge has an overall discretion to exercise which may permit a flexible measure.

In conclusion, I am of the opinion that *Kendall* accepted an English practice that was unsound and unsupported by authority. I am further of the view that there are sound reasons for allowing costs to successful self-represented lay litigants, and no good reason why costs should be denied to such litigants.'

[**58**] This decision was followed by *Fong v Chan*[32] which further developed a process for self-represented litigant costs awards. The court in *Fong* recognised that lawyers as professional agents should not be the only parties entitled to costs, as self-represented litigants also devote their own time away from paid activity to pursue a legal claim. At paras [23]–[24], the court observed:

'[23] Since the *Chorley* case over 100 years ago, it had been accepted that self-represented lawyers are entitled to indemnity on the "time is money" or opportunity cost rationale. It is difficult to see why the opportunity cost rationale should not be more generally applicable to self-represented litigants. The self-represented lawyer possesses legal skills, but lacks professional detachment when acting in his or her own cause. If the law is prepared to compensate lawyers for this loss of time when devoting their efforts to their own cause, I fail to see any basis for denying the same entitlement to self-represented lay litigants who are able to demonstrate the same loss.

[24] A rule precluding recovery of costs, in whole or in part, by self-represented litigants would deprive the court of a potentially useful tool to encourage settlements and to discourage or sanction inappropriate behaviour. For example, an opposite party should not be able to ignore the reasonable settlement offer of a self-represented litigant with impunity from the usual costs consequences. Nor, in my view, is it desirable to immunize such a party from costs awards designed to sanction inappropriate behaviour simply because the other party is a self-represented litigant.'

[**59**] The court however found that these costs were not to include the time that a represented party would ordinarily spend on their case as a 'client', for example attending a hearing or preparing for the trial with their lawyer.

'[26] I would also add that self-represented litigants, be they legally trained or not, are not entitled to costs calculated on the same basis as those of the litigant who retains counsel. As the *Chorley* case, supra, recognized, all litigants suffer a loss of time through their involvement in the legal process. The self-represented litigant should not recover costs for

---

32  *Fong v Chan* (1999) 46 OR (3d) 330.

the time and effort that any litigant would have to devote to the case. Costs should only be awarded to those lay litigants who can demonstrate that they devoted time and effort to do the work ordinarily done by a lawyer retained to conduct the litigation and that, as a result, they incurred an opportunity cost by forgoing remunerative activity. As the early Chancery rule recognized, a self-represented lay litigant should receive only a "moderate" or "reasonable" allowance for the loss of time devoted to preparing and presenting the case. This excludes routine awards on a per diem basis to litigants who would ordinarily be in attendance at court in any event. The trial judge is particularly well-placed to assess the appropriate allowance, if any, for a self-represented litigant, and accordingly, the trial judge should either fix the costs when making such an award or provide clear guidelines to the Assessment Officer as to the manner in which the costs are to be assessed.'

[**60**] I have also considered that even the English courts have recognised the inconsistency of allowing self-represented lawyers to recover for their time while refusing the same right to lay litigants. In *Buckland v Watts*,[33] Donaldson J observed that in principle the opportunity cost rationale applied equally to self-represented lay litigants, and that their time could be compensated with appropriate modification for lack of professional skill and training. However, Donaldson J held that he was not free to depart from past authority, and he disallowed the lay litigant's claim and this decision was upheld on appeal.

[**61**] This anomaly appears to have been recognised by the English legislators who determined that if the anomaly were to be removed by abolishing the general rule, it could appropriately be done only by legislation and not judicial decision. In 1975, the UK Parliament enacted the Litigants in Person (Costs and Expenses) Act[34] which now allows lay litigants to recover 'sums in respect of any work done, and any expenses and losses incurred, by the litigant in or in connection with the proceedings to which the order relates'. While neither the act nor the English Civil Procedure Rules ('the English CPR') defines what a litigant in person is, r 46.5(6) of the English CPR clarifies that a litigant in person can include a company or other corporation, a barrister, a solicitor, a solicitor's employee, a manager of a body recognised under s 9 of the Administration of Justice Act 1985 (incorporated practices) and a person who, for the purposes of the Legal Services Act 2007, is authorised to conduct litigation.

[**62**] Recognising that the Virgin Islands is governed by a written Constitution with entrenched fundamental rights provisions, this Court invited the parties to address the obvious constitutional implications which arise in these proceedings. The parties were specifically asked to consider s 12 of the Virgin Islands Constitution Order 2007[35] ('the Constitution') which

---

33  [1970] 1 QB 27 at 31.

34  Section 1(2) of Cap 27.

35  SI 2007/1678.

provides that everyone is equal before the law and has the right to equal protection and benefit of the law.

[**63**] Counsel for the appellant, Mr Crystal submitted that there can be no doubt that denying lay litigants in person whist permitting self-representing barristers and solicitors is a breach of s 12 of the Constitution. Indeed, counsel went further and submitted that this would amount to a breach of s 26 of the Constitution which guarantees protections against discrimination. He submitted that the justification advanced in *Chorley* for such disparate treatment – that 'the private expenditure or labour and trouble by a layman cannot be measured' is now fallacious.

[**64**] Not surprisingly, counsel for both Maples and Calder and Agon Litigation were of a contrary view. The former submitted that allowing Maples and Calder to recover its costs would not engage s 12 of the Constitution and urged the Court not to depart from the clear and well-established common law position. According to Mr Welford, everyone is entitled to the benefit of expert legal services in connection with litigation if they so wish and everyone who is successful in such litigation is entitled to recover the costs of those services. Where the litigant is a lawyer, he is able to provide such services himself, where the litigant is not a lawyer, he is unable to do so. The difference is a consequence of their respective individual circumstances and not a discriminatory legal rule. The legal rule is the same for lawyers and laymen alike as they may each recover the costs of incurring expert legal assistance.

[**65**] Mr Welford submitted that English authorities have long rejected the argument that the *Chorley* exception is in some sense discriminatory. He noted that the court in *Chorley* expressly rejected that the exception rests on some form of solicitor privilege.

[**66**] He further submitted that in any event, Maples and Calder is entitled to recover its costs because none of the authorities referenced have suggested that it is inequitable for a successful litigant law firm to recover its costs of employees engaged to represent it in litigation. Counsel referred to the following dictum in *Bell Lawyers v Pentelow*:

> '[50] **A decision by this Court that the Chorley exception is not part of the common law of Australia would not disturb the well-established understanding in relation to in-house lawyers employed by governments and others, that where such a solicitor appears in proceedings to represent his or her employer the employer is entitled to recover costs in circumstances where an ordinary party would be so entitled by way of indemnity.**
>
> [51] Whether the same view should be taken in relation to a solicitor employed by an incorporated legal practice of which he or she is the sole director and shareholder stands in a different position. It might be queried whether such a solicitor has sufficient professional detachment to be characterised as acting in a professional legal capacity when doing work for the incorporated legal practice. And it might be queried whether costs claimed by an incorporated legal practice for work of its sole director and shareholder are within the expansive view of indemnity that has been

adopted in the authorities. In this regard, in *McIlraith*, Brereton J was disposed to attribute "no significance" to the circumstance that the party seeking an order for costs was an incorporated legal practice whose director was the solicitor who actually performed the work for which costs were sought. It is neither appropriate nor necessary to come to a conclusion as to whether Brereton J was correct in this regard.' (My emphasis.)

[**67**] This dovetails with the approach taken in the New Zealand case of *McGuire v Secretary for Justice*:[36]

'It was, however, directly addressed by the Court of Appeal in *Henderson BC v Auckland Regional Authority*. There, Cooke J, with whom Woodhouse P and Richardson J agreed, noted: **In New Zealand I do not think it can be said to be improper for an employed barrister to represent his employer. Nor did counsel for the appellant so argue. A fortiori an employed solicitor duly enrolled and with a current practising certificate may properly act as solicitor for his employer. Against that background it appears to me that the fact that an employed practitioner has acted for the successful party is not a sufficient reason for denying that party an award of party and party costs: after all, the time of a salaried employee has been occupied. On this basis, the successful party who had been represented by an employed solicitor was awarded costs in both the High Court and Court of Appeal.**' (My emphasis.)

[**68**] Mr Welford concluded that Maples and Calder would be entitled to recover its costs on the basis of the generally accepted exemption which applies to in-house lawyer or lawyers employed by a law firm or government.

[**69**] Counsel for Agon Litigation, Mr Fay QC submitted that there is nothing in s 12 of the Constitution which compels the Court to abandon the well-known and long-standing *Chorley* exception in this case because it has been determined that this exception survived the migration of the English Civil Procedure Rules, has been accepted without controversy in this jurisdiction and has not been expressly abolished by the CPR or by any other statute.

[**70**] He argued that there is nothing inherently invidious in providing for different rules for recoverability of costs in different circumstances where practical considerations warrant them. In this regard, counsel relied on the Irish case of *Dillane v Ireland*[37] in which the Supreme Court of Ireland upheld the distinction in Ord 67 of the District Court Rules which provides that no award can be made against a police officer acting in the discharge of his duties brings a prosecution. This rule has the effect of differentiating between a common informer who is a police officer and an ordinary common informer who is not a police officer. The discrimination was held not to breach the equality guarantee of art 40.1 because it related to the difference in social

36  [2018] NZSC 116.
37  [1980] ILRM 167.

function between the two categories in a manner that was not arbitrary or capricious. Significantly, Henchy J said in relation to the rule:

> '[W]hat matters is whether it could reasonably have been arrived at as a matter of policy by those to whom the elected representatives of the people delegated the power of laying down the principles upon which costs are to be awarded …
>
> the desirability that members of the Garda Siochána should be encouraged to discharge their police duties assiduously by being given immunity from liability for costs or witnesses' expenses in the District Court – this discrimination could reasonably be thought a justifiable concomitant of the social function of the members of the Garda Siochána when carrying out their duties as police officers.'

Like Maples and Calder, Agon Litigation reiterated that the court in *Chorley* was clear that it was not creating or recognising a privilege for solicitors. Instead the distinction is based on purely pragmatic grounds which are neither arbitrary nor capricious. These pragmatic grounds were summarised in *Halborg v EMW Law LLP*.[38]

[**71**] According to Mr Fay, any assertion that the distinction drawn between solicitors and others is invidious or 'unfairly or offensively discriminating' is unsupportable, given that the *Chorley* principle does not prevent the court in an appropriate case from extending the benefits of *Chorley* to other litigants in person. He concluded that this Court could only depart from the principles adumbrated in *Chorley* where it is satisfied that it has been demonstrated that the *Chorley* exception possesses such an invidious character such that it warrants a finding that the rule has been in fact abolished by the Legislature by a very wide and necessarily idealistic provisions relating to equality before the law as opposed to a specific legislative provision.

[**72**] I have carefully considered the very useful submissions of the respondents in this matter which urged this Court to refrain from departing from long held precedents. However, I am satisfied that courts have an obligation to apply and develop the common law in a manner which is consistent with the fundamental values enshrined in the Constitution. The civic values of the Virgin Islands are laid out in its Constitution, which prescribes that every person in the Virgin Islands is entitled to the fundamental rights and freedoms of the individual. Section 12 of the Constitution secures one such fundamental right. It is based on the principle that each independent being must be treated equally by the law and that all are subject to the same laws of justice. That section provides as follows:

> '(1) Everyone is equal before the law and has the right to equal protection and benefit of the law.
>
> (2) Subject to such limitations as are prescribed by law, equality includes the full and equal enjoyment of all rights and freedoms.'

[**73**] In *McEwan v A-G of Guyana*[39] the Caribbean Court of Justice opined on

---

38  See para [8] of this judgment.
39  [2018] CCJ 30 (AJ), [2019] 1 LRC 608, 94 WIR 332.

the scope of the equivalent right (art 149) under the Guyana Constitution. At paras [64]–[65] of the judgment, the Court noted:

> '[64] At the heart of the right to equality and non-discrimination lies a recognition that a fundamental goal of any constitutional democracy is to develop a society in which all citizens are respected and regarded as equal. Article 149 gives effect to this goal. The Article signifies a commitment to recognising each person's dignity and equal worth as a human being despite individual differences.
>
> [65] The Inter-American Court of Human Rights has repeatedly made the link between equality and dignity. In its Advisory Opinion on *Proposed Amendment to the Political Constitution of Costa Rica related to Naturalization*, the Court said at para 55:
>
>> "The notion of equality springs directly from the oneness of the human family and is linked to the essential dignity of the individual. That principle cannot be reconciled with the notion that a given group has the right to privileged treatment because of its perceived superiority. It is equally irreconcilable with that notion to characterize a group as inferior and treat it with hostility or otherwise subject it to discrimination in the enjoyment of rights which are accorded to others not so classified." '

[74] Therefore, the law must guarantee that no individual or group of individuals be privileged or discriminated against, whether by prescribing legislative distinctions or by applying other measures that would treat a group of persons as second-class citizens. The principle of equality and non-discrimination guarantees that those in equal circumstances are dealt with equally in law and practice.

[75] However, it is important to stress that not every distinction or difference in treatment will amount to discrimination. In general, a violation of the principle of non-discrimination arises if: (a) equal cases are treated in a different manner; (b) a difference in treatment does not have an objective and reasonable justification; or (c) if there is no proportionality between the aim sought and the means employed. In the words of *McEwan*:

> 'Parliament may, for example, properly enact legislation limiting or impinging fundamental rights if such legislation is reasonably required in the interests of, inter alia, public order, public morality, or for the purpose of protecting the rights and freedoms of other persons, including the right to practice and observe any religion, or that imposes restrictions upon public officers. Any such limitation should be demonstrably justified in a democratic society. In other words, the infringing law must pursue some pressing objective and be rationally connected to that objective. The infringing law should impair only such of the right as is necessary to be impaired. And there must be proportionality of effects between the deleterious and salutary effects of the infringing law in question.'

[76] When I consider the rationales which underpin the *Chorley* exception, I

am satisfied that they do not meet the relevant threshold. The analysis set out in *Bell Lawyers v Pentelow*, in my view, persuasively debunks each limb underpinning the justification. At paras [18] and [19] of the judgment, the High Court deals with the contention that it is somehow a benefit to the other party that a solicitor acts for himself or herself, because the expense to be borne by the losing party can be expected to be less than if an independent solicitor were engaged. The Court in *Chorley* found that this is not self-evidently true. There can be no doubt that a self-representing solicitor, lacking impartial and independent advice that the court expects its officers to provide to the litigants they represent, may also lack objectivity due to self-interest. Ultimately, this may, result in higher legal costs to be passed on to the other party in the event that the self-representing solicitor obtains an order for his or her costs. In fact, where a solicitor acts for himself or herself there cannot be independent and impartial advice, and this is in principle a strong reason for holding that a solicitor litigant should not be entitled to costs of acting for him or herself.

[**77**] At paras [21] and [22], the High Court considered the contention that the professional skill and labour of a solicitor are recognised and can be measured by the law while the private expenditure of labour and trouble by a layman cannot be measured. The High Court found that this argument was also not persuasive, and observed as follows:

> 'The general rule that a self-represented litigant may not obtain any recompense for his or her time spent on litigation is not based on a concern about the difficulty of valuing the appropriate amount of recompense, but, as was explained by the majority in *Cachia v Hanes*, because "costs are awarded by way of … partial indemnity … for professional legal costs actually incurred in the conduct of litigation". Accordingly, to say that the value of legal services rendered by a solicitor to himself or herself can be measured is not to justify an exception to the general rule.'

[**78**] I am in full agreement that there is no reason why, in principle, the reasonable value of the time of any litigant cannot be measured. The courts regularly value the provision of labour or services in the context of quantum meruit claims. In my view, to act upon a principle that evidence enabling the quantification of the value of the time of non-solicitor litigants in person should not be received or acted upon by the courts is to exalt the position of solicitors in the administration of justice to an extent that is an affront to equality before the law. To say that practical difficulties may arise in taking evidence to value the time of non-lawyers spent in the course of litigation is merely to identify a reason why, as a matter of policy, the general rule should not be abolished. No doubt such practical difficulties as might be expected to arise in that event could be addressed in legislation for the abolition of the general rule. The need to address practical questions of this kind is one reason why the abolition of the general rule is properly a matter for the legislature rather than the courts.

[**79**] It follows that the practical difficulties could not, without more, justify the continued application of the *Chorley* exception. Certainly, other

jurisdictions have not been reticent in considering and implementing workable solutions. For instance, the English Parliament no doubt recognising the obvious disparity enacted the Litigants in Person (Costs and Expenses) Act 1975.[40] Although the Litigants in Person (Costs and Expenses) Act does not define a litigant in person, the term plainly refers to a person who acts on his own behalf for either all or part of the claim is likely to be a litigant in person, unless represented. Moreover, r 46.5(6) of the English Civil Procedure Rules clarifies that a litigant in person can include a company or other corporation, a barrister, a solicitor, a solicitor's employee, a manager of a body recognised under s 9 of the Administration of Justice Act 1985 (incorporated practices) and a person who, for the purposes of the Legal Services Act 2007, is authorised to conduct litigation.

[**80**] Clearly, the United Kingdom has taken steps to level the playing field which remains wholly unequal under the common law in the Virgin Islands. In the absence of legislative intervention and in circumstances where the rationale for allowing the costs of a solicitor acting for himself is so unconvincing, the logical answer may be to abandon the exception in favour of the general principle. Like the Australian High Court, I am convinced that the contention that the exception does not confer a privilege on legal practitioners is naïve. In my view, it would have been unrealistic in 1884 and it is patently unrealistic in these modern times.

[**81**] Equal justice according to law may require, where the law permits, differential treatment of persons according to differences between them relevant to the scope, purpose and subject matter of the law. Fairness, justice and equality before the law and their reflections in a lack of differential treatment or discrimination without a reasonable relation to a proper objective must characterise the judicial process and its expected outcomes. Once the rationales for the purported *Chorley* exception are convincingly debunked, the only logical conclusion which remains is that the exception is grounded in privilege. In my judgment, there can be no doubt that the so-called *Chorley* exception would therefore be inconsistent with the equality of all persons before the law.

[**82**] The respondents in this appeal have urged judicial restraint on the basis of established judicial precedent. It is clear that whether the *Chorley* exception is part of Saint Lucian common law was not in question in *Husbands v Warefact*. That court simply assumed the correctness of the *Chorley* ratio without argument and without considering its rationale and whether it supported the derogation from the fundamental right to equality before the law.[41] I am therefore satisfied that that decision would not bind a later court to accept the wholesale application of the *Chorley* exception.[42]

[**83**] What then is the appropriate course to be adopted in the

---

40  See: para [61] above. In the United Kingdom Parliament resolved this problem by setting costs of a self-represented lay litigant as two thirds of the amount the taxing officer considered to be reasonable solicitor client costs.

41  *CSR Ltd v Eddy* (2005) 226 CLR 1 at 11 (para 13).

42  *R v Warner* (1661) 1 Keb 66 at 67, (1661) 83 ER 814 at 815; *National Enterprises Ltd v Racal Communications Ltd* [1974] 3 All ER 1010 at 1013, [1975] Ch 397 at 405–406; in *Re Hetherington, Gibbs v McDonnell* [1989] 2 All ER 129, [1990] Ch 1 at 10.

circumstances? The referenced case law discloses that there are obvious available alternatives. Counsel for the appellant submitted that the Court should simply decide that the *Chorley* exception is inconsistent with the Constitution and that the respondents are only entitled to such costs as a litigant in person would be entitled to a claim in the Virgin Islands. This proposal would not affect the position of in-house lawyers employed by governments or firms. Mr Welford however, submitted that any concerns would not impact Maples and Calder's entitlement to costs because it is clear that the firm would be entitled on the basis of the employed lawyer rule. In the event that the Court is minded to adopt a broader review, counsel cautioned the Court to consider the terms of s 31 of the Constitution which he contends sets out the scheme by which alleged contraventions of the protections afforded by the Constitution should follow. Counsel submitted that the Court should direct the joinder of interested parties such as the Attorney General and the Bar Association as it is apparent that any decision in this area would substantially impact the conduct of litigation by self-represented barristers and solicitors going forward. Finally, on behalf of Agon Litigation, Mr Fay submitted that if the court finds that there is inconsistency, then this would necessitate a finding that the Constitution effectively abolished *Chorley* from the date of its enactment.

[**84**] A careful review of relevant judicial authorities discloses that constitutional or fundamental rights concerns do not arise in the case where an employed barrister seeks to represent his employer law firm in legal proceedings. In the New Zealand case of *Henderson BC v Auckland Regional Authority*[43] this issue was deftly considered by Cooke J, who concluded that:[44]

> 'A fortiori an employed solicitor duly enrolled and with a current practising certificate may properly act as solicitor for his employer. Against that background it appears to me that the fact that an employed practitioner has acted for the successful party is not a sufficient reason for denying that party an award of party and party costs: after all, the time of a salaried employee has been occupied.'

In that case, the court determined that the successful party who had been represented by an employed solicitor was awarded costs in both the High Court and Court of Appeal.

[**85**] In the English case of *Malkinson v Trim*[45] the rationale was explained in the following terms:

> '[24] … A partner who is represented in legal proceedings by his firm incurs no liability to the firm; but he suffers loss for which under the indemnity principle he ought to be compensated, because the firm of which he is a member expends time and resources which would otherwise be devoted to other clients. The only sensible way in which effect can be given to the indemnity principle is by allowing those costs.

---

43   [1984] 1 NZLR 16 (CA).

44   Ibid *per* Cooke J, at 23.

45   [2002] EWCA Civ 1273, [2003] 2 All ER 356, [2003] 1 WLR 463 (at [24]).

And, as I have sought to explain, that is the solution which, for over one hundred years, the courts have adopted as a rule of practice.'

[**86**] It follows that where the litigant is a lawyer or a law firm but is represented by a lawyer whom they employ, the costs associated with the work of such an associate would be justified.[46] I accept the contention that to the extent that both Maples and Calder and Agon Litigation were represented before both the High Court and this Court by partners or associates of these firms, they would be entitled to the same costs as when acting on behalf of a client except for those items which did not exist by virtue of the fact they were acting for themselves.

[**87**] However, where the costs claimed are on account of the work of a barrister or solicitor who is not a salaried employee, then the position is somewhat more complicated given the findings herein. In considering these complications, I am satisfied that the answer may well lie in the present framework governing the award of costs in the Virgin Islands.

[**88**] There can be no doubt that costs are a creature of statute.[47] In the Virgin Islands, the principal regulating statute which deals with the issue of costs is the CPR. Costs are regulated under Pts 64 and 65 of the CPR. The statutory definition of 'costs' in r 64.2 includes 'legal practitioner's charges and disbursements, fixed costs, prescribed costs, budgeted costs and assessed costs'. The general rule is that where the rule relating to fixed costs does not apply and a party is entitled to costs of any proceedings, those costs must be determined in accordance with the prescribed scales set out in appendices A–C of Pt 65 or alternatively, in accordance with a budget approved by the court under r 65.8 (budgeted costs) and if neither prescribed nor budgeted costs are applicable, by assessment in accordance with procedures rr 65.11 and 65.12.

[**89**] This presents a complete departure from the previous costs regime which was solely based on complex and often arbitrary taxation. This regime was touted as being certain, easy to calculate and transparent; and in large measure, it achieved its aim. The basis for determining the measure of fixed or prescribed costs is the value of the claim. Rule 65.5(2) prescribes that the value of the claim is to be decided in the case of the claimant or defendant, by the amount agreed or ordered to be paid; or if the claim is for damages and the claim form does not specify an amount that is claimed, such sum as may be agreed between the party entitled to, and the party liable to, such costs or, if not agreed, a sum stipulated by the court as the value of the claim or if the claim is not for a monetary sum it is to be treated as a claim for $50,000, unless the court makes an order pursuant to an application to determine the value of the claim filed under r 65.6(1)(a).

[**90**] Parts 64 and 65 together with the appendices provide different scales of costs and for minimum and maximum units. This presents a substantial incursion into the so-called practical difficulties by the legislative framework which operates in the Eastern Caribbean Supreme Court as it essentially

---

46  *Brownie Wills v Shrimpton* [1999] Lloyd's Rep PN 39.

47  Per Pereira CJ in *Halliwel Assets Inc v Hornbeam Corporation* [2015] ECSCJ No 212 (delivered 12 October 2015).

dispenses with the need to measure the private expenditure, and reasonable time and labour of laymen. Where this form of quantification proves untenable and the court is obliged to assess costs, then I am satisfied that a judge or master properly exercising his discretion, can assess what these costs ought to be as is done where the litigant is represented by counsel. Certainly, there is precedent for this at an appellate level.[48]

[**91**] Of course, it is unclear whether the drafters of the CPR properly contemplated the implications for recovery of costs by unrepresented lay litigants. As it stands, the position is not sufficiently definitive and in my view there needs to be a more categorical legislative framework which comprehensively addresses this issue. Given that the source of power for awarding costs is statutory, there is a good argument that this would be the only appropriate course in the circumstances.

[**92**] In the Eastern Caribbean however, the common law has continued to evolve such that there now appears to be no reason to continue to maintain a common law distinction adumbrated in the *Chorley* line of authorities. In *Horsford v Bird*[49] the appellant, Mr Horsford, acted as a lay litigant in person in legal proceedings which included an appeal to the Privy Council. During his appeal, the Board was asked to determine the damages to be awarded after the defendant had built a wall which encroached on the appellant's land and appropriated some 455 square feet. Aggravated damages had been awarded. The Board was asked whether the damages should reflect the increase in value of the defendant's property rather than the strict value of the land itself. After advising Her Majesty that the appellant's appeal should be allowed, the Board made the following costs order:

> 'Costs in the lower courts will be the appellant's costs at the prescribed rate. The respondent must pay the costs of this appeal.'

[**93**] There is therefore an authority at the highest appellate level in which a lay litigant was awarded his costs incurred in legal proceedings before the Antiguan courts and up to the Privy Council. In a judgment written by Gordon JA, this Court put the matter beyond doubt, holding that whether or not a successful party uses a legal practitioner of reasonable competence, such party would be entitled to the same costs as if such a practitioner had been sued pursuant to r 65.2(1) of the CPR. Gordon JA [Ag] observed at para [11]:

> 'The appellant is a lay person. That is to say, he is a person who does not possess a practicing certificate as an attorney at law. Implicit in the Privy Council Order is an acknowledgment that notwithstanding the status of the appellant as a lay person he is entitled to prescribed costs. I have no doubt that their Lordships considered the language of Part 65.5 of CPR which speaks to "a party" being entitled to the costs of any proceedings and the language of Part 65.7 which states that prescribed

48  *Horsford v Bird* (17 November 2008, unreported) per Kimberly Cenac-Phulgence, Chief Registrar (as she then was).

49  [2006] UKPC 55, [2007] 2 Costs LR 245, [2006] All ER (D) 20 (Dec). This order was applied by the Court of Appeal in HCVAP 2008/005.

costs include "attendance and advocacy at the trial …" However, where a matter, such as the instant application being dealt with, is excluded from prescribed costs, then I am of the view that the applicable law in respect of costs is the pre-CPR law.'[50]

[**94**] No doubt the drafters will ultimately provide a clear rationale for how such costs are to be quantified but for now and for this appeal, I am satisfied that the modern approach is one which fully remedies the constitutional dilemma fostered by *Chorley* and its disparate treatment of self-represented lay litigants. It also effectively erases any lingering doubts which I may have had about the continued application of this exception in the Virgin Islands.

**CONCLUSION**

[**95**] Applying the findings herein, and given the ruling of this Court (rendered by Webster JA [Ag]) which disposed of the application and the appeal in favour of the respondents, I find that the respondents, who are law firms which were represented by counsel, who are employed barristers, are both entitled to their costs on the basis that costs follow the event.

[**96**] This however, is an appeal lodged in the commercial division and so the prescribed costs approach on appeal is disapplied notwithstanding r 65.13 of the CPR because r 69B.10 specifically disapplies the prescribed costs approach at first instance see: *Westford Special Situations Fund Ltd v Barfield Nominees Ltd*.[51] It follows that the relevant costs will have to be assessed. The basis of such quantification is not new. Since 2000, r 65.2(1) has prescribed that the sum to be allowed is the amount that a court deems to be reasonable where the work is to be carried out by a legal practitioner of reasonable competence and which appears to the court to be fair both to the person paying and the person receiving such costs.

[**97**] In conducting such an assessment, therefore, the manner of disposal in this matter must be borne in mind. While there may have been some limited effort expended in preparing for the substantive appeal in this matter, the fact is that this appeal was ultimately disposed of on the basis of an unsuccessful interlocutory application seeking an extension of time. While costs of the appeal may be recoverable it would be inappropriate for this to be assessed on the basis of the two-thirds rule given the risk for duplication and the fact that the substantive appeal was not heard.

[**98**] I would therefore order that the appellant pay the costs of the respondents, their costs of the application and such reasonable costs incurred in preparing for the hearing of this appeal to be assessed by a judge of the commercial court if not agreed within 30 days of the date of this order.

**PEREIRA CJ.**

I concur.

---

50  See footnote 49.

51  *Westford Special Situations Fund Ltd v Barfield Nominees Ltd* [2011] ECSCJ No 61 at para 42 et seq per George-Creque JA (as she then was).

**WEBSTER JA (Ag).**
I concur.

# Exhibit I



**Michaelmas Term**
[2021] UKPC 26
**Privy Council Appeal No 0017 of 2020**

# JUDGMENT

## Gordon (Appellant) *v* Havener (Respondent) (Antigua and Barbuda)

## From the Court of Appeal of the Eastern Caribbean Supreme Court (Antigua and Barbuda)

before

**Lord Lloyd-Jones**
**Lord Kitchin**
**Lord Burrows**
**Lord Stephens**
**Lady Rose**

**JUDGMENT GIVEN ON**
**4 October 2021**

**Heard on 8 July 2021**

*Appellant*
Tom Poole QC
Sara Ibrahim
(Instructed by Simons Muirhead Burton LLP (Newman Street))


*Respondent*
Dane Hamilton QC
(Instructed by Dane Hamilton & Associates)

**LORD BURROWS:**

**1.      The essential facts and an overview of the dispute**

1.      This appeal is concerned with three plots of land at Dian Bay, Antigua. Contracts for the sale of those plots of land were made between a sister and her brother. The sister, the seller, is Mrs Jacqueline Havener and she is the defendant and the respondent in this appeal. The brother, the purchaser, is Mr Gregory Gordon and he is the claimant and the appellant in this appeal. Following the death of their mother, Margaret Ruth McNutt (also known as Ruth Gordon Livingston), Mrs Havener became the sole owner of the three plots of land. Mrs Havener lives in the United States. Although of no direct relevance to the matters on this appeal, in November 2005 Mrs Havener gave Mr Gordon a power of attorney to act on her behalf in certain matters but she revoked that in September 2009.

2.      Mr Gordon alleges that, in breach of contract, Mrs Havener has failed to transfer the plots of land to him and that he should therefore be granted specific performance or damages for breach of contract. She alleges that he is in breach of contract by failing to pay the agreed purchase price under any of the three contracts. Mr Gordon further alleges that, if his claim for breach of contract fails, he should be awarded a remedy under the doctrine of proprietary estoppel as he has detrimentally relied on Mrs Havener's promise to transfer to him the legal title in the plots of land.

3.      The three plots of land are referred to as plot 117 (being part of parcel 59), plot 116 (being the other part of parcel 59) and plot 82B (being part of parcel 82). It is not in dispute that Mr Gordon already owns plot 83, which is next to plot 82, and already owns Gordon House, which is next to plot 117. It is also submitted on his behalf that, at the time of the contracts of sale, he was already the lessee of plots 116 and 117 under a 99-year lease granted by his mother and sister, dated 12 January 1979.

4.      The first contract of sale, dated 15 June 2001, was for plot 117 and the agreed contract price was US$1,000. The second contract of sale, dated 27 August 2007, was for plot 116 and the agreed contract price was US$10. The third contract of sale, also dated 27 August 2007, was for plot 82B and the agreed contract price was also US$10. All three contracts were written, signed and dated. In relation to all three contracts, the purchase price was to be paid on the signing of the contract; and "closing" (that is, completion) was defined as the settlement of the obligations of the seller to deliver to the purchaser a deed transferring ownership of the respective plot of land and the purchaser paying the purchase price to the seller.

5.      Mr Gordon alleges that he paid Mrs Havener the agreed price for all three contracts by the payment by a cheque in the sum of US$3,000 on or around 24 January 2006. Mrs Havener disputes that and alleges that that sum was paid to enable her to obtain legal services in relation to a dispute with a tenant, Charles Fernandez, which involved her issuing proceedings for eviction against Mr Fernandez in 2006.

6.      Mr Gordon also alleges that, in reliance on the title being transferred to him, he expended a total sum of EC$192,125 maintaining, repairing, and improving the three plots of land; and that he also paid the property taxes on those plots for the years 2008, 2009 and 2010.

## 2.      The decisions and reasoning of the lower courts

7.      At first instance, in the Eastern Caribbean Supreme Court (Antigua and Barbuda), Cottle J, in a judgment dated 6 August 2015, dismissed Mr Gordon's claims. His central reasoning was as follows:

(i)      The contracts for the sale of the plots of land were not valid and enforceable for two reasons. First, there was no intention to create legal relations. These were family arrangements. Secondly, there was an "absence of consideration" (para 17 of Cottle J's judgment) because the agreed purchase price was not paid. The payment of US$3,000 in 2006 was not related to the contract made five years earlier in 2001. Nor was it intended to be the consideration for the two contracts made one year later.

(ii)      Mrs Havener did not request or encourage Mr Gordon to expend money in relation to the plots of land so that there was no basis for an equitable estoppel. In any event, he claimed to have a long lease of plots 116 and 117, and he could not therefore "be relying on a promise by the defendant to give him lands which he effectively owns" (para 19 of the judgment). The requirements for the doctrine of equitable estoppel were therefore not made out.

8.      Mr Gordon appealed to the Court of Appeal of the Eastern Caribbean Supreme Court (Antigua and Barbuda). While critical of some aspects of the trial judge's reasoning, the Court of Appeal dismissed Mr Gordon's appeal for the following main reasons:

(i)      The trial judge had been incorrect in deciding - and his conclusion on this was irrational - that there was no intention to create legal relations. Even if one started from the presumption that there was no intention to create legal relations, because these were agreements made in a family context, that presumption was comfortably rebutted. This was because, for example, the agreements had been reduced to formal written and signed contracts with consideration payable.

(ii)      The trial judge was clearly entitled to find that the payment of US$3,000 was not the payment of the consideration for the three contracts of sale. The amount paid did not match the amount owing and the time when the US$3,000 was paid did not align with the date of the contracts. In the words of Gonsalves JA, at para 35, in giving the leading judgment in the Court of Appeal, with which Baptiste JA and Blenman JA agreed:

> "Bearing in mind the timelines specified for payment of the consideration in each of the contracts, the dates when the $3,000 was paid, the amount paid, and the circumstances of payment, the judge was, on the evidence, clearly entitled to reject the evidence of the appellant that the $3,000 was effective to provide the consideration for the contracts."

However, the fact that the US$3,000 was not the payment of the consideration did not mean that the contracts were invalid for "absence of consideration". The non-payment meant that there was a defect in Mr Gordon's performance not that there was a defect in the formation of the contract.

(iii)      It was not now open to Mr Gordon to argue that he was ready, able and willing to pay the contract price. That was not how his case had been pleaded and it would be manifestly unfair to the defendant for that new argument to be considered. In any event, having incorrectly alleged that he had already paid the contract price, Mr Gordon would not be coming to the court with clean hands. For these reasons, the trial judge had been correct not to grant specific performance.

(iv)      Turning to proprietary estoppel, the various promises and representations alleged were inextricably bound up with the promise or representation made in the contracts of sale in 2001 and 2007. As there were valid contracts between the parties, one could not found a separate proprietary

estoppel argument on those valid contracts. Rather, Mr Gordon's remedy lay in contract only. As Gonsalves JA said, at para 41:

> "[W]hat the appellant describes as representations … are inextricably tied up with the promise said to emanate from the contracts. The difficulty that this causes is that, this Court having found that the promises contained in the contracts were enforceable, the matter then lay in contract and not in proprietary estoppel."

Having cited two cases, one from Australia and another from New Zealand, and some academic writing in support of the proposition that the law of contract, not proprietary estoppel, applied, Gonsalves JA continued at para 43:

> "[I]f the matter lies in contract, no proprietary estoppel can be established, at least when the promise or assurance being relied upon arises exclusively out of the contract. Having determined that a valid contract existed between the parties, as between contract and proprietary estoppel, it is to the contract that the appellant must look for his remedy."

## 3.    The appeal to the Board

9.    Mr Gordon has now appealed to the Judicial Committee of the Privy Council. Tom Poole QC, counsel for Mr Gordon, with considerable skill, submitted that, because of legal errors by the Court of Appeal, following the errors exposed in the trial judge's reasoning by the Court of Appeal, Mr Gordon has not had his claims properly considered. He therefore invited the Board to remit the matter to the High Court for Mr Gordon's case to be reheard both on his contractual claims and, in the alternative, on his claim for proprietary estoppel.

10.    More specifically, Mr Poole submitted that, as regards the non-payment of consideration, the Court of Appeal had erred in regarding the contractual term as a condition and in treating the non-payment as being fatal to the contractual claim. The consideration for each of the three contracts should have been looked at separately. Moreover, the trial judge had been influenced in his approach to consideration by his erroneous approach to the intention to create legal relations. In addition, not all the relevant evidence had been taken into account by the lower courts in deciding that the US$3,000 payment was not the payment of consideration for the three contracts. It

followed that specific performance was an appropriate remedy and, in any event, neither of the lower courts had gone on to consider the alternative remedy of damages for breach of contract.

11.     Turning to proprietary estoppel, Mr Poole submitted that this had not been properly considered by the lower courts. The trial judge had erroneously thought that there could be no proprietary estoppel in relation to plots 116 and 117 because Mr Gordon was already a lessee of those plots. And the Court of Appeal had incorrectly thought that one could not properly separate out the representations made outside the contract from those made within the contract. But the interest that Mr Gordon was claiming, under proprietary estoppel, was an interest in the real property and was distinct from a contractual interest.

12.     Despite Mr Poole doing all that he possibly could have done, it is clear that the Board's advice to Her Majesty must be that this appeal should be dismissed. The Board considered it unnecessary to call on Dane Hamilton QC, counsel for Mrs Havener.

### 4.     The reasons why the appeal should be dismissed

13.     There are three reasons why this appeal should be dismissed. The first is that, for the reasons set out by the Court of Appeal (see para 8(ii) above), the trial judge was clearly entitled to find, on the evidence, that the payment of US$3,000 was not the payment of the consideration for the three contracts of sale. The consideration moving from Mr Gordon under the contracts was the promise to pay, respectively, US$1,000, US$10 and US$10. The sum of US$3,000 did not match those agreed purchase prices. No explanation was given by Mr Gordon as to why he had paid an excess sum. That sum of US$3,000 was paid almost five years after the making of the first contract of sale and over 18 months before the making of the second and third contract of sale. No explanation was given as to why the dates did not align. The explanation for the payment given by Mrs Havener - that the US$3,000 was paid to enable her to obtain legal services in relation to the litigation involving Mr Fernandez - is far more convincing. In any event, it is the well-known practice of the Board not to go behind the concurrent findings of fact of two lower courts: see, eg, *Dass v Marchand* [2021] UKPC 2; [2021] 1 WLR 1788.

14.     Secondly, and in the light of that first reason, the correct legal analysis is as follows. Mr Gordon failed to pay any part of the agreed purchase price under any of the three contracts. Even if one viewed the payment terms as innominate terms (sometimes referred to as intermediate terms), as Mr Poole submitted, rather than as conditions, the consequences of the breach were such as to "deprive the party not in

default [Mrs Havener] of substantially the whole benefit" of the contract in question (to use the famous words of Diplock LJ in *Hongkong Fir Shipping Co Ltd v Kawasaki Kisen Kaisha Ltd* [1962] 2 QB 26, 70) so that Mrs Havener was entitled to terminate the contracts for breach. She has exercised her right to terminate the contracts by making clear to Mr Gordon - not least by defending Mr Gordon's claims in this litigation - that she is treating the contracts as being at an end. As the contracts have been terminated for Mr Gordon's breach, he is not entitled to an order of specific performance and, as there has been no breach by Mrs Havener, he is also not entitled to damages for breach of contract.

15.     Thirdly, the Court of Appeal was entitled to decide and, in the Board's view, was correct to decide, that, having considered the pleadings and submissions, the only clear alleged representations or promises as regards the three plots of land were contained in the contracts of sale or, at least, were inextricably tied up with the contractual promises. To understand the legal consequence of this, it is helpful to clarify that, in essence, in this context, proprietary estoppel applies where a person makes a promise to confer rights in relation to its land, which is then detrimentally relied on by the promisee such that it would be unconscionable for the promisor to go back on its promise: see, eg, *Crabb v Arun District Council* [1976] Ch 179; *Cobbe v Yeoman's Row Management Ltd* [2008] UKHL 55; [2008] 1 WLR 1752; *Thorner v Major* [2009] UKHL 18; [2009] 1 WLR 776; *Chitty on Contracts*, 33rd ed (2018), paras 4-139 to 4-185. While it appears that proprietary estoppel can sometimes be invoked where a contract is void (see the discussion in *Chitty on Contracts*, 33rd ed (2018), paras 5-044 to 5-048 in relation to contracts for the sale of land that do not comply with formal requirements), proprietary estoppel cannot, as a matter of principle, be invoked by a contract-breaker where the relevant promise is contained in the contract, or is inextricably tied up with the contractual promise, and that contract has been terminated for breach by the innocent party. Two explanations may be given as to why that is the principled position. The first is that it would be inconsistent with the contractual agreement for a contract-breaker to be able to enforce the contractual promise by proprietary estoppel when he or she would be unable to enforce the contract directly because it has been terminated for the breach. The second is that proprietary estoppel is concerned to prevent unconscionable behaviour by the promisor and it would not be unconscionable for a promisor to deny proprietary estoppel where the promisee has committed a breach of contract entitling the promisor to terminate the contract and the promisor has done so.

16.     Although not necessary for this decision, and neither the trial judge nor the Court of Appeal directly addressed this point, the Board is also of the view that the alleged expenses incurred by Mr Gordon have not been sufficiently clarified to constitute relevant detrimental reliance for the purposes of proprietary estoppel. Although the Board has seen the break-down of those costs, there is no indication of

the date when those costs were incurred (they are simply listed as expenses incurred for all three plots of land between 2001 and 2010) and not all the expenses are separately allocated to separate plots of land. Moreover, some of the alleged expenses are specified as being incurred in relation to plots 116 and 117 and yet it is not clear how far they might have been incurred in Mr Gordon's alleged capacity as a lessee.

**5.    Conclusion**

17.    For all these reasons, the Board will humbly advise Her Majesty that the appeal should be dismissed.

# Exhibit J

# ABBOTT v ABBOTT
## [2007] UKPC 53 (26 July 2007)

Privy Council

Lord Bingham of Cornhill, Lord Walker of Gestingthorpe,
Baroness Hale of Richmond, Lord Carswell
and Lord Neuberger of Abbotsbury

26 July 2007

*Property – Constructive trust – Married couple – No direct contributions to
purchase price – Course of conduct – Inferences – Financial assistance to
newly married couple – Finances organised jointly*

About a year after the marriage between the Canadian wife and the Antiguan husband
the husband's mother transferred a plot of land in Antigua into the husband's name.
The couple moved between Canada and Antigua for some years, during which time
their two children were born. After a final return to Antigua the couple built a
matrimonial home on the gift of land, financed partly by a loan that later became a
mortgage, and partly by gifts from the husband's mother. The husband was the legal
owner, but the wife was jointly and severally liable for repayment of the
loan/mortgage; insurance polices on both lives secured the loan. The husband's income
went into a joint account from which all expenditure was paid, including the purchase
of furniture and the payment of mortgage instalments and insurance premiums; for the
short period during which the wife worked outside the home, her income also went
into the joint account. The husband moved out of the matrimonial home, and after a
brief attempt at reconciliation, divorce proceedings began. Under the law of Antigua
property disputes between married couples had to be resolved according to the
ordinary law; the wife claimed half the property, half the value of the furniture, and
half the value of certain shares held by the husband. In the High Court the judge
concluded that the house, the furniture and the shares were beneficially owned by the
husband and wife equally. The Eastern Caribbean Court of Appeal allowed the
husband's appeal; the wife appealed to the Judicial Committee of the Privy Council.

**Held** – allowing the wife's appeal in relation to the property and the furniture, which
the husband held on trust for both husband and wife in equal shares, dismissing the
wife's appeal in relation to the shares –

(1)   The inferences to be drawn from the conduct of husband and wife might be
different from those to be drawn from the conduct of parties to more commercial
transactions. The law had moved on since the dictum of Lord Bridge of Harwich in
*Lloyd's Bank plc v Rossett* [1991] 1 AC 107 to the effect that it was doubtful that a
constructive trust could be established without direct contributions to the purchase
price. The constructive trust was generally the more appropriate tool of analysis in
most matrimonial cases and, as noted in *Stack v Dowden* [2007] UKHL 17, the search
in constructive trust cases was to ascertain the parties' shared intentions as to
ownership of the property in the light of their whole course of conduct in relation to
the property (see paras [2]–[4], [6], [19]).

(2)   If a parent gave financial assistance to a newly married couple to acquire their
matrimonial home, the usual inference in England was that it was intended as a gift to
both of them. While it might be doubted whether such an inference could so readily be
drawn in countries other than England, in this case a Caribbean judge had at first
instance drawn the same inference, and it was not for the committee to say that it was
an inference the final judge was not entitled to draw (see para [17]).

(3)   Furthermore this inference was supported by the behaviour of both parties
during the marriage; the couple had organised their finances entirely jointly and had
been jointly liable for repayment of the mortgage (see para [18]).

(4)   The sale of the land in return for shares was an ordinary commercial transaction and the wife's counsel had conceded before the Court of Appeal that the shares belonged to the husband. Although the dividends were paid into a joint account, this did not provide evidence that the husband had constituted himself a trustee of the shares.

(5)   While the trial judge was correct in inferring the furniture was jointly owned, he had wrongly ordered an adjustment based on their value at time of purchase. This was unrealistic; none of it was alleged to be of particular value and was likely to have decreased in value. The wife was entitled to something to compensate her for what she had lost, but in the absence of better evidence it should not be more than 20% of the costs of acquisition.

**Cases referred to in judgment**

*Drake v Whipp* [1996] 1 FLR 826, CA
*Gissing v Gissing* [1971] AC 886, [1970] 3 WLR 255, (1970) FLR Rep 269, [1970] 2 All ER 780, HL
*Hyett v Stanley* [2003] EWCA Civ 942, [2004] 1 FLR 394, CA
*Lloyds Bank plc v Rosset and Another* [1991] 1 AC 107, [1990] 2 WLR 867, [1990] 2 FLR 155, [1990] 1 All ER 1111, HL
*McHardy and Sons (A Firm) v Warren and Another* [1994] 2 FLR 338, CA
*Midland Bank plc v Cooke and Another* [1995] 2 FLR 915, [1995] 4 All ER 562, CA
*Oxley v Hiscock* [2004] EWCA Civ 546, [2005] Fam 211, [2004] 3 WLR 715, [2004] 2 FLR 669, [2004] All ER (D) 48 (May), CA
*Pettitt v Pettitt* [1970] AC 777, [1969] 2 WLR 966, (1969) FLR Rep 555, [1969] 2 All ER 385, HL
*Stack v Dowden* [2007] UKHL 17, [2007] 2 WLR 831, [2007] 1 FLR 1858, [2007] BPIR 913, [2007] 2 All ER 929, HL

*Nicola Martin* for the appellant
*Gerald A Watt QC* (Antigua) for the respondent

*Cur adv vult*

**BARONESS HALE OF RICHMOND:**

**[1]**     These are proceedings between a divorced husband and wife about the beneficial ownership of their former matrimonial home, its furniture and some shares (an earlier dispute about a bank account has now been resolved). In the High Court, Mitchell J declared that both the house and the shares were beneficially owned by the parties in equal shares. He ordered that the house be sold and the proceeds divided equally, with an adjustment to reflect the wife's joint ownership of the furniture. The Eastern Caribbean Court of Appeal allowed the husband's appeal. The wife now appeals to the Board.

*The matrimonial home: the law*

**[2]**     Unlike some other Caribbean countries, Antigua and Barbuda have no equivalent of the wide powers of property adjustment enjoyed by divorce courts in the UK. Property disputes have therefore to be resolved according to the ordinary law. Nevertheless, the inferences to be drawn from the conduct of husband and wife may be different from those to be drawn from the conduct of parties to more commercial transactions. The modern law has been developed in four decisions of the House of Lords, *Pettitt v Pettitt* [1970] AC 777, [1969] 2 WLR 966, (1969) FLR Rep 555, *Gissing v Gissing* [1971] AC 886, [1970] 3 WLR 255, (1970) FLR Rep 269, *Lloyds Bank plc v Rosset and*

*Another* [1991] 1 AC 107, [1990] 2 WLR 867, [1990] 2 FLR 155, and most recently *Stack v Dowden* [2007] UKHL 17, [2007] 2 WLR 831, (1969) FLR Rep 555, largely approving an important decision of the Court of Appeal in *Oxley v Hiscock* [2004] EWCA Civ 546, [2005] Fam 211, [2004] 2 FLR 669.

**[3]**     Not surprisingly, both courts in this case based their reasoning on a famous passage from the speech of Lord Bridge of Harwich in *Rosset*'s case at 132–3, 877 and 163 respectively:

> 'The first and fundamental question which must always be resolved is whether, independently of any inference to be drawn from the conduct of the parties in the course of sharing the house as their home and managing their joint affairs, there has at any time prior to acquisition, or exceptionally at some later date, been any agreement, arrangement or understanding reached between them that the property is to be shared beneficially ….
>
>   In sharp contrast with this situation is the very different one where there is no evidence to support a finding of an agreement or arrangement to share, however reasonable it might have been for the parties to reach such an arrangement if they had applied their minds to the question, and where the court must rely entirely on the conduct of the parties both as the basis from which to infer a common intention to share the property beneficially and as the conduct relied on to give rise to a constructive trust. In this situation direct contributions to the purchase price by the partner who is not the legal owner, whether initially or by payment of mortgage instalments, will readily justify the inference necessary to the creation of a constructive trust. But, as I read the authorities, it is at least extremely doubtful whether anything less will do.'

Gordon JA in the Court of Appeal emphasised the last sentence. But in this respect the law has undoubtedly moved on, as we shall see.

**[4]**     There are, of course, two separate questions: first, was it intended that the parties should share the beneficial interest in a property conveyed to one of them only; and second, if it was so intended, in what proportions was it intended that they share the beneficial interest? There are two separate concepts which may help in answering those questions, explained by Peter Gibson LJ in *Drake v Whipp* [1996] 1 FLR 826 at 827:

> 'A potent source of confusion, to my mind, has been suggestions that it matters not whether the terminology used is that of the constructive trust, to which the intention, actual or imputed, of the parties is crucial, or that of the resulting trust which operates as a presumed intention of the contributing party in the absence of rebutting evidence of actual intention.'

It is now clear that the constructive trust is generally the more appropriate tool of analysis in most matrimonial cases. As Lord Walker of Gestingthorpe explained in *Stack v Dowden* at [31]:

'In a case about beneficial ownership of a matrimonial or quasi-matrimonial home (whether registered in the name of one or two legal owners) the resulting trust should not in my opinion operate as a legal presumption, although it may (in an updated form which takes account of all significant contributions, direct or indirect, in cash or in kind) happen to be reflected in the parties' common intention.'

**[5]**     Lord Walker also commented upon the passages from the speech of Lord Bridge of Harwich in *Lloyd's Bank plc v Rosset* quoted in para [3] above. Lord Walker pointed out, at para [25], that although Lord Bridge had drawn a sharp contrast between cases in which there had been some prior agreement to share and those where there had not, he and all the other members of the House were 'unanimously, if unostentatiously, agreeing that a 'common intention' trust could be inferred even when there was no evidence of an actual agreement'. Lord Walker of Gestingthorpe went on to comment, in para [26]:

'Lord Bridge's extreme doubt "whether anything less will do" was certainly consistent with many first-instance and Court of Appeal decisions, but I respectfully doubt whether it took full account of the views (conflicting though they were) expressed in *Gissing v Gissing* … see especially Lord Reid [1971] AC 886 at pp 896G–897B and Lord Diplock at p 909D-H). It has attracted some trenchant criticism from scholars as potentially productive of injustice (see *Gray & Gray*, *Elements of Land Law*, 4 ed [(2005)], paras 10.132 to 10.137, the last paragraph being headed "A More Optimistic Future"). Whether or not Lord Bridge's observation was justified in 1990, in my opinion the law has moved on, and your Lordships should move it a little more in the same direction …'

**[6]**     Lord Walker of Gestingthorpe, Lord Hoffmann and Lord Hope of Craighead all agreed with my own opinion, in which I summed the matter up thus at para [60]:

'The law has indeed moved on in response to changing social and economic conditions. The search is to ascertain the parties' shared intentions, actual, inferred or imputed, with respect to the property in the light of their whole course of conduct in relation to it.'

The House also approved a passage from the Law Commission's discussion paper on *Sharing Homes* (2002, Law Com No 278, para 4.27):

'If the question really is one of the parties' "common intention", we believe that there is much to be said for adopting what has been called a "holistic approach" to quantification, undertaking a survey of the whole course of dealing between the parties and taking account of all conduct which throws light on the question what shares were intended.'

*The matrimonial home: the facts*

**[7]**     The wife is Canadian and the husband Antiguan. They were married on 21 May 1983 in Nova Scotia while the husband was studying medicine there. In June 1984, the husband's mother transferred a plot of land at Paradise View in Antigua into the husband's name. On the wife's case this was so that they could in due course build their matrimonial home there. Husband and wife returned to Antigua in July 1984 and the husband set up in medical practice. The wife worked in the surgery for him for a while and also worked in a travel agency. In March 1986, their first child, Danielle, was born and the wife did not work outside the home again until 1995. In June 1986, the couple returned to Canada for the husband to pursue postgraduate studies. Their second child, Shannon, was born in December 1987. The family returned to Antigua in July 1990.

**[8]**     During 1990 and 1991 their matrimonial home was built on the land which had been given by the husband's mother in 1984. The construction was financed partly by a bridging loan, which was later replaced by a mortgage, and partly by gifts from the husband's mother. The mother contributed cash totalling some EC$400,000 but it is unclear how this was paid. The wife's case was that some was paid into the couple's joint bank account and some was paid direct to the tradesmen. The bridging loan of EC$250,000 was made by the Bank of Nova Scotia in November 1990. This too was paid into their joint account. In August 1991, it was replaced by a loan of the same amount, secured by a mortgage, from the Barbados Mutual Life Assurance Society. The husband, as legal owner, executed the charge over the property. But the wife also made herself jointly and severally liable for the repayment of the principal and interest on the loan. The loan was also secured by insurance policies on each of their lives, for EC$150,000 on the husband's life and for EC$100,000 on the wife's. The husband also took out a mortgage protection policy. The husband first stated in evidence that 'apart from the insurance I do not recall the claimant being involved in the loan in any other way' but had then to accept that 'she is a party to the charge. I do not know why'. He later claimed that 'today is the first that I heard that she was asking for 50%' although he had signed the defence to the statement of claim in which she had claimed an equal share. He then stated 'she has a share in the house, but I do not know what her share is. It should be linked to the $100,000 policy'.

**[9]**     All the couple's income went into a joint bank account from which the mortgage instalments and insurance premiums were paid. The wife began working outside the home again in 1995, when she went to work at the local branch of Kentucky Fried Chicken (KFC) where she still works. At first she paid her salary into the joint account but she stopped doing so when the husband moved out of the matrimonial home in January 1996. In November 1996 they signed a formal agreement for maintenance and visitation rights. Under this the husband was to pay a monthly sum to the wife and also the children's school fees, medical and dental bills. The wife was to be responsible for paying the mortgage, insurance and property tax on the matrimonial home. Repair costs were to be split between them.

**[10]**   The couple resumed cohabitation in September 1997 but the reconciliation did not last. Divorce proceedings were begun in 1999 and in July 2000, the wife and children left the matrimonial home. The divorce was granted in May 2001 and in April 2002 these proceedings were begun.

**[11]**    The husband's mother died in 1995, when the marriage was already in some difficulty. She was not therefore available to give evidence as to her intentions. The wife's case was that she had always had a good relationship with her mother-in-law, whom she had first met in 1981, and this grew even stronger when the couple were having marital difficulties. It was her understanding, gained from what her husband had told her that the plot had been given and the construction costs paid as a gift to them both. The plot had not been conveyed to them both because she was not then an Antiguan citizen and would have had to get a licence. This was not, however, discussed at the time. The husband's case was that they were a gift to him alone. But he also accepted that in happier times he had considered that whatever financial arrangements were for the benefit of the entire family, including the wife, and that 'it all belonged to my wife, myself and my two children'.

*The matrimonial home: applying the law to the facts*

**[12]**    The trial judge gave two main reasons for concluding that the parties had an equal beneficial interest in the matrimonial home. First he found 'no reason to believe that [the husband's mother] wanted to make a gift of the land to her son alone. On the contrary, there is every reason to believe that she intended the land to be a gift to both parties for the purpose of building their matrimonial home in the early days of their marriage when they could hardly afford to build the home themselves'.

**[13]**    Second were the circumstances surrounding the loan from Barbados Mutual. Both their life insurance polices were put up to secure the loan. Both became liable for its repayment. 'This is the clearest evidence of detrimental action or alteration of position on her part. If in truth she had no interest, Dr Abbott could have refused to have her join in both the loan and the security. Barbados Mutual could as easily have required her to execute the usual certificate or release that a lender requires of a spouse when a matrimonial home is being given as security only by the spouse with title'.

**[14]**    The judge also gave some weight to the fact that all the couple's income went into a joint bank account from which their furniture was bought and the loan payments made. 'All this combines to convince me that the parties from the time of the acquisition of the property and at all times prior to the breakup of the marriage had the understanding that Mrs Abbott had an equal joint beneficial interest in the home'.

**[15]**    In the Court of Appeal, Gordon JA took the view that there was 'absolutely no factual basis' for the inference that the land was a gift to them both. Relying on the second part of the passage cited in para [3] above from *Lloyd's Bank plc v Rosset*, therefore, he took the view that the wife could only acquire an interest by way of direct contributions to the mortgage payments. Counsel for the husband had generously agreed that it should be assumed that the whole of the wife's salary after she went back to work in 1995 should be attributed to the mortgage. This, he calculated, would give her 8.31% share in the equity. Gordon JA therefore seems to have disregarded altogether the wife's joint and several liability to repay the loan and the additional security given by her life assurance policy.

**[16]**    It is fair to say that there are passages in the judge's notes of evidence which can be taken either way. They might indicate the sort of unspoken assumptions upon which happily married couples organise their lives or they

might indicate something more concrete about their shared intentions as to ownership. Little would be gained by reciting them. The trial judge had the great benefit of seeing and hearing both parties give evidence. It is clear that he found the husband's evidence unsatisfactory in some respects, although he was not specific. It is easy to understand why, as the husband claimed to have no knowledge of matters which clearly ought to have been within his knowledge if his case were correct.

**[17]**    It has been said more than once in the English courts that if a parent gives financial assistance to a newly married couple to acquire their matrimonial home, the usual inference is that it was intended as a gift to both of them rather than to one alone: see *McHardy and Sons (A Firm) v Warren and Another* [1994] 2 FLR 338, at 340; *Midland Bank plc v Cooke and Another* [1995] 2 FLR 915, [1995] 4 All ER 562, at 920 and 570 respectively. It might be doubted whether such an inference could so readily be drawn in other countries where the culture may be different. But this was a Caribbean judge, albeit from a different small Caribbean island, and it is certainly not for us to say that it was an inference which he was not entitled to draw.

**[18]**    Furthermore, it was supported by the behaviour of both parties throughout the marriage until it broke down. Not only did they organise their finances entirely jointly, having only a joint bank account into which everything was paid and from which everything was paid. They also undertook joint liability for the repayment of the mortgage loan and interest. This has always been regarded as a significant factor: see *Hyett v Stanley* [2003] EWCA Civ 942, [2004] 1 FLR 394. Yet the Court of Appeal appear to have attached no weight to it at all.

**[19]**    Finally, it must be borne in mind that the husband accepted in the course of his evidence that the wife did have a beneficial interest in the home, although he disputed the amount. The Court of Appeal appears to have attached undue significance to the dictum of Lord Bridge of Harwich in *Lloyd's Bank plc v Rosset*, in particular as to what conduct is to be taken into account in quantifying an acknowledged beneficial interest. The law has indeed moved on since then. The parties' whole course of conduct in relation to the property must be taken into account in determining their shared intentions as to its ownership.

**[20]**    For all those reasons, the Board is of the view that the Court of Appeal should not have interfered with the findings of the learned trial judge on the beneficial ownership of the matrimonial home.

*The shares*

**[21]**    In 1985 the husband's aunt also gave him a parcel of land. The wife has never suggested that this was a gift to them both. But in 1991 the land was sold to the local Kentucky Fried Chicken (KFC) franchise for them to build a branch. On sale the husband received 10,000 shares in the company. The shareholders arranged for their dividends to be paid offshore. To that end a joint bank account was opened in the Cayman Islands in the names of both husband and wife into which the dividends were paid until the parties separated. Unusually, drawings from that account required the signature of both husband and wife.

**[22]**    The judge declared that the wife was entitled to one half of the funds in the Cayman Islands bank account. The husband has not appealed against

that finding. However, the judge also found that the husband held the shares themselves in trust for husband and wife in equal shares. The wife claimed that the husband intended that the shares should belong to them both. The husband denied any such intention.

**[23]**    The Court of Appeal recorded that the wife's counsel had conceded that the shares belonged to the husband exclusively. However, Gordon JA went on to observe that at no point did the judge find any evidence that the wife had acted to her detriment on the basis that the shares were hers. There was nothing to indicate that the husband had made himself constructive trustee of one half of the shares.

**[24]**    The wife should not now be allowed to resile from the concession made on her behalf in the Court of Appeal. In any event it was almost certainly properly made. The sale of the land was a perfectly ordinary commercial transaction. There was no participation by the wife as there was in the construction of the house. There was no express declaration of trust by the husband. Putting the dividends into an account in joint names cannot be construed as such. Agreeing to the husband's withdrawals from the Cayman Islands bank account cannot be construed as acting to her detriment in reliance on the belief that the shares, as opposed to the bank account, were hers. If the husband did indeed intend that the shares should belong to them both, this was an imperfect gift.

*The furniture*

**[25]**    The judge also decided that the furniture bought for the matrimonial home was owned in equal shares. The wife had not had the benefit of it since she left. Hence he ordered that she be given credit for half its value when the house was sold in accordance with his order. The Court of Appeal set aside his order for sale, ordering instead that the husband pay the wife the sum of EC$65,192 to represent her beneficial interest in the home. It must therefore have concluded that she had no interest in the furniture or that such interest as she had was worthless.

**[26]**    The judge's reasoning was that the furniture was bought out of the joint bank account for the benefit of the family as a whole, although the husband had contributed almost all the money to that account. But the husband appears to have accepted that the furniture belonged to them both. Furniture in the matrimonial home is very different from shares, which can readily be transferred into joint names. There is no simple means of delivering domestic furniture from one occupant to another. Buying it out of a joint account and causing it to be delivered to the family home for their joint use and benefit is the most that can usually be expected.

**[27]**    However, the judge proceeded to order an adjustment based upon the wife's estimate of the costs of purchase in 1991. This is unrealistic. It is not suggested that any of the furniture was valuable antiques or art work which might be expected to increase rather than decrease in value. Twelve years later much of it will have been of little value. Some had been disposed of and the wife had declined to take any of it with her. The wife is entitled to something to compensate her for what she has lost, but in the absence of better evidence it should not be more than 20% of the costs of acquisition.

*Conclusion*

**[28]**    The Board will therefore humbly advise Her Majesty that the appeal should be allowed in respect of the house and the furniture. There should be a declaration that the husband holds the house in trust for them both in equal shares. There should also be an order that the house be sold and the proceeds divided equally, subject to an adjustment in favour of the wife for 20% of the costs of acquiring the furniture. The wife's appeal in relation to the KFC shares should be dismissed. The parties are invited to make written submissions on costs within 21 days. Each has enjoyed a measure of success before the Board but in rather different proportions from the success enjoyed in the Court of Appeal.

Solicitors:   *Simons Muirhead & Burton* for the appellant
              *Myers*, *Fletcher & Gordon* for the respondent

PHILIPPA JOHNSON
*Law Reporter*

# Exhibit K

# Creque v Penn

*b*

[2007] UKPC 44

JUDICIAL COMMITTEE OF THE PRIVY COUNCIL

LORD BINGHAM OF CORNHILL, LORD RODGER OF EARLSFERRY, LORD WALKER
OF GESTINGTHORPE, LORD CARSWELL and LORD MANCE

*c*

9 MAY, 27 JUNE 2007

*Registered land – Disposition of land – Transfer in prescribed form –*     *d*
*Acknowledgement of receipt – Insufficiency of amount paid by way of consideration*
*– Right of seller to pursue payment of full consideration – Right in equity to pursue*
*personal action against original purchaser – Land Registration Act [British Virgin*
*Islands], s 106 – Eastern Caribbean Supreme Court (Virgin Islands) Act [British*
*Virgin Islands], s 14*
     *e*

The seller transferred certain parcels of land to the purchaser using the
transfer form prescribed by the Land Registration Act, which
incorporated a statement of the purchase price (totalling $100,000) and an     *f*
acknowledgement of the receipt of that sum (see s 106 of the Act).
Subsequently, the seller claimed that the purchaser had not in fact paid the
full price. At trial, the judge reviewed the evidence and ordered the
purchaser to pay $85,200 to the seller. The Court of Appeal, however,
allowed an appeal by the purchaser, ruling that the court could not look
behind the instruments of transfer. On further appeal,     *g*

**Held**, advising that the appeal be allowed, although s 106 provided that a
disposition of land by an instrument in prescribed form must contain a
statement of the amount of the purchase price and an acknowledgement
of receipt, the seller was entitled in equity (as between the original parties     *h*
to the transaction) to adduce evidence to contradict the
acknowledgement of receipt and to pursue the purchaser for any
outstanding part of the purchase price in a personal action (which would
not engage the concept of the indefeasibility of title inherent in the
Torrens system) as there was no provision in the Land Registration Act     *j*
ousting this well-settled rule of equity (see also the Eastern Caribbean
Supreme Court (Virgin Islands) Act, s 14).

*a*   Dictum of Sir John Romilly MR at p 126 in *Wilson v Keating* (1859) 27 Beav 121, and dictum of Lord Wilberforce at pp 584, 585 in *Frazer v Walker* [1967] 1 AC 569 applied.

*b*   *Frazer v Walker* [1967] 1 AC 569 considered.

**Cases referred to in the advice of the Board**

*Bickerton v Walker* (1885) 31 Ch D 151, 55 LJ Ch 227, 53 LT 731, England CA.

*c*   *Breskvar v Wall* (1971) 126 CLR 376, Australia High Court.

*British Caribbean Insurance Co Ltd v Perrier* (1996) 52 WIR 342, Jamaica CA.

*British Railways Board v Pickin* [1974] AC 765, [1974] 1 All ER 609, [1974] 2 WLR 208, HL.

*d*   *Frazer v Walker* [1967] 1 AC 569, [1967] 1 All ER 649, [1967] 2 WLR 411, PC.

*International Railway Co v Niagara Parks Commission* [1941] AC 328, PC.

*National Assistance Board v Wilkinson* [1952] 2 QB 648, [1952] 2 All ER 255, England Divisional Court.

*e*   *Oh Hiam v Tham Kong* (1980) 2 BPR 9451, PC.

*R v Secretary of State for the Home Department, ex parte Pierson* [1998] AC 539, [1997] 3 All ER 577, [1977] 3 WLR 492, HL.

*Wilson v Keating* (1859) 27 Beav 121, 28 LJ Ch 895, 33 LTOS 325, 54 ER 47, Sir John Romilly MR; affirmed, (1859) 4 De G & J 588, 7 WR 635, 45 ER 228, Lord Campbell LC and lords justices.

*f*

**Appeal**

Nathalie Creque, as administratrix of her late husband's estate, appealed to the Judicial Committee of the Privy Council (appeal 36 of 2005) against *g*   the order of the Court of Appeal of the Eastern Caribbean States (Alleyne and Gordon JJA, and Rawlins acting JA) on 28 February 2005 allowing the appeal of Cecil Penn, the respondent before the Board, who had appealed against the order of d'Auvergne J on 25 May 2004 awarding $85,200 to Mrs Creque as unpaid consideration on the sale of certain lands *h*   by her to Mr Penn. The facts and the grounds of appeal are set out in the advice of the Board delivered by Lord Walker of Gestingthorpe.

*David Chivers QC* and *Nathan Wells* (instructed by Charles Russell LLP) *j*      for the appellant, Mrs Creque.

The respondent, Mr Penn, did not appear and was not represented.

The Board took time for consideration.

**Lord Walker of Gestingthorpe** delivered the advice of the Board.

[1]   This appeal is concerned with the sale of two parcels of land (plots     *a*
125 and 126) in Virgin Gorda. The vendor was Mrs Nathalie Creque (the
appellant before the Board) acting as administratrix of her late husband's
estate. The purchaser was Mr Cecil Penn (the respondent, though he has
not appeared before the Board).

[2]   The sale was not preceded by any written contract. It was effected     *b*
by two transfers executed on 22 July 1996. The transfers were in the
standard form set out in the Third Schedule to the Registered Land Rules
and contained the printed words 'In consideration of . . . (the receipt
whereof is hereby acknowledged)'. The words 'the sum of $40,000' and
'the sum of $60,000' were typed in on the transfers of plot 125 and plot     *c*
126, respectively. But Mrs Creque claimed that when she executed the
transfers she had not in fact received $100,000 or any part of that sum; and
that her subsequent attempts to attain payment produced only $14,800
from Mr Penn. Her case was that she executed the transfers without the
purchase price having been paid because Mr Penn was a friend and she     *d*
trusted his statement that he needed the executed transfers in order to
obtain finance from a bank.

[3]   In 2002, shortly before the end of the limitation period, Mrs
Creque commenced proceedings against Mr Penn, claiming $85,200 as
the balance of the purchase price, and interest from 22 July 1996 (there     *e*
were further and alternative claims which are no longer relevant). Mr
Penn's pleaded case was that he had paid the purchase price in full on
execution of the transfers. His case at trial was that the consideration took
the form of the release of Mrs Creque from pre-existing indebtedness to
him under various commercial transactions.     *f*

[4]   The case was heard by d'Auvergne J who on 25 May 2004
delivered a reserved judgment in favour of Mrs Creque. The judge
accepted Mrs Creque's evidence and found the evidence of Mr Penn
inconsistent and unreliable. Her judgment contained some paragraphs
concerned with the parole evidence rule but no discussion of s 106 of the     *g*
Registered Land Act (to which neither side seems to have referred). The
judge ordered Mr Penn to pay to Mrs Creque $85,200 and costs of
$10,000. Her judgment did not award interest (nor did she give any reason
for not awarding it). It appears that no formal order was drawn up, since,
when Mr Penn appealed to the Eastern Caribbean Supreme Court, his     *h*
notice of appeal annexed the full text of the judgment below.

[5]   Mr Penn's notice of appeal set out several grounds of appeal.
There was no respondent's notice claiming interest. None of the grounds
of appeal referred to s 106 of the Land Registration Act, although the
second ground did refer to 'evidence that contradicted and undermined     *j*
the written documents'. Nor was the section mentioned in the course of
argument.

[6]   On 28 February 2005 the Court of Appeal (Alleyne and Gordon
JJA and Rawlins acting JA) gave judgment allowing the appeal and setting

aside the judge's order. Rawlins JA gave a written judgment in which the other members of the court concurred. Section 106 of the Land Registration Act assumed central importance in his judgment. It is in the following terms:

'(1) Every disposition of land, a lease or a charge shall be affected [*sic*] by an instrument in the prescribed form or in such other form as the Registrar may in any particular case approve, and every person shall use a printed form issued by the Registrar unless the Registrar otherwise permits.
'(2) [*Relates to leases and charges*]
'(3) Instruments shall contain a true statement of the amount of [*sic*] value of the purchase price or loan or other consideration (if any), and an acknowledgment of the receipt of the consideration.'

**[7]**   The crucial passage in the judgment of Rawlins JA was as follows (para [20]):

'Section 106 contemplates that when a person executes a transfer in accordance with the stipulated requirements and acknowledges receipt of the value of the consideration, that person has in fact received it. A court cannot go behind an instrument of transfer, which is completed in accordance with the terms of s 106. The court cannot go behind the transaction and rely on extrinsic evidence in order to determine whether a seller in fact received the consideration that he or she acknowledges or whether the consideration was the same as that which is acknowledged in the instrument. The words in the instruments, ". . . in consideration of the sum of $60,000 (receipt of which is hereby acknowledged)" suffice.'

**[8]**   Mrs Creque now appeals to the Board. Mr Penn has not been represented, nor has he appeared in person before the Board. But their lordships have had the advantage of excellent written and oral submissions from Mr Chivers QC and Mr Wells, counsel for Mrs Creque. Mr Chivers has ably performed counsel's duty of putting before the Board any matters on which counsel for Mr Penn, if instructed, might have been expected to rely.

**[9]**   Counsel's submissions on behalf of Mrs Creque can be summarised in two basic propositions. First, there is a well-settled rule of equity that a vendor or mortgagor may, *as against his own purchaser or mortgagee*, give evidence to contradict a receipt clause, even if it is contained in a deed. Second, there is nothing in the scheme or language of the Land Registration Act which operates, either expressly or by necessary implication, to oust this well-settled equitable rule.

**[10]**   The leading statement of the equitable rule is in the judgment of Sir John Romilly MR in *Wilson v Keating* (1859) 27 Beav 121, affirmed

by Lord Campbell LC and the lords justices (1859) 4 De G & J 588. The Master of the Rolls said (at p 126),

> 'It is true the deed does estop the parties at law, because at law you cannot contradict the deed, but it is settled by abundance of authority, that in this [Rolls] Court you can contradict the statement of the payment of the purchase money; nay more, though there is a receipt for the purchase money endorsed and duly signed by the vendor, yet, even then, the vendor would have a lien on the estate for the unpaid purchase money, and which would also be a debt due from the purchaser to the vendor.'

The position as against a third party (such as a mortgagee or a later purchaser deriving title from the original purchaser) would be quite different, because then it would be a matter of title, not personal obligation; see, for instance, the observations of Fry LJ in *Bickerton v Walker* (1885) 31 Ch D 151 at 157, that the plaintiffs, although morally excusable, 'were inexact and careless, and placed in the hands of [an unscrupulous assignee] the means of deceiving other persons'.

[11] Mr Chivers rightly submitted that under s 14 of the Eastern Caribbean Supreme Court (Virgin Islands) Act (equities of the plaintiff) the equitable rule (coupled with the judge's findings of fact) must be decisive in entitling Mrs Creque to relief, unless there is anything in the Land Registration Act to oust the rule.

[12] The appellant's second basic point, that there is nothing in the statute to oust the rule, was elaborated in written submissions which can be summarised in three propositions:

> (1) the Torrens system of land registration, although producing titles which are generally indefeasible, does not normally affect any personal right of action between parties to a transfer;
>
> (2) the Land Registration Act indicates that it was not intended to interfere with existing equitable and common law principles; and
>
> (3) the Court of Appeal paid insufficient attention to some settled principles of statutory construction: that existing law can be changed only by clear statutory words, or if there is no other way of making sense of the enactment; and that a statute should not be permitted to become an engine of fraud.

[13] The first of these three propositions is in the opinion of their lordships correct, and conclusive of this appeal. The Land Registration Act provides for the British Virgin Islands to have the Torrens system of land registration, named after Robert Torrens, a South Australian MP who promoted the Bill by which the system (actually the brainchild of a German immigrant, Dr Hübbe) was introduced in South Australia in 1858. Torrens later became Registrar-General of South Australia. The system was described by Barwick CJ in *Breskvar v Wall* (1971) 126 CLR

376 at 385 as 'not a system of registration of title but a system of title by registration'; see also Windeyer J (at pp 399 and 400). In *Breskvar v Wall* the High Court of Australia followed (and applied to the Queensland statutes with which they were concerned) the advice of the Board (of which Sir Garfield Barwick was a member) in *Frazer v Walker* [1967] 1 AC 569 (an appeal from New Zealand).

[14] Both those cases were mainly concerned with expounding the concept of indefeasible title (subject only to specific statutory exceptions) under the Torrens system. But in *Frazer v Walker* (at pp 584 and 585) Lord Wilberforce explained that indefeasibility of title does not exclude the possibility of a right of action for a personal remedy between the original parties to a transaction:

'Before leaving this part of the present appeal their lordships think it desirable, in relation to the concept of "indefeasibility of title" as their lordships have applied it to the facts before them, to make two further observations.

'First, in following and approving in this respect the two decisions in *Assets Co Ltd v Mere Roihi* and *Boyd v Mayor of Wellington*, their lordships have accepted the general principle that registration under the Land Transfer Act 1952 confers upon a registered proprietor a title to the interest in respect of which he is registered which is (under ss 62 and 63) immune from adverse claims, other than those specifically excepted. In doing so they wish to make clear that this principle in no way denies the right of a plaintiff to bring against a registered proprietor a claim "in personam", founded in law or in equity, for such relief as a court acting "in personam" may grant. That this is so has frequently, and rightly, been recognised in the courts of New Zealand and of Australia; see, for example, *Boyd v Mayor of Wellington* and *Tataurangi Tairuakena v Mua Carr*.'

Observations to the same effect were made by Lord Russell of Killowen in an appeal from Hong Kong, *Oh Hiam v Tham Kong* (1980) 2 BPR 9451 at 9454.

[15] Their lordships do not think it necessary or appropriate to say much about the appellant's second proposition, which is expressed in very general terms. The first part of s 3 of the Land Registration Act provides:

'Except as otherwise provided in this Ordinance, no other written law and no practice or procedure relating to land shall apply to land registered under this Ordinance so far as it is inconsistent with this Ordinance.'

Their lordships do not find it necessary to attempt to determine the precise content of the rather vague words 'practice or procedure relating to land'. There are some rules of equity (notably the general rule as to the

effect of actual notice) which plainly are inconsistent with s 23 of the Land Registration Act (effect of registration with absolute title) and do not apply to registered land. It is sufficient to repeat the point made by Lord Wilberforce in *Frazer v Walker*, that the continued existence of rights of action of a personal nature, as between the original parties to a land transaction, is not inconsistent with the Land Registration Act. There is in fact a parallel with the equitable rule as explained in cases such as *Bickerton v Walker*: a plaintiff may contradict a receipt clause as against the original contracting party, but not as against the latter's successor in title.

[16] As regards the third proposition, principles of statutory construction, counsel's written submissions refer to some well-known authorities such as *National Assistance Board v Wilkinson* [1952] 2 QB 648 at 659 (per Lord Goddard CJ) and 661 (per Devlin J), *R v Secretary of State for the Home Department, ex parte Pierson* [1998] AC 539 at 587 (per Lord Steyn) and *British Railways Board v Pickin* [1974] AC 765 at 795 and 796 (per Lord Wilberforce). It is not necessary to go into these authorities at any length but their lordships accept that they support the conclusion that the Land Registration Act was not intended to exclude the possibility of a personal remedy which has no effect on the principle of indefeasibility of title.

[17] For these reasons their lordships conclude that the Court of Appeal erred in allowing the appeal (on grounds which had been barely, if at all, argued before them). There remains the judge's omission to award interest. This point was raised briefly before the Court of Appeal (despite the absence of a respondent's notice) but it was not referred to in the judgment (unsurprisingly, since the judge's order was set aside).

[18] The Board has received further written submissions on this point from Mr Chivers and Mr Wells (a copy of these submissions has been sent to Mr Penn and acknowledged by him, with no further response). Their lordships accept those submissions. They are satisfied that the court had jurisdiction to award pre-judgment interest on the unpaid purchase price, and that Mrs Creque has an equitable entitlement to such interest (see the opinion of the Board, delivered by Luxmore LJ, in *International Railway Co v Niagara Parks Commission* [1941] AC 328 at 344 to 346, and s 14 of the Eastern Caribbean Supreme Court (Virgin Islands) Act).

[19] The re-amended statement of claim asked for 'interest on such sums found due at such rate and for such periods as to the court shall seem just', which amounted to substantial (though not complete) compliance with r 8.6(4) of the Civil Procedure Rules 2000. There is no reason to suppose that either the failure to comply strictly with r 8.6(4), or the absence of a formal respondent's notice, has caused any unfairness. The rate of pre-judgment interest to be awarded should be 'that on which the plaintiff would have had to borrow money in place of the money wrongfully withheld by the defendant' (*British Caribbean Insurance Co Ltd v Perrier* (1996) 52 WIR 342 at 354). In this case, on the materials put before them, their lordships consider that the rate should be 9 per cent.

*a*

[20] For these reasons their lordships will humbly advise Her Majesty that the appeal should be allowed with costs before the Board and in the courts below; and that the order of d'Auvergne J should be restored, but with an order for interest at the rate of 9 per cent from 22 July 1996 to the date of the judge's order (in addition to statutory interest at the rate of 5 per cent from judgment and until satisfaction of the judgment).

*b*

*Advice that appeal be allowed with costs.*

# Exhibit L

# PART III—EQUITABLE PROTECTION

CHAPTER 7

## FIDUCIARIES

CONTENTS

| | | |
|---|---|---|
| 1.— | Fiduciaries and Fiduciary Relationships . . . . . . . . . . . . . . . | 7-001 |
| 1. | "Fiduciary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-002 |
| 2. | Fiduciary Relationships . . . . . . . . . . . . . . . . . . . . . . . . . | 7-003 |
| 2.— | General Nature of Fiduciary Duties . . . . . . . . . . . . . . . . . . | 7-007 |
| 1. | Loyalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-008 |
| 2. | Concurrency of Fiduciary and Non-Fiduciary Duties . . . | 7-009 |
| 3. | Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-010 |
| 4. | Proscriptive Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-011 |
| 5. | Scope and Duration of Fiduciary Duties . . . . . . . . . . . . . | 7-012 |
| 6. | Authorisation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-014 |
| 3.— | Conflicts between Duty and Interest . . . . . . . . . . . . . . . . . | 7-018 |
| 1. | General Principle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-018 |
| 2. | Authorisation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-019 |
| 3. | Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-020 |
| 4.— | Conflicts between Duty and Duty . . . . . . . . . . . . . . . . . . . | 7-036 |
| 1. | General Principle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-036 |
| 2. | Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-037 |
| 5.— | Profits made out of Fiduciary Position . . . . . . . . . . . . . . . | 7-041 |
| 1. | General Principle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-041 |
| 2. | Authorisation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-042 |
| 3. | Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-043 |
| 6.— | Remedies for Breach of Fiduciary Duty . . . . . . . . . . . . . . | 7-051 |
| 1. | General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-051 |
| 2. | Rescission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-053 |
| 3. | Account of Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-054 |
| 4. | Proprietary Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-057 |
| 5. | Equitable Compensation for Loss . . . . . . . . . . . . . . . . . . | 7-058 |
| 6. | Forfeiture of Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-062 |
| 7. | Limitation Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-063 |
| 8. | Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-064 |
| 7.— | Relationship with other Equitable Doctrines of Protection . | 7-065 |
| 1. | Undue Influence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7-065 |
| 2. | Confidential Information . . . . . . . . . . . . . . . . . . . . . . . . . | 7-070 |

1.—   FIDUCIARIES AND FIDUCIARY RELATIONSHIPS

Separately from the equitable doctrines that modify existing rights of property **7-001** in the interests of justice, equity also provides protection against the inappropriate use of a position of superiority held over another person. One of the fundamental ways in which courts of equity have provided this sort of protection is through the

equitable doctrines applied to persons who are recognised as "fiduciaries" in their relationships with others.

### 1.   "Fiduciary"

**7-002**    The word "fiduciary" has been used in a variety of ways in equitable doctrine.[1] It has been used:

(i)    to describe certain kinds of duties, in order to distinguish those duties from other, non-fiduciary, duties;

(ii)   to identify relationships where fiduciary duties (in sense (i)) are owed;

(iii)  especially historically, as a description of a relationship that is sufficiently akin to the relationship between trustee and beneficiary that similar duties to those owed by a trustee are owed by the party in the trustee-like position[2];

(iv)   to describe relationships where fiduciary duties (in sense (i)) do not arise but where other related equitable doctrines of protection have been applied; and

(v)    inappropriately,[3] in an instrumental fashion in order to justify the imposition of remedies that appear to be unavailable unless the parties are characterised as being in a fiduciary relationship.

This multiplicity of usage, and "unthinking resort to verbal formulae",[4] has created confusion regarding the fiduciary concept and should be avoided.[5] The fiduciary concept has little practical utility unless it is:

"confined to those duties which are peculiar to fiduciaries and the breach of which attracts legal consequences differing from those consequent upon the breach of other duties."[6]

### 2.   Fiduciary Relationships[7]

**7-003**    **(a)   Fiduciary relationships and fiduciary duties.**   A fiduciary "is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them

---

1   See, e.g. *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 28-31.

2   P. D. Finn, *Fiduciary Obligations* (Sydney: Law Book Company, 1977) at [7]; Birks, "The Content of Fiduciary Obligation" (2000) 34 Israel L. Rev. 3 at 3, 8 (republished at (2002) 16 T.L.I. 34 at 36); *Gwembe Valley Development Co Ltd v Koshy* [2003] EWCA Civ 1478 at [89].

3   *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 29–30; *Norberg v Wynrib* (1992) 92 D.L.R. (4th) 449 at 481; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231 at 266.

4   *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 16; *Re Coomber* [1911] 1 Ch. 723 at 728.

5   *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 16; *Girardet v Crease & Co* (1987) 11 B.C.L.R. (2d) 361 at 361; *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 26; *Permanent Building Society (In Liquidation) v Wheeler* (1994) 14 A.C.S.R. 109 at 157.

6   *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14.

7   The propositions advanced in this subsection of the chapter were cited with approval in *Ross River Ltd v Waveley Commercial Ltd* [2012] EWHC 81 (Ch) at [235]–[238] (which decision was upheld on appeal as to the existence of a fiduciary relationship: *Ross River Ltd v Waveley Commercial Ltd* [2013] EWCA Civ 910).

FIDUCIARIES AND FIDUCIARY RELATIONSHIPS

that he is a fiduciary".[8] A fiduciary is someone who owes fiduciary duties, and a fiduciary relationship is a relationship between two or more persons in which one, the fiduciary, owes fiduciary duties to the other (or others).[9]

**(b)  Settled categories of fiduciary relationship.**    The paradigm example of a fiduciary relationship is the relationship between trustee and beneficiary: an express trustee owes fiduciary duties to his or her beneficiaries.[10] A resulting trustee or a constructive trustee may owe fiduciary duties to the beneficiaries of their respective trusts, but only once his or her conscience is affected by the trust (which will normally only be once he or she is aware of the trust).[11] Where the trustee is a company, the directors of the company will not ordinarily owe fiduciary duties directly to the beneficiaries of the trust, although they can do so where they have assumed such a responsibility.[12]

**7-004**

Several other categories of relationship are well-settled as fiduciary relationships. In these relationships there is a strong, yet rebuttable, presumption that fiduciary duties are owed.[13] Agents normally owe fiduciary duties to their principals.[14] Solicitors owe fiduciary duties to their clients.[15] Promoters owe fiduciary duties to the company which they are promoting.[16] Partners owe fiduciary duties to each other.[17]

---

[8]  *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14; *Arklow Investments Ltd v Maclean* [2000] 1 W.L.R. 594 PC (New Zealand) at 600. This observation is drawn from Finn, *Fiduciary Obligations* (1977) at [3].

[9]  See *Chirnside v Fay* [2006] NZSC 68 at [72]; [2007] 1 N.Z.L.R. 433.

[10]  See, e.g. *Keech v Sandford* (1726) 25 E.R. 223; Sel. Cas. Ch. 61; *Dougan v Macpherson* [1902] A.C. 197.

[11]  See *Lonrho Plc v Fayed (No.2)* [1992] 1 W.L.R. 1 at 11–12; *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 705–706; *R. v Chester and North Wales Legal Aid Area Office (No.12), Ex p. Floods of Queensferry Ltd* [1998] 1 W.L.R. 1496, 1500; P. Millett, "Restitution and Constructive Trusts" (1998) 114 L.Q.R. 399 at 405–406.

[12]  See *Sinclair Investment Holdings SA v Versailles Trade Finance Ltd* [2007] EWHC 915 (Ch) at [76]–[89]; [2007] 2 All E.R. (Comm) 993.

[13]  *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 28.

[14]  See, e.g. *De Bussche v Alt* (1878) 8 Ch. D. 286; *Boston Deep Sea Fishing & Ice Co v Ansell* (1888) 39 Ch. D. 339; *Kelly v Cooper* [1993] A.C. 205; *Paper Reclaim Ltd v Aotearoa International Ltd* [2007] NZSC 26 at [33]; [2007] 3 N.Z.L.R. 169; *FHR European Ventures LLP v Cedar Capital Partners LLC* [2014] UKSC 45 at [2]; [2015] A.C. 250. The word "agent" is used in a very broad sense in business, with the consequence that some who are described as agents will not necessarily owe fiduciary duties: *Tonto Home Loans Australia Pty Ltd v Tavares* [2011] NSWCA 389 at [177]. See also *UBS AG v Kommunale Wasserwerke Leipzig GmbH* [2017] EWCA Civ 1567 at [92]; Watts & Reynolds, *Bowstead & Reynolds on Agency*, 21st edn (2018), para.6-037. Like others, an agent's fiduciary duties must be moulded around the duties which the agent has undertaken in his or her retainer: see para.7-012; *Kelly v Cooper* [1993] A.C. 205, 214–215; *Tigris International NV v China Southern Airlines Co Ltd* [2014] EWCA Civ 1649 at [155].

[15]  See, e.g. *Nocton v Lord Ashburton* [1914] A.C. 932; *Moody v Cox* [1917] 2 Ch. 71; *Boardman v Phipps* [1967] 2 A.C. 46; *Clark Boyce v Mouat* [1994] 1 A.C. 428; *Bristol & West Building Society v Mothew* [1998] Ch. 1.

[16]  See, e.g. *Erlanger v New Sombrero Phosphate Co* (1878) 3 App. Cas. 1218; *Gluckstein v Barnes* [1900] A.C. 240; *Jubilee Cotton Mills Ltd v Lewis* [1924] A.C. 958; *Aequitas v AEFC* [2001] NSWSC 14 at [343]; (2001) 19 A.C.L.C. 1,006. See generally J. Gold, "The Liability of Promoters for Secret Profits in English Law" (1943) 5 U.T.L.J. 21; and see H. Gross, "Who is a Company Promoter" (1970) 86 L.Q.R. 493.

[17]  See, e.g. *Aas v Benham* [1891] 2 Ch. 244; *Thompson's Trustee in Bankruptcy v Heaton* [1974] 1 W.L.R. 605; *Chan v Zacharia* (1984) 154 C.L.R. 178; *Don King Productions Inc v Warren* [2000] Ch. 291; *Kao Lee & Yip v Koo* [2003] W.T.L.R. 1283 (Hong Kong).

FIDUCIARIES

Guardians owe fiduciary duties to their wards.[18] A receiver owes fiduciary duties to the person on whose behalf he is acting[19] (e.g. to the mortgagee when appointed under a power contained in the mortgage; not to the mortgagor or subsequent encumbrancers, to whom other, non-fiduciary, duties are owed[20]). Crown servants have been held to owe fiduciary duties to the Crown.[21]

Company directors have also consistently been held to owe fiduciary duties to the company.[22] This includes de facto directors,[23] and can also include shadow directors,[24] but not directors-elect.[25] The Companies Act 2006 now provides a statutory code of duties for directors in England and Wales, in place of the common law and equitable duties to which directors have hitherto been subject.[26] The result is that directors will no longer be subject to the duties discussed in this chapter, other than insofar as the 2006 Act so provides. Cases regarding directors which were decided prior to the implementation of the 2006 Act are, however, still relevant in two ways. First, many of them state principles which are of general application to fiduciaries. Secondly, the 2006 Act itself provides that such cases are relevant in interpreting the provisions of that Act.[27] However, caution must be exercised regarding cases decided under the 2006 Act before statements of principle in those cases are treated as statements of principles which apply to fiduciaries generally. The civil consequences of directors acting in breach of the duties contained in the 2006 Act will remain the same as if the corresponding common law or equitable duties had been breached.[28]

Directors' fiduciary duties are generally owed to the company, rather than to the

---

18   See, e.g. *Hatch v Hatch* (1804) 9 Ves. 292; 32 E.R. 615; *De Manneville v De Manneville* (1804) 10 Ves. 52; 32 E.R. 762; *Clay v Clay* [2001] HCA 9; [2001] W.T.L.R. 393.

19   See, e.g. *Nugent v Nugent* [1908] 1 Ch. 546; and see *Re B Johnson & Co (Builders) Ltd* [1955] Ch. 634 at 661–662.

20   See, e.g. *Downsview Nominees Ltd v First City Corp Ltd* [1993] A.C. 295 at 312; *Medforth v Blake* [2000] Ch. 86 at 98–102.

21   See, e.g. *Reading v Attorney General* [1951] A.C. 507; *Attorney General for Hong Kong v Reid* [1994] 1 A.C. 324; and see *Attorney General v Blake* [2001] 1 A.C. 268 at 280.

22   See, e.g. *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq. 461; 149 R.R. 32; *Imperial Mercantile Credit Association v Coleman* (1873) L.R. 6 H.L. 189; *Parker v McKenna* (1874) L.R. 10 Ch. App. 96; *Regal (Hastings) Ltd v Gulliver* [1967] 2 A.C. 134n.; *Guinness Plc v Saunders* [1990] 2 A.C. 663; *Nant-y-glo and Blaina Ironworks Co v Grave* (1878) 12 Ch. D. 738; *Eden v Ridsdales Railway Lamp and Lighting Co Ltd* (1889) 23 Q.B.D. 368.

23   See, e.g. *Ultraframe (UK) Ltd v Fielding (No.2)* [2003] EWCA Civ 1805 at [39]; *Re Canadian Land Reclaiming & Colonizing Co* (1880) 14 Ch. D. 660 CA at 670 and 673; *Primlake Ltd v Matthews Associates* [2006] EWHC 1227 (Ch) at [284]; *Shepherds Investments Ltd v Walters* [2006] EWHC 836 (Ch) at [78]. On determining when someone is a de facto director, see *Holland v Revenue and Customs Commissioners* [2010] UKSC 51; *Wetton v Ahmed* [2011] EWCA Civ 610; *Smithton Ltd v Naggar* [2014] EWCA Civ 939 (also considering shadow directorship).

24   *Instant Access Properties Ltd (in liq) v Rosser* [2018] EWHC 756 (Ch) at [255]–[275] (emphasising the highly fact-sensitive nature of this question); *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) at [142]–[143]; *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1284] and [1289]. See also Companies Act 2006 s.170(5), which was amended in 2015 to make clear that the statute's "general duties apply to a shadow director of a company where and to the extent that they are capable of so applying".

25   *Lindgren v L & P Estates Ltd* [1968] Ch. 572 at 596 & 604.

26   Companies Act 2006 s.170(3). For a useful analysis of the duties which applied to company directors before and after 1 October 2007 (when ss.170–181 but not ss.175–177 of the Companies Act 2006 came into force), and before and after 1 October 2008 (when ss.175–177 of the Companies Act 2006 came into force); see *Bhullar v Bhullar* [2017] EWHC 407 (Ch) at [83]–[88].

27   Companies Act 2006 s.170(4). See *Burns v Financial Conduct Authority* [2017] EWCA Civ 2140 at [64]–[75]; [2018] 1 W.L.R. 4161.

28   Companies Act 2006 s.178(1).

shareholders of the company. However, in some cases courts have concluded that, in the special circumstances of that particular case, the directors owe fiduciary duties directly to the shareholders.[29] It has also been said that where the fiduciary's duty is owed to a company, courts are more prepared to look behind the corporate veil to identify the persons to whom, as a matter of practical and common-sense reality, the fiduciary's duties are owed.[30]

**(c)    Ad hoc fiduciary relationships.**

*(1)    Principles.[31]*    The categories of fiduciary relationship are not closed.[32] Fiduciary duties may be owed despite the fact that the relationship does not fall within one of the settled categories of fiduciary relationships, provided the circumstances justify the imposition of such duties. Identifying the kind of circumstances that justify the imposition of fiduciary duties is difficult because the courts have consistently declined to provide a definition, or even a uniform description, of a fiduciary relationship,[33] preferring to preserve flexibility in the concept. Numerous academic commentators have offered suggestions,[34] but none has garnered universal support. Thus, it has been said that the "fiduciary relationship is a concept in search of a principle".[35]    **7-005**

There is, however, growing judicial support for the view that:

"a fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence."[36]

The undertaking can be implied in the circumstances, particularly where someone

---

29    See, e.g. *Peskin v Anderson* [2000] EWCA Civ 326 at [31]–[36]; *Kyrris v Oldham* [2003] EWCA Civ 1506 at [142]; *Sharp v Blank* [2015] EWHC 3220 (Ch) at [9]–[10]; *Brunninghausen v Glavanics* (1999) 46 N.S.W.L.R. 538; *Coleman v Myers* [1977] 2 N.Z.L.R. 225; *Allen v Hyatt* (1914) 30 T.L.R. 444; *Glandon Pty Ltd v Strata Consolidated Pty Ltd* (1993) 11 A.C.S.R. 543 at 547 (NSWCA).

30    *Ratiu v Conway* [2005] EWCA Civ 1302 at [78]–[80], [186] and [188].

31    See generally M. Conaglen, *Fiduciary Loyalty: Protecting the Due Performance of Non-Fiduciary Duties* (Oxford: Hart Publishing, 2010), Ch.9; cited by the Full Court of the Federal Court of Australia in *Grimaldi v Chameleon Mining NL (No.2)* [2012] FCAFC 6 at [177]; (2012) 200 F.C.R. 296.

32    *English v Dedham Vale Properties Ltd* [1978] 1 W.L.R. 93 at 110; *Tate v Williamson* (1866–67) L.R. 2 Ch. App. 55 LC at 61; *Waxman v Waxman* (2004) 7 I.T.E.L.R. 162 at [504] Ont CA; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231, 264; *Schipp v Cameron* [1998] NSWSC 997 at [695].

33    *Lloyds Bank Ltd v Bundy* [1975] Q.B. 326 at 341; *Hospital Products Ltd v United States Surgical Corp* (1984) 156 C.L.R. 41 at 96 and 141; *Maclean v Arklow Investments Ltd* [1998] 3 N.Z.L.R. 680 at 691; *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) at [138].

34    See, e.g. A. Scott, "The Fiduciary Principle" (1949) 37 Calif. L. Rev. 539 at 540; L. Sealy, "Fiduciary Relationships" [1962] C.L.J. 69 at 72–79; E. Weinrib, "The Fiduciary Obligation" (1975) 25 U.T.L.J. 1 at 4 and 15; Finn, *Fiduciary Obligations* (1977) at [467]; Shepherd, *The Law of Fiduciaries* (1981) at 96; J.C. Shepherd, "Towards a Unified Concept of Fiduciary Relationships" (1981) 97 L.Q.R. 51 at 74–76; P.D. Finn, "The Fiduciary Principle" in T.G. Youdan (ed), *Equity, Fiduciaries and Trusts* (Sydney: Law Book Company, 1989) 1 at 46 & 54; R. Flannigan, "The Fiduciary Obligation" (1989) 9 O.J.L.S. 285 at 309–310; J. Edelman, "When Do Fiduciary Duties Arise?" (2010) 126 L.Q.R. 302 (although see the critique of the latter piece in M. Conaglen, "Fiduciary Duties and Voluntary Undertakings" (2013) 7 Journal of Equity 105).

35    A. F. Mason, "Themes and Prospects" in P.D. Finn (ed), *Essays in Equity* (Sydney: Law Book Company, 1985) 242 at 246. This paragraph was quoted in *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1285].

36    *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 18; *Arklow Investments Ltd v Maclean*

has taken on a role in respect of which fiduciary duties are appropriate.[37] Hence, it has been said that:

"fiduciary duties are obligations imposed by law as a reaction to particular circumstances of responsibility assumed by one person in respect of the conduct or the affairs of another."[38]

"The concept encaptures a situation where one person is in a relationship with another which gives rise to a legitimate expectation, which equity will recognise, that the fiduciary will not utilise his or her position in such a way which is adverse to the interests of the principal."[39]

The expectation is assessed objectively, and so it is not necessary for the principal subjectively to harbour the expectation.[40] Nor is it relevant whether the person who is alleged to be a fiduciary subjectively considered himself to be undertaking fiduciary duties.[41]

Where the fiduciary expectation is appropriate in respect of part only of the arrangement between the parties, it is possible for fiduciary duties to be owed in respect of that part of the arrangement even though it is not fiduciary in general: "a person … may be in a fiduciary position quoad a part of his activities and not quoad other parts".[42]

A person who occupies a fiduciary position vis-à-vis another (the principal) may

---

[2000] 1 W.L.R. 594 at 598–600; *Peskin v Anderson* [2000] EWCA Civ 326 at [34]; *Hooper v Gorvin* [2001] W.T.L.R. 575 at 590; *Kyrris v Oldham* [2003] EWCA Civ 1506 at [142]; *Maclean v Arklow Investments Ltd* [1998] 3 N.Z.L.R. 680 at 691 and 723; *Button v Phelps* [2006] EWHC 53 (Ch) at [58]–[61]; *Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4)* [2007] FCA 963 at [272]; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231, 265; *Schipp v Cameron* [1998] NSWSC 997 at [697]; *Galambos v Perez* [2009] SCC 48; [2009] 3 S.C.R. 247; *Grimaldi v Chameleon Mining NL (No.2)* [2012] FCAFC 6 at [177]; (2012) 200 F.C.R. 296; *FHR European Ventures LLP v Cedar Capital Partners LLC* [2014] UKSC 45 at [5]; [2015] A.C. 250; *Farrar v Miller* [2018] EWCA Civ 172 at [75]; *Sheikh Tahnoon v Kent* [2018] EWHC 333 (Comm) at [158]-[159].

[37]  *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) at [139]–[141].

[38]  *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No.2)* [2011] EWHC 1731 (Ch) at [225]; [2012] Ch. 613.

[39]  *Arklow Investments Ltd v Maclean* [2000] 1 W.L.R. 594 at 598; *Farrar v Miller* [2018] EWCA Civ 172 at [75]. See also *Waxman v Waxman* (2004) 7 I.T.E.L.R. 162 at [512] Ont CA; *Brandeis Brokers Ltd v Black* [2001] 2 All E.R. (Comm) 980 at [36]–[37]; *Hughes Aircraft Systems International v Airservices Australia* (1997) 146 A.L.R. 1 (FCA) at 81; *News Ltd v Australian Rugby Football League Ltd* (1996) 64 F.C.R. 410 at 541; *Australian Securities Commission v AS Nominees Ltd* (1995) 62 F.C.R. 504 at 521; (1995) 133 A.L.R. 1 (FCA) at 17; *Glandon Pty Ltd v Strata Consolidated Pty Ltd* (1993) 11 A.C.S.R. 543 at 557 (NSWCA); *Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4)* [2007] FCA 963 at [273]; *Brooker v Friend* [2006] NSWCA 385 at [149]; *John Youngs Insurance Services Ltd v Aviva Insurance Service UK Ltd* [2011] EWHC 1515 (TCC) at [94(3)]; *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No.2)* [2011] EWHC 1731 (Ch) at [223] and [225]; [2012] Ch. 613; *Grimaldi v Chameleon Mining NL (No.2)* [2012] FCAFC 6 at [177]; (2012) 200 F.C.R. 296. This stems from Paul Finn's academic work: see Finn, "*The Fiduciary Principle*" in Equity, Fiduciaries and Trusts (1989) 1 at 54; P. Finn, "Fiduciary Law and the Modern Commercial World" in E. McKendrick (ed), *Commercial Aspects of Trusts and Fiduciary Obligations* (Oxford: Clarendon Press, 1992) 7 at 8.

[40]  *Hospital Products Ltd v United States Surgical Corp* (1984) 156 C.L.R. 41, 69 & 147; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231 at 265; *Tan Yok Koon v Tan Choo Suan* [2017] SGCA 13 at [194] and [199].

[41]  *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) at [139] and [142].

[42]  *New Zealand Netherlands Society "Oranje" Inc v Kuys* [1973] 1 W.L.R. 1126 at 1130. See also *Breen v Williams* (1996) 186 C.L.R. 71 at 107–108; *Maruha Corp v Amaltal Corp Ltd* [2007] NZSC 40 at [21]–[22]; [2007] 3 N.Z.L.R. 192; *Australian Securities and Investments Commission v*

FIDUCIARIES AND FIDUCIARY RELATIONSHIPS

also, in the course of performing that role, be found to have undertaken or as-
sumed responsibility for the interests of a third person to whom the principal owes
duties. In this way, a fiduciary relationship can arise vis-à-vis that third person as
well. Thus, for example, notwithstanding a lack of privity of contract between them,
a sub-agent can owe fiduciary duties to his principal's principal.[43]

   It has been said to be "of the first importance not to impose fiduciary obliga-
tions on parties to a purely commercial relationship".[44] However, "it is altogether
too simplistic, if not superficial, to suggest that commercial transactions stand
outside the fiduciary regime".[45] It is clear that it is possible for fiduciary duties to
arise in commercial settings.[46] Agency, which is frequently a relationship between
two commercial actors, provides a clear example[47]: the primary source of duty
between principal and agent is a matter of contract law, often applied in a com-
mercial setting, and yet fiduciary duties will be owed by the agent unless they have
been excluded.[48] The reason fiduciary duties do not commonly arise in com-
mercial settings outside the settled categories of fiduciary relationships is that it is
normally inappropriate to expect a commercial party to subordinate its own interests
to those of another commercial party.[49] But if that expectation is not inappropriate
in the circumstances of the relationship between the parties then fiduciary duties will
arise.[50]

   *(2)  Examples.*  Mortgagees,[51] tenants in common,[52] banks,[53] employees,[54] doc-    **7-006**

---

Citigroup Global Markets Australia Pty Ltd (No.4) [2007] FCA 963 at [285]; *John Youngs Insur-
ance Services Ltd v Aviva Insurance Service UK Ltd* [2011] EWHC 1515 (TCC) at [94(6)], [96].

[43]  *Powell & Thomas v Evan Jones & Co* [1905] 1 K.B. 11 at 18; *Australian Securities Commission v
AS Nominees Ltd* (1995) 62 F.C.R. 504 at 521 (company which managed a trustee company found
to owe fiduciary duties to the trust beneficiaries); *Sphere Drake Insurance Ltd v Euro International
Underwriting Ltd* [2003] EWHC 1636 (Comm) at [42]; *Markel International Insurance Co Ltd v
Surety Guarantee Consultants Ltd* [2008] EWHC 1135 (Comm) at [224]–[229]; *Oliver Hume South
East Queensland Pty Ltd v Investa Residential Group Pty Ltd* (2017) 259 F.C.R. 43; [2017] FCAFC
141 (senior employee of a parent company found to owe fiduciary duties to the subsidiary company).
See also *De Bussche v Alt* (1878) 8 Ch. D. 286, 310–311.

[44]  P. Millett, "Equity's Place in the Law of Commerce" (1998) 114 L.Q.R. 214 at 217.

[45]  *Hospital Products Ltd v United States Surgical Corp* (1984) 156 C.L.R. 41 at 100.

[46]  *Re Goldcorp Exchange Ltd (In Receivership)* [1995] 1 A.C. 74 at 98; *News Ltd v Australian Rugby
Football League Ltd* (1996) 64 F.C.R. 410 at 538–539; *South Australia v Peat Marwick Mitchell &
Co* (1997) 24 A.C.S.R. 231 at 266.

[47]  See, e.g. *De Bussche v Alt* (1878) 8 Ch. D. 286; *Boston Deep Sea Fishing & Ice Co v Ansell* (1888)
39 Ch. D. 339.

[48]  *Kelly v Cooper* [1993] 1 A.C. 205.

[49]  See also *John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd* (2010) 241 C.L.R. 1 at [90]
and [101]; [2010] HCA 19; *Adventure Golf Systems Australia Pty Ltd v Belgravia Health & Leisure
Group Pty Ltd* [2017] VSCA 326 [125]–[126].

[50]  See, e.g. *United Dominions Corp Ltd v Brian Pty Ltd* (1985) 157 C.L.R. 1; *Twinsectra Ltd v Yardley*
[2002] UKHL 12 at [13] and [76]; [2002] 2 A.C. 164.

[51]  *Knight v Marjoribanks* (1849) 2 Mac. & G. 10 at 13–14 (42 E.R. 4 at 5; also reported at (1849) 2
H. & Tw. 308 at 317–318 (47 E.R. 1700 at 1704)); *Warner v Jacob* (1882) 20 Ch. D. 220 at 224;
*Farrar v Farrars Ltd* (1888) 40 Ch. D. 395 at 410–411; *Colson v Williams* (1889) 58 L.J. Ch. 539
at 540; *Cuckmere Brick Co Ltd v Mutual Finance Ltd* [1971] Ch. 949 at 965–966; *Bishop v Bonham*
[1988] 1 W.L.R. 742 at 749–750; cf. *Watts v Midland Bank Plc* [1986] B.C.L.C. 16 at 23.

[52]  *Kennedy v De Trafford* [1897] A.C. 177 at 186; *Re Biss* [1903] 2 Ch. 40 at 57.

[53]  *Lloyds Bank Ltd v Bundy* [1975] Q.B. 326 at 341–342; *Commonwealth Bank of Australia v Find-
ing* [2001] 1 Qd. R. 168 CA at [9]–[10]; *Foley v Hill* (1848) 2 H.L.C. 28 at 36, 43 (9 E.R. 1002 at
1005, 1008).

[54]  The employee's duty of fidelity, and of mutual trust and confidence (if that is distinct), should be

[149]

tors[55] and professional advisers[56] do not ordinarily owe fiduciary duties. In other words, these are not settled categories of fiduciaries. But it is possible for the circumstances of the relationship between such a person and the other party to the relationship to justify the imposition of fiduciary duties, provided those circumstances are such that it is reasonable to expect that the fiduciary will subordinate his interests and act solely in the interests of the principal.

Thus, for example, a local branch manager of a bank has been held to have acted in a way that led his customer reasonably to expect that the bank was providing advice as to the wisdom of a proposed transaction in the customer's interests, rather than in the interests of the bank.[57] A manager has been held to owe fiduciary duties to a young and inexperienced musician for whom he was acting.[58] A prospective purchaser of property who, unbeknown to the prospective vendor, applied in the vendor's name for planning permission regarding the property, was held to owe fiduciary duties to the vendor. He had effectively appointed himself as the vendor's agent.[59] And a senior employee has been held to owe fiduciary duties to his employer in carrying out the specific duties which he was assigned.[60]

Financial advisers can occupy a fiduciary position vis-à-vis their clients[61] but accountants who had incompetently reported to their client that the proposed price for a takeover target was fair and reasonable were not guiding or influencing their client's decision and so did not owe fiduciary duties to the client.[62]

Joint venturers have been held to owe fiduciary duties to one another,[63] but not all joint ventures necessarily involve such duties.[64] While it has been suggested that joint ventures may be "inherently fiduciary" because of their similarity to partnership,[65] the term "joint venture" is a business term "which does not have a precise

---

differentiated from fiduciary duties: *University of Nottingham v Fishel* [2000] I.R.L.R. 471 at 482–484; *British Midland Tool Ltd v Midland International Tooling Ltd* [2003] EWHC 466 (Ch) at [94]; *Cobbetts LLP v Hodge* [2009] EWHC 786 (Ch) at [89]; *Ranson v Customer Systems Plc* [2012] EWCA Civ 841 at [22], [30]–[40]; cf. *Attorney General v Blake* [1998] Ch. 439 at 454.

[55]  *Breen v Williams* (1996) 186 C.L.R. 71; cf. *McInerney v MacDonald* (1992) 93 D.L.R. (4th) 415.

[56]  *Indata Equipment Supplies Ltd v ACL Ltd* [1998] F.S.R. 248 at 254.

[57]  *Commonwealth Bank of Australia v Smith* (1991) 102 A.L.R. 453 at 476–477.

[58]  *O'Sullivan v Management Agency & Music Ltd* [1985] 1 Q.B. 428.

[59]  *English v Dedham Vale Properties Ltd* [1978] 1 W.L.R. 93. See also *Luddy's Trustee v Peard* (1886) 33 Ch. D. 500; *Re Biss* [1903] 2 Ch. 40 at 60–61.

[60]  *Cobbetts LLP v Hodge* [2009] EWHC 786 (Ch) at [89]–[98].

[61]  *Daly v Sydney Stock Exchange Ltd* (1986) 160 C.L.R. 371 at 377; *Aequitas v AEFC* [2001] NSWSC 14; (2001) 19 A.C.L.C. 1006 at [307].

[62]  *Pilmer v Duke Group Ltd (In Liquidation)* [2001] HCA 31; (2001) 207 C.L.R. 165.

[63]  *United Dominions Corp Ltd v Brian Pty Ltd* (1985) 157 C.L.R. 1 at 7–8, 12–13 and 16; *Fawcett v Whitehouse* (1829) 1 Russ. & M. 132 at 148 (39 E.R. 51 at 57); *Murad v Al-Saraj* [2004] EWHC 1235 (Ch) at [325]–[341]; *Chirnside v Fay* [2006] NZSC 68; [2007] 1 N.Z.L.R. 433; *Schipp v Cameron* [1998] NSWSC 997; *Fraser Edmiston Pty Ltd v AGT (Qld) Pty Ltd* [1988] 2 Qd. R. 1; *Ross River Ltd v Waveley Commercial Ltd* [2013] EWCA Civ 910.

[64]  See, e.g. *Global Container Lines Ltd v Bonyad Shipping Co (No.1)* [1998] 1 Lloyd's Rep. 528 at 546–547; *Button v Phelps* [2006] EWHC 53 (Ch) at [59]–[61]; *Ross River Ltd v Cambridge City Football Club Ltd* [2007] EWHC 2115 (Ch) at [197]; *Gibson Motorsport Merchandise Pty Ltd v Forbes* [2006] FCAFC 44 at [2]; (2006) 149 F.C.R. 569; *John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd* [2010] HCA 19 at [44]; (2010) 241 C.L.R. 1; *Farrar v Miller* [2018] EWCA Civ 172 at [75]; *Adventure Golf Systems Australia Pty Ltd v Belgravia Health & Leisure Group Pty Ltd* [2017] VSCA 326 at [134]; and see *Explora Group Plc v Hesco Bastion Ltd* [2005] EWCA Civ 646 at [51], citing this paragraph.

[65]  *Chirnside v Fay* [2006] NZSC 68 at [14] and [74]; [2007] 1 N.Z.L.R. 433. See also, apparently, *Concrete Pty Ltd v Parramatta Design & Developments Pty Ltd* [2006] HCA 55; (2006) 231 A.L.R.

General Nature of Fiduciary Duties

legal meaning".[66] Indeed, it has been said not even to be a term of art in business.[67] It is unwise for such an ill-defined term to be the trigger for a category of fiduciary relationship. Instead, it is preferable for joint ventures not to be treated as a settled category of fiduciary relationship,[68] but an individual joint venture may appropriately be treated as a fiduciary relationship if, "after a meticulous examination of its own facts",[69] the fiduciary expectation[70] is found to be appropriate, bearing in mind the points made above regarding the appropriateness of that expectation between commercial actors[71]:

> "It is perfectly common for commercial entities to want to enter into cooperative arrangements for a specific purpose, involving a share of profits, but without intending to follow the route of mutual agency and the court should give effect to their intentions."[72]

The Law Society does not owe fiduciary duties to solicitors in connection with the compulsory insurance scheme, for the scheme is established, not in performance of a private duty owed to solicitors, but of a public duty under statute.[73]

### 2.— General Nature of Fiduciary Duties

"To say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?"[74]     **7-007**

### 1.    Loyalty[75]

"The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary."[76] This obligation of loyalty has several facets, which are addressed separately below. Millett LJ     **7-008**

---

663 at [156] per Callinan J.

[66] *BBC Worldwide Ltd v Bee Load Ltd* [2007] EWHC 134 (Comm) at [103].

[67] *Ross River Ltd v Waveley Commercial Ltd* [2013] EWCA Civ 910 at [34].

[68] *Paper Reclaim Ltd v Aotearoa Ltd* [2007] NZSC 26 at [31]–[32]; [2007] 3 N.Z.L.R. 169; *Maruha Corp v Amaltal Corp Ltd* [2007] NZSC 40 at [20]–[21]; [2007] 3 N.Z.L.R. 192.

[69] *Cook v Evatt (No.2)* [1992] 1 N.Z.L.R. 676 at 685; *Foster Bryant Surveying Ltd v Bryant* [2007] EWCA Civ 200 at [76].

[70] See para.7-005 above.

[71] See para.7-005 above.

[72] *BBC Worldwide Ltd v Bee Load Ltd* [2007] EWHC 134 (Comm) at [107].

[73] *Swain v Law Society* [1983] 1 A.C. 598.

[74] *Securities & Exchange Commission v Chenery Corp* 318 U.S. 80 at 85–86; 87 L. Ed. 626 at 632 (1943); quoted with approval in *Re Goldcorp Exchange Ltd (In Receivership)* [1995] 1 A.C. 74 at 98. See also *Boardman v Phipps* [1967] 2 A.C. 46 at 127.

[75] For a detailed examination of the fiduciary concept of loyalty, see M. Conaglen, *Fiduciary Loyalty: Protecting the Due Performance of Non-Fiduciary Duties* (2010). See also M. Conaglen, "The Nature and Function of Fiduciary Loyalty" (2005) 121 L.Q.R. 452.

[76] *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 18; *Boulting v Association of Cinematograph, Television & Allied Technicians* [1963] 2 Q.B. 606 at 636; *KLB v British Columbia* [2003] 2 S.C.R. 403; (2003) 230 D.L.R. (4th) 513 at [48]; *Chirnside v Fay* [2004] 3 N.Z.L.R. 637 at [51]; *Sinclair Investment Holdings SA v Versailles Trade Finance Ltd* [2005] EWCA Civ 722 at [20]; *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1285]–[1288]; *Gibson Motorsport Merchandise Pty Ltd v Forbes* [2006] FCAFC 44 at [11]; (2006) 149 F.C.R. 569; *Stevens v Premium Real Estate Ltd* [2009] NZSC 15 at [67]; [2009] 2 N.Z.L.R. 384; *Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd* [2010] EWHC 1614 (Ch) at [26]; *Rossetti Marketing Ltd v Diamond Sofa Co Ltd* [2012] EWCA Civ 1021 at [20]; *Adventure Golf Systems Australia Pty Ltd v Belgravia*

FIDUCIARIES

provided a non-exhaustive list of those facets in his judgment in *Bristol & West Building Society v Mothew*, which is "widely regarded as a masterly survey of the modern law of fiduciary duties"[77]:

> "A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal."[78]

The fundamental fiduciary obligation of loyalty comprises two related themes.[79] The first prohibits a fiduciary from acting in a situation where there is a conflict between the fiduciary's duty and his or her interest: "the objective is to preclude the fiduciary from being swayed by considerations of personal interest".[80] The second prohibits a fiduciary from making a profit out of his or her fiduciary position: "the objective is to preclude the fiduciary from actually misusing his position for his personal advantage".[81] It has been suggested that the second of these two themes is merely an instance of the first.[82] In most cases where the profit theme applies, the fundamental conflict theme will also capture the situation and give rise to liability on the part of the fiduciary.[83] The profit theme developed out of the conflict theme,[84] but has reached the point where it applies without the need for any conflict analysis.[85] In other words, the two principles largely overlap but there may be cases where the two do not necessarily both apply.[86]

The two themes are often addressed separately in respect of the same factual situation.[87] The two themes are, therefore, considered separately below, but the overlap in their application and their entwined development must be borne in mind

---

Health & Leisure Group Pty Ltd [2017] VSCA 326 at [124].

[77] Johnson v EBS Pensioner Trustees Ltd [2002] EWCA Civ 164 at [37].

[78] Bristol & West Building Society v Mothew [1998] Ch. 1 at 18.

[79] Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4) [2007] FCA 963 at [291]; South Australia v Peat Marwick Mitchell & Co (1997) 24 A.C.S.R. 231, 264; Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd [2010] EWHC 1614 (Ch) at [29]; Grimaldi v Chameleon Mining NL (No.2) [2012] FCAFC 6 at [178]; (2012) 200 F.C.R. 296; Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43 at [67]–[69]; (2018) 360 A.L.R. 1.

[80] Chan v Zacharia (1984) 154 C.L.R. 178 at 198 (quoted with approval in Don King Productions Inc v Warren [2000] Ch. 291 at [40]).

[81] Chan v Zacharia (1984) 154 C.L.R. 178 at 199 (quoted with approval in Don King Productions Inc v Warren [2000] Ch. 291 at [40]).

[82] See, e.g. Broughton v Broughton (1855) 5 De G.M. & G. 160 at 164 (43 E.R. 831 at 833); Bray v Ford [1896] A.C. 44 at 51; Boardman v Phipps [1967] 2 A.C. 46 at 123; New Zealand Netherlands Society "Oranje" Inc v Kuys [1973] 1 W.L.R. 1126 at 1129; Ratiu v Conway [2005] EWCA Civ 1302 at [59]; Huntington Copper & Sulphur Co (Ltd) v Henderson (1877) 4 S.C. (4th Series) 294 at 299; FHR European Ventures LLP v Cedar Capital Partners LLC [2014] UKSC 45 at [5]; [2015] A.C. 250.

[83] See, e.g. Boston Deep Sea Fishing & Ice Co v Ansell (1888) 39 Ch. D. 339 at 355, 357.

[84] See generally A. McClean, "The Theoretical Basis of the Trustee's Duty of Loyalty" (1969) 7 Alberta L. Rev. 218.

[85] See, e.g. Re Lewis (1910) 103 L.T. 495; Regal (Hastings) Ltd v Gulliver [1967] 2 A.C. 134n. at 144–145, 153, 159; Brown v Inland Revenue Commissioners [1965] A.C. 244 at 256, 265; Boardman v Phipps [1967] 2 A.C. 46 at 100–101, 103, 105, 118; Queensland Mines Ltd v Hudson (1978) 18 A.L.R. 1 at 4.

[86] Oceanic Life Ltd v HIH Casualty & General Insurance Ltd [1999] NSWSC 292 at [42].

[87] See, e.g. Don King Productions Inc v Warren (No.1) [2000] Ch. 291 at [40], [42]–[43]; Quarter Master UK Ltd v Pyke [2004] EWHC 1815 (Ch) at [53]–[55], [70]–[72]; Ultraframe (UK) Ltd v Fielding [2005] EWHC 1638 (Ch) at [1305]–[1306]; John Taylors v Masons [2001] EWCA Civ 2106

to comprehend fully the nature of fiduciary loyalty. Both themes "are canons of the court of equity which have their foundation, not in the actual commission of fraud, but in that hallowed orison, 'lead us not into temptation'".[88]

A further, more recent, development has been the recognition of principles which prohibit a fiduciary from acting in a situation where there is a conflict between the duties which he owes to more than one principal. These have developed out of the rule regarding conflicts between duty and interest, but have developed into a separate doctrine and so they are addressed separately below.

## 2.    Concurrency of Fiduciary and Non-Fiduciary Duties

Not all of the duties which a fiduciary owes are properly categorised as fiduciary duties. Only those duties which are an aspect of the fiduciary's duty of loyalty are properly categorised as fiduciary duties, as it is only these duties which are peculiar to fiduciaries.[89] The "essence of a fiduciary relationship is that it creates obligations of a different character from those deriving from the contract",[90] or from tort law, or from non-fiduciary equitable doctrines (e.g. such as those relating to trusts). Thus, a trustee who acts loyally but incompetently is not in breach of his fiduciary duties, although he may be in breach of a duty to exercise due care and skill,[91] or otherwise in breach of trust. Similarly, breach of a contractual duty to account, in the absence of a trust, is a breach of contract rather than a breach of fiduciary duty.[92] And a solicitor's negligence is not, without more, a breach of fiduciary duty.[93] "Not every breach of duty by a fiduciary is a breach of fiduciary duty."[94]

**7-009**

---

at [20]–[28], [2005] W.T.L.R. 1519; *O'Donnell v Shanahan* [2009] EWCA Civ 751 at [52]–[76].

[88] *Wormley v Wormley* 21 U.S. (8 Wheat.) 421 at 463; 5 L. Ed. 651 at 662 (1823). See also *Ross River Ltd v Cambridge City Football Club Ltd* [2007] EWHC 2115 (Ch) at [250], mentioning the "propensity" for misconduct that a bribe creates.

[89] *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 16; *Attorney General v Blake* [1998] Ch. 439 at 455; *Ocular Sciences Ltd v Aspect Vision Care Ltd* [1997] R.P.C. 289 at 413; *Girardet v Crease & Co* (1987) 11 B.C.L.R. (2d) 361 at 361; *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 28; *Permanent Building Society (In Liquidation) v Wheeler* (1994) 14 A.C.S.R. 109 at 157; *Roberts v R.* [2002] 4 S.C.R. 245; (2002) 220 D.L.R. (4th) 1 at [83]. See also *Chirnside v Fay* [2004] 3 N.Z.L.R. 637 at [51].

[90] *Re Goldcorp Exchange Ltd (In Receivership)* [1995] 1 A.C. 74 at 98. See also *Ratiu v Conway* [2005] EWCA Civ 1302 at [71]–[72]; *Strother v 3464920 Canada Inc* [2007] SCC 24 at [141]; [2007] 2 S.C.R. 177; *John Youngs Insurance Services Ltd v Aviva Insurance Service UK Ltd* [2011] EWHC 1515 (TCC) at [94(7)].

[91] *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 16, 18. See also *Spread Trustee Co Ltd v Hutcheson* [2011] UKPC 13 at [61]; [2012] 2 A.C. 194.

[92] *Paragon Finance Plc v DB Thakerar & Co* [1999] 1 All E.R. 400 at 415–416; *Coulthard v Disco Mix Club Ltd* [2000] 1 W.L.R. 707 at 728.

[93] *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145 at 205–206; *Nationwide Building Society v Vanderpump & Sykes* [1999] Lloyd's Rep. P.N. 422.

[94] *Hilton v Barker Booth & Eastwood* [2005] UKHL 8; [2005] 1 W.L.R. 567 at [29]; *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 16; *Base Metal Trading Ltd v Shamurin* [2004] EWCA Civ 1316; [2005] 1 All E.R. (Comm) 17 at [19]; *Chirnside v Fay* [2006] NZSC 68 at [15], [72], [73]; [2007] 1 N.Z.L.R. 432; *Strother v 3464920 Canada Inc* [2007] SCC 24 at [34]; [2007] 24 S.C.R. 177; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231, 266; *John Youngs Insurance Services Ltd v Aviva Insurance Service UK Ltd* [2011] EWHC 1515 (TCC) at [94(2)]; *Novoship (UK) Ltd v Nikitin* [2014] EWCA Civ 908 at [106]; [2015] Q.B. 499.

FIDUCIARIES

## 3.  Good Faith

**7-010**     Fiduciaries must act in good faith.[95] The cases contain references to this as being a fiduciary duty of good faith,[96] although it is unclear how that fits with the exhortation that "[t]he expression 'fiduciary duty' is properly confined to those duties which are peculiar to fiduciaries"[97] when it is borne in mind that duties of good faith are frequently recognised without any suggestion that the responsibility to act in good faith arose because of the presence of a fiduciary relationship or on the basis of fiduciary principles.[98]

## 4.  Proscriptive Duties

**7-011**     Fiduciary duties are fundamentally proscriptive in nature, rather than prescriptive: fiduciary doctrine "tells the fiduciary what he must not do. It does not tell him what he ought to do".[99]

## 5.  Scope and Duration of Fiduciary Duties

**7-012**     **(a)  Scope.**   The scope of fiduciary duties is "moulded according to the nature of the relationship and the facts of the case".[100] However, application of fiduciary doctrine is not an unprincipled exercise in judicial discretion. Rather, it requires a

---

[95] *Bristol & West Building Society v Mothew* [1998] Ch. 1, 18.

[96] *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) at [143] (fn.2); *Brent London Borough Council v Davies* [2018] EWHC 2214 (Ch) at [376].

[97] *Bristol & West Building Society v Mothew* [1998] Ch. 1, 16. See para.7-009 above.

[98] See, e.g. *Groom v Crocker* [1939] 1 K.B. 194 at 203; *Price v Bouch* (1987) 53 P. & C.R. 257 at 261; *Downsview Nominees Ltd v First City Corp Ltd* [1993] A.C. 295 at 317; *Abu Dhabi National Tanker Co v Product Star Shipping Line Ltd (The "Product Star") (No.2)* [1993] 1 Lloyd's Rep. 397 at 404; *Yorkshire Bank Plc v Hall* [1999] 1 W.L.R. 1713 at 1728; *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No.2)* [2001] EWCA Civ 1047 at [67]–[68], [76], [81]; *Paragon Finance Plc v Nash* [2001] EWCA Civ 1466 at [32], [36]. See also *Sheikh Tahnoon v Kent* [2018] EWHC 333 (Comm), esp at [153]–[176] where Leggatt LJ held that there was no fiduciary relationship, but the parties' relationship was subject to an obligation to act in good faith.

[99] *Attorney General v Blake* [1998] Ch. 439 at 455; *Breen v Williams* (1996) 186 C.L.R. 71 at 95, 113 & 137–138; *Pilmer v Duke Group Ltd (In Liquidation)* [2001] HCA 31 at [74], [127]; (2001) 207 C.L.R. 165; *Youyang Pty Ltd v Minter Ellison Morris Fletcher* [2003] HCA 15 at [41]; (2003) 212 C.L.R. 484; *Aequitas v AEFC* [2001] NSWSC 14; (2001) 19 A.C.L.C. 1,006 at [284]; *Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4)* [2007] FCA 963 at [290]; *Brooker v Friend* [2006] NSWCA 385 at [26]; *Gibson Motorsport Merchandise Pty Ltd v Forbes* [2006] FCAFC 44 at [12]; (2006) 149 F.C.R. 569; *P & V Industries Pty Ltd v Porto* [2006] VSC 131 at [32]–[34], [43]; (2006) 14 V.R. 1; *Commonwealth Oil & Gas Co Ltd v Baxter* [2009] CSIH 75 at [14]; *Eric Preston Pty Ltd v Euroz Securities Ltd* [2010] FCA 97 at [428]–[429]; *Grimaldi v Chameleon Mining NL (No.2)* [2012] FCAFC 6 at [178]; (2012) 200 F.C.R. 296; *Howard v Commissioner of Taxation* [2014] HCA 21 at [31], [56]; (2014) 253 C.L.R. 83; *Moulin Global Eyecare Holdings Ltd v Mei* [2014] 17 H.K.C.F.A.R. 466 at [36]; *Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd* [2018] HCA 43 at [67]; (2018) 360 A.L.R. 1. cf. *Fassihi v Item Software (UK) Ltd* [2004] EWCA Civ 1244 at [41]; *Sharp v Blank* [2015] EWHC 3220 (Ch) at [23]. See further, Conaglen, *Fiduciary Loyalty: Protecting the Due Performance of Non-Fiduciary Duties* (2010) Ch.7.

[100] *Hospital Products Ltd v United States Surgical Corp* (1984) 156 C.L.R. 41 at 102; *Re Coomber* [1911] 1 Ch. 723 at 729; *New Zealand Netherlands Society "Oranje" Inc v Kuys* [1973] 1 W.L.R. 1126 at 1130; *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 28; *Kelly v Cooper* [1993] A.C. 205 at 214; *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145 at 206; *Clay v Clay* [2001] HCA 9 at [46]; *Strother v 3464920 Canada Inc* [2007] SCC 24 at [118], [141]; [2007] 2 S.C.R. 177; *Australian Securities and Investments Commission v Citigroup Global*

meticulous examination of the facts of each case in order to determine what non-fiduciary duties are owed, so as to be able to determine the effect that fiduciary principles will have in the case[101]:

"The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the operation which the contract was intended to have according to its true construction."[102]

Careful analysis of both fiduciary *and* non-fiduciary duties is crucial.[103] It is nonsensical, for example, to talk of a conflict between duty and interest without careful analysis of what non-fiduciary duties are in fact owed.[104] Those duties will differ with the circumstances of each case. Fiduciary doctrine must be applied in a way that is sensitive to those differences. For this reason, there:

"is no class of case in which one ought more carefully to bear in mind the facts of the case … than cases which relate to fiduciary and confidential relations."[105]

It is also necessary to determine in what respects the person is a fiduciary,[106] because outside of those respects the fiduciary owes no fiduciary duties and is free to act in accordance with ordinary legal principles.

**(b)   Duration.**   Fiduciary duties are dependent upon the continued existence of an underlying relationship of duty:                                                    **7-013**

"We do not recognise the concept of a fiduciary obligation which continues notwithstanding the determination of the particular relationship which gives rise to it. Equity does not demand a duty of undivided loyalty from a former employee to his former employer."[107]

This follows from the conflict theme of fiduciary loyalty: if a retainer has been

---

*Markets Australia Pty Ltd (No.4)* [2007] FCA 963 at [288]; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231 at 266; *Stevens v Premium Real Estate Ltd* [2009] NZSC 15 at 23; [2009] 2 N.Z.L.R. 384; *John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd* [2010] HCA 19 at [91]–[92]; (2010) 241 C.L.R. 1; *Eric Preston Pty Ltd v Euroz Securities Ltd* [2010] FCA 97 at [425]–[426]; *Customer Systems Plc v Ranson* [2012] EWCA Civ 841 at [25]–[29]. Thus, e.g. in the case of an agent employed under a contract, the scope of any fiduciary duties of the agent will be determined by reference to the terms of the underlying contract: *John Youngs Insurance Services Ltd v Aviva Insurance Service UK Ltd* [2011] EWHC 1515 (TCC) at [94(1)].

[101]   *Howard v Commissioner of Taxation* [2014] HCA 21 at [61]; (2014) 253 C.L.R. 83.

[102]   *John Youngs Insurance Services Ltd v Aviva Insurance Service UK Ltd* [2011] EWHC 1515 (TCC) at [94(5)]. See also *Hospital Products Ltd v United States Surgical Corp* (1984) 156 C.L.R. 41 at 97; *John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd* [2010] HCA 19 at [91]; (2010) 241 C.L.R. 1.

[103]   See, e.g. *Strother v 3464920 Canada Inc* [2007] SCC 24; [2007] 2 S.C.R. 177; *Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4)* [2007] FCA 963. See also Conaglen, *Fiduciary Loyalty: Protecting the Due Performance of Non-Fiduciary Duties* (2010) Ch.7.

[104]   cf. *Longstaff v Birtles* [2001] EWCA Civ 1219, where the court found a conflict between duty and interest while denying the existence of any non-fiduciary duty.

[105]   *Re Coomber* [1911] 1 Ch. 723 at 729; *Boardman v Phipps* [1967] 2 A.C. 46 at 125; *Brooker v Friend* [2006] NSWCA 385 at [26]; *Eze v Conway* [2019] EWCA Civ 88 at [39]–[40].

[106]   *Eze v Conway* [2019] EWCA Civ 88 at [42]–[44]. See also para.7-005.

[107]   *Attorney General v Blake* [1998] Ch. 439 at 453; *Bolkiah v KPMG* [1999] 2 A.C. 222 at 235; *CMS Dolphin Ltd v Simonet* [2001] 2 B.C.L.C. 704 at [95]; *Foster Bryant Surveying Ltd v Bryant* [2007] EWCA Civ 200 at [8], [68]; *Tigris International NV v China Southern Airlines Co Ltd* [2014] EWCA Civ 1649 at [156]–[158]. The fact that fiduciary duties do not apply after the retainer has been terminated does not mean other doctrines, such as breach of confidence, are inapplicable: see *Bolkiah v KPMG*. Further, the court may be able to intervene where a solicitor acts against a former client,

FIDUCIARIES

brought lawfully to an end so that no non-fiduciary duties are owed any longer, there can be no possibility of conflict between duty and interest.[108] Thus, a trustee who had retired from the trust was not barred from purchasing trust property 12 years later.[109]

However, to prevent the emasculation of fiduciary duties, a fiduciary may not resign his fiduciary position in order to do that which fiduciary doctrine would otherwise bar him from doing,[110] unless he obtains his principal's fully informed consent, or the principal has made a clear decision no longer to use the fiduciary's services.[111] In this sense fiduciary duties "may endure beyond the termination of the retainer",[112] but this is in order to prevent fiduciary duties from being too easily avoided by the expedient means of resignation.[113] Furthermore, resignation will not avoid liability under the profit theme of fiduciary loyalty for a fiduciary such as a director:

> "if, after his resignation, he uses for his own benefit property of the company or information which he has acquired while a director."[114]

Nor may a fiduciary arrange a transaction and then resign in order to put the transaction into effect if the transaction could not have been entered into while the fiduciary remained in his fiduciary position.[115] A fiduciary is not, however, barred from resigning and exploiting opportunities within the market in which his principal operates, where he did not resign from his fiduciary position with a view to exploiting such opportunities and where the opportunity was not one which his principal was pursuing at the time of resignation or thereafter.[116]

Similarly, under the Companies Act 2006, resignation by a company director is ineffective to avoid liability for breach of his statutory duties (a) to avoid conflicts of interest as regards the exploitation of any property, information or opportunity of which he became aware while he was a director; and (b) not to accept benefits from third parties as regards things done or omitted by him while a director.[117]

The fact that fiduciary duties do not apply after the retainer has been terminated does not mean that other equitable doctrines of protection, such as breach of confidence, are inapplicable.[118] Further, the court may be able to intervene where a

---

in the exercise of its inherent jurisdiction over solicitors as officers of the court, although it should be slow to do so: *Winters v Mishcon de Reya* [2008] EWHC 2419 (Ch) at [94].

[108] *Allison v Clayhills* (1907) 97 L.T. 709 at 711.

[109] *Re Boles & British Land Co's Contract* [1902] 1 Ch. 244.

[110] *Ex p. James* (1803) 8 Ves. 337 at 352 (32 E.R. 385 at 390–391); *Re Boles and British Land Co's Contract* [1902] 1 Ch. 244 at 246–247; *Island Export Finance Ltd v Umunna* [1986] B.C.L.C. 460 at 476; *Edmonds v Donovan* [2005] VSCA 27 at 56–57 and 60–61.

[111] See, e.g. *In Plus Group Ltd v Pyke* [2002] EWCA Civ 370 at [76] and [90].

[112] *Longstaff v Birtles* [2001] EWCA Civ 1219 at [1].

[113] See generally P. Koh "Once a Director, Always a Fiduciary?" [2003] 62 C.L.J. 403; and Conaglen, *Fiduciary Loyalty: Protecting the Due Performance of Non-Fiduciary Duties* (2010) Ch.7.

[114] *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1309].

[115] *Spring v Pride* (1864) 4 De G.J. & S. 395 (46 E.R. 971); *Wright v Morgan* [1926] A.C. 788 at 796; *Industrial Development Consultants Ltd v Cooley* [1972] 1 W.L.R. 443.

[116] *Island Export Finance Ltd v Umunna* [1986] B.C.L.C. 460 at 482, 483. See also *Foster Bryant Surveying Ltd v Bryant* [2007] EWCA Civ 200.

[117] Companies Act 2006 s.170(2).

[118] See, e.g. *Bolkiah v KPMG* [1999] 2 A.C. 222. Injunctions can be sought to prevent a former fiduciary from acting in circumstances where there is a real risk that confidential information might be misused, e.g. *Georgian American Alloys Inc v White & Case LLP* [2014] EWHC 94 (Comm).

solicitor acts against a former client, in the exercise of its inherent jurisdiction over solicitors as officers of the court, although it should be slow to do so.[119]

<h2>6.   Authorisation</h2>

Fiduciary duties are applied strictly with few exceptions. However, their effect can be avoided if proper authorisation is obtained.    **7-014**

**(a)   Principal's consent.**    The fiduciary's principal is competent to relax, or to    **7-015**
forgo altogether, the protection which fiduciary doctrine provides him or her.[120] The principal may authorise the fiduciary to act in a way which would otherwise be a breach of fiduciary duty,[121] but the "relation must be in some way dissolved: or, if not, the parties must be put so much at arm's length, that they agree to take the characters of purchaser and vendor".[122] The principal may bring an end to the fiduciary relationship completely,[123] which avoids the application of fiduciary duties, or alter the fiduciary's non-fiduciary duties in respect of a particular transaction so that, for that transaction, there is no conflict between those non-fiduciary duties and the fiduciary's personal interest.[124]

To provide the fiduciary with an effective defence to a claim for breach of fiduciary duty, the principal's consent to relaxation of the fiduciary's liability must be fully informed.[125] The burden of establishing informed consent for conduct which would otherwise constitute a breach of fiduciary duty lies on the fiduciary.[126] In order to show that the consent was fully informed there must be clear evidence[127] that it was given after the fiduciary made "full and frank disclosure of all material facts".[128] "The key is disclosure—'sunlight bleaches'".[129] The principal's consent will be "watched with infinite and the most guarded jealousy" by the court.[130]

The materiality of information to be disclosed is determined not by whether it would have been decisive (although, if it would have been decisive, then it clearly

---

[119] *Winters v Mishcon de Reya* [2008] EWHC 2419 (Ch) at [94].

[120] *Quarter Master UK Ltd v Pyke* [2004] EWHC 1815 (Ch) at [70]; *Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4)* [2007] FCA 963 at [278]–[280]. A company director can act with a conflict between duty and interest if properly authorised by the disinterested directors (see s.175 of the Companies Act 2006; and see ss.177 and 180) but can also act if the shareholders have unanimously assented to the conduct with the benefit of full knowledge of the relevant facts: *Re Duomatic* [1969] 2 Ch. 365, 373; *Sharma v Sharma* [2013] EWCA Civ 1287; [2014] B.C.C. 73.

[121] *Downes v Grazebrook* (1817) 3 Mer. 200 at 208 (36 E.R. 77 at 80); *Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4)* [2007] FCA 963 at [293].

[122] *Gibson v Jeyes* (1801) 6 Ves. 266 at 277 (31 E.R. 1044 at 1049).

[123] See, e.g. *Ex p. Lacey* (1802) 6 Ves. 625 at 626 (31 E.R. 1228 at 1228); *Ex p. Bennett* (1805) 10 Ves. 381 at 394 (32 E.R. 893 at 897); *Plowright v Lambert* (1885) 52 L.T. 646 at 653.

[124] See, e.g. *Robinson v Randfontein Estates Gold Mining Co Ltd* [1921] A.D. 168 at 178 (South Africa); *Movitex Ltd v Bulfield* [1988] B.C.L.C. 104 at 118; *Queensland Mines Ltd v Hudson* (1978) 18 A.L.R. 1 at 10.

[125] *Boardman v Phipps* [1967] 2 A.C. 46 at 109; *Re Haslam & Hier-Evans* [1902] 1 Ch. 765 at 769–770.

[126] *Cobbetts LLP v Hodge* [2009] EWHC 786 (Ch) at [108]; *Hurstanger Ltd v Wilson* [2007] EWCA Civ 299 at [35]; [2007] 1 W.L.R. 2351.

[127] *Barr, Leary & Co v Hall* (1906) 26 N.Z.L.R. 222 at 225; *York & North-Midland Railway Co v Hudson* (1845) 16 Beav. 485 at 491 (51 E.R. 866 at 868–869); *Coles v Trecothick* (1804) 9 Ves. 234 at 246–247 (32 E.R. 592 at 597).

[128] *New Zealand Netherlands Society "Oranje" Inc v Kuys* [1973] 1 W.L.R. 1126 at 1132.

[129] *Northampton Regional Livestock Centre Co Ltd v Cowling* [2014] EWHC 30 (QB) at [6].

[130] *Ex p. Lacey* (1802) 6 Ves. 625 at 626 (31 E.R. 1228 at 1228).

# Exhibit M

Ch.

A

# CASES

determined by the

# CHANCERY DIVISION

B

and the

# COURT OF PROTECTION

and on appeal therefrom in the

C

# COURT OF APPEAL

—————

D

[COURT OF APPEAL]

## BRISTOL AND WEST BUILDING SOCIETY v. MOTHEW

1996   May 21, 22;                    Staughton, Millett and Otton L.JJ.
       July 24

E   *Solicitor—Negligence—Incorrect advice or information—Mortgage transaction—Solicitor acting for borrowers and lender—Solicitor negligently giving lender incorrect information—Lender suffering loss—Whether lender merely having to prove reliance on information—Whether necessary to show loss attributable to negligence—Whether breach of trust or fiduciary duty*

F   　　In 1988 the defendant solicitor acted for a husband and wife in the purchase of a house for £73,000 and also for the plaintiff to whom the purchasers had applied for a loan of £59,000 to finance the purchase. The plaintiff offered to advance the money on the express condition that the balance of the purchase price was provided by the purchasers without resort to further borrowing, and it instructed the solicitor to report, prior to completion, any proposal that the purchasers might create a second mortgage or otherwise borrow in order to finance part of the purchase price. The solicitor knew that the purchasers were arranging for an existing bank debt of £3,350 to be secured by a second charge on the new property but, due to an oversight, he stated in his report to the plaintiff that the balance of the purchase price was being provided by the purchasers without resort to further borrowing. The plaintiff advanced the loan and the purchase was completed. When the purchasers defaulted on

G

H   their mortgage repayments the plaintiff enforced its security and the house was sold at a loss. The plaintiff sought to recover the whole of its loss on the transaction from the solicitor, alleging breach of contract, negligence and breach of trust. The district judge gave the plaintiff summary judgment for damages to be

assessed for breach of contract and negligence and for damages    A
of £59,000 less the amount received on the sale of the property
for breach of trust. The judge affirmed those decisions.

On appeal by the solicitor:—

*Held,* allowing the appeal, (1) that, where a client sued his
solicitor for negligently giving him incorrect advice or information,
the client did not have to show that he would not have acted as
he did if he had been given the proper advice or correct
information but merely that he had relied on the incorrect advice    B
or information; that the evidence showed that the plaintiff had
relied on the solicitor's report in advancing the loan and,
therefore, the necessary causal link between the solicitor's
negligence and the loan was proved; but that the plaintiff had still
to establish what, if any, loss was attributable to the solicitor's
negligence and, as there was an issue as to what loss was
occasioned by the existence of the second charge and the    C
purchasers' indebtedness to the bank, damages remained to be
assessed (post, pp. 11D–E, F–H, 13B–C, 24E–F, 25E–F, 28A).

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co.
Ltd.* [1997] A.C. 191, H.L.(E.) and *Downs v. Chappell* [1997]
1 W.L.R. 426, C.A. applied.

(2) That the solicitor's conduct in providing the plaintiff with
the wrong information, although a breach of duty, was neither
dishonest nor intentional but due to an oversight and was    D
unconnected to the fact that he was also acting for the purchasers;
that, accordingly, his conduct and subsequent application of the
money advanced by the plaintiff to complete the purchase was
not a breach of trust or fiduciary duty; and that the order for
damages for breach of trust would therefore be set aside (post,
pp. 15H–16A, 19E, 20G, 22A–C, 24E–F, 25E–F, 26C–E, 28A).

Decision of Chadwick J. reversed.

E

The following cases are referred to in the judgments:

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997]
A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R.
801
*Clark Boyce v. Mouat* [1994] 1 A.C. 428; [1993] 3 W.L.R. 1021; [1993] 4 All    F
E.R. 268, P.C.
*Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453
*Coomber, In re; Coomber v. Coomber* [1911] 1 Ch. 723, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717
*Girardet v. Crease & Co.* (1987) 11 B.C.L.R. (2d) 361
*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145; [1994] 3 W.L.R. 761;    G
[1994] 3 All E.R. 506, H.L.(E.)
*Kelly v. Cooper* [1993] A.C. 205; [1992] 3 W.L.R. 936, P.C.
*LAC Minerals Ltd. v. International Corona Resources Ltd.* (1989) 61 D.L.R.
(4th) 14
*Lewis v. Hillman* (1852) 3 H.L.Cas. 607, H.L.(E.)
*Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992]
4 All E.R. 512, H.L.(E.)    H
*Moody v. Cox and Hatt* [1917] 2 Ch. 71, C.A.
*Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836, C.A.
*Nocton v. Lord Ashburton* [1914] A.C. 932, H.L.(E.)
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109

A          *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113;
              [1970] 3 W.L.R. 273; [1970] 2 All E.R. 471, C.A.
          *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
              3 All E.R. 785, H.L.(E.)
          *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
              [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)


B          The following additional cases were cited in argument:

          *Alliance & Leicester Building Society v. Edgestop Ltd.* (unreported), 18 January
              1991, Hoffmann J.
          *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465, P.C.
          *Canson Enterprises Ltd. v. Boughton & Co.* (1991) 85 D.L.R. (4th) 129
          *Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653
          *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1
C          *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
          *Wan v. McDonald* (1992) 105 A.L.R. 473
          *Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141


          The following cases, although not cited, were referred to in the skeleton
          arguments:

D          *Attorney-General for Hong Kong v. Reid* [1994] 1 A.C. 324; [1993] 3 W.L.R.
              1143; [1994] 1 All E.R. 1, P.C.
          *Bishopsgate Investment Management Ltd. v. Maxwell (No. 2)* [1994] 1 All
              E.R. 261, C.A.
          *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
              Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
          *Dawson, decd., In re; Union Fidelity Trustee Co. Ltd. v. Perpetual Trustee Co.
              Ltd.* [1966] 2 N.S.W.R. 211
E          *Farrington v. Rowe McBride & Partners* [1985] 1 N.Z.L.R. 83
          *McPherson v. Watt* (1877) 3 App.Cas. 254, H.L.(Sc.)
          *Miller's Deed Trusts, In re* (1978) 75 L.S.G. 454
          *Nelson v. Rye* [1996] 1 W.L.R. 1378; [1996] 2 All E.R. 186
          *Nestlé v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260; [1994] 1 All
              E.R. 118, C.A.


F          INTERLOCUTORY APPEAL from Chadwick J.
              On 21 June 1995 Deputy District Judge Raskin granted the plaintiff,
          Bristol and West Building Society, summary judgment pursuant to R.S.C.,
          Ord. 14 of its claims against the defendant solicitor, Anthony Paul
          Mothew (trading as Stapley & Co.), for damages to be assessed for breach
          of contract and negligence and damages for breach of trust. On 27 July
G          1995 Chadwick J. dismissed the defendant's appeal against that order.
              Pursuant to leave granted by Nourse L.J. on 29 December 1995 and
          by a notice of appeal dated 5 January 1996 the defendant sought to set
          aside the orders and be granted unconditional leave to defend on the
          grounds that the judge had erred in holding (1) that money paid to the
          defendant by the plaintiff was impressed with a constructive trust in
          favour of the plaintiff; (2) that the money was paid to the defendant under
H          a mistake of fact or had been induced by the defendant's misrepresentation,
          when no such allegations were made in the statement of claim; (3) that it
          was not necessary for the plaintiff to establish that it had sustained loss
          and damage as a result of the defendant's alleged breach of trust; (4) that

4

the defendant had no arguable defence to the claim for breach of trust  A
based upon acquiescence or affirmation by the plaintiff; and (5) that the
defendant had no arguable defence to the allegation that the plaintiff had
sustained loss and damage as a result of the breach of contract and
negligence.

By a respondent's notice dated 25 January 1996 the plaintiff contended
that it was entitled to judgment for the sum claimed in respect of its
claims for breach of contract and negligence.    .    B

The facts are stated in the judgment of Millett L.J.

*Jonathan Sumption Q.C.* and *Glenn Campbell* for the defendant.
A breach of a solicitor's conveyancing duty which makes no difference to
the lender's decision and has no impact on the value of the security cannot
result in the solicitor becoming the underwriter of the transaction when  C
the security is later sold at a loss: see *Target Holdings Ltd. v. Redferns*
[1996] A.C. 421. Although a solicitor has a number of fiduciary obligations
to his client, not every duty which is owed in the context of a fiduciary
relationship is a fiduciary duty: see *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362; *LAC Minerals Ltd. v. International Corona
Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 and *In re Coomber; Coomber*  D
*v. Coomber* [1911] 1 Ch. 723, 728. A solicitor's duty to report to his client
the outcome of conveyancing and allied inquiries is the ordinary
contractual duty of a professional to comply with his instructions and to
do so with reasonable skill.

*Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465 does
not assist the plaintiff as it was concerned only with a breach by a
fiduciary of his obligation to disclose to his principal his own personal  E
interest in the transaction. [Reference was also made to *Nocton v. Lord
Ashburton* [1914] A.C. 932.] The principle that relief is granted for such a
breach, without regard to what the plaintiff would have done if disclosure
had been made reflects the rule of equity that where a fiduciary has dealt
personally with the plaintiff without full disclosure to him the latter's
relief is not compensatory at all. He has, irrespective of his loss, an  F
absolute right to set aside the transaction or to claim an account of
profits. The compensation awarded to him is simply the financial
equivalent of setting aside: see *Gray v. New Augarita Porcupine Mines Ltd.*
[1952] 3 D.L.R. 1, 12–15. Compensation cannot be awarded for breach of
a duty as to the manner in which work should be carried out: see
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 164–165.
[Reference was also made to *Canson Enterprises Ltd. v. Boughton & Co.*  G
(1991) 85 D.L.R. (4th) 129; *Wan v. McDonald* (1992) 105 A.L.R. 473;
*Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141 and *Target Holdings Ltd.
v. Redferns* [1996] A.C. 421.]

There is no distinction between a solicitor who breaches his duty by
failing to report in accordance with his instructions before the mortgage
advance cheque is received and a solicitor who fails to deal with the
advance in accordance with his instructions after it is received. In neither  H
case does the breach of duty have the effect of terminating the solicitor's
retainer and his authority to complete the transaction. Equally, the
argument that the solicitor held the advance as soon as it was received on

A    a constructive trust to return it forthwith to the plaintiff cannot be supported. There cannot be a constructive trust inconsistent with the existing express trust to apply the loan moneys in completing the transaction, unless the solicitor's authority and obligation to complete the transaction are first brought to an end. [Reference was made to *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669; *Sinclair v. Brougham* [1914] A.C. 398 and *Lipkin Gorman*

B    *v. Karpnale Ltd.* [1991] 2 A.C. 548.]

If the plaintiff is to be awarded the amount of the advance money (less actual recoveries) it must be on the basis that that money has been misapplied. If the defendant had no authority to pay out the money to the vendor the payment was a breach of trust: see *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 and *Alliance & Leicester Building Society v.*

C    *Edgestop Ltd.* (unreported), 18 January 1991.

The plaintiff's loss on the loan transaction is due to the default of the purchasers and the fact that the security was not sufficient to cover the loan when it came to be realised, neither of which is the responsibility of the solicitor. The loss is not due to the existence or non-disclosure of a second mortgage.

D    *Nicholas Patten Q.C.* and *Timothy Higginson* for the plaintiff. The relationship between a solicitor and his client gives rise to fiduciary obligations on the part of the solicitor in the handling of his client's affairs. A failure to perform those obligations gives rise to a remedy in equity regardless of whether the acts complained of also constitute a breach of contract with a right to damages: see *Nocton v. Lord Ashburton* [1914] A.C. 932, 956–957. The underlying contractual relationship between

E    the parties cannot dictate or limit the scope of the concurrent fiduciary duties, as the defendant was expressly required to report any proposal for further borrowing before releasing the plaintiff's mortgage advance: see *Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145, 205–206.

A solicitor who acts for both lender and borrower in the same transaction has an unrestricted obligation to each client to act in his own best interests, including an obligation to disclose to the lender information

F    about the borrower which is material to the transaction: see *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437. [Reference was also made to *Lewis v. Hillman* (1852) 3 H.L.Cas. 607; *Kelly v. Cooper* [1993] A.C. 205; *Moody v. Cox and Hatt* [1917] 2 Ch. 71 and *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, 817–818.]

The non-disclosure of the proposed further borrowing was a breach of

G    trust. In addition, the release of the advance by the defendant when he had failed to disclose the proposed further borrowing in breach of his express instructions was made without authority and was itself a breach of trust. The right of the plaintiff to recover its advance is unaffected by *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 because the payment of the advance to the defendant (and therefore the creation of his agency to hold the money for the purpose of the intended transaction) was the direct

H    result of the reliance by the plaintiff upon the contents of the defendant's report on title. Therefore the defendant's ability to utilise the payment for the benefit of the borrowers in breach of trust was caused by the report on title.

6

Breaches of trust or fiduciary duty must cause the loss complained of A
but the test of causation is not the common law test. The inquiry is not to
determine what position the plaintiff would have been in had the contract
been performed but rather whether the loss would have been sustained
but for the breach of trust. The non-disclosure in the report on title caused
the loss because it induced the plaintiff to advance the funds in reliance
on the report. To inquire as to what the plaintiff would have done had
disclosure been made is to apply the common law test and is wrong in B
principle: see *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R.
465, 469; *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1,
15; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453 and
*Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653.

*Sumption Q.C.* replied.

C

*Cur. adv. vult.*

July 24.  The following judgments were handed down.

MILLETT L.J.  This is an appeal brought by the defendant with the
leave of the single Lord Justice from an order for summary judgment
given initially by the district judge and affirmed (for different reasons) by D
Chadwick J. It raises important questions of principle in relation to a
claim by a mortgagee to recover from the solicitor who was acting for
both mortgagor and mortgagee the loss arising from the mortgagor's
subsequent default.

The collapse in the property market which accompanied the recession
at the beginning of the present decade caused mortgage lenders to suffer E
serious losses. Unable to recover their advances from the borrowers or by
the enforcement of their security they have sought to recover them from
the valuers or solicitors on whose valuations or advice they have relied. In
some cases they have been the victims of a fraud to which the valuers and
solicitors have been parties. In other cases, such as the present, they have
been unable to accuse their solicitor of anything more serious than
negligence. Believing that the common law rules of causation and F
remoteness of damage might not enable them to recover the whole amount
of their loss they have turned to equity and alleged breach of trust or
fiduciary duty. We have thus been concerned to decide just what is
involved in these concepts.

*The facts*                                                                    G
The facts are not in dispute. The defendant is a solicitor. In August
1988 he acted for a Mr. and Mrs. Towers in the purchase of 17, Thameshill
Avenue, Romford for £73,000. In accordance with the usual practice he
also acted for the Bristol and West Building Society ("the society") to
which the purchasers had applied for an advance of £59,000 in order to
finance the purchase. (This was the Cheshunt Building Society, but its
rights have since vested in the society.) In their application form the H
purchasers had stated that the balance of the purchase price of £14,000
was being provided by them personally and that they were not applying
elsewhere for financial assistance towards the purchase price.

7

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A    The society offered to advance to the purchasers £59,000 on the security of a first mortgage of the property on the express condition that unless otherwise agreed in writing the balance of the purchase price was to be provided by the purchasers personally without resort to further borrowing and that no second mortgage or other loan was being arranged or contemplated in connection with the purchase. The defendant was provided with the offer of advance (but not with the purchasers'
B    application).

The society's standing instructions to solicitors acting for the society required them to report to the society prior to completion, inter alia:

"(viii) Any proposal that the applicant may create a second mortgage or enter into a promissory note or otherwise borrow in order to finance part of the purchase price. (ix) Any incorrect information
C    given in the solicitor's instructions. (x) Any other matters which ought to be brought to the notice of the society . . ."

The solicitor was required to submit a report on title and request for advance cheque to the society at least five clear working days before the cheque was required. This was done on a form by which the solicitor was asked to confirm, inter alia, that the title was good and marketable and
D    might safely be accepted by the society, that to the best of his knowledge and belief the balance of the purchase money was being provided by the applicant personally without resort to further borrowing, and that the special conditions attached to the offer of advance had been, or would be, complied with.

Mr. and Mrs. Towers intended to provide the balance of the purchase
E    price from the net proceeds of sale of their existing property after discharging a subsisting mortgage. As it happens, they owed money to Barclays Bank which was secured by a second charge on that property. They arranged with the bank to allow a small part of the debt (£3,350) to remain outstanding after the sale of the existing property and to be secured by a second charge on the new property. The defendant was informed of these arrangements and gave an undertaking to the bank to
F    hold the title deeds to its order pending registration. Unfortunately, he either failed to appreciate that, although they related to old borrowing, they were a matter which he was required to report to the society, or he had forgotten or overlooked them when he made his report.

By his report dated 2 August 1988 the defendant confirmed that to the best of his knowledge and belief the balance of the purchase money was
G    being provided by the applicants personally without resort to further borrowing and that the special conditions attached to the offer of advance had been or would be complied with. He failed to disclose the fact that Mr. and Mrs. Towers were making arrangements for a second mortgage in connection with the purchase.

It is conceded by the defendant that his statements were untrue and that his failure to report the purchasers' arrangements for a second
H    mortgage was a breach of his instructions. The society alleges that the defendant acted negligently and in breach of contract, and this is admitted. There is no allegation of dishonesty or bad faith, and if any such allegation were made it would be strongly resisted. The society does not allege that

8

Millett L.J.        **Bristol and West Building Society v. Mothew (C.A.)**                **[1998]**

the defendant made the statements in question knowing them to be untrue.    A
It alleges only that he "knew or ought to have known" that they were
untrue, and this is consistent with oversight.

Following the receipt of the report the society forwarded a cheque for
the amount of the advance to the defendant in readiness for completion
on 30 August. Completion took place on that date when the mortgage
advance was released to the vendor's solicitors as part of the purchase
price for the property. Mr. and Mrs. Towers executed a first charge in    B
favour of the society and a second charge in favour of the bank. On
25 November the defendant applied to the society for its consent to the
registration of the second charge in favour of the bank. The society
granted its consent on 10 March 1989. It does not appear that the society
was aware of the date of the bank's charge (and so was aware that it
constituted a breach of the conditions of the advance) when it gave its    C
consent, but it is alleged that the society must have learnt of it shortly
afterwards and nevertheless took no action.

The purchasers defaulted after making only small repayments and the
society enforced its security. The property was sold on 6 February 1991
and realised net proceeds of a little under £53,000. The society claimed to
recover the whole of its net loss on the transaction from the defendant,
alleging breach of contract, negligence and breach of trust. As I have    D
already indicated, breach of contract and negligence are admitted; breach
of trust is denied.

It has always been the defendant's case that the society would not have
been concerned by the purchasers' proposal to grant a second charge to
the bank if this had been disclosed to it in August 1988, that it would still
have proceeded with the transaction and that it would have suffered    E
precisely the same loss in that event. It is alleged that, in the heady days
of 1988, when the property market was at its height and mortgage lenders
were falling over themselves to advance money to house purchasers, the
society would not have been concerned by a proposal to grant a second
charge to secure a relatively trivial indebtedness which did not even
represent fresh borrowing; and it is contended that this is demonstrated
by the lack of concern shown by the society when it was asked to give its    F
consent to the registration of a second charge in March 1989. Despite the
submissions of the society to the contrary, I am satisfied that, if legally
relevant, these allegations raise a triable issue.


*The course of the proceedings below*
                                                                         G
It was common ground below that no damages would be recoverable
at common law for breach of contract or tort unless the society could
show that it would not have proceeded with the transaction if it had been
informed of the facts. The society, however, submitted that the position
was different in equity. It alleged that the defendant had committed a
breach of trust or fiduciary duty, and submitted that common law
principles of causation and remoteness of damage have no application in    H
such a case so that it was not necessary for the society to show that it
would not have proceeded with the transaction if it had been informed of
the facts.

9

A    The district judge accepted these arguments. In respect of the common law claims for breach of contract and negligence she gave summary judgment for damages to be assessed. This was apparently on the basis that the judgment would leave it open to the defendant to contend that no loss was caused by the breach.

The district judge also gave summary judgment for the society for breach of trust for the sum of £59,000 less the sums received by the society
B    on the sale of the property, and this was affirmed by the judge, who was satisfied that there was no question or issue to be tried in the action and dismissed the appeal.

*The course of the appeal*

C    In the course of the appeal the defendant submitted that, by consenting to the registration of the second charge, the society waived the breaches of which complaint is made; and that this raises a triable issue on liability which entitles him to unconditional leave to defend in relation to all the pleaded causes of action. In the absence of any evidence or reason to suppose that the society was aware of the date of the second charge when it gave its consent to its registration, I am not persuaded that there is a
D    triable issue on waiver, and I would not disturb the order below on this ground.

When the appeal was first argued before us it was still conceded by the society that it could not recover damages at common law for breach of contract or negligence unless it could show that it would not have proceeded with the mortgage advance if it had been informed of the facts.
E    The society, however, maintained that it could escape this principle because the defendant was also guilty of a breach of trust and that common law rules of causation and remoteness of damage have no application in such a case. The critical questions, therefore, appeared to be whether the defendant was guilty of a breach of trust or fiduciary duty and if so whether the society needed to prove that it would not still have proceeded with the transaction if it had been told of the facts.
F    After we had reserved judgment on the appeal, however, the society informed us that it wished to resile from its concession. Relying on the recent decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426, the society submitted that it was entitled to recover the whole of its net loss on the transaction by way of damages for negligence at common law without having to establish that it would not have proceeded with the
G    transaction if it had been informed of the facts. If correct, it submitted, this would be determinative of the case, and it would not be necessary for the society to rely on any breach of trust or fiduciary duty. Before the defendant's advisers could respond to this, speeches were delivered in the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. These were relevant to the common law position. For the reasons given by Staughton L.J., however, we decided that it was
H    not necessary to restore the appeal for further argument. This was because the assessment of damages at common law is still pending. They will have to be assessed in conformity with the decision of the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* and not

with any gloss which, in the absence of argument, we may inadvertently    A
have put upon that decision.

*The claims at common law*

The society has served a respondent's notice, in which it contends that
it is entitled to judgment for the sum claimed, and not merely for damages
to be assessed, in respect of its common law claims. If this is correct, then    B
the society does not need to establish that the defendant was guilty of a
breach of trust or fiduciary duty.

This question depends upon an alleged difference between the tests of
causation and remoteness of damage at common law and in equity. In a
case of the present kind, however, two different questions of causation are
involved and it is necessary to distinguish between them. Where a plaintiff
claims that he has suffered loss by entering into a transaction as a result    C
of negligent advice or information provided by the defendant, the first
question is whether the plaintiff can establish that the defendant's
negligence caused him to enter into the transaction. If he cannot his claim
must fail. But even if he can, it is not sufficient for him to establish that
the transaction caused him loss. He must still show what (if any) part of
his loss is attributable to the defendant's negligence. This is usually treated    D
as a question of the measure of damages rather than as causation, and for
convenience I shall so treat it in this judgment, but it must be
acknowledged that it involves questions of causation.

In *Downs v. Chappell* [1997] 1 W.L.R. 426 the plaintiffs bought a small
business in reliance on trading figures contained in a letter from
the vendor's accountants which was forwarded to them by the vendor.
The vendor knew that the figures contained in the letter were false. The    E
plaintiffs sued the vendor for deceit and the accountants for negligence.
The judge accepted the plaintiffs' evidence that they would not have
contracted to purchase the business without verification of the figures by
the accountants. But he was not satisfied that they would not still have
bought the business even if the correct figures had been supplied, and
dismissed the action against both defendants.

This court allowed the plaintiffs' appeal against both defendants.    F
Hobhouse L.J. gave the only reasoned judgment. In relation to the vendor,
he pointed out that for a plaintiff to succeed in the tort of deceit it was
necessary for him to prove (1) a fraudulent representation, (2) materiality
and (3) inducement. All three elements had been proved. The judge had
found that the representations did induce the plaintiffs to enter into the
transaction: they would not have done so without them. This was sufficient    G
proof of causation. Whether the plaintiffs would have entered into the
transaction if they had been told the truth was irrelevant.

We are not concerned with this part of the decision, since the present
case is not one of fraud. But Hobhouse L.J. held that the position was the
same in relation to the accountants, who were charged with negligence
only. Here the question was not inducement but reliance. The relevant
question was simply whether the plaintiffs had entered into the contract    H
in reliance upon the figures contained in the accountants' letter. The judge
had answered that question in the affirmative: the plaintiffs would not
have entered into the contract if they had not been provided with the

Case 23-50437-JTD    Doc 60-1    Filed 12/15/23    Page 259 of 850

11
Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A    letter. The causal relationship between the accountants' negligence and the plaintiffs' purchase was established. It was not necessary to consider whether the plaintiffs would have purchased the business if they had been supplied with the correct figures.

In the present case the society's claim is not for misrepresentation. Accordingly, questions of inducement and materiality are not relevant. Its claim lies in negligence, and the relevant concept is reliance. In considering

B    the issue of causation in an action for negligence brought by a client against his solicitor it appears from *Downs v. Chappell* that it is necessary to distinguish between two different kinds of case.

Where a client sues his solicitor for having negligently failed to give him proper advice, he must show what advice should have been given and (on a balance of probabilities) that if such advice had been given he would

C    not have entered into the relevant transaction or would not have entered into it on the terms he did. The same applies where the client's complaint is that the solicitor failed in his duty to give him material information. In *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113, which was concerned with a failure to give proper advice, the plaintiff was unable to establish this and his claim to damages for negligence failed. In *Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836,

D    which was concerned with a failure to convey information, the plaintiff was able to establish that if it had been given the information it would have withdrawn from the transaction and its claim succeeded.

Where, however, a client sues his solicitor for having negligently given him incorrect advice or for having negligently given him incorrect information, the position appears to be different. In such a case it is

E    sufficient for the plaintiff to prove that he relied on the advice or information, that is to say, that he would not have acted as he did if he had not been given such advice or information. It is not necessary for him to prove that he would not have acted as he did if he had been given the proper advice or the correct information. This was the position in *Downs v. Chappell* [1997] 1 W.L.R. 426.

In the present case the society makes complaints of both kinds. It

F    alleges that the defendant negligently and in breach of his instructions failed to report the purchasers' proposed arrangements with the bank prior to completion. This is a claim of the first kind, and if it were all the society would have to establish that if it had been informed of those arrangements it would not have proceeded with the mortgage advance. But the defendant went further than this. He did not merely fail to report

G    the arrangements to the society; he expressly represented to the society that no such arrangements existed. That brings the case within the second category. It follows from the decision of this court in *Downs v. Chappell* that it is sufficient for the society to prove that it relied on the representations in the report. Although the judge spoke in terms of inducement, he plainly found reliance. The society's procedures were designed to ensure that no cheque would be issued in the absence of a

H    satisfactory report from its solicitor.

In my judgment we are bound by the decision in *Downs v. Chappell* to hold that the necessary causal link between the defendant's negligence and the mortgage advance was proved.

12
Millett L.J.        **Bristol and West Building Society v. Mothew (C.A.)**            **[1998]**

*Measure of damages*                                                                    A

It does not, however, follow from the fact that the defendant's negligent statements caused the society to make the mortgage advance that the whole of the society's loss is attributable to his negligence. Having regard to the date of the advance, some part at least of the society's loss may well be attributable to the fall in property values which had occurred by the time that it was able to sell the property.                    B

In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191 the House of Lords ruled definitively on the correct measure of damages for the negligent provision of information on which the plaintiff relied in entering into a transaction from which loss resulted. The only speech was delivered by Lord Hoffmann. He distinguished between the measure of damages for (1) breach of a contractual warranty and (2) breach of a duty (whether contractual or tortious) to take care    C
(i) to give proper advice and (ii) to provide accurate information.

In the case of breach of warranty, the comparison is between the plaintiff's position as a result of entering into the transaction and what it would have been if the facts had been as warranted. The measure of damages is the extent to which the plaintiff would have been better off if the information had been right. In the case of a breach of duty to take    D
care the measure of damages is the extent to which the plaintiff is worse off because the information was wrong. Since he entered into the transaction in reliance on the advice or information given to him by the defendant, the starting point is to compare his position as a result of entering into the transaction with what it would have been if he had not entered into the transaction at all.

But that is only the starting point. Lord Hoffmann distinguished    E
between a duty to advise someone as to what course of action he should take and a duty to provide information for the purpose of enabling someone else to decide upon his course of action. In the former case, the defendant is liable for all the foreseeable consequences of the action being taken. In the latter case, however, he is responsible only for the consequences of the information being wrong. The measure of damages is    F
not necessarily the full amount of the loss which the plaintiff has suffered by having entered into the transaction but only that part if any of such loss as is properly attributable to the inaccuracy of the information. If the plaintiff would have suffered the same loss even if the facts had actually been as represented the defendant is not liable.

Accordingly, in this class of case the plaintiff must prove two things: first, that he has suffered loss; and, secondly, that the loss fell within the    G
scope of the duty he was owed. In the present case the society must prove what (if any) loss was occasioned by the arrangements which the purchasers had made with the bank.

The society was told that Mr. and Mrs. Towers had no other indebtedness and that no second charge was contemplated. The existence of the second charge did not affect the society's security. The absence of any indebtedness to the bank would not have put money in the purchasers'    H
pocket; it would merely have reduced their liabilities. Whether their liability to the bank affected their ability to make mortgage repayments to the society has yet to be established, but given the smallness of the liability

Case 23-50437-JTD    Doc 60-1    Filed 12/15/23    Page 261 of 850

13
Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A  its effect on the purchasers' ability to meet their obligations to the society may have been negligible. It may even be, for example, that the purchasers made no payments at all to the bank at the relevant time, and if so it is difficult to see how any part of the loss suffered by the society can be attributable to the inaccuracy of the information supplied to it by the defendant. It would have occurred even if the information had been correct.

B

*Conclusion*

The society has proved the causal link between the defendant's negligence and the making of the mortgage advance but it has not yet established the amount of its loss (if any) which is properly attributable

C  to the defendant's negligence. Damages remain to be assessed. We are bound by the decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426 to hold that the society will not have to prove that it would not have made the mortgage advance if it had known the true facts; but it will be required to establish what it has lost as a result of the existence of the second charge and the purchasers' indebtedness to the bank. It can maintain the money judgment which it has obtained below only if it can

D  invoke equitable principles.

*The claims in equity*

*The judge's reasoning*

The judge found that, in the events which happened, the defendant

E  committed a breach of trust by applying the mortgage advance in the purchase of the property, that he was accordingly liable to restore the trust property, viz. the £59,000 with interest less receipts, that no question of damages at common law or of compensation for loss arose, and that it was irrelevant whether, had it been told of the position, the society might still have chosen to make the advance notwithstanding the arrangements

F  which had been made with the bank. Accordingly the judge concluded that there was no question or issue to be tried in the action and gave summary judgment for the whole of the society's claim.

The judge's conclusion that the defendant had committed a breach of trust in applying the mortgage advance in the purchase of the property was based on the fact that he had obtained payment of the mortgage advance by misrepresentation. The judge said:

G

"it seems to me beyond argument that [the defendant] received the cheque . . . for £59,000 as a direct result of the misleading report which he had supplied to the society on 2 August 1988. The money was paid to the defendant . . . as a result of a misrepresentation made to the society by the defendant. . . . *The effect, in my judgment, was that from the moment when [the] cheque for £59,000 was received*

H  *by [the defendant] he held it upon a constructive trust to return it forthwith to the society, unless authorised by the society to retain, or dispose of, it after a full knowledge of the facts had been disclosed.*" (My emphasis.)

14

In the judge's opinion it necessarily followed that the defendant's       A
subsequent application of the mortgage money in the purchase of the
property constituted a breach of trust. He said:

> "In making that payment there is, in my view, no doubt that the
> defendant acted in breach of the trust which had been imposed upon
> him by the circumstances in which he had received the society's
> cheque. That trust required him to return the £59,000 to the society.
> Any payment of that £59,000 to a third party, albeit to the vendors       B
> of the property, was a breach of that trust."

The judge dismissed the submission that the society had to establish that
it would not have made the advance if it had known the facts. He said:

> "But that point affords no defence to the [society]'s claim. It is
> nihil ad rem that if the true position had been disclosed to the society,       C
> the society might or might not have issued an amended offer of
> advance. Liability to repay arises in this case because [the defendant]
> received money from the society as a result of his own
> misrepresentation. He cannot be heard to say that he could retain
> that money against the society, or dispose of it to the vendors,
> because, in other circumstances, the society might have chosen to
> make the advance notwithstanding the borrowing from [the bank]."       D

The judge did not explain why the consequence of the defendant's
misrepresentation was that he held the mortgage advance on a constructive
trust for the society, or why the defendant's authority to apply the money
in accordance with the society's instructions was determined, but he took
the opportunity to do so when he revisited these questions a few months
later in *Bristol and West Building Society v. May May & Merrimans* [1996]       E
2 All E.R. 801 after two county court judges had declined to follow his
decision in the present case. The later case involved a number of
transactions in which the same society had made mortgage advances and
suffered loss when the borrowers defaulted which it sought to recover
from the solicitors who had acted for both parties to the lending
transactions. In some cases the solicitor knew nothing, prior to the receipt
of the cheque for the mortgage advance, which ought to have led him to       F
qualify his report, though he discovered the facts afterwards and before
he disbursed the money on completion. In other cases the solicitor's
breach of his instructions preceded his receipt of the mortgage advance,
as it did in the present case.

The judge distinguished between the two groups of cases. In relation
to the first group he reluctantly felt compelled by the decision in *Target*       G
*Holdings Ltd. v. Redferns* [1996] A.C. 421 to conclude that, at least for the
purpose of an application for summary judgment, it was necessary for the
society to show that it would not have proceeded with the transaction if it
had known the facts. In relation to the second group, however, where the
society paid the cheque for the mortgage advance to the solicitor in
response to a request based upon a warranty or representation which (as
the judge put it) the solicitor "knew or must be taken to have known" to       H
be misleading, he confirmed his previous decision in the present case. He
held that the society was entitled to succeed in such cases whether or not
it would have still made the advance if it had known the facts.

15

A    In the course of his judgment the judge explained how the constructive trust in question arose. It was, he said, because the solicitor had given misleading information to his client. This constituted a breach of fiduciary duty which enabled the court to impose a constructive trust on the property acquired as a result of the breach of duty. He said [1996] 2 All E.R. 801, 818:

B    "where moneys have been received by the solicitor from the society following a request based upon a warranty or representation which he knew, or must be taken to have known, to be misleading in some material respect, equity will give a remedy in respect of any loss which the society may suffer as a result of its payment in reliance upon that request. That will be a remedy based upon breach of fiduciary duty and may, where necessary, take the form of the

C    imposition of a constructive trust on those moneys to enforce the solicitor's obligation to return them to the society forthwith. The constructive trust imposed by equity to enforce the obligation to make immediate restitution overrides any express or implied trust which might otherwise arise out of any instructions given by [the society] when the money is paid to the solicitor. No reliance can be

D    placed on ... those instructions, because they are vitiated by the breach of duty by which they were obtained.... In the absence of some fresh instructions, given by the society after full disclosure of the matters in respect of which it has been misled, the only course properly open to the solicitor is to repay the moneys to the society with interest."

E    The judge evidently considered himself to be imposing a remedial constructive trust as the appropriate remedy for a prior breach of fiduciary duty.

The judge's references to the solicitor having made a representation which "he knew, or must be taken as having known" to be misleading is not an accurate description of the facts of the present case. It is not alleged that the defendant "knew or must be taken to have known" the

F    facts, but only that he "knew or ought to have known" them, which is a very different matter. In explaining his decision in the present case the judge said that the defendant's misrepresentation could not be described as innocent because he "clearly had the knowledge which made the representation false:" see [1996] 2 All E.R. 801, 832. That confuses knowledge with the means of knowledge. On the society's pleaded case

G    the defendant must be taken to have known the facts at one time but to have forgotten or overlooked them so that they were not present to his mind when he came to complete his report to the society.

It is not alleged that the defendant deliberately concealed the arrangements which the purchasers had made with their bank from the society or that he consciously intended to mislead it. Nothing in this judgment is intended to apply to such a case. My observations are

H    confined to the case like the present where the provision of incorrect information by a solicitor to his client must be taken to have been due to an oversight. In such a case his breach of duty is unconscious; he will ex hypothesi be unaware of the fact that he has committed a breach of his

16

instructions; and if this means that his subsequent application of the   A
mortgage money constitutes a breach of trust then it will be a breach of a
trust of which he is unaware. I would not willingly treat such conduct as
involving a breach of trust or misapplication of trust money unless
compelled by authority to do so, and in my judgment neither principle
nor authority compels such a conclusion.

Before us the defendant submits that, while he was guilty of negligence
and breach of contract, he was not guilty of a breach of trust or fiduciary   B
duty. It is convenient to take first the question of fiduciary duty, and then
to consider the question of breach of trust.

*Breach of fiduciary duty*

Despite the warning given by Fletcher Moulton L.J. in *In re Coomber;*
*Coomber v. Coomber* [1911] 1 Ch. 723, 728, this branch of the law has   C
been bedevilled by unthinking resort to verbal formulae. It is therefore
necessary to begin by defining one's terms. The expression "fiduciary
duty" is properly confined to those duties which are peculiar to fiduciaries
and the breach of which attracts legal consequences differing from those
consequent upon the breach of other duties. Unless the expression is so
limited it is lacking in practical utility. In this sense it is obvious that not   D
every breach of duty by a fiduciary is a breach of fiduciary duty. I would
endorse the observations of Southin J. in *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362:

> "The word 'fiduciary' is flung around now as if it applied to all
> breaches of duty by solicitors, directors of companies and so
> forth. . . . That a lawyer can commit a breach of the special duty [of
> a fiduciary] . . . by entering into a contract with the client without   E
> full disclosure . . . and so forth is clear. But to say that simple
> carelessness in giving advice is such a breach is a perversion of
> words."

These remarks were approved by La Forest J. in *LAC Minerals Ltd. v.*
*International Corona Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 where
he said: "not every legal claim arising out of a relationship with fiduciary   F
incidents will give rise to a claim for breach of fiduciary duty."

It is similarly inappropriate to apply the expression to the obligation
of a trustee or other fiduciary to use proper skill and care in the discharge
of his duties. If it is confined to cases where the fiduciary nature of the
duty has special legal consequences, then the fact that the source of the
duty is to be found in equity rather than the common law does not make   G
it a fiduciary duty. The common law and equity each developed the duty
of care, but they did so independently of each other and the standard of
care required is not always the same. But they influenced each other, and
today the substance of the resulting obligations is more significant than
their particular historic origin. In *Henderson v. Merrett Syndicates Ltd.*
[1995] 2 A.C. 145, 205 Lord Browne-Wilkinson said:

> "The liability of a fiduciary for the negligent transaction of his duties   H
> is not a separate head of liability but the paradigm of the general
> duty to act with care imposed by law on those who take it upon
> themselves to act for or advise others. Although the historical

A  development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the
B  careless performance of what they have undertaken to do, not the description of the trade or position which they hold."

I respectfully agree, and endorse the comment of Ipp J. in *Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 157:

C  "It is essential to bear in mind that the existence of a fiduciary relationship does not mean that every duty owed by a fiduciary to the beneficiary is a fiduciary duty. In particular, a trustee's duty to exercise reasonable care, though equitable, is not specifically a fiduciary duty . . ."

Ipp J. explained, at p. 158:

D  "The director's duty to exercise care and skill has nothing to do with any position of disadvantage or vulnerability on the part of the company. It is not a duty that stems from the requirements of trust and confidence imposed on a fiduciary. In my opinion, that duty is not a fiduciary duty, although it is a duty actionable in the equitable jurisdiction of this court. . . . I consider that Hamilton owed P.B.S. a duty, both in law and in equity, to exercise reasonable care and skill,
E  and P.B.S. was able to mount a claim against him for breach of the legal duty, and, in the alternative, breach of the equitable duty. For the reasons I have expressed, in my view the equitable duty is not to be equated with or termed a 'fiduciary' duty."

I agree. Historical support for this analysis may be found in Viscount Haldane L.C.'s speech in *Nocton v. Lord Ashburton* [1914] A.C. 932, 956.
F  Discussing the old bill in Chancery for equitable compensation for breach of fiduciary duty, he said that he thought it probable that a demurrer for want of equity would always have lain to a bill which did no more than seek to enforce a claim for damages for negligence against a solicitor.

In my judgment this is not just a question of semantics. It goes to the very heart of the concept of breach of fiduciary duty and the availability of equitable remedies.

G  Although the remedy which equity makes available for breach of the equitable duty of skill and care is equitable compensation rather than damages, this is merely the product of history and in this context is in my opinion a distinction without a difference. Equitable compensation for breach of the duty of skill and care resembles common law damages in that it is awarded by way of compensation to the plaintiff for his loss. There is no reason in principle why the common law rules of causation,
H  remoteness of damage and measure of damages should not be applied by analogy in such a case. It should not be confused with equitable compensation for breach of fiduciary duty, which may be awarded in lieu of rescission or specific restitution.

18

This leaves those duties which are special to fiduciaries and which   A
attract those remedies which are peculiar to the equitable jurisdiction and
are primarily restitutionary or restorative rather than compensatory.
A fiduciary is someone who has undertaken to act for or on behalf of
another in a particular matter in circumstances which give rise to a
relationship of trust and confidence. The distinguishing obligation of a
fiduciary is the obligation of loyalty. The principal is entitled to the single-
minded loyalty of his fiduciary. This core liability has several facets.   B
A fiduciary must act in good faith; he must not make a profit out of his
trust; he must not place himself in a position where his duty and his
interest may conflict; he may not act for his own benefit or the benefit of
a third person without the informed consent of his principal. This is not
intended to be an exhaustive list, but it is sufficient to indicate the nature
of fiduciary obligations. They are the defining characteristics of the   C
fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations*
(1977), p. 2, he is not subject to fiduciary obligations because he is a
fiduciary; it is because he is subject to them that he is a fiduciary.

(In this survey I have left out of account the situation where the
fiduciary deals with his principal. In such a case he must prove
affirmatively that the transaction is fair and that in the course of the
negotiations he made full disclosure of all facts material to the transaction.   D
Even inadvertent failure to disclose will entitle the principal to rescind the
transaction. The rule is the same whether the fiduciary is acting on his
own behalf or on behalf of another. The principle need not be further
considered because it does not arise in the present case. The mortgage
advance was negotiated directly between the society and the purchasers.
The defendant had nothing to do with the negotiations. He was instructed
by the society to carry out on its behalf a transaction which had already   E
been agreed.)

The nature of the obligation determines the nature of the breach. The
various obligations of a fiduciary merely reflect different aspects of his
core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore,
connotes disloyalty or infidelity. Mere incompetence is not enough.
A servant who loyally does his incompetent best for his master is not   F
unfaithful and is not guilty of a breach of fiduciary duty.

In the present case it is clear that, if the defendant had been acting for
the society alone, his admitted negligence would not have exposed him to
a charge of breach of fiduciary duty. Before us counsel for the society
accepted as much, but insisted that the fact that he also acted for the
purchasers made all the difference. So it is necessary to ask: "Why did the   G
fact that the defendant was acting for the purchasers as well as for
the society convert the defendant's admitted breach of his duty of skill
and care into a breach of fiduciary duty?" To answer this question it is
necessary to identify the fiduciary obligation of which he is alleged to have
been in breach.

It is at this point, in my judgment, that the society's argument runs
into difficulty. A fiduciary who acts for two principals with potentially   H
conflicting interests without the informed consent of both is in breach of
the obligation of undivided loyalty; he puts himself in a position where
his duty to one principal *may* conflict with his duty to the other: see *Clark*

Case 23-50437-JTD    Doc 60-1    Filed 12/15/23    Page 267 of 850

19
Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A    *Boyce v. Mouat* [1994] 1 A.C. 428 and the cases there cited. This is
sometimes described as "the double employment rule." Breach of the rule
automatically constitutes a breach of fiduciary duty. But this is not
something of which the society can complain. It knew that the defendant
was acting for the purchasers when it instructed him. Indeed, that was the
very reason why it chose the defendant to act for it. The potential conflict
was of the society's own making: see *Finn, Fiduciary Obligations*, p. 254
B    and *Kelly v. Cooper* [1993] A.C. 205.

It was submitted on behalf of the society that this is irrelevant because
the defendant misled the society. It did not know of the arrangements
which the purchasers had made with their bank, and so could not be said
to be "fully informed" for the purpose of absolving the defendant from
the operation of the double employment rule. The submission is
C    misconceived. The society knew all the facts relevant to its choice of
solicitor. Its decision to forward the cheque for the mortgage advance to
the defendant and to instruct him to proceed was based on false
information, but its earlier decision to employ the defendant despite the
potentially conflicting interest of his other clients was a fully informed
decision.

D    That, of course, is not the end of the matter. Even if a fiduciary is
properly acting for two principals with potentially conflicting interests he
must act in good faith in the interests of each and must not act with the
intention of furthering the interests of one principal to the prejudice of
those of the other: see *Finn*, p. 48. I shall call this "the duty of good
faith." But it goes further than this. He must not allow the performance
of his obligations to one principal to be influenced by his relationship with
E    the other. He must serve each as faithfully and loyally as if he were his
only principal.

Conduct which is in breach of this duty need not be dishonest but it
must be intentional. An unconscious omission which happens to benefit
one principal at the expense of the other does not constitute a breach of
fiduciary duty, though it may constitute a breach of the duty of skill and
F    care. This is because the principle which is in play is that the fiduciary
must not be inhibited by the existence of his other employment from
serving the interests of his principal as faithfully and effectively as if he
were the only employer. I shall call this "the no inhibition principle."
Unless the fiduciary is inhibited or believes (whether rightly or wrongly)
that he is inhibited in the performance of his duties to one principal by
reason of his employment by the other his failure to act is not attributable
G    to the double employment.

Finally, the fiduciary must take care not to find himself in a position
where there is an *actual* conflict of duty so that he cannot fulfil his
obligations to one principal without failing in his obligations to the other:
see *Moody v. Cox and Hatt* [1917] 2 Ch. 71; *Commonwealth Bank of
Australia v. Smith* (1991) 102 A.L.R. 453. If he does, he may have no
H    alternative but to cease to act for at least one and preferably both. The
fact that he cannot fulfil his obligations to one principal without being in
breach of his obligations to the other will not absolve him from liability.
I shall call this "the actual conflict rule."

20

In the present case the judge evidently thought that the defendant was    A
in breach of both the duty of good faith and the actual conflict rule. In
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All
E.R. 801, 817–818 he said:

> "there can be no doubt that the requirement of unconscionable
> conduct is present where a solicitor who is acting for both borrower
> and lender misrepresents to the lender some fact *which he knows, or*    B
> *must be taken to know*, will or may affect the lender's decision to
> proceed with the loan. In those circumstances the solicitor *is abusing*
> *his fiduciary relationship with one client, the lender, to obtain an*
> *advantage for his other client, the borrower.* It is as much 'against the
> dictates of conscience' for a solicitor *knowingly to prefer the interests*
> *of one client over those of another client* as it is for him to prefer his
> own interests over those of his client." (My emphasis.)    C

I respectfully agree; but no such allegation is made in the present case.

As to the actual conflict rule, the judge said, at p. 832:

> "First, in *Mothew,* the 'agent' was a fiduciary who had put himself in
> a position in which his duty to the lender *was* in conflict with the
> interests of his other client, the borrower." (My emphasis.)    D

I do not accept this. By instructing him to act for them, the purchasers
must be taken to have authorised the defendant to complete the report
without which the mortgage advance would not have been forthcoming;
and to complete it truthfully. The defendant was required by the society
to report on the purchasers' title as well as to confirm the absence of any
further borrowing. The two stood in exactly the same case. The defendant    E
would not have been in breach of his duty to the purchasers if he had
disclosed the facts to the society any more than if he had reported a defect
in their title.

This proposition can be tested by considering what the defendant's
position would have been if he had acted for the purchasers and another
solicitor had been instructed to act for the society. He would have been    F
required to deduce the purchasers' title to the satisfaction of the society's
solicitor, and to confirm to him that no further borrowing or second
charge was in contemplation. His duty to the purchasers would have
required him to ascertain the facts from them and to report them to
the society. Unless they told him the facts and instructed him to lie to the
society, instructions which he would be bound to refuse, his duty to the
purchasers would not inhibit him in providing full and truthful information    G
to the solicitor acting for the society.

In my judgment, the defendant was never in breach of the actual
conflict rule. It is not alleged that he acted in bad faith or that he
deliberately withheld information because he wrongly believed that his
duty to the purchasers required him to do so. He was not guilty of a
breach of fiduciary duty.

The judge relied on *Nocton v. Lord Ashburton* [1914] A.C. 932 and    H
*Commonwealth Bank of Australia v. Smith*, 102 A.L.R. 453 to hold that a
party who pays money to his solicitor in reliance on a representation
*known* by the solicitor to be false has a remedy for breach of fiduciary

Case 23-50437-JTD    Doc 60-1    Filed 12/15/23    Page 269 of 850

21
Ch.          Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A   duty. Neither case is authority for the proposition (though its correctness is not in issue); certainly neither is authority for the proposition that a party who pays money to a solicitor in reliance on a representation which the solicitor *ought to have known* to be false has such a remedy.

In *Nocton v. Lord Ashburton* [1914] A.C. 932 a solicitor had an undisclosed personal interest in a transaction on which he gave his client

B   advice which was to his own advantage and the disadvantage of his client. The plaintiff pleaded breach of the duty of good faith. In fact this was unnecessary; the existence of the defendant's undisclosed interest was enough: see *Lewis v. Hillman* (1852) 3 H.L.Cas. 607. The plaintiff was entitled to receive, and thought that he was receiving, the disinterested advice of a solicitor with no other interest in the transaction. *Commonwealth Bank of Australia v. Smith*, 102 A.L.R. 453 involved a

C   breach of the actual conflict rule. The defendant, who was acting for both parties to a proposed transaction, placed himself in an impossible position by undertaking to advise one of them on the merits of the transaction.

In *Moody v. Cox and Hatt* [1917] 2 Ch. 71 a solicitor, who was acting for both vendor and purchaser, was in possession of valuations which showed that the property was not worth the price which the purchaser

D   had agreed to pay. He did not disclose them to the purchaser, and claimed that his duty to the vendor precluded him from doing so. The purchaser was allowed to rescind. The case bears a superficial resemblance to the present but there are two crucial differences: (i) the vendor was under no obligation to disclose the valuations to the purchaser and did not wish his solicitor do so; and (ii) the vendor and the solicitor tacitly agreed to

E   conceal the valuations from the purchaser. The solicitor was in breach of both the duty of good faith and the actual conflict rule; his defence fell foul of the no inhibition principle.

That was a case of deliberate concealment. Non-disclosure and concealment are two very different things. This has been a truism of the law from the time of Cicero (De Officiis, lib. 3, c. 12, 13 citing Diogenes

F   of Babylon). It is even enshrined, like other such truisms, in a Latin tag: aliud est celare, aliud tacere.

The society placed much reliance on a dictum by Lord Jauncey of Tullichettle in *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437 where he said:

> "Another case of breach [of fiduciary duty] is where a solicitor
G   > acts for both parties to a transaction without disclosing this to one of
> them *or where having disclosed it he fails, unbeknown to one party, to*
> *disclose to that party material facts relative to the other party of which*
> *he is aware.*" (My emphasis.)

But I do not think that Lord Jauncey meant to include an inadvertent failure which owes nothing to the double employment. Where such failure

H   is to the advantage of the other party, the court will jealously scrutinise the facts to ensure that there has been nothing more than inadvertence, but there can be no justification for treating an unconscious failure as demonstrating a want of fidelity.

22

In my judgment the distinction drawn by Ipp J. in *Permanent Building    A
Society v. Wheeler*, 14 A.C.S.R. 109 is sound in principle and is decisive
of the present case. On the society's pleaded case the fact that the
defendant was acting for the purchasers played no part in his failure to
report the true state of affairs to the society. It did not inhibit him from
fulfilling his obligations to the society. It is consistent with its pleaded case
that the defendant would have done so but for a negligent oversight. It
would have been exactly the same if he had failed to notice and report the    B
existence of a defect in the purchasers' title. To characterise either such
failure as a breach of fiduciary duty because he was acting for both parties
in a situation where that fact did not contribute to his failure is, in my
opinion, to substitute a verbal formula for principle.

In my judgment the judge's conclusion that the defendant was in
breach of fiduciary duty cannot be supported. It follows that it cannot be    C
sustained as a ground for holding the defendant in breach of a constructive
trust of the mortgage money.

### *Breach of trust*

It is not disputed that from the time of its receipt by the defendant the
mortgage money was trust money. It was client's money which belonged    D
to the society and was properly paid into a client account. The defendant
never claimed any beneficial interest in the money which remained
throughout the property of the society in equity. The defendant held it in
trust for the society but with the society's authority (and instructions) to
apply it in the completion of the transaction of purchase and mortgage of
the property. Those instructions were revocable but, unless previously
revoked, the defendant was entitled and bound to act in accordance with    E
them.

The society's instructions were not revoked before the defendant acted
on them, and in my judgment there was no ground upon which the judge
could properly conclude that his authority to apply the money in
completing the transaction had determined.

If his judgment in the present case is considered without the benefit of    F
his later explanation in *Bristol and West Building Society v. May May
& Merrimans* [1996] 2 All E.R. 801, it would appear that the judge was of
opinion that the defendant's authority to deal with the money was
automatically vitiated by the fact that it (and the cheque itself) was
obtained by misrepresentation. But that is contrary to principle.
Misrepresentation makes a transaction voidable not void. It gives the
representee the right to elect whether to rescind or affirm the transaction.    G
The representor cannot anticipate his decision. Unless and until the
representee elects to rescind the representor remains fully bound. The
defendant's misrepresentations merely gave the society the right to elect to
withdraw from the transaction on discovering the truth. Since its
instructions to the defendant were revocable in any case, this did not
materially alter the position so far as he was concerned, though it may
have strengthened the society's position in relation to the purchasers.    H

The right to rescind for misrepresentation is an equity. Until it is
exercised the beneficial interest in any property transferred in reliance on
the representation remains vested in the transferee. In *El Ajou v. Dollar*

Case 23-50437-JTD    Doc 60-1    Filed 12/15/23    Page 271 of 850

23

Ch.         **Bristol and West Building Society v. Mothew (C.A.)**         Millett L.J.

A  *Land Holdings Plc.* [1993] 3 All E.R. 717, 734 I suggested that on rescission the equitable title might revest in the representee retrospectively at least to the extent necessary to support an equitable tracing claim. I was concerned to circumvent the supposed rule that there must be a fiduciary relationship or retained beneficial interest before resort may be had to the equitable tracing rules. The rule would have been productive of the most extraordinary anomalies in that case, and its existence continually threatens

B  to frustrate attempts to develop a coherent law of restitution. Until the equitable tracing rules are made available in support of the ordinary common law claim for money had and received some problems will remain incapable of sensible resolution.

But all that is by the way. Whether or not there is a retrospective vesting for tracing purposes it is clear that on rescission the equitable title

C  does not revest retrospectively *so as to cause an application of trust money which was properly authorised when made to be afterwards treated as a breach of trust.* In *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 Lord Goff of Chieveley said, at p. 573:

"Of course, 'tracing' or 'following' property into its product involves a decision by the owner of the original property to assert his title to

D      the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it, but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. *Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, 307, *per* Cotton L.J.: 'an act lawful at the time of its performance [cannot] be rendered unlawful, by the application of the doctrine of

E      ratification.')"

In *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669 Lord Browne-Wilkinson expressly rejected the possibility that a recipient of trust money could be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, he was ignorant

F  of the existence of any trust. He said, at p. 705:

"Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case

G      of an express or implied trust, or, in the case of a constructive trust, of the factors which are alleged to affect his conscience."

Mutatis mutandis that passage is directly applicable in the present case. The defendant knew that he was a trustee of the money for the society; but he did not realise that he had misled the society and could not know that his authority to complete had determined (if indeed it had). He could

H  not be bound to repay the money to the society so long as he was ignorant of the facts which had brought his authority to an end, for those are the facts which are alleged to affect his conscience and subject him to an obligation to return the money to the society.

24

Millett L.J.        Bristol and West Building Society v. Mothew (C.A.)        [1998]

Before us the society put forward a more sophisticated argument. The defendant's instructions, it pointed out, expressly required him to report the arrangements in question "to the society prior to completion." This, it was submitted, made it a condition of the defendant's authority to complete that he had complied with his obligation. Whether he knew it or not, he had no authority to complete. It was not necessary for the society to revoke his authority or withdraw from the transaction. I do not accept this. The society's standing instructions did not clearly make the defendant's authority to complete conditional on having complied with his instructions. Whether they did so or not is, of course, a question of construction, and it is possible that the society could adopt instructions which would have this effect. But it would in my judgment require very clear wording to produce so inconvenient and impractical a result. No solicitor could safely accept such instructions, for he could never be certain that he was entitled to complete.

In my judgment the defendant's authority to apply the mortgage money in the completion of the purchase was not conditional on his having first complied with his contractual obligations to the society, was not vitiated by the misrepresentations for which he was responsible but of which he was unaware, had not been revoked, and was effective to prevent his payment being a breach of trust. Given his state of knowledge (and, more importantly, that his authority had not been revoked), he had no choice but to complete.

*Conclusion*

In my judgment the defendant was not guilty of breach of trust or fiduciary duty. This makes it unnecessary to consider what the consequences of such a breach would have been. I would allow the appeal and set aside the money judgment. I would leave undisturbed the judgments for damages to be assessed for breach of contract and negligence, but make it clear that it does not follow that the society will establish any recoverable loss.

OTTON L.J.   I have read with advantage the judgments of Staughton and Millett L.JJ. I agree with the analysis and reasoning regarding breach of trust and of fiduciary duty. I wish only to add a few words on the extant common law claims.

I am satisfied that there was sufficient evidence before the judge to establish negligence on the part of the defendant. There was the requisite proximity between the parties, and there was foreseeability of damage. Thus a duty of care arose. This duty included answering correctly such questions as were posed by the proposed lender and which it was reasonable for him to be required to answer. The answer sought was one of fact and not opinion. The fact sought could have been supplied accurately by information which was within his knowledge. If it was not at his fingertips the information was either on file or could easily have been obtained by direct inquiry of the intending purchaser. His breach of duty occurred when he conveyed the inaccurate information to the plaintiff. The duty was not simply a duty not to act carelessly; it was a duty not to inflict damage carelessly. Damage is the gist of the action.

A    The more complex issues are whether the inaccurate information given was causative of damage, and if so what measure. To my mind it is not necessary to adopt a particular procedural path to find the answer. I appreciate that Lord Hoffmann suggests that it is first necessary to decide the kind of loss to which the plaintiff is entitled. This may be appropriate in most cases where negligence/causation is involved. From a practical point of view in some cases it may be more expedient to establish

B    the causal link between the negligent act or omission and the reliance by the plaintiff or the course of action which he was induced to take. The judge may find as a fact that there was no reliance or that the plaintiff would have behaved in the same or substantially the same manner if he had been given accurate information; in either event the negligence had no causative potency. That is the end of the matter. The chain is broken,

C    there is no loss at all and there is no need to consider or determine the kind of loss.

    In other cases it may be appropriate to identify the type or particular head of damage claimed. This may identify damage which is too remote and for which no remedy lies (e.g. economic loss), and the claim in respect of it fails in limine. As I concur that the damages award must now be set aside the issue of the measure of damage, if any, is now at large. I regard

D    the evidence (in particular the hearsay evidence of Ms Samantha Bennett at paragraph 29 of Mr. Prees's affidavit) as falling short of resolving the issues of causation or damage. It does not (for example) address the possibility of a revised offer if the accurate and full position had been explained to the plaintiff.

    I do not think it necessary to conclude whether there was a breach of

E    contract. This cause of action probably adds nothing to the case in negligence. It is unlikely that there is any practical difference between a breach of the duty of care and a breach of contract, or in the issues arising on causation, or the measure of damages. If there is any issue it can be determined by the trial judge. I also consider that there was no waiver.

    For these reasons I consider that there are triable issues and they should be determined by a judge at first instance.

F    I would therefore allow the appeal and remit the assessment of damages as proposed by Staughton L.J. and dismiss the respondent's notice.

G    STAUGHTON L.J.    Mr. Mothew made his report to the Cheshunt Building Society on 2 August 1988. In it he answered one of the questions asked as follows:

    "Q. Please confirm that (to the best of your knowledge and belief) the balance of the purchase money is being provided by the applicant(s) personally without resort to further borrowing. If not please give details. A. Confirmed."

H    That was untrue. There were other aspects of the same error, but I need not go into them in detail. Although Mr. Mothew had the means of knowledge in his possession, which could have brought the error to his attention, it is not said that he acted fraudulently or in bad faith.

26

Staughton L.J.    Bristol and West Building Society v. Mothew (C.A.)    **[1998]**

The ordinary remedy of a client who has received wrong information    A
or advice from his solicitor is to claim damages for negligence, whether as
a breach of contract or as a tort. For such a claim to give rise to
substantial damages the building society would have to show that the
breach of contract or negligence caused them loss. By their respondent's
notice they seek to say that, if they had known the true facts, they would
not have lent any money to Mr. and Mrs. Towers.

The judge regarded that point as immaterial, since the building society    B
succeeded on other grounds. If it is material, in my opinion it raises a
triable issue. According to Samantha Bennett of the society's advances
department, the offer of advance would have immediately been withdrawn
if the society had known that even £3,350 was being borrowed elsewhere.
In the nature of things Mr. Mothew is unlikely to have evidence which
directly controverts that statement. But there are grounds for supposing    C
that it may be open to question. I would not give judgment under R.S.C.,
Ord. 14 on the basis that it is true. If it is critical, the case must go to
trial, perhaps with the aid of interrogatories and discovery of documents.

However in this particular case the building society were not the sole
clients of Mr. Mothew; he was also the solicitor acting for Mr. and
Mrs. Towers. That is said to make all the difference, because Mr. Mothew    D
then became under a fiduciary duty to the building society. And the
argument is that for breach of fiduciary duty the remedy does not depend
on causation or remoteness; all that is necessary is that the loss would not
have occurred *but for* the breach of duty.

It seems to me wrong that a breach of contract or tort should become
a breach of fiduciary duty in that way. I am glad to find that the
authorities relied on by Millett L.J. show that it is wrong. In my judgment    E
Mr. Mothew was in breach of a duty of care and nothing more. True he
was in a situation where he owed duties to two clients, and those duties
might conflict with each other. But he did not prefer the interest of one
client to that of another; at most he was guilty of negligence which had
that unintended effect.

Alternatively it is said that Mr. Mothew was in breach of trust because    F
he paid away the trust fund contrary to his instructions. He did indeed
hold the £59,000 in trust; it was not his own money. There was in my
opinion an express or implied trust, and not (as the judge held) a
constructive trust. But he did not pay it away contrary to the society's
instructions. The cheque reached Mr. Mothew with a letter dated
23 August 1988, which in effect instructed him to use it for completion of    G
the proposed purchase. That was what he did.

There being in my opinion no breach of fiduciary duty or breach of
trust, it is unnecessary to consider what remedy such a breach might have
afforded.

Thus far the appeal succeeds, but there remains judgment on the cause
of action at common law for damages to be assessed. Mr. Sumption says
that even that must go, since there is a triable issue as to waiver by the    H
building society. The problem that he faces is that, although the building
society readily agreed when they were asked to consent to the registration
of the second charge, they are not shown to have known that the second

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Staughton L.J.

A    charge was contemplated and intended at the time of Mr. Mothew's report. There has been ample opportunity to produce evidence that they knew, if indeed they did. In my judgment there was no waiver.

When the argument before us was concluded on 21 May that was all that we had to decide. But we have since been asked to consider the judgment of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426 and
B    the speech of Lord Hoffmann in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. Such has been the volume of litigation on the topic of loss to lenders following negligent professional advice and the collapse of the property market that judges risk being overtaken by new authority.

The Court of Appeal in the *Banque Bruxelles* case began with a reference to the well known principle that damages should be as nearly as
C    possible the sum which would put the plaintiff in the position in which he would have been if he had not been injured. That would lead to two possible answers in the present case. (1) If there had been no report from Mr. Mothew to the building society, the money would not have been lent; the society would still have their £59,000. There would have been no transaction, a phrase which I use not as a label for anything but as a
D    description of the fact. (2) If Mr. Mothew had provided an accurate report to the building society, then they might have been content to proceed on the terms previously proposed, or they might have made a revised offer, or they might have proceeded as in (1) above. There is a triable issue as to that. Left to myself, I would have ruled that (2) was the appropriate situation for the judge to consider in assessing the damages.
E    But I have to acknowledge that Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426, with the agreement of Butler-Sloss and Roch L.JJ., preferred method (1), both for fraudulent misrepresentation and for negligence.

Lord Hoffmann, in the *Banque Bruxelles* case [1997] A.C. 191, 211, as it seems to me, considered that either method was the wrong place to
F    begin:

> "Before one can consider the principle on which one should calculate the damages to which a plaintiff is entitled as compensation for loss, it is necessary to decide for what kind of loss he is entitled to compensation."

G    There follows an exposition of the problem and the answer to it, as set out in the judgment of Millett L.J.

For my part I feel that we should not at this stage purport to instruct the judge who has to assess the damages by a paraphrase or interpretation of that decision, for a number of reasons. First, we have not heard argument on it, and our judgment is already long delayed by intervening
H    material. I am told it would be impractical for us to have a further hearing before October. Secondly, the judge has yet to find the facts relating to the assessment of damages. Thirdly, the judge must be guided by what Lord Hoffmann has said and not by any gloss of ours.

I would allow the appeal and remit the assessment of damages, either    A
to Chadwick J. or to another judge of the Chancery Division as the
exigencies of business may require. The cross-appeal should be dismissed.

*Appeal allowed.*
*Cross-appeal dismissed.*

*Solicitors: Wansbroughs Willey Hargrave; Osborne Clarke, Bristol.*    B

[Reported by JILL SUTHERLAND, Barrister]

—————    C

[COURT OF APPEAL]

# TURNER v. STEVENAGE BOROUGH COUNCIL    D

1997  March 6                                Staughton, Pill and Mummery L.JJ.

*Arbitration—Arbitrator—Misconduct—Application to remove arbitra-*
*tor—Lengthy correspondence and preliminary proceedings—Arbitra-*
*tor proposing interim payment of fees and expenses—Payment*
*by one party only—Subsequent return of payment—Whether*    E
*misconduct—Whether arbitrator to be removed—Arbitration Act*
*1950 (14 & 15 Geo. 6, c. 27), s. 23*

In February 1993 an arbitrator was appointed to conduct
arbitration proceedings relating to a rent review between the
council, as landlords of a shop, and the tenant. The arbitrator's
terms of appointment contained no express provision for payment
of interim fees or expenses. The parties contemplated that the    F
arbitration would be concluded within about three months and
the arbitrator stated that the award would be made by 30 June
1993. In May 1994, after lengthy correspondence and five
preliminary hearings, the arbitration had still not concluded and
the arbitrator wrote to both parties suggesting a timetable for the
hearing and requesting payment by each party of half his interim
fees and expenses. The tenant objected and asked whether, if    G
payment were not made, the arbitrator would not hear the
arbitration. The arbitrator replied that the first priority was to fix
the hearing and to resolve the dispute, but that he hoped the
parties would agree that it was reasonable that he should receive
interim payment for time expended on the matter. The council
paid the sum to the arbitrator, but three months later, after
taking legal advice, he returned it. The tenant applied for the
arbitrator to be removed for misconduct under section 23 of the    H
Arbitration Act 1950[1] on the ground that he had no power to

—————
[1] Arbitration Act 1950, s. 23: "(1) Where an arbitrator or umpire has misconducted
himself or the proceedings, the High Court may remove him."

# Exhibit N

A

Supreme Court

# Children's Investment Fund Foundation (UK) *v* Attorney General and others

## [2020] UKSC 33

B 2020  Jan 14, 15;                        Lord Reed PSC, Lord Briggs, Lady Arden,
       July 29                              Lord Kitchin JJSC, Lord Wilson

*Charity — Charitable company — Jurisdiction of High Court — Extent of court's
jurisdiction over members of charitable company — Payment of grant to new
charity requiring resolution of company's members — Whether members owing
fiduciary duty to company — Whether court having jurisdiction to direct member
how to vote on resolution — Companies Act 2006 (c 46), s 217*

C

The claimant, an English registered charity and a company limited by guarantee
without a share capital, was founded by the second and third defendants, who were
two of its directors and, along with the fourth defendant, its only members. Following
a breakdown in the relationship between the second and third defendants, an
accommodation was reached under which the third defendant agreed to resign as a
member and director of the claimant and the claimant agreed to make a substantial
D grant to a new registered charity, also a company limited by guarantee without a share
capital, established by the third defendant. Pursuant to the authorisation of the
Charity Commission, the claimant applied to the court for approval to make the grant.
The judge held that the payment of the grant was a payment for loss of office to a
director of the claimant, within section 215 of the Companies Act 2006[1], with the
consequence that by section 217 it could not be made unless it had been approved by a
resolution of the claimant's members. Finding that the making of the grant would be
E in the best interests of the claimant, the judge directed the fourth defendant to vote in
favour of such a resolution. The Court of Appeal allowed the fourth defendant's
appeal, holding: (i) that the claimant's members, including the fourth defendant,
owed fiduciary duties to act in its best interests, thus engaging the court's jurisdiction
over fiduciaries; but (ii) that the court could not direct the fourth defendant how to
exercise his fiduciary powers since he was not acting, or proposing to act, in breach of
duty; and (iii) that it would be against the express intention of Parliament for the court
F to direct the fourth defendant how to exercise his discretion under section 217 of the
2006 Act since there had been no impropriety on his part.

On appeal by the third defendant—

*Held*, allowing the appeal (Lord Reed PSC dubitante but concurring in the order),
(1) that a member of a charitable company limited by guarantee whose memorandum
and articles of association contained restrictions preventing members from receiving
profits from the company owed a fiduciary duty of single-minded loyalty to the
G charitable purposes or objects of the company; that, in the context of a resolution
under section 217 of the Companies Act 2006 which involved a disposition of assets
that would otherwise be available for application by the company towards those
objects, that duty required a member to consider whether the resolution should be
passed by considering only the best interests of the objects of the company; and that,
accordingly, the fourth defendant was a fiduciary in relation to the objects of the
claimant (post, paras 44–45, 50, 72, 78–83, 100–101, 200, 205, 215).

H *Liverpool and District Hospital for Diseases of the Heart v Attorney General*
[1981] Ch 193 considered.

(2) That (per Lord Briggs, Lord Kitchin JJSC and Lord Wilson), like other
charitable trustees, the directors of a charitable company had the power to surrender

[1] Companies Act 2006, ss 215(1), 217(1): see post, para 10.

© 2022 The Incorporated Council of Law Reporting for England and Wales

to the court the exercise of their fiduciary discretion about a particular matter, which        A
surrender the court might or might not accept; that once the court had accepted such
surrender, it would exercise that discretion in accordance with what it considered
would best further the charitable purposes of the company, after hearing evidence
and submissions from interested parties and the Attorney General; that if the
surrender related to the approval or disapproval of a particular proposed transaction
the court would have to decide whether the transaction was, or was not, in
furtherance of the company's charitable purposes; that once the court's decision on        B
the merits of the transaction had been made it was binding and the duty of the
charity's fiduciaries, whether or not they had been joined as parties, was to use their
powers to ensure that the decision was implemented, both generally and in
accordance with any directions which the court had given for that purpose; that,
therefore, since the claimant's directors had surrendered to the court their discretion
whether to make the grant and the court had decided that the making of the grant
furthered the claimant's charitable purposes, the fourth defendant would commit a        C
plain breach of his fiduciary duty if he were to decline to vote on the resolution under
section 217 of the 2006 Act in accordance with that decision; or that (per Lady
Arden JSC) the exceptional circumstances of the present case represented an
exception to the non-intervention principle under which the court would not
substitute its judgment for that of a fiduciary unless he was acting, or threatening to
act, in breach of duty; and that, accordingly, in the circumstances the court could
exercise its jurisdiction over fiduciaries in relation to the fourth defendant (post,        D
paras 137, 201, 206–208, 218).

(3) That the purpose of section 217 of the 2006 Act was not to veto transactions
in which a director or a connected person had an interest but to ensure there was
adequate disclosure and approval by the company in general meeting; that the
protection given by Parliament by section 217 was, in any event, subject to being
rendered less effective by the company exercising other powers, such as the right to
attach special rights to shares; that, therefore, there could not be any policy objection
from the perspective of company law preventing a court, under the law of charities,        E
from directing a member how to vote on a section 217 resolution; that where the
directors or trustees of a charity had surrendered their discretion to the court and the
court had reached the unchallenged conclusion that it was in the best interests of
the charity for the resolution to be passed, the court could give a direction to a
fiduciary as to the manner in which to vote on the section 217 resolution and the
2006 Act did not by implication prevent the court from making such an order; and
that, accordingly, it was open to the court to make an order which compelled the        F
fourth defendant to vote on the section 217 resolution in a particular way (post,
paras 157, 159, 162, 165, 173, 202, 205, 210).

Decision of the Court of Appeal [2018] EWCA Civ 1605; [2019] Ch 139; [2018]
3 WLR 1470 reversed.

The following cases are referred to in the judgments:

*Andrews v M'Guffog* (1886) 11 App Cas 313, HL(Sc)        G
*Arklow Investments Ltd v Maclean* [2000] 1 WLR 594, PC
*Armitage v Nurse* [1998] Ch 241; [1997] 3 WLR 1046; [1997] 2 All ER 705, CA
*Ashton Charity, In re* (1856) 22 Beav 288
*Assénagon Asset Management SA v Irish Bank Resolution Corpn Ltd (formerly
    Anglo Irish Bank Corpn Ltd)* [2012] EWHC 2090 (Ch); [2013] Bus LR 266;
    [2013] 1 All ER 495
*Attorney General v Bishop of Worcester* (1851) 9 Hare 328        H
*Attorney General v Black* (1805) 11 Ves 191
*Attorney General v Brown* (1818) 1 Swans 265
*Attorney General v Dean and Canons of Christ Church* (1822) Jac 474
*Attorney General v Dedham School* (1857) 23 Beav 350
*Attorney General v Exeter Corpn* (1826) 2 Russ 45

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  *Attorney General v Governors of Christ's Hospital* [1896] 1 Ch 879
    *Attorney General v Governors of Foundling Hospital* (1793) 4 Bro CC 165
    *Attorney General v Governors of Sherborne Grammar School* (1854) 18 Beav 256
    *Attorney General v Haberdashers' Company* (1791) 1 Ves Jun 295
    *Attorney General v Harrow School* (1754) 2 Ves Sen 551
    *Baden's Deed Trusts, In re* [1971] AC 424; [1970] 2 WLR 1110; [1970] 2 All ER 228,
        HL(E)
B  *Bolton v Madden* (1873) LR 9 QB 55
    *Bristol and West Building Society v Mothew* [1998] Ch 1; [1997] 2 WLR 436; [1996]
        4 All ER 698, CA
    *Bushell v Faith* [1970] AC 1099; [1970] 2 WLR 272; [1970] 1 All ER 53, HL(E)
    *Chapman v Chapman* [1954] AC 429; [1954] 2 WLR 723; [1954] 1 All ER 798,
        HL(E)
    *Chinacheom Charitable Foundation Ltd v Secretary for Justice* [2015] HKCFA 35;
        18 HKCFAR 169; [2015] 3 HKC 549
C  *Citibank NA v MBIA Assurance SA* [2007] EWCA Civ 11; [2007] 1 All ER (Comm)
        475, CA
    *Clephane v Lord Provost of Edinburgh* (1869) LR 1 Sc 417, HL(Sc)
    *Comrs for Special Purposes of Income Tax v Pemsel* [1891] AC 531, HL(E)
    *Construction Industry Training Board v Attorney General* [1973] Ch 173; [1972]
        3 WLR 187; [1972] 2 All ER 1339, CA
D  *Cowan v Scargill* [1985] Ch 270; [1984] 3 WLR 501; [1984] ICR 646; [1984] 2 All
        ER 750
    *Egerton Trust Retirement Benefit Scheme, In re* (unreported) 1995, Robert Walker J
    *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No 2)* [2011] EWHC
        1731 (Ch); [2012] Ch 613; [2012] 3 WLR 10; [2012] Bus LR 891
    *French Protestant Hospital, In re* [1951] Ch 567; [1951] 1 All ER 938
    *Garnham v PC* [2012] JRC 50
    *Gaudiya Mission v Brahmachary* [1998] Ch 341; [1998] 2 WLR 175; [1997] 4 All ER
E       957, CA
    *Girls' Public Day School Trust Ltd, In re* [1951] Ch 400
    *Goldcorp Exchange Ltd, In re* [1995] 1 AC 74; [1994] 3 WLR 199; [1994] 2 All ER
        806, PC
    *Grimaldi v Chameleon Mining NL (No 2)* [2012] FCAFC 6; 200 FCR 296; 287 ALR
        22
    *Hampden v Earl of Buckinghamshire* [1893] 2 Ch 531, CA
F  *JW Laing Trust, In re* [1984] Ch 143; [1983] 3 WLR 886; [1984] 1 All ER 50
    *John Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113, CA
    *Kerr v British Leyland (Staff) Trustees Ltd* [2001] WTLR 1071, CA
    *Lacey, Ex p* (1802) 6 Ves 625
    *Letterstedt v Broers* (1884) 9 App Cas 371, PC
    *Liverpool and District Hospital for Diseases of the Heart v Attorney General* [1981]
        Ch 193; [1981] 2 WLR 379; [1981] 1 All ER 994
G  *National Anti-Vivisection Society v Inland Revenue Comrs* [1948] AC 31; [1947]
        2 All ER 217, HL(E)
    *Northern Counties Securities Ltd v Jackson & Steeple Ltd* [1974] 1 WLR 1133;
        [1974] 2 All ER 625
    *Pitt v Holt* [2013] UKSC 26; [2013] 2 AC 108; [2013] 2 WLR 1200; [2013] 3 All ER
        429, SC(E)
    *Public Trustee v Cooper* [2001] WTLR 901
H  *Randell, In re; Randell v Dixon* (1888) 38 Ch D 213
    *Royal Society for the Prevention of Cruelty to Animals v Attorney General* [2002]
        1 WLR 448; [2001] 3 All ER 530
    *Royal Society's Charitable Trusts, In re* [1956] Ch 87; [1955] 3 WLR 342; [1955]
        3 All ER 14
    *S (An Infant), In re* [1965] 1 WLR 483; [1965] 1 All ER 865, CA

© 2022 The Incorporated Council of Law Reporting for England and Wales

*Securities and Exchange Commission v Chenery Corpn* (1943) 318 US 80

*Stanway v Attorney General* (unreported) 5 April 2000, Sir Richard Scott V-C

*Steed's Will Trusts, In re* [1959] Ch 354; [1959] 2 WLR 470; [1959] 1 All ER 609

*Tempest v Lord Camoys* (1882) 21 Ch D 571, CA

*Von Ernst & Cie SA v Inland Revenue Comrs* [1980] 1 WLR 468; [1980] 1 All ER 677, CA

*Walsh v Secretary of State for India* (1863) 10 HL Cas 367, HL(E)

A

B

The following additional cases were cited in argument:

*Beloved Wilkes's Charity, In re* (1851) 3 Mac & G 440

*Charterhouse Capital Ltd, In re; Arbuthnott v Bonnyman* [2015] EWCA Civ 536; [2015] 2 BCLC 627, CA

*Gilmour v Coats* [1949] AC 426; [1949] 1 All ER 848, HL(E)

*Mettoy Pension Trustees Ltd v Evans* [1990] 1 WLR 1587; [1991] 2 All ER 513

*Oldham Borough Council v Attorney General* [1993] Ch 210; [1993] 2 WLR 224; [1993] 2 All ER 432, CA

*Wrightson, In re; Wrightson v Cooke* [1908] 1 Ch 789

C

**APPEAL** from the Court of Appeal

Pursuant to an authorisation given by the Charity Commission for England and Wales under section 115 of the Charities Act 2011 on 7 June 2016 the claimant charity, the Children's Investment Foundation Fund (UK), a company without share capital limited by guarantee, sought such directions to the defendants, the Attorney General, Sir Christopher Hohn and Jamie Cooper, or any of them, as the court thought fit for the purpose of procuring (subject to the consent of the Charity Commission under section 201 of the 2011 Act) the passing of a resolution by the members of the claimant under section 217 and/or section 218 of the Companies Act 2006 to approve the payment of a grant of US$360m to another English registered charitable company, Big Win Philanthropy, of which the third defendant was the only member. By order dated 10 May 2017 Sir Geoffrey Vos C ordered that Dr Marko Lehtimäki, the only member of the claimant apart from the second and third defendants, be joined as the fourth defendant to the claim. By a decision dated 9 June 2017 Sir Geoffrey Vos C [2017] EWHC 1379 (Ch); [2018] Ch 371 determined that the proposed grant required the approval of the claimant's members under section 217 which in turn required the written consent of the Charity Commission under section 201; that the claimant's members had fiduciary duties to act in its best interests; and that, although the court's approval did not abrogate the need for a members' resolution, in the exceptional circumstances the court would approve the grant and direct the fourth defendant to vote in favour of such a resolution approving the grant under section 217 of the 2006 Act.

The Court of Appeal (David Richards, Newey LJJ and Dame Elizabeth Gloster) on 6 July 2018 [2018] EWCA Civ 1605; [2019] Ch 139 allowed the fourth defendant's appeal on the grounds that although the fourth defendant owed the claimant charitable company a fiduciary duty to act in the claimant's best interest, the court could not direct a fiduciary how to exercise his powers unless he was acting in breach of duty or intending to exercise his power with impropriety, so as to undermine his discretion granted by Parliament by section 217 of the 2006 Act.

D

E

F

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    The Supreme Court (Lord Kerr of Tonaghmore, Lord Briggs and Lady Arden JJSC) granted the third defendant permission to appeal on 6 July 2019. The issues in the appeal were agreed to be: (i) whether the court had the power to direct the fourth defendant to vote to approve the resolution in the circumstances of the case; and (ii) (to the extent necessary) whether the court had been right to hold that a member of a charitable company was a fiduciary and, therefore, owed fiduciary duties such that the member was
B    susceptible to the control of the court as a fiduciary.

The facts are stated in the judgment of Lady Arden JSC, post, paras 1–5.

*Lord Pannick QC*, *Simon Taube QC* and *Edward Cumming QC* (instructed by *Bates Wells*) for the third defendant.

C    The court has power to decide whether a grant is in the interests of a charity, especially so where the charity itself and the Charity Commission have asked the court to decide whether the grant is in the interests of the charity: see *Public Trustee v Cooper* [2001] WTLR 901, *Gaudiya Mission v Brahmachary* [1998] Ch 341, *Gilmour v Coats* [1949] AC 426, *Construction Industry Training Board v Attorney General* [1973] Ch 173, *In re Ashton Charity* (1856) 22 Beav 288, *Oldham Borough Council v Attorney General*
D    [1993] Ch 210 and *In re JW Laing Trust* [1984] Ch 143. If necessary, in the circumstances of the present case where there is a problem in a charity which needs to be addressed, the decision of Sir Geoffrey Vos C in the present case can be described as a scheme for a charity: see *Chinachem Charitable Foundation Ltd v Secretary for Justice* (2015) 18 HKCFAR 169 and *In re Beloved Wilkes's Charity* (1851) 3 Mac & G 440. It is not accepted that anything said in the latter case suggests any limitation on the court's power
E    to intervene where the trustees have asked it to do so.

Reliance is placed by those resisting the appeal on cases concerning private trusts. However private trusts are not subject to the parens patriae jurisdiction of the court. In any event, in the context of private, non-charitable trusts there are circumstances where the court has exercised a broad jurisdiction to intervene to secure the more effective administration of trust property for the benefit of the beneficiaries. An example of that is the
F    court's inherent jurisdiction to remove a trustee from office, which power is not dependent on the ability of those seeking the intervention of the court to show any wrongdoing or threatened future wrongdoing on the part of the trustee: see *Letterstedt v Broers* (1884) 9 App Cas 371. The principle there articulated is a very general principle. So the reliance on private trusts does not suggest that the courts have no power to intervene unless there is bad
G    faith.

The court, especially when asked to do so by the trustees, does have power to decide whether a specific transaction is in the interests of the charity, subject only to the issue of whether it can give directions to the fourth defendant member who was not party to the surrender. However, the memorandum and articles of association of the present charity show that the members are part of the administration of the company. Consequently,
H    the fourth defendant is part of the administration of the charity and, as he has no personal interest to protect, the court has power to direct him to implement its decision given that the court has been asked by the charity and by the Charity Commission to decide whether the grant is in the interests of the charity. Further, if it is necessary to establish the fact, the fourth

defendant owes the charity fiduciary duties as one of its members in relation *A*
to the exercise of a member's exercise of his powers to approve the grant: see
*Bristol and West Building Society v Mothew* [1998] Ch 1, *Grimaldi v Chameleon Mining NL (No 2)* (2012) FCR 296 and *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No 2)* [2012] Ch 613. Cases
which might indicate the contrary can be distinguished: see *Bolton v Madden*
(1873) LR 9 QB 55 and *In re Girls' Public Day School Trust Ltd* [1951] Ch *B*
400.

Finally, section 217 of the Companies Act 2006 read with section 201 of
the Charities Act 2011 does not exclude the powers of the court to direct a
member as to how to perform his function. While section 217 does require a
resolution from the member, it does not exclude the powers of the court to
direct the member as to how to perform his function. Section 217 does not
address the distinct question of the powers of the court to direct the member *C*
how to vote and does not preclude the court from telling the member how to
perform his functions in the interests of the charity.

In the exceptional circumstances of the present case, where the charity
has surrendered its discretion to the court, and the court has decided the
substantive issue that it is both expedient and necessary to protect the
interests of the charity that the grant be made, then the court is at least *D*
entitled to take the view that it is appropriate to direct the member, when he
performs his function, not to adopt an approach which is inconsistent with
the finding the court has made, especially when the member is part of the
administration of the charity and owes fiduciary duties. The same would
apply if the Charity Commission had referred the matter to the court: the
court would be able to direct the Charity Commission to make the grant.
Once the court has determined the substantive issue, that is the end of the *E*
matter. There is an analogy to be drawn between the parens patriae and
wardship jurisdictions: see *In re S (An Infant)* [1965] 1 WLR 483. It requires
an express statutory provision to remove the court's inherent jurisdiction
and section 217 does not do so. For that reason *Attorney General v Governors of Christ's Hospital* [1896] 1 Ch 879 can be distinguished.

*Guy Morpuss QC, Prof Sarah Worthington QC, Theo Barclay* and *Ryan* *F*
*Turner* (instructed by *Macfarlanes LLP*) for the fourth defendant.

The court has no special jurisdiction in relation to charities which enabled
Sir Geoffrey Vos C to order the fourth defendant member to vote in favour of
the grant. The parens patriae jurisdiction is not a free-ranging jurisdiction
allowing the court to rewrite trusts; it is a narrow jurisdiction which has
developed over time: see *Halsbury's Laws of England*, vol 8 (2019), *G*
para 514 and *Tudor's Charitable Trusts*, 4th ed (1906), pp 181 et seq. There
is nothing in the authorities that comes close to the sort of order which the
Chancellor made in the present case, either in the trusts jurisdiction or in the
charity jurisdiction: see *In re Royal Society's Charitable Trusts* [1956] Ch
87, *Chapman v Chapman* [1954] AC 429, *Construction Industry Training Board v Attorney General* [1973] Ch 173, *In re JW Laing Trust* [1984] Ch
143 and *Oldham Borough Council v Attorney General* [1993] Ch 210. *H*
There is no support in those authorities for a charitable jurisdiction going
beyond the trust and the scheme jurisdictions and the fact that the court is
exercising an inherent jurisdiction on the basis of parens patriae does not
mean that that jurisdiction is unlimited.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    The scheme jurisdiction does not help the argument as there is nothing to suggest that the Chancellor had somehow directed a scheme. He was not even asked to direct a scheme. But more importantly there is no basis for a scheme. The present case does not even cross the threshold for getting into a scheme, ie that the machinery of the charity has failed: see *Chinachem Charitable Foundation Ltd v Secretary for Justice* (2015) 18 HKCFAR 169.

B    Further, even if the case did get over that threshold, a scheme is the means by which the court rewrites the constitution of the charity. There is a world of difference between rewriting the charity's constitution and telling the trustees what to do. Section 20(2) of the Charities Act 2011 specifically provides that the Charity Commission may not exercise the functions of charity trustees or be directly involved in the administration of a charity. The court cannot acquire a jurisdiction which the Charity Commission does

C    not have. Finally, the court ought to respect the fact that, in section 217 of the Companies Act 2006, Parliament has given a power of veto or approval to members.

As to the trusts jurisdiction, it is well established that where a trustee has absolute discretion the courts will not interfere unless his conduct is for improper motives: see *Lewin on Trusts*, 19th ed (2014), para 29-336 (citing *Tempest v Lord Camoys* (1882) 21 Ch D 571), para 29-338 and *Pitt v Holt*

D    [2013] 2 AC 108. The only way around that is the jurisdiction based on *Letterstedt v Broers* (1884) 9 App Cas 371, which is wholly exceptional. It requires a strong finding to be made against a trustee that the trust property will not be safe or the trust will not be properly executed: see *In re Wrightson; Wrightson v Cooke* [1908] 1 Ch 789. Importantly, *Letterstedt v Broers* was never even mentioned to the Chancellor. It was not the basis on

E    which he exercised his discretion. In any event there is no finding of fact to support a *Letterstedt v Broers* type of intervention. Second, and in any event, it is impossible to make the leap from removing trustees to some power to take the further step and actually tell trustees how to act. In *Hampden v Earl of Buckinghamshire* [1893] 2 Ch 531 the Court of Appeal found there was a breach of trust even though the trustee was acting in good

F    faith. That case is not authority for the proposition that the court can intervene where there is no breach of trust: see also *In re Baden's Deed Trusts* [1971] AC 424.

The surrender of discretion argument starts from the wrong point because it assumes that the trustees of the charity have made a decision to make a grant in the normal way, which they are entitled to do under the memorandum and the articles of association, where the members have no role. That would be a

G    pure trustee decision: see *John Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113. However, the present grant involves the trustees making a payment to one of their own. In those circumstances Parliament has stepped in and said that members need to give their approval pursuant to section 217 of the Companies Act 2006. It also, subsequently, passed section 201 of the Charities Act 2011, requiring the approval of the Charity Commission, but that is an additional requirement, not a replacement. Both approvals are

H    required. While it is accepted that section 217 of the 2006 Act does not say in terms that the inherent jurisdiction of the court is removed, the fact that Parliament passed section 217 is a powerful indicator that the court should not exercise any inherent discretion. Further, if the court did have a power to tell trustees or members how to vote, it would have exercised that power in

© 2022 The Incorporated Council of Law Reporting for England and Wales

*Attorney General v Governors of Christ's Hospital* [1896] 1 Ch 879, which    A
suggests that no such power exists.

However, the short answer to the surrender of discretion argument can be expressed as a matter of principle: on the assumption that the court has no jurisdiction either under the charitable jurisdiction or the trust jurisdiction to tell a member how to vote, what the court cannot do directly it cannot do indirectly.  To say that because a judge has expressed an opinion on the    B
appropriate course to be followed the members are not entitled to disagree with him would cut though all the existing case law on charities and trusts and override the discretion of the members.  In coming to his decision the Chancellor was looking at the matter entirely from the point of view of the trustees and not of the members.  He was also considering the benefit to charitable causes generally, while the members are concerned with the    C
interests of the particular charity concerned.

Further, there is a real danger if the wide jurisdiction exists, either under the trust jurisdiction or the charity jurisdiction, that the Charity Commission or the courts are going to find themselves being harassed by beneficiaries or trustees who are unhappy with decisions that others in the trust or the charity have made: see John Fowles "The Charitable Trust: Not So Special After All?" (2019) 25 Trusts & Trustees 382, 389.    D

Finally the trust jurisdiction only applies if members of a charity are fiduciaries.  If they are not, there is only the charitable jurisdiction, nothing else.  The role of a member does not lead to fiduciary duties.  First, there needs to be a principled reason why members of a three-member charity owe fiduciary duties but members of charities with a much larger membership do not.  The judgment of the Court of Appeal in the present case left the law in that regard in a state of some uncertainty.  Second, the fiduciary label should    E
not be used loosely but applied strictly to those who owe the duty of single-minded loyalty identified in *Bristol and West Building Society v Mothew* [1998] Ch 1, 18–19.  The question is whether a person has direct control over the assets.  In the present case it is the trustees who have such control.  Third, a person does not become a fiduciary simply because he is acting in the interests of someone else.  More is required.  Further, fiduciary    F
duties should only be imposed where they are strictly necessary because of the consequences of what comes with them.  They should not be imposed where other duties are sufficient: see Sarah Worthington, "Fiduciaries: When is Self-Denial Obligatory?" [1999] CLJ 500, 505.

*Jonathan Crow QC* (instructed by *Withers LLP*) for the second defendant.    G

The arguments of the fourth defendant member as to why he was not bound by Sir Geoffrey Vos C's decision are adopted.  The members did not surrender their discretion to the court, the trustees did.  It is axiomatic in company law that the members cannot delegate the directors' powers and vice versa: see *John Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113. Not only was the fourth defendant not a claimant, he was not even a party    H
when the proceedings were issued.  It was the proceedings in that original form that the Charity Commission agreed should be brought and it is clear from the pleadings that there would still need to be a members vote.  The Chancellor was not being asked to give any direction ordering the fourth defendant member what to do.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   It is the wrong approach to ask whether the court has an inherent jurisdiction in relation to charities to direct the members to act in a certain way and then ask whether section 217 of the Companies Act 2006 removed it. The scope of the inherent jurisdiction is constrained by statute: see *Gilmour v Coats* [1949] AC 426 and *Construction Industry Training Board v Attorney General* [1973] Ch 173. The decision in *In re S (An Infant)* [1965] 1 WLR 483 is not to the point as the issue in that case was entirely
B   different.

It is striking that the third defendant has been unable to cite a single precedent to support the proposition that the court has power to direct the members of a charitable company on how to vote. That is because the jurisdiction does not exist as the court's jurisdiction in relation to charities is proscriptive not prescriptive. It is a power to supervise and put in place
C   machinery if necessary. It is not a power to manage. There is a conceptual difference between the two. To say that the court has an "inherent" jurisdiction merely identifies the source of its power, not the content or scope of that power. The inherent jurisdiction in relation to charities is both circumscribed and defined by principle: the court has an inherent jurisdiction to ensure the proper execution of a trust: see *Attorney General v Bishop of Worcester* (1851) 9 Hare 328 and *In re Steed's Will Trusts* [1959]
D   Ch 354. Mere expediency is not enough to found the jurisdiction: see *Chapman v Chapman* [1954] AC 429. To suggest that the court has a different jurisdiction in relation to charitable trusts at a management decision-making level is heresy. It would not involve an evolution of the law but a complete U-turn, and it would be a retrograde one: see *Attorney General v Harrow School* (1754) 2 Ves Sen 551, *Attorney General v*
E   *Haberdashers' Company* (1791) 1 Ves Jun 295, *Attorney General v Governors of Foundling Hospital* (1793) 4 Bro CC 165, *Chitty on the Prerogatives of the Crown* (1820), pp 161–162, *Storey's Commentaries on Equity Jurisprudence*, 2nd ed (1839), vol II, p 431 et seq, *In re Beloved Wilkes's Charity* (1851) 3 Mac & G 440, *Attorney General v Governors of Sherborne Grammar School* (1854) 18 Beav 256 and *Letterstedt v Broers*
F   (1884) 9 App Cas 371.

Although a director is not in a strict sense a trustee of a company's assets, and a charitable company is not in a strict sense a trustee of its own assets, they are in a sufficiently analogous position to that of a trustee of a charitable trust for the court to exercise, in relation to charitable companies, the same inherent jurisdiction as in relation to charitable trusts. Hence, as a matter of principle, that jurisdiction can be no wider in relation to the directors of a
G   charitable company than it is in relation to the trustees of a charitable trust: see *Liverpool and District Hospital for Diseases of the Heart v Attorney General* [1981] Ch 193. The members of a company are at one remove from its day-to-day management when compared with the directors. As such, there is even less justification for widening the court's jurisdiction to intervene uninvited in relation to the exercise of a member's rights and powers (absent any actual or threatened breach of fiduciary duty, assuming
H   such duty exists) than there is in relation to the exercise of a director's functions.

There are three important practical and policy considerations which militate strongly against the uninvited intervention of the court in circumstances where there is no threatened breach of fiduciary duty by a

© 2022 The Incorporated Council of Law Reporting for England and Wales

member and there is no application before the court to make a scheme. First,          A
the members of a company are likely to be far better informed than the
court as to the affairs of the charity. Second, the court should be wary of
discouraging people from becoming members by expropriating to itself
decisions which by choosing to participate in a charity the members would
expect to take themselves: see *Attorney General v Exeter Corpn* (1826)
2 Russ 45. Third, if the court had power to intervene in the absence of any          B
threatened breach of trust, that would be liable to increase charity litigation,
because (for example) dissentient minority trustees or members would be
tempted to try persuading the court to accept their arguments and to
substitute the court's own judgment for that of the majority.

Members of charitable institutions do not owe fiduciary duties. The idea
that they do has never been regarded as forming part of the law. The
implications of imposing fiduciary obligations on members now would be          C
wholly unforeseen and likely to be undesirable.

*William Henderson* (instructed by *Linklaters LLP*) for the claimant.

The duties of the directors of a charitable company, and the duties of the
members in so far as they might reflect the duties of the directors, are as set
out in section 172 of the Companies Act 2006, which alters the general
duties of directors of ordinary commercial companies in the case where the          D
objects of the company are to promote a set of purposes. Charitable
companies do promote a set of purposes, with the consequence that the duty
is that the persons concerned must do what they consider in good faith
would be most likely to achieve the charitable objects, which is subtly
different from promoting the best interests of the particular charity
concerned. In the present case the aims of the new charity are much the same
as the aims of the existing charity. So the objectives of the existing charity          E
would not be undermined by making a grant to the new charity. The
charitable objects would continue to be carried out by the new charity. That
was the point made by Sir Geoffrey Vos C when making his order.

The purpose and effect of the surrender of discretion to the court, in the
present case made on behalf of the directors, is that the court steps into the
shoes of the relevant decision-making body and makes the decision on behalf
of that decision-making body: see *Public Trustee v Cooper* [2001] WTLR          F
901.

As a matter of policy, the imposition of fiduciary duties on members of
charitable companies is undesirable because: (i) it will give rise to uncertainty
in the administration of membership charities generally; (ii) even after that
uncertainty is removed it will involve more complication and cost in the
administration of such charities than would otherwise be the case; and (iii) as          G
a matter of policy, there is no need to impose such duties as the interests of
charity in charitable companies, their assets and their administration are
already well protected by legislation against the possible ill-effects of
members acting in their own interests. For the duties of members in greater
detail: see *In re Charterhouse Capital Ltd; Arbuthnott v Bonnyman* [2015]
2 BCLC 627. As to the duties of fiduciaries, see *Mettoy Pension Trustees Ltd
v Evans* [1990] 1 WLR 1587.          H

From the point of view of certainty, nothing more is required than to leave
the law as it is with members being obliged to comply with the general
rule applicable to members of companies. The court should not have an
effectively unlimited jurisdiction to direct members, trustees or directors on

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    how to vote, or what to do, in circumstances where they have not acted in any way wrongfully and are not threatening to do so. In the alternative, exercise of such a jurisdiction should be extremely rare and only applicable in the unusual circumstance where the trustees or directors have surrendered their discretion to the court and the court has accepted that surrender so that a direction to the members as to how they should vote is necessary to give effect to the decision of the court. The scope of the obligation should not be

B    developed incrementally.

There is a fundamental distinction between, on the one hand, the jurisdiction to alter the constitutional framework of a charity or to deal with assets or income which the existing constitution does not deal with adequately and, on the other hand, the jurisdiction to interfere with the exercise of discretions by the persons in whom they are vested under the

C    relevant constitutional framework.

*Robert Pearce QC* (instructed by *Treasury Solicitor*) for the Attorney General.

The appeal is supported. On the fiduciary duties issue it is understood that there is a desire for clarification but the present case is not a suitable one for the court to undertake a wide-ranging analysis of different kinds of

D    membership arrangements in the charity sector. It is appropriate to focus attention on the circumstances of the present case. In that regard the reasoning of the Court of Appeal is supported: the members of the claimant are fiduciaries.

There are three stages to determining whether one person stands in a fiduciary relationship to another. The first stage is to identify the characteristics of the relationship between the putative fiduciary and the

E    putative beneficiary. The second is to determine whether those characteristics fall within the legal concept of the fiduciary relationship. The third stage, if the answer to the second question is yes, is to determine what particular fiduciary obligations arise from that relationship.

Looking at stage one, members of the claimant have a range of powers in connection with the operation of the company, but the crucial circumstance

F    is that the property of the company is solely applicable for charitable purposes and the members as such cannot benefit from it. In those circumstances, the correct conclusion to draw is that a member of the claimant undertakes his functions solely to advance the charitable purposes of the company to the exclusion of any benefit for himself. Moving to stage two, the Court of Appeal relied on the description of fiduciary relationships in *Grimaldi v Chameleon Mining NL (No 2)* (2012) 200 FCR

G    296. The members of the claimant fall squarely within that definition. The obligations are owed to the claimant's charitable purposes. As to stage three, the only relevant fiduciary duty is that a member is obliged to exercise his power under section 217 of the Companies Act 2006 in the way that he decides in good faith would be most likely to further the purposes of the claimant. Insofar as the court might want to go further in identifying fiduciary duties, which is not encouraged, the correct approach is that set out

H    in *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No 2)* [2012] Ch 613. Whether a person is a fiduciary is a question of law, not policy. The law should develop incrementally. If members are subject to a fiduciary duty there is no real risk of them being subject to unlimited liability, because members rarely control the funds and the sanction of the

© 2022 The Incorporated Council of Law Reporting for England and Wales

Charity Commission is often required. In any event, the courts and the A
Attorney General have an inherent power to release a fiduciary from liability
and can be expected to act robustly.

On the assumption that the members of the claimant are fiduciaries, it
is accepted that the court will only interfere in the exercise of fiduciary
discretion in limited circumstances ("the non-intervention principle") which
applies to both charitable trusts and private trusts. Three propositions can
be derived from the authorities: (i) the courts have not exhaustively defined B
the exceptions to the non-intervention principle; (ii) the courts should
recognise that an exception to the non-intervention principle may arise if the
court considers it expedient or alternatively necessary to intervene in the
affairs of a charity; (iii) if the court does decide to intervene, its powers
extend to giving a specific direction to a fiduciary: see *In re Beloved Wilkes's
Charity* (1831) 3 Mac & G 440, *Pitt v Holt* [2013] 2 AC 108 and *Hampden* C
*v Earl of Buckinghamshire* [1893] 2 Ch 531.

As to proposition (ii), the courts are exercising a jurisdiction which is
derived from the Crown as parens patriae. The jurisdiction is part of the
court's jurisdiction in respect of trusts, but it has a different origin from the
court's jurisdiction in respect of private trusts. A charity is essentially a
purpose. In a sense, the court is not just supervising the actions of a trustee,
it is also representing the public interest. The present case is analogous to D
one where all the beneficiaries of a private trust are sui juris and before the
court. In that situation, the beneficiaries cannot compel the trustee to do
anything while the trust continues, but their unanimous agreement relieves
the conscience of the trustee. That is similar to the position where the court
is concerned with the affairs of a charity. Finally, the law shows favour to
charities: see *Comrs for Special Purposes of Income Tax v Pemsel* [1891] AC E
531 and *National Anti-Vivisection Society v Inland Revenue Comrs* [1948]
AC 31. Consequently, the court should be more ready to depart from the
non-intervention principle in the case of a charity than in the case of a
private trust.

It is not a necessary inference from section 20(2) of the Charities
Act 2011 that, because the Charity Commission may not intervene in
the administration of the charity, the court may not do so. The powers of the F
Charity Commission are not intended to duplicate those of the court. In the
circumstances of the present case, Sir Geoffrey Vos C was entitled to direct
the fourth defendant, as a member of the claimant, to vote in favour of the
grant on grounds of expediency and necessity.

*Pannick QC* in reply.

The force of the argument in favour of a general principle of G
non-intervention is accepted. However, the present case is exceptional.
There is no appeal against the finding that the grant is in the best interests of
the charity nor that is was appropriate on the facts to make the grant.
The only issue is whether Sir Geoffrey Vos C had the power to make the
grant. He was asked to answer a specific question asked by the Charity
Commission and did so. In the specific circumstances of the case his order
should stand. H

The mischief against which section 217 of the Companies Act 2006 is
aimed is protection against the directors deciding in their own interests that
one or more of them should receive a benefit. There is no reason to think
that where the court has determined that a particular grant is in the interests

© 2022 The Incorporated Council of Law Reporting for England and Wales

A of the charity that Parliament intended to deprive the court of the powers it would otherwise enjoy to give a direction to the member as to how he or she should perform the relevant functions. A more explicit statutory provision would be required to remove or confine the powers which the court otherwise enjoys.

B The court took time for consideration.

29 July 2020. The following judgments were handed down.

**LADY ARDEN JSC**

|  | Paragraph No |
|---|---|
| *Overview* | 1 |
| *Requirements for making the Grant* | 6 |
| *Only Dr Lehtimäki will vote at the meeting of CIFF on the section 217 resolution* | 15 |
| *The decisions of the Chancellor and the Court of Appeal* | 16 |
| *(a) Judgment of the Chancellor* | 17 |
| *(b) Judgment of the Court of Appeal* | 27 |
| *Issues on this appeal* | 33 |
| *Discussion* | 40 |
| *Summary of conclusions* | 40 |
| *Issue 1: Is Dr Lehtimäki qua member of CIFF a fiduciary?* | 42 |
| (1) What the term "fiduciary" means and why it matters in this context | 42 |
| (2) Companies as charities | 52 |
| (a) Backdrop | 52 |
| (b) Liberal approach taken to charities by the courts | 53 |
| (c) The recognition of charitable companies by Parliament | 56 |
| (d) The *Liverpool and District* case and wider points to be drawn from it | 67 |
| (3) Were the courts below in error in holding that the members of a charitable company are fiduciaries? | 75 |

© 2022 The Incorporated Council of Law Reporting for England and Wales

A

| (4) My conclusions on the question whether a member is a fiduciary | 78 |
|---|---|
| Mass membership charitable companies | 105 |
| Application of the principles to the facts of this case | 106 |
| *Issue 2: Have circumstances arisen with respect to the section 217 resolution in which the court can exercise its jurisdiction over fiduciaries in relation to Dr Lehtimäki?* | 108 |
| The competing positions of the parties | 108 |
| My conclusion on this issue | 119 |
| *Issue 3: Does section 217 of the Companies Act 2006 allow the court to direct a member to exercise his discretion in a particular way when Parliament has provided for members to pass the resolution?* | 153 |
| The range of the arguments on this issue | 153 |
| My conclusions on the third issue | 157 |
| *Would the court have jurisdiction to direct Dr Lehtimäki to vote in favour of the section 217 resolution on the breach of fiduciary duty route?* | 174 |
| *Lord Briggs JSC's concurring judgment on the breach of duty route* | 174 |
| *The views of the Chancellor and of the Court of Appeal* | 176 |
| *Submissions on the breach of duty route* | 178 |
| *Basis of jurisdiction must logically precede the conclusion of breach of duty* | 179 |
| *The court's approval may be frustrated by the action of non-fiduciaries* | 184 |
| *Avoiding a blanket approach to breach of duty* | 186 |
| *The importance of the subjective test for breach of fiduciary duty* | 187 |
| *Importance of my more nuanced approach in membership charities* | 190 |
| *Deadlocked trustees are not an analogous situation* | 193 |

B

C

D

E

F

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

169

A

| *A material change of circumstances would undermine the basis on which the direction has been made* | 194 |
| --- | --- |
| *Conclusions on the breach of duty route* | 196 |
| *Summary of my overall conclusions* | 200 |

*Overview*

1    The Children's Investment Fund Foundation (UK) ("CIFF") is a charitable company with more than $4 billion in assets helping children in developing countries. It was founded by Sir Christopher Hohn ("Sir Christopher") and Ms Jamie Cooper ("Ms Cooper") in 2002, but it became difficult to manage when their marriage broke down. To resolve those difficulties, Sir Christopher and Ms Cooper agreed that in exchange for a grant ("the Grant") of $360m, to be paid over five years, to Big Win Philanthropy ("BWP"), a charity founded by Ms Cooper, she would resign as a member and trustee of CIFF. CIFF, Sir Christopher and Ms Cooper entered into a grant agreement ("the Grant Agreement") for this purpose on 25 July 2015.

2    The main legal issues in the case stem from the special combination of three factors. First, the relevant arrangements came about with a view to resolving the governance issues resulting from the breakdown in the relationship between Sir Christopher and Ms Cooper, not for a reason derived from the activities of the charity. Second, CIFF is both a charity and a company limited by guarantee (not having a share capital) formed and registered on 8 February 2002 under the Companies Act 1985. I will call such companies "guarantee companies". As a guarantee company, CIFF has a two-tier governance structure, namely members and directors, the latter being called trustees, and the Companies Act 2006 ("the 2006 Act") applies to it. Dr Lehtimäki, the first respondent and a central figure in this appeal, is a member of CIFF, as are Sir Christopher and Ms Cooper. They were the original subscribers to the memorandum of association. CIFF has no other members. Third, the recipient of the Grant under the arrangements is a new charity established and already endowed by a $40m payment made by TCI Fund Management Ltd pursuant to a deed of covenant made by Sir Christopher on 25 July 2015.

3    In very brief outline, Sir Geoffrey Vos C, the Chancellor of the High Court [2018] Ch 371 decided on CIFF's application for directions that the Grant was in the best interests of the charity and directed the sole unconflicted member of CIFF, Dr Lehtimäki, the first respondent to this appeal, to vote in favour of a resolution of the members of CIFF to approve it pursuant to section 217 of the 2006 Act (see para 10 below). Dr Lehtimäki, however, prefers to be free to exercise his own judgment on how to vote as a member. He appealed to the Court of Appeal to set aside this part of the Chancellor's order. The Court of Appeal (Dame Elizabeth Gloster, David Richards and Newey LJJ) [2019] Ch 139 acceded to his appeal on this issue, and Ms Cooper now appeals to this court.

4    The other respondents to this appeal are Sir Christopher, CIFF and
HM Attorney General.  Dr Lehtimäki and Sir Christopher argue that the
appeal should be dismissed and the decision of the Court of Appeal upheld
on  additional  grounds.    This  is  because—while  Dr  Lehtimäki  and  Sir
Christopher agree that the Court of Appeal was right to conclude that it did
not  have  the  power  to  direct  Dr  Lehtimäki  to  vote  in  favour  of  the
Grant—they do not want the Supreme Court to uphold every aspect of the
Court of Appeal's decision.  In particular, they contend that the Court of
Appeal was wrong to conclude that the members of CIFF owe fiduciary
duties.  CIFF and HM Attorney General have made submissions for the
assistance of the court, and CIFF also advances positive criticisms of the
conclusion of both courts below that a member of a charitable company is a
fiduciary. (This is the subject of Issue 1, below.) The Attorney General must
be joined to proceedings of this nature and represents the Crown in its
role as parens patriae or protector of charities, an important and very
long-established role.  In the words of Lord Eldon LC:

"It is the duty of the King, as parens patriae, to protect property
devoted to charitable uses; and that duty is executed by the officer who
represents the Crown for all forensic purposes.  On this foundation rests
the right of the Attorney General in such cases to obtain by information
the interposition of a court of equity" (*Attorney General v Brown* (1818)
1 Swans 265, 291).

5    Because  of  the  joinder  of  the  Attorney  General,  the  Charity
Commission for England and Wales ("the Charity Commission") has
properly played no part in this appeal.

*Requirements for making the Grant*

6    The making of the Grant is governed by several matters: the terms of
the Grant Agreement, the provisions of the Companies Act 2006, the
provisions of the Charities Act 2011 ("the 2011 Act") and the general law
applying to charities, trustees and directors and members of companies.

7    The Grant Agreement is conditional on either the Charity Commission
having approved or made no objection to this payment or the approval of the
court.  Both Sir Christopher and Ms Cooper agreed separately to donate
$40m to BWP.  Ms Cooper's agreement in this regard was conditional on the
making of the Grant.

8    Prior to the Grant Agreement, Sir Christopher and Ms Cooper signed
a letter of intent dated 14 April 2015 in which they stated that they would
not vote on the proposed Grant on account of their conflict of interest.  Sir
Christopher also agreed:

"to support the application before the Board of CIFF, and in the
board's application for approval to the Charity Commission or any
tribunal or court that may have jurisdiction.  For the avoidance of doubt
such support shall not require any active steps to be taken by Sir Chris
beyond confirming the same in writing in the form of Appendix 1 when
required to do so."

9    By a Deed of Resignation dated 9 July 2015, Ms Cooper agreed to
resign as a member and trustee of CIFF.  That resignation will be effective
when the court approves or refuses to approve the Grant.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    10    The implementation of the Grant Agreement necessitates the passing of a resolution of CIFF in general meeting under section 217 of the 2006 Act because the payment of the Grant constitutes "a payment for loss of office . . . to a person connected with a director" for the purposes of section 215 of the 2006 Act. The relevant provisions of sections 215 and 217 of the 2006 Act provide:

B    "A company may not make a payment for loss of office to a director of the company unless the payment has been approved by a resolution of the members of the company." (Section 217(1).)
     "In this Chapter a 'payment for loss of office' means a payment made to a director or past director of a company— . . . (c) as consideration for or in connection with his retirement from his office as director of the company . . ." (Section 215(1).)

C    "For the purposes of sections 217 to 221 (payments requiring members' approval)— (a) payment to a person connected with a director . . . is treated as payment to the director." (Section 215(3).)

11    Moreover, under section 201 of the 2011 Act, the Grant requires the consent of the Charity Commission. Section 201 provides that:

D    "(1) In the case of a charitable company, each of the following is ineffective without the prior written consent of the Commission— (a) any approval given by the members of the company under any provision of Chapter 4 of Part 10 of the Companies Act 2006 (transactions with directors requiring approval by members) listed in subsection (2) . . .
     "(2) The provisions of the 2006 Act are— . . . (f) section 217 (payments to directors for loss of office); . . ."

E    12    The means by which the Grant is made must also comply with CIFF's own constitution, which consists of its memorandum and articles of association.
     13    The memorandum of association of CIFF contains various prohibitions on trustees receiving benefits from CIFF. In particular, clause 5.2 provides that a trustee must not receive any payment of money or other material benefit, directly or indirectly, from CIFF except in certain circumstances which do not apply in this case or with the prior written approval of the Charity Commission.

F    14    The articles of association of CIFF provide for the appointment of trustees who perform the functions of both directors of the company and charity trustees. The trustees are authorised by the articles of CIFF to manage its operations (see article 6.8 of CIFF's articles of association). Some matters, however, require a resolution of the company in general meeting, including the approval of payments to directors for loss of office under section 217 of the 2006 Act. The members cannot interfere with the decisions of the trustees unless they amend the articles to enable them to do so (see *John Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113, 134 approving a passage in *Buckley on the Companies Acts*, 11th ed (1930), p 723).

G

*Only Dr Lehtimäki will vote at the meeting of CIFF on the section 217 resolution*

H    15    Because the making of the Grant involves a conflict of interest on the part of both Sir Christopher and Ms Cooper, it is proposed that only one

© 2022 The Incorporated Council of Law Reporting for England and Wales

A

member, Dr Lehtimäki, will vote on any resolution required to carry the Grant into effect. The court has not been concerned with any issue about how this meeting is to be summoned, assuming that Dr Lehtimäki is not able to approve a written resolution.

*The decisions of the Chancellor and the Court of Appeal*

B

16   CIFF applied to the Charity Commission for approval of the overall transaction. The Charity Commission did not give its approval but instead made an order under section 115 of the 2011 Act authorising the bringing of proceedings to obtain the court's approval of the Grant and directions regarding the resolution under section 217 of the 2006 Act.

*(a) Judgment of the Chancellor*

C

17   *Grant approved*: The Chancellor of the Chancery Division of the High Court, Sir Geoffrey Vos C, held that the trustees had surrendered their discretion whether to make the Grant to the court.

18   The Chancellor, at para 64, cited a passage from an unreported judgment of Robert Walker J in *In re Egerton Trust Retirement Benefit Scheme*, cited by Hart J in *Public Trustee v Cooper* [2001] WTLR 901 in which Robert Walker J analysed the nature of various applications by trustees to the court, including the surrender of discretion by trustees. He made the important point that this was conceptually different from seeking the court's approval for a transaction since the court would be exercising its own discretion. The Chancellor found that that was the nature of the application which CIFF was making.

D

19   On the basis of the evidence presented to him, the Chancellor held that, in the exceptional circumstances of the case, the court would exercise its discretion in favour of approving the Grant. The Chancellor held, at para 128, that in the "unique circumstances" of this "extremely unusual" case, the Grant was in the best interests of CIFF. In approving the Grant, the principal reasons given by the Chancellor were that the parties should not be allowed to renege on the deal they had made in good faith, that Ms Cooper would be contributing a further $40m to her new charity and that approving the Grant would bring finality and avoid further legal costs. The Chancellor referred to the considerable talents of Ms Cooper. The Chancellor expressly stated that, while he had come to a clear conclusion that he should approve the Grant, he was "not saying that no reasonable trustee or fiduciary could disagree with [his] view" that the Grant was in the best interests of CIFF or that "anyone who disagreed with [his] view would automatically be acting in bad faith" (Judgment, para 135).

E

F

G

20   *Section 217 resolution*: The Chancellor held that the Grant would constitute a payment in connection with Ms Cooper's resignation as a director and that BWP is a person connected with Ms Cooper within sections 252(2)(b) and 254(2)(b) of the 2006 Act. There was no applicable exception from these provisions. Therefore the 2006 Act requires CIFF to disclose the Grant to members and obtain their approval by resolution. This is now common ground, and I will refer to the required resolution as "the section 217 resolution". As the Chancellor put it, section 217 of the 2006 Act applies as much to charitable companies as it does to ordinary trading companies.

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    21    *Reasons for making a direction that Dr Lehtimäki should vote in favour of the section 217 resolution*: Dr Lehtimäki was not one of the original parties to these proceedings but the Chancellor ordered him to be joined after the hearing started and he had an opportunity to make submissions to the court.

22    Dr Lehtimäki filed a witness statement on 17 May 2017 in which he explained his difficulties and concerns about voting to approve the Grant. These may be taken from his conclusions and I have set out these conclusions below at para 106, when I come to apply the law to the facts of this case.

B

23    The Chancellor wanted to ensure that the court's decision was not overridden by "an unaccountable membership" (Judgment, para 38). The Chancellor noted that the position of Dr Lehtimäki, a Harvard and Stanford-trained economist, was one of "studied neutrality" and that it was

C    "perhaps" more likely than not that he would vote against any section 217 resolution but the Chancellor stated that he would not take any suspicion on that point into account as Dr Lehtimäki had not been cross-examined (para 121). Dr Lehtimäki did not consider that he was bound to vote in favour of the section 217 resolution (para 132).

24    The Chancellor further held (at para 46) that:

D    "Generally a member of a commercial trading company may vote his shares at a general meeting in accordance with his own interests or wishes. Even a vote to amend the articles of association may be cast in accordance with the member's own view of what is in the best interests of the company, and the court will only determine that the votes of a member have not been cast in such a case for the benefit of the relevant company if no reasonable person could consider that it was for its benefit.

E    See *Pender v Lushington* (1877) 6 Ch D 70, 75–76, *North-West Transportation Co Ltd v Beatty* (1887) 12 App Cas 589, 593, *Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656, and *In re Charterhouse Capital Ltd; Arbuthnott v Bonnyman* [2015] 2 BCLC 627, para 90."

25    However, in the judgment of the Chancellor, Dr Lehtimäki was a fiduciary in that his power as a member of CIFF to vote on the section 217

F    resolution was vested in him for the benefit of CIFF and not vested in him personally. The Chancellor distinguished the rule that the members were not obliged to vote other than in their own interest (citing, at para 141, *Northern Counties Securities Ltd v Jackson & Steeple Ltd* [1974] 1 WLR 1133) as not decided in the context of charitable companies. In his judgment, members of a charitable company were bound into the regime in

G    the 2011 Act, under which the assets of a charitable company could only be used for charitable purposes (para 144). He further held that the members could not use assets for non-charitable purposes. Accepting, at para 145, the submissions made on behalf of the Attorney General and Ms Cooper that the members did not "stand outside the charity", the Chancellor held that the members of CIFF were an integral part of the administration of the charity. Accordingly, in his judgment, a member was

H    bound to exercise his right to vote in the best interests of the charity of which he was a member.

26    The Chancellor concluded that he should give the direction to Dr Lehtimäki because it was inappropriate to defer to the situation in which the court's decision could be undermined, there was a risk of extremely

© 2022 The Incorporated Council of Law Reporting for England and Wales

expensive litigation, charity generally would suffer and finality could only be
achieved by the court's exercising its discretion to make a direction against
the member. The member was a fiduciary and would not be acting in the
best interests of the charity if he came to a different conclusion from that of
the court. He did not have a free vote in this case, because he was bound by
the fiduciary duties described above and was subject to the court's inherent
jurisdiction over the administration of charities. In addition, the Attorney
General and the Charity Commission considered that such a direction could
be made.

### (b) Judgment of the Court of Appeal

27   The Court of Appeal agreed with the Chancellor with respect to the
question whether the members of CIFF were fiduciaries but went on to
hold that the Chancellor should not have made the direction against
Dr Lehtimäki.

28   On the question whether a member was a fiduciary, the Court of
Appeal distinguished the decision in *Bolton v Madden* (1873) LR 9 QB 55.
It further held that a member was part of the internal workings of the
charity and his powers were exercisable for the benefit of the charity. It
accepted, however, that the position might be different in relation to
companies with a large membership, which it called "mass-membership
charities" (para 46):

"It does not necessarily follow that members of charities such as the
National Trust also have fiduciary obligations. Since we are not dealing
with such an organisation, we do not need to decide whether their
members are in the same position as CIFF's. There may possibly,
moreover, be scope for argument as to whether it is less reasonable to
expect those belonging to mass-membership charities to act exclusively in
the charities' interests. That said, it is far from clear that it should be
legitimate for members of, say, the National Trust to vote to obtain
benefits for themselves from an entity with exclusively charitable
objects."

29   The Court of Appeal held that the members of a charitable company
have no proprietary rights. As to the content of their fiduciary duty, the
Court of Appeal held (at para 48) that it was unnecessary:

"to rule on the precise scope of the fiduciary duties owed by members
of CIFF. It is sufficient to say that a member of CIFF owes, in our view, a
duty corresponding to that specifically imposed on members of CIOs by
section 220 of the Charities Act 2011. In other words, the member must
exercise the powers that he has in that capacity in the way that *he*
decides, in good faith, would be most likely to further the purposes of
CIFF. It should be stressed that this duty is subjective: in other words,
that what matters is the member's state of mind (compare e g *Regentcrest
plc v Cohen* [2001] 2 BCLC 80, para 120, dealing with company
directors)."

30   A charitable incorporated organisation or "CIO" is a form of charity
incorporated under the 2011 Act (which repealed provisions of the Charities
Act 2006 introducing the CIO). The suggestion of a new legal form for
charities was first made by the Company Law Review Steering Group, set up

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  by the Department of Trade and Industry, of which I was a member (*Modern Company Law for a Competitive Economy* (2001), Final Report, para 4.63 et seq). A CIO has a separate legal personality from the individual trustees, and limited liability. Like a charitable company, a CIO has two tiers of governance: (1) the trustees and (2) the members. On incorporation, the CIO is registered only with the Charity Commission so it is not subject to

B  dual regulation under the 2006 Act. Section 220 of the 2011 Act, to which the Court of Appeal referred in the citation in the preceding paragraph, provides: "Each member of a CIO must exercise the powers that the member has in that capacity in the way that the member decides, in good faith, would be most likely to further the purposes of the CIO."

31    However, the Court of Appeal allowed the appeal on the basis of the non-intervention principle (described in para 36 below). The Court of

C  Appeal concluded that the court could not direct a fiduciary to substitute its view for that of his own feeling unless there was a breach of duty.

32    Additionally, the Court of Appeal considered that their conclusion was reinforced by the fact that, in enacting section 217 of the 2006 Act and section 201 of the 2011 Act, Parliament had specifically and expressly entrusted the responsibility of approving payments such as the Grant to the

D  members of the charitable company, subject only to the prior written consent of the Charity Commission. The Chancellor's order would prevent Dr Lehtimäki from exercising his choice as to whether to approve the transaction in accordance with section 217 and stop him from playing a part which in the circumstances Parliament had assigned him. There was no significant evidence of breach of duty and the Court of Appeal noted that the

E  Chancellor had expressly accepted that he was not saying that no reasonable trustee could disagree with his decision that the Grant should be approved (Judgment, para 135). It was therefore reasonably open to Dr Lehtimäki to disagree.

*Issues on this appeal*

F  33    On this appeal, there is no challenge to the Chancellor's finding that CIFF's trustees had surrendered to the court their discretion on the question whether to make the Grant or to his conclusion that the Grant was in the best interests of the charity. Dr Lehtimäki has not surrendered his discretion as a member of CIFF as to how to vote on the section 217 resolution.

G  34    The overarching question on this appeal is whether the Chancellor could in law make the direction. Leaving to one side the concurring judgment of Lord Briggs JSC, with whom Lord Wilson and Lord Kitchin JSC agree, to which I respond at paras 174–199 below, this question involves resolving three issues.

35    *First*, is Dr Lehtimäki in his capacity as a member of CIFF a fiduciary in relation to the objects of the charity? A person has to be a fiduciary for the

H  court's jurisdiction over fiduciaries to be engaged. This is a threshold question. Both the Chancellor and the Court of Appeal decided this issue in favour of the appellant, but Dr Lehtimäki contends that it should have been decided in his favour. I have added the words "in relation to the objects of the charity" because, as Frankfurter J held in *Securities and Exchange*

© 2022 The Incorporated Council of Law Reporting for England and Wales

*Commission v Chenery Corpn* (1943) 318 US 80, 85–86, "to say that a man   A
is a fiduciary only begins analysis; it gives direction to further inquiry. To
whom is he a fiduciary? What obligations does he owe as a fiduciary?"

36   *Second*, if Dr Lehtimäki is a fiduciary, have circumstances arisen
with respect to the section 217 resolution in which the court can exercise its
jurisdiction over fiduciaries in relation to Dr Lehtimäki? The jurisdiction to
intervene in relation to the discretionary actions of trustees is in general   B
governed by the principle, known as "the non-intervention principle", that
(in the absence of evidence of breach of duty) the court does not intervene in
the exercise by a fiduciary of a discretion. The Court of Appeal decided this
issue against the appellant, but Lord Pannick QC contends that it was wrong
in law to do so.

37   The parties to this appeal have presented their arguments on the
non-intervention principle on the basis that it applies where the fiduciary   C
owes duties to a charity's charitable purposes as well as where a fiduciary
acts with respect to a private trust, but in my judgment the application of the
principle in the two cases may not be coterminous. A major reason for a
distinction between the court's jurisdiction over fiduciaries who owe duties
to the purposes of a charity and its jurisdiction over those who owe duties to
the beneficiaries under a private settlement is in relation to schemes, which   D
are not available for private trusts. However, this may not be the only
distinction because the fact that the trust is charitable is clearly part of the
circumstances, and the court must have regard to all the circumstances when
considering whether to intervene in relation to a trustee's exercise of a
discretionary power.

38   The order which the Chancellor made against Dr Lehtimäki was a   E
direction that he should vote in a particular way on the section 217
resolution. Lord Pannick, for the appellant, submits that the court could
also grant the relief sought in this case against Dr Lehtimäki under its
separate jurisdiction to make a scheme for a charity. However, the direction
sought against Dr Lehtimäki does not fall within the meaning of scheme
since it neither relates to the purposes of CIFF nor affects the management
and administration of the charity. Lord Pannick points out that in   F
*Chinachem Charitable Foundation Ltd v Secretary for Justice* (2015) 18
HKCFAR 169 at para 41, Lord Walker of Gestingthorpe NPJ (formerly a
Justice of this court and sitting in the Court of Final Appeal of Hong Kong)
referred to a scheme as "a written instrument approved by the court to
regulate, in whole or in part, the future management and administration of
the trust", but it is important not to take this observation out of context. I do   G
not consider that Lord Walker's observation is intended to remove the
distinction to be drawn between on the one hand schemes, which may
operate in the way Lord Walker described or concern the charity's purposes,
and on the other hand directions which may be given in the operation of a
charity by the Charity Commission or the court.

39   *Third*, does section 217 of the 2006 Act allow the court to direct a
member how to exercise his discretion when Parliament has provided for   H
members to approve the resolution, subject to the prior written consent of
the Charity Commission? The Chancellor decided this issue in favour of the
appellant, but the Court of Appeal disagreed with him. The appellant
appeals against the Court of Appeal's ruling on this issue.

© 2022 The Incorporated Council of Law Reporting for England and Wales

[2022] AC          Children's Investment Fund (UK) v Attorney General (SC(E))
                                                                    Lady Arden JSC

A    *Discussion*

     *Summary of conclusions*

     **40**   In my judgment, the three issues should be decided in the appellant's favour. I have summarised my reasons at the end of this judgment.

     **41**   I will now consider each of the three issues in turn.

B    *Issue 1: Is Dr Lehtimäki qua member of CIFF a fiduciary?*

     (1) What the term "fiduciary" means and why it matters in this context

     **42**   The question whether a person is a fiduciary is important because of the duties which follow. But in this case the additional significance of the question whether Dr Lehtimäki is a fiduciary in his capacity as a member of CIFF is that the court will, subject to Issues 2 and 3 below, be able to direct
C    him as to how to vote on the section 217 resolution.

     **43**   Equity imposed stringent duties on persons who were appointed trustees of trusts: Lord Eldon LC is said to have held that these duties were imposed with "relentless jealousy" in order to ensure that trustees fulfilled their duties, and that trustees had to be "watched with infinite and the most guarded jealousy" (see *Ex p Lacey* (1802) 6 Ves 625, 626; and note 2 to the report). The words "infinite" and "relentless" aptly indicate the capacity of
D    equity to develop to meet new challenges. Over the years these duties were also imposed on directors, agents, solicitors and others. The term "fiduciary" is used to cover all persons subject to these duties, including trustees, and it is therefore a wider term than that of trustee.

     **44**   There has been considerable debate as to how to define a fiduciary, but it is generally accepted today that the key principle is that a fiduciary acts
E    for and only for another. He owes essentially the duty of single-minded loyalty to his beneficiary, meaning that he cannot exercise any power so as to benefit himself. In *Bristol and West Building Society v Mothew* [1998] Ch 1, 18 Millett LJ described the duties of a fiduciary as follows:

          "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a
F         relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not
G         intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary."

     **45**   So "the distinguishing obligation" of a fiduciary is that he must act only for the benefit of another in matters covered by his fiduciary duty. That means that he cannot at the same time act for himself.
H    **46**   If a person is a fiduciary then, as part of his core responsibility, he must not put himself into a position where his interest and that of the beneficiary conflict ("the no-conflict principle") and he must not make a profit out of his trust ("the no-profit principle"). The fiduciary is likely to owe other fiduciary duties as well, such as the duty to act in the best interests

© 2022 The Incorporated Council of Law Reporting for England and Wales

of the person to whom the duty is owed.  Section 178(2) of the 2006 Act    A
expressly makes this a fiduciary duty in the case of company directors.  It is
not necessary to consider whether these duties are fiduciary duties in all
cases.  It is not enough that a person has agreed to perform certain duties by
agreement.  As the Privy Council held in *In re Goldcorp Exchange Ltd*
[1995] 1 AC 74, 98, "the essence of a fiduciary relationship is that it creates
obligations of a different character from those deriving from the contract
itself".                                                                      B

47    The Court of Appeal adopted the following test put forward by
Finn J, sitting in the Federal Court of Australia, in *Grimaldi v Chameleon
Mining NL (No 2)* (2012) 200 FCR 296, para 177:

> "a person will be in a fiduciary relationship with another when and in
> so far as that person has undertaken to perform such a function for, or has    C
> assumed such a responsibility to, another as would thereby reasonably
> entitle that other to expect that he or she will act in that other's interest to
> the exclusion of his or her own or a third party's interest . . ."

48    This formulation introduces the additional concept of reasonable
expectation of abnegation of self-interest.  Reasonable expectation may not be
appropriate in every case, but it is, with that qualification, consistent with the
duty of single-minded loyalty.  There was a suggestion in this case that a    D
member would not expect to find that he was a fiduciary.  However, there was
no evidence about that, and Mr Robert Pearce QC, for Her Majesty's Attorney
General, pointed to a publication of the Charity Commission available since
2004 and entitled *RS7-Membership Charities*.  This makes it clear that the
Charity Commission takes the view that members of a charitable company
have an obligation to use their rights and exercise their vote in the best    E
interests of the charity of which they are a member (p 18), and that "the rights
that exist in relation to the administration of a *charitable* institution are
fiduciary" (p 33).  (There are similarities here with the duty imposed on
members of a CIO by section 220 and indeed *RS7-Membership Charities*
contemplates that members of a CIO would be placed under that duty.)

49    Leading works on charities, such as *Tudor on Charities*, 10th ed    F
(2015), paras 6-051 and 17-005 and Picarda, *The Law and Practice Relating
to Charities*, 4th ed (2010), p 287 considered it doubtful or an open question
whether members were fiduciaries.  This view derives support from a number
of decisions where that was assumed to be the case: see, for example, *Bolton v
Madden* LR 9 QB 55, 57 where the Court of Queen's Bench (now the High
Court) on appeal from the Lord Mayor's Court held that they could "find no
legal principle to justify us in holding that the subscriber to a charity may not    G
give his votes as he pleases".  However, it seems to me that when it comes to
finding whether there is a reasonable expectation in the public at large, the
Charity Commission's published guidance must have more weight than even
much respected legal commentaries.  For the reasons given below at para 104,
I do not consider that *Bolton v Madden* is necessarily inconsistent with
members of a charitable company owing a fiduciary duty.

50    I should add here that *Tudor* in the passage first cited, at footnote    H
485 criticises a learned article by Professor J Warburton, "Charity Members:
Duties and Responsibilities" [2006] Conv 330 for overlooking the fact that
any fiduciary duty owed by a member of a charitable company is owed to the
company itself.  The Court of Appeal in this case also expressed that view.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  As will hereafter become clear, I take the view that any fiduciary duty is owed not to the company (viz CIFF in this case) but to the charitable purposes or objects of the charity. The Attorney General or a duly qualified individual can bring charity proceedings to enforce this duty: see section 115 of the 2011 Act. (That section imposes limits on the bringing of proceedings: see section 115(2), which requires an order of the court or of the Charity Commission, and the case law on section 115.) My conclusion is consistent

B  with section 172(2) of the 2006 Act which provides that directors of companies set up for altruistic purposes owe their fiduciary duty to promote the purposes of the company:

> "Where or to the extent that the purposes of the company consist of or include purposes other than the benefit of its members, subsection (1) has effect as if the reference to promoting the success of the company for the benefit of its members were to achieving those purposes."

C

51    A person can be a fiduciary in relation to another party with whom he has a contractual relationship in respect of some only of his contractual obligations: see, for example, *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No 2)* [2012] Ch 613, especially at paras 212–216 and 223 per Sales J (as he then was). This is only one of the situations in which a

D  fiduciary duty may arise. It is important to examine the very specific context in which it is said that a fiduciary duty arises. This point was made by Sales J (para 223):

> "The touchstone is to ask what obligations of a fiduciary character may reasonably be expected to apply *in the particular context*, where the contract between the parties will usually provide the major part of the contextual framework in which that question arises." (Emphasis added.)

E

(2) Companies as charities

(a) Backdrop

52    It will seem extraordinary to many people that, despite the fact that there have been charitable companies for many years and that there are now

F  some 33,000 guarantee companies which are registered charities, the issue whether a member is a fiduciary has never before been decided. There is also little scholarship or textbook commentary on this issue. However, there are other signposts to guide the courts: first, the liberal interpretation taken to charities by the courts, second, the recognition of charitable companies by Parliament, and, third, the decision of Slade J (as he then was) in *Liverpool*

G  *and District Hospital for Diseases of the Heart v Attorney General* [1981] Ch 193 ("the *Liverpool and District* case"). I consider each signpost in turn.

(b) Liberal approach taken to charities by the courts

53    The first signpost is to be found in the case law and it is the general approach of the courts, which is to uphold charitable gifts wherever

H  possible. As Lord Macnaghten, with whom Lord Watson and Lord Morris agreed, held in *Comrs for Special Purposes of Income Tax v Pemsel* [1891] AC 531, 580–581:

> "The Court of Chancery has always regarded with peculiar favour those trusts of a public nature which, according to the doctrine of the

© 2022 The Incorporated Council of Law Reporting for England and Wales

court derived from the piety of early times, are considered to be       *A*
charitable.  Charitable uses or trusts form a distinct head of equity.
Their distinctive position is made the more conspicuous by the
circumstance that owing to their nature they are not obnoxious to the
rule against perpetuities, while a gift in perpetuity not being a charity is
void."

54   Examples of the approach of the court can be seen in marshalling,    *B*
where the deceased's debts were in some cases required to be paid out of
the residue of the deceased's estate rather than at the expense of some
charitable gift made by the will (see generally, Gareth Jones, *History of the
Law of Charity 1532–1827* (1969), pp 96–97, read with pp 156–157), and,
most importantly, in the way in which gifts which failed, because, for
example, the purpose was against public policy, were nonetheless applied   *C*
by the court "cy-près" to charitable purposes provided that a general
charitable intention was shown.   The latter point is described by Lord
Simonds in *National Anti-Vivisection Society v Inland Revenue Comrs*
[1948] AC 31, 64:

"Nowhere perhaps did the favour shown by the law to charities exhibit
itself more clearly than in the development of the doctrine of general      *D*
charitable intention, under which the court, finding in a bequest (often, as
I humbly think, on a flimsy pretext) a general charitable intention,
disregarded the fact that the named object was against the policy of the
law . . ."

55   So, too, in *Gaudiya Mission v Brahmachary* [1998] Ch 341, 350,
Mummery LJ observed that "Under English law charity has always            *E*
received special treatment".  The *Liverpool and District* case [1981] Ch 193
considered below (paras 67–73) provides a further example of the courts
adopting an approach designed to uphold an intention to make a charitable
gift rather allow the gift to fail on a technicality.

(c) The recognition of charitable companies by Parliament               *F*

56   An important signpost to the correct way to approach the law as it
applies to charitable companies is the recognition of charitable companies in
statute law and the conclusions to be drawn from this statutory scheme.

57   The legislature has modelled charitable companies on the normal
registered UK company.  Thus, in section 353(1) of the 2011 Act, unless
the context otherwise requires, the word " 'company' means a company       *G*
registered under [the 2006 Act] in England and Wales or Scotland".
Section 193 of the 2011 Act then provides that: "In this Act 'charitable
company' means a charity which is a company."

58   It is a short step from this to see that the provisions of the 2006 Act,
for example as to alterations of the memorandum and articles of association
and financial statements, then apply to a charitable company as they do to
other registered companies.  In some cases, however, the 2011 Act makes    *H*
further or different provision.  These provisions are engrafted on to the
model established by the companies legislation so that charitable companies
may be subject to two levels of regulation.  A notable example of this is
section 198 of the 2011 Act, which places restrictions on the amendments

© 2022 The Incorporated Council of Law Reporting for England and Wales

181

A   which a charitable company may effectively make to its memorandum and
articles of association:

"198 *Alteration of objects by companies and Commission's consent*
"(1) Any regulated alteration by a charitable company— (a) requires
the prior written consent of the Commission, and (b) is ineffective if such
consent has not been obtained.

B   "(2) The following are regulated alterations— (a) an amendment of the
company's articles of association adding, removing or altering a statement
of the company's objects, (b) any alteration of any provision of its articles
of association directing the application of property of the company on its
dissolution, and (c) any alteration of any provision of its articles of
association where the alteration would provide authorisation for any

C   benefit to be obtained by directors or members of the company or persons
connected with them."

59    There is nothing surprising in this section, or indeed in section 30(2)
of the Charities Act 1960, now section 197 of the 2011 Act.  Section 30(2)
for the first time prevented a charitable company from altering its objects
and then treating the assets as part of its general assets in response to the
*Report of the Committee on the Law and Practice relating to Charitable*

D   *Trusts* (1952) (Cmd 8710), para 573, cited by Mr Pearce.  A company still
has the powers conferred by the Companies Acts to alter its memorandum
and articles of association even though it is also a charitable company.
The 2011 Act remedies the consequences for charitable companies.  The
ruling of Slade J in the *Liverpool and District* case [1981] Ch 193 that a
company is not a trustee in the strict sense of the charitable assets but has a

E   beneficial interest in them is entirely consistent with the approach taken in
section 30(2).

60    Section 201 of the 2011 Act, which is set out in para 11 of this
judgment, follows the pattern I have identified since it provides for the
stapling of a requirement for the Charity Commission's prior written consent
on to the consents already required by the 2006 Act.

F   61    In turn the 2006 Act (as amended) contains a handful of references
to the 2011 Act, but it does not define the term "charitable company",
though the expression "companies that are charities" is used (see for
example section 42 of the 2006 Act).  Neither the 2006 Act nor the 2011 Act
further analyses the effect of the incorporation of a charity.

62    One can speculate as to how this dual system of legislative regulation
came about.  It must have occurred to charity trustees (assuming the charity

G   was not incorporated by Royal Charter or a statutory corporation) that it
would be useful if charities could be incorporated under a general Act of
Parliament by about 1870 because in 1872 Parliament passed the Charitable
Trustees Incorporation Act 1872 (35 & 36 Vict c 24) ("the 1872 Act")
providing that trustees could apply to the Charity Commissioners to be
incorporated.  This secured the perpetual succession of the trustees, which
meant there was no need to convey property or transfer securities to new

H   persons every time there was a change of trustees.  This system continues to
exist (see now section 251 of the 2011 Act).

63    Some charities avoided the problems resulting from the lack of
perpetual succession by vesting land and securities in the Official Custodian,
but where this was not sufficient, a form of incorporation was needed.  The

© 2022 The Incorporated Council of Law Reporting for England and Wales

form of incorporation originally provided by the 1872 Act and now by          A
section 251 of the 2011 Act is not generally satisfactory since it does not
provide that the incorporated body would have limited liability or provide
any rules for its internal management or dissolution, and an early edition of
*Tudor on Charities* stated in the footnotes that "The powers of the Act are in
practice never used".

64    It is quite possible that what happened was that the need for          B
incorporation was satisfied by charities being incorporated through
companies registered under the Companies Acts and that they sought to
register names dispensing with the word "limited".  That gave the Board of
Trade as it then was the power to impose conditions (which applied to other
types of company as well) that the memorandum of association should state
that the property and funds of the company should be used only for
promoting the objects of the charity and do not belong to the members of          C
the charity and no portion would be distributed to members with minor
exceptions for reasonable and proper remuneration for services provided,
interest up to 5% on loans and proper rent.  To dispense with the word
"limited", the memorandum also had to state that the persons fulfilling the
role of directors should be accountable for the company's property which
came into their hands and for their own acts and omissions as if the company
had not been incorporated.  This wording may have been based on section 5          D
of the 1872 Act which provided that despite incorporation all the trustees
should be "chargeable for such property as shall come into their hands, and
shall be answerable and accountable for their own acts, receipts, neglects,
and defaults, and for the due administration of the charity and its property,
in the same manner and to the same extent as if no such incorporation had
been effected" (see *Palmer's Company Precedents*, 17th ed (1956), vol 1,          E
p 290).  This provision assumed that on incorporation the charity continued,
but now encased in corporate form.  It also provided for all corporators who
were trustees to be liable to the charity as they were before without making
any distinction between directors and members.

65    The net result of this analysis for present purposes is that the
legislature has by the 2011 Act simply stapled on to the 2006 Act the
restrictions which it wished to impose on charitable companies.  Those          F
companies do not have a founding statute of their own but are subject to a
mosaic of statutory provisions.  Another key point is that Parliament clearly
considered that a company with exclusively charitable objects should itself
in law be a charity for the purposes of the 2011 Act.

66    On the basis that the legal framework is a mosaic, the next
important issue is whether the courts will apply their liberal attitude to          G
charities under the general law to making the mosaic work in places where
there are evident difficulties not foreseen by the legislature.  This brings me
to the important *Liverpool and District* case.

(d) The *Liverpool and District* case and wider points to be drawn
from it
          H
67    The issue of the relationship of charity law to company law came
to a head in the *Liverpool and District* case [1981] Ch 193.  A charitable
company had been formed to provide a hospital and promote research into
diseases of the heart and other ailments.  Its memorandum of association,
but not its articles, provided that on winding up its assets should not be

© 2022 The Incorporated Council of Law Reporting for England and Wales

A distributed amongst its members but transferred to an institution having similar objects. On the formation of the National Health Service, the hospital which it ran was transferred to the National Health Service. The company continued to do research until it discontinued its activities and was wound up on the petition of the Attorney General. At that point it was realised that, under section 302 of the Companies Act 1948 (now to be found in section 107 of the Insolvency Act 1986), surplus assets had to be

B distributed to the members of the company unless the articles otherwise provided. So the liquidator issued a summons in the liquidation for directions as to whether this statutory provision displaced the provisions of the company's memorandum of association. One of the arguments was that the assets of the charity did not belong to the company. The matter came before Slade J who considered the law in great depth.

C    68    Slade J concluded that the company's relationship to its assets was analogous to that of a trustee. It was not a trustee in the strict sense. It retained a beneficial interest in its assets and so they fell to be applied in accordance with the Companies Acts. However, the members had agreed to the memorandum of association and therefore this took effect and was binding on them. Even though there was no similar provision, as there is in CIFF's articles of association dealing with the distribution of surplus assets

D on winding up, the articles were subordinate to the memorandum and the provisions of the memorandum took effect. Finally, the court had jurisdiction now to order that assets be applied cy-près. This arose not only where there was a strict trust but also in relation to the assets of a charitable company where under the terms of its constitution there was a legally binding obligation to apply its assets for exclusively charitable purposes.

E Slade J accordingly directed that the company's assets should be applied cy-près.

   69    In reaching his decision, Slade J relied on the judgment of Buckley LJ in two important cases which it is convenient to mention here. The first was *Construction Industry Training Board v Attorney General* [1973] Ch 173, where the principal issue was whether a body set up by statute and subject to the control of a minister of the Crown was a "charity" within the meaning of

F section 45(1) of the Charities Act 1960, for which purpose it had to be subject to "the control of the High Court in the exercise of the court's jurisdiction with respect to charities". The case highlights that the High Court has two relevant bases of jurisdiction that can be invoked in the case of charities: its jurisdiction over trusts generally and its jurisdiction over charities. However, the reference to the control of the High Court did not refer to the court's power over statutory bodies generally to control actions

G outside their powers. The majority (Buckley LJ and Plowman J, Russell LJ dissenting) held that sufficient control was vested in the High Court despite the fact that the minister had complete control over the running of the board. That issue does not arise in this case, but it led to an illuminating description of the court's extensive jurisdiction over charities in the judgment of Buckley LJ (pp 186–187):

H        "It is a function of the Crown as parens patriae to ensure the due administration of established charities and the proper application of funds devoted to charitable purposes. This it normally does through the instrumentality of the courts, but this is not the only way in which the Crown can regulate charities or the application of charitable funds.

© 2022 The Incorporated Council of Law Reporting for England and Wales

Where a charity has been incorporated by Royal Charter, the Crown may amend its constitution or vary its permitted objects by granting a supplemental charter.  Where funds are given for charitable purposes in circumstances in which no express or implied trust is created, the Crown can regulate the application of those funds by means of a scheme under the sign manual.  Where the Crown invokes the assistance of the courts for such purposes, the jurisdiction which is invoked is, I think, a branch of the court's jurisdiction in relation to trusts.  In such cases the relief granted often takes the form of an order approving a scheme for the administration of the charity which has been laid before the court, but this is not the only way in which the court can exercise jurisdiction in respect of a charity or over charity trustees.  The approval of a scheme of this nature is, so far as I am aware, a form of relief peculiar to charities, but it does not constitute relief of a kind given in the exercise of a jurisdiction confined to giving relief of that sort.  The court could, for instance, restrain trustees from applying charitable funds in breach of trust by means of an injunction.  In the case of a charity incorporated by statute this might, as was suggested in the present case, be explained as an application of the doctrine of ultra vires, but I do not think that this would be a satisfactory explanation, for a similar order upon unincorporated trustees could not be so explained.  Or, by way of further example, the court could order charity trustees to make good trust funds which they had misapplied, or could order them to account, or could remove or appoint trustees, or could exercise any other kind of jurisdiction available in the execution of trusts other than charitable trusts.  In every such case the court would be acting upon the basis that the property affected is not in the beneficial ownership of the persons or body in whom its legal ownership is vested but is devoted to charitable purposes, that is to say, is held upon charitable trusts.  Any relief of this kind is, in my judgment, appropriately described as relief granted in the exercise of the court's jurisdiction with respect to charities, and, where the relief is such as to bind the body of trustees as a whole, this would, in my opinion, constitute control of the charity by the court in the exercise of its jurisdiction with respect to charities.  I consequently feel unable to accept the suggestion put forward on behalf of the Attorney General that the reference in section 45 of the Act of 1960 to the court's jurisdiction with respect to charities is in some way confined to its jurisdiction to approve charitable schemes."

70    Lord Walker commended this passage and the passage in the judgment of Slade J dealing with the question whether a charitable company was a trustee of the assets of the charity in *Chinachem* 18 HKCFAR 169 in the Court of Final Appeal of Hong Kong at para 45.  A further factor which weighed with Buckley LJ was that the minister had no powers of enforcement: the minister would have to invoke the assistance of the courts.  The court could make a scheme even if the charity was not a trust in the strict sense.

71    Slade J relied on the later judgment of Buckley LJ in *Von Ernst & Cie SA v Inland Revenue Comrs* [1980] 1 WLR 468, 479–480 in which he had specifically observed that the assets of a corporate charity were held on charitable trusts:

    "We were referred to certain authorities which give support to the view that a company incorporated for exclusively charitable purposes is in the

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    position of a trustee of its funds or at least in an analogous position. The authorities were *In re French Protestant Hospital* [1951] Ch 567; *Soldiers', Sailors' and Airmen's Families Association v Attorney General* [1968] 1 WLR 313; *Construction Industry Training Board v Attorney General* [1973] Ch 173 and *In re Finger's Will Trusts* [1972] Ch 286. In the first two of these cases it seems to me that it was assumed, rather than decided, that a corporate charity was in the position of a trustee of its funds. In the third, the question was what was meant by the words 'in the exercise of the court's jurisdiction with respect to charities' in section 45(1) of the Charities Act 1960. In the course of my judgment in that case I certainly did express the view that the court would exercise its jurisdiction over corporate charities on the basis that their assets were held on charitable trusts and it appears to me that Plowman J, as I understand his very short judgment, agreed with me in that respect. *In re Finger's Will Trusts* turned on a question of whether or not a bequest to a charitable corporation, which ceased to exist in the testatrix's lifetime, demonstrated a general charitable intention capable of permitting a cy-près application. I do not think that it is a decision which is of assistance for present purposes."

D    72   That passage provided a strong footing for the decision of Slade J. The *Liverpool and District* case [1981] Ch 193 evidences two points which are wider than the point just described. It is a yet further example of the determination of the courts to give effect to the charitable objects and not to allow technical matters, such as the reference to the company's articles in section 302 of the Companies Act 1948, to prevent the gift to charity taking effect. It would be a break with a long-standing tradition if this court was to depart from that approach. It also demonstrates another point, this time new as there had been little or no litigation about charitable companies registered under the Companies Acts in this regard before, namely the court's determination to make the statutory framework cohesive where this could be achieved.

F    73   No party to these proceedings has challenged the authority of this important case. This decision was cited with approval by Lord Walker in *Chinachem* 18 HKCFAR 169. It recognised that registered companies could be charities, and that meant that the new charitable vehicle had to meet both the charitable and corporate model. The members would be affected by the fact that the company was charitable because the practice was and is that the memoranda of association of charitable companies should provide that the assets should only be applied towards its charitable objects and other restrictions. The memorandum and articles of the company "bind the company and its members to the same extent as if there were covenants on the part of the company and of each member to observe those provisions" (see section 33(1) of the 2006 Act, which is derived from the Companies Act 1862 (25 & 26 Vict c 89), sections 11 and 16). So, members could not assert rights in disregard of their contractual obligations to the charity.

H    74   The next matter to be considered is the objections, principally those of CIFF, to members of charitable companies being fiduciaries as both the Chancellor and the Court of Appeal have held. The analysis conducted so far on this issue will shape my response to these submissions.

© 2022 The Incorporated Council of Law Reporting for England and Wales

(3) Were the courts below in error in holding that the members of a
charitable company are fiduciaries?

A

75    While Lord Pannick seeks to uphold the decisions of the Court of
Appeal and the Chancellor that Dr Lehtimäki is a fiduciary, Mr William
Henderson, for CIFF, impressed on us the difficulties which CIFF sees in
members of charitable companies being fiduciaries. The practical difficulties
he mentioned included: (i) whether there ought to be declarations of interest
before meetings of members; (ii) whether a member with a conflict of
interest can vote (which was particularly emphasised by Dr Lehtimäki on the
grounds of the difficulties that this would cause where a member was a
member of more than one charity in the same field); (iii) whether a member
has a duty to attend and vote at meetings; (iv) whether a member can
appoint a general proxy as permitted by section 324(1) of the 2006 Act;
(v) whether a member can receive a benefit from the company; (vi) whether
a member can fetter his discretion by making a voting agreement;
(vii) whether a member would have to investigate a matter before he could
vote on it; (viii) What information a member could require from the
company; (ix) whether a member is entitled to be indemnified for the cost of
attending a meeting of the company or for the cost of taking legal advice;
(x) whether a member would be liable to compensate the company if he
exercised his right to vote in breach of duty.

B

C

D

76    Mr Henderson also raises several objections of principle to members
being fiduciaries which I will address in the course of expressing my reasons
for concluding that the Court of Appeal and the Chancellor were correct on
this issue.

77    Mr Pearce submits that the members of CIFF have a range of powers.
The property of the company is solely applicable to charitable purposes,
so a member undertakes functions to promote charitable purposes to the
exclusion of any benefit to himself. The members of CIFF fall squarely
within the test of who is a fiduciary set out in *Grimaldi* 200 FCR 296. The
obligations of the members are to serve the purposes of the charity. It is
unnecessary to go further than to say that if a member exercises his powers
he must do so in a way that he decides in good faith would be most likely to
promote the purposes of the charity.

E

F

(4) My conclusions on the question whether a member is a fiduciary

78    The question who is a fiduciary has been considered above and I need
not repeat those points again. The court has to determine whether there
is a fiduciary relationship between the charitable objects of CIFF and
Dr Lehtimäki in his capacity qua member of CIFF. In my view that question
falls to be answered in the affirmative, and what applies to Dr Lehtimäki and
CIFF will apply to all other members of charitable guarantee companies
which, like CIFF, contain restrictions which in general prevent members
receiving profits from the company. Moreover, such restrictions are generally
contained in the memorandum and articles of association of charitable
companies.

G

79    The important point in my judgment is that the law allows the duties
of a fiduciary to be fashioned to a certain extent by the arrangements
between the parties. In the case of a member of a charitable company this
means that the duties of a member can be fiduciary even if the memorandum
and articles of association impose restrictions which mean that he cannot

H

187
[2022] AC          Children's Investment Fund (UK) v Attorney General (SC(E))
Lady Arden JSC

A  discharge all the obligations which a fiduciary would have under the general
law.

80  The decision in *Liverpool and District* [1981] Ch 193 was an
important decision because it set the direction of travel.  Slade J gave
precedence to the fact that a member had agreed to become a member of a
charity.  The general principle is that, as a result of the agreement which is
made when a person becomes a member of a company, the rights of a
B  member against the company and his liabilities to it stem from the
memorandum and articles and the obligations imposed by the Companies
Acts and the general law.

81  Thus, the fiduciary duties which a member owes are tailored by the
memorandum and articles.  There is therefore no difficulty in a member
delegating the right to vote to a general proxy if that is what the 2006 Act
C  and the articles allow.  Fiduciary duties take effect subject to the restrictions
imposed by the nature of the corporate form which constitutes the charity.

82  Trust law allows the fiduciary duties to be diminished by an
appropriate means and to an appropriate extent.  As to means, the members
can resolve to amend the memorandum and articles of association within the
powers conferred by the 2006 Act and subject to compliance with
restrictions imposed by the 2011 Act.  As to the extent to which a person's
D  fiduciary duties may be reduced before he ceases to be a fiduciary, the
principle is that there is no difficulty with this so long as the duties of a
fiduciary nature are not reduced below the "irreducible core" of obligations
identified by Millett LJ in *Armitage v Nurse* [1998] Ch 241, 253–254:

  "there is an irreducible core of obligations owed by the trustees to the
  beneficiaries and enforceable by them which is fundamental to the
E  concept of a trust.  If the beneficiaries have no rights enforceable against
  the trustees there are no trusts . . . The duty of the trustees to perform the
  trusts honestly and in good faith for the benefit of the beneficiaries is the
  minimum necessary to give substance to the trusts, but in my opinion it is
  sufficient."

83  In *Citibank NA v MBIA Assurance SA* [2007] 1 All ER (Comm) 475,
F  the controlling noteholder of a series of notes issued by a company and
secured by a trust deed argued that its extensive powers, while its notes
remained outstanding, to direct the trustee of the trust deed how to exercise
its discretion (for example, as to when to take enforcement action)
diminished the role of the trustee below the irreducible core which a valid
trust must have.  The Court of Appeal (Sir Anthony Clarke MR, Arden and
G  Dyson LJJ) rejected that argument by reference to various other powers
which the trust deed vested in the trustee and the trustee's obligation to act in
good faith.  So, there must be some fiduciary duty which the court can
enforce but it need not extend to the full range of fiduciary duties which a
fiduciary might owe.  I need not express a view on the further question
whether, if the duties were reduced below the irreducible minimum, the
court could in any circumstances declare that reduction to be ineffective.
H  84  The beneficiaries of a trust can, by giving their fully informed
consent, agree to authorise or permit their fiduciary to act notwithstanding a
conflict of interest or to receive certain profits: see, for example, *Ex p Lacey*
6 Ves 625.  In the present case, the memorandum of association as registered
on incorporation contains exceptions from the no-conflict and no-profit

© 2022 The Incorporated Council of Law Reporting for England and Wales

principles. There is no reason why the memorandum of association should    A
not validly authorise the trustees or members to be interested in the
transactions within those exceptions or to retain the profits there mentioned.
The exceptions include for example reasonable and proper remuneration for
goods or services supplied to CIFF: see clause 5 of CIFF's memorandum of
association.

85    The further significance of the provisions of the memorandum is that    B
it is clear that the original corporators of CIFF took the view that the
no-conflict and no-profit principles applied to members as well as trustees.
The subscribers and other members also agree in the memorandum of
association that the assets of the company should be applied for the objects
of the charity. The memorandum of association is open to public inspection
at the Companies Registry (sections 9 and 1085 of the 2006 Act) and it is
also available for inspection at the Charity Commission (section 38(4) of the    C
2011 Act). The provisions of the memorandum of association are a further
indication that members should be treated as fiduciaries. It represents the
understanding of CIFF and all its members that the members are fiduciaries
and they have agreed to represent that position to the entire world. So, it
would require a good reason not to conclude that members are fiduciaries.

86    A member may therefore still be a fiduciary in his capacity as a
member even if the company's articles of association mean that he will not    D
be able to obtain information relevant to the exercise of his fiduciary powers.

87    Moreover, under charity law, there is no objection to a member
receiving an incidental benefit provided that this is authorised by the
memorandum and articles of association. That releases him from the
no-profit principle. It does not, however, without more release him from
any obligation of disclosure or entitle him to vote on any resolution allowing
him a benefit, even one authorised by the memorandum or articles of    E
association.

88    The point is rightly made that members of companies are not
normally fiduciaries in relation to any of their powers. On the contrary, in
the case of non-charitable companies having a share capital, the share is a
right of property which the member can in general vote as he pleases even if
it is in his own personal interests rather those of the company. There are,    F
however, limitations on how a member may use his voting rights. For the
purposes of this judgment, it is not necessary to go further on this than
Briggs J (as he then was) did in *Assénagon Asset Management SA v Irish
Bank Resolution Corpn Ltd (formerly Anglo Irish Bank Corpn Ltd)* [2013]
Bus LR 266, para 44:

    "The basis for the application of that principle in relation to powers    G
    conferred on majorities to bind minorities is traditionally described as
    arising from general principles of law and equity, and by way of
    implication. In *Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656,
    671 Lindley MR said this, in relation to a power conferred on the
    majority of shareholders to alter the articles of association: 'Wide,
    however, as the language of section 50 is, the power conferred by it must,    H
    like all other powers, be exercised subject to those general principles of
    law and equity which are applicable to all powers conferred on majorities
    and enabling them to bind minorities. It must be exercised, not only in
    the manner required by law, but also bona fide for the benefit of the
    company as a whole, and it must not be exceeded. These conditions are

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    always implied, and are seldom, if ever, expressed.' In the same case
Vaughan Williams LJ said, at p 676: 'I also take it to be clear that the
alteration must be made in good faith; and I take it that an alteration in
the articles which involved oppression of one shareholder would not be
made in good faith.' "

89    The principle is no different in relation to companies which do not
B    have a share capital. However, where the company is also a charity, a
member may, in my judgment, in some circumstances be a fiduciary in
relation to the rights attached to membership, including the right to vote.

90    To answer the questions posed by Frankfurter J in *Securities &
Exchange Commission v Chenery Corpn* 318 US 80, 85, in my judgment a
member of CIFF owes a fiduciary duty to the charitable purposes, and that
duty is one of single-minded loyalty. What does that involve in the present
C    context? In my judgment, it requires that he considers whether the
resolution should be passed and that he do so only by considering the best
interests of the objects of the charity. That is because the resolution involves
a disposition of assets that would otherwise be available for application by
CIFF towards those objects. There is no basis for saying that a member
was intended to have any separate interest in this transaction. On
D    Dr Lehtimäki's case he neither provided those assets nor has any legitimate
competing interest in the application of those assets. That does not mean to
say that he would be bound to approach every members' resolution of
CIFF with only the charitable beneficiaries in mind. There may be some
resolutions where a member may be able to take other interests into account
as well.

91    It is useful to test the matter by reference to reasonable expectation,
E    as did the Court of Appeal in this case and has been done in other cases, such
as *Arklow Investments Ltd v Maclean* [2000] 1 WLR 594, 598 (PC). The
duty as I have found it to be exactly matches what Dr Lehtimäki for instance
considers is required of him. More importantly it is also surely what both a
potential beneficiary and member of the public would expect him to do.
Moreover, and this harks back to my earlier discussion of the liberal
F    approach taken towards charities by the courts, to hold that a member is a
fiduciary is consistent with the "special" and "beneficent" treatment which
the law gives to charities. That is no doubt because of their potential to
benefit society and the public at large in a very major way. This is an
appropriate consideration in this case because a charity must be established
for public benefit. Sir Richard Scott V-C held in *Stanway v Attorney
General* (unreported) 5 April 2000:
G
"Charities operate within a framework of public law, not private law.
The Crown is parens patriae of the charity and the judges of the courts
represent the Crown in supervising what the charity is doing and giving
directions . . . The Attorney General's function is to make representations
to the court as to where lies the public interest as he sees it." (Transcript,
p 4.)

H    92    I consider that, because CIFF is a guarantee company, Dr Lehtimäki
is not entitled to any further information than that to which members of a
company registered under the Companies Acts are entitled by virtue of those
Acts or the general law. That would include, for example, particulars of the
proposed transaction: see section 217(3) read with section 215(3) of the

2006 Act.  I consider that those limits mean that he cannot compel access to
further information (though he could of course still ask the directors
voluntarily to provide additional information).  That is a limit on his role as
a fiduciary, but that limit is not inconsistent with his position as a fiduciary
because it is imposed by the structure which has been adopted for the
administration of the charity.  It is essentially a contract-and-statute-based
model of fiduciary duty.  The structure comprises both the statutory
provisions in the Companies Acts and the agreement of the members and
CIFF which is deemed to occur when the members agree to become members
of it: see section 33(1) of the 2006 Act (set out in para 73 above).  The 2011
Act (in addition to the general law) provides additional restrictions, but they
are mainly from outside the structure.

93   Mr Henderson submits that it is unnecessary for a member of a
charitable company to be a fiduciary.  He submits that the interests of the
charity are already well protected by the 2011 Act against the risk of
members acting contrary to the charity's best interests (see for example
sections 197 to 202 of the 2011 Act) and there are constraints on which
members can exercise their voting rights.  Mr Guy Morpuss QC, for
Dr Lehtimäki, further cites a learned article by Professor Worthington in
which she expresses the view that the law should only consider a person to
be a fiduciary if the obligations imposed by contract or tort, or the duty to
act for proper purposes, would be insufficient for the task (Professor
S Worthington, "Fiduciaries: When is Self-denial Obligatory?" (1999) 58
CLJ 500, 506).  But I do not consider that it is necessary to go that far.  If
Dr Lehtimäki is a fiduciary, then a well-known set of rules and remedies
come into play.  It will be easier for the court to exercise its inherent
jurisdiction over charities, and the law of charities will be more internally
coherent.

94   On Mr Henderson's submission, which was not supported by any
particular evidence, for this court to hold that a member was a fiduciary is
likely to disincentivise a person from becoming a member when it is often
desirable to give those who support a particular charity a stake in its affairs.
I accept that this is an important point, but *RS7-Membership Charities* has
anticipated the point so that there was guidance from an official source
already available.  Also, approximately 65% (or 3,203 in number) of new
charities registered with the Charity Commission in 2018 were CIOs, which
suggests that section 220 of the 2011 Act is not seen as a disincentive by
those charities.

95   As an alternative to his submission that a company member does not
owe a fiduciary duty, Mr Henderson submits that a member of a charitable
company should owe the same duties as a member of a CIO by virtue of
section 220 of the 2011 Act (set out in para 30 above).  But this has a
dual disadvantage: firstly, it would subject a member to this duty in all
circumstances, and, secondly, it leaves open the full scope of a company
member's duties since section 220 does not state that this is an exhaustive
statement of the duties of a member of a CIO.  (Nor yet does that section
make it clear whether this is a fiduciary duty or not: contrast section 178(2)
of the 2006 Act applying to directors.)

96   It is not suggested that Dr Lehtimäki has any conflict of interest in
voting on the resolution.  But suppose that he was going to be a trustee or
member of BWP.  This is not an interest which the memorandum or articles

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  of CIFF has pre-authorised.  The Companies Acts do not provide for the disclosure of this kind of interest by him as a member of CIFF.  Moreover, there is neither any organ of the company which has the express function of receiving any disclosure of details of a conflict of interest nor any means of obtaining fully informed consent.  But, certainly, he would not be able to vote as a member on any resolution concerning the benefit.

B  97    This problem does not require to be resolved in the present case.  I do not, however, consider that it is correct to say, as Mr Henderson argues, that this problem undermines the initial conclusion.  The solution may be that, if Dr Lehtimäki could be said to thereby potentially obtain a benefit, the articles should be amended to permit a member to have this interest.  The prior written consent of the Charity Commission is required only if Dr Lehtimäki would obtain a benefit: section 198(2)(c) of the 2011 Act.  It

C  may also be the Charity Commission could issue guidance under section 15(2) of the 2011 Act on conflicts of interest in order to reduce practical difficulties.  It may similarly be possible for the problem to be solved by a scheme or by way of sanction under section 105 of the 2011 Act.

98    Section 198(2)(c) reflects the decision of Danckwerts J in *In re French Protestant Hospital* [1951] Ch 567, and reinforces the conclusion that members of a charitable company who receive benefits from it are within the

D  no-conflict and no-profit principles.  In that case, the governor and directors of a charity set up by Royal Charter sought to exercise a power conferred on them by the charter to amend the byelaws to enable the directors' professional firms to be remunerated for their services to the charity. Danckwerts J held that, even though they were not trustees, the governor and directors had the same duty as the corporation to apply the assets in

E  furtherance of the charitable objects because in reality they controlled the corporation.  They could not therefore authorise a benefit for themselves. They had to act "in a fiduciary manner on behalf of the charitable trusts" (p 571).  Therefore, in that case, the governor and directors could only proceed by way of scheme.

99    Mr Henderson also relied on *In re Girls' Public Day School Trust Ltd* [1951] Ch 400, but that case can have no bearing on the point under

F  consideration because the company's purposes were not exclusively charitable.  The company was therefore not a charity and so the question whether a member owes a fiduciary duty did not arise in the same way as it does in the case of a company which is exclusively charitable.  In that case, the company had a share capital and had issued preference shares which had valuable rights on a winding up and sufficient votes to compel a winding up.

G  The company was formed for charitable purposes but, because of the rights of the preference shareholders, those purposes were not exclusively charitable.  Thus, the company failed in its bid to establish that it was a charity.

100    On this approach, the fiduciary duty of a member of a charitable company should in my judgment be more narrowly drawn than it was drawn by the Court of Appeal which held that a member of a charitable

H  company would *in all circumstances* owe a duty to act in the way that would be most likely to further the purposes of that company.  The Court of Appeal stressed that the duty was subjective: I agree that it is for the member to reach a conclusion on that matter in good faith provided that he does not do so improperly or unreasonably, the court will not seek to intervene or to hold

© 2022 The Incorporated Council of Law Reporting for England and Wales

him liable if his view turns out to have been wrong in fact (see generally *Tempest v Lord Camoys* (1882) 21 Ch D 571, where the court declined to order one trustee to act in accordance with the proposals of the other).

101    The Court of Appeal understandably based their formulation of the duty on members of a charitable company on that adopted by statute for CIOs, but a CIO is not a vehicle incorporated under the Companies Acts and therefore there may be good reason for the difference in the duty of members which I have identified. Suppose, for example, that a charity runs a lending library but for those prepared to pay an annual subscription it also provides access to a small separate area for which the library has no use, but in which there has been installed a machine that dispenses coffee at cost. This is at no cost to the charity since the member pays an annual subscription to cover this cost. Suppose that the charity proposes a resolution at the annual meeting of the charity to reduce the opening hours of the separate area. It is difficult to see why a member should owe a duty of single-minded loyalty to the charitable objects on a matter on which only the members qua private individuals have an interest. Mr Pearce takes the different example of a separate arrangement between members and a charity:

> "if one becomes . . . a friend of the Royal Opera House, one pays them money and in return one gets priority booking. That is a completely different arrangement from anything to do with having a constitutional role in the affairs of the charity."

The precise circumstances in which the member of a charitable company has fiduciary duties in relation to the charitable purposes and the content of those duties will have to be worked out when they arise. The point of principle is the point made by P D Finn in *Fiduciary Obligations* (1977), para 4 that "A fiduciary for one obligation is *not* ipso facto a fiduciary for all".

102    While charities must be for public benefit, minor incidental benefits may be permitted. Parliament has enacted the gift aid scheme for tax relief on donations, and that relief is available if minor gifts are made unless certain limits are exceeded. So, Parliament has recognised that charities do sometimes, and without losing their charitable status, give members minor benefits in exchange for donations. Those charities may well be charitable companies, because that vehicle, together with the CIO is often a preferred option for a charity that wishes to encourage a wide range of persons to become members. In *Bolton v Madden* LR 9 QB 55, the subscribers obtained the right to vote in exchange for their subscription.

103    Mr Morpuss submits that members of CIFF had to use their section 217 power for a proper purpose but were not fiduciaries. That would mean that they did not owe a duty of single-minded loyalty even though their powers could, as in this case, result in a substantial grant out of the assets held on charitable trusts. In my judgment the duty to exercise powers for a proper purpose does not adequately recognise the scope of members' powers and it would not be consistent with the obligations of members of a CIO. I should add that there is no evidence before us that the duties imposed on members of a CIO is causing any difficulty in finding members of CIOs or that it creates an unsatisfactory level of uncertainty. Mr Jonathan Crow QC, for Sir Christopher, submits that it would be "astonishing" if members could not vote on their own appointments as

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   directors or trustees, but with respect it seems to me wholly reasonable to say that a person must not vote for himself.

104   The distinction which I have drawn between the duties which a member may owe which involve a duty of single-minded loyalty and those which do not may help explain the briefly reported case of *Bolton v Madden*, referred to at para 49 above.  That concerned two subscribers to an incorporated charity (and assuming that the incorporated charity was a
B   registered company they would be members: see now section 16(2) of the 2006 Act).  The issue was the lawfulness of an agreement to vote in favour of each other's choice of charitable object.  There is no suggestion that the parties to the agreement intended to select objects which did not qualify as charitable objects which were manifestly not appropriate for selection. When it comes to nominating charitable objects, the courts do not interfere
C   with the choice made by the party entitled to nominate unless it is corrupt or outside the terms of the power or the person chosen is manifestly unfit.  One example of this is *Attorney General v Dean and Canons of Christ Church* (1822) Jac 474, 486 where Sir Thomas Plumer MR held that he did not "know how any restriction on [the] power [of the Dean and Canons conferred by the testator to manage a school in Portsmouth and choose persons to be educated there] [could] be introduced".  So long as that
D   remains the law for charities generally it is difficult to see how members having a right of nomination as in *Bolton v Madden* could be held to a higher standard.  But that is clearly a different situation from exercising a power which amounts to an effective veto on the disposition of charitable assets since that veto is a (negative) right of control comparable to the issue of payment in connection with a director's loss of office to the right of
E   control in *In re French Protestant Hospital* [1951] Ch 567.

### Mass membership charitable companies

105   The above principles apply to charitable companies large or small. On this basis, the number of members which a guarantee company happens to have is not the deciding factor, and the Court of Appeal fell into error in
F   suggesting that there might be some different outcome as regards members of mass membership charities.  Since there is no comprehensive or statutory definition of such charities, the qualification made by the Court of Appeal introduced an element of uncertainty.  It was suggested that we should not say more about these cases until they arose, and I agree that it is not appropriate for the court to go further at this stage in this context.

G   ### Application of the principles to the facts of this case

106   In his witness statement dated 17 May 2017, Dr Lehtimäki summarised his difficulties and concerns over voting on the section 217 resolution:

"*Conclusion as to the Grant*

H   "34. The analyses that I have carried out above make me think that it is very difficult—on the currently available evidence—to decide whether the Grant is in the best interests of CIFF's beneficiaries.  On the one hand there is a clear benefit in resolving the historic governance problems and achieving finality.  On the other hand transferring $360m to BWP comes at a cost.  How big a cost is unknown, particularly given the lack of

© 2022 The Incorporated Council of Law Reporting for England and Wales

available information in relation to BWP and its very limited track record.    A
It may be large, and that is my biggest concern.

"35. I would very much like CIFF to be able to draw a line under
its difficulties, and move forward, with no further risk of litigation.
However, I remain concerned about the cost of achieving that end.  It is
for that reason that I consider this a difficult decision.  If I am—in the
future—able to vote on this issue, the points set out above are the ones    B
that are likely to influence my decision.  I will of course give careful
consideration to any further information that becomes available, as well
as to the conclusions of the court and the Charity Commissioners."

107    These are telling passages.  Dr Lehtimäki has rightly identified the
charitable purposes and recognised the need to exercise his right to vote in
their interests.  As I see it, he implicitly recognises what is in law a fiduciary    C
duty.  He does not indicate that there is any practical difficulty in recognising
or performing the obligations attached to his right to vote.  Those are
important obligations and, given their fiduciary nature, there is an onus on
the court to consider carefully how they are enforced.  It is of the essence of a
fiduciary obligation that it should be capable of effective enforcement by the
court.

D

*Issue 2: Have circumstances arisen with respect to the section 217
resolution in which the court can exercise its jurisdiction over fiduciaries in
relation to Dr Lehtimäki?*

The competing positions of the parties

108    This issue now falls to be considered on the basis that Dr Lehtimäki
owes fiduciary duties in relation to the way in which he votes on the    E
section 217 resolution.  The Chancellor considered the Grant to be in the
best interests of the charity, but he accepted that a person could reasonably
come to a different view.  He made a direction against Dr Lehtimäki for the
reasons explained above.  Those reasons are not open to challenge in this
case.

109    The Court of Appeal did not consider that Dr Lehtimäki's stance
represented a breach of any duty by him and I proceed on the basis that that    F
is the case.  That makes this issue particularly difficult because in the case of
private trusts the court rarely intervenes in the exercise of discretionary
judgment.  In this section I only give a very brief summary of the submissions
and it is more convenient to deal with other important points made by
counsel as I set out my conclusions.

110    The law of charities is described by Buckley LJ in the *Construction*    G
*Industry Training Board* case [1973] Ch 173 as a branch of the law of trusts
(see the passage set out above at para 69), but, as Buckley LJ indicates, the
law of charities has a number of different features which are unique to it and
do not apply to charitable trusts, the best known of which is its jurisdiction
to make a scheme for the application of the property of the charity cy-près.

111    Lord Pannick submits that the *Construction Industry Training*
*Board* case shows that the powers of the court were very broad and that    H
the court would be slow to substitute its own decision.  There is a
long-established jurisdiction to deal with alienations of property interests.
The views of the Attorney General are material.  The powers of the court are
not confined to a scheme.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    112  Lord Pannick relies on *In re JW Laing Trust* [1984] Ch 143 as demonstrating that the court may intervene in a charity when it is expedient in the interests of the charity to do so. Likewise, in *In re Royal Society's Charitable Trusts* [1956] Ch 87, Vaisey J made a scheme consolidating the investments of several special funds of which the society was a trustee in order to improve its management of these funds in a case where there was no suggestion of a breach of duty.

B    113  Lord Pannick submits that *Letterstedt v Broers* (1884) 9 App Cas 371 (see para 124 below) is an example of the court's broad jurisdiction since the court made it clear that the court could remove old trustees and substitute new ones where such a remedy was required. The main principle should be that the jurisdiction should be exercised for the welfare of the beneficiaries and the trust estate. He submits that this is a general principle. Accordingly, the court has power to decide whether a specific transaction is in the interests of the charity by reason of the inherent jurisdiction and surrender, and it can give directions to the members.

C    114  Mr Morpuss carried the burden of the case against the appellant for the first and fourth respondents on this issue. He submits that the court could not intervene in the decision of a fiduciary unless there was an actual or threatened breach of duty or the fiduciary had surrendered his discretion. The members had not surrendered their discretion to the court. Moreover, there was no question of any threatened or actual breach of duty. All the court could do in exercise of its special charitable jurisdiction was to direct a scheme, which it did not do. In any event there was no basis for directing a scheme because there had been no failure of machinery nor was an administrative scheme appropriate as that would involve changing the constitution of the charity. The present case does not fall within any exception to the non-intervention principle. Expediency was not enough: this was highlighted in *Chapman v Chapman* [1954] AC 429 where the House of Lords held that the court had no inherent jurisdiction to sanction a rearrangement of a private trust merely to gain a tax advantage.

D

E

F    115  Mr Morpuss essentially submits that there is no case cited which goes beyond the jurisdiction of the court as described by Russell LJ in the *Construction Industry Training Board* case [1973] Ch 173, to cure defects in the machinery of the trust or to supervise and direct the administration of a charitable trust or the application of its assets. In *In re JW Laing* [1984] Ch 143 no order was made directing the trustee to perform any particular act. It was an administrative scheme case because the beneficiaries could not properly make use of the considerable funds of the trust if they were all distributed within the period of ten years as directed by the settlor.

G    116  As counsel (later Buckley LJ) argued in *In re Royal Society's Charitable Trusts* [1956] Ch 87, the court exercises over trusts an equitable jurisdiction. Mr Morpuss accepts that the court can intervene in exceptional circumstances, and he submits that on the facts, the circumstances in *Letterstedt* 9 App Cas 371 were exceptional. There had been a very serious over-charge by trustees.

H    117  Mr Crow relies on *Attorney General v Bishop of Worcester* (1851) 9 Hare 328 and *In re Steed's Will Trusts* [1959] Ch 354. It is not a question of what is expedient. Further authorities included *Attorney General v Harrow School* (1754) 2 Ves Sen 551, *Attorney General v Haberdashers' Company* (1791) 1 Ves Jun 295, *Attorney General v Governors of Foundling*

© 2022 The Incorporated Council of Law Reporting for England and Wales

*Hospital* (1793) 4 Bro CC 165; and *Attorney General v Governors of*     A
*Sherborne Grammar School* (1854) 18 Beav 256. He referred to two texts:
*Chitty, Prerogatives of the Crown* (1820), *Storey's Equity Jurisprudence*
(1839). As Slade J recognised in the *Liverpool and District* case [1981] Ch
193, the jurisdiction of the court with respect to charities could be ousted by
statute. The applications in the property alienation cases were to approve
matters which the trustees wanted to do.
    118  Mr Pearce submits that there are particular cases where the     B
non-intervention principle does not apply. Examples of such cases are where
it is necessary or expedient for the court to interfere in the affairs of a charity
(see for example *In re JW Laing* [1984] Ch 143). But the courts have not
exhaustively defined the circumstances.

    *My conclusion on this issue*          C

    119  This issue is about whether the court has jurisdiction, that is, as
part of its supervisory jurisdiction over charities, to intervene to direct
Dr Lehtimäki to exercise his fiduciary discretion in a particular way. For
the reasons given in paras 121–173 below, I consider that the court can
take jurisdiction through an exception to the non-intervention principle.
Indeed, all the members of this court agree that, if an exception to the     D
non-intervention principle is needed, it can be found. Lord Briggs JSC,
however, joined by Lord Wilson and Lord Kitchin JSC on this issue, holds in
his concurring judgment that the same result can be reached more simply by
holding that the position adopted by Dr Lehtimäki would constitute a
threatened breach of fiduciary duty on his part ("the breach of duty route").
In the Chancellor's judgment, that position was one of "studied neutrality"
(para 121), and posed "too great a risk for the court to allow the final     E
decision to be taken by Dr Lehtimäki without guidance from the court"
(para 153). With respect to my colleagues, I consider that the court cannot
take jurisdiction over Dr Lehtimäki by that route: for my reasons, see
paras 174–199 below. Accordingly, in this section of my judgment, I confine
my attention to the non-intervention principle, which I consider to be the
correct principle to apply.          F
    120  The respondents' arguments on this issue are formidable. There is
no doubt in my judgment that there is a well-established "non-intervention
principle" which means that the role of the court is to ensure that the trustees
of a charity exercise their discretion properly and that the court does not
interfere in the trustees' exercise of a discretionary power unless they act
improperly or unreasonably.
    121  The leading authority on the non-intervention principle is now *Pitt*     G
*v Holt* [2013] 2 AC 108 where Lord Walker of Gestingthorpe (with whom
all the other members of this court agreed) held that a breach of duty was
necessary before the court could intervene with respect to matters that fell to
trustees to do or decide (para 73):

    "In my view Lightman J was right to hold that for the rule to apply the
    inadequate deliberation on the part of the trustees must be sufficiently     H
    serious as to amount to a breach of fiduciary duty. Breach of duty is
    essential (in the full sense of that word) because it is only a breach of duty
    on the part of the trustees that entitles the court to intervene (apart from
    the special case of powers of maintenance of minor beneficiaries, where

© 2022 The Incorporated Council of Law Reporting for England and Wales

A the court was in the past more interventionist: see para 64 above). It is not enough to show that the trustees' deliberations have fallen short of the highest possible standards, or that the court would, on a surrender of discretion by the trustees, have acted in a different way. Apart from exceptional circumstances (such as an impasse reached by honest and reasonable trustees) only breach of fiduciary duty justifies judicial intervention."

B

122   Lord Walker also made some important observations on a well-known saying of Lord Truro LC, which encapsulates the principle (para 88):

"Finally, on this part of the case, there is the submission that the trustees' duty to take account of relevant considerations is to be interpreted as a duty to act on advice only if it is correct—in effect, a duty to come to the right conclusion in every case. I have left this submission until the end because it is to my mind truly a last-ditch argument. It involves taking the principle of strict liability for ultra vires acts (paras 81–84 above) out of context and applying it in a different area, so as to require trustees to show infallibility of judgment. Such a requirement is quite unrealistic. It would tip the balance much too far in making beneficiaries a special favoured class, at the expense of both legal certainty and fairness. It is contrary to the well-known saying of Lord Truro LC in *In re Beloved Wilkes's Charity* (1851) 3 Mac & G 440, 448: 'that in such cases as I have mentioned it is to the discretion of the trustees that the execution of the trust is confided, that discretion being exercised with an entire absence of indirect motive, with honesty of intention, and with a fair consideration of the subject. The duty of supervision on the part of this court will thus be confined to the question of the honesty, integrity, and fairness with which the deliberation has been conducted, and will not be extended to the accuracy of the conclusion arrived at, except in particular cases.' The trustees' duty does not extend to being right ('the accuracy of the conclusion arrived at') on every occasion. The 'particular cases' that Lord Truro LC had in mind may have included cases concerned with the maintenance of minor beneficiaries. They may also have included cases (such as *Kerr v British Leyland (Staff) Trustees Ltd* [2001] WTLR 1071) in which the trustees have to make a particular factual judgment, rather than exercise a wide discretion."

C

D

E

F

123   It is to be noted that Lord Truro LC leaves room for exceptional cases in his final words. Lord Pannick cited several examples of this and further examples were cited by Mr Pearce, including examples from the judgment of Lord Walker: for example, paras 64, 74 and 75. In those circumstances I do not read Lord Walker as excluding the possibility of intervention in cases other than breach of duty (or scheme) if the circumstances attain a sufficient level of exceptionality and seriousness. In my judgment, these exceptional cases have special resonance in the law of charities, and it is unnecessary for me to cite all the examples we were given. Before leaving Lord Truro LC, I note that his formulation does not contain any equivalent of the "manifestly unfit" test used in relation to nominations. There is on his formulation no test of perversity, at most a requirement for fairness and fair consideration of the matter.

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

124    In this connection, Lord Pannick places particular reliance on   A
another well-known case, *Letterstedt v Broers* 9 App Cas 371, where the
Judicial Committee of the Privy Council removed the existing trustees of
a trust in the course of litigation against them by the beneficiaries even
though no allegation of misconduct on the part of the trustees had yet been
established. This was clearly seen as a very delicate matter and the Board
invoked the broad general principle that the duty of the court was to execute
trusts, being guided principally by the welfare of the beneficiaries. The   B
Board considered that it was probably not possible to lay down any more
definite rule than that. The Board considered on the complex facts of that
case that the continuance of the trustees would prevent the trust from being
properly executed. The useful point which I derive from this case is the
reminder that it is the duty of the court to see that a trust is executed. I start
from the basis, which is not challenged, that it has been decided that it is in   C
the best interests of the charity to make the Grant, and that seen from that
perspective if Dr Lehtimäki were to vote against the section 217 resolution,
the achievement of what is the best interests of the charity would be
impeded.

125    Lord Pannick also relies on *In re Ashton Charity* (1856) 22 Beav
288, and property alienation cases. In *In re Ashton Charity*, Sir John
Romilly MR held, at p 289, that: "upon an information, the Court of   D
Chancery has a general jurisdiction, as incident to the administration of a
charity estate, to alien charity property, where it clearly sees it is for its
benefit and advantage."

126    These cases concern the court's power to authorise the alienation of
interests in property held on charitable trusts and this topic is a very specific
exercise of the role of the court acting under the delegated power to act as   E
parens patriae. However, it also reflects the broad principle that the court's
duty is to see that charitable trusts are performed.

127    The *JW Laing* case [1984] Ch 143 is instructive. In that case, Peter
Gibson J considered an application by the trustees of a charity for a scheme
enabling the trustees for the time being to be discharged from an obligation
to distribute capital within ten years of the settlor's death. Deciding that
section 13 of the Charities Act 1960 was inapplicable, he approved the   F
scheme in exercise of the inherent jurisdiction of the court. In doing so he
noted that the court (at p 153F–G):

"can, and should, take into account all the circumstances of the
charity, including how the charity has been distributing its money, in
considering whether it is expedient to regulate the administration of the
charity by removing the requirement as to distribution within ten years of   G
the settlor's death."

128    Another important example is *Hampden v Earl of Buckinghamshire*
[1893] 2 Ch 531 (cited by Mr Morpuss) which as Mr Pearce explains shows
the flexibility of the court's response to applications for its intervention. In
that case, the Court of Appeal intervened to prevent a trustee about to act in a
manner which was within his powers but detrimental to other beneficiaries   H
applying the following principle:

"But . . . to preserve the estates for those intended by the settlor to
enjoy them, still an honest trustee may fail to see that he is acting unjustly
towards those whose interests he is bound to consider and to protect; and,

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    if he is so acting, and the court can see it although he cannot, it is in my opinion the duty of the court to interfere" (at p 544 per Lindley LJ).

129    P D Finn in *Fiduciary Obligations* (1977), at para 86, provides an interesting analysis of this case as one in which the court recognised that, even where a trustee acts in good faith in the manner in which he considers to be the best interests of his beneficiaries, his actions may be reviewed by the court by reference to their consequences.  Mr Morpuss submits that either

B    this case was wrongly decided or the Court of Appeal did consider that there had been a breach of trust because the trustee failed to consider all the relevant matters.  In my judgment, it is clear from the passage cited that Lindley LJ was proceeding on the basis that there was no breach of trust, and that the Court of Appeal took the view that it should intervene because of

C    the unjust consequences to the other beneficiaries.  This case is consistent therefore with the presence of an exceptional jurisdiction which goes beyond breach of duty.

130    There is little authority to support intervention by the court in circumstances such as the present, but as I see it that is because in the reported cases charities do not often have two governing organs with differing views: here the board of the company, i e the trustees, and the

D    company in general meeting, i e the members.  The trustees have surrendered their discretion to the court and the court has made a decision that a particular transaction which the board supports is in the best interests of the charity and should be put into effect.  The second organ wishes to make its own decision independently of the board.  It only has a right to vote on one element of the transaction by virtue of section 217 of the 2006 Act.  Under

E    the terms of the second organ's agreement with CIFF the necessary power is otherwise vested in the first organ.  It would be reasonable for a member of a commercial company to treat his voting power as a veto on the transaction and to use it as a bargaining counter, but CIFF is not a commercial company but a charitable company and Dr Lehtimäki is a fiduciary and bound to act in this matter for the single-minded purpose of promoting the charitable

F    objects.

131    The nearest case to the present may be that of *Attorney General v Governors of Christ's Hospital* [1896] 1 Ch 879, which the respondents rely on, but which properly understood is against them.  In that case, the court was asked to give a direction, but it required the consent of a second person *by the terms of the Royal Charter constituting the charity*.  It is quite clear that the objection which Chitty J saw to the making of the order was the fact

G    that the governors were given power to administer the charity (following a compromise of earlier disputes) by the Royal Charter of Edward VI for he held at p 888:

"I hold that it is beyond the jurisdiction of the court to sanction the Attorney General's scheme in the face of the opposition of the existing governing body.  Their title is founded on Royal Charter, and is

H    established by Act of Parliament.  To whatever lengths the court may have gone, it has never assumed legislative authority; it has never by a stroke of the pen at one and the same time revoked a Royal Charter and repealed an Act of Parliament.  It has never ousted from its rights of administering the charitable trusts such a body as the present governors against their will,

© 2022 The Incorporated Council of Law Reporting for England and Wales

and that, too, in a case where no breach of trust is charged.  There is no          A
authority in the books for any such proposition."

132    There is no suggestion that Chitty J would not have made the order
in that case but for the Royal Charter which prevented an order from being
made without the consent of the governors.

133    Although the court had no jurisdiction in the *Christ's Hospital*
case, it is significant that the jurisdiction of the court was not ousted where          B
the charity obtained a charter subsequent to its founding (*Attorney General
v Dedham School* (1857) 23 Beav 350) or if the charity established by a
charter had been translated from land to money following the compulsory
acquisition of its property (*Clephane v Lord Provost of Edinburgh* (1869)
LR 1 Sc 417).  In the cases where the court is not precluded by statute, the
court can, if on the application of the trustees it has decided that a particular
transaction is in the best interests of the charity, make a consequential          C
direction against not simply the applicants but also any other organ of the
charity, which would clearly include the members in the case of a charity.  As
the Chancellor put it in this case, "the members of CIFF do not stand outside
the charity; they are part of the administration of the charity, and they
cannot lay claim to any private interest" (para 145).  So, the court is entitled
to make a direction against the organ which made the application as it is          D
against any other organ whose consent is required, though that other organ
would have of course first to be given an opportunity to be heard, as
Dr Lehtimäki was in this case.

134    In this case, the trustees had surrendered their discretion with
respect to the Grant, but Dr Lehtimäki did not surrender his.  There is a
distinction between a surrender of discretion and an application to the court
for approval of a transaction without such surrender.  In the former case, it          E
has been held that "the court starts with a clean sheet and has an unfettered
discretion to decide what it considers should be done in the best interests of
the trust": per Lightman J in *Royal Society for the Prevention of Cruelty to
Animals v Attorney General* [2002] 1 WLR 448, para 31.

135    Coupled with the surrender of discretion by the trustees in this case
is the further fact that the governance disputes had brought the work of the          F
charity close to a halt and that situation has been resolved by an agreement
between the trustees and CIFF which will effectively divide the endowment
into shares and allow the parties to go their separate ways but both
employing their considerable skills in pursuit of charitable purposes albeit
through different charities in the future.  In addition, as I have shown above,
the courts have always leaned in favour of giving special treatment to
charities.          G

136    The court has a well-established jurisdiction to intervene where
the charity can no longer be carried on as the founder envisaged, perhaps
because the endowment has increased so substantially over the years that it
is excessive for achieving the founder's original purposes, and it is satisfied
that the charitable purposes can be beneficially carried out in some different
way (see now sections 62 and 67 of the 2011 Act).  (This is recorded by          H
Chitty J in the course of his judgment in the *Christ's Hospital* case [1896]
1 Ch 879, although there was no failure of the charitable objects in that case,
and see for example *Andrews v M'Guffog* (1886) 11 App Cas 313.)

137    The fundamental point appearing from all these cases is that
although the court must proceed with considerable caution, the categories of

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   exceptional circumstances referred to by Lord Truro LC are not closed.  In
the particular circumstances of this case, I consider that the Chancellor was
entitled to conclude that this was one of the cases in which the court can
exceptionally intervene irrespective of any breach of duty, alleged or found,
by any fiduciary.  That is because an impasse is threatened in the performance
of the trust if Dr Lehtimäki is unable to reach the same conclusion as the
B   Chancellor has done.  If he does that, the Grant cannot be made even though
the arrangements which have led to the proposal for that Grant provided the
means for settling an existential threat to the operation of the charity caused
by deeply felt dissension between its two founders.

138   As Lord Wilson pointed out at the hearing, there is power in
article 1.5 of the articles of association of CIFF for the trustees to remove
members but the process is cumbersome and may not lead to a clear result.  It
C   only applies when the continued membership of the member is harmful
to the charity and provision is made for the member to make written
representations.  So, I do not consider that it provides an adequate alternative
to the Chancellor's order.

139   That means that I must next consider a point which Mr Morpuss
raises about an important provision of the 2011 Act, which seems to follow
D   on from the non-intervention principle.  Section 20(2) applies to the Charity
Commission.  Section 20 (as amended by sections 6(3) and 7(3) of the
Charities (Protection and Social Investment) Act 2016) provides:

"20 *Incidental powers*
"(1) The Commission may do anything which is calculated to facilitate,
or is conducive or incidental to, the performance of any of its functions or
E   general duties.
"(2) But nothing in this Act authorises the Commission— (a) to
exercise functions corresponding to those of a charity trustee in relation
to a charity, or (b) otherwise to be directly involved in the administration
of a charity.
"(3) Subsection (2) does not affect the operation of section 84, 84A,
84B or 85 (power of Commission to direct specified action to be taken or
F   to direct application of charity property)."

140   Mr Morpuss contends that the Chancellor's direction, if made by
the Charity Commission, would fall within section 20(2).  He goes on to
submit that the court cannot have any wider jurisdiction than the Charity
Commission in this regard and so the court cannot make an order compelling
G   a member to vote in a particular way.

141   I do not consider that the first part of this proposition is sound.
A member is not a "charity trustee" as defined in the 2011 Act.  Section 177
of the 2011 Act states that, unless the context otherwise requires (which has
not been suggested), the expression "charity trustees" means "the persons
having the general control and management of the administration of the
charity".  The members of CIFF do not have general control of the activities
H   of CIFF for the reasons discussed in para 14 above, and so subsection (2)(a)
is not engaged by the Chancellor's direction.  In the light of my other
conclusions, I need not consider the question whether the direction to
Dr Lehtimäki that he is to vote on the section 217 resolution in favour of it
requires the performance of an act within the administration of a charity.

© 2022 The Incorporated Council of Law Reporting for England and Wales

142    I reject the submission that the same restrictions as are imposed on *A*
the Charity Commission by section 20(2) apply to the court's inherent
jurisdiction. What Mr Morpuss contends is that the court cannot have any
wider jurisdiction than the Charity Commission in this regard and so the
court cannot make an order compelling a member to vote in a particular
way. In my judgment, the court's inherent jurisdiction is not tailored to that
of the Charity Commission. The jurisdiction of the court with respect to
charities is of ancient origin and there is no provision in the 2011 Act which *B*
attempts to codify it. It would, as Lord Pannick points out, require an
express provision to remove or reduce the scope of the court's inherent
jurisdiction: see *In re S (An Infant)* [1965] 1 WLR 483. There is no such
express provision in either the 2011 Act or the 2006 Act which modifies the
inherent jurisdiction engaged in this case.

143    The final point is whether the court can exercise this jurisdiction by *C*
giving a direction and without making a scheme. It is said by the first and
fourth respondents that to give the relief sought the court is restricted to
making a scheme. Both Mr Morpuss and Mr Crow make the point that
Ms Cooper has been unable to find a previous case in which the court, in
reliance on its jurisdiction over trusts, has ordered a fiduciary to cast his vote
at a company meeting as the Chancellor did in this case.

144    As the circumstances of every case are likely to be unique it is not at *D*
all surprising that the appellant has not been able to rise to this particular
challenge. The facts and circumstances of this case are most unusual.
Moreover, ubi jus ibi remedium is one of the maxims of equity and certainly
examples can be found where the courts have made directions as
consequential relief in charity cases: see, for example, *Attorney General v
Black* (1805) 11 Ves 191, where Lord Eldon LC, having decided that the *E*
election of a master of a free school had not been carried out in accordance
with the terms of the trusts, continued the appointment of acting master
until proper elections could be held, which was obviously a necessary and
expedient intervention by the court. But there are more modern authorities
on this point.

145    Mr Pearce disagrees with the submission of Mr Morpuss. He *F*
submits that the jurisdiction of the court in respect of charities enables the
court, when it is necessary or expedient in the interests of the charity, to
direct the holder of a fiduciary power exercisable in respect of the charity's
property as to how to exercise that power. He also submits, but in my
judgment the wording is not beyond argument, that the Chancellor found
it necessary that the court should intervene because he held: "the only
remaining voting member of CIFF must be directed to approve it, otherwise *G*
the essential interests of charity which the court is there to protect would be
put at risk" (para 155).

146    In my judgment, the starting point on this issue is that the court has
the jurisdiction which it would normally exercise in respect of trusts and in
addition the special jurisdiction which the court has in respect of charities.
The latter is far wider than the former. It is ancient in origin and is the way
in which the prerogative of the Crown as parens patriae is exercised in the *H*
case of charities.

147    Buckley LJ in the *Construction Industry Training Board* case
[1973] Ch 173 considered that the court could exercise its jurisdiction in
relation to charities without a scheme (see the passage cited at para 69

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    above). I reject Mr Crow's submission that this is limited to the discussion of breach of duty later in the same paragraph. Buckley LJ's holding is in general terms. Moreover, the matters in the relevant sentence of that passage from Buckley LJ's judgment are expressly stated to be only by way of example in any event.

148    The correct principle is that articulated by Lord Wilberforce in the context of private trusts in *In re Baden's Deed Trusts* [1971] AC 424, 457:

B

> "the court, if called upon to execute the trust power, will do so in the manner best calculated to give effect to the settlor's or testator's intentions. It may do so by appointing new trustees, or by authorising or directing representative persons of the classes of beneficiaries to prepare a scheme of distribution, or even, should the proper basis for distribution appear by itself directing the trustees so to distribute. The books give many instances where this has been done . . ."

C

149    In the present case, there cannot be any doubt but that the trustees were entitled to seek the directions of the court as to whether CIFF should make the Grant, and the court, once it had decided that the making of the Grant was in the charity's best interests, was entitled and bound to consider how those interests may be carried into effect. The matter simply did not require a scheme-it only required directions.

D

150    Lord Wilberforce's examples relate to private trusts, but many examples can be found in relation to charities. One of the first reported cases of a direction is *Attorney General v Haberdashers' Company* (1791) 1 Ves Jun 295, cited by Mr Crow, where Lord Thurlow LC made a direction for the respondent trustee to distribute certain funds. There was no allegation of any misconduct by the trustee. Later examples include *In re Randell* (1888) 38 Ch D 213, where a limited gift to charity had come to an end (citing *Walsh v Secretary of State for India* (1863) 10 HL Cas 367, concerning the destination following the Indian mutiny of a trust fund established by Lord Clive of India for the East India Company's militia). In the context of charities, the court is not in a case such as this seeking to execute the trust "in the manner best calculated to give effect to the settlor's or testator's intentions" (see per Lord Wilberforce above) but in the manner most likely to advance the charitable purposes for public benefit.

E

F

151    No party, other than Sir Christopher, suggested that there was any doubt about whether there could be a scheme in relation to CIFF even though the Law Commission of England and Wales in its report on *Technical Issues in Charity Law* (2017) (Law Com No 375) records a doubt about this, though it saw no reason to exclude charitable companies and other corporate charities from the scheme-making power of the court and the Charity Commission: see para 4.22. A charitable company is only in a position analogous to that of a trustee, but it is now well-established that the court's jurisdiction with respect to charities extends to institutions which are not trusts in the strict, technical sense of the word (see the comments of Slade J in the *Liverpool and District* case [1981] Ch 193, 214; see also the *Construction Industry Training Board* case [1973] Ch 173). (It is to be noted that the scheme in the *Liverpool and District* case would not have involved any change to the company's constitution as the company was in liquidation and its assets were held on the statutory trusts for distribution.) That is sufficient for the purposes of this case.

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

152    Accordingly, in my judgment, while the court may commonly make     A
a scheme, particularly where the application of assets cy-près is required, in
an appropriate case it may also give effect to the charitable purposes by
giving a direction.  There would seem to have been little point in a scheme in
this case, and there is no evidence that the Charity Commission thought that
there should be a scheme.

B

*Issue 3: Does section 217 of the Companies Act 2006 allow the court to
direct a member to exercise his discretion in a particular way when
Parliament has provided for members to pass the resolution?*

The range of the arguments on this issue

153    Lord Pannick submits that, although the court should be slow to
exercise its power to intervene, section 217 of the 2006 Act does not prevent    C
the court from exercising its inherent jurisdiction to direct the member as to
how exercise his discretion under section 217.

154    As for the first and fourth respondents, Mr Crow took the burden of
their arguments on this issue.  He submits that Dr Lehtimäki would be using
different skill sets from those of the court and implied there was therefore a
good reason why Dr Lehtimäki should be able to exercise his vote
independently.  Mr Crow made the forensic point that no one had produced    D
any case in which the court had directed a member how to vote when there
was no evidence that he had acted in breach of duty.  The court had power to
put in place machinery for the charity, but not to manage its activities.  The
prohibition on the Charity Commission from managing a charity in
section 20 of the 2011 Act (discussed above) reflected the policy of the courts.

155    Mr Crow submits that, in the absence of a breach of duty, the court    E
does not usurp the judgmental discretion of the decision-maker.  By analogy
with public law (and charities operated within the realm of public law (see
*Stanway v Attorney General* (unreported) 5 April 2000), the court should
defer to the decision of the decision-maker chosen by Parliament.  An inherent
jurisdiction is not an unlimited jurisdiction.  The court intervenes to approve
matters which the fiduciaries wished to do: see, for example, *In re Ashton
Charity* 22 Beav 288.  In any event, policy supports the non-intervention    F
principle because (1) members are better informed than the court, (2) it is
important not to discourage donors who were potential members, (3) there is
likely to be an increase in charity litigation if there is more intervention,
(4) the court should by analogy with public law defer to the decision of
the decision-maker chosen by Parliament.  Therefore, the court could not
override the members' powers under section 217.

G

156    Mr Pearce submits that the direction given by the Chancellor to
Dr Lehtimäki was a proper exercise of that discretion.  Mr Pearce submits
that the power of the court extends to giving directions (see per Lord
Wilberforce in *In re Baden's Deed Trusts* [1971] AC 424) even though
Fox LJ in *Kerr v British Leyland (Staff) Trustees Ltd* [2001] WTLR 1071
thought that the trustee could not be directed.

H

*My conclusions on the third issue*

157    I have concluded that the court could intervene where this is
necessary or expedient to see that the charitable trusts are performed and can
do so by way of a direction as opposed to a scheme.  I deal here only with the

© 2022 The Incorporated Council of Law Reporting for England and Wales

[2022] AC        Children's Investment Fund (UK) v Attorney General (SC(E))
Lady Arden JSC

A    issue that turns on section 217. There are a number of principles in play here:

(1) The court's inherent jurisdiction with respect to charities and the principle that Parliament must make it clear if it is restricting the jurisdiction of the court.

(2) The principle that the regulation of charities takes place in the field of public law and that in public law the court does not substitute its decision for that of the decision-maker selected by Parliament, which in the case of
B    section 217 is the members of CIFF.

(3) The principle that to be valid steps taken by registered companies in pursuance of statutory powers must follow those provisions of the Companies Acts applicable to them. In default the action taken without following the provisions of the 2006 Act will be of no effect.

158    Lord Pannick relies on the first and third principles, while
C    Mr Morpuss and Mr Crow rely on the second.

159    Starting with the position of the non-charitable company, the purpose of section 217 is not to veto transactions in which a director or her connected person has an interest but to ensure that there is adequate disclosure and approval by the company in general meeting. This is apparent from the drafting of the section. The original prohibition, as originally enacted, applied only to directors but the Law Commission of England and
D    Wales and the Law Commission of Scotland recommended that it should be extended to payments to connected persons in their report, *Company Directors: Regulating Conflicts of Interest and Formulating a Statement of Duties* (1999) (Law Com No 261; Scot Law Com No 173), paras 7.31–7.37. The Government decided to propose the necessary changes in the 2006 Act on the basis of the Law Commission's report.

E    160    Moreover, the legislature has not sought to interfere with or restrict the special voting rights a company may confer on any member, and so the articles could provide that only one member should effectively be able to vote on a resolution. The House of Lords considered in *Bushell v Faith* [1970] AC 1099 that the mandatory rule in section 184 of the Companies Act 1948 (now section 168 of the 2006 Act), whose purpose was to prevent
F    companies from making removal of a director subject to an extraordinary resolution, did not prevent special voting rights being attached to a particular share on any ordinary resolution for the removal of a director. In that case, the House of Lords by a majority held that the article attaching special voting rights was valid despite the provisions of section 184(1), since Parliament was only seeking to make an ordinary resolution sufficient to remove a director and had not sought to fetter a company's right to issue a
G    share with such rights or restrictions as it thought fit.

161    Lord Donovan held at pp 1110–1111:

"When, therefore, it is said that a decision in favour of the respondent in this case would defeat the purpose of the section and make a mockery of it, it is being assumed that Parliament *intended* to cover every possible case and block up every loophole. I see no warrant for any such
H    assumption. A very large part of the relevant field is in fact covered and covered effectively. And there may be good reasons why Parliament should leave some companies with freedom of manoeuvre in this particular matter. There are many small companies which are conducted in practice as though they were little more than partnerships, particularly

© 2022 The Incorporated Council of Law Reporting for England and Wales

family companies running a family business; and it is, unfortunately, *A*
sometimes necessary to provide some safeguard against family quarrels
having their repercussions in the boardroom.  I am not, of course, saying
that this is such a case: I merely seek to repel the argument that unless the
section is construed in the way the appellant wants, it has become 'inept'
and 'frustrated'."

162  So, the protection given by Parliament is subject to being rendered *B*
less effective by the company exercising other powers, such as the right
to attach special rights to shares.  There cannot therefore be any policy
objection from the perspective of company law why the law of charities
should not enable a court to direct a member how to vote on a section 217
resolution.

163  Furthermore, there are other provisions in the 2006 Act which *C*
confer broad powers on the court to make directions: see, for example,
section 994 of the 2006 Act (relief against unfair prejudice).  While the court
could not dispense with the requirement for a resolution as described in
section 217 this power could be used in an appropriate case to require a
member to vote in favour of a resolution.

164  In the case of a charitable company, the member is a fiduciary for
certain purposes which would include the making of a grant, like the *D*
Grant in this case.  The question how he votes is usually an exercise of
his discretion in which the court cannot interfere (see generally Issue 2,
above).

165  However, if the directors (here the trustees) have surrendered their
discretion to the court, then the court will exercise their power to agree to a
transaction which involves a payment in connection with a trustee's loss of *E*
office.  The court is called upon to approve the exercise of that discretion.
The Chancellor did so unconditionally (save as to the Charity Commission's
approval), and in particular his decision was not dependent on Dr Lehtimäki
taking the same view and agreeing to pass the section 217 resolution.  In
those circumstances the field for the operation of public law in this case is
exhausted.  The section 217 resolution becomes a matter of the internal
management of the company.  So, in my judgment, it is open to the court to *F*
make an order which compels the member entitled to vote on the section 217
resolution to vote in a particular way.

166  This outcome is consistent with the role of a member in a registered
company where the power to manage the company's activities is delegated
to the board unless and to the extent that the 2006 Act or the company's
constitution provide otherwise.  Section 217 of the 2006 Act only gives *G*
members the right to vote on the Grant because it is also a payment in
connection with loss of office: a member would normally have no say on the
making of grants by a grant-making charitable company and in any event
has no role in initiating or negotiating the proposal.

167  There is no interference with the statutory scheme in the 2006 Act
because there still must be a resolution for the purposes of section 217.  In the
same way, a resolution has to be passed even where a member is effectively *H*
disenfranchised because another member has weighted voting rights.  That is
so even though, unless the member is a fiduciary who is not authorised to vote
on a resolution, he is the director who, or whose connected person, will
benefit under the resolution.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A    168   Likewise, there is no interference with the statutory scheme in the 2011 Act. The court does not dispense with the separate requirement in section 201 of that Act for the prior written consent of the Charity Commission.

169   If the conclusion of the Court of Appeal were right, it would mean that if, in this case, Dr Lehtimäki had come to the view that, despite the conclusion of the Chancellor, the Grant was not in the interests of the charity, the court would have no power in an appropriate case to give a direction to Dr Lehtimäki to vote in favour of the section 217 resolution or to see that the charitable purposes were performed.

B

170   Mr Morpuss submits that section 201 recognises that the Charity Commission cannot by a scheme under the 2011 Act "short-circuit" the requirement for a resolution of the members of a charitable company. The Law Commission of England and Wales likewise noted that there was uncertainty on this point in relation to a company's power to alter its constitution (which requires a special resolution) in its recent report, *Technical Issues in Charity Law* (2017) (Law Com No 375), which is currently awaiting government response. The 2011 Act and the 2006 Act are both primary legislation and thus my provisional view (as this point has not been fully argued) is that, under the law currently in force and in the absence of an order by a court having power to make the necessary change itself, a charitable company must follow the procedures in the 2006 Act if it proposes to alter its constitution or take any other step for which a procedure is prescribed by the 2006 Act, and that Mr Morpuss' submission about section 201 would appear to be correct.

C

D

171   The frustration felt by Dr Lehtimäki at not being called upon to exercise his own, highly skilled judgment is understandable, but the Chancellor was in a position to consider the merits of the Grant very carefully in the light of the evidence filed. Of course, the law applies in the same way whether a fiduciary has Dr Lehtimäki's knowledge and skills or not. The court finds itself in the position that it is totally uncertain as to what the final conclusions of Dr Lehtimäki's deliberations might be, and he has not sought an opportunity to come to a view before the court makes any order.

E

F

172   As CIFF was seeking the directions of the court, it must, in the absence of some evidence to the contrary (and there is none), be assumed that all relevant information known to it was placed before the court.

173   Moreover, as a member, Dr Lehtimäki is subject to the terms of the articles which entrust the management of CIFF to the trustees and they have resolved to surrender their discretion to the court. The court must look at all the circumstances and the full context of the potential exercise of discretion. In that regard, the question is not only what Parliament intended in enacting section 217 of the 2006 Act but also what the settlors intended in establishing a charity which gave members only a subsidiary role. Looking for the intention of the settlors as expressed in the structure which they established, it seems to me unlikely that they intended in a case such as the present that members should prevent the charitable purposes from being performed and their beneficiaries safeguarded as a result of reaching a different view from the court, exercising the discretion of the trustees, on the question of the Grant.

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

*Would the court have jurisdiction to direct Dr Lehtimäki to vote in favour of*   A
*the section 217 resolution on the breach of fiduciary duty route?*

    *Lord Briggs JSC's concurring judgment on the breach of duty route*

**174**  I have had the benefit of reading Lord Briggs JSC's judgment.  Lord
Briggs JSC's conclusion on Issue 2 is that reliance on an exception to the
non-intervention principle is unnecessary and that the court can simply direct
Dr Lehtimäki to vote in favour of the section 217 resolution because the court   B
has determined, on exercise of the trustees' discretion surrendered to it, that it
is in the best interests of the charity for the Grant to be made.  Lord Wilson
and Lord Kitchin JSC agree with Lord Briggs JSC.  I respectfully disagree.

**175**  In the judgment of Lord Briggs JSC, the determination by the court
that the Grant should be approved on the trustees' surrender of their
discretion to the court binds Dr Lehtimäki as a member of CIFF because he
has been joined as a party to the proceedings (para 208).  Although the   C
ordinary duty of a fiduciary is to "exercise the powers that he has in that
capacity in the way that he decides, in good faith, would be most likely to
further the purposes of CIFF", that power has "to give way" (para 218), and,
once the court has given its approval, "there can be no reasonable basis for a
fiduciary acting contrary to that decision" (para 232).  "The duty of the
fiduciary is then to use his powers so as to give effect to the court's decision"   D
(para 218).  In Lord Briggs JSC's judgment, there is "no longer any
legitimate debate" on the question that the court has decided (para 218).
Lord Briggs JSC considers that the member's only option if he cannot vote
for the section 217 resolution is to resign (para 218).  Moreover, while
Parliament has imposed constraints on the trustees' exercise of their powers
in section 217 of the 2006 Act and section 201 of the 2011 Act, those
constraints do not serve the same purpose where the court makes that   E
decision in place of the trustees (paras 209 and 210), and so the members can
be directed how to vote by the court.  Dr Lehtimäki ceases to be "entitled
under section 217 to overrule the trustee directors" (para 221).  In contrast,
my conclusion is that a direction should be made by way of an exception to
the non-intervention principle based on the exceptional circumstances of
this case.   F

    *The views of the Chancellor and of the Court of Appeal*

**176**  Lord Briggs JSC founds his conclusion on the judgment of the
Chancellor.  As I have explained above, the Chancellor accepted that
another fiduciary acting reasonably could reach a different conclusion from
his own (para 135: "I am not saying that no reasonable trustee or fiduciary
could disagree with my view") but then went on to hold that, once the court   G
has made its decision, the member no longer had a free vote and would be
acting in breach of duty if he acted contrary to the court's decision.  Thus, he
held:

    "Here, both the Commission and the trustees of CIFF have decided that
their discretion to approve the Grant should be exercised by the court.
That discretion has now been exercised.  The discretion so exercised binds   H
the charity and the charitable company, CIFF.  Its management is only
divided between trustees and members for specific purposes.  Here the
trustees of CIFF bound CIFF in relinquishing their discretion to the court,
and the court order will bind CIFF in deciding that the Grant should be

A   made. That means that, whilst the members must pass a resolution under section 217 to approve the Grant, it is not in this case open to any member of CIFF to vote against that resolution, once the court and the Commission have approved the Grant. The member does not have a free vote in this case because he is bound by the fiduciary duties I have described and is subject to the court's inherent jurisdiction over the administration of charities. When the court has decided what is expressly in the best interests of a charity, a member would not be acting in the best interests of that charity if he gainsaid that decision" (para 154).

B

177   The Court of Appeal disagreed with the Chancellor. Moreover, their view, with which I agree, was that there was no basis for any suggestion that when Dr Lehtimäki makes his decision he will not do so in the proper performance of his fiduciary duties (para 69).

C

*Submissions on the breach of duty route*

178   The only party to this appeal to advocate the breach of duty route before this court was Ms Cooper, and then only fleetingly. Mr Morpuss' brief rejection of this route was to my mind convincing. The approval given by the court in this case is only on the surrender by the trustees (with the

D   Charity Commission's approval) of <u>their</u> discretion. On Mr Morpuss' submission, the court did not have jurisdiction as against the member simply because it had jurisdiction as against the trustees. He went on to describe that proposition as bootstrapping.

*Basis of jurisdiction must logically precede the conclusion of breach of*
E   *duty*

179   I emphasise that word "jurisdiction", which means, as already explained, the court's supervisory jurisdiction over charities. The Chancellor had no jurisdiction to make an order against Dr Lehtimäki unless he was threatening to act in breach of his duty. But Dr Lehtimäki was not threatening to act in breach of this duty. The Court of Appeal so found.

F   180   The fiduciary's duty is subjective, namely to do that which he considers to be in the best interests of the objects of the charity. The importance of a subjective duty is that it is the fiduciary, and not the court, which decides which option to take. The question, properly formulated, for a member is not as stated in para 222 of Lord Briggs JSC's judgment: is the Grant in the best interests of CIFF?, but: do I in good faith consider that the transaction is in the best interests of CIFF (or, more accurately, the

G   charitable objects)?

181   The order of the Chancellor to approve the Grant was an exercise of the discretion which had been surrendered to him by the trustees. The Chancellor made Dr Lehtimäki a party to the proceedings but that does not alter the nature of the application or enlarge the court's jurisdiction (cf para 227 of Lord Briggs JSC's judgment). Dr Lehtimäki chose not to surrender his discretion to the court and the trustees had no power to

H   surrender his discretion for him. On that the position in this court remains the same as it was before the Chancellor. When the court exercises a discretion surrendered to it, it acts in the place of the trustees and the surrender confers no power on the court which the trustees themselves did not have: see *Lewin on Trusts*, 20th ed (2020), para 39-099.

© 2022 The Incorporated Council of Law Reporting for England and Wales

182   So the jurisdiction has to be found in some other way. Lord
Briggs JSC explains that when the Grant is approved Dr Lehtimäki's duty is
transformed from one under which he is bound to act in what he considers to
be the best interests of the charity to one under which he has no discretion
but to vote to approve the Grant.  The Chancellor made a mandatory order
against him to that effect.  But the order approving the Grant could not alter
his powers in that way.  If the required transformation can be achieved at all,
despite the fact that Dr Lehtimäki was intending to exercise his powers in a
proper manner, it could not be done by an order exercising the trustees'
discretion: see *Lewin on Trusts*, above.  It could only be done by making a
separate substantive order to that effect against Dr Lehtimäki changing his
subjective duty into one to vote to give effect to the court's decision.

183   Furthermore, the point is not one of form.  Jurisdiction must be
established in substance before the direction is given, it is not enough for the
court to found jurisdiction on a breach of duty which does not arise unless
the court has jurisdiction to make the order.  To do otherwise is, with
respect, circular.  Therefore, as I analyse it, the breach of duty route
cannot be followed because there is no jurisdiction.  The court must first
establish jurisdiction by finding, if it properly can, an exception to the
non-intervention principle.  That may explain why counsel made detailed
submissions on this principle to almost the complete exclusion of the breach
of duty route.

### The court's approval may be frustrated by the action of non-fiduciaries

184   The exceptions to the non-intervention principle only enable the
court to make orders against fiduciaries.  It does not enable the court to bind
any non-fiduciary such as a donor, benefactor or founder of a charity who
has reserved the right to give consent to any transaction, save to the extent
that they are themselves fiduciaries.  If their consent is required, but is
withheld, the effect is likely to be that the transaction which the court
approved on the trustees' application cannot be implemented.  So too with
the Charity Commission.  The Chancellor made it clear that the Charity
Commission, which is not a party to these proceedings and has not made
submissions, should be free to decide whether to give its approval
(para 150):

> "In these circumstances, therefore, it is relatively clear that the
> Commission has deferred to the court in relation to the decision as to
> whether the making of the Grant is 'expedient in the best interests of
> CIFF' and should, therefore, be sanctioned, but has decided to wait
> and see what the court decides before giving its prior approval to a
> section 217 resolution.  When it took these decisions, however, the
> Commission did not know what the court now knows as to the legal
> position of the members of CIFF (as now determined) and as to
> Dr Lehtimäki's position as described to the court.  Nonetheless, I take
> the view that the Commission's approach should be respected, and that
> it should be given its statutory opportunity in the light of this judgment
> to consider whether to approve the making of a members' resolution
> under section 217 of the Companies Act."

185   The Chancellor's direction against Dr Lehtimäki was expressly
made conditional on the Charity Commission giving its consent under

A section 201 of the 2011 Act (as well as under the constitution of CIFF), and there has been no appeal against that part of the Chancellor's decision. In my judgment, the Charity Commission as a public body cannot be bound to reach its decision on what is expedient in the interests of the charity by virtue of the decision which the court has made on the trustees' application. The Charity Commission must make its own decision on the materials available to it though no doubt it would take into account the court's decision.

B However unlikely, it is open to it to come to a different conclusion, and if it does, the Grant will not proceed.

### Avoiding a blanket approach to breach of duty

C **186** The breach of duty route involves a blanket approach: all other fiduciaries for the charity in question must vote to give effect to the transaction which the court has approved. Once it is appreciated that the Charity Commission and the holder of any non-fiduciary power to give consent is not bound by the order made on the trustees' surrender of their discretion to the court, a more nuanced view of the position can be taken and the conclusion reached that there is no absolute need for a member of a charitable company to have his discretion taken away from him. Even if he

D is bound to act reasonably, there can, as is demonstrated by the judgment of the Chancellor in this case, be a reasonable difference of judgment on the exercise of a discretion.

### The importance of the subjective test for breach of fiduciary duty

E **187** The subjective nature of the fiduciary's duty is very important to the operation of charity law. The court does not interfere in a dispute as to how a charity is to be administered: see paras 120–122 above. The non-intervention principle reflects the judicial policy of not interfering with the acts or decisions of trustees in the absence of evidence of a breach of duty. As explained, any departure from the non-intervention principle calls for caution.

F **188** Furthermore, Lord Briggs JSC's approach is out of line with the benevolent approach which the law adopts in relation to charitable trusts (see paras 53–55 above) and also in relation to charitable trustees. Thus, for example (and remembering that I have not concluded that there is any threatened or actual breach of duty by Dr Lehtimäki: see further para 195 below), the law looks benevolently on charity trustees even where there is evidence of actual or potential breach of duty: see, for example, the judgment of Lord Eldon LC in *Attorney General v Exeter Corpn* (1826)

G 2 Russ 45, 54 (approved by the House of Lords in *Andrews v M'Guffog* 11 App Cas 313, 324) as follows:

> "With respect to the general principle on which the court deals with trustees of a charity, though it holds a strict hand over them, when there is wilful misapplication, it will not press severely upon them, where it sees nothing but mistake. It often happens, from the nature of the instruments

H creating the trust, that there is great difficulty in determining how the funds of a charity ought to be administered. If the administration of the funds, though mistaken, has been honest, and unconnected with any corrupt purpose, the court, while it directs for the future, refuses to visit with punishment what has been done in time past. To act on any other

© 2022 The Incorporated Council of Law Reporting for England and Wales

principle would be to deter all prudent persons from becoming trustees of charities." *A*

189   There are practical reasons for the court's benevolent approach, and the reasons are equally valid in support of the subjective nature of the fiduciary's duty.  Lord Eldon explains that the reason for the court's benevolence is to encourage people to become trustees of charities.  Another reason would also be that it may give donors to charities confidence that *B* their generous, and in this case, massive, donations for public benefit will be managed and applied as the officers and, in the case of a membership charity like CIFF, its members think fit in accordance with the law and the constitution of the charity, and not by the court.  The court may not have the same detailed experience and knowledge of the charity as the officers and members have.  The Court of Appeal expressed similar views to those in this *C* paragraph in para 63 of its judgment when agreeing with a submission by Mr Robert Ham QC, then appearing for Sir Christopher.

### *Importance of my more nuanced approach in membership charities*

190   Another important reason for the court's restraint in the case of membership charities is that people become members so that they can have a say in how the charity is run.  The function of the membership charity is *D* inherently participatory for those who desire to do more than give and also want to play a part in the direction of the charity.

191   The effect of the breach of duty route is that once the court has decided on the trustees' application that a particular step is in the best interests of a charity, its members will have no further say.  As already indicated, this is contrary to the ethos of a membership charity.  The court *E* may not be aware of their reasons on a particular proposal of the charity trustees, especially if the members are drawn from a wide section of the public.  Society draws enormous strength and benefit from charities of this kind, and that factor should in my judgment incline the court to hold that jurisdiction can only be founded in this case if there is an applicable exception to the non-intervention principle.  That principle should in my judgment *F* prevail over any disagreement with or disapproval of Dr Lehtimäki's conduct in this matter.

192   The trustees surrendered their own discretion to the court, not that of Dr Lehtimäki.  The Chancellor was therefore not exercising any corporate power conferred on the members or any other person.  In my judgment the court should be very circumspect in overriding protections written into the articles or conferred on members by the Companies Acts.  Appropriate *G* restraint is reflected in the non-intervention principle.

### *Deadlocked trustees are not an analogous situation*

193   Lord Briggs JSC seeks to draw an analogy with cases where the court makes directions to resolve disputes among a deadlocked body of trustees but in my respectful view that analogy misses the point.  In those *H* cases, the court has only a single body of fiduciaries before it.  In this case, there are two: (i) the trustees and (ii) the members of CIFF.  As a matter of corporate law, the trustees do not control the members' powers (see para 14 above).  In any event, the cases on deadlock form an exception to the

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   non-intervention principle (see per Lord Walker in *Pitt v Holt* [2013] 2 AC
108, para 73, cited at para 121 above).

*A material change of circumstances would undermine the basis on which
the direction has been made*

**194**   Lord Briggs JSC accepts that there could be a change of
B   circumstances and the possibility that the order of the court (para 230
below) would have to be reviewed but he does not explore the consequences
of that acceptance.  An important consequence is that it may turn out that in
the event there is no breach of duty by the time the member comes to vote.
A change of circumstances could occur at any time before the date on which
Dr Lehtimäki has to vote on the section 217 resolution, which is the material
time for assessing the existence of a breach of his duty.

C   **195**   Once it is accepted that his decision is one to be taken at the date of
the vote (which may not take place for some time), it cannot be concluded
that a fiduciary, who has assured the court that he will act bona fide in the
best interests of the objects of the charity, is currently threatening to act in
breach of his subjective duty at the date of the court's determination on the
trustees' application or that there is no basis on which if there were no order
D   he could not reasonably form the view that it was not in the best interests of
the charity to vote in favour of the section 217 resolution (cf per Lord
Briggs JSC at para 232 below).  So to conclude would be to prejudge the
issue.  On conventional principles, there is no threatened breach of duty at
the present time, and a quia timet injunction would not lie on the basis of the
subjective duty.

E   *Conclusions on the breach of duty route*

**196**   The breach of duty route assumes that which must first be proved
and diverts attention away from the source of the court's jurisdiction to
make a direction against a member.  Unless there is an applicable exception
to the non-intervention principle, there is no jurisdiction.  And it seems to me
wrong for a court, in an understandable desire to ensure the effectiveness of
F   its order, to characterise any dissension from it as automatically a breach of
duty.  Rather, it should satisfy itself that it is justified in concluding that there
is an appropriate exception to the non-intervention principle.  That is the
principled way to ensure that a member cannot exercise a veto on the court's
approval of the Grant.

**197**   Moreover, the conclusion that there is a threatened breach of duty
can only be reached, as Lord Briggs JSC accepts, by making what I see as a
G   significant inroad into the subjective duty.  Lord Briggs JSC's response is that
the test has to be objective in these circumstances.  But the effect of that
approach is to make a fundamental change in the member's duty.  It also
involves taking away the member's discretion: in the words of the
Chancellor's judgment, at para 154, "the member does not have a free vote
in this case", and so he is no longer free to exercise his voting rights as he
thinks fit in the proper performance of his duties.

H   **198**   The making of a direction against Dr Lehtimäki on the basis that it
would be a breach of duty for him to act other than as the court has decided in
relation to the trustees may have consequences which stretch beyond the very
exceptional nature of this particular case.  In my judgment, the broader
consequence in membership charities is to tip the balance of power in favour

of the trustees and/or the court, and against the membership. The members *A*
who take a different view from the court will be compelled to return to the
court to justify their approach. The onus should not be on them to do so. The
core facts of this case are not necessarily "very unusual": it is not infrequent to
find disagreements between the trustees and members of substantial and
well-known membership charities. Accordingly, in my judgment, to hold
that members are automatically bound by the court's decision in relation to
the trustees is the wrong turn for charity law to take. *B*

199    Respectfully, I consider that the non-intervention principle has to
be observed even in this case. The court can only make a direction against
Dr Lehtimäki if it is satisfied that there is an applicable exception to that
principle. I am so satisfied for the reasons that I have given.

*Summary of my overall conclusions* *C*

200    On the first issue, I consider that a member of a charitable
company owes fiduciary duties to the charitable purposes in relation to the
passing of a resolution such as the 217 resolution, which, if passed, will
make possible a disposition of assets which would otherwise have been
applicable for those purposes. The fiduciary duties are tailored to fit within
the corporate vehicle, and thus Dr Lehtimäki has no greater right to *D*
demand information from the trustees (the directors) than the terms of the
company's constitution or the general law relating to companies allows a
member. I also consider that the duties are narrower than those formulated
by the Court of Appeal so that they do not apply in every instance where a
member has power to act. Those circumstances must be worked out as and
when they arise.

201    On the second issue, I conclude that the fundamental principle *E*
is the non-intervention principle under which the court does not seek to
substitute its judgment for that of a fiduciary. Any departure from this
principle must be approached with considerable caution by the court.
Litigation which simply seeks to draw the court into matters which can be
dealt with by the trustees under their powers is not to be encouraged, but
litigants must in any event overcome the hurdles to bringing charity
proceedings to which I have referred in para 50. However, in my judgment, *F*
the present case is a rare exception to that principle. The trustees of CIFF
have surrendered their discretion to the court and the court's priority is to
see that fiduciaries for the charity perform their duties in the way most likely
to achieve its continued existence notwithstanding what has been held to be
in effect an existential threat to the proper governance of the charity. I also
consider that the court has jurisdiction to give a direction to Dr Lehtimäki *G*
to vote in favour of the section 217 resolution, and that there does not have to
be a scheme.

202    On the third issue, I conclude that, CIFF's trustees having
surrendered their discretion to the court, and the court having reached the
unchallenged conclusion that it is in the best interests of the charity for
the Grant to be made, the court can give a direction to a fiduciary as to the
manner in which he votes on the section 217 resolution and that the 2006 *H*
Act does not by implication prevent the court from making such an order.

203    I therefore conclude that the Court of Appeal was in error in not
making the direction. However, differing here from Lord Briggs JSC,
I would reject the breach of duty route, that is, the view that the court can

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  found its jurisdiction to make this order against a member on the basis that for a member to threaten to vote other than in favour of the section 217 resolution would be a breach of duty by the member simply because the court has reached the conclusion that the Grant should be approved on the trustees' application (paras 174–199 above).

204    I would allow the appeal to the extent explained in this judgment.

B  **LORD BRIGGS JSC** (with whom **LORD KITCHIN JSC** and **LORD WILSON** agreed)

205    I agree that this appeal should be allowed, and with the summary of the reasons for doing so given by Lady Arden JSC in paras 200–202 (but not 203) of her judgment.  I add a few words of my own first because there is in my view a simple although unusual reason why it was right for the
C  Chancellor to direct Dr Lehtimäki how to cast his vote under section 217 which depends upon no deep consideration of the law of trusts and charities of the type which both the parties and my Lady have considered it necessary to undertake.

206    CIFF is a charitable company, falling under the court's special jurisdiction in relation to charities.  Like a charitable trust CIFF is only a charity because its objects (i e its purposes) as laid down by its constitution
D  are exclusively charitable.  The furtherance of those purposes is entrusted primarily to its trustees.  Although their functions are in most respects indistinguishable from those of company directors, like other charitable trustees they have the power to surrender to the court the exercise of their fiduciary discretion about a particular matter, a surrender which the court may or may not accept.  If (as here) the court accepts that surrender, it
E  will exercise that discretion in accordance with what it considers will best further the charitable purposes of the company, after hearing evidence and submissions from interested parties and from HM Attorney General representing the Crown as parens patriae.

207    If the surrender of the trustees' discretion relates to the approval or disapproval of a particular proposed transaction the court will have to come
F  to a decision whether the company's entry into that transaction is, or is not, in furtherance of those charitable purposes.  If the court concludes that it is, then it will follow that those purposes will not best be furthered by that transaction not going ahead.  The court's decision on this question may be (and was in this case) a very difficult one, about which reasonable minds, activated by nothing less than the loyal performance of a fiduciary duty, may well differ.

G  208    But once the court's decision about the merits of the transaction is made then, subject to any appeal (or perhaps a significant change in circumstances before it is implemented), that difficult question has been finally resolved.  It ceases to be a question for debate.  It is binding on all those interested parties joined to the relevant proceedings, and the duty of the charity's fiduciaries (whether or not joined as parties) is to use their
H  powers to the end that it is implemented, both generally and in accordance with any directions which the court may give for that purpose.  It would in my view be a plain breach of fiduciary duty for a relevant fiduciary of the charity to do otherwise, a fortiori to exercise a fiduciary power so as in effect to veto the very transaction which the court has decided should proceed in furtherance of the charity's purposes.

© 2022 The Incorporated Council of Law Reporting for England and Wales

209   Where a proposed transaction by a company involves a payment to A
one or more of its directors for loss of office, then section 217 of the
Companies Act 2006 requires that the payment element of the transaction be
approved by a members' resolution.  Section 201 of the Charities Act 2011
requires that, in addition, the payment element be approved by the Charity
Commission where the relevant company is a charity.  Section 217 recognises
the need for an ordinary company's main stakeholders to have a veto over
the ability of its directors to make payments to themselves or to one of B
their number from the company's funds.  Section 201 recognises that the
Commission, as the representative of the public for this purpose, should have
the same ultimate control over such payments out of the funds of a charity.
Both these sections recognise the obvious risk that directors may be swayed
by inappropriate motives in deciding upon such payments, even when the
intended recipients abstain entirely from the decision-making process. C

210   Such constraints have no equivalent purpose where the decision
that the charity should enter into a transaction involving payment to a
director or trustee for loss of office is not merely approved, but actually
decided on, by the court, after a surrender of the requisite discretion, and
after those with contrary views are given a proper opportunity to make
submissions and furnish evidence.  The court will not be affected by fellow
feeling of the type which might affect the directors or trustees.  If the court D
gets the decision wrong, there is an appellate process in place to put it right.
It is common ground that the Charity Commission may defer to the court
under section 201 in such a case.  It would be most unlikely if (as in the
present case) the Charity Commission had authorised proceedings designed
to enable the court rather than the trustees to make the decision that it would
then decline to consent to a transaction which the court had approved, as E
being in furtherance of the purposes of the charity.  But the same goes, or
ought to go, for the members of a charitable company under section 217 if,
as here, they are pure fiduciaries with no proprietary or other separate stake
of their own in the company's assets.  That is not to say that a section 217
resolution becomes unnecessary, but only that the members, if fiduciaries,
can be directed by the court to approve it, if they are minded to do otherwise.
Nor would approval by the Charity Commission become unnecessary, but F
in the absence of something having gone badly wrong with the court
proceedings, it is hard to conceive why it would be withheld.

211   Applied to the facts of the present case, the analysis is as follows.
The management of CIFF was gravely threatened by the most unfortunate
falling out between its generous and dedicated founders, Sir Christopher and
Ms Cooper.  What became the Grant (as Lady Arden JSC describes) was G
thrashed out as a way of dealing with that threat in a way which would effect
a form of demerger of CIFF's funds and activities into two charities, CIFF
and Big Win Philanthropy ("BWP"), each with the same (though differently
worded) objects as CIFF, the latter to be managed by Ms Cooper who would
withdraw from CIFF, with its funds augmented by further substantial
donations from both Sir Christopher and Ms Cooper.

212   CIFF was under the control of five trustees, including Sir H
Christopher and Ms Cooper.  The latter two were, along with Dr Lehtimäki,
the only members of CIFF.  For perfectly understandable reasons the trustees
considered it appropriate to surrender to the court their discretion whether
to commit CIFF to the making of the Grant, and the Charity Commission

© 2022 The Incorporated Council of Law Reporting for England and Wales

A  deferred to the court by authorising the proceedings.  But the Grant included
what was, strictly, a payment for loss of office within section 217, and
therefore required the approval of the members of CIFF.  Again for
understandable reasons, Sir Christopher and Ms Cooper declined to
participate in voting as members.  So the question whether to vote in favour
of the making of the Grant fell upon the shoulders of Dr Lehtimäki.

B  213  The court heard submissions from all interested parties including
CIFF itself, HM Attorney General and Dr Lehtimäki, who was joined as a
party and lodged evidence.  The Charity Commission understandably took
no active part itself.  The Chancellor decided that the making of the Grant
was in the best interests of CIFF; i e that its charitable purposes would be
better advanced by the making of the Grant than by its not being made.  He
found that a difficult decision, about which relevant fiduciaries, including in
C  particular Dr Lehtimäki, could reasonably differ without thereby being in
breach of duty.  But there has been no challenge to that decision.

214  When informed that Dr Lehtimäki did not consider himself
compelled by the court's decision as to the best interests of CIFF to approve
the making of the Grant under section 217, he directed him to do so.
Speaking of Dr Lehtimäki he said, at para 154:

D      "The member does not have a free vote in this case because he is bound
      by the fiduciary duties I have described and is subject to the court's
      inherent jurisdiction over the administration of charities.  When the court
      has decided what is expressly in the best interests of a charity, a member
      would not be acting in the best interests of that charity if he gainsaid that
      decision."

E  I agree.

215  I must say something very briefly about the two principal grounds
on which that direction has been challenged, successfully, in the Court of
Appeal.  The first is the submission that Dr Lehtimäki is not, as a member of
CIFF, a fiduciary at all, although it may be conceded that he was bound by
the "proper purpose" rule, that is to exercise his section 217 power for the
purpose for which it was given.  On this issue I agree with the Chancellor,
F  the Court of Appeal and with Lady Arden JSC that Dr Lehtimäki is a
fiduciary, in particular in relation to the exercise of his power as a member of
CIFF to approve or disapprove the making of the Grant.  There may be slight
differences in emphasis and detail in their reasoning, particularly in relation
to the question whether the members of mass membership charities like the
National Trust are fiduciaries and, if not, why not.  Like Lady Arden JSC
G  I would prefer to leave these issues to a case where they might affect the
outcome.  In the case of CIFF, its constitution confers no particular benefits
on its members which would bring that question into play.

216  The second, and main, ground is what is loosely described as
the "non-intervention principle", namely that the court will not generally
interfere with the performance by fiduciaries of their duties unless they are
acting, or threatening to act, in breach of duty, or have surrendered their
H  discretion, and that the court's special jurisdiction over charities gives rise
to no exception.  It was the main ground upon which the Court of Appeal
overturned the Chancellor's direction to Dr Lehtimäki as to how he should
vote upon the necessary section 217 resolution.  Lady Arden JSC deals with
this ground on the assumption that Dr Lehtimäki's stance involved neither a

© 2022 The Incorporated Council of Law Reporting for England and Wales

breach nor a threatened breach of his fiduciary duty.  On that basis she
concludes that the non-intervention principle, important though it
undoubtedly is, cannot be without exception, either in the law of trusts or a
fortiori in relation to charities and that this case is, on its very unusual facts,
just such an exception.  In particular she concludes, and I agree, that the
court's jurisdiction to intervene in the affairs of charities extends beyond its
trusts jurisdiction more widely than just in relation to schemes.

217   If it were necessary to proceed upon the basis that Dr Lehtimäki
was neither committing nor threatening a breach of his fiduciary duty by
declining to vote on the section 217 resolution in accordance with the court's
decision that the making of the Grant furthered the charitable purposes of
CIFF, then I would agree both with Lady Arden JSC's conclusion and with
her analysis.  But I am unable to accept the premise.  I shall assume in
Dr Lehtimäki's favour that, as the Chancellor said, a conclusion by him that
the making of the Grant was not in the best interests of CIFF, and a vote
against it under section 217, would not *in the absence of the court's decision
on the point* have involved any breach of fiduciary duty on his part.  Thus if
for example the trustees had resolved that the Grant should be made (on
their perception that to do so would be in the furtherance of CIFF's
charitable objects) without seeking the assistance of the court it would have
been perfectly consistent with his fiduciary duty as a member to consider the
matter afresh and, if he concluded otherwise, to prevent the making of the
Grant by voting against it as the only unconflicted member.  It is plainly
within the intent of section 217 (which Parliament clearly intended should
apply with full force to charitable companies) that the members may
overrule the trustee directors in the event of a bona fide disagreement of that
kind, where (as here) the transaction in question includes a relevant payment
for loss of office.

218   But once the court has ruled upon the underlying common question
whether the proposed transaction is in the best interests of the charity, in
properly constituted proceedings in which both the company and the
members are joined as parties, the position fundamentally changes.  It may
well be that particular fiduciary organs of the charity bona fide opposed
and argued against the decision which the court reached and remained
unconvinced by the court's reasoning.  But there comes a point where the
ordinary subjective duty of the fiduciary (as the Court of Appeal put it at
para 48) to "exercise the powers that he has in that capacity in the way that
*he* decides, in good faith, would be most likely to further the purposes of
CIFF" has to give way, where the court has reached a different view from his
own and made a final decision to that effect.  This is because the concept
that the fiduciary is entitled to form his own subjective judgment about a
matter affecting (in this case) the company assumes that there are different
conclusions about the matter which may reasonably be reached.  But when
the very question in issue has been finally decided by the court in proceedings
in which the fiduciary has been joined as a party and been heard, then there
is no longer any legitimate debate.  The duty of the fiduciary is then to use his
powers so as to give effect to the court's decision about the company's best
interests, however much he may disagree with it.  If he finds that he cannot in
conscience do so, then he should resign.

219   There is a useful parallel in the situation which arises where trustees
who have to act unanimously in deciding whether or how to exercise a

A    fiduciary power find themselves deadlocked and, exceptionally, the court needs to resolve that deadlock in order to enable the trust to be duly administered. The court may be called upon to do so by one or more of the trustees, without a surrender of discretion by all of them, or indeed on the application of any interested party, such as a beneficiary. The opposing sides among the trustees may each have perfectly reasonable and bona fide views about whether the exercise, or non-exercise, of the relevant power would

B    best serve the interests of the beneficiaries. Where in such a case the court chooses to decide whether or how the power should be exercised, in the best interests of the beneficiaries, then it becomes the duty of all the trustees to act in accordance with the court's decision, regardless whether they agree with the court's view about the merits of the matter. If necessary the court may direct them to do so. For a useful summary of English and Commonwealth

C    authorities on this aspect of the court's jurisdiction in the administration of trusts, see *Garnham v PC* [2012] JRC 50.

220    It is suggested in this case that the above analysis is inapplicable because all that the court was doing was standing in the shoes of the trustees in making for them their decision on the merits of the Grant, whereas Dr Lehtimäki as a member is a different organ of the company, unaffected by that decision, entitled to reach and act upon his own view of the merits

D    and thereby to overrule the trustees. It is said that his joinder as a party, otherwise than at his request, does not detract from that entitlement. I respectfully disagree, for the following reasons.

221    First, the court was not merely resolving some internal disagreement among the trustees. It was at the trustees' unanimous request making the decision about the merits of the Grant for the company itself,

E    exercising for that purpose its inherent jurisdiction in relation to the administration of the company as a charity, with the consent of the Charity Commission. CIFF was, in recognition of that, joined as a party, for the purpose of being bound by the outcome. As the organ charged with the overall direction and management of CIFF the trustees were beyond question the appropriate body within CIFF to put that question before the court on CIFF's behalf. While it is true that this is not a case of deadlock

F    (because the members are, in respect of proposed payments for loss of office, entitled under section 217 to overrule the trustee directors), the court became seized of the issue as to the merits of the Grant by a legitimate alternative route.

222    Secondly, the underlying question whether the making of the Grant was in furtherance of CIFF's charitable purposes was the determinative

G    question for both the trustees and for the members, although they were different fiduciary organs of the company. This is not a case (as it would usually be in the case of an ordinary commercial company with non-fiduciary members) where the two organs might legitimately have a different agenda from each other. There is no sense in which it could be said that Dr Lehtimäki as a member might legitimately bring different objectives into his decision making, from those actuating the trustees. For both of them, the decisive

H    question was the same: would the making of the Grant further the charitable purposes of CIFF? If it would, then they both had a duty to see that it happened.

223    Thirdly the court was astute to make CIFF's members, and Dr Lehtimäki in particular, parties to the proceedings, both to obtain their

© 2022 The Incorporated Council of Law Reporting for England and Wales

assistance in the making of a difficult decision, in the form of evidence and submissions, and to bind them into the outcome.

224   It is in my view nothing to the point that Parliament has by section 217 given the members of a company their own decisive say in relation to the making of payments for loss of office to directors, and confirmed it in relation to charitable companies in which the members will usually be fiduciaries. The members' decisive role is given to them as a control upon what would otherwise be the uncontrolled discretionary power of the directors (here the trustees). It was no part of Parliament's purpose to give fiduciary members of a charitable company the like control over the court's exercise of power over the company under its jurisdiction in relation to charities. That does not mean that section 217 was thereby disapplied, or for that matter the requirement for the approval of the transaction by the Charity Commission under section 201 of the 2011 Act, as the Chancellor recognised by the terms of his order.

225   Lady Arden JSC was kind enough to read a draft of my judgment, which ended at para 224 above. She has, in paras 174 and following of her judgment set out at length why she disagrees with the breach of duty route. I must explain why I have not been persuaded by her analysis. I mean no disrespect by doing so briefly.

226   First however, I acknowledge the awkwardness of a point which asserts a threatened breach of duty when this was not in the forefront of the arguments which the court heard. But this is a really important point: can a fiduciary whose duty is to further the purposes of a charity stand aloof from a final decision of the court, made for the charity, on that very point, in proceedings in which he had been both joined and heard, so as to exercise a veto over what the court has decided would best further those purposes, or would it be a breach of duty to do so? I have not been persuaded by Lady Arden JSC's reasons for not affirming the judge's conclusion that such conduct would be a breach.

227   Lady Arden JSC says (at paras 178 and 181) that she prefers the submission of Mr Morpuss that the court had no jurisdiction over Dr Lehtimäki as a member merely because it had accepted a surrender of the trustees' discretion. I agree. But having joined Dr Lehtimäki, the court's jurisdiction to require him to vote in favour of the Grant arose because his threat not to do so was a threatened breach of duty.

228   Lady Arden JSC acknowledges, at para 178, that the breach of duty point was, albeit briefly, taken on Ms Cooper's behalf in her Grounds of Appeal. The Court asked Lord Pannick during his opening of the appeal whether he adhered to the argument that Dr Lehtimäki would be in breach of duty if he voted against the Grant after its approval by the Chancellor and he said, again briefly, that he did. So the point remained to be decided, even though little was thereafter said about it during the hearing.

229   More to the point, as I have sought to explain, the breach of duty point was precisely the basis upon which the Chancellor decided to direct Dr Lehtimäki to vote in favour of the Grant. True it is that the Court of Appeal disagreed with the Chancellor's reasoning, but that is why there is an appeal to this court. It must be open to this court on a second appeal to conclude that the first instance judge was right in his analysis, save perhaps where all parties to the appeal are for good (rather than tactical) reasons

© 2022 The Incorporated Council of Law Reporting for England and Wales

[2022] AC          Children's Investment Fund (UK) v Attorney General (SC(E))
Lord Briggs JSC

A    united in the view that he was wrong. There was no such unanimity in the present case.

230   I am unable to agree with Lady Arden JSC's next point (at paras 184–186), which is that if (as the Chancellor recognised) the Charity Commission retained its power to approve or disapprove the transaction under section 201 of the 2011 Act, then there could be no valid distinction with Dr Lehtimäki's power as a member under section 217. First, the Charity
B    Commission is not a fiduciary subject to the court's general jurisdiction in relation to breach of duty. It is a separate public body with its own statutory jurisdiction. Secondly the Charity Commission was not joined as a party to the proceedings, or heard on the merits of the Grant. The relationship between the court and the Charity Commission is quite different from that between the court and a fiduciary who is also a party to the proceedings, and
C    its detail is beyond the scope of the issues in this appeal. Leaving aside change of circumstances, it seems very unlikely that the Charity Commission would prohibit the making of the Grant by a refusal under section 201, where the court had already finally decided that it would further the purposes of CIFF, and directed Dr Lehtimäki to vote in favour of it under section 217.

231   Lady Arden JSC makes a number of points which may be loosely characterised as suggesting that the breach of duty route would have
D    ramifications adverse to the willingness of members of the public to become engaged in the affairs of charity by becoming donors or members of charitable companies. Thus she says that the decision that Dr Lehtimäki was threatening a breach of duty would undermine the subjective basis of fiduciary liability, that it would be contrary to the benevolent treatment of charity trustees by the court, that donors would react adversely to the
E    court preferring its own views to those of members and trustees, and that it would discourage membership by shifting the balance of power from the membership to management and the court.

232   I accept that the principled basis upon which the Chancellor decided to direct Dr Lehtimäki to vote (with which I agree) does involve some limited departure from a purely subjective assessment of the question whether a fiduciary has committed, or is threatening to commit, a breach of
F    duty. But the test for breach of fiduciary duty has never been purely subjective. The fiduciary's belief has to be both bona fide and reasonable, if he or she is to act upon it without risking breach of duty. In *Cowan v Scargill* [1985] Ch 270, 289, Sir Robert Megarry V-C said this, of the trustee's duty in relation to investment: "This requirement is not discharged merely by showing that the trustee has acted in good faith and with sincerity. Honesty
G    and sincerity are not the same as prudence and reasonableness." Where the court has finally decided what is in the charity's best interests there can be no reasonable basis for a fiduciary acting contrary to that decision and, here, actually vetoing the transaction which the court has decided best furthers the purposes of the charity.

233   Nor can such conduct, in the face of a final decision of the court after hearing full argument, be equated with the type of bona fide mistake
H    referred to by Lord Eldon LC in *Attorney General v Exeter Corpn* (1826) 2 Russ 45. He contemplated that the court would readily give directions as to future conduct by the trustee, but be merciful in relation to punishment for the past. No one is suggesting that Dr Lehtimäki should be punished. Nor should anyone be discouraged from becoming a fiduciary for a charity

© 2022 The Incorporated Council of Law Reporting for England and Wales

(as a trustee or a member) by the prospect that, in unusually difficult cases *A* like the present, the court may give such directions, in the expectation that they will be complied with. The fact that the court is there to lend its assistance when the fiduciaries are divided, or cannot make up their minds, should be an encouragement to those uncertain whether to undertake what may occasionally be a challenging role.

234  I fully agree with Lady Arden JSC that membership of corporate *B* charities should be encouraged, and that members should also be encouraged to play their constitutional part in decision making about the charity. But there will, very occasionally, be decisions of great difficulty, sometimes of great controversy, with which the court is there to assist, in its general supervisory role over charity. That this is just such a case is the foundation of Lady Arden JSC's judgment as much as it is of mine. I do not think that this very unusual case will tend to shift the balance of power away *C* from members towards management and the court. In the present case Dr Lehtimäki was, by his joinder, encouraged to put his own view of the merits of the Grant before the court, although it was the trustees who placed the matter before the court. In fact the originators of the proposal to make the Grant, Sir Christopher and Ms Cooper, were both members as well as trustees.

235  I would therefore allow the appeal, and restore the order made by *D* the Chancellor, essentially for the reasons which he gave.

## LORD REED PSC

236  With some reluctance, as I found the judgment of the Court of Appeal more persuasive than have your Ladyship and your Lordships, but in deference to the unanimity of the other members of the court as to the outcome of this appeal, and bearing in mind that the facts of this case seem *E* unlikely ever to be replicated, I concur in the order proposed.

*Appeal allowed.*

Ms B L Scully, Barrister

# Exhibit O

Court of Appeal

# Tulip Trading Ltd (a Seychelles company) *v* Bitcoin Association for BSV and others

### [2023] EWCA Civ 83

2022 Dec 7, 8; 2023 Feb 3                    Lewison , Popplewell, Birss LJJ

*Practice — Claim form — Service out of jurisdiction — Claimant bringing claim in relation to substantial amount of digital currency assets — Claimant alleging breach of fiduciary or tortious duty by defendants — Claimant given leave to serve claim on defendants outside jurisdiction — Defendants applying to set aside service — Whether serious issue to be tried*

The claimant company claimed to be the owner of some bitcoin with a very high total value held at two addresses on the blockchain called 1Feex and 12ib7. The private keys had been lost in a hack, likely stolen, meaning that the claimant could not access its assets or move them to safety. The claimant brought a claim contending, inter alia, that the defendant developers which controlled and ran the four relevant bitcoin networks, should be recognised as a new ad hoc class of fiduciary, owing fiduciary duties to the true owners of bitcoin cryptocurrency like the claimant. It was contended that the fiduciary duties owed should extend to implementing the necessary software patch to solve the claimant's problem and safeguard its assets from the thieves. The claimant also alleged the existence of certain duties in tort. All of the defendants were resident outside the jurisdiction. The claimant had been given leave to serve the defendants outside the jurisdiction. A number of the defendants applied to set aside service. The judge approached the decision on the merits by identifying that the two claims each depended on a point of law which could be decided, even assuming the facts alleged by the claimant in the claimant's favour. The points of law were whether, on those facts, the defendants owed the alleged fiduciary duties or duties in tort. The judge concluded that no such duties arose in law and set aside the service.

On the claimant's appeal—

*Held*, allowing the appeal, that there were three matters to be addressed in jurisdiction disputes like the present: a merits test relating to the claim itself, a test relating to the gateways for service out of the jurisdiction under CPR Practice Direction 6B, and a forum conveniens/ discretion question focused on whether England and Wales was the appropriate forum for the dispute; that the same principles, about how to approach points of law, should be applied to the merits test aspect of a jurisdiction application as to the test under the gateways; that, therefore, the court could, but was not bound in law, to decide any legal question arising, mindful of the warning against deciding controversial points of law in a developing area on assumed or hypothetical facts; that that was an important factor and did not cease to apply simply because the point arose in a jurisdiction application (whether under the merits test or the gateways); that for the claimant's case to succeed would involve a significant development of the common law on fiduciary duties, but there was a realistic argument to be made along the following lines: that the developers of a given network were a sufficiently well-defined group to be capable of being subject to fiduciary duties; that viewed objectively the developers had undertaken a role which involved making discretionary decisions and exercising power for and on behalf of other people, in relation to property owned by those other people which had been entrusted into the care of the developers; that, therefore, the developers were fiduciaries; that the essence of that duty was single minded loyalty to the users of bitcoin software; that the content of the duties included a duty not to act in their own self interest and also involved a duty to act in positive ways in certain circumstances; that realistically it might include a duty to act to introduce code so that an owner's bitcoin could be transferred to safety in the circumstances alleged by the claimant; that, accordingly, the case advanced raised a serious issue to be tried that there was a fiduciary duty in law in the circumstances alleged by the claimant; that the time to decide on the duty was once the facts were established, and to rule out the claimant's case as unarguable would require an assumption of facts in the defendant developers' favour which were disputed and which could not be resolved that way (post, paras 14–15, 70–86, 91, 92, 93).

1

© 2023. The Incorporated Council of Law Reporting for England & Wales

*Bristol and West Building Society v Mothew* [1998] Ch 1, CA and dicta in *Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd* [2012] 1 WLR 1804, para 86, PC considered.

Decision of Falk J [2022] EWHC 667 (Ch); [2022] 2 All ER (Comm) 624 reversed.

**APPEAL** from Falk J

By an amended claim form, particulars of claim and application to serve out filed in April 2021, the claimant Tulip Trading Ltd ( a Seychelles company) brought a claim against (1) Bitcoin Association for BSV (a Swiss verein), (2) Wladimir Jasper van der Laan, (3) Jonas Schnelli, (4) Pieter Wuille, (5) Marco Patrick Falke, (6) Samuel Dobson, (7) Michael Rohan Ford, (8) Cory Fields, (9) George Michael Dombrowski, (10) Matthew Gregory Corallo, (11) Peter Todd, (12) Gregory Fulton Maxwell, (13) Eric Lombrozo,(14) Roger Ver, (15) Amaury Séchet and (16) Jason Bradley Cox. The claim alleged that the defendants as software developers who looked after bitcoin owed fiduciary duties or duties in tort to the claimant as owner of that cryptocurrency.

By order dated 7 May 2021 Deputy Master Nurse granted permission to serve all parties out of the jurisdiction, and in the case of certain defendants by e-mail. The first defendant accepted service and the thirteenth did not respond. The second to twelfth and fourteenth to sixteenth defendants sought to set aside service.

By a decision dated 25 March 2022 [2022] EWHC 667 (Ch); [2022] 2 All ER (Comm) 624 Falk J granted the application to set aside on the grounds that there was no serious issue to be tried.

By an appellant's notice with permission of the Court of Appeal (Andrews LJ) granted 10 August 2022 the claimant appealed.

By a respondent's notice the defendants sought to uphold the judgment.

The facts are stated in the judgment of Birss LJ, post, paras 1–11.

*John Wardell KC, Bobby Friedman, Sri Carmichael*(instructed by *Ontier LLP*) for the claimant.
*James Ramsden KC* (instructed by *Bird & Bird LLP*) for the second to twelfth and fifteenth to sixteenth defendants.
*Alex Charlton KC* and *Daniel Khoo* (instructed by *Brett Wilson LLP*) for the fourteenth defendant.
The first and thirteenth defendants did not appear and were not represented.

The court took time for consideration.
3 February 2023. The following judgments were handed down.

**BIRSS LJ**

**1** The question in this appeal is whether the developers who look after bitcoin may arguably owe fiduciary duties or duties in tort to an owner of that cryptocurrency.

**2** The problem arises in this way. Tulip Trading Ltd, a company associated with Dr Craig Wright, claims to be the owner of some bitcoin with a very high total value (the value in $ expressed in April 2021 was about $4bn). The bitcoin is held at two addresses on the blockchain called 1Feex and 12ib7. However the private keys have been lost in a hack, likely stolen. Without its private keys Tulip cannot access its assets or move them to safety. However, Tulip contends, the developers named as defendants in this case control and run the four relevant bitcoin networks, and it would be a simple matter for them to secure Tulip's assets, eg by moving them to another address which Tulip can control. Tulip contends that the role the developers have undertaken in relation to Tulip's property (the bitcoin) and the power this role gives them, and all the circumstances (discussed below), mean that the developers should be recognised as a new ad hoc class of fiduciary, owing fiduciary duties to the true owners of bitcoin cryptocurrency, including in this case Tulip as true owner of the bitcoin at 1Feex and 12ib7. The fiduciary duties owed should extend to implementing the necessary software patch to solve Tulip's problem and safeguard Tulip's assets from the thieves. Tulip also alleges the existence of certain duties in tort. The developers deny they owe fiduciary or any other duties to Tulip. They contend that they have nothing like the power or control Tulip alleges and that duties of the kind Tulip contend for would be highly onerous and unworkable.

**3** All of the defendants are resident outside the jurisdiction. Tulip obtained leave from the Master to serve the defendants outside the jurisdiction and the matter came before Falk J on an application to set aside service brought by most of the defendants who had by then been served. They were the second to twelfth, fifteenth and sixteenth defendants. The first defendant did not challenge service and the thirteenth defendant has not responded.

2

**4** There is no dispute here or below about the general approach to jurisdiction disputes of this kind. There are three matters to be addressed: a merits test relating to the claim itself, a test relating to the gateways for service out of the jurisdiction under CPR Practice Direction 6B, and a forum conveniens/discretion question focussed on whether England and Wales is the appropriate forum for the dispute (see eg *VTB Capital Plc v Nutritek International Corpn* [2012] EWCA Civ 808; [2012] 2 BCLC 437, paras 99–101. The claimant bears the burden on all three points.

**5** The judge addressed all three matters, ruling against Tulip on the first one (the merits). The conclusion was that Tulip had not established a serious issue to be tried because there was no realistic prospect of establishing that the facts pleaded amount to a breach of fiduciary or tortious duty owed by the defendants to Tulip.

**6** On the second (gateway) and third (forum) matters Falk J reached conclusions in Tulip's favour at paras 138–165 and 166–168 respectively. There was also an allegation by the defendant applicants of lack of full and frank disclosure before the Master but this was rejected (at paras 169–170). None of these other matters have been pursued on appeal.

**7** Although not relevant to the appeal, given the international nature of this dispute, it may be worth briefly highlighting aspects of the judge's now unchallenged conclusions that there was a good arguable case that the claim would fall within the court's jurisdiction. There was no dispute that the cryptocurrency in issue was property (para 141) and there was a good arguable case that Tulip was resident in the jurisdiction (despite being a Seychelles registered company) and that the property was located here (see the passage from para 142, concluding at para 158). Therefore the property gateway 11 (CPR PD 6B) was satisfied. For similar reasons gateway 9(a) (damage within the jurisdiction) was satisfied (paras 159–164). In terms of forum, the conclusion (para 168) was that there was no other jurisdiction with which the dispute had a closer link than England, or was even arguably the proper forum.

**8** Many of the factual allegations made by each side were disputed by their opponents, and a significant volume of evidence had been filed. The judge held (para 13) that "The defendants' evidence was certainly not sufficiently strong to enable me to conclude that [Tulip's] factual case was no more than fanciful." There is no challenge to that conclusion, which in my judgment was the right one. The judge later (para 52) expressly held that Tulip's claim to ownership of the bitcoin and that the hack had occurred could not be dismissed summarily.

**9** The judge approached the decision on the merits by identifying that the two claims (of breach of fiduciary duty and in tort) each depended on a point of law which could be decided, even assuming the facts alleged by the claimant in the claimant's favour. The points of law were whether, on those facts, the defendants owed the alleged fiduciary duties or duties in tort.

**10** The judge decided no such duties arose in law and so, since the claimant failed at the first limb, it followed that the judge's order set aside the service on the relevant foreign defendants. The judgment is *Tulip Trading Ltd v Bitcoin Association for BSV* [2022] EWHC 667 (Ch); [2022] 2 All ER (Comm) 624. On appeal, the judge having refused permission, Andrews LJ gave permission on 10 August 2022. The fourteenth defendant was served after other defendants; and by various orders that defendant has joined the proceedings before this court on the same basis as the existing respondents to Tulip's appeal.

**11** Also before the judge was an argument about whether Tulip was seeking to change its case. The judge addressed this at paras 114–125, refusing to take the new submission into account because no draft Amended Particulars of Claim had been put forward and no application to amend had been made. On appeal Tulip produced a draft Amended Particulars of Claim and, after prompting from the court, undertook to make an application to amend. I will come back to this below.

*Approach to the merits test*

**12** The merits test can be summarised as being whether there is a serious issue to be tried, which is the same as there being a real as opposed to fanciful prospect of success, and is the same as the test for summary judgment (see eg *Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 WLR 1804, paras 71 and 82, *Lungowe v Vedanta Resources plc* [2019] UKSC 20; [2020] AC 1045, para 42).

**13** So far so good, but what is to be done about points of law? It is not easy to reconcile all the statements in the authorities on the approach to points of law on applications of this kind. The question boils down to whether jurisdiction applications are treated differently from other kinds of summary procedure. Is the court bound to decide a question of law, or at least should the court normally decide it, because the application is a jurisdiction application? Does it depend on whether the question goes to jurisdiction itself, ie the gateways, or "only" to the merits test?

3

Moreover how does all this fit with another general principle, pulling in the opposite direction, that on a summary procedure it is no part of the court's function "to decide difficult questions of law which call for detailed argument and mature consideration" (*American Cyanamid Co v Ethicon Ltd* [1975] AC 396, 407, cited in this context in *Altimo*, para 84), and the frequent warning in the authorities against deciding controversial points of law in a developing area on assumed or hypothetical facts rather than on the basis of actual factual findings (eg *Altimo*, paras 84–86 and *Begum v Maran (UK) Ltd* [2021] EWCA Civ 326; [2022] 1 All ER (Comm) 940, per Coulson LJ, paras 23 and 71)?

**14** In my judgment the same principles, about how to approach points of law, should apply to the merits test aspect of a jurisdiction application as to the test under the gateways, and I believe that view is supported by the first sentence of para 86 of *Altimo* as follows:

> "There is no reason why the same principle *[that it is not normally appropriate in a summary procedure to decide a controversial question in law in a developing area]* should not apply to the question whether, in a service out of the jurisdiction case on the 'necessary or proper party' head, a claim is 'bound to fail' as well as to the question whether there is a 'serious issue to be tried' in the claim against D2."

**15** Therefore the court may, but is not bound in law to, decide any legal question arising, whether it is under the merits limb or the gateway limb. No doubt an important factor in deciding whether to do that will be the fact that the question goes to the jurisdiction of the court. If the point goes to jurisdiction and it can be decided summarily then no doubt it should be. However another important factor is the warning against deciding controversial points of law in a developing area on assumed or hypothetical facts. This concern does not cease to apply simply because the point arises in a jurisdiction application (whether under the merits test or the gateways). It is always an important factor to bear in mind.

*The case on duty*

**16** To grapple with the case it is necessary to spend a bit of time on what bitcoin is, what the bitcoin networks are, the role of the developers in all this, and the position of Tulip. Much of what follows is taken from the corresponding section in the judgment (at paras 16–35) but some of the points of emphasis and detail are different, no doubt owing to the way the case was put on appeal.

**17** In October 2008 a famous paper, generally referred to as the "Bitcoin White Paper", was published. Its actual title was *"Bitcoin: A Peer-to-Peer Electronic Cash System"*. The named author is "Satoshi Nakamoto", which was a pseudonym. Dr Wright claims he is Satoshi Nakamoto. This is a hotly disputed claim and does not matter in this case.

**18** The White Paper proposed a new online electronic cash system. The fact it is cash is important (and that is why the word "coin" is in the name bitcoin). The thing about physical cash is that it cannot be spent twice. Once I have handed over a physical coin to buy something from a shopkeeper, they now have it and I no longer do. I cannot spend it again. In the language of possession, before the transaction I possessed the token (and nobody else) while afterwards it is possessed by the shopkeeper. This characteristic of a physical coin is a key part of what allows the recipient of that token, and therefore everyone else, to place trust in the token's value.

**19** Electronic payment systems, which of course existed in 2008 as the White Paper acknowledged, solve the double spending problem in a different way because the payment systems are run by financial institutions, which both parties have to trust. The point of the White Paper was to propose a scheme using cryptographic methods to solve the double spending problem and create a form of electronic cash which does not rely on third party financial institutions.

**20** Since then a number of different systems have been developed. Dr Wright maintains that the original bitcoin, and the only one properly so-called, is that held though the BSV Network. Like the judge, my use of the term bitcoin in this judgment reflects common usage, rather than being intended to express a view on that point, which is not relevant.

**21** In the bitcoin scheme transactions are recorded in a ledger or database known as a blockchain, with each network having its own ledger. The blockchain constitutes a public registry recording every transaction. A given amount of bitcoin is simply a number held at a certain digital address. A transaction simply involves reducing the value at one address and correspondingly increasing it at another. Whether new addresses are created in this process does not matter for present purposes, as different cryptocurrencies work in different ways. The

4

amounts held at every address are public, but the identity of the parties is not. The blockchain does not reveal the relationship between the digital addresses and any persons.

**22** Each digital address is associated with a pair of public and private cryptographic keys. The public key identifies the address on the network. The relevant private key is the means by which bitcoin can be dealt with. The holder of the private key uses it to cryptographically sign a record of the transaction moving bitcoin from one address to another. The record is called a cryptographic hash. The public/private key pair means that the person signing with the private key is proving that they are associated with the public key (and so the address), without revealing the private key itself. The hash ensures that any attempt to alter the record would be noticeable, because even the smallest change would alter the hash.

**23** For each network there are devices on the network that undertake "mining". This is the means whereby transactions are validated. The latest transactions are gathered together into a block, which also includes a hash of the previous block (hence each block is chained to its predecessor, making a "blockchain"). The miners work in competition with each other to produce an appropriate hash of this new block. The competition is to find a unique "number used once" or nonce, which causes the hash of the new block to have certain defined characteristics. This is called a "proof of work". Blocks that have been validated this way are broadcast to the network and incorporated into further work. Miners receive both transaction fees and new bitcoin.

**24** The signing of the hashed transaction record with users' private keys in the first place, and the incorporation of these records into a hashed chain of blocks produced by the proof of work, solves the double spending problem. This characteristic of bitcoin does not emerge as a matter of law or convention, it is a characteristic which arises as a matter of fact from the way the software works. As a result it is meaningful to describe bitcoin not merely as something which is transferable but as "rivalrous" (see the Law Commission's recent *Digital Assets: Consultation Paper* (2022) (Law Com No 256) [Ch 5.48]). For a transferable thing to be rivalrous, the holding of it by one person necessarily prevents another from holding that very thing at the same time. Because the holder cannot double spend their bitcoin, such that it is rivalrous, the cryptoasset can be said to be capable of assumption by a third party (see the definition of property in *National Provincial Bank v Ainsworth* [1965] AC 1175). Thus, as Bryan J held in *AA v Persons Unknown* [2019] EWHC (Comm) 3556; [2020] 4 WLR 35, paras 55–61 citing *Ainsworth*, a cryptoasset such as bitcoin is property.

**25** In a sense the token which is the bitcoin analogue of a real coin is the chain of cryptographically signed and validated transactions relating to the relevant entry in the ledger. Since every transaction relating to that token adds to its chain, some would say a fresh piece of property is created every time bitcoin is transferred, but there is no need on this appeal to get into that debate.

**26** There are four bitcoin networks in issue in this case: BSV, BTC, BCH and BCH ABC. Dr Wright contends that these networks arose in chronological order, starting with BSV. Each later network started life as a copy of the blockchain of a pre-existing network (which is after all public) but by then applying different software thereafter. BTC was created by copying the BSV blockchain as it was in 2017, and subsequently BCH and BCH ABC were formed in a similar way. As the judge explained (para 20):

> "The effect of copying is that all historic transactions up to the point of creation of an additional Network are the same as for the Network from which the blockchain was copied. This is the reason that all four Networks are involved here: [*Tulip's*] case is that the relevant assets were held on the BSV Network and have been replicated in the others through the process just referred to, including (in the case of the BCH ABC Network) after the hack occurred."

**27** Some of the foregoing is not accepted by the defendants but this appeal proceeds on the basis that it can be assumed to be correct.

**28** Each network is supported by software called client software. Not only are the blockchains public, but the source code for the necessary client software for a given network is also public. The source code is made available on a public ("open source") code database called GitHub. To participate in a given network participants run the source code for that network from the relevant database. It is that software which embodies the rules applicable to that network.

**29** Anyone can propose a change to this software, however a change can only be implemented by someone with the relevant electronic password for the particular code database on GitHub. At least in the case of the software for the BTC Network, this is by a process called

5

"merge commit", but the detail does not matter. Tulip's case is that the developers are in control of that software because they decide what amendments, if any, are made to the software. They hold the relevant passwords. This explains why the relevant defendants are called developers. They are software developers.

30 Tulip contends that the second to thirteenth defendants are the developers of the BTC Network, the fourteenth defendant is the developer for the BCH Network, and the fifteenth and sixteenth defendants are the developers of the BCH ABC Network.

31 This software development process is an ongoing one. No software is static. Although the code develops over time in other ways, it is instructive to consider software bugs briefly. The existence of bugs comes to light and they will then need to be fixed. This applies to bitcoin like any other software. However even that can involve judgment, since there may not be agreement that the alleged bug in the software is a bug at all and, even if that is agreed, there may not be a consensus on how to fix it. It is the developers who make this decision. It can be as much a decision not to fix something which some people contend is a bug, as it is a decision to introduce a fix and change the way the software works. When the developers introduce new software, that may operate in unexpected ways, introducing new (alleged) bugs.

32 Notably, says Tulip, it is not miners who control the software. If a miner operating on a given network failed to apply a given software update, then, as the judge explained in para 33, they would become unable to mine the network in question from the perspective of the majority of users, which would be against their (substantial) commercial interests or the interests of those who control them.

33 The defendants challenge this description of the developers' position and of the likelihood that software updates would be accepted. The debate involves the concept of "decentralisation", which includes the suggestion that the developers are better seen as a large and shifting class, and the idea of "forks". It is summarised in the judgment at paras 34 and 35:

> "34. The defendants challenge this, portraying (particularly in the case of the BTC developers) a decentralised model in which, to the extent that they are or continue to be involved in software development for the Networks (which is disputed for some of them), they are part of a very large, and shifting, group of contributors without an organisation or structure. Further, any change that they were able to propose to address [*Tulip's*] complaint would be ineffective, because miners would refuse to run it and instead would continue to run earlier versions of the software. What [*Tulip*] sought went against the core values of bitcoin as a concept. A disagreement could lead to a 'fork' in the Networks, resulting in the creation of additional networks rather than a resolution of the issue. The fifteenth and sixteenth defendants also claim that if they attempted to make the changes sought to the BCH ABC Network it would have a severely detrimental effect on their reputations, and participants would refuse to adopt them.
>
> "35. [*Tulip*] disputes this, maintaining that there is no mechanism among miners that could allow for a collective refusal to accept a software update, the consensus mechanism that does exist being limited to the acceptance by nodes of blocks of transactions verified by other nodes (by using the hash value produced as the starting point for the next block), rather than relating to the protocols that govern the Network. A fork would only be created if some of the developers refused to make the change. If some developers produced rival protocols, then a split could occur, such as those that resulted in the different Networks in this case. However, the controlling developers are parties to these proceedings and would be bound by the court's order."

34 That debate could not be resolved in the jurisdiction application, nor on this appeal, although one ground of appeal is a submission that part of the reasoning in the judgment involved an unwarranted acceptance of part of the defendants' disputed case on decentralisation.

35 At this stage I refer to the academic literature, which was cited below. A paper refers to "the myth of decentralised governance" and argues that the developers of public blockchain systems like bitcoin are fiduciaries. The paper is entitled "*In Code(rs) we trust: Software Developers as Fiduciaries in Public Blockchains*" by Angela Walch of St Mary's University San Antonio Texas and UCL Centre for Blockchain Technologies and appears as a chapter in *Regulating Blockchain, Techno-Social and Legal Challenges*, (2019) ed Hacker, Lianos, Dimitropoulos & Eich. Nevertheless there is also academic literature supporting the contrary view, ie Haque et al "Blockchain Development and Fiduciary Duty" (2019) 2.2 Stanford Journal of Blockchain Law and Policy, 139.

© 2023. The Incorporated Council of Law Reporting for England & Wales

**36** The judgment refers to this literature compendiously at para 66 noting that it is not written from an English legal perspective. That is true. Nevertheless it seems to me that the Walch paper in particular provides independent support, if it were needed, for the idea that Tulip's challenge to the case on decentralisation is arguable.

**37** The position of Tulip concerning its ownership of the bitcoin and the hack was addressed fully by the judge in paras 23–31. To recap briefly, Tulip claims that it is the owner of bitcoin at the addresses mentioned above. It also claims that the relevant private keys were kept in encrypted electronic file(s) which were password protected. The loss of the files due to a hack was discovered in February 2020 and reported to Surrey police (Dr Wright lives in Surrey). Dr Wright believes the bitcoin may not have been moved from the addresses because although the hackers have taken the files, they cannot crack the encryption which protects the private keys inside them.

**38** One might wonder how Tulip's bitcoin (assuming that is what it is) can be transferred without the private key and so restored to Tulip. The answer is Tulip's submission that it is incorrect to suggest that bitcoin may only be transferred using private keys. It is true that as the bitcoin software is currently coded, a user cannot transfer bitcoin on the blockchain other than with the relevant private key, however, as the judge explained in para 21:

> "Dr Wright maintains that it is not technically difficult for a patch to the computer code that operates the relevant Network to be developed which would have the effect of transferring the digital assets to which access has been lost to a new address. That new address would have a (new) private key, which the rightful owner could then use to regain access to their digital assets, and a public key. … [*Tulip*] claims alternatively that the patch the Defendants could provide could ensure that [*Tulip*] regains control of the assets in their existing locations, which I assume would involve allocating replacement private keys to the existing addresses. In either case, however, the relief sought is a patch which would resolve the position for [*Tulip*] alone."

**39** One aspect of the defendants' case is that if such a patch was added to the bitcoin network source code at the relevant GitHub database, then the miners might not accept it and a fork would or may occur, but the likelihood of that happening is an aspect of the dispute on decentralisaton which cannot be resolved without a trial.

**40** The essence of Tulip's case is that the result of all this is that the developers, having undertaken to control the software of the relevant bitcoin network, thereby have and exercise control over the property held by others (ie bitcoin), and that this has the result in law that they owe fiduciary duties to the true owners of that property with the result that, on the facts of this case, they are obliged to introduce a software patch along the lines described above, and help Tulip recover its property.

*The law on the incidence of a fiduciary duty*

**41** For the purpose of this appeal the case on whether the defendants owe a duty in law on these facts can focus entirely on the fiduciary duty. As the case was argued by the claimant, the duties in tort only arise if the defendants do owe a fiduciary duty. Even if there is a fiduciary duty, it does not follow that the pleaded duties in tort necessarily must arise but there is a sufficiently close relationship between the issues that if the appeal should be allowed on fiduciary duty, the right course would be to allow the appeal on the tortious duties as well and allow the case as a whole to go forward.

**42** The classic definition of a fiduciary was set out by Millett LJ in the following passage from *Bristol and West Building Society v Mothew* [1998] Ch 1, 18A–C:

> "A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary."

7

**43** Millett LJ's test has often been cited with approval, including by the Supreme Court in *FHR European Ventures LLP v Cedar Capital Partners LLC* [2014] UKSC 45; [2015] AC 250, para 5 and, more recently, in *Children's Investment Fund Foundation (UK) v Attorney General* (also referred to as *Lehtimaki v Cooper*) [2020] UKSC 33; [2022] AC 155. In the latter case at para 44 Lady Arden JSC said:

> "There has been considerable debate as to how to define a fiduciary, but it is generally accepted today that the key principle is that a fiduciary acts for and only for another. He owes essentially the duty of single-minded loyalty to his beneficiary, meaning that he cannot exercise any power so as to benefit himself."

**44** Tulip framed its case by reference to the "reasonable expectations" of persons about the behaviour of a putative fiduciary. The idea of using "reasonable expectations" as a tool for identifying a fiduciary relationship seems to stem from academic work by Professor Paul Finn (later Finn J). One way of expressing the idea is as follows:

> "… a person will be a fiduciary in his relationship with another when and insofar as that other is entitled to expect that he will act in that other's interest to the exclusion of his own several interest."

[taken from a 1989 article by Professor Finn, cited in the judgment of Newey J in *Vivendi v Richards* [2013] EWHC 3006 (Ch) [2013] BCC 771, para 138].

**45** However in *Children's Investment Fund* in the Supreme Court Lady Arden JSC referred to the fact that the Court of Appeal in the same case had adopted a test based on reasonable expectations (put forward by Finn J, by then a judge sitting in the Federal Court of Australia, in *Grimaldi v Chameleon Mining NL (No 2)* (2012) 200 FCR 296, para 177). At para 48 Lady Arden JSC said:

> "This formulation introduces the additional concept of reasonable expectation of abnegation of self-interest. Reasonable expectation may not be appropriate in every case, but it is, with that qualification, consistent with the duty of single-minded loyalty."

**46** Therefore, at least in this jurisdiction, the concept of reasonable expectations may have explanatory power after the event in some cases but cannot be used as a touchstone for classifying a relationship as fiduciary or not. The definitive test remains as set out in *Mothew*.

**47** Tulip also relied on Mason J's dissenting judgment in *Hospital Products Ltd v United States Surgical Corpn* [1985] LRC (Comm) 441 (another Australian case) for the proposition that an imbalance of power and vulnerability are the defining characteristics of a fiduciary relationship. However, as pointed out by the respondents, the Chief Justice, with whom the majority agreed, said at para 32 that: "it is clear that [inequality of bargaining power] alone is not enough to create a fiduciary relationship in every case and for all purposes".

**48** It also important to note that the question of whether someone is a fiduciary is an objective one. As set out in *Mothew* at p 18C: "[the fiduciary] is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary". As explained by Sales J in *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No 2)* [2011] EWHC 1731 (Ch); [2012] Ch 613, para 225, fiduciary obligations are "imposed by law as a reaction to particular circumstances of responsibility assumed by one person in respect of the conduct of the affairs of another". In *Vivendi SA v Richards* [2013] BCC 771, para 139, Newey J put it clearly that: "the question whether there was such an undertaking/assumption must be determined on an objective basis rather than by reference to what the alleged fiduciary subjectively intended".

**49** Finally, *Mothew* also clarifies at p 18H that a fiduciary is in breach of their obligation of undivided loyalty if they act for two principals who have potentially conflicting interests without obtaining the informed consent of both.

*The judgment below*

**50** The judge held (paras 53–83) that, assuming in Tulip's favour that it would be able to establish the facts on which it relies at a trial, nevertheless Tulip had no realistic prospect of establishing that a fiduciary duty of the kind alleged was owed by the defendants to Tulip. The detailed reasoning in support of this conclusion is in paras 73 to 83.

**51** At para 73 the judgment characterises the foundation of Tulip's case as the alleged imbalance of power combined with the fact that Tulip had "entrusted" its property to the

8

defendants. Imbalance of power is rejected as relevant because it is not a defining characteristic or a sufficient condition for the existence of the duty. On entrustment the finding is that, (para 73):

> "… Further (and to the extent relevant), I do not think that bitcoin owners can realistically be described as entrusting their property to a fluctuating, and unidentified, body of developers of the software, at least in the sense and to the extent claimed by [*Tulip*]."

**52** Para 74 addresses the developers' ability to introduce for their own advantage a bug or feature into the software that compromised owners' security but served their own purposes, finding:

> "… I can see that it is conceivable that some form of duty could be engaged in that situation, although whether it would properly be characterised as a fiduciary duty is another matter. At least it could be said that in that situation the developers making the update had arguably assumed some responsibility by performing that function, although I think it is much more doubtful whether that would amount to a relationship requiring single-minded loyalty."

**53** Para 75 and later para 82 address the fact that Tulip's case involves the imposition of a positive duty (to introduce a software patch), acknowledging that *Attorney General v Blake* [1998] Ch 439; [1998] 2 WLR 805 did not exclude the possibility of the court requiring a fiduciary to perform positive steps. The positive duties alleged by Tulip are held to go well beyond the kinds of activity recognised in previous cases (para 82 last sentence). Also in this respect para 75 notes that the assumption of responsibility Tulip has to rely on is:

> "the defendants' alleged control of the Networks and their alleged *ability* to make a change to the software, irrespective of whether they are actually engaged in making changes, and in the absence of any more general contractual or other obligation to make changes in the future."

**54** At the end of para 75 the point is made that it cannot realistically be argued that the defendants owe continuing obligations to remain as developers and make future updates whenever they might be necessary.

**55** Paras 76–80 address what is described as a fundamental difficulty for Tulip, ie the defining characteristic of a fiduciary relationship—the obligation of undivided loyalty. Tulip had accepted that the fiduciary duty it relies on must be owed to bitcoin owners generally, however the difficulty which remains was said to be that the steps that Tulip would require to be taken were a specific software patch for its benefit alone rather than a systemic change for the benefit of other users. This could be to the disadvantage of other participants in the Network, most obviously to those with a rival claim to the assets. Tulip's answer to that latter point was that the duty owed is to the true owner of bitcoin and not others, and that if Tulip were established as the true owner then the relief sought would not breach any duty owed to other claimants. This raised a point on the nature of a declaration of ownership operating in personam rather than in rem and issued under CPR r 40.9.

**56** However the judge's main reason for rejecting Tulip's answer on this issue is given in paras 78 to 79:

> "78. I do not consider that this [*the argument the duty is owed to the true owner*] is a sufficient answer. It is uncontroversial that a fundamental feature of the Networks, at least in their existing form, is that digital assets are transferred through the use of private keys. [*Tulip*] effectively seeks to bypass that. There must be a real risk that acceding to [*Tulip*]'s demands would not be consistent with a duty of single-minded loyalty owed to other users.
>
> "79. At a general level, some users may not agree that a system change that allowed digital assets to be accessed and controlled without the relevant private keys, contrary to their understanding of how the system is intended to operate, accords with their interests, even if made only following an order of the English court declaring that [*Tulip*] owns those assets."

9

**57** Then at para 80, the judgment again refers to rival claimants for the bitcoin and highlights the problem that in acceding to Tulip's demand the defendants may be exposed to risk on their own account. Such a claim would not necessarily be brought in the English court. This passage concludes as follows:

"… Even if it could be argued that there was some form of relationship of trust and confidence, it does not follow that a duty of loyalty arises to [*Tulip*] to the exclusion of the interests of others, whether third parties or the defendants themselves."

**58** Finally at para 81 the concept of legitimate expectation is found to be useful in the present case on the footing that there is no realistic prospect of establishing that there was a reasonable, or legitimate, expectation, that the defendants would act only in Tulip's interests, in circumstances where that could expose them to real risk.

**59** In conclusion para 83 is as follows:

"As already indicated, at a general level I can see that any holder of digital assets on the Networks will have certain expectations, for example about the security of the Network and private keys, the efficacy of the 'proof of work' processes and indeed anonymity. A software change that compromised these might engender some cause for complaint by users (although that is far from saying that any duty that might arise in those circumstances would necessarily be in the nature of a fiduciary duty). But what I cannot see is a realistic basis for concluding that the pleaded facts could provide a basis for the imposition of a fiduciary duty in favour of [*Tulip*], together with a conclusion that that duty has been breached."

**60** Thus the claim based on fiduciary duty failed.

**61** At this stage it is convenient to address the part of the judgment dealing with the change in Tulip's case. This was covered in paras 114–125. There was a debate about procedure but the point of substance was that one of the difficulties about Tulip's case was that it required the defendants to investigate and make decisions about the (potentially) disputed ownership of the relevant bitcoin and then give effect to those decisions. This reflected the fact that Tulip pleaded that the defendants were already in breach of the duties. Tulip sought to answer this by submitting that its case included a contention based on anticipated breach. In other words an argument that while the defendants may not be in existing breach of the duty now, because the court has not yet positively declared that Tulip is indeed the owner, nevertheless the defendants' position was already clear that even if the court did grant such a declaration, they would not act in the manner Tulip said they should. Therefore although the breach had not yet occurred, it could clearly be anticipated in the circumstances. After all the key remedy sought by Tulip in this case is an injunction to require the developers to act.

**62** In terms of procedure, Tulip argued that there was no need to amend pleadings because this case was already covered by the existing pleadings. The judge held (para 117) that this anticipatory case was not covered by the existing pleading. Therefore (para 125) while permission to amend might have been granted if a proper application had been made, subject to costs, there was no such application and without it Tulip were not entitled to pursue this alternative case.

**63** The judgment on the merits ends with two final matters—policy considerations (paras 129–135) and a point on effectiveness of remedies (para 136–137). In relation to policy, para 133 accepts that the case raises important issues. However as the paragraph (and para 134) concludes, rightly in my view, the fact that a case raises important or difficult issues does not help if there is no serious issue to be tried. The section on policy ends at para 135 with a reference to the current Law Commission project on digital assets, which includes as areas for consideration both competing claims to digital assets and how legal remedies or actions can protect them, stating that:

" … Whether the law should be developed in a way that would address all or part of [*Tulip's*] case is no doubt something that could be considered by the Law Commission and, if appropriate, by Parliament."

**64** The point on the effectiveness of remedies related to the status of others who were not defendants and who might frustrate the purpose of the injunction sought in this case by Tulip. At paras 136–137 the judge concluded it was not necessary to decide the issue. I agree.

© 2023. The Incorporated Council of Law Reporting for England & Wales

*The grounds of appeal*

65 Permission was given on six grounds. It is convenient to start with ground 6, which relates to the change in Tulip's case. I am not surprised the judge refused to permit Tulip to rely on its alternative case in the circumstances as they were below. However Tulip has now provided draft Amended Particulars of Claim and has undertaken to apply to amend. Given the very early stage which these proceedings have reached, the only prejudice which would now be caused if permission is given can be compensated in costs. That means that the alternative case can be considered in this court, as part of the analysis of the other grounds of appeal.

66 Of the five remaining grounds, there is no need to consider ground 5 because it relates to duties in tort and as explained above, the tort case cannot succeed without the fiduciary claim but if the appeal succeeds on fiduciary duty, the same should follow for the tort claim.

67 The four relevant grounds of appeal are, very briefly:

(i) **Ground 1:** this is a developing, complex and uncertain area of law and therefore the point ought to go to trial;

(ii) **Ground 2:** the conclusions are in error because they are based on findings impermissibly assumed against Tulip (5 specific points are taken);

(iii) **Ground 3:** Taking into account the Law Commission project was an error;

(iv) **Ground 4:** The judge was wrong to hold that Tulip has no real prospect of establishing that the claimed fiduciary duties exist (this ground involves 7 specific points).

68 Of these grounds, the real issues relate to grounds 2 and 4. Ground 1 is best considered as a theme of Tulip's overall submissions rather than a free-standing submission. It is not capable of turning a case in which there really is no serious issue to be tried into a viable action which ought to go ahead. Ground 3 is a minor point and a poor one. The submission is that the reasoning in para 135 in effect used the existence of the Law Commission's project as a reason for not finding a fiduciary duty in this case. In fact by this stage of the judgment it is clear that the judge had formed the view that there was no serious issue to be tried. The relevant observation that the Law Commission is undertaking a project in this area was not deployed as a reason for denying a duty. It was an accurate observation that if the law should be developed beyond the point the judgment had identified then that is something the Law Commission could consider.

69 Two grounds are advanced by the respondent's notice. The first is that even if, which is denied, the judgment does proceed on a factual premise wrongly assumed against Tulip, even absent those matters Tulip's case still fails. The second is that regardless of whether it is permitted for Tulip to advance its alternative case, it does not raise a serious issue to be tried. In relation to the alternative case, there is a point on remedies which I will address below in context.

*Assessment*

70 I start the analysis with the passage from *Bristol and West Building Society v Mothew* [1998] Ch 1, 18A–C cited above. As counsel for Tulip submitted, what *Mothew* shows is that a fiduciary is someone who has undertaken a role with the relevant characteristics. Key characteristics are that the role involves acting for or on behalf of another person in a particular matter and also that there is a relationship of trust and confidence between the putative fiduciary and the other person. The reason for spelling this out is because in the present case, in my judgment, the developers are people who it is clearly arguable have undertaken a role which at least bears some relationship to the interests of other people, that is to the owners of bitcoins. Of course getting this far in the analysis is not sufficient to fix the developers with fiduciary duties, but these are important features of the circumstances, and they are also necessary components of what it means to be a fiduciary.

71 Next, it is relevant to observe that the facts of this case (whichever party is right about the details) are new and quite a long way from factual circumstances which the courts have had to examine before in the context of fiduciary duties. The categories in which fiduciary relationships can be identified are not closed; albeit that it is exceptional for fiduciary duties to arise other than in certain settled categories (per Leggatt J at para 157 of *Al Nehayan v Kent* [2018] EWHC 333(Comm); [2018] 1 CLC 216). Nevertheless the common law often works incrementally and by analogy with existing cases, and rightly so; but if the facts change in a way which is more than incremental I do not believe the right response of the common law is simply to stop and say that incremental development cannot reach that far.

72 The unusual factual feature of the present case is that literally all there is, is software. A physical coin has properties which exist outside the minds of people who use it and in that sense is tangible. Bitcoin is similar. It also has properties which exist outside the minds of individuals, but those properties only exist inside computers as a consequence of the bitcoin software. There is nothing else. And crucially, asserts Tulip, it is the developers who control

11

this software. On Tulip's case that control is very significant. In a bank the software developers as individuals will be tasked with maintaining the source code for the bank's accounts and payment systems, but they are subject to ultimate control by the board (and subject to regulation). The bank's developers have nothing like the control over the customer's assets which Tulip alleges the bitcoin developers have over bitcoin. These allegations are heavily contested by the developers in this case, who advance their case on decentralisation, but that cannot be resolved on this application or appeal.

**73** A further aspect of Tulip's case is to examine the manner in which the developers exercise their control over the software. Focussing on a software bug, if a third party identifies such a problem and the developers agree it should be fixed, then the developers will no doubt act to introduce a change in the source code in the relevant GitHub account, and computers on the network will update the software they are running (absent a fork, which again can only be a matter for trial). In other words the fulfilment of their role as developers involves taking active steps to update the code. It is not limited to such active steps, because the developers can also decline to update the code, but the role has a clear positive element.

**74** This analysis also demonstrates that the role involves the exercise of authority by the developers, given to them by their control of access to the source code, and it is a decision-making role, in effect making decisions on behalf of all the participants in the relevant bitcoin network, including miners and also including the owners of the bitcoin. These features, of authority and of discretionary decision making, are common to fiduciary duties (see *Al Nehayan* para 159).

**75** A point which took on more significance on appeal than it may have had below is whether it is arguable that the developers owe at least some kind of fiduciary duty to bitcoin owners, different from the one pleaded by Tulip. The example would be a duty not to introduce a feature for their own advantage that compromised owners' security, referred to in judgment para 74.

**76** I agree with the judge that it is indeed conceivable that relevant individuals—when they are acting in the role of developers—should be held to owe a duty in law to bitcoin owners not to compromise the owners' security in that way. It would be a duty which involves abnegation of the developer's self-interest. It arises from their role as developers and shows that the role involves acting on behalf of bitcoin owners to maintain the bitcoin software. It is also single minded in nature at least in the sense that it puts the interests of all the owners as a class, ahead of the developer's self-interest. It is, I would say, arguably a fiduciary duty. It is difficult to see what other sort of duty it could be.

**77** The significance of this conclusion is that it undermines part of the defendants' case, which if correct would deny any fiduciary duty of any sort. One of the points made in the judgment (at para 73) is that there is no entrustment by owners because the developers are a fluctuating and unidentified body. Tulip does not agree with that characterisation. It is in fact part of the developers' case on decentralisation and, no doubt inadvertently, the judgment here accepted a highly contested fact as a premise. In my judgment, as Tulip submits on appeal ground 2C and 4A, this is a significant flaw in that part of the reasoning. Moreover if such a point were sound, it would be just as good as a reason to deny the fiduciary duty I have just identified as arguable.

**78** A further step from here is to examine whether the arguable duties arising from the role the developers have undertaken include not only a negative duty not to exercise their power in their own self-interest but a positive one to introduce code to fix bugs in the code which are drawn to their attention. It would be a significant step to define a fiduciary duty in that way, but since the developers do have the practical ability to prevent anyone else from doing this, one can see why a concomitant duty to act in that way is properly arguable. Without the relevant password (etc) for the bitcoin software account in Github, no one else, such as a concerned bitcoin owner, could fix the bug. If a bitcoin owner identified a bug and wrote the code to fix it, that fix could still only be implemented if the developers agreed to do so in the exercise of their de facto power. In a very real sense the owners of bitcoin, because they cannot avoid doing so, have placed their property into the care of the developers. That is, in my judgment, arguably an "entrustment".

**79** Moreover, in terms of legitimate expectations (see judgment para 81) it is realistic to say that bitcoin owners have a legitimate expectation that the developers will not exercise their authority in their own self-interest to the detriment of owners, and that they will act in good faith to use their skills to fix bugs in the software drawn to their attention.

**80** Again if this analysis is arguably correct, as I believe it to be, it undermines the defendants' case about competing interests and undivided loyalty (see judgment at paras 76–80). There may well not be a consensus amongst bitcoin owners that a given bug should be fixed in a particular way or at all. But the developers will still make a decision to make a change or not, and no doubt

12

act in good faith in doing so. The fact there may not be a consensus amongst owners does not of itself undermine the conclusion that the duty of developers is fiduciary in nature. If anything it serves to underline the fact that the owners really do place trust in the developers to make good decisions on their behalf. The informed consent of the owners as a whole to the developers to exercise their authority this way can be inferred from the circumstances (cf *Mothew* [1998] Ch 1, 18H and *Kelly v Cooper* [1993] AC 205). Trustees will often have to make decisions which have the result of favouring the interests of one beneficiary over another, but that does not mean they cease to be fiduciaries as a result. Therefore even if a change was only for the benefit of one owner (such as in this case), that does not preclude it being in accordance with the relevant fiduciary duty.

81 The final step relates to the specific duties pleaded in this case. These undoubtedly go even further. Focussing on Tulip's case as amended and putting it at its highest, the duty is said to arise when it is established (eg by a court of competent jurisdiction) that the true owner of the bitcoin at a certain address is unable to access it because their private key has been stolen by thieves. The true owner's property is vulnerable because the thieves might be able to extract the private key from what they have stolen and transfer the owner's bitcoin for themselves. The duty which is said to arise in these circumstances is to introduce a code update which will transfer that bitcoin into a safe account controlled by the true owner or which will safeguard that bitcoin in some other way.

82 Tulip's amended case arguably removes one of the difficulties with its case as put previously, that the developers were already in breach only because they had not acted after Tulip raised its claim with them. The amended case puts the duty on the basis that it is only breached if the developers do not act with the benefit of a decision of a court of competent jurisdiction on the ownership of the property. The developers do not have to adjudicate the dispute themselves.

83 Nevertheless I recognise that a decision of this court in a dispute within its jurisdiction will only be in personam and not in rem, but that is true in any or at least most property disputes. A question posed is the risk to which developers may be exposed by an order of this court based on a decision that they are in breach of fiduciary duty. What if a rival claimant went to a different court and obtained a contrary judgment or order? The answer in my judgment is that this concern, which I accept may not be fanciful, cannot be a reason why there is not a serious issue to be tried in what would otherwise be a properly arguable case within the court's jurisdiction. Taken to its logical limit the problem would arise whichever court a claim of this kind came before and would lead to the view that there is no court which can adjudicate the claim. That is not right. The internet is not a place where the law does not apply. It is worth repeating a point made at the beginning that there is no challenge at this stage to the judge's ruling that this case involves property situated in this jurisdiction.

84 In paras 78 and 79 the judgment notes that the change sought by Tulip would bypass what is currently a fundamental feature of the networks, namely that private keys are the only way to transfer the digital assets. This is said to risk being contrary to the duty of single minded loyalty but as I have explained above, the developers are already arguably entrusted with decision-making for the benefit of the owners as a class, even if some owners object. That loyalty seems to me to be capable of being sufficiently single minded to satisfy a legal test of fiduciaries.

85 In terms of the nature of the activity required to fulfil the duty, it is relevant that it is an act of the same kind as the actions the developers undertake to fulfil their ordinary role, i e a code update. The difference between positive and negative steps is very fact dependent. There is not always a clear cut distinction. The only real difference between the activity alleged to be required to fulfil this duty and the normal acts of the developers lies in the circumstances triggering it. I therefore do not regard the fact that updating software involves a positive step by the developers (cf *Attorney General v Blake* [1998] Ch 439) is a sound basis for saying there is no realistic prospect of success.

86 Pulling all this together, I recognise that for Tulip's case to succeed would involve a significant development of the common law on fiduciary duties. I do not pretend that every step along the way is simple or easy. However there is, it seems to me, a realistic argument along the following lines. The developers of a given network are a sufficiently well defined group to be capable of being subject to fiduciary duties. Viewed objectively the developers have undertaken a role which involves making discretionary decisions and exercising power for and on behalf of other people, in relation to property owned by those other people. That property has been entrusted into the care of the developers. The developers therefore are fiduciaries. The essence of that duty is single minded loyalty to the users of bitcoin software. The content of the duties

13

includes a duty not to act in their own self interest and also involves a duty to act in positive ways in certain circumstances. It may also, realistically, include a duty to act to introduce code so that an owner's bitcoin can be transferred to safety in the circumstances alleged by Tulip.

87 In reaching this conclusion I have addressed all the major points advanced by Tulip on this appeal, as well as the first ground of the developers' respondent's notice. They were: the fluctuating class of developers/decentralisation/entrustment (ground 2C and 4A), single minded loyalty and conflicting duties (ground 4B and 4C), rival claimants, risks to the developers and expectations (ground 4D and 2A), positive steps (ground 4F), a change only for one owner's benefit (ground 4E).

88 I have not addressed the imbalance of power directly (ground 4G) because it does not add anything to the fiduciary analysis. I believe it is a potential distraction, which is a similar reason to the judge's decision to put that point to one side. Nor have I addressed ground 2D (owners are anonymous) or 2E (insurance) because they do not advance the issues.

*Respondent's notice ground 2 — remedies*

89 The respondent's notice ground 2, as put in relation to Tulip's alternative case, is that the injunction sought if Tulip's case was made out is not realistically arguable because Tulip has not sought relief "against the alleged hackers or the operators of the wallets from which the bitcoin was allegedly stolen". To the extent this point was still pressed in this case, it is not a good one. It is true that today there is a well-developed practice of interim remedies relating to cryptoassets in the Business and Property Courts, including the Commercial Court and the Chancery Division. This includes freezing orders such as those against cryptocurrency exchanges and/or the holders of private keys, and information orders. However it was accepted in argument, rightly in my judgment, that none of these remedies would avail this claimant in this case because, on its case, Tulip does not know who stole the private keys.

90 The right place to examine the efficacy of remedies in this case would be at trial.

*Conclusion*

91 I would allow this appeal. The conclusion is not that there is a fiduciary duty in law in the circumstances alleged by Tulip, only that the case advanced raises a serious issue to be tried. The time to decide on the duty in this case is once the facts are established. As the judgment itself showed, to rule out Tulip's case as unarguable would require one to assume facts in the defendant developers' favour which are disputed and which cannot be resolved this way. If the decentralised governance of bitcoin really is a myth, then in my judgment there is much to be said for the submission that bitcoin developers, while acting as developers, owe fiduciary duties to the true owners of that property.

**POPPLEWELL LJ**
92 I agree.

**LEWISON LJ**
93 I also agree.

*Appeal allowed.*

ALISON SYLVESTER, *Barrister*

© 2023. The Incorporated Council of Law Reporting for England & Wales

# Exhibit P

# SHARP v BLANK

## Chancery Division

## Nugee J: 12 November 2015

### [2015] EWHC 3220 (Ch); [2017] B.C.C. 187

**H1** *Directors—Duties of directors—Fiduciary duties—To whom directors' duties owed—Takeover—Information provided to shareholders of offeror company—Shareholders alleged they relied on the directors' information—Whether directors owed duty to shareholders—Whether special factual relationship between directors and shareholders—Duty to provide sufficient information—Claim by shareholders for breach of fiduciary and tortious duties—Application by directors for summary judgment or to strike out parts of particulars of claim.*

**H2** This was a claim by shareholders in a bank against former directors for breach of fiduciary duties in the bank's takeover of another bank, including a duty to provide the shareholders with sufficient information to enable them to make an informed choice about the acquisition, where the directors applied for summary judgement or to strike out certain paragraphs of the particulars of claim, on the basis that they not owe any wider fiduciary duties to the claimant shareholders because no special relationship existed between them and they had not undertaken to act for the shareholders in any more extended sense.

**H3** The defendants were directors of Lloyds Bank which had taken over "HBOS" at what was later claimed to be an excessive price (and Government intervention was later required to sustain Lloyds). The takeover also required a recapitalisation of Lloyds. The claimants, who were shareholders in Lloyds, contended that the defendants advised the Lloyds shareholders that the acquisition of HBOS and the recapitalisation scheme were in the shareholders' best interests and recommended that they approved those transactions. The claimants later alleged misrepresentations and omissions by the directors in relation to the acquisition and pleaded breach of various fiduciary and tortious duties by the defendant directors. They contended that the directors had had the benefit of detailed disclosure by HBOS and full access to the books and records of HBOS so that the knowledge of the directors of Lloyds of the financial circumstances of HBOS was vastly superior to the knowledge of the Lloyds shareholders who relied on the directors to provide them with information. Further, that the directors provided disclosure of information relating to the proposed transactions and in giving such advice, making such recommendations and providing disclosure of information the defendants voluntarily undertook responsibility for the correctness of the advice and recommendations given to the shareholders and the completeness and accuracy of all material information provided in respect of the proposed transactions. The directors accepted that they owed a "sufficient information duty" to provide shareholders with sufficient information to enable them to make an informed decision about how to vote in relation to the acquisition. They also accepted, in light of that, that they owed duties not to mislead or conceal material information and to advise and inform the shareholders in clear and comprehensible terms. However, they denied that they owed various other fiduciary duties which

had been pleaded and submitted that they did not owe fiduciary duties to the shareholders and that it would not be possible for the shareholders to establish certain claims that the directors had breached tortious duties by putting the proposed acquisition to the shareholders and permitting a meeting to take place on the basis of what they knew to be incomplete and misleading information. The directors applied for summary judgement and/or to strike out parts of the particulars of claim.

**H4 Held,** striking out certain parts of the particulars of claim:

**H5** 1. It was well established that directors of a company owed fiduciary duties to the company. This flowed from the fact that directors were agents of company and stewards of its affairs. In general directors did not, solely by virtue of their office of director, owe fiduciary duties to the shareholders, collectively or individually, as a company was distinct from its members. The directors directed and controlled the affairs and assets of the company: they did not direct or control the affairs or assets of the members. (*Peskin v Anderson* [2001] B.C.C. 874 applied.) The general principle that directors did not owe fiduciary duties to shareholders was also said to be supported by a number of policy considerations.

**H6** 2. There were however circumstances where directors have been held to owe particular fiduciary duties to shareholders. Such duties were dependent on establishing a "special factual relationship" between the directors and the shareholders in the particular case (*Peskin v Anderson* (above), *Allen v Hyatt* (1914) 30 T.L.R. 444, *Coleman v Myers* [1977] 2 N.Z.L.R. 225, *Re Chez Nico (Restaurants) Ltd* [1991] B.C.C. 736 considered.) This special relationship must be something over and above the usual relationship that any director of a company has with its shareholders. It was not enough that the director as such has more knowledge of the company's affairs than the shareholders have, nor was it enough that the actions of the directors would have the potential to affect the shareholders: since directors directed and controlled the company's affairs this would almost inevitably be the case. The sort of relationship that has given rise to a fiduciary duty to shareholders has been where there has been some personal relationship or particular dealing or transaction between them.

**H7** 3. A fiduciary was someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust and confidence. (*Bristol & West Building Society v Mothew* [1998] Ch. 1 applied.) That was why the distinguishing obligation of a fiduciary was the obligation of loyalty: someone who has agreed to act in the interests of another has to put the interests of that other first. But the relationship between directors and shareholders was not in general like that. A director was a fiduciary for his company: by agreeing to act as director, he necessarily agreed to act in the interests of the company but he did not have, by virtue of his appointment, any direct relationship with the shareholders. The interests of the shareholders and the company were in general aligned but that did not mean that a director agreed to act for the individual shareholders or had a direct relationship with them: his relationship was with the company. If he was to be held to owe fiduciary duties to the individual shareholders, there must be something unusual in the nature of the relationship which gave rise to it. That explained why the cases where such a duty was held to exist mostly concerned companies which were small and closely held, where there was often a family or other personal relationship between the parties, and where, in almost all cases, there was a particular transaction involved in which directors were dealing with the shareholders, from which the directors often stood to benefit personally. The present case was a long way removed from that paradigm case.

**H8** 4. The facts relied on did not plead any special relationship between directors and shareholders such as the authorities required. All that the pleaded facts amounted to was that the directors, who knew more about the company than the shareholders, gave the shareholders advice and information to enable them to decide how to vote at the relevant meeting. It was not disputed that such a relationship

gave rise to a duty, namely the sufficient information duty, which was expressly accepted to include a duty not to mislead or conceal material information and a duty to give advice and information in clear and readily comprehensible terms. But once this duty was accepted, there was no other duty on the facts. There was nothing which came close to a relationship where the directors had undertaken to act for or on behalf of the shareholders in such a way as to give rise to a duty of loyalty, or have undertaken an obligation to put the interests of shareholders first, or were themselves entering into transactions with the shareholders, or where there were any of the other hallmarks of a fiduciary relationship.

**H9** 5. The correct starting point was to identify what the content of the sufficient information duty was. Directors had a duty in equity to give to shareholders sufficient information for them to make informed decisions about proposals to be put to them at meetings. The essence of the duty was reasonableness or fairness in the circumstances having regard to the interests of the company as a whole. (*Re RAC Motoring Services Ltd* [2000] 1 B.C.L.C. 307, *Residues Treatment & Trading Co Ltd v Southern Resources Ltd* (1988) 14 A.C.L.R. 375 considered.) There was no suggestion that the sufficient information duty shared the characteristics typical of fiduciary duties owed by those who had undertaken to act in the interests of others and who had agreed to serve the interests of others with loyalty. The wellspring of this duty was not that the directors agreed to put the interests of the shareholders first, but the much more simple one that if they were going to invite the shareholders to a meeting, common fairness required that they explained what the purpose of the meeting was. That included being clear and comprehensible and not misleading or tricky; but the reason for this was one of fairness, not of loyalty. It was very doubtful that it was appropriate to describe this duty as a fiduciary duty at all, but whether or not that was so it did not seem that the duty included all the usual attributes of fiduciary duties.

**H10** 6. Therefore the sufficient information duty did not include the fiduciary duties which the shareholders claimed were owed to them by the directors: to act in good faith, to act in the best interests of the shareholders and to prevent them from suffering loss; not to place themselves in a position where their duties to the shareholders conflicted with their personal interests or duties to third parties, and to act for a proper purpose. Those duties would therefore be struck out as they disclosed no reasonable grounds for bringing the claim.

**H11** 7. Other claims concerning breach of tortious duties were struck out. Those pleadings were unsustainable as they did not require the shareholders to establish causation by proving what would have happened if the directors had not called the meeting and had made the disclosure which the shareholders said they should have made. There was no suggestion that the shareholders could establish the necessary causation.

**H12 Cases referred to:**
*Allen v Hyatt* (1914) 30 T.L.R. 444 (PC)
*Breen v Williams* [1997] 1 L.R.C. 212 (HCA)
*Bristol & West Building Society v Mothew* [1998] Ch. 1 (CA)
*Brunninghausen v Glavanics* [1999] NSWCA 199; (1999) 32 A.C.S.R. 294
*Chez Nico (Restaurants) Ltd, Re* [1991] B.C.C. 736 (Ch)
*Coleman v Myers* [1977] 2 N.Z.L.R. 225 (NZCA)
*Crawley v Short* [2009] NSWCA 410
*Dusik v Newton* (1985) 62 B.C.L.R. 1 (BCCA)
*Foss v Harbottle* (1843) 2 Hare 461 (Ch)
*Kaye v Croydon Tramways Co* [1898] 1 Ch. 358 (CA)

*Percival v Wright* [1902] 2 Ch. 421 (Ch)
*Peskin v Anderson* [2000] B.C.C. 1110 (Ch); [2001] B.C.C. 874 (CA)
*Pilmer v Duke Group Ltd (in liq.)* [2001] 2 B.C.L.C. 773 (HCA)
*Platt v Platt* [1999] 2 B.C.L.C. 745 [2001] (Ch); 1 B.C.L.C. 698 (CA)
*Prudential Assurance Co Ltd v Newman Industries Ltd (No.2)* [1982] Ch. 204 (CA)
*RAC Motoring Services Ltd, Re* [2000] 1 B.C.L.C. 307 (Ch)
*Residues Treatment & Trading Co Ltd v Southern Resources Ltd* (1988) 14 A.C.L.R. 375 (SASC)
*Salomon v A Salomon & Co Ltd* [1897] A.C. 22 (HL)
*South Australia Asset Management Corp v York Montague Ltd* [1997] A.C. 191 (HL)
*Stein v Blake* [1998] B.C.C. 316 (CA)
*Tiessen v Henderson* [1899] 1 Ch. 861 (Ch)
*Valastiak v Valastiak* [2010] BCCA 71

**H13** *Alan Steinfeld QC* and *Stuart Adair* (instructed by Harcus Sinclair UK Ltd) for the claimants.
*Helen Davies QC* and *Tony Singla* (instructed by Herbert Smith Freehills) for the defendants.

## JUDGMENT

## NUGEE J:

### Introduction

**1.** This is the last in a series of judgments or rulings that I have given either orally or in writing in relation to the defendants' application for summary judgment under CPR r.24.2 and/or a strike out under CPR r.3.4(2)(a) in relation to various parts of the particulars of claim. The background is well known to the parties and briefly summarised in my judgment on the LIBOR allegation and I need not repeat it. This judgment deals with a number of points of law raised by the defendants as to the claimants' pleading of fiduciary and tortious duties owed by the defendant directors to the claimants as shareholders in Lloyds.

### The pleadings

**2.** The generic particulars of claim contain the following allegations under the heading "the Duties owed to the Shareholders of Lloyds":

"37. The directors of Lloyds had had the benefit of detailed disclosure by the directors of HBOS and, through the teams carrying out due diligence, full access to the books and records of HBOS. In the premises, the knowledge of the directors of Lloyds of the financial circumstances of HBOS was vastly superior to the knowledge of the Lloyds shareholders. The Lloyds shareholders relied on the directors of Lloyds to provide them with information. The directors of Lloyds, including the Defendants, advised the shareholders of Lloyds that (a) Lloyds' acquisition of HBOS and (b) the recapitalisation of Lloyds through participation in the Recapitalisation Scheme were in their best interests and recommended that they approved both transactions. Further, the directors of Lloyds provided disclosure of information in various forms relating to the proposed transactions. In giving such advice, making such recommendations and providing disclosure of information the Defendants voluntarily undertook responsibility for:
    (1)  The correctness of the advice and recommendations given to Lloyds shareholders;

    (2)  The completeness and accuracy of all material information provided to the Lloyds shareholders in respect of the proposed transactions.

38. In advising the shareholders of Lloyds in relation to the merits of the acquisition of HBOS and recapitalisation, in providing information to the shareholders to enable them to make an informed decision as to whether or not to approve the acquisition of HBOS and the recapitalisation of Lloyds, in procuring and/or permitting the transactions to be put before the Lloyds shareholders for approval and in procuring the completion of the transactions the Defendants owed the shareholders of Lloyds (including, for the avoidance of doubt, the holders of Lloyds ADRs), including the Claimants, both fiduciary duties and a common law duty of care in tort.

39. The fiduciary duties owed to the shareholders of Lloyds (including the Claimants) by the Defendants included, *inter alia*, the following duties ('the Fiduciary Duties'):

    (1)  A duty to act in good faith;

    (2)  A duty to act in the best interests of the Claimants and to prevent them from suffering loss;

    (3)  A duty not to mislead the Claimants or conceal material information from them;

    (4)  A duty not to place themselves in a position where their duties to the Claimants conflicted with their personal interests or their duties or obligations to any third party;

    (5)  A duty to act for a proper purpose;

    (6)  A duty to advise and inform the shareholders of Lloyds in clear, and readily comprehensible terms.

40. Further, the common law duty of care owed to the shareholders of Lloyds (including the Claimants) by the Defendants included, *inter alia*, the following duties ('the Tortious Duties'):

    (1)  A duty to use reasonable care and skill when providing advice and information to the Claimants;

    (2)  A duty to ensure that the information provided to the Claimants was complete and did not contain any material omissions;

    (3)  A duty to ensure that any advice provided to the Claimants was reasoned and supported by the information available to the Defendants;

    (4)  A duty not to mislead the Claimants or conceal information from them.

    (5)  A duty to take all reasonable steps to prevent the claimants from suffering loss and damage."

**3.** So far as tortious duties are concerned it is admitted in the defence (at para.37(e)(1)) that the defendant directors owed the shareholders a duty to take reasonable care and skill in insofar as they made any written statements and/or provided any recommendations in certain documents (the announcement, revised announcement and circular, which included the chairman's letter). It is not admitted that that extended to oral statements in the course of meetings and conference calls, but that is not a matter that has been argued before me.

**4.** Only one issue was raised by Ms Davies on this application in relation to the tortious duties pleaded and I will deal with that here. It concerned the plea in para.40(5) of the particulars of claim that the tortious duties involved a duty to take all reasonable steps to prevent the claimants from suffering loss and damage. It became apparent however in the course of argument that Mr Steinfeld did not attempt to support the duty pleaded in para.40(5) as a free-standing head of duty. He said that it had really been meant to plead that the loss that had been suffered was within the scope of the tortious duties relied on, so as to satisfy the requirement in *South Australia Asset Management Corp v York Montague Ltd* [1997] A.C. 191 that a claimant must not only show a breach of duty but that

"it was a duty in respect of the kind of loss which he has suffered". If that is what it was attempting to do it was not a particularly informative or successful way of doing it as para.40(5) did not identify any particular kind of loss at all; but I need not take up any time with this as Mr Steinfeld in effect accepted that it was not pleaded as tidily as it might have been. As I suggested in argument the effect that Mr Steinfeld said the plea was intended to achieve would be more accurately expressed by deleting para.40(5) as it currently stands and adding instead at the end of para.40 a plea that the scope of the tortious duties pleaded in para.40(1)–(4) above included a duty in respect of the kinds of losses which the claimants claim to have suffered as pleaded below, with a cross-reference to where the plea of loss and damage can be found. I did not understand Mr Steinfeld to dissent from that or Ms Davies to object in principle to an amendment along those lines. No formal application to amend to that effect was before me but the claimants intend to tidy up their pleading in any event and I assume that this is one of the matters that will be addressed. In those circumstances I do not propose to say any more about that aspect of the application.

**5.** The remainder of this part of Ms Davies' application concerned the plea of fiduciary duties. The defence admits at para.37(f) that the defendant directors owed a duty in equity in these terms:

> "It is admitted and averred that between the date of the Announcement and the date of the EGM the Director Defendants owed a duty in equity to the shareholders in Lloyds (including the Claimants) to provide them with sufficient information as to enable them to make an informed decision as to how to vote at the EGM in relation to Lloyds' acquisition of HBOS and its participation in the Recapitalisation Scheme."

I will call this the "sufficient information duty".

**6.** Although the application notice sought to strike out the whole of para.39 where the fiduciary duties are pleaded out, in the light of the defendants' acceptance that they owed the sufficient information duty, Ms Davies accepted that she could not really dispute the duties pleaded at para.39(3) (duty not to mislead or conceal material information) and 39(6) (duty to advise and inform the shareholders in clear and readily comprehensible terms); and although she said that the authorities suggested that the better description of the sufficient information duty was a "duty in equity" rather than a "fiduciary duty" she did not seek to argue which was correct, and was content to proceed on the basis that the duty was arguably a fiduciary one. I agree that what is important is the content of the duty, not the label put on it.

**7.** She did however object to the other duties pleaded. Her submission in summary was that directors of a company do not in general owe fiduciary duties to the company's shareholders, and that there is nothing in the facts relied on here that warrants the conclusion that the directors owed any other equitable duty than the sufficient information duty.

**8.** I accept this submission and I will now try and explain why.

### Fiduciary duties owed by directors

**9.** The general principles are well established:

(1)  The directors of a company owe fiduciary duties to the company. This is unexceptionable and flows from the fact that the directors are agents of the company and stewards of its affairs. As Mummery LJ puts it in *Peskin v Anderson* [2001] B.C.C. 874 at [33] the fiduciary duties owed by directors to the company "arise from the relationship between the directors and the company directed and controlled by them"; it is the fact that they are directors of the company's affairs which by itself gives rise to their fiduciary duties.

(2) But in general the directors do not, solely by virtue of their office of director, owe fiduciary duties to the shareholders, collectively or individually: *Peskin v Anderson* (above) at [29]. As pointed out by Handley JA in the New South Wales Court of Appeal in *Brunninghausen v Glavanics* [1999] NSWCA 199; (1999) 32 A.C.S.R. 294 at [40], this is in essence no more than an application of the principle established by *Salomon v A Salomon & Co Ltd* [1897] A.C. 22 that a company is distinct from its members. The directors direct and control the affairs and assets of the company; they do not direct or control the affairs or assets of the members.

(3) The general principle that directors do not owe fiduciary duties to shareholders has also been said to be supported by a number of policy considerations. Handley JA in *Brunninghausen* (above) referred to the fact that only the company, not its members, can sue for wrongs done to the company (under the rule in *Foss v Harbottle* (1843) 2 Hare 461), and the principle that where a wrong has been done to a company, individual shareholders are not able to sue for losses which are merely derivative or reflective (as exemplified by *Prudential Assurance Co Ltd v Newman Industries Ltd (No.2)* [1982] Ch. 204 and *Stein v Blake* [1998] B.C.C. 316—this is of course not a complete explanation as some losses claimed by shareholders go beyond merely reflective loss (as indeed in the present case). Handley JA also said that if the directors owed fiduciary duties to the shareholders they would be liable to harassing actions by minority shareholders, and exposed to a multiplicity of actions, each shareholder having his own personal claim. This latter point was also made by Mummery LJ in *Peskin v Anderson* (above) at [30] where he said that it was important that directors are not over-exposed to the risk of multiple legal actions by dissenting minority shareholders. At first instance in the same case Neuberger J said that to hold that a director owed some sort of general fiduciary duty to shareholders would involve placing an unfair, unrealistic and uncertain burden on a director, and would present him frequently with a position where his duty to shareholders would be in conflict with his undoubted duty to the company: [2000] B.C.C. 1110 at 1121. The idea of a potential conflict between the directors' duty to the company and their supposed duty to shareholders can also be found in *Percival v Wright* [1902] 2 Ch. 421, often regarded as the origin of this line of authority, where Swinfen Eady J referred to the fact that if directors owed a duty to disclose negotiations to shareholders it would place them in a most invidious position, as premature disclosure of negotiations might well be against the best interests of the company.

(4) The actual decision in *Percival v Wright* (above) has had a chequered history which it is not necessary to recount; whatever the merits of the actual decision, the general principle that directors do not owe fiduciary duties to their shareholders is confirmed by *Peskin v Anderson* and is not in doubt.

**10.** There are however circumstances where directors have been held to owe particular fiduciary duties to shareholders. The duties that arise in such cases are dependent on establishing a "special factual relationship" between the directors and the shareholders in the particular case: *Peskin v Anderson* (above) per Mummery LJ at [33]. Examples put before me are as follows:

(1) *Allen v Hyatt* (1914) 30 T.L.R. 444, a decision of the Privy Council in a Canadian appeal, where it was held that directors who had acquired shares from shareholders in order to sell them to a third party had made themselves agents for the shareholders, and hence were accountable for the profits they had made.

(2) *Coleman v Myers* [1977] 2 N.Z.L.R. 225, a decision of the Court of Appeal of New Zealand, where the company was an old established private company in which many of the shareholders,

individually or through trusts, were relatives, and two directors (father and son) engineered a takeover, persuading some members of the family to sell, and seeking to compel a reluctant minority. It was held that in the particular circumstances the directors owed fiduciary duties. Woodhouse J said (at 325) that in deciding the standard of conduct required from a director in relation to dealings with a shareholder it was not possible to lay down any general test, but some factors would usually be influential, including:

> "dependence upon information or advice, the existence of a relationship of confidence, the significance of some particular transaction for the parties and, of course, the extent of any positive action taken by or on behalf of the director or directors to promote it."

Cooke J thought it obvious that a fiduciary duty was owed in the particular circumstances of the case, summarising the facts which gave rise to the duty as being (at 330):

> "the positions of father and son in the company and the family; their high degree of inside knowledge; and the way they went about the take-over and the persuasion of shareholders."

Casey J (at 371) referred in particular to the fact that it must have been obvious to the son that other shareholders were reposing trust and confidence in him; and that the father was in everyone's eyes the head of the family group and its associated shareholders:

> "whom they respected to look after their personal interests in the management of the company."

(3) *Re Chez Nico (Restaurants) Ltd* [1991] B.C.C. 736, where Sir Nicolas Browne-Wilkinson V-C referred to *Coleman v Myers* (above) and said (at 750):

> "Like the Court of Appeal in New Zealand, I consider the law to be that in general directors do not owe fiduciary duties to shareholders but owe them to the company; however in certain special circumstances fiduciary duties, carrying with them a duty of disclosure, can arise which place directors in a fiduciary capacity vis-à-vis the shareholders. *Coleman v Myers* itself shows that where directors are purchasing shares in the company from outside shareholders such duty of disclosure may arise dependent on the circumstances of the case."

On the facts of the case he did not in fact have to decide whether such a duty arose or not.

(4) *Platt v Platt* [1999] 2 B.C.L.C. 745, a decision of David Mackie QC, sitting as a judge of the High Court. He held, following *Coleman v Myers* and the obiter comments in *Re Chez Nico*, that a fiduciary duty was owed where the oldest of three brothers, who was the only director of the company, bought out his younger brothers who held preference shares. The Court of Appeal ([2001] 1 B.C.L.C. 698) dismissed an appeal without expressing any views on this particular point.

(5) I was not referred to any other English case where such a fiduciary duty had been held to arise, although there are a number of other cases from overseas. It is not necessary to refer to them in any detail: see *Dusik v Newton* (1985) 62 B.C.L.R. 1 (where the Court of Appeal of British Columbia held that a special relationship existed between a director and the only other shareholder); *Brunninghausen* (also concerning a company with only two shareholders, where the sole director bought out the other shareholder); *Crawley v Short* [2009] NSWCA 410 (where one of three shareholders was bought out); and *Valastiak v Valastiak* [2010]

BCCA. 71 (misappropriation by director of company property held to be a breach of fiduciary duty to his wife who was the beneficial owner of half the shares). All these cases concerned small closely-held companies.

**11.** By contrast in *Peskin v Anderson* both Neuberger J and the Court of Appeal held that directors of the Royal Automobile Club Ltd who were contemplating a sale of the company's motoring services business did not owe a fiduciary duty to members who had resigned, or not renewed, their membership in ignorance of the proposals and who had thus missed out on substantial payments made to those who were members when the transactions completed. Mummery LJ said (at [59]) that there was "nothing special" in the factual relationship between the directors and the members, and no relevant dealings or negotiations between them.

**12.** I take it therefore to be established law, binding on me, that although a director of a company can owe fiduciary duties to the company's shareholders, he does not do so by the mere fact of being a director, but only where there is on the facts of the particular case a "special relationship" between the director and the shareholders. It seems to me to follow that this special relationship must be something over and above the usual relationship that any director of a company has with its shareholders. It is not enough that the director, as a director, has more knowledge of the company's affairs than the shareholders have: since they direct and control the company's affairs this will almost inevitably be the case. Nor is it enough that the actions of the directors will have the potential to affect the shareholders—again this will always, or almost always, be the case. On the decided cases the sort of relationship that has given rise to a fiduciary duty has been where there has been some personal relationship or particular dealing or transaction between them.

**13.** I do not find this surprising. A fiduciary, as explained by Millett LJ in his classic judgment in *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 18A–F, is someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust and confidence. That is why the distinguishing obligation of a fiduciary is the obligation of loyalty: someone who has agreed to act in the interests of another has to put the interests of that other first. But the relationship between directors and shareholders is not in general like that. A director is a fiduciary for his company: by agreeing to act as director, he necessarily agrees to act in the interests of the company. But he does not have, by virtue of his appointment as director, any direct relationship with the shareholders: no doubt the interests of the shareholders and the company are in general aligned but this does not mean that a director has agreed to act for the individual shareholders or has a direct relationship with them—his relationship is with the company. If he is to be held to owe fiduciary duties to the individual shareholders, there must be something unusual in the nature of the relationship which gives rise to it. That no doubt explains why the cases where such a duty has been held to exist mostly concern companies which are small and closely held, where there is often a family or other personal relationship between the parties, and where, in almost all cases, there is a particular transaction involved in which directors are dealing with the shareholders, from which the directors often stand to benefit personally. The imposition of a fiduciary duty in such circumstances reflects the fact that directors who have a close family or other personal relationship with shareholders, and are entering into transactions with them, may be tempted to exploit that relationship to take unfair advantage of the shareholders for their own benefit.

## Application of principles

**14.** The present case is a long way removed from that paradigm case. It is therefore necessary to consider what is said by the claimants to give rise to fiduciary duties nevertheless being owed. That

is found in para.37 of the particulars of claim. What is there said is effectively (i) that the directors had vastly superior knowledge to the shareholders, and (ii) that the shareholders relied on the directors to provide them with information. To this is added the plea that in giving advice, making recommendations and providing information, the defendants "voluntarily undertook responsibility" for the correctness of advice and recommendations and the completeness and accuracy of information. The language of voluntary undertaking of responsibility suggests that what the pleader had in mind was the well-known line of authority that the voluntary assumption of responsibility can be a factor in deciding whether a tortious duty of care is owed, and this part of the plea reads as if it is directed primarily at establishing a tortious duty. I will assume however that it is also directed at establishing fiduciary duties.

**15.** But even on this basis the facts relied on do not seem to me to plead any special relationship between directors and shareholders such as the authorities require. All that the pleaded facts really amount to is that the directors, who knew more about the company than the shareholders (the addition of "vastly" does not seem to me to change the analysis), were giving the shareholders advice and information to enable them to decide how to vote at the forthcoming extraordinary general meeting (EGM). That is the only relationship pleaded. It is not disputed that such a relationship—that is the relationship between directors who invite shareholders to vote at an EGM and give them advice and information in that connection, and the shareholders—does give rise to a duty, namely the sufficient information duty, which is expressly accepted to include a duty not to mislead or conceal material information, and a duty to give advice and information in clear and readily comprehensible terms. But once this duty is accepted, what other duty do these facts give rise to? In my judgment there is none. The relationship is one of giving advice and information for a particular purpose: there is nothing here which as far as I can see comes close to a relationship where the directors have in any more extended sense undertaken to act for or on behalf of the shareholders in such a way as to give rise to a duty of loyalty, or have undertaken an obligation to put the interests of shareholders first, or are themselves entering into transactions with the shareholders, or where there are any of the other hallmarks of a fiduciary relationship.

**16.** In my judgment the facts pleaded in para.37 of the particulars of claim do not amount to a special relationship which give rise to any fiduciary duties being owed by the directors to the shareholders beyond the sufficient information duty.

**Mr Steinfeld's argument**

**17.** Mr Steinfeld's argument did not really dispute the principles to be derived from the English and overseas authorities. His position was the simple one that once it was accepted that there was a fiduciary duty, the other duties pleaded in para.39 were all part of that duty as they were inherent in any fiduciary duty. He referred to the exposition in *Mothew's* case (above) of what the distinguishing duty of loyalty means: this includes acting in good faith and not putting oneself in a position of conflict.

**18.** This seems to me to fall into the error of starting by labelling a particular duty as a fiduciary duty and then using that label to determine what the content of the duty is. This is the wrong way round. One should first identify what the content of the duty owed by a person in particular factual circumstances is; it is then possible to characterise that duty as being fiduciary or not—and indeed to characterise the person as a fiduciary or not. As Millett LJ said in *Mothew* [1998] Ch. 1 at 18C:

"As Dr Finn pointed out in his classic work *Fiduciary Obligations* (1977), p.2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

**19.** It seems to me therefore that rather than starting with whether the sufficient information duty is a fiduciary duty and arguing for its content from that, the correct starting point is to identify what the content of the sufficient information duty is. This can be found conveniently set out in the judgment of Neuberger J in *Re RAC Motoring Services Ltd* [2000] 1 B.C.L.C. 307, an earlier round of litigation arising out of the disposal by the RAC of its motoring services business. At 327a–c, he cites from the Australian decision of *Residues Treatment & Trading Co Ltd v Southern Resources Ltd* (1988) 14 A.C.L.R. 375 at 377–378 where White J said:

"The directors have a duty in equity to give to shareholders sufficient information for them to make informed decisions about proposals to be put them at meetings."

And

"The essence of the duty is reasonableness or fairness in the circumstances having regard to the interests of the company as a whole."

**20.** White J referred in that case to the duty being of long standing, and Neuberger J himself cites at 326a-i from two cases from the end of the 19th century, *Kaye v Croydon Tramways Co* [1898] 1 Ch. 358, and *Tiessen v Henderson* [1899] 1 Ch. 861. Both cases characterise the rule as a rule of ordinary fairness: in the former case Sir Nathaniel Lindley MR refers to "ordinary fairness of language" and Rigby LJ to the purpose of the meeting being "fairly and in language that could be understood by ordinary people disclosed"; and in the latter case Kekewich J refers to the shareholder having "fair warning of what was to be submitted to the meeting".

**21.** I do not find in these citations—or in anything else that I was shown—any suggestion that the sufficient information duty shares the characteristics typical of fiduciary duties owed by those who have undertaken to act in the interests of others and who have agreed to serve the interests of others with loyalty. The wellspring of this duty is not that the directors have agreed to put the interests of the shareholders first, but the much more simple one that if they are going to invite the shareholders to a meeting, common fairness requires that they explain what the purpose of the meeting is. That includes being clear and comprehensible and not misleading or tricky; but the reason for this is one of fairness, not of loyalty.

**22.** In these circumstances I am very doubtful if it is appropriate to describe this duty as a fiduciary duty at all, but whether or not that is so (and as I have already said Ms Davies accepted that this was arguable), it does not seem to me that the duty includes all the usual attributes of fiduciary duties as set out in *Mothew's* case.

**23.** Specifically as to the duties pleaded in para.39:

(1) Paragraph 39(1) pleads a duty to act in good faith. The expression "good faith" is unfortunately an ambiguous one. In most cases to accuse someone of a breach of a duty of good faith is to accuse them of acting in bad faith, which itself connotes acting with some conscious improper motive. In the present case the claimants did initially plead that the defendants in some respects acted in bad faith, but they do not wish to pursue those allegations and have agreed that they will amend to delete them (although as appears below at least one seems to have survived, in para.121(5), I assume inadvertently). In those circumstances "good faith" in this sense is not in issue. In some contexts however, including that of fiduciary duties, the context of "good

faith" is used as a shorthand for certain duties, including in particular the duty of a fiduciary to disclose material facts before entering into a transaction with his principal, and it is possible to breach a duty such as that without conscious or deliberate impropriety. As Mr Steinfeld made clear, it is that extended sense of "good faith" which the claimants seek to invoke here, but for the reasons I have sought to give, that type of good faith obligation does not in my judgment form part of the sufficient information duty.

(2) Paragraph 39(2) pleads a duty to act in the best interests of the claimants and to prevent them from suffering loss. That duty cannot in my judgment be derived from the sufficient information duty.

Ms Davies also objected to this duty on the basis that fiduciary duties are always proscriptive not prescriptive, citing *Breen v Williams* [1997] 1 L.R.C. 212 at 250–251 and *Pilmer v Duke Group Ltd (in liq.)* [2001] 2 B.C.L.C. 773 at [69]–[83], both decisions of the High Court of Australia. I do not intend to embark on a discussion of this point, which seems to me to raise quite difficult issues—for example express trustees (who are certainly fiduciaries) are in some respects under a positive duty to act in the best interests of their beneficiaries, and one would have thought this was an example of a prescriptive fiduciary duty; it is sufficient to say, as I have, that whatever the scope of the sufficient information duty it does not extend to a positive duty to act in the best interests of the shareholders or prevent them from suffering loss.

(3) Paragraph 39(3) pleads a duty not to mislead the claimants or conceal material information from them and is not disputed.

(4) Paragraph 39(4) pleads a duty not to place themselves in a position of conflict. Again I do not think this can be derived from the sufficient information duty. Without finally deciding anything at this stage, I may add that it is not clear to me that this conclusion has any practical significance. I was referred to para.120(4) where it is pleaded that the defendant directors put themselves in a position of conflict between their duties to the shareholders not to conceal information from them and the interests of third parties such as the UK Government and others in maintaining secrecy in various matters. I do not see that this adds anything of substance to the allegation that the directors did not disclose what they should have done. Either the sufficient information duty required them to disclose something more to shareholders or it did not. If it did, then they were in breach of duty and it does not I think matter what their reasons were for failing to disclose. If it did not, the question falls away and the reason why they did not disclose is equally irrelevant.

(5) Paragraph 39(5) pleads a duty to act for a proper purpose. It is trite law that any powers (whether fiduciary or not) can be exercised only for the purposes for which they are conferred, and not for any extraneous or ulterior purpose, and this is certainly true of the powers conferred on directors. But the duty of directors to use their powers for a proper purpose is a facet of the duties owed by directors to their company. (This has now in fact been put on a statutory footing: see s.170(1) and s.171(b) of the Companies Act 2006). I do not see that this is a duty separately owed to the shareholders; nor do I see it as encompassed within the sufficient information duty.

(6) Paragraph 39(6) pleads a duty to advise and inform the Lloyds shareholders in clear and readily comprehensible terms, and is not disputed. Save for the duties pleaded at para.39(3) and (6) therefore, the other duties pleaded in para.39 do not in my judgment form part of the sufficient information duty, and on the facts pleaded in para.37 are not sustainable in law. I will therefore strike them out under CPR r.3.4(2)(a) on the basis that they disclose no

reasonable grounds for bringing the claim (CPR r.3.4(2)(a) refers to striking out a statement of case but by CPR r.3.4(1) this includes part of a statement of case).

## Calling of the EGM

**24.** Ms Davies also sought to attack one other aspect of the particulars of claim, namely paras 121, 122(2) and 127. These read as follows:

(1) Paragraph 121:

> "In the light of the Directors' Knowledge, the Written and Oral Representations, the Omissions and, in particular, the Concealment, it was a breach of the Fiduciary Duties and/or Tortious Duties for the directors of Lloyds, including the Defendants, to (a) put the proposed acquisition of HBOS and participation in the Recapitalisation Scheme to shareholders and/or (b) permit the EGM to take place and the Lloyds shareholders to vote on the Resolutions on the basis of what they knew to be incomplete and misleading information, statements and advice."

This is followed by particulars of breaches. Sub-paragraphs (1)–(4) of these plead certain things that the defendant directors are said to have known. It continues

> "(5) In the premises, in putting the proposed transactions to shareholders and/or permitting the EGM to take place and Lloyds shareholders to vote on the Resolutions, the Defendants were acting in bad faith and contrary to the best interest of shareholders.
>
> (6) Alternatively, if it be alleged that the Defendants did not know or understand any of the matters detailed at subparagraphs (1) to (4) above, the Defendants ought to have known and understood those matters and, therefore, acted negligently in permitting the EGM to have taken place."

(2) Paragraph 122:

> "In the premises set out above, the Defendants, acting in accordance with the Fiduciary Duties and/or the Tortious Duties rather than breaching them, would have either
>
> (1) Disclosed to Lloyds shareholders the fact that HBOS had received a £10 billion loan from Lloyds and was wholly reliant on covert financial support from the Bank of England and the Federal Reserve to enable it to pay its debts as they fell due and to continue to trade;
>
> Or
>
> (2) Declined to proceed with the acquisition of HBOS."

(3) Paragraph 127:

> "In breach of the Fiduciary Duties and/or the Tortious Duties, the directors of Lloyds, including the Defendants, procured that the EGM took place on 19th November 2006 in accordance with the Notice."

**25.** Ms Davies' submission is that the allegation that it was a breach of duty to go ahead with the EGM must on analysis be based on the supposed duties to prevent loss to the shareholders, as the other duties all relate to the provision of information and advice to shareholders. It became clear in

the course of argument that her particular concern was that an allegation that it was a breach of duty to permit the EGM to go ahead would enable the claimants to run the argument on causation that (i) the defendants were in breach of duty in allowing the EGM to proceed; (ii) if the defendants had not been in breach of duty the EGM would not have taken place; (iii) if the EGM had not taken place the acquisition of HBOS would not have happened; and therefore (iv) damages (or equitable compensation) should be assessed on the basis of the position the claimants would have been in had the acquisition not gone ahead.

**26.** This is not I think an argument that is open to the claimants on the current pleadings. The allegation that the defendants' various breaches of duty caused the claimants loss is found firstly in paragraphs 122 to 125. Paragraph 122 (set out above) does not simply plead that the defendants would not have gone ahead with the EGM had they complied with their duties: as can be seen, it pleads that the defendants would *either* have disclosed certain matters *or* not gone ahead. In principle I can see nothing illogical or wrong in such a plea. It is accepted that the duty of directors when calling an EGM is or includes the sufficient information duty. Suppose that the court holds that this duty required the disclosure of a particular fact. It follows that for the directors to go ahead with the EGM without disclosure of that fact was a breach of duty. It seems to me true and unobjectionable to say that in those circumstances if the directors were to avoid being in breach of duty they either had to disclose the fact or not proceed with the EGM. To put it another way the formulation of the sufficient information duty by White J in the *Residues Treatment* case (above) (adopted by Neuberger J in *Re RAC Motoring Services Ltd* [2000] 1 B.C.L.C. 307 (above)) is a duty to give shareholders:

> "sufficient information for them to make informed decisions about proposals to be put them at meetings."

It follows that if no proposals are put, no information needs to be provided, so directors can avoid being in breach either by not putting proposals or by providing the requisite information. I am not therefore persuaded that para.122(2) or any part of para.122 falls to be struck out.

**27.** What however this does not do is answer the question how one assesses the loss caused by the breach. That depends on what would have happened had the directors not acted in breach of duty. Paragraph 123 pleads that if the matters referred to in para.122(1) had been disclosed this would have been picked up by the financial press and market analysts and they would have written extensively on the folly of Lloyds' acquisition of HBOS on the proposed terms, and Lloyds would have been forced to pull out of the acquisition; para.124 then pleads an alternative case that no shareholder properly informed of the true financial circumstances of HBOS would have voted in favour of the acquisition. Paragraph 125 then pleads that it necessarily follows that if the defendants had acted in accordance with their duties, the acquisition would not have gone ahead and the claimants would not have suffered the loss and damage for which the claim is made.

**28.** None of this seems to me to assert that the claimants can establish causation on the simple basis that it was a breach of duty to call the EGM and hence that loss should be assessed by reference to what would have happened had the EGM not been called. On the contrary, it seems to me plain that to make good the plea at para.125 that the claimants would not have suffered the loss claimed, the claimants will have to establish not only a breach of duty, but also that if there had been disclosure either the acquisition would not have gone ahead for the reasons pleaded in para.123 (the directors being forced to pull out of the acquisition as a result of press and market commentary on the folly of proceeding), or for the reasons pleaded in para.124 (the shareholders not voting in favour of it). As I understood it, Mr Steinfeld accepted that in the course of argument, but whether he did or not, I am clearly of the view that the current pleading does require the claimants to establish causation by

establishing what would have happened had the directors made the disclosure which they say should have been made.

**29.** There is a further plea of causation in paras 130–133: para.130 pleads that the Lloyds shareholders relied on various representations and other matters; para.131 that they were misled as to the true merits by various representations and omissions; para.132 that if they had not been misled:

> "the majority in number and by value of the Lloyds shareholders would have voted against the Resolutions at the EGM on 19th November 2008 and would not have suffered the loss and damage in respect of which this claim is made"

and para.133 then adds that although some of the claimants in fact voted against the resolutions or abstained they too have suffered loss because the defendant directors misled the vast majority of shareholders into voting in favour of them.

**30.** As can be seen there is no suggestion in those paragraphs either that the claimants can establish causation on the basis that it was a breach of duty to call the EGM and hence that loss should be assessed by reference to what would have happened had the EGM not been called. It is firmly tied to the question how the majority of shareholders would have voted had they not been misled by the alleged misrepresentations and omissions which are said to constitute a breach of duty.

**31.** In these circumstances Ms Davies' concerns about this point largely I think fall away. But taking the three paragraphs that are attacked on their merits, my views are as follows:

(1)   I have already said that there seems to me nothing wrong with para.122.

(2)   Paragraphs 121 and 127 can be taken together. Although para.127 taken by itself appears to plead simply that it was a breach of duty to hold the EGM, Mr Steinfeld accepted that this was not intended to go beyond what was alleged in para.121 and should be read as a reference back to what was said there.

(3)   Paragraph 121 alleges a breach of both fiduciary and tortious duties (as does para.127). So far as tortious duties are concerned, this has to be read with para.121(6) which pleads that it was negligent of the defendants to permit the EGM to take place when they ought to have known certain matters. I agree with Ms Davies that this can only be understood as a breach of the particular duty pleaded at para.40(5), as the other tortious duties are all concerned with a duty to take care in giving advice and I do not see how it can be a breach of a duty to take care in giving advice not to hold the EGM. But with the clarification that para.40(5) is not intended to plead a freestanding duty and is only intended to plead that the scope of the duty of care extended to the losses claimed, it can be seen that there is no duty which will support this particular allegation of negligence. It does seem to me therefore that Ms Davies is right that the references to tortious duties in paras 121 and 127 are unsustainable and should be struck out.

(4)   That leaves the allegation of breach of fiduciary duties. As I read it (and Mr Steinfeld did not suggest to the contrary) the words at the end ("on the basis of what they knew to be incomplete and misleading information, statements and advice") are intended to qualify both limb (a) (putting the proposed acquisition to shareholders) and limb (b) (permitting the EGM to take place) as no sensible distinction can be drawn between them. On this assumption the statement in the body of the paragraph that it was a breach of duty to allow the EGM to go ahead without full information seems to me merely another way of saying that their duty was to provide sufficient information if the matter was to go ahead. I do not think that by itself it is objectionable.

(5) However the particulars of breach given under this paragraph, which are found in sub-para.(5), refer to the directors acting in bad faith and contrary to the best interests of Lloyds shareholders. These are clearly pleaded as breaches of the duties in para.39(1) and (2) which I have already held to be unsustainable. Since this is the only basis for the plea of breach of fiduciary duties in para.121, I think it logically follows that the plea of breach of fiduciary duties is unsustainable.

(6) Since I have held that neither the plea of breach of tortious duties nor the plea of breach of fiduciary duties is sustainable, I consider that this paragraph (and para.127 which is dependent on it) do also fall to be struck out pursuant to CPR r.3.4(2)(a).

## Conclusion

**32.** It may be helpful if I summarise my conclusions:

(1) Paragraph 40(5), which is not intended to plead a separate free-standing tortious duty, should be deleted and replaced by a statement that the duties in para.40(1)–(4) included duties in respect of the kinds of losses which the claimants claim to have suffered.

(2) Paragraphs 39(3) and 39(6) are not objected to but paras 39(1), (2), (4) and (5) should be struck out.

(3) Paragraph 122, including para.122(2), is not objectionable and should be allowed to stand.

(4) Paragraphs 121 and 127 should be struck out.

**33.** Where I have held that parts of the pleading should be struck out, I have done so under the powers in CPR r.3.4(2)(a). The application notice relies in the alternative on CPR r.24.2 but in circumstances where I have held that the pleas do not plead a sustainable case in law, the powers in CPR r.3.4 seem to me to be both adequate and fitting and I do not think that in those circumstances it is either necessary or appropriate to resort to the powers in CPR r.24.2 as well.

*(Order accordingly)*

# Exhibit Q

*a*

# Platt and another v Platt

CHANCERY DIVISION
DAVID MACKIE QC (SITTING AS A DEPUTY JUDGE OF THE HIGH COURT)
14–16 JUNE, 19 JULY 1999

*b*

*Directors – Fiduciary duty – Misrepresentation – Whether director induced shareholders to transfer shares by making misleading statements – Whether director in breach of fiduciary duty to shareholders to disclose matters relevant to transfer of shares – Measure of damages – Valuation of shares.*

*c* Three brothers were shareholders in a company which held a BMW dealership. The defendant ran the business and held ordinary shares. The other two brothers, the claimants, did not work in the business and held redeemable preference shares. In 1992 the company was financially weak and the claimants at the defendant's instigation transferred their preference shares to the defendant for £1. The claimants alleged that they were told that *d* the transfer was necessary because of the company's financial position to enable the business to be sold at the insistence of BMW, and that if the sale did not proceed the shares would be returned. The company's financial position improved and BMW did not require the business to be sold. The claimants then asked the defendant to retransfer the shares but he refused. *e* The business was sold in 1996 and the claimants took proceedings seeking damages for breach of contract, misrepresentation and breach of fiduciary duty.

**Held** – (1) The defendant misled the claimants by suggesting that BMW would withdraw the franchise if the business was not sold. He misstated the *f* extent of the company's financial troubles. He had said that he would return the shares if no sale materialised but had no intention of keeping that promise. The shares would not have been transferred but for the misrepresentations which were at least negligent.

(2) On the facts a fiduciary duty was imposed on the defendant which obliged him to disclose to the claimants matters which he knew or had reason *g* to believe would be material to the claimants' decision to transfer the shares. The defendant breached that duty by failing to give the claimants a candid and full account of his discussions with BMW.

(3) The measure of damages was the same for misrepresentation and breach of fiduciary duty and consisted of the value of the shares at the time *h* of sale. A valuation based on an estimated future income stream was generally preferable to one based on net realisable assets, but uncertainties in the income position of the business meant that an assets value was preferable in this case. There would be judgment for the claimants for a sum to be agreed or established on that basis.

*i* **Cases referred to in judgment**
*Chez Nico (Restaurants) Ltd, Re* [1992] BCLC 192.
*Coleman v Myers* [1977] 2 NZLR 225, NZCA.

*Percival v Wright* [1902] 2 Ch 421.
*Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management)*
     *Ltd* [1997] 1 BCLC 350, [1997] AC 254, [1996] 4 All ER 769, [1996] 3     *a*
     WLR 1051, HL.

**Action**
Colin Jeffrey Platt and Denis Trevor Platt each took proceedings against their
brother Keith Henry Platt seeking damages for breach of contract and/or
fiduciary duty and/or misrepresentation relating to the transfer by the     *b*
claimants to the defendant of their preference shares in LJK Holdings Ltd
and his failure to retransfer the shares to the claimants. The facts are set out
in the judgment.

*Nigel Dougherty* (instructed by *Paul Robinson & Co*) for the claimants.     *c*
*Stuart Cakebread* (instructed by *Fairchild, Greig and Wells*) for the
     defendant.

                                                              *Cur adv vult*

19 July 1999. The following judgment was delivered.                     *d*

**DAVID MACKIE QC.**
     1. This unhappy dispute about a family company concerns the transfer at
a meeting in May 1992 by the two claimant brothers Mr Colin Platt and Mr
Denis Platt of their preference shares in LJK Holdings Ltd (Holdings) to their
elder brother, the defendant Mr Keith Platt. In the interests of brevity I shall     *e*
refer to the brothers from now on as Colin, Denis and Keith. Did Keith gain
control of this BMW dealership in Essex through breaches of contract and/
or fiduciary duty and/or misrepresentations and, if so, what if any relief are
the claimants entitled to?

*Procedure*                                                            *f*
     2. This is the trial of two separate actions, one brought by Colin, the other
by Denis seeking virtually the same relief. I reserved judgment on 17 June
1999 after two and a half days of evidence and submissions. I have been
greatly helped, and money has been saved for the parties, by the able and
concise approach of both Mr Dougherty and Mr Cakebread, counsel for the
parties.                                                               *g*

*Facts agreed or not greatly in dispute*
     3. Mr Platt, the father of the parties, retired in the early 1980s and passed
on to his three sons various family businesses in equal shares. These included
Jarman and Platt Properties Ltd and LJK Garages Ltd (Garages) acquired in
the 1960s. Keith was the dominant, if not the only, brother involved with     *h*
Garages which obtained a franchise from BMW in the early 1970s and then
grew steadily. In about 1981 Colin, the middle brother and his brother-in-
law, set up Original Art Shops Ltd (Art Shops) and at some point his younger
brother Denis was also involved. At first Art Shops did well. Garages
guaranteed the rental liabilities of Art Shops under many shop leases in     *i*
return for 10% of the shares in Art Shops. In 1990 Garages sold on its shares
to Jarman and Platt on terms that it remained liable under the guarantees
should Jarman and Platt default.

4. Garages traded successfully making profit before tax of over £350,000 in 1987 and over £230,000 in 1988. Keith became unhappy about receiving no more from Garages than his brothers despite doing the work and being mainly responsible for the success. It is common ground that BMW took a keen interest in the organisation and management of the business and wanted its control to be concentrated in the hands of those running it day to day. At one stage the three brothers had hoped that Keith would buy out Colin and Denis for £2m but BMW insisted on a more gradual arrangement. This led to a reorganisation set out in an agreement of 16 July 1990. Holdings was incorporated. The brothers sold their shares in Garages to Holdings in return for an allotment of shares in Holdings as to 781,998 ordinary shares to Keith, 782,000 redeemable £1 D preference shares to Denis and 650,000 £1 C preference shares to Colin. The preference shares had no voting rights but yielded a preferential dividend of 8.62% and 9% respectively. A default dividend was payable if the preferential dividend was in arrears and there were provisions for redemption. Colin and Denis left the board. The idea was for Keith to control the business and for the brothers to have an income until Keith could afford to redeem the preference shares.

5. In the early 1990s Garages did badly in the recession and Colin and Denis agreed to forego dividend payments and the redemption of shares was postponed. The waiver of dividend entitlement was formalised by a deed of waiver executed by Colin and Denis in January 1992. The position continued to deteriorate and Art Shops too was in difficulties. By 1992 Holdings was financially weak, gearing was high and there was a pressure on cash flow. BMW thought that Holdings needed to invest in facilities but it did not have the money to do so. In March BMW received copies of the 1990 accounts for Holdings disclosing for the first time the rental guarantee exposure for Art Shops. BMW's concern about the finances was aggravated by what they saw as a liability entered into in apparent breach of the dealer agreement. A meeting was held late in April between Keith and Mr Giorgi and Mr O'Donnell of BMW, the outcome of which is set out in a letter of 21 April which mentioned BMW's concerns in general terms that the operation was not generating enough money to pay shareholders and invest in the future. There was a need to consider a new location and a proposal was required by the end of June 1992. Discussions between the brothers about seeking to isolate the garage business from the guarantee liabilities failed for legal reasons and also because Colin and Denis feared the problem was being used to take away their shares. Indeed they refused (see letter of 9 May 1992) to transfer their shares to Keith in return for him agreeing to 'look after' them.

6. By this stage Keith was the only brother in touch with BMW and the only director of Holdings, Mr Jaques an employee who became increasingly responsible for the day to day management of the dealership had became a director of Garages.

7. By 1992 the originally profitable business of Art Shops had been hit by the recession and, perhaps, an increase in its overheads. By April Holdings faced potentially very substantial claims on guarantees which in early 1992 were difficult to quantify but seemed to be of the order of perhaps £200,000 or more. Art Shops went into liquidation in July 1992.

8. Relations between Keith on the one hand and Colin and Denis on the other had been strained for some time. Even before 1990 the younger brothers resented what they saw as Keith's 'champagne lifestyle' and his undeserved benefits and bonuses. After 1990 they were no doubt unhappy at not receiving the promised dividends. There is a flavour of one side of this antagonism in Colin's letter to Keith of 4 May 1991. For his part Keith no doubt resented large payments going to two brothers who were making no day-to-day contribution to Garages which itself was threatened by the collapse of Art Shops, a business run by Colin. Jarman and Platt's condition deteriorated greatly as a result, it seems, of a bad investment decision by Colin which Keith had strenuously opposed. This increased the potential burden on Garages.

9. In May Holdings lent some £37,000 to Art Shops to fend off, for whatever motive, the risk of insolvency. On Wednesday 27 May 1992 Keith telephoned Colin to arrange an emergency meeting which took place between about 7pm and about 10pm at the Post House Hotel in Ipswich. They chose Ipswich as it was easier for Denis to get to.

*27 May 1992 – First meeting*

10. Although this case turns on what happened at the meeting in the evening I will first deal with what was said earlier when Mr Giorgi of BMW met Keith and perhaps Mr Jaques. There are three accounts of that earlier meeting.

11. Mr Giorgi of BMW remembered that he had also visited the dealership in May 1992 as well as in April. He was under the impression when he got there that Keith had already arranged to see his brothers that evening. He would certainly have emphasised the need to move forward to deal with Garages' problems. He said however that he would not have threatened termination of the dealership as that was a step that could not be taken without the consent of his superiors and/or the board at BMW (GB). He did feel that between the three brothers something should be done and that it was 'preferable' for Colin and Denis to give up their preference shares. He might well have said that the company was technically insolvent. He did not believe that he had ever suggested that it would be best for Garages to sell the business and then negotiate a job or consultancy for Keith. He might have mentioned to Keith, as something to explore as an option, the sale of the business but in his own view this was not possible at that time in the middle of recession and given the problems which the business faced.

12. Credit restrictions had been imposed but probably lasted no more than a couple of weeks. At the meeting Mr Giorgi's concern was about the contingent liabilities and the need for Keith to reach a solution to the problems with the landlords. As BMW saw it, it would help Keith's motivation if he obtained control of the business. The meeting seems, in Mr Giorgi's eyes, to have been routine in the context of the earlier letter and the meeting was not a 'crunch' or 'crisis' encounter.

13. As Keith saw it the potential liability was by this stage about £1m. In addition the company had an overdraft of £1m and a mortgage of £300,000 on its building. There were also liabilities to BMW and others for stocks of cars. This had caused BMW to withdraw credit and become nervous, as a result of what had happened at another garage. Keith recalled that BMW in the form of Mr O'Donnell and Mr Giorgi made it very difficult for him to

operate and told him and Mr Jaques, though not in writing, that they must either sell the business or BMW would terminate the dealership. Keith said

*a* that at the May meeting Mr Giorgi advised that the brothers should relieve Holdings of their burden by giving up their preference shares and that the company was technically insolvent. It would be better for Keith to sell the business and perhaps negotiate a job or consultancy with the new owner.

14. Russell Jaques, managing director of Holdings between 1990 and 1995, was present with Keith at discussions with BMW. As he saw it BMW

*b* were insistent that problems be resolved to avoid eventual termination of the dealership. There was however no threat of imminent termination. BMW suggested that the preference shares were a liability of Holdings and that the crisis might be a good opportunity for Keith to get them back. As BMW saw it Keith also had to regain control because BMW were concerned about the

*c* contingent liability on the leases. BMW of course were aware of the preference shares being in a sense responsible for that arrangement in 1990. Mr Jaques saw the meeting with BMW as no more than a pretext for what Keith was to do later.

15. It was against this background that the crucial meeting of 27 May was held.

*d*

*27 May 1992 – Second meeting*

16. Colin said that the meeting had been arranged after Keith had telephoned that afternoon in an agitated state. Colin had agreed to organise the meeting and to ensure that Denis was there. The two brothers met Keith and Mr Jaques. Keith began by saying that they had a meeting that afternoon

*e* with a BMW representative who had told Keith that there was no option but for him to sell LJK Garages. The alternative was withdrawal of the franchise and liquidation. The representative had told him that a sale would be almost impossible with the preference shares remaining on the balance sheet. As these were almost worthless they should transfer them to Keith for £1 if only

*f* to give Keith the chance to get a job with the new owners. After a lengthy conversation transfer seemed the only way out and Colin said that he would agree to this but only on the basis that the shares would be returned if Keith managed to pull off a miracle and save the business. Colin accepted that if the shares had ever been returned it would have been necessary to renegotiate their value. He had seen no need to record the transaction in writing. The

*g* brothers still trusted each other after a fashion. Keith had said that they were having problems negotiating over the rent guarantees. Keith initially said that he would look after the two brothers but Colin said that was not enough and that the shares must be returned if there were no sale. Keith then agreed and somewhat to Colin's surprise produced two stock transfer forms already made out for £1. Colin agreed that Keith had said that he was owed the

*h* chance to make something of the business. There was also discussion that someone known to them might possibly have put up the money to save the business. Colin was adamant that he would never have agreed to be 'looked after' by Keith when he had clearly rejected this possibility in writing only a couple of weeks previously.

*i* 17. Denis's account was very similar. Keith had placed emphasis upon the cost of the rent guarantees and the growing default dividend. It was a 'no hope' situation and the franchise would be withdrawn by BMW before Holdings went into liquidation. Keith agreed to return the shares if the

company was not sold and accordingly, like Colin, Denis signed the transfer. Denis believed that Keith had acted in a ruthless and devious manner, he was quite sure that Keith had claimed that there had been an actual threat by BMW to terminate and that the liabilities to rent guarantees could be £200,000 or more. They had been shareholders for 20 years. There was no reason why the shares could not have been handed back and the dividend renegotiated if a purchaser could not be found or the business was turned round. They were all engrossed in the immediate problems and it did not seem likely that the shares would come back or dividends again be paid.

18. Mr Jaques said that he and Keith saw the meeting as an opportunity for Keith to exaggerate the problems and to understate the positive aspects in order to persuade Colin and Denis to transfer their shares. He says that he and Keith planned exactly the details of what would and would not be disclosed and that the company should be portrayed as being in a hopeless position. Mr Jaques was there, he said, to give credibility to Keith's claims. Mr Jaques says that he and Keith knew that the fortunes of Holdings would improve in a couple of months, through improved trading and also because negotiations for the leases were already being resolved very favourably at around 10% of their claim. The only real difference about what happened at the meeting is that Colin and Denis recollect that Keith agreed to return their shares to them if he somehow managed to pull off a miracle and did not sell the business as he told them he must.

19. Keith's account was somewhat different. Keith said that after the BMW meeting he had immediately decided that the preference shares must be acquired, spoke to his accountants who told him of the formalities and reminded him that he had stock transfer forms. He completed those and took them with him on the journey. As Keith saw it, it was looking very much as though BMW would pull the plug. He thought they probably would. As he put it at an earlier stage if the preference shares were not transferred BMW 'would be likely to withdraw the franchise'. Keith said that those were the words and he had only just remembered them when giving evidence. Keith rejected Mr Jaques' account of the journey to the meeting. Keith accepted that he had later made no effort to sell the company. Keith accepted that he had told Colin and Denis that at a meeting that afternoon with representatives of BMW he had been told he had to sell Holdings because of the company's financial situation. The only alternative to a sale was termination of the dealership. Sale would be almost impossible with the preference shares remaining on the balance sheet. Keith therefore proposed that the shares should be sold to him for £1 as they were worthless and Denis and Colin owed him the opportunity to get a job with the new owners. Keith's recollection is that Mr Jaques told the brothers that their businesses had caused all the problems and that they owed it to Keith to transfer the preference shares. Keith told his brothers that they must set him free to do whatever was necessary. He said that he told the brothers that Colin, who had some ambitious ideas about the value of the preference shares was mistaken and that if he ever got out of the mess 'I would look after them and I told them that I could not promise them anything'.

20. Keith was asked about a number of features of his statement. He was asked who it was at BMW who although they did not put it in writing told him on several occasions that he must either sell the business or that they

would terminate our dealership. It seems that neither Mr O'Donnell or Mr Giorgi ever said quite that. He explained a letter from BMW Finance from
*a*  which it seemed clear that finance was available by saying that BMW's withdrawal of credit had only been for a couple of weeks and had not been accompanied by any letter. (Mr Giorgi's evidence confirmed that there had indeed been only this brief suspension of credit.) Keith's claim that the company 'had an overdraft of £1 million' was he said, when extracts from the records compiled by Mr Jaques were put to him, an estimate of a liability
*b*  which ranged between £700,000 and £1.1m. Keith denied that his recollections of what happened in 1992 were more likely to have been references to 1993. Keith accepted that Mr Giorgi's advice did not amount, as he had suggested in his statement to persuading him 'very firmly' that the brothers should give up their preference shares. He agreed that at a meeting
*c*  with Littlejohn Frazer, his accountants, on 27 March he had been told that there was about £500,000 of value in LJK which, if it had to be distributed on an insolvency, would go to his brothers, the preference shareholders. He did not agree that it was unlikely that his brothers would settle for general assurances that he would look after them given Colin's rejection of this concept in his letter to Keith of 9 May 1992.

*d*  21. It seems common ground that the terms of any retransfer of shares were not discussed. Denis accepted that the conditions for that transfer would have had to reflect the commercial realities of the company rather than the original terms on which the preference shares had been issued.

22. After the transfer had been made Keith wrote to Mr O'Donnell of
*e*  BMW on 25 June to tell them what had happened and on 29 June Mr O'Donnell replied confirming that 'This settles the issue of ownership and obviates the need for you to generate sufficient money to buy "C" and "D" Preference Shares'. He went on to refer to the contingent liabilities to Art Shops as not being an immediate threat but as having the potential to be far more serious than the preference shareholder issue.

*f*  23. Keith gradually brought the contingent liabilities under control but this appears to have happened more in the second part of 1992 than the first. It seems from Keith's letter of 8 July to Jarman and Platt that by that stage two claims had been received but no more. By February 1993 the total potential claims appeared to be some £425,000 but by March 1993 Keith
*g*  was rightly proud of what he described as 'tremendous settlement results' and settled in the end for some £72,000. The dealership also became more profitable following real sacrifices on Keith's part. By this time BMW had certainly discussed a sale by Garages of its business but on 23 March 1993 Mr O'Donnell advised that BMW felt 'sufficient progress has been made by you for us to confirm that we will not be asking you to sell the business at
*h*  the end of March 1993'.

24. On 27 March 1993 Colin wrote to Keith starting correspondence raising the issues to be resolved in this action. Colin said that Keith would recall that had taken 'great pains to show that the company was virtually worthless in break-up form and that you were going to try, with BMW's help
*i*  and approval to find a person or organisation to take it over and hope that they would employ you both in senior capacities afterwards'. He went on to say that he and Denis had reluctantly signed their shares over to achieve this and on the express condition that this was Keith's only option apart from

calling in receivers. 'We also agreed with you that should circumstances change and that you, by some miracle, were able to save LJK from being sold or liquidated that these shares would be returned to us'. The letter goes on to contrast what he had been told about the contingent liabilities in May 1992 and the position as it was by March 1993. On 2 April Keith replied to Colin to say that his recollection was 'certainly different' and that he did not say that he would return shares. He said that he could not commit himself to anything in the future as it was pie in the sky and totally unknown. 'I did however agree that if a miracle did happen and I sold the business for millions within months of acquiring the Preference Shares I would look after you. Those were my words'. He went on to refer to his efforts over the years including the sale of his house. On 30 April Colin responded suggesting that Keith and Mr Jaques 'purposely engineered a situation where Denis and I were deliberately misinformed as to your true intentions over the future of LJK'. Colin said that the shares were transferred 'exclusively to assist in the sale of the business since we were informed everything was lost anyway and BMW had insisted you sold out'. He went on to say that since there was no longer an intention to transfer the business the shares should be reinstated. On 10 May 1993 Keith wrote to Colin inviting him to talk to his solicitor and accountant about the issue. Keith was asked in evidence why if he had promised 'to look after' his brothers he had not done so. He replied that in early 1993 he had changed his mind because of the correspondence. Colin's doubts about the reliability of agreeing to be 'looked after' accordingly had justification.

*Conclusions about the two meetings on 27 May*

25. There is no note or letter confirming what happened at the crucial meeting on 27 May but little disagreement about what was actually said. The main difference is Denis and Colin's recollection that Keith agreed to return the shares if no sale took place and Keith's that he agreed to do no more than offer to look after them. I conclude, when looking at the comparatively minor differences about what happened at the meeting between the parties on 27 May, that the account of the claimants is to be preferred to that of the defendant. It was clear from the evidence of Colin, even through the grave disability which now impedes his movements and his power of speech, that he is an intelligent and forceful individual who by May 1992 would not willingly have parted with his shares. His recollection seemed to me clear, precise and consistent with the documents. It seemed to me that Denis would generally follow Colin's lead and his evidence too was clear and straightforward. I discount to some considerable degree, but not altogether, the evidence of Mr Jaques. Mr Jaques admitted lying to the claimants at the meeting and on other occasions and having lost an unfair dismissal claim against, in effect, Keith, has I suspect some continuing sense of grievance. I have no hesitation in preferring the account of Mr Giorgi to the others available about the meeting early on 27 May. Except on some points of detail which he could not be expected to remember after all this time, his evidence seemed to me to be straightforward and accurate. He clearly had no wish to favour either party and concentrated on assisting the court with even-handed recollections of all he could remember. I prefer his evidence to that of Keith and pay no particular regard to the evidence of Mr Jaques. Keith's evidence was unconvincing although it was clear to me that he was not seeking to

*a*

mislead the court. It was clear from his cross-examination, some features of which I have referred to above, that his recollection of detail was patchy and inexact and that features he identified in his statement with precision turned out, on examination, to be mistaken or approximate. While it is natural that some recollections will be clearer than others, Keith's memory moved from the vague to the photographic and back again in a way which suggests to me that his recollection was at fault. Finally, setting the meeting between the parties in its context, I do not believe, having seen and heard the witnesses, that Colin and Denis would have parted with their shares unless they had been presented with a situation that appeared to be dramatically more severe than it had been a couple of weeks before when they had flatly refused to transfer their shares.

*b*

*c*

26. Keith undoubtedly and knowingly exaggerated the seriousness of the situation. BMW were primarily concerned about the contingent liabilities and Keith was under real pressure to do something about these by 30 June. While BMW were concerned about preference shares this was, in the context of the company's other troubles, not of itself a pressing matter. While BMW recognised that sale of the business was one possibility it did not expect, let alone require Keith to sell. Keith misled his brothers by suggesting first that BMW were on the point of withdrawing the franchise and secondly that they were urging him to sell. Keith knew that matters were not as grave as that. His later actions in doing nothing about a sale were themselves inconsistent with his assertion that BMW were applying pressure on him to sell. These were features which had not been present before and which caused the brothers to transfer their shares to Keith when in not dissimilar circumstances they had earlier flatly refused to do so. There was a temptation for Keith to exaggerate. At this stage a business which he, almost alone, had built up over many years was under severe pressure because of the problems of Art Shops which were no fault of his. Keith took advantage of the position and, at the least, failed to disclose to his brothers BMW's true intentions.

*d*

*e*

*f*

27. The business continued to trade profitably but not without problems. In October 1995 BMW gave 12 months' notice to terminate the dealership. As a result the business was sold on 16 April 1996 to DC Osborne Ltd for a total sum of £1,955,568.44. Of this £169,652.38 (warranty refunds), £161,075.34 (unpaid parts), £200,000 (alleged service overcharges) and £354,097.36 (loan finance) were retained by BMW and subsidiaries and £300,000 was repaid to Lloyds Bank leaving net profit after all expenses and debts of £769,743.36. Of the £200,000 retained by BMW £78,666.34 plus interest of £22,064.25 has been repaid to Keith.

*g*

*The law*

*h*

28. Colin and Denis bring their claim against Keith on three grounds:

(a) Breach of contract. The claimants say that it was an express term of the contract by which the shares were transferred to Keith for £1 that if a sale did not proceed they would be transferred back to the claimants within a reasonable time. Although I find that there was such an agreement it is conceded that it is not one capable of having contractual force because both claimants acknowledge that any retransfer would have to have been on terms as to purchase price and payment of dividends to be negotiated and agreed. It follows that the claims in contract fail.

*i*

(b) Misrepresentation. Colin and Denis claim that they only agreed to transfer the preference shares to Keith, and were induced to do so by his representations first that he had been told by BMW that it was imperative for the shares to be acquired by the defendant or otherwise BMW would terminate the dealership and secondly that the defendant intended to investigate the possibility of selling the business and or the issued share capital of the company with the dealership agreement remaining in place with Garages but that in the event of such a sale not proceeding, the preference shares would be transferred back to the claimants.

(c) Colin and Denis claim that Keith owed them fiduciary duties, (i) not to make to them, as shareholders, statements on matters material to any proposed dealing in the shares of the company which were either deliberately or carelessly misleading, and/or (ii) to disclose matters material to any proposed dealing in the shares of the company between the defendant and the claimant on which the defendant knew or had reason to believe that the claimant was inadequately informed.

*Misrepresentation*

29.  There is no dispute between the parties about the principles of liability (as opposed to assessment of damage) the dispute being the factual one as to whether Keith made misrepresentations upon which his brothers relied. I find that Keith did misstate the extent of the company's financial troubles and exaggerate the urgency of BMW's concern. In particular he wrongly claimed that the shares had to be transferred to him so that on BMW's insistence the business could be sold. I am also clear that Keith said he would return the shares if no sale materialised but had no intention of keeping this promise. There was no such insistence and, against the background I have described, I do not believe that the shares would have been transferred but for this misrepresentation. The misrepresentations were, at the least, negligent ones.

*Breach of fiduciary duty*

30.  The fiduciary duties are said to arise from the fact that Keith was actively involved in the day-to-day management of the business of Garages and Holdings and acted as chairman of Holdings, that at all material times Denis and Colin were, to the knowledge of Keith, wholly or substantially reliant on Keith for information about the company, its business and the value of their holdings of preference shares in the capital of the company. It is the case that Keith alone knew exactly what BMW said and required, although that company's methods of operation were common ground. The brothers did not receive management accounts, not being directors, and had no source of information about the affairs of the company beyond what Keith told them and what was in the audited accounts. Counsel for Colin and Denis developed this by pointing out that Keith was the older brother and he had made the approach to acquire the claimants' 'birthright'. No up to date accounts were available. Furthermore, Keith, perhaps sensibly, prevented Denis and Colin from contacting BMW itself. Although this made business sense it prevented Colin and Denis from checking the facts with BMW. The proposed transfer was to Keith's obvious and immediate advantage.

31.  Keith denies that a fiduciary duty arises and reliance is placed on the well known authority of *Percival v Wright* [1902] 2 Ch 421 the headnote of which reads as follows:

> 'The directors of a company are not trustees for individual
> shareholders, and may purchase their shares without disclosing pending
> negotiations for the sale of the company's undertaking.'

Against that my attention was drawn to *Re Chez Nico (Restaurants) Ltd*
[1992] BCLC 192 at 208 in which Sir Nicolas Browne-Wilkinson V-C
doubted the breadth of the proposition said to be contained in *Percival v
Wright*, a point earlier made in *Coleman v Myers* [1977] 2 NZLR 225. As
Browne-Wilkinson V-C puts it at 208:

> 'The actual decision does not bear out the headnote. Like the Court of
> Appeal in New Zealand, I consider the law to be that in general directors
> do not owe fiduciary duties to shareholders but owe them to the
> company: however, in certain special circumstances fiduciary duties,
> carrying with them a duty of disclosure, can arise which place directors
> in a fiduciary capacity vis-à-vis the shareholders. *Coleman v Myers* itself
> shows that where directors are purchasing shares in the company from
> outside shareholders such a duty of disclosure may arise dependent on
> the circumstances of the case.'

In *Coleman v Myers* [1977] 2 NZLR 225 it was held that directors owed
fiduciary duties to the shareholders given the family character of the
company, the position of father and son, the high degree of inside knowledge
of the directors as opposed to the shareholders and the manner in which
those directors went about the persuasion of those shareholders. As it was
put by Woodhouse J (with whom Cooke J (now Lord Cooke of Thorndon)
and Casey J agreed) at 324–325:

> '. . . the standard of conduct required from a director in relation to
> dealings with a shareholder will differ depending upon all the
> surrounding circumstances and the nature of the responsibility which in
> a real and practical sense the director has assumed towards the
> shareholder. In the one case there may be a need to provide an explicit
> warning and a great deal of information concerning the proposed
> transaction. In another there may be no need to speak at all . . . while it
> may not be possible to lay down any general test as to when the fiduciary
> duty will arise for a company director or to prescribe the exact conduct
> which will always discharge it when it does, there are nevertheless some
> factors that will usually have an influence upon a decision one way or
> the other. They include . . . dependence upon information and advice,
> the existence of a relationship of confidence, the significance of some
> particular transaction for the parties and, of course, the extent of any
> positive action taken by or on behalf of the director or directors to
> promote it.'

The observations in *Re Chez Nico (Restaurants) Ltd* [1992] BCLC 192
may be obiter and *Coleman v Myers* [1977] 2 NZLR 225 is a New Zealand
case. These are however cases of the highest persuasive authority and, I add
very respectfully, plainly right. Accordingly the fact that the relationship
between director and shareholder does not of itself give rise to a fiduciary
duty does not prevent such an obligation arising when the circumstances

require it. In so far as *Percival v Wright* [1902] 2 Ch 421 indicates otherwise this is only because of the significance attached to the headnote which, for the reasons pointed out in the two cases cited above, is broader than is justified by the underlying decision.

The facts of *Coleman v Myers* [1977] 2 NZLR 225 bear resemblance to those in this case. But even if they did not it seems to me clear on the facts as I have found them to be that a fiduciary duty arose the nature of which obliged Keith to disclose matters which he knew or had reason to believe would be material to Colin and Denis's decision to transfer the shares. That duty is similar to those claimed to arise in the pleadings. There was a fiduciary duty and Keith broke it by failing to give a candid and full account of his discussions with BMW.

Having found that there is a liability on Keith both in misrepresentation and for breach of fiduciary duty the next question is the remedy if any to which the claimants are entitled.

### Quantum – principles of assessment

32. On 25 April 1997 Keith, as the sole shareholder of Holdings, was party to resolutions converting the preference shares into ordinary shares of Holdings. As the shares no longer exist it is agreed that the only remedy open is damages. It is also agreed that the measure for damages for misrepresentation is the same as that for breach of fiduciary duty. There is however an initial dispute as to the basis upon which damages should be assessed where there has been a misrepresentation and/or breach of fiduciary duty which has led a claimant to sell shares which would otherwise have been kept.

33. The measure of damages for misrepresentation is an award which puts the plaintiff into the position he would have enjoyed if the representation had not been made and not, as with breach of a contractual term, into the position he would have been in if the representation had been true. As with many misrepresentations this case is about the sale of shares. What is unusual is that the representations were not made to cause the claimants to purchase shares at an inflated price but to persuade them to sell at a nominal price. The normal measure of damages in these cases is the difference between the purchase price (in this case £1) and their actual value if any at the time of the transaction. The normal measure has the advantage of avoiding many problems of causation as Lord Browne-Wilkinson pointed out in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] 1 BCLC 350 at 360, [1997] AC 254 at 266:

> 'One of the difficulties of either valuing the asset at a later date or treating the actual receipt on realisation as being the value obtained is that difficult questions of causation are bound to arise. In the period between the transaction date and the date of valuation or resale other factors will have influenced the value or resale price of the asset. It was the desire to avoid these difficulties of causation which led to the adoption of the transaction date rule.'

In *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] 1 BCLC 350 at 360-361, [1997] AC 254 at 267 Lord Browne-Wilkinson sets out seven principles for assessing damages

payable where the plaintiff has been induced by fraudulent representation to buy property which must apply equally to where it is a sale not a purchase and (at 363, 269) Lord Mustill commends these seven propositions to those engaged on the task with which I am now faced. The relevant propositions are (4) and (5):

> '(4) As a general rule, the benefits received by him include the market value of the property acquired as at the date of acquisition; but such general rule is not to be inflexibly applied where to do so would prevent him obtaining full compensation for the wrong suffered.
> (5) Although the circumstances in which the general rule should not apply cannot be comprehensively stated, it will normally not apply where either (a) the misrepresentation has continued to operate after the date of the acquisition of the asset so as to induce the plaintiff to retain the asset or (b) the circumstances of the case are such that the plaintiff is, by reason of fraud, locked into the property.'

It is clear that in this case the value of Holdings grew from 1992 to 1996 partly no doubt as a result of there being no further obligations to pay dividends on the preference shares but also, without doubt, due to Keith's own efforts, which included various personal sacrifices, to restore the company's fortunes and to other factors. As I see it justice is best done by trying to value the shares at the time of sale if only because this reduces some of the problems of causation identified above.

*Quantum – how much?*

34. What was the value of these shares on 27 May 1992? There was helpful expert evidence from Mr Maher of Deloitte & Touche for the claimant and from Mr Pattrick of Derek Webster for the defendant. They agreed: (a) that the value of the preference shares in Holdings could not exceed the value of the company at the various dates discussed; (b) on the method by which value was allocated as between the C and D preference shares, which carried somewhat different rights. There was however substantial disagreement between the experts about the valuation as of 27 May 1992.

35. Mr Maher rejects the discounted future cash flow and dividend yield methods of valuation, finds that the price earnings method is inappropriate, rejects replacement cost and so turns to net realisable value, an approach which focuses on the value of a business assuming an orderly realisation of its assets. He accepts that an assets basis is not ideal but judges it to be the best one given the limits on the information available to him and the special facts. This leads him to value the consolidated net assets at 31 December 1991 at £401,522 which after deduction of payments for the deed of waiver and a discount applied to net assets and what seemed like five months trading losses to 27 May 1992 amounting to £30,037 left a value of £287,990. This then leads, through the agreed exercise, to a valuation of Denis' shareholding at 27 May 1992 as being £157,585 and Colin's being £130,405.

36. In contrast Mr Pattrick believes that the correct way of valuing Holdings is to use its historical results to calculate an estimated future sustainable income stream. The value will then be the price that someone is prepared to pay to acquire the rights to that stream. The calculation can be

based on the dividend policy of the company. As Holdings' dividend policy was erratic Mr Pattrick looks instead at the estimated future profit of Garages. He next takes a weighted average of the future profit stream in the five years ended 31 December 1991 before dividends and other items and arrives at average profits of some £79,545. He then finds this to be misleading in a position where the profit trend was steadily downward (despite, he concedes, the anomalous fact that a budgeted loss of £32,735 for the first four months of 1992 was in fact a profit of £74,693). Mr Pattrick concludes that the contingent liabilities were unknown in extent at May 1992 and it was not known that they would ultimately be settled for £72,086 inclusive of legal costs. He believes that as of May 1992 any responsible quantification of the extent of these contingent liabilities would have more than offset the average maintainable profit of £79,545. Having eliminated all value he then looks at a valuation on an asset basis. He reduces the net assets in the balance sheet at 31 December 1991 by estimated guarantee obligations of £239,507. He next looks (out of context as he seemed to accept) at a letter from the company's auditors dated 23 December 1992 showing a deficiency of some £1.4m which he suggests could not be dissimilar to a calculation of net realisable value at 27 May 1992. He therefore concludes that either on a going concern or an assets basis the shares in Garages held by Holdings were worthless, or at best of 'hope' value.

37. Although I have summarised the evidence of each expert only briefly, I have of course had regard to the totality of what they wrote and what they said. I accept Mr Pattrick's view, supported by literature, that a valuation based on an estimated future income stream will generally be preferable to one based on net realisable value of assets. However the very uncertainties in the income position of Garages seemed to me to point to an assets value as being the most satisfactory method of valuation and I propose to adopt it. Mr Pattrick is himself alive to the problems in working on an income stream basis given the history of this company before and after 1992. Even when applying this method to 1994, and doing a calculation, he himself recognises that adjustments are necessary to what would otherwise be the right calculation. It is only by making adjustments to take account of the downward progression of profits, weighing recent years more heavily than previous ones and assuming that the first few months of 1992 were not a general reversal of a downward trend, that Mr Pattrick places this basis of valuation in perspective. I have a sense that while the income stream is in principle more satisfactory, in a case like this it involves making broad subjective assumptions. The assets basis may be crude but the need for subjective assumptions is less. Even so there are many imponderables here, for example the particular circumstances of the company, its widely fluctuating profits, and its possible lack of appeal to a purchaser on purely financial grounds offset by the prospect that BMW dealerships, not being available on the shelf, might still have been very attractive to a commercial purchaser. Mr Pattrick disputes the discounts applied by Mr Maher to arrive at his valuation of £287,990. He also believes that a substantial reduction should be made for contingent liabilities. So do I, though not to the extent he suggests. While initially inclined to value the contingent liabilities by reference to what they turned out to be, less than £75,000, I see that would be the wrong approach. There are conflicting and mutually inconsistent

pointers in the papers and the evidence of what the contingent liabilities might really have been seen to have amounted to in May 1992. I have had regard to all of these. The contingent liabilities can plausibly be argued to be either zero or the maximum potential exposure under the guarantees. They were also considered at various figures in between for particular purposes. Keith gave a figure of about £200,000 in May 1992, a view shared by Colin and Denis in evidence but of course at that time neither would have been aware of Keith's actual or expected progress in negotiating down the liability. It is likely that by May 1992 it would have been clear to Keith that these liabilities would be capable of being negotiated. I therefore propose to take as a compromise and in the round the sum of £110,000 for contingent liabilities at May 1992.

38. With these uncertainties the figures provided by the two helpful experts have been adjusted in ways that are necessarily subjective. There is precision in their calculation which is necessarily spurious. To do broad justice I take Mr Maher's valuation of £287,990 and first correct it to take account of the fact that what was assumed to be five months' loss to 27 May, £30,037, was in fact a profit of £74,693. I then deduct £48,194 and £15,800 as additional discounts to be applied to net assets reflecting the views of Mr Pattrick, but only to some degree. For the contingent liabilities I deduct the sum of £110,000.

39. The resulting figure for the value of Holdings in May 1992, which I emphasise reflects the need to look at things broadly and in the round, appears to give a value to Garages as of May 1992 of £218,726. I round this up to the sum of £220,000 which then falls to be allocated between the claimants by the method set out in Mr Maher's report, with which Mr Pattrick agrees. I invite the parties to agree this calculation.

40. It follows that there will be judgment for the claimants for a sum to be agreed or established when this judgment is handed down when I will also deal with interest and costs if the parties cannot agree these. Similarly, while the parties are not free to open up any points of substance which I have decided I will consider, and indeed will welcome, corrections or suggestions as to points of detail on the calculation of damages.

*Order accordingly.*

Celia Fox    Barrister.

# Exhibit R



Neutral Citation Number: [2019] EWHC 1926 (Comm)

Case No: CL-2015-000305

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

The Rolls Building,
Fetter Lane,
London, EC4A 1NL

Date: 18/07/2019

**Before** :

**MR JUSTICE JACOBS**

- - - - - - - - - - - - - - - - - - - -

**Between :**

| | | |
|---|---|---|
| **(1) VALD. NIELSEN HOLDING A/S** | | **Claimants** |
| **(2)  NEWWATCH LIMITED** | | |
| **- and -** | | |
| **(1) MR VICTOR BALDORINO** | | **Defendants** |
| **(2) MR RICHARD BENNETT** | | |
| **(3) MR JULIAN MANTELL** | | |

- - - - - - - - - - - - - - - - - - - -

**Michael Booth QC and Christopher Lloyd** (instructed by **Collyer Bristow LLP**) for the
**Claimants**
**Alain Choo-Choy QC and Nicholas Sloboda** (instructed by **Cooke Young & Keidan**) for the
**Defendants**

Hearing dates: 18th – 21st March, 25th – 28th March, 1st – 4th April, 8th-12th April, 15th-17th April,
8th – 10th May 2019.

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE JACOBS

## MR JUSTICE JACOBS:

**INDEX**                                                                     **PARAGRAPH**

**A: Introduction**                                                                     1

**B: Factual background and broad chronology of relevant events**                       39

**C: Deceit: the law**                                                                 130

**D: The 20 April e-mail**                                                             160

**E: The 3 June e-mail**                                                               226

    **E1: The preparation of the Weighted Budget and the information provided to Tenon and LMS.**                                                                     230

    **E2: The background to 3 June e-mail**                                           253

    **E3: The allegation of deceit in relation to 3 June e-mail**                      283

**F: The Defendants' case and evidence: further considerations and conclusions.**       314

    **F1: The Defendants' case as to fraudulent intent.**                             315

    **F2: Motive and the Defendants' evidence as to their desire to obtain the maximum price**    321

    **F3: The strike out application**                                                337

    **F4: Other relevant conduct at the material time**                               359

    **F5: Specific arguments advanced by the Defendants**                             362

    **F6: Legal responsibility for the deceit**                                       372

    **F7: Conspiracy**                                                                387

**G: Inducement**                                                                      391

**H: Causation and Loss**

    **H1: The shape of the parties' arguments**                                       425

    **H2: The facts relevant to the causation and loss arguments**                    437

    **H3: The parties' arguments in more detail**                                     462

    **H4: Analysis and conclusions: legal principles**                                484

    **H5: Analysis and conclusions: Causation**                                       492

    **H6: Analysis and conclusions: quantification**                                  541

**I: Fair value of Updata UK**                                                         568

**J: Assignment**

**J1: The shape of the arguments**        **621**

**J2: The facts**        **631**

**J3: Danish law**        **658**

**J4: Analysis and conclusions**        **678**

**K: Breach of fiduciary duty** **716**

**L: Conclusion** **764**

## A: Introduction

*The claims made in the proceedings*

1.      This case, involving allegations of fraud, arises out of the sale of a business to its management and private equity investors in July 2009. The courts are familiar with claims made by buyers of businesses against sellers who are alleged to have given the buyers far too rosy a picture of the business being sold. The present case is unusual because it is the converse. The basis of The Claimants' claim is that the business being sold was far more successful than the sellers had been led by the management to believe, and that the sellers were misled into selling at the time when they did, and for the price which they received. The sellers contend that if the true picture had been presented to them, they would not have been willing to sell at that time at the price which was being offered.

2.      The business in question was a company called Updata Infrastructure (UK) Ltd ("Updata UK"). This was an English company whose majority shareholder was Updata Europe A/S ("Updata Europe"), which in 2009 owned 60% of its shares. The majority of the shares in Updata Europe were owned by members of the family of its founder, Mr. Peter Johnsen ("Mr. Johnsen"), directly or via a long-established company, the First Claimant ("Vald. Nielsen"). There were two other shareholders in Updata Europe, Mr. Henrik Hildebrandt and Mr. Henrik Bremerskov. A further 12.4% of the shares were held by the Second Claimant, Newwatch Limited ("Newwatch"). This was a Jersey company which was owned by Mr. Johnsen and Mr. Hildebrandt. Updata Europe and Newwatch were referred to at trial as the "European vendors" or "EVs".

3.      The three Defendants were the executive management team of Updata UK, and their management buyout ("MBO") was backed by a private equity house called LMS Capital Plc ("LMS"). The sale was successfully completed in July 2009. This was after a bidding process where there was a competing potential purchaser, Mr. Jens Nielsen and interests which he represented. Mr. Nielsen was a former chairman of Updata UK. The final LMS offer was considered more attractive by Updata Europe than the proposals which were forthcoming from Mr. Nielsen, and the sale took place. The entire issued share capital of Updata UK was purchased by a new company, Updata Infrastructure Holdings Limited ("Updata Holdings" or "newco"), in which the Defendants and LMS had significant stakes. For that purpose, a sale and purchase agreement ("SPA"), and various associated documents, were signed on 11 July 2009.

4.      The sale price received by Updata Europe for its 60% share was £ 5.244 million. The Claimants contend that the true value of this stake, at the time of the sale, was £ 22 million. The success of the business was such that in March 2014, less than 5 years after the sale, Updata Holdings was sold to Capita IT Services Holdings Ltd. ("Capita") for £ 80 million, and the Defendants together received at least £ 21 million for their shares in that sale. Long before that sale, however, Mr. Johnsen and Mr. Hildebrandt had come to believe that they had been misled in the course of the negotiations for sale in 2009.

5.      Vald. Nielsen claims to be the assignee of the rights of Updata Europe to bring claims in fraud and for other remedies against the management who are alleged to have been party to the deception. There is a significant issue in the case as to the validity of the

assignment agreements pursuant to which Vald. Nielsen allege that they acquired the rights of Updata Europe, and the Defendants make allegations of fraud against certain individuals involved in the assignment, including Mr. Johnsen. This allegation of fraud was ultimately the only point relied upon by way of an attack on the validity of the assignment, since other arguments based upon champerty and a "non-assignment" clause in the SPA were abandoned by the Defendants in closing argument. The allegation of fraud focused on the backdating of the assignment documents so as to record a date of 19 November 2010 instead of the actual date of signature which was January 2011.

6.    Newwatch does not bring a claim in fraud, since such claims were struck out by order of Sir Richard Field in 2016. Newwatch cannot claim to have suffered loss by fraud because it was able to roll over its prior investment in Updata UK into an equivalent shareholding in Updata Holdings. This meant that in due course Newwatch was able to benefit from the sale to Capita. However, Newwatch makes various equitable claims based upon the proposition that the Defendants acted in breach of fiduciary duty.

*The witnesses called and the important areas of factual dispute*

7.    The trial occupied 23 days, including just over 18 days of factual and expert evidence. A large number of factual witnesses gave evidence at trial, and the evidence covered the history of Updata Europe and Updata UK over many years in a very considerable amount of detail.

8.    The factual witnesses who gave evidence on behalf of the Claimants were: Mr. Johnsen, Mr. Henrik Hildebrandt, Mr. Flemming Holm and Mr. Jorgen Johnsen, all of whom had been the Danish directors of Updata UK at various times in the period prior to the sale in July 2009. The other factual witnesses were:

i)    Mr. Jens Nielsen (the former chairman of Updata UK who was interested in purchasing the business in 2009);

ii)    Mr. Esben Bigaard (whose company purchased Updata Europe in late 2009, and who was a signatory to the assignment documentation);

iii)    Mr. Mads Birkeland, a dual-qualified Danish lawyer and English solicitor who worked in London for the law firm Corren Troen, and who acted on behalf of Updata Europe and Newwatch in connection with the sale, and subsequently on behalf of Vald. Nielsen in connection with the assignment;

iv)    Mr. Henrik Bremerskov, who was a 5% shareholder in Updata Europe and worked in Denmark for the Updata group;

v)    Mr. Thomas Nyegaard, an investment banker by profession, and a shareholder in Updata UK by virtue of having provided some initial funding at the request of Mr. Johnsen who was a childhood friend;

    vi)     Mr. Lynge Thang Jorgensen, who was a senior officer within the bank which had extended loan facilities to Updata Europe and its Danish subsidiary; and

    vii)    Ms. Tina Kambo (nee Rana), who was in 2009 a junior solicitor at Corren Troen. She assisted Mr. Birkeland with certain administrative but nevertheless important aspects of the transaction. This included the gathering of materials for a data room ("the Data Room") in connection with the bidding process and the eventual sale.

9.     In addition, a number of Civil Evidence Act statements were adduced, most notably a statement given by Mr. Helge Homann prior to his death in 2017. Mr. Homann was a senior partner with KPMG in Denmark, and played various roles in the events leading to the sale. He was responsible for the audit of Updata Europe, but he also provided assistance to Mr. Nielsen in connection with his proposed bid and due diligence work.

10.    On the Defendants' side, the principal factual witnesses were the Defendants themselves. Each of them was cross-examined at considerable length. The only other factual witnesses were:

    i)     Mr. Pieter Hooft, who had been responsible for the MBO transaction on behalf of LMS; and

    ii)    Mr. Finn Jepsen who had briefly been appointed as "Supervisor" of Updata Europe and whom (the Defendants alleged) was the person that was intended to be deceived by the backdating of the assignment documentation.

11.    At the time of the events leading to the sale, the Defendants had been advised by a firm of corporate financial advisers called Tenon Corporate Finance ("Tenon"). Despite their central role in the relevant events, no witness from Tenon gave a statement or was called to give evidence.

12.    Although the factual evidence was wide-ranging, the important aspects of the that evidence in my view concerned the following areas:

    i)     The events, which really began in early 2009, concerning the negotiations and dealings of the parties, and ultimately leading to the sale of Updata UK in July 2009. These are central to the allegations of deceit and conspiracy, and in particular what representations were made, whether they were deliberately false, and whether they induced the sale.

    ii)    The factual circumstances, also in 2009, relevant to the parties' arguments on causation, and in particular whether or not Updata Europe would or would not have sold to LMS at the offered price even if false representations had not been made. The facts relevant to this issue included the dealings and relationship between Updata Europe and its bank in the context of Updata Europe's indebtedness to that bank, the general market conditions prevailing at that time (not long after the onset of the global financial crisis in the autumn of 2008), and whether there was a realistic possibility of any sale to an alternative purchaser, such as Mr. Nielsen or his backers.

iii)   The facts relating to the assignment to Vald. Nielsen which was executed in January 2011, and the circumstances which led to it. This sequence of events starts in mid-2010, but the critical period is November 2010 to January 2011.

13.   Accordingly, this judgment deals in some detail with the facts between 2009 and early 2011, and in less detail with the facts outside that period except in so far as those facts cast light on the events in the period 2009 to early 2011.

14.   Although there were a large number of witnesses called, this is not a case whose determination requires the resolution of sharp or significant conflicts between the evidence called by the Claimants on one side and the Defendants on the other. Disputes between these witnesses did exist, for example as to what was said at a meeting on 29 May 2009 in the run-up to an important e-mail sent on 3 June 2009 ("the 3 June e-mail"), and which the Claimants allege to contain fraudulent misrepresentations. Rather, the principal focus of cross-examination on both sides involved examining and exploring what was really known and happening on the other side of the fence, as it were, and which was not known at the time by the EVs on the one hand, or the Defendants on the other.  Thus, in relation to the deceit and conspiracy case, the Claimants sought to cross-examine the Defendants by reference to the picture that was said to emerge from a careful examination of the Defendants' own internal documents; the principal feature of that picture being expected financial results which were far more optimistic than those given to the EVs. Similarly, on the issues of whether any loss had been suffered, the Defendants explored in some detail the circumstances in which Updata Europe found itself, and in particular its indebtedness to its bank. The Defendants did know at the time that there was a significant indebtedness, but they did not know much of the detail of the dealings which were explored in the evidence. Similarly, the assignment issue involved examination of dealings on the Claimants' side of which the Defendants were unaware at the time. It was only as a result of disclosure within these proceedings that the Defendants became aware of materials which, on their case, enabled them to attack the assignment by alleging serious wrongdoing by a large number of individuals, but which ultimately narrowed so as to focus on just three: Mr. Johnsen, Mr. Homann and Mr. Bigaard.  Prior to these proceedings, the Defendants had taken no point on the validity of the assignment: for example, in February 2011 they had each been happy to sign a "Deed of Rectification" to the SPA which identified Vald. Nielsen as assignee, and which provided them with a significant benefit.

15.   Each side therefore sought to contend that the evidence advanced by the witnesses on the opposing side, as to what they were thinking, doing and would have done in other circumstances, should be rejected in the light of the contemporary documents and inherent probabilities.

*General approach to the evidence*

16.    There was no dispute that, in assessing the evidence of the factual witnesses on all issues, I should adopt the approach commended by Robert Goff LJ in *Armagas Ltd v. Mundogas S.A.* (The Ocean Frost), [1985] 1 Lloyd's Rep. 1, 57:

> "Speaking from my own experience, I have found it essential in cases of fraud, when considering the credibility of witnesses, always to test their veracity by reference to the objective facts proved independently of their testimony, in particular by reference to the documents in the case, and also to pay particular regard to their motives and to the overall probabilities. It is frequently very difficult to tell whether a witness is telling the truth or not; and where there is a conflict of evidence such as there was in the present case, reference to the objective facts and documents, to the witnesses' motives, and to the overall probabilities, can be of very great assistance to a Judge in ascertaining the truth."

17.    In the same case, Dunn LJ said (to similar effect):

> "I respectfully agree with Lord Justice Browne when he said in *re F*, [1976] Fam. 238 at p. 259, that in his experience it was difficult to decide from seeing and hearing witnesses whether or not they are speaking the truth at the moment. That has been my own experience as a Judge of first instance. And especially if both principal witnesses show themselves to be unreliable, it is safer for a Judge, before forming a view as to the truth of a particular fact, to look carefully at the probabilities as they emerge from the surrounding circumstances, and to consider the personal motives and interests of the witnesses. As Lord Wright said in *Powell v. Streatham Manor Nursing Home* sup. at p. 267:
>
> > . . . Yet even where the Judge decides on conflicting evidence, it must not be forgotten that there may be cases in which his findings may be falsified, as for instance by some objective fact . . .
>
> and he referred in particular to some conclusive document or documents which constitute positive evidence refuting the oral evidence of the witnesses."

18.    The approach of Robert Goff LJ was approved by the Privy Council in *Grace Shipping v Sharp & Co* [1987] 1 Lloyd's Rep 207 at 215-216:

> "And it is not to be forgotten that, in the present case, the Judge was faced with the task of assessing the evidence of witnesses about telephone conversations which had taken place over five years before. In such a case, memories may very well be unreliable; and it is of crucial importance for the Judge to have regard to the contemporary documents and to the overall probabilities.
>
> …
>
> That observation [i.e. of Robert Goff LJ] is, in their Lordships' opinion, equally apposite in a case where the evidence of the witnesses is likely to be unreliable; and it is to be remembered that in commercial cases, such as the present, there is usually a substantial body of contemporary documentary evidence."

19.    Robert Goff LJ's approach is also reflected in more recent authority such as *Gestmin SGPS SA v Credit Suisse (UK) Ltd* at [2013] EWHC 3560 (Comm) at [15]-[23].

20.    There was therefore no dispute in the present case that my approach should be to consider the objective evidence and in particular the documentary evidence, as well as the inherent probabilities, and to test the accounts of the witnesses against those matters.

21.    In so doing, I bear in mind that the events with which the trial are concerned took place some 10 years ago. It was obvious that a number of witnesses, in particular Mr. Jorgensen from the Bank, had great difficulty remembering those events with any degree of accuracy, given the passage of time and the ageing process. In some cases, too, illness or the effect of retirement from the business world meant that individuals who may have been much sharper 10 years ago were no longer at the top of their game. The Defendants also rightly submitted that the principal witnesses on both sides have much to gain or lose from the present litigation, which has been bitterly fought for many years, and that this will inevitably colour the ability of some of the witnesses to give objective evidence about the relevant events.

*Assessment of the witness evidence: general views*

22.    In assessing the evidence of the various witnesses, I have endeavoured to take into account their evidence as a whole. It does not follow from the fact that the evidence of a witness on a particular issue is to be rejected, or that a witness gave a single bad answer or series of bad answers, that everything that a particular witness has said is to be rejected. The evidence of a witness as to one part of the case may be consistent with the documents or inherent probabilities, whereas his evidence on another area of

the case may be otherwise. Accordingly, where the factual evidence of particular witnesses on a particular topic is important, I address that evidence in more detail below in the context of that topic. However, I start by giving some general observations which are reflected in my fact-findings later in this judgment.

*The Claimants' witnesses*

23.    On the Claimants' side, the principal witness was Mr. Peter Johnsen. He has, quite plainly (and in my view with some justification, for the reasons set out in this judgment) nursed a grievance against the Defendants for a considerable time; in that in 2010, fairly soon after the relevant events leading to the sale, he considered that he had been misled during the course of the negotiations. He has had to struggle to bring this claim to a hearing, facing the need to raise significant funds and also needing to overcome a strike-out application made by the Defendants. He has therefore been living with this case for many years. That said, it did seem to me that he did seek to give fair answers to the questions which he was asked, with as much objectivity as one might expect in the circumstances. For example, he made no attempt to downplay the financial difficulties which confronted Updata Europe, and he gave frank evidence about his unsuccessful attempts to find outside investment in Updata Europe in late 2008 and 2009 and the reasons for that lack of success. I have significant reservations, however, about his evidence as to his knowledge of the circumstances leading to the backdating of the assignment documentation in 2011. But this does not lead me to reject his evidence on other aspects of his case where his evidence is material, in particular the issue of inducement.

24.    Mr. Henrik Hildebrandt has also been living with this case for many years, and is one of its main protagonists together with Mr. Johnsen. He stands to gain significantly in the event that the claim succeeds. Nevertheless, it seemed to me that he sought to give careful and truthful answers to all the questions that he was asked. He gave a disarmingly frank account of the difficulties that would have confronted Updata Europe if it had tried to obtain alternative finance from a different bank in the aftermath of the 2008 financial crisis; evidence which to my mind holed one aspect (albeit not the most important part) of the Claimants' case on causation. I thought that in many ways he was an impressive witness, and consider that his evidence as to how he did react to the information that he was given, and how he would have reacted to other information that he was not given, was generally reliable.

25.    Mr. Flemming Holm is now aged 78, and has been retired for many years after a successful professional career. He was a witness who, in my view, must have lost something of his former sharpness. His recollection of events was not good. But he was undoubtedly seeking to assist the court in the evidence that he gave, even if at times the contemporary documents indicated that it was unlikely to be accurate. He was one of the individuals on the Claimants' side who was involved in the discussions leading to the 3 June e-mail, and it was plain from his evidence (which in material respects was not disputed) that he was both extremely concerned to ensure that both

bidders were operating on a level playing field, and understood and believed, following the 3 June e-mail, that they were.

26.    There were two other former Danish directors of Updata UK who gave evidence. First, there was Mr. Jorgen Johnsen, the father of Peter Johnsen. He was cross-examined only briefly, and no allegation of intention to deceive (in the context of the assignment) was put to him or ultimately pursued. The Defendants did not mount any particular attack on his evidence in their closing submissions. It did not seem to me that his evidence added very much, if anything, to the Claimants' case. But I see no reason to doubt the evidence that he gave.

27.    The other former director was Mr. Jens Nielsen. It was clear from the correspondence that he was held in low regard not only by the Defendants but also by Mr. Nyegaard (whose e-mail at the time referred to Mr. Nielsen as a "dimwit"). He had also fallen out with Mr. Johnsen some time before the sale. He has the prospect of a relatively small financial recovery, in respect of monies unpaid many years ago, if this action were to succeed. But I did not consider that he was a witness whose evidence was in any way motivated by the prospect of such recovery. As a witness, I thought that he sought to assist the court on the relevant facts by giving honest evidence, and that this was generally consistent with the documentation that he was shown in cross-examination. He was rather more impressive as a witness than some of the contemporaneous assessments of him as a businessman would indicate.

28.    Mr. Thomas Nyegaard provided seed capital for Updata UK, and ultimately substantially benefited from the sale to Capita in 2014, although his reward would have been greater if he had been permitted by LMS and the management team to roll over the full amount of his investment at the time of the sale in 2009. He had a good relationship with the Defendants in 2008 and early 2009, assisted them and was very much on their side in relation to the proposed MBO. He maintained a good relationship thereafter, notwithstanding a degree of unhappiness arising from his shareholding being reduced by the sale. He has no financial outcome in the present litigation, but in the light of the facts which have emerged he has a strong and genuine feeling that the Defendants behaved improperly in relation to the sale. I thought that Mr. Nyegaard was a most impressive witness, and at all times he sought to give accurate and truthful answers to the questions asked. In their closing submissions, the Defendants did not make any particular criticism of his evidence. I thought at the time, and still think, that his evidence provided a valuable insight into the relevant events, not least because in many respects Mr. Nyegaard could reasonably be viewed as an independent witness and I did not consider that he had any particular axe to grind.

29.    Mr. Birkeland gave evidence over a number of days, with other factual evidence being interposed. There were times when Mr. Birkeland was somewhat combative and argumentative, with a tendency to wish to support the Claimants' case. This is perhaps not surprising since he was heavily involved on Updata Europe's behalf in

the relevant events in 2009, and on Vald. Nielsen's behalf in relation to the assignment. He had also assisted in the litigation, certainly at the outset. Despite these matters, I considered that generally speaking Mr. Birkeland sought to assist the court by giving his genuine recollection of events. His evidence did not always support Mr. Johnsen. In relation to the deceit case, he gave evidence of the events which led to the 3 June e-mail, and in particular the preceding meeting on 29 May. I discuss this evidence in more detail below, where I accept much of his evidence about what was said at the meeting albeit not everything.

30.     Mr. Bigaard is a lawyer of many years' standing. He was not closely involved in the discussions which led to the assignment documents, which he had very much left to Mr. Homann. He had no obvious interest in the outcome of this litigation. He answered questions in a reasonable way, although his memory of events was somewhat hazy. I address his evidence in more detail in the section (Section J) addressing the assignment. I was not persuaded that he had intended to deceive the supervisor, Mr. Jepsen.

31.     Mr. Bremerskov was a small shareholder in Updata Europe. Neither his witness statement, nor the ensuing cross-examination, seemed to me to add anything material to either party's case. Indeed, his evidence was not referred to in the Claimants' closing, and merited only a brief footnote in the Defendants' closing.

32.     Ms. Tina Kambo (nee Rana) ("Ms. Rana") was the junior solicitor at Corren Troen who carried out work in relation to the Data Room. As part of her work, she was the recipient in July 2009 of a CD. This CD contained an important document: a "Weighted Budget" which had originally been prepared in March 2009. However, neither Ms. Rana nor anyone else on the EVs' side spotted that a potentially important document had been disclosed in the closing stages of the transaction and the EVs never looked at it. These events relating to this CD were central to the argument advanced by the Defendants on a strike out application in 2016 before Sir Richard Field. In particular, the Defendants argued on that occasion that the disclosure of this Weighted Budget meant that the Defendants could not have been dishonest, and that the case was a suitable one for striking out. By the end of the trial, however, it seemed to me that this particular argument had rather evaporated, and rightly so. Ms. Rana's evidence as to her work on the Data Room was not the subject of any significant challenge, and she gave her evidence carefully and well. If her evidence were truly material to any issue, then I would have no difficulty in accepting it. But in the end I did not consider her evidence to be of any particular importance.

*The Defendants*

33.     The Defendants are three intelligent individuals who clearly worked hard to make Updata UK the success that it undoubtedly was. They were each handsomely rewarded by the eventual sale to Capita, receiving around £ 21 million for their shares. In 2009 they were, in my view, very highly motivated to make sure that the LMS bid and the MBO succeeded, and that Mr. Nielsen's bid failed. As Mr. Hooft explained in his evidence when speaking of the position in mid-April 2009, the

Defendants were "very scared of losing control of the business". Contrary to the evidence given by the First Defendant ("Mr. Baldorino") and the Second Defendant ("Mr. Bennett"), they were not at any stage interested at that time in trying to obtain the maximum price either for their own shares or still less for the shares owned by the majority shareholder Updata Europe. They were also highly motivated to remove, or at least significantly dilute, Updata Europe as shareholder; something which is essentially an aspect of their desire for the MBO to succeed. (I address these matters in more detail in Section F below.) Their motivation for the MBO to succeed, and for Mr. Nielsen to fail, was such that they were in my judgment prepared to lie in the two e-mails which are at the heart of the Claimants' case on deceit. I do not consider the responses in those e-mails to be consistent with honest responses to the questions or issues raised, and to which the responses were being given: see Sections D and E below. I am also, for reasons which will be explained in this judgment, unable to accept the Defendants' evidence on many of the critical issues in the case. I also consider that the Defendants' evidence to Sir Richard Field was misleading; in particular in failing to explain to the Court that, as all the Defendants have now said in their evidence, the disclosure of the Weighted Budget to Ms. Rana was accidental and by mistake. Had this been explained, and for reasons also explained in Section F, I consider that the central case advanced to Sir Richard Field (namely that the Defendants could not have been dishonest because they disclosed the Weighted Budget) would have been fatally undermined and indeed would have been unarguable. It will therefore be apparent that I am not willing to accept the evidence of the Defendants on important issues unless corroborated by contemporary documents or other evidence or unless clearly consistent with the inherent probabilities.

34.     Mr. Hooft of LMS  was a witness who generally gave reasonable and fair answers to the questions which he was asked. I did consider, however, that he had a tendency to seek to "spin" some of his answers on important questions so as to paint LMS in a good light and justify what, even on the Defendants' expert evidence, was the purchase of Updata Europe's shareholding at a significant undervalue. I was not convinced by his denial that LMS's offer started from the level of the debt and then used the EBITDA figures to justify it, rather than the other way round. It seemed to me that this was the natural reading of the relevant slide in the presentation which LMS gave on 2 April 2009. This slide started by saying that the "Loan face value of £ 5m sets "base level" expectation for 60% stake", and then went on to state that the historical, last 12 months and year to date figures gave "ammunition" for a lower valuation. Mr. Hooft had not, as far as I could see, exhibited or disclosed any of LMS's internal documents relating to the transaction, and it was therefore not possible to test some of Mr. Hooft's assertions – for example as to how the original offer was calculated, whether certain figures for future earnings prepared by Mr. Szpiro were considered too optimistic, and whether LMS had in fact reached close to the maximum amount that they were prepared to pay for the business – against such materials. I do not suggest that Mr. Hooft was other than an honest witness, but bearing in mind the above matters as well as the fact that Mr. Hooft was giving evidence in relation to matters many years ago and without LMS's internal documents in front of him, I treat his evidence with a degree of caution.

35.     Mr. Jepsen gave a short statement and was cross-examined briefly. His evidence was not controversial, since there was no dispute that he was not told about the assignment of Updata Europe at the time it was made. He only learned of it long after his short tenure as supervisor had come to an end.

*Expert evidence*

36.     The expert evidence on Danish law was given by Mr. Jakob Rosing and Ms. Kamilla Krebs for the Claimants, and Ms. Henriette Gernaa and Mr. Peter Carlstedt Nortved for the Defendants. The Claimants' original expert on Danish law was Mr. Jens Rostock-Jensen. Owing to illness, he was unable to give oral evidence, and Mr. Rosing and Ms. Krebs (partners at Mr. Rostock-Jensen's law firm) stepped in at a late stage and, save for some relatively uncontroversial and minor points, adopted what Mr. Rostock-Jensen had said in his prior reports and the joint report. In the end, there was relatively little disagreement between the experts as to the relevant Danish law principles, and I address their evidence in context below.

37.     The experts on valuation were Mr. Doug Hall for the Claimants and Mr. Paul Smethurst for the Defendants. Their disagreements were more substantial. Again, I address their evidence in the appropriate context below.

*Scheme of this judgment*

38.     In the following section of this judgment, I outline the factual background and the broad chronology of the relevant events in Section B. Section C sets out legal principles relating to the tort of deceit. A number of the issues in the case require more detailed treatment and consideration of the facts, and these are addressed in later sections: Section D, which addresses the 20 April e-mail relied upon by the Claimants in support of their case on deceit and conspiracy; Section E, which addresses the 3 June e-mail; Section F, which addresses a number of aspects of the Defendants' evidence and conduct at the time; Section G, which addresses inducement. I then turn to consider the arguments on causation (Section H), the fair value of Updata UK (Section I), assignment (Section J) and breach of fiduciary duty (Section K).

## B: Factual background and broad chronology of relevant events

*The Updata group of companies*

39.     The origins of the group of companies which ultimately included Updata Europe and Updata UK can be traced back to 1996. In that year, Mr. Johnsen, a Danish citizen, founded Updata Danmark A/S. By 1999, the business of that company was the provision of network solutions to local government authorities in Denmark. It enjoyed a measure of success, winning a large proportion of new tenders for local government contracts in Denmark, although by 2009 it owed substantial amounts to its bank. In 2001, Mr. Henrik Hildebrandt joined Updata Denmark as sales director.

40.     In 2003, Mr. Johnsen and Mr. Hildebrandt decided to open an English company to develop a similar business in the UK market. Mr. Johnsen decided to go into business with Mr. Baldorino, who took a 15% share in the company, Updata UK. Mr. Bennett" was Mr. Johnsen's cousin, and Mr. Johnsen offered him a position at Updata UK together with a 7.5% shareholding. Part of the initial funding for Updata UK was provided by Thomas Nyegaard. Mr. Nyegaard provided a £ 100,000 loan and received 5.1% of the shares. Mr. Johnsen's shareholding was initially held through Newwatch, but in 2006 this was changed so that 60% of the shares were held by Updata Europe and 12.4% by Newwatch. Thus, by the time of the sale in 2009, the shares in Updata UK were held as follows:

| Shareholder | No. of shares | Percentage |
| --- | --- | --- |
| Updata Europe | 600,000 | 60% |
| Newwatch | 124,000 | 12.4% |
| Mr. Baldorino | 150,000 | 15% |
| Mr. Bennett | 75,000 | 7.5% |
| Mr. Nyegaard | 51,000 | 5.1% |

41.     Updata Europe, which became the main shareholder in Updata UK, was incorporated by Mr. Johnsen in 2001 and acted as a holding company for the shares in other Updata entities. By early 2007 the shareholders in Updata Europe were Mr. Johnsen, his father Jorgen Johnsen, his mother Kristen Johnsen, Mr. Hildebrandt, Mr. Henrik Bremerskov and Mr. Jens Nielsen. Mr. Nielsen was in due course to play an important part in the events which led to the MBO.

42.     Prior to June 2007, Mr. Nielsen had acted as a director and chairman of Updata UK and Updata Europe. However, in June 2007 Mr. Johnson took steps to remove Mr. Nielsen from these positions and purchased his 7.5% shareholding, although as matters transpired he defaulted on payment of the full purchase price. By December 2008, Vald. Nielsen had become a shareholder together with the individuals (apart from Mr. Nielsen) identified in the preceding paragraph. Vald. Nielsen was a company which was owned by Jorgen Johnsen and other members of his family, and it (or its subsidiaries) had been the Johnsen family business for nearly 100 years. In due course, it was to become (or purported to become) the assignee of rights of Updata Europe. The assignment was aimed at benefiting the former shareholders of Updata Europe (although not Mr. Bremerskov) who had identified potential claims against the Defendants arising out of the sale in July 2009. By the time that these claims had been identified, these shareholders were no longer the owners of Updata Europe, which had been sold in December 2009 to a company owned by Mr. Esben Bigaard. Mr. Bigaard and his company had no interest in pursuing these potential claims for their own account, and were happy to assign them to Vald. Nielsen. As already outlined, there is a significant issue as to the validity of the assignment as a result of the backdating of the assignment documents. But, unsurprisingly, arguments that the assignment fell foul of English law principles relating to champerty were ultimately abandoned; no doubt in view of the fact that the assignment was intended to benefit the Danish prior shareholders in Updata Europe who had lost out in consequence of the alleged fraud.

43.     In addition to Updata UK, there were a number of other directly or indirectly owned subsidiaries of Updata Europe which played some part in the relevant events. There

were a number of Danish companies including Updata Danmark A/S ("Updata Denmark") and Change Networks ApS, both of which were both wholly owned by Updata Europe. Another Danish company within the group was Cagain Europe ApS in which Updata Europe had a 52% interest. Separate companies were incorporated in Spain and Germany with a view to an expansion into those countries which proved unsuccessful.

*Sparekassen Lolland A/S*

44.   Updata Europe's bank at the material times was Sparekassen Lolland A/S ("the Bank"). This was a regional Danish bank whose CEO was Mr. Lynge Thang Jorgensen.Updata Europe and Updata Denmark had been customers of the Bank for some time prior the events of 2009, and had gradually built up significant debts. By the time of the sale in July 2009, Updata Denmark owed DKK 14-16 million to the Bank, Updata Europe owed DKK 27 million and had guaranteed the debts of Updata Denmark. The total liability was in the region of DKK 41- 43 million. At the time, the DKK:£ exchange rate was around 8.5:1. The total indebtedness to the Bank was therefore around £ 5 million, inclusive of the guarantee of the debts of Updata Denmark. A further DKK 14 million (around £ 1.6 million) was owed to Vald. Nielsen.

45.   The Bank's lending to Updata Europe and Updata Denmark represented some 2% of its loan portfolio and this meant that the group was both an important customer and a significant exposure. By the end of 2008, the Bank was looking to reduce this exposure, not least because of a general desire to reduce exposures in view of the global financial crisis of late 2008. Indeed, the finances of the Bank itself, as with many banks around the world, were under strain as a result of this crisis and in particular because of problems within a subsidiary bank which was heavily exposed to the property market.

*Updata UK's business and management*

46.   Updata UK's business was in the telecommunications sector. It involved the creation of networks for local authorities, using existing infrastructure at a competitive cost. A contract would involve a customer paying an installation fee, and thereafter a periodic (usually quarterly) rental fee. The contracts were medium or long-term and the process of tendering and obtaining a contract was usually long, and could take 12-18 months. The nature of the business was such that Updata UK had, and was looking to obtain, a small number of large, long-term contracts rather than a large number of small contracts.

47.   The management team at Updata UK comprised Mr. Baldorino as Commercial Director, Mr. Bennett as Sales Director, Mr. Mantell as head of finance and Mr. George Cowan (who is not a defendant to these proceedings) who was head of operations. Mr. Baldorino was one of the initial directors of Updata UK. Mr. Bennett was initially the company secretary, and was later appointed as a director. Mr. Mantell had joined in 2004 but was not a director of Updata UK prior to sale.

48.   In addition to Mr. Baldorino and Mr. Bennett, Updata UK's board included a number of Danish directors. Initially these were Mr. Johnsen and Mr. Nielsen. Mr. Nielsen was removed as director in 2007 and Mr. Johnsen resigned as a director in February

2008. Following these changes, the Danish directors in 2009 were Mr. Hildebrandt, Mr. Holm and Jorgen Johnsen. Mr. Holm was a former partner in Arthur Andersen and became chairman of Updata UK. The three Danish directors were non-executive directors.

*The position in late 2008*

49.     Although the evidence in the case covered in immense detail much of the history of the various Updata companies, it is unnecessary to describe this in detail and the material events can be described by reference to the position in late 2008. However, I will briefly sketch the background which I take from the evidence of Mr. Nyegaard. He was the childhood friend of Mr. Johnsen who had provided around £ 100,000 as start-up capital for Updata UK, in return for 5% of the equity (which subsequently grew to 5.1%). He was an investment banker by profession and took an active interest in Updata UK and developed a close relationship with the UK management team, and specifically Mr. Bennett and Mr. Baldorino. He was called as a witness by the Claimants, and much of his evidence as to the events which led to the buyout was not controversial. As I have indicated, he was a very impressive witness, and had the advantage from my perspective of not having any financial interest in the outcome of the present litigation.

50.     By 2006 and certainly by late 2008, Updata Europe was in an increasingly difficult financial situation due to its indebtedness to its Bank. This debt was exacerbated by the failure of an attempt to expand into Spain. Mr. Johnsen had decided upon this expansion against the advice of Mr. Baldorino, who was half Gibraltarian and knew the market. An attempt to expand into Germany had also been unsuccessful. The precarious nature of the finances of Updata Europe resulted in pressure on Updata UK.

51.     These factors contributed, over the course of several years, to a falling out between Mr. Baldorino and Mr. Bennett on one side, and Mr. Johnsen on the other, and what Mr. Nyegaard described as a general lack of trust between the UK and Danish owners of Updata UK. Mr. Nyegaard said in his witness statement that Mr. Johnsen came to be considered as the "enemy" by the UK management team. Mr. Bennett wrote a lengthy memo to Mr. Holm, in around February 2008, where he referred to the relationship being characterised "by lack of communication and mutual distrust". The memo referred to an accusation that the UK team had provided false, incomplete information to the majority shareholders for their own gain, and it went on to deny that this had ever happened:

> "The information supplied by the UK team has never been manipulated to show a false picture and the figures provided have been the same with which the UK management team have managed the business and are the ones which have kept Lloyds and BDO satisfied with the reporting standards. The UK team bitterly resent accusations to the contrary".

52.     Mr. Johnsen's evidence was that he did not recall ever saying anything to the effect that he mistrusted the UK management, and did not recall Mr. Hildebrandt or his father doing so either. He thought that the accusation, referred to in the memo, had been made by Mr. Nielsen. He agreed, when it was put to him in cross-examination,

that from the Updata Europe board's perspective, the UK management had always behaved professionally, and that as far as he could tell the management had always dealt with Updata Europe in a straightforward manner. Mr. Hildebrandt said that whilst the relationship between the UK management and Updata Europe was not the best, he did not believe (speaking of the position in June 2009) that Updata UK would hold back information, and that he "trusted" them. Mr. Holm said that he personally had good communication with the UK management, but did not think that they were "interested in co-operating with the group". Mr. Bennett said in his evidence that he did not think that Mr. Johnsen "should have had reasons to distrust me".

53.    Overall, the evidence in the case suggested to me that the lack of trust described by Mr. Nyegaard reflected more the attitude of Updata UK towards Updata Europe, rather than vice versa. But nevertheless the Updata Europe board was aware that relations were not the best, and that there was a degree of antipathy on the part of the UK management towards them.

54.    There were various attempts over the years to restructure the group. One plan was to merge Updata Europe and Updata UK, which would have had the effect of enabling Updata Europe to benefit directly from the business and cashflow of Updata UK. This was fiercely resisted by the minority shareholders of Updata UK (i.e. Mr. Baldorino, Mr. Bennett and Mr. Nyegaard). In late 2007, the minority shareholders put forward proposals for the acquisition of shares which would have the effect of reducing Updata Europe's shareholding, but this was rejected by the Danish shareholders.

55.    Mr. Nyegaard described how, during 2008, the situation between Updata UK and Updata Europe was strained and continued to deteriorate, due to the lack of confidence that Mr. Baldorino and Mr. Bennett felt in Updata Europe's expansion plans. The UK management felt that the Danish shareholders were serving their own interests, or those of the various Danish companies, at the expense of Updata UK. These companies were seen as a potential drain on Updata UK, and the time of the UK management was spent in fighting internal battles with the shareholders of Updata Europe.

56.    In late 2008 and early 2009 a further proposal was made to regulate the relationships between the shareholders, but this came to nothing. The failure of this route led the UK management and Mr. Nyegaard to believe that the situation, which they regarded as profoundly unsatisfactory, needed to be resolved by replacing or diluting Updata Europe as the majority shareholder of Updata UK. From the UK management's perspective, the preferred route was a management buyout rather than simply finding a new majority shareholder. Mr. Nyegaard agreed to assist the management team to find a solution that would give them more stability in the day-to-day business of running the company.

57.    In late December 2008 and January 2009, the Defendants had sought advice from Tenon. At that point in time, the Defendants wanted Tenon to assist them in: (i) demonstrating that Updata UK could not afford to pay £50,000 per month to Updata Europe; and (ii) preparing for a possible "pre-pack" administration of Updata UK.

*January – March 2009: Mr. Nielsen's approach*

58.     In late 2008 and early 2009, Updata Europe was under increasing pressure from the Bank to repay or reduce its debts or provide further security. The Bank's role and attitude at this time, and as the events of 2009 unfolded, are crucial to arguments advanced by the Defendants in relation to reliance, causation and quantum and I will address them in greater detail in that context. There is no dispute, however, that Updata Europe's very difficult financial position was a significant factor in the events leading to the sale of Updata UK.

59.     The trigger for a possible MBO of Updata UK was a proposal made on 16 January 2009 by Mr. Jens Nielsen to Mr. Jorgensen of the Bank. The letter was copied to Mr. Helge Homann of KPMG, who were Updata Europe's auditors. Mr. Nielsen indicated that he was prepared to purchase 100% of Updata Europe or 100% of Updata UK. The letter sought an exclusivity period during which he could conduct due diligence. The letter indicated that, subject to due diligence, Mr. Nielsen anticipated placing a bid placing a value of £ 5.0 million on the UK company. That was roughly the level of Updata Europe's debt to the Bank.

60.     The Defendants learned of Mr. Nielsen's proposal in early February 2009. Mr. Nielsen's possible purchase of Updata UK was regarded by UK management, for a large variety of reasons, as very undesirable indeed. They did not like Mr. Nielsen and held him in low regard. They were, as Mr. Hooft said, scared of losing control of the company, particularly to someone like Mr. Nielsen. In their evidence at trial, the Defendants explained that they would not have stayed with the business under Mr. Nielsen's control.

61.     This unwanted approach led to Mr. Bennett, on 25 February 2009, meeting with Tenon again, this time for the purpose of discussing Tenon's role in finding a backer for either an MBO or a pre-pack administration. An e-mail from Tenon on 26 February referred to the discussion at the meeting which was either to identify funders "prepared to invest £ 4-5 million to facilitate an acquisition from your overseas parent" or alternatively "identifying funders prepared to fund an acquisition out of administration of £ 2-2.5 million". In due course, on 16 March 2009, Tenon were formally engaged by the UK management. A letter of engagement set out Tenon's role and responsibilities. The sequence of events and the terms of engagement are discussed in more detail in Section E below. In the meantime, prior to or around the time of Tenon's formal engagement, the Defendants had meetings with a number of private equity houses in early March 2009 with a view to finding a backer for an MBO. These included meetings on 12 March 2009 with Moore Capital; 17 March 2009 with Inflexion; and with Lloyd's Development Group.

62.     Between 16 and 18 March 2009, Mr. Nielsen and Mr. Homann attended Updata UK's offices for the purpose of conducting due diligence. In addition to his role as Updata Europe's auditor, Mr. Homann was providing assistance to Mr. Nielsen in connection with his bid. They sought information about Updata UK's financial forecasts for 2008/09 and 2009/10, as well as copies of all customer contracts. Mr. Nielsen and Mr. Homann received a copy of a presentation headed "Financial Overview". This document ("the Financial Overview") is a critical document in the case. It showed the following:

| (£000) | Budget 2009 | Forecast 2009 | Budget 2010 Worst case | Budget 2010 Middle case | Budget 2010 Best case |
|---|---|---|---|---|---|
| Turnover/sales | 11,046 | 10,490 | 6,864 | 7,540 | 15,183 |
| Profit before tax | 1,103 | 904 | 154 | 418 | 2,195 |
| EBITDA | 1,695 | 1,496 | 1,129 | 1,393 | 3,348 |

63. The important figures, on which the arguments in the present case have centred, are those for EBITDA (i.e. Earnings before Interest, Tax, Depreciation and Amortisation). This is the financial metric which is particularly relevant to potential investors in companies, with valuations commonly being based upon a multiplier being applied to EBITDA. The Financial Overview therefore indicated that Updata UK was behind budget for the financial year 2009, which by that stage had run for just over 8 months: the company's financial year ended on 30 June of each year. It also indicated that the company's "Middle Case" for the following year (i.e. the year ending 30 June 2010) would decline; i.e. reduce from EBITDA of £ 1,496,000 to £ 1,393,000, albeit that the "Best Case" would show an improvement to £ 3,348,000.

64. The concepts of "Worst case", "Middle Case" and "Best Case" were explored in the evidence, and I say something about those concepts at this stage since they are relevant to the figures which I subsequently describe. Mr. Hooft of LMS agreed in evidence that: a "best case is normally on the assumption that everything goes right. Worst case will be everything that can go wrong does and middle case will be realistic." Similarly, Mr. Bennett agreed:

> "Q. Would you agree, therefore, normally when someone has, as it were, best case, middle case and worst case, obviously worst case you're not assuming an asteroid hits the planet or something of that sort, but in realistic terms, you're looking at what realistically the worst case for the worst case; yes? What you would more or less expect as a reasonable outcome being the middle case; yes?
>
> A. Yes.
>
> Q. And then, again, although sometimes best case can be exceeded, but the best case would normally be the realistically best case that it was thought could be achieved?
>
> A. I would agree with that."

65. Accordingly, the concepts of a "worst case" and a "best case" would not be understood literally, with worst case denoting Armageddon (or as Mr. Booth colourfully put it, an asteroid hitting the planet) and a best case denoting Utopia. Rather, they denote a realistic worst case and a realistic best case. A company's middle case would therefore represent something in between: as Mr. Bennett said what would be "more or less" expected to be achieved.

*March – April 2009: events and the work leading to the LMS offer on 16 April 2009*

66.     Prior to and around the same time as Mr. Nielsen and Mr. Homann were provided with the Financial Overview, the Defendants had started to provide financial information to Tenon for the ultimate purpose of producing an investment memorandum to send out to potential backers of their proposed MBO. There was evidence that Tenon were provided with the Financial Overview itself, but it is plain that this document was of no significance in relation to the projections which were developed in March and which ultimately were reflected in the investment memorandum.

67.     It is not necessary to describe in detail, at this stage, all the exchanges between the management team and Tenon in March: I address this in more detail in Section E below. For present purposes, the important features of those exchanges can be summarised as follows. The attachment to the e-mail sent by Tenon following the meeting on 25 February was a document headed "Updata Infrastructure – Due Diligence". This referred to "[weighted case] budget for the year to 30 June 2010" and the "[weighted case] projections for the year to 30 June 2010". (The words "[weighted case]" were in square brackets in the document.) The concept of a "weighted" case was that the budget or projection would consider contract opportunities which were available to Updata UK, and give them an appropriate weighting to reflect the likelihood of a successful outcome and the consequent income generation.   This was a concept familiar to Updata UK, and in particular Mr. Baldorino who had developed his own system of weighting which depended upon the stage which a particular proposed project had reached.

68.     As matters progressed in March, Tenon were provided with a number of documents, again as described in more detail in Section E.

69.     The information provided to Tenon included a document setting out detailed information as to projects in the "pipeline". Thus, on 25 March 2009, Mr. Baldorino e-mailed Guy Helman at Tenon with a spreadsheet entitled "Pipeline Breakdown v1". He had shared this document with Mr. Mantell and Mr. Bennett in advance. It showed, in a digestible format: (i) the identity of the contracting counterparty; (ii) the value of each contact; (iii) the prospect (in a column headed "Probability") of the contract being won by Updata UK expressed as a percentage, with a commentary on the stage reached in the negotiations; and (iv) the identity of nine contracts with 100% prospects (i.e. the contracts had been won by Updata UK albeit not yet formalised).

70.     The information also included detailed financial projections, in the form of a "Weighted Budget". These budget documents were authored by Mr. Mantell (as shown on the metadata), and were based on Mr. Baldorino's weighted pipeline. Mr. Mantell circulated a number of versions of a 2009/10 weighted budget on 25 March 2009: see further Section E below. The final version, referred to at trial (and herein) as the "March Weighted Budget" was circulated at 8.50 pm that night. This showed EBITDA figures for the 2009/2010 which were in excess of £ 6 million. The EBITDA figures were not shown as such in the budget documents, but are to be derived by adding back the figure for "depreciation" to the figure for "profit before tax"; the latter figure having originally been calculated after deduction of depreciation. The depreciation figure was £ 1,057,918, and the figure for "Profit before bank expenses" was £ 5,012,270. Using these figures, the EBITDA was £ 6,070 million. An

alternative calculation was to add the depreciation figure to the figure for "Profit before exceptional items" (£ 4,981,305). This would produce EBITDA of £ 6,039 million. The relatively small difference between £ 6,070 million and £ 6,039 million was the inclusion of bank charges of £ 31,000.

71.     These budget documents contained very detailed workings in relation to each of the contracts which were considered relevant for consideration. Despite being a "weighted budget", the projections were based primarily on contracts which had already been won. Only six contracts were included on a 'weighted' basis, and all of the contracts which Mr. Baldorino had weighted at 100%, in his pipeline document, were included without a discount.

72.     On 27 March 2009, Mr. Mantell e-mailed Tenon with a spreadsheet entitled "Budget 2009-2010 (weighted case) (v4)". The material figures had not changed. It showed EBITDA (using the figure for "Profit before exceptional items") for 2009/10 of £ 6.070m based on turnover of £ 19.039m.

73.     The information supplied by the Defendants was then incorporated into two documents: the "Tenon Memorandum" and the Tenon Data Pack. These documents were sent to potential backers of the MBO. The Tenon Memorandum ran to 23 pages, and stated at the start that it had been prepared by Tenon "based on information provided by the management of [Updata UK] and has been approved by the management." It provided an upbeat assessment of the company's prospects. It described the business as profitable, highly cash generative and with a significant qualified new business pipeline in excess of £ 70 million. It also provided a description of Updata Europe's indebtedness to the Bank. The relevant paragraphs were in the following terms:

> 3.2 Opportunity
>
> The opportunity is to acquire an established fast growing managed network service provider with long term contractual relationships with local authorities in the UK. The business is profitable, highly cash generative and has a significant qualified new business pipeline in excess of £70m.
>
> Updata Europe owes c£3m to a small Danish Bank ('The Bank') which has taken security over the shareholding in Updata.
>
> The Danish Bank is keen to find an investor into Updata Europe and has been exploring this option although it realises that a sale of their 60% holding in Updata is the most likely exit. The Bank is now actively exploring this exit route.
>
> A private individual invested £1.5m into the Group in 2008 and their debt is held between two tranches of the Bank debt in terms of priority. Any purchaser will need to take this debt into consideration whilst formulating an offer for the business.

> Whilst total debt within Updata Europe totals an estimated DKR40m (£5m), it is anticipated that a deal might be possible at slightly below par value, although this will require further discussion and negotiation with the Bank.

74.    The reference to "par value" (as Mr. Hooft confirmed in his evidence) meant the amount of the debt.

75.    I note in passing that, as described above, the total debt to the Bank was, inclusive of the guarantee of Updata Denmark's debts, around £ 5 million, with an additional £ 1.6 million owed to Vald. Nielsen (the "private individual" referred to in the above passage). It seems, however, that (as the Claimants submitted) this was not appreciated by those on the MBO side at the time. They proceeded on the basis that the Bank was owed around £ 3 million (or DKK 26 million), which was secured by 1st and 3rd ranking charges on the shares, with a further sum of around £ 1.5 million owed to Vald. Nielsen and secured by a 2nd ranking charge sitting in between the Bank's debt. That meant that in order to pay off the Bank's DKK 26m debt in full, any offer would need to cover the sums owed to Vald. Nielsen as well. Nobody on the MBO side appears to have appreciated that the true extent of Updata Europe's liability to the Bank included the sums owed by Updata Denmark to the Bank and guaranteed by Updata Europe.

76.    In the section headed "Financials", there was a table which included the following actual and projected results which are material to the issues in the case:

| (£000) | Actual year end 30.06.08 | Forecast year ended 30.06.09 | Weighted forecast for year ended 30.06.10 |
|---|---|---|---|
| Turnover/sales | 5,133 | 11,045 | 19,039 |
| EBITDA | 813 | 1,694 | 6,071 |
| EBIT | 265 | 1,103 | 5,014 |

77.    The figures for 2009/10 were explained as follows:

> "The figures for Year Ended 30 June 2010 are weighted proportionately against the probability of securing the contracts. If Updata are successful in securing all of the contracts that they are presently tendering for this will lead to achieving a materially higher value of contracted revenue and EBITDA."

The 2009/10 projection was therefore taken from the March Weighted Budget, described above, prepared at the end of March. The projection was therefore very substantially in excess of both the "middle case" and the "best case" which were set out in the Financial Overview.

78.    The Tenon Data Pack was a lengthy document which included: a detailed analysis of the company's performance in the year to date; its anticipated earnings in the year to 30 June 2009; its projected earnings in the year 2009/10; and the status of each of its

actual and likely contract wins. The important features of the Tenon Data Pack included the following:

a)   It showed forecast EBITDA for 2008/09 of £ 2,479,000 against a budget of £ 1,717,000. Page 23 of the Data Pack gave details of this forecast under the heading "Management expect to outperform the FY09 budget by £ 0.8m of EBITDA". A similar statement appeared on page 4 of the Data Pack in a box which referred to the "Management Run rate". The text within the box stated: "Based on run rate Performance and known installations, management expect to outperform FY09 Budget".

b)   It showed forecast EBITDA of £ 6.070m for 2009/10: i.e. the same figure contained in the Weighted Budget and the Tenon Memorandum.

c)   It also showed "pro forma EBITDA" for 2009/10 of £ 4.4m. This was based on existing contracts which were set out on page 7 of the Data Pack.

d)   It included a detailed breakdown of the company's turnover and margin on each contract, as well as an analysis (in Appendix 2) of "current contracts" and (in Appendix 3) "new contracts" with weighting information as to the likelihood of new contracts being won.

79.   On 26 March 2009, the Defendants had meetings with three private equity houses (Octopus PE, Epic PE and Hamilton Bradshaw). Since the investment memorandum had not been completed at that point, the Defendants decided to use a pre-existing presentation known as the "Kelso Presentation" as part of their presentation to these potential investors. (This presentation had originally been given to a potential investor, Kelso, in October 2008). At 8.22am on 26 March, Mr. Bennett e-mailed the original Kelso Presentation to Mr. Mantell. At 8.30am Mr. Mantell replied, having amended the final slide on the Kelso Presentation to present the following financial information:

| (£000) | Mgmt. A/Cs 2008 | Budget 2009 | Forecast 2010 |
|---|---|---|---|
| **Turnover/sales** | 5,133 | 11,045 | 19,039 |
| **Profit before tax** | 28 | 1,112 | 4,981 |
| **EBITDA** | 854 | 1,704 | 6,039 |

80.   The 2009/10 figures in the amended Kelso Presentation were those from the March Weighted Budget circulated at 8.50pm on 25 March 2009. This amendment to the Kelso Presentation is of particular significance in the light of what was later said in the e-mail dated 3 June 2009.

81.   On 30 March 2009, Moore Capital followed up on their meeting with Mr. Bennett and Mr. Baldorino by requesting further information. This particular e-mail chain had commenced on 19 March 2009 with Mr. Bich of Moore Capital asking for "Updata's latest financial statements pls (Balance sheet, P&L, Cash flow statement)". Mr. Mantell responded by sending Mr. Bich a document known as the "2009/10 Weighted

Budget". This is a shorter version of a revision (immaterial for present purposes) to the March Weighted Budget sent to Tenon on 27 March 2009. It shows:

| (£000) | Budget 2009/10 |
|---|---|
| Turnover/sales | 19,039 |
| Profit before tax | 4,981 |
| EBITDA* | 6,039 |

* As previously indicated, EBITDA is not specifically shown, but it is to be derived by adding together the figure for "Profit before taxation" and "Depreciation".

82.    Following the release of the Tenon Data Pack, on 3 April 2009 the Defendants received a number of offers from potential backers. Nearly all of them were pitched at the same level: roughly £ 5 million for Updata Europe's 60% stake. This reflected the fact that the Tenon Memorandum had presented the "opportunity" as one to acquire at around or below the par value of Updata Europe's debt. It also reflected Tenon's remit, as described in their e-mail of 26 February 2009, to identify "funders prepared to invest £ 4-5 million to facilitate an acquisition from your overseas parent".

83.    LMS appear not to have sent an offer letter but instead presented their offer in a Powerpoint presentation to 2 April 2009. On valuation (and as I have already mentioned in my discussion of Mr. Hooft's evidence) LMS noted that:

-    "Loan face value of £5m sets "base level" expectations for 60% stake

-    This reflects equity value of £8.3m

-    Together with £1.4 million net debt at end of Feb this gives an enterprise value of £9.7 million

-    Certainly, Historical, LTM and YTD underperformance compared to budget give ammunition for lower valuation

-    However, if outturn numbers will be achieved, the entry price multiple falls to just below 4x EBITDA, a realistic valuation in today's markets…

-    …whilst Pro Forma numbers give a flavour of the upside to be gained by Investor / Management if UD UK successfully executes on its plan."

84.    Having considered the various proposals, the Defendants decided to work with LMS. On 14 April 2009, Mr. Bennett, Mr. Baldorino, Mr. Nyegaard, Mr. Hooft and Mr. Jamie Rhodes (of LMS), and Mr. Helman and Mr. Castledine (Tenon) met with Mr. Jorgensen in Denmark. I consider this meeting in more detail below (see Section H).

85.    On 16 April 2009 LMS sent their offer letter by e-mail to Mr. Holm, Mr. Johnsen and Mr. Jorgen Johnsen. The letter was addressed to Mr. Flemming Holm, as chairman of

Updata Europe. LMS offered DKK 65 million for the entire issued share capital of Updata UK. The letter explained that this "would value the 60% stake held by Updata A/S at DKK 39 million". LMS's letter stated that LMS had worked closely with management and advisers; that they had performed their:

> "stage one financial due diligence. This included a review of historical and year to date (YTD) trading results, historical and year to date ("YTD") trading results, historical and current balance sheets positions including analysis of working capital, as well as a review of key contracts."

86. The letter went on to provide an explanation or justification for the level at which they had pitched their offer:

> "From this information we know that YTD February 2009 results are behind plan due to delays on installations and lower than budgeted margins: Sales £6.0 million (budget £8.6 million) and EBITDA £0.8 million (budget £1.3 million). The actual run rate results of the company (12 months to 28th Feb 2009) are as follows: Sales £8.4 million, EBITA £1.5 million and EBIT £0.85 million. In other words, significant progress is still required to achieve budget results for June 2009. However, despite this shortfall, the Company is showing good growth compared to 2008.
>
> In addition, our analysis shows several creditors have gone unpaid (including VAT!) and the true indebtedness of the Company is around £1.4 million. The resulting enterprise value of Updata UK (using an exchange rate of 8.5 DKK/GBP) is £9.1 million.
>
> Therefore our Offer reflects the following valuation multiples:
>
> EBITDA £1.50 million = 6.1x
>
> EBIT £0.85 million = 10.7x
>
> We have taken these factors and the resulting high entry price multiples into account in formulating our Offer. We believe that under LMS ownership, a well financed Updata UK, freed from its current constraints, has good prospects for profitable growth."

*Reaction to the LMS offer and the 20 April e-mail*

87. On the morning of 20 April 2009, at 10.12am, Mr. Holm e-mailed Mr. Hooft to say that Updata Europe had given exclusivity to another party and was interested in getting investment into Updata Europe. That response prompted various communications that morning between LMS, Tenon and the Defendants. These are described in more detail below. In particular, at 10.28am Mr. Bennett e-mailed LMS, Tenon and others to say that "Peter Johnsen is coming to the UK this week with the

express intention of raising circa £2m". The Defendants at that stage already knew about Mr. Johnsen's intention to look for investment of around £ 2 million as a result of a proposal which Mr. Johnsen had made known as 'Project Eagle'. It was on the morning of 20 April that Mr. Bennett responded, rejecting that proposal.

88.    At 9.41am Mr. Johnsen e-mailed Mr. Bennett. The e-mail was written in Danish (which Mr. Bennett spoke), and the subject line was: "Re: Seneste budget". This meant: "Re: Latest budget".

> "Could you forward the latest budgets for Updata UK for 2008/9, 2009/10 and 2010/11. Some adjustments need to [have] been made regarding the changes that are mentioned in the letter from LMS.
>
> Thanks in advance.
>
> PS. I would very much like to use them today if possible"

89.    At 3.05pm, Mr. Bennett replied. He did not change the subject line "Re Latest budget". His e-mail response attached 6 pages of February 2009 management accounts and the Financial Overview. The text of his e-mail, which was written in English after the greeting "Hej Pede" was:

> "The numbers used by LMS were taken from the February Management Accounts. The projections used were the same that we presented to Helge Homann and Jens in March. Please see attached. I do not know what adjustments LMS have made internally."

90.    This e-mail forms one of the two central planks of the Claimants' case on fraudulent misrepresentation. In summary, the Claimants contend that Mr. Bennett was dishonestly representing that the Financial Overview was the latest budget which Mr. Johnsen had requested, and that this was a document which had been given to LMS. The true position, so the Claimants contend, is that Mr. Bennett knew that the Financial Overview was not the latest budget. The management's real expectation for 2008/2009 was for the higher figures which can be seen in the Tenon memorandum, and their real expectation for 2009/2010 was the higher figures in the March Weighted Budget which was also reflected in the Tenon memorandum. The Defendants deny that the e-mail contained any false representation and deny any intention to mislead. The parties' arguments on this e-mail, and its attachments, were extensive and are addressed in greater detail below: see Section D.

*May 2009 and the establishment of the Data Room*

91.    On 6 May 2009, Mr. Nielsen's team met with the Defendants as part of the continuation of Mr. Nielsen's due diligence. The Defendants were reluctant to meet with him. Mr. Baldorino's attitude is apparent from his e-mail to Mr. Nyegaard on 2 May: "Well, as far as I am concerned I don't want to see him. If he has something to say he can put it in writing. Quite frankly whatever he says … we are not prepared to work with him". Nevertheless, they did meet him.

92.     On 13 May 2009, Mr. Nielsen sent a "letter of understanding" to Mr. Holm and Mr. Jorgensen. He proposed to arrange for: (i) a capital injection of DKK 52.5 million for 75% of the share capital of Updata Europe (with the money to be used to repay the debts owed by Updata Europe to the Bank and to Vald. Nielsen); and (ii) the purchase of Newwatch's 12.5% interest in Updata UK. The valuations were based on "5.0 x EBITDA for both the Danish and English operations". Mr. Nielsen's letter expressed concern that the Defendants had not answered his questions following his due diligence meeting with them in March. He also noted that the Defendants had produced a "Business Plan" which had not been provided to his team. He said that "this document ought to be made available as it would provide management and staff's clearest picture of UK operations, revenue forecasts and commercial and strategic intelligence."

93.     On 15 May 2009, LMS made a second offer. LMS offered to purchase the entire share capital of Updata UK for DKK 76 million (valuing Updata Europe's 60% interest at DKK 46 million), representing an 18% increase in the price offered on 16 April. LMS explained that they had already done "extensive preliminary due diligence" in conjunction with Tenon and the management, but that final due diligence to completion would be required and this could start immediately. They stated that they would expect to enter into a period of exclusivity upon acceptance of the offer. They also offered the EVs the opportunity for them to "rollover" part of their interests into the new company: Newwatch could roll over its entire 12.4% interest; Updata Europe could retain a 10% interest in the newco.

94.     On 20 and 21 May 2009 Mr. Jorgensen e-mailed Mr. Birkeland recommending that a Data Room be opened as part of the sale process. Mr. Jorgensen asked Mr. Birkeland to pass his e-mail to Updata Europe's Board and interested parties. The e-mail also stated that "if Jens Nielsen wants to access the data room from Tuesday, 26 May 2009, the binding offer shall be submitted no later than Sunday, 24 May 2009." The requirement for a Data Room, and its subsequent establishment, are the important backdrop to the 3 June e-mail. The course of events is described in more detail in Section E below, and what follows here is a broad summary.

95.     In accordance with Mr. Jorgensen's request, a Data Room was established, in relation to Updata UK, at its premises in Reigate. On 22 May 2009, Mr. Birkeland e-mailed Mr. Bennett a draft list of information to be included in the Data Room. The same list was sent to Mr. Hildebrandt at Updata Denmark. It included "any current budget, forecast or business plan (prepared by or for the company or the management)" and "customer contracts". Mr. Bennett forwarded the list to Mr. Mantell.

96.     Both Mr. Nielsen and LMS were informed of the establishment of the Data Room on 22 May 2009. In response, Mr. Nielsen insisted that the Data Room should include:

          "answers to our questions to the UK management, copy of all contracts, pipeline information for UK, copy of all information, written and oral, given to LMS Capital (together with confirmation from UK management that this is the exact information handed over in writing and orally)…"

97.     On 26 May 2009, Mr. Nielsen e-mailed Mr. Jorgensen with: (i) a letter stating that he was working with e-Kong Group Limited (a telecommunications company listed in

Hong Kong) on a model involving a cash injection of DKK 60 million into Updata Europe (including the acquisition of Newwatch's shares in Updata UK); and (ii) a letter from e-Kong expressing their interest in participating in the acquisition of a majority stake in Updata Europe. On 28 May 2009, Mr. Nielsen sent a revised letter of understanding to Mr. Jorgensen (cc'd to Mr. Birkeland and Mr. Homann).

98.     On 28 May 2009, Mr. Birkeland and Mr. Bennett discussed the contents of the Data Room in a telephone call. Mr. Birkeland followed up his call by e-mailing Mr. Bennett a copy of the "draft data room rules". On the same day, Mr. Birkeland circulated a draft confidentiality agreement and drafts of the Data Room rules to LMS. The same documents were sent to Mr. Nielsen on 29 May. The Data Room was to be open from 1 June 2009 – 12 June 2009; final offers were due by 19 June 2009 (to include a draft share purchase agreement); Updata Europe would decide whether to proceed with any offer by 24 June 2009; and any bidder chosen by Updata Europe would have an exclusivity period until 10 July 2009 to complete the transaction. The "draft data room rules" indicated that:

> "Any sale and purchase agreement relating to the Target [Updata UK] shall provide that the contents of the documents contained in the data room shall be deemed to be disclosed against any warranties contained in the sale and purchase agreement, although no warranty shall be given as to the accuracy of those documents."

99.     On the same day, 28 May 2009, Mr. Nielsen repeated his concerns that the Defendants (and LMS) had access to information which had not been disclosed to his team. He e-mailed Mr. Birkeland to describe what he called the "deficiencies in the process to date" and repeated his concerns about the disparity of available information:

> "Outstanding Due Diligence
>
> I also refer to my e-mail to you, dated 24[th] May 2009, and repeat my request for information to be included in the DD material:
>
> (a) answers to our questions to the UK management;
>
> (b) copy of all contracts, pipeline information for UK;
>
> (c) copy of all information or disclosure, written or oral, given to LMS Capital, including a copy of a UK management's business plan (together with confirmation from UK management that this is the exact information handed over in writing or orally),
>
> (d) Due Diligence information package for Updata Denmark and Change Networks, concise statement on status of Updata Germany and Spain (ongoing liabilities, contracts etc)."

100.    Mr. Nielsen's concerns were taken seriously by the Bank, Mr. Birkeland and Mr. Holm. Mr. Birkeland e-mailed Mr. Holm to say that "we should follow up on this, and explicitly make sure that this is also complied with".

*29 May meeting and its subsequent correspondence*

101.    On 29 May 2009, Mr. Birkeland had a meeting with Mr. Bennett at Updata UK's offices. There are disputes as to precisely what was said at the meeting, and I deal in more detail below with the meeting and the correspondence which followed. There was no dispute, however, that Mr. Birkeland told Mr. Bennett that both parties had to have equal access to the documents and information provided to Tenon. It was also not disputed that Mr. Birkeland was told by Mr. Bennett that the Defendants would not be putting a copy of the Tenon Memorandum itself into the Data Room.

102.    Following the meeting on 29 May 2009, there were a number of important exchanges which are addressed in more detail in Section E below. They began with an e-mail from Mr. Birkeland to Mr. Bennett at 8.22 pm that night. Mr. Birkeland said that "as discussed we need to include a business plan in the [data] room" and he copied and pasted a series of bullet point information requests made by Mr. Nielsen the previous day. He also asked Mr. Bennett to answer a number of outstanding questions which had been raised by Mr. Nielsen much earlier. Finally Mr. Birkeland said:

> "We will then prepare a statement from  Management Team confirming that LMS Capital has not in writing/orally been provided with any factual information etc. which is different from the information included in the data room, hereunder in the business plan, or the responses."

103.    On 29 May 2009, at 21.51, Mr. Bennett forwarded Mr. Birkeland's e-mail to Mr. Hooft of LMS commenting: "a little too much information don't you think?" On 31 May, Mr. Bennett sent Mr. Hooft his draft responses to Mr. Nielsen's bullet points for Mr. Hooft to comment on.

104.    On 1 June 2009, Mr. Mantell on behalf of Mr. Bennett, sent Mr. Holm: (i) a copy of Mr. Birkeland's e-mail with answers to Mr. Nielsen's bullet-point information requests, and (ii) a document known as "JNDD1" (which contained the Defendants' answers to the questions first asked by Mr. Nielsen following his due diligence meetings in March). In the e-mail, Mr. Bennett said that:

> "There is no formal business plan in place for Updata UK. The document which most closely resembles a business plan is a presentation to Kelso Asset Management which RB & VB presented in October 2008. This can be updated but is a Power Point presentation and not a descriptive document."

105.    In the meantime, the Defendants considered how to respond to Mr. Birkeland's request for a statement that LMS had not been provided with any factual information which was different from that to be included in the Data Room. Mr. Robert Kidson of Tenon gave the following advice on 2 June 2009:

> "Our advice is that ALL information which you as directors have supplied to Lee/Tenon in the course of them preparing a report for you (including any pipeline info) should go in the data room. The report by Tenon since it was commissioned by you and is for your benefit does not have to be shown to anyone else however.
>
> Our view is that to breach the above would expose you to potential problems/even litigation."

*The 3 June e-mail*

106.    The second crucial plank of the Claimants' case on fraudulent misrepresentation is an e-mail which was sent by Mr. Bennett to Mr. Birkeland and Mr. Holm in the afternoon of 3 June 2009. The e-mail was copied to Mr. Mantell, and was bcc'd to Mr. Baldorino, Mr. Cowan and Mr. Hooft. The e-mail was in the following terms:

> "Hi Mads and Flemming,
>
> I apologise for not getting this to you sooner. I came in on Sunday to complete and was convinced I had sent everything, except the presentation, off to you.
>
> Please find attached answers to JN's & HH's questions from the round off meeting we had in the UK. Where further detail is required please refer to Julian as he has all the detailed paperwork.
>
> In response to Mads' e-mail earlier today and my subsequent conversation with Flemming, I would like to confirm that there is no business plan, nor has there been for a long time (years). The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum.
>
> The factual data available to both Tenon at the time and LMS subsequently, does not differ from that information currently in the data room. In fact there is now far more factual data in the Data Room than has ever been supplied to Tenon or LMS in the past. We, as a management team will be available to answer questions, from either party, up until the 19th June when we understand that firm offers have been tabled by both reams. We would of course require some notice, although this is to some extent catered for in Data Room rules.
>
> If either of you have any questions, concerns or suggestions, please revert back to me or Julian
>
> Kind regards,

Richard"

107.    In addition to this text, Mr. Bennett had inserted (in red text) responses to the bullet-point information requests which had been made by Mr. Nielsen, and which Mr. Birkeland had set out in his e-mail of 29 May. In response to the request for a "Concise statement of business plans for the next 3 years, with long term (to 5 years) prospects for Updata DK, Change and Updata UK", Mr. Bennett wrote:

> "There is no formal or informal business plan in place for Updata UK. The document which most closely resembles a business plan is a presentation to Kelso Asset Management which RB & VB presented in October 2008. Jens and Helge Homann were given this presentation when they came to the UK in Feb/ March. We have updated this (please see attached) to reflect new business won but please bear in mind that this is a PowerPoint presentation and not a descriptive document."

108.    The e-mail attached a Powerpoint document called "Kelso Presentation Updated May 2009" (the "Updated Kelso Presentation"). On the final page, under the heading "financial projections" the following information was provided:

| (£000) | Man Accs 2008 | Budget 2009 | Best Case forecast 2010 |
|---|---|---|---|
| Turnover/sales | 5,133 | 11,045 | 15,183 |
| Profit before tax | 28 | 1,112 | 2,195 |
| EBITDA | 854 | 1,704 | 3,348 |

109.    The figure of £ 3,348,000 was exactly the same figure as contained in the Financial Overview which had been provided to Mr. Nielsen and Mr. Homann in March, and then sent to Mr. Johnsen as an attachment to the 20 April 2009 e-mail. It was therefore a substantially lower figure than the forecast in the March Weighted Budget and used in the Tenon Memorandum. It was also substantially lower than the figures which Mr. Bennett had previously used, in March 2009, to update the original Kelso presentation.

110.    The Claimants contend that the 3 June e-mail contained a number of fraudulent misrepresentations. Again, the Defendants contend that that there were no such representations or inducement, and they raise various arguments in that context which are addressed separately below.

*June and July 2009*

111.    The Data Room was in due course populated with various documents. Notwithstanding the advice of Tenon, these did not include all of the documents which "you as directors have supplied to Lee/Tenon in the course of them preparing a report for you (including any pipeline info)". For example, there was no dispute that the Data Room was not populated with the pipeline document which Mr. Baldorino had prepared in March, and which was then used for the purposes of preparing the March Weighted Budget. The most significant omission, at least until a very late stage in the process, was the March Weighted Budget. This budget, whilst not included in the Data Room, was provided on the 6 July CD, sent to Corren Troen by Mr Mantell.

The fact that the Defendants had disclosed the March Weighted Budget was central to various arguments deployed by the Defendants on a summary judgment / strike out application heard by Sir Richard Field in 2016. Those arguments are now principally relevant to issues relating to the Defendants' credibility, since it is no longer contended that the mistaken disclosure of the Weighted Budget at the very end of the process can realistically provide any answer to the case in fraud. I deal with the relevance of the summary judgment / strike out application, and the Defendants' case presented to Sir Richard Field, in Section F below.

112.    Both LMS (on 4 June 2009 and 9 June 2009) and Mr. Nielsen's team (represented by Mr. Hans Christian Iversen) (on 11 June 2009) visited the Data Room. They sought photocopies of certain documents. Mr. Nielsen received a copy of the Updated Kelso Presentation and "JNDD1" by e-mail on 10 June 2009. Mr. Iversen had a meeting with Mr. Mantell on 11 June 2009 in which they discussed, among other matters, "update on 2009 out turn", "details of budgeting / forecast structure" and "a breakdown of rental and installation revenue". Mr. Iversen's report of the meeting indicates that he was looking at, amongst other things, the figures in the Financial Overview and the EBITDA figure of £ 3,348 million which was in both the Financial Overview and the Updated Kelso Presentation.

113.    The Data Room closed on 12 June 2009.

114.    On 19 June 2009 LMS made its offer to the EVs as well as Mr. Baldorino and Mr. Bennett. LMS provided signed heads of terms, an exclusivity agreement and proof of funds (showing £ 15 million held with HSBC). LMS offered, subject to contract, to purchase the entire company at a value of DKK 76.6 million (£ 8.8m): this was the same figure as they had offered on 15 May 2009. Mr. Bennett, Mr. Baldorino and Mr. Nyegaard would receive shares in the purchasing vehicle instead of cash. The EVs would have the option to roll over part of the consideration by acquiring up to 17.36% in the purchasing vehicle. They would retain the option to acquire shares in the purchasing vehicle for a year after the sale, but at a decreasing percentage every month.

115.    Also on 19 June 2009, e-Kong submitted a letter to the board of Updata Europe. e-Kong said that it was "not in a position to submit any formal offer to Updata Europe and/or Sparlolland on any acquisition of interest in or assets of Updata Europe." The letter noted that e-Kong had received very limited information on Updata Europe and its non-UK subsidiaries "and only very recently some financial information on Updata UK." e-Kong suggested that it remained interested in a transaction whereby it would acquire 75% of Updata Europe for DKK 52.5 million and Newwatch's interest in Updata UK for DKK 7 million.

116.    On 20 June 2009, Mr. Birkeland produced a 'score sheet' for the two bids. The LMS bid out-scored the e-Kong bid on nearly every point. By contrast, Mr. Holm (and others) preferred the e-Kong bid as introducing a strategic partner at the holding company level.

117.    On 23 June 2009 there was a conference call between Updata Europe's board and e-Kong (including its chairman Mr. Richard Siemens) to discuss e-Kong's proposal. On 24 June 2009, Mr. Birkeland informed LMS that they had been granted exclusivity until 10 July 2009 to complete the transaction.

118.    In the period leading up to the sale, LMS engaged in further financial and commercial due diligence (with the assistance of Tenon, Nabarro (LMS's solicitors) and a firm called AMR International ("AMR")). They also sought to negotiate the finer points of the sale. The parties' lawyers (Corren Troen for EVs; Nabarro for LMS; Rosenblatt for Mr. Bennett and Mr. Baldorino) worked on the contractual documentation. Some features of the work carried out are relevant to the issues in the case, in particular the dispute between the accounting experts as to the market value of Updata Europe's shareholding at the material time. It is not necessary to describe this work in any detail. However, it is relevant to note that there is no suggestion that the financial and commercial due diligence caused the Defendants, or indeed LMS, to downgrade their expectations as to the future prospects of the business.

119.    Thus, by way of illustration, on 29 June 2009 Mr. Szpiro of LMS e-mailed Mr. Bennett (copied to individuals at LMS and Tenon) with a "summary headline P&L for years 2011-2014" (which included figures for 2009 and 2010). Mr. Szpiro explained that he had given some consideration to the "outer year figures as these will ultimately drive value on exit." He explained that his assumptions were conservative and "essentially build on the 2010 figures for "current", "in the Bag" and "Weighted" (as per Julian's model, although there are small differences if trying to reconcile) including further contract wins (called "New") which are not in the pipeline." Mr. Szpiro's spreadsheet showed the following:

| (£000) | Jun-09 | Jun-10 | Jun-11 | June-12 | Jun-13 | June-14 |
|---|---|---|---|---|---|---|
| Turnover/sales | 10,681 | 21,439 | 24,065 | 24,884 | 25,755 | 26,755 |
| Gross profit | 4,911 | 10,842 | 10,127 | 10,425 | 10,774 | 11,174 |
| EBITDA | 1,911 | 7,402 | 6,515 | 6,633 | 6,791 | 6,992 |

120.    In order to produce these figures, LMS had received a "weighted budget 2009/10" produced by Mr. Mantell which contained the same figures for the 2009/10 financial year as those used by Mr. Szpiro. Like Mr. Szpiro's figures, Mr. Mantell's budget differentiated between income from "current" contracts, "in the bag" contracts and "weighted" contracts. It showed a net profit for 2009/10 of £ 6.9 million.

121.    Tenon's financial due diligence report recorded the following financial information:

| (£000) | Normalised 12 mths to Jun-09 | Run rate at Jun-09 | Proforma run rate at Jun-10 | Projected normalised 12 mths to Jun-10 |
|---|---|---|---|---|
| Turnover/sales | 10,860 | 11,887 | 17,368 | 21,161 |
| Gross profit | 5,190 | 5,814 | 8,207 | 10,562 |
| EBITDA | 2,103 | 3,089 | 5,106 | 7,460 |

122.    Tenon noted that there was "a margin for error around the above figures, in aggregate, ought to be within say £0.2 million" (notwithstanding revenue recognition difficulties and other issues).

123.    On 1 July 2009, Ms. Rana (the junior solicitor at Corren Troen) called Ms. Elizabeth Moynihan at Nabarro to note that Corren Troen were going to move the Data Room files back from Updata UK's offices in Reigate but did not want to interrupt Nabarro's due diligence. Ms. Rana and Ms. Moynihan spoke by telephone and Ms. Moynihan said that Nabarro had a CD with all the documents on it. The same day, Ms. Rana requested a copy of the CD from Mr. Mantell. Mr. Mantell posted the CD to Ms. Rana on around 3 July 2009 and it was received by Ms. Rana at Corren Troen on 6 July 2009. The CD included the 2009-10 March Weighted Budget. I conclude below that, as I have been told by all of the Defendants, this disclosure of the March Weighted Budget was accidental on the part of Mr. Mantell. Throughout the course of the events, the Defendants had intended to withhold this important document from the Data Room and had done so. By this time, the transaction was about to complete and Ms. Rana did not appreciate that there was any significance to the March Weighted Budget. No-one at Updata Europe spotted the fact that this disclosure had been made, or saw the March Weighted Budget at that stage.

*The Sale*

124.    The sale completed in the early hours of 11 July 2009. Updata Europe "cashed out". It received £ 5,244 million for its 60% interest in the company. Newwatch "rolled over" its interests into the newco, Updata Holdings: it used the nominal consideration payable to them for their shares in Updata UK to subscribe for shares and apply for loan notes in Updata Holdings. Thus, Newwatch acquired: 63,046 "B" shares in Updata Holdings; £ 699,091 "A" loan notes and £ 349,546 "B" loan notes in Updata Holdings; and an option to acquire further shares and loan notes at any point in a period up to July 2010.

*Subsequent events*

125.    Updata Europe used its DKK 45.5 million proceeds of sale to repay its DKK 27 million debt to the Bank and its DKK 13 million debt to Vald. Nielsen. This debt arose from funding provided by Mr. Johnsen's family some time previously, when Updata Europe was desperately in need of cash. It also paid certain professional fees due to Corren Troen and others. Updata Europe remained indebted to the Bank pursuant to its guarantee of Updata Denmark's debts (approximately DKK 12 million) and owed other sums to various parties including KPMG and Mr. Nielsen.

126.    Despite the sale proceeds from Updata UK, Updata Europe remained in a difficult financial position. There were ultimately unsuccessful negotiations with the Bank and the minority shareholders in Change Networks for further funding to pay off part of the Bank's outstanding debt. The Bank declared Updata Denmark to be in default. On or about 15 December 2009, 95% of the shares in Updata Europe were sold to Bigaard Ejendomme ApS (a company owned by Mr. Esben Bigaard) for DKK 1 million.

127.    As a result of financial information which Mr. Johnsen and Mr. Hildebrandt received in the course of 2010, and which indicated that Updata UK was performing very significantly better than the outlook which had been presented to them in 2009, they took advice from English counsel in the spring of 2010 about the possibility of a claim arising from the sale of Updata UK. One difficulty for them was that they no longer owned Updata Europe: they therefore sought advice as to whether or not they

could seek an assignment of Updata Europe's rights against the Defendants and others who had been involved in the sale. Eventually, assignment documentation was executed in January 2011 following a sequence of events which it will be necessary to describe in some detail.

128.    Although Mr. Johnsen and Mr. Hildebrandt were contemplating possible litigation by 2010, and although a letter before action was sent in 2013, the present proceedings were not commenced until March 2015. However, this is no reflection on the merits of the claim, and instead was principally a consequence of the need to raise very significant sums of money in order to pursue the present case.

129.    Once the proceedings were commenced, the Defendants issued a strike out application. That application was supported by witness statements from each of Defendants: see further Section F below. Suffice it to say that although Sir Richard Field did strike out certain parts of the claim, he did not strike out the claim in deceit. This is the principal case that has been pursued before me and which I need to resolve, although the Claimants also advance claims for breach of fiduciary duty. In the case of Newwatch, which in substance retained its shareholding and therefore cannot claim to have suffered loss in consequence of deceit, it is the only claim advanced.

## C: Deceit: the law

130.    There was ultimately no significant dispute between the parties as to the legal principles relating to the tort of deceit, albeit that each side emphasised certain features of the principles established in the case-law. The decision of Hamblen J. in *Cassa di Risparmio v Barclays Bank* [2011] EWHC 484 (Comm) ("*Cassa*") paragraphs [210] – [232] contains a valuable statement the relevant general principles, and my summary below is derived in substantial part from that judgment. (In two subsequent decisions, to which the Defendants referred, Hamblen J. restated the principles which he had set out in *Cassa*: see *Standard Chartered Bank v Ceylon Petroleum Corporation* [2011] EWHC 1785 (Comm) and *Brown v InnovatorOne Plc and others* [2012] EWHC 1321 (Comm). But it did not seem to me that these decisions established any additional point of principle.) There has been recent and important consideration of the principles relating to inducement by the Supreme Court in *Hayward v Zurich* [2016] UKSC 48; [2017] A.C. 142 and by the Court of Appeal in *Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises* [2019] EWCA Civ 596.

*The basic requirements*

131.    The tort of deceit requires the claimant to show that: (i) the defendants made false representations to the claimants; (ii) the defendants knew the representations to be false, or had no belief in their truth, or were reckless as to whether they were true or false; (iii) the defendants intended the claimants to rely on the representations; (iv) the claimants did rely on the representations; and (v) as a result the claimants have suffered loss and damage: see e.g. *Hayward* at [58] per Lord Toulson JSC, and *Cassa* para [210].

*Representation*

132.    A representation is a statement of fact made by the representor to the representee on which the representee is intended and entitled to rely as a positive assertion that the fact is true. Determining whether any and if so what representation was made by a statement requires (1) construing the statement in the context in which it was made, and (2) interpreting the statement objectively according to the impact it might be expected to have on a reasonable representee in the position and with the known characteristics of the actual representee. It is essential in any case of fraud for the dishonest representation to be clearly identified.

133.    In order to be actionable a representation must be as to a matter of fact. A statement of opinion is therefore not in itself actionable. However, as stated in *Clerk & Lindsell* para. 18-13.

> "A statement of opinion is invariably regarded as incorporating an assertion that the maker does actually hold that opinion; hence the expression of an opinion not honestly entertained and intended to be acted upon amounts to fraud. And the same goes for projections as to the future: if a defendant says he expects an event to take place when he does not, he makes an untrue statement of fact. The only obstacle in the way of maintaining an action for a false representation on this basis lies in the difficulty of proving what the defendant's real opinion was, and in the difficulty of distinguishing a representation of the existence of an opinion from the representation of the existence of a fact on which that opinion is based."

134.    In addition, at least where the facts are not equally well known to both sides, a statement of opinion by one who knows the facts best may carry with it a further implication of fact, namely that the representor by expressing that opinion impliedly states that he believes that facts exist which reasonably justify it. In the context of deceit, *Clerk & Lindsell* paragraph 18-14 expresses this in the following terms:

> "Furthermore, at least where the facts are not equally well known to both sides, then a statement of opinion by one who knows the facts best will often carry with it a further implication of fact, namely that the representor by expressing that opinion impliedly states that he believes that facts exist which reasonably justify it. If he does not actually believe in such facts, it follows that he will be liable in deceit. In such a case, the test as to whether a statement of opinion involves such a further implied representation will involve a consideration of the meaning which is reasonably conveyed to the representee. The material facts of the transaction, the knowledge of the respective parties, their relative positions, the words of the representation and the actual condition of the subject-matter are all relevant to this issue."

135.    Silence by itself cannot found a claim in misrepresentation. But an express statement may impliedly represent something. For example, a statement which is literally true

may nevertheless involve a misrepresentation because of matters which the representor omits to mention. The old cases about statements made in a company prospectus contain illustrations of this principle: for example, *Oakes v Turquand* (1867) LR 2 HL 325, where Lord Chelmsford said (at 342–3):

> "… it is said that everything that is stated in the prospectus is literally true, and so it is; but the objection to it is, not that it does not state the truth as far as it goes, but that it conceals most material facts with which the public ought to have been made acquainted, the very concealment of which gives to the truth which is told the character of falsehood."

136. In relation to implied representations the 'court has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context': per Toulson J in *IFE v Goldman Sachs [2006] EWHC 2887 (Comm); [2007] 1 Lloyd's Rep 264* at para. [50]. That involves considering whether a reasonable representee in the position and with the known characteristics of the actual representee would reasonably have understood that an implied representation was being made and being made substantially in the terms or to the effect alleged. The test for implied representations has recently been reviewed by the Court of Appeal in *Property Alliance Group Ltd v Royal Bank of Scotland PLC* [2018] EWCA Civ 355; [2018] 1 WLR 3259 at paragraphs [122] to [132]. The Court of Appeal approved as "helpful" a formulation of Colman J in a previous decision, namely "whether a reasonable representee would naturally assume that the true state of facts did not exist and that, had it existed, he would in all the circumstances necessarily have been informed of it". But this was not to "water down the requirement that there must be clear words or clear conduct of the representor from which the relevant representation can be implied."

137. In a deceit case it is also necessary that the representor should understand that he is making the implied representation and that it had the misleading sense alleged. A person cannot make a fraudulent statement unless he is aware that he is making that statement. To establish liability in deceit it is necessary "to show that the representor intended his statement to be understood by the representee in the sense in which it was false": per Morritt LJ in *Goose v Wilson Sandford & Co* [2001] Lloyd's Rep PN 189 at para. [41].

138. It is necessary for the statement relied on to have the character of a statement upon which the representee was intended, and entitled, to rely. In some cases, for example, the statement in question may have been accompanied by other statements by way of qualification or explanation which would indicate to a reasonable person that the putative representor was not assuming a responsibility for the accuracy or completeness of the statement or was saying that no reliance can be placed upon it. Thus the representor may qualify what might otherwise have been an outright statement of fact by saying that it is only a statement of belief, that it may not be accurate, that he has not verified its accuracy or completeness, or that it is not to be relied on.

139. The courts have noted that "a cocktail of truth, falsity and evasion is a more powerful instrument of deception than undiluted falsehood. It is also difficult to detect": *Smith New Court Securities v Citibank* [1997] AC 254 at 274 per Lord Steyn.

140.    Deliberate ambiguity – where the representor uses language intending to rely on its literal meaning, but hoping that the representee would understand it differently – is often a hall-mark of fraud: *Spencer, Bower & Handley, Actionable Misrepresentation*, 5th Ed. at 4.15 - 4.24 ("Spencer Bower"). At paragraph 4.15, the authors state:

> "There is another type of ambiguity when the inference is open that the representor deliberately used ambiguous language intending to rely on its literal meaning, but hoping the representee would understand it differently. The contrast is between ambiguity that appears spontaneous, and that which appears contrived. In the latter case every presumption is made against he who used dubious language."

141.    In the case of an ambiguous statement, it is "essential that the representor should have intended the statement to be understood in the sense in which it was understood by the claimant (and of course a sense in which it is untrue) or should have deliberately used the ambiguity for the purpose of deceiving him and succeeded in doing so": per Rix LJ in *The Kriti Palm* [2006] EWCA Civ 1601; [2007] 1 All ER (Comm) 667 at [253].

142.    Different statements at different times must frequently be read or construed together in order to understand their combined effect as a representation. At paragraph 4.24 of *Spencer Bower*, the authors state:

> "Statements connected by express or implied reference may form a single representation and their combined effect must be considered. This rule applies to statements in one document such as a prospectus, to statements in a number of documents such as a series of letters … This may render the composite representation false, though the components by themselves are true, or render it true, though some of the components, by themselves, are false. The composite representation may also be as false as every part, and every part as false as the whole."

143.    Where one person has made a misrepresentation, it is open to him to correct the misstatement prior to the contract and to rely on the correction as a defence to a claim in deceit (effectively on the basis that the misrepresentations cannot have induced the claimant to enter the contract: see below). However, in those circumstances "it is not enough to show that the claimant could have discovered the truth, but that he did discover it." It is not sufficient just to provide documents from which the claimant could work out the truth: the correction must be made fairly and openly: see *Peekay v ANZ Banking Group [2006] EWCA Civ 386;* [2006] 1 CLC 582 at [29]-[40]. The explanation must be "quite clear": *Arnison v Smith* (1889) 41 ChD 348 at 370 per Lord Halsbury.

*Falsity*

144.    The representation must be false. A representation may be true without being entirely correct, provided that it is substantially correct and the difference between what is represented and what is actually correct would not have been likely to induce a reasonable person in the position of the claimants to enter into the contracts: *Avon Insurance v Swire Fraser* [2000] Lloyd's Rep IR 535 at [17] per Rix J.

*The mental element*

145.    The classic statement of the mental element required to found a claim in deceit remains that of Lord Herschell in *Derry v Peek* (1889) 14 App Cas 337:

> "First, in order to sustain an action of deceit, there must be proof of fraud and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement from being fraudulent, there must, I think, always be an honest belief in its truth."

146.    As to recklessness, even if the party making the representation may have had no knowledge of its falsehood, he will still be responsible if he had no belief in its truth and made it, 'not caring whether it was true or false': see *Clerk & Lindsell*, at [18-21]. As Lord Herschell put it *Derry v Peek*, *supra*, at 368 (and 361):

> "Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it knows, yet at least that he believes it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true."

147.    It is not necessary that the maker of the statement was 'dishonest' as that word is used in the criminal law: *Standard Chartered Bank v Pakistan National Shipping Corp (No. 2)* [2000] CLC 133.  Nor is the defendant's motive in making the representation relevant. "If fraud be established it is immaterial that there was no intention to cheat or injure the person to whom the false statement was made": *Clerk & Lindsell*, para. 18-20, quoting *Bradford Third Benefit Building Society v Borders* [1941] 2 All ER 205, 211 per Viscount Maugham. What is required is dishonest knowledge, in the sense of an absence of belief in truth: *The Kriti Palm*, [257] (Rix LJ). It is in that sense that I use the word "dishonest" in this judgment.

148.    The ingredient of dishonesty (in the above sense) must not be watered down into something akin to negligence, however gross: *The Kriti Palm*, [256]. However, the unreasonableness of the grounds of the belief, though not of itself supporting an action for deceit, will be evidence from which fraud may be inferred. As Lord Herschell pointed out in *Derry v Peek* at 376, there must be many cases:

> "where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the court that it was not really entertained, and that the representation was a fraudulent one."

149.  The standard of proof in a case of fraud is the balance of probabilities. Whilst the court of course considers what is alleged when deciding on inherent probability, this is purely an aspect of common sense, not the standard of proof, *In Re B* [2008] UKHL 35; [2009] 1 A.C. 11 at [15] per Lord Hoffmann. There is no necessary logical connection between seriousness of the allegation and the likelihood of its having occurred, nor should the court talk about more serious allegations requiring more cogent evidence: *In Re B* at [64] and [72] per Baroness Hale. This approach was reaffirmed in *Re S-B* [2009] UKSC 17; [2010] 1 A.C. 678 at [12]-[13].

*Intention*

150.  Actionable fraud involves an intention on the part of the representor to induce the representee to act as he did. The Defendants submitted in their opening submissions, relying upon *Spencer Bower* paragraph 5.05, that the representor must actually intend the representee to be induced to act in the way that he in fact acted. In that paragraph, the authors discuss *Peek v Gurney* (1873) LR 6 HL 377, where a claim by a purchaser of shares on the Stock Exchange failed, because the representations in the prospectus were intended to induce subscriptions rather than purchases in the market. In their closing submissions, the Defendants made the same submission, but this time relying upon paragraph 5-19 of *Cartwright: Misrepresentation, Mistake and Non-Disclosure* 4th Ed.

151.  The nature of this requirement was considered by the Court of Appeal in *Goose v Wilson Sandford*, and subsequently *Mead v Babington* [2007] EWCA Civ 518, [2007] All E.R. (D) 226. As *Cartwright* notes, it is not necessary for the representor to intend to induce the specific action taken by the representee in reliance on the misrepresentation: see *Goose* at [48], where the Court of Appeal held that the "the more normal formulation is that the representor should intend to deceive the representee, with intent, that is to say, that it shall be acted upon by him." In *Mead,* Longmore LJ applied *Goose*, holding that there "was no requirement that the representation had to be intended to be acted on in the manner in which damage resulted to the claimant. It was not the specific action of the claimant which had to be intended: it was only necessary that there should be an intention that the representation should be acted on…"

*Inducement*

152.  A representee must show that he in fact understood the statement in the sense (so far as material) which the court ascribes to it, and that, having that understanding, he relied on it: *Raiffeisen Zentralbank Osterreich v Royal Bank of Scotland* [2010] EWHC 1392 (Comm) at [87]. This requirement is of particular significance in the case of implied representations.

153.  In *BV Nederlandse Industrie Van Eiprodukten v Rembrandt Enterprises* [2019] EWCA Civ 596, the court held at [43] that, in a case of deceit

> "there is an evidential presumption of fact (not law) that a representee will have been induced by a fraudulent misrepresentation intended to cause him to enter the contract and that the inference will be "very difficult to rebut" to use the words of Lord Clarke (at [43])."

154.    While the onus of proof is on the representee to prove inducement, he has the benefit of that evidential presumption, and he only needs to show that the misrepresentation was "actively present in his mind" when he made the decision to enter into the transaction (*BV Nederlandse* at [45]). The phrase "actively present in his mind" is taken from the judgment of Bowen LJ in *Edgington v Fitzmaurice* (1885) 29 Ch. D 459, 483 where he explained the principle as follows:

> "But such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the Plaintiff's mind, and if his mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a mistake himself could make no difference".

155.    It is sufficient for the misrepresentation to be <u>an</u> inducing cause of the claimant entering into the transaction on the terms that he did. It is not necessary for it to be the sole cause (*Hayward v Zurich* at [33]).

156.    There were differing submissions as to the necessary weight of impact of an inducing representation. The Defendants, relying on *Dadourian v Simms* [2009] EWCA Civ 169; [2009] 1 Lloyd's Rep 601, submitted that the misrepresentation must play a "real and substantial part", albeit not decisive, in inducing the representee to act. The Claimants, relying upon a decision of the High Court of Australia referred to in [33] of *Hayward*, submitted that the representation need only play some part, even if only a minor part, in contributing to the course of action.

157.    As Lord Clarke indicates in [36] of *Hayward*, in the context of his discussion as to what is required to rebut the presumption of inducement, "the authorities in this area are not entirely consistent as to "whether what must be proved is that the misrepresentation played "no part at all" or that it did not play a "determinative part", or that it did not play a "real and substantial part"". This issue was not directly addressed in *BV Nederlandse*, although Longmore LJ did refer to the relevant part of Lord Clarke's judgment: see [42]. The inducement issue in *BV Nederlandse* was determined in the claimant's favour because the representation was "one of the reasons why the representee made the relevant contract": see [49]. It seems to me that this – combined with the statements that "it is very difficult to rebut the presumption" – indicates that it is not appropriate to try to measure the precise weight of a representation where it is one of the reasons why a representee has entered a contract. If the representation is of no real significance, then a court will decline to hold that it was one of the reasons which induced the contract. If, however, it was a matter of significance, the decision will be the other way.

158.    It is no answer to a claim in fraud that the representee could have discovered the falsity of the statement by exercising reasonable care and skill (e.g. by inspecting books or records available to him) *Hayward v Zurich* at [39]. It therefore does not lie in the mouth of a liar to argue that the claimant was foolish to take him at his word: *Clerk & Lindsell* at 18-37. Nor can the representor escape liability (or argue that the representee was not induced by the false statement) simply because the representee's agent (such as his solicitor) is in receipt of the truthful information to correct a

previous misrepresentation: *Wells v Smith* [1914] 3 K.B. 722 at 725 per Scrutton J; *Clerk & Lindsell* at 18-37.

*Causation and loss*

159.    In their opening submissions, the Claimants accepted that, if the representee would have acted in the same way even in the absence of the fraud, the claim will fail. The parties' arguments in relation to causation and loss, and the relevant legal principles, are addressed separately in Section H below.

## Section D: The 20 April e-mail

*The 20 April e-mail*

160.    As described in Section B above, the relevant e-mail exchange was as follows. At 9.41am on 20 April 2009 Mr. Johnsen e-mailed Mr. Bennett. The subject-line was "Re: Latest budget".

> "Could you forward the latest budgets for Updata UK for 2008/9, 2009/10 and 2010/11. Some adjustments need to [have] been made regarding the changes that are mentioned in the letter from LMS.
>
> Thanks in advance.
>
> PS. I would very much like to use them today if possible"

161.    At 3.05pm, Mr. Bennett replied. He attached 6 pages of February 2009 management accounts and the Financial Overview. The text of his e-mail was:

> "The numbers used by LMS were taken from the February Management Accounts. The projections used were the same that we presented to Helge Homann and Jens in March. Please see attached. I do not know what adjustments LMS have made internally."

*Context*

162.    Mr. Johnsen's e-mail that morning was sent some four days after the LMS offer. It expressly referred to the LMS letter, and it is obvious that the LMS letter was part of the context of Mr. Johnsen's e-mail. Mr. Bennett's reply was not sent immediately: it took over 5 hours for him to reply. It is clear, in my judgment, that Mr. Bennett's reply was carefully considered. It was not rushed, and he went to the trouble of removing certain pages from the February 2009 management accounts.

163.    In the meantime, there was some further communication on 20 April which provides further context for Mr. Bennett's reply. Shortly after Mr. Johnsen's e-mail, Mr. Holm e-mailed Mr. Hooft to say that their current objective was to "seek investments into Updata Europe A/S". In other words, Updata Europe's preferred course was not to sell Updata UK, but to seek investment at the parent company level. Mr. Hooft was also informed that Updata Europe had "given full exclusivity to another party" and

that they were not at liberty to enter into negotiation until 1 May at the earliest (i.e. 11 days later). The e-mail concluded:

> "Should you wish to enter into a dialogue with us on the above mentioned conditions, please feel free to contact us then".

164.    This e-mail from Mr. Holm resulted in something of a flurry of e-mail activity that morning. This e-mail activity does not form part of the context relevant to interpreting the 20 April e-mail exchange, because Mr. Johnsen was not aware of it. It is, however, relevant to the state of mind of Mr. Bennett, who was involved in this activity, as well as Mr. Baldorino who was copied in on the correspondence. It is plain that, unsurprisingly, Mr. Bennett and LMS were disappointed by the e-mail from Mr. Holm, and that discussion took place in order to decide tactics on how to respond.

165.    Thus, Mr. Hooft passed Mr. Holm's e-mail to Mr. Baldorino and Mr. Bennett, and others at LMS and Tenon, indicating that it would be interesting to know what the terms of the exclusivity were. Mr. Bennett's response to Mr. Hooft, copied to others, was:

> "Interesting … particularly as Peter Johnsen is coming to the UK this week with the express intention of raising circa £ 2m. It must be a fairly loose exclusivity agreement or perhaps they are in breach".

166.    An e-mail from Mr. Nyegaard timed at 10.47 am indicated that he and Mr. Bennett had spoken. Mr. Nyegaard's advice was to send Mr. Holm's letter to the Bank's lawyers. Mr. Nyegaard thought that the key was "to stay very close to the bank and have them know all communications surrounding this deal". He added that he saw "only Jens as a potential threat now". In his witness statement, Mr. Nyegaard said that "from this point, I was repeatedly left with the impression that Richard and Vic perceived Mr. Nielsen as a threat to the success of their bid, and even to their livelihoods, if he were to be successful in winning a [bid] and subsequently fire them". I consider that this evidence did fairly reflect the attitude of Mr. Bennett and Mr. Baldorino at that time, and is consistent with, for example, Mr. Hooft's evidence as to the management being scared of losing control of the company.

167.    At 11.12 that morning, Mr. Hooft sent an e-mail confirming his discussion with Mr. Bennett as to their approach. This approach included speaking to Niels Sorensen, the Bank's lawyer, and telling him of Mr. Holm's note and forwarding it if he asked for it. The aim was "for the bank to ask to see the exclusivity agreement". Mr. Hooft also proposed sending a note to Newwatch "extending our offer and inviting discussions at 12.4%".

168.    Shortly afterwards, Mr. Bennett sent Mr. Sorensen the response from Mr. Holm, commenting that it was "a more negative response than LMS had anticipated in light of the fact that their offer repays all debt within such short time period".

169.    In the meantime, Mr. Bennett responded, by e-mail at 10.31 am, to a paper that Mr. Johnsen had prepared and which put forward various proposals known as "Project Eagle". These proposals, which had been made by Mr. Johnsen on 13 April, involved a restructuring of the group, essentially by merging Updata UK into Updata Europe. It

would have resulted in Mr. Baldorino and Mr. Bennett becoming minority shareholders in Updata Europe, thereby diluting their interest in Updata UK. The proposals were rejected by Mr. Bennett. Mr. Johnsen's paper had referred to a short-term finance requirement of DKK 20,000,000; i.e. the figure of circa £ 2 million that Mr. Bennett had said that Mr. Johnsen was coming to the UK to try to raise.

*What, if any, factual representations were made in the 20 April e-mail*

170.    The e-mail itself consisted of four sentences. Yet the arguments (which will be apparent from my discussion below) as to what (if any) factual representations were made were elaborate, particularly on the Defendants' side. On the Claimants' side too there was a considerable degree of over-complication, because paragraph 48 of the Re-Amended Particulars of Claim set out a lengthy series of implied representations derived not simply from the 20 April e-mail, but also subsequent meetings and statements. In opening and closing submissions, and as cross-examination progressed, the Claimants' case became rightly focused on the words which had actually been used in the 20 April e-mail. But it is convenient to start by identifying the terms of the representations pleaded:

> "48. As a matter of construction of and/or implication from the statements made by Mr Mantell and Mr Bennett on behalf of and with the knowledge of Mr Baldorino as set out above, the UK management made the following representations to the European Vendors:
>
> (1) That UK management had a reasonable basis for believing that figures included in the Financial Overview to be correct;
>
> (2) That the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position;
>
> (3) That the figures in the Financial Overview were the only forecasts of Updata UK's financial position for the financial year 2009/2010 which had been prepared by or on behalf of the UK management;
>
> (4) That all the information which was material and/or relevant to Updata UK's financial position and/or the value of Updata UK had been made available to the European Vendors;
>
> (5) That there was no other relevant or material information to disclose;
>
> (6) That the UK management had not provided to LMS and/or Tenon any information which the European Vendors did not also have;

    (7) That the UK management were not aware of the basis upon which LMS had calculated the value of Updata UK;

    (8) That no other information which would be included in a business plan was available; and

    (9) That all the contracts which Updata UK had won and/or had renewed had been disclosed to the European Vendors, including the value and duration of each contract".

171. This is a case where express representations were made in a particular e-mail. The question of what representations of fact were made is in my view to be answered by construing that e-mail in the context in which it was made, and interpreting the statements objectively according to the impact that they might be expected to have on a reasonable representee in the position and with the known characteristics of Mr. Johnsen. The e-mail refers to attachments, and in accordance with the principles set out in Section C above it is appropriate to consider the combined effect of the statements in the e-mail and the attachments which were provided.

172. Read in that context, it seems to me that there are a number of clear factual representations, which are material for present purposes.

173. First, the e-mail was a response to a request, in Danish, for the "latest budget for Updata UK for 2008/9, 2009/10 and 2011". The subject matter of the e-mail request, and of the response, was "Latest budget", also in Danish. The evidence of Mr. Johnsen, which was not disputed in this respect, was that the word "budget" in Danish was used synonymously with "forecast" or "projection", and that there was only one word in Danish for it. Mr. Bennett, in response, provided the Financial Overview, which set out the "Forecasts" for 2009 (EBITDA £ 1,496,000) and the best, middle and worst case "Budget" for 2009/2010 (EBITDA £ 1,348,000; £ 1,393,000, and £ 1,129,000). The body of the e-mail refers to "the projections", and then says: "Please see attached". In my view, any reasonable recipient of the e-mail and the attachments would understand that he was receiving the latest budget or forecast for the years in question.

174. This conclusion is reinforced by the following matters. The request was one made by the founder of the business in the context of a possible sale of Updata UK following an offer received only a few days earlier. This is relevant context. There was additional context, known to both Mr. Bennett and Mr. Johnsen, that Mr. Johnsen was looking for an outside investor and was coming to the UK for that purpose. The figures were requested from, and provided by, a senior executive director of Updata UK in response to what was obviously an important request, made by Mr. Johnsen, naturally arising from the circumstances of a possible sale or investment. The projections were presented in the format of a detailed table containing not only a projection for 2008/2009 against the original "Budget", but a series of forecasts for 2009/2010 indicating variation between the best, middle and worst cases.

175. Secondly, the e-mail stated that the numbers used by LMS were taken from the February Management Accounts, and that "the projections used were the same that

we presented to Helge Homan and Jens in March". Any reasonable recipient would understand that LMS had been given and used the same information as to projections as had been given to Mr. Homann and Mr. Nielsen in March. Since LMS had made its offer only 4 days earlier, this served to reinforce the fact that the information provided in the Financial Overview was current.

176.    For the above reasons, there is in my judgment no difficulty at all in concluding that there was a representation in the terms pleaded in paragraph 48 (2) of the Re-Amended Particulars of Claim, namely, that "the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position". Indeed, this is a classic case where, as discussed in *Clerk & Lindsell* paragraph 18-13, a party provides a representation of his opinion as to what will happen in the future, and the law has no difficulty in saying that the opinion must be honestly entertained at the time that it is made. For reasons explained hereafter, I consider that this representation alone is sufficient for the purposes of the Claimants' case based upon deceit in relation to the 20 April e-mail. Nevertheless, I will address the other representations which are set out in paragraph 48 of the Re-Amended Particulars of Claim.

177.    Paragraph 48 (1) of the Re-Amended Particulars of Claim pleads a representation that "the UK management had a reasonable basis for believing the figures included in the Financial Overview to be correct". The formulation of this representation can be criticised because, in the context of a forecast as to what results will be in the future, it is inappropriate to say that the figures are "correct"; at least if "correct" means that what will actually happen in the future. However, the Claimants did not contend that this pleaded representation was to be understood in that rather literal way. Rather, this pleading is intended to reflect the type of representation discussed in paragraph 18-14 of *Clerk & Lindsell;* namely a representation that by expressing an opinion (here as to the future results), the representor impliedly states that he believes that facts exist which reasonably justify it. I consider that in the circumstances of this case – where the senior Updata UK management knew the up-to-date information and where there was an imbalance of information between the management and the representatives of Updata Europe – such a representation was made. Indeed, this is in my view the substance of the representation pleaded if the words "to be correct" were omitted: i.e. a representation that the UK management had a reasonable basis for believing the figures included in the Financial Overview.

178.    Paragraph 48 (3) of the Particulars of Claim pleads that the "figures in the Financial Overview were the only forecasts of Updata UK's financial position for the financial year 2009/2010 which had been prepared by or on behalf of UK management". In so far as this representation goes beyond that pleaded in paragraph 48 (1) and (2), I do not consider that it was made in the 20 April e-mail. That e-mail contained a representation as to what were the latest or current forecasts, and (as discussed below) what projections had been provided to LMS, but did not represent that no other forecasts had ever been prepared in the past.

179.    I also consider that the representations pleaded in paragraphs 48 (4) ("that all the information which was material and/or relevant to Updata UK's financial position and/or the value of Updata UK had been made available to the European Vendors"), 48 (5) ("that there was no other relevant or material information to disclose") and 48 (6) ("that the UK management had not provided to LMS and/or Tenon any

information which the European Vendors did not also have") are not made out on the basis of the 20 April e-mail. These are all, in my view, far too broadly expressed and cannot reasonably be derived from the statements made in the 20 April e-mail.

180.   However, that e-mail did state, in response to the request for the latest budget for the years in question, that the "projections used were the same that we presented to Helge Homan and Jens in March". It was common ground that the "projections used" referred to projections used by LMS. The first sentence of the e-mail referred to the "numbers used by LMS". The statement in the second sentence as to the "projections used" is equally to be read by reference to what LMS had used. In context, any reasonable representee would understand that he was being told that these were the projections which had been provided to LMS by Updata UK's management (just as they had been provided to Mr. Homann and Mr. Nielsen) and that these were the projections which had been used, in the sense of being considered or evaluated, by LMS in deciding upon their offer. In my view, this is the objective interpretation of what was said in the second sentence.

181.   Paragraph 48 (7) pleads a representation that the UK management were not aware of the basis upon which LMS had calculated the value of Updata UK. The Claimants sought to derive this representation from the final sentence of the e-mail, although by the end of the trial the Claimants' case as to the meaning of the final sentence had moved significantly away from the pleaded case. I do not consider that Mr. Bennett's statement, in context, was addressing the way in which LMS had calculated their offer. It was addressing a different point, arising from the LMS offer letter and Mr. Johnsen's question.

182.   LMS's offer letter (whose terms are important to the arguments as to the interpretation of Mr. Bennett's e-mail which the Defendants advanced) stated:

> "From this information we know that YTD February 2009 results are behind plan due to delays on installations and lower than budgeted margins: Sales £6.0 million (budget £8.6 million) and EBITDA £0.8 million (budget £1.3 million). The actual run rate results of the company (12 months to 28th Feb 2009) are as follows: Sales £8.4 million, EBITA £1.5 million and EBIT £0.85 million. In other words, significant progress is still required to achieve budget results for June 2009. However, despite this shortfall, the Company is showing good growth compared to 2008.
>
> In addition, our analysis shows several creditors have gone unpaid (including VAT!) and the true indebtedness of the Company is around £1.4 million. The resulting enterprise value of Updata UK (using an exchange rate of 8.5 DKK/GBP) is £9.1 million.
>
> Therefore our Offer reflects the following valuation multiples:
>
> EBITDA £1.50 million = 6.1x
>
> EBIT £0.85 million = 10.7x

> We have taken these factors and the resulting high entry price multiples into account in formulating our Offer. We believe that under LMS ownership, a well financed Updata UK, freed from its current constraints, has good prospects for profitable growth."

183. I think that it is likely that Mr. Johnsen was thinking that LMS might have made some adjustments to the budgeted figures which they had been given; because they referred to the YTD February 2009 results being behind plan due to delays on installations and lower than budgeted margins. Mr. Johnsen was therefore enquiring as to what adjustments had been made. In the final sentence, Mr. Bennett was replying to indicate that he did not know what adjustments LMS had made internally.  I do not consider that this exchange can be read as being a representation as to the way in which LMS had calculated their offer. However, to my mind, the final sentence of the e-mail serves to reinforce my conclusion as to the meaning of the second sentence (see paragraph 180 above); i.e. that Mr. Bennett was referring to the projections which had been provided to LMS by Updata UK's management  and that these were the projections which had been used, in the sense of being considered or evaluated, by LMS in deciding upon their offer. This is because the reference to "adjustments" only makes sense if they are adjustments to figures which have been given to LMS. Mr. Bennett was therefore indicating that LMS might have made some adjustments to the figures which had been given by the UK management, but he did not know what they were.

184. Paragraph 48 (8) is a representation which clearly cannot be derived from the 20 April e-mail. It is dependent upon the events leading to, and statements made in, the 3 June e-mail, as Mr. Booth acknowledged in closing submissions. Similarly, paragraph 48 (9) clearly cannot be derived from the 20 April e-mail.

185. Accordingly, I conclude that the representations which are material to the case advanced by the Claimants, and which can properly be derived from the 20 April e-mail are as follows:

   a) That the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position.

   b) That the UK management believed that facts existed which reasonably justified the figures included in the Financial Overview.

   c) That the projections in the Financial Overview were those which had been provided to LMS by Updata UK's management (just as they had been provided to Mr. Homann and Mr. Nielsen) and that these were the projections which had been used, in the sense of being considered or evaluated, by LMS in deciding upon their offer.

*The Defendants' arguments in greater detail*

186. The Defendants advanced a number of arguments directed at the proposition that the representations relied upon by the Claimants could not be derived from the 20 April e-mail. I accept, as is apparent from the above discussion, that many of the

representations pleaded in paragraph 48 of the pleading cannot be derived from the 20 April e-mail alone. However, I now address in more detail the Defendants' arguments as to why the three representations cannot be so derived. I start with what I consider to be the most important representation, namely that set out in paragraph 48 (2): that the figures in the Financial Overview represented the UK management's genuine (and current) forecast of Updata UK's financial position. In that regard, the Defendants' argument had a number of themes.

187.    First, Mr. Choo Choy emphasised that the context of Mr. Johnsen's request for information was the LMS offer. Mr. Johnsen accepted in cross-examination that it was the LMS offer letter which had prompted his e-mail. (This is a point which is relevant to inducement, as I shall describe below: see Section G). The substance of Mr. Choo Choy's argument was that Mr. Bennett's response was simply addressing the derivation of the figures in the passage from the LMS offer letter. Thus, the first sentence referred expressly to the "numbers used by LMS". The second sentence, referring to the "projections" used, was only a reference to the column in the Profit and Loss Account headed "Budget 2009", which identified that the Budget for 2009 was £ 1,695,000. The LMS letter referred to progress being required to "achieve budget results for June 2009", and this was the only projection to which Mr. Bennett was referring. The logic of this submission, from which Mr. Choo Choy did not shrink, is that Mr. Bennett was declining to respond to Mr. Johnsen's request for the "latest budget for Updata UK for 2008/9, 2009/10 and 2010/11", and was providing no information at all in response to that request.

188.    I have no hesitation in rejecting this argument. The Financial Overview provided by Mr. Bennett contained not simply the budget figure for 2008/9, but also a "forecast" for that year, and "budget" figures (which were obviously forecasts) for 2009/2010 on a best, middle and worst case basis. Any reasonable reader would understand that Mr. Bennett was indeed responding to the request for the latest budgets, albeit that he did not provide a figure for 2010/2011. In that regard, the conclusion that would naturally be drawn, and which Mr. Johnsen said that he drew, was that Mr. Bennett was responding with the figures that he had, and that the omission of 2010/2011 indicated that he did not have figures for that year. The reference in the e-mail to the "projections" obviously refers, in my judgment, to the forecast for 2008/9 and the forecasts for the following year which were provided. The word "projections" might possibly be said to encompass the figure for the 2008/9 "Budget", although given that the forecast (£ 1,496,000) was substantially behind budget (£ 1,695,000), the "budget" figure in that context would be understood to have been an earlier projection rather than the "latest" figures which were what Mr. Johnsen was asking for. On any view, however, the reference to "projections" in the e-mail was not confined to the earlier budget figure for 2008/9. Had Mr. Bennett's intention been simply to convey information as to that earlier budget, then there was no reason to send the Financial Overview in that form, containing other forecasts.

189.    Had Mr. Bennett simply sent the Financial Overview in response to Mr. Johnsen's e-mail, with the various figures there set out, there could be no doubt that he would have been responding to Mr. Johnsen's request for the latest budget (i.e. forecasts) for those years. There is nothing at all in the words of his 20 April e-mail which suggest that he was not doing so. On the contrary, he was indicating that the attachments were the figures which LMS had used in the context of an offer which had been made only

a few days earlier, and they were the same as figures given previously to Mr. Homan and Mr. Nielsen.

190.    Mr. Choo Choy's argument in the present context focused heavily on the word "used" (i.e. the projections used by LMS), when read in conjunction with the relevant section of the LMS offer letter.  There was, however, an obvious difficulty (as Mr. Choo Choy's submissions accepted) in identifying any projections "used" in the LMS offer letter itself. The explanation of the offer contained in the relevant part of the LMS letter was not based upon projections at all. Rather, LMS were referring to historic results. They referred to the "YTD February 2009 results": this was a reference to Updata Europe's financial year to date, namely the 8 months from July 2008 to February 2009. LMS also referred to the "actual run rate results of the company (12 months to 28th Feb 2009)": this was a reference to the results from 1 March 2008 to 28 February 2009. Therefore the offer letter did not "use" any forward projections, in the sense of basing the offer on forward projections. The letter did refer to the 2009 budget in the sentence: "significant progress is still required to achieve budget results for June 2009". But I agree with the Claimants that it is an extraordinary interpretation of the 20 April e-mail to treat the reference to the "projections used" as being a cross-reference to this particular reference to the 2009 budget in the LMS letter, whilst ignoring everything else in the Financial Overview. I do not consider that this is how any reasonable reader would understand the e-mail and specifically the reference to "projections used". In context, and as already explained above, I consider that this would have been understood to be a statement that the projections in the Financial Overview had been given to LMS and used, in the sense of being considered or evaluated, by LMS in deciding upon their offer.

191.    There is a further point which is significant in the present context. As further discussed below, the Defendants argued – both in their written opening and written closing – that the reference to the "projections used" was indeed a reference to one of the projections contained in the Financial Overview; namely the figure of £ 1,496 million which was set out as the "Forecast 2009". Their argument was that this was the same "projection" that had been used in the LMS offer letter. As described below, it was only after this argument was revealed to be a bad point that the Defendants sought to suggest that the "projections" could only have been a reference to the budget referred to in the LMS offer letter.

192.    Once it is accepted (as I do accept) that the 20 April e-mail was referring to all of the projections in the Financial Overview, the Defendants then needed to meet the Claimants' argument that (see *Clerk & Lindsell* paragraph 8-13) the forecasts given represented the views which UK management held at that time. The Defendants argued, in substance: that forecasting was uncertain; that any forecasts necessarily involved the use of assumptions; that Mr. Nielsen and Mr. Homann had previously been given not simply the Financial Overview, but also the assumptions upon which it was based; and that nothing could be read into the statements about "best", "middle" and "worst" cases in the Financial Overview beyond the proposition that these were forecasts based on certain specific assumptions.

193.    Again, I have no hesitation in rejecting this argument. I did not think that any of the reasons given by Mr. Choo Choy in the course of his submissions provided any reason for rejecting what I would regard as the obvious conclusion that, by putting forward the projections in the Financial Overview, there was a representation that

these were the management's genuine and current forecast. Any forecast or projection in a business context will of course be based upon assumptions. But that does not negate the representation relied upon as to the genuineness of the forecast given at the time at which it was given.

194.    It was also argued that the concepts of "Best case", "Middle case" and "Worst case" are too uncertain to be ascribed any meaning, at least beyond a representation that certain assumptions have been made. I disagree. I have already referred to the evidence of Mr. Hooft and Mr. Bennett in relation to these concepts: see Section B above. I agree with the Claimants that a "best" case would ordinarily be understood to be the realistic "best case", and a worst case understood to be the realistic "worst case". If a range from "worst" to "best" is provided, the reasonable reader would understand that the range encompasses all the reasonable assumptions that could be made at either end of the scale. The "middle" case would be understood as indicating the management's expectation as to where, on that scale, the results were considered to be most likely to land.

195.    Accordingly, there is nothing in the Defendants' submissions which persuades me that the paragraph 48 (2) representation should be rejected. I next turn to the representation, based upon paragraph 48 (1), that UK management believed that facts existed which reasonably justified the figures included in the Financial Overview. I should note that in view of my findings below that there was a fraudulent misrepresentation as to the opinions held by the UK management, the paragraph 48 (1) representation is not crucial in this case. Such representations are likely to be more important in cases where the Claimants are unable to prove that opinions put forward were not genuinely held. Nevertheless, apart from the criticism that paragraph 48 (1), with its reference to the figures being "correct", was too broadly pleaded, it did not seem to me that the Defendants had any real answer to the substance of the representation relied upon. Their principal argument was that such a representation, with its reference to "reasonable basis for believing", was in practice an allegation of negligence, and that such a case was not permissible in view of the decision of Sir Richard Field to strike out negligence claims. I disagree. As *Clerk & Lindsell* makes clear, there can in principle be a fraudulent representation by a person expressing an opinion who thereby impliedly states that he believes that facts exist which reasonably justify it. If "he does not actually believe in such facts, it follows that he will be liable in deceit".

196.    The third representation, which was in my view made, concerned the provision of the Financial Overview to LMS. The Defendants' arguments in that regard were based on the narrow interpretation which they sought to ascribe to the word "used" in "the projections used". I have already rejected that argument for the reasons set out above.

197.    The parties' closing submissions addressed in some detail the statement in the first sentence of the 20 April e-mail: "The numbers used by LMS were taken from the February Management Accounts". It is not necessary to discuss in detail whether this was a misrepresentation, because – as the Defendants rightly pointed out including in brief submissions made in writing subsequent to closing – the various representations pleaded in paragraph 48 did not include an allegation of misrepresentation in relation to this first sentence, and indeed did not appear to be based upon it. It seems to me that the parties' arguments as to the first sentence are therefore relevant only to the credibility of Mr. Bennett (and the other Defendants in so far as they may have known

and approved what Mr. Bennett was saying). I shall therefore deal with this point briefly, not least because there are in my view other more significant points concerning the Defendants' credibility. In my view, it was incorrect for Mr. Bennett to state that the "numbers used by LMS were taken from the February Management Accounts".

198.  The material part of the LMS offer letter referred to two sets of numbers. The first was the result for the year to date (i.e. commencing on 1 July 2008) as at February 2009. The numbers which LMS used (sales £ 6 million against budget of £ 8.6 million and EBITDA of £ 0.8 million against budget of £ 1.3 million) were in fact taken from the Tenon Data Pack. The relevant figures, which LMS rounded, appear on page 5, which is headed: "Management expect to exceed budget for FY09 by £ 0.8m with volatile pipeline reversing YTD trend". It is true to say that the figures for sales of £ 6 million, and EBITDA of £ 0.8 million against budget of £ 1.3 million, can be seen or derived from the information in the pages of the management accounts which Mr. Bennett sent Mr. Johnsen. But the figure of £ 8.6 million was not contained in those numbers (the equivalent figure was £ 8.1 million), and perhaps more importantly there is no documentary or other evidence that LMS were ever given the management accounts sent to Mr. Johnsen.

199.  The second set of numbers, referred to by LMS, were for the "actual run rate results of the company (12 months to 28th February 2009)". These were: Sales £ 8.4 million, EBITDA £ 1.5 million and EBIT £ 0.85 million. These figures were again taken from the Tenon Data Pack, page 4: in a slide headed "Strong historical growth has resulted in increased recurring rental income with future growth visible through a strong pipeline". None of these figures can be seen in the management accounts sent to Mr. Johnsen, although he did not look sufficiently closely at the management accounts to appreciate the point at the time. There are two further matters to note in the present context.

200.  First, the page of the Data Pack which contained the LTM (last 12 months) numbers used by LMS also included the statement, in a box, that: "Based on run rate Performance and known installations, management expect to outperform FY09 Budget". The box referred to a budget for the FY 2009 of £ 1,717,000 and "outturn" of £ 2,479,000. This is relevant to the allegation of falsity which I will address shortly.

201.  Secondly, the figure of £ 1.5 million EBITDA, based on the actual run rate of the company for the last 12 months, was a significant figure in the LMS offer letter. The letter used that EBITDA figure in explaining that the offer reflected a multiple of 6.1 x £ 1.5 million. The Defendants' written closing submissions sought to correlate the figure of £ 1.5 million in the LMS offer letter with the forecast of £ 1.496 million for 2009 which was contained in the Financial Overview. In that written closing, the Defendants submitted as follows in paragraph 42.6:

> "The second sentence stated that "*The projections used were the same that we presented to Helge Homan and Jens in March.*" Again, the "*projections used*" can only have meant the projections used in the LMS offer letter. Those were projections for FY09, as Mr Johnsen accepted: [**Day4/25/17-24**]. And the projections used in the LMS offer letter for FY09

were EBITDA of £1.5m, which was the same projection given to Mr Homann, Mr Nielsen (and indeed Tenon) on 23 March 2009 in the Financial Overview (and which ended up being £0.3m <u>higher</u> than the actual year-end figure)."

202.    The Defendants had made a similar point in paragraph 71.1 of their written opening:

"The LMS offer was based on a multiple of <u>FY09</u> (<u>not FY10</u>) forecast EBITDA.    The FY09 EBITDA numbers LMS mentioned in their letter were the same (rounded up) as in the Financial Overview (of £1.496m), which he attached."

203.    This particular argument did not withstand analysis, as Mr. Choo Choy recognised in his oral closing submissions. Whilst it is true that there was a similarity between the figures used in the LMS offer letter (£ 1.5 million), and the forecast for 2009 in the Financial Overview (£1.496 million), the two figures were calculated on a different basis. The £ 1.5 million in the LMS offer letter was not a projection at all, but was an historic figure looking at results to 28 February 2009. The figure of £ 1.496 million in the Financial Overview was a forecast for Updata UK's financial year to the end of June 2009. It was only after this point had been exposed as a bad point that the Defendants sought to argue, in oral closing, that the "projections used" in the 20 April e-mail referred not to the forecast in the Financial Overview for 2008/9, but rather to the budget.

204.    The parties' submissions also addressed the final sentence of the e-mail, and I have already rejected the argument that this contained a representation as to the UK management's knowledge of the basis on which LMS had calculated the value of Updata UK. The last sentence does, however, have some relevance to Mr. Bennett's integrity and credibility, as discussed below.

*Falsity*

205.    I again have no hesitation in saying that each of the representations made were false.

206.    First, the figures in the Financial Overview did not represent the UK management's current forecast of Updata UK's financial position. Their current forecasts (to use the pleaded words, which I consider to be synonymous with the "latest" budgets which Mr. Johnsen had requested) were those contained in the Tenon Memorandum and the Data Pack.

    a)    As far as 2008/9 is concerned, the forecast in the Financial Overview was £ 1.496 million. The equivalent figure in the Tenon Memorandum was nearly £ 200,000 higher at £ 1.694 million. The Data Pack contained a higher figure of £ 2.479 million accompanied by statements that the management expected to outperform the budgeted figure of £ 1.717 million and explanations as to why that expectation was held.

    b)    As far as 2009/10 is concerned, the current forecast was a figure which could be rounded up to £ 6.071 million (Tenon Memorandum) or rounded down £ 6.070 million (Data Pack). This was based upon the March Weighted Budget: see Section B above. It was many millions of

pounds higher than the figures given in the Financial Overview for the management's "middle" case (£ 1.393 million) and "best" case (£ 3.348 million).

207.    Secondly, the figures in the Financial Overview did not represent the UK management's genuine forecast of Updata UK's financial position, at the time that it was given to Mr. Johnsen. By that time, Updata UK's management, in particular Mr. Mantell, had taken a very careful look at the figures in order to decide what numbers could properly be given to prospective investors in order to persuade them to offer to purchase the business. The March Weighted budget, which had been preceded by a number of iterations and eventually gave the figures seen in the Tenon Memorandum and Data Pack, did contain the figures in which the management believed and which represented their genuine forecasts at that time. (In the following Section E, I describe in more detail the process which led to the March Weighted Budget). That was why those figures were given to a large number of potential investors in the market. In so far as the Defendants gave evidence that they did not believe in the figures which were given to the market via the Tenon Memorandum and Data Pack, I regard that evidence as unreliable and reject it. (I deal in more detail below, in Section F, with my assessment of the evidence given by the Defendants). It involves the proposition that Mr. Johnsen was the only party to whom the Defendants gave their genuine opinion as to the prospects for Updata UK, and that neither Tenon nor the other market participants were given the management team's genuine opinion. This is in my view the converse of the factual position.

208.    I note in this context that the much higher figures (i.e. higher than the Financial Overview) contained in the Tenon Memorandum and Data Pack were not an aberration, but are consistent with figures which can be seen in various documents produced in the course of the following months in 2009. These included:

        a)    A document entitled "Gross Profit Breakdown v7" prepared by Mr. Mantell on 17 June 2009 for the purposes of meetings with LMS on around that date. This showed EBITDA of £ 5.55 million based only on contracts which were regarded as "in the bag"; i.e. without weighting for those contracts which did not merit this characterisation.

        b)    A budget e-mailed by Mr. Mantell to Tenon on 3 July 2009, again based on "in the bag" contracts. This showed EBITDA of £ 6.2 million.

        c)    Documents e-mailed by Mr. Mantell to Nathalie Simpson of Tenon on 9 July 2009, and which contain similar figures for EBITDA: £ 5.5 million for "in the bag" contracts, and £ 6.2 million if commissions are excluded.

209.    Perhaps the most striking such document is the Tenon Due Diligence report. This was dated 10 July 2009, and was prepared by Tenon as part of LMS's due diligence after LMS had been granted exclusivity. It contains various figures whose source was "Management and management analysis, statutory accounts". This included figures for 2008/9: £ 2.103 million (normalized) and £ 3.089 million (run rate). The figure for 2009/10 was £ 7.46 million on a weighted basis. Most significantly, this Tenon Due Diligence report was one of the "Reports" in relation to which the Defendants gave

warranties to LMS in a "Subscription and Shareholders' Agreement" dated 11 July 2009 in the following terms:

### REPORTS AND INFORMATION

1.1 Each of the Warrantors has read and considered the Reports and

> 1.1.1 none of the Warrantors materially disagrees with any opinions or expectations expressed in the Reports or considers any such opinion or expectation to be unreasonable or not based on all relevant assumptions;

> 1.1.2 so far as the Warrantors are aware, the factual information contained in each of the Reports is materially true and accurate; and

> 1.1.3 so far as the Warrantors are aware, there is no other matter, fact or circumstance which renders any of the factual information or the opinions and expectations in any of the Reports materially misleading.

1.2 All factual information which has been given by or on behalf of the Managers to the Investor or to the solicitors, accountants, consultants, advisors or agents of the Investor in the course of the negotiations leading to this agreement, as set out in the Disclosure Letter and the SPA Disclosure Letter was when given and is at the date of this agreement materially true, accurate and not misleading.

210.   Accordingly, it is not the projections contained in the Tenon Memorandum and Data Pack which are an aberration, but rather those contained in the Financial Overview. Since the Defendants were prepared (as they were) to warrant the figures at around the level set out in the Tenon Due Diligence report, the only reasonable conclusion is that such figures (and not the much lower figures in the Financial Overview) represented their genuine views as to the forecast results of Updata UK at the time of sale.

211.   Third, since the figures in the Financial Overview did not represent the UK management's genuine and current forecast of Updata UK's financial position, it necessarily follows that the management did not, as at 20 April, believe that facts existed which reasonably justified the figures included in the Financial Overview. The falsity of this representation therefore does not materially add to the falsity of the representation previously discussed.

212.   Fourth, the projections in the Financial Overview had not been provided to LMS by Updata UK's management. They had been provided to Tenon (as described in Section E) but there was no evidence that the Financial Overview or the projections contained therein had ever been provided to LMS. The figures which had gone to LMS, and indeed the rest of the market, were those contained in the Tenon Memorandum and Data Pack.  The Financial Overview projections had therefore never been considered or evaluated by LMS.

*Mr. Bennett's state of mind*

213.   There are two separate questions which arise when fraud is alleged: whether the representor intended to make representations in the terms alleged, and whether he made a false statement knowingly, without belief in the truth of the statement made or recklessly in the sense of not caring whether it was true or false. I am satisfied that the Claimants have proved their case in relation to both matters.

214.   Given the terms of the e-mail request, and Mr. Bennett's response, it is obvious in my view that Mr. Bennett intended to make the representations to Mr. Johnsen. Those representations are, in my view the ordinary objective interpretation of the words used in the e-mail; i.e. the way in which the words would be understood by a reasonable recipient in Mr. Johnsen's position. I have addressed and rejected the various different interpretations of the words used which have been advanced in the course of argument on behalf of the Defendants. I do not believe that any of those different interpretations would have occurred to Mr. Bennett at the time. It is certainly possible, at least in theory, for a person to make a written representation without intending the representation to be understood in the manner in which the words would ordinarily be interpreted. However, the court would then need to be persuaded by credible evidence that the representor did understand the words used in a different sense. There was in my view no such evidence in this case, and indeed the thrust of Mr. Bennett's evidence was not that he had some peculiar interpretation of the words which he was using in his 20 April e-mail, but rather that he genuinely believed in the figures being put forward; or at least genuinely believed in the "best case" figures (because he accepted that the "middle case" figures were particularly pessimistic). I deal with this issue below. But as far as intention to represent is concerned, I have no doubt that Mr. Bennett did intend Mr. Johnsen to understand that the figures provided in the Financial Overview were the management's current figures, and that these were the figures which had been given to LMS and used by them in considering what offer to make. If a senior executive such as Mr. Bennett gives a set of figures to the founder of the business, and a representative of the majority shareholder, he will also know that the figures would be understood to represent the management's genuine views and that there was a proper basis for those figures.

215.   Mr. Bennett's evidence was that he sent his e-mail response without giving it "that much thought. I've got a three-line e-mail. I gave a three-line e-mail back. I – you know, it wasn't something I sat and -- sat and agitated over". I do not accept this evidence. The e-mail from Mr. Johnsen was clearly an important request for information, coming as it did only a few working days after the LMS offer and at a time when Mr. Johnsen was known by Mr. Bennett to be seeking outside investment. It was also unusual, in that the documents referred to at trial did not indicate that Mr. Johnsen was regularly making requests for documentation. Mr. Bennett gave careful

thought to how he should respond, because he took the trouble to obtain the management accounts and then to remove certain pages from them.

216.    I also have no doubt that Mr. Bennett knew that he was making deliberately false statements to Mr. Johnsen. The reason that he wanted to do this was straightforward. He wanted the LMS bid to succeed, because he perceived this to be in the best interests of himself and the other members of the Updata UK management team. His hope, and the hope of LMS, had been for a sale to be effected at around the level of what they understood to be Updata Europe's debt. It was in fact Mr. Bennett who had drafted the relevant section of the Tenon Memorandum which described the "opportunity" by reference to the debt, and the possibility of acquiring the company for less than the par value of that debt. He knew that LMS had put forward an offer which reflected a valuation multiple of 6.1 applied to EBITDA of £ 1.5 million. There had been disappointment on the very morning of 20 April when Mr. Holm's letter had come in, and the strategy developed that morning was to make contact with the Bank's lawyers in the hope that the Bank would see the full benefits of the offer made which would result in substantial repayment to the Bank. I have no doubt that Mr. Bennett did not want to reveal to Mr. Johnsen the very much more positive outlook (compared to the Financial Overview), both for the current year and for 2009/10. To do so would have potentially very undesirable consequences for the success of the LMS bid. If the management's expectation of EBITDA for 2009/10 of £ 6.070 million were revealed, it would naturally indicate that the price offered by LMS as set out in the LMS letter was an undervalue. That offer reflected an EBITDA of only £ 1.5 million. In addition, the better the expected results, the more likely it would be that the company would attract other investors and higher offers, including from Mr. Nielsen whom was regarded by the Defendants as a most undesirable purchaser. Mr. Bennett knew that Mr. Johnsen was coming to the UK in order to try to raise additional investment, as contemplated by the "Project Eagle" proposal on which Mr. Bennett had commented (and rejected) on the morning of 20 April. Mr. Bennett wanted to do nothing which would encourage a successful result to Mr. Johnsen's efforts. (I return to the evidence relating to the Defendants' motive in Section F below).

217.    In addition, if Updata Europe were given to understand that the budget for the current financial year (which ended around 6 weeks after the 20 April e-mail) would likely be outperformed, and that the forecast EBITDA for the following year would be in the region of £ 6 million, this might have impacted on Updata Europe's willingness or need to sell at all; since it would raise the possibility that Updata UK would be sufficiently cash-generative in the near future to enable dividends to be paid and thereby monies repaid to the Bank. The issue of whether Updata UK could or should pay a dividend had been an issue considered in the period prior to the 20 April e-mail, with the Defendants strongly opposed to such payment. Mr. Bennett would have been aware of this potential impact of a good set of forecasts at the time that he sent the 20 April e-mail. Indeed, on 29 April 2009 he sent an e-mail to Mr. Kidson, referring to a statement in Updata Europe's accounts about a dividend payment from Updata UK, and expressing the view that non-payment of the dividend might mean that the Bank "deem this a breach and call in its security". The e-mail as a whole reflects Mr. Bennett's desire that the Bank should make life difficult for Updata Europe. He noted that if a dividend was declared, Updata UK would no longer be a going concern, and "I doubt very much that Spar Lolland would be delighted to see its primary asset

declared as "not a going concern". I wonder if that may help them take action." Mr. Castledine's response on 1 May referred to the need to "tread carefully but we are all aware of the good news to come"; a reference to the very positive expected performance of Updata UK.

218. It would have been very easy indeed for Mr. Bennett to give a straightforward and honest answer to Mr. Johnsen's request for the latest budget. The figures were readily available, since they had been prepared by Updata UK's management (in particular Mr. Mantell) and had been given to Tenon and used in the Tenon Memorandum and Data Pack. So there was no difficulty in Mr. Bennett identifying what the figures were. But he decided to give the different figures set out in the Financial Overview. He knew that the management's current expectation was for much higher figures, both for 2008/9 and 2009/10. He knew that the management expected the results for 2009/10 to exceed by some considerable margin all of the figures shown in the Financial Overview for that year. He knew that the "middle case" was a very long way from the management's forecasted results. Indeed, he accepted in evidence that the "middle case" figures were "extraordinarily pessimistic", whilst maintaining that at the time that he sent the Financial Overview he was not actually aware of the assumptions on which those figures were based. He had in my view no reason at all to think that LMS had been given the Financial Overview, since he knew that the figures given to all potential investors were much higher. I consider that the response which Mr. Bennett gave was dishonest, in the sense in which dishonesty is required for the purposes of a claim in deceit.

219. A great deal of the Defendants' argument in this case has depended upon the proposition that the figures which management had given to Tenon were not the figures of Updata UK (the company) but were personal to the management because they had been prepared for the purposes of Tenon's work and hence for the MBO. Hence, it was submitted that there was a valid rationale for not providing the latest figures which had been given to Tenon, and that there can have been no dishonesty on the part of Mr. Bennett or the other Defendants. I reject this argument. I do not consider that this rationale occurred to Mr. Bennett at the time. He was asked:

> Q. Right. So just so I can be clear about this, are you saying that it was specifically in your mind at the time you were replying to Mr Johnsen that you couldn't give him a budget because the latest budget was a budget that belonged to you and the management team and did not belong to the company?
>
> A. That wasn't in my mind. The only thing in my mind was about giving budget, it was to try and answer the question.

220. Mr. Baldorino was also asked whether, as at 20 April 2009, the thought had "already crystallised within your head and within the heads of your colleagues, namely that you weren't going to give the weighted budget because it was your document". He said that he could not recall whether this is what he was thinking at that stage. There is no contemporaneous evidence which suggests that he was. Indeed, his evidence was that he knew nothing about Mr. Bennett's exchange on 20 April, and Mr. Bennett's response was not discussed with him.

221.    I address this line of argument in more detail in Section F. However, even if (which I do not accept) there had been some belief at that stage that the figures given to Tenon were the management's figures and therefore did not have to be disclosed, it was still necessary for Mr. Bennett to give an answer to the questions which Mr. Johnsen had raised, and to do so honestly. I accept the Claimants' submission that Mr. Johnsen's request for the latest budget presented Mr. Bennett with a choice. He could provide the latest budget figures, which were those which had been given to Tenon. He could provide something else (as he did), but with an explanation that there was a budget prepared for the MBO that was not being provided, and explaining his position in that regard.  Or he could provide something else without any explanation that information was being withheld. The first option risked derailing the MBO, since it would cast doubt on the price which LMS was offering to pay, would potentially assist Mr. Johnsen in raising alternative investment, and potentially have the other impacts described above. The second option risked the latest figures, including the March Weighted Budget, being flushed out by direct requests for its disclosure. Indeed, it is difficult to see how the management could realistically have maintained a position that they were not prepared to provide the latest budgets to the board of Updata UK (where the Danish representatives were in the majority) or to the majority shareholder. Ultimately, the board could have insisted that the management should provide up-to-date figures. The last option involved lying to Mr. Johnsen but improving the prospects of the MBO succeeding. This is the option that Mr. Bennett chose.

222.    It will be apparent from the foregoing, and from my introductory comments in Section A, that I do not consider that Mr. Bennett was a witness upon whose evidence I could place any reliance, certainly unless corroborated by contemporary documentation or other independent evidence or unless clearly consistent with the inherent probabilities. I formed the same opinion as to the evidence of Mr. Baldorino and Mr. Mantell. I expand upon my reasons for this reaching this conclusion in Section F below.

*Express oral representation*

223.    Paragraph 40 of the Re-amended Particulars of Claim alleges that at around the time of the 20 April e-mail, both Mr. Bennett and Mr. Baldorino warned Mr. Johnsen orally that Updata UK was failing to make significant sales and would not meet the 2009 budget. Neither the Claimants' opening or closing contained any reference to any evidence from Mr. Johnsen on this point, and Mr. Bennett could not recall saying this. Mr. Baldorino denied saying this. I do not think that the evidence as to this representation is sufficiently strong to enable me to come to any conclusion, on the balance of probabilities, as to what was said. It seems to me that, in any event, the oral representation adds nothing to the representation made by virtue of the Financial Overview. This showed, contrary to the Defendants' actual expectation, that Updata UK's results would indeed fail to reach its budgeted results for the 2008/9.

*Intention to induce and Inducement*

224.    The Defendants have called into question whether there was any intention on the part of Mr. Bennett, or the Defendants, to induce the EVs to act in any relevant way. This issue is best addressed after considering the evidence relating to the 3 June e-mail, and I address it in Section E below,

225.    The Claimants contended that representations in the 20 April e-mail were an inducing cause of Updata Europe's decision ultimately to enter into the contract on the terms that they did, and relied upon the presumption of inducement. The Defendants contended that this was not the case, and that they had successfully rebutted the presumption of inducement by showing that the 20 April e-mail was not a real and substantial inducing cause. It is again appropriate to address this issue after considering the developments following 20 April, and in conjunction with figures in the Updated Kelso Presentation which were provided on 3 June, not least because the Defendants' argument drew heavily upon those events as negating inducement (Section G below). There are also issues as to whether Mr. Baldorino and Mr. Mantell, who were not copied into the e-mail exchange on 20 April, can be held liable for Mr. Bennett's deceit. I deal with this issue in Section F, in the context of my further consideration of the Defendants' evidence.

**E: The 3 June e-mail**

226.    In order to understand the shape of the arguments in relation to the 3 June e-mail – in particular as to the nature of the representations made, their alleged falsity, and the Defendants' state of mind – it is necessary to explain in more detail two areas of factual background.

227.    The first area relates to the Tenon Memorandum and the interaction of the management team with Tenon which led to that Memorandum. This is important for a number of reasons, including the description in the 3 June e-mail of the dealings with Tenon, which were in the following terms:

> "The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum. "

228.    This is also of importance because of the Defendants' case that there was no fraudulent intent because they genuinely believed that the March Weighted Budget was a document which was proprietary to the management team, and therefore did not have to be disclosed to Updata Europe. To some extent this point was advanced in the context of the 20 April e-mail. But there was no positive evidence from the Defendants that, in the context of the 20 April e-mail, this point was something which motivated the response: see Section D above. However the case that the March Weighted Budget was proprietary to the Defendants featured significantly in the evidence which was given in relation to the 3 June e-mail and indeed generally. Indeed, in his oral evidence, Mr. Mantell went even further, suggesting that the Weighted Budget contained "Tenon's numbers". Thus, when asked about the figures which were included in the Tenon Memorandum, there was the following exchange with Mr. Mantell:

> "No, I helped provide the figures to – to Tenon, but these were Tenon's – Tenon's numbers. They were – Tenon were employed by – by the four of us to create an IM for the business and that's what they did. You're making it sound like I – I created it and did it and that's – that's only partly true."

229.    The second area relates to the background to the 3 June e-mail itself, because of the importance of reading it in the context of the issues which it was addressing, and what the parties had been discussing.

**E1: The preparation of the Weighted Budget and the information provided to Tenon and LMS.**

230.    The provision of figures by the management team to Tenon appears to have started by the time of the meeting between Mr. Bennett and Tenon on 25 February 2009. Mr. Bennett's e-mail sent prior to that meeting indicated that he hoped to provide some "accurate forecasts for Lee [Castledine] and his team". It is not clear what figures were actually provided, but this is not material. What is clear, as Mr. Mantell accepted in evidence, is that the "provision of financial information and answer of information by Tenon had already started by 16 March [2009]." On that day, Mr. Castledine of Tenon e-mailed Mr. Bennett setting out his "analysis of revenue and cash flows by project based on the budget pack". The attachment to the e-mail showed that Tenon were working on a weighted case for sales of £ 16.24 million, and EBITDA of £ 3.799 million.

231.    Tenon were formally engaged on 18 March 2009. Their terms of engagement included the following:

> "**Scope of work**
>
> Our role in the initial phase of this project will be to prepare the necessary information and evaluate the financial information in order to approach potential purchasers and consider a refinancing of the bank debt. Potentially (depending on progress with your discussions with Sparekassen Lolland) this role may extend to the structuring of a transaction.
>
> Our role will be as follows:-
>
> 1. Prepare an information Memorandum with which to approach potential acquirers.
>
> 2. Research, identify and approach potential equity purchasers
>
> 3. Attend meetings with management and prepare any relevant information required by potential purchasers
>
> 4. Identify and approach potential funding banks for a refinancing exercise
>
> 5. Undertake a review of the financial information
>
> 6. Negotiate terms with potential debt and equity providers and approach Sparekassen Lolland on agreeing a transaction."

232.    The terms of engagement therefore contemplate that Tenon's role would include the evaluation of the financial information to be provided by the management, and reviewing it, rather than preparing it in the first instance. This is hardly surprising: it

is the management who know the business, with Tenon being financial advisers who have played no previous part in that business. One therefore would expect that it would be the management which would provide the financial information and that it would be considered by Tenon, who would no doubt wish to be comfortable with the management figures which were going to the market in whatever documentation Tenon produced. In due course, it seems to me that this is what happened, as I shall describe. Ultimately, in the Tenon Memorandum and Data Pack, figures were put forward as reflecting the management's expectation. Clause 3.1 of Tenon's terms and conditions indicated that the management remained responsible for the financial information which they provided:

> "You accept that any model or related documentation supplied by us as part of the provision of Services ("Model") is prepared by us, wholly or in part, in reliance on the assumptions and other information provided by you. You accept and agree that any such Model and its related output do not to any extent substitute for the exercise of professional and business judgment on your part and that of your employees".

233.    On 17 and 18 March 2009, Mr. Bennett provided information for the purpose of the information memorandum ("IM") which in due course became the Tenon Memorandum. He provided a body of text, including a section in which he summarised the "opportunity" as one to acquire Updata Europe's shares for the level of the Bank debt, which, for reasons already given, required repayment of monies loaned by Vald Nielsen. He also provided a graphic showing Updata UK's contracts for the purpose of the IM.

234.    Tenon were due to go to Updata UK's offices on Monday 23 March 2009. Mr. Castledine e-mailed Mr. Bennett on Friday 20 March, copied to Mr. Baldorino. He said that he had spoken to Tony Nash, who worked for Lloyd's Development Group, one of the prospective partners in the MBO.

> "He asked for certain information in terms of financials which is something to pick up with Julian on Monday no doubt:
>
> – cash flow historically
>
> - what is the management case projections – <u>what do you think you will really do</u>
>
> – p&l and cash flow projections
>
> – balance sheet analysis" (Emphasis supplied)

235.    At 3.56 pm on 23 March 2009 Mr. Helman of Tenon e-mailed Mr. Mantell to request a breakdown of some of the financial information that had been given to Tenon. He asked Mr. Mantell to give a breakdown of the "weighted prospects for 09/10 for each customer so I am able to illustrate where the £ 8.7m is coming from". The figure of £ 8.7 million in weighted prospects for 2009/10 was taken from figures which were attached to the e-mail, and which were materially identical to those attached to Mr. Castledine's e-mail of 16 March. So at that point, Tenon were working from

"weighted" figures for FY10 of £ 16.24 million in turnover and £ 3.77 million in EBITDA. At 4.25pm Mr. Helman e-mailed Mr. Mantell to ask him for a summary of the 2005 – 2010 figures. He required "Revenue, Cost of Sales, Overheads and EBIT". At 4.53pm Mr. Mantell replied attaching the "Financial Overview". The "Best case" figure of £ 3.348 million set out in that document was about 10% lower than the EBITDA figure of £ 3.77 million which Tenon had used in their e-mails of 16 and 23 March.

236.    At 5.27pm Mr. Helman replied to Mr. Mantell attaching a table which he needed completing of the key financial information for 2005 – 2010 (which would form part of the Tenon Memorandum). The table, which had no figures included, had the following headings and proposed financial information:

| | Actual Year Ended 30 June 2005 | Actual Year Ended 30 June 2006 | Actual Year Ended 30 June 2007 | Actual Year Ended 30 June 2008 | Actual Year Ended 30 June 2009 | Actual Year Ended 30 June 2010 |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| Expenses: Cost of Sales Overheads | | | | | | |
| EBIT | | | | | | |
| EBIT % | | | | | | |

237.    Thus, it is true to say that Tenon were provided with the figures in the Financial Overview. Equally, however, it is clear that the figures for the 2009/10 year in that Financial Overview were not included in the Tenon Memorandum, or indeed any draft of the Tenon Memorandum. Instead, at around this time or very shortly afterwards, detailed work was beginning on what became the March Weighted Budget, in order to have up-to-date figures for 2009/10 for inclusion in the IM. Whilst the key historic figures in the Tenon Memorandum for the years ending June 2006, June 2007 and June 2008 are materially identical to those in the Financial Overview, the forecast for the years ended 30 June 2009 and 30 June 2010 were materially different. (By way of reminder: for 2009, the EBITDA was £ 1.694 million in the Tenon Memorandum as compared to £ 1.496 million in the Financial Overview. For 2010, the respective figures were £ 1.393 million (middle case) and £ 3.348 million (best case) compared to £ 6.071 million.)

238.    In cross-examination, Mr. Mantell eventually accepted (after an initial reluctance to do so), based on the documents that he was shown, that he knew at the time that Tenon's work on the figures did not start with the Financial Overview. He was right

to do so. He also agreed that it could "well have been" that the intention was to update the figures in the Financial Overview in order to populate the blank table that Tenon had provided. He agreed that it was therefore not simply a question of transposing the figures from the Financial Overview into the blank table. Indeed, I note that even after receiving the Financial Overview on 23 March, Mr. Helman e-mailed Mr. Mantell at 18.28 on 23 March 2009 saying that he would "require historical and forecast figures for IM as we discussed …". Mr. Mantell also agreed "that whatever figures you are going to put in here are figures that you would regard as reasonably reliable". He accepted that this was because he knew that "what Tenon wanted is what you really thought would happen". Again, I consider that this must have been the case.

239.    In the following days, work was carried out on the March Weighted Budget. On 25 March 2009, at 8.50 pm, the "Budget 2009-2010 (weighted case) (v2)" was circulated to both Mr. Bennett and Tenon, under cover of an e-mail from Mr. Mantell. The EBITDA figure which could be calculated from the figures in the Profit and Loss account in that budget was £ 6.039 million (if based upon "Profit before exceptional items") or marginally in excess of £ 6.070 million (if based upon "Profit before bank expenses"). The figure eventually included in the Tenon Memorandum was the latter figure, rounded up to £ 6.071 million.

240.    Earlier in that day, other figures had been produced. At 11.57am on that day, Mr. Mantell circulated a version of the budget which showed turnover of £ 22.2 million and EBITDA of just in excess of £ 8 million. At 13.49 he circulated a further version which showed the same figures. Then, Mr. Mantell received Mr. Baldorino's detailed analysis of the pipeline, which listed and assigned probabilities to each contract (either 100%, 70%, 50%, 30% or 10%). He then created the March Weighted Budget, incorporating and using the substance of Mr. Baldorino's contract information which had been provided that afternoon to both Mr. Mantell and Tenon.

241.    Upon receipt of the March Weighted Budget, Mr. Bennett e-mailed Mr. Castledine that evening (at 9.19 pm) to say that he could not open the attachment, but "sales are circa 19m, ebit £ 4.9m ebitda £ 6m which seems more like it". He was therefore in my view endorsing the figures in the March Weighted Budget. His reference to "seems more like it" may have been a reference to the fact that the higher figures sent earlier that day were (as he said in evidence) not sustainable, or may have been referable to the lower figures which had been contained in the Financial Overview. But what is clear is that Mr. Bennett was comfortable with the reasonableness of the figures contained in the March Weighted Budget. Indeed, I consider that all members of the management team must have been comfortable with those figures, or they could not properly have allowed them to be presented to the market. On 8 April, Mr. Bennett responded to some points of detail made by one potential investor (Lloyd's Development Corporation), saying that: "In summary therefore I do not feel uncomfortable with the figures presented when viewed in their entirety".

242.    There is no documentary evidence indicating that Tenon played any role in the production of the figures in the March Weighted Budget. The e-mail correspondence on 25 March does indicate that Mr. Castledine was, at lunchtime, heading to Updata's offices in Reigate. No witness from Tenon gave evidence in support of the case that the March Weighted Budget was in substance a joint management/ Tenon document. On the afternoon of 25 March 2009, Mr. Castledine raised one particular point, saying that he would "await Julian's figures to confirm". This confirms that the figures being

produced were regarded by Tenon as those of Mr. Mantell (i.e. "Julian's figures") rather than their own. Since Tenon were financial advisers, it is possible that Mr. Mantell may, as he carried out his work which culminated in the March Weighted Budget, have raised some issues with Mr. Castledine, or bounced some ideas off him. However, I see no reason why this would necessarily have happened, given that the UK management knew the business and knew how to prepare budgets with appropriate weighting. But even if there were some interaction between Mr. Mantell and Tenon as Mr. Mantell carried out his work, it would not mean that the March Weighted Budget was in any sense a joint document, as opposed to a document prepared by management and which Tenon would evaluate and review. Indeed, when Mr. Mantell did circulate the March Weighted Budget, he did so under cover of an e-mail sent to Mr. Bennett, and copied to Mr. Castledine and Mr. Helman, saying: "Please find enclosed draft numbers for your review". This is consistent with the March Weighted Budget being a document prepared by Updata UK's management, with Tenon having a review function. Mr. Mantell suggested that Tenon were at times sitting alongside him as he filled in the spreadsheets, but there is no documentary or other corroborative evidence to support this, and for reasons which appear in this judgment I do not consider Mr. Mantell to be a reliable witness.

243.    On the following morning (26 March) a number of meetings had been scheduled with some private equity houses: Epic, Endless, Octopus and Hamilton Bradshaw. The first meeting was due to start at 10.30 am. The Tenon Memorandum had obviously not been completed at this point, and Mr. Bennett and Mr. Mantell corresponded early that morning in relation to a Powerpoint presentation. Although Mr. Baldorino said that he couldn't remember whether this Powerpoint had been used on a "roadshow", I consider it likely that this was the document used in the discussions with the potential investors that morning. At 8.22 am, Mr. Bennett e-mailed the original Kelso Presentation to Mr. Mantell. At 8.30 am Mr. Mantell replied, using the subject-line: "Done again". The final slide was headed "Financial Projections". It had a column headed "Forecast 2010", and the figures were revised by Mr. Mantell so as to reflect those contained in the March Weighted Budget which had been sent out on the previous night. The "Forecast 2010" was therefore EBITDA of £ 6.039 million based on turnover of £ 19.039 million and Net Profit of £ 4.981 million. In light of subsequent events and the 3 June e-mail, it is important to note that this figure was presented as the "Forecast", not as the "Best Case".

244.    It would appear that Tenon had no substantial issues with the March Weighted Budget which had been sent on the previous evening. There is no documentary record showing any review or comments received. It does appear, however, that there may have been some discussion between Mr. Mantell and Ms. Nathalie Simpson of Tenon on the morning of 27 March. At 10.14 am, Mr. Mantell sent her, copied to Mr. Bennett, a revised budget: "Budget 2009-2010 (weighted case) (v4) xlsx". No changes were made to the relevant figures from which EBITDA is to be calculated. Although it was a "weighted" budget, the projections were based primarily on contracts which had already been won, with only 6 contracts included on a weighted basis.

245.    In due course, it was the EBITDA figure of £ 6.071 million, and other material figures from the March Weighted Budget, which were incorporated into relevant part of the table in the Tenon Memorandum.

246. The Claimants submitted, based upon these documents as explained in the oral evidence at trial, that the March Weighted Budget circulated at 8.50 pm on 25 March 2009: (i) was a company document based on company information; (ii) represented the Defendants' genuine and accurate views of the prospects of the company; (iii) was not an "optimistic sales case"; (iv) was not a Tenon document; and (v) was not based on any particular purchaser coming in, or getting rid of Updata Europe. It seemed to me that all of these submissions were well-founded in the evidence.

247. *Company document.* The March Weighted Budget was created using a pre-existing company spreadsheet. It was prepared by Updata UK's head of finance, Mr. Mantell, during company time, on a company computer. It was based on company information, in respect of which the Defendants owed confidentiality obligations to the company, about company contracts, company expenses and company pipeline opportunities. It was based on information provided by company directors and employees. In particular, the information about the "in the bag" and "weighted" contracts (including their value and duration) was based on the pipeline circulated by Mr. Baldorino to management and then to Tenon on 25 March. Mr. Bennett accepted in evidence that this pipeline information was part of the company's business and part of the information that it needed to run that business.

248. *Genuine views and not an optimistic sales case.* I have no doubt that the March Weighted Budget did contain the management's genuine view as to the results for 2009/10. It was a document which was carefully prepared because Tenon and the market needed to know what the management really thought; i.e. what they thought that they would "really do". As Mr. Mantell agreed, whatever figures were going to be included in the blank table in the Tenon memorandum were figures that he would regard as reasonably reliable. It was put to Mr. Baldorino in cross-examination that, in relation to the figures in the Tenon Data Pack, the figures represented the realistic view of management. He agreed.

249. In so far as the Defendants (particularly Mr. Mantell) sought to suggest that the figures were excessively optimistic, indefensibly high, or pie in the sky, I have no hesitation in rejecting that evidence. The figure of EBITDA in excess of £ 6 million was included in the revised Kelso Presentation Powerpoint prepared on the morning of 26 March as a "forecast", and in my view represented the management's view as to the most likely result for 2009/10; i.e. what they really thought. This is consistent with the fact that the figures which were in this region, or higher, were contained in other documents produced in the course of the summer, and those contained in the Tenon Due Diligence report were ultimately warranted by the Defendants: see Section D above.

250. *Not a Tenon document.* As previously indicated, and for the reasons given, I do not accept that the March Weighted Budget was in any sense a Tenon document. There is nothing in the documents which indicates that Tenon considered this to be their document. Indeed, as discussed below, there came a time in early June when Tenon were asked what documents had to be provided to the Data Room. Their response was to say: all documents, other than the Tenon Memorandum itself. I reject Mr. Mantell's evidence that the March Weighted Budget numbers were Tenon's figures. I accept that Tenon were likely to have reviewed the figures provided, since that would be an important part of their role as a financial adviser. But there is no evidence that they changed anything. This is perhaps not surprising in view of the fact that the people

who really knew about the business were the management, not Tenon. The contemporaneous e-mails, described above, show Tenon asking management for the figures, not the other way round.

251. *Not based on a new owner.* There was in my view nothing to indicate that the March Weighted Budget was prepared on the basis of changes which might be made by a hypothetical new owner. Mr. Baldorino agreed that his pipeline projections and percentages were based on the existing position. The Defendants did not identify any assumption or figures which were premised upon new ownership.

252. The Claimants contend that one of the respects in which the representation made in the 3 June e-mail ("The factual data available to both Tenon at the time and LMS subsequently, does not differ …") was false, at the time of that e-mail, because the March Weighted Budget was provided to Tenon, and was not in the Data Room. It was never deliberately put into the Data Room. But the Claimants also pointed out, correctly, that there were other documents which were supplied to Tenon or LMS in the period before that representation was made, and which also were never put into the Data Room. Mr. Baldorino's pipeline document, circulated on the afternoon of 25 March, was one such document. In addition, on 13 May 2009, Mr. Bennett and Mr. Baldorino met with LMS. Following that meeting, Mr. Mantell e-mailed Mr. Hooft on 15 May with information "as requested". The documents attached to his e-mail contained breakdowns on turnover, installation and rental revenue and margins in respect of the company's FY10 contracts. Mr. Bennett agreed that this was company information and that, if requested, it was "part of all the information you'd expect to provide as part of due diligence to a potential purchaser." Neither the pipeline document, nor the information given to LMS on 15 May, was given to the EVs or included in the Data Room.

**E2: The background to the 3 June e-mail**

253. The key feature of the background to the 3 June e-mail is, in my view, the need – recognised by all involved in the transaction – for both potential bidders, LMS and Mr. Nielsen, to be treated equally in terms of the information provided to them; a matter of which the Defendants, as well as the EVs, Mr. Nielsen and the Bank, were fully aware.

254. Between 13 May 2009 and 3 June 2009 Mr. Nielsen emphasised the need for him to have access to the same information as the rival bidder, and complained to EVs and the Bank that LMS had access to more information than he did.

255. These complaints were taken seriously by both the EVs and the Bank. On 20 May 2009, Mr. Jorgensen wrote to Mr. Birkeland and Mr. Homann, stating that it was "essential that all interested buyers (management at Up-Data and Jens Nielsen via their equity funds respectively) are ensured equal conditions for the transaction".

256. Mr. Nielsen's e-mail of 24 May to Mr. Birkeland gives a sufficient flavour of his position:

> "Further to our telephone conversation, I confirm my request for information to be included in the due diligence material; answers to our questions to the UK management, copy of all

contracts, pipeline information for UK, copy all information, written and oral, given to LMS Capital (together with confirmation from UK management that this is the exact information handed over in writing or orally), and a full Due Diligence information package for Updata Denmark and Change Networks, Updata Germany and Spain."

257.    The request was repeated in a subsequent e-mail, which Mr. Birkeland clearly took seriously. On 28 May, he e-mailed Mr. Holm, setting out the requests made, and stating that "we should follow up on this, and explicitly make sure that this is also complied with". The requests made were in the following terms:

> In order to provide us with a proper basis for the next stages, I request from the company a full "Business Plan", covering the following:
>
> - Adequate information on the historical and current financial information from all operations
>
> - The business plans for the next 3 to 5 years for Updata UK, and the combined business of Change and Updata DK.
>
> - What is Updata's current infrastructure and assets,
>
> - Management's opinion on its competitive landscape
>
> - Strength, risk and opportunity,
>
> - Management commitment to the company
>
> - Capex (investments), rollout timeline/ commitments/ requirements
>
> I also refer to my email to you, dated 24th May 2009, and repeat my request for information to be included in the due diligence material; answers to our questions to the UK management, copy of all contracts, pipeline information, written and oral, given to LMS capital, including (if any) a copy of UK business plan, (together with confirmation from UK management that this is the exact information handed over in writing or orally), and a full Due Diligence information package for Updata Denmark and Change Networks, Updata German and Spain.
>
> By phone Jens has asked me for:
>
> A description of the market
>
> - Competitors
>
> - Pipeline (we have said that if he were to have a copy, this would be anonymised)

- Investments in networks

- Up to date numbers (the ones we have are as at February)

258. The Defendants too were alive to the importance of the Data Room containing equal information for both sides. On 22 May 2009, Mr. Birkeland spoke to Mr. Bennett about establishing a data room. Mr. Birkeland's evidence, which I accept, was that Mr. Bennett said that he would co-operate with that process. Mr. Birkeland then e-mailed Mr. Bennett with a list of documents to include in the Data Room. The list included "any current budget, forecast or business plan (prepared by or for the company or the management)" as well as "All other relevant financial information". Mr. Bennett forwarded Mr. Birkeland's e-mail on to Mr. Mantell on 22 May, commenting that it was quite a lot of work to put together, but that it was "important to get the process under way and we will need this information irrespective of who comes in". Mr. Baldorino said that he was aware that what was required by the list was supposed to go into the Data Room, including the current budgets, forecasts or business plans.

259. Mr. Bennett's evidence was that there was no discussion between the Defendants, at least at this stage, about the approach to take in relation to the Data Room. In contrast, however, Mr. Nyegaard's evidence was that Mr. Bennett told him "in no uncertain terms that he would ensure that the minimum possible information would be put in the Data Room to reduce the chances of a successful bid by a competing bidder". Mr. Nyegaard said that this conversation took place on 6 May 2009, in the context of a discussion about the likely procedures in relation to the upcoming due diligence process by Mr. Nielsen and what information would be provided to him and his associates. His oral evidence was that he and Mr. Bennett would both have been anticipating a data room process, even though this may not yet have been specified by the Bank. It may be that, ten years on, Mr. Nyegaard is mistaken about the timing of this conversation and that it took place after Mr. Jorgensen's email of 20 May 2009. But I have no hesitation in accepting his evidence that the conversation took place. It is consistent not only with Mr. Bennett's response to the 20 April e-mail, but with what subsequently transpired on 3 June and the Defendants' unwillingness to put key information into the Data Room.

260. On 29 May 2009, Mr. Birkeland and Mr. Bennett met at Updata UK's offices. Although there was some dispute as to exactly what was said at the meeting, I do not think that any disputes are of any materiality when it comes to considering the ordinary interpretation of the 3 June e-mail or the other issues relating to deceit. It was common ground that, at this meeting, the EVs were told for the first time about the Tenon Memorandum. Mr. Birkeland's evidence, which in this respect was not significantly challenged and I accept, was that the meeting was intended as a discussion regarding how the UK management would populate the Data Room. The parties discussed the need for a business plan and financial information to be included. Mr. Birkeland also mentioned the requests for information which Mr. Nielsen had made, in particular for financial projections, in e-mails that Mr. Nielsen had sent on 24 and 28 May. Mr. Birkeland stressed that the requests had to be addressed as a matter of urgency because Mr. Nielsen had been waiting for this information for some two months by this point. Mr. Bennett accepted, in his third witness statement, that Mr. Birkeland made the point that both bidding parties,

namely LMS and Mr. Nielsen's consortium, should have access to the same information from Updata UK.

261.  Mr. Birkeland's evidence was that Mr. Bennett initially claimed that no such business plan or financial projections existed. Mr. Birkeland that he could not imagine that, if UK management had been meeting potential buyers, they had done so without some kind of information memorandum or business plan setting out the financial projections and other financial information about the company. Mr. Bennett then said that they did, in fact, have an information memorandum that had been produced by Tenon, but that it belonged to UK management and had been paid for by them. Again, this aspect of Mr. Birkeland's evidence was not challenged, and I accept it. It was therefore common ground that the Defendants made it clear, at the meeting, that the Tenon Memorandum itself would not be provided.

262.  There was, however, as Mr. Bennett accepted in evidence, no reference to any refusal to provide documents other than the Tenon Memorandum. He agreed that he did not say that "he was not going to give certain information which had been given to Tenon". His evidence was that he did not remember referring to the "Tenon suite of documents" at the meeting, and in my judgment he did not. Had he done so, that would have provoked questions as to what comprised this "suite" of documents; a question to which the Defendants gave somewhat different answers in the course of their evidence. Moreover, I do not consider that Mr. Bennett by this time (or by the time that he sent the 3 June e-mail) had in mind any concept of a "Tenon suite of documents". This phrase seems to have first emerged well into the litigation, and was used in Mr. Bennett's third witness statement (paragraph 119) for, as far as I can see, the first time. There is no contemporaneous reference in the documents reference to this concept. Nor do I consider that the other Defendants had this concept in mind in May or June 2009.

263.  After the existence of the Tenon Memorandum had emerged in the parties' discussions, and Mr. Bennett had said that he would not provide it, the parties discussed what would be provided. Mr. Birkeland's evidence (which again in this respect was not challenged) was that there was then some discussion about the Kelso Presentation, which Mr. Birkeland knew about and recalled. This was in the nature of a business plan (as Mr. Bennett's 3 June e-mail recognises) and there was some discussion about how this could be updated. Mr. Birkeland's evidence was that he suggested to Mr. Bennett that they should update the Kelso Presentation so as to have the same financial highlights, projections and conclusions as the Tenon Memorandum. He went on to say, in his witness statement, that Mr. Bennett gave an assurance that he would do that, but (as the Defendants fairly pointed out in their written closing) his oral evidence was more equivocal as to whether there was such an assurance. I do not think that this particular dispute, as to whether there was an assurance, is of any consequence. The subsequent correspondence, including the 3 June e-mail itself, indicates that Mr. Bennett did indeed update the Kelso Presentation. It is reasonable to conclude that the idea of doing so was discussed at the 29 May meeting, albeit that it is not possible – particularly given the passage of time – for me to conclude that there was any particular assurance as to exactly how this updating would occur.

264.  Mr. Bennett accepted that his understanding as a result of the conversation was "that both parties needed to have equal access to Updata UK's documents and that the

information (i.e. Updata UK's documents) provided to Tenon, which had assisted in the preparation of the Tenon Memorandum, should be in the data room". He said that he agreed to Mr. Birkeland's request on the "basis of this understanding". He said that this was also consistent "with Tenon's advice … that whilst the Tenon Memorandum itself did not have to be provided, all information supplied to Tenon in the course of them preparing the Tenon Memorandum should go in the data room". He went to say, in paragraph 119 of his witness statement, that he believed that it was "well understood at the time that both parties should have access in the data room to the same information belonging to Updata UK, that this did not include the Tenon Memorandum itself but did include information of Updata UK's which had been used to prepare the Tenon Memorandum".  It was in this paragraph, however, that he asserted that the same analysis which led to there being no obligation to disclose the Tenon Memorandum also applied both to the March Weighted Budget and the Tenon Data Pack "because these documents also comprised the Tenon suite of documents prepared for the Defendants and George Cowan (as opposed to Updata UK) for the purposes of the management buyout". He accepted however that this was not something which had been discussed with Mr. Birkeland.

265.    Following the meeting, on the evening of 29 May, Mr. Birkeland e-mailed Mr. Bennett. The e-mail was cc'd to Mr. Mantell, Mr. Holm and Ms. Rana, who was dealing with the administrative aspects of the Data Room. Mr. Birkeland set out Mr. Nielsen's bullet point requests for information. He also indicated that he would be asking for written confirmation that there had been equality of provision of "factual information etc.". This was done, as Mr. Birkeland said in evidence, to put the Defendants under pressure and to make it clear how serious it was that there should be equality of information. The e-mail was in the following terms:

> "Thank you for a constructive meeting this afternoon. I will of course inform you and Julian as soon as I know more about when JN's team will arrive. Hopefully, we will not have to meet up at your offices before Monday morning to get the last preparations in place.
>
> As mentioned LMS is expected to arrive Thursday and Friday next week.
>
> As discussed we need to include a business plan in the room. Please find below as agreed an extracted list of the content requested to be included in this business plan:
>
> - Concise statement with adequate appendices (or notes) supporting on information on the historical and current financial information for all operations;
>
> - Concise statement of business plans for the next 3 years, with long term (to 5 years) prospects for Updata DK, Change and Updata UK;
>
> - Concise overview of Updata's current infrastructure and assets;

- Concise statement on management's opinion on its competitive landscape; description of major competitors.

- SWOT analysis, strength, risk and opportunity and threats,

- Overview of capex rollout timeline/ commitment/ requirements to meet 1 to 3 year operations.

As agreed you will contact Flemming tomorrow to discuss in further details the content of the business plan.

We also look forward to receiving you responses to the already put forward by JN's team. I understand that you have the questions. Please let me know if it is otherwise. I suggest that you send your responses to Flemming and I as soon as possible. We will then prepare an appropriate statement from Management Team confirming that LMS Capital has not in writing/orally been provided with any factual information etc. Which is different from the information included in the data room, hereunder in the business plan, or the responses."

266. Mr. Bennett immediately forwarded Mr. Birkeland's e-mail to Mr. Hooft, with the comment "A little too much information don't you think".

267. On the following day (30 May 2009), and as contemplated by Mr. Birkeland's e-mail, Mr. Holm spoke to Mr. Bennett. Mr. Holm had been following the prior correspondence concerning the need for equality of information and Mr. Nielsen's complaints. Mr. Holm's evidence about that conversation in his witness statement was as follows:

> "In my conversation with Mr Bennett on Saturday, 30 May 2009, Mr Bennett explained that he did not possess a business plan for Updata UK and did not intend to include the Tenon Memorandum within the documents in the Data Room. We therefore discussed how a business plan could be put together given the time restraints. I told Mr Bennett to include a definition of market segment, sales pipeline, contracts won, imminent contract wins as well as a 3-5 year budget, with key indicators as turnover, installation, rentals and EBITDA. I reiterated the fundamental importance of this information being correct and identical to the information given to LMS, in order that there could be a fair bidding process. "

Counsel confirmed, during Mr. Holm's cross-examination, that there was no challenge to the substance of that evidence.

268. On the Sunday evening, 31 May 2009, Mr. Bennett sent to Mr. Hooft a draft of his proposed response, and asked for his comments. The draft response reproduced Mr. Birkeland's e-mail, with Mr. Bennett's responses interposed in red. In relation to the request for a concise statement of business plans for the next 3 years, with long term prospects for Change and Updata UK, Mr. Bennett wrote:

> "There is no formal business plan business plan (sic) in place
> for Updata UK. The document which most closely resembles a
> business plan is a presentation to Kelso Asset Management
> which RB & VB presented in October 2008. This can be
> updated but is a PowerPoint presentation and not a descriptive
> document."

269.  At this point, Mr. Bennett had not actually updated the Kelso Presentation, or at least
he did not send it to Mr. Hooft. On the following morning (1 June), Mr. Bennett
circulated his proposed responses to Mr. Baldorino, Mr. Mantell and Mr. Cowan. This
was obviously done with a view to seeing if they had any comments on those
responses. The e-mail attached "JNDD 1". This contained Mr. Bennett's proposed
responses, again by interposing his responses into the text, to Mr. Nielsen's earlier
outstanding questions. ("JNDD" denoted Jens Nielsen Due Diligence.)

270.  In the afternoon of 1 June 2009, when Mr. Bennett was out of the office, Mr. Mantell
on behalf of Mr. Bennett forwarded Mr. Bennett's responses to Mr. Holm. There were
no material changes to the draft which Mr. Bennett had circulated to his colleagues
that morning, from which I conclude that those colleagues were content with the
proposed response. Mr. Holm was therefore told that there was no business plan, but
that the presentation to Kelso "*can be updated*".

271.  On the following day, 1 June 2009, Mr. Hooft reported to Tenon that Mr. Birkeland's
request for a statement that both sides had equal information was "worrying them".
This may explain why, in the draft response sent to Mr. Hooft on the Sunday evening,
and the actual response sent by Mr. Mantell on the Monday afternoon (1 June), there
was no red text responding to this part of Mr. Birkeland's e-mail. At all events, Mr.
Hooft suggested that the Defendants take legal advice on the point by having a word
with a friendly lawyer. He asked Tenon whether they had any materials "to make
them aware of their rights and responsibilities".

272.  Mr. Kidson of Tenon then advised on this issue. He was a senior person at Tenon: his
job title was "Director of Corporate Finance". His advice as to the management
team's responsibilities was in my view unequivocal.  Mr. Kidson's e-mail, sent on 2
June, was in the following terms:

> "Richard/ Vic
>
> I know there has been a lot of discussion on what should and
> should not be provided in the data room and therefore to Jens et
> al. Our advice is that ALL information which you as directors
> have supplied to Lee/Tenon in the course of them preparing a
> report for you (including any pipeline info) should go in the
> data room. The report by Tenon since it was commissioned by
> you and is for your benefit does not haver [sic] to be shown to
> anyone else however.
>
> Our view is that a breach of the above would expose you to
> potential problems/even litigation."

The word "ALL" was capitalised in this e-mail.

273. Early on the morning of 3 June, Mr. Baldorino raised a specific question with Mr. Kidson, in an e-mail copied to Mr. Bennett. It related to the materials to be provided in the Data Room. The specific question arose from Mr. Baldorino's concern that Mr. Nielsen might have been acting on behalf of a trade buyer, and Updata UK did not know who that trade buyer was. He therefore asked whether the "**detailed** pipeline information" (emphasis in original) needed to be divulged, because there was a possibility that it could be used "against us in a detrimental way". Mr. Baldorino asked for advice because Mr. Kidson was far more experienced "than we are and we don't want to be accused of withholding vital information and taken to court for failing in our duties".

274. The initial response to Mr. Bennett and Mr. Baldorino came from Mr. Castledine, whose job title was Director of Transaction Services at Tenon. Mr. Castledine indicated that he had had a discussion with Mr. Bennett, and indicated that "really confidential information" might be provided only at a later stage, when exclusivity had been granted to the bidder, but that he had seen such information provided earlier "but only on a confidential basis (e.g. Customer 1, Customer 2 etc etc)". The possibility of anonymising this information was therefore mooted. I accept the Claimants' submission that, on the evidence, there was no discussion with Tenon of withholding the March Weighted Budget, nor any discussion of the concept of a "Tenon suite of documents" which could be withheld from disclosure.

275. On the following morning, 4 June, Mr. Kidson himself responded to Mr. Baldorino's e-mail of 3 June. The advice was again unequivocal:

> "Our view is that all information given to one bidder (i.e. the MBO team) has to be given to all bidders to provide a level playing field. I don't think there is any way around this. The non-disclosure point is not helpful but is a separate issue".

276. In the meantime, on 3 June, there had been further important correspondence. Early in the morning, Mr. Nielsen wrote to Mr. Birkeland asking for news "concerning getting the requested material and information regarding Updata UK?" The e-mail shows, in my view, that Mr. Nielsen was particularly interested in the position of Updata UK. In full, it read:

> "Further to your data room preparation, I am writing to ask whether you have any news concerning getting the requested material and information regarding Updata UK? Specifically, but not only, it is vital to get the requested information on pipeline, 3-5 year budgets, and answers to the questions sent to the UK management in connection with the initial due diligence in April.
>
> It goes without saying, that getting this information is required in order for us to conduct a proper due diligence in preparation for a binding offer, and it also defies any logic that we are bidding against UK MBO, where this information is clearly at hand to the management and LMS Capital. This is not only prohibitive to our efforts, but also against the interest of the existing shareholders."

277.  On 3 June 2009 at 10:41am Mr. Birkeland e-mailed Mr. Bennett and Mr. Holm to emphasise again that both parties should have the same information available. He was concerned to ensure that the business plan should be put into the Data Room on the following day, before a planned visit by LMS. Mr. Birkeland said that he was trying his hardest to "ensure, that we avoid at a later date, to what extent did both parties have the same information available". The e-mail was written in Danish, and Mr. Bennett translated it and forwarded it to Mr. Mantell, Mr. Baldorino and Mr. Cowan as well as Mr. Hooft.  Mr. Bennett said in evidence that he was aware that "both the bank and the process that was being set up was supposed to ensure equal conditions for all bidders for the business". Mr. Mantell too said that he appreciated the significance of the request for "any current budget, forecast or business plan", and also that the purpose of the Data Room was that there should be an equal exercise so that the bidders had access to the same documentation and information.

278.  By this time (i.e. the morning of 3 June) there were two significant matters which had not yet been addressed. First, the e-mail sent on 1 June had indicated that the Kelso Presentation, which had been used in October 2008, could be updated. But no update had yet been provided. Secondly, there had been no response to the part of Mr. Birkeland's e-mail where he indicated that he would be preparing an "appropriate statement" from the UK management confirming, in effect, equality of information. Mr. Birkeland himself had not yet prepared such a statement.

279.  Both of these matters were then, in my view, addressed in the e-mail sent on 3 June. At 1.06pm Mr. Bennett e-mailed Mr. Birkeland and Mr. Holm. The e-mail was copied to Mr. Mantell, and bcc'd to Mr. Baldorino, Mr. Cowan and Mr. Hooft. The e-mail reattached JNDD1 with Mr. Bennett's interposed answers. It also interposed Mr. Bennett's answers to Mr. Birkeland's e-mail. It also attached the Updated Kelso Presentation. The text of one of the interposed answers was changed to reflect the fact that this updating had occurred, in contrast to the earlier e-mail which indicated that it "can be updated", Mr. Bennett stated:

> "There is no formal or informal business plan in place for Updata UK. The document which most closely resembles a business plan is a presentation to Kelso Asset Management which RB and VB presented in October 2008. Jens and Helge Homann were given this presentation when they came to the UK in Feb/March. We have updated this (please see attached) to reflect new business won but please bear in mind that this is a PowerPoint presentation and not a descriptive document".

280.  In addition to incorporating in red his responses to Mr. Birkeland's e-mail, and to JNDD 1, the e-mail had the following substantive text:

> "Hi Mads and Flemming
>
> I apologise for not getting this to you sooner. I came in on Sunday to complete and was convinced I had sent everything, except the presentation, off to you.
>
> Please find attached answers to JN's and HH's questions from the round off meeting we had in the UK. Where further detail is

required please refer to Julian as he has all the detailed paperwork.

In response to Mads' e-mail earlier today and my subsequent conversation with Flemming, I would like to confirm that there is no business plan, nor has there been for a long time (years). The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum.

The factual data available to both Tenon at the time and LMS subsequently, does not differ from that information currently in the data room. In fact there is now far more factual data in the Data Room than has ever been supplied to Tenon or LMS in the past. We, as a management team will be available to answer questions, from either party, up until the 19[th] June when I understand that firm offers have to be tabled by both teams. We would of course require some notice, although this is to some extent catered for in the Data Room rules.

If either of you have any questions, concerns or suggestions, please revert back to me or Julian."

281.   I agree with the Claimants that this e-mail was clearly intended to be a substitute for the fuller confirmatory statement from all the management that Mr. Birkeland had suggested. But, even if that were wrong, it was clearly intended to provide assurances in response to "Mads e-mail earlier today", where Mr. Birkeland had emphasised the need for equality of information. The importance of that point had been emphasised by Mr. Holm in the conversation between Mr. Bennett and Mr. Holm following Mr. Birkeland's e-mail of 29 May. Mr. Holm thought that this conversation had taken place on Saturday 30 May, and this was not disputed. It appears that there may have been a further conversation on 3 June as well (Mr. Bennett's e-mail refers to "my subsequent conversation with Flemming"), where no doubt the same point was made.

282.   On any view, given the history which I have described, this was an important e-mail. I have no doubt that all of the Defendants knew this. Mr. Birkeland's e-mail of 29 May, and the repeated references both in meetings and correspondence to the need for equality of information, had caused concern within the UK management team and had led to the advice given by Tenon. In so far as Mr. Baldorino and Mr. Mantell sought to distance themselves from the figures contained in the Updated Kelso Presentation, I do not accept their evidence. I consider it inherently probable that they would have discussed with Mr. Bennett and agreed exactly what figures were to be given. They knew from the draft e-mail sent to them on the morning of 1 June 2009 that the Kelso Presentation was to be updated, and they knew from the 3 June e-mail itself and its attachment that the figures had been updated and what those figures were.

**E3:   The allegation of deceit in relation to the 3 June email**

283. Against this background, I turn to consider the ingredients of the tort of deceit in the context of this e-mail.

*What, if any, factual representations were made in the 3 June e-mail?*

284. Again, since this is a case of express representations, it is appropriate to focus on the language of what was said, and construe what was said objectively according to the impact on a reasonable representee in the position of Mr. Birkeland and Mr. Holm, to whom the e-mail was sent. The Claimants' pleaded case relies upon the representations in paragraph 48 of their pleading (see Section D above) and three further representations set out in Paragraph 52 as follows:

> "By including the Updated Kelso Presentation and the Opportunities Presentation in the Data Room, and by making the statements in Mr. Bennett's e-mail of 3 June 2009 (set out at paragraph 46 above), the UK management represented and/or implicitly represented to the European Vendors that:
>
> (1) UK management has a reasonable basis for believing the figures in the Updated Kelso Presentation to be correct;
>
> (2) That no other more accurate financial information, other than the information including the Updated Kelso Presentation, was available;
>
> (3) The UK management had not provided LMS and/or Tenon any information over and above the information contained in the Data Room."

285. Again, the Claimants' pleading, in paragraphs 48 and 52, can be fairly criticised as being somewhat over-elaborate. But in my view it is possible to cut through the language of the pleading in order to identify the critical representations. I consider that there are two categories of representation which are material to the case, and which the Claimants have sought to translate into their various pleaded representations. The first relates to the projections that were presented in the Updated Kelso Presentation. The second relates to the express representation concerning equality of information ("The factual data available to both Tenon at the time and LMS subsequently, does not differ from that information currently in the data room. In fact there is now far more factual data in the Data Room than has ever been supplied to Tenon or LMS in the past").

286. As far as the projections are concerned, the 3 June e-mail stated in terms that the original Kelso Presentation had been updated to reflect new business won. The attachment contains Financial Projections. The material financial projection is the "Best Case Forecast" for 2010 with Turnover £ 15.183 million, Net Profit £ 2.195 million and EBITDA £ 3.348 million. These were, of course, identical to the figures which had been given in the Financial Overview. For essentially the same reasons as set out in the context of the 20 April e-mail, I consider that Mr. Bennett thereby made factual representations that:

i)     This forecast in the Updated Kelso Memorandum represented the UK management's genuine (and current) forecast of Updata UK's financial position; and

ii)     The UK management believed that facts existed which reasonably justified the figures included in the Updated Kelso Presentation.

287.     These projections contained only one "case": i.e. the best case. Since it was identical to the figures given some 6 weeks earlier, it was implicit in this representation that there had been no change to the management's expectations since the time that the Financial Overview had been given. Nothing was therefore done to "correct" the prior representations as to management's "middle case".

288.     As far as equality of information is concerned, the representation was as to the "factual data" that had been provided to both LMS and Tenon. There are two pleaded implied representations which come close to reflecting this representation, namely that set out in paragraph 48 (6) ("that the UK management had not provided to LMS and/or Tenon any information which the European Vendors did not also have") and paragraph 52 (3) ("the UK management had not provided LMS and/or Tenon any information over and above the information contained in the Data Room"). These formulations rightly focus on the information provided by UK management, rather than the information which Tenon may, as a result of work they carried out, have provided to potential investors. The only difficulty with accepting that these implied representations were made is the width of the word "information", bearing in mind that the e-mail itself uses the words "factual data". In theory at least, there might be a distinction between the two concepts, although there is clearly a very considerable degree of overlap.

289.     It seems to me that the real issue here is not how to formulate an implied representation, but simply how to construe what was said in that sentence, against the relevant context. Mr. Choo Choy argued for a narrow interpretation of the words "factual data". His submission was that understood in context, the specific reference to "factual data" meant (and was intended to mean) the raw factual data from the company – not the assumptions and forecasts which the Defendants had prepared with and for Tenon as part of the MBO. He submitted that this was obvious from the fact that it was neither intended nor understood to extend to the Tenon Memorandum, the Weighted Budget, or the Data Pack. As a matter of ordinary construction, the term "factual data" did not cover forecasts or assumptions underlying forecasts as to the future. A forecast is an expression of opinion, not a statement of fact or factual data. The words "factual data" would therefore refer, for example, to the facts surrounding whether a contract had been concluded, what negotiations had taken place, and what stage of the tendering process had been reached. Documents recording judgment calls as to what probability existed of concluding a contract did not contain "raw" factual data.

290.     By contrast, Mr. Booth argued for a wider interpretation. He submitted that there was no reasonable distinction to be drawn between factual and opinion data. He drew attention to evidence given by all of the Defendants that the March Weighted Budget was or contained factual data. Data can come in different forms, but remains data. Management opinions are matters of fact, and a budget prepared by management is a factual document and would have been understood as such. The same is true of a document setting out the pipeline.

291.    I do not consider that, in context, a reasonable representee would have understood the representation made in the limited sense for which Mr. Choo Choy contended. The context of that representation was of course the need, emphasised to Mr. Bennett both by Mr. Birkeland and Mr. Holm, for there to be equality of information. If a budget is prepared by the management, setting out their views and understanding of what contracts there are, how much and when income is going to be received, what expenditure will be incurred in fulfilling those contracts, it would in my view be understood that this budget and the information that it contained was "factual data", even if that data contained an element of prediction as to what would happen in the future.

292.    All of the Defendants in their evidence accepted that the March Weighted Budget was or contained "factual data", and in my view they were right to do so. Mr. Mantell agreed that the March Weighted Budget was "factual data available to Tenon". Mr. Bennett agreed that this weighted budget was "factual information", albeit that it was factual information "which I've already said I wouldn't have provided". Mr. Baldorino agreed that both the March Weighted Budget and his pipeline document "included factual data" and that this was factual data that was not in the Data Room.

293.    I do not consider that any reasonable recipient would have considered that the confirmation that all "factual data" had been made available would have been understood to exclude the budgets or other projections, expressing the management's analysis and views, which had been made available to Tenon. Mr. Bennett agreed that since the March Weighted Budget was not included in the Data Room, the words which he used in his e-mail were a "bit clumsy and incomplete, but not as a lie with an attempt to mislead". He agreed that he should have said that there was information which had been sent to Tenon and to LMS, but which he regarded as private information that shouldn't be disclosed. To my mind, these answers reinforce my conclusion as to how a reasonable recipient would have understood what Mr. Bennett was saying.

294.    It is true, of course, that Mr. Birkeland and Mr. Holm knew that they were not going to be given the Tenon Memorandum. But it does not follow at all, in my view, that because the Tenon Memorandum would almost certainly contain some projections, that the reference to the provision of "factual data" in Mr. Bennett's e-mail should be understood to exclude any data which had an element of futurity about it, such as budgets or projections provided by the management. There is a distinction between: (i) the Tenon Memorandum, which would have been understood to be a Tenon document containing Tenon's views, and (ii) the materials had been provided by management to Tenon so as to enable them to form those views and write their memorandum. The discussions which led to this e-mail had focused on the need for equality of the information given by management to both bidders. There was nothing in Mr. Bennett's e-mail which suggested that equality of information did not extend to materials provided by management which had an element of futurity, such as a recent budget. On the contrary, the prior two sentences of the e-mail ("The information … investment memorandum") conveyed how management had given relatively little by way of written materials to Tenon, with the Tenon Memorandum being based on the PowerPoint and subsequent questions and answers at meetings. This was reinforced by the subsequent statement that there was far more factual data in the Data Room than had ever been supplied to Tenon or LMS in the past.

*Falsity*

295.  Again, I have no hesitation in saying that the representations were false. The representations as to the projections were false for the same reasons that the representations in the 20 April 2009 e-mail were false. The representation as to factual data was false because there was important factual data, as described above, which had been provided to Tenon or LMS and which was not included in the Data Room; specifically, the March Weighted Budget, Mr. Baldorino's pipeline document, and the other information provided to LMS in May 2009.

*The Defendants' state of mind*

296.  I deal with the state of mind of the Defendants collectively, having already held that Mr. Baldorino and Mr. Mantell both knew about what Mr. Bennett proposed to say in his e-mail and what financial information he intended to provide in the Updated Kelso Presentation.

297.  I consider that the Defendants intended to make representations in the terms alleged. The representations concerning the projections follow naturally from the words used in the 3 June e-mail, and the provision of the projections. The representation as to "factual data" is an express representation. None of the Defendants gave any credible alternative explanation to the effect that the e-mail and its attachment were intended to be understood in a different way.

298.  I also have no doubt that the Defendants knew that deliberately false statements were being made to Mr. Holm and Mr. Birkeland. They were made because telling the truth was unpalatable and too risky as far as they were concerned. Revealing the true expectation at that time would put at severe risk any willingness on the part of Updata Europe to contemplate accepting the LMS offer as well as risking offers from Mr. Nielsen which were well in excess of the LMS offer. It seemed to me that (as with the 20 April e-mail) there were a number of dishonest statements in the 3 June e-mail, as described in the following paragraphs. In Section F, I deal with some other points which bear on my unwillingness to accept the Defendants' evidence.

299.  I start with the terms of the description which was given by Mr. Bennett of the process which led to the Tenon memorandum, viz:

> "The information we provided to Tenon began with the PowerPoint presentation attached, which was followed by a number of meetings in which they asked specific questions which we answered. From the information supplied they wrote an investment memorandum."

300.  In my judgment, even bearing in mind that this was a summary of what happened leading to the Tenon Memorandum, this was thoroughly misleading. There was no evidence that the Kelso Presentation (which was the PowerPoint attached) had ever in fact been given to Tenon. The Defendants suggested that Mr. Bennett must have intended to refer to the Financial Overview, rather than the Kelso Presentation, and that his response was therefore somewhat confused. But even if Mr. Bennett was intending to refer to Financial Overview, the factual position (as set out in detail above) was that the management had provided Tenon with financial information in

the days indeed weeks before the Financial Overview was given to them. More importantly, however, the description in the 3 June e-mail omits completely the critical part of the process leading to the figures in the Tenon Memorandum: i.e. the careful preparation, by management, of budgets and ultimately the March Weighted Budget which was given to Tenon on the evening of 25 March 2009. The e-mail seeks to convey the impression that the Tenon Memorandum was the result of Tenon's work in considering the PowerPoint and then asking questions of management in meetings. This is not what happened.

301.    Next, I turn to the projection for 2009/10 contained in the Updated Kelso Presentation. The figure of EBITDA £ 3.348 million did not represent management's genuine and current views of the "Best Case" for 2010. There had been no sudden downward shift in management's expectation of EBITDA in excess of £ 6 million, as set out in the March Weighted Budget and subsequently used by Tenon in the Tenon Memorandum and Data Pack. This figure in the March Weighted Budget was, in my view, management's view of the most likely result (i.e. their forecast for the year), and was not a "Best case" forecast.

302.    The manner in which the Kelso presentation came to be updated is also significant in the context of dishonesty. The original Kelso Presentation had in fact already been updated, as described above, on the morning of 26 March 2009. It was updated by Mr. Mantell, so that the final page containing financial projections included the £ 19 million turnover and £ 6 million EBITDA figures from the March Weighted Budget. The reason that it was updated that morning was in order for Mr. Bennett and Mr. Baldorino to make presentations to a number of private equity houses that the management was planning to meet. They therefore knew about the updated figures, as did Mr. Mantell who had done the work.

303.    Accordingly, there was already in existence, in early June 2009, an updated version of the Kelso Presentation which was available to the Defendants. When Mr. Bennett came to do his separate updating prior to sending his e-mail on 3 June, he deliberately and in my view dishonestly altered the existing Kelso Presentation so as to reduce the 2010 figures, and in particular the EBITDA figure of £ 3.348 million EBITDA. He also changed the heading to the column, so that a figure of £ 6 million which was said to be the "Forecast" (i.e. not a "Best Case" forecast) was changed so as to be a "Best Case" forecast of £ 3.348 million.

304.    In cross-examination, Mr. Bennett sought to justify the £ 3.348 million "best case" in the Updated Kelso Presentation. His evidence was that he had performed some sort of calculation in his head by which he took the £ 6.070 million EBITDA in the March Weighted Budget; accounted for the loss of the Hampshire and Dorset Upgrades contracts; determined that the loss of those contracts would result in reduced EBTDA; and then chose to take the "best case" figure from the Financial Overview as being a "fair" figure in the circumstances. I agree with the Claimants that this evidence should be rejected. Indeed, in his closing submissions, Mr. Choo Choy realistically did not seek to support this explanation, acknowledging that Mr. Bennett had simply used the Financial Overview figures, whilst maintaining that Mr. Bennett had been doing his best to assist the court.

305.    In my view, this was a classic case of a witness who, when confronted with a difficult document in the witness box, simply invents an answer which he thinks may support

his case and justify his conduct. If this happens, the witness should not be surprised if a judge concludes, as I do in the case of Mr. Bennett (for this and many other reasons apparent from this judgment), that he is not a witness upon whose evidence reliance can be placed. Indeed, in his witness statement for the strike-out application, Mr. Bennett's evidence was very different. In his second witness statement, Mr. Bennett's evidence was that he did <u>not</u> update the figures, and that he did not represent that the figures were the most recent projections, because it would have been "obvious to [EVs] that the projections contained within the Updated Kelso presentation were essentially the same as the projections they had previously received". In his third witness statement, he says he was not willing to provide the March Weighted Budget so he updated the Kelso Presentation by taking the "best case" from the Financial Overview. Mr. Bennett's evidence at trial is also inconsistent with the fact that, two weeks later, the Defendants produced "in the bag" FY10 EBITDA projections of £ 5.55 million.

306.    Overall, I reached the same conclusion as in relation to the 20 April e-mail. The Defendants had a choice. They could refuse to provide any projections, and give an explanation as to why. Or they could provide the projections which contained the management's current expectation. Or they could lie, which is what Mr. Bennett did.

307.    The representation as to factual data was also deliberately false. Tenon had been given the various weighted budgets as well as Mr. Baldorino's pipeline document. These were crucial documents which led to the Tenon Memorandum. Further financial information had been given to LMS in the course of May 2009, as described above. None of this information was in the Data Room, and the Defendants knew it. They also knew, because Tenon told them in clear terms in early June, that they needed to provide "ALL" the information which had been supplied to Tenon. The Defendants decided to ignore that advice, because it did not suit their commercial interests which lay in ensuring that the LMS bid succeeded, that Updata Europe accepted it, and that Mr. Nielsen and his consortium failed.

*Intention to induce*

308.    I deal here with intention to induce in relation both to the 20 April e-mail and the 3 June e-mail. The relevant legal requirement for intention to induce is that the representor should intend that the representee should act upon the representation. I do not consider that there can be any doubt that this is what the Defendants did intend. The 20 April e-mail was an important e-mail sent in response to a request for the latest information, and it was sent in the context of the offer sent by LMS on 16 April. The 3 June e-mail was an important e-mail sent to both Mr. Holm and Mr. Birkeland. It arose from a chain of correspondence and discussion as to what should go into the Data Room. It followed the Bank's recommendation that there should be a data room, and the complaints and requests made by Mr. Nielsen. I cannot see any basis for a contention that there was no intention that the representee should act on the representations.

309.    The Defendants submitted that it needed to be proved that there was a subjective intention that "Updata Europe would rely on these representations to enter the SPA". I do not consider that, legally, it is necessary for this specific action to be intended: see Section C above. But in any event, these representations were made to Updata Europe for the very reason that a sale of its shares was in the offing, that an offer for

the shares had been made (at the time of the 20 April e-mail), and that (by the time of 3 June e-mail) there was a bidding process which would lead to a sale and purchase agreement. It is irrelevant, in my view (if this is what the Defendants are suggesting) that at this stage there was no draft SPA in existence, or that LMS had yet to be chosen by Updata Europe as the preferred bidder. A false representation made in the course of discussions for a possible contract is actionable even if made at an early stage of the discussions.

310.    The Defendants' real point on intention to induce, as it seemed to me, was that the figures in the Updated Kelso Presentation were directed at Mr. Nielsen and that therefore there was no intention to induce Updata Europe to act. I did not consider that this argument could have any application to the 20 April e-mail, which was sent to Mr. Johnsen prior to the bidding timetable coming into existence. In the context of the 3 June e-mail, however, Mr. Choo Choy's submission was that the Updated Kelso Presentation was really directed at Mr. Nielsen. It was updated in the way that it was because the Defendants did not want to "spoon-feed" Mr. Nielsen. It was for him to do his own work. This argument was also, as I understood it, advanced as a reason why the Defendants had no dishonest intent.

311.    In whatever way the argument is advanced, in my view it is a bad one. I do not accept that any distinction can be drawn, either in relation to the e-mail itself (which was sent to Mr. Holm and Mr. Birkeland), or more generally, between an intention to mislead Mr. Nielsen rather than Updata Europe. There was no practical way in which Updata UK could give up-to-date information and its current forecasts to Updata Europe, without these also becoming available to Mr. Nielsen as well. Similarly, if they were given to Mr. Nielsen, Updata Europe would necessarily see them. Therefore the desire not to "spoon-feed" Mr. Nielsen, and to "make him do his own work", was by definition a desire not to "spoon-feed" Updata Europe as well. If the Defendants were to achieve the sale that they wanted, they needed to direct statements as much to the seller (Updata Europe) as to the bidder with whom they were in competition.

312.    More importantly, it seems to me that in the present context, the use of the word "spoon-feed" is really a euphemism for "mislead". It would been open to the Defendants to say to Mr. Nielsen that they were simply not willing to give him any figures, and that it was for him to do his own work on the data that had been given, and that they were not prepared to give any confirmation to the effect that the bidders had been treated equally. But this is not what the Defendants did. Instead, as part of their reluctance to "spoon-feed" Mr. Nielsen, the Defendants positively gave misleading projections to Updata Europe in the Updated Kelso Presentation. Those projections did not represent the UK management's genuine (and current) forecast of Updata UK's financial position. Nor did the management believe that facts existed which reasonably justified the figures included in the Updated Kelso Presentation. Quite simply, that is fraud and it is no answer to say that this was borne of a desire not to "spoon-feed" another party. A desire not to spoon-feed could lead to a person refusing to give any information and making this clear. But it cannot justify positive false statements.

*Inducement*

313.    I deal separately with inducement in Section H below, where I conclude that the requirement of inducement is satisfied.

**F: The Defendants' case and evidence: further considerations and conclusions.**

314.    This section addresses a number of further matters which are relevant to my conclusions as to deceit set out above, and to the Defendants' responsibility for that deceit. I identify other reasons which have led me to conclude that the Defendants' evidence is unreliable. I return to the question of motive, in the context of the evidence of Mr. Baldorino and Mr. Bennett as to whether it was their intention to obtain the highest price on the sale to LMS. I deal with Defendants' case and evidence for the strike-out hearing before Sir Richard Field, where the Claimants' contend that the Defendants sought to mislead the court. I also address a number of other points which were advanced by the Defendants as to why there was no fraudulent intent. Finally, I consider the question of whether Mr. Baldorino and Mr. Mantell – neither of whom sent the 20 April or 3 June e-mails – can be held responsible for Mr. Bennett's misrepresentations, either in deceit or for the tort of conspiracy. I consider these matters in the context of the Defendants' case as to why neither Mr. Bennett, nor the other Defendants, had any fraudulent intent, and I start by identifying the principal points advanced.

**F1: The Defendants' case as to fraudulent intent.**

315.    The Defendants' case was that even if false representations were made or intended to be made, there was no intention to deceive. Mr. Baldorino and Mr. Mantell denied any knowledge of the 20 April e-mail from Mr. Bennett: this was Mr. Bennett's document alone. As for the 3 June e-mail, which had been copied to Mr. Mantell and bcc'd to Mr. Baldorino, this was again Mr. Bennett's document. The substance of Mr. Baldorino's evidence was that he had paid little or no attention to the figures in the Updated Kelso Presentation.  Mr. Mantell did not seek to distance himself from those figures in the same way. Indeed, it was Mr. Mantell who placed the Updated Kelso Presentation in the Data Room.

316.    The Defendants accepted that, with hindsight, the Defendants (and Mr. Bennett in particular) might have done things differently or phrased things more precisely. The updating of the Kelso Presentation for Mr Nielsen should probably have been given more thought. But, standing back, the inherent probabilities were irreconcilable with fraudulent intent as opposed (at most) to unreasonableness or incompetence or a view that Mr Nielsen should be doing his own work in assessing the prospects of the company and not be spoon fed the product of the Defendants' work with Tenon for the purposes of their MBO bid. In that context, the Defendants emphasised that:

    a)    They had not set out to do an MBO or oust Updata Europe. On the contrary, it was Mr Nielsen who, with assistance from the Bank, had set matters in motion in January 2009 and it was in response to that that the Defendants started work on an MBO.

    b)    The Claimants were unable to identify any credible dishonest motive for the Ds to have committed fraud in circumstances where LMS would be the principal beneficiary and not them.

    c)    It could not be right to assume that a desire on the Defendants' part to succeed in their MBO bid intrinsically meant that they intended to mislead. It is true that the Defendants no longer wished to have Updata

Europe as majority shareholder, but this was because of a desire to ensure that the business was properly capitalised going forward and no longer controlled by Updata Europe. There was no desire to remove Updata Europe completely.

d)  The suggestion that the Defendants desired to get rid of the European Vendors, and deliberately to withhold information from the Data Room, should be rejected. It was common ground that Updata Europe's representatives never visited the Data Room and that the purpose of the Data Room was for the use of prospective bidders, not for the seller. In any event, this suggested desire was inconsistent with the facts that (a) both European Vendors were offered a roll-over of their investment in Updata UK and (b) Mr. Bennett went out of his way in Spring 2009 to seek to explore a structure whereby Updata Europe would retain 45% of its shares. Those were not the actions of fraudsters desperate to oust the European Vendors.

e)  If the Defendants were fraudsters, then the very last thing they would want was for the European Vendors to remain in the business as significant shareholders, with the ability to discover the "true" performance in FY10. Nevertheless, Newwatch was allowed to roll over its participation in Updata UK into the newco, and in due course Mr. Johnsen came to learn the successful results of the business.

f)  The Financial Overview document was not a dishonest document prepared to deceive. It was prepared in the ordinary course of business of Updata UK. It had been given to Tenon as well as Mr Nielsen and Mr Homann on the same day. If it were a dishonest document, or thought to be incorrect and out of date, why would Mr. Mantell have sent it to Mr. Helman of Tenon on 23 March 2009 in response to a request for 2005-2010 EBIT figures? The Claimants' case theory did not stack up with the inherent probabilities. What is more, Mr. Mantell provided the assumptions underlying each of the FY10 scenarios described in the Financial Overview. These are not the actions of an individual who intends to deceive.

317.  As regards the 3 June e-mail and the Updated Kelso Presentation, the Defendants submitted that the Claimants' case theory again was beset with difficulties:

a)  In advance of sending it, Mr. Bennett specifically asked Tenon for advice. Mr. Kidson said (copying in Mr. Hooft) that the Defendants should provide:

> "ALL information which you as directors have supplied to Lee/Tenon in the course of them preparing a report for you (including pipeline info) should go in the data room. The report by Tenon since it was commissioned by you and is for your benefit does not have to be shown to anyone else however"

b) The Defendants understood the Weighted Budget and the Tenon Data Pack to have been essentially the same as the Tenon Memorandum. These were the core of the MBO sales case they had paid Tenon to help them prepare. Tenon's advice was not inconsistent with that, and the Defendants put the most detailed pipeline information in the Data Room in the form of the April "Opportunities" document. Tenon and LMS obviously knew that the March Weighted Budget was not put in the Data Room, since they visited the Data Room a number of times.

c) There was no good reason why Mr. Bennett would ask Tenon for advice on 2 June if he had already been conspiring with Mr. Baldorino and Mr. Mantell to deceive Updata Europe back in March/April, or why he would do so if he was on the verge of sending his 3 June e-mail in implementation of such a conspiracy. Again, the case theory was highly implausible and improbable.

d) The same point arose in relation to LMS. Mr. Bennett specifically asked Mr. Hooft for advice on his response to Mr. Birkeland's queries on Mr. Nielsen's behalf. Moreover, he copied Mr. Hooft into his e-mail to Mr. Birkeland and Mr. Holm. So, the Court should infer, Mr. Hooft did not think there was anything fraudulent with what Mr. Bennett was saying in his e-mail, or with the Updated Kelso Presentation being sent and then put in the Data Room (but not the March Weighted Budget). Mr. Hooft was a plainly honest witness, with an impressive recollection of events. He was clear in his witness statement that he was entirely unaware of any alleged deceit or fraud occurring at the time, and no case of fraud was made against him. It is not realistic to suppose that the Defendants were part of a conspiracy to deceive, but Mr. Hooft was not. That is an incoherent case bearing in mind what Mr. Hooft knew and saw at the time.

318. More generally, the fact that the Claimants do not allege that either Mr. Cowan or LMS were party to the alleged fraud, despite their integral roles in the MBO, is also significant. It is inherently implausible that the Defendants could have perpetrated a fraud without the involvement or knowledge of Mr. Cowan or LMS.

319. Although there was a great deal of cross-examination of the Defendants directed at the proposition that the March Weighted Budget was Updata UK's document, rather than the document of the management team, the precise legal position in that respect was not what mattered. The real issue, in terms of deceit, was the genuineness of the Defendants' belief that the three documents (the Tenon Memorandum, the Tenon Data Pack and the March Weighted Budget) were essentially part of the same type or in the same category; namely documents that the management team had been preparing for the purposes of the MBO. Mr. Choo Choy therefore submitted that it "made complete sense that they would have treated those documents as being for their use". It would therefore have been natural for Mr. Bennett and the other members of the management team to think of the March Weighted Budget as their document, not the company's document or budget; because it was the working document that provided the financial metrics for the Tenon Memorandum and the Data Pack for the purposes of the MBO. It was therefore very easy to see how, from the management's perspective, the March Weighted Budget was honestly thought by them to be their

work product. Therefore when Mr. Bennett received Mr. Johnsen's request for the latest budgets, it is not realistic to think that he would have interpreted this as a request for the March Weighted Budget. He treated the request as being a request for the latest company budget, not for the budget prepared for the MBO.

320.    Mr. Choo Choy's written and oral submissions recognised that the Updated Kelso Presentation was a somewhat difficult document to defend. His oral submissions addressed this document in detail. He submitted that if there had been an intention to deceive, it was very strange that Mr. Bennett used exactly the same numbers as had been given to Mr. Nielsen and Mr. Homan in March. One would have expected him to use slightly different numbers, perhaps slightly higher. Moreover, the same numbers were used for the best case figures in circumstances where the assumptions underlying the original financial overview in March had been fully disclosed. The best case assumptions as to the pipeline in those assumptions did not reflect the additional 2009 contracts identified on the earlier page of the Updated Kelso Presentation. If there had been an intention to deceive, one would not have expected Mr. Bennett to identify the further contracts which had been obtained in 2009. A careful recipient of the document could not have failed to notice the similarity between the figures in the Financial Overview and those in the Updated Kelso Presentation. At the heart of the submission was the proposition that Mr. Bennett's repetition of the best case FY 2010 figures was reflective or consistent with an intention on his part not to give Mr. Nielsen the benefit of the UK management's MBO work and therefore not to "spoonfeed him and do his work for him".

**F2: Motive and the Defendants' evidence as to their desire to obtain the maximum price**

321.    I have already set out (see Section B) the backdrop to the events in early 2009, including how Mr. Johnsen came to be regarded as "the enemy" by the UK management team, and the UK management's lack of trust in Updata Europe. I have also considered the question of motive in Sections D and E above. I accept Mr. Nyegaard's evidence that, during 2008, the situation between Updata UK and Updata Europe was strained and that Mr. Bennett and Mr. Baldorino lacked confidence in Updata Europe; that they thought that the Danish companies were a potential drain on Updata UK; and that there was a need to replace or dilute Updata Europe as majority shareholder.

322.    I have no doubt that the Defendants' preference was for replacement rather than dilution, if that were achievable. This is reflected in an e-mail sent by Mr. Baldorino in July 2009 after the sale: "It is now done with the Danes kicked into touch". In late 2008, Mr. Bennett and Mr. Baldorino had contemplated putting Updata UK into administration as a means of taking control of the company through a pre-pack administration. In the event, this idea came to nothing. But the need for positive action was lent a degree of urgency when the Defendants was learned that Mr. Nielsen was making an unwelcome approach to buy the company in early 2009. I consider it clear that, thereafter, the last thing that the UK management wanted was for Mr. Nielsen's bid to succeed. None of the Defendants wanted to work with Mr. Nielsen. Their response was therefore to try to put together an MBO. They spent time and money doing so, and chose an investor (LMS) with whom they could work in the future. It is obvious that the Defendants would have been highly motivated for the MBO to succeed. The Defendants were optimistic as to the future of the business, as reflected in the text of the Tenon Memorandum and the forecasts which were given to

Tenon. They wanted to enjoy its future prosperity. The argument (which I have already addressed) that Mr. Bennett did not want to "spoon feed" Mr. Nielsen, and that Mr. Nielsen had to do his own work, also demonstrates the Defendants motive for their bid to succeed, and for Mr. Nielsen to fail. The Defendants therefore had an obvious motive for misleading both Updata Europe and Mr. Nielsen as to the prospects of the business.

323.   Throughout their evidence, both Mr. Bennett and Mr. Baldorino, but in particular the latter, sought to maintain that in 2009 they wanted to obtain the highest price for the shares in Updata UK. They said that they were shareholders and stood to benefit from a sale, just as Updata Europe did. I was sceptical of this evidence at the time it was given, and after closing submissions I was helpfully provided by the parties with an agreed list of their evidence on this topic. I have reviewed it bearing in mind (as Mr. Choo Choy correctly submitted) the importance of reading a witness's evidence as a whole, and in the context of the question asked. It does seem to me that, fairly read, both Mr. Bennett and Mr. Baldorino did give evidence that they were seeking to maximise the price on the sale.

324.   Thus, Mr. Bennett said that, when preparing the figures for the weighted case, he discussed with Mr. Cowan the need to "get the number as high as possible, we're trying to get investors on board quickly. We're trying to get them to pay the best price and therefore we're going to create an optimistic sales document". When referring to his early discussions with LMS in early April 2009, in the context of a question that the pricing was always intended to be referable to the monies owed to the Bank, he said: "We are the management team wanting the highest price". When asked about the position in mid-April, when the LMS offer was made, there was the following exchange:

> "Q. So in terms of the position as it now stood, as I understand your evidence you're saying that you are trying to get the highest value possible for the purchase price?
>
> A. That's exactly what we were trying to do".

325.   Mr. Baldorino's evidence was to the same effect, indeed more emphatic. He said that he wanted to maximise his 15% share in the business. So it wasn't "selling the shares at a lower price or anything like that". He disputed the suggestion that since he did not want to work for Mr. Nielsen, it was even more important for him to ensure that his bid did not succeed:

> "Not really, because I – if his bid would have been very high or higher, much higher, I would have benefited from it.

326.   When asked about the 20 April e-mail, he denied that this had been sent after discussion with him and Mr. Mantell. He was then asked:

> "Q: And it reflected the fact that you did not want Updata Europe to have any real opportunity to try and make the most of its opportunity to sell its shares for the highest possible price?"

A: I would have wanted the highest price for those shares, absolutely.

Q: Well, what I suggest to you is you didn't want that but you knew Mr Johnsen wanted that?

A: No, I wanted – I wanted the price to be as high as possible."

327.   When asked questions in the context of the Claimants' fiduciary duty case, he said that it was:

"in my interests to get the highest price possible obtained ….

….

My interest was probably in line with the European Vendors to sell my share of the business at a highest possible price.

…

I think that we all wanted the highest possible price."

328.   Finally, in response to questions from me, he confirmed that his evidence was that he was seeking to maximise the price that could be paid for the Updata shares in the interests of both the management team and the majority shareholder; and that his colleagues in the management team were seeking to do that as well.

329.   In my view, all of the evidence of Mr. Bennett and Mr. Baldorino, directed towards the proposition that they wanted to maximise the price, was contrary to the documents and the inherent probabilities. It was unreliable and I reject it. I am inclined to think that it was deliberately untruthful as well, since it is difficult to see how these witnesses could, having seen the documents, have persuaded themselves that they wanted and sought to obtain the highest possible price. But it is not necessary to reach a positive conclusion in that regard. It is possible that these witnesses were to some extent on auto-pilot when answering these questions, responding by reference to what they knew their case was and what their answers ought to be, giving insufficient thought to the answers given. This evidence and my rejection of it is relevant to my overall assessment of the Defendants as witnesses, albeit that I agree with Mr. Choo Choy that one should not draw a general conclusion from just one area where the evidence of a witness is rejected.

330.   In relation to the question of whether the Defendants were seeking to maximise the price paid for the shares, the true factual position was in my view as follows. The Defendants, together with Tenon, were certainly seeking to maximise the amount of interest in the opportunity from the private equity houses whom they approached. A considerable amount of work and thought went into the figures which were contained in the March Weighted Budget. There was a considerable degree of optimism amongst the management as to the future results of the business, and this optimism was therefore fairly reflected in the figures which were then given to Tenon and ultimately to the market. This was certainly a way of interesting potential investors. However, when approaching the market, the Defendants were not seeking to

maximise the price. Instead, the relevant section of the Tenon Memorandum, which was drafted by Mr. Bennett, described the opportunity as one to acquire the shares at or below the level of the debt. Similarly, the original approach to Tenon, as reflected in Mr. Castledine's e-mail of 26 February 2009, was to identify funders prepared to invest £ 4-5 million to facilitate an acquisition from Updata Europe.

331.    It is therefore no surprise that when the bids came in from the private equity houses, they were all at or around the level of the debt identified in the Tenon Memorandum. There was no evidence that the Defendants' selection of LMS was thereafter made on the basis of seeking to maximise the price that LMS would pay for the shares, rather than by reference to the private equity house with whom the Defendants preferred to work. Neither Mr. Bennett nor Mr. Baldorino could identify any positive steps that they had taken, apart from approaching a number of private equity houses in the first instance in order to create "competitive tension", to maximise the price. I do not accept that there was any real attempt to create competitive tension. The opportunity was presented as one to acquire the shares at the level of the debt. The hope, no doubt, would be that a number of houses would be attracted by such an opportunity, and would be willing to pitch at that level. The Defendants would then be in the position of being able to pick and choose their preferred investor. That is what in fact happened. There is no evidence that, after the bids came in, the Defendants tried to create competitive tension by encouraging the private equity houses to increase their offers, for example by playing one house off against another.

332.    On 2 April 2009, LMS gave the presentation which I have already described. This noted that the company was "set to gain significant scale: from recent £ 1 million rental [Gross Profit] to £ 4-5 million in near future". The presentation referred to the possibility of using "Historical, LTM [Last 12 months] and YTD underperformance compared with budget [to] give ammunition for lower valuation." There is no evidence of the Defendants challenging LMS as to their proposed use of "ammunition" for a lower valuation. Indeed, following this presentation, it was LMS that was selected as the Defendants' preferred bidder. After LMS had been selected, there is nothing in the documents which evidences attempts by the management to maximise the price payable by LMS. Instead, there are some internal documents showing the management's very real interest in their personal position, including a ratchet mechanism which would increase their shareholding.

333.    On 14 April 2009, there was a meeting at the Bank in Denmark attended by Mr. Jorgensen, the Bank's lawyer Mr. Sorensen, Mr. Bennett and Mr. Baldorino, and representatives of LMS (including Mr. Hooft) and Tenon. The purpose of the meeting was to inform the Bank of the intention of LMS and the UK Management team to buy the shares held by Updata Europe. Mr. Baldorino's contemporary notes of the meeting record: "offer holding co. 60% stake amount same as credit facility": i.e. to offer the same as the outstanding debt. Mr. Bennett and Mr. Baldorino were content with this approach, which was consistent with the opportunity set out in the Tenon Memorandum. Mr. Nyegaard's evidence was that the deal proposed by LMS and the UK Management was deliberately structured so that it exactly covered Updata Europe's debt to the Bank. He said that everyone in the room knew this. I accept that evidence. Mr. Bennett said that he couldn't remember the meeting but it "wouldn't surprise" him if the discussion before the meeting was that the level of the offer was to be pitched by reference to the bank debt. I therefore do not accept Mr Hooft's

evidence in so far he suggested that LMS's first offer was not calculated by reference to the debt, and that his valuation coincidentally matched the debt figure.

334.    On 16 April 2009, LMS made its offer. Mr. Bennett and Mr. Baldorino would have appreciated that, based on the figures which they had given Tenon, there was a very strong argument (to put it at its lowest) that an offer based on EBITDA of only £ 1.5 million would substantially undervalue the company. There is no evidence of any attempt by them to point this out either to LMS or to Mr. Johnsen or anyone else on the Updata side. Instead, as previously discussed, the e-mail traffic on the morning of 20 April was aimed at trying to ensure the success of the LMS bid and explaining its benefits to the Bank.

335.    There is also an obvious point that can be made against the case that the management were seeking to maximise the price, as Mr. Baldorino accepted at the end of his evidence. Had this been the case, Mr. Nielsen would have been given the same figures as had been given to Tenon. Indeed, there would have been every reason to disclose the Tenon Memorandum and the Data Pack (leaving aside the Weighted Budget) both to Mr. Nielsen and Updata Europe in order to ensure that any buyer paid the highest possible price.

336.    The evidence given by Mr. Bennett and Mr. Baldorino on this important issue is one reason why I regard them as unreliable witnesses. But this is not the only reason, and I bear in mind Mr. Mantell did not give evidence along the lines discussed. I therefore now turn to a number of other points of significance.

**F3:    The strike out application**

*The March Weighted Budget*

337.    The Claimants contend that the Defendants deliberately sought to mislead Sir Richard Field on the strike-out application. This was a heavy and important application which, if successful, would have resulted in the dismissal of the claim. The background to this argument is as follows.

338.    On 15 February 2016, the Defendants applied to strike out the proceedings in their entirety. The application was supported by the first witness statement of Mr. Bennett ("RB1"). Mr. Bennett was authorised by the other Defendants to tender RB1 on their behalves, and he accepted in evidence that he must have discussed the events of 6- 10 July 2009 (described in more detail below) with them before it was finalised. Following reply evidence from the Claimants, Mr. Bennett submitted a further witness statement ("RB2") in support of the strike out application, and this was also authorised by Mr. Baldorino and Mr. Mantell.

339.    A principal focus of RB1 and RB2, and the argument that in due course took place before Sir Richard Field, was the provision of the CD in July 2009 which contained the March Weighted Budget. The essential facts here are that on 1 July 2009, Ms Rana of Coren Troen asked Mr. Mantell for a copy of the CD which had already been provided to Nabarros, who were acting for LMS. On or about 3 July 2009, Mr. Mantell posted the CD (described on his 'to do' list as "Data Room Files"). On 6 July 2009, Corren Troen received the CD. It included a version of the March Weighted Budget. On 8 July 2009, Mr Dempsey of Rosenblatt (acting for the Defendants) asked

Ms Rana to check the draft disclosure letter and also check whether the "'data room materials' are different to the CD of docs the other side have received". On 10 July 2009 at 00:07am, Ms Rana produced an amended index to the disclosure letter which referred, amongst other things, to the "2009-10 budget".

340. The Claimants rely upon what they contend to be significant differences between the evidence given by the Defendants on the strike-out application in relation to the CD, and the evidence now given at trial. The Defendants' case at the present trial has been, in summary: (i) that they had never intended to provide the March Weighted Budget to Ms. Rana, because it was regarded as part of the "Tenon suite of documents" which were proprietary to them, and (ii) the reason that it was provided to Ms. Rana in July 2009 was because of a mistake by Mr. Mantell. Mr. Mantell's evidence in both his witness statement and his oral evidence was that he did not appreciate, in July 2009, that he had made this mistake. In Mr. Bennett's third witness statement (served in December 2016), he states that he was not, at the time, aware that Mr. Mantell had provided a copy of the March Weighted Budget to Corren Troen. In his oral evidence, he was unclear as to whether he knew of this mistake prior to completion of the sale transaction in July 2009, saying that when he did discover that it had been included he remembered "being quite surprised".

341. Mr. Booth submitted that one possibility was that the disclosure in July 2009 had been deliberate, because the Defendants could see no way out of providing Corren Troen with the same documents as Nabarro. But this was not at the forefront of his submissions, and I consider it far more likely that the Defendants' evidence on this issue is true; namely that a mistake was made by Mr. Mantell in the final days leading to the close of the transaction, at a time when there was a considerable amount to do. I think that this is far more probable, given the efforts previously made (on 20 April and again 3 June) not to give the EVs the March Weighted Budget. Indeed, the metadata shows that Mr. Mantell printed the March Weighted Budget on 2 June 2009, and I agree with the Claimants that this is likely to have been in anticipation of putting it in the Data Room. A decision must then have been made not to do so. Mr. Mantell in his evidence could not provide any alternative explanation of why he had printed this document on that day.

342. The Claimants' key point was that, in their evidence for the strike out hearing, the Defendants had given no indication at all that the March Weighted Budget had been disclosed by mistake. Instead, whilst RB1 did not expressly say that there had been deliberate disclosure, that was the clear implication of the case that was advanced both in the witness statement and, based upon that evidence, in counsel's submissions to Sir Richard Field. It was also the way in which Sir Richard Field had understood the case that was being presented to him.

343. On behalf of the Defendants, Mr. Choo Choy (who, unlike Mr. Booth, had appeared before Sir Richard Field) did not suggest that, fairly read, either RB1 or RB2, or his submissions on that occasion, indicated that the March Weighted Budget had been disclosed by mistake. He submitted, however, that there had been no intention to seek to mislead at all. Mr. Bennett's first statement did not address why the Weighted Budget had been included on the 6 July CD. It made the point that the CD had in fact gone across to Corren Troen. It addressed the case that the Claimants were advancing, namely that the March Weighted Budget had been concealed, and that this was a very unlikely case of deceit. When the draft judgment had become available, the

Defendants' counsel had written to the judge, in a Note, to question the inclusion of a conclusion, in the draft judgment, that "implicit in Mr. Choo Choy's submissions is an acceptance that the Defendants were aware from 6 July 2009 onwards that the Weighted Budget should be disclosed to the European sellers". Overall, it was submitted that this particular aspect of the strike out hearing could and should have been addressed more clearly. But Mr. Bennett did not seek to mislead, and the matter was raised with Sir Richard Field in the Note.

344.    I consider that the evidential case that was put forward by Mr. Bennett in RB1, and which was supported by Mr. Baldorino and Mr. Mantell, was indeed misleading, as the Claimants submitted. All of the Defendants knew (at least if their evidence on this issue at trial is to be accepted) that the March Weighted Budget had been disclosed by mistake. But neither Mr. Bennett, nor any of the other Defendants, explained this to the court. RB1 clearly implied that there had been deliberate disclosure.

345.    For example, paragraphs 10, 12, and 62 of RB1 all suggest that there was deliberate disclosure:

> "10. What is, I believe, so very remarkable about the Claimants' case is that **it is common ground that we did disclose the 2009/2010 Weighted Budget (which contained the allegedly relevant information) to the European Vendors (through their solicitors)**. It is common ground that we provided this information to the European Vendors' solicitors, alongside the few remaining contracts which had not previously been disclosed because they had not been available, and that we did so nearly a week (on 6 July 2009) before the European Vendors (along with all the other parties) signed the sale agreement on 11 July 2009 (the "SPA") (pages 41 to 98) – and in circumstances in which Updata Europe say they were under no time pressure to execute the SPA" (Emphasis in original)
>
> 12. We believe we therefore face a completely fanciful claim. We (three honest individuals with unblemished careers) are alleged to have deliberately and fraudulently concealed the information contained in the 2009/10 Weighted Budget and Tenon Memorandum despite the fact that it is common ground that we in fact did disclose that very information to the European Vendors prior to the sale, and the 2009/10 Weighted Budget was then deliberately included in in the list of disclosed documents under the SPA by the European Vendors' own solicitors. Not only does that make the Claimants' case legally untenable, but I believe it is factually fanciful. It beggars belief that – had we been fraudulent – we would have provided this information to the European Vendors (and the Claimants have never explained how a case of Fraud is consistent with our actions).
>
> 62. But whatever may be the true position on reliance and inducement, it is my understanding and belief that in

circumstances where the information which forms the basis of the Claimants' allegations of non-disclosure and misrepresentation was in fact disclosed to the European Vendors and their legal advisers well in advance of the execution of the SPA, there cannot be sustainable case of non-disclosure or misrepresentation or of any intention on the Defendants' part to conceal or mislead the European Vendors. The claims of fraud and conspiracy set out at paragraphs 83, 87 and 88 of the PoC should therefore be struck out; alternatively Summary Judgment should be entered in the Defendants' favour in relation to those claims.

346.    So too does paragraph 49, where Mr. Bennett stated that "we naturally assumed that they kept their clients informed of all developments". In the context of a witness statement relying upon the disclosure of the March Weighted Budget, this obviously implied that the Defendants assumed at the time that the contents of the March Weighted Budget would be brought to the attention of Updata Europe by Corren Troen. There were other passages, which I need not set out in full, which similarly suggested that the Defendants actively relied upon and considered Corren Troen would check the documents and bring them to the EVs' attention: see paragraphs 11, 57-58 and 60-61 of RB1.

347.    It seems to me that the proposition that there had been deliberate disclosure was central to the case that was advanced on the strike out application, and that this was how the judge understood the case. At [42] of his judgment, Sir Richard Field summarised Mr. Choo Choy's argument as follows:

> "Mr. Choo Choy QC for the Defendants submitted that the provision to the European Sellers' solicitors, Corren Troen, of the 6 July CD, containing as it did a copy of the Weighted Budget, irrefutably demonstrated that the Defendants were not acting dishonestly at the relevant time in withholding the information it is alleged they fraudulently concealed and accordingly the fraud claim was bound to fail"

348.    Similarly, at [43], the judge records a further submission on behalf of the Defendants that they "would have been in no doubt that Corren Troen would become aware of the Weighted Budget before completion of the SPA".

349.    This summary of the argument reflected submissions made at the hearing. Thus, at the end of the first day of the hearing, Mr. Choo Choy submitted:

> "The idea that all of that was happening whilst we were simultaneously setting out to deceive them is extraordinary. Their case essentially boils down to this, that we have been fraudulently motivated all along, right until early July, then suddenly we're asked for the CD that will reveal the we've been lying and acting fraudulently, and we readily provide it and what's more, we tell their solicitors to check it, and they do check it. So we say that's just fanciful."

350.    Following this submission, Sir Richard Field had an important exchange with the Mr Choo Choy in which he asked directly for an explanation of why the March Weighted Budget was produced on 6 July CD but not before. He pointed out that this had not been explained in the Defendants' evidence. Mr. Choo Choy responded to say that he would bear that in mind overnight.

351.    On the second day of the hearing, Sir Richard Field again pressed Mr. Choo Choy on why the March Weighted Budget was only disclosed on the 6 July CD and why its relevance was not highlighted when it was put on the CD. He was not told that the March Weighted Budget had only been disclosed by mistake. I emphasise that this is no criticism of Mr. Choo Choy, because he could only base his submissions on the evidence given by the Defendants, and this evidence was only consistent with deliberate disclosure. Towards the end of Mr. Choo Choy's submissions, the judge indicated (and counsel accepted) that there were two points being advanced.

352.    The first point was whether the provision of the March Weighted Budget meant there was no misrepresentation, because any such misrepresentation had been corrected on 6 July. The first point was submitted to be an objective question. Counsel accepted that he had not emphasised that particular point in his submissions that morning. In due course the judge rightly rejected it because (see e.g. *Peekay v ANZ Banking Group*) the authorities say that any correction of a false representation must be made fairly and openly.

353.    The second point, however, was whether the provision of the March Weighted Budget meant that it was fanciful to say that the Defendants were dishonest. Counsel submitted that the question of dishonest intent was a subjective issue relating to the Defendants' state of mind. It was therefore crucially important, in dealing with that second point, for the court to consider the Defendants' intentions in providing the March Weighted Budget on the 6 July CD. Counsel submitted (at pages 66-67 of the transcript of Day 2):

> "The importance of the distinction between those two points is that in relation to the question of intent it is relevant in my submission that, in the light of the objective communications that took place, it is very hard to see how it could realistically be said that we had reason to believe and did believe that the contents would not in fact be reviewed and appreciated, because unless you can establish that, how will my learned friend credibly challenge the defendants when they say, well, true we had refused to provide the information until then because we thought that that was part of our presentation to the potential investors, but when we were asked for the CD of all that had been provided to LMS we were prepared to give it, and we certainly didn't intend to mislead? How will he credibly challenge that assertion if he is not able to say credibly that we had reason to believe either that the contents would not be reviewed incompetently, and that the point would simply be missed? We say that is at the very least a powerful point."

354.    It seems to me that counsel's submission on the second point clearly suggested both deliberate provision of the document and a belief on the part of the Defendants that

the document would be reviewed (as was suggested in the evidence which I have summarised above). It was this submission that was reflected in paragraphs [42] and [43] of the judge's judgment as set out above.

355.   I agree with the Claimants that if the court had been told that the provision of the March Weighted Budget had been a mistake, the complexion of the Defendants' application would have changed completely. Indeed, it is impossible to see how the accidental disclosure of this document could possibly be said to demonstrate irrefutably that the Defendants were not acting dishonestly at the relevant time. Accidental disclosure would be entirely consistent with fraud, and the case which was advanced to Sir Richard Field could not realistically have been made.

356.   I also agree with the Claimants that the Defendants' failure to explain the true position as to accidental disclosure of the March Weighted Budget in their evidence, and their putting forward a case of deliberate disclosure, is a serious matter. It was in my judgment an attempt by the Defendants to mislead the court, and to obtain the ultimate remedy of striking out a claim in consequence. And even if it were too draconian a conclusion to say that there was an attempt to mislead the court, I would nevertheless conclude that the episode indicates that the Defendants are not witnesses on whose evidence the court can rely.

357.   I do not think that the Note sent to Sir Richard Field after the hearing is of any assistance to the Defendants. The Note did not explain that the March Weighted Budget had been disclosed by mistake: this is unsurprising, because there was nothing in the evidence to support such a proposition. The Note simply queried whether Sir Richard Field was correct to regard Mr. Choo Choy's submissions as containing an implicit acceptance of the need to disclose the March Weighted Budget. Given that the case advanced was that there had been deliberate disclosure, with reliance being placed on the Defendants' expectation that the material disclosed would be reviewed, one can well understand the judge's conclusion in the first sentence of [45]: a sentence that he declined to change. But what matters for present purposes, in my view, is not what was implicit in the submissions, but rather what said in the witness evidence and explicitly in the submissions as summarised above.

*Unblemished career of Mr. Mantell*

358.   In the evidence on the strike out application, Mr. Bennett stated in RB1 that the Defendants had "unblemished careers" (paragraph 12) and "unblemished professional business careers" (paragraph 26). Although neither Mr. Bennett nor Mr. Baldorino knew this, Mr. Mantell's business career was not unblemished. In fact, Mr. Mantell had been disqualified as a director in 2014 for a period of four years for conduct which included preparing and signing false VAT returns. This related to a business concerning a bar/restaurant which had nothing to do with Updata UK. Although it was a separate business, Mr. Mantell knew that his career was not unblemished. Nevertheless, Mr. Mantell approved Mr. Bennett's witness statement, which was served around 2 years from the time when the disqualification order was made, and during the time that it was current. Again, I consider that it is a serious matter for the court wrongly to be told on a strike-out application that a person has an unblemished professional career, when that is not the case. Again, it is a matter which I take into account in rejecting the integrity and reliability of Mr. Mantell.

## F4:    Other relevant conduct at the material time

359.    It will be apparent from my conclusions in Section D and E above that I consider that important statements made in both the 20 April and 3 June e-mails were not consistent with honest responses to the questions and issues raised. There is other evidence that, at that time, the Defendants did not want Updata Europe to know the picture of success in the UK and behaved with a lack of integrity towards Updata Europe.

360.    On 16 February 2009, Mr. Mantell sent an e-mail setting out recent "wins" and forecast "wins". The e-mail was sent to Mr. Forsyth at Lloyd's Bank, who were Updata Europe's bankers. He did not, however, copy the e-mail to Mr. Holm, despite copying Mr. Holm into another e-mail sent to Lloyd's the same day. Mr. Baldorino was also cross-examined, effectively in my view, on documents showing that contract wins in 2009 were reported internally at Updata UK, but not externally to Updata Europe.

361.    On 18 March 2009, very shortly after Tenon had been formally engaged, Mr. Mantell sent them a cash flow statement which had been sent to Lloyd's bank (Updata UK's bankers), showing a positive £425,000 year-end balance. The e-mail was copied to Mr. Bennett and Mr. Baldorino. Mr. Mantell e-mailed Mr. Holm on the following day to say that due to the diligence work being carried out that week, "unfortunately I have not had time to produce the weekly cash flow forecast". Again, the e-mail was copied to Mr. Bennett and Mr. Baldorino. I agree with the Claimants that this was transparently dishonest conduct towards Mr. Holm, who was chairman of Updata UK and Updata Europe. Mr. Mantell had no explanation for this conduct in his evidence. To my mind, the obvious explanation is that none of the Defendants wanted Mr. Holm and Updata Europe to know about the very positive cash flow figures which had just been sent to Lloyd's. Mr. Mantell, and the other defendants who saw both e-mails, were happy to mislead Mr. Holm in that regard.

## F5:    Specific arguments advanced by the Defendants

362.    In the course of this judgment I have already addressed many of the specific arguments raised by the Defendants, including my conclusions as to motive, the Defendants' attitude to Updata Europe, the figures in the Updated Kelso Presentation and the "spoon-feeding" of Mr. Nielsen, and the general reliability of the Defendants. I have reviewed the Defendants' arguments as summarised in Section F1 above, and in the light of the evidence as a whole I do not find any of the points made persuasive. I comment briefly on the principal points in so far as they have not already been addressed.

363.    *Roll-over.* It is true that offers were made by LMS to permit the EVs to roll over, to some extent, their shares. The first such offer was made after the 20 April representations were made. But it is right that the 3 June representations were made after LMS had proposed a roll-over. I do not think that the proposed roll-over is inconsistent with dishonest intent. The Defendants wanted the LMS offer to succeed, and their focus was on kicking the Danes into touch. Given that focus, I do not think that they gave any thought to the possible consequences of a roll-over in terms of information that might subsequently become available which might cast doubt on the statements that they were making. It would have required a degree of lateral thinking for the Defendants to apply their minds to a possible chain of events whereby the roll-

over would in due course enable Newwatch (and hence Mr. Johnsen) to obtain financial information about the later performance of the business, and that this would then lead to allegations in relation to statements made in the course of the negotiations leading to sale. I do not think that the Defendants thought this through.

364.  *Spring 2009 structure*. Mr. Bennett gave evidence about a possible structure that he explored, which would result in Updata Europe being left with 45 % of the shares. Whilst I accept that this did happen, I do not consider that it assists. Mr. Bennett's idea was in fact unworkable because, as he said, the "debt markets were basically shut". Moreover, I do not consider that this was structure represented what the Defendants hoped and wanted to achieve, which was a successful MBO.

365.  *Financial Overview not originally a dishonest document*. I do not consider that this argument assists. The relevant questions in this case concern how matters stood at the time when the relevant representations were made. The fact that there may have been a projection, prepared some time earlier, which represented the UK management's genuine views at that earlier time, does not in my view address the case advanced.

366.  Nor do I attach any significance to the fact that the evidence indicates that the assumptions or "backing sheets" underlying the Financial Overview appear to have been given to Mr. Nielsen and Mr. Homann. This was a point emphasised in the Defendants' post-hearing brief written submissions, and was relied upon as negating dishonesty. Mr. Bennett's evidence, however, was that he did not know how the "worst", "middle" and "best" case had been compiled or the assumptions on which those three cases were based. The point that the backing sheets had been provided was one which, as it seemed to me, emerged as a result of careful scrutiny of the documents in the course of the trial. But it was not something which played any part in the thinking of Mr. Bennett, nor any of the other Defendants, at the time. I therefore cannot see that it assists in negating the evidence of dishonesty.

367.  *March Weighted Budget was believed to be essentially the same as the Tenon Memorandum*. For reasons already given, I do not believe that the Defendants – either on 20 April or on 3 June – rationalised their approach by reference to the concept of a "Tenon suite of documents" which included the March Weighted Budget. In so far as the Defendants gave evidence to that effect (and there was no such evidence in relation to the 20 April 2009 e-mail), I regard that evidence as unreliable and do not accept it. The Tenon advice was clear cut. The Defendants' rationale for non-production of the Weighted Budget (which Mr. Mantell had printed on 2 June in anticipation of including it in the Data Room) was quite simply that they did not want the EVs or Mr. Nielsen to know the real figures.

368.  *Advice sought from Tenon*. I did not see how this assisted the Defendants. Advice was sought from Tenon, but not in relation to the March Weighted Budget or in relation to the concept of a Tenon "suite of documents". The advice received was clear. The Defendants decided to disregard it. The fact that advice was sought is, to my mind, beside the point in these circumstances.

369.  *Mr. Hooft*. Mr. Hooft did not see the 20 April e-mail. He did see the 3 June e-mail, which attached the Updated Kelso Presentation. No allegation of fraud was made against Mr. Hooft. Mr. Booth said in opening that the Claimants did not have the material to assert that LMS was party to the fraud. I did not think that this was

surprising. Mr. Hooft's evidence was that by the time of the 3 June e-mail he was focusing on LMS's own analysis rather than the numbers in the Updated Kelso Presentation. Mr. Hooft was not sent, in draft, the proposed wording of the first part of the 3 June e-mail ("Hi Mads and Flemming …. Kind regards, Richard"). Nor was he sent, in advance, the Updated Kelso Presentation. He was not asked to advise on what should be said. He had become aware of the matters which were "worrying" the UK management, and specifically asked Tenon to advise as to the management's responsibilities. Tenon's advice, that ALL information should go into the data room, apart from the "report by Tenon", was copied to Mr. Hooft.

370.   Against this background, I did not consider that the absence of an allegation of dishonesty against Mr. Hooft was of any assistance in deciding the state of mind of the Defendants. As Mr. Booth submitted in opening, Mr. Hooft was on the outside, and what he was told or made of the information that he was given was a matter for him. But that could not affect the question of what the Defendants were doing, what they understood and what they intended. I agree that knowledge or participation, or the lack thereof, by any other party does not impact on the key issues in the case.

371.   For the same reasons, I do not attach any significance to the absence of an allegation of fraud against Mr. Cowan or Tenon.

**F6:   Legal responsibility for the deceit**

372.   The two critical e-mails were sent by Mr. Bennett. There was no dispute that Mr. Bennett would, if deceit be proved, be legally responsible for the deceit. There was, however, an issue as to whether or not Mr. Baldorino and Mr. Mantell could be held responsible for what Mr. Bennett said.

*The Claimants' case*

373.   The Claimants' case in their written opening submissions was that the representations were made by and on behalf of all of the Defendants. This case was cross-referenced to their case on unlawful means conspiracy, where the same facts were relied upon. The Claimants contended that the Defendants plainly acted in concert in pursuing the MBO; seeking to dispense with control by the Danish shareholders; and deciding what information was to be provided and what representations made. If any one of the three Defendants had not been party to the conspiracy, the campaign of non-disclosure and misrepresentation would have collapsed. Any one of them could have said "here is the accurate information you have asked for"; any one of them could have said "I'm afraid the figures in the Financial Overview and Updated Kelso Presentation are not accurate"; any one of them could have said "LMS and Tenon have received a lot more information than we have provided to you or to Mr Nielsen"; and any one of them could have sent an e-mail to EVs to notify them of the contract wins in early 2009. They did not do so because they were acting in concert to fraudulently withhold this information from EVs.

374.   In the course of his oral opening submissions, Mr. Booth explained that there was little distinction between the case of deceit and unlawful means conspiracy. His primary case was that the Defendants were "operating in tandem and they're operating together and it's inconceivable that a representation is put other than with the agreement and on behalf of the others because they are acting as a trio". The only

situation in which the unlawful means conspiracy argument potentially had an independent life was if, for some reason, there was an issue as regards authority for a particular representation. If that arose, then there would be a more relaxed test for unlawful means conspiracy; since the relevant question would be whether the Defendants were party to a conspiracy to use false information, and it would not be necessary to show who joined at which point. The essential case, however, was that Mr. Bennett was acting on behalf of all of them.

375.   In closing submissions, the Claimants put the case in the same way. As far as the 20 April e-mail was concerned, the Claimants contended that it was more likely than not that all of the Defendants discussed the information to send to Mr. Johnsen in response to his request. If Mr. Johnsen was going to be given information, it was important to all three Defendants that it was not the accurate information from the March Weighted Budget (because that would improve Mr. Johnsen's chances of raising investment and may lead him to think the LMS offer was too low). And Mr. Bennett could not act alone without the significant risk that one of the other Defendants might give Mr. Johnsen the March Weighted Budget. Once they had decided to pursue the MBO, they were acting in concert, and had to do so. Hence, they stuck to the same position in the subsequent litigation.   They were jointly represented because there is no actual/ potential conflict: they all acted together to pursue their desired MBO and the removal of Updata Europe.

376.   As far as concerns the 3 June e-mail, the Claimants submitted that the draft e-mail circulated on 1 June, and then sent later that day, must have been agreed by all the Defendants. This too must have been the case with the 3 June e-mail, which was copied to both Mr. Mantell and Mr. Baldorino. Indeed, the Claimants submitted (in the context of conspiracy) that by the time that the Defendants were preparing the information to give to Tenon, they must have agreed that they were going to use such up to date and true information for their own purposes and exclude the EVs from it. That is what they in fact did. The Claimants relied upon the failure of Mr. Baldorino and Mr. Mantell to disassociate themselves from the 3 June e-mail, and the failure to act upon the clear advice of Tenon regarding disclosure.

377.   It was submitted that it was therefore fanciful to suggest that had Mr. Johnsen only contacted Mr. Baldorino or Mr. Mantell rather than Mr. Bennett, that on 20 April 2009 he would have received truthful information: the whole scheme would never have worked unless they had agreed to restrict that information, and the Defendants had all adhered faithfully to this.

*The Defendants' case*

378.   The Defendants submitted (correctly) that in a multi-defendant case, it was necessary to establish the tort of deceit against all of the Defendants. A person could only be liable in deceit if he himself was fraudulent. They submitted that the only representor was Mr. Bennett. They accepted, based upon *Cartwright* paragraph 5-07, that a person could be treated as having made a representation "if he manifestly approves and adopts a representation made by a third party". But they submitted in closing that there was no plea that Mr. Mantell or Mr. Baldorino manifestly approved or adopted Mr. Bennett's e-mails either, or what manifest matters were relied upon to support any such allegation of approval or adoption.

379.    As for the 20 April e-mail, the Defendants submitted that there was no evidence that either Mr. Mantell or Mr. Baldorino ever manifestly approved or adopted any representation made in the 20 April e-mail. The Defendants relied upon their evidence that they had not done so. They said that there was no evidence to suggest that the Defendants had conspiratorially got their heads together before Mr. Bennett replied to Mr. Johnsen the same day, or that they had involvement in the e-mail exchange.

380.    In relation to the 3 June e-mail, the Defendants submitted that Mr. Mantell and Mr. Baldorino cannot be said to have approved or adopted either the e-mail itself or the Updated Kelso Presentation. Neither of them considered or agreed it (or any drafts of it) in advance. They relied upon their evidence that they had not paid it much attention at the time, and submitted that there was no contemporaneous evidence that they did any of these things.

*Analysis and conclusions*

381.    I did not consider that there was any substance in the Defendants' pleading point. This point was not taken, or at least not taken clearly, in the Defendants' written or oral opening, notwithstanding that Mr. Booth had clearly explained the nature of the case that was being advanced. In any event, paragraphs 48 and 52 of the Re-Amended Particulars of Claim, and indeed the pleading as a whole, make it plain that the representations were alleged to have been made by each of the Defendants or on their behalf.

382.    There was, however, no dispute that the relevant question was whether Mr. Baldorino and Mr. Mantell had manifestly approved and adopted the representation. This expression comes from the judgment of Viscount Maugham in *Bradford Third Equitable Benefit Building Society v Borders* [1941] 2 All ER 205, 211. I do not consider that there is any special significance to the word "manifestly": it was used in that case to distinguish "mere silence, however morally wrong". If I am satisfied that the relevant representations were made by Mr. Bennett with the agreement of the other Defendants, then this would be a case of manifest approval and adoption.

383.    I am satisfied that this is the case in relation to both the 20 April and 3 June e-mails, essentially for the reasons given by Mr. Booth as summarised above. The evidence in the case shows that, even before the 20 April e-mail, the Defendants were withholding information from Updata Europe, and that Mr. Mantell was willing positively to mislead Mr. Holm as to existence of a cash-flow statement: see Section F4 above. When Mr. Johnsen's request for information came in on 20 April 2009, it is inherently probable that the response would have been discussed and agreed by Mr. Baldorino and Mr. Mantell with Mr. Bennett. It was an important request, at a very sensitive time; i.e. around the time when the LMS offer had come in, Mr. Holm had indicated that Mr. Nielsen had been given exclusivity, and Mr. Johnsen was seeking outside investment. It was also somewhat unusual for Mr. Johnsen to ask for information. I consider it improbable that Mr. Bennett would not have told the other Defendants about the request, or that he would have acted alone in deciding how to respond. This would indeed run the risk that a request might be made by another route (for example, Mr. Holm had a channel of communication with Mr. Mantell), and different information might be provided.

384. I also have no doubt that both Mr. Baldorino and Mr. Mantell were comfortable with Mr. Bennett providing figures, on 20 April, which were out of date and which did not represent their genuine and current views as to the prospects of the company. This is what Mr. Bennett did, again, when he sent the Updated Kelso Presentation on 3 June. Neither Mr. Baldorino or Mr. Mantell sought to disassociate themselves from this. This was so, notwithstanding that Mr. Mantell had printed a copy of the March Weighted Budget on 2 June, and notwithstanding the advice from Tenon. The provision of out-of-date and low figures on 3 June was therefore of a piece with the provision of out-of-date and low figures on 20 April. Indeed, the figures provided on 3 June were the "Best Case" figures taken from the Financial Overview provided on 20 April.

385. Furthermore, the e-mail traffic (see Section E above) which had started with Mr. Birkeland's e-mail on Friday 29 May, and which ended with the e-mail of 3 June, involved both Mr. Baldorino and Mr. Mantell – and the 3 June e-mail was copied to both of them. Mr. Baldorino was clearly interested in, indeed worried by, what Mr. Birkeland was asking for. Mr. Mantell had sent out the first response on 1 June. It is overwhelmingly likely that all aspects of Mr. Bennett's response on 3 June were agreed by all of the Defendants.

386. Accordingly, in my judgment all of the Defendants are responsible in law for the deceit arising from the representations in the 20 April and 3 June e-mails.

**F7:    Conspiracy**

387. These conclusions also mean that the claim in conspiracy also succeeds, although (as the Defendants' written opening submissions contemplated) it adds nothing to the successful claim in deceit.

388. The requirements of a claim for unlawful means conspiracy are:

    i)      A combination or understanding between two or more people;

    ii)     An intention to injure the claimant (albeit without the need for it to be the sole or predominant intention);

    iii)    Unlawful acts carried out pursuant to the combination or understanding; and

    iv)    Loss to the claimant suffered as a consequence of those unlawful acts. (see *Kuwait Oil Tanker v Al Bader* [2000] 2 All ER (Comm) 271 at [108]).

389. Subject to the question of causation of loss (see Section H below), it follows from my previous findings that these requirements are satisfied. The Defendants conspired together to make fraudulent representations to the EVs. Those were unlawful acts carried out pursuant to their combination or understanding. They did so for the ultimate purpose of enriching themselves and removing, if possible, Updata Europe as a shareholder.

390. It was common ground, however, that issues as to causation and the measure of damages did not differ as between the claims in deceit and unlawful means conspiracy.

## G:    Inducement

*The parties' arguments in relation to the forecasts*

391.    The Claimants relied upon the evidence of Mr. Johnsen and Mr. Hildebrandt in support of their case that the representations made in the 20 April e-mail, and the Updated Kelso Presentation, had induced them to sell to LMS on the terms which they did.

392.    The Defendants argued that these representations played no real or substantial part in inducing the EVs to sell. In his oral closing submissions, Mr. Choo Choy emphasised a number of points. There was no contemporaneous evidence of any reliance being placed either on the 20 April e-mail or on the 3 June e-mail or its attachments. It was not as if the EVs were actively considering the contents of those documents in terms of valuing their shares. There was no analysis of what the figures implied or meant in terms of what was offered. There was no evidence that Mr. Johnsen used the figures which he was given in any tangible way, to try to either assess the acceptability of the LMS offer or try to influence it. That explained why no-one on the Updata Europe side picked up the oddity about the contents of the Updated Kelso Presentation; specifically the fact that one of the slides indicated that new contracts had been won in 2009, but the "best case" figures were nevertheless exactly the same as those in the Financial Overview.

393.    The Defendants submitted that even if the lower figures being shown to Mr. Nielsen in the Updated Kelso Presentation had a causal impact, because higher figures might have led to a higher price being offered, that was not the same thing as the EVs relying on and being induced in any relevant legal way by the representations. This was a case where a sale process was already in train, and the only causal impact of the representations was on the course of the bidding process and the resulting price being offered. But it played no real and substantial part in the decision of the EVs as to whether to transact. Although Mr. Johnsen and others on the Updata Europe Board may have wanted to understand the basis of the offer being made by LMS, that did not mean that they were themselves relying on the information when deciding whether or not to sell; because the decision to sell was "essentially predetermined", and the level of offer ultimately came through the bidding process. At best, therefore, the figures may have been given a cursory glance. The evidence as to what happened to the 3 June e-mail was consistent with this proposition: it was not forwarded either by Mr. Birkeland or Mr. Holm to the other members of the Board, and that is why there was no evidence of any Updata Europe Board discussion or consideration of the contents of the Updated Kelso Presentation.

394.    Ultimately, therefore, there was no real inducement by the forecasts themselves in terms of the ultimate sale, certainly in terms of the decision to sell, which had been essentially preordained or predetermined by the Bank's course of action, or as to the price level.

*Analysis and conclusions*

395.    In my judgment, the representations made in the 20 April 2009 e-mail, and those in the Updated Kelso Presentation, were an inducing cause of Updata Europe entering into the transaction with LMS on the terms that it did. In so far as this is a necessary

legal requirement, I consider that they played a real and substantial part in Updata Europe's decision. In this respect, the Claimants have the benefit of an evidential presumption which is difficult to rebut, and none of the points made by the Defendants has persuaded me to hold that it has been rebutted.

396.    In reaching these conclusions, I have taken into account the contemporaneous documents and the inherent probabilities, as well as the evidence of Mr. Johnsen and Mr. Hildebrandt. I start with the former.

*The contemporaneous documents and inherent probabilities*

397.    The starting point in my view is the 20 April e-mail itself. Mr. Johnsen was seeking out information a matter of days after the LMS offer: the offer had been made on Thursday 16 April and Mr. Johnsen asked for the information on the following Monday morning. The Defendants accepted the obvious fact that Mr. Johnsen was doing this in order to evaluate the LMS proposal. He was clearly doing this because the information requested was highly material within the context of what was happening at that time. Decisions as to whether to sell, and if so at what price, were going to be required by Updata Europe as matters moved forward, within an overall context where Mr. Nielsen was also on the scene and Mr. Johnsen was himself looking for outside investors. Accordingly, this is not a case where a representee is relying upon a chance remark made to him spontaneously in the course of discussions. It is a case where the representee has deliberately sought important information.

398.    For reasons already given, Mr. Bennett appreciated the materiality of the information that had been requested. He answered Mr. Johnsen's e-mail dishonestly because he wanted, and perceived that he needed to, influence the course of the subsequent decision-making by Updata Europe in favour of the MBO. There is therefore nothing inherently improbable in Updata Europe contending that the 20 April e-mail materially influenced their subsequent and ultimate decision-making. That is exactly what Mr. Bennett understood would be the likely impact of providing the false information which he provided.

399.    It is true that there is no documentation showing an internal analysis of the figures by Updata Europe in the context of its subsequent decision-making. But the figures in the Financial Overview were not complex, and they could easily be compared to the figures which were set out in the LMS letter. It is inherently probable, in my view, that having asked specifically for the figures, Mr. Johnsen would have carefully considered what was provided, and discussed them with one or more of his colleagues at Updata Europe, and that this would have happened without internal analyses being prepared. As to the ease of comparison between the figures contained in the LMS offer and the Financial Overview: the LMS offer letter used an EBITDA figure of £ 1.5 million (derived from the February 2009 YTD figures), and this was in the same ballpark as the forecast for 2009 (£ 1,496,000), and rather better than the "Middle Case" forecast for 2009/10 (£ 1,393,000). I have no doubt that this is the conclusion that Mr. Bennett wanted Mr. Johnsen to draw. I shall come to Mr. Johnsen's evidence in that regard in due course.

400.    Furthermore, there is other contemporaneous evidence that, consistent with the inherent probabilities, Updata Europe were indeed considering the financial information provided, and evaluating proposals from LMS in that context. On 20 May

2009, Mr. Birkeland sent an e-mail to Mr. Jorgensen, attaching a copy of the improved offer which LMS had made on 15 May 2009. The letter identified various objectives which Updata Europe was working to achieve including redeeming the current loan facilities with the Bank, redeeming the loan made by Vald. Nielsen, and achieving "maximum upside from the investment in England". The e-mail also stated:

> "We want to ensure that we are fully familiarized with the material upon which LMS has based their valuation. We would therefore ask to receive a copy of it, in order to evaluate their assumptions before we risk closing the door to other offers".

401.    When this e-mail was sent, and as the chronology described above indicates, it was Mr. Nielsen who by this time (20 May 2009) was concerned to obtain relevant financial and other information and to be put on an equal footing with his competitor bidder. And it was on that day that Mr. Jorgensen wrote to Mr. Birkeland and Mr. Homann stating that it was "crucial that all interested buyers (the management at Updata UK and Jens Nielsen via their respective capital funds) are ensured equal conditions for the transaction". He went on to recommend that "the data room be opened for both interested parties on the same conditions applicable from Tuesday 26 May 2009". These matters then formed the backdrop to the meeting of 29 May, the 3 June e-mail and the Updated Kelso Presentation.

402.    The documentary evidence demonstrates that the Updated Kelso Presentation was e-mailed in the first instance to Mr. Birkeland and Mr. Holm, as an attachment to the 3 June e-mail. The attachment was then forwarded by Mr. Birkeland to Mr. Hildebrandt under cover of an e-mail dated 9 June 2009 in which he said that the "Business Presentation is attached, as agreed, that was updated last in May by UK Management". It is in my view inherently probable that Mr. Hildebrandt would have considered this presentation, and indeed he was cross-examined on the basis that he did. The words of Mr. Birkeland's e-mail "as agreed" suggest that there had been some discussion about it, prior to its being sent to Mr. Hildebrandt. It is also inherently probable that, if Mr. Hildebrandt had seen it, Mr. Johnsen would also have seen it at the same time.

403.    As described in Section E above, Mr. Bennett had not sent the Kelso Presentation in the form in which it existed, already amended, as at 3 June; i.e. the form in which it had been updated on 26 March 2009, prior to the meetings on that morning. He went to the trouble of reducing the figure shown for "Best Case" to the same figure as had been shown in the Financial Overview, even though management's expectation at this time was that the results would be some millions of pounds higher. The reason that he did this was for the same reason that he had given false figures on 20 April. He again wanted, and perceived that he needed to, influence the course of the subsequent decision-making by Updata Europe in favour of the MBO.  No doubt he also wanted to give false information, as to the management's expectations, to Mr. Nielsen as well. But again, there is therefore nothing inherently improbable in Updata Europe contending that the projections in the Updated Kelso Presentation, which showed that there had been no change in the management's "Best Case", materially influenced their subsequent and ultimate decision-making. Again, that is exactly what Mr. Bennett understood would be the likely impact of providing the false information which he provided.

*The witness evidence*

404.    It is against this background that I come to consider the Claimants' witness evidence on this issue. This evidence is relevant to the question of inducement, and the related question as to how Updata Europe understood the representations made.

405.    In his first witness statement (served in March 2016 in the context of the strike-out application), Mr. Johnsen referred to the 20 April e-mail, expresses the view that it was "simply false", and states:

> "At that time, I had no reason to doubt Richard or to think he would have lied to me; or that he would be providing different information to the buy-out team of which he was a member from the information he was providing to Mr. Nielsen. I took the Financial Overview to be UK Management's most accurate projections of Updata UK's future prospects".

He then went on to describe his dealings with the Bank, saying that if he had had:

> "different numbers to show the Bank, the decisions which were made would, I am certain, have been different
> …
> We were having weekly conversations with the Bank about how to address the situation, but we could only deal with things in light of the information which we had at the time, and that information was not optimistic.
> …
>
> With the information that Updata Europe was given by Updata UK, it had no option but to sell its shares, as it was not able to negotiate with the Bank for more time of for another solution… There were two potential bidders interested in the company, and from the information that we had about Updata UK there was no reason to delay its sale as on the forecasts we had it did not appear that a few months would make any difference"

406.    When addressing the work on the sale, he said that at the time that he received the offers from LMS and Mr. Nielsen, he thought that "Updata UK must have been very unsuccessful in winning contracts, and that we had simply been unfortunate in not being able to hold onto the company for long enough."

407.    Mr. Johnsen was cross-examined on the issue of his understanding of what he was told, and more generally as to inducement: see in particular Day 4, pages 26-31, and 51-69. In relation to the 20 April e-mail, his evidence was that he thought that Mr. Bennett was giving "the fullest answer he could give me … I thought he was giving me the best information he had at that moment". Mr. Johnsen said that when he sold, he was not happy but it was the best price that he could get in the circumstances:

> "We had asked for the newest, most up-to-date forecast and budget … from management. We've asked them to show us on what basis the LMS bid was offered. And to the best of our knowledge at the time this was the most correct picture of the business' performance both then and for the future".

408.   He said that, looking at the forecasts, he didn't see a "chance of persuading the Bank to wait longer". He had hoped that the business was worth more, but "we were not able to show it". They were looking at the "middle-case scenario at the time, which we thought would be the management's best guess as to what would happen". He did not attach significance to the figures for the best case, because a best case is not the basis on which anyone would be able to sell a company. In his "humble opinion, a best case scenario is not the starting point of a negotiation with anyone". He had no reason to challenge the LMS valuation. He might have hoped for a multiple of 10, but Mr. Nielsen had mentioned a multiple of 5 and LMS had mentioned 6.1. He had no reason to:

> "argue with that since, when we looked at the 2010 budget, it actually went down, so if we would have argued that we would rather look at the 2010 numbers, then we were asking for a lower bidding price".

409.   His evidence was that although he had not been sent the Updated Kelso Presentation directly in an e-mail, he was shown a hard copy of it. He did not ask any questions because "we went to the financial projections and saw no change, so we did not see that there should be anything of big significance in what is mentioned on the other page". (He was referring to the page where a number of 2009 contracts were shown). There had been no significant change, except that the middle case and worst case had been taken out. He agreed that Updata Europe had not visited the data room. But he said:

> "If, my Lord, we had been told that there would be information that we did not already have, I can assure the court that we would have been there with as many people as we could send".

410.   In re-examination, Mr. Johnsen was asked again about the 20 April e-mail, and said that his understanding was that "these numbers were the best available at the time and these were given to LMS". He understood from the e-mail that Mr. Nielsen had used the projections as well as LMS. He thought that they represented the "up-to-date" numbers, the "true position of the company".

411.   My assessment of Mr. Johnsen's evidence is as follows, as already outlined in Section A. Generally speaking, Mr. Johnsen gave fair and short answers to the questions which he was asked, and his answers were generally consistent with the documentary evidence and the inherent probabilities. As will be apparent below, I have a significant reservation as to one aspect of his evidence in relation to the assignment. I also bear in mind that Mr. Johnsen is the central person behind the present litigation, which in one form or another has been in his mind since 2010, and that his evidence will inevitably be coloured by that. It is also important that some considerable time has passed since the events on which the witnesses were being questioned, with some of the cross-examination taking place on the 10[th] anniversary of the documents in question. But these matters do not cause me to reject the evidence, as summarised above, as to how Mr. Johnsen understood the information that he was given and how he reacted to it in terms of his decision-making. It seems to me that his evidence in that regard was consistent with the documentary evidence and the inherent probabilities, and I accept it. Indeed, it seems to me Mr. Johnsen was reacting to the statements made to him and information supplied by Mr. Bennett in exactly the way

that Mr. Bennett wanted him to react, so as to accomplish the goal of obtaining Updata Europe's acceptance of the terms offered by LMS. In those circumstances, it would be a surprising conclusion to say that there was no inducement.

412.   Mr. Johnsen's evidence was in material respects corroborated by Mr. Hildebrandt. His evidence in his first witness statement did not specifically address the 20 April e-mail and Financial Overview, or the Updated Kelso Presentation. He explained that he was reluctant to sell Updata UK, and that his preferred solution was to get a new investor for Updata Europe. He expressed the view that if Updata Europe had known the true financial position of Updata UK, he had no doubt that Mr. Jorgensen would have been prepared to extend the terms of Updata Europe's loan. He was convinced that if he had been able to provide the information in the March Weighted Budget to Mr. Jorgensen, "it would not have been necessary to sell Updata UK".

413.   His evidence in cross-examination and re-examination was focused more directly on the 20 April e-mail, the Financial Overview, and the Updated Kelso Presentation. His evidence in cross-examination was that he had seen the 20 April e-mail and the Financial Overview, which he described as containing a "profit warning" for 2009; in that the forecast was £ 1,496 million against a budget of £ 1,695 million. He said in the following year, "suddenly the EBITDA was down to £ 1.39 something", and that therefore there was no point trying to rely upon that figure in a negotiation:

> "you don't want to go and tell the bidder and say to them, "Please can you look into the year .. to the next year because the figures are lower
>
> …
>
> I'm not totally unhappy with the multiple that was put on, that was 6.1. But if you put it on EBITDA that was less than expected, then of course you get a lower price".

414.   He confirmed (indeed accepted) in cross-examination that he had seen the Updated Kelso Presentation in June 2009, because it was sent to him under cover of an e-mail from Mr. Birkeland. He agreed that he would have read that presentation at the time. After it was put to him that he did not think that the Updated Kelso Presentation was "a big issue at the time", there was the following evidence and exchange:

> "A. No, because there didn't seem to be any change in the value of the company which is what the board was looking at the time. We were only looking at the overall figures to see is there any chance we can change the EBITDA to get a better price on the company? That is what you use – you use a multiple on the EBITDA and if the EBITDA stays the same, you don't have any argument to go out and get a higher price.
>
> Q. Am I right also, Mr Hildebrant, that at that point in time you never approached UK management to try to develop and EBITDA case with them as you had done when – in late 2008 when you were trying to impress Rudersdal and also seeking outside investment?

> A. My Lord, sorry – no, my Lord, I did not do that. In the case
> in 2008 that was for a specific municipal. In June 2009, I
> believed of course that we would get the right figures from the
> UK management. I would not believe that they were holding
> back information from us. They got their salary and we're on –
> of course I trusted them."

415.    He was asked about the Updated Kelso Presentation in re-examination. His evidence
was that "we typically look at the EBITDA figures", and that it is typical to apply a
multiple to multiply EBITDA with a factor to give an indication of the value of the
company. He saw the best case figure of £ 3.348 million in the Updated Kelso
Presentation, and this:

> "led me to say that there had been no change since we saw the
> financial review in – on 20 April where it was exactly the same
> figure in that document and what they just have left out here is
> the middle case and the lower case scenario.
>
> …
>
> … I could not see any changes based on these figures. I would
> expect it would be exactly as we were told on 20 April. There
> was no other indication, my Lord."

416.    Again, I accept the oral evidence that Mr. Hildebrandt gave on these issues. Mr.
Hildebrandt in my view throughout his evidence sought to give careful and honest
answers to the questions raised. This was demonstrated when, in the course of cross-
examination on Day 6, he explained the very real difficulties that there would have
been in finding any other bank prepared to refinance the Bank; an answer which, in
my view, made one aspect of the Claimants' case on causation untenable. I appreciate
that he too is a major protagonist in this litigation, and that his evidence must
therefore be viewed carefully with close regard to his motives. Again, however, it
seems to me that his evidence, as to how he understood and reacted to the statements
and figures provided by Mr. Bennett and Updata UK, was consistent with the inherent
probabilities and the documentary evidence. (I say nothing at this stage on the
causation question addressed in Mr. Hildebrandt's witness statement as to how Mr.
Jorgensen would have reacted to different information).

417.    I therefore accept that Mr. Hildebrandt trusted the figures which he was given,
believing that he would "get the right figures". I accept that the figures provided on 20
April, and then in the Updated Kelso Presentation, were considered by Updata Europe
when evaluating the offers made by LMS and in their decision as to what to do. I
accept that the Updated Kelso Presentation was understood to be showing that there
was no improvement on the figures previously provided, and have no doubt that this
is precisely what Mr. Bennett wanted Updata Europe to understand. Overall, in the
light of the evidence of Mr. Johnsen and Mr. Hildebrandt, I accept that Updata Europe
understood from the figures that there was no basis for doing anything other than
accepting the LMS offer. They also recognised that they could not realistically
challenge it as being at an undervalue, since Updata Europe had no material to
indicate that a valuation based on EBITDA of £ 1.5 million (with a multiplier of 6.1
which was reasonable) was inappropriate. I do not accept that there was no

inducement because the course of events was in some way predetermined or pre-ordained. The process leading to sale was a dynamic one, with Updata Europe ultimately having to decide whether or not to accept the LMS offer. The representations were designed to influence Updata Europe's decision-making in that process and ultimately did so.

418.    My conclusions as to inducement are reinforced by the fact that the evidence indicates that as soon as Mr. Johnsen started to receive a reasonable amount of information as to the performance of Updata UK in 2010, his reaction was that he had been misled. Advice was taken from counsel in the Spring of 2010, and steps were then taken in 2010 in connection with the proposed assignment which contemplated the issue of proceedings of the present kind. This is not therefore a case where Mr. Johnsen or Mr. Hildebrandt were reacting with remorse when they learned of the very successful sale to Capita in 2014.

419.    A considerable amount of cross-examination of the Claimants' witnesses, in particular Mr. Johnsen and Mr. Hildebrandt, was directed towards the proposition that they should have asked further questions in the light of the information that had been received. This essential point was relied upon by the Defendants in various different ways and contexts, for example:

    a)    Reliance was placed upon an inference that Mr. Nielsen and Mr. Homann had been given, in March 2009, the assumptions on which the various 2009/10 figures in the Financial Overview had been based. I agree that this reference is consistent with later evidence concerning questions which Mr. Iversen asked when he visited the Data Room. It was submitted that it would have been apparent from those assumptions that the "worst case" numbers were extremely pessimistic, as indeed were the "middle case" numbers, and that Mr. Nielsen and Mr. Homann would have recognised this.

    b)    The 3 June e-mail from Mr. Bennett contained an offer to answer any further questions. No further questions were asked by Mr. Holm, to whom the e-mail was sent.

    c)    One of the slides in the Updated Kelso Presentation, which had indeed been updated in this respect, identified a number of contracts concluded in 2009, albeit without giving any financial details of the size of those contracts or the date when they would be fulfilled so as to impact the company's financial results. Updata Europe asked no questions about those contracts.

    d)    It was obvious that the "best case" figure in the Updated Kelso Presentation was the same as the Financial Overview. Questions should have been asked in view of the implausibility of there being no change in the "best case" since the March figures, particularly bearing in mind the new contracts identified earlier in the presentation.

420.    The Defendants therefore suggested that Updata Europe were not really interested in or did not rely upon the information that they were given. Indeed, the point was developed even further, by reference to Mr. Nielsen's witness statement, where he

said that he did not believe that he had been given the same information as had been given to LMS.

421.    I agree with the Claimants' submission that none of these ways of putting the case is of any assistance to the Defendants. It is well established that it is no answer to a claim in fraud that the representee could have discovered the falsity of the statement by exercising reasonable care and skill. I also agree that with the Claimants that it does not lie in the Defendants' mouth to contend that further questions should have been asked in order to elicit the true information in circumstances where: (i) an explicit request for up-to-date information was made on 20 April and Updata Europe was then given false information, and (ii) further false information was given in the Updated Kelso Presentation, which was produced in the context of the Defendants being told of the need for equality of information. Similarly, whilst Mr. Nielsen may well have distrusted the information that he was given by the Defendants, the question is whether or not Updata Europe relied upon the representations that were made. That question is not answered by demonstrating that Mr. Nielsen was suspicious that information was withheld from him, particularly in circumstances where the evidence of both Mr. Johnsen and Mr. Hildebrandt was to the effect that they trusted the UK management to give them the latest figures. Moreover, even if Mr. Nielsen's view were relevant, *Hayward v Zurich* demonstrates that a representee may distrust a representation, but nevertheless be induced by it.

422.    Some reliance was placed by the Defendants on evidence from Mr. Holm to the effect that: he could not understand why the figures in the Financial Overview were the same as in the Kelso presentation, which he thought that he had seen in October 2008; that there was something to look into because there were now some new contracts; and that it was left to Mr. Birkeland and others to do this, because Mr. Holm was not in negotiation with LMS at that point and it was not his job to do this. Mr. Holm's evidence in this regard was somewhat confused. He had clearly not seen the £ 3.348 million figure in any prior Kelso Presentation. Nor had he seen the Financial Overview in October 2008 (as he indicated in re-examination). I think that Mr. Holm's evidence as to his reaction to the figures is likely to be mistaken. But in any event, there was nothing in this evidence which leads me to reject the evidence of Mr. Johnsen and Mr. Hildebrandt as to inducement. There was no suggestion that Mr. Holm raised the issue of the figures with them. Moreover, I think that the reliance placed by the Defendants on Mr. Holm's evidence was just another way of putting the argument that the representee could or should have discovered the falsity of the statement by exercising reasonable care and skill. I reject this argument for the reasons already given.

423.    I have hitherto focused on inducement in the context of the representations relating to the figures that were provided. There is a further question of inducement in the context of the representation concerning equality of information. I consider that this too was an inducing cause of Updata Europe entering into the transaction, and (in so far as necessary) that it played a real and substantial part in the decision. The background to this representation is described in Section E. The question of equality of information was a matter of considerable importance to the Bank, Mr. Birkeland and Updata Europe, including in particular Mr. Holm who was personally involved in the discussions at the end of May. It was pursued by Mr. Birkeland with a degree of vigour in late May and early June. His e-mails at the end of May 2009 indicate how

important it was to him. Both Mr. Birkeland and Mr. Holm understood, once they had received the 3 June e-mail, that Updata UK's management had given the confirmation which they required. I accept Mr. Holm's evidence in his witness statement that he had "no reason to doubt Mr. Bennett's statement that the information in the Data Room was the same as the information which had been provided to Tenon and LMS, and I proceeded throughout the sale process on the basis that this was correct". Mr. Birkeland's evidence was that when he read the e-mail, he felt that "they would provide all relevant information in the data room. The only thing not being there was of course the information memorandum itself but everything else would be there. That is how I read it". I accept that evidence, which in my view is confirmed by the fact that, although there had been important correspondence and discussion about equality of information prior to the 3 June e-mail, that correspondence and discussion ceases thereafter. There was nothing, in my view, to rebut the presumption of inducement in relation to this representation.

424.   It follows that the Claimants succeed on the issues as to how the representations were understood, and on the issue of inducement in relation to the 20 April e-mail and the Updated Kelso Presentation.

## H:   Causation and Loss

## H1:   The shape of the parties' arguments

425.   Vald. Nielsen, as Updata Europe's assignee, sought damages on alternative bases. Its primary case was that damages should be assessed by reference to the market value of the shares at the date when the sale took place (July 2009). It was at that time that Updata Europe parted with its shares in Updata UK at an undervalue in consequence of the deceit, and applying the principles in *Smith New Court Securities Ltd. v Citibank N.A.* damages should be assessed as at that date, subject only to a possible later alternative date. The Claimants submitted that in a case where the victim had been deprived of his shares as a result of fraud, the court should assume that the shares could have been sold for their true value.

426.   Alternatively, damages were sought by reference to their higher value in 2014 when the sale to Capita took place. This was on the basis, as the Claimants submitted, that "but for the fraud, Updata Europe would have persuaded the Bank to allow it to retain its shares" and would then have sold them to Capita at the price in fact paid by Capita. There were two legal bases which led to the conclusion that the later date was appropriate.

427.   First, *Smith New Court* showed that it was open to the court to use a date other than the date of sale, where that was appropriate on the facts in order to reflect the real loss suffered by the victim of deceit. Secondly, the same result was reached by applying an analysis based on "loss of a chance". The factual reasons for adopting this approach to damages were in essence as follows. Updata Europe did not want to sell its shares in Updata UK in 2009, but was admittedly under some pressure from the Bank to do so in order to reduce its significant indebtedness. If the representations had not been made, Updata Europe would have come to learn of the true success of Updata UK. Updata Europe would then have been able to persuade the Bank that a sale in 2009 was not necessary, or at least there was a real and substantial chance of so doing. This was because of the prospect of obtaining substantial dividends from Updata

UK's very positive cash-flow, and more generally because the Bank would have been able to see how valuable the company was at that time and that it would become even more valuable over time.

428.    The Defendants submitted that, on a proper analysis of the facts, Updata Europe had suffered no loss. The Bank had decided in early 2009 that the indebtedness had to be eliminated or at least very significantly reduced, and therefore that outside investment needed to be found. Updata Europe was under enormous pressure from the Bank, which was calling the shots in relation to how Updata Europe should act. Thus it was the Bank that compelled Updata Europe to deal with Mr. Nielsen in early 2009, and it was the Bank that set up the bidding process once LMS were on the scene in April 2009. Even if there had been no misrepresentations, that bidding process would have played out in the same way and on the same timescale as it did. Updata Europe had no room for manoeuvre, and even if there had been no misrepresentations they would have been in the same position as they ultimately found themselves; i.e. with the same offer from LMS which was made in June 2009, which was far more certain and beneficial than anything that Mr. Nielsen had come up with. If Updata Europe had not itself been willing to accept that offer, then the Bank would have compelled them to do so. Accordingly, no loss was suffered; because Updata Europe would, even if there had been no misrepresentations, have sold to LMS in July 2009 on the same terms.

429.    The Defendants' argument on causation, if accepted, therefore disposed of both ways in which Vald. Nielsen advanced its case for damages. But even if this argument were not accepted in its totality, any claim for damages would be minimal. The Defendants contended that the alternative (2014 Capita) case was unsustainable, because there was no way in which the Bank would have allowed Updata Europe to postpone a sale beyond September 2009. The Bank wanted repayment and hard cash, not promises of jam tomorrow. As far as the primary (2009 "market value") case was concerned, it was not appropriate on the facts of the present case to look at theoretical market value, whatever the experts might have said on that topic. This was a case where the Bank was, in practical terms, forcing a sale; a fact which itself inevitably depresses value. By May 2009, the sale procedures were in place, with two bidders in the frame. There was no real possibility of obtaining a higher price from LMS: Mr Hooft's evidence was that LMS had reached its limit, with the only possibility being a fractional increase. Mr. Nielsen had not been able to show hard cash, and there were other problems which attended his whole approach. In particular he or his consortium were looking to invest in the parent company (Updata Europe), rather than simply buying Updata UK. Updata Europe had not enabled Mr. Nielsen to carry out proper due diligence in relation to Updata Europe, because no data room had been established in Denmark. Accordingly, Mr. Nielsen and his consortium would never have come up with an acceptable offer. These were the only two realistic purchasers in the frame, and there was therefore no prospect of obtaining further monies from them. It was speculative to think that other purchasers, willing to pay market value or any higher price than LMS, might exist; particularly bearing in mind that Mr. Johnsen had spent some considerable time looking for outside investors, but without success.

430.    As far as the law is concerned, it was common ground that the question of causation was a separate legal question from the issue of inducement. Whilst there might be an overlap on the facts relevant to both questions, a favourable answer to the Claimants on inducement did not enable the Claimants to bypass the question of causation. The

Defendants referred to a number of authorities in support of that proposition, including the following passage in *Chitty on Contracts* 33rd edition, paragraph 7-039:

> "It seems to be the normal rule that, where a party has entered a contract after a misrepresentation has been made to him, he will not have a remedy unless he would not have entered the contract (or at least not on the same terms) but for the misrepresentation. Certainly this is the case when the misrepresentee claims damages in tort for negligent misstatement; and it seems also to be required if damages are claimed for fraud."

431. The Defendants also cited the analysis of Doyle CJ in an Australian case, *Copping v ANZ McCaughan Ltd* (1997) 67 SASR 525, 539:

> "It is sufficient if the relevant loss can be said to be caused by the representation, and it is not necessary to show that the loss is attributable to that which made the representation wrongful. In that sense the test is a relatively generous one, in that the misrepresenting party may have thrown upon it risks unrelated to the representation. But there is still the requirement that the loss flow from the representation, and it seems to me impossible to conclude that it does so flow if one concludes that quite apart from the representation the appellant would have entered into a transaction bringing with it the very risk which eventuated in the relevant transaction and which can be seen as the cause of the loss which the appellant seeks to recover. There may be an element of impression in all this."

432. In the light of these authorities, it appeared to be common ground that one relevant factual question on causation was whether Updata Europe could prove that, but for the misrepresentation, it would not have entered into the contract with LMS on the same terms that it did. Where a question arose as to what Updata Europe would or would not have done, it was also common ground that the question was to be resolved on the balance of probabilities.

433. There was, however, disagreement as to whether the principles relating to "loss of a chance" played any part in the causation analysis. Mr. Booth submitted that once this factual question was resolved in his clients' favour, the only remaining question would be the assessment of loss. "Loss of a chance" principles had no role to play in resolving the causation question, which involved looking at the question of whether Updata Europe would, in 2009, have entered into the contract with LMS on the same terms. In the present case, the assessment of loss was straightforward and (subject only to the question of whether loss should be assessed in 2014) simply involved looking at the true or market value of the shareholding at the time of sale. Mr. Booth submitted it was not necessary or appropriate to look beyond the assessment of market value. Cases such as *Parabola Investments Ltd. v Browallia Cal Ltd.* [2010] EWCA Civ 486 and *Vasiliou v Hajigeorgiou* [2010] EWCA Civ 1475 showed that once the causation threshold had been passed, the only remaining matter was to assess loss. The only place where loss of chance had any potential role to play was the alternative (2014) case; since Mr. Booth accepted that Updata Europe's ability to hold

on to their shares after 2009 would have depended upon the Bank's willingness to allow them to do so, and that this was a claim for loss of opportunity.

434.   Mr. Choo Choy accepted in his oral submissions that the question of "whether or not Updata Europe would have done this, that or the other" was a question to be approached on the balance of probabilities. However, he also submitted that on the facts of the present case, loss of a chance came into the causation analysis; in particular, because the Bank (a third party) played a critical part in the chain of causation. Thus, the question of whether Updata Europe would have entered into the contract with LMS on the same terms involved considering the key question of whether the Bank would have forced them to do so. He submitted that, applying the principles in the seminal decision in *Allied Maples v Simmons v Simmons* [1995] 1 W.L.R. 1602, this had to be assessed on the basis of loss of a chance. He submitted that the question of whether there would have been a transaction with LMS was essentially dependent on the actions of the Bank. Where the causal chain relied upon by the Claimant "as a matter of fact involves consideration of what a third party would have done, it is not permissible to approach it otherwise than on the basis of a loss of a chance".

435.   However, on the Defendants' case it was not simply the position of the Bank that was relevant to the question of causation. Mr. Choo Choy submitted that the causal theory in relation to the 2009 case involved consideration of the actions of multiple third parties: not only what the Bank would have done, but also what LMS might have done, or what Mr. Nielsen might have done or what e-Kong might have done. The court therefore requires consideration of the "substantiality" of the chance in relation to the relevant acts of each of those third parties. Relying upon the recent decision of Bryan J in *Assetco PLC v Grant Thornton UK LLP* [2019] EWHC 150, Mr. Choo Choy submitted that the court should apply a mathematical approach of multiplying the probabilities. The Defendants' submission, ultimately, was that there was no real or substantial chance of any offer being made at a higher price than that offered by LMS.

436.   I will now set out my findings as to the factual context in which these arguments arise, before summarising the arguments in greater detail.

**H2:   The facts relevant to the causation and loss arguments**

437.   It is not necessary to trace in detail the history of Updata Europe's financial difficulties before 2009. That such difficulties existed was clear on the evidence, and was reflected in the need for Mr. Johnsen to approach his grandmother for a loan in early 2008. She mortgaged her house in order to make a loan to Vald. Nielsen, and the funds were then used to repay some monies owed to the Bank and for which the Bank was pressing at that time. In return, Vald. Nielsen was given a priority interest in Updata Europe's shares in Updata UK. This interest, however, ranked behind the Bank's first priority interest in respect of larger debts which were owed by Updata Europe.

438.   By the middle of 2008 Updata Europe owed around DKK 26 million to the Bank and DKK 14 million to Vald. Nielsen. Updata Europe had also guaranteed Updata Denmark's debts of around DKK 16 million. Mr. Johnsen accepted that Updata Europe was under serious financial pressure in 2008, and that he had been forced to

reach out to family to secure further funding for the group. There appears to have been a general view in late 2008 that Updata Europe required around DKK 25-35 million as a capital injection.

439.   On 2 January 2009 Mr. Homann wrote a note to Mr. Jorgensen stating that the group's liquidity need was DKK 10 million. The Bank was not prepared to lend that sum, as Mr. Jorgensen made clear in his evidence. There is no dispute that, by early 2009, Updata Europe had (as Mr. Jorgensen put it) "no money" and did not appear to be able to pay the interest on the Bank's loans. In that context, the Bank was understandably concerned. But Mr. Jorgensen explained that he had no interest in "bankrupting" Updata, since this was not in the Bank's interest. Accordingly, notwithstanding the indebtedness, Mr. Jorgensen did not do so, and did not in fact enforce any of the Bank's rights under its pledges.

440.   The reason that Mr. Homann had written the above note to Mr. Jorgensen on 2 January 2009 was that Mr. Homann was finalising Updata Europe's accounts for 2007/8, and the issue arose as to whether or not KPMG could certify Updata Europe as being a going concern. For that purpose, Updata Europe needed the Bank to confirm that it would not immediately demand repayment of the outstanding debt. Mr. Homann also reported Mr. Nielsen's interest in a possible investment or acquisition: he had been "chasing persistently" and wanted exclusivity for a period.

441.   Discussions followed between Mr. Homann and Mr. Jorgensen, and an agreement was reached on a way forward, enabling Mr. Homann to sign off on the accounts. This was recorded in an exchange of e-mails on 6 January 2009. Mr. Jorgensen agreed that the Bank's engagement to both Updata Denmark and Updata Europe could be terminated at the earliest on 30 September 2009. But the latter engagement was subject to Updata Europe's obligation to (in translation):

> "…withdraw the maximum interim dividend in the English subsidiary, so the accrued interest from the bank is paid as a minimum, that transport of these dividends is noted in favour of Sparekassen, plus that the efforts with regards to capital injection are intensified".

442.   The Bank was to be kept informed of the operation and liquidity of the companies on an ongoing basis, as well as the efforts to supply new capital. Mr. Jorgensen added the following terms to those which Mr. Homann had recorded:

> "Termination will however be possible if the engagement with Sparekassen Lolland A/S is in default – see the provisions in relation to this
>
> When it comes to capital supply, Sparekassen reserves the right to have the deciding influence on investor as well as invested amount."

443.   Accordingly, the Bank was at that stage prepared to give Updata Europe some latitude in that, subject to the agreed other terms, Updata Europe had until September before the Bank carried out an earlier threat (as described in Updata Europe's internal documents) to "pull the plug". Accordingly, the Bank did not take an

uncompromising or inflexible attitude at that time, consistent with Mr. Jorgensen's evidence that he did not want to bankrupt Updata. This flexibility became known to Mr. Nyegaard, who reported to Mr. Baldorino and Mr. Bennett on 25 March 2009 that: "from what I understand they have until September before the bank gets serious on them – at least that's the last thing I heard on the matter". In due course, the Bank was to prove to be flexible in relation to the requirement to be paid a dividend. In May 2009, by which time no dividend had been declared, an e-mail from Mr. Birkeland to the Board of Updata Europe records Mr. Jorgensen having agreed to have no objections to the board deciding to postpone the decision as to the declaration of an interim dividend, provided that it was reconsidered in a month's time. By that time, of course, the possibility of a sale of Updata UK or investment in Updata Europe was very much a possibility, with both Mr. Nielsen and LMS on the scene.

444.    I note one other feature of the Bank's decision in early January 2009. As the Defendants pointed out, the Bank was at that stage given quite optimistic forecasts for Updata UK: the equivalent of EBITDA £ 3.379 million for the 2008/2009, and £7.836 million for 2009/2010. Nevertheless, Mr. Jorgensen was, as he confirmed in his evidence, looking to reduce the debt so that the bank had a lower risk, and was only prepared to give an extension until September.

445.    On 6 January 2009, Mr. Homann was able to sign off Updata Europe's accounts. It was a going concern, but the auditor's report noted that there were conditions which governed the company's ability to continue operating. The company's continued operations were "dependent on raising additional financing, on distributing dividends from the English subsidiary and on not terminating business with the company's bankers".

446.    By this time (early January 2009), Mr. Johnsen had himself been looking for outside investors but without success. One such investor was a Mr. Klobucar of a firm called Moore Capital. Mr. Klobucar was a friend of Mr. Nyegaard, who had introduced Mr. Johnsen to him. A meeting had taken place towards the end of 2008. Mr. Johnsen had apparently valued the business at £ 20 million, but Mr. Klobucar had not been interested. His e-mail to Mr. Nyegaard on 20 November 2008, in the midst of the global financial crisis, said that: "There is ZERO cash out there. He won't get a penny, at least not at that valuation".

447.    However, by early January 2009, one potential investor, Mr. Nielsen, was on the scene. Mr. Nielsen sent an expression of interest to Mr. Jorgensen on 16 January 2009. He said that he anticipated placing a bid of £ 5 million for Updata UK, with a possible bid for Updata Europe dependent upon due diligence. He asked Mr. Jorgensen for exclusivity. The bid was addressed to the shareholders of Updata Europe, but was marked for the attention of Mr. Jorgensen at the Bank. It was not actually sent to Updata Europe by Mr. Nielsen; because Mr. Nielsen took the view that the Bank was in a controlling position in relation to the sale, since he understood the shares in Updata UK had been pledged to it.

448.    Mr. Jorgensen did not grant exclusivity himself. He passed Mr. Nielsen's bid to Mr. Holm. Mr. Jorgensen's letter dated 2 February to Mr. Holm expressed dissatisfaction that he had yet to receive an explanation as to how outstanding interest would be paid, and he asked for clarification as to the progress of certain efforts to increase capital. The letter concluded by Mr. Jorgensen expressing his expectation that the Boards of

Updata Europe and Updata Denmark should "commit to the desires of the private equity fund" whom Mr. Jorgensen understood Mr. Nielsen to represent. Mr. Holm forwarded the letter to the other members of the board of Updata Europe, stating that in his opinion "there's nothing else to do but take up initial negotiations with Jens Nielsen". Mr. Johnsen's evidence was that if the Bank told them to talk to Mr. Nielsen they could not in practice refuse; because the Bank's possible next step would be to "require the votes and make it happen anyway". This was a reference to the potential exercise by the Bank of voting rights under the pledge.

449.    On 6 March 2009, the Bank wrote to Mr. Nielsen, and to Mr. Medhurst (who was a corporate finance consultant assisting Mr. Nielsen). The letter granted Mr. Nielsen a 5-week period to carry out due diligence and then two further working weeks to finalise his bid. The Defendants submitted that it was significant that it was the Bank which demanded and then gave Mr. Nielsen exclusivity, and that this showed that the Bank was intent on and able to control the sales process and force Updata Europe to bend to its wishes. I agree that it is clear that Mr. Jorgensen wanted Updata Europe to co-operate with Mr. Nielsen with a view to a possible deal. It is also clear that Updata Europe recognised that, as Mr. Holm had put it, there was "nothing else to do". But I do not consider that the correspondence indicates, in so far as this was being suggested, that the Bank was acting unilaterally, or against any express wishes of Updata Europe. The opening paragraph of Mr. Jorgensen's letter stated that both the Bank "and the shareholders of Updata Europe A/S have accepted that a due diligence process can be initiated by you". It would therefore seem that, as one would expect, Mr. Jorgensen had sought and obtained Updata Europe's agreement prior to sending that letter. I did not consider that there was anything in the documents, relating to the course of the bidding process either at that time or subsequently, which showed the Bank overriding the wishes of Updata Europe at any stage in the events leading to the ultimate sale.

450.    By mid-April 2009, the Bank was aware of the interest of LMS and the 14 April meeting (to which reference has already been made) took place in Denmark. In the present context, the significance of the meeting is that it is the only meeting which LMS attended with the Bank, and there was nothing at all to indicate that it would be the Bank that would decide whether or not LMS's offer was acceptable. A handwritten note of Mr. Baldorino dated 8 April recorded that: "Bank would push LMS towards the board. Board would then make a yes or no".

451.    This is what happened. No deal was made with the Bank at that meeting. LMS and the Defendants understood from that point, if not before, that it was Updata Europe's decision as to whether it was willing to agree terms with LMS. Apart from the meeting on 14 April 2009, LMS had almost no contact with the Bank. Their offer letters were addressed to Updata Europe. The response to their first offer on 20 April 2009 came from Mr. Holm on behalf of the Updata Europe Board. It was this which led to the flurry of activity on the morning of 20 April 2009: see Section D above. LMS's negotiations and discussions were with representatives of Updata Europe (Mr. Johnsen, Mr Holm and Mr. Birkeland), not the Bank. When their first offer was not accepted, they directed their efforts at persuading Updata Europe (and Mr. Johnsen in particular) to look more favourably on their offer. This led to an offer of a "roll-over" for some of the existing shares of Updata Europe and Newwatch, and the offer of co-operation in respect of a product called "Blue" which Mr. Johnsen was keen to

promote. LMS's proposals in those respects were both included in their second offer following discussions with Mr. Johnsen, not with the Bank.

452.    It is also important to note that at no stage did the Bank enforce its pledge over the Updata UK shares. It never in fact exercised voting rights in respect of the Updata UK shares or the Updata Europe shares. Ultimately, if Updata Europe had refused LMS's offer made on 19 June 2009, the Bank could have tried to enforce its pledge over the Updata UK shares, and then sell those shares as mortgagee in possession. But as Mr. Birkeland explained, based on his experience, this is very much a last resort for a bank; not least because it would then have to consolidate the company into its group accounts.

453.    Once both Mr. Nielsen and LMS were on the scene, the Bank did take an interest in the bidding process, albeit after some delay. On 20 May 2009 (the date appearing on the Danish original rather than the English translation in the hearing bundle), which was around a month after the LMS offer, Mr. Jorgensen wrote his e-mail stating that the Bank wanted to take a "more active role" in the possible transfer/ sale of the Updata Group, and expressing concern about some (unspecified) "rather unprofessional action" by management in relation to the execution of the transaction. It was in this e-mail that Mr. Jorgensen said that it was "essential that all interested buyers (management at Up-Data and Jens Nielsen via their equity funds respectively) are ensured equal conditions for the transactions." This e-mail appears to have been prompted in part by complaints which Mr. Nielsen had made (in his "Letter of Understanding" dated 13 May 2009, described in more detail below) concerning problems in obtaining information from UK management. It also reflected an e-mail sent on 18 May 2009 by Mr. Homann to Mr. Jorgensen, to which Mr. Homann attached a memorandum and financial statement. The covering e-mail stated that the value of the group was "significantly improved" but that the cash situation was highly critical. It was "highly essential" to maintain the "cadence for completion of a capital injection or sale of the English shares". The memorandum itself said, similarly:

> "The values of the group are now visible but the handling and speed of implementation reveals the weaknesses in the top management. Therefore the recapitalization must be followed up with changes in the board and management".

454.    It is unsurprising that the Bank was keen to ensure equal access to information, given that Mr Nielsen had made complaints to the effect that information was being withheld from him. Mr Jorgensen's evidence was that he liked Mr Nielsen, and I think that it is clear that, at the time, he did not want to shut him out on the basis of unequal information.

455.    Mr. Jorgensen also "recommended" in that e-mail that a data room be opened for both interested parties on the same conditions. He then set out a proposed timetable, so that Mr. Nielsen (who still had exclusivity at that point) should have to make a binding offer by 24 May 2009, i.e. 6 days away, if he wanted to make use of his exclusivity. The data room for both parties would then open on 26 May.

456.    On 28 May 2009, after expiry of Mr. Nielsen's exclusivity period, Mr. Birkeland wrote to the interested parties setting out the bid timetable. This envisaged that the process would run for approximately 6 weeks. The data room would be open from 1

June to 12 June. Further or final offers would be made no later than 19 June. A final board decision would follow by 24 June. Completion would take place on 10 July.

457.    The Defendants submitted that the Bank was trying to push the sale process along as fast as possible in the hope of getting its debts repaid quickly. I consider that this rather overstates the position. It seems to me that by mid-May, Mr. Jorgensen (prompted by Mr. Homann) was concerned to ensure that matters did not drift, and that it was important to introduce a process with deadlines. This would focus the minds of participants and bring matters to a conclusion. Prior to that time, however, the Bank does not seem to have been unduly concerned with the pace of progress. Thus Mr. Nielsen had made his first proposal on 16 January 2009, but was not granted an exclusivity period until 5 March 2009.  Furthermore, if the Bank had wanted its debts repaid quickly, it could have tried to do a quick deal with LMS on 14 April 2009, as LMS and the Defendants were hoping would happen, or after the later LMS offer was made in May. It did not do so.

458.    I also agree with the Claimants that the bid timetable laid down at the end of May was not particularly rushed, in circumstances in which both LMS and Mr. Nielsen had already carried out due diligence (LMS referred to their "extensive" due diligence in their letters). As far as the Bank was concerned, there was no need to drag out the timetable. The timetable ensured both parties had equal information and made offers at the same time. It also gave the Board the opportunity to consider rival bids on that basis.

459.    The events following the setting of the bid timetable have been sufficiently described in previous Sections: see Section A and Section E. Ultimately, the two proposals made by LMS and Mr. Nielsen/e-Kong were evaluated by Mr. Birkeland in a "scorecard". It was Updata Europe (not the Bank) that decided to accept the LMS bid.

460.    During the process leading to acceptance of the offer and the sale transaction, it did not seem to me that Mr. Jorgensen was acting aggressively towards Updata Europe. In so far as he was involved, his focus seems to have been to ensure that matters proceeded smoothly and fairly, and his limited intervention on 20 May 2009 was designed to ensure that that happened.

461.    The picture changed somewhat after the transaction had gone through. On 2 September 2009, the Bank gave notice requiring Updata Denmark's overdraft to be repaid immediately, and terminating its commitment if there was no repayment. It seems to me that this is consistent with the agreement made back in January, when the agreed extension of the facility was up until September. Shortly before then, on around 21 August, Mr. Jorgensen had spoken to Mr. Johnsen. The latter reported his conversation to Mr. Bigaard and others. Mr. Jorgensen "was very upset. He called us "a bunch of untrustworthy idiots"". By this time, of course, Updata UK had been sold and the amount realised had been insufficient to repay the Bank entirely. Later in 2009, Mr. Jorgensen commenced legal proceedings against both Updata Europe and Updata Denmark to try to force through a sale to Mr. Bigaard, and he told Updata's shareholders that they should agree to sell to Mr. Bigaard for DKK 1 million or there would be adverse financial consequences.

## H3:  The parties' arguments in more detail

462.    In the course of their arguments, each side emphasised particular features of this factual background and advanced different conclusions both in relation to causation and loss.

*The Claimants' submissions*

463.    The Claimants relied upon the fact that (as I have found) it was Updata Europe which made the decision to accept or reject the LMS offer, not the Bank. The Bank had not enforced its pledge. If Updata Europe had refused to accept an offer that was being made, on the basis that it did not represent the fair value of the business, the Bank would have been entitled to exercise its rights under the pledge. But if the Bank were to do this, it should and would not lead to the proposed sale at an undervalue, because the Bank would have duties in that regard: see *Cuckmere Brick Co v Mutual Finance* [1971] Ch 949 at 966, 968-9 (per Salmon LJ) 977-978 (per Cairns LJ); *Silven Properties v RBS* [2003] EWCA Civ 1409 [2004] 1 WLR 997 (CA) at [19] per Lightman J. In particular, a mortgagee in possession would be required to expose the shares reasonably to the market, and must obtain the proper price or the true market price.

464.    In the present case, the sale went ahead with Updata Europe's agreement, and with Updata Europe being amenable to the sale to LMS. But this was because Updata Europe had been misled as to the figures and had also been given to understand that there had been equality of information in the Data Room process. Had the true picture as to Updata UK's performance and forecast been known, Updata Europe would not have agreed to the LMS final offer, because it would obviously have undervalued the company. Furthermore, had Updata UK been told that LMS had received different information to that which had been given to Mr. Nielsen, both Updata Europe and the Bank would have appreciated that there had not been a fair sale process. For either or both of these reasons, it was unrealistic to imagine that the Bank would have forced Updata UK to sell at the price offered by LMS in June 2009, even assuming that this was the best offer on the table at that time. However, the Claimants also challenged the premise that, had there been no fraud, matters would have played out in the way that they in fact did, so that the best offer on the table in June 2009 was the LMS offer.

465.    In oral submissions, Mr. Booth emphasised that the question of causation had to be considered in the context of the misrepresentations that were made. It would be a "bizarre factual approach" to ignore all the consequences of the fraud, and the impact which that had on the key players, and to say that "it would have made no difference": i.e. that Updata Europe would have sold to LMS at the same price.

466.    The Claimants submitted that if there had been no fraud, Updata Europe would have known in at least April (or earlier) about higher earnings projections. They would therefore come to know about each of the contracts as it was won. There would have been no shortage of interest in Updata UK, including:

        a)    Mr Nielsen and e-Kong (who, as Mr Nielsen explained, had the money to pay a higher price for Updata UK);

b)      Trade buyers, including various companies listed in the AMR Report which had been prepared in the context of LMS's final due diligence in late June and July. Mr. Bennett accepted in his evidence that trade buyers would have been interested in Updata UK. (He also explained why he was not interested in a trade sale at that time. He thought that if Updata UK was put up for sale to the trade, other competitors would use that fact to their advantage by arguing to customers that the proposed sale showed the weak financial position of Updata UK's parent, and that therefore customers should not do business with the company);

c)      Other private equity houses – since there had been a number of PE houses who had responded positively to the original approach in April 2009, with the UK management ultimately having a choice as to who to select and choosing LMS; and

d)      Other interested investors, had there been proper details and marketing.

467.    Mr. Booth placed much emphasis on the fact that the reason the fraud took place was that the Defendants were not willing to risk the alternative; i.e. giving true responses in the 20 April 2009 and 3 June e-mails. This was because of the impact that disclosure would have on the attitude of the key players, Updata Europe, Mr. Nielsen and at least to some extent the Bank, which wanted an equal playing-field. The effect of the fraud was therefore to choke off other potential purchasers and put LMS in pole position. The fraud resulted in what was essentially a false market "by making sure that this was not tested by the market".

468.    Evidence as to the Bank's attitude in the counter-factual world, where misrepresentations had not been made, was given by Mr. Jorgensen. He was a witness called by the Claimants themselves. But the Claimants submitted that his evidence needed to be treated with considerable caution. Some of his answers were contradictory, and he was – certainly by the time that he was being asked questions about the counter-factual world – very confused about the facts. It was therefore important to look not at individual answers, but at his evidence as a whole and also, as indeed with all witnesses, the contemporary documents and inherent probabilities. They acknowledged that Mr. Jorgensen's evidence was clear, and he repeated a number of times that he did not want to lose LMS as a purchaser: LMS had shown that they had the cash, and he did not want them to walk away. However, they submitted that if it had become known, even at the end of the sale process in July, that the sale process had been unequal and that the shares were undervalued, Mr. Jorgensen's concern not to lose LMS would not have led him to a sale at the LMS price. To do so would likely have constituted a breach of the Bank's duties. It would have exposed the Bank to a serious risk of litigation. Mr. Booth submitted that it would be an extraordinary conclusion to reach on causation; i.e. to conclude that the Bank would have "forced us to sell at that price both as a matter of fact and both having regard to the legal obligations".

469.    Furthermore, if the Bank were to enforce a sale in those circumstances, it would have been against the Bank's own commercial interests, given that the LMS proposed price was insufficient to discharge the overall indebtedness of Updata Europe to the Bank, because of its guarantee in favour of Updata Denmark. Obtaining market value was in

the interests both of Updata Europe and the Bank, and there was therefore no reason to suppose that the Bank would have required a sale which would not allow a timescale to obtain a reasonable price. There was no basis for assuming that the Bank would act contrary to its commercial interests and legal duties.

470.    The Claimants emphasised that the Bank was flexible, and was not some far-off faceless institution. Mr. Jorgensen had shown a flexible attitude in January, when it had agreed to extend time (on terms), and again in May, when he agreed to postpone payment of any dividend. Interest had not been paid in 2009, but he did not terminate the facility. The evidence showed that Mr. Jorgensen trusted both Mr. Homann and Mr. Birkeland, relying on them for advice in connection with the sale, and he was also in close contact with Mr. Hildebrandt. If necessary, therefore, the Bank would have given more time, particularly if it had emerged at a late stage that one of the bidders had not been given equal information.

471.    In his oral reply submissions, Mr. Booth submitted that it would contradict all reality to conclude that the figures in the March Weighted Budget, which actually relied on relatively few weighted contracts to reach the EBITDA of just over £ 6 million, would have made no difference to Updata Europe. These figures went to the heart of the company's value and no vendor would have ignored that information and sold to LMS on the existing price regardless. The figures showed likely high cash generation soon, and substantial value within the company. The Defendants must have recognised this, and this was why they made the fraudulent misrepresentations.

472.    In relation to quantification, the Claimants' essential submission was that the normal measure of damages would be the difference between the market price or true value of the asset disposed of in consequence of the fraud, and the price obtained as a result of the operative fraud. Mr. Booth submitted that it would be a very strong thing to say that market value should be interfered with. The Court should not be tempted to say that, because of its debts to the Bank and the pressure it was under to achieve some form of repayment, Updata Europe might not have achieved the full market value for its shares. This would result in an arbitrary reduction of the market value by reference to a factor (creditor pressure) which does not affect the market value at all. That was not an appropriate approach to quantum in the case of fraud.

*The Defendants' submissions*

473.    The Defendants submitted that it was not appropriate to determine loss by reference to the price that would have been paid by a willing buyer and willing seller. Rather, the price should be based on the true likely facts attending a sale in 2009, which includes pressure from the Bank to sell within a limited timescale.

474.    The Defendants also contended that the principles developed in the context of cases concerning loss of a chance were applicable to the present case. Both causation of loss and proof of loss involved reliance upon the acts of third parties. Relying on the recent decision in *Assetco v Grant Thornton* [2019] EWHC 592, they submitted that the claimant had to establish a real or substantial chance of a third party acting in accordance with a claimant's causal theory. Where there were multiple third-party acts in the chain of causation, the claimant needs to establish a real or substantial chance in respect of each third party whose hypothetical actions were necessary in the

relevant causal chain. If there are multiple third-party independent actions, each must be given a percentage chance and these are then multiplied together.

475.   In his oral submissions, Mr. Choo Choy submitted that the question of whether there would have been a transaction with LMS, and the Claimants' overall causal theory, was dependent upon the actions of a number of different third parties. Mr. Choo Choy focused particularly upon the Bank, but also LMS and Mr. Nielsen. Since they were each independent actors, it would be necessary to assess the respective chances of higher bids being received from LMS and Mr. Nielsen, as well as the chance of the Bank allowing an extra period for the sale. The various probabilities would then need to be multiplied together. There were, admittedly, other potential actors: the market was not confined to Mr. Nielsen or LMS. But other potential players could be disregarded, because Mr. Johnsen had previously approached other investors without success.

476.   He also submitted that, in approaching causation, it was necessary to posit what would have happened differently if the deceit had not occurred. In that context, the earliest time that any relevant information would have been available was 20 April. But by that time, the two-horse race was already well on the way. Disclosure of relevant information by 20 April or even late May would not, contrary to the Claimants' submission, have made a huge difference to the process because the structure of the race between LMS and Mr. Nielsen had pretty much been set. Even if there were a chance, at that stage, of Mr. Nielsen and e-Kong improving on their offer, various other questions would arise. These included: what processes would there have been between Mr. Nielsen and his backers in terms of improving his offer; how long would it have taken to get an improved offer; what would the improvement have been; how would LMS have reacted. The Claimants had to posit a credible factual scenario which would lead to the conclusion that they might have been able to either get a higher price for the shares from one of the two potential bidders, or alternatively retain the shares until 2014. In the Defendants' submission, there was no such scenario. In that context, it was necessary to look carefully at the evidence of Mr. Nielsen and Mr. Jorgensen. Overall, however, the Defendants submitted that Updata Europe would have acted in the same way that they did even if they had been given different information. Furthermore, there was no real or substantial chance of Updata Europe and the Bank obtaining a materially better offer in a timescale that would have been consistent with what the Bank wanted.

477.   The Defendants then identified and addressed the position of each of the third parties that formed part of the relevant causal chain.

478.   First, there was the Bank. The Defendants submitted that the Bank was never going to be persuaded (let alone was there a real and substantial chance of it being persuaded) to let Updata Europe keep its shares until 2014 simply by seeing higher forecasts, the March Weighted Budget, the Tenon Memorandum or anything of the sort. The Bank's patience was exhausted, it was under its own pressures, and Updata Europe was in default even of the compromise reached on 6 January 2009. The Bank, having seen higher forecasts at the beginning of 2009, still wanted the Updata Europe debt repaid or substantially reduced immediately. To suppose the Bank might have done otherwise (let alone allowed Updata Europe to keep the shares until 2014 to sell to Capita at the same price) is sheer speculation, when all the evidence is to the contrary. They had reached the end of the road, and wanted to get repaid immediately

479.    In that regard, the Defendants relied upon evidence given by Mr. Jorgensen and more generally upon the following matters:

a)    The Bank's relationship with and approach to Updata Europe was a very difficult one, given the size of Updata Europe's debt and its inability to repay. Over time, the Bank had taken what the Defendants described as an aggressive and interventionist stance. This included demands for payment which had led to Mr. Johnsen obtaining a loan from his grandmother in 2008, and a further demand in late 2008.

b)    Mr. Johnsen had been trying hard in 2008, and failing, to find an external investor in order to placate the Bank. An approach had been made to Kelso in late 2008, and to Mr. Klobucar. But these and other attempts to find an investor had been unsuccessful.

c)    In January 2009, the Bank did receive various forecasts, which showed high EBITDA numbers. But the Bank was not interested in forecasts. Mr. Jorgensen wanted outstanding interest paid, and he wanted the debt reduced or repaid and he wanted that to happen promptly. The Bank also wanted some control over the process of finding an external investor; because (as Mr. Jorgensen agreed in his evidence) the Bank wanted to make sure that, if there was going to be a capital injection, it would have to be an injection which was sufficiently substantial. The reality therefore was that the sale of Updata UK (whether directly or indirectly through shares in Updata Europe) had to happen by the summer of 2009, given Mr. Jorgensen's stance. A sale was inevitable, and Mr. Jorgensen wanted to exercise control and scrutiny over the process. It was therefore no surprise that Mr. Jorgensen ultimately came down heavily in favour of LMS, which was a cash buyer and ready to complete.

d)    The Bank had taken control of the process and was intent on compelling a sale in 2009, as could be seen from the events at the start of the year.

e)    The Bank was itself under considerable pressure, not least as a result of the 2008 global financial crisis. The Updata Europe debt was the largest single exposure to the Bank. The Danish FSA was looking closely at the Bank in May 2009. There was a meeting between Mr. Jorgensen and the FSA at that time, and Mr. Jorgensen told them that a sale process (in relation to Updata Europe) was underway at that time.

f)    The competitive bidding timetable was laid down for a deliberately short period. At the end of that process, LMS had offered cash, and Mr. Nielsen/e-Kong had not done so. Mr. Jorgensen favoured the LMS bid. Whereas LMS had shown that they could pay, e-Kong had not shown that they could pay and as Mr. Jorgensen said, "then I were afraid for that LMS would run away [sic]".

g)    In his evidence, Mr. Jorgensen gave certain answers which suggested (at the Defendants contended) that he was not concerned about the

possible disparity of information given to the two bidders; and also that he did not particularly care whether Updata Europe's shares might be worth more than the LMS's bid.

h)   Almost immediately after the sale, in July 2009, the Bank had written to Updata Denmark requiring payment of the outstanding indebtedness within 14 days. The game was then up. Accounts were then blocked in October 2009. This showed the Bank's attitude very clearly.

480.   Accordingly, the Defendants submitted that the Bank's stance was always going to be the same, regardless of any causal effect of any alleged deceit. The case based upon the price that a willing buyer or seller would pay was a legal artifice, and was both "unreal and nonsensical". Updata Europe's inability to obtain that price was not caused by any alleged deceit. It was "simply the product of the situation with their history with the Bank" as well as the exceptionally difficult market circumstances in 2009.

481.   Secondly, there was LMS. The Defendants submitted that there was no prospect of negotiating a higher price with LMS. They invited the Court to accept Mr. Hooft's evidence that he would not have bid significantly higher: at most he might have gone higher by 1 or 2% (around £ 50,000 - £ 100,000). Mr. Hooft had thought that LMS was under competitive pressure at the time of the bidding, since he did not know what bids would come from Mr. Nielsen/ e-Kong. LMS were incentivised to bid competitively, and their bid fairly reflected all the financial information which they had received. That information was the full information; i.e. no information was withheld from LMS. LMS did not bid on the basis of the projected £ 6 million EBITDA, but on the basis of past results. There was no real or substantial chance that Mr. Hooft would bid significantly higher.

482.   Thirdly, there was Mr. Nielsen. He was simply not in a position to bid at all within the Bank's timeframe. He failed to make any firm bid at all, either at the end of his period of exclusivity, or in June 2009 after the data room period. His difficulties had little or nothing to do with the availability of higher forecasts. They included his insistence on bidding for the shares of Updata Europe (rather than Updata UK); his desire for the Defendants to stay in the business, which they were refusing to do (if he was the buyer); problems of due diligence in Denmark; and his inability to find a backer who was willing to come forward with proof of funds. Mr. Nielsen and e-Kong were never close to tabling a proper cash bid.

483.   In short, EVs had no real and substantial chance of securing a higher price for their shares, whether from LMS, Mr. Nielsen/e-Kong, or any other third party, over and above the SPA price. This was so particularly bearing in mind the actual offer made by LMS, which included the valuable concession of allowing Newwatch to roll over its existing shareholding and subscribe for further shares within a prescribed timescale; effectively an option to buy 17% of the new company.

## H4:  Analysis and conclusions: legal principles

*General approach in cases of damages for deceit*

484. *Smith New Court Securities Ltd. v Citibank N.A.* [1997] A.C. 254 is the leading case relating to damages for deceit in the context of contracts of purchase. In that case, the Court of Appeal had proceeded on the basis of the law as laid down in a series of cases at the end of the 19[th] century, namely that:

> "where a fraudulent misrepresentation has induced the plaintiff to enter into a contract of purchase, the measure of damages is, in general, the difference between the contract price and the true market value of the property purchased, *valued as at the date of the contract of purchase*".

(per Lord Browne Wilkinson at 261, italics in the original)

485. There was no dispute that this was the general rule, and there is nothing in the decision of the House of Lords which casts doubt upon it. Thus, Lord Steyn said at 284:

> "It is right that the normal method of calculating the loss caused by the deceit is the price paid less the real value of the subject matter of the sale".

486. The importance of the decision was to make it clear that rule that the relevant date was the date of the contract of purchase was not an inflexible one. A different approach may be required in order to give effect to the general principle that damages should compensate for the loss suffered, and for the generous approach to damages in the case of fraud (in particular as to the recovery of consequential loss) which was stated in *Doyle v Olby (Ironmongers)* [1969] 2 QB 158 (a decision of the Court of Appeal which was approved in *Smith New Court*). Accordingly, there were likely to be many cases where the general rule (i.e. assessing damages by reference to the true value on the transaction date) "has to be departed from in order to give adequate compensation for the wrong done to the plaintiff" (see 266F-G).

487. *Smith New Court* was a decision involving a claim by a defrauded buyer against the seller. But the same approach should be taken in the less usual case where the buyer has defrauded the seller into selling an asset such as shares. This was, correctly, the approach of Mr David Mackie QC in *Platt v Platt* [1992] 2 BCLC 746, where the judge had applied *Smith New Court* in the context of a claim by the seller. Although the case was unsuccessfully appealed, there was no appeal on this aspect of the judge's decision. It is also the approach taken in an earlier Court of Appeal case *Smith Kline & French Laboratories v Long* [1989] 1 WLR 1 CA. In that case, which did not involve a share of sales and is somewhat far removed from the present facts, the Court of Appeal looked at the market value of drugs which the plaintiff pharmaceutical manufacturer had been fraudulently induced to sell to a purchaser. In so doing, the court drew upon authority in the context of the tort of conversion and other situations where damages are awarded by reference to market value.

488.    Whilst the starting point and general rule for the assessment of damages is the true value of the asset at the date of the transaction, it is not necessarily the end-point. As *Smith New Court* shows, it is possible that a later date may, on particular facts, properly reflect the Claimants' loss more fairly and reasonably than the date of the transaction. In the present case, the Claimants drew upon this principle in support of their alternative claim (a claim also based upon "lost opportunity") that damages should be assessed by reference to the sale in 2014, rather than the sale in 2009.

*Causation and loss of a chance*

489.    Although the general approach to the assessment of damages for fraud was not in dispute, the parties disagreed as to whether this general rule had any application on the facts of the present case. The principal dispute in this context concerned whether, and the extent to which, the principles developed in the case-law concerning "loss of a chance" were applicable. I was referred by the parties to a number of authorities in that area, including some which I have already mentioned: *Allied Maples Group Ltd. v Simmons & Simmons* [1995] 1 WLR 1602; *Vasiliou v Hajigeorgiou* [2010] EWCA Civ 1475; *4 Eng v Harper* [2008] EWHC 915 (Ch), [2009] Ch 91; *Parabola Investments Ltd. v Browallia Cal Ltd.* [2010] EWCA Civ 486; *Law Debenture Trust Corp PLC v Elektrim* [2010] EWCA Civ 1142; *Dennard v PwC* [2010] EWHC 812 (Ch); *AssetCo v Grant Thornton* [2019] EWHC 150 (Comm); and the discussion of loss of a chance in *McGregor on Damages* 20th Edition.

490.    A relatively recent decision of the Court of Appeal (referred to extensively in *AssetCo*) contains a summary and exposition of the relevant principles both in relation to claims based on loss of a chance as well as the assessment of damages where there is uncertainty as to the amount of loss: see the judgment of Floyd LJ in *Wellesley Partners LLP v Withers LLP* [2015] EWCA Civ 1146, paragraphs [94] – [110]. These can be summarised as follows (square-bracketed numbers referring to the paragraphs of that judgment):

    a)    The assessment or quantification of damages is an exercise which is different in nature from establishing whether any fact did or did not occur, or even whether any event would, in some hypothetical situation, have occurred. [96]

    b)    The assessment of damages may be dependent on the court's view as to whether particular events would have occurred or will occur. Those chances are to be taken account of in the assessment of damages [97]. Where quantification involves a hypothetical exercise, the court does not apply the same balance of probability approach as it would to proof of past facts. Rather it estimates the loss by making the best attempt it can to evaluate the chances, great or small (unless those chances amount to no more than remote speculation) taking all significant factors into account. [102 - 103, citing *Parabola*]. Where the quantification of loss depends upon events which did not happen the judge is left to assess to chances of the alternative scenario he is presented with. This has nothing to do with loss of a chance as such. It is simply the judge making a realistic and reasoned assessment of a variety of circumstances in order to determine what the level of loss has been. [104, citing *Vasiliou*].

c)      Questions of assessment of damages have to be distinguished from questions of causation [98]. The loss of a chance doctrine is primarily directed to issues of causation and needs to be distinguished from the evaluation of factors which go only to quantum. [104, citing *Vasiliou*].

d)      Where a breach of duty consists of an omission, and the question is what the claimant would have done had the breach of duty not occurred, the claimant must prove what he would have done on the balance of probabilities. [99]

e)      Causation of the claimant's loss may depend on the hypothetical action of a third party, either in addition to the claimant himself or independently of him. In such cases, the claimant does not have to prove what the third party would have done on the balance of probabilities. For causation, all the claimant has to show is that the chance is a real or substantial one. Having done so, the claimant must still show, on the balance of probabilities, that the defendant's act has caused the loss of the chance to this effect. Once that has been shown, the valuation of the chance is a question for the quantification or assessment of damages. [99].

491.    It is also apparent from decisions analysed in *Wellesley* that when it comes to the assessment of damages, quantification may be shaped by fact-findings that the court is able to make. Thus, in *The Front Ace* [2008] EWCA Civ 101, there was a fact-finding that the vessel would have been profitably engaged, and also as to the relevant market. This meant that it was not appropriate, in assessing damages, to make any discount for the possibility that the vessel would not have been profitably engaged: see *Wellesley* at [108]. Similarly, in *Vasiliou*, the court's finding that the restaurant would have been a success precluded the argument that a general discount should be made for the possibility of failure: see [24] of Vassilou, cited at [104] of *Wellesley*. But in a case where there is uncertainty as to whether the claimant would find a market for its services, a discount to reflect the possibility of failure is appropriate as part of the evaluation of the relevant chance: see *Wellesley* at [107].

## H5: Analysis and conclusions: Causation

492.    I start with the question of causation. I consider that the relevant question here is whether, on the facts, there was no loss because Updata Europe would have sold at the LMS price (i.e. on the terms which were ultimately agreed in July 2009) in any event. This was the question identified in paragraph 188 of the Claimants' closing where the Claimants acknowledged that it was open to the Defendants to "show that the fraudulently induced transaction caused no loss because Updata Europe would have sold at the LMS price in any event". It is also the question contemplated by the above passage in *Chitty*: "he will not have a remedy unless he would not have entered the contract (or at least not on the same terms) but for the misrepresentation". The Defendants identified a similar question in paragraph 61 of their written closing:

"The Claimants, so it is understood, wish to claim as their loss the difference between the price a willing buyer would have paid a willing seller in 2009 and the price LMS in fact paid. But to do so they have to prove that the deceit has caused them that

> particular loss. If it is the case that they would have sold the
> shares under a distressed sale (to LMS) under pressure from the
> Bank anyway, then any such 'loss' is not caused by the deceit.
> It would have occurred irrespective of the alleged deceit."

493.    Paragraph 188 of the Claimants' written closing suggested that the Defendants bear
the burden of proof on this issue. But Mr. Booth correctly acknowledged in the course
of argument that the Claimants had to establish causation.

494.    At first sight, the question of whether or not Updata Europe would have sold at the
LMS price is an issue to be resolved on the balance of probabilities, and has nothing
to do with loss of a chance. This is because it is a question as to (as Mr. Choo Choy
put it) "whether or not Updata Europe would have done this, that or the other", which
he accepted was to be approached on the balance of probabilities. The Claimants' case
was that this issue was indeed to be resolved on the balance of probabilities. It
involved looking at the position in July 2009, and doing so on the factual premise that
the misrepresentations had not been made.

495.    I consider that it is indeed appropriate to resolve this particular causation question by
considering the issue on the balance of probabilities. This was the approach of the
Court of Appeal in *Sykes v Midland Bank* [1971] 1 Ch 113 (a case referred to in *Allied
Maples* and considered by *McGregor on Damages*, paragraph [10-159]. In that case,
the plaintiffs' claim for substantial damages failed, because they could not show that,
even if properly advised, they probably would not have entered into the relevant
contract. Similarly, in *Dennard v PwC* [2010] EWHC 812 (Ch), the claimants'
primary case (namely that they would not have proceeded with a contract with
Barclays Bank if a different valuation had been given) was addressed by Vos J., and
rejected, on the balance of probabilities.

496.    In *4 Eng v Harper*, the claimants were the victims of deceit which had led them to
purchase a company (E Ltd.). Their case was that if they had not been so deceived,
they would have purchased T Ltd. instead. They sought damages by reference to the
loss of the chance to earn income and capital profits from T Ltd. The case establishes
that loss of a chance principles are potentially applicable in cases of deceit, as well as
their more usual application to cases of negligence by solicitors and others. In that
case, loss of chance principles came into play because the claimants contended that
they would have purchased T Ltd., and a successful purchase of that company
depended upon the acts of a third party; i.e. whether or not the owners of T Ltd. would
be willing to sell to the claimants. However, the initial question for David Richards J.
was whether, on the assumption that the owners of T Ltd. were willing to sell, the
plaintiffs would indeed have purchased that company and could have funded the
purchase. The judge approached that question on the balance of probabilities: see
paragraphs [60] – [80]. The issue was addressed in that way, and without regard to
"loss of a chance" principles, even though the plaintiffs' conduct would have been
affected by decisions made by third parties; in particular whether the plaintiffs'
bankers would have been prepared to provide funding for the purchase (see [69]).

497.    The question in that case (would the claimants have been in a position to acquire T
Ltd., and would they have sought to do so) is not quite the same as the question in the
present case (would the claimants have entered into the contract with LMS in any
event). But I do not consider that there is any reason why the approach, namely to

decide the question on the balance of probabilities, after considering all the evidence, should be any different.

498.    Finally as far as the authorities are concerned, in *Wellesley*, the initial question was whether the claimants would have opened a New York office, and secondly whether or not it would have obtained business from a particular customer. Floyd LJ said (at [109]) that the Claimants "had, first, to prove that its own actions would have been such as to place itself in a position to obtain that work, and it had to do so on the balance of probabilities". It may well be that the question of whether a party's actions would have placed itself in a position to obtain a benefit will itself depend, at least to some extent, on the actions of third parties. For example, the opening of an office in New York might well require funding from a bank, the agreement of a landlord to let suitable premises, the agreement of staff to work in the office, the granting of visas by the US authorities, and possibly regulatory approvals. However, I do not consider that the involvement of third parties means that loss of a chance principles need to be, or should be applied, when deciding whether or not the claimant would have opened the office. If the claimant cannot show, on the balance of probabilities, that he would have been in a position to open the office, then the claim cannot succeed.

499.    In the present case, the Claimants' primary claim is that Updata Europe owned a valuable asset in 2009, and they were misled into selling it, at the price offered by LMS, as a result of the Defendants' fraud. At that time (2009), the Bank had not exercised its security rights, and the decision as to whether or not to sell, and if so on what terms, was a decision for the Board of Updata Europe to take. It is of course true that that decision would be shaped by external considerations, including the positions taken by third parties. In order to decide what decision Updata Europe would have made, in the hypothetical world where there had been no deceit, there would be a range of factors which would be relevant to Updata Europe's decision: whether higher offers had been received from third parties, what pressure there was from the Bank, what pressure there may have been from members of Mr. Johnsen's family. But whilst these external considerations are highly relevant to what Updata Europe's ultimate decision would have been, the ultimate question is whether Updata Europe would have sold at the LMS price in any event. This, in my view is and remains a question to be resolved on the balance of probabilities.

500.    The Defendants' argument that the Claimants suffered no loss, because they would have sold at the LMS price in any event, ultimately boiled down to two principal points. The first point was that even if the misrepresentations had not been made, the course of the bidding process would have proceeded as it did, with the result at the end of that process, the LMS bid was the only bid. The second point was that if that were the position, the Bank would have compelled Updata Europe to accept the LMS bid, by making it known that the bid had to be accepted so that repayment of the Bank debt could be made, or ultimately forcing a sale using its powers under its security.  In relation to these arguments on causation, it is necessary to consider what consequences would have likely resulted from a situation in which the representations had not been made.

501.    On the facts of the present case, I consider that if the representations had not been made, the consequence would necessarily have been that the true figures, representing management's expectation, would have been revealed to Updata Europe, and thence to any other potential purchasers including Mr. Nielsen. The consequence would also

have been that on 3 June, if the figures had not already been revealed, Updata Europe would have been told that the management had given different documentation to LMS to that which had hitherto been given to Mr. Nielsen. In either event, it seems to me that the details underlying the headline numbers – for example the extensive detailed workings in the March Weighted Budget – would have been revealed to Updata Europe, and indeed to other potential purchasers. If one assumes that the misrepresentations had not been made, the corollary therefore would be that the true figures would be revealed; not least because there would then have been no point in the Defendants seeking to try to conceal the detail and because the information would need to go into the Data Room. And in any event, the detail could easily have been flushed out by, for example, Updata Europe's board asking for the detail, or in response to the questions asked by Mr. Nielsen who throughout was pressing for more information. I also accept Mr. Johnsen's evidence that if he had been given positive information showing substantial values, "we would have been all over it" in terms of asking for the detail. Mr. Choo Choy was therefore correct to approach the case, in terms of causation, by "assuming against [himself] for the moment that the counterfactual should be equated with positive disclosure of the weighted budget"; i.e. on the basis that the true figures would have been revealed.

502.   If the representations had not been made, and in consequence the true figures had been revealed, this would inevitably have had a major impact on the way in which all the relevant parties would have reacted and behaved. In my view, it is wholly unrealistic to suppose that, if the misrepresentations had not been made, matters would have developed in the way that they in fact did, so that the best offer on the table in late June was an offer from LMS in the terms which Updata Europe ultimately accepted. Since it is more likely than not that there would have been a better offer on the table in late June, it follows that Updata Europe would not have sold at the LMS price in any event. My reasons for these conclusions are as follows.

503.   In the context of inducement, Mr. Booth drew attention to a passage from an article by Hon K.R. Handley, 'Causation and Misrepresentation' (2015) 131 LQR 277, 284, quoted with approval in *Hayward v Zurich* at [38] (per Lord Clarke):

> "The representor must have decided to make the misrepresentation because he or she judged that the truth or silence would not, or might not, serve their purposes or serve them so well. In doing so they fashioned an evidentiary weapon against themselves, and the court should not subject the victim to "what if" inquiries which the representor was not prepared to risk at the time."

504.   In the present context of causation, the misrepresentations are also evidentiary weapons against the Defendants. The reason why the representations were made was because the Defendants were not prepared to risk the consequences of telling the truth. They recognised that there was a serious risk of jeopardising the sale to their favoured PE house at the price offered. Updata Europe would then see figures which were highly material to the valuation of Updata Europe, and which would reveal the inadequacy of the LMS original offer based on £ 1.5 million EBITDA, even taking into account the relatively small (18%) increase made by LMS in their May offer.

505.  The true figures also would make the business more attractive to outside investors, including Mr. Nielsen and e-Kong, who would see that Updata UK's business was much more substantial than the figures in the Financial Overview would suggest, and indeed was really taking off.

506.  In addition, if the misrepresentation as to equality of information made on 3 June had not been made, then it would have become known that Mr. Nielsen's previous due diligence work had been conducted on a false basis. It is not difficult to see that Mr. Jorgensen at the Bank, who regarded equality of information to both prospective buyers as essential, would have reacted unfavourably to the way in which Updata UK's management had behaved. But at all events, I have no doubt that he would have taken steps to ensure that Mr. Nielsen, and any other potential bidders, did have the same relevant management information as LMS. Given that the Bank itself, as well as Updata Europe, had a real interest in obtaining the best possible price on the sale, it is not difficult to conclude that, if necessary, the sale timetable could be extended somewhat so as to ensure that all potential purchasers had a fair crack of the whip.

507.  It is of course impossible to say exactly what would have happened, in terms of bidding, if the true figures had been revealed. However, in my view it is improbable in the extreme that Updata Europe would have let matters proceed in the same way as they did in fact proceed. At that time, Mr. Nielsen was using a multiple of 5 x EBITDA, and LMS had used 6.1 (albeit applied to historic results). Updata Europe's Board comprised a number of intelligent people, and it would have been obvious to them that the LMS offer (based on EBITDA of £ 1.5 million) significantly undervalued the company. If this had happened, any discussions between Mr. Johnsen and LMS about the LMS offer of 16 April would have been very different to the discussion which took place on 29 April 2009, and which Mr. Hooft recorded in his note to file of that date. Mr. Hooft's first key point in that note was that there had been a "Very friendly tone". He went on to record his impression that "we were potentially not a million miles apart" and that "[o]verall Peter was very positive". If the true figures had been revealed, I consider that Mr. Johnsen would have brought home both to LMS and UK management that a deal at the levels proposed by LMS would be unacceptable.

508.  Both LMS and UK management would then have needed to reconsider their positions. I was not persuaded by Mr. Hooft's evidence that LMS had, in May 2009, virtually reached the limit of what LMS were prepared to offer. He was clearly a tough and skilled negotiator, who would have sought to minimise the price paid. But I consider that, if necessary, he would have been prepared to move rather higher. Certainly the figures for maintainable earnings which were produced by one of his team on 29 June 2009 (and which are described in more detail in Section I below) would have justified a significantly higher valuation.

509.  If, however, LMS were not prepared to offer significantly more, the management would have had to approach some of the other PE houses to see whether there was a willingness to make offers which more fairly reflected the value of the company. Hitherto, of course, those houses had been approached on the basis that the opportunity was to acquire Updata UK at or below the level of Bank debt. Had the representations not been made, however, it would have become clear that this option, whilst attractive to a PE house, was not a practical option. It is also important to recognise that the management had a very real desire to have a successful MBO, and

they would themselves have recognised the need for better terms to be offered to Updata Europe, if necessary by foregoing some of their personal advantages in the deal which they had negotiated with LMS. At the same time, Mr. Johnsen would have had detailed numbers which he could show to other potential outside investors. It is also relevant that both the Bank and Mr. Homann were owed money, so that both of them had a very real interest in fair value being received for the business.

510.     I also accept Mr. Nielsen's evidence that the real numbers would have had an impact on his decision-making, and that of his consortium. I deal in more detail with Mr. Nielsen's evidence below. The Defendants sought to rely, in the context of inducement, on Mr. Nielsen's evidence that he did not believe that he had been given the same information as the other bidder. I do not think that this assists the Defendants in the context of the inducement issue, for reasons already given. But in my view it is positively damaging to the Defendants in the context of causation. If the misrepresentations had not been made, this would have led to a factual situation in which Mr. Nielsen and his proposed investor or investors did have the relevant figures on which to work. Instead of being discouraged from bidding as result a lack of information – something which was precisely what the Defendants sought to achieve by their deceit – and suspicion as to lack of equality of treatment, Mr. Nielsen and his proposed investor or investors would have been far better placed to bid. Mr Nielsen explained in evidence that:

> "the information that was in the data room gave us an enormous challenge to extract information that you would normally expect that the management or the ones who were making the business plans would have done all that work already and had made contract per contract an overview of the cash flow projections, the risks involved and so on."

He said that the Updated Kelso Presentation was useless: it contained a single number, which was a "best case" and he was embarrassed sending it to e-Kong because it was no basis on which to make an investment decision. "You can't ask a professional investor or a strategic investor even to make investment decision based on the material which is a one-page financial projection and then a list of names of counties and councils that are favourites or preferred or not sure and 10%". He said that e-Kong were very disappointed in the quality of information received. In my judgment, the position would have been otherwise if the misrepresentations had not been made.

511.     I consider that all of these factors would naturally have had the effect of driving the price offered for the shares towards their true market value rather than the price offered by LMS, which (for reasons discussed in Section I below) was substantially below their true value. Accordingly, I do not accept that, if there had been no misrepresentations, the best offer on the table at the end of June would have been the LMS offer. It seems to me that this is a necessary premise of the Defendants' argument on causation; namely that Updata Europe would have accepted the LMS offer in any event. The argument assumes that the effect of the misrepresentations was to change nothing in terms of how matters would have progressed. In my view, however, if the true position had been known, matters would simply not have progressed as they did. The misrepresentations themselves, for reasons already given, provide an evidentiary weapon, and in my view a powerful evidentiary weapon, in

support of this conclusion. It necessarily follows that the Defendants' case on causation fails.

512.    In the light of this conclusion, I regard it as unrealistic to ask "would Updata have accepted the LMS offer in any event" or a similar question: since it assumes that the best offer on the table as at the end of June would have been the LMS offer. Even if that were so, however, it is not probable that Updata Europe would have accepted it. Indeed, I would regard it as highly improbable. In my view, Updata Europe would have made efforts to explain to the Bank that the business was worth far more, and that it was now or shortly would be highly cash generative. Mr. Homann, who had the ear of Mr. Jorgensen, would have supported them in that argument. I do not consider it at all probable that the Bank would have forced a sale at an undervalue there and then. This would, as Mr. Booth submitted, have been contrary to the Bank's own interests and would have exposed the Bank to potential litigation.

513.    That said I do not consider that the Bank would have given limitless time for Updata Europe to hold onto its shares, particularly if there were buyers around who were willing to pay for them. The Bank would have insisted that a sale took place as soon as reasonably possible. At the time when the bids came in June, there was still a certain amount of time to go before September; i.e. the date before which (subject to performance of other conditions) the Bank had agreed not to call in the facilities. I bear in mind that the Bank could have taken the point that there had been a failure to perform the other conditions, and therefore could have called in their loan. But I accept Mr. Jorgensen's evidence that the Bank had no interest at that time in bankrupting Updata. I have also already noted that Mr. Jorgensen did not act aggressively in the period between January and June. I consider that (on the present unreal hypothesis that the only offer was that which LMS actually made) faced with arguments from Updata Europe, supported by Mr. Homann, the Bank would likely have shown a degree of flexibility so that fair value for the company could be realised. If they had not already done so, the same factors as identified above would then have driven the price towards their true market value. Again, therefore, I consider that even on this alternative hypothesis, the Defendants' case on causation fails.

514.    I consider that the only relevant question on causation, certainly as far as concerns the Claimants' primary case based on the sale in 2009, is that which I have addressed above; i.e. whether the Claimants would have sold to LMS at the LMS price in any event. I do not consider that this part of the claim raises separate issues of causation, which require an *Allied Maples* loss of a chance analysis. The primary claim is in respect of the value of an asset which Updata Europe were induced to sell by fraud. There are indeed questions which arise as to how, on the facts of the present case, Updata Europe's loss is to be quantified, bearing in mind any potential difficulties in realising the full value of the asset. But I consider that these are issues of quantification, not causation and I address them in Section H5 below. However, if I were wrong about that, and, if the relevant question on causation were whether or not there was a real or substantial chance of third parties offering a higher price, or of Updata Europe persuading the Bank that the offer from LMS should not be accepted, I would have answered these questions favourably to the Claimants.

515.    In reaching my conclusions on the causation issue, I have taken into account my assessment, as described in more detail below, of the evidence of Mr. Nielsen, Mr.

Jorgensen and the late Mr. Homann (as well as that of Mr. Hooft which I describe elsewhere in this judgment).

*Mr. Nielsen's evidence*

516.    I start by setting out the principal features of the chronology concerning Mr. Nielsen's involvement in the bidding process. By January 2009, Mr. Nielsen had expressed an interest in a possible investment or acquisition. By mid-January, he was being assisted in that process by Mr. David Medhurst, who had worked for the Australian banking group Macquarie. Mr. Medhurst was a corporate finance consultant with experience in various aspects of mergers and acquisitions, including deal structuring and valuations. At around that time he had set up in business as David Medhurst International Inc. with a subsidiary called European Equity Partners (Canada). Mr. Nielsen was also being assisted at this time or shortly afterwards by a lawyer, Mrs. Marianne Phillip. He described himself as having a "very strong team" assisting him. Mr. Nielsen had a considerable amount of business experience himself, having worked as a management consultant in information technology and having been involved in the development, sale and purchase of numerous IT and telecoms companies over the years. He had also been chairman of Updata UK from 2002 to 2007, and therefore knew the business well.

517.    On 6 March 2009, the Bank wrote to Mr. Nielsen (with the concurrence of Updata Europe) granting a period of exclusivity which would commence on 5 March 2009 and end no later than 10 April, with a further two weeks to finalise his bid. During that time, he went with Mr. Homann and met Mr. Bennett and Mr. Baldorino at Reigate on 18 March. He received a small folder of materials which included the Financial Overview. His evidence was that it was pretty clear from the meeting that management were not keen on his involvement. He had a feeling that they were going to give him the minimum information possible. These impressions were consistent with the evidence, already described, as to the UK management's views. Subsequent to the meeting, on 5 April, Mr. Homann circulated a list of questions, but these were not answered at the time.

518.    Mr. Nielsen did not make any bid on 10 April, but there were extensions of time which were granted for his due diligence: on 1 May 2009, Mr. Jorgensen said that he could offer an extension to 12 May 2009, but that on that date there needed to be a written offer. On 6 May 2009, Mr. Nielsen had a second meeting with the UK management, and a detailed note of that meeting was prepared by Mr. Bennett. The meeting was attended by the Defendants and Mr. Cowan for Updata UK, and by Mr. Nielsen, Mr. Medhurst and his colleague Ms. Olga Ojero. Mr. Medhurst explained that the deal was too small for Macquarie itself, but that Macquarie had interests in a number of other funds who had investments in a similar space. He and Ms. Ojero said that they were looking at either a quoted trade buyer or a number of financial buyers, and that ultimately it was up to Mr. Nielsen to decide on the most preferable. They favoured a group wide approach (which I understand to mean buying the whole group), and they felt that a trade buyer was most likely to want to go cross-border. Mr. Medhurst described, but did not identify, the trade buyer that they had in mind: a telecoms company which was not based in Europe, but which had world-wide interests apart from Europe. An important question was whether the investor would be interested in Denmark or not. But "the UK is not in question here". In other words, there was no doubt that any buyer would be interested in the UK. Towards the end of

the meeting, Mr. Bennett was asked whether Updata UK was on target to reach its budget. Mr. Bennett answered "no". (As set out in Section D above, a very different message was being given to the private equity houses who had been approached in early April).

519.  Following that meeting, on 13 May 2009, Mr. Nielsen (on behalf of his company MLL Holding ApS) sent Updata Europe and Mr. Jorgensen a lengthy "Letter of Understanding – Intent to Provide a Binding Offer". The letter was not a binding offer itself, but outlined the framework for an offer. It referred to the fact that questions raised of the UK management, and requests for documents, remained outstanding and unanswered. It also expressed concern that the UK management had authored a business plan which had not been contained in the due diligence binders provided, and that this had been used in meetings with potential equity providers to gain support for their MBO. The letter then set out a number of conditions for incorporation into any binding agreement, including a more detailed due diligence period.

520.  The Letter of Understanding contained certain figures, which indicated that Mr. Nielsen was valuing both the Danish and English operations on the basis of a multiple of 5 x EBITDA. Mr. Nielsen agreed in cross-examination that, for Updata UK, he had been using an EBITDA figure of around £ 1.496 million; i.e. the figure which had been contained in the Financial Overview.

521.  The Letter of Understanding received a negative reaction from the Bank and, a few days later, Updata Europe made a counter-proposal. On 26 May 2009, Mr. Nielsen wrote to the Bank indicating that he would shortly be discussing a revised offer letter with Mr. Medhurst and Mr. Homann as well as e-Kong. This was the first time that e-Kong had been referred to in the correspondence, although it seems clear that this was the investor that Mr. Medhurst had been describing at the 6 May meeting with management. Mr. Nielsen explained in his evidence that e-Kong was a good contact of Mr. Medhurst, who knew them well. In his letter to the Bank, Mr. Nielsen explained that e-Kong was a telecoms holding company, listed on the Hong Kong stock exchange, and that it had been analysing and preparing "this bid for Updata Europe A/S".

522.  On the same day (26 May) e-Kong wrote to Updata Europe, copied to Mr. Birkeland. The letter was sent at Mr. Nielsen's request and was "an indication on our part of an interest in participating in a consortium with Mr. Nielsen for acquiring such majority stake in Updata Europe or its business, assets and undertakings (or part or parts thereof)" upon terms and conditions to be agreed. The letter indicated that access to documents, information, data and people would be required, so that e-Kong could "fully appreciate the business and value of the Subject Assets". Mr. Nielsen's evidence was that this letter was also sent to Mr. Jorgensen.

523.  On the following day (27 May), Mr. Nielsen sent a revised Letter of Understanding. This repeated, to a large extent, his previous letter, but with some modifications. It was not a firm bid.

524.  By around this time, and as described in more detail in Section E, a bid timetable had been laid down and correspondence was developing in relation to equality of information and the provision of materials in the data room. Mr. Nielsen did not

personally visit the data room, but he engaged Mr. Iversen to do so. On 11 June, Mr. Iversen visited, met Mr. Mantell and subsequently prepared a report for Mr. Nielsen.

525.    On 19 June 2009, e-Kong wrote to the Board of Directors of Updata Europe, referring back to their earlier letter. They referred to having carried out a fact-finding exercise over the past weeks, trying to learn more about the opportunity and referred to their discussions with, amongst others, Mr. Jorgensen and Mr. Homann. They indicated that in the light of their "ample experience of founding and developing different telecommunication companies", they could see the market potential of Updata and had "gained interest in applying their expertise and experience again while joining existing shareholders of Updata in building Updata to become another profitable and scalable business". However, they went on to refer to the fact that they had obtained "very limited information, data or knowledge" regarding Updata Europe and its non-UK subsidiaries, and "only until very recently some financial information on Updata UK". They were therefore not in a position to submit a formal offer, but expressed an interest in exploring the possibility of a proposal which they set out in Annexure B to that letter. The annexure included further financial, legal and operational due diligence on Updata Europe and its subsidiaries.

526.    In the context of causation and loss, the material parts of Mr. Nielsen's evidence in his witness statement were as follows. Prior to submitting his first letter of understanding on 15 May 2009, he was dissatisfied with the amount of information received from the UK management. They had been reluctant to give information at the March meeting and had not answered the questions sent on 5 April. He had raised his concerns in his letter of understanding. At the time of that letter, he was already in discussions with e-Kong as a potential investor. He had also had discussions with Macquarie itself, but e-Kong quickly developed as the main contender. e-Kong were a serious investor with a very professional approach: it was a company used to buying other companies and creating infrastructure. e-Kong wanted to acquire the whole group, but it was most interested in Updata UK.

527.    Mr. Nielsen regarded the establishment of the Data Room as a positive step; i.e towards making sure both bids had access to the same information. He also hoped that the involvement of e-Kong, which was a large company, might ensure that the bidding process was conducted fairly. But his hopes were disappointed.  Mr. Iversen had indeed attended the Data Room, and seen and reviewed the relevant materials which included answers to Mr. Nielsen's questions and the Updated Kelso Presentation. Mr. Iversen's due diligence report, based on the information made available to him, was "useless". As Mr. Nielsen explained in his evidence, this was a reflection on the quality of the information in the Data Room, not on Mr. Iversen. Mr. Nielsen said that:

> "the information provided in the data room and the UK Management's responses to my specific questions were, frankly, disappointing. It was clear to me that UK Management had not provided me with the information they had given to LMS – there was no way in my view that LMS had just got the Updated Kelso Presentation as the basis for their bid. But I wasn't really in a position to force the information out of them: if they weren't prepared to give it to me I probably couldn't get hold of it."

528.    In relation to the 19 June letter from e-Kong, Mr. Nielsen's evidence was that despite the lack of information, e-Kong had nevertheless wanted to progress with further discussions.  But the valuation of the company based on the information provided was low.  Indeed, Mr. Medhurst could not work out why the LMS bid was so high, given the figures.  Mr. Nielsen "simply did not have the backing from e-Kong to match that kind of offer; based on the material I had, I could not justify that kind of price".  He then went on to say:

> "[54] I would say that if it had been possible, on the basis of information from Updata UK, to value the company at a higher level, the deal would probably have been even more attractive to e-Kong. They had enough money to meet a higher price and any difficulty that I faced in persuading e-Kong to invest in Updata UK had been because, on the values that Mr. Medhurst and I saw in the company, the project was possibly too small
>
> …
>
> [58] Mr. Medhurst and I were working on the basis of a 5x earnings multiple to value the business. If we had seen that Updata UK's EBITDA for 2009/10 (based on contracts which were already won, or income streams weighted proportionately to win likelihood) was around £ 5 million, that would have had a significant influence on the valuation we would have attributed to the company."

529.    Mr. Nielsen was cross-examined for a day.  My impression during the course of evidence was that he was honest and fair-minded, and that his evidence was reliable.  He had no significant personal interest in the outcome of the litigation, but had come forward because he thought that it was his duty to do so and despite the background of a degree of antipathy or falling out between himself and Mr. Johnsen.  He has no business relationship now with Mr. Johnsen or any member of the family.  At the time that he gave his evidence, I did not think that the cross-examination caused me to doubt the key features of his written evidence as summarised above.

530.    Nevertheless, and as requested by the Defendants, I have reviewed Mr. Nielsen's cross-examination (and brief re-examination) in its entirety, and I remain of the same view in relation to his reliability as a witness.  Mr. Nielsen spent a considerable amount of time working on the deal over a 6 month period.  He sought to take a professional approach, and was assisted by experienced professionals in the corporate finance world.  It is clear from the documentary evidence that he was very keen to see the figures for the Updata UK.  I accept his evidence that this was the business that was of most interest to him and to any potential investor.  As he explained, the Danish companies were 'distressed' and operated in a much smaller market than the UK.  But it "wasn't hard to convince that the UK was a substantial investment opportunity".  He recognised the potential of a sale to a strategic trade investor, who could "scale the company much better than … a private equity investment".  "The most important thing was to get the UK numbers in place".  e-Kong's prime interest was certainly in the UK market, and although they were prepared to look at other markets, they wanted to "grab European foothold and start out with the most interesting market in Europe, being the UK".  The problems that he encountered along the road, and which led to his

inability to make a firm bid, were that he "was waiting for information and the answers on key questions", and ultimately that the figures that he was given were based on poor quality information and did not justify a price higher than that which LMS had offered. As he said: "it's not the kind of sufficient information you would normally expect in a transaction of this kind". At the end of his cross-examination, he said that he was very committed, he was very serious; he had a good team with lots of experience "but I did not receive the proper information for the due diligence to come up with a substantial – a substantial or firm offer". I have no doubt that the Defendants saw Mr. Nielsen as a very real threat, and that this explains why in my view they took steps, by making false representations to Updata Europe, to hobble his bid.

*Mr. Jorgensen's evidence*

531.   I did not consider that Mr. Jorgensen's evidence had any real bearing on my conclusion that if the misrepresentations had not been made, matters would not have developed in such a way that the best offer on the table in late June was an offer from LMS in the terms which Updata Europe ultimately accepted. But it did have some bearing on the question of what would have happened if, contrary to my conclusions, matters had proceeded in essentially the same way that they did proceed, so that this was indeed the only offer on the table at that time.

532.   Mr. Jorgensen had retired from the Bank in 2012. I was told at the start of his evidence that he had been in poor health; that this was a personal matter that he did not want to go into further; and that he would indicate if he needed a break at any stage. I told him that if he needed a break apart from the usual ones, he should tell me. Mr. Jorgensen had given a relatively short witness statement in Danish, because he was not fluent in English. He explained at the start of his cross-examination, however, that his understanding of English was better than his ability to speak it, and that he would be happy to listen to the question in English and then to give his answer in Danish with the benefit of translation. As the cross-examination proceeded, however, Mr. Jorgensen in fact tried to give his evidence in English. From time to time, however, both the questions and the answers required translation, and this was carried out by an interpreter. It was perhaps unfortunate that the same interpreter was not present throughout his evidence: one interpreter attended on the first afternoon of his evidence, and then another interpreter (who to my mind seemed somewhat less accomplished) on the second day.

533.   Some criticisms were made by the Claimants, in their written closing argument, as to the process that was followed: the submission being that all questions and answers should have been translated. I did not consider that these criticisms were justified. It seemed to me that Mr. Jorgensen did understand the questions that he was being asked, and that where there appeared to be a misunderstanding or lack of clarity in either question or answer, assistance was provided by the interpreter. That was my impression at the time, and I have re-read the entire transcript of Mr. Jorgensen's evidence and it remains my view.

534.   That said, it did seem to me that there was considerable force in the Claimants' submission that Mr. Jorgensen's evidence needed to be treated with "considerable caution". This was not, I emphasise, because Mr. Jorgensen was in any way seeking to give anything other than truthful evidence. Far from it: the fact that he wanted to

give his evidence in English to the best of his ability was to my mind one indication that he was a witness who was trying to assist the court. I also had no doubt, as I listened to his evidence, that he was seeking to assist as best he could. However, it became clear as his evidence progressed – and in particular on the second afternoon of his evidence by which time he may well have been tiring – that he had a very poor recollection of the relevant events. Indeed, some of his answers towards the end of his evidence were treated with some incredulity by Mr. Choo Choy. Mr. Jorgensen thought that the sale to LMS was a sale of Updata Europe, rather than a sale of Updata UK. He said that he did not know that LMS had been working with the UK management and had been discussing the company with them. He said that he did not recall meeting LMS in April 2009 with the UK management, even though the meeting was referred to in his witness statement, and even though he had referred to the meeting in his oral evidence that morning. ("The first meeting we had with LMS to the close I think one month"). He could not remember the LMS offer letter. When asked whether he knew that the UK management were involved in the bidding process, he said that he did not know (prompting Mr. Choo Choy to say that this was "quite extraordinary"). His evidence that the period between the LMS letter to the close (of the sale) was 1 month was not accurate: the period was in fact close to three months (14 April to 9 July). Mr. Jorgensen could not recall many of the documents that he was shown in cross-examination (perhaps unsurprisingly in view of the passage of time).

535.    Mr. Jorgensen's witness statement addressed the question of how the Bank might or would have acted if different financial information had been presented to the Bank. For example, he expressed that view that if, at the beginning of 2009, he had received "positive forecasts of likely performance of Updata Europe and its subsidiaries, I believe that … it is very likely that I would have been receptive to allowing Updata Europe to continue as before and I would have put the company under less pressure to search for new investors". It seemed to me that this evidence was not sustainable in the light of the evidence that Mr. Jorgensen had in fact received positive forecasts of likely performance in January 2009, particularly in relation to Updata UK, but had nevertheless put Updata Europe under some pressure by virtue of the terms of the agreement with reached with Mr. Homann in January 2009.

536.    Much of Mr. Jorgensen's cross-examination was directed at how he did in fact react to the circumstances as they were understood to be, rather than to the question of how he would have reacted if the circumstances had been different. Indeed, it was only after I had asked counsel as to whether he was challenging the relevant paragraphs of Mr. Jorgensen's witness statement, as to what he would have done in different circumstances, that questions were directed towards that issue. Mr. Jorgensen clearly had difficulty in recalling the events of the time, and in answering questions which were hypothetical. Indeed, the opening sentence of paragraph 31 of his witness statement stated, very fairly, that he could not say with certainty what he would have done differently if there had been information available to him that "confirmed positive forecasts about Updata UK's performance". Similarly, paragraph 36 of his witness statement acknowledges, sensibly in my view, that Mr. Jorgensen would have been less inclined to stop the sale process at a late stage, once LMS had been awarded exclusivity.

537. Having considered Mr. Jorgensen's evidence as a whole, and against the background described above, I do not consider that I can properly rely upon any particular passage in Mr. Jorgensen's witness statement, or any specific answer in his oral evidence, in relation to how he would have reacted if the facts had been different. Rather, my conclusions as to what would likely have happened, as described above, are based upon what seems to me to be inherently probable in the light of Mr. Jorgensen's attitude as expressed in the contemporaneous documents at the time, and as supplemented by evidence from witnesses who dealt with him, when taken together with a number of consistent themes in Mr. Jorgensen's evidence. In particular, it is in my view clear that Mr. Jorgensen:

    a) did want to see Updata Europe's debt reduced significantly, albeit not eliminated;

    b) did show a degree of flexibility in his approach to Updata Europe and Updata Denmark and did not want to bankrupt or liquidate them, but did not have limitless patience;

    c) was influenced by what he was told by Mr. Homann, as shown by the agreement reached in January, and also in the 20 May e-mail sent out shortly after Mr. Homann's e-mail of 18 May;

    d) was concerned to ensure equality of treatment as between the bidders;

    e) was interested in a sale at fair value, and believed at the time (as he said in his evidence) that LMS was paying a fair price;

    f) would have been very reluctant to stop the sale at a late stage in the process, particularly if there was a risk that a buyer with available cash might then walk away.

*Mr. Homann's evidence*

538. Mr. Helge Homann died prior to the trial, and therefore his evidence could not be subject to cross-examination. Nevertheless, I considered that his evidence had some value in confirming my conclusions as set out above. As far as Mr. Jorgensen was concerned, Mr. Homann's evidence was in substance that the former was persuadable: "I found it was always possible to persuade Mr. Jorgensen not to accept an offer, so long as we could persuade him that it was not a good offer, and that Updata Europe would continue to service its debt. So long as Updata Europe could show a proper income stream, Mr. Jorgensen might not be happy, but he would be satisfied". He referred in this connection to the agreement reached in January 2009, which was made on the basis of expected receipt of dividends. To my mind, this evidence was consistent with what occurred.

539. Mr. Homann then went on to describe his involvement with Mr. Nielsen's bid, the due diligence process, and certain work that he carried out using the Financial Overview. He described his frustration at the lack of figures from the UK management, and his involvement in discussions with e-Kong including a conference call on 23 June between various participants (e-Kong, Mr. Nielsen and his team, Mr. Holm and Mr. Birkeland). The problem at this stage was that e-Kong were not in a position to bid on

the basis of the limited information that was available following due diligence. His evidence was that: "… the budget forecast was key in enabling – or preventing – a rival bid from being calculated". He said that with the financial information contained in various documents (including the Weighted Budget), "the proper share price would have been around five times what Mr. Nielsen was able to justify on the basis of the figures that were actually provided to him by Mr. Baldorino and Mr. Bennett". He went on to say:

> "If Mr. Nielsen had seen the Budget Pack, which was not in the Data Room, he would have been able to use all of the detailed information in there for each contract to put together a bid. With this information, I would have been able to persuade the Bank to give us more time".

540.    Again, I consider that Mr. Homann's evidence, albeit not cross-examined upon, is consistent with the inherent probabilities as well as the evidence of Mr. Nielsen himself.

## H6: Analysis and conclusions: quantification

541.    Having resolved the causation issue in favour of the Claimants, the next issue which arises is how to quantify Updata Europe's loss. Mr. Booth submitted that the exercise was a straightforward one. The ordinary measure of loss is the difference between the value of the asset disposed of and the price obtained at the date of the loss: see *Smith New Court* and *Platt.* He said that in principle (and subject to his argument that the appropriate date of loss was 2014) there was no reason to depart from that approach. It would be inappropriate to apply any discount to reflect the possibility that Updata Europe would not be able to obtain the market value on a sale.

542.    The Defendants' submission was, in essence, that this was an unrealistic approach in circumstances where there was considerable uncertainty as to whether any increased price could in fact be achieved. They argued for a mathematical approach, which involved assessing separately the chances of LMS increasing its offer, Mr. Nielsen increasing his offer, the Bank agreeing to extend time, and factoring in any other contingencies (such as other purchasers making proposals), and then multiplying each of the resulting probabilities. At most, whether on this approach or any other, any increase would have been no more than 5 or 10% above the price which LMS actually paid. Mr. Choo Choy pointed to various matters, including the uncertainty relating to whether Mr. Nielsen/e-Kong would have made an increased offer, and their difficulties in so doing in light of the management's unwillingness to work with Mr. Nielsen. There were other factors militating against Updata Europe's ability to obtain the market price; in particular, the tight timetable, and the fact that any new purchasers would have to carry out due diligence. Any purchaser would also inevitably know about the Bank debt, and would be looking to pay the minimum price possible. It would also be appropriate to take into account the value which LMS gave up by allowing Newwatch to retain its shares and acquire more. Furthermore, any hypothetical outside purchaser would be competing against an incumbent management, which was the worst kind of opposition. All of these matters would have a moderating influence on any possible increased price.

543.   In my judgment, the starting point is, again, that this is a case where the Claimants parted with a valuable existing asset which they owned. There was no dispute that a claim for the value of an asset disposed of in consequence of fraud was a recognised head of loss in the context of the tort of deceit, although of course credit needs to be given for the value received. The Claimants have established, on the basis of my findings above, that, if the representations had not been made, they would not have disposed of the asset on the terms which they did, and that the effect of the misrepresentation was that they were presented with a best offer which was lower than would have been the case if the misrepresentations had not been made.

544.   I agree with the Claimants that the starting point in the present case ought to be the true value of the asset at the time when the disposal took place; see *Smith New Court Securities Ltd. v Citibank N.A.*

545.   In the present case, I do not consider it appropriate to take any date later than the date of sale (or thereabouts in 2009) as the starting point for quantification. I do not consider that 2014 date (as contended for by the Claimants in their alternative case) would be a reasonable date to take. The position in 2009, and in particular July 2009, was that the Bank wanted a reduction in the indebtedness, and I have no doubt that it would not have been amenable to suggestions which would have had the effect of significantly postponing a large capital repayment, even if there were some possibility of dividends being paid and also a possibility of future growth in the value of the company. The evidence showed that the Bank had its own pressures and problems in the aftermath of the financial crisis, albeit I was not persuaded that there was any particular pressure by the Danish FSA in relation to the Updata Europe loans. Whilst I have concluded that there might have been some flexibility in terms of extending the timing of a sale, I consider that this is to be measured in terms of weeks or a few months at most, and not in terms of years. If there was a buyer in 2009 willing and able to buy the company, with funds available, the Bank would not have wanted the buyer to walk away, as Mr. Jorgensen's evidence made clear.

546.   Updata Europe would have recognised this reality, including the need to preserve its relationship with the Bank (since Updata Europe including Updata Denmark were still in business) and would have proceeded to a sale. This would also have the benefit of repaying Vald. Nielsen in respect of the monies originally provided by Mr. Johnsen's grandmother. I do not therefore consider that Updata Europe would, in July 2009 (when the sale took place) or September 2009 (when the extension agreed with the Bank ran out) have attempted to obtain an indefinite postponement of a sale of the shares in Updata UK. Nor do I think, on the evidence, that there would have been a real or substantial chance of obtaining the Bank's agreement to such a postponement. In the light of Mr. Hildebrandt's frank evidence, I also do not consider that, in the very difficult banking conditions of late 2008 and 2009, there was any real or substantial chance of Updata Europe finding another Bank willing to refinance. Accordingly, the relevant date for the assessment of loss is July 2009.

547.   These conclusions also mean that the Claimants' alternative claim based on the 2014 date – namely a claim based on "loss of a chance" for the lost opportunity of persuading the Bank to postpone a sale – also fails. It is fair to note that Mr. Booth never embraced a claim based on "loss of a chance" with any enthusiasm. His opening submissions contained no reference to loss of a chance, and his primary submission (in a short note produced a few days into the trial, after I had raised the

potential applicability of "loss of a chance" principles) was that this was not a loss of a chance case. I consider that Mr. Booth was correct, including in relation to his case for a 2014 date to assess loss. In accordance with the cases which I have already discussed, the issue of whether or not the Claimants would have decided, and would have been in a position, to postpone sale until 2014 is an issue to be resolved on the balance of probabilities: it concerns what the Claimants would have done. If the Claimants were unable to establish these facts, on a balance of probabilities, then the claim based on a 2014 sale should fail. There is in my view no intermediate case based on the lost opportunity to persuade Mr. Jorgensen – who was not a potential purchaser of the shares – to permit the Claimants to retain their shares.

548.    Accordingly, I return to my starting point for the assessment of loss, namely the value of the asset in 2009. The question is whether that is also the finishing point in the assessment of damages. In my view, even though the true value of the asset at the date of loss is the starting point for assessing loss, it is appropriate to consider all the factual circumstances in deciding whether or not it is appropriate to award damages by reference to the true value of the asset. Mr. Booth was inclined to agree that, in some circumstances at least, an award of damages less than the true value may be appropriate. He gave the example of a vendor who was, for some reason or another, not motivated to try to obtain the true value of an asset, because he was very favourably inclined to a particular purchaser.

549.    However, I do not think that that is the only case in which the facts may result in an award of damages which is different to the true value. The quantification of damages is, even in a case of fraud, compensatory not punitive. There is no authority which in my view compels the conclusion that, in a case of fraud, the court must assume that the shares could have been sold for their true value. There may be various factors which militate against this conclusion; for example: time-pressures on a vendor to sell, a weak bargaining position, a lack of expertise or professional assistance in relation to selling an asset where there is no instantly available market (such as a stock exchange) for the purchase of such assets. It seems to me that it is appropriate, before awarding damages by reference to the true value of the asset, to consider the chances of the relevant event occurring. I consider this to be in accordance with the law as to quantification of loss which is summarised in *Wellesley* and the cases there considered.

550.    Thus, in *Mallett v McMonagle* [1970] AC 166,176, Lord Diplock said:

> "But in assessing damages which depend upon its view as to what will happen in the future or would have happened in the future if something had not happened in the past, the court must make an estimate as to what are the chances that a particular thing will or would have happened and reflect those chances, whether they are more or less than even, in the amount of damages which it awards".

551.    Similarly, in *Vasiliou* at paragraph [25], Patten LJ (with whom the other judges agreed) said:

> "Where the quantification of loss depends upon an assessment of events which did not happen the judge is left to assess the

> chances of the alternative scenario he is presented with. This has nothing to do with loss of chance as such. It is simply the judge making a realistic and reasoned assessment of a variety of circumstances in order to determine what the level of loss has been".

552.    Patten LJ then referred to *Parabola,* where Toulson LJ said (in the context of a claim for lost profits):

> "The next task is to quantify the loss. Where that involves a hypothetical exercise, the court does not apply the same balance of probability approach as it would to the proof of past facts. Rather, it estimates the loss by making the best attempt it can to evaluate the chances, great or small (unless those chances amount to no more than remote speculation), taking all significant factors into account".

553.    In the present case, I have found that Updata Europe would not have retained the relevant asset beyond 2009, because there was no real or substantial chance of persuading the Bank to allow them to avoid a sale. The alternative scenario with which I am presented, on the Claimants' case, is therefore that the shares would have been sold in 2009 for their true market value. I have to consider the chances, great or small, of that occurring. This is, as the above passages show, not a "loss of a chance" analysis, but simply the process of quantification of loss taking into account all relevant circumstances.

554.    I do not consider that the possibility of a discount from the true, objectively assessed, value of the shares involves taking, as the Claimants sought to suggest, an "arbitrary" approach. In various cases, the courts have awarded damages based on the reduced chance of realising what might otherwise be regarded as the true value of the asset: see, for example, *First Interstate Bank of California v Cohen Arnold* [1996] CLC 174 (CA), and *Blue Circle Industries Plc v Ministry of Defence* [1999] Ch 289. *McGregor on Damages* paragraph [10-050] specifically treats the latter case as a case of quantification of loss.

555.    However, the Claimants drew attention to the judgment of the Court of Appeal in *Elektrim.* The issue there concerned damages payable for breach of a contract which, if performed, would have required the valuation of shares by two investment bankers and a consequent payment to the claimants. Arden LJ delivering the judgment of the Court of Appeal said [46] that:

> In the present type of case the court has to assess what a banker would have concluded as to the valuation of certain shares. That may not be easy but if something of value has been lost, the court must do its best to estimate that value and should not too readily decide that it is a matter of chance what the true value of something as concrete as a share is likely to be.

556.    I do not, however, consider that the decision in *Elektrim* means that it is never permissible to make an allowance for contingencies surrounding the ability of a party to realise the true value of shares, albeit that care needs to be exercised before doing

so. Ultimately, the question of whether a discount is appropriate depends upon the context in which the issue arises. On the facts of the present case as described above, where the relevant asset was in the course of being sold and there is obvious uncertainty as to what price could be achieved, I consider that it is appropriate to consider the chances of the sale achieving the true value of the asset in question, and if appropriate to apply a discount to reflect uncertainty.

557.    However, I do not accept that it is appropriate to address this question by considering each particular contingency on which a sale may have depended, and then multiplying the resulting probabilities together. The authorities reviewed by Bryan J. in *AssetCo* indicate that this may be appropriate in some loss of a chance cases. But for reasons already given, I do not consider that this is a loss of a chance case. In any event, neither *AssetCo*, nor the line of authority considered in that case including the seminal decision in *Allied Maples*, involved the question of how to value the claimant's loss in circumstances where he was deprived of a valuable asset by fraud. As I have indicated, the starting point in such cases is the true value of the asset, but with the possibility of a discount to reflect the chances of realising the true value of that asset in the particular circumstances of the case. I would also in any event have considered the multiplication approach to be inappropriate in any event. The central question is to consider the prospect of a purchaser, whether it be LMS, some other private equity house, Mr. Nielsen, a trade buyer or otherwise, paying the true value for the shares, and doing so within the timescale of a sale by September 2009 or a few weeks or months thereafter. It would in my view be inappropriate to try to assess the percentage chance of any particular purchaser buying the shares, and then multiply together the various percentages. The reason can be illustrated by a simple example. If there was a single potential purchaser where the chance of paying true value was 75%, the damages would be assessed at 75%. But if there were two such purchasers, the damages would, on the multiplication theory, be calculated on the basis of a lower figure, namely 75% x 75%. The larger the number of potential purchasers at 75%, the smaller the damages on the basis of the Defendants' multiplication approach. This counter-intuitive result must in my view be wrong. The reason is that each potential purchaser does not constitute a separate contingency that needs to be considered and evaluated and overcome by Updata Europe in order to obtain the benefit of a sale. In order to obtain a sale at true value, there only needed to be one purchaser. If there was one purchaser who was willing to pay 75% of the true value, the existence of other purchasers who were only willing to pay less would not diminish the amount that could be obtained from the purchaser willing to pay more.

558.    I consider that, as in many of the cases involving assessment of damages where there is an element of uncertainty, it is appropriate to take a broad view as to the appropriate discount in the light of the relevant facts. Turning now to the facts, I consider that there should be a material discount from the true value of the asset, but I do not consider that there are any factors which lead me to conclude that this should be a very substantial one. Indeed, it seems to me that there are good reasons for awarding something relatively close to true value.

559.    This is a case where the evidence is clear that the majority shareholding in Updata UK was an asset which was actually and potentially attractive to a variety of investors. The initial offering by Tenon to the private equity market quickly resulted in interest from a number of houses. It is true that the offers made were at or around what was

understood to be the level of the Bank debt, but this was an unsurprising and obvious consequence of the "opportunity" having been presented as one to acquire the shareholding at that level. The AMR Report showed that Updata UK would potentially be of interest to trade buyers; i.e. to companies in the technology sector. This is borne out by the interest shown by e-Kong. The management itself was clearly very confident as to the future of the business, and were highly motivated to remove Update Europe and retain (with private equity investment) control of the business. There was another bidder actually on the scene (Mr. Nielsen), with a potential backer and a capable corporate finance adviser. In the context of causation, I have already indicated that, had the representation not been made, these and other factors would have had the effect of driving the price offered towards the true market value of the business. In addition, the expert accounting evidence served to confirm, in my view, the existence of a market of willing buyers for the asset in question. There was no suggestion, for example, that the asset was so specialised that there was only a very limited potential pool of potential purchasers.

560.    I also consider that this conclusion (i.e. that damages should be close to the true value of the asset) is supported, and reinforced, by a point which Mr. Booth emphasised in the course of argument. This is a case of fraud, where what happened was that the Defendants sought deliberately to divert the course of events from that which they would and should have taken if the 20 April and 3 June e-mails had not contained false information. In the context of an asset for sale, that course of events should ordinarily lead to the vendor receiving the fair value of that asset. In those circumstances, I do not consider that the court should look favourably on arguments to the effect that fair value should not be taken as the measure of loss, because there are too many imponderables to know whether fair value would have been received. There are always imponderables. But the Defendants were sufficiently concerned as to how events would transpire that they found it necessary to misrepresent the position. Again in the present context, their misrepresentations form an evidential weapon which should lead the court to be somewhat sceptical in relation to the Defendants' submission that the Claimants would not, if there had been no deceit, have received the true value of their asset.

561.    I have considered the various factors relied upon by the Defendants in support of their case that, ultimately, Updata Europe would have received little more than the amount which LMS paid, and the extent to which it is appropriate the reduce the damages, otherwise assessed on the basis of the true value of the asset, because of these contingencies. The most significant points seem to me to be as follows.

562.    First, the sale was carried out in 2009 under some pressure from the Bank, and in a timescale which (once Mr. Jorgensen sent his e-mail on 20 May 2009) was to some extent dictated by the Bank. There was also the pressure arising from the fact that the January 2009 agreement between the Bank and Updata Europe/ Denmark meant the facilities could be terminated in September. But I do not consider that these factors should result in a very substantial reduction from the true value of the asset. The initial misrepresentation was made on 20 April 2009, when no timetable had been imposed on the bidders and there was still a fair amount of time to September. Even on 3 June, there were still some months before September. The evidence indicated to me that the process leading to a sale, including due diligence, can be accomplished relatively quickly if parties set their minds to it. Furthermore, by the middle of May

2009, if not before, a data room was being contemplated and was then set up; thereby facilitating any due diligence that a potential purchaser would wish to carry out. Accordingly, I did not think that the time-scales involved were such as to require a very substantial discount to the value of the asset because of the pressure to sell.

563.    Secondly, another possible discount arises from the fact that Mr. Johnsen had been trying for some time to raise investment, but had failed to do so. It is also the case, and an important consideration, that Mr. Johnsen's efforts to find a purchaser gave the impression of being somewhat amateur. He did not engage professional advisers (the equivalent of Tenon or Mr. Medhurst), but rather seems to have carried out the work on his own, approaching people whom he knew or to whom he was introduced. These efforts had not been successful. Mr. Johnsen explained that, certainly in a number of cases, this was because he was seeking investment at the parent company level, and the structure of the shareholding made this unattractive. I did not think that such matters were a reflection on the true value of Updata UK, but were a reflection on Mr. Johnsen's ability to obtain full value for Updata Europe's shares.

564.    On the other hand, whilst it is true that Mr. Johnsen had not succeeded in finding investors, the position by mid-April 2009 was that the Defendants had succeeded in finding a number of private equity houses who were potentially interested, and the Defendants were themselves highly motivated to carry out an MBO. So whilst Mr. Johnsen had not successfully found potential investors, the Defendants had done so with the assistance of firm of corporate finance advisers (Tenon) with expertise in this area. Similarly, Mr. Nielsen was using the services of Mr. Medhurst, who was looking (albeit with inadequate and false information as to the projected results of Updata UK) at both the trade market and the private equity market. It is wrong, in my view, simply to focus on Mr. Johnsen's efforts on the "sell" side whilst ignoring the efforts which had been made, and could be made, on the "buy side" as well, where there was strong motivation for a sale and a potential market of buyers had been established. Furthermore, if the misrepresentations had not been made, Mr. Johnsen would have had figures – which had attracted the private equity market – which he could show other potential investors.

565.    Thirdly, there is the position of Newwatch, which was allowed to roll over its shareholding and acquire further shares. Neither expert suggested that this factor affected the true value of Updata Europe's shares. However, it does seem to me that it is a factor which is potentially relevant to the price that would have been obtained upon a sale. Mr. Johnsen would in my view have been attracted to proposals which may have fallen short of the true value of Updata Europe's shares, if they were accompanied by a willingness to allow Newwatch to retain its interest and acquire further shares.

566.    Fourthly, and to an extent related to the previous point, I consider that Mr. Johnsen was in a relatively weak bargaining position. It is a fact that Updata Europe had a substantial indebtedness to the Bank, and was under pressure to sell. Any potential purchaser would not have found it too difficult to find this out, since Updata Europe's most recent accounts referred to its indebtedness.

567.    Taking all the relevant factors into account, I consider that the chances of obtaining the true value of the shares was less than 100%. I assess the appropriate discount to reflect the uncertainty of achieving true value at 25%.

## I:    Fair value of Updata UK

568.    The fair value of the shares in Updata UK as at July 2009 was the subject of expert accountancy evidence from Mr. Doug Hall for the Claimants and Mr. Paul Smethurst for the Defendants. Fair value in this context means the price that would be paid by a willing buyer and willing seller, rather than the price that might be realised in the scenario of a forced sale. Both experts had prepared two detailed written reports, and a very helpful joint report in which the differences between them were identified and the reasons for their respective conclusions were expanded upon.

569.    Both experts were agreed as to the basic principles by which the fair value of shares in a private company such as Updata UK should be ascertained. This involved making an earnings-based assessment by which an estimate of Updata UK's maintainable earnings as at the date of the SPA on 11 July 2009 (such earnings being measured as EBITDA) is first made. A multiplier should then be applied in order to arrive at an estimate of the "Enterprise Value" of the company. That Enterprise Value would then be adjusted, where necessary, for any net debt. Two other adjustments would then be made, so that there were therefore four main components. These were: (i) maintainable earnings, (ii) the multiplier, (iii) a premium for taking control of the company, and (iv) a discount to reflect the fact that the shares were in a private company.

570.    The experts were agreed that, in relation to (iv), the appropriate discount was 33%. They were disagreed on the other three elements, and the respective positions of the experts were as follows:

   a)  Maintainable earnings: £ 7,000,000 (Mr. Hall) or £ 4,500,000 (Mr. Smethurst)

   b)  Multiplier: 6 (Mr. Hall) or 4.98 (Mr. Smethurst);

   c)  Control premium: 35% (Mr. Hall) or 25% (Mr. Smethurst).

571.    These disagreements resulted in an overall difference between the two experts of around £ 20 million. Mr. Hall's figure for the fair value of the equity was therefore £ 37,899,000. Mr. Smethurst's figure was £ 18,666,000. The calculations which produced these figures were set out in their joint report, and are reproduced below:

|  | DH | PS | Difference |
|---|---|---|---|
| Multiplier | 6.00 | 4.98 | 1.03 |
|  | £'000's | £'000's | £'000's |
| EBITDA[A] I | 7,000 | 4,500 | 2,500 |
| mplied total enterprise value [A x |  |  |  |

| | | | |
|---|---:|---:|---:|
| multiplier] | 42,000 | 22,388 | 19,613 |
| Less: Net debt | (100) | (100) | |
| Equity value (minority basis) [B] | 41,000 | 22,288 | 19,613 |
| Plus: control premium 35% or 25% [B x 35% Or 25%] | 14,665 | 5,572 | 9,093 |
| Equity controlling basis [C] | 56,565 | 27,859 | 28,706 |
| Less: Private company discount 33% [C x 33%] | (18,666) | (9,194) | (9,473) |
| **Fair value of equity** | 37,899 | 18,666 | 19,233 |

572.    The above figures represented the experts' views as to the fair value of 100% of the equity. Updata Europe had a 60% shareholding, and therefore the fair value of that shareholding would (on the basis that a premium for control was appropriate) be either £ 22.7 million (Mr. Hall) or £ 11.5 million (Mr. Smethurst); i.e. a difference of around £ 11 million. I considered that it would, on the facts of the present case, be appropriate to include such a premium. This is for the simple reason that Updata Europe had a 60% shareholding in Updata UK, whose sale would result in control of the company being transferred to the purchaser.

573.    The figures for maintainable earnings, multiplier, and control premium, as set out above, generally speaking reflected a figure which was at or close to the mid-point of a range of numbers which each expert initially put forward.

*Forced sale*

574.    It will be apparent from the above figures that there was a significant difference between the fair value of the 60% shareholding, as assessed by the experts, and the consideration received by Updata Europe on the sale to LMS. The amount of that consideration was £ 5,244,798 after taking account of the settlement of an intra group loan of £ 134,312. This was substantially lower than the figure of around £ 11.5 million put forward by Mr. Smethurst.

575.    The explanation for this difference, on Mr. Smethurst's approach, was that the sale which took place in July 2009 was a "forced sale". Mr. Smethurst described the characteristics of a "forced sale" as being either or both of the following: a compulsion to contract (i.e. an unwilling seller or purchaser) and/or a reduced sale period. The accountants were agreed that, in general terms, the price achieved on

"forced sale" will be lower than that which might be obtained assuming no forced sale. They were also agreed that it would be for the court to determine if the sale of Updata UK was indeed a "forced sale" and whether, as a result, Updata Europe suffered any loss. Mr. Smethurst's view was that – whilst acknowledging that it was for the court to determine whether the sale of Updata Europe's shares was a forced sale – if it was determined that it was a forced sale then (as he said in the joint report) "there is no loss as the price achieved was the best that could be obtained in the circumstances". In his first report, he put the matter this way:

> "If the Court determines that this was a forced sale then in my view there is no loss. The amount offered and accepted reflected the circumstances of the sale and what a third party was prepared to part with in order to acquire the shares on offer".

576.  Mr. Hall did not agree that, even if the sale were forced, Updata Europe suffered no loss, "as that rules out any opportunity to have obtained a higher price within the shortened timescale that a forced sale would entail".

577.  I do not accept Mr. Smethurst's view that if this were a forced sale, it follows that Updata Europe suffered no loss. It seems to me that on the facts of the present case, where fraud is alleged, it is essential to address the question:  what would have happened if the fraudulent misrepresentation had not been made? This issue, addressed in detail in Section H above, involves the resolution of factual matters which are for the court to determine, and are not matters for the expert accountants. It is not right to short-circuit the analysis by proceeding (as did Mr. Smethurst) from a starting point - that the sale had characteristics of a forced sale - directly to the conclusion that there was no loss because the best price was obtained. As Mr. Smethurst fairly accepted in cross examination: "If – if there was fraud involved and some people didn't have – and some people didn't have information and others did, then I don't know what would have happened".

578.  It became clear in the course of his evidence that Mr. Smethurst's view, that there was no loss, was reached without factoring in the fact that this was a case in which fraud was alleged. His oral evidence was that, prior to cross-examination, he had not realised that allegations of fraud were being made against the Defendants. Later in his evidence, he accepted that the question of whether or not Updata Europe had suffered a loss would depend upon all the circumstances, including what the effect would have been on the timetable for sale if proper or full information had been provided. He said that if there would have been "some latitude for some other course of action, then that's where one might explore further". His concept of a forced sale was very much a concept of the seller having to sell, and having in practice no or little room for manoeuvre. The extent to which there was room for manoeuvre is a factual question which I have addressed in Section H.

579.  I therefore did not derive any assistance from Mr. Smethurst's view that there had been no loss. Indeed, it seemed to me simply to restate the argument, that Updata Europe would have sold at the LMS price in any event. This is an argument which I have rejected on the facts.

580. In these circumstances, I did not consider that it was necessary or helpful to answer the question: was this a "forced sale"? If one were to apply Mr. Smethurst's very broad criteria for "forced sale", I would conclude that the sale did have some characteristics of such a sale. In one sense it could be said that there was a "compulsion to transact", and that Updata Europe was not a willing seller. This was because Updata Europe was clearly under pressure to reduce the debt to the Bank, and it would have preferred to have retained its shares if it could. Had there been no significant debt, Updata Europe would not have been selling. However, the sale did not come about because the Bank actually forced Updata Europe to sell against its wishes, and so there was no "compulsion" in that sense. Indeed, when the bidding process concluded, it was Updata Europe's decision to sell. There was also, again in one sense, a "reduced sale period": in that a timetable was laid down in May 2009 for the bidding process leading ultimately to a sale. But as described in Section H, the overall timetable for the sale was not unduly compressed. Indeed, the whole process, starting from Mr. Nielsen's expression of interest in January, took over 6 months, and nearly 3 months passed between the original LMS offer and the conclusion of the sale process.

581. Overall, for the reasons given in Section H, I did not consider that this was a case where Updata Europe had no latitude or for manoeuvre at all. I also considered that Mr. Hall was right to say that there was a spectrum of "compulsion", and that there might be different degrees or a spectrum of compulsion. The concept of a "forced sale" therefore involved, as he said, "shades of grey". At one end of a scale, a bank may demand immediate repayment of a loan. At another end of the scale, it may give the company, say, 6 months to sell; i.e. enough time for an orderly sale. So "it depends where you are between those extremes".

582. My conclusion is therefore that such compulsion as existed in the present case did not lead to the conclusion that Updata Europe suffered no loss. However, in assessing the amount of Updata Europe's loss, and specifically the extent to which Updata Europe would have obtained the fair value of the asset, it is necessary to take into account the pressure from the Bank to sell, and the fact that limitless time to do so was not available. I have sought to reflect these and other factors in my assessment of the loss suffered in the present case by application of a 25% discount from the true value for the reasons given in Section H.

*The LMS offer*

583. A different line of argument on behalf of the Defendants, but leading to the same conclusion, was that this was a case where the market was tested, and where – in the context of a competitive bidding process – LMS made an offer to buy. The price at which they bought should therefore be treated as the market price or the fair value in the real world. The competitive bidding process started at an early stage. LMS was originally selected as the management's preferred bidder after they had put in a proposal to UK management at the start of April 2009. At that time, LMS knew that they were in competition with other private equity houses. In due course, when LMS made its first offer to Updata Europe in April, its second offer in May, and then repeated that offer in June, LMS was doing so knowing that it was in competition with Mr. Nielsen. Accordingly, whilst the accountants might have their own views as to what was fair value, the best evidence of fair value was the offer which LMS actually made and which was accepted. In this context, the Defendants emphasised

that this offer made by LMS was made on the basis of full knowledge of the optimistic management's forecasts, and was not therefore depressed because of a lack of financial information.

584.    I do not accept this argument. I agree with the Claimants that it is inappropriate to determine fair value by reference to the price that a single bidder was prepared to offer; particularly in view of the expert evidence which indicates that the LMS offer was at a significant undervalue. There may be a variety of reasons for the price offered by a particular bidder, and which do not reflect on the true value of the asset. For example, the bidder may be interested in the asset, but only if he can acquire it cheaply. He may have internal criteria, such as a targeted internal rate of return, which dictate the level of his offer. The level of his bid may have been dictated by a perception that a bank will pressurise a seller to sell in order to pay off a bank debt.

585.    The position is different if, instead of looking at a single bidder, there are a range of bids made by different players in the market. In the present case, that did not happen. There were a number of private equity houses which expressed interest, to Tenon and LMS, in the acquisition in early April. But these expressions of interest were not made to Updata Europe, but rather as part of a potential negotiation with Updata UK's management. Furthermore, these expressions of interest were given in the context of the private equity houses having been told, in the Tenon Memorandum, that the opportunity was to acquire the asset at the level of the bank debt. It is therefore not surprising that their proposals were pitched at around that level.

586.    A further argument advanced by the Claimants, in support of their case that the LMS bid was not a guide to fair value, was that LMS had been told that Mr. Nielsen had been given different information as to the expected performance of the company. In that regard, the Claimants relied upon a statement in the initial presentation by LMS on 2 April 2009:

> "Ex UD [Updata] AS chairman [i.e. Mr. Nielsen] possible "fly
> in ointment" and unfriendly party due to Peter Johnson conflict
> 2 yrs ago – also working off unrealistic projections".

587.    The Claimants suggested that the "unrealistic projections" were the low projections contained in the Financial Overview. If so, then Mr. Nielsen would not have been perceived as likely to put in a competitive bid; because he was wrongly proceeding on the basis of the low figures. The Defendants, in contrast, suggested that "unrealistic projections" was a reference to the fact that Mr. Nielsen had been given the rather higher figures that had been circulated to Mr. Homann and others towards the end of 2008.

588.    I am not prepared to proceed on the basis that LMS knew that Mr. Nielsen was working from the unrealistically low figures in the Financial Overview. As the Defendants correctly pointed out, Mr. Hooft was not cross-examined on this particular passage in the presentation. It remains unclear as to what "unrealistic projections" LMS was referring. In my view, it is at least as likely that LMS was referring to the higher figures which had been in circulation at the end of 2008. If it was a reference to the much lower figures, then it is difficult to see why Mr. Nielsen was a possible "fly in the ointment". Furthermore, no allegation of fraud has been made against LMS, and it seemed to me that an allegation that LMS knew that Mr. Nielsen was working from

lower figures would come very close (particularly in the light of the correspondence leading to the 3 June e-mail) to an allegation of fraud against LMS.

589.    A variation on these themes was the reliance placed by the Defendants on the value placed by LMS on the acquired asset at the end of 2009. The value attributed to LMS' 53.3% stake in Updata Infrastructure in its annual report for 2009 was approximately £ 8 million. This implied that the value of 100% of the company as a whole was approximately £ 15 million; an increase of 29% on its acquisition cost. This 2009 valuation to an extent supported the Claimants' case the company was worth more than LMS paid for it, but also supported the Defendants' case that the figures put forward by the accountants were too high. I did not, however, consider that I derived any real assistance from this valuation. There was no information as to how this value, used for the purposes of LMS's annual report, was arrived at, and what criteria were applied. Moreover, I again do not consider that it is appropriate to value the asset, having regard to the expert evidence, by reference to the valuation of LMS alone.

*Approach*

590.    Accordingly, my approach to ascertaining the fair value of the relevant asset is to consider the four principal constituent elements which the experts used in their methodology, and to resolve the three issues on which they were in disagreement. In order to avoid unnecessarily complicating the analysis, I shall express my ultimate conclusions – as did the experts in the table set out above – by reference to a single figure, rather than identifying a range and then a figure at or close to the mid-point.

*Maintainable earnings*

591.    Both experts took as their starting point a figure for the financial year ("FY") 2009-2010 which was contained in a document called "Gross Profit Breakdown v10" which was prepared by Mr. Mantell. This document was last modified on 9 July 2009, shortly before the SPA was signed in the early hours of 11 July 2009, and therefore contains the management's figures on almost the eve of the sale. The EBITDA shown in this document was £ 7,469,000. However, Mr. Hall had identified that this figure wrongly failed to take into account certain overheads or administrative costs totalling £ 809,000. This meant that the figure of £ 7,469,000 should be reduced to £ 6,691,000 for the FY 2009-2010. This figure was somewhat higher than the equivalent FY 2009/2010 figure in the March Weighted Budget (which was £ 6,071,000), and this reflected Updata UK's strong performance since the time when that budget had been prepared. It should also be noted that the figure, whether £ 6,691,000 or £ 6,071,000, represented a very significant increase over the results for the FY 2008/2009 which had ended at the end of June. The company's results for the FY 2008/2009, as set out in due course in restated accounts for that year, were £ 1.869 million. Importantly, however, both experts agreed that the relevant starting point for maintainable earnings was the FY 2009/2010, rather than the "trailing" FY 2008/2009.

592.    Using this starting point of the "Gross Profit Breakdown v.10" prepared in July 2009, Mr. Hall then made an estimate of earnings for the subsequent years to June 2011, 2012 and 2013. He assumed that the company would win 8 new contracts per year in these subsequent years. This compared to 7 new contracts secured in the FY to June 2009, and 14 new contracts secured in the FY to June 2010. His projections for the subsequent years were £ 6.767 million (2011), £ 7.819 million (2012), and £ 9.161

million (2013). The weighted average of these figures, applying a greater weighting to the earlier years, was £ 7.200 million. Mr. Hall rounded this down to £ 7 million; a figure which he considered could reasonably have been assumed by the UK management of Updata UK at the date of the SPA to be the maintainable earnings of the company. It was this figure of £ 7,000,000 which is contained in the table set out above.

593.    Mr. Smethurst started at the same figure of £ 7.4 million contained in the "Gross Profit Breakdown v.10". But Mr. Smethurst reduced it to a range of £ 4.2 - £ 4.7 million, ultimately a mid-point of £ 4.5 million for maintainable earnings. The reductions from the £ 7.4 million starting point were made for a number of reasons. Mr. Smethurst considered that a willing purchaser would not ascribe any value to contracts which Updata UK had weighted as having a probability of 50% or below. He also reduced the weighting of 90% and 70% probability contracts to 70% and 50% respectively. He also considered a contemporaneous e-mail from Mr. Szpiro of LMS, setting out his views as to maintainable earnings. This e-mail (described in more detail below) showed year-on-year reductions in projected earnings, and Mr. Smethurst applied the same percentage reductions as shown in the LMS e-mail. He also applied a 10-25% reduction in gross profit on rental and installation revenue on the basis of likely public sector cuts. Mr. Smethurst's figure of £ 4.2 million assumed a 25% reduction, and his figure of £ 4.7 million reflected a 10% reduction. His figures also made allowance for the exclusion of overheads/ administrative expenses.

594.    Each expert supported his approach by reference to various factors. Mr. Hall referred to the fact that Updata UK's revenue was not derived from one off sales, with no following rental stream. Rather, its revenue and margins were incremental as it added new contracts, each of which would provide a revenue stream for multiple years and with the good prospect of renewal at the end. Although it was relevant to look at the wider economic and commercial environment when considering the value of Updata UK, including the global financial crisis in late 2008, it was also important to look at the report prepared by AMR in July 2009 as part of due diligence for LMS. This showed that, notwithstanding the crisis, AMR considered that Updata UK's business was likely to prove very successful. AMR reported positively on a revenue forecast of approximately £ 21.4 million for FY 2010, and EBITDA for that year of approximately £ 6.9 million. Mr. Hall drew attention to the forecast of maintainable earnings in the LMS e-mail of 29 June 2009. In his view, this supported a maintainable EBITDA level of approximately £ 7 million at that time.

595.    Mr. Smethurst referred to, and described in some detail, the wider economic and commercial environment. There was a general lack of available finance/ lending from banks to prospective purchasers. This, and the general economic climate, impacted upon the price that purchasers were prepared to pay in connection with corporate acquisitions. The number of corporate transactions was significantly reduced in 2009. The financial crisis also had an impact on the amount which local authorities were prepared to pay. Potential cuts to local authority spending were a matter of concern to Updata UK and a feature of the commercial landscape. Against this background, a prospective purchaser would not be looking at maintainable earnings of £ 7 million for a company which had never achieved EBITDA of anything approaching that level. The figure of £ 7 million represented a multiple of around 3.75 times the earnings achieved in 2009 (£ 1.869 million). It was not credible that a hypothetical purchaser

would use this value when considering how much to pay. Given the economic climate, a purchaser would take a more cautious view of contracts with only a limited chance of coming to fruition.  Mr. Smethurst also drew attention, in addition to the uncertainty and instability caused by the global credit crisis and the threats of cuts in public spending, to question-marks as to the continuity of the existing UK management. Although there were generally positive comments in the AMR report as to Updata UK's prospects, that report was not considering the amount that might be paid as between a willing buyer and seller, and did not contain a figure for maintainable earnings.

596.   It seemed to me that each expert made reasonably arguable points, as summarised above, in support of the views which each put forward. This is not a case where it would be appropriate to prefer the view of one expert against the other. I considered that a prospective purchaser would assess the company's maintainable earnings at some point on the spectrum between the figures which each expert put forward. I consider that the appropriate point would be marginally more towards Mr. Hall's figures than Mr. Smethurst's for the following reasons.

597.   First, I consider that it is helpful to look at the figures for maintainable earnings which were given by Mr. Szpiro of LMS in his e-mail to Mr. Bennett on 29 June 2009. These figures were not in any way influenced by the exigencies of the present litigation. The purpose of preparing figures was explained by Mr. Szpiro at the start of his e-mail as follows:

> "Richard
>
> Please find attached a summary headline P&L for years 2011-2014.
>
> To date we have focused on the 2009 out-turn and 2010 but we also need to give some consideration to the outer year figures as these will ultimately drive value on exit. To this end, it would be helpful if LMS could have a session with Vic, Jules and yourself at some point this week to discuss our broad assumptions. I will be in Reigate tomorrow but I know Pieter in particular would like to be present.
>
> The attached figures are LMS's base/conservative case figures and essentially build on the 2010 figures for "Current", "In the Bag" and "Weighted" (as per Julian's model, although here are small differences if trying to reconcile) by including further contract wins (called "New") which are not in the pipeline".

598.   Mr. Spiro therefore described the figures as "LMS's base/ conservative case figures". They built on figures which Mr. Mantell had provided. Mr. Szpiro made various assumptions as to further contract wins. He described the assumption applied to the "Total Contract Value" of new contract wins as "conservative" and "somewhat harsh". His figures showed wins, but the Total Contract Value was forecast to drop from £ 18.3 million in 2011 to £ 7.3 million in 2014.

599. The bottom line EBITDA figures, which were contained in the attachment to the e-mail, showed projections of: £ 7.4 million (2010); £ 6.515 million (2011); £ 6.633 million (2012); £ 6.791 million (2013); and £ 6.992 million (2014) see paragraph 119 above. The starting point for these figures, namely £ 7.4 million, was the same figure as in due course appeared in the July 2009 "Gross Profit Breakdown v.10" which both experts used. It was a figure which both experts agreed was overstated by around £ 800,000 because of the exclusion of overheads/ administrative expenses. It follows that the other figures for projected EBITDA, which assumed a 5% growth in administrative costs, would have been similarly overstated. After making this deduction, it will be seen that the figures for maintainable earnings in the years 2011-2014, as estimated by Mr. Szpiro, were between £ 5.7 million and £ 6.1 million.

600. Mr. Szpiro did not give evidence at the trial, but Mr. Hooft was asked about this document and said that he remembered it. He disagreed with the proposition that the figures were conservative. In particular, he took issue with the starting figure of £ 7.4 million, and said that LMS had far more detailed figures from Tenon. LMS's view for 2009/2010, he said, was "more in line of 5/6 million, not 7.4". (It will be recalled that the figure in the Tenon Memorandum was just over £ 6 million.) He explained that Mr. Szpiro was seeking to extrapolate into the future from contracts recently won. When asked whether these were "intended to be realistic conservative assumptions as regards what was expected to happen going into the future", Mr. Hooft said that he was just "disputing the word "conservative" because we at LMS did not think for example that 7.4 in 2010 was conservative."

601. I think that it is more likely than not that, notwithstanding Mr. Hooft's evidence, the figures attached to the e-mail were indeed intended to be conservative, which is what Mr. Szpiro's e-mail says. Because there has been no disclosure of LMS's internal documents in these proceedings, there are no other contemporaneous LMS figures available. Viewed overall, and bearing in mind the error in relation to overheads, I consider that the LMS e-mail is relevant evidence that a willing purchaser would conservatively assess the company's maintainable earnings looking into the future, and beyond FY 2010, as between £ 5.7 million and £ 6.1 million; i.e. a midpoint of £ 5.9 million. This is consistent with Mr. Hooft's evidence that LMS was looking at £5-6 million.

602. Secondly, I agree with Mr. Hall that the AMR report does provide a valuable contemporaneous insight as to the prospects of the business, again uninfluenced by the exigencies of litigation. I thought that it was contemporaneous evidence that counteracted the suggested negative or at least cautious approach which, according to Mr. Smethurst, would be taken by a prospective purchaser.

603. Thus, page 7 of the report describes how the company "took off in 2008." The AMR report as a whole serves to explain why the company had succeeded, and gave a very positive view as to its future prospects. In particular, the report contained a fairly detailed analysis of the market, and amongst the headline points were: "Updata is well positioned to renew existing local authority contracts; good growth is possible beyond the pipeline, subject to competition" (page 12); "Respondent interviews indicate a high likelihood of further contract renewals" (page 13); "Updata's pipeline is achievable at the probabilities Updata has assumed" (page 50); "Updata has good potential to add further customers in regions where it is already present, as the marginal cost of serving them is low" (page 18); "Through Logicalis, Updata has won

the PSBA, which will act as a springboard for additional Welsh contracts" (page 26); "Updata is a niche player in the local authority and education broadband market; its public sector focus is a relative advantage" (page 48); "High capital costs of an alternative provider, together with strong performance against KPCs [Key Performance criteria] make contract renewal highly likely" (page 54).

604.    Thirdly, I was not persuaded by Mr. Smethurst's discounting of the probabilities which had been assigned to Updata UK's pipeline. It seemed to me that not only Updata UK, but also Tenon, LMS and AMR, considered these probabilities to be reasonable. It is of course true that they were only assessments as to what might happen in the future, and that an assessment of a 10% probability of success by definition meant that there was a 90% chance of failure. However, I thought that a willing purchaser would expect some of the contracts with a 50% or less probability to come to fruition, not least because that is what must have happened historically (since the probabilities were assigned depending upon the stage reached).

605.    Fourthly, I thought that Mr. Smethurst's most powerful point was, as Mr. Hall recognised in his evidence, that a figure of £ 7 million is a very considerable step upwards from the amounts which the company had previously made. A purchaser might naturally take a cautious view as to whether this would be maintainable. I agree, and this is one reason why I would not accept Mr. Hall's figure of £ 7 million, and would reduce it to a figure of £ 5.8 million, which is towards the lower end of the range of £ 5.7 – £ 6.1 million to which I have referred. It is true that this is itself a considerable step up on the previous performance of the company, including the performance in FY 2008/9. Nevertheless, it represents a reduction on the figure in the Tenon Memorandum (just over £ 6 million) and a substantial reduction on the FY 2010 figure (correcting for administrative expenses) in the July weighted budget (£ 6.6 million). On the facts of the present case, however, such a step-up is justified. As the AMR report said, the company "took off" in 2008.  And to be fair to Mr. Smethurst, his figure of maintainable earnings of £ 4,500,000 does acknowledge a very considerable step up.

606.    For these reasons, I consider that a figure of £ 5.8 million is appropriate for maintainable earnings.

*Multiplier*

607.    Mr. Hall adopted a multiplier of between 5.0 and 7.0 in his estimate of value, with a midpoint of 6. Mr. Smethurst adopted a multiplier of 4.85 to 5.1, with a midpoint of 4.98. Each expert considered in detail a number of transactions in the market at the relevant time. Argument developed as to the extent to which these transactions were comparable. Mr. Hall accepted that determination of the appropriate multiplier is not an exact science.

608.    Here, I consider that it is again valuable to consider the contemporaneous evidence as to multiples, prior to the onset of litigation and the careful analysis carried out by the experts. Mr. Homann described himself as a reconstruction specialist, and he clearly had experience of mergers and acquisitions. In his note to Mr. Jorgensen in January 2009, he used a multiple of 5 times EBITDA. The same multiple of 5 was used by Mr. Nielsen in the various proposals which he made. It is true that LMS used a higher figure of 6.1 in their letter of 16 April 2009. But this was applied to historic results,

and was in any event a rationalisation of their offer which was based on repaying the bank, rather than an attempt to calculate the appropriate EBITDA multiple. Mr. Hildebrandt's evidence was that Mr. Nielsen's multiple of 5 was reasonable.

609.  In these circumstances, I consider that a multiple of 5 is appropriate.

*Premium for control*

610.  In Mr. Hall's first report, he expressed the view that a prospective purchaser would pay a premium of between 20% and 50% for control of a company, and that this should  in effect be an additional amount over and above the figure derived by multiplying EBITDA by an appropriate multiple. Mr. Hall chose the midpoint (35%) as being the appropriate premium for control. It was common ground that there should be some addition to reflect the premium for control; because the "multipliers" derived from comparable companies in the market were generally for small parcels of shares, and therefore did not reflect the premium that would be paid for control.

611.  In his first report, Mr. Smethurst identified a number of takeovers in the IT consultancy and data processing sectors in 2009. Mr. Smethurst identified the share price on the day before a takeover offer was made, and the share price which was contained in the takeover offer. The average premium was 22.6%, and the median was 19.8%. He therefore applied a 22% uplift for control.

612.  Mr. Hall's response, in his supplemental report, was that Mr. Smethurst's methodology of comparing the price offered with the price on the previous day was inappropriate, because it assumed that there was no market knowledge whatsoever of the transactions until they actually took place. Mr. Hall therefore looked at data relating to the companies identified by Mr. Smethurst, including in some cases the average share trading price 3 months preceding the date of the initial offer. He considered it reasonable to assume that in at least some of Mr. Smethurst's examples, the target's share price had already increased to reflect a proportion of the control premium. Mr. Hall's approach produced an average control premium of 34.07% and a median of 36.82%. It also resulted in a much narrower range of premiums for control, in contrast to the figures used by Mr. Smethurst which varied from 3% negative to 87% positive.

613.  In his supplemental report, Mr. Smethurst recognised that his previous methodology did not take account of information leakage that might have taken place prior to the day before the offer. He therefore looked at the share price one month prior to the offer. He excluded one takeover (Borland Software Corporation) which he described as an "outlier": in the case of that company, the one-month comparison showed a premium of 188%. Having excluded this outlier, Mr. Smethurst's figure was an average of 26.04% and a median of 23.11%. The midpoint of those two figures was 24.58% which Mr. Smethurst rounded to 25%. If the Borland transaction were to be included, then (on the basis of Mr. Smethurst's figures) the average would be 38.54% (i.e. close to Mr. Hall's figure of 35%) and the median would be 25.13%.

614.  The respective experts then carried out further analysis and expressed further views in their joint report. Mr. Hall considered in more detail a number of companies in Mr. Smethurst's list, and made certain corrections to Mr. Smethurst's calculations. For example, one of the companies (FDM Group Holdings PLC) had announced in June

2009 that it had received an approach. This was some time before one month prior to the offer, and it showed that Mr. Smethurst's bid premium was understated. In the case of another company (Valtech SA), there was a press article which referred to a premium of 43.1% compared to the average trading price of the shares during the three months preceding the filing of the offer. In the case of Sodifrance, there had been an increase in the company's share price in December 2008, following the signing of a memorandum of understanding. Mr. Smethurst's calculation of the bid premium for that company was, in Mr. Hall's view, understated: since he should have had regard to the share price between 17 November 2008 and 16 December 2008. In the case of Borland (Mr. Smethurst's outlier at 188.46%), Mr. Hall relied upon a press release which referred to a premium of approximately 67% over the average thirty day closing price. Accordingly, this "outlier" should not have been excluded.

615.    Having made these and other adjustments, Mr. Hall's figure for the average of the transactions was 38.75%, with a median of 36.12%. If Borland were excluded, the average was 35.93% and the median was 35.63%.

616.    Mr. Smethurst's response in the joint report was to carry out further work to try to identify evidence of communication or rumour of a deal for each individual transaction and to consider premium by reference to the share price at that time. He pointed out that Mr. Hall has used a variety of approaches, sometimes looking at a period of 3 months prior to the transaction, and sometimes at other data. Mr. Smethurst's reworked calculation produced an average of 35.75%, and a median of 27.4%, if all the companies were included; i.e. including Borland and Sodifrance where the bid premia were much higher than the rest (87.5% and 89.75% respectively). In Mr. Smethurst's view, however, these companies were outliers. Excluding those companies, the average was 26.15% and the median was 25.71%. The midpoint of the average and median premia was 25.93%; i.e. just above the 25% which Mr. Smethurst had selected. Mr. Smethurst did not, however, exclude a company (RGI SpA) which appeared to be an "outlier" in terms of the low bid premium (2.39%).

617.    In my view, reviewing this body of data as a whole, I consider that Mr. Hall's initial assessment of 35% was justified. This was done by Mr. Hall on the basis, without detailed analysis, that bid premia usually fall within the range of 20 – 50%. However, it seemed to me that that broad estimate was ultimately proved to be valid. When considering Mr. Smethurst's final table: of the 13 transactions referred to, 7 fell within this range and one (Carl Lamm) was only just outside it. Furthermore, if all 13 transactions are included, the average was (on Mr. Smethurst's figures) 35.75%. I was not persuaded that it was appropriate, in what seems to me to be a fairly broad-brush exercise, to omit two of the transactions completely on the basis that they were "outliers". I think that it is reasonable to look at all of the data, and on any view to include at least a substantial part of the premium paid for those companies.

618.    Furthermore, if those two "outliers" were to be excluded, then so should the low "outlier" (RGI SpA). If this is done, the average moves to 28.52% and the median to 27.4% on Mr. Smethurst's figures. Both of these numbers are higher than Mr. Smethurst's selected figure of 25%. However, the average on Mr. Smethurst's figures for all companies (35.75%) corresponds very closely with the average as calculated by Mr. Hall (38.75%), and I do not attach great significance to the fact that Mr. Hall has sometimes looked at different date ranges in order to derive his average figures.

*Conclusion*

619.   The relevant calculation of the fair value of Updata Europe's 60% shareholding is therefore as follows:

| Multiplier | 5.00 |
|---|---|
| £ 000's | |
| EBITDA [A] | 5,800 |
| Implied Total Enterprise Value ([A] x Multiplier) | 29,000 |
| Less: Net debt | 100 |
| Equity value (minority basis) [B] | 28,900 |
| Plus premium for control (B x 35%) | 10,115 |
| Equity (controlling basis) [C] | 39,015 |
| Less private company discount 33% (C x 33%) | (12,874) |
| Fair value of equity | 26,141 |
| Value of 60% | 15,684.6 |

*Calculation of Damages*

620.   On the basis of my conclusion in Section H, I assess the chances of Updata Europe obtaining fair value for its shareholding at 75%. Accordingly, the loss suffered by Updata Europe (and potentially claimable by Vald. Nielsen as assignee) is £ 11,763,450 (£ 15,694,600 x 75%) less the amounts actually received (£ 5,244,798). I therefore assess damages, subject to the question of assignment, at £ 6,518,652.

## J:    Assignment

## J1:    The shape of the arguments

621.   In January 2011, three deeds of assignment were signed by various signatories. These were as follows.

  i)     A "long-form" deed of assignment entered into by Updata Europe as assignor, Vald. Nielsen as assignee, and "other Persons" listed in the Schedule. Those other persons were all (bar one, Mr. Bremerskov)  the former shareholders in Updata Europe at the time of the SPA: Vald. Nielsen itself, Mr. Johnsen, Jorgen Johnsen, Kirsten Johnsen and Mr. Hildebrandt. The subject matter of the assignment was "all the Assignor's right, title and interest under and in respect of the Share Purchase Agreement and the Shares". The assignment to Vald. Nielsen was "for and on behalf of" the persons listed in the Schedule. The governing law of this long-form assignment was Danish law.

  ii)     A "medium-form" deed of assignment. The parties and signatories were the same. This assignment was governed by English law.

  iii)    A "short-form" assignment, again with the same signatories and also governed by English law.

622.    Each of these agreements was dated in handwriting, on the front page, "19 November 2010". On the first page of each agreement, the opening words were: "THIS DEED is dated 19.11 2010 …" Again, the date was handwritten. Each page was also initialled, and on the final page of each document there was a date underneath Mr. Johnsen's initials: "19.11.10".

623.    There was no dispute that the various signatories had not signed the documentation on 19 November 2010. The signatures were applied at various dates in the first half of January 2011. The three deeds of assignment had been sent, undated and unsigned, by Mr. Birkeland to Mr. Johnsen on 22 December 2010, and were then sent on to Mr. Homann later that day. They were then sent again by Mr. Johnsen to Mr. Homann on 5 January 2011 under cover of an e-mail described below. They were then signed by three signatories on behalf of Updata Europe: Mr. Bigaard, Mr. Allan Bartroff, and Mr. Kaj Kristiansen. The Claimants suggested that these individuals may have signed in late December or at some date prior to 3 January. But I think it unlikely that they were signed prior to Mr. Johnsen resending the documents on 5 January.

624.    Mr. Johnsen then picked up the signed documents from Mr. Homann in Copenhagen on 6 or 7 January. The deeds at that time already had the handwritten date of 19 November: the manuscript date on the cover page was in Mr. Homann's handwriting. Having received them from Mr. Homann, Mr. Johnsen then collected the remaining signatures. The documents were signed by Mr. Jorgen Johnsen on behalf of Vald. Nielsen, and by the other signatories. This signature process was completed by 15 January 2011, and the original documents were then delivered to Mr. Birkeland on Monday 17 January.

625.    The Defendants' original pleaded case as to the validity of the assignments started with a relatively narrow argument based on champerty and failure to obtain consent to the assignment in accordance with the terms of the SPA. Following disclosure, the case then expanded very considerably in the re-amended defence, served in January 2017, so as to allege, in substance, deceit against Vald. Nielsen and all the other "Signatories" on the Vald. Nielsen side of the fence (the three members of the Johnsen family, and Mr. Hildebrandt), as well as Mr. Birkeland. In 2018, there was a further amendment to allege deceit on the part of the Updata Europe signatories. There was, however, no pleaded allegation of deceit against Mr. Homann, who died before the further expansion of the pleading in 2018. The pleaded defence on this issue occupied many pages. The deceit related to the backdating of the assignment documents.

626.    As the trial and cross-examination progressed, however, it appeared to the Claimants that the Defendants' case was narrowing. In particular, there was no cross-examination of Mr. Jorgen Johnsen, Mr. Hildebrandt, or Mr. Birkeland on the basis that they had acted deceitfully in relation to the assignment documentation. On 23 April 2019, prior to submission of written closings, the Defendants' solicitors wrote in connection with the "obvious narrowing of the Defendants case" and identified the factual points that they would be pursuing in their closing argument concerning alleged wrongful behaviour in connection with the assignment.

>        "3. In essence, the Defendants' case is that Mr Bigaard, Mr Homann and Mr Peter Johnsen had actual knowledge that the contracts of assignment were being (and thus intended that they

be) backdated to 19 November 2010 for a deceitful purpose – namely, to mislead the Supervisor and/or creditors. Further, and as Mr Rosing confirmed (day18/160/16 – day18/161/3), assuming Mr Homann and Mr Peter Johnsen were acting as agents with authority to negotiate on behalf of Updata Europe and Vald Nielsen (and the other shareholders of Updata Europe named in the Schedule to the contracts of assignment) respectively as their principals (as the Claimants themselves allege), then their principals (namely, the eventual parties to the contracts of assignment) are treated as having the same knowledge and state of mind as Mr Homann and Mr Peter Johnsen.

4. Further or alternatively, the Defendants will contend that, whether or not Mr Bigaard and/or Mr Peter Johnsen knew of the precise purpose of the backdating (namely, to deceive the Supervisor/creditors) they at least knew (at the time of the back-dating of the contracts) that the contracts were backdated, and that there had been no binding oral agreement on 19 November 2010. On the assumption that at least Mr Homann knew of the deceitful purpose, that is sufficient to invalidate the contracts of assignment, on the alternative basis described by Ms Gernaa (day20/50/12 – day20/51/17)

5. In light of these facts and the provisions of section 5.1.2 of the Danish Act of King Christian V, the Defendants will contend that each of the assignment agreements falls foul of Danish morality/public policy and is therefore invalid or not binding as a matter of Danish law. Likewise, if and in so far as necessary, the Defendant will contend that such agreements are unenforceable as a matter of English law or public policy.

6. Beyond the essential matters set out above, the Defendants will not be seeking primary findings regarding wrongdoing concerning assignment from the Court in closing arguments. That does not, of course, preclude the Defendants from making points relevant to credibility or honesty, or alleging that any of the Claimants' witnesses had an intention to mislead or did not give truthful evidence on matters relevant to those primary findings. "

627.    In the course of oral closings, Mr. Choo Choy also confirmed that no case was being pursued in relation to champerty or that there had been a lack of consent to the assignment.

628.    In their written closings, the Claimants drew attention to the various changes in the Defendants' case, suggesting that they were scrabbling around in order to know what their case was. I did not think that there was any substance to this line of argument. The Defendants were not party to the discussions which led to the assignment, and had no knowledge of the facts save as they emerged from the documents, witness statements and evidence given at trial. It is not surprising that, as the Defendants'

legal team learned more about what had happened, their case narrowed or altered in certain respects.

629. Nor was I impressed with any of the pleading points that were taken in the Claimants' closing argument. It seemed to me that the case was sufficiently pleaded, indeed was pleaded in some considerable detail. It is true that the Defendants' case originally involved allegations of deceit against more individuals on the Vald. Nielsen side than Mr. Johnsen. However, a case was always made against Mr. Johnsen, and I did not consider that the Claimants can reasonably complain that there was no pleaded case that, as a matter of Danish law, Mr. Johnsen's knowledge was to be attributed to Vald. Nielsen. The pleading contains clear allegations against Mr. Johnsen. Since it was Mr. Johnsen who had carried out the negotiations with Mr. Homann, and was the only person on the Vald. Nielsen side who did so, it would ordinarily follow (certainly if English law were being applied) that Mr. Johnsen's knowledge would be attributed to Vald. Nielsen. If it were to be suggested that Danish law produced some different result, then it would be for the Claimants to prove that Danish law as to attribution was different to English law. In the event, Mr. Rosing (the Claimants' Danish law expert) confirmed what might be thought to be the ordinary position in his evidence; namely that where the terms of a contract are negotiated by agents on behalf of their principals, the knowledge of the agent acquired in the course of the negotiation is treated as the knowledge of the principal. He agreed at the conclusion of his evidence that if such agents were to share an intention to deceive a third party through backdating, an agreement negotiated by such an agent would be unenforceable: because the knowledge of the agent would be assumed to be the knowledge of the principal.

630. Accordingly, I consider that the Defendants' case should be addressed on the merits and the facts. The critical factual issue which arose on this defence was whether or not the backdating was for a deceitful purpose, namely to mislead the Supervisor of Updata Europe and/or its creditors, and if so who was party to any deceitful purpose. If there was such a deceitful purpose, then issues arose as to what were its consequences, both under Danish law and under the approach now taken to illegality under English law. The Claimants' case was that there was no deceitful purpose to the backdating, and that in any event no-one on the Claimants' side (and specifically Mr. Johnsen) was aware of this deceitful purpose. They also contended that even if an intention to deceive the Supervisor or creditors could be demonstrated, the assignment remained valid under English law.

## J2: The facts

631. In order to address this defence, it is necessary to set out the background facts in more detail. Evidence as to the circumstances in which the three deeds of assignment came to be made was given at trial by Mr. Johnsen, Mr. Bigaard and Mr. Birkeland. Mr. Homann had addressed the assignment in his witness statement signed in October 2016, prior to the expansion of the case to allege deceit against the various signatories on the Vald. Nielsen side. My description of the facts below includes my findings based on the evidence of the various witnesses.

632. In the spring of 2010, Mr. Johnsen and Mr. Hildebrandt were already contemplating bringing proceedings against the Defendants (and possibly others) arising out of the sale transaction and their view that they had been misled. Mr. Birkeland at that time

took advice from English counsel, whom I understand to have been Mr. Richard Boulton (now QC) of One Essex Court. One potential difficulty, however, was that it was Updata Europe that had sold its shares under the SPA, and that company had now been acquired by companies owned by Mr. Bigaard. This led to the idea that there could be an assignment by Updata Europe of its rights to the former owners of Updata Europe who had, on the proposed case, lost out as a result of the conduct which had led to the sale at an alleged undervalue.

633.    In the latter part of 2010, Mr. Johnsen began discussions with Mr. Homann as to a possible assignment. These discussions began in October or November, but prior to the meeting on 19 November described below. Mr. Johnsen explained to Mr. Homann that he considered that Updata UK had been sold at an undervalue, and that he wanted to bring a claim against the UK management to reclaim the loss that he and the other shareholders in Updata Europe had suffered. Mr. Homann was by now working closely with Mr. Bigaard in relation to the business of Updata Europe. As Mr. Homann explained in his written statement, after the sale of Updata Europe to Mr. Bigaard, Mr. Homann continued to work with Updata Europe and he had authority to act on its behalf on various matters.

634.    The possibility of an assignment clearly had its attractions to Mr. Homann. Updata Europe had owed monies to KPMG, and as part of his settlement package upon leaving KPMG, Mr. Homann had taken an assignment of the debt. A successful claim against the UK management could produce funds which would enable this debt to be paid, as well as possibly other unpaid debts of Updata Europe. Equally, there was in practical terms no real downside to Updata Europe, or Mr. Bigaard, from assigning the potential claims. Mr. Bigaard had no interest in pursuing such claims himself: as he said in evidence, the Updata Europe group had many problems which occupied him at that time. The pursuit of a claim against the former management would be potentially expensive, and its prospects would have appeared very uncertain, and in practice it could not be pursued without the assistance of the former shareholders in Updata Europe. Mr. Bigaard could also see some positive advantages to an assignment. If the Johnsens recovered monies, that might encourage them to invest again in Updata Europe. In addition, a recovery might enable some of the debts of Updata Europe to be paid. Mr. Bigaard was happy to leave Mr. Homann to carry out the discussions. He described Mr. Homann as very skilled accountant and also an experienced businessman, and "so I trusted him to make the best agreement for him and the group when he was on his way to negotiate with Mr Johnsen". Mr. Bigaard therefore left things to Mr. Homann and did not follow the detail of the discussions.

635.    Mr. Homann and Mr. Johnsen prepared to meet for further discussion on 19 November. Prior to that meeting, Mr. Johnsen had been in communication with Mr. Birkeland, and there had been discussion of a figure of DKK 2 million that would be paid to Mr. Homann if there were to be an assignment and the proceedings against management succeeded.

636.    Mr. Homann described the discussions and the meeting in paragraphs 38-41 of his witness statement. He said that he had authority to negotiate on behalf of Mr. Bigaard. He described how at the meeting, he and Mr. Johnsen "reached an agreement on the broad terms of what was being assigned by Updata Europe and how that assignment was to be paid for". The agreement he described was that Updata Europe would assign any interests it had under the SPA to the Updata Europe shareholders at the

time (i.e. the Johnsen family and Mr. Hildebrandt). In return for the assignment, any compensation or damages that were received would be used to repay certain debts of Updata Europe which had not been paid from the proceeds of the original sale of Updata UK. Such compensation would be used to repay DKK 1 million in respect of the debt to KPMG which had been assigned to Mr. Homann, and a further DKK 250,000 in respect of other debts. Mr. Johnsen's evidence was, also, that he reached an agreement with Mr. Homann at that meeting. Both Mr. Birkeland and Mr. Hildebrandt, neither of whom attended the meeting, gave evidence that they were told that an agreement had been reached.

637. The Defendants did not dispute that there had been a meeting on 19 November 2010, but they contended that agreement reached was only no more than an agreement in principle rather than a legally binding oral agreement. They contended that this must have been understood by the participants, who would have known and understood that an agreement would have to be documented and signed before it was binding. They also contended that the documents indicated that the parties to the assignments were at that stage considering, or were agreed upon, DKK 2 million as being the sum that would be paid to Mr. Homann, and that it was only at a later stage that this was reduced to DKK 1 million. I will return to these controversial issues below.

638. What is clear is that Mr. Johnsen did speak to Mr. Birkeland that same day, and Mr. Birkeland immediately started working on a draft "Assignment and Name Lending Agreement". The metadata for the first draft of the document shows that the document was created at 19.34 on Friday 19 November 2010. Mr. Birkeland worked on it over the weekend, and it was last modified on the evening of Sunday 21 November at 18.51. He then sent it to Mr. Johnsen at 18.53 on the Sunday evening under cover of an e-mail saying:

> "Let's discuss. I suggest that we get the barrister to read through the assignment/ name lending [document]".

639. The draft agreement was between Updata Europe and Vald. Nielsen, and had an English governing law clause. Clause 4 contained a provision allocating compensation realised from the assigned rights of action. The first priority was DKK 2 million "owed by the Assignor to Helge Homann in relation to the fees originally owed by the Assignor to KPMG as per 11 July 2009 (and subsequently assigned to Helge Homann". The second priority was towards the discharge of DKK 250,000 "related to other obligations of the Assignor as per 11 July 2009 (and which remains outstanding)". The balance was to be "paid in full to the Assignee".

640. On 22 November 2010, and before Mr. Birkeland had sent the draft agreement to counsel, Mr. Johnsen e-mailed him with a request from Mr. Bennett. Mr. Bennett was concerned about a tax liability arising out of the way in which the original SPA documentation was drafted. Some £ 500,000 in tax could be saved if the parties entered into a deed of rectification. Mr. Bennett asked Mr. Johnsen to whom he should send "the documentation for agreement on behalf of NewWatch". Mr. Birkeland responded:

> "If new agreements are going to be signed, the EU should probably also sign. The question is whether they have contacted the EU".

The reference to "EU" was to Updata Europe. The e-mail is relied upon by the Defendants as indicating that Mr. Birkeland did not at that stage consider that there had been a binding assignment of rights from Updata Europe to Vald. Nielsen. Otherwise, it was argued, Mr. Birkeland would have referred to the need for Vald. Nielsen to sign as assignee, rather than Updata Europe.

641.    On 23 November 2010, Mr. Birkeland sent the draft Assignment and Name Lending Agreement to the clerk at One Essex Court, copied to Mr. Boulton. Mr. Birkeland's e-mail stated:

> "As mentioned we have now got an opportunity to have assigned the Rights of Action and/or use the name of the vendor company in a potential action against the management team.
>
> I would be grateful if Richard Boulton could review the agreement before we produce it to the new owners of Updata Europe A/S. Please let me know when you expect that Richard Boulton would be able to revert with his comments.
>
> My clients have not been on the best terms with the new owners of Updata Europe A/S in the past and there is a risk that they will change their mind if the circumstances in Denmark that have made this arrangement possible change. I therefore hope that we can proceed with this agreement as soon as possible".

642.    Each side relied upon this e-mail in support of their contention as to whether a binding agreement had or had not been reached. The Claimants referred in particular to the reference to the risk of Updata Europe changing their mind, as indicating that an agreement had been reached and that Mr. Birkeland was concerned to avoid the risk that Updata Europe would change its mind and try to walk away. The Defendants referred to the reference to "opportunity to have assigned" as indicating that what existed was an opportunity, but that nothing firm had been agreed.

643.    Mr. Boulton (who was at that time in Singapore) gave some initial advice by e-mail on 25 November, raising a number of queries and issues, including questions of champerty. It is not necessary to describe these in detail. On 30 November, Mr. Birkeland indicated that it would be best to discuss the matter further when Mr. Boulton returned to London. That discussion took place on the evening of 15 December, following which Mr. Birkeland sent through a revised draft. It was at this stage that the documentation changed from being a single agreement to three agreements. Mr. Birkeland explained to Mr. Boulton the idea behind the three agreements in the following terms:

- UK Rights of Action: Assignment subject to English law (where the "consideration" is not specified) which is to be produced to the court;

- DK Rights of Action: Assignment subject to DK law where the Consideration is specified – not to be disclosed to the court.

- UK Assigned of Rights: This does not include "Rights of Action" and may be used e.g. to execute other documents related to Updata on more "amicable terms" without disclosing that we also consider to pursue the "Rights of Action".

644.    Apart from now comprising three agreements, the drafts included other changes to the previous version, including making the "other Persons listed in the Schedule" party to the agreement. This was considered to be a way of addressing possible arguments on champerty.

645.    Mr. Boulton replied on 16 December 2010, with various comments. He stated that he could not advise at this stage on what documents might need to be provided to the English court. "It is possible that the Danish version would need to be produced". He appears, however, to have had no difficulty in principle with the idea that there should be 3 agreements.

646.    By this time (16 December), nearly a month had passed since the 19 November meeting between Mr. Johnsen and Mr. Homann. There had been no further discussions about the assignment between them. None of the drafts had been sent to Mr. Homann for comment. The work on the documentation that was being done was carried out by Mr. Birkeland with the assistance of Mr. Boulton. Mr. Johnsen himself had not, by this stage, commented to Mr. Birkeland on any of the drafts. It seems likely that this was because there was little point doing so whilst the terms of the documentation were still under discussion between Mr. Birkeland and Mr. Boulton. But this changed shortly afterwards.

647.    A meeting was arranged between Mr. Johnsen, Mr. Homann and Mr. Birkeland for the evening of 21 December. Prior to that meeting, probably on the previous day, Mr. Birkeland went through a draft of the agreements with Mr. Johnsen. At this point, the consideration clause still referred to Mr. Homann receiving DKK 2 million. According to Mr. Birkeland, it was at this time that Mr. Johnsen pointed out that Mr. Homann had actually agreed a lower figure, namely DKK 1 million. Mr. Birkeland then amended the draft on 21 December, which he completed at around 1 pm or 2 pm. This was done prior to the meeting with Mr. Homann that evening. Although they were by that time in final form, the drafts were not given to Mr. Homann at that meeting. They were, however (as described above) sent by Mr. Birkeland to Mr. Johnsen, and then to Mr. Homann, on the following day (22 December). These were in the form which Mr. Birkeland had completed prior to the meeting.

648.    Mr. Homann was clearly content with the drafts. He did not raise any points or seek to negotiate. They were in due course signed by Mr. Bigaard and others in early January, as described above.

649.    Prior to signature, however, there had been a significant development. On 3 January 2011, Updata Europe was made the subject of a supervisory order by the Danish bankruptcy court. The court hearing was attended by both Mr. Bigaard and Mr.

Homann. A Supervisor, Mr. Finn Jepsen, was appointed over its affairs. This is akin to administration. As a matter of Danish law, as described below, any material contract concluded after that time required the consent of the Supervisor. From that date, it is common ground that Updata Europe was not entitled to enter into material contracts without the Supervisor's consent. Mr. Jepsen was not asked to and did not consent to the assignment. There was no dispute that the assignment was a material contract.

650. Two days after this appointment, on 5 January 2011, Mr. Johnsen sent an e-mail to Mr. Homann. He enclosed further copies of the agreements which had been sent on 22 December. The e-mail stated:

> "Hi Helge.
>
> Here are the electronic copies of the agreements entered into on the 2nd of October 2010"

651. Mr. Johnsen described this e-mail as very peculiar and he could not explain the reference to 2 October. He also denied knowing about the appointment of Mr. Jepsen at the time. I do not accept this evidence. I have no doubt that Mr. Homann did tell Mr. Johnsen about the appointment of Mr. Jepsen, and that this created a potential problem in relation to the assignment documentation which at that stage had not been signed. There must in my view have then been some discussion about the possibility of backdating the documentation, and Mr. Johnsen in his e-mail was intending to lay the groundwork for backdating; by suggesting that the agreements had been concluded in early October. I also infer that Mr. Homann did not consider this date (2 October 2010) acceptable or justifiable. It may well be that there had been discussions about the possible assignment on or around 2 October, but there was no basis for saying that any agreement had been concluded at that time. So instead it was Mr. Homann who identified the relevant date as 19 November, and this was the date which he inserted at the start of the documents which Mr. Bigaard and others signed.

652. I also was unpersuaded by Mr. Johnsen's evidence that he added the date "19.11.10", to his initials on the final page of the assignments, in order to make it clear that the final signature pages were linked to the assignment documents themselves. This could have been done by simply stapling the signature pages to the rest of the document, and in any event it is difficult to see that there was any room for doubt as to whether the final signature page formed part of the document. I therefore agree with the Defendants that this dating was done as a method of Mr. Johnsen reinforcing the date of 19 November 2010 which appeared at the start of the assignment documentation. Mr. Johnsen's decision to do this was, in my view, indicative of the fact that he had previously been told by Mr. Homann about the appointment of the Supervisor, and that backdating was necessary in order to avoid potential arguments.

653. I should also describe two other developments which are relevant to the parties' arguments in relation to the assignment.

654. First, it will be recalled that on 22 November, Mr. Bennett had raised the need for a deed of rectification. Mr. Birkeland in due course received documentation, and wrote to Mr. Hildebrandt and Mr. Johnsen about it on 4 December 2010. In his e-mail, he said:

> "Please particularly note that Updata EU needs to sign. This may give us the opportunity to be "foresightedly/ preventively critical" and still cooperative".

The first sentence is relied upon by the Defendants in support of its argument that Mr. Birkeland appreciated that there was not yet any concluded assignment: hence his reference to the need for Updata EU (not Vald. Nielsen as assignee) to sign. The second, rather cryptic sentence, referred to the fact that Mr. Birkeland saw the utility of the request for a deed of rectification; since this would provide an opportunity to give notice of the assignment as and when it was signed.

655. This particular aspect of the story continued as follows. On 22 December, Mr. Birkeland wrote to Mr. Inkester of Nabarro LLP, who was dealing with the proposed deed of rectification on behalf of the new UK company and its shareholders, including the Defendants. Mr. Birkeland said that he had met with Mr. Homann "in relation to some other matters. There may be an opening in relation to UE as well, but it is still too early to tell. I will revert when I have something more concrete in this respect". Mr. Birkeland did not therefore tell Mr. Inkester that there had been an assignment. On 28 January 2011, after the documentation had been signed, Mr. Birkeland wrote to Mr. Inkester commenting on the Deed of Rectification. His e-mail concluded:

> "We should also now have found a solution for the purpose of Updata Europe A/s. As mentioned to you the board of directors in Updata Europe A/S has agreed to and assigned all rights related to the Share Purchase Agreement to Vald. Nielsen Holding A/S (a company owned by Jorgen Johnsen and Kirsten Johnsen) as part of a larger settlement of outstanding matters in Denmark. The assignment also include a power of attorney to sign documents on behalf of Updata Europe A/S if that is more appropriate".

656. Subsequently, on 14 February 2011, Vald Nielsen signed the Deed of Rectification as assignee of Updata Europe. This Deed of Rectification was beneficial to the Defendants, and the new UK company in which they owned shares, because there was a substantial tax saving. The Defendants did not at that stage seek to investigate or take any point on the validity of the assignment documentation, or even to ask to see it. However, the fact that the Defendants willingly signed the Deed of Rectification, thereby acknowledging Vald. Nielsen as assignee, was no doubt one reason why (belatedly) the Defendants abandoned their argument based upon lack of consent to the assignment.

657. Secondly, the appointment of Mr. Jepsen as Supervisor lasted a very short time. His appointment was terminated in April 2011, so that Updata Europe then returned to being in control of its own affairs. There has been no suggestion that any creditors of Updata Europe have in fact been prejudiced by the assignment, or by the fact that during his brief period of office Mr. Jepsen did not consent to it.

## J3: Danish law

658. Evidence as to Danish law was given by a number of experts. The Claimants' expert was originally Mr. Jens Rostock-Jensen, a partner in Kromann Reumert. His original

report addressed contractual issues concerning the Danish law relating to assignments, and his subsequent report addressed bankruptcy/insolvency issues concerning the effect of the appointment of the Supervisor. The Defendants' expert on the contractual issues was Ms. Henrietta Gernaa, a partner in Gorrissen Federspiel. These two experts then produced a very helpful joint memorandum on the contractual issues. There was in fact very little disagreement between them. The Defendants also served a short expert report from Mr. Peter Nørtved, a senior legal counsel also with Gorrissen Federspiel. This addressed Danish bankruptcy/insolvency law, and gave rise to Mr. Rostock-Jensen's report on that topic.

659.   By the time of the trial, however, Mr. Rostock-Jensen could not, owing to illness, be available to give evidence. His place was taken by two of his partners at Kromann Reumert: Mr. Jakob Rosing, who addressed the contractual issues and Ms. Kamilla Krebs who addressed the bankruptcy/insolvency issues. Those witnesses had considered the previous reports, including the joint report, of Mr. Rostock-Jensen and, subject to some relatively minor qualifications, adopted what he had said. There was rightly no objection to these witnesses substituting for Mr. Rostock-Jensen in this way.

660.   At trial, Mr. Rosing and Ms. Gernaa were both cross-examined, albeit not at great length, but in a manner which assisted in explaining the points made in the written reports. Ms. Krebs and Mr. Nørtved were also cross-examined, but very briefly indeed. I considered that all the experts sought to assist the court on the Danish law issues, and that there was in truth very little material disagreement between them. Furthermore, the narrowing of the Defendants' case as to the invalidity of the assignment – and in particular the fact that reliance was no longer placed upon the fact that consent to the assignment had not been sought in advance – meant that some of the issues addressed by the experts are no longer of importance. The expert evidence on the contractual issues also strayed, perhaps inevitably, into questions as to how a Danish court would approach the factual evidence in a case. Neither side, however, placed significant reliance on this aspect of the Danish law expert evidence, and rightly so. The role of the experts was to identify the relevant principles of Danish law. The determination of how that law applies to the facts of the present case is a matter for the English court. The assessment of the strength or otherwise of the evidence in that regard is also a matter for the English court, applying its own approach to the evidence rather than any particular approach that might be taken by a Danish judge.

*Danish law as to bankruptcy/insolvency*

661.   In order to understand the nature and relevance of the case advanced on the contractual issues, it is appropriate to start by describing the material aspects of the evidence concerning the insolvency issues.

662.   The factual background can be summarised shortly. In the latter half of 2010, a bankruptcy petition against Updata Europe was issued by a company called Krone Kapital A/S. At around the same time, Krone Kapital, Deloitte and acompany called Actelis Networks (Israel) started bankruptcy proceedings against Updata Denmark. A hearing of the petition against Updata Europe took place on 3 January 2011. At that hearing, the Bankruptcy Division of the Danish Maritime and Commercial Court decided to postpone the bankruptcy petition which had been filed against Updata

Europe. During the "postponement period", Mr. Jepsen was appointed as Supervisor. In April 2011, however, the postponement period was lifted, and the company returned to normal operations.

663.    The Danish Bankruptcy Act, section 15, provides as follows:

> "The debtor may not enter into transactions of material significance without consent from the appointed supervisor. No debts may be paid, unless in accordance with the order of priority of creditors, or if such payment is necessary to avert loss".

664.    Ms. Krebs, adopting the report of Mr. Jens-Rostock, explained the consequences of a transaction entered into with or without the consent of the supervisor. This evidence was not controversial and was not therefore cross-examined upon:

i)    The requirement for supervisor consent is intended to guard the interests of the creditors.

ii)    If a transaction is entered into with the consent of the appointed supervisor, the counterparty is entitled to preferential payment in a subsequent bankruptcy estate. The consent of the appointed supervisor also has the effect that the transaction is subject to extended protection against avoidance of the transaction in the event of a subsequent bankruptcy.

iii)    The lack of supervisor consent does not, however, automatically render the transaction void or invalid as the authority to act is still with the debtor. A counterparty who has acted in good faith will be able to uphold the transaction.

iv)    One leading scholar has specifically addressed the situation where (as happened with Updata Europe) the debtor regains full authority over his assets, because no actual bankruptcy was declared. In those circumstances, the debtor will be bound by the transaction which had been entered into without consent.

665.    Ms. Krebs therefore expressed the view that the rules on consent from the supervisor were intended to guard the interests of creditors, in the event that the company was insolvent and was subsequently declared bankrupt. But in the event that the postponement period ceased (as happened in April 2011), and the debtor resumed ordinary business and regained full authority over his assets, the interests of creditors were sufficiently protected by the ordinary rules on management liability. According, in a situation where the debtor has resumed business and there is no bankruptcy, there is no basis for claiming that a prior transaction entered into without consent is (simply because of the lack of consent) invalid. The debtor is therefore bound by the transaction. Accordingly, the lack of consent is inconsequential in the event that the debtor resumed his ordinary course of business, as was the case with Updata Europe. As Ms. Krebs summarised the position in paragraph 13 of her report:

> "it is my opinion that a transaction entered into without the consent of a supervisor, would not at a later stage be impeached due to the lack of consent from the supervisor, in the event that

> the debtor has subsequently resumed his ordinary course of
> business and is not declared bankrupt".

666.    Since this evidence was uncontroversial, it followed that the Defendants could not
rely simply on the lack of supervisor consent as invalidating the assignments. If the
assignments were to be invalidated under Danish law, some different principle would
need to be identified so as to achieve that result.

*Contractual principles*

667.    The relevant legal principle relied upon by the Defendants was summarised in the
joint report as follows:

> "The experts agree that if an agreement has been backdated
> with an intent to defraud/deceitful intent, e.g. misleading a third
> party, the agreement will be invalid".

668.    The situation where there is an intention to defraud or deceive is to be contrasted with
a case where there is what might be described as legitimate backdating. Thus, as Ms.
Gernaa explained in her report, contracting parties may decide to date a document or
an agreement on a day which falls before the document's signature. In her opinion,
Danish law would give effect to a backdated agreement:

> "where the purpose of the backdating is to give formal approval
> to an oral agreement that was in fact entered into on the earlier
> date on the same terms. However, if the agreement has been
> backdated with an intent to defraud/deceitful intent, e.g.
> misleading a third party, the agreement will be invalid".

669.    This passage of Ms. Gernaa's report was then reflected in the joint report, where the
experts agreed that "Danish law would give effect to a backdated agreement where
the purpose of the backdating is to give formal approval to an oral agreement that was
in fact entered into on the earlier date on the same terms".

670.    In his evidence, Mr. Rosing explained that it was not necessary for the prior oral
agreement to have contained precisely the same terms as those contained in the
subsequent written document, in order for Danish law to give effect to the backdated
agreement. In his view, it would "suffice if the main terms of the contract were agreed
upon at the earlier date". He illustrated this point by drawing a distinction between
terms of the written agreement which fleshed out the earlier oral agreement, and terms
of the written agreement which changed it. An example of the former category would
be a case where the parties had agreed the main terms orally, but had not given
thought to the question of governing law. If the subsequent agreement contained a
provision for governing law, Danish law would uphold the backdated agreement (i.e.
as taking effect on the backdated date), even though Danish law was not a matter
which had featured in the parties' discussions. An example of the latter category
would be a case where the parties had agreed on a consideration of DKK 2 million,
and had subsequently changed the agreement so as to provide for a consideration of
DKK 1 million. In that situation, a main term would have been changed. This aspect
of Mr. Rosing's evidence was not substantially disputed by Ms. Gernaa. She agreed in
her evidence with the proposition that "as long as you have the main terms of the deal

agreed, the fact that there are other things to be fleshed out … doesn't alter the fact that the original oral agreement is binding and then is represented by the later agreement".

671.    I considered that this evidence made complete sense. Where an oral agreement is reduced to writing, particularly if lawyers are involved, it is almost inevitable that the drafting process will mean that the final document contains terms which were not the subject of specific discussion. If it were a requirement that an agreement could only be backdated when there was exact precision between the prior oral agreement and the subsequent written agreement, it is doubtful whether any agreements could be backdated.

672.    A number of other aspects of the evidence in this regard are of potential relevance.

673.    First, if an agreement was backdated in circumstances where there had been a material change to the terms (DKK 2 million to DKK 1 million being an example), this did not in itself mean that the agreement was invalid. Instead, absent an intention to deceive, the agreement would remain a valid agreement; but it would only take effect from the actual date of the agreement, rather than the backdated date. Ms. Gernaa agreed with the proposition that, in this scenario, the agreement would be valid but could only be enforced from the date agreed, rather than the earlier date. Mr. Rosing's evidence was to the same effect: if there was no intention to deceive, then the contract remained valid but would only take effect from the date when it was actually made.

674.    Secondly, the reason for the invalidity of an agreement where the backdating was effected in order to deceive is that the enforcement of the agreement would be contrary to Danish public policy. Under the Danish Act of King Christian V, section 5-1-2, contracts are to be observed "if not against the law or virtuousness". A recent (2014) decision of the Danish Supreme Court (Case U 2014.2434 H) illustrates the application of that statute. In that case, C (a contractor) had agreed with A and B, the owners of a property, to carry out construction work. They had agreed that part of the price would be paid without the addition of VAT, with the intention of depriving the public purse of VAT and taxes in connection with the construction. C's action to recover the balance of the price was unsuccessful, even though C had re-calculated the claim so as to include VAT. The Court held that:

> "Under the Danish Act of King Christian V, section 5-1-2, an agreement may, in the circumstances, be invalid if the agreement is contrary to the general perception of morality, even though no other legal standards have been violated. The Supreme Court finds that section 5-1-2 of the Danish Act of King Christian V is applicable when the agreement violates a third party's interest or the interest of the public even though none of the contracting parties wish for the agreement to be set aside".

675.    Ms. Gernaa said that the case illustrated the proposition that the question of whether the contract was contrary to public policy was to be judged at the time when the contract was made. Hence, C could not establish his claim even though he had subsequently decided to include VAT. Mr. Rosing, rather tentatively, suggested that a court might look at events subsequent to the making of the contract, in order to decide

whether or not public policy should prevent enforcement of the contract. Thus, in the present case, Mr. Rosing suggested that the fact that the Supervisor's appointment had been terminated after 3 months, with Updata Europe resuming full control of its activities, might be relevant. However, I thought that this rather tentative suggestion could not easily be reconciled with the decision in Case U 2014.2434 H and I preferred Ms. Gernaa's evidence on this point. Accordingly, the question of whether a contract entered into with an intention to deceive third parties is contrary to morality within the meaning of section 5.1.2 is judged as at the date that the contract was entered into, notwithstanding that as a result of subsequent events there ceased to be any need to deceive or that there was no actual deception.

676.   Thirdly, the experts addressed the question of when an oral agreement would be binding. They were agreed that both written and oral agreements are valid and binding under Danish law, and that there are no formal requirements as to how an assignment agreement should be established or what terms it must contain. An oral agreement for an assignment is therefore binding in Danish law. However, if the parties have agreed that there is no agreement until the contract is signed, then the prior oral agreement will obviously not be binding. The experts were also agreed that it was necessary for the parties to have agreed on the main terms of the assignment. The main terms of an assignment would be (i) specification of precisely who the parties to the agreement are and (ii) specification of the assigned rights.

677.   The experts also addressed what seemed to me to be issues which were not of substantive law, but how a Danish court would approach the evidence in a case where there was a disputed oral agreement. This evidence showed that the existence and terms of an oral agreement are difficult to prove, and that a Danish court generally requires substantial evidence before recognising and enforcing an oral assignment agreement. If the parties are not able to prove that they have reached an agreement regarding the main terms, a Danish court would be reluctant to give effect to such an agreement. Proving an oral agreement in Denmark is therefore difficult, and the courts would likely to assume as a starting point that a significant agreement would not be binding until reduced to writing. Ms. Gernaa said that in a situation where both parties knew that the agreement would be committed to writing at a later stage, the courts would be "reluctant" to say that there was a binding contract prior to the point where the parties actually signed the contract.

## J4:   Analysis and conclusions

678.   It is in my view appropriate to consider, separately, the validity of the long-form assignment (governed by Danish law) and the medium-form assignment (governed by English law). The reason that there were these two separate documents was that Mr. Birkeland decided that it was sensible to take a "belt and braces" approach, particularly in view of the question-marks as to possible challenges to the assignment based on champerty that had been raised by Mr. Boulton. Mr. Birkeland's intention was that if for some reason one of the agreements was held to be invalid under its governing law, the other agreement could still be valid under its governing law. I consider that this, too, must have been the intention of the parties to the assignments; since it is the most obvious and an entirely rational explanation of why these two agreements were exercised. There was no suggestion by the Defendants that this was an impermissible approach either under English law or under Danish law. In view of this rationale, arguments which had featured in the Defendants' opening as to the

uncertainty of what had been agreed, and difficulties in reconciling the two agreements, were not pursued in closing and were in any event in my view ill-founded.

679.    I focus on these two agreements because I do not consider that the third agreement, the so-called short-form agreement, has any material bearing on the issues. The explanation for that agreement was a concern on the part of Vald. Nielsen that it might not want to tell the Defendants the full detail of the terms of the assignment, in case it alerted them to the proposed litigation. Mr. Choo Choy confirmed that he did not rely on the intention to potentially conceal the full terms of the assignment as "an independent basis for non-enforceability'. But he did say that it was relevant, in terms of background, "as to the relevant individuals' willingness to do what they have to do in order effectively pretend that the assignments were fully valid". I did not think that even this limited point had any force. It seems that the idea that it might be problematic to show the Defendants the full terms of the assignment, and that therefore there should be a short-form document, had nothing to do with the case that there was an intention to deceive the Supervisor. It was Mr. Birkeland (against whom the pleaded allegation of deceit in relation to backdating was ultimately not pursued) who drafted the short-form assignment. Furthermore, he took advice from counsel in relation to the three assignments, and counsel did not suggest that there was anything improper in relation to the signature of three agreements, albeit that he made it clear that he was not expressing a view as to what might need to be produced to the court in due course.

*The "long form" agreement governed by Danish law*

680.    The issue here is an issue of fact: was there an intention to deceive the Supervisor on the part of Mr. Bigaard, Mr. Homann and Mr. Johnsen? There is no doubt that the reason that the documents were backdated was because of the appointment of Mr. Jepsen, and therefore a concern to avoid a suggestion that the assignments required his consent. But I did not consider that this fact in itself demonstrated that there was an intention to deceive. I agree with the Claimants that the real question was not whether, applying Danish law, there was a legally binding agreement made on 19 November 2010, but rather whether the parties to the assignments genuinely believed that there had been a binding agreement. If so, there could be no dishonesty in the backdating: if there was a genuine belief that a binding agreement had previously been concluded, the parties' written agreement would have been giving formal approval to an oral agreement entered into an earlier date. On behalf of the Defendants, Mr. Choo Choy rightly accepted that if everybody genuinely thought the agreement had "absolutely been made on 19 November but for some technical reason, as a matter of Danish law, the agreement would not be treated as being made on 19 November, that it would be difficult then to say that they intended to deceive". But he submitted that there was no such genuine belief; because the parties to the assignments appreciated that the deal would only be done when the documentation was drawn up and signed. The Defendants' case in opening was that Mr. Johnsen, and the others on the Vald. Nielsen side, "knew the agreements were <u>misleadingly</u> backdated – misleading because there was no binding oral agreement on 19 November 2010 in the same terms as the three agreements they were signing. Their evidence that there was such an oral agreement is untruthful". By the time of closing,

the only allegation along these lines, as far as concerns those on the Vald. Nielsen side, concerned Mr. Johnsen.

681.    It seems to me that the burden of proving that there was an intention to deceive is upon the Defendants. I do not consider that the evidence justifies a finding that any of the relevant individuals (Mr. Bigaard, Mr. Homann and Mr. Johnsen) had no genuine belief, in early January, that a binding agreement had been concluded on 19 November. Indeed, I think it more likely than not that when they looked back on what had happened, they believed that their written agreement was indeed giving effect to an oral agreement made earlier. In that regard, they did not subject the events to the rigorous scrutiny or legal analysis that would have been necessary if, for example, there had been litigation between the participants as to whether or not a binding agreement had been made at an earlier stage. Instead, they would have formed a broad view based on what had happened.

682.    Thus, there is no doubt that Mr. Homann and Mr. Johnsen did meet on 19 November, and there was indeed a discussion about an assignment. That is clear from the fact that Mr. Birkeland started his work on the documentation that very Friday evening, and had completed a draft by the Sunday. The meeting was between two people, neither of whom were lawyers, who knew each other well. It was not the first discussion between them. I have no reason to doubt the evidence of Mr. Homann, supported by Mr. Bigaard, that Mr. Homann had been given authority to deal with the matter. The discussion was not a difficult one, because (for reasons already given) it was in the interests of Mr. Johnsen as well as Mr. Homann and Updata Europe for there to be an assignment. It is in my view inherently probable that matters were then settled at that meeting, and that both Mr. Johnsen and Mr. Homann left the meeting thinking that they had a deal. This is consistent with the evidence of Mr. Hildebrandt, Mr. Birkeland and Mr. Bigaard as to what they were told at some point after the meeting, namely that there was a deal.

683.    I think it unlikely that either Mr. Johnsen or Mr. Homann gave any real thought on 19 November 2010 to the question of whether or not the agreement was binding as a matter of Danish or any other law. They were, after all, businessmen rather than lawyers. In my view, they would both have understood that the agreement would have to be documented properly. Hence Mr. Birkeland became involved immediately after the meeting. But there is no reason to think that there was any specific agreement between them that nothing was binding unless and until it was signed and documented. If either of them had been asked after the meeting whether or not their agreement was binding, each would probably said that they had done a deal and that they hoped and expected that the other side would not try to back away from what had been agreed, albeit that it remained to be documented.

684.    If one of them did seek to back away (and of course neither of them did), then that might have given rise to a healthy argument as to whether or not he was entitled to do so. I think that if that argument had come before a Danish court, the party who backed away from the agreement would have had the better of the argument; because proving an oral agreement is difficult, particularly in a situation where it was contemplated that the agreement would be reduced to writing. But it seems to me that this conclusion does not assist, or go very far in assisting, the Defendants' argument that there was no genuine belief that there had been a binding agreement. In January 2011, the parties to the assignments were not applying their minds to how a Danish court

might resolve a theoretical dispute as to whether or not an agreement had been reached in November 2010. Rather, they were considering how matters stood in the light of the fact that a deal had been made in November, that there had been no dispute, that acceptable documentation had been produced on 22 December and had been ready for signature since that time. In those circumstances, I do not consider it surprising that the participants took the view that their signature of the documentation was giving effect to their prior agreement.

685.    In that context, I agree with the Claimants that it is a relevant, and indeed rather unusual, feature of the case that there is no evidence of any negotiation subsequent to 19 November meeting. All the drafting was done by Mr. Birkeland. There was some delay in producing a document to Mr. Homann, but this seems to have been attributable to Mr. Boulton's absence from London and the need to address the points which Mr. Boulton raised. When the draft document was in due course given to Mr. Homann on 22 December, he raised no queries about it and it was subsequently signed without amendment by Mr. Bigaard and his colleagues. This seems to me to support the case that the agreement signed did indeed fairly reflect what had been agreed at the 19 November meeting.

686.    The only other opportunity for further negotiation was, as it seems to me, the meeting which took place on 21 December 2010 attended by Mr. Birkeland, Mr. Homann and Mr. Johnsen. But I have no reason to doubt Mr. Birkeland's evidence that this meeting took place in the evening (or perhaps late afternoon), after he had completed the documentation.

687.    I agree with the Defendants that it is puzzling that Mr. Birkeland's first draft (sent on 21 November) recorded a figure of DKK 2 million rather than the DKK 1 million which was only changed in the draft that was finalised on 21 December. Mr. Birkeland supported Mr. Johnsen's evidence as to how the first draft came to refer to DKK 2 million: this was a figure that had been discussed between Mr. Birkeland and Mr. Johnsen prior to the meeting on 19 November as being the figure which Mr. Homann was looking for and which Mr. Johnsen was in principle agreeable; Mr. Johnsen had agreed a figure of DKK 1 million at the 19 November meeting; but when he spoke to Mr. Birkeland after the meeting, he was travelling with Mr. Homann in the same car, and he did not want to refer to the fact that the figure agreed was less than the DKK 2 million that Mr. Johnsen had been contemplating as the payment. The point was not picked up until 20 December when Mr. Birkeland and Mr. Johnsen went through the documents.

688.    I have to say that I was sceptical about this explanation when this evidence was given. However, I do not consider that I can reject it as implausible. The fact is that the documentation which was given to Mr. Homann on 22 December did refer to DKK 1 million: he had never been given any document showing DKK 2 million. If the agreement reached on 19 November had been an agreement for DKK 2 million, then it is difficult to see why Mr. Johnsen would subsequently have sought to reduce it, at a time when he was no doubt keen to finalise the documents, and possibly risk an argument with Mr. Homann; an argument about a comparatively small sum of money which was only ever going to be paid if the litigation was successful. Equally, it is difficult to see why Mr. Homann, if he had already agreed DKK 2 million, would have agreed to reduce it to DKK 1 million rather than sticking to what had previously been agreed. The fact that Mr. Homann then obtained signatures on the assignments,

without any challenge to the DKK 1 million, again supports the proposition that the agreements reflected the amount (DKK 1 million) which had previously been agreed. Mr. Birkeland's evidence was that there was no negotiation at the meeting on 21 December about these figures, and I have no reason to reject that evidence.

689.  Against this background of a deal having been reached on 19 November 2010, and acceptable documentation giving effect to that agreement having been produced on 22 December, I think that it would not be right to conclude that – when the decision was made in January to backdate the assignments – any of the three individuals had no genuine belief that a binding agreement had been concluded on 19 November. I think that it is far more likely that each of them considered that there had been a prior binding agreement, that their written agreement was seeking to give effect to what had previously been agreed, and that it was therefore permissible to backdate.

690.  As far as Mr. Bigaard was concerned, he had not participated in the discussions, and had left things to Mr. Homann. His evidence was that he was told by Mr. Homann at some point in November or December that there was a "done deal". This happened prior to Mr. Jepsen's appointment, and therefore it was not something to which Mr. Jepsen needed to give his consent. Mr. Bigaard is a lawyer with over 40 years' experience. He struck me as a very careful man, and I think that he would have hesitated long and hard before agreeing to backdate documentation for the purpose of deceiving Mr. Jepsen. I do not wholly accept the Claimants' submission that he had no motive improperly to backdate documents, and no motive to lie to the court about what had happened. In theory, he may have been motivated to backdate the documents because the assignment was beneficial to Mr. Homann, with whom he worked closely, and potentially beneficial to Updata Europe at least in the long-term. In theory, he could then have lied to the court because he had no option but to justify what he had done, in view of the fact that he had backdated the documents. However, whilst there is a theoretical motivation, I did not think that this is what happened, or what is likely to have happened. I regard it as far more probable that Mr. Bigaard backdated the documents because he thought that they reflected a prior "done deal", and that he considered that it was legitimate to do so.

691.  Similarly, I have no reason to think that Mr. Homann, who was an experienced professional, was intending to act deceitfully. The idea of backdating to 19 November seems to have been his idea. It is his handwriting at the front of the documents, and I infer that he did not think that it was appropriate to backdate to 2 October (the date referred to in Mr. Johnsen's e-mail of 5 January). There was a great deal of evidence about Mr. Homann in the course of the case. He seems to have been held in high regard by many people, including Mr. Jorgensen and Mr. Nielsen. He had worked for KPMG for 37 years, where he was a partner. There was nothing in the evidence that suggested that he lacked integrity. Indeed, as I have previously mentioned, the pleadings themselves do not allege deceit against Mr. Homann, and the case against him seems to have developed at a comparatively late stage. But at all events, I am unable to conclude on the evidence that he intended to deceive Mr. Jepsen. Again, I think it far more probable that Mr. Homann believed that backdating was permissible because the written agreement reflected the agreement reached on 19 November.

692.  As far as Mr. Johnsen is concerned: he signed the documents after they had been signed by Mr. Bigaard, and he received them from Mr. Homann. Given that those

individuals considered that backdating was permissible, in my view Mr. Johnsen had no reason to believe and did not believe otherwise.

693.   I also agree with the Claimants that it does not appear that any of these individuals had any qualms or worries about the backdating of the assignment after it had been done. If they had any concerns, it would have been a very simple matter – once Mr. Jepsen was off the scene in April 2011 – to have executed fresh documentation. The fact that no-one thought that this was necessary is, in my view, an indication that none of these individuals considered that they had acted improperly in backdating the documents.

694.   I do not consider that any of the documents authored by Mr. Birkeland during this period (such as the e-mail to One Essex Court, or the documents concerning the Deed of Rectification) cast doubt on this conclusion. I am ultimately concerned with the state of mind of Mr. Bigaard, Mr. Homann and Mr. Johnsen, against whom the allegation of intention to deceive is made. It is no longer alleged that Mr. Birkeland was party to any intended deception of the Supervisor. I agree that Mr. Birkeland's statements during this period are potentially relevant to the question of whether Mr. Johnsen, with whom Mr. Birkeland was in contact, believed that a binding agreement had been made on 19 November 2010. However, there is no indication that this was an issue which was discussed between Mr. Birkeland and Mr. Johnsen at the time, or to which any thought was even given. This is not surprising. In November and December, it was simply not a live issue. Mr. Birkeland was not giving, and did not need to give, any consideration to the question of whether or not, as a matter of law, a binding agreement had been reached at the 19 November meeting. Rather, he was approaching matters on the basis that what was important was for the agreement to be documented. As Mr. Birkeland said, it would be very hard to prove that there was an agreement, or to act upon it, if it was not documented. He therefore said that he "needed to have a document signed by all parties to confirm the terms that had been agreed between Mr. Homann and Mr. Johnsen". The statements which he made in his e-mails at the time therefore reflected his unsurprising view that it was important to document the assignment, and do not assist in answering the question of whether, when the documents were backdated, Mr. Johnsen (or Mr. Homann or Mr. Bigaard) believed that a binding agreement had previously been made.

695.   Nor did I think that the correspondence between Mr. Birkeland and Mr. Inkester advanced matters from the Defendants' perspective: Mr. Birkeland was dealing with a solicitor who was on the other side, and he would naturally have been rather circumspect in his statements to him prior to having the signed assignment documents in his possession.

696.   Rather more significant, in my view, is the fact that Mr. Birkeland was subsequently given the backdated assignment documents in January, and does not seem to have reacted adversely to the fact that they were backdated. It is true that he did not at that stage know about the appointment of Mr. Jepsen, and that there is no suggestion any longer that Mr. Birkeland acted deceitfully. But he did know that the documents had only been finalised in December, and that there had been backdating. The fact that he did not comment is some indication that he too considered that the documents recorded an agreement which had been reached in November 2010.

697.   A significant amount of time at the trial was spent in exploring other agreements or negotiations which were on-going in Denmark at that time, including for example a settlement agreement between Mr. Johnsen and Mr. Nielsen, a potential loan by Vald. Nielsen to a company called Cagain, and a possible sale of Vald. Nielsen's factory. Mr. Birkeland in his e-mail to Mr. Inkester had referred to the assignment "being part of a larger settlement of outstanding matters in Denmark". I did not consider, however, that the existence of these negotiations supported a case of an intention to deceive, based on the proposition that the relevant participants knew that there had been no binding agreement in November 2010 for assignment. When Mr. Birkeland started to draft the assignment documentation on 19 November, immediately after the meeting, this was the only material document that he drafted. (He also sent through to Mr. Johnsen, on 21 November, a draft letter of appointment whereby a Mr. Henrik Hansen was to be appointed as an observer on the board of the Newco on behalf of Newwatch. But this has nothing to do with the various ongoing discussions in Denmark). In due course, when the assignment documentation was signed by the various representatives of Updata Europe, there is no indication that it was conditional upon the conclusion of any other contracts. Nor is there any such suggestion in the correspondence with Mr. Boulton.

698.   Mr. Birkeland explained in his second witness statement that there were indeed other agreements entered into and under discussion "around this time". There was discussion of the replacement of an existing loan agreement between Vald. Nielsen and one of Mr. Bigaard's companies, Bigaard Four Holding. A draft of a new loan agreement was circulated in early 2011, but this was not done until 7 February 2011; i.e. a month after Updata Europe had signed the assignment. Accordingly, it cannot be said that the assignment was conditional upon this loan agreement. There was also discussion of another loan agreement involving Cagain Europe and Change Networks. Mr. Birkeland drafted a loan agreement after the 21 December meeting, but in the end he did not believe that this loan was ever made. Again, therefore, the assignment was not conditional upon this loan agreement. The same can be said about a settlement agreement concluded between Mr. Johnsen and Mr. Nielsen. This was made on 31 January 2011, again some time after Updata Europe had signed. Moreover, Mr. Nielsen was not involved in the discussions concerning the assignment, and does not appear to have known about the details of the assignment until very recently. The documents therefore do not support a case that the assignments were conditional upon the conclusion of other agreements, or that the participants knew that there had been no binding agreement in November 2010 because other documents remained to be negotiated and concluded.

699.   The Defendants also relied upon a passage in Updata Europe's annual report for the year 2009/2010, and which was finalised and signed by the Board (Mr. Bigaard, Mr. Bartroff and Mr. Kristiansen) in July 2011. This stated:

> "The company's partially owned subsidiary Updata Infrastructure UK Ltd. was sold during the financial year 2008/9. In connection with this sale consideration is being given to bringing a lawsuit against the management of the subsidiary on the basis of the circumstances surrounding the sale. As is estimated such a step would result in significant costs, the step is carefully considered."

700.    I do not consider that this statement throws any light on the issue which I need to resolve. The position by the time that these accounts were signed off, in July 2011, was that the assignment documentation had been concluded many months previously. Updata Europe itself was not considering bringing a claim; since the claim had been assigned to Vald. Nielsen. In so far as the passage can be read as suggesting that Updata Europe was considering bringing a claim, and might incur costs, it is puzzling if not misleading. It is possible, however, as the Claimants suggested, that: (i) the language was deliberately phrased in the passive ("… consideration is being given"), because it was the assignee which was giving consideration to the possibility of action; and (ii) the passage was included because there would be some benefit to Updata Europe's creditors if the action were to succeed. However, I do not consider that the passage provides any support for the case on intention to deceive by backdating.

701.    Reliance was also placed upon certain correspondence with Mr. Hildebrandt in early 2011. Prior to signing in January, he sought and received some reassurance from Mr. Birkeland that his economic interest in the claim would be protected. It seems to me that this episode is again of no real assistance in relation to the argument on intention to deceive. I accept that it is unlikely that the 19 November 2010 discussions and agreement between Mr. Johnsen and Mr. Homann had involved the question of whether shareholders such as Mr. Hildebrandt would be party to the agreement. However, Mr. Homann's witness statement indicates that, unsurprisingly, he understood that the purpose of the assignment would be to benefit the former shareholders of Updata Europe, and this would of course include Mr. Hildebrandt and others. Subsequently, the idea emerged – during the drafting process and as a result of Mr. Boulton's advice and concerns about champerty – that the former shareholders should be parties to the assignments, and in due course this is what happened (save for Mr. Bremerskov). But I do not think that, at the time, it would have occurred to Mr. Johnsen or Mr. Homann (or Mr. Bigaard, who was in any event distant from the detail) that this development was a material alteration to what had previously been agreed, or meant that it was improper to backdate the assignment.

702.    Accordingly, since I conclude that the Defendants have failed to prove an intention to deceive on the part of any of the individuals against whom the allegation is made, I consider that the Danish law assignment is valid and binding.

*The medium-form assignment – governed by English law*

703.    This conclusion means that it is unnecessary to consider in detail the arguments as to the validity of the English law assignment. This is because the Defendants' case on illegality in relation to the English law agreement was based on the same illegality as was alleged to render the agreement unenforceable under Danish law: i.e. the case that the agreements were executed and back-dated for the purpose of or with the intention of deceiving the Supervisor and/or the general creditors of Updata Europe and avoiding the need to seek the Supervisor's consent to the assignment. Having rejected the argument based on intention to deceive in the context of Danish law, it follows that the premise of the argument in relation to the English law agreement fails as well.

704.    Even if, however, I had accepted the Defendants' case as to intention to deceive the Supervisor or the general creditors, I do not consider that this would lead to the conclusion that the English law assignment was unenforceable on the grounds of

illegality. It was common ground that in relation to illegality under English law, it was appropriate to apply the approach set out in the judgment of Lord Toulson in *Patel v Mirza* [2016] UKSC 42, [2017] A.C.467 at paragraph [120]:

> "The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system (or, possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary (a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, (b) to consider any other relevant public policy on which the denial of the claim may have an impact and (c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather by than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate."

705.    Applying this approach, I first consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim. Here, the underlying purpose of the prohibition transgressed is, as the Defendants rightly submitted, the deterrence of fraudulent conduct, and in particular conduct which is fraudulent towards (i) a person who has been appointed by the court as the equivalent of an administrator and thereby (ii) the creditors of a company. I agree that there is a powerful public interest in protecting the legal system from claims based on fraudulent documents. The purpose of the prohibition would therefore, all other things being equal, be enhanced by denial of the claim. But in the present case all other things are not equal; because an unusual feature of the present case is that the effect of the Defendants' argument, if successful, would be to produce a result which in practice insulates them from liability for their own fraudulent conduct. Accordingly, the Defendants' invocation of the importance of deterring fraudulent conduct rings hollow in the circumstances of the present case. Accordingly, I hesitate to say that in the context of the present case, the purpose of the prohibition transgressed would be enhanced by denial of the claim. But for present purposes I proceed on the basis that it would, whilst noting that, on any view, the Defendants' own fraudulent conduct is a matter which is relevant to the question of proportionality.

706.    Next, I consider any other relevant public policy on which denial of the claim may have an impact. I agree with the Defendants that, subject to one matter, there is no particular competing public policy which requires the enforcement of the assignment in Vald. Nielsen's favour. The consequence of the non-enforcement of the assignment

is that Updata Europe would have throughout have retained its claims against the Defendants, albeit that a time-bar would almost certainly now prevent Updata Europe from enforcing its claims. The one matter is, again, that there is a public policy in favour of making those responsible for fraudulent conduct liable for the consequences of their actions. Again, however, I proceed for present purposes on the basis that this is matter which is relevant to the question of proportionality, rather than the question of whether there is any other relevant public policy on which denial of the claim may have an impact.

707.    I then turn to the question of whether denial of the claim would be a proportionate response to the illegality, bearing in mind  that punishment is a matter for the criminal courts. It seems to me that denial of the claim, taking into account all the circumstances of the present case, would clearly not be a proportionate response. The particular circumstances of the present case which lead me unhesitatingly to this conclusion are as follows.

708.    First, this is a case where the Defendants have, in accordance with my previous findings, defrauded Updata Europe and (indirectly) the former shareholders of Updata Europe who have the benefit of the assignment (if upheld). It would in my view be grossly unjust if the assignee was to have no remedy, even assuming that there was an intention to deceive the Supervisor and creditors.

709.    Secondly, the Defendants' case as to intention to deceive rests upon the 19 November 2010 dating of the documents, and upon the argument that the parties to the assignments had not – as at that date – reached a binding agreement. Even if that were the case, however, it seems to me to be very clear on the evidence that the parties did reach a clear agreement for an assignment prior to the appointment of the Supervisor. The factual position is that Mr. Birkeland produced the final draft of the assignment documentation on 21 December 2010, and this was prior to the final meeting in Copenhagen between himself, Mr. Homann and Mr. Johnsen on 21 December 2010. The documents were then sent by e-mail on 22 December, and were signed in that form. There is no evidence of any negotiation after that meeting on 21 December. It is also the case that by 21 December, the documents referred to Mr. Homann receiving DKK 1 million (rather than the DKK 2 million referred to in earlier drafts). Accordingly, even if I had accepted the Defendants' argument that the original agreement was DKK 2 million, the reduction had been agreed by 21 December.

710.    A number of points flow from these facts, in the context of proportionality:

a)      In my view, the documentation could, without any substantial objection, have been backdated to 21 December 2010 (the date of the final meeting), rather than 19 November 2010. Both dates are prior to the appointment of the Supervisor. I consider it would be disproportionate in those circumstances to deny the claim on the basis that the parties to the assignments chose the November date for the documentation rather than the December date.

b)      Equally, if the documents had been signed promptly by the Updata Europe signatories, again the illegality argument would not run. It is likely that the reason why they were not signed promptly is not because there was any dissatisfaction with the documents or any further

negotiation required, but rather because it was the Christmas period and no-one thought that there was any particular urgency.

c) This also illustrates what in my view is the highly technical nature of the illegality relied upon by the Defendants in the present case. This is a case where the parties to the assignment had, prior to the appointment of the Supervisor, reached agreement on all material terms of the proposed assignment. The only problem, if there was a problem, was that the parties had not signed the documentation. True, this opens the way for the Defendants' argument that the agreement reached was not binding unless and until the documents were signed. But it is difficult to see why, even if this were so, it would be proportionate to deny the claim.

711. Thirdly, this is not a case where there can be any argument that the backdating actually caused any prejudice either to the Supervisor or the creditors of Updata Europe. The factual position is that the appointment of the Supervisor was rapidly terminated, in April 2011. The Supervisor never knew of the assignment. No creditors have ever needed to set aside the assignments.

712. Fourthly, and again illustrative of the highly technical nature of the case advanced, it would have been perfectly possible for Updata Europe and Vald. Nielsen and the other signatories to have executed fresh assignment documentation in April 2011 or at any time thereafter. Had this been done, all of the Defendants' arguments would have fallen away. The fact that this was not done indicates that none of the relevant individuals against whom the allegation of intention to deceive is made (Mr. Johnsen, Mr. Homann and Mr. Bigaard) had any qualms or concerns as to the backdating. This reinforces my conclusion that those individuals did not intend to deceive: the fact that no-one bothered to re-execute documentation after April 2011 is strongly suggestive of the fact that everyone thought that it had been legitimately executed in the first place.

713. This leads to a related point. It seems to me that, subsequent to April 2011, the parties to the assignments have conducted themselves on the basis that these were valid and effective. Thus, Mr. Bigaard has clearly been aware of the present proceedings, and indeed has given evidence in support of the Claimants. In these circumstances, the fact that fresh documentation has not been executed, when it could have been, seems rather irrelevant, and is certainly not a reason for denying the claim. All the parties to the assignments therefore treated them as valid and continuing, and could easily have executed fresh documentation if they had wanted to.

714. Fifth, it is in my view a relevant consideration in relation to proportionality that the Defendants themselves have taken advantage of the assignment for their own benefit. They were keen to obtain, for tax reasons, the Deed of Rectification. This was signed by Vald. Nielsen as assignee, and the Defendants were perfectly content with that. It is only now, many years later, and long after the tax benefits have been obtained, that the Defendants have decided to put the assignment under scrutiny.

715. For all these reasons, I consider that denial of the claim would not be a proportionate response to the illegality. The Claimants contended that a further reason for so concluding would be the Defendants attempt to mislead the Court in the strike-out/

summary judgment application. I was not persuaded that the proportionality exercise contemplated by the Supreme Court in *Patel v Mirza* contemplated an examination of a party's behaviour within the context of the litigation. I therefore do not rely upon that particular factor. But if it were relevant, then it would be an additional reason for rejecting the Defendants' case.

## K: Breach of fiduciary duty

*The shape of the arguments*

716.　The Claimants contended that each of the Defendants owed them fiduciary duties. The pleaded facts relied upon as giving rise to these duties were set out in paragraph 35 of the Re-Amended Particulars of Claim. Reliance was placed on the "circumstances of the negotiations and sale". The specific circumstances included:

　　　a)　The Defendants' responsibility for the provision of information to bidders in the Data Room, such information being solely in the Defendants' control;

　　　b)　The Defendants' provision of information to the bidders, in particular LMS, in the course of discussions to which the European Vendors were not party;

　　　c)　The Defendants' involvement in assisting LMS in putting together its offer on 16 April 2009; and

　　　d)　The Defendants' use of information available to them as senior employees or directors, and the fact that they knew that the EVs were not privy to that information.

717.　The fiduciary duties owed were said to include a duty on the part of the Defendants not to place themselves in a position of conflict without obtaining the EVs fully informed consent. Compliance with that duty put the UK management under a duty:

　　　a)　to disclose to the EVs all material facts and matters relating to the proposed sale of Updata UK;

　　　b)　not to make deliberately misleading statements to the EVs or prospective purchasers on material facts and matters relating to the proposed sale of Updata UK, so that the EVs were not compelled to part with their shares at an undervalue;

　　　c)　not to prefer and promote their own interests at the expense of the EVs

718.　These duties were alleged to have been broken by virtue of various matters:

　　　a)　The failure of the UK management to provide the EVs with documents, information and explanations, specifically: (i) the March 2009 Weighted Budget or the information on which it was based; (ii) the Tenon Memorandum and Data Pack, or the information on which it was based; (iii) full details of contracts won or likely to be won; (iv) any other information material to the sale of Updata UK; (v) various

other budgets and projections and other financial information prepared in May, June and July 2009;

b)    The making of deliberately misleading statements to the EVs, and also to Mr. Nielsen.

719.    In view of my conclusion that Vald. Nielsen (as assignee of Updata Europe) is entitled to damages for deceit, the claim for breach of fiduciary duty is relevant only to the claim of Newwatch. I did not understand Vald. Nielsen to allege that it could recover an account of profits for breach of fiduciary duty in addition to damages for deceit.  (In his closing submissions, Mr. Choo Choy referred to the need to elect between these remedies, and this was not challenged by Mr. Booth). Since Newwatch rolled over its shareholding in Updata UK into the new UK company, Newwatch had no claim for loss caused by deceit and could only advance a claim for breach of fiduciary duty. The object of such claim is to recover an account of profits.

720.    The parties' submissions focused particularly upon the issue of whether or not any fiduciary duty was owed by the Defendants to the Claimants. There were also arguments, albeit to a lesser extent, as to whether or not any such duty was broken, and in particular the extent to which the claims advanced were permissible in the light of the order made by Field J. on the strike-out hearing. That order struck out claims: (i) for breach of fiduciary duty based on non-fraudulent misrepresentation, and (ii) as against Mr. Mantell, for breach of fiduciary duty based on non-fraudulent non-disclosure. There were also arguments as to whether it was appropriate for the court to order an account, particularly in circumstances where the Claimants had not sought to quantify or prove at trial the amounts claimed in consequence of the breach of duty.

*Fiduciary duty: the law*

721.    There is no doubt that the general position is that directors of a company do not, solely by virtue of their office of director, owe fiduciary duties to shareholders. Equally, the case-law establishes that there are circumstances in which such duties can be owed. The relevant principles under English law are to be found in the decision of the Court of Appeal in *Peskin v Anderson & Ors* [2001] BCC 874 and more recently in the judgment of Nugee J. in *Sharp v Blank* [2015] EWHC 3220 (Ch) [2017] BCC 187.

722.    *Peskin* concerned a claim against the committee of the Royal Automobile Club and against its holding company. A number of members had resigned their memberships without knowing of the possibility that there would be changes to the structure of the club and a sale of RAC Motoring Services Ltd., which operated the well-known motoring services business known as the RAC. The Court of Appeal dismissed the ex-members' claims based on various alleged breaches of fiduciary duty, holding that the facts relied upon were insufficient to found a claim for the existence or breach of such duty. The relevant principles were explained by Mummery LJ as follows:

> "[33].  The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship

between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities , which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.

[34]. These duties may arise in special circumstances which replicate the salient features of well established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted or, depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him. There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.

[35] The court has been referred to the valuable and detailed surveys of the authorities, expounding the special circumstances which justify the imposition of fiduciary duties on directors to individual shareholders, in the judgments of *Court of Appeal in New Zealand in Coleman v. Myers [1977] 2 NZLR 225* ( especially pp.323–325,328–330) and of the *Court of Appeal of New South Wales in Brunninghausen v. Glavanics [1999] 46 NSWLR 538* (especially pp. 547–560). In both of those cases fiduciary duties of directors to shareholders were established in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned."

723.  More recently, the case-law in England and elsewhere was reviewed by Nugee J. in *Sharp v Blank* [2015] EWHC 3220 (Ch) [2017] BCC 187. Mr. Booth accepted the correctness of Nugee J's analysis. Nugee J. said:

> "[12] I take it therefore to be established law, binding on me, that although a director of a company can owe fiduciary duties to the company's shareholders, he does not do so by the mere fact of being a director, but only where there is on the facts of the particular case a "special relationship" between the director and the shareholders. It seems to me to follow that this special relationship must be something over and above the usual relationship that any director of a company has with its shareholders. It is not enough that the director, as a director, has more knowledge of the company's affairs than the shareholders have: since they direct and control the company's affairs this will almost inevitably be the case. Nor is it enough that the actions of the directors will have the potential to affect the shareholders – again this will always, or almost always, be the case. On the decided cases the sort of relationship that has given rise to a fiduciary duty has been where there has been some personal relationship or particular dealing or transaction between them.

> [13]  I do not find this surprising. A fiduciary, as explained by Millett LJ in his classic judgment in *Bristol & West Building Society v Mothew [1998] Ch 1* at 18A-F, is someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust and confidence. That is why the distinguishing obligation of a fiduciary is the obligation of loyalty: someone who has agreed to act in the interests of another has to put the interests of that other first. But the relationship between directors and shareholders is not in general like that. A director is a fiduciary for his company: by agreeing to act as director, he necessarily agrees to act in the interests of the company. But he does not have, by virtue of his appointment as director, any direct relationship with the shareholders: no doubt the interests of the shareholders and the company are in general aligned but this does not mean that a director has agreed to act for the individual shareholders or has a direct relationship with them – his relationship is with the company. If he is to be held to owe fiduciary duties to the individual shareholders, there must be something unusual in the nature of the relationship which gives rise to it. That no doubt explains why the cases where such a duty has been held to exist mostly concern companies which are small and closely held, where there is often a family or other personal relationship between the parties, and where, in almost all cases, there is a particular transaction involved in which directors are dealing with the shareholders, from which the directors often stand to benefit personally. The imposition of a fiduciary duty in such

circumstances reflects the fact that directors who have a close family or other personal relationship with shareholders, and are entering into transactions with them, may be tempted to exploit that relationship to take unfair advantage of the shareholders for their own benefit."

*Existence of the fiduciary duty: the Claimants' submissions*

724.    The Claimants submitted that the circumstances in which fiduciary duties are owed are variable and depend upon the facts of the case. It is possible in "special circumstances" for a director or senior employee to owe fiduciary duties to the shareholders of a company. The existence of the duty was therefore "fact-specific", and almost always involved: relatively small companies where there were certain directors who had the information and certain shareholders who were not in the same position; a situation where there was going to be some type of dealing or disposal, whether a direct purchase or a transaction involving a third party on which the shareholders' rights would be affected; and where there was an imbalance of information.

725.    Thus, "special circumstances" included, in particular, the following:

a)      *Transactions for the sale/purchase of shares*: where there is a proposed transaction involving the disposal of the shareholders' shares, and the director is either a purchaser or interested in the purchase, the director will inevitably hold more information about the value of the shares than the shareholder. The fiduciary relationship arises from the particular circumstances of the proposed transaction; the disparity in available information; and the special trust the shareholder must necessarily repose in the director to provide him with material information. The Claimants referred in that connection to a number of Australian and New Zealand cases which were considered in *Sharp v Blank,* and in particular *Crawley v Short* [2009] NSWCA 410, *Coleman v Myers* [1977] 2 NZLR 255; *Brunninghausen v Glavanics* [1999] NSWCA 199; and *Platt v Platt* [1999] BCLC 745.

b)      *Small / family held companies*: many of the cases in which a director has been held to owe fiduciary duties to a shareholder involve small, family-owned companies. But there is no justification for confining cases in which such duties are owed to those in which the company was run as a family enterprise or quasi-partnership (where there is a pre-existing relationship of trust and confidence).

c)      *Vulnerable shareholders*: transactions involving the sale/purchase of shares will put the directors in a special position of power. They will have a special opportunity to exercise the power or discretion to the detriment of the shareholders, such that the shareholders are vulnerable to abuse by directors of their position. The scope for unilateral exercise of a discretion or power to the potential determinant of another who is peculiarly vulnerable to the exercise of the power is a hall-mark of a fiduciary relationship.

726.   This was exactly the sort of case where the court should hold that fiduciary duties were owed by the Defendants to the EVs:

    a)   Updata UK had only five shareholders. There were close relationships between the executive director/shareholders and EVs. Mr. Bennett was Mr. Johnsen's cousin and Jorgen Johnsen's nephew. Mr. Bennett had been brought into the company by Mr. Johnsen when he was unemployed in 2003.

    b)   The Defendants controlled information in relation to Updata UK. EVs (and the non-executive directors appointed by them) were dependent upon the Defendants for information about Updata UK's financial position and its prospects. EVs necessarily trusted the Defendants to provide accurate information about Updata UK's financial position.

    c)   In the context of the proposed sale of EVs' shares in Updata UK, the Defendants controlled the flow of information to: (i) EVs, (ii) the rival bidders (Mr. Nielsen and, by extension, the Data Room) and (iii) their own side (Tenon and LMS). EVs had to (and did) trust the Defendants that the information provided to them, and to Mr. Nielsen, was the same as the information that had been provided to Tenon and LMS.

    d)   In the context of the proposed sale, the Defendants made false representations to EVs about Updata UK's performance and projected performance, on which they knew EVs would rely. EVs had no way to check the accuracy of the information provided and took it on trust that it was accurate.

    e)   The Defendants' unique access to information about Updata UK put them in a position in which they could prefer their own interests to those of EVs, and take advantage of EVs' particular vulnerability to non-disclosure of financial information in the build up to the sale.

727.   In his oral submissions, Mr. Booth emphasised that the imposition of a fiduciary duty in the present case would not conflict with the fiduciary duties owed by the Defendants to Updata UK. Concerns as to such conflict had been expressed in certain of the authorities, such as the decision in *Percival v Wright* [1902] 2 Ch 421. Whilst in certain situations the imposition of duties on directors vis-a-vis members at "every step of the way" could cause real problems in the running of the company, this was not so in the present case. If the transaction went through, it would make no difference to the company or the way that it was run: it was simply a sale of shares by existing shareholders to, in effect, other existing shareholders and an outside party (LMS).

728.   Here, therefore, there was a specific transaction being carried out for the benefit of the Defendants, and an information deficit between the parties. The Defendants were seeking to remove Updata Europe as main shareholder, and were planning an MBO. If there was going to be an MBO, it was particularly vital that as between those with knowledge on the inside and those with shares on the outside, that there was full and proper disclosure so that those who might be selling their shares were not disadvantaged by what happens. The court should impose a duty in that situation. If a

director is going to take advantage of his knowledge to benefit himself, vis-a-vis a shareholder, it is not unreasonable to impose a duty to ensure that he is being full and frank about what the position is. If no fiduciary duty existed in the present case, then it is difficult to conceive of a case where it would be held to exist.

*Existence of the duty: the Defendants' submissions*

729.   The Defendants submitted that there was no basis for holding that a fiduciary duty existed in the present case. There was no relationship of trust, confidence and loyalty, or anything close to it. Neither of the EVs entrusted anything to the Defendants. Indeed, Newwatch was not selling at all, so it was impossible to see how that company was entrusting matters to the Defendants. None of the factors relied upon by the Claimants led to the conclusion that there was a special relationship in the sense described in *Peskin* and *Sharp*. The requirements for a fiduciary duty formulated in these English cases which should be applied, rather than any more expansive approach that may have been taken in the Australian and New Zealand cases. The Defendants' more detailed submissions on these matters are to a large extent reflected in my conclusions below.

*Analysis and conclusions: the authorities*

730.   The authorities, as discussed in *Sharp v Blank*, show that the reason why the directors of a company owe fiduciary duties to the company is that, by virtue of their appointment as directors, they become agents of the company and stewards of its affairs. By contrast, the directors of a company do not, merely by virtue of their office of director, owe fiduciary duties to the shareholders, whether collectively or individually. This is because a company is legally distinct from its members, and the directors' direction and control of the affairs and assets of the company cannot be equated with direction or control of the affairs or assets of the members. The general principle that directors do not owe fiduciary duties to shareholders is also supported by well-established policy considerations, as summarised by Nugee J in *Sharp v Blank* at [9(3)].

731.   It is also the case, however, that directors may be held to owe fiduciary duties to shareholders. This is by way of exception to the general rule. As Nugee J said at [13], there must be something unusual in the nature of the relationship which gives rise to it. In *Peskin*, Mummery LJ (with whom the other members of the Court of Appeal agreed) identified the situation in which fiduciary duties arise as depending upon the existence of "special circumstances which replicate the salient features of well-established categories of fiduciary relationships". Such fiduciary duties generally attach to "a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted, or depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him." (*Peskin* at [34]).

732.   This approach is, as the Defendants correctly submitted, consistent with the classic analysis of fiduciary relationships contained in Millett LJ's speech in *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 18A-F, and cited by Nugee J. in *Sharp* at [13]. A fiduciary is "someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust and confidence". The

distinguishing obligation of a fiduciary is the obligation of loyalty, including the obligation to put the interests of that other party first.

733.    It is not difficult to see why the courts in England and elsewhere have held that certain relationships between director and shareholder, or between shareholders inter se, replicate the salient features of well-established categories of fiduciary relationships. *Coleman v Myers* involved an old established private company in which many of the shareholders were relatives, and two directors (a father and son) engineered a takeover, persuading other family members to sell. The New Zealand Court of Appeal did not proceed on the basis that whenever a director purchased shares from a shareholder, a fiduciary duty would arise. Rather, each member of the court referred, in similar but not identical language, to the closeness of the particular relationship which existed in that case, including the trust or confidence that other family members placed in the father and son.

734.    Thus, Woodhouse J. said:

> "… the standard of conduct required from a director in relation to dealings with a shareholder will differ depending upon all the surrounding circumstances and the nature of the responsibility which in a real and practical sense the director has assumed towards the shareholder."

735.    He went on to identify factors which were relevant to the existence of the duty, and these included:

> "dependence upon information and advice, the existence of a relationship of confidence, the significance of some particular transaction for the parties and, of course, the extent of any positive action taken by or on behalf of the director or directors to promote it".

736.    Cooke J referred (at 330) to "the family character of this company; the positions of father and son in the company and the family; their high degree of inside knowledge; and the way in which they went about the take-over and the persuasion of shareholders". He then described how, from its early days, the company had been very much a family one. "For many years [the father] had been its key figure. Inevitably and justifiably the shareholders must have come to repose confidence in him. The son was his natural successor."

737.    Similarly, Casey J said (at 371):

> "I have no doubt that in this tightly-held family company, both directors owed a fiduciary duty to the appellants and to the other shareholders. It must have been clear to Mr AD Myers [i.e. the son] particularly that they were reposing trust and confidence in him, from their discussions and the inquiries they made. I have no doubt Sir Kenneth Myers [i.e. the father] was in everyone's eyes the head of the family group and its associated shareholders, whom they respected and trusted to look after their personal interests in the management of the

company. … In such a family situation the latter, as managing director, would inevitably have been expected to continue the care and prudence displayed by his father for the welfare of family and associates, notwithstanding the fact that he was bidding for their shares. The evidence points to his recognition of this in the discussions he willingly held with the appellants about the reasons for his take-over and his plans …"

738.    In *Platt v Platt,* David Mackie QC (sitting as a Deputy Judge of the High Court) found a fiduciary relationship to exist in the context of a company owned by three brothers, where the older brother (who ran the business) approached the other brothers to acquire their "birthright". He considered that the facts of *Coleman v Myers* bore resemblance to those in the case before him.

739.    The decision of the New South Wales Court of Appeal in *Brunninghausen,* upon which the Claimants relied heavily, illustrates that a fiduciary duty can be held to exist even in a case where the shareholder does not actually place trust and confidence in the director. In that case, the plaintiff and defendant were brothers in law, being married to two sisters. They owned shares in a company, but had fallen out. There was, as the judge said, "no relationship of confidence, and indeed all trust had been broken years before and succeeded by hostility at the worst, wariness at the best". Their mother-in-law was keen for them to restore harmony, and therefore there were discussions with a view to a buyout and in due course the defendant acquired the shares of the plaintiff. This was done at a significant undervalue, because the defendant did not reveal the existence of a substantial offer from a prospective purchaser of the company. Neither the judge nor the Court of Appeal considered that the facts were as strong as *Coleman*, but nevertheless a fiduciary duty was held to exist. Handley JA said [54]:

"If a fiduciary duty exists here it must arise from the bare facts of the relationship. These include the position of the defendant as the sole effective director, the existence of only one other shareholder, their close family association, the intervention of the mother-in-law to secure a family reconciliation, and the exclusive advantage or opportunity which the defendant's position conferred on him to receive any offers to purchase the company's business from third parties".

740.    *Brunninghausen* was referred to in both *Peskin* and *Sharp*, without any suggestion that it was wrongly decided. It is clearly not a case where the plaintiff actually entrusted the care of his property, affairs, transactions or interests to the defendant. But as Mummery LJ said at [34], a fiduciary duty may arise where, depending on all the circumstances, a person is "treated as" having assumed responsibility to act on behalf of another, and the other person may, depending on all the circumstances, "be treated" as having so entrusted his property, affairs etc. to the other person. He described the case (and *Coleman*) as cases where fiduciary duties were established "in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned". Nugee J. in *Sharp* drew attention to the fact that it was a company with only two shareholders, where one had bought the other out.

741.    *Brunninghausen* is perhaps at the outer limit of cases where an English court might be prepared to say that the circumstances replicated the salient features of the well-established categories of fiduciary relationships. But in any event, as will be apparent from my discussion below, the facts of that case are very far removed from those of the present.

742.    The cases make clear that it is not possible to give an exhaustive list of the facts which will give rise to such duties. In a subsequent case in the New South Wales Court of Appeal, *Crawley v Short*, Young JA (delivering the leading judgment) said (at [108]) (quoting from an earlier judgment of his):

> "Without attempting to state an exhaustive list, the duty will arise where the member has expressly or impliedly sought the director's assistance and the director has expressly or impliedly undertaken to act on the member's behalf, where the director occupies a place of influence in the family, of which family the members is also associated. These matters may be exacerbated if associated with other factors".

743.    In a later passage, at [122], he identified the circumstances in which a shareholder or director/ shareholder holds a special position where he may owe a fiduciary duty to another shareholder:

> "Without being an exhaustive list, this will occur where: one shareholder undertakes to act on behalf of another shareholder; where one shareholder is in a position to have special knowledge and knows that another shareholder is relying on her to use that knowledge for the advantage of another shareholder as well as herself; and where the company is in reality a partnership in corporate guise, nowadays termed a quasi partnership."

744.    The authorities also illustrate a number of other relevant matters. The decision in *Sharp* shows that the mere fact that a director has more knowledge than (or indeed exclusive knowledge compared to) the shareholders of the company's affairs, or that the directors' actions have the potential to affect the shareholders, does <u>not</u> amount to "special circumstances" and does not give rise to a "special relationship" between the directors and shareholders. Such features are usual, indeed inevitable, features of the relationship between directors and shareholders of a company, since the directors direct and control the affairs of the company, whereas the shareholders do not: see *Sharp v Blank* at [12]. The existence of such features is therefore not sufficient to establish that the directors have undertaken (or that they have been entrusted by the shareholders) to act for or on behalf of the shareholders in any particular respect.

745.    It also seems clear that the mere fact that a director is purchasing shares from a shareholder is not in itself sufficient to give rise to a fiduciary duty. To hold otherwise would be contrary to the decision in *Percival v Wright*. English law has not yet, in my view, gone down this particular route, although a contrary approach was taken in the first instance decision in *Coleman* and can also be seen in some of the passages in *Brunninghausen.* As far as English law is concerned, even in a situation where a director is purchasing shares from a shareholder, the existence of a fiduciary duty

depends upon the existence of special circumstances: see *Re Chez Nico (Restaurants) Ltd.* [1992] BCLC 192, 208 (Browne-Wilkinson VC).

746.  Overall, it seems to me that the circumstances in which a fiduciary duty will usually be held to exist are well-summarised by Nugee J. at [13] of *Sharp*: the cases where such duty has been held to exist mostly concern companies which are small and closely held, where there is often a family or other personal relationship between the parties, and where, in almost all cases, there is a particular transaction involved in which directors are dealing with the shareholders.

*Application to the facts*

747.  I consider that the facts of the present case are a long way from the circumstances of other cases where a fiduciary relationship has been held to exist, and that there are no special circumstances in the present case which replicate the established categories of fiduciary relationships. I address in turn each of the principal factual matters relied upon by the Claimants as supporting the existence of the fiduciary duty.

748.  *Closeness of the relationship.* Updata UK was not a closely held family company. There were five shareholders in Updata UK (Updata Europe, Newwatch, Mr. Baldorino, Mr. Bennett and Mr Nyegaard). In turn, Updata Europe had six shareholders (Peter Johnsen, Jørgen Johnsen, Kirsten Johnsen, Henrik Hildebrandt, Vald Nielsen and Henrik Bremerskov). Newwatch had two shareholders (Peter Johnsen and Mr. Hildebrandt). Accordingly, some of the shares were held, directly or indirectly, by members of Mr. Johnsen's family. But many of the shares were not: Mr. Baldorino, Mr. Nyegaard and Mr. Hildebrandt were not family members. Furthermore, neither Mr. Baldorino nor Mr. Mantell (who was not a shareholder in or director of Updata UK) had any family or close personal relationship with either Updata Europe or Newwatch, or any of their shareholders or directors, or any of the shareholders of Updata UK other than Mr. Bennett.

749.  As far as Mr. Bennett was concerned: although he was a cousin of Mr Johnsen and nephew of Jørgen Johnsen and Kirsten Johnsen (Mr Johnsen's mother), there is no evidence that he had a close personal relationship with any of them. Whilst his introduction into Updata UK had come via Mr. Johnsen, this does not establish a close personal relationship. Nor is this a case where, in contrast to the father in *Coleman v Myers*, any of the Johnsen family members looked to Mr. Bennett to protect their interests. The e-mail correspondence in 2009 in relation to Mr. Johnsen's proposed "Project Eagle" was businesslike and relatively formal, rather than communications between friends or friendly relatives. This is unsurprising. As described in Section B above, relations between Mr. Johnsen and Updata UK's management were, certainly by 2008-2009, not the best. The Board of Updata Europe was aware that there was a degree of antipathy on the part of the UK management towards them.

750.  The limited family tie between Mr. Bennett and Mr Johnsen's family therefore had no bearing on the way in which Updata UK was managed. Nor did the EVs  look to the UK management for the protection of their interests. Thus, when Mr Johnsen resigned from the Board of Updata UK in February 2008, the EVs appointed three new directors (Jørgen Johnsen, Flemming Holm and Henrik Hildebrandt) in order to protect the interests of the EVs (and those of Vald. Nielsen, which, by then, was not only a shareholder in Updata Europe but also a substantial lender to it). When it came

to the possible sale in 2009, Mr. Johnsen and the other board members similarly appreciated that they were the ones who would have to look after their own interests. Mr. Bennett, who was working with LMS, was not going to do that for them. They did not consult with Mr. Bennett, or any of the UK management team, so as to obtain their views as to the LMS offer. The EVs engaged their own legal adviser (Mr. Birkeland), and no doubt thought that they had sufficient experience and financial acumen to be able to evaluate the LMS proposals.

751.    In summary, there is nothing in the facts which justifies a conclusion either that Mr. Bennett (or any of the Defendants) undertook a responsibility to act on behalf of or for the benefit of the EVs, or that the EVs entrusted the care of their property, affairs, transactions or interests to any of them. Nor, in my view, are there any facts which lead to the conclusion that Mr. Bennett or the other defendants should be treated as having undertaken such a responsibility, or that the EVs should be treated as having entrusted the care of their property etc. to them.

752.    Furthermore, in contrast to some of the cases such as *Coleman*, this is not a case where Mr. Bennett or the other Defendants used their relationship with the shareholders in order to negotiate or push through a sale or other transaction. The origin of the sale to LMS lay in the approach of Mr. Nielsen in early 2009. This caused the Defendants to react by seeking investors for a possible MBO, leading in due course to the selection of LMS. Mr. Baldorino told Mr. Johnsen in an e-mail of 16 April 2009, referring to a conversation on the previous day, that: "we have embarked on facilitating a substantial proposal from LMS Capital". There was, therefore, no approach by the Defendants on their own behalf, and Mr. Johnsen was only told of the forthcoming proposal from LMS on the day before it was made. When the offer was made on 16 April 2009, it was made by LMS in writing. It was not made by the Defendants. The offer contemplated that the transaction would be consummated by an acquisition vehicle, the newco, which would be financed entirely by LMS and selected management members. This is what in due course happened: the SPA was a sale by all the existing shareholders of Updata UK (including the Defendants themselves) to the new company, Updata Infrastructure Holdings Ltd. In the meantime, there were negotiations between Mr. Johnsen and others with LMS: in particular, a telephone call on 29 April 2009 between Mr. Johnsen and Mr. Hooft, another such call on 4 May 2009, and a meeting between Updata Europe board members and representatives of LMS at Mr. Holm's home on 11 June 2009. The Defendants themselves did not participate in these discussions or negotiations. Accordingly, the ultimate transaction, including the terms on which Newwatch could rollover its shares and acquire further shares, was a consequence of the bidding process and a commercial negotiation between Mr. Johnsen and others and LMS. It was not a consequence of a commercial negotiation between Mr. Johnsen (or others from the EVs) with the Defendants, who had minority interests in the acquiring vehicle.

753.    *EVs' dependence on the Defendants for information about Updata UK's financial position.* I agree with the Claimants that the EVs were dependent upon the Defendants for information about Updata UK's financial position. However, I agree with the Defendants that their control of information relating to Updata UK and the EVs' reliance on the Defendants for such information was a usual incident of all relationships between directors and shareholders. The UK management inevitably had

more knowledge of the company's affairs than the shareholders, since they directed and controlled its affairs. There is, therefore, nothing special about this fact, whether alone or taken with the other circumstances, which justifies holding that there was a fiduciary relationship.

754.    Again, a contrast is to be drawn between the circumstances of some of the cases where a fiduciary duty has been held to exist, and the present facts. This is not a case where the EVs had no access to Updata UK's business information, other than for example audited accounts. Historically, as described in Mr. Hildebrandt's evidence, both Mr. Johnsen and Mr. Nielsen worked at Updata UK's offices, as did Mr. Hildebrandt both before and after he became a director of Updata UK. They could and did discuss matters with the UK management. Updata UK did provide financial information to Updata Europe; for example, Mr. Holm did receive regular cash flow statements, and he had a channel of communication to Mr. Mantell if he wanted financial information – albeit that Mr. Mantell would invariably want to check with Mr. Bennett before he provided anything. The present case arises not from the fact that the UK management gave no information to the EVs during the time when Updata UK was in business, or because the EVs had no access to financial information. Rather, it arises from statements made in 2009 when requests for information were made, but false answers were given.

755.    *Control of the flow of information in the context of the proposed sale.* I do not consider that this adds anything to the previous point. Again, the invocation of the directors' superior knowledge of the business, compared to that of the shareholders, is not a special circumstance. It is the usual feature of the ordinary relationship between directors and shareholders.

756.    *The making of false representations.* I have accepted that false representations were made, and that there is therefore liability for deceit. But I do not consider that these facts in themselves, or taken in conjunction with the other matters that I have described, establish the existence of a fiduciary duty. Mummery LJ does refer to various events, including the making of material representations by directors to shareholders, as being capable of constituting special circumstances and generating fiduciary obligations. However, this statement is made in the context of the earlier part of [34] of his judgment, where he identifies the hallmarks of a fiduciary relationship. I do not consider that the relevant passage means that whenever a false statement is made, even in the context of a possible share acquisition by a director from a shareholder, a fiduciary duty arises.

757.    *Unique access to information about Updata UK.* I agree with the Defendants that this is no more than a reiteration of the earlier arguments concerning dependence on information, or control over the flow of information.

758.    Accordingly, I do not consider that any of the features relied upon by the Claimants, individually or collectively, justifies the conclusion that the Defendants owed fiduciary duties to the Claimants.

759.    This means that it is unnecessary to consider in detail the remaining arguments, and I shall only make brief comments about some of them.

760.    First, I was not persuaded that any fiduciary duty was owed to the EVs by Mr. Mantell, who was not a director or shareholder. None of the cases cited to me imposed a fiduciary duty towards shareholders on someone who was neither a director or shareholder. Similarly none of the factual circumstances indicated the existence of any such duty on his part.

761.    Secondly, if fiduciary duties were owed, then it seemed to me that my findings as to fraudulent misrepresentation, and the nature of the fraud in the present case, would inevitably mean that those duties were broken. The fraud involved deliberate and fraudulent concealment of the expected results of Updata UK and specifically of the March Weighted Budget, as well as the fact that the UK management had provided different "factual data" to Tenon and LMS. There can be no doubt that claims for breach of fiduciary duty based on fraudulent misrepresentation and fraudulent non-disclosure are permissible in the light of the order of Sir Richad Field.

762.    Thirdly, I did not consider that there was any case management reason which precluded the court from ordering an account. However, I was dubious as to whether it was appropriate, as a matter of discretion, to order an account in circumstances where Newwatch had rolled over its shareholding, had therefore not sold any shares, and had in due course benefited in full from the transaction with LMS which ultimately led to the sale to Capita.

763.    Accordingly, as a result of my decision that fiduciary duties were not owed, the claims based on breach of fiduciary duty fail.

## L:    Conclusion

764.    The claim of Vald. Nielsen for damages for fraud or conspiracy succeeds, and I assess such damages at £ 6,518,652. The Claimants' claims based on breach of fiduciary duty fail and are dismissed. I will hear argument as to consequential matters, including interest and costs.

# Exhibit S

Case No: A3/2012/2944

<u>Neutral Citation Number: [2013] EWCA Civ 910</u>
**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**MR JUSTICE MORGAN**
**[2012] EWHC 81 and 2487 (Ch)**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: Monday 29th July 2013</u>

Before:

**<u>LORD JUSTICE MUMMERY</u>**
**<u>LORD JUSTICE LLOYD</u>**
and
**<u>LORD JUSTICE FULFORD</u>**
- - - - - - - - - - - - - - - - - - - -
**Between:**

| | |
|---|---|
| **(1) ROSS RIVER LIMITED** | **<u>Claimants</u>** |
| **(2) BLUE RIVER LIMITED PARTNERSHIP** | **<u>Appellants</u>** |
| **- and -** | |
| **(1) WAVELEY COMMERCIAL LTD** | **<u>Defendant</u>** |
| | **<u>Defendant</u>** |
| **(2) PETER BARNETT** | **<u>and</u>** |
| | **<u>Respondent</u>** |
| **(3) PAUL HARNEY** | |
| **(4) WESTBURY PROPERTIES LTD** | **<u>Defendants</u>** |

- - - - - - - - - - - - - - - - - - - -

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - -
**David Caplan** (instructed by **Mishcon de Reya**) for the **Appellants**
**Piers Hill** (instructed by way of Direct Access) for the **Respondent**
- - - - - - - - - - - - - - - - - - - -
**Judgment**

**Lord Justice Lloyd:**

**Introduction and summary**

1.  This judgment is given on an appeal and a cross-appeal against an order of Mr Justice Morgan dated 9 October 2012, following the delivery of two judgments, one on 25 January 2012, [2012] EWHC 81 (Ch), and the other on 6 September 2012, [2012] EWHC 2487 (Ch). I will refer to the latter as the judgment on remedies.

2.  The litigation arose from a development project concerning land in Ampthill, Bedfordshire. The project was initiated by Mr Barnett, the Second Defendant and respondent to the appeal, together with Mr Harney, the Third Defendant, who took no active part in the litigation. At first the project was conducted through a company owned by Mr Barnett, Bradcliffe Ltd. Late in 2004, the Claimants were introduced to Mr Barnett and to the project. They were able to assist by providing the finance needed to buy a site (known as the Shell Site) which was required so as to make it possible to satisfy a condition subject to which it was expected that planning permission would be granted, and by contributing that site to the project on agreed terms. At that stage, the First Defendant, Waveley Commercial Ltd (WCL) was incorporated, to be owned by Mr Barnett and Mr Harney, and a joint venture agreement (JVA) was entered into between the Claimants and the First Defendant, to which Mr Barnett and Mr Harney were also parties as guarantors of liabilities of WCL, though only of liabilities which did not in the event arise.

3.  I will refer to the Claimants together as Ross River, though Ross River Ltd, the First Claimant, was a party to the JVA as the general partner of the York Development Limited Partnership, which later changed its name to Blue River Limited Partnership, the Second Claimant. The individual who stands behind Ross River is a Mr York.

4.  WCL was not specifically restricted to carrying out only one development project, but in fact it did not do anything else. When it was set up Mr Harney was its only director, but Mr Barnett, who became a director in 2008, accepted that he had been a shadow director throughout.

5.  I will have to refer to some of the terms of the JVA in detail later. In August 2005 the parties entered into a Side Agreement which, as the judge found, increased Ross River's entitlement to the Net Profits (as defined in the JVA) from one third to £560,000 plus one third, and gave priority to Ross River's entitlement to that amount. Later, another agreement increased Ross River's share from one third to 40%. A further agreement was reached in February 2006 under which Mr Barnett and Mr Harney were to be entitled to be paid management fees of (or up to) £120,000, the payment of which by WCL which would be deductible for the purpose of calculating the Net Profits.

6.  The development was completed in 2007, but its realisation took a long time, and the last elements of the scheme were not sold until 2011, during the trial. Ross River became dissatisfied in 2008 with the lack of progress and the lack of information supplied by WCL, and suspicious of some of WCL's dealings. The litigation was commenced in 2009, the immediate occasion being an application for an injunction to restrain what was said to be an improper sale of part of the development. The issues

developed during the litigation, but from the start one of the contentious points was the status and effect, if any, of the Side Agreement.

7.    By the time of the trial, which took place over 11 days in July 2011 followed by 6 days in October 2011, the principal issues were what was the amount of the Net Profits, what was the status and effect of the Side Agreement, and whether Mr Barnett owed duties directly to Ross River as well as the duties that he owed to WCL as director and those that WCL owed to Ross River under the JVA and related agreements.  Ross River contended that Mr Barnett owed it contractual duties, under terms to be implied into the JVA, but also that both he and WCL owed it fiduciary duties.  By then WCL was not able to pay its debts as they fell due, and was being supported by Mr Barnett.  Although WCL was clearly indebted to Ross River, subject to the decision as to quantum of Net Profits and as to the effect of the Side Agreement, a judgment against WCL was unlikely to be of any real value to Ross River.  So it was important for it to establish a direct remedy against Mr Barnett.  WCL and Mr Barnett were represented by a single team of solicitors and Counsel at the trial.

8.    The judge decided most of the issues at trial in favour of Ross River, though he rejected the case as to implied contractual duties owed by Mr Barnett.  He decided a number of specific issues as to the Net Profits in favour of Ross River, but did not decide the exact figure because the impact of his judgment on consequential calculations would need to be considered, for which he did not have the necessary material.  He held that the Side Agreement was enforceable according to its terms, and was not a sham, as Mr Barnett and WCL had alleged, and he resolved in favour of Ross River arguments as to its interpretation.  He also held that WCL and Mr Barnett did owe fiduciary duties to Ross River, of good faith and not to do anything as regards the handling of the joint venture revenues which favoured WCL (and Mr Barnett) to the disadvantage of Ross River.  He rejected the argument that they also owed a more extensive fiduciary duty.

9.    Mr Justice Morgan gave his first judgment on 25 January 2012, and a date in February was fixed for the final details to be sorted out.  In the event, that hearing was adjourned, but the judge then made orders for interim payments to Ross River, of £1 million by WCL and £450,000 by Mr Barnett, neither of which was paid.  He gave a separate judgment about the interim payment orders: [2012] EWHC 407 (Ch).  The adjourned hearing took place in June 2012.  In the meantime, WCL had been ordered to be wound up in May 2012.  The outcome of the adjourned hearing, explained in the judge's judgment handed down on 6 September 2012, was that the Net Profits were quantified at £1,209,815, and Ross River's entitlement out of that as being £1,043,926, but that Ross River was not held to be entitled to any equitable compensation for breach of fiduciary duty as against Mr Barnett.  The judge's eventual order was made after a further hearing on 8 and 9 October 2012; his judgment on that occasion has the reference [2012] EWHC 3006 (Ch).  His order included a provision that there be no order for costs as between Ross River and Mr Barnett.

10.   Mr Barnett had filed an Appellant's Notice against the holding in the first judgment that he owed fiduciary duties to Ross River.  Ross River was given permission to appeal by the judge against his final order and against his rejection of the implied terms and of the more extensive fiduciary duty for which they had contended.  Mr

Barnett's earlier appeal did not proceed, but the issues were taken up in a Respondent's Notice to Ross River's appeal, by which Mr Barnett contends first that he owed no fiduciary duty at all to Ross River (and nor did WCL) and in the alternative that the duty was less extensive than the judge had found it to be. Ross River has not pursued on appeal the contention that terms are to be implied into the JVA.

11.    During the trial Mr Barnett and WCL were represented by leading and junior Counsel instructed by Geoffrey Leaver LLP, solicitors. By the time of the hearing in June 2012, Mr Barnett was acting in person, but with the benefit of representation by Mr Piers Hill (who had not appeared in the proceedings before) instructed on a direct access basis. For the appeal and cross-appeal Mr Hill represented Mr Barnett again, still on a direct access basis. Ross River was represented on the appeal by Mr David Caplan on instructions from Mishcon de Reya, he having been their junior Counsel at the trial and (on his own) at the hearing in June.

12.    The first issue on the Respondent's Notice, as to whether Mr Barnett (and WCL) did owe a fiduciary duty at all, has to be addressed, logically, before any issue as to the scope of the duty or its consequences. Mr Hill therefore opened his cross-appeal first. In the course of his submissions on the cross-appeal Mr Caplan opened up some of the questions as to the scope of the duty, which arose on both the appeal and the cross-appeal. Then we heard argument separately on the appeal as to whether the judge was right to reject the claim for equitable compensation for breach of fiduciary duty.

13.    For the reasons which are set out below, my conclusion is that the judge was right to hold that WCL and Mr Barnett were subject to fiduciary duties owed to Ross River, but that he failed to apply the incidents and features of those duties correctly. I would therefore dismiss Mr Barnett's cross-appeal and allow Ross River's appeal, to an extent and in terms that I will set out below.

**The Joint Venture Agreement**

14.    Mr Hill submitted that the JVA set out the entirety of the rights and duties of the several parties, and that the attempt to fasten a fiduciary duty on Mr Barnett and WCL was an illegitimate way of rendering Mr Barnett liable as a guarantor of WCL's obligations which was inconsistent with the JVA. For his part Mr Caplan accepted that it was necessary to focus on the JVA and that it would be wrong to assert a collateral duty of any kind that was inconsistent with the JVA. Of course, he asserted that the fiduciary duties propounded were not incompatible with the JVA, but were complementary to it. On any basis it is necessary to consider some aspects of the JVA in detail. Helpfully the judge set the whole agreement out as an appendix to his first judgment.

15.    Clause 2, headed Preliminary, sets out what are in substance several recitals. They show that Ross River had agreed to assist WCL by acquiring the Shell Site which was necessary to the proposed development, and that the parties had agreed "to enter into this agreement as a joint venture". Clause 3 was headed Objectives. It set out initial objectives, which are those relevant to the proceedings, as well as alternative and fallback objectives. Some were concerned with the implementation of the project, and need not be referred to, but two of them, not at all surprising in content, deserve

quotation, together with a third which gives an indication of the joint nature of the enterprise:

> "3.1.1.  To maximise the profits arising from the development of the Supermarket Scheme upon the Composite Site
>
> …
>
> 3.1.4    To acquire or bring under the parties control all outstanding freehold and leasehold interests comprised in the Composite Site including in particular the freehold of the current car parks within the Composite Site currently within the ownership of Ampthill Town Council
>
> …
>
> 3.1.7    To share in the profits arising from the development in the manner provided in this agreement at the earliest practicable time"

16.    Clause 5 dealt with obtaining planning permission, in relation to which there were specific obligations of co-operation between WCL and Ross River.  I need not refer to any of those provisions in detail, nor to other provisions as to the conduct of the development, which was to be the responsibility of WCL.

17.    By clause 7.7 WCL (defined as the Promoter) was under the following obligation:

> "The Promoter will be responsible for payment of all fees and expenses incurred in respect of all obligations contained in this clause and will provide [Ross River] with copies of all invoices and accounts. All such fees and expenses will be added to the base costs and will be taken into account in assessing Net Profits."

18.    Clause 10 deals with Ross River's entitlement out of the profits.  Ross River was to be entitled to receive the Basic Profit (£250,000), as well as the agreed sale price of the Shell Site, but it was also entitled to opt to receive the Development Profit instead of the Basic Profit, and it did take advantage of that option.  Clause 10.5 was as follows:

> "the Development Profit will be payable by the Promoter to [Ross River] at such times and in such manner as the parties agree consistent with the Objectives … But Provided Always no party shall receive Development Profits in advance of the other and the Development Profit will be distributed as soon as practicable following receipt"

19.    Clause 11 dealt with a fall-back provision which did not in the event arise.  It was only if this came to pass that Mr Barnett and Mr Harney were liable as guarantors of WCL's obligation (in that event) to buy the Shell Site from Ross River.  The fall-back provision only arose if no satisfactory planning permission was obtained or if WCL did not exercise its option to buy the Shell Site from Ross River.  If that happened it could no doubt have been foreseen that WCL's assets might be inadequate to meet its liabilities to Ross River, hence the need for a guarantee.

20.    Clause 12 governed what was to happen on completion of the sale of the Shell Site. Most of this does not matter, but reference was made to clause 12.3.5:

>    "If [Ross River] has elected to receive the Development Profit the parties will endeavour to agree the method and manner of payment of the Development Profit and the means to secure payment to [Ross River] in the meantime and failing agreement the matter in dispute will be referred to the Expert Surveyor"

21.    Clause 15 provided for the determination of disputes by an appropriate expert, who in the case of a dispute concerning financial matters was to be an accountant.

22.    The Development Profit, which Ross River elected to take, was defined in the JVA as one third of the Net Profits derived (in the event) from the entire site. Net Profits meant the sum calculated in accordance with principles expressed in Part II of the Schedule to the JVA. The principal operative provision, paragraph 4 of Part II of the Schedule, is simple:

>    "Net Profits shall be the difference between all revenues received from the disposal of the Composite Site … and the costs fees and expenses incurred in achieving such revenues calculated in accordance with the forgoing provisions"

23.    The previous provisions referred to principles and policies "to be agreed between the parties" and to Accounting Standards and GAAP. They also provided that, in computing Net Profits, regard was to be had to the base costs referred to in the Financial Proposal as revised from time to time, and to various other matters identified in general terms. The original version of the Financial Proposal was annexed to the JVA, and was headed "Schedule of costs and projected costs" of the component parts of the site, with option, legal and planning costs incurred to 1 November 2004. Reference was made in the course of argument before us to two figures: "Costs, option fees, planning and legal etc" put at £217,000 (these being items already incurred) and "Option fees due 31/3/05" put at £40,000.

24.    Besides the Side Agreement which I have mentioned, three supplemental agreements were entered into between the parties in 2005 and 2006. The only one which matters for present purposes, and only for the record, is that the third such agreement, in May 2006, varied the Development Profit as a proportion of Net Profits from one third to 40%.

25.    In February 2006 a meeting took place between Mr York and another representative of Ross River, Mr Barnett and Mr Harney, at which there was discussion of the subject of management charges. WCL had put forward an appraisal which included an item of £120,000 by way of management fees at £10,000 per month for a maximum of one year. The judge recorded that the meeting was difficult or tense. He held that it was agreed between the parties, at or soon after that meeting, that the management fee to be paid by WCL to Mr Barnett and Mr Harney was not to exceed £120,000. That was, in effect, a further agreement supplemental to the JVA.

**The Side Agreement**

26.    The Side Agreement is dated 15 August 2005.  It is expressed as a side agreement to the JVA, and is between the same parties.  It stated that nothing in the Side Agreement "will affect the terms as set out in the [JVA] save for introduction of the Capital Introduced and Prior Profit Allocation which are in addition to the those terms".  It provided for Ross River to pay WCL a sum of £325,000, which was defined as "Capital Introduced", and for WCL to be liable, in return, to pay Ross River £235,000 as a fixed share of the Net Profits in addition to the other sums to which it was entitled, "by way of a Prior Profit Allocation".  It provided that this sum was, in the events which happened, to be grossed up to £352,500.  Repayment of the Capital Introduced and of the Prior Profit Allocation was to take place from the Net Profit once the development was fully sold or let.  Accompanying the Side Agreement was a letter of guarantee signed by Mr Barnett and Mr Harney and addressed to Ross River, guaranteeing that certain payments would be made by each of them to WCL.  The Side Agreement and the letter of guarantee are set out in a second appendix to the judge's first judgment.

27.    At trial WCL and Mr Barnett contended that the Side Agreement was not the true agreement between the parties and that it was a sham, with no legal effect, intended to enable Ross River to misrepresent the position to the tax authorities.  They said that the true agreement had been that WCL was not liable to pay any sum to Ross River, and that, instead, Mr Harney was liable to pay Ross River £400,000, and Waveley Developments Ltd (WDL), a company belonging to Mr Barnett and Mr Harney which was carrying out a quite separate project, was to be liable to pay Ross River £160,000.  I need not go into the detail underlying this contention, because the judge rejected it on the evidence.  He held that the relevant agreement reached between the parties was that recorded in the Side Agreement and the letter of guarantee.  He recorded that it was not accurate to describe the £325,000 as Capital Introduced, because the money was paid to WCL, not with a view to it being used in the development project, but to it being passed on to Mr Harney and WDL.  However, this inaccuracy made no difference to the validity of the agreement.

28.    Even so, the Side Agreement gave rise to some difficulties of interpretation.  The judge grappled with these issues and reached conclusions which are not challenged on appeal.  He held that the sum of £325,000 was payable to Ross River by WCL and was not to be deducted from gross receipts in calculating the Net Profits (paragraph 192) and that the sum of £235,000 was also so payable (paragraphs 195 to 197).  He also held that these two sums were not payable until it was clear that the Net Profits would exceed £560,000, but that when that did become clear, then those sums were payable (paragraph 198).

29.    Ross River's case had been put on the basis that the Side Agreement gave it priority as regards the first £716,667 of the Net Profits.  Mr Caplan told us that he had discovered this to be the result of an arithmetical error and that the true figure was £933,333.  I do not need to decide which of these figures is correct.  Even the lower figure is sufficient for Mr Caplan's submissions based on the Side Agreement.

**Fiduciary duties**

30.    For Mr Barnett, Mr Hill's main argument on the cross-appeal is simple.  The joint venture was set up and conducted on a purely contractual basis, the rights and obligations of the parties being set out in the JVA, the supplemental agreements and the Side Agreement.  There was no justification for finding that either WCL or Mr Barnett became subject at any stage to any obligation towards Ross River other than those set out in these agreements.  Mr Barnett never came under any obligation under the agreements, because the events in which he would be liable as a guarantor did not occur.  WCL was liable in contract to pay Ross River its share of the proceeds, that liability being enforceable against WCL or, now, by proof in its liquidation.  The agreement being a commercial one, there was no basis for importing equitable duties into it, which could have been provided for expressly if they had been sought and agreed.

31.    He relied on observations such as those of Lord Walker in *Cobbe v Yeoman's Row Management Ltd* [2008] UKHL 55, to the effect that as a matter of general principle the court should be very slow to introduce uncertainty into commercial transactions by the over-ready use of equitable concepts such as fiduciary obligations (paragraph 81), and that, although equity has important functions in regulating commercial life, those functions must be kept within proper bounds (paragraph 85).  He also said that in the commercial context the claimant is typically a business person with access to legal advice who is expecting to get a contract (paragraph 68).  That particular comment was apposite to the case before the House of Lords, in that the parties had been negotiating expressly subject to contract and had never reached the point of entry into a contract.  In the present case, of course, the parties did enter into a contract, and the point is different: not that the court should not use equitable principles to make good the absence of a contract, but that it should not use them to make up for what might be seen as deficiencies (in the events which happened) in the agreed contract.

32.    In particular, he argued that, although there were cases in which a contract in the nature of a joint venture was found to impose fiduciary duties on one party, or on an individual standing behind one of the parties, there was nothing in the circumstances of the present case which could justify that course.

33.    Mr Caplan submitted that the judge was correct to find that both WCL and Mr Barnett were subject to fiduciary duties, though he contended that the judge should have found the duties to be more extensive than he did.  Conversely, Mr Hill submitted that, even if a duty was rightly held to exist, it should be less onerous, and he also argued that the difficulties to which any duty gave rise should be seen as arguments against their existence at all.  I will consider first the judge's basis for finding that there were fiduciary duties, before turning to the arguments about the content of the duty.

34.    Between paragraphs 235 and 255 the judge considered the law as to fiduciary obligations in relation to joint ventures.  We were shown some of the cases to which he referred in that part of his judgment.  From these it is clear that, although the analogy with a partnership may suggest that fiduciary duties are owed in the context of a joint venture, the phrase "joint venture" is not a term of art either in a business or in a legal context, and each relationship which is described as a joint venture has to be

examined on its own facts and terms to see whether it does carry any obligations of a fiduciary nature.

35.    Two particular cases were identified as examples of fiduciary duties being owed in a joint venture context.  One is *Murad v Al-Saraj* [2004] EWHC 1235 (Ch), a decision of Etherton J.  Morgan J summarised that case aptly as follows at paragraph 247:

> "In *Murad v Al Saraj*, the claimants successfully argued that the defendant owed them fiduciary duties in connection with a joint venture to acquire a hotel.  The fiduciary duties were held to arise because the parties were in the position of joint venturers, the relationship was one of trust and confidence, the defendant had taken on a number of responsibilities in connection with the joint venture, in some respects acting as the claimants' agent, the claimants had no relevant experience, they had no knowledge of the arrangements made by the defendant with third parties and they entrusted the defendant with extensive discretion to act in relation to venture which affected the claimants' interests.  The judge ordered that the defendant should account for the entirety of his profits from the joint venture even though that remedy gave to the claimants significantly more than they would have obtained pursuant to an award for damages for deceit, to which they were also entitled."

36.    It is to be noted that the fiduciary obligation was held to be owed by Mr Al-Saraj even though the joint venture was carried out through a jointly-owned company, Danescroft Ltd, and even though Mr Al-Saraj was not a shareholder in Danescroft, shares being held instead by a company wholly owned by him, Westwood Ltd.

37.    The second case is *J D Wetherspoon plc v Van de Berg & Co Ltd* [2007] EWHC 104 (Ch), on a striking out application, and [2009] EWHC 639 (Ch) at trial.  It was not in dispute in that case that the Defendant, a corporate agent, owed fiduciary duties to the Claimant as principal.  The issue was as to whether any of the three directors of the Defendant owed such duties as well.   Lewison J declined to strike out the allegation of fiduciary duty as against two of the three directors but, in his judgment given after the trial, Peter Smith J held that whereas one director was subject to a fiduciary duty, the other two were not.  That result is a good illustration of the proposition that the existence of a fiduciary duty in such a case is very fact-sensitive.

38.    We were also referred to *Crossco No 4 Unlimited v Jolan Ltd* [2011] EWCA Civ 1619, where Etherton LJ referred to his own decision in *Murad* as follows:

> "In the absence of agency or partnership, it would require particular and special features for such fiduciary duties to arise between commercial co-venturers.   It is clear, however, that in special circumstances they can arise: Snell's Equity (32nd ed) at 7-006; *Murad v Al-Saraj* [2004] EWHC 1235 (Ch) at [325]-[341], [2005] EWCA Civ 959."

39.    Accordingly, the judge turned to consider the particular facts of the case, in order to see whether the circumstances of this particular joint venture justified the finding that WCL and Mr Barnett were under fiduciary duties in addition to WCL's defined

contractual duty.  He did so first as regards WCL and in relation to the most basic suggested duty, namely to act in good faith in relation to the conduct of the joint venture and the payment of money to Ross River.  He found that there was such a duty.  His reasoning is set out in his paragraph 257 which I will quote in full:

> "Under the JVA, as between Ross River and WCL, the latter had complete control over the operation of the joint venture, at any rate in the later stages following the sale of the supermarket site (which occurred in March 2006).  Thus, WCL was to handle the disposals of the interests in the site.  WCL was to receive the proceeds of those disposals.  WCL was to incur the expenditure necessary for the purposes of the joint venture and it was to pay the sums due in those respects.  WCL was to account to Ross River in relation to the Net Profits and to pay to Ross River the Development Profit.  Some of the terms of the JVA are of particular relevance in this regard.  The agreement was expressed to be "a joint venture".  The objectives of the parties were to maximise profits from the development.  The parties were to share in the profits from the development at the earliest possible time.  WCL was to provide Ross River with all relevant invoices and accounts.  Under clause 10.5, Ross River was entitled to receive Development Profit.  Development Profit was to be arrived at by deducting relevant expenses from relevant revenues.  Clause 10.5 appeared to contemplate that WCL was not entitled to pay itself out of the revenues of the development before it accounted to Ross River for its share of Net Profit.  Ross River had no control over most if not all of these matters.  Ross River had no nominee director on the board of WCL and had no shares in WCL.  Mr Barnett accepted when cross-examined that Ross River "reposed a very high degree of trust in [him] and Mr Harney to run the JV for the benefit of all parties" and that "with that trust came duties which [he] owed, [he] and WCL owed, ... to the Ross River parties".  That answer by Mr Barnett partly concerns matters of fact and partly deals with the legal consequences of those facts.  Mr Barnett accepted as a fact that Ross River placed a very high degree of trust in him and Mr Harney.  He also accepted, seemingly as a legal consequence of that fact, that he and WCL owed duties to Ross River.  I am not obliged to find as a matter of law that WCL (and Mr Barnett) did owe a fiduciary obligation of some sort to Ross River just because of that answer.  The issue is ultimately one of law and not one of fact.  However, the issue of law is very sensitive to the particular facts of the case.  If I felt that Mr Barnett had been pressurised into giving this answer, I would pay little attention to it on its own.  However, apart from the inevitable pressure of the process of cross-examination, Mr Barnett gave this evidence readily and freely.  He did not make any attempt to quarrel with, or even qualify, the proposition that was put to him.  I am able to make a finding supported by this evidence that Ross River did have to trust WCL and Mr Barnett as to the operation of the joint venture and as to the necessary accounting process at the end of it.  Indeed, that finding is supported by all the evidence in the case.  I am also entitled to bear in mind that Mr Barnett freely accepted that he and WCL owed duties to Ross River as a result

of the fact that Ross River placed trust and confidence in them. Ross River also relied upon an email of 15th December 2004 between the solicitors for the parties at the time of the negotiation of what became the JVA. The email referred to the need for "a high measure of trust and understanding between the parties to reach agreement in relation to outstanding matters". I do not place much weight on this email. It appears to be dealing with the process of negotiation of the JVA agreement itself rather than with the operation of the concluded JVA. However, the email does not in any way detract from the finding I make as to the trust and confidence which necessarily Ross River had to have in WCL (I will consider the position of Mr Barnett separately in a moment)."

40. On that basis he held, in paragraph 258, that WCL did owe Ross River a fiduciary obligation to act in good faith in the relevant respects. This was consistent with clause 10.5 of the JVA and was not undermined by this separate contractual provision.

41. Then at paragraph 259 he considered Ross River's further contention that WCL owed a duty not to allow a conflict between its own interests and its duty to Ross River. On balance, despite the fact that WCL was plainly a party to the JVA in order to make a profit for itself, he held that "WCL did owe Ross River a fiduciary obligation not to do anything in relation to the handling of the joint venture revenues which favoured itself to the disadvantage of Ross River". Then in paragraph 260 he said that, at the time when the JVA was entered into, the particular content of that fiduciary duty was "to act in good faith in relation to Ross River's entitlement to receive [its then one third share of Net Profits] and not to do anything in relation to the handling of the joint venture revenues which favoured itself to the disadvantage of Ross River's entitlement to receive that share". At the end of that paragraph he held that, after the Side Agreement had been entered into, the application of the fiduciary duty in question was such that it "extended to both of the sums payable to Ross River under the Side Agreement as they did to the Development Profit payable under the JVA".

42. Then turning to Mr Barnett, and rejecting the argument that it was simply obvious that Mr Barnett owed such a duty, he said at paragraph 261:

"… normally it will not be right to hold that a director of a company which is dealing with a third party owes personal fiduciary obligations to that third party, even in a case where the company owes fiduciary obligations to the third party. The distinction which is normally to be made between the company and the director is a fundamental one in company law. Nonetheless, the cases show that it is possible in special circumstances to find that a director has taken on such a fiduciary obligation. Are the circumstances here special enough or are they no more than what is normally the case where a company deals with a third party?"

43. In paragraph 262 the judge addressed the issue of a duty of good faith on the part of Mr Barnett. He referred to Mr Barnett's evidence that he had been deeply involved in the proposed development or a similar development for some years and that it was only through his exceptional persistence and skill that the development could take

place at all. Originally he had used his wholly-owned company Bradcliffe, but WCL was formed as a clean company to enter into the JVA and to undertake the development project from then on, owned by Mr Barnett (80%) and Mr Harney (20%). Mr Barnett considered that he and Mr Harney should be paid personally for managing the joint venture project, which led to the agreement that I have mentioned as to WCL paying them up to £120,000 which would come out of the development proceeds as a deduction in the calculation of the Net Profits, so that it would reduce the sum which Ross River's entitlement would produce. This arrangement emphasised to the judge the personal contributions being made by Mr Barnett and Mr Harney in carrying out the joint venture. The judge also referred to Mr Barnett's evidence in cross-examination as follows:

> "he accepted that Ross River "reposed a very high degree of trust in [him] and Mr Harney to run the JV for the benefit of all parties" and that "with that trust came duties which [he] owed, [he] and WCL owed, ... to the Ross River parties". Thus he freely accepted that he personally owed duties to Ross River, based on the trust and confidence which Ross River placed in him personally."

44.    The judge concluded from this review that Mr Barnett did owe a fiduciary duty of good faith to Ross River, for much the same reasons as he had held that WCL did, and that he also owed the same fiduciary duty not to allow a conflict of interest and duty to occur. In terms of transactions which favoured Mr Barnett, for this purpose, he included cases where the party favoured was a company controlled by him or in which he had a substantial interest.

45.    That, then, is the reasoning which Mr Hill challenged in arguing upon his Respondent's Notice. In addition to the general points to which I have already referred, as to it being inappropriate to invoke equitable principles in relation to the incidents of commercial contracts, he made a number of points on the facts. He pointed out that, unlike in *Wetherspoon*, there was no prior relationship between Ross River and Mr Barnett on the basis of which it could be said that Ross River reposed trust in Mr Barnett. Ross River would have known that whether it was able to be paid at the end of the day would depend on WCL's assets and solvency, but it did not obtain any contractual security for such payment, not even by using the contractual provision in clause 12.3.5, and no such obligation on the part of the company or of its directors, in effect as guarantors, could be implied nor should it be imposed. The fact that Mr Barnett accepted that Ross River reposed trust in him, in the course of his evidence, could not suffice to justify the finding of a fiduciary duty, and all the more without knowing more about the content of the trust of which the witness spoke. Moreover, if Mr Barnett was under a fiduciary duty to Ross River, then this might put him in a position of conflict as regards his other fiduciary duties to, for example, WCL itself as director. So far as the duty to avoid conflicts of interest and duty is concerned, he pointed out that WCL had its own separate interest for its own sake in the joint venture project, and he submitted that the suggested duty owed to Ross River would apparently override that independent interest of WCL itself, which could not be right. He argued that the judge's reference to "joint venture revenues" was mistaken. There were no such revenues. All proceeds of the development belonged exclusively and beneficially to WCL. He suggested that the judge may have had in mind the idea that the proceeds of the development were in some sense held in trust for WCL and

Ross River, in the relevant shares, but that this was not correct, and that the error undermined the judge's reasoning and conclusion.

46.   He had a particular point about the application of the duty as found by the judge to the sum due under the Side Agreement. As to this he said that it would clearly put Mr Barnett into the position of a guarantor, because he would be liable to Ross River (as would WCL itself) even if the reason that WCL was not in a position to pay the sums due to Ross River was that WDL and Mr Harney had not paid to WCL that which was due from them. As Mr Caplan pointed out, this argument is not well founded. Under the Side Agreement WCL did undertake a liability to Ross River, as regards payment out of the Net Profits, which is not dependent on WDL or Mr Harney having complied with their separate obligation to make payments to WCL as regards the sums lent to them by WCL out of the £325,000 paid to it by Ross River. In that respect WCL did undertake an obligation that was independent of WDL and Mr Harney performing their obligations, and was only dependent on the amount of the Net Profits.

47.   He sought to distinguish *Murad* on the basis that, there, Mr Al-Saraj had been a personal agent for and adviser to the claimants, who were inexperienced in property matters, and lived abroad, far away from London where the joint venture was to be carried out, whereas Ross River was fully experienced in property matters and required no advice from Mr Barnett in the way that the claimants in *Murad* required from Mr Al-Saraj. He pointed out that in *Wetherspoon* the director of the defendant who was held to be under a fiduciary duty had had a long prior relationship with the claimant company, in the course of which undoubtedly the claimant had reposed trust in him, and the relationship had been of a kind which it was fully appropriate to identify as fiduciary. By contrast, he said, there were no such special factors in the present case.

48.   He argued that the payment of management fees made no difference. They were paid by WCL and could not give rise to any duty to any party other than WCL.

49.   Further, he submitted, if there was to be any fiduciary duty, it must not be incompatible with the position that it was WCL who had to run the project and to pay the appropriate expenses which it incurred. Thus, for example, WCL required office space, and made an arrangement for that purpose with a company owned by Mr Harney. He argued that no duty should be found to exist which would be breached if payment was made to a company for that service, being a proper expense of the development. That particular argument lacks persuasiveness, given that the judge considered the amounts claimed for these expenses and disallowed them in his first judgment: see paragraphs 148 and following.

50.   More particularly, he submitted that the duty should be such as would not be breached except by the making of a payment in bad faith and with the intention of preventing WCL from discharging its obligations to Ross River. As an alternative formulation, he said it should not be breached by a payment made if Mr Barnett reasonably believed, on advice, that it was due. He gave a particular example in this context, of the reimbursement to Bradcliffe of its acquisition costs, for which the figure of £217,000 was included in the financial appraisal, as I have mentioned. Mr Barnett had contended that the correct figure was higher than £217,000, and that the higher figure had been paid to Bradcliffe in good faith. The judge held that the true figure

was just over £208,000 and that no more than that amount could be allowed.  Mr Hill submitted that at the very least the £217,000 had been paid (or at least could have been paid – there was no evidence as to Mr Barnett's state of mind as regards the circumstances in which it had been paid) in good faith, and that in that case there could be no breach of any fiduciary duty.

51.    We were shown some interesting passages from a work of which I was not previously aware, Fiduciary Obligations and Joint Ventures, subtitled The Collaborative Fiduciary Relationship, by Gerard M D Bean, Oxford 1995, in particular from chapter 3, Fiduciary Law in a Commercial Context, and chapter 8, The Operator as Manager. A passage in the latter chapter headed the Managerial Fiduciary Duty is of particular interest.    The label JOA which the author uses there stands for Joint Operating Agreement, a species of joint venture often used in the world of oil and gas exploration and development.  The author suggests that these are representative of the structure of many joint ventures although they may well be more detailed in their express provisions than many joint ventures in other areas of commercial activity. This passage is from pages 165 to 167:

> "It is more common for managerial duties to arise in various business structures outside the trust example, as the trust is not the most common business structure.  Moreover, the operator in a JOA is more analogous to an agent or a managing partner than to a trustee. Managerial duties arise where the purpose of the relationship is maximizing returns from a profit-making apparatus for others.   The classic examples are company directors, managing partners of partnerships, and managers of unincorporated businesses.  The courts in controlling managers' powers to manage (i.e. by requiring those powers to be exercised honestly in the best interest of the enterprise) have created a duty to manage the business honestly in the best interests of the enterprise.

> Finn [see P.D. Finn, Fiduciary Obligations, 1977] considers that a duty to act in the best interests of the beneficiary (a prescriptive fiduciary duty) arises in the case of the 'fiduciary office holder'.  Such office holders are entrusted with power to act for the benefit of another, but are not under the immediate control and supervision of the beneficiary. In such cases the fiduciary 'is positively required in his decision making to act honestly in what he alone considers to be the best interests of … his beneficiaries'.  Finn cites the usual categories of such persons as trustees, company directors, court appointed receivers, personal representatives, and trustees in bankruptcy and notes that the distinguishing feature of these persons is that they do not derive their powers from agreement with the beneficiary.  But, this common factor is not the most important: the important fact is that these persons all exercise some form of managerial function.

> Finn's rationale is that the fiduciary who has freedom to determine how the interests of the beneficiary are to be served requires the supervision of equity.   Indeed, it is the fiduciary's autonomy in decision-making that requires equity's supervision and this is required

whether or not the autonomy is created under a contract between the parties or is inherent in the office.

The courts have recognized that managerial powers of company directors are subject to a duty to act *bona fide* in the interests of the company.  Partners, too, must act in perfect good faith toward their co-partners and, hence, in their exercise of the right to manage must act in the interests of the partnership.  Also agents with discretion, either as part of their relationship or because their instructions are capable of more than one construction, are bound to act *bona fide* in their principal's interests.   In a JOA the operator acts as manager of the project and, therefore, we may postulate that an operator is under a duty to act honestly in the best interests of the joint venture in the exercise of any managerial powers."

52.     Those comments seem to me to be well justified in the light of the authorities to which we were referred and of the relevant practical and commercial considerations.

53.     We were also shown *John v James* [1991] FSR 397, mentioned by Bean, and relied on by Mr Justice Morgan in the present case (see paragraph 246).   In that case the claimant (Elton John) asserted fiduciary duties against his manager, publisher and associated companies under agreements for the exploitation of compositions, accompanied by the assignment of the copyright in the compositions.  Nicholls J held that fiduciary duties did exist, even though the copyrights were assigned outright to the Defendant, and the Defendant had its own interest in the exploitation of the compositions, as did the Claimant.  He said this at 432-3:

"The defendants' own formulation of its obligation regarding exploitation was that, in addition to an implied term to use reasonable diligence to publish, promote and exploit compositions accepted under the publishing agreements, the publisher was obliged to act honestly and not to organise sub-publishing in a way which no reasonable publisher would have done.  Those were the limits of its obligations, and those obligations were contractual and not fiduciary.

I am unable to accept this.  This formulation would, for instance, leave DJM free to publish abroad itself, or (which is of no relevant commercial difference) through a wholly-owned subsidiary company, and to fix for itself or its subsidiary once and for all or from time to time the rate at which it or its subsidiary should be paid for that work. So long as DJM honestly considered that exploitation on those terms was for the joint benefit and the terms were commonly found in the publishing trade, the writers could not object.  That cannot be right. On a natural, fair reading of the documents one would have expected that the writers' entitlement to sums equal to one half of the royalties "received from persons authorised to publish the musical compositions in foreign territories" (clause 9(c) of the 1967 publishing agreement) carried with it the protection for the writers that, in fixing with the overseas "persons" the amount of the royalties to be remitted, DJM would be negotiating with another person an arm's length deal in which the interests of DJM and of the writers would not be in conflict."

54.    The judge continued as follows:

> "I am in no doubt that under the publishing agreements DJM occupied a fiduciary position in respect of any exploitation which it carried out. In particular, in addition to being under a duty to exploit the assigned copyrights only in a way it honestly considered was for the joint benefit of the parties, DJM was under a duty not to make for itself any profit not brought into account in computing the writers' royalties. … I consider this to be a natural, indeed an obvious, consequence of the arrangements made by the publishing agreements for the exploitation of the assigned copyrights.  The agreements were to endure for the whole life of the copyrights and the copyrights were to comprise all the compositions of the writers for a period of three or six years.  The copyrights were to be assigned to the publisher, and to become its property, but with the intention that they would be exploited by the publisher, which would have complete control over the method of exploitation, not for its benefit alone but for the joint benefit.  Thus, commercially, the arrangement was in the nature of a joint venture, and the writers would need to place trust and confidence in the publisher over the manner in which it discharged its exploitation function."

55.    It seems to me that Mr Caplan was right in submitting that this shows a clear and instructive example of a transaction in the nature of a joint venture where the relevant assets belong legally and beneficially to one party, whose task it is to exploit them, but they are to be exploited for the common benefit of both parties, and where fiduciary duties arose from the situation despite the fact that the operator had its own personal interest in the exploitation to which it was entitled to have regard.

56.    Mr Hill showed us the judgment of Briggs J in earlier litigation between Ross River and another undertaking, Cambridge City Football Club, [2007] EWHC 2115 (Ch), where on the facts the judge held that a fiduciary duty of good faith was owed, but that the terms of the agreement between the parties were such as not to justify finding a specific fiduciary duty of disclosure, because it would be inconsistent with the detailed express contractual duties.   Briggs J said this at paragraph 197, which includes a useful quotation from an influential and much-quoted judgment of Mason J in the High Court of Australia:

> "In relationships falling short of partnership, but having in them elements of joint enterprise or joint venture, there is no hard and fast rule as to the existence or otherwise either of a duty of good faith, a fiduciary duty or a duty of disclosure.  Each case will turn on its own facts, but if the relationship is regulated by a contract, then the terms of that contract will be of primary importance, and wider duties will not lightly be implied, in particular in commercial contracts negotiated at arms' length between parties with comparable bargaining power, and all the more so where the contract in question sets out in detail the extent, for example, of a party's disclosure obligations: see more generally *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41, at 97, where Mason J said this:

"That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is all important because it is the contract that regulates the basic rights and liabilities of the parties. The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to, them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the effect the contract is intended to have according to its true construction.""

57.   In paragraph 198 Briggs J referred to:

"well known badges or hallmarks of a fiduciary relationship, such as … [if] the plaintiff entrusts to the defendant a job to be performed, for instance, the negotiation of a contract on his behalf or for his benefit."

58.   At paragraph 234 he said:

"This is in my judgment a case in which the specific obligations to volunteer information were exhaustively set out in the sale agreements, such that the identification of any wider or more general obligation of disclosure would conflict with those detailed provisions by rendering them unnecessary."

59.   Despite Mr Hill's attempts to distinguish cases such as *John v James* and to criticise Morgan J's reasoning in the present case, in my judgment the judge's conclusion that both WCL and Mr Barnett owed fiduciary duties to Ross River is properly reasoned and is sound and correct on the facts of the present case.

60.   The absence of any prior relationship between Ross River and Mr Barnett seems to me of no significance as compared to the nature of the structure adopted under the JVA, where WCL owned all the relevant assets and was entirely in control of their exploitation, and Mr Barnett was entirely in control of what WCL did in this respect. I agree with Mr Hill that Mr Barnett's evidence under cross-examination that Ross River reposed trust in him and that he owed them a duty is not by any means decisive. But I do not see that the judge erred in what he said about that evidence. It would not have sufficed by itself but it was consistent with the conclusion reached by the judge from the other material. I am not impressed with Mr Hill's point about conflicting fiduciary duties. I do not regard that as a realistic problem in the present case, even if there might be cases where the possibility of such conflicts would have to be considered. The judge was under no misapprehension from his use of the phrase joint venture revenues. This was just a convenient label, and it was not misleading in the context. Paragraph 265 showed that the judge had it clearly in mind that the assets belonged to WCL and were not held on trust.

61.     I have already explained why I reject Mr Hill's argument about the Side Agreement. It follows that I would uphold specifically the judge's conclusion that the fiduciary duty applied in relation to all of Ross River's entitlement out of the Net Profits, including all of that part of this entitlement that was derived from the Side Agreement.

62.     So far as analogies with or distinctions from other decided cases are concerned, of course all such cases are factually different in material respects. *Murad*, *Wetherspoon* and *John v James* are relevant as setting out the principles, and as examples of their application. For my part I find *John v James* the most useful and compelling analogy with the present case, for all the differences that can be pointed out as between the position of Ross River in the present case and that of Elton John in that one, vis-à-vis their respective counterparties in negotiation and in the joint venture itself.

63.     It is relevant, in my judgment, that Mr Barnett was not only in control of the project but was also, for a time, paid a management fee which was properly deductible in the calculation of Net Profits, so that it affected the interests, as between them, of Ross River and WCL (i.e. himself).

64.     I do not accept Mr Hill's alternative formulation which would depend on proof of bad faith. That seems to me entirely inconsistent with the origin and nature of fiduciary duties arising in circumstances such as these. Of course it is not a breach of such a duty for the operator to pay an expense which is properly payable, or which is in any event agreed to be paid, but if a fiduciary duty exists at all, it throws the burden on the party subject to the duty to justify any payment in any case where there is any doubt as to whether it was properly made. Thus, I accept Mr Caplan's submission that the judge was right to find established at least a fiduciary duty of good faith, on the part of both WCL and Mr Barnett. The full extent of the fiduciary duties owed requires further consideration, for which it is necessary to examine also what the judge said in his later judgment as to remedies.

**The judge's judgment as to remedies**

65.     Both on the appeal and on the cross-appeal issues were raised as to the extent of the duty. These were brought into sharp focus by the judge's judgment given in September 2012 as to the remedies to which Ross River was entitled, in which, as I have mentioned, he reached conclusions as to the amount of the Net Profits and as to Ross River's entitlement out of those Net Profits, but he also concluded that although Mr Barnett had acted in breach of his fiduciary duty, he was not liable to pay any equitable compensation for that breach of duty to Ross River. Mr Caplan argued that this could not be right, and that although the judge's decision as to fiduciary duty was correct, he had misapplied it when addressing the issue of compensation. Conversely Mr Hill submitted that the judge's conclusion showed that his initial decision as to fiduciary duty was not correct.

66.     I do not need to take time referring to the judge's decision as to the amount of the Net Profits, or as to Ross River's entitlement out of that amount. As I have mentioned, the Net Profit figure was held to be £1,209,815, and Ross River's entitlement was £1,043,926. That meant that WCL was entitled to retain £165,889.

67.    I do, however, need to go back to the passage in the first judgment in which the judge discussed the question of breach of fiduciary duty in order to introduce his ultimate decision on the point. This started at paragraph 264. Speaking of the content of the obligation not to make any payment out of the joint venture revenues which favoured WCL or Mr Barnett to the disadvantage of Ross River, he compared hypothetically, on the one hand, a small payment to a connected party at a time when the Net Profits were expected to be £1.5 million and WCL was entitled to two thirds of them, and no sum was yet due to Ross River, and on the other hand a large payment or series of payments to a connected party which might prevent WCL from being in a position to pay all its creditors and to pay £500,000 to Ross River. In the first case he said that because the payment could not disadvantage Ross River it would not be a breach of the fiduciary obligation, whereas in the latter case the payment might be in bad faith and so in breach of duty (see paragraph 264).

68.    He found himself assisted less than he wished by the approach of the parties at trial. Ross River had taken a hard line, submitting that any payment at any time by WCL to a connected party which was not for joint venture purposes was a breach of fiduciary duty, and was made in bad faith and dishonestly. Conversely Mr Barnett maintained (at times, though not consistently) in his evidence that no payments were made which were not for joint venture purposes. No attention was given in the course of the evidence to what the state of mind of Mr Barnett and through him WCL was at the time of any given payment. Faced with this position on the evidence, the judge decided, as a starting point for his discussion of the issue, to identify what WCL ought reasonably to have considered from time to time would be the likely outcome of the development, and the resulting sum payable to Ross River and therefore the resulting sum which WCL would be entitled to retain. He concluded that WCL should have had in its mind during the course of the joint venture the figure of £1.5 million "as the possible outcome by way of Net Profits". Then, by reference to the sequence of agreements, he identified an expected entitlement for WCL of £1 million from the JVA until the Side Agreement, of £440,000 once the Side Agreement had been entered into, until the third supplemental agreement, and £340,000 thereafter. On the basis of those figures he said, in paragraph 271, that from May 2006 onwards:

> "WCL and Mr Barnett would know that if WCL paid connected parties sums which were not for joint venture purposes in circumstances where it could not be confident that it would recover those monies from those parties and those monies exceeded £340,000 then it would have jeopardised its ability to pay the full sum which it could expect Ross River would be entitled to."

69.    The judge referred in his first judgment to the state and development of the evidence and the rival contentions as to the issue of payments to connected parties and payments otherwise than for legitimate joint venture purposes, but he was unable to come to a clear conclusion on this matters. One of the points identified as potentially contentious was payments in respect of legal fees in defending the claim on the part of WCL.

70.    By the time of the adjourned hearing, the payments in respect of legal fees had become a major issue. Geoffrey Leaver had been instructed on behalf of both Mr Barnett and WCL, on the basis that each was jointly and severally liable for the sums due to the solicitors. Mr Barnett paid three sums to WCL, of £50,000, £50,000 and

£200,000 before July 2011. These payments (together with, in one case, a VAT repayment) enabled WCL to pay £48,000, £85,000 and £200,000 to Geoffrey Leaver. The judge recorded that, though later payments were not in evidence, he had been told that Mr Barnett had paid further sums to WCL which WCL had paid on to Geoffrey Leaver, who had by January 2012 received in all just over £596,000, and further sums since then, although these were not quantified in the judge's judgment. He noted Geoffrey Leaver as having said, in January 2012, that their fees overall, inclusive of VAT, came to £1,150,000 of which WCL had paid £596,346, and Mr Barnett had paid £40,696 and had also given security for further fees, the security being worth £300,000. Mr Barnett had asserted that he and WCL had incurred legal costs amounting in all to over £1,160,000, of which WCL had paid £556,000 odd, and he himself had paid £120,000. We were shown a circular by the liquidators of WCL to all known creditors dated 26 June 2013, which shows Geoffrey Leaver as having claimed £556,270 in the liquidation.

71.    Ross River contended that, in substance, all of the legal costs were incurred for Mr Barnett's benefit and that WCL had no good reason to incur legal costs in defending the claim at all, so that WCL ought not to have been made liable for the solicitors' costs. This was based on the proposition that, when the claim was commenced, WCL's assets were no more than some £9,000 in the bank and the unsold assets in the development, which were in due course realised for no more than some £350,000, whereas under the Side Agreement alone WCL was liable in any event to pay Ross River more than £700,000. The Claim Form in its original form claimed the payment of either £795,000 under the agreements taken together, or at least £716,666 under the Side Agreement. WCL was therefore insolvent on any basis (assuming, as the judge held, the Side Agreement was valid and effective according to its terms) and it could not improve its position by resisting the proceedings. The only person whose position was at risk in the proceedings (ignoring Mr Harney) was Mr Barnett. Therefore it was for his sake, and not at all for WCL's sake, that the defence was mounted and maintained, and he should have been solely liable for the solicitors' costs. Since the costs incurred in defending the proceedings could not be regarded as joint venture expenditure, it was said that Mr Barnett's conduct in making WCL liable for Geoffrey Leaver's costs was itself a breach of fiduciary duty.

72.    Mr Caplan's submission to the judge is summarised in the judge's paragraph 62, which it is convenient to quote:

> "Mr Caplan's basic submission on the facts was that: (1) WCL only ever had one project, the joint venture; (2) WCL should have retained all of the revenues of the joint venture until Ross River was paid its share of Net Profits; (3) if WCL had retained all of the joint venture revenues, it would have been able to pay Ross River in full; (4) WCL is now in insolvent liquidation and Ross River will receive very little, if anything, from WCL; (5) WCL and, now more importantly Mr Barnett, should not have allowed this to happen; (6) WCL and Mr Barnett must have been in breach of fiduciary duty in allowing this state of affairs to come about; (7) the loss suffered by Ross River is exactly equal to the sums not paid to it by WCL."

73.    The judge noted that some aspects of this submission repeated points that he had rejected in his first judgment, namely the proposition that WCL and Mr Barnett would

be in breach of their fiduciary duties merely by making an unauthorised payment to a third party, irrespective of the circumstances. He then addressed the question of WCL's incurring liability for, and paying, the legal costs. It had not been pleaded, nor advanced at trial, that WCL was in breach of fiduciary duty in incurring liability for, and paying, legal costs of defending the proceedings.

74.     It is clear that WCL was a necessary party to the proceedings, even if Ross River's main target was Mr Barnett. WCL had to be a party to the process of quantification of the Net Profits, and to the issues over the Side Agreement. The judge said at paragraph 67:

> "On the face of it, WCL was entitled to defend itself and to use its own assets to do so, even though the use of those assets might produce the result that it used up all of its available funds and ended up being unable to pay any sum found to be due to Ross River."

75.     Shortly thereafter, at paragraph 69, he said this:

> "In my judgment, both WCL and Mr Barnett were real and substantial defendants. Both were entitled to defend the claims brought against them without there being a breach of fiduciary duty owed to Ross River. The fiduciary duties which, in my earlier judgment, I found to exist do not go so far as to restrict either WCL or Mr Barnett from putting forward their chosen stance in litigation brought by Ross River against them. It would be a very onerous fiduciary duty which prevented a party to adversarial litigation from defending itself."

76.     He also rejected an argument from Mr Caplan that, even if this were so in general, it could not justify WCL and Mr Barnett in incurring expense in defending the claim in the way in which they had done so, putting forward a dishonest defence, involving the fabrication of documents and the telling of lies.

77.     As to Mr Caplan's point that it could not be right that WCL could use its assets, which were the net proceeds of the joint venture, to resist Ross River's claims under the JVA and the related agreements - in substance, he said, WCL was defending Ross River's claim using the very money which was due to Ross River - the judge said, at paragraph 70:

> "Unfortunately, Ross River's problem is not an unusual one. It is not uncommon for a potential claimant to have to consider whether a defendant is worth suing. Even if the potential defendant is worth suing at the outset, the potential defendant may use up much of, or even all of, its funds in defending the litigation so that it becomes worthless during, or by the end of, the litigation. Even where the court considers that a defendant is likely to attempt to dissipate its assets to make itself judgment proof, the court still allows such a defendant to use its assets to defend the litigation brought against it."

78.     Those comments on the judge's part are well made, in general. A corporate defendant to an ordinary money claim may have the wherewithal to pay the claim or to defend the proceedings but not both, but neither it nor any of its directors is ordinarily in

breach of any duty owed to the claimant by resisting the proceedings. However, it seems to me that there is force in Mr Caplan's point that the judge's comments do not take account of the features of this claim, unlike many, namely that, first, WCL had no real interest of its own in defending the claim and, secondly, Mr Barnett did have a real interest in doing so, so that WCL ought to have adopted a neutral position, and Mr Barnett ought to have been the person, and the only one, who incurred cost in defending the litigation.

79.    The judge referred to an incidental dispute, namely the basis on which, given that both WCL and Mr Barnett were liable to the solicitors, the liability should be apportioned as between them. Each side argued for an 80/20 split, but in opposite directions. The judge held that the right proportions should be 50/50 (paragraph 73).

80.    The judge also rejected the contention that it was a breach of Mr Barnett's fiduciary duty not to cause WCL to go into liquidation early in 2009.

81.    He held that, on the basis of the overall estimate of legal fees mentioned above, WCL being liable for half, or about £575,000, the payment already made by WCL, whether of £596,000 or of £546,000, "did not involve any substantial payment by WCL which was not for the benefit of WCL but was for the benefit of Mr Barnett or for the benefit of connected persons", and accordingly that it was not a breach of fiduciary duty for Mr Barnett to arrange that these payments were made (paragraph 76). He also pointed out that, given that WCL carried out only the one project, and was only entitled to retain £166,000 of the Net Profit for itself, the burden of legal fees would have driven WCL into insolvent liquidation even if it had kept all the joint venture revenues in a separate account which could be used only for paying joint venture expenses and legal fees. Moreover he held that it was not a breach of fiduciary duty for Mr Barnett to cause WCL to pay its full share of the legal costs before he had paid the full amount of his own share.

82.    Earlier in his judgment the judge had referred to the calculation of the net balance as between WCL and connected parties in respect of payments which were not authorised under the joint venture. Leaving aside the debate about payments for legal fees, the aggregate balance, in favour of WCL, was £775,868 as at the date of the trial in July 2011. That is the deficit for which Ross River contended that, as at that date, WCL and Mr Barnett were liable to make good to Ross River by reason of the breaches of fiduciary duty in making payments to Mr Barnett and connected parties of sums which were nothing to do with the joint venture and which were not otherwise authorised by Ross River.

83.    However, the effect of the judge's decision about WCL's liability for legal fees altered that figure radically. First of all, the judge treated Mr Barnett's payments made to WCL, of sums which it then used to pay the solicitors, as being the return of funds by Mr Barnett, thereby reducing the deficit, and secondly he treated the payments made by WCL to the solicitors as properly made, and therefore not increasing the deficit. The combined effect of these two factors reduced the deficit to £179,452.68 (paragraph 40).

84.    Then the judge turned to the question whether, on the footing of that lower deficit figure, Mr Barnett had been in breach of his fiduciary duty. Referring back to the approach he had outlined in his first judgment (in passages summarised and partly

quoted at paragraph [68] above) he said that, if at a given time WCL could reasonably have expected its share of the Net Profits to be £340,000, then paying £179,000 to connected parties would arguably not have been a breach of fiduciary duty, even though there was a risk that the Net Profits would be lower (as they turned out to be) and therefore WCL's share, even at that time, would itself be lower. That was in his paragraph 78, and I do not think it is part of the final basis for his decision, rather than an observation on the way, but it does indicate the lines on which he was proceeding, which were consistent with the reasoning in his first judgment.

85.    He proceeded, however, by saying that what mattered was not the amount of the deficit at the date when the litigation started but, at any rate as regards causation of loss, its amount when WCL went into liquidation. He observed that there was no evidence at trial as to what amount WCL and Mr Barnett were entitled to expect that the Net Profits would be in the end, at any given time during the development process. Given the lack of any examination of that aspect of the matter at trial, the judge said, at paragraph 80, that he was not able to make a finding that payments in excess of any specific figure should have been appreciated by Mr Barnett as placing on Ross River an unacceptable risk of it not being paid in full. He concluded on this topic as follows:

> "81.    Mr Barnett may have been in breach of his fiduciary duty to Ross River at an earlier point in time when the deficit was much greater than it later became. However, Mr Barnett has taken steps which, correctly analysed, resulted in the deficit being a lower figure and, in particular, at a level where I am no longer able to hold that the existence of the deficit is attributable to a breach of fiduciary duty by Mr Barnett.
>
> 82.    My conclusion on the evidence at the trial is that Ross River has not shown that Mr Barnett was in breach of his fiduciary duty in relation to a deficit of £179,452.68."

86.    Thus, despite the judge's finding that Mr Barnett was in breach of fiduciary duty, that there had been a deficit of £775,000 as regards payments to connected parties when the litigation began, and that WCL was entitled to no more than £165,889 out of the Net Profits, the net result of the claim was, as the judge said at paragraph 88, that he made no order as to the payment of equitable compensation by Mr Barnett.

**Issues in relation to the judgment on remedies: general**

87.    Both Counsel contended before us that the reasoning and the outcome of the judge's judgment as to remedies showed that the judge had gone wrong in the first judgment. Mr Hill argued that it showed that the judge should not have held that WCL or Mr Barnett was under a fiduciary duty at all, or at any rate no more than a duty of good faith. He contended that the difficulty which the judge encountered in applying the more extensive duty, not to deal with joint venture receipts in such a way as to favour WCL to the disadvantage of Ross River, showed that it was an unrealistic and unreasonable duty to have found to exist in the circumstances. Conversely, Mr Caplan submitted, not only that the judge was in any event wrong as regards the legal fees, but that his approach to the formulation of the fiduciary duty as set out in his first judgment was incorrect.

88.     It does not seem to me that anything that the judge said in his judgment on remedies casts doubt on the analysis or reasoning on the basis of which he held, in the first judgment, that WCL and Mr Barnett were under fiduciary duties of the kinds which he identified. The control which WCL had over all aspects of the management of the joint venture project, and over the disposal of the funds arising from it and of the assets comprised in it, and the control which Mr Barnett was able to exercise over WCL and what it did in these and all other respects, seem to me amply to justify the judge's conclusion, for the reasons set out in paragraphs 257 to 263 of the first judgment, that both company and director were under the identified fiduciary duties.

89.     My difficulty with the judge's reasoning in the judgment on remedies, and in the corresponding part of the first judgment, is that it does not seem to me that he carried through in a fully logical way the consequences of the fiduciary duties that he had held to exist.

90.     The duty which the judge found existed, in addition to the duty of good faith, was an application to the particular circumstances of the duty not to allow WCL's interests to conflict with its duty to Ross River, and not to profit from its position as a fiduciary. Since as a joint venturer it did have its own interests to which it was entitled to pay regard, and it was to profit from the joint venture, the application of the basic duties without any adaptation to the circumstances would have been inappropriate. Accordingly the judge found established the particular version of these duties which he set out in paragraph 259 of the first judgment (see paragraph [41] above). In this he was fortified by clause 10.5 of the JVA, which prohibited WCL from paying itself on account of the Net Profits before it paid Ross River. However, the approach which he then promulgated in paragraph 264 of the first judgment is not consistent with clause 10.5 of the JVA because it treated it as permissible for WCL to make a payment to itself or for its own benefit, or to a connected party, not being the payment of a proper joint venture expense, so long as the amount was such that, on the figures known or reasonably anticipated at the time, to make that payment would not put Ross River at a disadvantage, that is to say, it would not reasonably be expected to jeopardise WCL's ability to pay Ross River the amount to which it was entitled out of Net Profits in due course. Necessarily, to make such a payment would involve WCL drawing, so to speak, on its own prospective entitlement to Net Profits, and anticipating its entitlement. It follows that to make the payment would be a breach of clause 10.5 of the JVA. It would be such a breach however confident, or even certain, WCL could reasonably be that the amount of the payment would be within its own prospective entitlement.

91.     I agree with the judge's comment in paragraph 258 of the first judgment that clause 10.5 supports the conclusion that a fiduciary duty was owed, the clause being consistent with the fiduciary obligation identified. Correspondingly the fiduciary obligation ought to be consistent with the express contractual obligation. In paragraph 259 the judge observed that Ross River had not relied on clause 10.5 in its pleaded case and had not claimed relief in reliance on it. He considered that this was a weakness in Ross River's pleaded case, though it did not, in the end, persuade him not to find that the fiduciary obligation was owed.

92.     With respect to the judge, I do not see why it should count against Ross River in any way that it did not seek relief on the basis of clause 10.5. In contractual terms, WCL's breach of that clause was to pay itself its share of Net Profits before paying

the corresponding share to Ross River. It is not clear what additional contractual relief Ross River could have obtained in reliance on that breach (which undoubtedly occurred). Moreover, the main part of Ross River's case, certainly if measured in financial terms, was not that WCL had paid itself its own share too early, but that it had also paid itself a substantial part of Ross River's share, which was a breach of a more fundamental obligation than that of clause 10.5.

93.    As it seems to me, the judge, having rightly identified that the circumstances of the JVA gave rise to a fiduciary obligation owed both by WCL and in turn by Mr Barnett, should have been guided both by the normal principles of fiduciary obligations and by clause 10.5, so as to find that WCL was prohibited from paying itself, or using for its own benefit, any part of the proceeds of the development (any joint venture assets, as the judge described them) otherwise than (a) in payment of proper expenses of the development or (b) as agreed with Ross River, whether generally or on an ad hoc basis. I therefore consider that the judge was wrong to allow to WCL the freedom to make payments to itself or for its own benefit, outside these two permitted categories, if it was able to make a reasonable judgment, in good faith, that to make the payment would not jeopardise its ability in the end to pay to Ross River that to which it was entitled out of the Net Profits. The judge's approach enabled WCL and Mr Barnett to impose on Ross River the risk that the development would not work out as well as expected. It also permitted WCL and Mr Barnett to contend that whether a payment was justified depended on reasonable foresight as to the eventual outcome at the date of the payment, thereby putting Ross River at the risk of the conclusion to which the judge came, that because the evidence at trial had not included any investigation of what outcome could reasonably have been foreseen at any relevant dates, therefore Ross River was not entitled to any compensation, not having proved a breach by WCL or Mr Barnett of the fiduciary obligation.

94.    In general, where a person is subject to a fiduciary obligation as regards his or its dealings with assets, then it is up to that person to establish the justification for his or its dealings, if there is any contest, rather than it being for the beneficiary (i.e. the person to whom the obligation is owed) to prove that the payment was not justified. The judge's approach does not seem to me to reflect that principle. Moreover, quite apart from the question of the burden of proof, the judge's approach does allow WCL to pay itself on account of its share of Net Profits, before any sum is paid, or even payable, to Ross River on account of its share. Further, once the Side Agreement had been entered into, Ross River was (as the judge found) entitled to the first £560,000 – and in fact rather more – that became payable by way of Net Profits, and was entitled to be paid that sum when (but not before) the composite site was fully sold or let. Even after the rights of the parties had been changed by the Side Agreement with that effect, the duty as expressed by the judge entitled WCL to make payments for its own benefit which cast upon Ross River the risk that the outcome of the development would not permit the payment in full (or possibly at all) to Ross River of that sum, to which Ross River was contractually entitled to priority.

95.    For these reasons, it seems to me that, while the duty formulated by the judge as the second aspect of the fiduciary obligation owed by WCL and Mr Barnett was sound, the way in which he interpreted it, or applied it, was inconsistent with the essential nature of a fiduciary duty, by not placing on the fiduciary the burden of justifying any payment or dealing which was contested, and also by subjecting the beneficiary to the

risk of the payment for the fiduciary's own benefit not turning out in the end to be justified. I also consider that it was inconsistent with the contractual agreement between the parties, above all clause 10.5 of the JVA and the Side Agreement in turn, each of which is incompatible with WCL making a payment for its own benefit out of anticipated Net Profit.

96.    On the footing that, for those reasons, the correct analysis of the fiduciary duty which the judge found to be owed by WCL and Mr Barnett to Ross River is that WCL was not entitled to pay sums to itself, for its own benefit or to connected persons (not being proper development expenses), the justification for payment of which depended on WCL's share of Net Profits being sufficient in the end, that would make a major difference to the outcome of the case. The burden would have been on WCL and Mr Barnett to justify the 215 payments identified at trial made by WCL to connected parties. It would not have been relevant for this purpose to enquire what could reasonably have been foreseen, at the time of any of these payments, as to the outcome of the development and the eventual amount of the Net Profits at the end of the day. In practice, the only issue would have been whether any given payment was or was not a proper payment by way of development expenses, or whether Ross River had agreed to the payment being made even if it was not a development expense.

97.    On that basis, I revert to the issue between Mr Hill and Mr Caplan as to the scope of the duty. What I have said so far on this aspect is consistent with Mr Caplan's submission that the judge should have found a more extensive duty than he did. That is so even though I criticise not the judge's general formulation of the duty but his application of it in detail. However, Mr Hill's argument was that, if the duty were of this kind, and therefore significantly more onerous on WCL and through it on Mr Barnett, then it would not be right to find that such a duty was owed at all. That submission was consistent with his argument that at most WCL should be under a duty such that it would not be a breach of duty for it to make a payment, even if not in the end justifiable as made by way of development expenses, so long as it was made in good faith on the footing that the payment was reasonably regarded (maybe with the benefit of advice) as due and payable by way of development expenses.

98.    That would not be a duty of a kind that I would recognise as being one such as the law imposes on a person in a fiduciary position. Accordingly, it seems to me that Mr Hill's argument in this respect really comes back to his basic position, namely that no fiduciary obligation should be found to exist in this situation at all. I reject that submission for the reasons given earlier in this judgment. It seems to me that the judge was right to find that both WCL and Mr Barnett owed fiduciary duties to Ross River, of the kind identified by the judge, for the reasons which he set out and which I have reviewed above. Moreover, it seems to me that it follows logically that the content of the fiduciary duty is more onerous than the judge found it to be. On this aspect of the case, therefore, I would reject Mr Hill's arguments on the Respondent's Notice that either no fiduciary duty, or one more restricted than that identified by the judge, should be found to exist. Correspondingly I would allow the appeal and hold that the second aspect of the fiduciary duty which the judge held was owed, first, did not permit WCL to make any payment out of the joint venture revenues (in advance of any payment to Ross River of its entitlement out of the Net Profits) other than proper payments of development expenses and payments which Ross River had

agreed could be made, and secondly, required WCL (and Mr Barnett) to justify any payment made, in the event of any dispute.

99.     During the oral argument on the appeal Mr Caplan mentioned a claim for Ross River to be entitled to an account of secret profits made by WCL, Mr Barnett or any connected party. It did not seem that any such claim had been advanced in the Particulars of Claim. In any event, on instructions Mr Caplan said that, if Ross River was held, as a result of the appeal, to be entitled to equitable compensation for Mr Barnett's breach of fiduciary duty, it would not in addition seek any remedy as regards secret profits. Accordingly I need not do more than mention that point.

**Legal costs of defending the proceedings**

100.    That finding would itself alter the outcome of the case in favour of Ross River, but I need now to deal with the separate dispute about the legal costs incurred by WCL in defending the proceedings brought by Ross River. The judge held that WCL was entitled to defend itself in the proceedings, and that it was entitled to spend money out of the joint venture revenues for that purpose. I have set out above, or referred to, the relevant passages from the judge's judgment as to remedies.

101.    At first sight it would be a striking proposition to say that a company against which a claim is brought seeking orders for payment of substantial sums, under an agreement such as the JVA, and such as the Side Agreement in respect of which there were substantial disputes, and moreover asserting fiduciary duties, should not be entitled, as against the claimant, to spend its own money on defending the claim. Often there would be no basis for such a contention. In the present case, however, it seems to me that Mr Caplan made some good points in favour of this proposition in the given circumstances.

102.    That WCL was a proper and indeed a necessary party does not itself justify the incurring of substantial expenditure. Often a company is a necessary defendant but the proceedings are really between others, in particular shareholders in the company, and it is not proper for the company to do anything substantial in the proceedings, leaving it to the real protagonists to fight it out at their own expense.

103.    In the case of some joint ventures that might be a direct analogy, if the joint venture is carried out through a company of which both or all parties are (directly or indirectly) shareholders (as was the case in *Murad*). This is not such a case, since WCL was owned and controlled by one side only, but it was the vehicle for carrying out the joint venture project, and it was therefore in and by that company that the joint venture assets were held. They were held legally and beneficially by WCL, but they were nevertheless the subject of contractual and fiduciary duties owed to Ross River as to what was done with them.

104.    Mr Caplan submitted that, in commercial and economic terms, by the time the proceedings began, the real contest was between Ross River and Mr Barnett. WCL still held some modest assets, including the remaining development assets. Apart from those it had no more than some £9,000, held in a bank account. Those assets could not justify incurring substantial expense. If the case was to be fought the person who really stood to gain or lose was Mr Barnett. It was indeed he who provided virtually all of the money which WCL used to pay its solicitors – there was no other

available source. On the basis on which the judge proceeded, WCL was defending the proceedings, in substance, at Ross River's expense. Even if the payment of legal expenses had not been (as the judge held) a legitimate outlay, the fact that they were incurred by WCL meant that they further depleted what little might be available to meet Ross River's claim at the end of the day. On the basis that they were a legitimate expense, then the process of resisting Ross River's claim, even though unsuccessful, itself reduced the amount of that claim from what it would have been at the commencement of the proceedings. Mr Caplan submitted that this could not be right, and that Mr Barnett ought to have incurred the cost of resisting the proceedings on his own behalf and without involving the company, leaving the company either with no representation and taking no step in the proceedings, or at most with such limited representation and participation as would prevent a default judgment being entered, but taking a position analogous to that of an interpleader. At the remedies hearing it was submitted that Mr Barnett should have put WCL into insolvent liquidation rather than procure that it should defend the proceedings at its own expense, jointly with his conduct of the proceedings. The case was not put to us on that basis and I do not need to refer further to that point. For Mr Caplan's purposes it would have been sufficient and appropriate to allow WCL to continue to exist, but not to incur any, or any substantial, expense in relation to the proceedings.

105. By contrast, the judge's conclusion meant not only that WCL could and did use virtually the whole of the sum which it was liable to pay to Ross River in order to defend, unsuccessfully, Ross River's claim against it, but also that Mr Barnett on the one hand obtained a credit by paying sums to WCL (thereby in the judge's view reducing the deficit as between WCL and connected parties) and on the other hand, when the same sum was paid out to the solicitors, that did not increase the deficit, because the judge regarded it as a proper payment. If the judge had taken the view which Mr Caplan urged upon him, the payments into and out of WCL would have been regarded as neutral, because Mr Barnett should have paid the legal costs himself anyway. The deficit would not have been reduced by his payment to WCL, which ought to have been made directly to the solicitors in or towards satisfaction of a liability which only he had incurred.

106. I have referred above to the judge's reasons for rejecting the arguments addressed to him by Mr Caplan on this point. It seems to me that the judge ought to have accepted the contention that the real dispute, throughout the proceedings, was between Ross River and Mr Barnett, and that Mr Barnett's defence of the proceedings ought to have been conducted at his own expense, without any of that cost or liability being shifted to WCL. Mr Caplan showed us passages from Mr Hill's skeleton argument and his oral submissions as to costs, for and at the hearing on 8 and 9 October 2012, which bore this out convincingly. These points were made by Mr Hill in support of the proposition that there ought to be a costs order favourable to Mr Barnett as against Ross River. In support of that proposition Mr Hill made a number of points on the basis that the real contest had always been between Ross River and Mr Barnett. Thus, in the skeleton argument this was said at pages 10 to 11:

> "Therefore the reality is that everything else that was claimed in this action was directed at D2, who was the only possible source of payment of any judgment apart from under the account of JV revenues and the side agreement. The provision of the account and the

arguments relating to the validity of the side agreement were relatively minor aspects of the case so far as the costs generated by them were concerned.

…

Therefore the reality was that at least by the end of 2010 when costs started to escalate substantially with C's application for a [freezing] order, the real target of C in the litigation was D2 and the substantial proportion of the costs was incurred in defending that target."

107.    Mr Hill's skeleton argument put forward figures of £150,000 incurred by the Defendants as at 8 September 2010 and £350,000 as at 18 February 2011.  On the footing of a total bill of £1,150,000 (see paragraph [70] above) Mr Caplan pointed out that this showed that at least £800,000 and quite probably more had been incurred during the period when even the Defendants accepted that Mr Barnett was the real target of the litigation.  Those costs were therefore incurred in defending him, not really in defending WCL.

108.    During the hearing on 8 October 2012 Mr Hill made these points in the course of his oral submissions:

"… in order to understand who has been successful, we need to look at what the proceedings were about.  It was always the claimant's position that the company, WCL, had been deprived of assets, assets had been either taken out, loaned out to other companies, or properties had, it was suggested, been sold for an under-value, in order to deprive WCL of funds which it would otherwise would have had to pay the profit share to the claimant and that it was either Mr Harney or Mr Barnett who had deprived it of those funds.  Therefore, these proceedings were about identifying what those funds should have been to pay the profit and then going after the parties who had taken them to get them back.  They were never about getting the money out of the company; the claimant's position was always they had gone from the company.

…

The focus of the litigation was a money claim against Mr Barnett, so that was relevant on costs for two reasons.  That was the one reason that he was going to be the paying party.  The other reason is that it goes significantly to what were the issues which were going to be the dominant issues in the case."

109.    Mr Hill supported the judge's reasoning and pointed out, for example, that Ross River had never sought to restrain WCL from using its funds to pay legal costs.  That is true but does not seem to me to be of any relevance.  He also relied on the formulation of the claim, from time to time, in the Particulars of Claim, and on Ross River's applications for interim relief against WCL during the proceedings, to show that WCL was properly entitled to resist the proceedings itself and at its own expense.  It is a fair comment that the formulation of the claim changed from time to time, and that not all

the claims asserted were pursued, some being introduced by amendment and then deleted by later amendment. None of the claims made was asserted only against WCL, however, and the sequence of formulations does not seem to me to make good Mr Hill's point that at any stage WCL had a separate interest from that of Mr Barnett in resisting the proceedings. Nor does that seem to me to follow from the applications for interim relief, especially as it was the actions of WCL procured by Mr Barnett that led to these applications being made.

110.    The judge's initial formulation of the fiduciary duty not to allow interest to conflict with duty referred in general terms to not doing anything in relation to the joint venture revenues which favoured WCL to the disadvantage of Ross River. That was subject to the implicit but necessary exception allowing for payment of proper development expenses and of sums which Ross River agreed should be paid. The judge's conclusion as regards legal expenses requires a further exception to be made to this fiduciary duty. This exception is not justified by anything inherent in or directly relevant to the fiduciary duty itself. If Mr Barnett had not been, on the one hand, the person in whose interest WCL would (if at all) resist the proceedings and, on the other hand, the only, and the real, source of funds for WCL to do so, then there might have been something to be said for the idea that WCL had to be allowed to spend its money on resisting the proceedings, and that it was therefore not a breach of the fiduciary obligation already mentioned for WCL to incur liability for legal costs or for Mr Barnett to procure that it should do so, and should satisfy that liability. As it is, however, it seems to me that Mr Caplan's submission is correct that, because the real contest was between Ross River and Mr Barnett, to which WCL was a necessary party but not one which had any separate interest of its own in resisting the claims, therefore it was a breach of the fiduciary obligation for WCL to spend its own money on defending the proceedings, and for Mr Barnett to procure that it should do so. The fiduciary obligation required Mr Barnett to spend his own money in defending the proceedings, if he wished to do so, and he should not have caused WCL to become jointly or severally liable together with him for Geoffrey Leaver's bills. Accordingly, the payments which he made to Geoffrey Leaver via WCL should be regarded as entirely distinct from the joint venture, and the company should be treated as merely being used as a conduit to pass to the solicitors payments that he ought to have made to them directly, being solely liable to the solicitors.

111.    Mr Caplan had a narrower submission in relation to the legal fees, based on the manner in which the defence was advanced and conducted. I do not need to refer to that, since I accept his broader argument which does not depend on how the defence was put forward.

**Causation**

112.    Mr Hill had a separate response to Mr Caplan's arguments on the effect of the fiduciary duty. He said that, even if it was a breach of fiduciary duty for WCL to pay, and for Mr Barnett to procure that WCL should pay, sums which were not proper development expenses and had not been agreed to by Ross River, it did not follow simply from this that Ross River was entitled to be paid the difference between whatever amount it will recover in the liquidation of WCL and the full amount to which it was entitled. He said that Ross River would have to prove (and could not do so, on the evidence) that, if the relevant sums had not been paid away by WCL, they

would have been paid by WCL to Ross River.  His primary point was that this ignored WCL's liability to other creditors, including, above all, Geoffrey Leaver.

113.   The latter aspect of the point is not well made, on the basis of what I have already said about the legal costs aspect.  WCL ought not to have been made liable for the legal fees.  If therefore there had not been any breach of fiduciary duty, WCL would not have incurred liability to Geoffrey Leaver.  That is the major aspect of this point, but not the only one.  Mr Hill also submitted that WCL had, or would have had, other legitimate creditors, and that Ross River would have had to have competed with those for recovery of its entitlement, which was not in any respect secured.  So far as that is concerned, WCL's only business was in fact the joint venture development, so it is not clear that it had, or should have had, any other creditors than those whose debts were proper development expenditure, leaving aside such modest amounts as would have been due by way of statutory requirements incidental to its corporate status.  It has not been suggested that these were or could have been material in amount.  Accordingly, it seems to me that other potential creditors can also be ignored.

114.   Mr Hill also argued that if WCL had not paid out management fees to Mr Barnett, after the period covered by the agreement as to management fees, then the project would not have been managed, and it could not be assumed that the outcome of the development would have been as good as it was in fact.  The period after that covered by the agreement as to management fees started in 2007, by which time the development was complete and the main activity that required attention was to find buyers or tenants.  Agents were used for these purposes.  I also note that the judge considered payments of £40,000, £28,000 and £52,000 which were said to have been paid to Mr Barnett by way of management fees, but the recovery of which was precluded because the amount allowed for by the agreement in February 2006 had already been drawn in full.  At paragraph 147 of his first judgment the judge commented on these three payments, and on Mr Barnett's complete inability in evidence to explain how they were earned as management fees.  He said that the payments appeared to be no more than drawings, which were described as management fees once the dispute arose, but that "there was no real basis for that description".  Accordingly, even if this might have been a valid point in principle (as to which I have my doubts – it does not appear to have been raised below), it cannot be made good on the facts.

115.   Mr Hill also referred to the cause of the loss as regards the £560,000 due under the Side Agreement as being the non-payment by WDL and Mr Harney, but that goes back to the unjustified point referred to earlier as to where the risk of such non-payment lay.  It is clear that it lay with WCL (and therefore with Mr Barnett), not with Ross River.  Ross River's entitlement under the Side agreement depended only on the Net Profits amounting to £560,000 or more.  That was not in any way dependent on whether WDL or Mr Harney repaid what they had borrowed from WCL.  Similarly, Mr Hill argued that the use of the so-called "cash-book" – a summary of payments appearing from the documents disclosed by WCL and prepared by Ross River's forensic accountant, Mr Davidson – was too simplistic as it took no account of the ability of entities to which loans had been made out of the development receipts to repay those loans.  Since these loans ought not to have been made, it was not for Ross River to bear the risk of their not being repaid.  It was sufficient for Ross River to show that sums had been paid out which were not for development

expenditure (or otherwise agreed to by Ross River). That was enough to make WCL and Mr Barnett accountable for those sums. If they could get them back from the recipient, so much the better for them, but that made no legal difference to Ross River's entitlement as against them.

116.    Accordingly, I would reject Mr Hill's arguments on causation. It seems to me that Ross River was able to show that WCL and Mr Barnett were accountable, as fiduciaries, for their breach of fiduciary duty in paying away, or in Mr Barnett's case causing WCL to pay away, sums out of the joint venture revenues otherwise than on development expenditure or in ways to which Ross River had agreed. In my judgment they are liable for the full amount so paid away, and resulting loss (e.g. interest lost to WCL), up to the amount of Ross River's entitlement.

**Should the remedy be for Mr Barnett to refund sums to WCL?**

117.    Mr Hill submitted that, if any remedy was to be granted against Mr Barnett, it should require payment to WCL rather than to Ross River. The judge referred to this at paragraph 285 of his first judgment and at paragraphs 83 and 84 of his judgment on remedies.

118.    Mr Hill drew an analogy with cases of breach of trust where, if a beneficiary proves that a trustee, or former trustee, has committed breaches of trust from which the trust fund has suffered, he said that the trustee would be ordered to make good the trust fund, rather than to pay money directly to the beneficiary. That is not always the remedy granted, even in a case of breach of trust: see *Bartlett v Barclays Bank* [1980] Ch 515. In the present case, where the essence of the fiduciary duty was that WCL's assets should have been kept intact, without being depleted by unauthorised payments, so as to be available to pay Ross River its due share of Net Profit under the JVA, as varied, and the Side Agreement, where there is no question of any trust fund, and where WCL, the vehicle for the joint venture, has been rendered subject to claims by other creditors (including the solicitors) with which Ross River would have to compete for a dividend in the liquidation, but who ought not to have been creditors of WCL, vis-à-vis Ross River, it seems to me that there is no reason in principle why the remedy should require payment by Mr Barnett to WCL, and every reason in practice and in justice why Mr Barnett should be ordered to make payment of the appropriate amount directly to Ross River.

**Calculation**

119.    The judge found himself in a difficulty as regards evidence relating to particular transactions, because they had been identified by Ross River's forensic accountant but had not been investigated in detail. This situation arose because of the position adopted by the protagonists in the litigation. Mr Davidson identified some 215 payments through WCL's bank account which were labelled connected party transactions – payments to Mr Barnett, to Mr Harney or to persons connected with either or both of them. He asked the Defendants for information about these, but this request was refused. He compiled the "cash book", to which I have referred, so as to record these payments, and to show a running deficit, that is to say a running total of all net connected party transactions from WCL's current account. Mr Barnett was asked about some of these transactions in cross-examination. His initial position, partly maintained in cross-examination, was that no payments had been made which

were not proper joint venture payments.  This was shown to be false, and some of his evidence attempting to explain particular payments was also shown to be false.

120.  Thus, Ross River was able to show that many payments had been made out of WCL's current account which did not appear on their face to be legitimate joint venture payments, and some of which on examination were certainly not, and moreover these payments appeared to be for the benefit of Mr Barnett, Mr Harney or persons connected with them.  Mr Caplan argued with some cogency that in this situation it should not have been necessary for Ross River to demonstrate by reference to each one of the 215 transactions that it was not a legitimate payment.  Indeed, for that to be necessary would have reversed the normal burden of proof as between a fiduciary and the person to whom the fiduciary duty is owed.  It is sufficient for the latter to put a payment, or a series of payments, in issue, or even simply to require the fiduciary to account for his or its dealings with the relevant funds, and it is then for the fiduciary to prove that the payments were proper.  There may be cases in which the beneficiary acts unreasonably in persisting in questioning the fiduciary's account, in which case there may be issues as to the incidence of the costs of the accounting process.  But it does not seem to me that it could be said that this is such a case.  Accordingly, it seems to me that, to the extent that the judge criticised Ross River for not having proved its case in detail as regards individual transactions, that criticism was not justified.  It should have been up to WCL and Mr Barnett to justify the payments which were questioned, in particular the 215 connected party payments.  On that basis, none of these payments was shown to the judge to be justified.  Mr Barnett is therefore accountable to Ross River for every one of them by way of compensation for his breach of fiduciary duty.

121.  The judge held that Ross River's entitlement under the JVA and the Side Agreement, as against WCL, was to the sum of £1,043,926.  Ross River has judgment against WCL for that amount, and for most of its costs.

122.  Mr Caplan put to us a number of variants of Ross River's claim in monetary terms, depending on our conclusion on the various issues in the case.  His primary case is that Ross River should have judgment against Mr Barnett for the amount achieved by deducting from the sum for which Ross River has judgment against WCL the amount which Ross River is likely to recover from WCL in respect of its judgment against WCL for the amount due under the JVA and the Side Agreement.

123.  Ross River will be entitled to a dividend in the liquidation of WCL.  The latest information from the liquidators gives an estimate of funds available for distribution of just over £244,700, and claims for over £2,965,000.  If those are the eventual figures (and ignoring costs of the liquidation) the dividend would be of 8¼ pence in the pound.  That would give Ross River £86,171 by way of dividend on its claim for £1,043,926.  That is to be deducted from the sum for which Mr Barnett is liable to Ross River.

124.  I accept Mr Caplan's submission, on the basis of his primary case as indicated above, that the estimated amount of the dividend is the only deduction that falls to be made from the sum of £1,043,926 in calculating the amount for which Mr Barnett is liable. I would therefore hold that Mr Barnett should be ordered to pay to Ross River the sum of £957,755.

**Conclusion**

125.   For the reasons that I have set out above, it is my conclusion that the judge was right to hold that WCL and Mr Barnett owed fiduciary duties to Ross River, and did so in relation to the amounts due under both the JVA itself (as varied) and the Side Agreement.  I would therefore dismiss the cross-appeal by Mr Barnett.

126.   On the other hand, although in general terms the judge's formulation of the duties was apt, I consider that he was wrong in his interpretation and application of one of those duties.  In my judgment it was a breach of fiduciary duty for WCL to pay, and for Mr Barnett to procure that it paid, any sum other than (a) such as was properly required for development purposes or (b) one to the payment of which Ross River had agreed. It was not open to WCL, in effect, to draw on its anticipated share of the Net Profits so as to make payments not falling within either of these categories.  It was a breach of fiduciary duty for it to make any payments not falling within these categories before the time came for the distribution of the Net Profits, and even then it would be permissible only after payment to Ross River of the amount of its prior entitlement under the Side Agreement.  In particular, it was a breach of fiduciary duty for WCL to pay legal expenses incurred in defending Ross River's proceedings out of the joint venture revenues.  Moreover, in case of any dispute as to whether a payment made by WCL was or was not proper or authorised, it was for WCL and Mr Barnett to prove that it was proper or authorised, not for Ross River to prove the contrary.

127.   I also consider that Ross River is entitled to a remedy for the breaches of fiduciary duty which requires Mr Barnett to pay compensation to Ross River directly.

128.   In consequence I would allow Ross River's appeal and hold that Ross River is entitled to judgment against Mr Barnett in the principal sum of £957,755.

**Lord Justice Fulford**

129.   I agree.

**Lord Justice Mummery**

130.   I also agree.

# Exhibit T

**874**                                                                    [2001] BCC

## Peskin & Anor v Anderson & Ors.                                         A

Court of Appeal (Civil Division).
Simon Brown, Mummery and Latham L JJ.
Judgment delivered 14 December 2000.

> *Directors – Directors' duties – Fiduciary duties – Club operated companies –
> Directors negotiated to sell business of company – Members unaware of
> negotiations – Some club members resigned or retired – Companies sold rendering*   B
> *windfall profit for remaining members – Former members claimed breach of
> fiduciary duty owed to them – Application for summary judgment to strike out –
> Whether claims had real prospect of success – Whether special circumstances giving
> rise to fiduciary relationship between directors and individual members – Claim
> struck out – Appeal.*

This was an appeal against a decision of Neuberger J ([2000] BCC 1,110) summarily   C
dismissing a claim alleging breach of fiduciary duty by the directors of a company to its
members.

The Royal Automobile Club was owned by a holding company, 'RACL'. The club's
valuable motoring services business was run by 'RACMS', which was also owned by
RACL. The directors of RACL were the committee of the club and the members of RACL
were the full members of the club. The objects clause in the memorandum of association
of RACL allowed the business of the company to be sold but a clause prohibited assets   D
from being distributed to the members. The motoring services business was sold in 1999
after the court sanctioned schemes of arrangement of RACMS and RACL. The scheme
included deleting the provision in RACL's memorandum preventing assets being
distributed to members. Thereafter the members of the club as at July 1998 received
payments of about £34,000 each for the sale of the business. The claimants ceased to be
members between 1995 and 1998 by retiring or allowing their membership to lapse. Their   E
claim was against the directors of RACL and committee members of the club at the
relevant time for breach of fiduciary duty in failing to disclose the plans for the de-
mutualisation of the club and de-merger of RACMS and in particular the fact that the
directors were incurring expenditure, which was allegedly ultra vires, for the purpose of
removing the prohibitions in the memoranda on distributions to members. If such
matters had been disclosed the claimants would have been able to make a properly
informed choice as to whether to remain members of the club. Neuberger J summarily   F
dismissed the claims as having no real prospect of success on the basis that the directors
did not in the circumstances owe any fiduciary duty to the members who had ceased to be
members of their own motion when no specific transaction was in contemplation.

*Held,* dismissing the appeal:

1. Fiduciary duties owed by directors to a company arose from the legal relationship
between directors and the company directed and controlled by them. Fiduciary duties   G
owed by directors to shareholders did not arise from that legal relationship but were
dependent on establishing a special factual relationship between the directors and the
shareholders in the particular case. Events could take place which brought the directors
into direct and close contact with the shareholders in a manner capable of generating
fiduciary obligations, such as a duty of disclosure of material facts, or an obligation to use
confidential information and valuable commercial opportunities, acquired by the
directors in their office as such, for the benefit of shareholders and not to prefer and   H
promote the directors' own interests at the expense of the shareholders.

2. There were instances of directors making direct approaches to, and dealing with,
the shareholders in relation to a specific transaction and holding themselves out as agents
for the shareholders in connection with the acquisition or disposal of shares; or making
material representations to them; or failing to make material disclosure to them of

© 2001 Sweet and Maxwell Ltd

A    insider information in the context of negotiations for a take-over of the company's
     business; or supplying to them specific information and advice on which they relied.
     These events were capable of constituting special circumstances and of generating
     fiduciary obligations, especially in those cases in which the directors, for their own
     benefit, sought to use their position and special inside knowledge acquired by them to
     take improper or unfair advantage of the shareholders. This was especially so in the
     context of familial relationships of the directors and shareholders and their relative
B    personal positions of influence in the company concerned. (Coleman v Myers [1977] 2
     NZLR 225 and Brunninghausen v Glavanics (1999) 46 NSWLR 538 considered.)

     3. The judge was right that the factors were insufficient to found a claim for the
     existence and breach of a fiduciary duty to disclose to the claimants the proposals and
     plans for de-mutualisation. There was nothing special in the factual relationship between
     the directors and the members to give rise to a fiduciary duty of disclosure. In particular
C    there were no relevant dealings, negotiations, communications or other contact directly
     between the directors and the members. The actions of the directors had not caused the
     members to retire when they did. Probably most important of all, prior to March 1998
     there was nothing sufficiently concrete and specific, either in existence or in
     contemplation, for the directors to disclose to the members.

     4. In this case there was no distribution contrary to the prohibitions in the
D    memorandum before those prohibitions were deleted under the schemes of arrangement.
     It was not ultra vires for the directors to authorise expenditure of the company's money
     on investigating proposals to sell RACMS, or proposals to de-mutualise the company and
     distribute assets to members and, for that purpose, to amend the memorandum. Even a
     provision purporting to entrench the prohibition in the memorandum could lawfully be
     removed by a scheme of arrangement. The removal of the prohibition was plainly
     incidental to the purpose of selling the motoring services business which was lawful under
E    the memorandum. There was no wrongdoing and no duty to disclose.

     5. There was insufficient evidence that the directors were acting wrongfully by
     benefiting personally from the de-mutualisation and there was therefore no duty to
     disclose. Even if the strongly disputed allegations of personal benefit were established, the
     duty to disclose ultra vires acts would be owed to the company and not to individual
     members of the club. In any event, any breach in relation to personal benefits would not
F    have been causative in relation to claimants' decisions to cease to be members.

     The following cases were referred to in the judgment of Mummery LJ:

     *Allen v Hyatt* (1914) 30 TLR 444.
     *Brunninghausen v Glavanics* (1999) 46 NSWLR 538.
     *Chez Nico (Restaurants) Ltd, Re* [1991] BCC 736.
     *Coleman v Myers* [1977] 2 NZLR 225.
G    *Company (No. 004377 of 1986), Re (Re XYZ Ltd)* (1986) 2 BCC 99,520.
     *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821.
     *Percival v Wright* [1902] 2 Ch 421.
     *Sherborne Park Residents Co Ltd, Re (Company (No.005136 of 1986)* (1987) 3 BCC 99,528.
     *Stein v Blake* [1998] BCC 316.

     Geoffrey Vos QC and Daniel Lightman (instructed by Class Law) for the appellants.

     Lord Grabiner QC and Craig Orr (instructed by Slaughter and May) for the respondents.
H

                                      JUDGMENT

     **Mummery LJ:** 1. This is an appeal from the order of Neuberger J on 7 December 1999
     under the *Civil Procedure Rules* 1998 (SI 1998/3132) ('CPR'), Pt. 24. He summarily
     dismissed claims for damages for breach of duty brought (or intended to be brought) by about

355 former full members of the Royal Automobile Club ('the club') against the committee of     A
the club and against its holding company. His judgment is now reported in [2000] BCC 1,110.

2. He refused permission to amend the statement of claim dated 21 July 1998. He refused
permission to appeal, which was granted by a single Lord Justice on 19 April 2000.

3. The dispute arises out of the fact that the claimants did not obtain any benefit from the
de-mutualisation of the club. That took place after their membership of the club (and of its
holding company) had ceased, either by their retirement from membership or by them allowing     B
their membership to lapse, during the period from 9 July 1995 to 28 March 1998. The
substantial sums (£34,161 each) distributed to those who were members of the club at 8 July
1998 stemmed from the sale in mid-1999 of the valuable motoring services business associated
with the club and its holding company.

4. It is common ground that the relevant question is whether the claims have a real prospect
of succeeding. If they do not, then the judge was right to dismiss them at this stage. If they do,     C
then they should be allowed to proceed to trial in the usual way.

### The club, the companies and the members

5. The Club was a proprietary club. It was not a members' club. It was the property of its
holding company, The Royal Automobile Club Ltd ('RACL'), which was incorporated in 1897
as a company limited by guarantee.                                                              D

6. The full members of the club were members of RACL. The board of directors of RACL
for the time being constituted the committee of the club. The committee was vested with the
entire management of the club in accordance with the rules of the club. The rules provided for
the submission of an annual report by the committee to the annual general meeting under r. 19
and for the election of members. Membership was from year to year ending on 31 December in
each year. Subscriptions were due and payable on 1 January in each year. Membership ceased     E
for non-payment of subscriptions. Members were permitted to resign in accordance with a
notice procedure in r. 56. If a member resigned and re-applied for membership within three
years, he might be re-elected without being proposed and seconded, if the committee so
decided.

7. RAC Motoring Services Ltd ('RACMS'), which operated the motoring services
business, was also owned by RACL. So the full members of the club had an indirect interest     F
in it.

8. The memorandum of association of RACL contained provisions at the heart of this
dispute between the former members and the committee. The objects of RACL stated in cl. 3 of
the memorandum included:

'(a) To establish, maintain and conduct a club for the encouragement and development
in Great Britain of the auto-motor vehicle and other allied industries, and for the
accommodation of Members of the Company and their friends, and to provide a club-     G
house or club-rooms, and other conveniences, and generally to afford to Members and
their friends all usual advantages, conveniences, and accommodation of a social club
and centre of information and advice on all matters pertaining to auto-motor vehicles.

. . .

(m) To sell or dispose of the undertaking of the Company, or any part thereof, for such
consideration as the Company may think fit, and in particular for shares, debentures, or     H
securities of any other company.

. . .

(p) To do all such other things as are incidental or conducive to the attainment of the
above objects, or any of them ...'

© 2001 Sweet and Maxwell Ltd
bcp2001 bcp   239 Mp   876—bcp23075

A    Clause 4 provided that:

'The income and property of the Company, whensoever derived, shall be applied solely towards the promotion of the objects of the Company as set forth in this Memorandum of Association, and no portion thereof shall be paid or transferred directly or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the Members of the Company. And upon the winding up of the Company, the surplus assets (if any) of the Company or funds arising from the realisation thereof which shall remain, after

B    payment of all the debts and liabilities of the Company, shall not be paid or distributed among Members of the Company, but shall be given, paid or transferred to such public museum or to such institution or institutions connected with engineering, or with the objects of the Company as the Directors of the Company shall determine at or before the time of dissolution of the Company ...'

Article 67 of the articles of association provided that:

C    'If upon the winding up or dissolution of the Company there remains ... any property whatsoever, the same shall not be paid to or distributed among the Members of the Company but shall be paid or applied as provided for by the Memorandum of Association.'

Clause 4 of the memorandum of RACMS contained a prohibition on distribution to members in slightly different terms with a further cl. 5 which stated that:

D    'No addition, alteration or amendment shall be made to Clause 4 hereof.'

9. In mid-1998, after all the claimants had ceased to be members of the club, these prohibitions were deleted from the memorandum of each company by the combined effect of special resolutions and two schemes of arrangement made by the court under s. 425 of the *Companies Act* 1985.

**The sale of RACMS**

E
*A. The negotiations for sale to Cendant*

10. The defendants' case is that in March 1998 an approach was made to RACL by Cendant Corporation ('Cendant') with a view to acquiring the business of RACMS. This is disputed by the claimants. Coincidentally, a proposal to call an extraordinary general meeting, as the first step in a process to de-mutualise the club and to de-merge RACMS, was made in a letter dated 27 March 1998 from the then chairman of RACL, Mr Jeffrey Rose, to all the full members of

F    the club. The board resolved that it would not elect any person as a member of RACL after 27 March 1998. In May 1998 the terms of sale of RACMS to Cendant for £450m were finally agreed.

*B. The scheme*

11. On 4 June 1998 a meeting was held for a scheme of arrangement of RACMS. On

G    19 June 1998 a meeting was held for a scheme of arrangement of RACL. At that meeting a special resolution was passed for the deletion of cl. 4 of the memorandum.

12. On 8 July Neuberger J approved the schemes of arrangement of RACMS and RACL under s. 425 of the *Companies Act* 1985: see *Re RAC Motoring Services Ltd* [2000] 1 BCLC 307. The schemes of arrangement became effective on 9 July 1998. They facilitated the transaction for the disposal of RACMS to Cendant and enabled the members to realise their indirect interest in RACMS.

H    13. The effect of the scheme was that the members ceased to be members of RACL at the close of business on 8 July 1998. A new company named RAC Acquisitions became the sole member of RACL. RAC Acquisitions itself became a subsidiary of RAC Holdings Ltd ('RACH'). One share of £1 each in RACH was allotted to each person who was a member of RACL at the close of business on 8 July 1998. That share was later divided into two shares of 50p each.

**878**                         Peskin v Anderson                    **[2001] BCC**
                                  (Mummery LJ)

14. In addition, each of those former members of RACL became a member of New Club Co    A
Ltd, to which the entire share capital of a company called Club Acquisition Co Ltd ('CACL')
was transferred. CACL had, while it was a subsidiary of RACL, acquired all the assets of
RACL.

15. The New Club Co, which became and remains the ultimate proprietor of the club, was
later re-named 'The Royal Automobile Club Ltd.' RACL was re-named 'RAC Ltd' and was
subsequently re-registered as an unlimited company with a share capital, whereupon its name
became 'RAC'.                                                                            B

*C. The sale to Lex Service*

16. On 4 February 1999 it was announced that Cendant had decided not to proceed with the
purchase in view of conditions imposed by the Secretary of State for Trade and Industry on
competition grounds.                                                                     C
17. On 9 February 1999 Lex Service plc announced that it was making a bid. On 21 May
Lex Service made an offer to the shareholders in RACH to purchase their shares. That offer
became unconditional on 9 July 1999. The sale took place for £437m.

18. The end result was that Lex Service became the holding company of RACH, RACL and
RACMS and that the members, in their new capacity as shareholders in RACH, received about
£34,000 each direct from Lex Sevice in respect of the sale of their shares in RACH.       D

**The proceedings**

19. As the claimants had all ceased to be members of the club and to be members of RACL
before the schemes of arrangement took effect, they never became shareholders in RACH. So
they never became entitled to receive any part of the benefits flowing from the sale of RACMS
to Lex Service.                                                                          E
20. The majority of the personal defendants were the directors of RACL and the members of
the committee at the material time. Four of the defendants only became directors of RACL and
members of the committee on or after 1 January 1998, by which time most, if not all, of the
claimants had ceased to be members. RACL is a proposed defendant under its new name RAC
Ltd.

21. The claims in the draft amended statement of claim were for damages for breach of     F
fiduciary duties of disclosure and for being wrongfully deprived of the opportunity to make a
fully informed choice as to whether or not to continue their membership of the club. The basis
of the claims was that the defendants, in breach of a fiduciary duty owed by them to the
claimants, failed to disclose to them the plans, discussions, proposals, investigations and
instructions relating to the de-mutualisation of the club and the de-merger of RACMS, in
particular the expenditure by them of the assets of RACL on the proposed cancellation of cl. 4
of the memorandum of RACL, so as to permit distributions to be made to the members.      G

22. It is alleged that, if these matters had been disclosed to the claimants before they retired,
they could then have made an informed decision about their membership. They would have
decided not to retire. Instead, they would have remained members of the club and shareholders
in RACL. They would then have been entitled to benefit from the sale of RACMS to Lex
Service in 1999.

23. On 7 December 1999 Neuberger J acceded to an application by the defendants under     H
CPR, Pt. 24 to dismiss the action on the ground that it had no real prospect of success.

**The judgment of Neuberger J**

24. The claims were unsuccessfully advanced to the judge on a number of grounds which
have now been dropped from the draft re-amended statement of claim.

© 2001 Sweet and Maxwell Ltd

A      25. The judge rejected the claimants' contentions that the rules of the club, (including r. 19 which required the committee to report annually 'on the work done by The Club'), represented the terms of a contract between the members of the club or between the members and the committee; that r. 19 of the club put the committee under an obligation to inform the members about the developments and all likely future developments affecting the club and the company and its subsidiaries, including discussions, investigations and proposals with a view to selling RACMS; and that r. 56 (which conferred a discretion on the committee to re-elect a member

B      who had resigned and re-applied for membership within three years of his resignation) entitled former members to be re-instated automatically.

26. As for the remaining claims based on breach of fiduciary duty as pleaded in the draft amended statement of claim, the judge held that they had no real prospect of succeeding. In outline, his reasoning on this issue was as follows:

1. A director does not owe a general fiduciary duty to shareholders of the company.

C      2. A director of a company could owe a fiduciary duty to shareholders, if he had, in relation to the sale of shares, special knowledge not possessed by the shareholders.

3. There was no fiduciary duty in the circumstances of this case. The judge identified eight factors leading him to that conclusion:

(1)    the absence of any special facts in the relationship of the directors and the members of
D           RACL, which would make the existence of a fiduciary duty more likely;

(2)    the claimants had resigned membership of their own motion, uninfluenced by any information provided by, or views expressed by, the directors;

(3)    no specific transaction was in contemplation at the time of the resignations;

(4)    the defendants did not, in their capacity as directors of RACL, benefit from the claimants ceasing to be members, either directly (e.g. they did not acquire shares from the
E           members or encourage them to part with their shares) or indirectly (e.g. by minimising the number of members, so as to increase their share of the proceeds of sale);

(5)    the alleged interest of the directors in profits from the sale in the form of 'golden hellos and employment contracts' did not impinge on the issue whether they were under a duty to disclose at an early stage the possibility of selling off the RACMS business;

(6)    the investigation and promotion of proposals for the de-mutualisation of RACL
F           (including the incurring the costs in relation to the amendments of the memoranda of RACL and RACMS sanctioned by the court) did not involve the directors in the pursuit of an unauthorised and improper object;

(7)    it was unreasonable for directors to be put in the sort of position which the claimants' contentions would necessarily involve with regard to the disclosure of contemplated arrangements or transactions best kept confidential; and

G   (8)    the claimants' arguments would place directors in the unfortunate position of being 'damned if they do and damned if they don't', if they were put under a duty to disclose to the members a contemplated sale which might, or might not, happen.

### Fiduciary duties – the legal principles

27. There was no serious dispute between Mr Vos QC, for the claimants, and Lord Grabiner
H     QC, for the committee and RAC Ltd, about the relevant legal principles governing the fiduciary duties of company directors.

28. For his part, Mr Vos accepted that the fiduciary duties owed by the directors to RACL do not necessarily extend to the individual members of the club and that, in general, directors do not, solely by virtue of the office of director, owe fiduciary duties to the shareholders, collectively or individually.

29. According to the headnote in *Percival v Wright* [1902] 2 Ch 421 that case decided that:                A
'The directors of a company are not trustees for individual shareholders, and may
purchase their shares without disclosing pending negotiations for the sale of the
company's undertaking.'

30. The apparently unqualified width of the ruling has, over the course of the last century,
been subjected to increasing judicial, academic and professional critical comment; but few
would doubt that, as a general rule, it is important for the well being of a company (and of the
wider commercial community) that directors are not over-exposed to the risk of multiple legal      B
actions by dissenting minority shareholders. As in the affairs of society, so in the affairs of
companies, rule by litigation is not to be equated with the rule of law.

31. For his part, Lord Grabiner QC accepted that the fiduciary duties owed by the directors
to the company do not necessarily preclude, in special circumstances, the co-existence of
additional duties owed by the directors to the shareholders. In such cases individual
shareholders may bring a direct action, as distinct from a derivative action, against the directors      C
for breach of fiduciary duty.

32. A duality of duties may exist. In *Stein v Blake* [1998] BCC 316 at pp. 318 and 320
Millett LJ recognised that there may be special circumstances in which a fiduciary duty is owed
by a director to a shareholder personally and in which breach of such a duty has caused loss to
him directly (e.g. by being induced by a director to part with his shares in the company at an
undervalue), as distinct from loss sustained by him by a diminution in the value of his shares      D
(e.g. by reason of the misappropriation by a director of the company's assets), for which he (as
distinct from the company) would not have a cause of action against the director personally.

33. The fiduciary duties owed to the company arise from the legal relationship between the
directors and the company directed and controlled by them. The fiduciary duties owed to the
shareholders do not arise from that legal relationship. They are dependent on establishing a
special factual relationship between the directors and the shareholders in the particular case.
Events may take place which bring the directors of the company into direct and close contact      E
with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of
disclosure of material facts to the shareholders, or an obligation to use confidential information
and valuable commercial and financial opportunities, which have been acquired by the
directors in that office, for the benefit of the shareholders, and not to prefer and promote their
own interests at the expense of the shareholders.

34. These duties may arise in special circumstances which replicate the salient features of      F
well established categories of fiduciary relationships. Fiduciary relationships, such as agency,
involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and
attached to a person who undertakes, or who, depending on all the circumstances, is treated as
having assumed, responsibility to act on behalf of, or for the benefit of, another person. That
other person may have entrusted or, depending on all the circumstances, may be treated as
having entrusted, the care of his property, affairs, transactions or interests to him. There are, for
example, instances of the directors of a company making direct approaches to, and dealing      G
with, the shareholders in relation to a specific transaction and holding themselves out as agents
for them in connection with the acquisition or disposal of shares; or making material
representations to them; or failing to make material disclosure to them of insider information in
the context of negotiations for a take-over of the company's business; or supplying to them
specific information and advice on which they have relied. These events are capable of
constituting special circumstances and of generating fiduciary obligations, especially in those
cases in which the directors, for their own benefit, seek to use their position and special inside      H
knowledge acquired by them to take improper or unfair advantage of the shareholders.

35. The court has been referred to the valuable and detailed surveys of the authorities,
expounding the special circumstances which justify the imposition of fiduciary duties on
directors to individual shareholders, in the judgments of Court of Appeal in New Zealand in
*Coleman v Myers* [1977] 2 NZLR 225 (especially pp. 323–325, 328–330) and of the Court of

© 2001 Sweet and Maxwell Ltd

A    Appeal of New South Wales in *Brunninghausen v Glavanics* (1999) 46 NSWLR 538 (especially pp. 547–560). In both of those cases fiduciary duties of directors to shareholders were established in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned.

36. The cases of *Allen v Hyatt* (1914) 30 TLR 444 at p. 445 (directors making representations to secure options to purchase shares of shareholders and undertaking to sell shares of shareholders in agency capacity); *Howard Smith Ltd v Ampol Petroleum Ltd* [1974]

B    AC 821 at pp. 834, 837–838 (directors' use of fiduciary power of allotment of shares for a different purpose than that for which it was granted, and so as to dilute the voting power of the majority shareholding of issued shares); *Re Sherborne Park Residents Co Ltd (Company (No.005136 of 1986)* (1987) 2 BCC 99,528 at p. 99,531; and *Re Chez Nico (Restaurants) Ltd* [1991] BCC 736 at p. 750 were also cited. See also the discussion in *Spencer-Bower on Actionable Non-Disclosure* (2nd edn, 1990) at pp. 417–435.

C    37. The claims for breach of fiduciary duty owed by the directors to the members of the club are put in several different, though interrelated and overlapping, ways. They have been argued on the appeal by Mr Vos QC (who did not appear below) with a somewhat different emphasis than before the judge as indicated in a draft re-amended statement of claim. This judgment will refer to certain passages in the draft amended statement of claim (which have since been deleted), since they were the pleaded claims before the judge.

D
### The ultra vires expenditure point

38. Mr Vos's primary attack on the judgment focused on point (6) in the above summary of the list of factors considered by the judge.

39. He asserted, and Lord Grabiner accepted, that directors act in breach of the fiduciary duties owed by them to the company, if they participate in the commission of acts ultra vires the

E    company.

40. Mr Vos went further and asserted that, where all the directors are involved in the same ultra vires act, they are under a duty to disclose to the individual members their intention to commit, and their commissions of, ultra vires acts and the ultra vires intentions and acts of their fellow directors. In such a case proper disclosure by the directors to the company cannot be made. The duty to disclose to the company would lack content, if all the directors are embarked

F    on a course which is ultra vires and benefits them all, but is detrimental to the shareholders at large.

41. This additional duty to disclose ultra vires intentions and acts to individual shareholders does not, he emphasised, depend on establishing special circumstances justifying an exception to the general rule that fiduciary duties are owed by the directors only to the company. He made separate submissions on that exception to the principle in *Percival v Wright* (supra). They are discussed later in this judgment.

G    42. Further, liability for non-disclosure to the shareholders is not abrogated by s. 35 of the *Companies Act* 1985, as amended by s. 108(1) of the *Companies Act* 1989. It is true that subs. (1) provides that:

> 'The validity of an act done by a company shall not be called into question on the ground of lack of capacity by reason of anything in the company's memorandum.'

H    But subs. (2) provides that:

> 'A member of a company may bring proceedings to restrain the doing of an act which but for subsection (1) would be beyond the company's capacity...'

and subs. (3) provides that:

> 'It remains the duty of the directors to observe any limitations on their powers flowing from the company's memorandum; and action by the directors which but for subsection

(1) would be beyond the company's capacity may only be ratified by the company by      A
special resolution.'

43. The claimants' primary case in this court is that the directors of RACL owed a fiduciary
duty to disclose to them their ultra vires intentions and acts; and that they acted in breach of
duty by not disclosing to them their intentions not to observe, and their failure to observe, the
limitations on their powers flowing from the provisions of cl. 4 of the memorandum of RACL.
If there were no such duty of disclosure to the members, the right of the members to seek to
restrain the commission of ultra vires acts under s. 35(2) would be sterilised. Disclosure was      B
also required so that the members could consider whether to ratify under s. 35(3) the ultra vires
acts by special resolution.

44. Mr Vos reminded the court of the approach which it should take at this early stage
(without the benefit of disclosure and evidence) in these unprecedented proceedings: when the
full facts are not known and when the legal principles are in a state of development, the court
should be cautious in concluding that the claims have no real prospect of succeeding.              C

45. The argument was developed in this way. The fiduciary duty of disclosure of ultra vires
intentions and acts is owed to the members, because the damage caused by the breach of duty is
to the personal interests of the individual shareholders (in this case the retired members), not to
the value of the company or its assets or the shares in it.

46. The directors should have disclosed to the members intended and actual expenditure
from 1996 onwards of RACL's assets (e.g. on professional advice), which was considerable      D
and was committed to the furtherance of complex proposals for the restructuring of the
company in order to allow distribution of the proceeds of the intended sale of RACMS among
the members of the club.

47. This was not simply a case of proposing to change the objects of a company, so that it
could sell an existing business or engage in a new business. The proposal was for the
distribution of the company's property in the face of an express absolute prohibition in cl. 4 on
the distribution to members of any part of the property of RACL. That clause is not the same as      E
an object of the company, which may be changed by special resolution. As a matter of
construction of cl. 4 of the memorandum, that expenditure on the formulation and
implementation of the proposal for the sole purpose of de-mutualisation was ultra vires RACL.
That purpose was prohibited.

48. The directors were in breach of fiduciary duty in committing the company to that ultra
vires expenditure and in not disclosing that conduct to the members. The members should have      F
been consulted. The directors should have sought the approval of the members in general
meeting about the proposals to investigate and prepare a scheme for de-mutualisation before
assets were expended on that prohibited purpose. Had the claimants been consulted, they
would have known about it. They would have decided to remain full members of the club. They
could have obtained an injunction under s. 35(2) of the *Companies Act* 1985; or they could
have ratified the expenditure under s. 35(3), so as to benefit from the de-mutualisation. As it
was, they made their decision to retire from the club in ignorance of the commitment of the      G
directors to impermissible and significant actual and intended expenditure in pursuing and
achieving an expressly prohibited object.

49. In my judgment, this flight of fancy does not, on the pleaded facts, even make it to the
point of take off and should be grounded immediately under CPR, Pt. 24.

50. It is not even alleged that the directors caused any distribution of the assets of RACL to
be made to members in breach of cl. 4 of the memorandum before 8 July 1998, when that      H
clause was cancelled under the scheme of arrangement. It was not ultra vires for the directors to
authorise the expenditure of the company's money on investigating proposals to sell RACMS,
or on proposals to de-mutualise the company and distribute assets to the members and, for that
purpose, to amend the memorandum. That expenditure was not caught by cl. 4. The prohibition
in cl. 4 did not extend to attempts to change the law of the company by altering the clause or

© 2001 Sweet and Maxwell Ltd
bcp2001 bcp   239 Mp   882—bcp23075

A    cancelling it from the memorandum, so as to permit what was previously prohibited. Even if it
     did, such as by a prohibition of the kind to be found in cl. 5 of the memorandum of RACMS, the
     entrenching provision could also be lawfully removed by a scheme of arrangement.

     51. In substance the expenditure complained of in this case is no different from expenditure,
     which Mr Vos accepts may be permitted, on changing the objects in the memorandum, so as to
     allow the company to carry on a different business, which is impliedly prohibited until the
B    objects are changed. It is lawful for a company to change its objects and to amend its
     memorandum by means of the appropriate procedures: *Companies Act* 1985, s. 4 (special
     resolution altering memorandum with respect to the statement of the company's objects) and
     s. 17 (special resolution altering a condition in the company's memorandum which could have
     been lawfully contained in the articles of association and cancellation of the condition so far as
     it is confirmed by the court).

C    52. It must follow that it is lawful for the directors to authorise the expenditure of
     company's money for the purpose of the cancellation of cl. 4. That expenditure is reasonably
     incidental to the attainment or pursuit of the lawful purpose of the cancellation of cl. 4 from the
     memorandum in the context of giving effect to the overall object permitted in cl. 3(m) of
     selling or disposing of RACMS. I do not agree with Mr Vos's contention that the de-
     mutualisation was completely unrelated and irrelevant so far as the sale of RACMS was
     concerned. The expenditure was not made to achieve a prohibited object. There was no
D    wrongdoing on the part of the directors in relation to the expenditure, which it was their duty to
     disclose either to the company or to the individual shareholders in RACL.

     **The special circumstances point**

     53. Quite apart from the alleged fiduciary duty of directors to disclose their own and each
     others' intended and actual ultra vires acts to the members, Mr Vos submitted that there was a
E    free-standing fiduciary duty of full disclosure of the de-mutualisation and de-merger plans,
     discussions and proposals to the members, as well as to the company, by reason of special
     circumstances. Had all the members been made aware of these matters, they would not have
     resigned their membership of the club.

     54. It was pleaded in the draft amended statement of claim that the duty of the directors was
     not to withhold from the members of the club or the company any information, which they
F    obtained as members of the committee or the board and which they knew, or ought to have
     known, would be, or might be, material to their decisions each year whether or not to renew
     their membership of the club or to dispose of their interests in the company. Further, in the
     event that the committee or the board were considering plans for and/or were in the course of
     conducting negotiations with third parties concerning the disposal of substantial assets of the
     company, there was a duty to disclose all matters relevant to the interests of the members of the
G    club, or the company, who were contemplating retirement from the club (and thereby a
     disposal of their interests in the company) in circumstances where they knew, or had reason to
     believe, that such retiring members were inadequately informed. The directors were in
     exclusive possession of information, which they had acquired by virtue of their office, affecting
     the potential financial value of membership of the club and of RACL. The members would not
     have had that information. In their state of knowledge (or ignorance), the members could only
     have placed a nil value on their membership.

H    55. It was also alleged that, for a period of at least 18 months prior to March 1998, the
     committee had been actively considering taking professional advice concerning and discussing
     the sale and disposal of RACMS and the possibility of de-mutualisation of the club and the
     potential de-merger of RACMS. At a meeting in about October 1996 the committee and/or the
     board is alleged to have considered and rejected a scheme for de-mutualisation and/or de-
     merger of RACMS, but still continued to seek to formulate a workable plan to that end.

56. As already indicated in the submissions on the ultra vires point, it is alleged that the          A
committee had, in relation to those matters, incurred a liability on behalf of the club and RACL
for professional fees, expenses and disbursements, including a liability in respect of the retainer
of Slaughter and May to prepare a scheme for de-mutualisation and/or de-merger of RACMS.

57. Mr Vos submitted that this duty of disclosure to the members fell within an exception to
the general rule laid down in *Percival v Wright* (supra). The special facts from which it is
contended that this fiduciary duty to the members emerges are that knowledge of the proposal
by the directors was inside information of which the directors had exclusive possession; that          B
they had acquired the information by virtue of their office; that the information provided
knowledge to the directors of the potential financial value of membership of the club and
RACL, which was not known to the members; that that knowledge was, contrary to their
expectations, that their membership (which could not have been sold or transferred) could have
any value; that, by resigning membership, the claimants had given up any right to participate in
the substantial assets of RACL; and that they had done so in ignorance of the directors' plans to      C
allow members to benefit from a distribution.

58. I agree with the judge that these factors are insufficient to found a claim for the existence
and breach of a fiduciary duty to disclose to the claimants the proposals and plans for de-
mutualisation.

59. There was nothing special in the factual relationship between the directors and the
members in this case to give rise to a fiduciary duty of disclosure. In particular there were no
relevant dealings, negotiations, communications or other contact directly between the directors     D
and the members; the actions of the directors had not caused the members to retire when they
did; and, probably most important of all, prior to March 1998 there was nothing sufficiently
concrete and specific, either in existence or in contemplation, for the directors to disclose to the
members.

**The benefits to directors and associates point**                                                    E

60. The third area of alleged fiduciary duty to the members is that the directors failed to
disclose to the members of the club that they had committed breaches of duty to RACL, in that
they personally and their associates stood to benefit, and had in fact benefited, from the
proposed de-merger and de-mutualisation and that, had they made disclosure of these matters
to all the members, as they should have done, the claimants would have chosen to remain
members and would have benefited from the distribution of the proceeds of sale of RACMS.

61. In particular, the draft amended statement of claim pleaded that the members of the               F
committee were under a duty to treat all the members of the club fairly; not to disclose to a third
party any information which they had obtained as members of the committee or the board of
RACL and which was material to the interests of the members of the club and the company,
without first informing all of the members; and not to disclose any such information to some
members and not others.

62. An assortment of personal benefits constituting breaches of the duty to disclose are             G
alleged, though it has to be said that the pleading is short on particulars and the evidence is
exiguous. The claimants contend that this is almost bound to be the case in advance of
disclosure of documents by the defendants and, indeed, they rely on that as a factor relevant to
the court's discretion under Pt. 24.

63. The allegations in the draft amended statement of claim may be summarised as follows:
there was a conflict of interest between, on the one hand, the interests of the members of the
committee and of the board and, on the other hand, the interests of the members, who were        H
ignorant of these material matters; the directors stood to benefit as more existing members
retired and gave up their shares in the company; under the Cendant proposal some directors
were to receive substantial additional personal benefits in the form of shared bonuses and, in
the case of Mr Neil Johnson (the fifth defendant), office as chief executive in the new group;
under the sale to Lex Service the directors received undisclosed bonuses and one (Mr Ian

A  Mavor – the twelfth defendant) was to be appointed to a consultancy; some directors were able to, and did, fast track friends into full membership of the club before March 1998, in the knowledge of the intended disposal of RACMS and the distribution of the proceeds; the directors were in a position to, and did, slow down the waiting list for full membership of the club (e.g the case of a Mr Malcolm Bissiker) and that would increase the value of their own membership on de-mutualisation.

B  64. At the end of the day, however, these additional allegations add nothing of substance to the arguments already deployed and rejected. The points made on directors' benefits are essentially the same as the other arguments, i.e. that it was the duty of the directors to disclose to the members that they were committing, or intending to commit, ultra vires acts (e.g. by benefiting, or intending to benefit, personally from the distribution of the sale proceeds to the members) and in circumstances which justified an exception to the general rule that the directors' fiduciary duties are owed only to the company. For the above reasons and for the

C  reasons given by the judge, the facts pleaded are insufficient to support the existence of a duty of disclosure to the members.

65. Even if the allegations were established (and they are strongly disputed by the defendants), the duty to disclose the ultra vires acts in this case would be owed by the directors to the company and not, in the absence of special circumstances, to the individuals members of the club.

D  66. I would add that these alleged breaches of duty do not appear to impact on the alleged duty to disclose to the members, before their decision to resign, the plans and proposals to de-mutualise the Club and to de-merge RACMS. It was non-disclosure at an earlier stage of those plans and of the alleged ultra vires commitment to expenditure on them, rather than non-disclosure of the personal benefits for directors and associates, that would have affected the opportunity of the members to make an informed decision on membership.

E  67. It is also contended that there was a breach of fiduciary duty to shareholders by one of the directors (Mr Johnson), who frequented a Warwickshire shooting club. It was alleged that, in consequence of the disclosure of inside information, about ten members of the shooting club were fast tracked into full membership of the club early in 1998, shortly before de-mutualisation. The claim was that this involved unfairness between shareholders, as the inside information should have been shared with all the members of the club. That allegation would not, however, justify claims for breach of fiduciary against all the members of the committee.

F  For the reasons already stated, however, this claim does not, in any event, have any real prospect of succeeding against any of the defendants.

**Conclusion**

68. In my judgment, the claims, as pleaded and as proposed to be amended or re-amended, have no real prospect of succeeding at trial against the personal defendants or against the

G  company. The judge was right to make an order under CPR, Pt. 24. I would dismiss the appeal.

**Latham LJ:** I agree with both judgments.

**Simon Brown LJ:** 69. The Royal Automobile Club has over 12,000 members. All those who were full members on 8 July 1998 received windfall payments of some £34,000 following the sale of the RAC motor services business. It was for them a happy and unexpected event: until March that year they had had no reason to suppose that their membership was of any

H  financial value whatever.

70. The appellants represent 355 retired members of the club who resigned (or in a few cases failed to pay their annual subscription) in the three years prior to this payout. To them, understandably, it seemed a less happy event: their chagrin is not difficult to imagine.

71. The appellants' complaint in these proceedings is against the committee (strictly the board of the company of which all full members of the club were members) and is to the effect

that the committee kept from them the various discussions and investigations which led to this       A
payout. Had they known it was in the offing, they would never, of course, have resigned.

72. They cannot complain simpliciter that the committee should have kept them in the
picture: Mr Vos QC was constrained to recognise that no such general duty is cast upon
directors. He has therefore had to argue a more circuitous case. What he asserts is first that the
board acted ultra vires and therefore in breach of their fiduciary duty, and secondly that they
thereby came under a further duty to disclose their ultra vires conduct to the members. Thus
would the members have discovered the financial value of their membership.                           B

73. The conduct which principally Mr Vos contends to have been ultra vires was the
defendants' expenditure of company funds on preparing for the sale of the motor services
business and, more particularly, for the scheme of de-mutualisation which was a necessary
pre-condition of any payment to members. Clause 4 of the company's memorandum of
association is central to the argument. Let me read only the most material part:

> '4. The income and property of the Company, whensoever derived, shall be applied         C
> solely towards the promotion of the objects of the Company as set forth in this
> Memorandum of Association, and no portion thereof shall be paid or transferred directly
> or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the
> Members of the Company. And upon the winding up of the Company, the surplus assets
> (if any) of the Company or funds arising from the realisation thereof which shall remain,
> after payment of all the debts and liabilities of the Company, shall not be paid to or       D
> distributed among Members of the Company, but shall be given, paid or transferred to
> such public museum or such institution or institutions connected with engineering, or
> with the objects of the Company as the Directors of the Company shall determine ...'

The objects of the company most relevant to this appeal are:

> '3(a) To establish, maintain and conduct a club for the encouragement and development
> in Great Britain of the auto-motor vehicle and other allied industries, and for the        E
> accommodation of Members of the Company and their friends, and to provide a club-
> house or club-rooms, and other conveniences, and generally to afford to Members and
> their friends all usual advantages, conveniences and accommodation of a social club and
> centre of information and advice on all matters pertaining to auto-motor vehicles.
>
> ...
>
> 3(m) To sell or dispose of the undertaking of the Company, or any part thereof, for such      F
> consideration as the Company may think fit, and in particular for shares, debentures, or
> securities of any other company.
>
> ...
>
> 3(p) To do all such other things as are incidental or conducive to the attainment of the
> above objects, or any of them ...'

74. As I understand the appellants' argument with regard to these clauses it runs essentially       G
as follows:

(1) Clause 4 constituted a fundamental prohibition against any form of payment out to
embers. Any scheme for de-mutualisation clearly, therefore, required its removal.

(2) De-mutualisation was distinct from the sale of the motor services business and did not
itself fall within any of the objects clauses. In particular it was not to be regarded (within
cl. 3(p)) as 'incidental or conducive to the attainment of' the sale of the motor services business    H
(within cl. 3(m)).

(3) The defendants were, therefore, forbidden to apply any company funds towards de-
mutualisation.

75. The difficulty with this argument is that it appears to overlook the plain fact that, by the
same token as a company may seek to change its objects, so too it may seek to change its other

CA                          **Peskin v Anderson**                          **887**
                          (*Simon Brown* LJ)

A    rules such as the prohibition constituted by cl. 4 in the present case. And if a company can seek
     to change its rules, then in my judgment it must also be entitled to expend such sums (for
     example by way of legal fees) as are reasonably incurred in exploring the need for and effecting
     such change. This, we kept suggesting to Mr Vos in argument, was the complete answer to his
     case. Not so, he repeatedly submitted, but, I confess, I never came to understand why not. All I
     can do is to quote verbatim from the last of the relevant passages in the transcript of the
     argument before us to indicate my difficulty:

B         'Mr Vos: It is, of course, not illegal to change the law of the company. But the question
          is, whether on the facts ... that expenditure ... was in fact directly spent for the purpose,
          not just of changing the law of the company, but for the purpose of ensuring that monies
          were paid to members in violation of the memorandum ... The scheme was not directed
          at just changing, that was just one small part of the scheme. The scheme was directed at
          distributing the money to the members indirectly ... Let us assume that in order to
C         transfer to the members of the company you have to expend £1 million, and let us
          assume that the assets of the company are £10 million, and that the object of the scheme
          and the proposal is to get the £10 million to the Members, that is what is intended and
          that is what is alleged. In order to achieve it, you have to spend £1 million and therefore
          the distribution is only £9 million; it can only be. It would be, because you have spent
          £1 million of the £10 million of the assets of the company on achieving the purpose ...
          Assume that is all right, can it really be said that you have not expended that £1 million
D         for this prohibited purpose? In our respectful submission, you have obviously expended
          it for that purpose and it is not an answer to say that the mechanics, the way in which you
          achieved it, was by changing this provision ...

          Lord Justice Mummery: It is spent for the purposes of removing the prohibition.

          Mr Vos: That is the dispute, with respect. Your Lordship says it is spent just for the
          purpose of removing the prohibition, and I say it is spent for achieving the prohibited
E         object ... It is an obvious wrong to go about doing something before you change the
          provision. You have to change it first. That is why s.35(3) says so ... You go to the
          general meeting, under s.35(3), which assumes you do, and say, 'We want to spend
          money on this ultra vires act, may we do so?', and you can have it approved.'

     76.  For the life of me, I remain unable to see how payments (say to solicitors) expended to
     remove a prohibition against making payments to members can themselves be characterised as
     payments to members in violation of the prohibition, and nor can I see how s. 35(2) of the
F    *Companies Act* 1985 advances the appellants' argument. Section 35(3) provides:

          'It remains the duty of the directors to observe any limitations on their powers flowing
          from the company's memorandum; and action by the directors which but for subsection
          (1) would be beyond the company's capacity may only be ratified by the company by
          special resolution.

G         A resolution ratifying such action shall not affect any liability incurred by the directors
          or any other person; relief from any such liability must be agreed to separately by special
          resolution.'

     Section 35(1) prevents third parties from calling into question the validity of an act done by a
     company on the ground of lack of capacity by reason of anything in the company's
     memorandum.

     77.  Mr Vos's submission on s. 35(3) begs rather than answers the question at issue. If, as I
H    think, it is lawful to spend money changing the company's rules, then there can be no occasion
     to seek ratification of such expenditure from the company (even assuming, which I doubt, that
     s. 35(3) contemplates advance rather than retrospective ratification).

     78.  I referred earlier to Mr Vos having acknowledged that directors (at least of private
     companies) are under no general duty to inform shareholders of developments or proposals
     which may increase the value of their shareholding. Were it otherwise, I for my part would

regard this as a prime case for asserting a breach of such duty. After all, nothing could more   A
fundamentally affect the value of club memberships than the de-mutualisation scheme here
devised which overnight transformed a worthless membership into one worth £34,000. But the
same surely is true of a company which strikes a rich vein or contemplates takeover; or a
building society which contemplates de-mutualisation. And yet no one suggests that those
unlucky enough to miss out on these bonanzas have any claim in law.

79. The RAC's ex-members' *cri de coeur* is, as I began by saying, understandable. Given,   B
however, that they cannot frontally attack their directors for not keeping them informed – and
thereby giving them an opportunity to prolong a membership they had not otherwise thought
worth maintaining – it seems to me not merely contrived but unattractive to criticise, not de-
mutualisation itself (the necessary foundation of their damages' claim), but rather the
inevitable expense of de-mutualising. And the same can be said too of their further complaints
about the directors gaining personal advantages from the eventual scheme – complaints which   C
might more logically come from members who remained than those who resigned (certainly
absent any shred of evidence that the directors were allowing numbers to dwindle to enhance
the value of their own individual memberships).

80. Although agreeing with all that Mummery LJ has said I have been anxious in addition to
indicate my own basic reasoning for rejecting this claim. One way or another I have no doubt
that it is worthless and must fail. I too would dismiss the appeal.

D

(*Appeal dismissed with costs. Permission to appeal to the House of Lords refused*)

E

F

G

H

© **2001 Sweet and Maxwell Ltd**
bcp2001 bcp   239 Mp   888—bcp23075

# Exhibit U

Case 23-50437-JTD    Doc 60-1    Filed 12/15/23    Page 648 of 850

[1973]

A

[PRIVY COUNCIL]

*NEW ZEALAND NETHERLANDS SOCIETY
"ORANJE" INCORPORATED    .    .    .    .    APPELLANT

AND

B

LAURENTIUS CORNELIS KUYS AND ANOTHER    .    .    RESPONDENT

[ON APPEAL FROM THE COURT OF APPEAL OF NEW ZEALAND]

1973  Jan. 22, 23, 24, 25;             Lord Wilberforce, Lord Hodson,
      March 7                          Lord Pearson, Lord Diplock
                                       and Lord Simon of Glaisdale   C

*New Zealand—Passing off—Fiduciary relationship—Plaintiff found-
ing newspaper and publishing while secretary of incorporated
society—Plaintiff and society publishing newspapers under
same title after plaintiff ceasing to be secretary—Action for
passing off—Whether special arrangement whereby plaintiff
published newspaper—Whether plaintiff making full disclosure
of material facts—Whether fiduciary obligation to hold news-       D
paper on trust for society*

The plaintiff, who was the secretary of an incorporated
society, founded and published a newspaper under the name
of "The Windmill Post." The society claimed ownership of
the newspaper on the ground that the plaintiff was in a fiduciary
position as secretary of the society and had acquired the
newspaper while he held that office and by virtue of it. The     E
society launched a similar publication with the same name and
the two almost identical newspapers circulated simultaneously.
The plaintiff claimed an injunction to restrain the society
from publishing their newspaper under the name or style of
"The Windmill Post." The Supreme Court of New Zealand
granted the injunction and their decision was affirmed by the
Court of Appeal.

On appeal by the society to the Judicial Committee:—        F
*Held,* dismissing the appeal, (1) that the plaintiff's fiduciary
position and responsibilities as secretary of the society did not
exclude the possibility that the publishing of the newspaper
was a separate arrangement and one in which the plaintiff owed
no fiduciary duty to the society and, since the judge had
found that there was such an arrangement and there was an
established set of facts which fully displaced any potential
fiduciary obligation, the plaintiff did not hold the newspaper    G
in trust for the society (post, pp. 1130H—1131A–C).

(2) That if an arrangement was to stand whereby a trans-
action which would otherwise come within a person's fiduciary
duty was to be exempted from it, there must be full and
frank disclosure of all material facts but, since the society
had been unable to point to any matter relevant to the estab-
lishment of the newspaper which had not been disclosed, the       H
society was unable to rely on non-disclosure and, accordingly,
the plaintiff was entitled to the injunction granted (post,
pp. 1131H—1132A–B).

Judgment of the Court of Appeal of New Zealand affirmed.

The following cases are referred to in the judgment:

*Birtchnell* v. *Equity Trustees, Executors and Agency Co. Ltd.* (1929)
    42 C.L.R. 384.

1 W.L.R.          N.Z. Netherlands Society v. Kuys (P.C.)

A      *Phipps* v. *Boardman* [1964] 1 W.L.R. 993; [1964] 2 All E.R. 187; [1965]
           Ch. 992; [1965] 2 W.L.R. 839; [1965] 1 All E.R. 849, C.A.; [1967]
           2 A.C. 46; [1966] 3 W.L.R. 1009; [1966] 3 All E.R. 721, H.L.(E.).
       *Tufton* v. *Sperni* [1952] 2 T.L.R. 516, C.A.

       The following additional cases were cited in argument:

B      *Armstrong* v. *Sheppard & Short Ltd.* [1959] 2 Q.B. 384; [1959] 3 W.L.R.
           84; [1959] 2 All E.R. 651, C.A.
       *Boulting* v. *Association of Cinematograph, Television & Allied Technicians*
           [1963] 2 Q.B. 606; [1963] 2 W.L.R. 529; [1963] 1 All E.R. 716,
           C.A.
       *Bray* v. *Ford* [1896] A.C. 44, H.L.(E.).
       *Ford* v. *Foster* (1872) 7 Ch.App. 611.
C      *General Electric Co. (of U.S.A.)* v. *General Electric Co. Ltd.* [1972] 1
           W.L.R. 729; [1972] 2 All E.R. 507, H.L.(E.).
       *Gray* v. *New Augarita Porcupine Mines Ltd.* (1952) 3 D.L.R. 1.
       *Industrial Development Consultants Ltd.* v. *Cooley* [1972] 1 W.L.R. 443;
           [1972] 2 All E.R. 86.
       *Kettles & Gas Appliances Ltd.* v. *Anthony Hordern & Sons Ltd.* (1934)
           35 S.R.(N.S.W.) 108.
D      *Leather Cloth Co. Ltd.* v. *American Leather Cloth Co. Ltd.* (1863) 4
           De G.J. & S. 137; (1865) 11 H.L.Cas. 523, H.L.(E.).
       *Peso Silver Mines Ltd. (N.P.L.)* v. *Cropper* (1966) 58 D.L.R. (2d) 1.
       *Reading* v. *Attorney-General* [1951] A.C. 507; [1951] 1 All E.R. 617,
           H.L.(E.).

       APPEAL (No. 21 of 1972) from a judgment (April 7, 1971) of the Court
E   of Appeal of New Zealand (North P., Turner and Haslam JJ.) dismissing
   an appeal by the appellant, the New Zealand Netherlands Society " Oranje "
   Incorporated, from a judgment of the Supreme Court (Speight J.) in favour
   of the respondents, Laurentius Cornelis Kuys and the Windmill Post Ltd.,
   that the appellant should be restrained by injunction from publishing,
   distributing or selling a newspaper under the name or style of " The Wind-
   mill Post."
F      The facts are stated in the judgment of their Lordships.

       *Bernard H. Clark* (New Zealand Bar) and *T. Lloyd* for the appellant
   society.
       *R. A. Heron* and *J. A. Farmer* (both of the New Zealand Bar) for the
   respondent.
G
                                                     *Cur. adv. vult.*

       March 7: The judgment of their Lordships was delivered by LORD
   WILBERFORCE.
       This is an appeal from a judgment of the Court of Appeal of New
   Zealand affirming a judgment in the Supreme Court at Auckland of
H   Speight J. in favour of the present respondents. At the trial the learned
   judge granted the respondents, plaintiffs in the proceedings, a perpetual
   injunction restraining the appellant from publishing, distributing or selling
   a newspaper under the name or style of " The Windmill Post " or any
   use of the words " Windmill " or " Post " or from the use of the large
   windmill device on the front page. This was, in effect, relief against passing
   off, since the appellant was publishing a newspaper with the same title and
   device.

1128

The litigation arises out of the existence and activities of the Dutch  A
community of residents in New Zealand.  To further their interests there
was formed in 1949 the Netherlands Society " Oranje " Incorporated
(predecessor of and not to be confused with the appellant society).  This
was centred in Auckland, and may be referred to as the " Auckland
Society."  The respondent Laurentius Cornelis Kuys joined this society
in 1962: he became a member of its committee and in 1963 its secretary.
In 1963 he started a group travel scheme whose purpose was to enable  B
members to travel to the Netherlands at reduced rates.  Also from 1963
the society published a newsletter for the benefit of its members called " The
Holland Bulletin," of which Kuys was the original editor.  By the end
of 1966 the Bulletin was in serious financial difficulties such that it could not
continue in its then form and the last number in fact appeared in December
1966.
                                                                              C
Kuys, previously to this, had desired to establish a national society of
the Dutch in New Zealand and a proper newspaper on the lines of one
published in Australia: this desire was shared by other members including
Mr. Dubois, the president of the society; but Kuys was told more than
once that to do so was financially impossible.  In 1966 Kuys acquired the
only other Dutch newspaper, the " New Zealand Hollander," for £100
which, as the judge held, came out of his own resources.  He took on a  D
partner, Mr. I. L. Griffiths, not a member of the Auckland Society, and
some time in 1966 Kuys and Griffiths fixed upon the name " Windmill
Post " as a trade name for the export and import of goods.  Griffiths
was aware of Kuys' desire to start a newspaper.  Towards the end of
1966 contacts had been made by Kuys or Griffiths with printers and other
newspapers with a view to calculating the cost of publication.
                                                                              E
On January 5, 1967, there was a meeting of members of the Dutch
community at the house of Mrs. Hoeberigs, at which Kuys and Dubois
were present.  At the trial there was a radical disagreement between
Dubois and others representing the appellant society on the one hand
and Kuys and his witnesses on the other as to what was decided at this
meeting.  It is not disputed that it was agreed to form a new national
society of the Dutch community in New Zealand—this became the appellant  F
society which was incorporated on January 27, 1967.  It is also not disputed
that it was agreed to produce a newspaper to be called " The Windmill
Post."  This was in fact produced first in February 1967 and later became
the property of the second respondent, a company formed by Kuys and
Griffiths.  But there was a critical difference as to the terms on which the
paper was to be administered.
                                                                              G
The appellant's contentions, supported by the evidence of Dubois and
one Renneberg, a committee member of the Auckland Society and later
treasurer of the appellant, were that it was agreed that the paper should
be the property of the society, that Kuys should be the editor and publisher,
that in the first place the society should not be under any financial responsi-
bility for the paper but that the whole risk (of loss or profit) should be
borne by Kuys who would look to sales and advertisements to make it  H
pay; that for six months the society should guarantee purchases by its
members of 2,000 copies at 1s. per copy and finally that after six months
the whole project should be reconsidered.
On his side Kuys' case was that, the former Bulletin being moribund,
he, Kuys, should publish a new newspaper to be called " The Windmill
Post " which should be his property; that the society should have the
right to publish in it the society's news; that the society would guarantee

A  for six months the purchase of the new paper at 1s. per copy by 2,000 members; finally that at the end of six months these terms, including the question whether the society would continue its support, would be re-negotiated. (It will be noted that both versions refer to " the society," in disregard of the fact that the appellant was not at the time in existence. It must be taken to mean the Auckland Society and subsequently the appellant as its assignee. The expression " the society " will be used

B  hereafter in this sense.) The question which of these versions was correct was vital, and the entire case depends on it. Speight J. heard evidence from persons present at the meeting. He also heard evidence from persons present at a later meeting held in March 1967 at which the arrangements made in January were reported and again discussed. There was evidence which the judge accepted, that at this March meeting complaints were

C  made as to the society's prospective liability for newspaper losses, so that attention was focussed upon the exact terms of the January arrangement. One of the witnesses, whose evidence the judge found to be acceptable made a tape recording at the time of the March discussions which he transcribed in typescript.

On this evidence, the trial judge accepted the evidence of Kuys and his witnesses and rejected that of the appellant society. He

D  held that the newspaper was the property initially of Kuys and later of his assignee the second respondent. It being proved that the appellant, who had parted from Kuys in June 1967, was seeking to publish a rival news-paper under the same name and emblem, he granted an injunction in the terms already mentioned. On appeal, the Court of Appeal, after reviewing all the facts, endorsed the judge's findings and affirmed his judgment.

E  Before their Lordships, counsel for the appellant conceded, necessarily, that no attack was possible upon the concurrent findings of primary fact in the courts below. But it was submitted that the judgment of Speight J. was defective in law. The appellant, as defendant to the proceedings, had pleaded, it was correctly said, that Kuys, by virtue of his position as secretary and member of committee of the society, was in a fiduciary position. He had acquired the ownership of the newspaper while he held

F  this position and by virtue of it. Admittedly it would be possible for the society to release him from accountability and to allow him to keep the ownership for himself: but this could only be done by an arrangement freely arrived at after full disclosure of all relevant matters. There had not, it was said, been that full disclosure. Moreover, it was contended that Kuys' conduct in a number of respects was such as, in any event, should disentitle him to the equitable remedy of injunction.

G  Their Lordships are in agreement with these contentions in so far as they stress the necessity to give consideration to the nature of the relation-ship between Kuys and the society and to the question whether that relationship imposed upon him, in relation to the particular transaction under investigation, duties of a fiduciary character. The obligation not to profit from a position of trust, or, as it is sometimes relevant to put it, not

H  to allow a conflict to arise between duty and interest, is one of strictness. The strength, and indeed the severity, of the rule has recently been em-phasised by the House of Lords: *Phipps* v. *Boardman* [1967] 2 A.C. 46. It retains its vigour in all jurisdictions where the principles of equity are applied. Naturally it has different applications in different contexts. It applies, in principle, whether the case is one of a trust, express or implied, of partnership, of directorship of a limited company, of principal and

agent, or master and servant, but the precise scope of it must be moulded   A
according to the nature of the relationship.   As Lord Upjohn said in
*Phipps* v. *Boardman* at p. 123:

> " Rules of equity have to be applied to such a great diversity of
> circumstances that they can be stated only in the most general terms
> and applied with particular attention to the exact circumstances of
> each case."
>                                                                            B

The present case is concerned with an officer of an incorporated, non-
profit-making society.   Kuys was not paid for his services but he was
a trusted employee; and he was ready to agree that he had duties of trust
and confidence placed in him.   On the other hand the scope of his
responsibility and the dividing line between that and his own personal
interests were loosely defined.   It appears from the evidence that he   C
was able to run a small insurance business of his own: also it appears
that he was permitted a personal interest in the group travel service
which he managed for the society.   A person in his position may be
in a fiduciary position quoad a part of his activities and not quoad other
parts: each transaction, or group of transactions, must be looked at.
Their Lordships find support for this approach in the English Court of
Appeal's judgments in *Tufton* v. *Sperni* [1952] 2 T.L.R. 516, particularly   D
in that of Jenkins L.J., and in the High Court of Australia's judgment in
*Birtchnell* v. *Equity Trustees, Executors and Agency Co. Ltd.* (1929) 42
C.L.R. 384.   Dixon J. said, at p. 408:

> " The subject matter over which the fiduciary obligations extend is
> determined by the character of the venture or undertaking for which
> the partnership exists, and this is to be ascertained, not merely from   E
> the express agreement of the parties . . . but also from the course
> of dealing actually pursued by the firm."

This was said in the context of a partnership but the principle must be
of general application.

It is, then, necessary to consider the relationship of Kuys and the
society in regard to the publication of a newspaper.   In their Lordships'   F
opinion, there was at least the potentiality of a fiduciary relationship.   The
Auckland Society had for several years published the newsheet called the
Holland Bulletin—this was at the centre of its activity.   Kuys was for some
time the editor of the Bulletin and there is no doubt that he was so in
his capacity as secretary.   It was contemplated that in one form or another
the new society, which became the appellant society, should be associated
with a newspaper: its stated objects included taking over the publication   G
of the Holland Bulletin.   It was obvious and essential that any newspaper
would largely depend for its viability upon subscriptions by the society's
members and that they would subscribe partly at least because it contained
the society's news.

Another source of finance would be advertising, and there was evidence
that the main likely clients, the airlines, were interested in supporting the   H
society.   Thus, in these circumstances, if Kuys had proceeded to launch a
newspaper, without any special arrangement, there would be at the least
a case for saying that to claim or retain the benefit of it for himself would
be a breach of fiduciary duty.

On the other hand, what has already been said as to Kuys' position
and responsibilities, left open the way for a special arrangement, and,
equally, such an arrangement was, on the judge's findings, made.   It was

A  straightforward and, in the circumstances, reasonable. The Bulletin could not be carried on: to produce a newspaper obviously involved the risk of loss. The contract limited the society's commitment to the purchase of 2,000 copies at 1s. each for six months. Kuys was to secure what advertising and other income he could to cover all outgoings and his own remuneration. He was not to come down upon the society for any losses. As one witness said, he was not to cry on its shoulder. The
B  newspaper was to be his for ill and for good.

There was much discussion at the trial as to what was to happen at the end of the period of six months. But the judge's finding (supported by the evidence) was that the reconsideration then to be given to the situation was limited to the amount, if any, of the society's support. That the ownership of the newspaper should revert to the society was certainly not
C  agreed, and if it was not agreed, either, in terms, that the ownership should remain with Kuys, no other conclusion was possible from the terms which were agreed. There was therefore, in their Lordships' opinion, established a set of facts which would fully displace any potential fiduciary obligation on Kuys to hold the newspaper in trust for the society.

The judge did not in terms deal with the case in this way. He simply found the facts regarding the contract made in January 1967 and treated
D  them as disposing of the case. Their Lordships would not disagree with the Court of Appeal, or indeed with the appellant's argument before the Board, that this somewhat telescoped approach may be open to criticism. But they also agree with the conclusions of the Court of Appeal, which were reached after a careful re-examination of the evidence, that the essential findings had been made. As was said by Turner J.:

E      ". . . I read the judgment, even though the words ' fiduciary ' or ' dispensation ' do not appear therein, as finding as a basic essential fact that the effect of the conversations of January 5 was to give Kuys a dispensation from the fiduciary duty which without that dispensation he might have owed."

And North P. said:
F      " I agree that it might have been better if the judge had said in express terms that Mr. Kuys had discharged the burden of showing that the fact that he was the secretary of the Auckland Society and later of the National Society did not in the circumstances require him to hold that he was trustee of the newspaper and its title for the society. Nevertheless, in result that is what I understand the learned judge
G      really decided. I should add that on my own examination of the facts, I would undoubtedly have come to the same conclusion, for it is beyond my powers of credence to contemplate that Mr. Kuys would have been willing to incur all the risks which everybody knows are attendant on commencing the publication of a newspaper and then be obliged to hand over the newspaper to the society at the end
H      of six months if, as proved to be the case, he ceased to be secretary of the society."

On the main portion of this case their Lordships are in agreement with the Court of Appeal.

The remaining points may be briefly dealt with. First, as to disclosure. Their Lordships entirely accept, as a matter of law, that if an arrangement is to stand, whereby a particular transaction, which would otherwise

come within a person's fiduciary duty, is to be exempted from it, there    A
must be full and frank disclosure of all material facts.   But the appellant
was quite unable to point to any matter relevant to the establishment of
the newspaper or which, had it been disclosed, could have affected the
society's decision that, on the facts found, had not been disclosed by
Kuys.   It is apparent from the judgments that even if the argument as to
non-disclosure was advanced in the courts below it was not accepted.
There are no grounds on which it can be accepted in this appeal.          B

Secondly, as to the granting of an equitable remedy to the respondents.
Their Lordships again endorse the validity of the maxim that seekers of
equity must come with clean hands.   A number of authorities, in various
fields, were properly cited.   But the appellant's argument, in this part
of the case, fails on the facts.   A large number of facts were ventilated at
the trial, in an attempt to show that Kuys had been guilty of irregularities    C
of various kinds in his management of the society's affairs.   Some of these
are, their Lordships understand, the subject of further litigation.   Their
Lordships do not find it appropriate to do more than endorse the opinions
of the courts below that nothing, relevant to the transaction in question,
of sufficient gravity, was established to entitle their Lordships to take a
different view, on what is a matter of discretion, from the courts below.
The one matter which was proved was the unjustified use in the respondents'    D
newspaper of an emblem belonging to the society (a small windmill), but this
was expressly excluded from the relief granted.   In their Lordships' opinion
the injunction granted should be upheld.

Their Lordships will humbly advise Her Majesty that the appeal be
dismissed.   The appellant must pay the costs of the appeal.

                                                                          E
Solicitors: *Wray, Smith & Co.; Slaughter & May.*

                                        R. W. L.-S.


                                                                          F



                                                                          G

                        ————


                                                                          H

# Exhibit V

189

[2015] 1 WLR                                              Smithton Ltd v Naggar (CA)

A                              Court of Appeal

# *Smithton Ltd (formerly Hobart Capital Markets Ltd) *v* Naggar

## [2014] EWCA Civ 939

B  2014   March 11, 12;                               Arden, Elias, Tomlinson LJJ
          July 10

*Company — Director — Breach of duty — De facto or shadow director — Whether
    director of claimant's holding company acting as de facto or shadow director of
    claimant — Whether judge erring in principle — Guidance on determining
    whether person de facto or shadow director — Companies Act 2006 (c 46),
    ss 250, 251*

C  *Company — Powers — Substantial property transactions — Statute prohibiting
    arrangement under which person connected with director "is to acquire"
    substantial non-cash asset from company unless approved by resolution of
    members — Contract for differences entitling investor when closing out contract
    to acquire shares owned by company — Whether prohibition applying where
    acquisition less than certain — Whether applying to option in contract —*

D  *Companies Act 2006, s 190(1)*

The claimant company brought proceedings against the defendant, a director of
its former holding company, seeking to recoup losses which it had incurred in
consequence of transactions with investors introduced to it through the defendant.
Each transaction was a "contract for differences" for shares, owned by the claimant,
in another company ("the referenced shares"), under which the claimant had agreed

E  to pay the investor a sum equal to any increase in the value of the referenced shares at
the date when the contract was closed out and the investor agreed to pay a sum equal
to any fall in value of the shares at that date.  The investor could, when closing
out, decide to acquire the referenced shares.  The claim was made on, inter alia, the
alternative bases that (i) the defendant, although not one of the duly appointed
directors of the claimant, was a de facto or shadow director of it, within section 250
or section 251 of the Companies Act 2006[1]; or (ii) the transactions in question

F  infringed section 190(1)(a) of the 2006 Act, which provided that a company could
not enter into an arrangement under which a person connected with a director of its
holding company, such as one of the claimant's investors, "is to acquire from the
company" a substantial non-cash asset, such as shares, unless the arrangement had
been approved by a resolution of the members of the company or was conditional on
such approval being obtained.  The judge dismissed the claim, holding that (i) the
evidence did not show that the defendant had been involved in the management of
the claimant to any significant extent, so as to make him a de facto director, or that

G  the claimant's board had been accustomed to act in accordance with his instructions,
so as to make him a shadow director; and (ii) the fact that there was a real prospect
that on closing out a contract for difference an investor would acquire the referenced
shares did not bring such a transaction within section 190 of the 2006 Act.

On the claimant's appeal—

*Held*, dismissing the appeal, (1) that the judge had made no error of principle in
her approach to determining the capacity in which the defendant had acted and, on

H  the facts, had been entitled to conclude that the defendant's involvement with the
claimant's affairs had been in his capacity as a director of the holding company or

---

[1] Companies Act 2006, s 190: see post, para 93.
S 250: see post, para 18.
S 251: see post, paras 18–19.

© 2015 The Incorporated Council of Law Reporting for England and Wales

some capacity other than that of de facto or shadow director of the claimant (post, paras 62, 66, 77, 81, 87, 90–91, 111, 112, 113).

(2) That the words "is to acquire" in section 190(1) of the Companies Act 2006 were not to be construed as meaning "may acquire"; that, rather, section 190 required a high degree of certainty at a time when the arrangement was entered into that the non-cash asset would be acquired, and a real prospect that it would be acquired was insufficient; and that, accordingly, since the contracts for differences provided only a means whereby investors might ultimately acquire the referenced shares, and there was no certainty that they would do so, section 190 did not apply to them (post, paras 102, 108, 110–111, 112, 113).

Guidance as to relevant factors in determining whether a person is a de facto director (post, paras 34–45, 112, 113).

*Revenue and Customs Comrs v Holland* [2010] 1 WLR 2793, SC(E) applied.

Decision of Rose J [2013] EWHC 1961 (Ch); [2014] 1 BCLC 602 affirmed.

The following cases are referred to in the judgment of Arden LJ:

*Duckwari plc, In re* [1997] 2 BCLC 713, CA
*Duckwari plc, In re* [1999] Ch 253; [1998] 3 WLR 913, CA
*Mea Corpn Ltd, In re* [2007] 1 BCLC 618
*Mumtaz Properties Ltd, In re* [2011] EWCA Civ 610; [2012] 2 BCLC 109, CA
*Revenue and Customs Comrs v Holland* [2010] UKSC 51; [2010] 1 WLR 2793; [2011] Bus LR 111; [2011] 1 All ER 430, SC(E)
*Secretary of State for Trade and Industry v Deverell* [2001] Ch 340; [2000] 2 WLR 907; [2000] 2 All ER 365, CA
*Secretary of State for Trade and Industry v Jones* [1999] BCC 336
*Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch); [2006] FSR 293

The following additional cases were cited in argument:

*British Racing Drivers' Club Ltd v Hextall Erskine & Co* [1996] 3 All ER 667
*Hydrodam (Corby) Ltd, In re* [1994] 2 BCLC 180
*Kaytech International plc* [1999] 2 BCLC 351, CA
*McKillen v Misland (Cyprus) Investments Ltd* [2012] EWHC 521 (Ch)
*Mills v Sportsdirect.com Retail Ltd* [2010] EWHC 1072 (Ch); [2010] 2 BCLC 143
*Murray v Leisureplay plc* [2005] EWCA Civ 963; [2005] IRLR 946, CA
*Prest v Prest* [2013] UKSC 34; [2013] 2 AC 415; [2013] 3 WLR 1; [2013] 4 All ER 673, SC(E)
*Pritchard v Briggs* [1980] Ch 338; [1979] 3 WLR 868; [1980] 1 All ER 294, CA
*R v Inland Revenue Comrs, Ex p Coombs (TC) & Co* [1991] 2 AC 283; [1991] 2 WLR 682; [1991] 3 All ER 623, HL(E)

**APPEAL** from Rose J

By a claim form issued on 11 January 2011 and re-re-amended on 13 March 2013 pursuant to CPR r 17.1(2)(a) the claimant company, Smithton Ltd, formerly known as Hobart Capital Markets Ltd, claimed against the defendant, Guy Naggar, damages (1) for breaches of the duties which he had owed to the claimant as a de facto or alternatively shadow director of the claimant pursuant to sections 172, 174 and/or 175 of the Companies Act 2006, arising out of the defendant's involvement in a number of contracts of differences to which the claimant was a party; (2), alternatively, the defendant's actions which constituted a breach of section 190 of the 2006 Act; and (3) negligent misrepresentation, including an order for accounts, inquiries and indemnity. The defendant brought contribution proceedings against three directors of the claimant, Barry Townsley, Colin Thomas, and Jason Barry. By a judgment handed down on

[2015] 1 WLR                                        Smithton Ltd v Naggar (CA)
                                                                    Arden LJ

A   11 July 2013 Rose J [2013] EWHC 1961 (Ch); [2014] 1 BCLC 602
    dismissed the claim on the basis that the defendant was not a de facto or
    shadow director of the claimant, that the transactions did not fall within
    section 190, and that the alleged misrepresentations had not been made.
        By an appellant's notice filed on 30 August 2013 and pursuant to
    permission granted by the judge the claimant appealed on the grounds that
B   the judge had (1) failed to analyse the corporate governance structure of the
    claimant properly; and (2) been wrong in her approach to "hat
    identification", in that, if the defendant could possibly have acted wearing
    some other "hat" than that of director, his acts should be attributed to the
    role represented by that hat.
        The facts are stated in the judgment of Arden LJ.

C   *Philip Marshall QC* and *Mary Stokes* (instructed by *Dechert LLP*) for the
    claimant and the three directors.
        *Michael Crystal QC*, *David Alexander QC*, *Tom Smith QC* and
    *Professor Dan Prentice* (instructed by *Isadore Goldman*) for the defendant.

    The court took time for consideration.

D   10 July 2014. The following judgments were handed down.

    **ARDEN LJ**

    *Issues on this appeal*
        1  The appellant ("Hobart") has brought proceedings against Mr Guy
E   Naggar, a director of its former holding company (Dawnay Day
    International Ltd or "DDI"), to recoup losses which it incurred (on its case)
    in consequence of transactions with clients introduced to it through
    Mr Naggar. It seeks to recoup its losses by seeking damages on the basis
    that, while Mr Naggar was not one of the duly appointed directors of
    Hobart, he was a de facto or shadow director of it or alternatively on the
    basis that he was a director of DDI and the arrangements in question
F   infringed section 190 of the Companies Act 2006 (providing for the
    avoidance of substantial property transactions), giving rise to a statutory
    liability on his part to indemnify Hobart. The claims are for some £4m. By
    her order dated 11 July 2013, Rose J [2014] 1 BCLC 602 rejected both
    claims: she held that (1) Mr Naggar was not a de facto and shadow director
    and (2) the transactions did not fall within section 190. Hobart now appeals
G   on these issues.
        2  In my judgment, for the reasons set out in detail below, this appeal
    should be dismissed: (i) There is no basis for setting aside the judge's
    conclusion that Mr Naggar had been involved with Hobart's affairs but this
    was in his capacity as a director of DDI or some other capacity than that of
    director of Hobart; (ii) section 190 did not apply to the relevant
    arrangements whereby Hobart acquired shares in connection with
H   transactions with persons connected with Mr Naggar.
        3  I analyse the de facto/shadow director issue and the section 190 issues
    separately below. The former turns on how Hobart was run and the second
    on the nature of the arrangements in question. So I next set out the material
    facts about Hobart's governance structure and business.

© 2015 The Incorporated Council of Law Reporting for England and Wales

*Hobart's governance structure and business*                                    A

  *Governance structure*

4    Hobart was a joint venture company and was therefore subject to strong shareholder control.  Prior to incorporation it was run as a division of Dawnay Day Brokers Ltd ("DD Brokers") a subsidiary of DDI.  The two main businesses of the DDI group were financial services and property investment.    Mr Naggar was responsible for financial services, and a    B Mr Peter Klimt was responsible for the property investment business.  The net assets of DDI were over £1bn.

5    Mr Naggar was appointed a director of DDI and other group companies, including (from 2004 to 1 October 2007) Dawnay Day Brokers Ltd ("DD Brokers").

6    On 1 October 2007 Hobart was incorporated as a separate company,    C Dawnay Day Capital Markets Ltd ("DDCM"), and carried on business as a subsidiary of DDI.

7    The interests and responsibilities of those involved in Hobart were set out in a joint venture agreement dated 12 September 2007 ("the JVA"). Under that agreement, DDI held just over 50% of the voting rights.  The rest was held by the management of DDCM, principally Mr Townsley.

8    Under the JVA the directors of Hobart were to be Mr Townsley,    D Mr Warnford-Davis, Mr Thomas, Mr Berry and Mr Kelly.  There were also three appointees of DDI: Mr Pincus, Mr Keane and Mr Morley ("the DDI-nominated directors").  I will call the directors named in the JVA "the agreed directors".  The JVA did not provide for Mr Naggar to be a director of Hobart.  Under clause 4 of the JVA the shareholders agreed to act reasonably and in good faith towards one another to use their reasonable endeavours to    E promote the DDCM business generally.  Dawnay Day group agreed to provide various services to Hobart, including secretarial services, human resources, administrative services, accounting services and office space: clause 15.

9    Under the JVA, Hobart undertook continuing obligations contained in schedule 1, including providing shareholders with detailed financial information such as monthly management and progress reports, monthly    F management accounts, returns to regulators and "such further information as was reasonably required by any shareholder as to all matters relating to the business or affairs of the company".  In addition, the management of Hobart agreed that certain matters, known as reserved matters, would not be done without the consent of the majority shareholder, DDI.

10    The reserved matters were set out in schedule 2 to the JVA.  The    G principal reserved matter was any change in the nature of Hobart's business, which was to consist exclusively of the previous business of the division of DDCM, being "the provision of full range brokering services to investors, including . . . the creation of long and short contracts for difference . . ." That business had to be carried out in accordance with the agreed business plan.  The appointment and removal of directors was a reserved matter, as    H was the incurring of any capital expenditure over £20,000.

11    It appears, however, that nothing much of significance was discussed or decided at board meetings.  Important decisions were in fact taken by Mr Townsley and Mr Naggar acting effectively as partners in the business outside of formal board meetings.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    12   Hobart applied for its own Stock Exchange and regulatory permissions and did not seek permission for Mr Naggar. Mr Naggar never attended board meetings or meetings of its principal board committee, Exco. Mr Naggar never held himself out as a director of Hobart and no-one ever held him out as a director. He was a busy individual. When Mr Klimt's son had an accident he had to take over the property side of DDI as well. In addition, Mr Naggar did not get closely involved in management. The judge called him a "deal" person.

B

### Hobart's business of writing CFDs

13   In February 2007 Mr Naggar concluded that shares in Foreign & Colonial Asset Management Ltd ("F & C") were undervalued. Hobart began writing "contracts for differences" ("CFDs") for F & C shares on behalf of its clients, many of whom were connected to Mr Naggar. I refer to them below as "connected persons".

C

14   Under a CFD, the provider agrees to pay a sum equal to the increase in value at the date the contract is "closed out". The investor correspondingly agrees to pay a sum equal to the fall in value in the shares at the date the contract is "closed out". He also agrees to accept the continuing obligation to meet demands ("calls") to provide margin to secure his obligations. So, if the value of the shares changes and in particular if it falls, he is obligated to provide more margin. In the case of the CFDs written by Hobart with its clients, including connected persons of Mr Naggar, there was no fixed date for closing out. CFDs may be contrasted with options to buy or sell shares whereby the investor agrees to buy or sell shares in question. However, the judge found that the client could when closing out decide whether to acquire the shares that were referenced by the provider. In this case, Hobart as did other providers hedged its position by taking out a contract with another provider referencing the same number and volume of shares as it wrote for its own client. In those circumstances, if on closing out the client wished to acquire the shares in question, Hobart would have sold those shares to the holder. The process of taking shares is called "taking the shares physical".

D

E

F

### Hobart ceases to be part of DDI group

15   In April to June 2008 DDI began to suffer cash-flow problems and in July 2008 it collapsed. Hobart carried on business as a subsidiary of DDI for about ten months ("the Period") before DDI collapsed in July 2008. Hobart is now called Smithton Ltd.

G

### De facto/shadow director issue

16   The question who is a director of a company is important because of the substantial duties which a director has. It is usually easy to tell if a person is a director if he has been duly appointed as such by the company (and is then a de jure director or "director in law"), but much less easy if he has not been even purportedly appointed as a director but has simply acted as a director on occasions (when he might be a de facto director or director "in fact") or if he has persuaded the directors to act in a particular way (when he might be a "shadow" director). A question which often arises in practice is whether a director of the holding company of a group of

H

© 2015 The Incorporated Council of Law Reporting for England and Wales

194
Smithton Ltd v Naggar (CA)                                    [2015] 1 WLR
Arden LJ

companies has become a director of its subsidiary. As explained below, the    A
expressions de facto director and shadow director have been defined by
statute and considered by the courts in recent case law.

17    Directors must declare conflicts with their interest in accordance
with section 177 of the 2006 Act. That duty is buttressed by section 190 of
the Act, which renders voidable arrangements under which a director of a
company or its holding company or persons connected with him are to    B
acquire assets from the company. Section 190 gives rise to subsidiary issues
on this appeal. It is common ground that some of Hobart's clients were
connected persons of Mr Naggar (as defined in section 190). Hobart claims
that the hedging transactions, which it entered into when it entered
"contracts for differences" (explained below) with those clients, fell within
section 190. The judge also rejected this argument and held that the
arrangements in question did not breach section 190.    C

### Statutory definitions of de facto and shadow director

18    The statutory definitions of de facto director and shadow director
appear in sections 250 and 251 of the 2006 Act respectively:

"250 'Director'
"In the Companies Acts 'director' includes any person occupying the    D
position of director, by whatever name called.
"251 'Shadow director'
"(1) In the Companies Acts 'shadow director', in relation to a
company, means a person in accordance with whose directions or
instructions the directors of the company are accustomed to act.
"(2) A person is not to be regarded as a shadow director by reason only    E
that the directors act on advice given by him in a professional capacity."

19    Section 251(3) contains an exception which prevents holding
companies from becoming shadow directors of their subsidiaries:

"A body corporate is not to be regarded as a shadow director of any of
its subsidiary companies for the purposes of—Chapter 2 (general duties
of directors), Chapter 4 (transactions requiring members' approval), or    F
Chapter 6 (contract with sole member who is also a director), by reason
only that the directors of the subsidiary are accustomed to act in
accordance with its directions or instructions."

### Case law on whether a person is a de facto and shadow director

20    The leading case is Revenue and Customs Comrs v Holland [2010]    G
1 WLR 2793; [2011] Bus LR 111 and it is not now necessary to consider
many cases in addition to this. In Holland's case, the Supreme Court (by a
majority) decided that Mr Holland, a director of a corporate director, which
was the sole director of some 43 trading companies, was none the less not a
de facto director of those other companies. He had acted only in his capacity
as a director of the corporate director. The corporate director acted as a
director in employing employees (whose services were contracted out),    H
arranging for the payment to them of a salary and in their capacity as
shareholders distributions and other administrative services.

21    Lord Hope of Craighead DPSC's analysis treats the separate legal
personality of the corporate director as the key consideration. Accordingly

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    he held that the question whether the director was a de facto director of the other company had to be approached on the basis that the companies were separate legal persons. Lord Hope DPSC held that there was no definitive test to determine who was a de facto director. He held that all the facts had to be considered and in addition the purpose of the statutory provision there in question, section 212.

B    22    Lord Hope DPSC held, at para 42:

"So long as the relevant acts are done by the individual entirely within the ambit of the discharge of his duties and responsibilities as a director of the corporate director, it is to that capacity that his acts *must* be attributed." (Emphasis added.)

C    23    On the facts the director had done no more than discharge his duties as a director of the corporate director. As they had been done "within the ambit" of the discharge of those duties, his acts were required to be attributed to that capacity without any further inquiry as to whether they also fell "within the ambit" of what a director of the composite companies would have done.

D    24    Lord Collins of Mapesbury JSC came to the same conclusion by different reasoning. He held that the original basis of liability as a de facto director was that a person had been appointed a director by an invalid process and acted as such. On that footing, the original basis of liability was thus the assumption of responsibility as a director. Where a person had never been even invalidly appointed a director, it was necessary to examine the governance system of the company in order to assess whether he acted as a director: judgment, para 93. Otherwise the breadth of liability would go

E    beyond that which a court could impose by development of the concept of de facto director. Thus, Lord Collins JSC held at para 96:

"There is no material to suggest that Mr Holland was doing anything other than discharging his duties as the director of the corporate director of the composite companies. It does not follow from the fact that he was taking all the relevant decisions that he was part of the corporate

F    governance of the composite companies or that he assumed fiduciary duties in respect of them. If he was a de facto director of the composite companies simply because he was the guiding mind behind their sole corporate director, then that would be so in the case of every company with a sole corporate director. The development of the law of de facto directors from *In re Lo-Line* [1988] Ch 477 and *In re Hydrodam* [1994]

G    2 BCLC 180 onwards was a significant judicial innovation given that for some 150 years de facto directors meant individuals who had actually been appointed, or purportedly appointed, as directors. As has been seen, in two of the three older cases which dealt with the liability of de facto directors, an analogy was drawn with executors de son tort: *Gibson v Barton* (1875) LR 10 QB 329 and *In re Canadian Land Reclaiming and Colonizing Co (Coventry and Dixon's Case)* (1880) 14 Ch D 660. That

H    suggests strongly that the basis of liability was the assumption of responsibility. The legislature has already intervened in the 2006 Act to ensure that there is a natural person to whom responsibility is attributed. The purpose of what became section 155(1) of the 2006 Act, was to ensure that every company would have at least one individual who could,

© 2015 The Incorporated Council of Law Reporting for England and Wales

A

if necessary, be held to account for the company's actions: see Department of Trade and Industry, *Company Law Reform* (Cm 6456) (2005), para 3.3. For the court to hold that every significant decision of individual directors of a corporate director is to be regarded as being taken as if they were directors of the company of which it is the corporate director goes considerably beyond the law as it has been developed at first instance and by the Court of Appeal in the modern de facto director cases, and beyond what I would regard as the function of the court. I would not wish to question the modern judicial development of the de facto director concept, and I well understand the policy reasons why in such a case as this a person in the position of Mr Holland should be liable, although those reasons may not be as powerful as they were prior to the enactment of section 155(1) of the 2006 Act. The legislature could have intervened to require that all directors be natural persons, as under section 201B of the Corporations Act 2001 (Australia), section 105(1)(c) of the Canada Business Corporations Act 1985, section 701 of the New York Business Corporation Law, and section 141(b) of the Delaware General Corporate Law. But it did not, and in my judgment the proposed extension which is inherent in HMRC's case is a matter for the legislature and not for this court."

B

C

D

25   The penultimate sentence may be a case of "be careful what you wish for lest it become true". Lord Collins JSC refers to the fact that Parliament had not legislated to prohibit corporate directors but there is now a Bill before Parliament which contains a clause which (if it becomes law) would have the effect of preventing the appointment of corporate directors: the Small Business, Enterprise and Employment Bill 2014, clause 76.

E

26   Lord Saville of Newdigate agreed with both judgments. Lord Walker of Gestingthorpe JSC dissented on the basis that Mr Holland acted both as a de jure director of the corporate director and as de facto director of the trading companies. Lord Clarke of Stone-cum-Ebony JSC agreed with the analysis of the law by Lord Collins JSC but came to the same conclusion on the facts as Lord Walker JSC. In those circumstances, the judgment of Lord Collins JSC contains the ratio of the decision. It is notable that the majority placed no weight on the fact that Mr Holland was involved in all the directorial decisions made on behalf of the composite companies, so that the volume of decisions in which a person is said to have made as a de facto director will not have significance if those decisions were made in some other capacity.

F

27   In *Holland's* case [2011] Bus LR 111, the issue was therefore whether Mr Holland had acted as a director of the "composite companies" or as a director of the corporate director. In other cases, the director has no alternative capacity and must have acted either as an individual person or as a director. One such case is *Secretary of State for Trade and Industry v Jones* [1999] BCC 336, where Jonathan Parker J held that a management consultant was a de facto director of his client company. He had signed a letter to the client's auditors to confirm their appointment on the headed notepaper of the client, describing himself as "joint managing director". He had also become a signatory on the company's bank account, dealt directly with the company's creditors and agreed prices with supplier of the company.

G

H

© 2015 The Incorporated Council of Law Reporting for England and Wales

197

A    28    But another issue that may arise is whether the acts relied on are actually the acts of a director at all. *Holland's* case did not address the question what actions make a person a director, save in so far as the majority clearly make it clear that the court should ask whether the defendant formed part of the corporate governance structure of the company. However, that is merely to restate the question. The real issue in some contexts will be whether the acts demonstrate the assumption of acts as a director. That

B    question was not explored in this case. There was simply no argument as to whether the acts on which Hobart relied lacked the quality of directorial acts.

29    In *Holland's* and *Jones's* cases, the acts in question were plainly directorial in nature. In *Holland's* case, the corporate director was the sole director: there was no evidence of any other person taking management

C    decisions on its behalf or on behalf of the composite companies.

30    In this case, Hobart challenges the judge's failure to make findings about its corporate governance structure. This case raises the fundamental point of why the court needs to undertake that exercise and (in consequence) what makes a person a director.

31    The Companies Act definition does not elucidate that matter. Provisionally it seems to me that that term is to be tested against the usual

D    split of powers between shareholders and directors under Table A, i e on the basis that the powers of management of the company's business are delegated to the directors and the shareholders cannot intervene except by special resolution. On that basis it means a person who either alone or with others has ultimate control of the management of any part of the company's business. In the usual case, in my judgment, it would not include a purely

E    negative role of giving or receiving permission for some business activity.

32    The role of a de facto or shadow director need not extend over the whole range of a company's activities: see *In re Mea Corpn Ltd* [2007] 1 BCLC 618; *Secretary of State for Trade and Industry v Deverell* [2001] Ch 340. A person may be both a shadow director and a de facto director at the same time: *In re Mea Corpn.*

F    *Practical points: what makes a person a de facto director?*

33    Lord Collins JSC sensibly held that there was no one definitive test for a de facto director. The question is whether he was part of the corporate governance system of the company and whether he assumed the status and function of a director so as to make himself responsible as if he were a director. However, a number of points arise out of *Holland's* case and the

G    previous cases which are of general practical importance in determining who is a de facto director. I note these points in the following paragraphs.

34    The concepts of shadow director and de facto are different but there is some overlap.

35    A person may be de facto director even if there was no invalid appointment. The question is whether he has assumed responsibility to act as a director.

H    36    To answer that question, the court may have to determine in what capacity the director was acting (as in *Holland's* case).

37    The court will in general also have to determine the corporate governance structure of the company so as to decide in relation to the company's business whether the defendant's acts were directorial in nature.

38    The court is required to look at what the director actually did and          A
not any job title actually given to him.

39    A defendant does not avoid liability if he shows that he in good faith
thought he was not acting as a director.  The question whether or not he
acted as a director is to be determined objectively and irrespective of the
defendant's motivation or belief.

40    The court must look at the cumulative effect of the activities relied          B
on.  The court should look at all the circumstances "in the round" (per
Jonathan Parker J in *Secretary of State for Trade and Industry v Jones* [1999]
BCC 336).

41    It is also important to look at the acts in their context.  A single act
might lead to liability in an exceptional case.

42    Relevant factors include: (i) whether the company considered him to
be a director and held him out as such; (ii) whether third parties considered          C
that he was a director.

43    The fact that a person is consulted about directorial decisions or his
approval does not in general make him a director because he is not making
the decision.

44    Acts outside the period when he is said to have been a de facto
director may throw light on whether he was a de facto director in the
relevant period.          D

45    In my judgment, the question whether a director is a de facto or
shadow director is a question of fact and degree.  The principles of appellate
review are well established.  I need only summarise those applicable here.
Where the decision depends on the judge's assessment of weight to be
attached to various facts, the test to be satisfied on appeal is that in most
cases the judge was plainly wrong.  Where the appellant contends that the          E
judge misdirected herself as to the law, the court must determine what
the law is and whether the judge applied it.

*Judge's findings on the de facto/shadow director issue*

46    As Mr Naggar held many directorships, the judge approached the
question of de facto and shadow directorship as one of "hat" identification.          F
In other words she approached the matter on the basis that he had a hat for
each office he held and that the question to be decided was which hat he was
wearing at any particular point in time.  This meant looking at what he
actually did.  She gave less weight to incidents before the incorporation of
Hobart.  She accepted Mr Marshall's concession that Mr Naggar's actions
before 31 October 2007 were not evidence to support him being a de facto
director of Hobart after its incorporation but continued to influence how the          G
business was run.  She also accepted his submission that it was important to
examine the way the company was governed, citing my judgment in *In re
Mumtaz Properties Ltd* [2012] 2 BCLC 109 in these terms [2014] 1 BCLC
602, paras 51–52:

"51.  Subsequent to *Holland's* case was *In re Mumtaz Properties Ltd*
[2012] 2 BCLC 109.  In that case Arden LJ (with whom Aikens and          H
Patten LJJ agreed) said that the first step in approaching the question of
whether a person is a de facto director is to examine the governance
structure of the company.  That case concerned a family company which
was 'run with a high degree of informality with decisions not necessarily

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    being taken at board meetings but whenever relevant family members
were in communication with each other'.

"52. Arden LJ held that the judge had been entitled to be satisfied
looking at the evidence as a whole that the respondent was part of the
corporate governance structure of the company. In her words he was 'one
of the nerve centres from which the activities of the company radiated':
see para 47 of her judgment."

B

47    The judge found as a fact that in the case of Hobart important issues
were discussed and decided not at board meetings or at meetings of Exco but
through a structure laid down in the JVA: judgment, para 70. She held that,
although the parties may not have referred to the JVA when things were
going well, it had an important effect on management's participation in the
C    business. The judge considered that the JVA governed the relationships
between the parties. It showed that the parties expressly agreed that
Mr Naggar should not be appointed a director of Hobart. Moreover,
Hobart required authorisation from the Financial Services Authority ("the
FSA") in order to carry on its business and it never reported to it that
Mr Naggar was one of its directors. She attached importance to that point
D    and did not think that it could be brushed aside. The judge rejected the
suggestion that allegations made by Hobart in proceedings against MF
Global (a CFD provider) helped her understand Mr Naggar's role in
Hobart's business. No party has appealed against her conclusions on that
point.

48    The judge identified four main elements in Hobart's case on this
E    issue: (A) the DDI-nominated directors of Hobart simply acted as nominees
of Mr Naggar; (B) Mr Naggar exerted control over the day-to-day business
of Hobart; (C) Mr Naggar, rather than the board of Hobart, would make
decisions on important aspects of Hobart's business; (D) Hobart entered
into CFDs with connected persons of Mr Naggar on Mr Naggar's
instructions.

49    The judge observed that these were very general allegations, and she
F    approached the case by reference to the particular instances of acts relied on
by Hobart in a document called the Factors Document at the start of the
trial.

A. Conduct of DDI-nominated directors

50    Since major decisions were not made at board meetings, Hobart
G    relied on the particular instances as showing that Mr Pincus and Mr Keane
(two of the DDI-nominated directors) referred back to Mr Naggar and
implemented his instructions. For instance, they referred for his approval a
contract to acquire an electronic trading platform (the Fidessa contract).
She thought this was natural for them to consult him since they wanted
group support for the decision. It was not, therefore, an instance of
H    Mr Naggar giving instructions to Hobart directors. The same pattern was
repeated with the appointment of senior employees and other matters. The
judge concluded that there was no evidence to support the contention that
the DDI-nominated directors acted in accordance with Mr Naggar's
instructions: judgment, para 103.

© 2015 The Incorporated Council of Law Reporting for England and Wales

B. Mr Naggar exerted control over the management of the day-to-day
business of Hobart

    **51**  Hobart contended that Mr Naggar exerted control over the
management of the day-to-day business of Hobart by reference to open
position reports ("OPRs"), the weekly figures and Mr Naggar's instructions
to employees.

    **52**  Hobart produced the OPRs daily. OPRs listed every client of Hobart
and set out information about their CFDs with Hobart including
confidential information as to the margin which they were due to pay.
Mr Naggar was keen to see the OPRs. Hobart contended that the fact that
Mr Naggar was shown these reports, including confidential information,
was an indication that Hobart's directors regarded him as a director, rather
than client. Mr Naggar insisted on being told the margin rates being
obtained by Hobart from its providers. The judge accepted that a mere
client could not normally have access to this information. However, she
held that Mr Naggar had an interest in making sure that money was moved
around group companies in a reasonable way. Furthermore she held that the
OPRs were important to Mr Naggar to enable him to keep an eye on the
exposure of DDI group to the risks of Hobart's business. An exchange of
emails showed that Mr Naggar's interest in the payment of margin was
driven by his interest on behalf of DDI.

    **53**  Hobart also relied on comments which Mr Naggar made when
reading the OPRs. There were written comments on about 8% of the OPRs
in evidence, but the judge accepted that he made comments in other ways.
The comments in evidence were analysed during the trial. The judge
concluded that neither the provision of OPRs to Mr Naggar nor his
comments on them indicated that he was a de facto director. She did not
deal with all of the documents individually but held that in two specified
cases Mr Naggar's comments were justified by his concern as chairman of
DDI in the financial position of the group.

    **54**  The weekly figures showed the turnover of Hobart. The judge
considered that the comments were anodyne and they were in the event
made before the incorporation of Hobart. As to instructions to Hobart
employees, there were nine kinds of instruction which the judge examined in
detail. The judge stated, at para 121, that she had considered each
instruction carefully and had concluded that all of Mr Naggar's
interventions were "readily explicable either on the basis of his role as a
client or as chairman of DDI or because they were one-off incidents arising
from a particular situation." Whether considered individually or taken as a
whole, they did not, in the judge's judgment, show that Mr Naggar was a de
facto director.

C. Mr Naggar and not the board made decisions about important aspects
of Hobart's business

    **55**  Hobart relied on some eleven kinds of conduct in support of its
allegation as showing that Mr Naggar, and not the Hobart board, made
decisions. The judge came to a global decision on these instances: she did
not deal with them individually. She concluded that, in all the instances,
Mr Naggar was acting in another capacity, or again, that they were

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    particular one-off situations "in which his involvement was unremarkable": judgment, at para 123.

    D. Mr Naggar's instructions causing Hobart to enter into CFDs with his connected persons

    56    Again the judge concluded that Mr Naggar could only give these
B   instructions as representative of the connected persons and not in his capacity as a director of Hobart.

    57    The judge therefore concluded that the evidence fell far short of showing that Mr Naggar was involved in the management of Hobart after 1 October 2007 to any significant extent.    Likewise she rejected the allegation that he was a shadow director, there being no evidence that the majority of the board were accustomed to act in accordance with his
C   instructions.

*Issue 1: should this court set aside the judge's finding that Mr Naggar was neither a de facto nor shadow director of Hobart?*

    58    Mr Philip Marshall QC appears, with Ms Mary Stokes, for Hobart. The respondents were represented by Mr Michael Crystal QC, Mr David
D   Alexander QC, Mr Tom Smith QC and Professor Dan Prentice.    Mr Alexander led for Mr Naggar on this issue.    Mr Marshall's submissions fall into five parts.    Mr Alexander's submissions were mainly directed to the second of these five parts.

    *First submission: failure to analyse corporate governance structure of*
E   *Hobart*

    59    Mr Marshall's first submission is that the judge failed to make findings about the corporate governance structure of Hobart and to take it into account.    She was right to say that the Hobart board did not make the important decisions.    As in the *Mumtaz* case [2012] 2 BCLC 109, Hobart's business had been run informally and major corporate decisions had been taken by Mr Naggar and Mr Townsley, who had operated like partners in
F   Hobart's business.    There was only one board minute.    There was not even a board meeting to deal with the interim dividend.    There were meetings of a board committee called Exco.    That was set up before Hobart was incorporated and while it was still a division of DD Brokers.    But, submits Mr Marshall, that committee did not deal with any important matters.

    60    Mr Marshall submits that the de jure directors of Hobart did not
G   make any significant decision, whether as to IT, investment, staffing, premises or otherwise, without Mr Naggar's agreement.    Mr Naggar received regular information and gave regular instruction concerning the day-to-day operation of Hobart's business.    Mr Naggar for instance exercised considerable control over the hiring and firing of staff.

    61    In my judgment, Mr Marshall is correct to say that the judge focused
H   on "hat identification" rather than on ascertaining the corporate governance system of Hobart.    He is also correct in his submission that determining whether Mr Naggar was part of the corporate governance system was an important step in deciding whether he had assumed the responsibility of a director.    The corporate governance system will vary from company to company.    Therefore in the normal course, it is vital that the trial judge

makes findings about the role which the defendant played in running the    A
company in question.

62    However, in this case, Mr Naggar did not at trial dispute that he
performed directorial acts. He sought to run his defence on the basis of "hat
identification" i e that he had multiple roles and that he had acted in a
different capacity at all times from that of a Hobart director. In those
circumstances, there is no material error of law on the judge's part in not    B
seeking to meet a defence which was not run.

### Second submission: "hat identification"

63    Mr Marshall's second submission is that the judge was wrong in her
approach to "hat identification". He submits that the judge proceeded on
the basis that, if a person could possibly have acted wearing some other hat
than that of director, his acts should be attributed to the role represented by    C
that hat. This, he submits, was an error of principle. Mr Marshall submits
that the weight which the judge gave to the position as a representative
investor meant that the act could not also make him liable as de facto
director. The correct approach would have been to determine in what
capacity any act was actually done.

64    The judge's conclusion was not in terms that at the material times    D
Mr Naggar acted as chairman of DDI or as an investor but rather that
nothing which the judge had seen "goes beyond the involvement one would
expect to see from a person who combined the roles of major client and
chairman of the majority shareholder": judgment, para 125.

65    Mr Marshall interprets this as a holding that all the acts were ones to
be expected of a client and chairman of the major shareholder and that they    E
were to be attributed to that capacity without considering whether they were
actually done in that capacity. While I accept that those words read on their
own can be interpreted in this way, in my judgment they have to be read in
the context of the judgment as a whole. In particular the judge took the view
that in the light of the JVA and the need for directors of Hobart to be
authorised by the FSA it was unlikely that Hobart would have permitted
Mr Naggar to act as a de facto director: judgment, para 73. In other words,    F
the passage on which Mr Marshall relies is to be read as saying that she had
considered Mr Naggar's involvement objectively against the conduct to be
expected of a major client and chairman of the majority shareholder, that his
involvement was consistent with that conduct and that he had in fact acted
in that capacity. So read, her conclusion is in my judgment unassailable.

66    The assessment of the capacity in which a person acts is one of fact    G
and degree and all the circumstances must be taken into account.
Mr Marshall relies on this appeal on passages in his closing submissions in
respect of a considerable number of specific categories of acts or specific
episodes as showing that the judge came to the wrong conclusion. He does
not contend that the judge was not entitled to come to the conclusion to
which she came, and so it is clear that the challenge is in reality a
disagreement with the judge's findings. As such, it does not amount to a    H
good ground of appeal.

67    Mr Marshall relies in particular on the inferences to be drawn from
the evidence about the OPRs. I take Mr Marshall's submissions on the
OPRs separately under the next part of Mr Marshall's submissions.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    68    Mr Marshall also submits that the incidents which the judge held
were one-off incidents were not such.  Furthermore the actions which
Mr Naggar took were actions in a management role in respect of the
company.  The fact that he had other interests as a director of DDI or as a
shareholder of DDI did not prevent those acts from making him a de facto
director.  The position remains, however, that the judge came to conclusions
on these points which were open to her.

B    69    Mr Marshall additionally submits that DDI had no rights under the
JVA or otherwise to information but it is clear from my summary of the JVA
that schedule 1 gave a right to information in terms sufficiently wide to cover
the OPRs.

70    Mr Marshall accepts that there must be a cogent reason to attribute
an act to a person as a de facto director if there are other capacities in which
C    he could lawfully have acted.  However, he submits that this burden is
discharged by showing that the defendant performed acts which a director of
that company would normally do, as in the *Jones* case [1999] BCC 336.  The
judge should therefore have looked at the nature of the acts relied on and
asked whether they were acts which a director would normally do.  I do not
accept this submission as it seems to be the analogue of the argument which
he contends the judge wrongly accepted, namely that, if an act might have
D    been done in a particular capacity which would not result in his being a de facto
director, it ought to be attributed to him in that capacity.  This
submission again is predicated on the basis that the test is one of possibility
rather than one of assessing what actually happened.

71    The judge's answer to the point that it was enough that the act in
question could have been done by a director was that the management of the
E    business of Hobart was governed by the JVA.  Mr Marshall submits that the
judge failed to analyse the JVA in the context of the evidence.  He contends
that it was entirely ignored.  Mr Marshall contends that Mr Naggar
remained involved in the business even though he was not one of the
directors named in the JVA.  However, the judge did not so find.  There is a
difference between ignoring an agreement and not referring to it.  We were
not taken to any evidence to undermine the judge's finding, at para 71, that it
F    had an important effect on the management of the business.  Take for
instance the apparently mundane subject of hiring and firing staff.  This was
a reserved matter if it would involve expenditure in excess of £20,000 which
must have been the case for the appointment of at least most members of
staff.  Mr Marshall submits that this court should take account of matters
and determine whether the judge correctly categorised the facts she found,
G    but that is clearly not the function of this court on appeal: the appellant must
demonstrate that there is an error.

72    Mr Alexander submits that the mere fact that an act is capable of
being done by someone in their capacity as a de facto director does not
establish that they were such.  The burden was on Hobart to establish that he
did indeed do that act in that capacity.  The case did not therefore turn on
making assumptions about the role in which activities were to be attributed.
H    73    Mr Alexander's submission was that it was a significant factor that
Hobart applied for its own regulatory and stock exchange permissions and
that it did not identify Mr Naggar as a director.  Moreover Mr Naggar did
not attend board meetings or meetings of the executive committee of the
board known as Exco.

© 2015 The Incorporated Council of Law Reporting for England and Wales

74    Mr Alexander went through the judge's findings on the various    A
categories of acts on which Hobart relied for making him a de facto director.

75    In my judgment, on the overarching question of capacity, there is a
subtle difference of expression between Lord Hope DPSC and Lord
Collins JSC.  As explained, in my judgment, Lord Collins JSC's view is that
of the majority.  The court does not make an artificial attribution of a
director's act to some particular role of his.  It simply asks whether the    B
claimant has discharged its burden of showing that he acted in some
particular capacity.

76    On that basis, the determination of capacity thus boils down to a
question of assessing the evidence.  In making findings, the judge was
entitled as a matter of common sense to take the view that, where there had
been an agreement as to who would be on the board of Hobart, other parties
to that agreement would not take on that role but would act within the roles    C
to which they had been lawfully appointed.  The JVA was not necessarily a
complete answer.  Mr Naggar could have acted as director despite the thrust
of the JVA, but, in the absence of other factors, the likelihood is that he
would not do so.

77    I conclude that the judge made no error of principle and that the
appellant's challenge is really no more than a disagreement with the judge's
findings of fact about the capacity in which Mr Naggar acted.  She was    D
entitled to make those findings.

*Third submission: OPRs*

78    The OPRs were important documents so far as Hobart's business
was concerned because they assisted in the management of the risk created
by the CFD business.  Mr Marshall submits that Mr Naggar was keen to    E
receive these reports and from time to time he commented on them both
in writing and orally.  On Mr Marshall's submission, these comments
amounted to Mr Naggar giving instructions about calling margin to the
directors.

79    Mr Kelly gave evidence about Mr Naggar making comments on the
weekly financial figures supplied by Hobart.  However the judge found that
those comments were entirely anodyne.  All of Mr Naggar's conversations    F
with employees of Hobart were explicable on the basis that he was giving
instructions on behalf of his connected persons, i e as a client.

80    With regard to the OPRs, essentially Mr Marshall submits that in
giving these reports to Mr Naggar Hobart breached its duty of confidence to
its clients (because they included information as to the level of margins
clients had given and any margin deficiency) and the regulatory rules    G
applying to its business.  The judge did not take this into account.  Therefore
the judge failed to consider all the relevant circumstances.  The fact that
Mr Naggar had access to this confidential information was a powerful
indicator that Hobart regarded him as a director.

81    The judge rejected this argument.  In my judgment, the judge was
entitled to give the fact that the information was confidential little weight
because it was not a point which received any contemporary attention.    H
There is no evidence that the Hobart directors considered any question of
breach of confidence or disposed of any concern on the basis that Mr Naggar
was in the position of a director.  The fact was that he received the OPRs.
The fact that they contained information which should not have been

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   disclosed does not mean that he was a de facto director or that he necessarily
    became one. The judge considered the evidence about his comments on
    them and was satisfied that he made comments because of his overall
    concern as the chairman of DDI for the group's financial position.

### Fourth submission: judge's fact-finding was vitiated by error

B   82   Mr Marshall informed us that the appellant's case does not extend to
    challenging the primary facts found by the judge but (as already indicated
    above) he makes a number of challenges to the judge's fact-finding.
       83   Mr Marshall submits that there was no evidence that DDI made any
    request under the JVA for copies of the OPRs. There was also no evidence
    that DDI gave him authority to ask for the OPRs. I agree that this is one of
    the strands of relevant evidence in this case, but it is not a point which of
C   itself can undermine the judge's conclusion.
       84   Mr Marshall submits that there were a number of matters with
    which the judge simply did not deal, such as episodes when Mr Naggar gave
    instructions to Mr Fraser, one of Hobart's brokers, about trades in F &
    C shares. These instructions included directions to retain certain shares in
    the course of trading. Mr Marshall contends that only a director of Hobart
D   could have given these instructions. These matters were extensively
    canvassed in written submissions yet the judge concluded that she had not
    seen anything that went beyond actions by Mr Naggar in some other
    capacity. She must therefore have rejected this evidence as showing action as
    a director of Hobart. We were not taken to any evidence showing that this
    conclusion was not open to her. Furthermore, it would be wrong to criticise
E   the judge for not dealing separately with each and every incident.
       85   Mr Marshall submits that the evidence of the executive directors was
    consistent. However, it was not confirmed by the non-executive directors and
    it was for the judge to decide whose evidence she preferred. Mr Alexander
    submits that none of the witnesses called by Hobart could say that any of them
    had been present when Mr Pincus or Mr Keane had ever reported anything to
    Mr Naggar or had sought his approval for anything or that they had ever
F   received instructions from Mr Naggar. Mr Marshall did not correct him.
       86   Mr Marshall criticises the judge's rejection of the evidence that
    Mr Naggar was the dominating force as impressionistic and difficult to
    refute. He submits that in In re Mea Corpn [2007] 1 BCLC 618 the court did
    not discount evidence simply because it was general in nature. Again,
    questions as to the weight to be given to such evidence were for the judge and
G   the appellant has not demonstrated that the judge's decision to give this
    evidence no weight was not one which she could properly have made.
       87   Mr Marshall criticises the judge's decision to give little weight to
    what happened before Hobart was incorporated. He submits that things did
    not change then: Mr Naggar continued to be the dominating force. In my
    judgment, but for the same reasons as I gave in relation to the judge's
    treatment of the general allegations, that ground of challenge must fail.

H
### Fifth: judge's failure to find that Mr Naggar was a shadow director

    88   I can take the question whether Mr Naggar was a shadow director
    shortly. Mr Marshall was content to rely on his written submissions. He
    submits that in any event Mr Naggar was a shadow director: the Hobart

© 2015 The Incorporated Council of Law Reporting for England and Wales

directors or at least a majority of them were accustomed to act in accordance    A
with his instructions.  The appellant relies on the same evidence as has been
discussed above in relation to the judge's finding that Mr Naggar was not a
de facto director.

89  Mr Alexander relies on the judge's judgment and contends that the
shadow director case was hopeless.  The DDI-nominated directors gave
evidence on Hobart's behalf but they were in any event a minority on the    B
board.  There was no evidence that the majority acted in accordance with
Mr Naggar's instructions.  Therefore Mr Naggar was not a shadow director.

90  If the judge was entitled to come to the conclusion that Mr Naggar
was not a de facto director because he was protecting his or others' interests
in some other capacity, she was similarly entitled to come to the conclusion
that he was also not a shadow director.

91  In conclusion, for the reasons given above, I would dismiss the    C
appeal on Issue 1.

*Section 190 issue*

92  The issue here is whether the judge was wrong to reject Hobart's
argument that section 190 of the Companies Act 2006 was infringed when it
entered into arrangements with Mr Naggar in connection with CFDs for    D
clients who were Mr Naggar's connected persons for the purposes of that
section.  If this argument succeeds, those contacts were voidable and
Mr Naggar is obliged to indemnify Hobart for its loss.  If section 190 applies,
it does so because Mr Naggar was a director of Hobart's holding company
and not because Mr Naggar was a de facto or shadow director of Hobart.

93  As in force at the material time, section 190 provides:    E

    "*Substantial property transactions: requirement of members' approval*
    "(1) A company may not enter into an arrangement under which—
(a) a director of the company or of its holding company, or a person
connected with such a director, acquires or is to acquire from the
company (directly or indirectly) a substantial non-cash asset, or (b) the
company acquires or is to acquire a substantial non-cash asset (directly or    F
indirectly) from such a director or a person so connected, unless the
arrangement has been approved by a resolution of the members of
the company or is conditional on such approval being obtained.  For the
meaning of '*substantial non-cash asset*' see section 191.

    "(2) If the director or connected person is a director of the company's
holding company or a person connected with such a director, the
arrangement must also have been approved by a resolution of the    G
members of the holding company or be conditional on such approval
being obtained."

94  The words in subsection (1) "or is conditional on such approval
being obtained" did not appear in section 190 when originally enacted.  That
produced the inconvenient result that arrangements could not be made
conditionally on shareholder approval subsequently being obtained.    H

95  As Lewison J held in *Ultraframe (UK) Ltd v Fielding* [2006] FSR
293, with respect to the predecessor section (section 320 of the Companies
Act 1985), the question whether an arrangement falls within the section
must be asked on the basis of the arrangement as at its inception.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    96    It is not said that the CFDs were non-cash assets of the requisite value but that the shares by which they were referenced were "substantial non-cash assets" as those expressions are defined for the purposes of section 190: see sections 191(2) and 1163(1) of the 2006 Act.

*Two bases for finding infringement of section 190*

B    97    As before the judge, the claim against Mr Naggar under section 190 is put on two bases. For the purposes of this appeal, they are in essence: (i) The "narrow" basis: when Hobart acquired shares (on Mr Naggar's instructions) to be used in back-to-back transactions for CFDs, it did so prior to the purchaser being identified and therefore it itself acquired shares or an interest in shares. (ii) The "wide" basis: the arrangements between Mr Naggar and Hobart for writing CFDs for Mr Naggar's connected persons

C    fell within section 190 because there was a real prospect that on closing out Mr Naggar's connected persons would acquire the referenced shares.

*Judge's conclusions on the section 190 issues*
Narrow basis

D    98    When Mr Naggar gave instructions for CFDs, he rang up Hobart and stated the volume of F & C shares that he wished to buy. He did not state whether the shares would be referenced by a CFD with Hobart or via CFD with another provider and he did not indicate who the counterparty would be. So, when Hobart went into the market to buy shares to be used to hedge the CFD, it was not known who would ultimately hold the shares.

99    Moreover, Hobart did not have authorisation from the FSA to take a risk on share positions even for a moment. It could only act as a riskless

E    principal. So Hobart had to know who was buying the shares by the end of the day.

100    Hobart argued that, since, when it bought the shares, it did not know the identity of the purchaser, it must have bought and sold as a principal on behalf of Mr Naggar personally. Therefore, Mr Naggar must have acquired a beneficial interest in the shares at that point. Otherwise

F    Hobart would breach the limitations imposed on it by the FSA.

101    Both sides led evidence about the effect of these transactions. The judge accepted the evidence of a Dr May that beneficial ownership did not pass from Hobart to Mr Naggar and that the shares remained on Hobart's principal account until they were transferred to the CFD provider once the CFD was opened. The judge noted that the FSA treated the counterparty

G    identified at the end of the day as having assumed the market risk from the time of purchase of the shares. Therefore, the narrow basis failed since Mr Naggar did not acquire an asset from Hobart or Hobart from him in the course of the trading day.

Wider basis

H    102    The judge rejected Hobart's submission that Mr Naggar had a settled intention either that the DDI group would itself bid for the share capital of F & C or that it would take part in a consortium bid. Mr Naggar might, for instance, have decided to cut his losses and close out the CFDs without taking the shares. The judge accepted the submission of Mr Crystal that the wording of section 190(1) requires a high degree of certainty at a

© 2015 The Incorporated Council of Law Reporting for England and Wales

A

time when the arrangement is entered into that the asset will be acquired. The possibility that there might be successful negotiations with the bidder was not enough to bring the arrangements within the wording of section 190 because they were not arrangements under which Mr Naggar acquired or was to acquire the shares.

### Submissions on this appeal

Appellant's submissions

B

103    Mr Marshall focuses in his oral submissions on the wider basis. He submits that section 190 should be interpreted so as to cast the net widely in order to achieve its statutory purpose and that the fact that it covers conditional arrangements shows that the judge was wrong to hold that a high degree of certainty is required.

C

104    Mr Marshall submits that section 190 is engaged if there was a real prospect that the connected person would opt to take the shares on closing out. If so, where Hobart was the CFD provider, the shares would be sold to Hobart and Hobart would on sell them to the CFD holder who would be Mr Naggar or one of his connected persons. In practice, submits Mr Marshall, Mr Naggar and his connected companies had worked to build up a stake in F & C and thereby to encourage takeover activity so it was likely that they would exercise their option to take the physical referenced shares.

D

105    Mr Marshall relies on *In re Duckwari plc* [1999] Ch 253 where a company bought the right to complete a contract for the purchase of a property from a company which was a connected person of one of its directors and this court heard an appeal as to the amount of the director's statutory liability. Mr Marshall makes the point that, under that arrangement, there was clearly no requirement for the company to acquire the property if it did not wish to do so: see, per Nourse LJ, at pp 259–260. In my judgment, that case does not assist Mr Marshall because the right was itself a non-cash asset of the requisite value. This may be seen from the earlier decision in *In re Duckwari plc* [1997] 2 BCLC 713, in which this court held that the statutory predecessor of section 190 applied to that arrangement. In the present case, Hobart does not contend that the CFDs were non-cash assets of the requisite value.

E

F

106    Mr Crystal presented the case for Mr Naggar on the section 190 issue. It is not necessary to deal with all of his submissions. On the wider basis, Mr Crystal submits that the CFD holder had no legal entitlement to the referenced shares but the judge held that in practice he would have been allowed to take them should he wish to do so. However, Mr Crystal also submits that it was not certain that the CFD holder would be able to fund the purchase: the purchase of the referenced shares when the CFDs were finally closed out would have required some £151m. The effect of the words "is to acquire" is that until Mr Naggar decided to acquire the referenced shares it cannot be said that he entered into an arrangement which met the requirements of the section. On his submission there has to be an objective manifestation of an intention for the acquisition of an asset. Otherwise the arrangement is not within the section.

G

H

107    As to the narrower basis, Mr Marshall's written submissions contended that Dr May's evidence supporting the finding of a rule or

A  practice was plainly a wrong interpretation of the relevant rule on waivers
from the riskless principal rule.  Mr Crystal relied on the judge's finding and
other points.

   108   In my judgment, the appeal should be dismissed on both the wider
and the narrower basis.

   109   As to the narrower basis, the argument turns on the fact that a
purchaser was not identified until the end of the day on which the shares
B  were purchased.  But by the end of the day the purchaser was ascertained
and therefore its acquisition of the shares operated with effect from the
earliest moment in the day under the law of ratification.  So in the end the
CFD provider acquired shares and ratified the purchase and section 190 was
never on this basis engaged.  Furthermore the judge found as a fact that
Hobart would in those circumstances be treated under the rules of the
C  market as not having acquired any interest, and there has been no effective
challenge to that finding.

   110   As to the wider basis, in my judgment the judge was correct in her
conclusion.  It is only necessary to focus on one point.  Section 190 requires
an arrangement (which can be a non-contractual arrangement) under which
a director or connected person acquires "or is to acquire" an interest in
shares.  There is no basis for interpreting the words "is to acquire" as "may
D  acquire".  The fact that conditional arrangements are permitted does not
require this interpretation since even a conditional arrangement must still
satisfy the words quoted even if it is conditional.   Since, when the
arrangement was made for the CFDs to be written there was no certainty
that on closing out the CFD holder would opt to acquire the referenced
shares, section 190 does not apply.  The arrangement was not said to be
E  made on closing out and election to take the referenced shares.

   *Conclusion*

   111   I would dismiss the appeal on both issues raised on this appeal.  The
judge held that Mr Naggar was not a de facto or shadow director of Hobart
and there is no basis for setting aside that finding on this appeal.  The claim
F  by Hobart against Mr Naggar under Companies Act 2006, section 190 for
indemnification on the grounds that the arrangements between him and
Hobart for the acquisition of F & C shares to be used to hedge CFDs fails
because (1) the technical grounds for saying that an acquisition by Hobart of
an interest in shares occurred in the course of purchase fail in law and on the
evidence, and (2) the arrangements themselves provided only a means
whereby the CFD holders *might* ultimately acquire non-cash assets of the
G  requisite value, namely shares by which the contracts for differences were
referenced, not that they would do so.

   **ELIAS LJ**
   112   I agree.

H  **TOMLINSON LJ**
   113   I also agree.

*Appeal dismissed.*

KEN MYDEEN, *Barrister*

© 2015 The Incorporated Council of Law Reporting for England and Wales

# Exhibit W

*a*

# Instant Access Properties Ltd (in liquidation) v Rosser and others
# Murphy and another v Rosser and others

*b*

### [2018] EWHC 756 (Ch)

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES          *c*
CHANCERY DIVISION
MORGAN J
20–24, 27–30 NOVEMBER, 4–8, 11, 18–20 DECEMBER 2017, 13 APRIL 2018

*Director – Shadow director – Duties – Fiduciary duties – Test – Company*   *d*
*run as property club receiving commission from developers – Company*
*paying half commission to companies in which defendants had an interest –*
*Whether defendants de facto or shadow directors of company – Whether*
*defendants in breach of their fiduciary duty to company – Whether*
*company giving 50% of commission to other companies for no or no*
*adequate consideration – Whether defendants in breach of duty not to*   *e*
*obtain benefit or make profit for themselves – Whether defendants in*
*breach of no conflict or self-dealing rules – Whether defendants' actions*
*ratified by shareholders – Whether defendants knowing transactions*
*intended to defraud creditors or fraudulent – Limitation Act 1980, ss 21, 32*
*– Companies Act 1985, ss 317, 727 – Insolvency Act 1986, s 213.*

*f*

Instant Access Properties Ltd ('IAP') was incorporated in 2002 and until it
went into administration and liquidation in 2008 it carried on business as a
property club sourcing and marketing to its members overseas residential
properties being sold by developers in the United States and elsewhere. IAP
received substantial sums by way of commission from the developers,   *g*
usually 20% of the sale proceeds or 10% in one case. By an agreement
dated 26 November 2003 IAP appointed LH Ltd to assist in selling and
marketing developers' properties and agreed to share its commission from
developers with LH Ltd on a 50/50 basis. In March 2004 IAP, LH Ltd and
a developer agreed that LH Ltd would undertake the marketing of the
developer's properties in return for a commission of 20% to be shared with   *h*
IAP on a 50/50 basis. In October 2004 DC Ltd replaced LH Ltd on
essentially the same terms, and thenceforth DC Ltd contracted with the
developers and paid half its commission of 20% or 10% to IAP. In August
2007 LH Ltd and DC Ltd ceased to be involved in the marketing and sales
of properties and IAP entered into contracts directly with the developers.
LH Ltd and DC Ltd were BVI companies, the shareholders being   *i*
discretionary trusts or foundations which were essentially discretionary
trusts. The first and third defendants were potential beneficiaries of the
discretionary trusts or foundations. The third defendant was a director of
IAP until he resigned in October 2003 and was replaced by LM Ltd, which

*a*  thereafter acted as the nominee for the first and third defendants. By March 2008 IAP was in financial difficulty and later that year it went into administration and then into liquidation. The liquidators brought an action against seven defendants alleging that the arrangements made by IAP with LH Ltd and DC Ltd were a fraud on IAP under which IAP gave away to LH Ltd and DC Ltd, for no or inadequate consideration, commission to

*b*  which IAP alone was entitled, that the first and third defendants were de facto or shadow directors of IAP and had knowingly participated in fraudulent trading by IAP, they had acted in breach of their fiduciary and other duties owed to IAP. The liquidators also brought a claim against the professional advisers of IAP alleging that they had dishonestly assisted the breaches of fiduciary duty and were negligent. The issues arose (i) whether

*c*  the first and third defendants were de facto or shadow directors of IAP, (ii) whether as de facto or shadow directors they were in breach of their fiduciary duty by causing IAP to give away 50% of its commission to LH Ltd and DC Ltd, in which they had interests, for no or inadequate consideration, (iii) whether the first and third defendants had breached their

*d*  duties to act bona fide in the best interests of the company and not to make a profit or obtain a benefit from a third party by reason of their position as directors, (iv) whether the agreements made between IAP, LH Ltd and DC Ltd involved a conflict of interest or a breach of the self-dealing rule, (v) whether any breach of duty by the first and third defendants had been ratified by the shareholders of IAP, (vi) whether IAP's tax advisors and

*e*  solicitors were negligent or had dishonestly assisted breaches of fiduciary duty by the directors or had engaged in a conspiracy to injure or cause financial loss to IAP by unlawful means, (vii) whether the defendants had knowingly participated in fraudulent trading by IAP with the intent to defraud creditors, contrary to s 213(1) of the Insolvency Act 1986, and

*f*  (viii) whether the claims were statute barred.

**Held** – (1) Although the concepts of shadow director and de facto director were different it was possible to be simultaneously a de facto and a shadow director. Whether a person was a de facto or shadow director depended on the specific facts of each case as there was no clear legal test to determine that status. The crucial question was whether the relevant individual had

*g*  assumed the duties of a director; it was necessary in each case to focus on what the person actually did in relation to the company, taking all relevant factors into account. Being an influential shareholder did not of itself make a shareholder a de facto or shadow director. (See paras [217], [221], [224], [227], below.) Dicta of Morritt LJ in *Secretary of State for Trade and*

*h*  *Industry v Deverell* [2000] 2 BCLC 133 at [35]–[36], of Lord Hope and Lord Collins *Re Paycheck Services 3 Ltd* [2010] UKSC 51, [2011] 1 BCLC 141 at [26]–[37] and [93] and [96], and of Arden LJ in *Smithton Ltd v Naggar* [2014] EWCA Civ 939, [2015] 2 BCLC 22 at [33]–[45] applied.

(2) A de facto director was in the same position, and owed the same duties to the company, as a de jure director. A shadow director on the other

*i*  hand could owe some, but not all, of the usual fiduciary duties of a director and could owe fiduciary duties in respect of only some, but not all, parts of the activities of the company. If a person was a shadow director, then that gave rise to the separate question whether he owed fiduciary duties to the company and if so, which duties. Outside the paradigm cases of established

fiduciaries, the duties owed by a shadow director were a fact-sensitive *a* matter and instead of attempting to define the duties of a typical shadow director or to determine whether an individual was a shadow director it was preferable to consider whether in all the circumstances the individual owed fiduciary duties, and if so what duties, to the company. A helpful test was whether he had expressly or impliedly undertaken or assumed a position of trust and confidence or whether there was a legitimate expectation that he *b* would not use his position in a way adverse to the interests of the company. If he gave directions or instructions to the de jure directors intending those directions or instructions to be acted upon and the de jure directors did in fact act on them causing loss, that could well be an appropriate case for holding him liable for the resulting loss. On the other hand, if on the same set of facts a de jure director would be relieved from liability under s 727 of *c* the Companies Act 1985 or s 1157 of the Companies Act 2006 it would be difficult to establish that a shadow director, acting honestly and reasonably, owed a fiduciary duty to the company and was in breach of it and thus liable for any resulting loss. (See paras [216], [249], [259], [261]–[263], [270]–[274], [277]–[278], below.) Dicta of Lord Wilberforce in *New* *d* *Zealand Netherlands Society 'Oranje' Inc v Kuys* [1973] 2 All ER 1222 at 1225–1226, of Lord Collins *Re Paycheck Services 3 Ltd* [2010] UKSC 51, [2011] 1 BCLC 141 at [93], and *Ross River Ltd v Waveley Commercial Ltd* [2012] EWHC 81 applied.

(3) The first and third defendants were not de facto directors because they *e* did not need to be, as the affairs of IAP which were required to be dealt with at board level were dealt with by the de jure directors on their direction or instruction. However, they were shadow directors at least in relation to some parts of the activities of IAP, and LM Ltd acted as their nominee director and another de jure director was accustomed to act on their directions or instructions although there were times when she did not *f* fall in with their directions. Nevertheless, they were not in breach of their fiduciary duty by causing IAP to give away 50% of its commission to LH Ltd and DC Ltd, since the agreement between IAP and LH Ltd was not a sham, it was made for a legitimate commercial purpose, it was binding on both parties, it imposed obligations upon LH Ltd and IAP had the benefit of those obligations and therefore LH Ltd plainly gave consideration, there *g* was no evidence that the consideration was not adequate, and the fact that the agreement conferred benefits on the shareholders of LH Ltd which were passed on to the first and third defendants did not mean that it was to the detriment of IAP or not made for a legitimate purpose. Furthermore, since the first and third defendants had not used their position in connection with IAP to obtain a benefit for themselves through LH Ltd and DC Ltd, the *h* question of whether they owed a fiduciary duty to IAP not to accept a benefit from a third party by reason of their position in IAP did not arise. (See paras [237], [247], [249], [282], [292], [295]–[296], [299], [305], [314], [330], [337], below.) *Regal (Hastings) Ltd v Gulliver* [1942] 1 All ER 378 considered.

(4) The duty not to obtain a benefit from a third party and the no conflict *i* or self-dealing rule operated in different ways and were subject to different considerations. In relation to the self-dealing rule the question could arise whether the position was properly declared to the other directors, as distinct from being disclosed to the general body of shareholders. Since the

a first and third defendants did not consider themselves to be directors they had not complied with the formal requirements of s 317 of the 1985 Act, which imposed a duty on a director to declare to a meeting of the directors the nature of his interest in any proposed contract with the company. However, since they had acted in good faith in their dealings with IAP it was clear that if they had been de jure directors a formal declaration by

b them would not have made the slightest difference to their liability for their failure to declare their interest because whatever fiduciary duty was imposed on them it would not put them under a liability to account for profits because a de jure director in the same position would be relieved from liability under s 727 of the 1985 Act. (See paras [339], [345], [352]–[356], below.) Dicta of Lord Templeman in *Guinness plc v Saunders*

c [1990] BCLC 402 at 414, of Lightman J in *Neptune (Vehicle Washing Equipment) Ltd v Fitzgerald* [1995] 1 BCLC 352 at 359, and of Lewison J in *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1454]–[1460] considered.

(5) Before a director could rely upon ratification by the shareholders in

d relation to what would otherwise be a breach of fiduciary duty, he had to show that the shareholders had full knowledge of the relevant facts so that they could appraise the situation and make an informed decision whether to ratify what had occurred. If the first and third defendants had been held to have been in breach of the self-dealing rule their actions had been ratified by a shareholders' resolution which ratified IAP's agreements with LH Ltd

e and DC Ltd, but if they were held to have caused IAP to enter into the agreements with LH Ltd and DC Ltd for no or inadequate consideration their actions had not been ratified by the shareholders, as they were not given full information on the matter. (See paras [368], [375]–[377], [379], below.) *Re Duomatic Ltd* [1969] 1 All ER 161 and dicta of Mummery LJ in *Gwembe Valley Development Co Ltd v Koshy (No 3)* [2003] EWCA Civ

f 1048, [2004] 1 BCLC 131 at [65]–[66], of Neuberger J in *EIC Services Ltd v Phipps* [2003] EWHC 1507 (Ch), [2004] 2 BCLC 589 at [122] and *Sharma v Sharma* [2013] EWCA Civ 1287 applied.

(6) IAP's professional advisers did not owe any duty to IAP to assess the commercial value of the consideration provided by LH Ltd and DC Ltd, since they were not retained to advise IAP on a commercial matter such as

g that, IAP did not expect them to give such advice, there was no negligence in relation to the advice they did give, and since the directors, whether de jure, de facto or shadow, had not committed breaches of fiduciary duty owed to IAP and IAP had not suffered any loss or damage the professional advisers could not be held to have dishonestly assisted breaches of fiduciary

h duty committed by the directors or to have engaged in a conspiracy to injure or cause financial loss to IAP by unlawful means. (See paras [391], [397], [399], [403], below.)

(7) In order for a defendant to be liable under s 213 of the 1986 Act he had to participate in the carrying on of the business with the knowledge that the transactions in which he participated were intended to defraud

i creditors or were in some other way fraudulent. Although certain documents were fabricated or contained false statements that had not caused loss to IAP or to any third party and the business of IAP had not been carried on with the intent to defraud creditors or for any fraudulent purpose. There was therefore no basis for a declaration that any of the

defendants was liable to make a contribution to the assets of IAP under    *a*
s 213. (See paras [404], [412], [414]–[415], below.) Dicta of Chadwick LJ
in *Morphitis v Bernasconi* [2002] EWCA Civ 289, [2003] 2 BCLC 53
at [43], [47], [53]–[55] applied.

(8) If the first and third defendants had been held to have been in breach
of their fiduciary duty in not formally disclosing their interests in LH Ltd
and DC Ltd when those companies entered into contracts with IAP, the    *b*
claim would have been statute barred because the breach would not have
been a fraudulent breach of trust within s 21(1)(a) of the Limitation
Act 1980, the resulting claim to an account would not have been a claim to
recover trust property or the proceeds of trust property within s 21(1)(b) of
the 1980 Act, the action would not have been an action based on fraud
within s 32(1)(a) of the 1980 Act, and the claim would not have been    *c*
within s 32(1)(b) of the 1980 Act as no facts relevant to the claimants' right
of action had been deliberately concealed from them. (See para [418],
below.) *First Subsea Ltd v Balltec Ltd* [2017] EWCA Civ 186, [2018]
1 BCLC 20 applied.

*d*

**Cases referred to**

*AIB Group (UK) plc v Redler* [2014] UKSC 58, [2015] 1 All ER 747,
  [2015] AC 1503, [2014] 3 WLR 1367.

*Arklow Investments Ltd v Maclean* [2000] 1 WLR 594, PC.    *e*

*Australian Securities Commission v AS Nominees Ltd* [1995] FCA 1663,
  (1995) 62 FCR 504, 133 ALR 1, 18 ACSR 459, Aust FC.

*Birtchnell v Equity Trustees, Executors and Agency Co Ltd* (1929) 42 CLR
  384, [1929] ALR 273, (1929) 3 ALJR 236, Aust HC.

*Boardman v Phipps* [1966] 3 All ER 721, [1967] 2 AC 46, [1966] 3 WLR    *f*
  1009, HL; *affg* [1965] 1 All ER 849, [1965] Ch 992, [1965] 2 WLR
  839, CA; *affg* [1964] 2 All ER 187, [1964] 1 WLR 993, Ch D.

*Bristol & West Building Society v Mothew* [1996] 4 All ER 698, [1998]
  Ch 1, [1997] 2 WLR 436, CA.

*Burnden Holdings (UK) Ltd (in liq) v Fielding* [2016] EWCA Civ 557,
  [2017] 1 WLR 39.    *g*

*Canadian Land Reclaiming and Colonising Co, Re, Coventry and Dixon's
  Case* (1880) 14 Ch D 660, CA.

*Coleman Taymar Ltd v Oakes* [2001] 2 BCLC 749.

*Dominion International Group plc, Re (No 2)* [1996] 1 BCLC 572.

*Duckwari plc, Re (No 2)* [1998] 2 BCLC 315, sub nom *Re Duckwari plc*    *h*
  [1999] Ch 253, [1998] 3 WLR 913, CA.

*Duomatic Ltd, Re* [1969] 1 All ER 161, [1969] 2 Ch 365, [1996] 2 WLR
  114.

*EIC Services Ltd v Phipps* [2003] EWHC 1507 (Ch), [2004] 2 BCLC 589,
  [2003] 1 WLR 2360, [2003] 3 All ER 804; *rvsd* [2004] EWCA Civ 1069,    *i*
  [2004] 2 BCLC 589, [2005] 1 WLR 1377, [2005] 1 All ER 338, CA.

*Farrar v Miller* [2018] EWCA Civ 172, [2018] 2 P & CR D6.

*Fayers Legal Services Ltd v Day* [2001] Lexis Citation 1363, [2001] All ER
  (D) 121 (Apr), Ch D; *affd* [2001] EWCA Civ 1257, CA.

*a*  *FHR European Ventures LLP v Mankarious (No 2)* [2014] UKSC 45, [2014] 2 BCLC 145, [2014] 4 All ER 79, sub nom *FHR European Ventures LLP v Cedar Capital Partners LLC* [2015] AC 250, [2014] 3 WLR 535.

*First Subsea Ltd v Balltec Ltd* [2017] EWCA Civ 186, [2018] 1 BCLC 20, [2018] Ch 25, [2017] 3 WLR 896.

*b*  *Gibson v Barton* (1875) LR 10 QB 329.

*Gray v New Augarita Porcupine Mines* [1952] 3 DLR 1, PC.

*Guinness plc v Saunders* [1990] BCLC 402, [1990] 1 All ER 652, [1990] 2 AC 663, [1990] 2 WLR 324, HL.

*Gwembe Valley Development Co Ltd v Koshy (No 3)* [2003] EWCA Civ 1048, [2004] 1 BCLC 131.

*c*  *Herman v Simon* (1990) 4 ACSR 81, (1990) 8 ACLC 1094, NSW CA.

*Hydrodam (Corby) Ltd, Re* [1994] 2 BCLC 180.

*Interactive Technology Corp Ltd v Ferster* [2017 ] EWHC 217 (Ch), [2017] All ER (D) 195 (Feb).

*d*  *JSC MP Bank v Pugachev* [2015] EWCA Civ 139, [2015] 2 All ER (Comm) 816, [2016] 1 WLR 160.

*JSC MP Bank v Pugachev* [2017] EWHC 2426 (Ch), 20 ITELR 905.

*Kaytech International plc, Re, Secretary of State for Trade and Industry v Kaczer* [1999] 2 BCLC 351, Ch D and CA.

*Kelly v Cooper* [1994] 1 BCLC 395, [1993] AC 205, [1992] 3 WLR 936, PC.

*e*  *Lee Panavision Ltd v Lee Lighting Ltd* [1991] BCLC 575; *affd* [1992] BCLC 22, CA.

*Lo-Line Electric Motors Ltd, Re* [1988] BCLC 698, [1988] 2 All ER 692, [1988] Ch 477, [1988] 3 WLR 26.

*f*  *MacPherson v European Strategic Bureau Ltd* [1999] 2 BCLC 203, Ch D; *rvsd* [2000] 2 BCLC 683, CA.

*Morphitis v Bernasconi* [2002] EWCA Civ 289, [2003] 2 BCLC 53, [2003] Ch 552, [2003] 2 WLR 1521.

*Neptune (Vehicle Washing Equipment) Ltd v Fitzgerald* [1995] 1 BCLC 352, [1996] Ch 274, [1995] 3 All ER 811, [1995] 3 WLR 108.

*g*  *Neptune (Vehicle Washing Equipment) Ltd v Fitzgerald (No 2)* [1995] BCC 1000.

*New Zealand Netherlands Society 'Oranje' Inc v Kuys* [1973] 2 All ER 1222, [1973] 1 WLR 1126, PC.

*Paycheck Services 3 Ltd, Re, Revenue and Customs Comrs v Holland* [2010] UKSC 51, [2011] 1 BCLC 141, sub nom *Holland v Revenue and Customs Comrs* [2011] 1 All ER 430, [2011] Bus LR 111, [2010] 1 WLR 2793, [2011] STC 269.

*h*  *Premier Waste Management Ltd v Towers* [2011] EWCA Civ 923, [2012] 1 BCLC 67, [2012] IRLR 73.

*Primlake Ltd (in liq) v Matthews Associates* [2006] EWHC 1227 (Ch), [2007] 1 BCLC 666.

*i*  *Regal (Hastings) Ltd v Gulliver* [1942] 1 All ER 378, [1967] 2 AC 134n, HL.

*Ross River Ltd v Waveley Commercial Ltd* [2013] EWCA Civ 910, [2014] 1 BCLC 545, CA; *affg* [2012] EWHC 81 (Ch).

*Ross River Ltd v Waveley Commercial Ltd (No 2)* [2012] EWHC 2487 *a*
  (Ch), [2012] All ER (D) 29 (Sep); *rvsd* [2013] EWCA Civ 910, [2014]
  1 BCLC 545, CA.
*Runciman v Walter Runciman plc* [1992] BCLC 1084.
*Secretary of State for Trade and Industry v Deverell* [2000] 2 BCLC 133,
  [2001] Ch 340, [2000] 2 All ER 365, [2000] 2 WLR 907, CA.
*Secretary of State for Trade and Industry v Jones* [1999] BCC 336.        *b*
*Sharma v Sharma* [2013] EWCA Civ 1287, [2014] BCC 73.
*Smithton Ltd v Naggar* [2014] EWCA Civ 939, [2015] 2 BCLC 22, [2015]
  1 WLR 189.
*Sukhoruchkin v Bekestein* [2014] EWCA Civ 399.
*Tufton v Sperni* [1952] 2 TLR 516, CA.                                    *c*
*Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch), [2007] WTLR
  835, [2006] FSR 293, [2005] All ER (D) 397 (Jul).
*Vivendi SA v Richards* [2013] EWHC 3006 (Ch), [2013] Bus LR D63.


**Actions**                                                               *d*
By a claim dated 18 December 2014 the claimant, Instant Access
Properties Ltd, acting by its liquidators, Kevin Anthony Murphy and
Richard Howard Toone, brought an action against the defendants, Bradley
John Rosser, Maria Helena Gifford, James Bernard Moore (a bankrupt),
Jeffcote Donnison LLP, Phillip Donnison, Mishcon De Reya (a firm) and
Jonathan Berman, pursuant to s 213 of the Insolvency Act 1986 alleging   *e*
that all of the defendants participated in the carrying on of the business of
IAP with the intent to defraud creditors of IAP and/or for a fraudulent
purpose, that the first and third defendants were de facto or shadow
directors of IAP and as such had breached their fiduciary duties owed to
IAP by causing it to give away its assets to Leadenhall Group Ltd and
Darrencrest Corporation Ltd, in which they had interests, had breached    *f*
their duty to act bona fide in what they considered to be the best interests of
the company, their duty not to obtain a benefit from a third party by reason
of their position as directors, and their duty as directors to avoid a conflict
of interest. The liquidators brought a second claim based on fraud or
deliberate concealment against the de jure, de facto and shadow directors
and the fourth to seventh defendants as the professional advisers of IAP   *g*
alleging breaches of fiduciary duty and that the professional advisers had
dishonestly assisted those breaches of fiduciary duty and been negligent,
and that all of the directors and the advisers had conspired to injure IAP by
the use of unlawful means which had caused loss and damage to IAP.

                                                                          *h*

*Mark Phillips QC* and *Daniel Lewis* (instructed by *Taylor Wessing LLP*) for
  the claimant.
*Lance Ashworth QC* and *Matthew Morrison* (instructed by *Francis Wilks
  & Jones*) for the first defendant.
The second defendant in person.
The third defendant did not appear and was not represented.              *i*
*Mark Simpson QC*, *Isabel Barter* and *Niamh Cleary* (instructed by *DAC
  Beachcroft LLP*) for the fourth defendant.
*Edmund Cullen QC* and *Joseph Farmer* (instructed by *DAC
  Beachcroft LLP*) for the fifth defendant.

*a*  *Jamie Smith QC* and *Michael Ryan* (instructed by *DWF LLP*) for the sixth and seventh defendants.

*Judgment was reserved.*

*b*  13 April 2018. The following judgment was delivered.

**MORGAN J.**

| Heading | Paragraph number |
|---|---|
| Introduction | [1] |
| The relevant entities and individuals | [8] |
| A comment on the discretionary trusts | [34] |
| Mr Moore | [37] |
| Mr Rosser | [38] |
| Mrs Gifford | [40] |
| Mr Donnison | [42] |
| Mr Berman | [47] |
| Other witnesses | [48] |
| The various agreements involving IAP, Leadenhall and Darrencrest | [49] |
| The agreement dated 24 October 2003 | [50] |
| The agreement dated 26 November 2003 | [55] |
| The agreements dated 26 March 2004 | [59] |
| The agreement between Darrencrest and Maesbury in October 2004 | [63] |
| The agreement dated 7 October 2004 | [64] |
| The agreement dated 4 April 2005 | [65] |
| The agreement dated 5 September 2005 | [66] |
| The agreements dated 1 August 2007 | [67] |
| The agreement dated 28 August 2007 | [71] |
| A summary of the position under the agreements | [72] |
| The evidence | [74] |
| Findings of fact | [76] |
| The matters to be considered | [198] |
| The pleaded case as to breach of the duties of a director | [199] |
| De facto and shadow directors | [213] |
| The Claimants' case as to de facto and shadow directors | [230] |
| Were Mr Moore and/or Mr Rosser de facto and/or shadow directors of IAP? | [235] |
| The duties of a de jure director | [252] |
| The duties of a de facto director | [254] |

| | | |
|---|---|---|
| The duties of a shadow director | [255] | a |
| Did Mr Moore and/or Mr Rosser owe fiduciary duties to IAP? | [276] | |
| The allegation of no or no adequate consideration | [279] | |
| The allegation as to obtaining a benefit from a third party by reason of being a director: the law | [309] | b |
| The allegation as to obtaining a benefit from a third party by reason of being a director: the facts | [315] | |
| Conflict of interest in transactions with IAP | [339] | |
| Ratification | [358] | |
| Negligence | [381] | c |
| Dishonest assistance of a breach of fiduciary duty | [399] | |
| Conspiracy to injure by unlawful means | [402] | |
| Section 213 of the Insolvency Act 1986 | [404] | |
| Limitation | [416] | |
| The overall result | [419] | d |

## INTRODUCTION

[1] Between 2003 and going into administration, and then liquidation, in 2008, Instant Access Properties Ltd ('IAP') received substantial sums by way of commission in relation to sales of residential properties acquired by members of IAP, principally as investments. The commission in question was directly or indirectly received from the developers of those properties. During that period, IAP shared the commission paid by the developers with two other companies, Leadenhall Group Ltd ('Leadenhall') and Darrencrest Corporation Ltd ('Darrencrest'). As will be explained, at the relevant times, there were three persons who had interests of some kind or other in IAP and who also had interests of some kind or other in Leadenhall and Darrencrest. These three persons were Mr Moore, Mr Rosser and Ms Forth. Mr Moore is the third defendant and Mr Rosser is the first defendant in these proceedings. Ms Forth is not a defendant.

[2] The essential case put forward by IAP and its liquidators in these proceedings is that the arrangements made by IAP with Leadenhall and Darrencrest were a fraud on IAP. It is said that, in effect, IAP gave away for the benefit of Leadenhall and Darrencrest, and for no consideration, commission to which IAP alone was entitled. It is said that this fraud on IAP was committed by Mrs Gifford (the second defendant in these proceedings) who was a de jure director of IAP and by Mr Moore and Mr Rosser who are said to have been de facto or shadow directors of IAP. Accordingly, the case is that these 'directors' broke whatever fiduciary duties they owed to IAP by giving away its assets to Leadenhall and Darrencrest, in which Mr Moore and Mr Rosser in particular had interests.

[3] IAP and its liquidators also alleged that the purpose of the fraud being committed on IAP was to engage in tax evasion which was said to be unlawful and dishonest. Leadenhall and Darrencrest were both incorporated in the British Virgin Islands and the intention of Mr Moore and Mr Rosser, in particular, was that dividends paid by those companies to their shareholders would not be subject to any significant amount of tax. It

a    was said by IAP and the liquidators that the arrangements made by IAP with Leadenhall and Darrencrest were contrary to the transfer pricing provisions contained in Sch 28AA to the Income and Corporation Taxes Act 1988.

    [4] These proceedings were brought on 18 December 2014. The events which were said to have amounted to wrongdoing by the de jure, de facto

b    and shadow directors of IAP had all taken place more than 6 years before that date. The potential limitation defences which might be put forward to these claims obviously influenced the way in which the claims were put. First, the liquidators of IAP brought a claim pursuant to s 213 of the Insolvency Act 1986 which allows a court to order certain persons to contribute to the assets of IAP where those persons have knowingly

c    participated in fraudulent trading by IAP. If that allegation could be established, the liquidators could not be defeated by a limitation defence as the relevant six year period began to run on the liquidation of IAP on 21 December 2008 and the s 213 claim was brought in time (just) on 18 December 2014.

d    [5] IAP, acting through its liquidators, brought a second claim against the de jure director and against the allegedly de facto and shadow directors and the professional advisers of IAP. IAP alleged a number of breaches of fiduciary duty on the part of the de jure director and the allegedly de facto and shadow directors. It also alleged that the professional advisers had dishonestly assisted those breaches of fiduciary duty and all of the

e    'directors' and the advisers had conspired to injure IAP by the use of unlawful means which had caused loss and damage to IAP. For good measure, IAP contended that the professional advisers had been negligent. IAP obviously faced limitation problems with these claims. However, IAP might have been able to get around these limitation problems if their claims were based on fraud or deliberate concealment.

f    [6] In these circumstances, the case against the 'directors' and the professional advisers was pleaded, and was opened, as a case based upon a fraud or a series of frauds against IAP and against the Revenue.

    [7] In their closing submissions, IAP and the liquidators have continued to assert that IAP has been the victim of fraud practised by the various defendants. However, the allegation that there had been a fraud on the

g    Revenue has effectively disappeared. Further, in the course of discussing the scope of the fiduciary duties of directors and, more particularly, shadow directors, a number of submissions have been advanced which, the defendants say, were not properly pleaded. Further, IAP and the liquidators have advanced the case that, even if IAP suffered no loss by reason of what

h    has occurred, the allegedly de facto or shadow directors are liable to account for profits made as a result of breaches of their fiduciary duties owed to IAP. Again, the defendants say that a claim to an account of profits was never pleaded. As will be seen, I will consider the various ways in which IAP and the liquidators have tried to identify a claim against the various defendants even though a claim for an account for breach of a

i    fiduciary duty, where there was no fraud or deliberate concealment, will face some obvious limitation problems.

## THE RELEVANT ENTITIES AND INDIVIDUALS

[8] IAP was incorporated in England and Wales (under the name Abberise Ltd) on 8 April 2002. Its articles of association provided that the regulations contained in the Companies (Tables A to F) Regulations 1985 should apply save as otherwise provided in the articles. The articles did not disapply reg 85 of the 1985 regulations. Regulation 85 is referred to later in this judgment. Article 13 provided that a director was entitled to vote as a director in regard to any contract or arrangement in which he was interested or upon any matter arising out of such a contract or arrangement and, if he should vote, his vote should be counted and he should be reckoned in estimating a quorum when any such contract or arrangement was under consideration. Article 14 provided that the necessary quorum for the transaction of the business of the directors was two, unless otherwise fixed by the directors.

[9] The directors of IAP were:

(1) Mrs Kim Moore (who was at that time the wife of Mr Moore) from 4 May 2002 to 28 February 2003;

(2) Mr Moore from 1 March 2003 to 23 October 2003;

(3) Mrs Gifford from 23 October 2003 to 4 July 2011;

(4) Lumley Management Ltd ('Lumley') from 31 October 2003 to 10 January 2008;

(5) Mr McKay from 18 January 2008 until IAP went into liquidation on 21 December 2008.

[10] The liquidators contend that Mr Moore was a de facto and/or a shadow director of IAP from the time when he ceased to be a de jure director (on 23 October 2003) until IAP went into administration on 19 September 2008.

[11] The liquidators contend that Mr Rosser was a de facto and/or a shadow director of IAP from around June 2003 until IAP went into administration on 19 September 2008.

[12] Mrs Gifford was the company secretary of IAP from 4 May 2002 until IAP went into administration on 19 September 2008.

[13] The shareholdings in IAP were as follows:

(1) before 31 May 2003, 100 shares (being all of the shares then issued) were held by Prism Holdings Ltd;

(2) by November or December 2003 there were altogether 200 issued shares in IAP held as to 105 shares by Prism Holdings Ltd, 40 shares by the Jiki Trust, 40 shares by the Mhoran Trust and 15 shares by the Omegaville Trust;

(3) on or about 19 February 2004 Prism Holdings Ltd transferred its 105 shares to the Pearson Foundation.

[14] Prism Holdings Ltd was incorporated in Malta in around December 2002. The shares in Prism Holdings Ltd were held by AVMT (Trustees) Ltd on trusts which were not identified in the evidence before me. The liquidators would wish to say that Prism Holdings Ltd was beneficially owned by Mr Moore and there is certainly material to support that possibility but I do not need to make a specific finding as to that.

[15] The Pearson Foundation was a foundation registered in Panama on 27 October 2003. I was asked to proceed on the basis that the Pearson Foundation involved the assets of the Foundation being held by trustees on what were essentially discretionary trusts. One of the potential beneficiaries

a   under this discretionary trust was Mr Moore.

[16] The Jiki Trust was a trust declared in accordance with the laws of the Isle of Man. The trustees of the Jiki Trust held the assets of the trust on a discretionary trust and one of the potential beneficiaries under the trust was Mr Moore.

b   [17] The Mhoran Trust was a trust declared in accordance with the laws of the Isle of Man. The trustees of the Mhoran Trust held the assets of the trust on a discretionary trust and one of the potential beneficiaries under the trust was Mr Rosser.

[18] The Omegaville Trust was a trust declared in accordance with the laws of the Isle of Man. The trustees of the Omegaville Trust held the assets of the trust on a discretionary trust and one of the potential beneficiaries under the trust was Ms Forth.

c   [19] The trustees of the Jiki Trust, the Mhoran Trust and the Omegaville Trust were Duncan Lawrie Offshore Services Ltd and Jeffcote Donnison (Overseas) Ltd.

[20] IAP went into administration on 19 September 2008 and went into creditors' voluntary liquidation on 21 December 2008.

d   [21] Inside Track Seminars Ltd ('ITS') was incorporated in England and Wales on 21 May 2002. Mrs Moore was a director of ITS until 23 October 2003 when she was replaced by Mrs Gifford. Lumley was appointed as a second director on 31 October 2003. Mrs Gifford was the company secretary. The shareholders in ITS were the same as the shareholders in IAP.

e   [22] IAP and ITS were not formally in a group of companies although there are repeated references in the documents to 'the Inside Track Group'. Further, the documents frequently used the term 'Inside Track' in circumstances where it was not clear whether this was a reference to ITS or to IAP. In some of these cases, the term 'Inside Track' was used because the person using that term had not formed a view as to which company was relevant.

f   [23] Leadenhall was incorporated in the British Virgin Islands on 10 October 2003. From around November 2003, the director of Leadenhall was Candolle Management Ltd ('Candolle') and the company secretary was JDS Secretaries Ltd.

g   [24] The shareholders in Leadenhall were as follows:

(1) As at 5 January 2004 145 shares were held by the Pearson Foundation, 40 shares were held by the Montpelier Foundation and 15 shares were held by the Derwent Foundation;

(2) On 8 October 2004 the Pearson Foundation transferred its 145 shares to the Bespoke Foundation;

h   (3) On 31 December 2005 the Bespoke Foundation transferred its 145 shares back to the Pearson Foundation.

[25] I have already described the position in relation to the Pearson Foundation.

[26] The Montpelier Foundation was a foundation registered in Panama in December 2003. I was asked to proceed on the basis that the Montpelier Foundation involved the assets of the Foundation being held by trustees on what were essentially discretionary trusts. One of the potential beneficiaries under this discretionary trust was Mr Rosser.

i   [27] The Derwent Foundation was a foundation registered in Panama. It may be that the Derwent Foundation was only created in March 2004 but

I was asked to proceed on the basis that it owned 15 shares in Leadenhall *a* with effect from 5 January 2004. I was asked to proceed on the basis that the Derwent Foundation involved the assets of the Foundation being held by trustees on what were essentially discretionary trusts. One of the potential beneficiaries under this discretionary trust was Ms Forth.

[28] Sunpuddles Ltd was a company incorporated in the British Virgin *b* Islands for the purpose of entering into a consultancy agreement with Leadenhall. Under the agreement, Leadenhall was required to pay fees to Sunpuddles Ltd. The shares in Sunpuddles Ltd were held by the Montpelier Foundation and the fees paid to Sunpuddles Ltd were ultimately for the benefit of Mr Rosser.

[29] Darrencrest was incorporated in the British Virgin Islands on 15 June *c* 2004. The director of Darrencrest was Candolle and the company secretary was JDS Secretaries Ltd.

[30] The shareholders in Darrencrest as at 10 January 2005 were as follows:

  (1) 62% of the issued shares were held by the Delenas Foundation;
  (2) 27% of the issued shares were held by the Montpelier Foundation; *d*
  (3) 7.5% of the issued shares were held by the Derwent Foundation;
  (4) 2.5% of the shares were held by Riko Real Estate SA;
  (5) I note that these percentages add up to 99% but these were the percentages given to me by the parties.

[31] I have already described the position in relation to the Montpelier Foundation and the Derwent Foundation. *e*

[32] The Delenas Foundation was a foundation created in Lichtenstein. I was asked to proceed on the basis that the Delenas Foundation involved the assets of the Foundation being held by trustees on what were essentially discretionary trusts. One of the potential beneficiaries under this discretionary trust was Mr Moore.

[33] As to Riko Real Estate SA, I was told that Mrs Gifford had a 40% *f* interest in that company held through Falcor BC Ltd and that Mr Donnison had a 60% interest in Riko Real Estate SA held through Jeffcote Donnison (Suisse) SA Ltd ('JDS'). I am not able to be more precise as to the nature of these interests.

*g*

**A COMMENT ON THE DISCRETIONARY TRUSTS**

[34] I have referred above to various discretionary trusts or to foundations, where I am asked to proceed on the basis that the arrangements were in substance similar to the arrangements under discretionary trusts. In this case, it was not argued that these discretionary *h* trusts were shams or that they created arrangements which were not genuine discretionary trusts. It was accepted that I should analyse the position of potential beneficiaries under such trusts in a conventional way. The conventional analysis is that a potential beneficiary under a discretionary trust has a right to be considered as a potential recipient of benefit by the trustees. That right is an interest which equity will protect. That right is more than a mere hope. However, that right is not a *i* proprietary interest in the assets held by the trustees. I take this analysis from *JSC MP Bank v Pugachev* [2015] EWCA Civ 139, [2015] 2 All ER (Comm) 816 at [13], [2016] 1 WLR 160 per Lewison LJ. The particular arrangements in that case were considered in great detail in the later

*a*  judgment of Birss J in that case: see *JSC MP Bank v Pugachev* [2017 ] EWHC 2426 (Ch), 20 ITELR 905.

[35] It is worth commenting at this stage on the fact that the shares in IAP and in Leadenhall and in Darrencrest were held on discretionary trusts or pursuant to arrangements which I was asked to treat as akin to discretionary trusts. By the end of the case, it appeared to suit the claimants

*b*  to contend that this was indeed the position. This meant that the shareholders in IAP were not the same as the shareholders in Leadenhall and Darrencrest. In particular, it appeared to suit the claimants to say that the shareholders in IAP were not Mr Moore, Mr Rosser and Ms Forth but instead were different legal persons, namely, the trustees of certain discretionary trusts. The claimants had not always put matters in that way.

*c*  Throughout their pleadings, the claimants had asserted that Mr Moore, Mr Rosser and Ms Forth were the beneficial owners of these three companies. If, in fact, Mr Moore, Mr Rosser and Ms Forth had owned the shares in IAP, then some of the contentions put forward by the claimants as to non-disclosure of the interests of Mr Moore and Mr Rosser in

*d*  Leadenhall and Darrencrest to the shareholders in IAP would have fallen away. Similarly, if Mr Moore, Mr Rosser and Ms Forth had been the shareholders in IAP, then it could be said that they had consented to IAP entering into contracts with Leadenhall and Darrencrest with full knowledge of the interests of Mr Moore and Mr Rosser in Leadenhall and Darrencrest. The claimants did not at any stage amend their pleadings to

*e*  remove the allegations that Mr Moore, Mr Rosser and Ms Forth were the beneficial owners of these three companies but, instead, in closing submissions they made their submissions on the basis that the shareholders in the three companies were the trustees of various discretionary trusts and Mr Moore and Mr Rosser were merely potential beneficiaries in relation to the discretionary trusts which were relevant to them.

*f*  [36] The defendants did not contend that the claimants should be held to their pleaded case that Mr Moore, Mr Rosser and Ms Forth were the beneficial owners of IAP. The defendants also accepted that the shares in these three companies were held by the trustees of discretionary trusts. I will therefore proceed on that basis. However, although I will accept that the trusts were genuine discretionary trusts, it was quite clear on the evidence

*g*  that in the case of Mr Moore and Mr Rosser they fully expected that all of the benefits received by the trustees from the arrangements which are the subject of this dispute would flow to Mr Moore or Mr Rosser as the case may be or, possibly, to the members of their immediate families. This fact is relevant to the question whether Mr Moore or Mr Rosser were fraudulent

*h*  or dishonest, as alleged by the claimants. At the time of the events in question, each of the three companies was solvent so that there was no question of the companies being run in a way which was adverse to the position of creditors of the companies. Accordingly, Mr Moore and Mr Rosser had no reason or motive to act in a fraudulent way as regards IAP or its shareholders because, in view of the way in which they expected

*i*  to benefit from the discretionary trusts of the shares in IAP, any harm which they did to IAP would be harm to themselves. No doubt it was this consideration which caused the claimants to allege that it was HMRC which was the victim of the alleged fraud but, by the end of the case, the claimants appeared to accept that the arrangements made by the three

companies in this case amounted to tax planning, which did not involve    *a*
fraud, whether such tax planning was effective or not.

## MR MOORE

[37] Mr Moore was originally the moving force behind ITS and IAP. He
was described in the evidence as a very good salesman. He made the
connections which were of central importance to the making of the    *b*
arrangements which are at the heart of the dispute in this case. At some
point, Mr Moore was made bankrupt and I was told that his trustee in
bankruptcy had consented to these proceedings being brought against
Mr Moore. Mr Moore did not participate in any way in these proceedings.

## MR ROSSER                                                         *c*

[38] Mr Rosser was brought up in Australia. After university in Australia
and the United States he worked for the Bond Corporation in Australia and
then joined the London office of the well-known management consultants,
McKinsey & Co. Between 1995 and 1998 he worked for Virgin as the
group corporate development director and from 2001 to 2003 he acted as a
consultant to Unilever, helping to develop Unilever Ventures. He has also    *d*
over the years pursued his own ventures. By 2003 he had not had previous
experience of the property world. In the middle of 2003 he became
connected with matters which are now relevant in this litigation. He had a
contract of employment with ITS but not IAP. I was not shown a signed
copy of any such contract of employment but the trial bundle included an
unsigned contract of employment dated '2004' which stated that his    *e*
employment began on 1 June 2003. He was never a de jure director of any
company which is relevant to this litigation. It will be necessary to make
further findings in due course as to his involvement with such companies.

[39] It is convenient to comment at this stage on the evidence which
Mr Rosser gave at the trial. He prepared two witness statements, the first of    *f*
which was very detailed. He was cross-examined in detail as to the relevant
events which began in 2003, some 14 years before the trial. However, at
least some of those events were relevant to an application made in 2011 by
the Secretary of State for an order that Mr Rosser be disqualified from
acting as a director. In connection with that application, Mr Rosser made a
detailed affirmation in 2012 which was therefore nearer in time to the    *g*
events of 2003, although still some time after them. I find that he had
genuine difficulty in recalling detailed matters from so long ago particularly
when the point of detail was not recorded in any contemporaneous
document. He certainly stated at many points in his evidence that he could
not recall the point of detail about which he was asked questions. However,
it is quite possible that he professed an inability to recall certain matters in    *h*
an attempt to prevent any further detailed examination of them. He was
also at pains to say, in the course of his evidence, that he had not been
involved in much of the detail at the relevant time as his role was a strategic
one which did not require him to descend into such details. I consider that
he overstated the extent to which he was detached from detailed events and    *i*
matters at the time.

## MRS GIFFORD

[40] In 2002 Mrs Gifford was running a small accountancy practice from
her home. At that time, Mr Moore approached her and invited her to set up

*a*  some administration and accounting processes for IAP and ITS. Mrs Gifford became the company secretary of IAP and ITS from around that time and she became a director of IAP and ITS on 23 October 2003. I was not told that she had been involved in running a business (apart from her accountancy practice) before 2002 and I was not told that she had any experience in the types of business being run by IAP and ITS. I will make

*b*  findings in due course as to the extent to which she acted on the directions or instructions of Mr Moore or Mr Rosser.

[41] Mrs Gifford was directly involved in creating documents at various stages which were deliberately designed to misdescribe the real events. These documents purported to record things which had not occurred and they were given dates which were intended to mislead. I will refer to these

*c*  false documents in more detail later in this judgment. I find that Mrs Gifford's involvement in creating these documents was clearly dishonest. In this respect, it does not matter that the documents were not in the end used to mislead anyone. In her evidence, Mrs Gifford denied any wrongdoing and put forward implausible suggestions as to how these

*d*  documents were created in an honest way. Mrs Gifford must have known that these implausible suggestions were untrue. In the light of this, I will treat her evidence with considerable caution.

**MR DONNISON**

*e*  [42] Mr Donnison (the fifth defendant) is a chartered tax adviser and a member of the fourth defendant, Jeffcote Donnison LLP ('JDLLP'), which was a limited liability partnership offering tax advice and corporate and commercial services to both personal and business clients.

[43] Mr Donnison gave evidence that Jeffcote Donnison Consulting Ltd

*f*  ('JDCL') operated as a separate entity from JDLLP. He said that he used JDCL to advise IAP on a consultancy basis to deal with matters which went beyond tax planning (on which JDLLP could and did advise IAP) and audit and accountancy services (with which the firm of Slaven Jeffcote LLP dealt).

[44] Mr Donnison was a director of Lumley which was appointed as a corporate director of both IAP and ITS. Mr Donnison carried out the

*g*  activities of Lumley as the director of IAP and ITS.

[45] Mr Donnison was directly involved in preparing notes which were prepared a considerable time after the meetings to which they purportedly related. Some of these notes were prepared for the purpose of being shown to others to describe the relationship between IAP and Leadenhall. Some of these notes were misleading as to the actual events and Mr Donnison must

*h*  have appreciated this at the time he prepared the notes. There are also grounds for suspicion as to the extent of his involvement in the preparation of documents which were created in his office and which were backdated in order to misdescribe the events which had occurred.

[46] Mr Donnison gave fluent and apparently careful evidence. Nonetheless in view of the grounds for suspicion which exist in relation to

*i*  his possible involvement in relation to documents which were created and backdated at his offices, I considered that I ought to be cautious about the evidence which he gave. However, in the end, I do not reject the evidence which he gave in relation to the matters which are now of central importance. Having regard to the contemporaneous documents and the

inherent probabilities, I am able to accept a great deal of his evidence as *a* being reliable.

**MR BERMAN**

[47] Mr Berman (the seventh defendant) is a solicitor and a partner in the sixth defendant, Mishcon de Reya (a firm). That firm was the predecessor to Mishcon de Reya LLP and the firm and the LLP are well known *b* solicitors. Having regard to the contemporaneous documents and the inherent probabilities I am able to accept a great deal of his evidence as being reliable.

**OTHER WITNESSES**

[48] I heard evidence from a large number of other witnesses in addition to Mr Rosser, Mrs Gifford, Mr Donnison and Mr Berman. I found the evidence of these other witnesses to be helpful and generally reliable. I do not consider that it is necessary to refer to these other witnesses in more detail at this stage.

**THE VARIOUS AGREEMENTS INVOLVING IAP, LEADENHALL AND DARRENCREST**

[49] It is necessary to refer to a number of agreements which were entered into by IAP or Leadenhall or Darrencrest. It is convenient to list these agreements at this point and I will then refer to the relevant terms of those agreements before I make further findings of fact. The agreements to which *e* I will refer are:

(1) An agreement dated 24 October 2003 between IAP and Maesbury Homes Inc ('Maesbury');

(2) An agreement dated 26 November 2003 between IAP and Leadenhall;

(3) An agreement dated 26 March 2004 between IAP, Leadenhall and Maesbury;

(4) An agreement dated 26 March 2004 between Leadenhall and Maesbury;

(5) An agreement dated 26 March 2004 between Leadenhall and IAP;

(6) An agreement in October 2004 between Darrencrest and Maesbury;

(7) An agreement dated 7 October 2004 between Darrencrest and IAP;

(8) An agreement dated 4 April 2005 between Lake Austin Properties I Ltd ('Lake Austin') and Darrencrest;

(9) An agreement dated 5 September 2005 between IAP, Darrencrest and Lake Austin;

(10) An agreement dated 1 August 2007 between IAP and Leadenhall;

(11) An agreement dated 1 August 2007 between IAP, Leadenhall and *h* Maesbury;

(12) An agreement dated 1 August 2007 between IAP and Darrencrest;

(13) An agreement dated 1 August 2007 between IAP, Darrencrest and Maesbury;

(14) An agreement dated 28 August 2007 between Darrencrest, Lake Austin and IAP.

**THE AGREEMENT DATED 24 OCTOBER 2003**

[50] The agreement dated 24 October 2003 was made between IAP as 'the Agent' and Maesbury as 'the Developer'. Mrs Gifford signed the

a    agreement on behalf of IAP. The agreement referred to 'the Development' as defined in the Schedule to the agreement. The Schedule referred to 'the Units' as later defined but the later provisions were not completed as at 24 October 2003. Instead the agreement provided that the Schedule would be agreed from time to time between the Agent and the Developer. The agreement recited that the Developer was in the process of developing the

b    Development and wished to secure sales of Units in the Development. The agreement further recited that the Agent had marketing experience in the property field and was willing to act as the exclusive marketing agent for the Units on the terms of the agreement.

[51] By cl 2.1 of this agreement, the Developer appointed the Agent for an Exclusivity Period from 10 October 2003 to 9 October 2004 as its exclusive

c    worldwide agent for the promotion of the Units and the solicitation of purchasers for the Units and the Agent agreed to act in that capacity. Clause 2.2 provided for the Developer and the Agent to complete a Schedule which defined the Units which were agreed to be the subject of the agreement.

d    [52] By cl 4.1 of the agreement, the Agent agreed to use its reasonable commercial endeavours to promote and market the Units in the UK and to seek purchasers for the Units. By cl 4.6, the Agent was entitled to obtain from a person introduced as a purchaser of a Unit a deposit in respect of that Unit at a level to be negotiated by the Agent.

[53] By cl 6.1 of the agreement, the Developer agreed to pay to the Agent

e    a commission equal to (after an initial period at a different rate) 20% of the Sale Price of each Unit in respect of which the Developer entered into a contract of sale with a person introduced, directly or indirectly, by the Agent. The benefit of the agreement was assignable by either party.

[54] By cl 12 of the agreement, the Developer and the Agent were to nominate a suitable senior employee to assume overall responsibility for its

f    obligations under the agreement. Clause 12 stated that the first person so nominated by the Agent was Mr Rosser.

g    **THE AGREEMENT DATED 26 NOVEMBER 2003**

[55] The agreement dated 26 November 2003 was made between IAP and Leadenhall. The agreement was signed by Mrs Gifford on behalf of IAP. The agreement recited that IAP carried on the business of sourcing and marketing for sale to its members residential properties which were located predominantly in the UK. The agreement further recited that IAP wished to

h    market to its members and others properties located outside the UK and wished to appoint Leadenhall to assist in establishing, exploiting and managing 'the Business'. 'The Business' was defined to mean the business of promoting for sale any property located in a Territory (to be agreed between the parties but so that it would exclude England, Wales, Scotland and Northern Ireland), such business to include any ancillary commercial

i    activities whether as agent or by way of joint venture, partnership, principal or otherwise. The agreement further recited that IAP had agreed to appoint Leadenhall as its representative to establish, exploit and manage the Business.

[56] By cl 2.1 of the agreement, IAP appointed Leadenhall as its exclusive

representative in the Territory with effect from 1 October 2003 for the a purpose of:

(1) sourcing properties suitable for being sold to members of IAP or others and procuring the appointment of IAP as the marketing agent in respect thereof;

(2) negotiating the terms of arrangements with developers and others;

(3) managing the business of IAP in the Territory including matters such b as establishing and maintaining good relations with developers, mortgage brokers and various professionals and arranging for the payment of fees and expenses incurred by IAP.

[57] By cl 3 of the agreement, Leadenhall took on certain obligations which it owed to IAP. These included obligations to:

(1) use its reasonable endeavours to promote the interests of IAP in c relation to the Business in the Territory;

(2) seek developers willing to appoint IAP as marketing agents;

(3) provide quarterly reports;

(4) act on the direction of IAP in specified respects;

(5) describe itself as 'overseas representative' of IAP.  d

[58] By cll 4.1 to 4.3 of the agreement, IAP agreed to pay to Leadenhall a commission equal to 50% of the net proceeds received by IAP in respect of the Business and to reimburse all expenses exceeding £5,000 in aggregate in any month; IAP was also to pay a 'non-returnable but fully recoupable' advance of £20,000 per month in respect of commission. By cl 4.13, IAP agreed to make a loan to Leadenhall of £500,000 for working capital e purposes upon which interest of 4% per annum, compounded annually, was payable and which was to be repaid on the earlier of the second anniversary of the agreement and the termination of Leadenhall's appointment.

**THE AGREEMENTS DATED 26 MARCH 2004**  f

[59] On 26 March 2004 IAP, Leadenhall and Maesbury entered into a tripartite agreement, described as a Termination Agreement, intended to bring the earlier agreements of 24 October 2003 and 26 November 2003 to an end. The tripartite agreement recited the earlier agreement of 24 October 2003. It further stated that '[p]rior to entering into [the agreement of 24 October 2003] Leadenhall was appointed by [IAP] as its sub-agent for g the sale of the properties'. Then the tripartite agreement recited that as the arrangements between IAP and Leadenhall had commenced prior to the agreement of 24 October 2003, the parties wished the earlier agreements to be terminated and for Leadenhall to be appointed as Maesbury's agent pursuant to a new agency agreement so as to 'more appropriately reflect the actual arrangements between the parties'. The operative terms of the h tripartite agreement then sought to give effect to the intentions declared in the recitals.

[60] Also on 26 March 2004, Leadenhall entered into an agreement with Maesbury. This agreement largely, but not entirely, followed the form of the agreement dated 24 October 2003, save that Maesbury's counterparty was now Leadenhall in place of IAP.  i

[61] Finally, on 26 March 2004 Leadenhall entered into an agreement with IAP. This agreement recited that IAP carried on the business of marketing residential properties for sale to its members and that Leadenhall carried on the business of sourcing and predominantly through sub-agents

*a*    marketing for sale on behalf of developers residential properties located
       outside the UK. The agreement further recited that IAP wished to be
       appointed as a sub-agent of Leadenhall to market to its members and others
       properties located outside the UK and Leadenhall had agreed to make that
       appointment. It should be noted that the agreement dated 26 March 2004
       between Leadenhall and IAP was very different from the earlier agreement
*b*    between those parties of 26 November 2003. The agreements of 26 March
       2004 did not simply reverse the roles of the parties pursuant to the earlier
       agreement.

       [62] The agreement dated 26 March 2004 between Leadenhall and IAP
       specified a commencement date of 1 October 2003. The agreement
       provided for certain circumstances in which Leadenhall would be obliged to
*c*    notify IAP of Leadenhall's appointment as the sales agent for certain
       properties. Following such notification, IAP was free to choose whether to
       accept an appointment as Leadenhall's sub-agent. If IAP were then
       appointed as Leadenhall's sub-agent, IAP was under an obligation to
       Leadenhall to perform the obligations imposed on Leadenhall by its
*d*    agreement with a developer. In consideration of the obligations undertaken
       by IAP as sub-agent of Leadenhall, Leadenhall was to pay to IAP a
       commission equal to 50% of the net proceeds received by Leadenhall
       pursuant to its appointment by the developer.

       **THE AGREEMENT BETWEEN DARRENCREST AND MAESBURY IN**
*e*    **OCTOBER 2004**

       [63] It appears that in early October 2004, Darrencrest and Maesbury
       entered into an agreement. The documents in evidence included a draft of
       the intended agreement between these parties but not the executed
       agreement. The draft agreement between them was in the same terms as the
       agreement dated 26 March 2004 between Leadenhall and Maesbury save
*f*    that the commencement date was to be 1 October 2004. The intention
       seems to have been that Leadenhall and Maesbury would continue to have
       the rights and obligations under the agreement of 26 March 2004 in
       relation to the properties which had previously been identified as being the
       subject of that agreement but, in relation to properties which were
       subsequently identified by Maesbury, they would be the subject of the
*g*    agreement of October 2004 between Darrencrest and Maesbury. In
       particular, the development at Lake Austin was to be the subject of the
       agreement with Darrencrest and not the agreement with Leadenhall.

       **THE AGREEMENT DATED 7 OCTOBER 2004**
*h*    [64] On 7 October 2004 Darrencrest entered into an agreement with IAP.
       This agreement was executed by Mr Donnison for Lumley as a director of
       IAP. This agreement was in essentially the same terms as the agreement
       dated 26 March 2004 between Leadenhall and IAP save that IAP's
       counterparty was Darrencrest rather than Leadenhall.

*i*    **THE AGREEMENT DATED 4 APRIL 2005**
       [65] On 4 April 2005 Darrencrest entered into an agreement with Lake
       Austin. This agreement followed the format of the original agreement dated
       24 October 2003 between IAP and Maesbury (and therefore the format of
       the later agreements based on that original agreement). In the agreement of

4 April 2005, there was a completed schedule which identified the
properties which were initially the subject of the agreement. The agreement
defined the commencement date as 30 September 2004. The commission
payable was 10% of the sale proceeds of the units rather than 20% in
earlier agreements.

### THE AGREEMENT DATED 5 SEPTEMBER 2005

[66] On 5 September 2005 IAP, Darrencrest and Lake Austin entered into
an agreement whereby Lake Austin appointed Darrencrest as its agent (on
the terms of the earlier agreement of 4 April 2005) and Darrencrest
appointed IAP as its sub-agent (on the terms of the earlier agreement of
7 October 2004) in relation to the properties the subject of the agreement of
5 September 2005.

### THE AGREEMENTS DATED 1 AUGUST 2007

[67] On 1 August 2007 IAP and Leadenhall entered into an agreement
which terminated, from that date, the arrangements made under their
earlier agreement of 26 March 2004. It was agreed that any receipts by
Leadenhall on or after 1 July 2007 pursuant to the agreement which
Leadenhall had entered into with Maesbury on 26 March 2004 would be
dealt with as follows: the first $4m would belong to Leadenhall and any
further receipts would belong to IAP.

[68] Also on 1 August 2007, IAP, Leadenhall and Maesbury entered into
a tripartite agreement dealing with the payment of monies due under the
earlier agreement dated 26 March 2004 between Leadenhall and Maesbury.
The copy of that agreement in the trial bundles was incomplete and I will
proceed on the basis that this agreement gave effect to the agreement of
1 August 2007 between IAP and Leadenhall as to the payment of
commission by Maesbury to Leadenhall and IAP.

[69] On 1 August 2007 IAP and Darrencrest entered into an agreement
which terminated, from that date, the arrangements made under their
earlier agreement of 7 October 2004. Darrencrest then assigned to IAP, with
effect from 1 July 2007, the benefit of all the agency agreements which
Darrencrest had made with various developers. The relevant developers
were seven developers in Florida (including Maesbury and Lake Austin) and
two in Cyprus. In consideration of that assignment, IAP agreed to pay to
Darrencrest the first $6.8m it received as commission from developers
under the agency agreements which had been assigned to IAP.

[70] Also on 1 August 2007, Darrencrest, Lake Austin and IAP entered
into a tripartite agreement which substituted IAP for Darrencrest under the
earlier agreement of 4 April 2005 between Darrencrest and Lake Austin and
under the earlier agreement of 5 September 2005 between IAP, Darrencrest
and Lake Austin.

### THE AGREEMENT DATED 28 AUGUST 2007

[71] On 28 August 2007 Darrencrest, Lake Austin and IAP entered into a
tripartite agreement which was supplemental to the earlier agreement of
4 April 2005 between Darrencrest and Lake Austin and to the earlier
agreement of 5 September 2005 between IAP, Darrencrest and Lake Austin.
The parties agreed certain terms as to the payment of commission. IAP and
Lake Austin agreed to enter into a new agency agreement under which Lake

*a*  Austin was to appoint IAP as its marketing agent. The new agency agreement was said to be in the form attached to the agreement of 28 August 2007 but I was not shown this form of agreement.

## A SUMMARY OF THE POSITION UNDER THE AGREEMENTS

*b*  [72] Although the above agreements contained detailed provisions as to the rights and obligations of the various parties, it is possible to summarise some key points arising from this sequence of agreements:

(1) Throughout the series of agreements, there was always an agreement or agreements with a source of properties for sale in the United States, the source being either Maesbury or Lake Austin;

*c*  (2) The first agreement with Maesbury was made by IAP, providing for IAP to receive a commission at the rate of 20%;

(3) IAP then made an agreement with Leadenhall under which IAP was to pay to Leadenhall one-half of that commission;

(4) Then the agreements between Maesbury, IAP and Leadenhall were restructured so that Leadenhall contracted with the source of the properties

*d*  in return for a commission of 20% and Leadenhall agreed to pay one-half of that commission to IAP;

(5) At that stage, although the contractual arrangements were restructured, the economic situation was broadly similar, certainly to the extent that a commission of 20% was paid by Maesbury and the 20% commission was divided equally between IAP and Leadenhall;

*e*  (6) The next step was to substitute Darrencrest for Leadenhall in relation to new properties with the result that Darrencrest contracted with Maesbury, and later with Lake Austin, and then Darrencrest agreed to pay one-half of its commission to IAP;

(7) When the individuals behind IAP, Leadenhall and Darrencrest wished to revise these arrangements in 2007, IAP contracted directly with

*f*  Maesbury and Lake Austin and Leadenhall and Darrencrest ceased to be involved as regards future marketing and sales.

[73] I will also make some further general points about these agreements. First, it was not alleged that the agreements were shams or that they took effect in any way other than in accordance with their terms. Secondly,

*g*  although it was pointed out, in relation to the agreement of 24 October 2003, in particular, that the agreement related to properties described in a schedule and that, as at 24 October 2003, the schedule had not been completed and therefore did not identify any properties which were the subject of that agreement, the subsequent conduct of the parties did identify the properties which were to be the subject of that agreement and the

*h*  parties then operated the provisions of that agreement in relation to those properties.

## THE EVIDENCE

[74] In the usual way, I was provided with evidence in the form of contemporaneous documents and oral evidence. As regards the documents,

*i*  there are two categories of documents which I need to mention at this point. The first category consists of documents which were written after a relevant event and then back-dated to make it appear that they were written at the time of the relevant event. Plainly, I cannot hold that those documents were brought into existence on the dates which they bear. Further, I do not

consider, in relation to the majority of these documents, if not all of them, *a*
that I can regard the contents as reliable as if the documents were an
accurate note of what had happened at a time before the documents were
created. Generally speaking, in relation to this first category of documents,
it is clear that the document was created not only to mislead as to its date
but also to have misleading contents.

The second category of documents does not involve any misleading as to *b*
the date of creation of the documents. Instead, this category consists of
documents prepared as a purported description of earlier events. In relation
to such documents, it was put to the author of the document that the
author was knowingly making a false statement. Even if the author of the
document did not know the contents to be false I do not regard these *c*
descriptions, some years after the event, as reliable as to what had happened
earlier. Generally speaking, these later accounts were prepared for the
purpose of achieving a particular result or convincing someone as to what
had happened and they contain a considerable amount of presentation or
'spin', even if they are not wholly false. In fact, in relation to the earlier
matters which are purportedly described in this category of documents I *d*
have reasonably reliable evidence as to what really happened at the relevant
time and I will make my findings in those respects without paying very
much attention to the later presentations of those matters.

[75] I have already referred to the oral evidence which I received.

*e*

**FINDINGS OF FACT**

[76] ITS was incorporated in May 2002 and commenced trading in
August 2002. Mr and Mrs Moore used ITS to run a new business of
providing information and advice to potential investors in residential
properties. The provision of information and advice took different forms
but one form involved seminars conducted by Mr Moore himself. *f*

[77] The business of ITS achieved some success and that led to potential
investors seeking further advice and assistance in order to make investments
in residential property. That led Mr and Mrs Moore to use IAP, a company
they had earlier formed or acquired, to start a further business in around
March 2003. IAP offered membership, in different categories. The benefits
of membership were that a member would be informed by IAP of *g*
investment opportunities in residential properties. IAP did not itself source
properties to be introduced to its members. As regards properties in the UK,
it used a separate company, Whitedrake Ltd, a company in which
Mrs Moore's sister had an interest. As regards property in Spain, it used
Regency Estates SL, a company in which initially Ms Forth and then later *h*
Mr Moore and Ms Forth had interests. The evidence as to what these two
sourcing companies did was not as clear as the evidence which I was given
as to the work which was later done by Leadenhall and Darrencrest, which
were also described as sourcing companies for IAP. In connection with
Leadenhall and Darrencrest, the evidence was that the work done by a
sourcing company extended to sourcing such properties, usually at the *i*
off-plan stage, carrying out some due diligence on behalf of potential
purchasers, obtaining discounts on the purchase price from the developers
and supporting potential purchasers through the purchase. The support
involved the sourcing company liaising between the purchaser and the

a  developer, lawyers and mortgage brokers.

[78] Mr Moore met Mr Rosser in 2002 when they discussed various business opportunities. Mr Moore contacted Mr Rosser by email on 26 March 2003. He told Mr Rosser that 'we sell £20m of property per month' and he wished to explore with Mr Rosser strategic expansion of his business with a view to its sale in one or two years' time. He asked if

b  Mr Rosser would be interested in discussing that subject. Mr Rosser was interested and met Mr Moore in April 2003. At their meeting, Mr Moore described the businesses of ITS and IAP. He explained that those businesses had experienced rapid growth. Mr Rosser's evidence was that Mr Moore wanted him to use his skills, knowledge and experience of public relations, branding and strategic business development to bear on ITS and specifically

c  to provide strategic advice with a view to ultimately achieving a successful sale of one or more of ITS, IAP and any related businesses. Mr Moore had a particular concern that property education and investment businesses tended to have a poor reputation and he wished the businesses of ITS and IAP to be distinguished from others in the market. Mr Rosser gave evidence

d  that he was not being asked by Mr Moore to run ITS or IAP or become involved in the selection of properties for sale or the like.

[79] Mr Rosser asked Mr Moore about the identity of the directors and the managers of ITS and IAP. As the intention was that one or other of these companies would be sold on terms that Mr and Mrs Moore would not remain involved, Mr Rosser advised that the companies needed directors

e  and management who were capable of running the businesses without Mr and Mrs Moore. Mr Rosser also advised Mr Moore that the companies should retain experienced accountants, auditors and lawyers and that these professionals should review the systems and mode of operation of the companies. To this end, Mr Rosser introduced Mr Moore to Mr Berman a partner in Mishcon de Reya, to Mr Donnison's practice (for tax advice) and

f  to Slaven Jeffcote LLP, as auditors, where Mr Donnison was a member.

[80] The trial bundle includes a minute of a purported meeting of the board of IAP on 31 May 2003. The minute suggests that by the end of May 2003 it had been agreed that Mr Rosser (or more accurately the trustees of a discretionary trust in relation to which he was a potential beneficiary) should be issued shares in IAP. At that time, Mr Moore was the sole

g  director of IAP and Mrs Gifford was the company secretary. The minute purports to record a resolution as to the issue of shares which would result in there being 200 issued shares with entities connected to Mr Moore (Prism and the Jiki Trust) holding 72.5% of the shares, the discretionary trust connected to Mr Rosser holding 20% of the shares and the

h  discretionary trust in relation to which Ms Forth was a potential beneficiary holding 7.5% of the shares. Although the minute is dated 31 May 2003, it is clear from later documents that the issue of shares in IAP in this way was not settled until much later. Indeed, there is a clear pattern in this case of minutes being prepared for meetings that never took place and which are given a date long before the minutes were prepared. The evidence shows

i  that this minute was signed after 27 October 2003 and then back-dated. I also find that no such board meeting took place on 31 May 2003.

[81] On 14 June 2003 Mrs Gifford sent an email to various persons (including Mr and Mrs Moore) who, I assume, were connected to the businesses of ITS and IAP and stated that Mr Rosser had 'been appointed

Vice Chairman of the group from the 1 June 2003'. The email went on to describe Mr Rosser's strategic planning experience and the intention that he would provide guidance through a period of growth and diversification.

[82] In June 2003 Mr Moore and Mr Rosser met a Mr Storey. Although the details are not clear, it appears that Mr Storey met Mr Moore at an ITS seminar in Manchester and he met Mr Rosser at Heathrow. In due course, Mr Storey came to play a significant part in relation to the sourcing of residential development properties particularly in the United States. At this time, Mr Storey was an official in the British Embassy in Lima but, rightly or wrongly, he did not feel inhibited in performing the services for IAP or Leadenhall or Darrencrest which are referred to below. It appears from an exchange of emails between Mr Storey and Mr Moore on 24 June 2003 that Mr Moore and Mr Rosser discussed with Mr Storey the services and the introductions which he might be able to provide. In the exchange of emails, Mr Moore told Mr Storey that 'we' wanted to explore the possibility of Mr Storey helping with sourcing property outside the UK. It is not clear who was being referred to as 'we'. Mr Moore then referred to 'our international sourcing company' and suggested some possibilities as to Mr Storey's connection with, or involvement in, such a company. In his reply to Mr Moore, Mr Storey stated that he was intending to meet certain representatives of Pulte Homes and he suggested that Pulte Homes might be a source of properties of interest to Mr Moore.

[83] Mr Storey sent his initial email in June 2003 to Mr Moore alone but Mr Moore copied Mr Rosser into the exchanges and thereafter, in June and July 2003, Mr Moore addressed his emails to Mr Rosser and Mr Moore. In an email from Mr Storey to Pulte Homes on 24 June 2003, he referred to the chairman and the vice-chairman of the company for whom he was acting. These were references to Mr Moore and Mr Rosser respectively. However, Mr Storey also described himself as a non-executive director of whichever was the relevant company although he was not a non-executive director of any relevant company. He regarded that as an inaccurate but nonetheless appropriate self-promotion for consumption by Pulte Homes.

[84] Before 30 June 2003, Mr Donnison had a meeting with Mr Rosser, Mr Moore and Ms Forth. I will refer later to the question of which entity Mr Donnison was acting for in this respect. Mr Donnison had been introduced to Mr Moore and Ms Forth by Mr Rosser who had been a client of Mr Donnison's since 1996, if not earlier. On 30 June 2003 Mr Donnison wrote to Mr Rosser, Mr Moore and Ms Forth. It appears from this letter that Mr Donnison had been asked to advise on the tax consequences of the use of various corporate structures involving Mr and Mrs Moore, Ms Forth and Mr Rosser. Mr Donnison referred to the possibility that the reorganisation of arrangements would involve the use of offshore trusts.

[85] On 30 June 2003 Mr Rosser emailed Mr Storey with suggestions as to the arrangements which could be made to involve Mr Storey. The email referred to 'Inside Track' and its wish to develop its international business. When discussing how Mr Storey would be remunerated for his services, Mr Rosser referred to the setting up of a single purpose entity that would be majority owned by Inside Track but it was clear at that point that the detail

*a*  of this suggestion had not been worked out.

[86] In July 2003 Mishcon de Reya were retained by ITS and IAP on the recommendation of Mr Rosser.

[87] On 2 July 2003 Mr Storey wrote to Mr Rosser and Mr Moore referring to the role he might have in connection with their 'international sourcing company'. He was obviously here referring to what Mr Moore had
*b*  said in the earlier email of 24 June 2003. There were further emails between Mr Rosser and Mr Storey in July 2003 on the subject of Mr Storey's remuneration. Mr Rosser told Mr Storey that the relevant companies were going through a corporate restructuring and the agreement involving Mr Storey would be made with 'an inside track entity of our choosing as recommended by our tax advisor'.
*c*  [88] On 25 July 2003 Mr Rosser emailed a Mr Flanagan who was to be appointed as managing director 'of the new entity'. It was not made clear what this entity was to be. However, the email shows Mr Rosser negotiating with and appointing Mr Flanagan as a managing director of some company or other connected with ITS and/or IAP.

*d*  [89] In the trial bundle, bearing the date 3 August 2003, is a letter apparently from Leadenhall to Mrs Gifford. The letter states that it was written to provide Leadenhall's assessment of a certain residential development, Windward Bay, in Florida. The letter purported to enclose a report bearing the date August 2003 concerning that development. The report states that Leadenhall had negotiated certain rights in relation to 36
*e*  units on that development. The letter then referred to Leadenhall's research and its due diligence in relation to this development. The letter purports to be signed by Mr Storey.

[90] The trial bundle includes a purported reply, dated 15 August 2003 to the earlier purported letter of 3 August 2003. The reply acknowledges receipt of the letter of 3 August 2003 and the report on Windward Bay. The
*f*  reply is signed by Mrs Gifford.

[91] It is obvious that the letter dated 3 August 2003 was not sent on or around that date. For one thing, Leadenhall did not exist on that date. It follows that someone went to the trouble of creating this document at a later time and putting the date of 3 August 2003 on it. Further, someone went to the trouble at a later time of creating the purported reply on which
*g*  was placed the date of 15 August 2003. It was suggested that these letters had indeed been written later than August 2003 but that there was a quasi-innocent explanation in that certain communications from Mr Storey had gone missing at a later time and that led IAP to endeavour to make good the gap in its records by doing its best to recreate what the records
*h*  had earlier showed. However, whatever went missing and whatever the missing documents earlier showed, they did not include a letter of 3 August 2003 from Leadenhall which did not exist at that date. It is obvious to me that these letters were created with a view to them being used to be shown to a third party at a later time. The intention was either to mislead a third party or to manufacture evidence to support a case which it was otherwise
*i*  difficult to prove. I have no evidence to show that they were actually used to mislead anyone or relied upon as evidence but that does not detract from my finding that they were created so that they could be used to mislead a third party or used as manufactured evidence.

[92] Mrs Gifford signed the letter dated 15 August 2003. She told me that

she did not notice that when she signed it (probably some considerable time
after 15 August 2003) was dated 15 August 2003. I do not accept that
evidence. Further, it is clear to me that when Mrs Gifford gave that evidence
she knew that she was not telling the truth and she knew she was
concealing from the court the real explanation for these letters.

[93] There was an issue as to when these letters were created. It was
suggested that these letters were created in accordance with what was said
by Mrs Gifford in her email to Mr Rosser and Mr Moore on 20 November
2003. This email was sent after the agreement between IAP and Leadenhall
had been signed by IAP; the agreement was later dated 26 November 2003.
In her email, Mrs Gifford said that the '[p]aper trail will start asap (waiting
to do some letterheads)'. If the letters which were dated 3 August 2003 and
15 August 2003 were what was contemplated by Mrs Gifford's reference to
a paper trail, then that might indicate that Mr Moore and Mr Rosser knew
what Mrs Gifford intended to do and what she then later did when creating
the letters which were dated 3 August 2003 and 15 August 2003. On its
own, that is quite a plausible explanation. However, it was countered by
Mrs Gifford pointing out that the letter of 15 August 2003 has the reference
'MV002' and giving evidence that 'MV' was a reference to Melanie Vink
who was only employed by IAP in April 2005. There was no evidence to
link the reference to MV to anyone else. This evidence suggests that the
letters were created after April 2005. Of the two explanations, I find that it
is likely that the letters were indeed created after April 2005 and there is no
direct link between what Mrs Gifford said to Mr Moore and Mr Rosser in
November 2003 about a paper trial and these letters.

[94] I have already held that the letters were created in order to mislead a
third party or at least to be passed off as evidence of a matter that required
to be proved. The next question is: in what way were the letters to be relied
upon? That can be answered by considering the position as revealed in the
letters. They suggest that in August 2003 (before IAP entered into the
agreement with Maesbury on 24 October 2003), Leadenhall was sourcing
properties in the United States and passing on the information about those
properties to IAP. It is apparent from later documents, that for various
reasons (including a possible sale of the shares in IAP and also including the
tax position arising from the relationship between IAP and Leadenhall) IAP
wished to show, or convey the impression, that the original relationship was
between Leadenhall and Maesbury rather than between IAP and Maesbury.
I find that these letters were deliberately created to help IAP put forward
that case.

[95] I have discussed the position in relation to the letters which were
dated 3 and 15 August 2003. There are other documents which were false
and which appear to have been created for the same reason as the letters of
6 and 15 August 2003 were created. I will not separately discuss those other
documents as the same reasoning and the same conclusions apply in
relation to them.

[96] This attempt to mislead or to manufacture evidence plainly involves
serious wrongdoing. I have found that Mrs Gifford was knowingly involved
in that wrongdoing. I am not able to make specific findings as to who else
was involved in this element of wrongdoing. I have referred earlier to
Mr Donnison's preparation of notes which were misleading but I have not
made a finding as to whether he was aware of other documents being

a  falsely created and wrongly dated in his offices. I do find, however, that it is
unlikely that knowledge as to the preparation of misleading documents was
restricted to Mrs Gifford and Mr Donnison.

[97] The liquidators drew attention to these documents which had been
falsely created to advance their case that IAP was being operated
dishonestly in a number of respects including this respect. However,
b  Mr Phillips QC accepted that a finding that IAP had created these false
documents did not give him any cause of action based on the creation of
those documents. Conversely, the defendants did not attempt to persuade
me that these documents were genuine or even that they were useful
evidence as to what was happening at any time. Accordingly, having
considered those documents and their implications, I will continue to assess
c  my findings of fact as to the relationship between IAP, Maesbury and
Leadenhall without regard to what appears in those manufactured
documents.

[98] In August 2003 Mr Berman drafted a consultancy agreement in
relation to Mr Storey. The agreement was drafted to be entered into by ITS
d  although the benefit of the agreement could be assigned to certain
connected persons.

[99] On 15 August 2003 Mr Storey emailed Mr Moore and Ms Forth
with information about the terms he had negotiated with Mr Oxley of
Maesbury. These terms were later the subject of the agreement dated
24 October 2003 between IAP and Maesbury. However, as at 15 August
e  2003, Mr Storey described the proposed arrangements as being between ITS
and Maesbury.

[100] On 18 August 2003 a draft consultancy agreement was sent to
Mr Storey by the finance director of ITS. On 21 August 2003 Mr Storey
emailed Mr Rosser and the finance director of ITS about the draft
agreement and Mr Rosser replied on the same day.
f  [101] On 26 August 2003 Mr Storey received a proposal from Park
Square Homes, a developer in the United States, about the possibility of
'Inside Track' acting for it in connection with marketing its properties.
Around the same time, there were email exchanges between Mr Storey and
Pulte Homes which referred to the possibility of 'Inside Track' acting for
Pulte Homes.
g  [102] On 20 August 2003 a firm of solicitors, Thomas Eggar, sent to
Mr Rosser a draft agreement between a Developer and an Agent. It seems
that those solicitors had given advice to Ms Forth in connection with the
agent named in the draft agreement. It seems that the draft agreement was
sent to Mr Rosser to be used as a possible model for an agreement to be
h  entered into with a developer or developers in the United States. Mr Rosser
emailed the draft to Mr Berman and his email referred to a marketing
agency agreement for IAP.

[103] On 18 September 2003 Mr Donnison had a meeting with
Mr Moore. Mr Donnison prepared a list of action points following this
meeting and he also gave detailed evidence about the meeting. I will begin
i  by referring to the list of action points and proceed then to Mr Donnison's
oral evidence about this meeting.

[104] Mr Donnison's list of action points started with the heading
'COMPANY' and then had as the first point:

'Set up International Marketing Company to provide marketing and property sourcing. Base in Geneva. Use Homestar. Owned 100% Jim's foundation to start. Bill group companies under Service Contract to be set up. Will buy Prism contract in due course.'

[105] The list of action points continued with references to setting up new companies in Spain and in North and South Cyprus. The company in Spain was to take over from Regency Estates SL. IAP had prior to this time used Regency Estates SL as a company to source properties in Spain for IAP.

[106] The list of action points went on to deal with the various shareholdings in the various companies. It is apparent from this list that the shares in IAP and ITS had not yet been allotted to the discretionary trusts connected with Mr Rosser and Ms Forth.

[107] A further action point in the list referred to the position of Mr Rosser and the intention to set up a BVI company to invoice 'non UK companies' for part of his remuneration package. In due course, Sunpuddles Ltd was set up in the BVI and it entered into a consultancy agreement with Leadenhall under which Leadenhall was to make payments to Sunpuddles Ltd as a fee for services purportedly rendered. The payments to Sunpuddles Ltd were ultimately for the benefit of Mr Rosser. Leadenhall made the payments to Sunpuddles Ltd out of the commission it received from IAP and later the commission it directly received from Maesbury.

[108] As background to the meeting with Mr Moore on 18 September 2003, I was told that Mr Moore moved to Spain in 2003 and was registered for tax there with effect from 1 September 2003. Mr Donnison gave evidence that Mr Moore told him at the meeting on 18 September 2003 that Mr Moore wished to set up an offshore property sourcing and marketing company to invoice what he called the Inside Track Group for some of the property sourcing that was carried on by Mr Moore overseas. Mr Moore told Mr Donnison that this new company would be wholly owned by Mr Moore. Mr Donnison told me that at this point he understood that the opportunities to source properties abroad 'belonged' to Mr Moore and not to IAP. Mr Moore's desire to have a property sourcing company set up overseas was tax driven. He also envisaged that if and when ITS and/or IAP were sold this overseas company would be retained by him.

[109] The reference to Homestar in the list of action points was a reference to a company which Mr Donnison had acquired for Mr Moore earlier in 2003. Mr Donnison told me that both he and Mr Moore assumed that Homestar would be the overseas sourcing company. When cross-examined, Mr Donnison was asked about Mr Moore's intentions as to the contractual arrangements between Maesbury, IAP and Homestar. I did not find his evidence on that subject to be clear and it may be that Mr Moore had not at that point thought through what the contractual arrangements ought to be. However, Mr Donnison did give clear evidence, which I accept, that the intention was that Homestar would invoice IAP for the service which Homestar would provide to IAP. This service was to be the sourcing of international property which Homestar would introduce to IAP for IAP to introduce to its members.

[110] Also on 18 September 2003, Mr Rosser emailed Mr and Mrs Oxley of Maesbury. The email referred to an earlier meeting between Mr Rosser, Mr Moore and Mr and Mrs Oxley. Mr Rosser appeared to be writing on

*a*   behalf of 'Inside Track' and he described himself as 'Vice Chairman'. His email proposed certain terms, including commission at 20%, in return for Inside Track acting for Maesbury in marketing a Maesbury development.

[**111**] Later on 18 September 2003, Mr Storey emailed Mr Moore and Mr Rosser to report on a conversation which Mr Storey had with Mr Oxley. Mr Storey reported on the possibility that Mr Oxley would wish
*b*   to instruct Inside Track on the marketing of developments at Bahama Bay and Bahama Bay 2 and a future project at Lake Austin.

[**112**] On 22 September 2003 Mr Donnison emailed to Mr Moore, with a copy to Mr Rosser, the list of action points following Mr Donnison's meeting with Mr Moore on 18 September 2003. In this way, Mr Rosser would have been able to see that Mr Moore's intention was to set up (or
*c*   use) an international sourcing company and, in particular, to use Homestar for that purpose. On 24 September 2003 Mr Moore's PA forwarded this email to Mrs Gifford. Mrs Gifford was then contacted by Mr Moore and he asked her to raise with Mr Donnison some questions arising out of the list of action points. She did so by an email to Mr Donnison of 24 September
*d*   2003. She did not raise a question as to the proposal to set up an international sourcing company and to use Homestar for that purpose. However, in a later question which she did raise, she referred to the proposal that Mr Rosser should set up a BVI company to take payment for his benefit and she asked about the position of other directors. Mr Donnison replied stating that the position was not clear and in
*e*   particular it was not clear whether they could use the BVI company which would be the international sourcing company.

[**113**] By 1 October 2003 Mr Berman had drafted an agreement to be entered into with a US developer. On 1 October 2003 he emailed a copy of the draft to a US attorney for advice on certain points. In his email he stated that his client was ITS but the agreement might be entered into by an
*f*   associated company which acted as a property agent. This email was copied to Mr Rosser and Ms Forth. Mr Rosser approved the form of the draft and it seems that Ms Forth approved it with some suggested amendments.

[**114**] On 2 October 2003 there was a meeting between Mrs Gifford, Mr Rosser, Ms Forth and Mr Donnison. Mr Donnison's note of the meeting referred to Mr Rosser having been involved with effect from 1 June 2003. It
*g*   appears that at this meeting the share split in relation to ITS and IAP was decided. It was proposed that the agreement as to shares would be recorded by a board minute back-dated to May 2003. As indicated earlier, a board minute was later drawn up and dated 31 May 2003. It was also agreed that the directors of ITS and IAP would be Mrs Gifford and Lumley. The note
*h*   stated that Lumley would act as a nominee for Mr Moore. Mr Moore had been the director of those two companies since March 2003 and it was intended that he would resign as a director and that is what happened in due course. Mr Donnison also recorded:

   'THIRD PARTY DEVELOPMENT COMPANIES
*i*      Brad explained that they were looking to get into development of properties in various countries where they will work with local developer and have a contract to buy the finished product into the group. The structure for this is still to be owned by all the shareholders in proportion subject to a percentage being held by the local developers.

This group is to be separate from the main group and would not be *a*
included in any capitalisation. Accordingly, it may require its own UK
holding company.

Initially, a deal is being done in Spain with a guy called Jens for a
development there. Further deals may be done in North and Southern
Cyprus. Local companies will be used, owned by the UK holding
structure underneath the various trusts and foundations.'          *b*

**[115]** The reference to third party development companies was not to the
international sourcing company which had been discussed earlier but was to
other companies to be set up in which Mr Moore and Mr Rosser in
particular would have interests.

**[116]** On 2 October 2003 Mr Donnison prepared a file note in relation to    *c*
the setting up of a new Panama foundation for Mr and Mrs Moore. The
note contained a reference to 'an international marketing company'. The
note recorded that a BVI company based in Switzerland had been set up
and that this company would provide services to the group in sourcing and
negotiating contracts on properties and in providing international          *d*
marketing support.

**[117]** On 3 October 2003 Mr Berman sent to Mr Storey a draft of an
agreement providing for ITS to retain the services of Mr Storey. The draft
stated that the agreement was deemed to have commenced on 1 July 2003.
Under the agreement, Mr Storey was to identify properties anywhere in the
world, except the UK, for 'the Company' to offer for sale to its members.
Properties were to be identified in accordance with certain stated criteria    *e*
one of which was that 'the Company' would be appointed as exclusive
marketing agent in respect of such properties. On the wording of the draft
agreement, 'the Company' was ITS although the company which had
members for this purpose was IAP, rather than ITS. The draft listed other
services to be provided by Mr Storey. The draft provided that the benefit of
the agreement could be assigned by ITS to certain other entities. The draft    *f*
provided for Mr Storey to be paid by ITS for his services.

**[118]** Mr Phillips QC, acting for the claimants, appeared to accept that
the contract for Mr Storey's services was made by ITS and not by IAP. He
also accepted that the benefit of the contract was not later assigned by ITS
to IAP. He did however submit that IAP had the benefit of the contract in
the sense that the services which Mr Storey was under the contract with ITS    *g*
obliged to provide were services which would benefit IAP as it could pass
on to its members information about the properties sourced by Mr Storey.
Mr Phillips submitted that IAP had paid Mr Storey and that Mr Storey had
invoiced IAP for payment. However, the material produced on behalf of
Mr Donnison and JDLLP showed that this was not the case. In 2003 ITS    *h*
and not IAP paid Mr Storey and in 2004 Mr Storey was paid by
Leadenhall.

**[119]** Also on 3 October 2003, Mr Berman sent to Mr Oxley of
Maesbury a draft of an agreement to be entered into by IAP and Maesbury.

**[120]** On 9 October 2003 Mr Donnison emailed Mrs Gifford in
connection with the proposed shareholdings in ITS and IAP and the          *i*
appointment of new directors of those companies. He asked her to prepare
a board minute to be dated May 2003 in relation to the shareholdings and
she in due course did so.

**[121]** On 14 October 2003 Mr Donnison prepared a file note in respect

*a*    of the setting up of Sunpuddles Ltd, a BVI company. The note records that the shares in this company would be held by the Mhoran Trust, the Isle of Man discretionary trust where Mr Rosser was a potential beneficiary. Although the note records that Sunpuddles Ltd would provide services to the group of companies known as 'Inside Track', Sunpuddles Ltd would invoice Homestar and another sourcing company, Regency Estates SL,

*b*    which sourced properties in Spain. Homestar was described as an international and property search vehicle for the group. Mr Donnison gave evidence that at this stage he believed that Homestar, owned by Mr Moore alone, would be the international sourcing company for ITS/IAP.

[**122**] In mid-October 2003, as a result of information provided to Mr Berman by Mr Storey, Mr Berman drafted an agreement to be entered

*c*    into by IAP and Maesbury as an agreement supplemental to their main agency agreement.

[**123**] On 21 October 2003 Mr Berman sent to Mrs Gifford an email which was copied to Mr Rosser. The email enclosed the draft agreement to be entered into by IAP and Maesbury. Mrs Gifford was asked to sign this

*d*    agreement on behalf of IAP. At this date, it had been decided that Mrs Gifford would become a director of IAP although that only formally occurred on 23 October 2003. In his email, Mr Berman explained to Mrs Gifford how the agreement with Maesbury was intended to operate and how the schedule to the agreement would be subsequently completed. Mr Berman also asked Mrs Gifford to sign a second agreement contained in

*e*    a draft letter. He pointed out that the letter ought to come from IAP rather than ITS.

[**124**] Also on 21 October 2003, Mr Berman sent to Park Square Homes and to Pulte Homes drafts of agreements to be entered into by IAP with those companies. The draft agreements were in similar terms to the draft of the agreement between IAP and Maesbury, although the rates of

*f*    commission were different. I was not shown any executed contracts with Park Square Homes or Pulte Homes. I was told that IAP did enter into an agreement with Park Square Homes but not with Pulte Homes. However, there was no real investigation at the trial as to the position in relation to Park Square Homes, nor as to the commission which was paid by Park Square Homes nor as to what sums were received by Leadenhall out of any

*g*    commission paid by Park Square Homes to IAP.

[**125**] The trial bundle contains a minute of a board meeting of IAP which recorded the resignation of Mr Moore as a director of IAP and the appointment of Mrs Gifford and Lumley, all these steps being said to take effect on 23 October 2003. In fact, Lumley asked for certain indemnities to

*h*    be provided before taking up the appointment and it became a director from 31 October 2003.

[**126**] Mrs Gifford, as a director of IAP, executed the agreement between IAP and Maesbury and dated it 24 October 2003. Mr Oxley executed it on behalf of Maesbury.

[**127**] Mr Donnison had a number of meetings relevant to this case in the

*i*    week beginning 27 October 2003. The meetings involved Mr Donnison meeting Mr Moore and Mr Rosser. He did not meet Ms Forth nor Mrs Gifford. He prepared a note of these meetings around that time and he sent a copy of his note to Mr Moore, Mr Rosser, Ms Forth and Mrs Gifford. The note dealt with a large number of points including points

arising about property in Spain and in Cyprus. Mr Donnison's note referred *a*
to the signing of a minute for a meeting of the board of IAP which had
allegedly taken place on 31 May 2003 and this was duly done. The note
discussed the position of Homestar and the result of the discussion was that
Homestar would remain wholly owned by Mr Moore and there were
references to Homestar invoicing Regency Estates SL as the property
sourcing company in Spain. *b*

[128] Mr Donnison's note then recorded:

> 'A new BVI marketing company is going to be set up to (*sic*) based at
> JD offices in Geneva. This company will enter into a contract with
> Instant Access Properties Limited for fees in relation to the marketing
> and introduction of overseas developments to the UK customer base. *c*
> The company will shortly issue its first invoice for this activity.'

[129] The note later referred to Sunpuddles Ltd invoicing the new BVI
marketing company. Thus, the position which was established at this stage
was in some respects the same as that indicated by Mr Moore to
Mr Donnison on 18 September 2003 but in other respects differed from the *d*
earlier position. On both occasions, it was envisaged that the work of
sourcing international property, particularly in the US, would be carried out
by an off-shore company which would be regarded as providing services to
IAP for which IAP would pay that company. The original intention was that
the off-shore company would be Homestar, wholly owned by interests
connected to Mr Moore, whereas in late October 2003 the intention was to *e*
set up a new BVI company to provide the services of sourcing international
property. Mr Donnison's note of the meetings in late October 2003 does not
expressly state who were to be the shareholders in the new BVI company.

[130] On 31 October 2003 Mr Donnison sent an email to Mr Rosser. The
email referred to a meeting between Mr Donnison, Mr Rosser and
Mr Moore the following day. The note referred to a new BVI marketing *f*
company which was to attract non-UK developers to the UK companies and
to bill the UK companies for this service.

[131] After his various meetings with Mr Moore and Mr Rosser, and
probably before 6 November 2003, Mr Donnison wrote the words
'Leadenhall Group Limited' alongside the first reference to the BVI *g*
company. He also added a manuscript note to the effect that the new
company would pay 'the agents' who had earlier been paid by IAP. There
was some inconclusive debate in the course of the evidence whether this
referred to a person such as Mr Storey or to formation agents who had been
involved in creating the new BVI company.

[132] Mr Donnison arranged for the purchase of a new BVI company and *h*
by 6 November 2003, he had acquired Leadenhall with the intention that it
would be used as the international sourcing company.

[133] Around this time, Mr Moore, Mr Rosser and Ms Forth entered into
a Nominee Agreement and a Management Agreement. These documents
were dated 1 November 2003 which was a Saturday and it may be that the
documents were actually signed on a different date but nothing now turns *i*
on that. The nominee agreement was made by the three individuals with
JDS Secretaries Ltd. This agreement recorded that JDS Secretaries Ltd held
200 shares in Leadenhall and held those shares as nominee for the three
individuals. (I have described, earlier in this judgment, how the shares were

a   ultimately held by three Panama Foundations.)

[134] The management agreement in relation to Leadenhall was made by the same three individuals as the Beneficiaries and by JDS and Candolle as the Director. The three individuals stated that they were the beneficial owners of the shares in Leadenhall. It was agreed that JDS would provide Leadenhall with a registered office. JDS agreed that it and the director

b   would follow all lawful instructions of the three individuals and, in particular, would arrange for the business activities of Leadenhall. If this management agreement were taken at face value it would mean that the three individuals controlled Leadenhall and the position of the Panama foundations as shareholders was side-lined.

[135] On 6 November 2003 Mr Donnison had a meeting with Mr Rosser

c   alone and that was followed by an important meeting between the two of them and Mrs Gifford. Mr Berman joined this meeting after it had begun. Mr Berman made notes of the meeting as it proceeded after he arrived and those notes are available to be consulted. The trial bundle also contained a note prepared by Mr Donnison. This note was prepared in late April 2005.

d   It is clear that when Mr Donnison prepared his note, he did not do so for the purpose of giving a comprehensive account of the meeting, as his note is short. Further, it is clear that Mr Donnison's note was not intended to be precise and accurate as to what had been discussed at the meeting. His note does not even record the presence of Mr Rosser at the meeting. Instead, Mr Donnison's note was prepared to support a case which it suited IAP to

e   present later as to how it came about that IAP entered into a contract with Leadenhall as it later did on 26 November 2003. I can make similar comments about a note prepared later by Mrs Gifford and dated 6 November 2003 or 16 November 2003 and which purported to be a note of this meeting. I do not regard the notes prepared by Mr Donnison and Mrs Gifford as of any real help as to what was discussed at the meeting.

f   Conversely, Mr Berman's note is of real assistance. If it had not been for this note, I would have had real difficulty in determining what had transpired at this meeting not least because, in the absence of this note, the memories of the witnesses may well have been unreliable.

[136] This meeting was the first occasion when Mr Donnison met Mr Berman. Mrs Gifford attended the meeting in her capacity as a director

g   of IAP. Mr Donnison attended the meeting as the representative of Lumley in its capacity as a director of IAP. The position of Mr Rosser at the meeting is contentious.

[137] Mr Berman's note of the meeting obviously started from the time of his arrival into a meeting which had already begun. The note begins by

h   referring to matters which are not now of central importance in that they dealt with the corporate structures and the financial arrangements for activities in Cyprus and Spain. The note then refers to Leadenhall. There was some disagreement as to how to read Mr Berman's note and what finding to make as to what was said and what was agreed in relation to Leadenhall. In particular, Mr Berman without having any independent

i   recollection of what was said, interpreted his note as recording instructions given to him that Leadenhall had had an oral agreement for the preceding six months to source international properties. I do not read the note in that way. I find that what Mr Berman was told and what he recorded was that in the preceding six months ITS/IAP had had oral agreements with

individuals like Mr Storey and Gus (a similar agent operating in Australia) *a*
to source international properties for ITS/IAP. The note then referred to
there being offshore marketing agreements with Gus, Mr Storey and
Maesbury. As to Mr Berman's interpretation of the note, it was plainly not
the case that Leadenhall had had such arrangements for the preceding six
months as Leadenhall had only become involved or potentially involved a
matter of days earlier. There was no reason for anyone to have misdescribed *b*
the situation in that respect to Mr Berman.

[**138**] Mr Berman's note then referred to the arrangements to be made
between IAP and Leadenhall. His note included the following statements.
He recorded that the rationale of the arrangements was to get a tax
deduction for the benefit of IAP. He referred to there being an effective date
of 1 July 2003; that was probably by reference to the date from which *c*
Mr Storey had been retained by ITS. The next part of the note is probably
to be interpreted as saying that Leadenhall would repay to IAP sums paid
by IAP, in particular the sum of £8,000 paid to Mr Storey. The note then
recorded that 'Jim is in Leadenhall'. 'Jim' was Mr Moore. The note then
recorded that Leadenhall was to take over from that day all foreign work *d*
for IAP. The note specified the foreign work as being or including work of
co-ordination, enforcement and arranging payments in return for which
Leadenhall would be paid a retainer.

[**139**] The note then turned to what is now an important topic, namely,
what sum would be paid by IAP to Leadenhall. The position finally adopted
as recorded in the note was that Leadenhall would receive 50% of the fee *e*
paid to IAP. This meant in the case of IAP's agreement with Maesbury, that
IAP would receive a commission of 20% from Maesbury and IAP would
then give 50% of that to Leadenhall. The note shows that the figures of
30% and 40% were written down and then crossed out before the parties
arrived at 50%. The note records that there were to be certain deductions
from the payment to Leadenhall to reflect certain costs borne by IAP and a *f*
separate monthly payment made to Leadenhall.

[**140**] Mr Berman's note recorded that the appointment of Leadenhall by
IAP was to be non-exclusive although when Mr Berman drafted an
agreement for these parties to enter into he altered that point and he made
a note to that effect on his note of the meeting of 6 November 2003.

[**141**] I heard evidence about this meeting from Mr Rosser, Mrs Gifford, *g*
Mr Donnison and Mr Berman.

[**142**] In his first witness statement, Mr Rosser stated that he was not
involved in the negotiations between IAP and Leadenhall which led to the
agreement that IAP would pay half of its 20% commission to Leadenhall.
He was then shown Mr Berman's notes of the meeting of 6 November 2003
which indicated that Mr Rosser had been present at that meeting. *h*
Mr Rosser then prepared a second witness statement. In that statement, he
said that he could not recall the meeting of 6 November 2003, 14 years
earlier. However, he did recall or professed to recall that Mr Moore had
wanted a split of commission under which Leadenhall took 90% of the
commission from IAP. He also said that any stance taken by him at the *i*
meeting on 6 November 2003 would have been on behalf of Leadenhall.

[**143**] Mr Rosser was cross-examined about the meeting of 6 November

a  2003 but he repeatedly stated that he did not now recall what was said at the meeting.

[**144**] In her witness statement, Mrs Gifford did not specifically deal with the meeting of 6 November 2003 although she referred to her note which bore the date 16 November 2003. When cross-examined by Mr Smith QC, acting for Mishcon de Reya and Mr Berman, she said that there had been 'a
b  strong discussion' about the split of commission between IAP and Leadenhall. She said that she was there 'to fight my corner' by which she meant she was representing the interests of IAP. She also said that she put her case based on what IAP was receiving in relation to Spanish property and after 'much discussion' those present arrived at a 50/50 split. When
c  cross-examined by Mr Phillips QC, she suggested that Mr Moore may have spoken to her before the meeting and said that Leadenhall wanted to have 90% of the commission payable to IAP. She said that she looked at the figures appropriate in the case of the sourcing of Spanish property and some calculations were done and they came to a split of 50/50.

[**145**] In his first witness statement, Mr Donnison stated that he could not
d  remember precisely what was discussed at the meeting on 6 November 2003 and he then set out the best of his recollection as to that meeting. He believed that he knew of the existence of the IAP/Maesbury agreement by 6 November 2003. He stated that his understanding had been that Mr Moore was at all times intending to source overseas property through an offshore company. He said that the terms of the proposed agreement
e  between IAP and Leadenhall were discussed in detail with Mr Berman at this meeting. Mr Berman did not suggest there was any issue as to the legality of such an agreement. Mr Donnison did not mention the issue of transfer pricing at the meeting but he was well aware that HMRC would be 'all over' the transaction and that it would be necessary to justify the commercial arrangements which were made.
f  [**146**] Mr Donnison's witness statement contained this passage:

'I relied on IAP to satisfy itself that the agreement was a good deal for IAP, by which I mean whether a 50:50 split was a fair contribution and by extension whether HMRC would have considered it to be equivalent to arm's-length terms. I was not in a position to assess the
g  commerciality of the terms to be agreed between IAP and Leadenhall. I had only just become involved and was still unfamiliar with the day to day running of the business. I did not know how to approach the question of international property sourcing or how such services should (or even could) be priced. Therefore, I relied on Maria (and she in turn would have relied on Jim, and Brad) to assess whether the terms being
h  agreed by Leadenhall and IAP were commercial. I understood that Jim and his team were going to take some remuneration through Leadenhall, rather than through IAP. I could not have assessed whether a 50:50 profit share reflected the level of input that it was intended that Leadenhall would have relative to IAP, but it was to be inferred that this was the minimum that Leadenhall was prepared to accept, and I relied
i  on Brad and Maria to tell me if the split was fair or not. I don't remember whether any other percentage splits were discussed although Jonathan's note (which I deal with below) suggests that they were.'

[**147**] Mr Donnison prepared a second witness statement to respond to

Mr Rosser's second witness statement and Mr Donnison stated that he did not recall a discussion on 6 November 2003 about a split of commission 90/10 in favour of Leadenhall. Mr Donnison was cross-examined by three leading counsel about this meeting. In his first cross-examination, he stated that he did not remember very much about the meeting. He said that he thought a 50/50 split was acceptable as a starting point for an arms-length relationship and that if he had thought that it was not acceptable, he would not have allowed it to be agreed at that meeting. In the second cross-examination, Mr Donnison was prepared to accept that he had participated in a discussion on the split of the commission.

[148] In the third cross-examination of Mr Donnison, he gave evidence as to what he knew on 6 November 2003 as to the previous activities of IAP and what he knew about those whom he described as the people behind Leadenhall, in which group he included Mr Moore, Mr Rosser, Ms Forth and Mr Storey. Mr Donnison said that he knew of the agreement between IAP and Maesbury but he understood that no properties had been sold as contemplated by that agreement so that the making of new arrangements between IAP and Leadenhall would not have involved a transfer of a business which already existed in the UK. Mr Donnison said that he would have been very uncomfortable if the commission had been split 90/10 because he did not think that would be a realistic split. Mr Donnison said that the negotiation as to the percentage split was between Mrs Gifford and to some extent himself on behalf of IAP and Mr Rosser and the known views of Mr Moore on behalf of Leadenhall.

[149] In his witness statement, Mr Berman said that he remembered the discussion at the meeting on 6 November 2003 about the level of fees payable to Leadenhall. He said that Mr Rosser and Mr Donnison had had 'a vigorous discussion' about the level of the fee. Mr Berman did not give any detail of how the discussion went. He stated that Mr Donnison was confident that a 50/50 split was appropriate. Mr Berman remembered that it was thought to be appropriate that the fee was justifiable as an arm's-length price. When cross-examined, Mr Berman said that there had been 'a proper discussion' and the figures as to the split of commission went backwards and forwards. When asked about the figures of 30, 40 and 50 referred to in his note, he was not able to recollect who had proposed which figures to whom.

[150] It was put to Mr Berman that the discussions at the meeting on 6 November 2003 should have alerted him to certain persons having a conflict of interest in relation to IAP and Leadenhall. Mr Berman's evidence, which I accept, was that the suggestion of a conflict of interest did not occur to him and he did not raise any problem of that kind at the meeting. At that time, he did not have any doubts about the legality of what was proposed and which he later went on to provide in an agreement which he drafted.

[151] My findings about the meeting on 6 November 2003 are as follows:

(1) there was a clear intention that IAP would enter into an agreement with Leadenhall;

(2) there was a clear intention that IAP would pay part of its 20% commission to Leadenhall;

(3) the benefit to IAP of paying part of its commission to Leadenhall was

a  that IAP's taxable profit from the various transactions would be reduced;

(4) the benefit to the shareholders in Leadenhall would be that the commission received by Leadenhall would not be taxed in the UK;

(5) as regards Mr Moore, Mr Rosser and Ms Forth, they preferred to derive their benefits from the transaction from the untaxed profits of Leadenhall rather than from the taxed profits of IAP;

b  (6) before the meeting, Mr Moore had expressed the view that Leadenhall should receive 90% of IAP's commission; this fact was known to those present at the meeting;

(7) at the meeting, it was agreed that Leadenhall should receive 50% of IAP's commission;

c  (8) it is not possible to know whether anyone at the meeting pressed for Leadenhall to receive 90% of IAP's commission; it is likely that Mr Rosser argued for Leadenhall to receive more than 50% of IAP's commission; Mr Rosser's wish was to get as high a percentage as reasonably possible for Leadenhall;

d  (9) it is possible that Mrs Gifford contributed to the meeting by saying that a net receipt of 10% commission by IAP would be a good outcome for IAP and it is possible that she referred to the arrangements which applied in Spain as support for this view; Mrs Gifford's wish was for IAP to receive a worthwhile level of commission and 10% was worthwhile for IAP;

(10) the split of commission was discussed in some detail as the figures, 30, 40 and 50 in the note indicate;

e  (11) Mr Berman did not express any view about the split of commission;

(12) it is likely that Mr Donnison expressed the view that the split of commission should appear to be at arm's-length so that it could be justified to HMRC if the need arose;

(13) although Mr Donnison could not himself evaluate the services to be provided by Leadenhall to IAP, he favoured a 50/50 split as something that could potentially be justified as an arm's-length split;

f  (14) those present at the meeting took Mr Donnison's advice that a 50/50 split could be presented as an arm's-length agreement but a split which was more generous to Leadenhall might be more difficult to justify.

[152] Following the meeting of 6 November 2003, Mr Berman drafted an agreement to be entered into by IAP and Leadenhall. On 10 November 2003, he sent his draft agreement to Mrs Gifford, Mr Rosser and Mr Donnison. In his covering email, he provided a short summary of the terms of the draft agreement. The draft provided for the agreement to take effect on 1 October 2003. Mr Berman explained that the intention was for the agreement to apply from the beginning of the operation of the existing arrangements which IAP had made and he had in mind the agreement between IAP and Maesbury amongst others. Mr Berman had taken the initiative when drafting to modify some of the proposals made at the meeting of 6 November 2003. He did so on the basis that he was drafting for both parties to the proposed agreement and he adopted wording which he considered more appropriate or fairer. One example of this is where he provided for the appointment of Leadenhall to be an exclusive one rather than a non-exclusive one as had been proposed at the meeting.

[153] On 17 November 2003 there was a meeting called a 'Management Meeting' of ITS and/or IAP. This meeting was attended by Mr and Mrs Moore, Mr Rosser and Mrs Gifford and nine employees of ITS and/or

IAP. Mr Moore appears to have chaired the meeting and appears to have *a* given a number of directions to those present. Mrs Gifford gave 'an overview of the company'. Mrs Moore presented the position in relation to a number of topics. Mr Rosser also gave a number of directions to those present.

[**154**] On 18 November 2003 Mr Donnison emailed Mrs Gifford in relation to a contract to be entered into by ITS and Prism and stated that *b* there were 'transfer pricing issues' as the two parties to the contract were related. This shows that at this point at any rate Mr Donnison was aware of the need to demonstrate that the commercial terms as to price in a contract between related parties were at arm's-length.

[**155**] On 19 November 2003 Mr Berman's secretary at Mishcon de Reya, a Ms Elliott, sent to him a draft of an email to be sent to Mrs Gifford. The *c* email referred to the draft of the agreement between IAP and Leadenhall and added the comment: '(Section 320 Shareholders resolution of Instant Access required)'. The reference to s 320 was to s 320 of the Companies Act 1985 which prohibited substantial property transactions involving directors unless the arrangement was first approved by a resolution of the *d* company in general meeting. The suggested need for a resolution of shareholders was not pursued and Mr Berman suggested in his evidence that there was no need for such a resolution but he could not recall his thinking at the time.

[**156**] On 21 November 2003 Mrs Gifford emailed Mr Moore and Mr Rosser and said that the contract with Leadenhall had been signed *e* (presumably by her on behalf of IAP). She added 'paper trail will start asap (waiting to do some letterheads)'. I have already referred to the suggestion that the 'paper trail' here referred to was to the documents which Mrs Gifford subsequently created and back-dated to suggest the involvement of Leadenhall some months before November 2003. *f* Mr Moore replied to this email but he dealt with a different subject namely his views about the size of the wage bill of ITS and/or IAP.

[**157**] The agreement between IAP and Leadenhall was executed on behalf of Candolle as a director of Leadenhall and was dated 26 November 2003.

[**158**] On 15 December 2003 there was a management meeting of ITS and/or IAP. The meeting was attended by Mr Rosser, Mrs Moore and *g* Mrs Gifford. The minutes of the meeting record interventions by Mr Rosser on a number of points. Mr Rosser also made a presentation on a number of topics. Mrs Gifford also dealt with a number of specific topics.

[**159**] On 5 January 2004 the Pearson Foundation, the Montpelier Foundation and the Derwent Foundation became the registered shareholders in Leadenhall. The percentages in which they held their shares *h* were 72.5%, 20% and 7.5% respectively.

[**160**] On 9 January 2004 Mr Gandy (of JDLLP) wrote to Mr Rosser at 'Inside Track' with his letter being copied to Mrs Gifford. The letter contained five pages and was a very detailed account of the tax rules in relation to transfer pricing. The basic point being made in the letter was that prices agreed between connected companies might in certain *i* circumstances be subject to scrutiny by HMRC to ensure that the prices were arm's-length prices and, if they were not, the companies in question would be taxed on the basis that an arm's-length price had been paid. Mr Gandy stated that in the absence of evidence as to the prices charged by

a the relevant company to an unconnected party, it would be necessary to do work to support and justify the prices charged between the connected companies. Mr Gandy did not refer to any particular companies or to any particular transactions. The evidence did not make clear what was the catalyst which had led to his letter being sent. It is therefore not clear that Mr Gandy had in mind the arrangements between IAP and Leadenhall

b when he wrote the letter although it is possible that he did. Mr Gandy had suggested in his letter that the matter might be discussed at a meeting but it does not appear that any such meeting took place. Mr Rosser does not appear to have done anything in response to the letter nor even given the matter much thought at that time. There is no evidence that Mrs Gifford gave any thought to the letter or did anything in response to it.

c    [161] By late February 2004 or early March 2004 IAP/Leadenhall were considering a rearrangement of the agreements which had been made in October and November 2003 between Maesbury, IAP and Leadenhall. This appears from statements made in draft instructions to counsel which were dated 11 March 2004. The proposal was that the earlier agreements should

d be replaced by an agreement between Maesbury and Leadenhall and then an agreement between Leadenhall and IAP. Under the new arrangements, Leadenhall would be paid 20% commission by Maesbury and Leadenhall would share that commission 50/50 with IAP. The instructions to counsel did not seek advice on the appropriateness of making these new arrangements but on the different question of the possible obligation on IAP

e to disclose to its members, who might agree to buy a property from Maesbury (or another developer), the fact that Maesbury (or another developer) was paying commission in connection with that sale. Mr Chitham of Mishcon de Reya appears to have taken advice from junior counsel on some aspect of the matter but I was not given evidence as to the advice received. Mr Berman and Mr Chitham then wished to have further

f advice from Mr Ian Hunter QC and he was duly instructed and gave advice in consultation on 15 March 2004 and later in a written advice dated 18 March 2004.

    [162] I was not given any real evidence as to who suggested that there be a rearrangement of the agreements nor as to why it was thought to be desirable in March 2004. The initiative does not seem to have come from

g Mr Moore, or Mr Rosser or Mrs Gifford. It might have come from Mr Donnison. The reason might have been that the new agreements were a better reflection of how the previous arrangements were being operated in practice. It is conceivable that it was thought that the new agreements would help IAP to argue that it did not have to disclose that the developer

h was paying commission on the sales to IAP's members. It is even possible that it was thought to be helpful in connection with transfer pricing considerations that IAP was not paying a sum to Leadenhall but was receiving a sum from Leadenhall. It was submitted at the trial that the new arrangements were more favourable in various respects to IAP than the previous arrangements but there was no sign of that possibility being

i considered by IAP at that time.

    [163] On 26 March 2004 Maesbury, IAP and Leadenhall entered into the agreements which resulted in a rearrangement of the relationship between them. I have referred to the terms of these agreements earlier in this judgment. Under the new agreements, the marketing contract with

Maesbury was made by Leadenhall and not IAP. Leadenhall was to receive *a*
commission of 20% from Maesbury. Leadenhall then contracted with IAP
on terms that IAP would receive 50% of the commission received by
Leadenhall. The effective date for the operation of the agreement between
Leadenhall and IAP was 1 October 2003 and that had been the effective
date for the operation of the earlier agreement (dated 26 November 2003)
between those parties. *b*

[164] The Termination Agreement dated 26 March 2004 between IAP,
Leadenhall and Maesbury recited that prior to Maesbury and IAP entering
into their earlier agreement of 24 October 2003, IAP had appointed
Leadenhall as its sub-agent and in view of that fact the parties now wished
to have an agreement under which Maesbury appointed Leadenhall as its *c*
agent. Those recitals were not correct. Mr Berman was not able to explain
how it was that the recitals were incorrect. I consider that it is at least
possible that the draftsman of the Termination Agreement took the
opportunity to rewrite history in an attempt to emphasise that the
relationship with Maesbury had been with Leadenhall rather than with IAP.
These recitals tend to support the idea that the agreements were rearranged *d*
in March 2004 to assist IAP in some way with any arguments it might have
with HMRC on the arm's-length nature of the split of commission with
Leadenhall.

[165] On or about 9 August 2004 Mr Moore, Mr Rosser, Mr Oxley and
Mr du Preez or, more accurately, companies controlled by them or with
which they were connected, entered into a partnership agreement for Lake *e*
Austin, a Florida limited partnership. Mr Moore through his interests in a
company and a foundation had a 34% share in this partnership. Mr Rosser
through a company and a foundation had a 15.5% share in the partnership.
Mr Oxley had a 42.5% share and Mr du Preez had a 7% share. The
remaining 1% share was held by the general partner, GFD Inc, the shares in
which were owned equally by companies controlled by Mr Oxley and *f*
Mr Rosser respectively. The partnership agreement provided that the
general partner had the sole and exclusive authority to manage the affairs of
the partnership.

[166] In the summer of 2004 Mr and Mrs Moore were in the process of
being divorced. Although I do not know all of the details, it appears that
Mrs Moore had an interest in Leadenhall through the Pearson Foundation. *g*
Mr Moore wished to arrange matters so that any further properties which
might be available to be introduced by Maesbury or the Lake Austin
partnership would be introduced to a new company in place of Leadenhall
and so that Mrs Moore would not have an interest in the new company.
Accordingly, Darrencrest was formed in the BVI at that time and, as I *h*
understand it, Mr Moore did, but Mrs Moore did not, have an interest in
the Delenas Foundation which acquired 62% of the shares in Darrencrest.
Thus if Maesbury and the Lake Austin partnership were thereafter to
contract with Darrencrest in place of Leadenhall, Mrs Moore would not
share in the benefits flowing from those contracts.

[167] As explained earlier, the other shares in Darrencrest were owned by *i*
the Montpelier Foundation, the Derwent Foundation and Riko Real Estate.
They owned, respectively, 27%, 7.5% and 2.5% of the shares in
Darrencrest. Mr Rosser was a potential beneficiary in relation to the
Montpelier Foundation and Ms Forth was a potential beneficiary in relation

*a*  to the Derwent Foundation. Mr Donnison (through JDS) had a 60% interest in Riko Real Estate and, but only from a later date (in 2005), Mrs Gifford (through Falcor BC Ltd) had a 40% interest in Riko Real Estate.

[**168**] On or about 7 October 2004 Darrencrest entered into an agreement with Maesbury in essentially the same terms as the agreement between
*b*  Leadenhall and Maesbury. On 7 October 2004 Mr Donnison wrote to Mr Sierro of JDS (on behalf of Darrencrest) stating that the agreement would cover the ongoing marketing of the development at Lake Austin (also called Grand Palisades).

[**169**] On 7 October 2004 Darrencrest entered into an agreement with IAP in essentially the same terms as the agreement of 26 March 2004
*c*  between Leadenhall and IAP.

[**170**] On 17 November 2004 Mr Donnison made a note of a meeting he had had with Mrs Gifford and Mr Rosser. His note records that Mr Rosser had stated that each of the directors, meaning Mrs Gifford and Lumley, or possibly Mr Donnison, would receive 1% of Mr Rosser's share of the net
*d*  proceeds of sale of the companies, presumably that was ITS and IAP.

[**171**] On 10 December 2004 Mr Rosser attended a meeting with Mr Berman and Mr Donnison. The purpose of the meeting appeared to be to discuss various matters which needed attention in connection with a proposal to sell the shares in ITS and IAP. Mr Rosser asked for a full review of the documents which had been entered into so that properly executed
*e*  documents would be available as part of a due diligence exercise in connection with the sale. Mr Berman was also asked to review the minute books of the companies. Mr Berman stated that he wanted the shareholders of ITS and IAP, and in particular a Mr Dawson representing the trustees of the various Isle of Man trusts, to be aware of the arrangements with Leadenhall and Darrencrest and he wished there to be disclosure to the
*f*  shareholders and ratification by the shareholders of all issues involving related parties.

[**172**] On 2 March 2005 Mr Berman prepared a note to be used by Mr Rosser at an intended meeting with Mr Dawson who was acting for the trustees of the various Isle of Man trusts. The most relevant part of the note stated:
*g*
> 'Why ratify? Given that the various businesses with which we are involved are not all in one group, according to Jonathan, there is a prospect that following a sale, the new directors of any company could try and make a case to attack the previous board in relation to conflicts of interest and to attack me, Alex and Jim, by claiming that we were
*h*  > shadow directors and saying that we, through the trusts, make secret profits. Whilst we do not believe that any of the companies would have a claim against any of the directors for past acts (for example the Board of Inside Track attacking its directors for allowing business to be conducted through Instant Access or the Board of Instant access attacking the directors for permitting business to be conducted through
*i*  > Fuel), or against Jim, me or Alex, the one way to avoid any prospect is to officially disclose everything and to get the shareholders to ratify everything that has gone on. This will protect the directors, Jim, Alex and myself and through us the trusts etc. I do not want to have the

prospect of anyone claiming that I made a secret profit as a shadow *a*
director when it is crystal clear to everyone involved what I have and
where. Jonathan tells me that technical breaches can be used by Courts
to force directors to pay profits over, i.e. the assets of Mhoram (*sic*) etc.
There is no way that anyone involved would want to voluntarily put
themselves into a position whereby they would hand over control of the
company to somebody who could get it into their minds that they could *b*
recover some of the sale price by claiming that Jim I and Alex were
directors, that we did not declare our interests fully and that we made
secret profits in which case the monies would have to be repaid. It
would be irresponsible not to deal with this issue however unlikely it
would be to occur. Given the prospect, it is best to avoid the problem by
blessing everything that has happened.' *c*

[173] There then followed a long process of drafting, amending and
approving a number of documents intended to be used for obtaining the
ratification proposed in the note of 2 March 2005. I will refer to the
documents which emerged from this process when I consider the question
of ratification later in this judgment. *d*

[174] On 4 April 2005 Darrencrest and Lake Austin entered into an
agreement whereby Darrencrest was appointed as the exclusive worldwide
marketing agent for the units at Grand Palisades, Florida. The agreed rate
of commission payable to Darrencrest was 10%.

[175] At the end of 2004 ITS and IAP (or their shareholders) had *e*
embarked on a process designed to lead to the sale of those shares. This was
a major exercise which took place in two phases and the first phase of the
process lasted until around January 2006. ITS and IAP retained a number
of advisers to assist them with the sales process and, in particular, in around
April 2005, they engaged Deloitte & Touche LLP ('Deloittes') to prepare a
detailed report as a Due Diligence Report which would be made available *f*
by the vendor of the shares to a potential purchaser.

[176] It appears to be the case that it was around this time that
Mrs Gifford began creating letters and attendance notes, which she dated
2003 and 2004, in an attempt to rewrite the history of what had occurred
in relation to the arrangements which IAP had made with Leadenhall and
Darrencrest. *g*

[177] On 10 May 2005 Deloittes prepared a draft Vendor Due Diligence
Report. This draft report referred to the businesses of ITS and IAP and also
referred to Leadenhall and Darrencrest. On page 31 of the draft report
Deloittes stated that they had not been able to obtain details of the
ownership of Leadenhall and Darrencrest but that they had been advised by
the management of ITS/IAP that these companies were not connected to *h*
ITS/IAP. On page 123 of the draft report Deloittes discussed the rules as to
transfer pricing whereby in certain circumstances prices agreed between
related companies, if those prices are not at arm's-length, are replaced by
arm's-length prices for the purposes of taxation. Deloittes noted that if the
same parties controlled IAP and Leadenhall, the arrangements between
those companies could fall within the transfer pricing rules. On page 124 a *i*
similar comment was made in relation to the arrangements between IAP
and Darrencrest.

[178] On 13 May 2005 Deloittes sent to ITS/IAP a revised section of their
draft report dealing with transfer pricing (amongst other things). In relation

a  to the arrangements which IAP had made with Leadenhall, Deloittes stated that it was difficult to identify the exact nature of the relationship between those companies and it was difficult to conclude whether the remuneration received was appropriate for tax purposes.

[179] The Deloittes' draft report was followed by a number of communications between ITS/IAP and Deloittes. On 8 July 2005 Deloittes
b  prepared a revised draft of their report. This draft stated that the management of ITS/IAP had stated that Leadenhall and Darrencrest were not connected parties to ITS/IAP but given the potential legal and commercial implications of the arrangements, a legal review of the contracts should be carried out. That did not occur and the first phase of the sales process came to an end in January 2006.
c
[180] On 5 September 2005 IAP, Darrencrest and Lake Austin entered into an agreement whereby Lake Austin appointed Darrencrest as its exclusive agent in relation to the sale of units in Grand Palisades and Darrencrest appointed IAP as its exclusive sub-agent in relation to the sale of those units.

d  [181] On 1 March 2006 HMRC opened an enquiry into IAP's tax return for the year to 30 April 2004. On 4 August 2006 HMRC asked JDLLP for a copy of the contract of 26 November 2003 (between IAP and Leadenhall). On 25 September 2006 HMRC wrote to JDLLP stating that their remaining concern related to the arrangements between IAP and Leadenhall and stating that the majority control of Leadenhall was the same as that of IAP.
e  HMRC made a number of points in relation to that connection and one of the points questioned the 50/50 split of commission between the two companies. On 1 November 2006 Mr Gandy of JDLLP wrote to HMRC giving an account of the circumstances in which IAP had entered into arrangements with Leadenhall.

[182] In 2006 ITS/IAP began a second phase of their sales process.
f  ITS/IAP re-engaged Deloittes to assist them and also instructed Ernst & Young. It appears that when ITS/IAP instructed Ernst & Young as to their forecast sales figures they included revenues to be earned by Leadenhall and Darrencrest. Deloittes became aware of these forecasts and by email of 28 November 2006 Deloittes asked ITS/IAP for their explanation. On 30 November 2006, at a meeting between representatives of Deloittes and
g  representatives of ITS/IAP, Deloittes reported that they had been told by Ernst & Young that ITS/IAP said that the arrangements with Leadenhall and Darrencrest were 'only tax schemes'.

[183] On 4 December 2006 representatives of Deloittes met Mr Rosser, Mrs Gifford, Mr Donnison and Mr Berman and one other. Deloittes
h  expressed their unease at the various bits of information that they had been given about Leadenhall and Darrencrest. Deloittes had in mind in this respect their draft report of 8 July 2005, JDLLP's letter to HMRC of 1 November 2006 and the recent proposal to include the revenues of Leadenhall and Darrencrest in the forecasts for ITS/IAP. Deloittes then resigned from their appointment by ITS/IAP with immediate effect.

i  [184] On 5 December 2006 Mr Rosser met Ms McKinnon of Deloittes but Deloittes remained of the view that they ought to resign their appointment. A note prepared by Deloittes recorded that Mr Rosser had

said to Ms McKinnon that Leadenhall and Darrencrest were established *a*
'solely for tax purposes'.

[185] On 9 March 2007 HMRC wrote to IAP stating that the enquiry in
relation to IAP had been taken over by the Special Civil Investigations office
of HMRC and that the enquiries were into the three years ended 30 April
2003, 2004 and 2005. The investigation was to be carried out in
accordance with COP8 which is used where serious fraud is not suspected. *b*
On 1 May 2007 HMRC wrote to JDLLP questioning the 50/50 split of
commission between IAP and Leadenhall.

[186] On 6 July 2007 Mr Donnison emailed Mr Rosser and Mr Berman
to say that IAP had 'finished its negotiations' with Leadenhall and
Darrencrest with a view to agreeing a termination of the agreements
between IAP and Leadenhall and IAP and Darrencrest. Mr Donnison stated *c*
that he expected Leadenhall and Darrencrest to accept this proposal at their
board meetings on 19 July 2007. On 16 July 2007 Mr Kitto sent to
Mr Berman a list of developers by whom Darrencrest had been appointed
as a marketing agent. The list included Maesbury and Lake Austin but also
included five other developers in Florida and two in Cyprus. *d*

[187] On 24 July 2007 HMRC (Special Civil Investigations) notified IAP
that they intended to enquire into IAP's tax return for the year ended
30 April 2006.

[188] On 1 August 2007 IAP entered into agreements with Leadenhall
and with Darrencrest terminating the earlier agreements between them; in
the case of Leadenhall the earlier agreement was dated 26 March 2004 and *e*
in the case of Darrencrest the earlier agreement was dated 7 October 2004.
Also on 1 August 2007 IAP entered into two further agreements; the first of
these was with Leadenhall and Maesbury and the second was with
Darrencrest and Lake Austin. Under these various agreements, Leadenhall
remained entitled to the first $4m received by way of commission from
Maesbury and Darrencrest remained entitled to the first $6.8m by way of *f*
commission received from the developers with which it had previously
made agency agreements; these were the seven developers in Florida and the
two in Cyprus referred to earlier. Darrencrest assigned to IAP the benefits of
its agency agreements with those developers.

[189] On 28 August 2007 IAP entered into a further agreement with
Darrencrest and Lake Austin which provided for IAP to enter into a new *g*
agency agreement with Lake Austin.

[190] On 4 September 2007 JDLLP wrote to HMRC giving an account,
or a purported account of the commercial background to the original
arrangements between IAP and Leadenhall and the reasons for the
commercial terms agreed between those parties. *h*

[191] By 25 October 2007 the sum of $6.8m due to Darrencrest under the
agreements of 1 August 2007 had been paid in full. At some date thereafter,
Darrencrest went into liquidation.

[192] Lumley resigned as a director of IAP on 10 January 2008 and on
18 January 2008 Mr McKay was appointed a director of IAP. Mr McKay
had been appointed chief operating officer of IAP in 2004. *i*

[193] By March 2008 IAP appears to have been in some financial
difficulty as evidenced by an email dated 19 March 2008 from Mr Gandy
to Mr Donnison referring to the company's 'plight' and predicting that

*a*  HMRC would seek to take action sooner rather than later to protect its position.

[**194**] On 12 May 2008 Mr Rosser emailed Mr Donnison referring to the initial arrangements in relation to IAP and Leadenhall in particular. By this time, Mr Rosser had fallen out with Mr Moore. Mr Rosser suggested that the original arrangements involved the understanding that any income
*b*  received by IAP or Leadenhall would be paid out as dividends to the shareholders. Mr Rosser also suggested that Mr Donnison was in control of IAP and that Mr Moore (or perhaps it should have been the trustees of the discretionary trust under which he was a potential beneficiary) as the majority shareholder in IAP was not in a position to take control of IAP.

[**195**] On 19 September 2008 IAP appointed joint administrators
*c*  pursuant to para 22 of Sch B1 to the Insolvency Act 1986. The administrators were Mr Murphy and Mr Toone of Chantrey Vellacott DFK LLP.

[**196**] On 10 October 2008 the joint administrators reported to the creditors of IAP with their proposals in relation to the administration. The
*d*  report stated that the administrators had been informed that in early 2008 the shareholders of IAP had invested almost £4m to support the business by way of loan stock.

[**197**] On 21 December 2008 IAP entered creditors' voluntary liquidation and Mr Murphy and Mr Toone were appointed joint liquidators.

*e*  **THE MATTERS TO BE CONSIDERED**

[**198**] I will consider the issues which now need to be decided under the following headings:

(1) the pleaded case as to breach of the duties of a director;

(2) de facto and shadow directors;

(3) the claimants' case as to de facto and shadow directors;
*f*  (4) were Mr Moore and/or Mr Rosser de facto or shadow directors of IAP?

(5) the duties of a de jure director;

(6) the duties of a de facto director;

(7) the duties of a shadow director;

(8) did Mr Moore and/or Mr Rosser owe fiduciary duties to IAP?
*g*  (9) the allegation of 'no or no adequate consideration';

(10) the allegation of obtaining a benefit from a third party by reason of being a director: the law;

(11) obtaining a benefit from a third party by reason of being a director: the facts;

(12) conflict of interest in transactions with IAP;
*h*  (13) ratification;

(14) negligence;

(15) dishonest assistance;

(16) conspiracy to injure by unlawful means;

(17) s 213 of the Insolvency Act 1986;
*i*  (18) limitation.

**THE PLEADED CASE AS TO BREACH OF THE DUTIES OF
A DIRECTOR**

[**199**] The claimants plead that Mrs Gifford was a de jure director; that is not in dispute. As to the duties which she owed to the company, the

claimants used the wording which is now contained in ss 171 to 177 of the
Companies Act 2006 and added in an allegation of a duty to consider and
act in the interests of the creditors of the company when it was insolvent or
in the vicinity of insolvency or was likely to be rendered insolvent by reason
of the directors' actions. Although the wording of most of the pleaded
duties was taken from the Companies Act 2006, which was not in force at
the time of the relevant events in this case, there was no real argument as to
the extent of the duties owed by Mrs Gifford to the company.

[200] As to Mr Moore and Mr Rosser, it was pleaded that they were de
facto, alternatively shadow directors of the company. Mr Moore did not
participate in these proceedings but this allegation was denied by
Mr Rosser. The claimants then pleaded that Mr Moore and Mr Rosser
owed the same duties as a de jure director. That was denied by Mr Rosser.

[201] As to the alleged breaches of duty, by the end of the trial, it seemed
to me that the claimants wished to argue that Mrs Gifford had committed
one breach of her duties and that Mr Moore and Mr Rosser had committed
the same breach and two other breaches of their duties. In the case of all
three of these defendants, the claimants said that they had broken the duty
to act bona fide in what he or she considered were the best interests of the
company. In particular, the claimants contended that these defendants had
caused IAP to enter into certain agreements for no or no adequate
consideration. The claimants did not allege that all of the agreements made
by IAP in this case were disadvantageous to IAP; for example, it was
accepted that the agreement made with Maesbury in October 2003 was
very profitable for IAP. In relation to certain agreements made by IAP with
Leadenhall and Darrencrest, it was in some cases pleaded that IAP had
entered into an agreement for 'no or no adequate consideration' and it was
sometimes pleaded that commission that was 'due to IAP' was 'diverted' to
Leadenhall or Darrencrest. It was then separately pleaded that the
agreements referred to below were to the detriment of IAP and for no
legitimate purpose and instead for other purposes (presumably illegitimate
purposes) such as evading tax, concealing ownership and 'personally
profiting Mr Moore and Mr Rosser as the ultimate beneficial owners of
[Leadenhall] and [Darrencrest] to which IAP's revenue was diverted'. The
specific agreements which were the subject of these allegations were:
  (1) the agreement dated 26 November 2003 between IAP and Leadenhall;
  (2) the agreements dated 26 March 2004 involving IAP and Leadenhall;
  (3) the agreement dated 7 October 2004 between IAP and Darrencrest;
  (4) the agreement dated 4 April 2005 between Darrencrest and Lake
Austin;
  (5) the agreement dated 1 August 2007 between IAP and Leadenhall; and
  (6) the agreement dated 28 August 2007 between Darrencrest, Lake
Austin and IAP.

[202] It is accepted that the claimants have adequately pleaded a case of
breach of duty by these three defendants in the respects described above.

[203] As to Mr Moore and Mr Rosser (but not Mrs Gifford), by the end
of the trial the claimants wished to allege two further breaches of duty by
them. In this respect, the duties which it was alleged they owed to IAP were
the duty of a director not to obtain a benefit from a third party by reason of
his position as a director of the company and the duty of a director to avoid
a conflict of interest. The claimants' case in closing submissions appeared to

a    be that each of Mr Moore and Mr Rosser had obtained benefits for himself (through Leadenhall and through Darrencrest) as a result of being a director of IAP and that the relevant agreements involved a conflict of interest. The claimants also wished to argue that even if these two breaches of duty had not caused loss to IAP, IAP was nonetheless entitled to require Mr Moore and Mr Rosser to account for the profits which they had made as a result of their alleged breaches of duty.

b

    [204] The defendants contended that the two breaches of duty referred to in the last paragraph had not been pleaded and, further, that the claimants had not pleaded a claim for an account of profits resulting from a breach of duty. I will take separately the two alleged breaches of duty.

c    [205] As to the allegation of a breach of the duty not to obtain a benefit from a third party by reason of his position as a director of the company, it is clear that the claimants pleaded that Mr Moore and Mr Rosser owed such a duty to IAP. It was then pleaded that they had acted in breach of 'the above duties' which phrase included this specific duty. It is also correct that the claimants pleaded that Mr Moore and Mr Rosser had benefitted from the matters complained of; para 102.6(iv) of the pleading alleged that Mr Moore and Mr Rosser had personally profited as the ultimate beneficial owners of Leadenhall and Darrencrest to which 'IAP's revenue was diverted'. It could be said that the pleading should have done more to explain how it was to be alleged that Mr Moore and Mr Rosser had benefitted 'by reason of his position as a director of IAP'. However, the pleading does say that Mr Moore and Mr Rosser caused or permitted IAP to enter into certain agreements. It is far from obvious from the pleading that the claimants were intending to develop an allegation of a breach of this kind and I would have expected a more specific and clearer pleading if that had been their intention. If the claimants had intended to put forward this allegation that fact is rather disguised as it is somewhat swamped by a large number of allegations (to which I refer below) which pleaded a number of illegitimate purposes behind the relevant transactions and which allegations were not pursued at the end of the trial. However, after some hesitation, I consider that the pleading is just sufficient to put forward an allegation of the relevant breach.

d

e

f

g    [206] As to the allegation that Mr Moore and Mr Rosser were in breach of the duty of a director to avoid a conflict of interest, the pleading does allege that Mr Moore and Mr Rosser owed a duty to IAP to avoid a situation of conflict of interest. It was then pleaded that they had broken 'the above duties' including therefore this duty. Then it is pleaded that they personally profited from the transactions. The words 'conflict of interest' are not repeated in the particulars of breach and an allegation of a breach in this respect is again entirely swamped by the other allegations of illegitimate purposes. Nonetheless, it can be said that a director who personally profits from a transaction with the company is inevitably in a position of a conflict of interest and duty and the fact of personal profit was expressly pleaded. In this case, with even more hesitation than in the former case, I consider that the pleading just crosses the line in order to do enough to put forward an allegation of the relevant breach. The defendants also submitted that the relevant duty on a director was to disclose the conflict of interest and it had not been pleaded that Mr Moore and Mr Rosser had failed to do so. I consider that the true position is that it is open to the claimants to allege

h

i

that Mr Moore and Mr Rosser benefitted in a situation of conflict but it is    *a*
open to Mr Moore and Mr Rosser to defend that claim by showing that
they disclosed the conflict to the board or to the shareholders and that such
disclosure avoided a breach of duty.

[207] The defendants then argued that the claimants had not sought in
their pleading the remedy of an account of profits made by Mr Moore or
Mr Rosser from the alleged breach of duty. The defendants submitted that    *b*
the claim had been for 'equitable compensation' which meant compensation
for loss resulting from the breach of duty and did not extend to an account
of profits where IAP had suffered no loss. The claimants pointed to the fact
that the prayer for relief referred to 'equitable compensation for breach of
fiduciary duty, alternatively damages for breach of duty' and also claimed
further or other relief 'including all necessary accounts and enquiries to    *c*
determine the amount of compensation or damages payable to IAP'.

[208] I am inclined to agree that the main thrust of the prayer for relief
was to claim compensation for loss caused by the alleged breaches of
fiduciary duty. However, the words 'equitable compensation' are sometimes
used to refer to an account of profits resulting from a breach of fiduciary    *d*
duty. In *FHR European Ventures LLP v Mankarious* (*No 2*) [2014] UKSC
45, [2014] 2 BCLC 145, [2015] AC 250 (at [7]), Lord Neuberger PSC
referred to a case of principal and agent where the agent had received a
bribe or secret commission and where the principal was entitled to an
account of the profit made by the agent. He then stated that the principal's
right to seek an account gave him a right to 'equitable compensation' in    *e*
respect of the bribe or secret commission which was the quantum of the
bribe or secret commission (subject to any permissible deduction for
expenses incurred by the agent). In *AIB Group* (*UK*) *plc v Redler* [2014]
UKSC 58, [2015] 1 All ER 747 at [120], [2015] AC 1503 Lord Reed JSC
discussed the right to equitable compensation, by which he meant the right
to compensation for loss caused by a breach of duty in equity and he    *f*
explained that in *Mankarious* the description of a right to payment of the
sum found due on an account of profits as 'equitable compensation' was the
use of the phrase in a different sense. In *Interactive Technology Corp Ltd v
Ferster* [2017 ] EWHC 217 (Ch), [2017] All ER (D) 195 (Feb) I had to
construe the words 'equitable compensation' in an order of the court and I
held that I should construe those words in the light of certain background    *g*
matters which were said to be relevant. So construed, on the specific facts of
that case, I held that the words meant compensation for loss resulting from
a breach of duty. In the light of the way in which the words 'equitable
compensation' were used in the *Mankarious* case, I think it would be too
strict to rule out the possibility that it is open to the claimants to claim an    *h*
account of profits made by Mr Moore or Mr Rosser as a result of the
alleged breaches of duty.

[209] Before reaching a final conclusion on these pleading points, I will
refer briefly to those parts of the pleaded case which tended to swamp the
allegations which the claimants wished to rely upon at the end of the trial.
The claimants' pleaded case asserted breaches of duty in that IAP was    *i*
permitted to continue with the above arrangements with Leadenhall and
Darrencrest after receipt of the Deloittes' report of 13 May 2005. This plea
appeared to depend upon it being shown that the arrangements in question
fell within 'the transfer pricing provisions' which provisions were later

a identified as Sch 28AA to the Income and Corporation Taxes Act 1988. This plea was coupled with the further plea that these three defendants were in breach of duty by failing to apply the transfer pricing provisions and to self-assess the tax due from IAP resulting in the underpayment of tax to HMRC. Although the operation of the transfer pricing provisions in this case was a highly contentious issue at the beginning of the trial, this
b particular allegation of breach was not pursued in the claimants' closing submissions.

[210] The next allegation of breach of the duties of a director related to the payment of dividends and, perhaps, a related allegation that the diversion to Leadenhall and Darrencrest of sums allegedly due to IAP amounted to an unlawful distribution to the shareholders of IAP. Again, at
c the end of the trial it did not appear to me that the claimants were pursuing that way of putting their case as an addition to their other allegations of breach of duty. In particular, as regards the allegation of the unlawful payment of dividends by IAP, the claimants did not call the evidence which would be needed to determine whether they had established their pleaded
d case in that respect.

[211] The final allegation of breach of the duties of a director was that it was said that Mrs Gifford, Mr Moore and Mr Rosser had attempted to conceal the true position from Deloittes and from HMRC and had created a number of false documents. As to that allegation, it was accepted by the claimants that even if they established that these defendants had made false
e statements, it was not being said that the making of such statements had given the claimants any separate cause of action against these defendants. Instead, the allegedly false statements were said to be part of the circumstances in which the other alleged breaches had been committed and, further, the allegedly false statements showed that these defendants had acted dishonestly in connection with the arrangements in question.

f [212] I have certainly hesitated before reaching my conclusions as to the case pleaded by the claimants. I have considerable sympathy for the position in which the defendants were placed at the end of the trial having to face allegations of breach of duty which had not been given any real prominence earlier in the case and finding that substantial and serious allegations of wrongdoing which had been made against them were simply
g no longer being pursued. Nonetheless, I have decided that it would not be right to shut the claimants out from alleging the two further breaches of duty against Mr Moore and Mr Rosser to which I have referred.

## DE FACTO AND SHADOW DIRECTORS

h [213] Mr Phillips submitted that Mr Moore and Mr Rosser were de facto or shadow directors of IAP at the times which are material in this case. Counsel for the various defendants submitted that Mr Moore and Mr Rosser were neither de facto nor shadow directors at any material time. Mr Phillips submitted that a de facto director owes to the company the same fiduciary duties as a de jure director. The defendants seemed to accept
i that that was so. Mr Phillips further submitted that a shadow director also owes to the company the same fiduciary duties as a de jure director. The defendants submitted that that was not so and that in a particular case a shadow director might owe no fiduciary duties to the company. The parties also appeared to agree that a de facto director could seek relief, under s 727

[2020] 1 BCLC 256

of the Companies Act 1985 (now s 1157 of the Companies Act 2006), from *a*
liability for a breach of fiduciary duty if he had acted honestly and
reasonably but that a shadow director could not seek such relief.

[**214**] At this point, I will refer to certain statutory provisions. This case is
governed by the Companies Act 1985 and not by the Companies Act 2006
but it is nonetheless worthwhile considering how de facto and shadow
directors are treated under both these Acts. Both the 1985 Act and the 2006 *b*
Act defined 'director' and 'shadow director' for the purposes of those Acts.
In s 741(1) of the 1985 Act (s 250 of the 2006 Act), 'director' was defined
to include 'any person occupying the position of a director, by whatever
name called'. This was generally taken to mean that a de facto director was
a 'director' of the company and, in the case of the 2006 Act, was a director *c*
for the purposes of the codification of a director's duties in ss 171 to 177 of
that Act. 'Shadow director' was defined by s 741(2) of the 1985 Act (s 251
of the 2006 Act) to mean 'a person in accordance with whose directions or
instructions the directors of a company are accustomed to act'. This was
subject to later qualifications relating to persons giving advice in a
professional capacity and, for certain purposes, qualifications relating to *d*
persons who are bodies corporate: see s 741(2) and (3) of the 1985 Act and
s 251(2) and (3) of the 2006 Act. Section 251 of the 2006 Act was later
amended by s 90 of the Small Business, Enterprise and Employment
Act 2015 to introduce further qualifications.

[**215**] In the case of the codification of a director's duties in ss 171 to 177 *e*
of the 2006 Act, s 170(5) originally provided that these duties applied to
shadow directors: 'where, and to the extent that, the corresponding
common law rules or equitable principles so apply'. Section 170(5) has
since been amended by s 89(1) of the Small Business, Enterprise and
Employment Act 2015 so that it now provides: 'The general duties apply to
a shadow director of a company where and to the extent that they are *f*
capable of so applying.' Section 89(2) of the 2015 Act gave to the Secretary
of State power to make regulations making provision for the application of
the general duties of directors to shadow directors. Section 89(3) of the
2015 Act provided that the regulations could, in particular, make provision:
(a) for prescribed general duties of directors to apply to shadow directors
with such adaptations as may be prescribed; and (b) for prescribed general *g*
duties of directors not to apply to shadow directors.

[**216**] In the present case, I am asked to determine whether Mr Moore
and/or Mr Rosser were de facto directors or were shadow directors. If they
were de facto directors, it is agreed that they owed the same duties to the
company as would a de jure director. If they were shadow directors, there is
a separate question as to whether they owed fiduciary duties to the
company and, if so, which duties. If I am asked to apply a provision of the *h*
Companies Act 1985 which expressly deals with the position of a shadow
director, then (for that purpose) I plainly need to decide whether Mr Moore
or Mr Rosser were shadow directors. However, if I am asked to decide
whether Mr Moore or Mr Rosser owed fiduciary duties to the company, it
might be said that I should proceed to a discussion of that question without *i*
deciding whether to put the label of shadow director on them. However, as
the parties addressed in detail the question whether Mr Moore or
Mr Rosser were shadow directors I will do so also.

[**217**] As will be seen, the question whether a person is a de facto director

*a*  or a shadow director depends upon the specific facts of each case. There does not appear to be a clear legal test to help one decide whether a person is or is not a de facto or a shadow director. For the purpose of deciding that question, it is necessary to focus on what the person actually did in relation to the company. Whilst in earlier cases, there were said to be clear distinctions between a de facto director and a shadow director, those

*b*  distinctions have since been blurred and it is now possible to be simultaneously a de facto director and a shadow director.

[**218**] The parties cited a large number of cases as to the test for determining whether a person is a de facto or a shadow director. The cases before 2010 were fully reviewed by the Supreme Court in *Re Paycheck*

*c*  *Services 3 Ltd, Revenue and Customs Comrs v Holland* [2010] UKSC 51, [2011] 1 BCLC 141, [2010] 1 WLR 2793. The issue in that case was whether a director of a corporate director of the relevant company was a de facto director of that company. The Supreme Court, by a majority of 3 to 2, held that he was not. The judges who formed the majority were Lords Hope, Collins and Saville JJSC.

*d*  [**219**] Lord Hope (at [26]–[37]) reviewed the earlier authorities. He approved propositions in earlier cases to the effect that:

(1) if it is unclear whether the acts of the person in question are referable to an assumed capacity or to some other capacity such as shareholder or consultant the person in question must be entitled to the benefit of the doubt;

*e*  (2) it is difficult to postulate one decisive test;

(3) in considering whether a person 'assumes to act as a director' what is important is not what he calls himself but what he did;

(4) circumstances vary widely from case to case, the issue is one of fact and all relevant factors must be taken into account.

*f*  [**220**] Lord Collins (at [58]–[93]) also reviewed the earlier cases. He made the following comments, in particular:

(1) it was now impossible to maintain the distinction between a de facto director and a shadow director;

(2) the court had a very difficult problem of identifying what functions were in essence the sole responsibility of a director or board of directors;

*g*  (3) the most relevant tests for identifying what functions were the responsibility of a director were:

(a) whether the individual was the sole person directing the affairs of a company (or acting with others equally lacking in a valid appointment);

*h*  (b) if there were true directors, whether the individual was acting on an equal footing with them in directing the affairs of the company;

(c) whether there was a holding out by the company of the individual as a director and whether the individual used that title;

(d) whether the individual was part of 'the corporate governing structure' of the company, which phrase refers to the system by which companies are directed and controlled.

*i*  [**221**] On the question as to whether the relevant person owed the fiduciary duties of a director, Lord Collins said at [93]:

'[93] It does not follow that "de facto director" must be given the same meaning in all of the different contexts in which a "director" may

[2020] 1 BCLC 256

be liable. It seems to me that in the present context of the fiduciary duty *a*
of a director not to dispose wrongfully of the company's assets, the
crucial question is whether the person assumed the duties of a director.
Both Sir Nicolas Browne-Wilkinson V-C in *Re Lo-Line Electric
Motors Ltd* [1988] BCLC 698 at 707, [1988] Ch 477 at 490 and
Millett J in *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 at 183
referred to the assumption of office as a mark of a de facto director. In *b*
*Fayers Legal Services Ltd v Day* [[2001] Lexis Citation 1363, [2001]
All ER (D) 121 (Apr)], a case relating to breach of fiduciary duty,
Patten J, rejecting a claim that the defendant was a de facto director of
the company and had been in breach of fiduciary duty, said that in
order to make him liable for misfeasance as a de facto director the
person must be part of the corporate governing structure, and the *c*
claimants had to prove that he assumed a role in the company sufficient
to impose on him a fiduciary duty to the company and to make him
responsible for the misuse of its assets. It seems to me that that is the
correct formulation in a case of the present kind. See also *Primlake Ltd
(in liq) v Matthews Associates* [2006] EWHC 1227 (Ch), [2007]
1 BCLC 666 at [284].' *d*

[**222**] At [96], in expressing his conclusion that Mr Holland was not a de
facto director of the relevant company, Lord Collins said:

'[96] There is no material to suggest that Mr Holland was doing
anything other than discharging his duties as the director of the *e*
corporate director of the composite companies. It does not follow from
the fact that he was taking all the relevant decisions that he was part of
the corporate governance of the composite companies or that he
assumed fiduciary duties in respect of them. If he was a de facto
director of the composite companies simply because he was the guiding *f*
mind behind their sole corporate director, then that would be so in the
case of every company with a sole corporate director. The development
of the law of de facto directors from *Re Lo-Line Electric Motors Ltd*
and *Re Hydrodam (Corby) Ltd* onwards was a significant judicial
innovation given that for some 150 years de facto directors meant
individuals who had actually been appointed, or purportedly appointed, *g*
as directors. As has been seen, in two of the three older cases which
dealt with the liability of de facto directors, an analogy was drawn with
executors de son tort: *Gibson v Barton* (1875) LR 10 QB 329 and *Re
Canadian Land Reclaiming and Colonising Co, Coventry and Dixon's
Case* (1880) 14 Ch D 660. That suggests strongly that the basis of
liability was the assumption of responsibility. The legislature has *h*
already intervened in the 2006 Act to ensure that there is a natural
person to whom responsibility is attributed. The purpose of what
became s 155(1) of the 2006 Act 2006, was to ensure that every
company would have at least one individual who could, if necessary, be
held to account for the company's actions: Department of Trade and
Industry, Company Law Reform (Cm 6456, 2005), para 3.3. For the *i*
court to hold that every significant decision of individual directors of a
corporate director is to be regarded as being taken as if they were
directors of the company of which it is the corporate director goes
considerably beyond the law as it has been developed at first instance

a    and by the Court of Appeal in the modern de facto director cases, and
beyond what I would regard as the function of the court. I would not
wish to question the modern judicial development of the de facto
director concept, and I well understand the policy reasons why in such
a case as this a person in the position of Mr Holland should be liable,
although those reasons may not be as powerful as they were prior to the
b    enactment of s 155(1) of the 2006 Act.'

[223] Lord Saville gave a short concurring judgment.
[224] In *Smithton Ltd v Naggar* [2014] EWCA Civ 939, [2015] 2 BCLC
22, [2015] 1 WLR 189 the Court of Appeal considered and applied the
c    majority decision in *Holland*. Arden LJ said (at [75]), that the judgment of
Lord Collins expressed the view of the majority. Her judgment contains the
following passage (at [33]–[45]):

'*Practical points*: *what makes a person a de facto director*?
[33] Lord Collins sensibly held that there was no one definitive test
d    for a de facto director. The question is whether he was part of the
corporate governance system of the company and whether he assumed
the status and function of a director so as to make himself responsible
as if he were a director. However, a number of points arise out of
*Holland* and the previous cases which are of general practical
importance in determining who is a de facto director. I note these points
e    in the following paragraphs.
[34] The concepts of shadow director and de facto [director] are
different but there is some overlap.
[35] A person may be de facto director even if there was no invalid
appointment. The question is whether he has assumed responsibility to
act as a director.
f    [36] To answer that question, the court may have to determine in
what capacity the director was acting (as in *Holland*).
[37] The court will in general also have to determine the corporate
governance structure of the company so as to decide in relation to the
company's business whether the defendant's acts were directorial in
nature.
g    [38] The court is required to look at what the director actually did
and not any job title actually given to him.
[39] A defendant does not avoid liability if he shows that he in good
faith thought he was not acting as a director. The question whether or
not he acted as a director is to be determined objectively and
h    irrespective of the defendant's motivation or belief.
[40] The court must look at the cumulative effect of the activities
relied on. The court should look at all the circumstances "in the round"
(per Jonathan Parker J in *Secretary of State for Trade and Industry v
Jones* [1999] BCC 336).
[41] It is also important to look at the acts in their context. A single
i    act might lead to liability in an exceptional case.
[42] Relevant factors include:
    (i) whether the company considered him to be a director and held
him out as such;
    (ii) whether third parties considered that he was a director.

[43] The fact that a person is consulted about directorial decisions or his approval is sought for such decisions does not in general make him a director because he is not making the decision.

[44] Acts outside the period when he is said to have been a de facto director may throw light on whether he was a de facto director in the relevant period.

[45] In my judgment, the question whether a director is a de facto or shadow director is a question of fact and degree …'

[225] Although both of these cases discussed the position of a shadow director as well as that of a de facto director, it is still helpful to refer to the earlier case of *Secretary of State for Trade and Industry v Deverell* [2000] 2 BCLC 133, [2001] Ch 340 which considered the meaning of 'shadow director' for the purposes of the Company Directors Disqualification Act 1986. That Act defines 'shadow director' in essentially the same way as in the Companies Act 1985 and the Companies Act 2006. In that case, Morritt LJ said (at [35]):

'[35] I propose to express my conclusions on these and other issues in a number of propositions.

(1) The definition of a shadow director is to be construed in the normal way to give effect to the parliamentary intention ascertainable from the mischief to be dealt with and the words used. In particular, as the purpose of the Act is the protection of the public and as the definition is used in other legislative contexts it should not be strictly construed because it also has quasi-penal consequences in the context of the 1986 Act. I agree with the statement to that effect of Browne-Wilkinson V-C in *Re Lo-Line Electric Motors Ltd* [1988] BCLC 698 at 706, [1988] Ch 477 at 489.

(2) The purpose of the legislation is to identify those, other than professional advisers, with real influence in the corporate affairs of the company. But it is not necessary that such influence should be exercised over the whole field of its corporate activities. I agree with the statements to that effect of Finn J in *Australian Securities Commission v AS Nominees Ltd* (1995) 133 ALR 1 at 52–53 and Robert Walker LJ in *Re Kaytech International plc* [1999] 2 BCLC 351 at 424.

(3) Whether any particular communication from the alleged shadow director, whether by words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence. In that connection I do not accept that it is necessary to prove the understanding or expectation of either giver or receiver. In many, if not most, cases it will suffice to prove the communication and its consequence. Evidence of such understanding or expectation may be relevant but it cannot be conclusive. Certainly the label attached by either or both parties then or thereafter cannot be more than a factor in considering whether the communication came within the statutory description of direction or instruction.

(4) Non-professional advice may come within that statutory description. The proviso excepting advice given in a professional capacity appears to assume that advice generally is or may be included.

a    Moreover the concepts of "direction" and "instruction" do not exclude the concept of "advice" for all three share the common feature of "guidance".

(5) It will, no doubt, be sufficient to show that in the face of "directions or instructions" from the alleged shadow director the properly appointed directors or some of them cast themselves in a

b    subservient role or surrendered their respective discretions. But I do not consider that it is necessary to do so in all cases. Such a requirement would be to put a gloss on the statutory requirement that the board are "accustomed to act in accordance with" such directions or instructions. It appears to me that Judge Cooke, in looking for the additional ingredient of a subservient role or the surrender of discretion by the

c    board, imposed a qualification beyond that justified by the statutory language.'

[226] At [36], Morritt LJ made two further observations, the first of which is relevant:

d    'Before leaving this part of the case I would add two observations. The first relates to the use of epithets or descriptions in place of the statutory definition of a shadow director. They may be very effective in graphically conveying the effect of the definition in the light of the facts of that case, as shown by their frequent use in the reported cases to which I have referred. But, it seems to me, they may be misleading when

e    transposed to the facts of other cases. Thus to describe the board as the cat's paw, puppet or dancer to the tune of the shadow director implies a degree of control both of quality and extent over the corporate field in excess of what the statutory definition requires. What is needed is that the board is accustomed to act on the directions or instructions of the

f    shadow director. As I have already indicated such directions and instructions do not have to extend over all or most of the corporate activities of the company; nor is it necessary to demonstrate a degree of compulsion in excess of that implicit in the fact that the board are accustomed to act in accordance with them. Further, in my view, it is not necessary to the recognition of a shadow director that he should

g    lurk in the shadows, though frequently he may. For example, in the case of a person resident abroad who owns all the shares in a company but chooses to operate it through a local board of directors. From time to time the owner, to the knowledge of all to whom it may be of concern, gives directions to the local board what to do but takes no part in the management of the company himself. In my view such an owner may be

h    a shadow director notwithstanding that he takes no steps to hide the part he plays in the affairs of the company. Lurking in the shadows may occur but is not an essential ingredient to the recognition of the shadow director.'

i    [227] I need to consider a number of further points about shadow directors which may be material in this case. A major shareholder can act in a way whereby he becomes a shadow director. However, being a shareholder whose views are relevant and considered influential by the directors does not of itself make a shareholder a shadow director. In this context it is relevant to refer to a passage in *Ultraframe (UK) Ltd v Fielding*

[2005] EWHC 1638 (Ch) at [1264]–[1269] where Lewison J discussed the   *a*
position of a funder or a lender (whether or not also a shareholder). He said
(at [1268]):

> 'A lender is entitled to keep a close eye on what is done with his
> money, and to impose conditions on his support for the company. This
> does not mean he is running the company or is emasculating the powers   *b*
> of the directors, even if (given their situation) the directors feel that they
> have little practical choice but to accede to his requests. Similarly with
> customers who may, because of their buying power, be able effectively
> to dictate conditions to their suppliers (or the other way around). In
> other words a position of influence (even a position of strong influence)
> is not necessarily a fiduciary position. To find otherwise would place a   *c*
> wholly unfair and unnatural burden on men of business. In broad
> terms, I accept this submission.'

Similar comments can be made in relation to an influential shareholder.

   **[228]** Also in *Ultraframe*, Lewison J discussed the part of the definition of   *d*
'shadow director' which refers to 'the directors of the company' being
accustomed to act on the direction or instruction of the alleged shadow
director. The judge said (at [1272]):

> 'There is, no doubt a difficulty, as a pure matter of language, in
> construing the phrase "the directors of the company" as meaning
> "*some* of the directors of the company" or even "*a majority of* the   *e*
> directors of the company". However, the policy underlying the
> definition is that a person who effectively controls the activities of a
> company is to be subject to the same statutory liabilities and disabilities
> as a person who is a de jure director. Since a de jure director is subject
> to those liabilities and disabilities even if he is non-executive, or even
> inactive, it would undermine the policy of the definition if the fact that   *f*
> an inactive director did not act on the instructions of an alleged shadow
> director (because he did not act at all) could prevent that person from
> being a shadow director, even though in reality he controlled the
> activities of the company. In my judgment, therefore, a person at whose
> direction a governing majority of the board is accustomed to act is   *g*
> capable of being a shadow director.'

   **[229]** Then, in *Ultraframe*, Lewison J considered the phrase 'accustomed
to act' and asked the question: if it is shown that, over a period, the
directors of a company were accustomed to act on the directions or   *h*
instructions of another person, is that person a shadow director from the
beginning of the period; or only from the point at which it can be said that
the directors are 'accustomed' to act on his directions or instructions?
Having discussed this question, the judge said (at [1277]):

> 'I conclude, therefore, that if a person becomes a shadow director as   *i*
> a result of the board being accustomed to act on his instructions or
> directions, transactions entered into before it can be said that the board
> is so accustomed are not retrospectively invalidated.'

## THE CLAIMANTS' CASE AS TO DE FACTO AND SHADOW DIRECTORS

[230] The claimants have served lengthy voluntary particulars of the case that Mr Moore and Mr Rosser were de facto and/or shadow directors of IAP. The particulars in relation to Mr Moore extend to 15 pages and those in relation to Mr Rosser extend to 29 pages. The particulars cover the entire period of the connection which they had with IAP although the particulars are not evenly distributed across the entirety of the period. I consider that it is potentially relevant to have regard to the position of Mr Moore and Mr Rosser in connection with IAP over the entire period of their involvement because it may be that their position at a particular point of time, or in relation to a particular decision by IAP, can only be assessed by reference to their previous involvement in the affairs of the company. However, it is also right that I should focus on the particular decision which is challenged and ask myself whether, in connection with that decision, Mr Moore or Mr Rosser participated in that decision as a de facto director or whether Mr Moore or Mr Rosser gave directions or instructions in relation to that decision and the de jure directors acted upon those directions or instructions.

[231] The main points pleaded by the claimants in relation to Mr Moore concerned the following:

(1) the holding out of Mr Moore as the chairman of 'the Group';

(2) statements made by various persons to the liquidators describing the role of Mr Moore;

(3) his involvement in recruitment and the negotiation of service contracts;

(4) his involvement in directions given as to contracts with developers;

(5) the financial reporting in relation to IAP;

(6) his involvement with the sale of 'the Group'.

[232] Mr Moore has not defended the claim against him so that I do not have any pleaded response by him to the claimants' case that he was a de facto and/or shadow director of IAP.

[233] The main points pleaded by the claimants in relation to Mr Rosser concerned the following:

(1) the holding out of Mr Rosser as the vice-chairman of 'the Group';

(2) statements made by various persons to the liquidators describing the role of Mr Rosser;

(3) his involvement in recruitment and the negotiation of various service contracts; these related to Mr Storey who had a contract of employment with ITS, but who provided services for the benefit of IAP, and to a Mr da Silva;

(4) his involvement in directions given as to contracts with developers and negotiations with developers;

(5) his involvement in instructions to Mr Berman and Mishcon de Reya and Mr Donnison and Mr Gandy in relation to the sale of 'the Group' and to the investigation by HMRC;

(6) the financial reporting in relation to IAP;

(7) his other involvement with the sale of 'the Group'.

[234] Mr Rosser pleaded the following in response to the allegation that he was a de facto or a shadow director of IAP:

(1) Mr Rosser was asked by Mr Moore to bring his strategic expertise and

experience of public relations and business development to enhance the
position of ITS with a view to the ultimate sale of ITS and IAP;

(2) Mr Rosser advised on the recruitment of directors and management
for ITS and IAP;

(3) Mr Rosser was not asked to be, and did not wish to be, a director of
ITS or IAP;

(4) it was important to Mr Rosser not to be a director of ITS or IAP as he
wished to pursue other projects;

(5) under his contract of employment, Mr Rosser was required to follow
the instructions of the board of ITS;

(6) Mr Rosser retained Mr Pinson and Mr Kitto to form a strategic
consultancy hub;

(7) Mr Rosser also advised Mr Moore to retain accountants, auditors and
lawyers of the companies;

(8) Mr Rosser was a strategic sounding board for the directors and
management of ITS and IAP;

(9) in 2004 and 2005 Mr Rosser's principal activity (apart from work for
Leadenhall and Darrencrest) was to arrange for commercial due diligence in
connection with the sale of ITS and IAP;

(10) legal and financial due diligence was delegated to professional
advisers working with Mrs Gifford;

(11) when the sale process ultimately failed in the latter part of 2007,
Mr Rosser had almost nothing to do with ITS or IAP apart from assisting
with attempts to raise finance to avoid IAP becoming insolvent;

(12) as regards the allegation that Mr Rosser negotiated contracts with
developers (this allegation being made in the Particulars of Claim as well as
in the voluntary particulars) Mr Rosser said that he negotiated with
developers on behalf of Leadenhall and Darrencrest and to the extent that
such contracts affected IAP the decisions made in relation to them were
taken by IAP's de jure directors;

(13) Mr Rosser's negotiations with Mr Storey were carried out on behalf
of Leadenhall and Darrencrest.

## WERE MR MOORE AND/OR MR ROSSER DE FACTO OR SHADOW DIRECTORS OF IAP?

[235] In his witness statement, Mr Donnison said:

'I deny that I assumed a personal role in the governing structure of
IAP, rather than merely acting in the role of director of Lumley
Management Limited ("Lumley"). I acted at all times within the scope
of Lumley's retainer (which is discussed further below at paragraphs 19
to 22). **Lumley acted on the instructions of Brad and (less frequently)
Jim.**' (Emphasis added.)

[236] I referred earlier to Mr Donnison's note of a meeting he had with
Ms Forth, Mrs Gifford and Mr Rosser on 2 October 2003. In that note
Mr Donnison recorded that Lumley would act as a nominee for Mr Moore.
When cross-examined by Mr Ashworth QC, Mr Donnison accepted that
the note did not refer to him acting as a nominee for Mr Rosser as well as
Mr Moore. However, when cross-examined by Mr Phillips QC,
Mr Donnison confirmed the accuracy of his witness statement as regards his
acting as a nominee for Mr Rosser and Mr Moore. He explained that for

a  some of the time, Mr Moore was away and 'anything that he wanted doing would have come through Brad or possibly Maria'.

[237] I accept Mr Donnison's evidence that Lumley acted as a nominee director for Mr Rosser and Mr Moore. Further, I accept his evidence that he generally acted 'on the instructions' of Mr Rosser and Mr Moore.

b  [238] Mr Rosser called Mr McKay as a witness on his behalf. Mr McKay's connection with IAP began in 2004. From 22 March 2004 Mr McKay was retained by IAP as a consultant and he became chief operating officer of IAP and ITS from 1 July 2004. He had a service agreement with IAP dated 19 July 2004. He became a director of IAP and ITS on 18 January 2008.

c  [239] Mr McKay had made various statements to the Insolvency Service or the liquidators before giving evidence at the trial. On 1 October 2008 he answered a question from the Insolvency Service which referred to shadow directors and he identified Mr Rosser as the vice-chairman of IAP. On 19 March 2010 Mr McKay told the liquidators that Mr Rosser was 'effectively CEO' of IAP. He also said that Mrs Gifford had told him that

d  she took instructions from Mr Rosser and Mr Moore.

[240] In his witness statement Mr McKay stated that after Mr Moore had ceased to be a director of ITS and IAP (in October 2003) and had moved to Spain, he continued to exercise influence and control over the affairs of ITS and IAP, primarily through Mrs Gifford and other members of the management. The result was that no major decisions were taken by the

e  directors or members of management without Mr Moore being consulted. Mr McKay described the work done by members of the management team and the work done by Mrs Gifford.

[241] Mr McKay then described the role played by Mr Rosser. Mr Rosser's most important role related to work on the strategy to prepare ITS and IAP for sale. Part of this work involved Mr Rosser focussing on how the businesses of the two companies could be improved. Mr McKay

f  described Mr Rosser's meetings with the management of the companies.

[242] Mr McKay then referred to earlier statements he had made to the Insolvency Service or the liquidators including a statement that he believed that Mr Rosser was a shadow director of IAP and a statement that Mr Rosser was 'effectively CEO'. He explained in his witness statement that

g  he now considered that whether someone was a shadow director was a legal question on which he did not have the necessary legal expertise to form a view. As to the statement that Mr Rosser was 'effectively CEO', Mr McKay explained that at the time that he made that statement, he felt aggrieved about the position in which he had been placed in relation to IAP and he

h  offered an explanation of his statement by reference to what Mr Rosser did in terms of setting key performance indicators.

[243] Mr McKay continued by saying that Mr Rosser did not hold himself out as a director and was not held out by others as a director. The title 'Vice Chairman' was explained as a grand sounding title. Mr Rosser was not a signatory on any relevant bank account. He had no role in

i  relation to finance, tax or accounting. He did not represent ITS at seminars nor IAP at member facing events. The collapse of the sale process in October 2007 led to Mr Moore assuming again a hands-on role in relation

to the businesses and a breakdown in the relationship between Mr Rosser  *a*
and Mr Moore.

[244] When cross-examined, Mr McKay accepted that it was correct to
say that Mr Rosser was 'effectively CEO'. He also accepted that it was
correct to say that everyone did what Mr Rosser said. He also confirmed
that Mrs Gifford had told him that she took instructions from Mr Rosser
and Mr Moore.  *b*

[245] Mrs Gifford's computer had a file comprising a note which stated:

'The factors with reference to Brad Rosser,
1. He joined as Vice Chairman as at 1 June 2003.
2. Ran the group from January 2004 as [Mr Moore] and [Ms Forth]
were away for personal reasons.  *c*
3. Started his initiative which was to recruit a strategy team and new
management team, preparing the company to sell in a period of time.
4. Recruited a number of key staff including CEO, the finance
director, the sales and marketing director, and the Fuel operations
director in spring 2004. During 2007 recruited MD of Fuel and Sales
Director.  *d*
5. From spring 2004 until the end of the first failed sale process (end
2006), he had weekly meetings with the entire management team.
6. Attended Board Meetings with Directors and gave us an update on
the management of the operations.
7. Drove the Dividend Policy.  *e*
8. Drove the salary and bonus of all senior personnel.
9. Had final say on all agreements/ contracts
10. Ran the process of the second attempt at the sale of the Business
11. Was instrumental in Novation Agreement.
12. Offered various contracts to directors and new staff members
offering equity (?) (which was never an option).  *f*
13. Authorised 3 months notice periods to his staff (strategy team
only)
14. Agreed/Approved all salary reviews, incentive schemes, bonus
discussions annually for all staff.
15. Carried out salary/bonus negotiations with senior staff annually.
16. Drove establishment of KH office, Fuel Establishment, Leadenhall  *g*
& Darrencrest.'

[246] This note appears to have been prepared in 2008. It is not wholly
clear who prepared it nor for what reason. I consider that it is likely that
this note represented Mrs Gifford's views in 2008. However, that was at a
time when Mr Rosser had ceased to be so involved with IAP and it is  *h*
possible that others, like Mrs Gifford, who remained were minded to blame
Mr Rosser for some of the difficulties which then faced IAP. I am prepared
to be cautious about some of the points in case they might not have been
wholly fair to Mr Rosser. Nonetheless, I do have very extensive evidence,
both documentary and oral, as to what Mr Rosser actually did in
connection with ITS and IAP and the evidence bears out many of the  *i*
specific points made in this note. What are of particular interest in the note
are the statements: 'Ran the group from January 2004' and 'Had final say
on all agreements/contracts'. The reference to his attendance at board
meetings might be considered to be double edged. The directors of a

a  company can invite non-directors to make reports to the board. A report to
the board is different from a direction or an instruction to the board.

[247] Prior to her appointment as a director, Mrs Gifford was the
company secretary. She was an accountant by training and she had a small
accountancy practice. She had no real business experience. It was not
expected that she would actually manage and direct the business of ITS and

b  IAP. She was made a director because it did not suit Mr Moore or
Mr Rosser to be directors. She was expected by them to act on their
directions or instructions. They did not have complete control over her
conduct and there were times when she did not fall in with their directions.
However, I find that she was accustomed to act on the directions or
instructions of Mr Rosser and Mr Moore.

c  [248] Mr Moore did not participate in these proceedings and did not give
evidence at the trial. In his evidence, Mr Rosser sought to play down his
involvement in relation to the running of IAP and emphasised his role in
relation to overall strategy and the sales process to deflect attention from
his involvement in relation to other aspects of the business of IAP. I prefer

d  the evidence of Mr Donnison and Mr McKay and the earlier views of
Mrs Gifford to the evidence of Mr Rosser as to the substance of his
involvement in the affairs of IAP.

[249] Based on these findings, my conclusion is that Mr Rosser and
Mr Moore were shadow directors at least in relation to some parts of the
activities of IAP. I do not find that they were de facto directors. They did

e  not need to be de facto directors because the affairs of IAP which required
to be dealt with at the level of the board would be dealt with by the de jure
directors (Mrs Gifford and Lumley) on the direction or instruction of
Mr Rosser and Mr Moore.

[250] The position of Mr Moore and Mr Rosser as shadow directors of
IAP in relation to some parts of the activities of IAP was not the only

f  capacity which they had in relation to matters which are relevant in this
case. Mr Rosser and Mr Moore were potential beneficiaries under the
discretionary trusts (the Mhoran Trust and the Jiki Trust), the trustees of
which held shares in IAP. Mr Moore also had an unspecified interest in
Prism and an interest in Pearson, which successively held shares in IAP.
Mr Moore and Mr Rosser were also interested in Leadenhall and

g  Darrencrest who were counterparties to contracts made with IAP.
Mr Moore and Mr Rosser also provided services to Leadenhall and to
Darrencrest.

[251] Having found that Mr Moore and Mr Rosser were shadow
directors, at least in relation to some parts of the activities of IAP, and
having further commented that both of them were involved with IAP in

h  other capacities, I will need to ask myself at a later stage in this judgment
whether the alleged breaches of duty by them involved the de jure directors
of IAP acting on the instructions or directions of Mr Moore or Mr Rosser.

THE DUTIES OF A DE JURE DIRECTOR

i  [252] As already described, when pleading the duties of (inter alios) a de
jure director, the claimants have used the wording now contained in ss 171
to 177 of the Companies Act 2006 and have then added further wording
whereby the duty (now contained in s 172) to promote the success of IAP
for the benefit of its members extends to a duty to have regard to the

interests of creditors of IAP at a time when IAP is or may become insolvent. *a*
I note that in *Premier Waste Management Ltd v Towers* [2011] EWCA Civ
923, [2012] 1 BCLC 67, [2012] IRLR 73, Mummery LJ commented on the
relevance of the wording of ss 171 to 177 of the Companies Act 2006 in a
case where the relevant facts occurred before the coming into force of those
sections. His comments encourage an approach whereby the court can
regard the wording of those sections as extracting and expressing 'the *b*
essence of the rules and principles which they have replaced' (see at [3]). In
any case, that was the approach adopted by Mr Phillips for the claimants
and this approach was not challenged by the defendants. There are
nonetheless some differences between the positions before and after the
Companies Act 2006 and, in particular, there is a difference between the
way in which disclosure is dealt with in s 317 of the 1985 Act and s 177 of *c*
the 2006 Act; I will consider the question of disclosure later in this
judgment.

[**253**] For present purposes, there is no dispute that a de jure director
owes to the company the following duties, in particular:

(1) a duty to act in the way which he considers, in good faith, would be *d*
most likely to promote the success of the company for the benefit of its
members as a whole;

(2) a duty not to accept a benefit from a third party (other than the
company) conferred by reason of his being a director or his doing (or not
doing) anything as a director; and

(3) a duty to avoid a situation in which he has, or can have, a direct or *e*
indirect interest that conflicts, or possibly may conflict, with the interests of
the company; this duty applies in particular to the exploitation of any
property, information or opportunity and it is immaterial whether the
company could take advantage of the property, information or opportunity.

## THE DUTIES OF A DE FACTO DIRECTOR *f*

[**254**] As explained, it was common ground in this case that a de facto
director owes to the relevant company the same duties as would a de jure
director of that company.

## THE DUTIES OF A SHADOW DIRECTOR *g*

[**255**] The parties did not agree as to whether a shadow director owed any
fiduciary duties to the relevant company. Mr Ashworth relied on the
reasoning and the conclusions of Lewison J in *Ultraframe* (*UK*) *Ltd v
Fielding* [2005] EWHC 1638 (Ch). The judge said (at [1289]):

'The indirect influence exerted by a paradigm shadow director who *h*
does not directly deal with or claim the right to deal directly with the
company's assets will not usually, in my judgment, be enough to impose
fiduciary duties upon him; although he will, of course, be subject to
those statutory duties and disabilities that the Companies Act creates.
The case is the stronger where the shadow director has been acting
throughout in furtherance of his own, rather than the company's, *i*
interests. However, on the facts of a particular case, the activities of a
shadow director may go beyond the mere exertion of indirect influence.'

*a*   [256] Lewison J had earlier remarked in *Ultraframe* (at [1285]):

'In truth, it seems to me that the use of labels such as "shadow director", which is a statutory definition, may serve only to obscure the real question. The real question is not what is the proper label to attach? It is: in what circumstances will equity impose fiduciary
*b*   obligations on a person with regard to property belonging to another?'

[257] The reasoning in *Ultraframe* was considered by Newey J in *Vivendi SA v Richards* [2013] EWHC 3006 (Ch), [2013] Bus LR D63. After a detailed discussion of the rival arguments, Newey J said (at [143]):

'In the end, my own view is that *Ultraframe* understates the extent to
*c*   which shadow directors owe fiduciary duties. It seems to me that a shadow director will typically owe such duties in relation at least to the directions or instructions that he gives to the de jure directors. More particularly, I consider that a shadow director will normally owe the duty of good faith (or loyalty) discussed below [for the avoidance of doubt, I regard the duty of good faith as a fiduciary duty] when giving
*d*   such directions or instructions. A shadow director can, I think, reasonably be expected to act in the company's interests rather than his own separate interests when giving such directions and instructions.'

[258] In *Sukhoruchkin v Bekestein* [2014] EWCA Civ 399 the Chancellor (Sir Terence Etherton) referred to *Ultraframe* and *Vivendi* and said (at [41])
*e*   that it was apparent that the law was 'not entirely settled as to the circumstances in which a shadow director owes fiduciary duties'.

[259] I commented earlier that if a party relies upon a statutory provision which expressly refers to 'a shadow director' then it will be necessary to determine whether a particular individual is a shadow director for the
*f*   purposes of the statutory provision. It may be that, in due course, in the exercise of the powers conferred by s 89 of the Small Business, Enterprise and Employment Act 2015, the Secretary of State will make regulations which define the duties of a shadow director. However, in the absence of any such regulations, when the ultimate question is whether an individual owes fiduciary duties to a company, it will not be essential and it may not
*g*   even be helpful to ask whether that individual is a shadow director of the company. In other words, instead of asking three questions, first, whether an individual is a shadow director, secondly, what fiduciary duties does a typical shadow director owe to a company and, thirdly, does the individual owe the same duties as a typical shadow director, it may be preferable to ask instead whether in all the circumstances of the case the individual owed
*h*   fiduciary duties, and if so what duties, to a company. I therefore agree with the comment of Lewison J in *Ultraframe* (at [1285]) that to attempt to define the duties of a typical shadow director may not be helpful.

[260] In *Re Paycheck Services 3 Ltd* [2011] 1 BCLC 141, [2010] 1 WLR 2793 (at [93]) Lord Collins said:

*i*   'It seems to me that in the present context of the fiduciary duty of a director not to dispose wrongfully of the company's assets, the crucial question is whether the person assumed the duties of a director.'

[261] Although Lord Collins was referring to the position of an alleged de facto director, his comment can be applied to the case of an alleged shadow

director who is alleged to owe fiduciary duties to the relevant company. In
a case of an alleged shadow director, the court ought to arrive at the same
answer whether the question is: (1) did the individual assume the duties of
a director (which consist of the usual fiduciary duties of a director)? Or
(2) did the individual assume fiduciary duties to the company?

[262] It is now well established that, outside the paradigm cases of
established fiduciaries, the question whether an individual owes fiduciary
duties is a fact-sensitive matter. This approach undoubtedly causes some
uncertainty as to the result in a particular case but nonetheless the decided
cases give guidance as to the approach to be applied. Some of the decided
cases involved joint venturers and the recent decision in *Farrar v Miller*
[2018] EWCA Civ 172, [2018] 2 P & CR D6 described the matter in this
way (per Kitchin LJ at [75]):

> 'I recognise that joint venturers may or may not have a relationship in
> which one of them owes fiduciary duties to the other. The question, to
> my mind, is whether the circumstances of their relationship justify the
> imposition of such duties, and in answering that question it is often
> helpful to consider whether, to adopt the words of Millett LJ in *Bristol*
> *& West Building Society v Mothew* [1996] 4 All ER 698 at 711–712,
> [1998] Ch 1 at 18, one joint venturer has undertaken to act for or on
> behalf of the other in a particular matter or circumstances which have
> given rise to a relationship of trust and confidence. It may also be
> helpful to ask whether one joint venturer is in a relationship with the
> other which has given rise to a legitimate expectation, which equity will
> recognise, that he will not use his position in such a way which is
> adverse to the interests of the other: see, for example, *Arklow*
> *Investments Ltd v Maclean* [2000] 1 WLR 594 at 598. Whether a joint
> venture relationship carries obligations of a fiduciary nature is therefore
> highly fact-sensitive: see, for example, *Ross River Ltd and anor. v*
> *Waverley Commercial Ltd* [2013] EWCA Civ 910, [2014] 1 BCLC 545
> at [30]--[64].'

[263] This passage shows that a question such as the present is
fact-sensitive but it is usually helpful to ask whether the individual has
expressly or impliedly (from the circumstances) undertaken or assumed a
position of trust and confidence or whether there is a legitimate expectation
that he will not use his position in a way adverse to the interests of the
other.

[264] Further, there are cases which show that even if an individual owes
some fiduciary duties to another, the circumstances may affect the extent of
those duties. In *New Zealand Netherlands Society 'Oranje' Inc v Kuys*
[1973] 2 All ER 1222 at 1225–1226, [1973] 1 WLR 1126 at 1130,
Lord Wilberforce, sitting in the Privy Council, said:

> 'The present case is concerned with an officer of an incorporated,
> non-profit making society. Kuys was not paid for his services but he was
> a trusted employee; and he was ready to agree that he had duties of
> trust and confidence placed in him. On the other hand the scope of his
> responsibility and the dividing line between that and his own personal
> interests were loosely defined. It appears from the evidence that he was
> able to run a small insurance business of his own: also it appears that he
> was permitted a personal interest in the group travel service which he

*a*  managed for the society. A person in his position may be in a fiduciary position quoad a part of his activities and not quoad other parts: each transaction, or group of transactions, must be be looked at. Their Lordships find support for this approach in the English Court of Appeal's judgments in *Tufton v Sperni* [[1952] 2 TLR 516], particularly in that of Jenkins LJ, and in the High Court of Australia's judgment in

*b*  *Birtchnell v Equity Trustees, Executors and Agency Co Ltd* ((1929) 42 CLR 384 at 408). Dixon J said (42 CLR at 408):

"The subject matter over which the fiduciary obligations extend is determined by the character of the venture or undertaking for which the partnership exists, and this is to be ascertained, not merely from the express agreement of the parties … but also from the course of dealing

*c*  actually pursued by the firm."

This was said in the context of a partnership but the principle must be of general application.'

*d*  **[265]** In *Kelly v Cooper* [1994] 1 BCLC 395, [1993] AC 205, the Privy Council held that the fiduciary duties of an agent were qualified by terms to be implied into the contract of agency.

**[266]** In *Vivendi* Newey J referred to my decision in *Ross River Ltd v Waveley Commercial Ltd* [2012] EWHC 81 which was upheld by the Court of Appeal ([2013] EWCA Civ 910). Newey J said that the decision was

*e*  reversed on other grounds but that is not quite right. The Court of Appeal upheld this decision. However, following my decision, which related to liability, I held a separate hearing and gave a later judgment on remedies ([2012] EWHC 2487 (Ch)) which was reversed by the Court of Appeal ([2013] EWCA Civ 910, [2014] 1 BCLC 545). *Ross River* did not involve a de facto director or a shadow director. The question was whether another

*f*  company, Waveley Commercial Ltd, owed to Ross River fiduciary duties in relation to a joint venture. If Waveley Commercial Ltd did owe such fiduciary duties there was then a second question as to whether a director of Waveley Commercial Ltd owed fiduciary duties to Ross River. There was no question of that director being a shadow director of Ross River. In the event, I held that both Waveley Commercial Ltd and its director owed

*g*  fiduciary duties to Ross River. What might be said to be interesting about the decision is that I held that the fiduciary duties in that case did not extend to the full range of duties owed by, for example, a trustee or a director. I held that both Waveley Commercial Ltd and its director owed a fiduciary duty of loyalty to Ross River and, in addition, owed a specific duty not to do anything in the handling of the joint venture revenues which

*h*  favoured itself to the disadvantage of Ross River but beyond that I did not go and I did not hold that there were fiduciary duties not to allow a conflict between duty and interest and not to profit from the fiduciary position.

**[267]** In *Ross River* [2012] EWHC 81 at [235]–[255] I discussed the principles which a court ought to apply when asked to determine whether a

*i*  person owed fiduciary duties to another. I held that the relevant question was whether on the specific facts of the case, the relevant person undertook expressly or by implication a fiduciary obligation. I will not repeat that lengthy passage in this judgment. In the Court of Appeal [2014] 1 BCLC 545 at [59], Lloyd LJ (with whom the other members of the court agreed)

held that my conclusions were properly reasoned and sound and correct on *a* the facts of that case.

[**268**] As to the differences between *Ultraframe* and *Vivendi*, these may be more apparent than real at the level of general principle. In the first case, Lewison J considered that a shadow director would not in many cases be subject to fiduciary duties but that in some cases he could be. In the second case, Newey J considered that a shadow director would normally owe a *b* duty of good faith but the use of the word 'normally' suggests the possibility that he might not owe such a duty. Further, Newey J thought that a shadow director would typically owe fiduciary duties 'at least' when giving directions or instructions to the de jure directors; that formulation does not specifically deal with a case where the shadow director is not *c* giving such directions or instructions. However, I consider it is probably wrong to regard the fact that the individual was acting in his own interests as a pointer to that individual not owing fiduciary duties (as Lewison J suggested at [1289]); that fact may be consistent with the individual owing fiduciary duties and acting in breach of them.

[**269**] The very real difficulties in laying down a general principle as to the *d* fiduciary duties (if any) of a shadow director are revealed when considering the differences between a de jure director and a typical shadow director.

[**270**] A de jure director has the status of director during the period that he holds that office. He is a director in relation to all of the activities of the company. He owes duties which impose positive obligations as well as negative obligations; I refer to the duty to promote the success of the *e* company (s 172) and the duty to exercise skill and care (s 174). Where the director is under a positive obligation he can be liable for failing to act. The director also owes negative obligations. He has a duty to avoid a conflict between his interests and the interests of the company (s 175). He has a duty not to accept benefits from third parties conferred by reason of his position as a director or his actions or omissions as a director (s 176). *f*

[**271**] It seems that a de facto director is in the same position as a de jure director. In a case where, for example, the individual is a de facto director because of a defect in his appointment as a de jure director and he acts as a director, then it seems reasonable that the de facto director should owe the full range of duties of a de jure director.

[**272**] A shadow director is defined as 'a person in accordance with whose *g* directions or instructions the directors of the company are accustomed to act'. It can be said that this definition refers to a status so that when the facts of the case come within the definition, the individual has the status of a shadow director. Indeed, there are statutory provisions which impose a duty to act on a person who has the status of a shadow director. Referring *h* to the provisions of the Companies Act 2006, rather than the earlier legislation, there are such duties, for example, imposed by ss 68, 75, 76, 84, 272, 275, 276 and 858. However, is it necessary for the person with that status to give a direction or an instruction in relation to a decision or an action which is challenged before he can be said to be liable in equity for the consequences of that decision or that action? Can a shadow director be *i* liable in equity for a breach of the positive obligations placed on a de jure director when the shadow director omits to act? As regards an alleged conflict between his interests and the interests of the company, if the shadow director abstains from giving a direction or an instruction to the

a   company, does he avoid committing a breach of fiduciary duty? As regards
the duty not to accept a benefit from a third party conferred by reason of
his being a director or by reason of his doing or not doing anything as a
director, if the shadow director abstains from giving a direction or an
instruction to the company, does he avoid committing a breach of fiduciary
duty? I remind myself that in the *Kuys* case [1973] 2 All ER 1222 at
b   1225–1226, [1973] 1 WLR 1126 at 1130, Lord Wilberforce said:

> 'A person in his position may be in a fiduciary position quoad a part
> of his activities and not quoad other parts: each transaction, or group of
> transactions, must be looked at.'

c   [273] I referred earlier to my decision in *Ross River* where I held that
Waveley Commercial Ltd and its director did owe fiduciary duties to Ross
River but the duties which they owed were not the full fiduciary duties
which would typically be owed by a trustee or a director. Accordingly, if
that decision is right (and the contrary was not submitted to me), when a
court is asked to determine whether a person owed fiduciary duties and the
case is outside the paradigm cases where the principles are established, it is
d   open to a court to hold that a person owed some of the usual fiduciary
duties, but not all of them, or to hold that the specific fiduciary duty owed
is a qualified form of the general fiduciary duty. This means that the court
is not confined to an all or nothing response to the question.
  [274] The possibility of answering the question in a highly fact-sensitive
e   way as described in the last paragraph might be relevant in this case. I can
illustrate the point by referring to the duties as expressed in the Companies
Act 2006. Section 175 imposes a duty to avoid conflicts of interest.
Section 177 imposes a duty on a director to declare an interest in a
proposed transaction with the company. The duties in ss 175 and 177 may
f   apply to a shadow director: see s 170(5). Section 1157 confers on the court
a power to relieve a director from a breach of fiduciary duty where he acted
honestly and reasonably and where he ought fairly to be excused. The
power in s 1157 can only be used in relation to an officer of the company
or an auditor. A shadow director is neither an officer or an auditor. If, in a
particular case, a de jure or a de facto director committed a technical breach
g   of ss 175 and 176 and the court thought it right to relieve him from
liability, that director would not be liable. If it were held that a shadow
director owed the identical duties as did a de jure or a de facto director and
had committed a technical breach of them but the court could not relieve
him from liability under s 1157, then the shadow director would be liable
when the de jure or the de facto director would not be. That result may well
h   be inappropriate. It is possible to avoid that result by holding that although
the shadow director owes a duty to avoid conflicts of interest and ought to
disclose his interest to the de jure directors of the company, the duty is to
act honestly and reasonably in those respects so that an honest and
reasonable shortcoming in these respects would not be a breach of fiduciary
duty. Conversely a dishonest or an unreasonable shortcoming in these
i   respects would be a breach of fiduciary duty.
  [275] It may be that it is not necessary in this case to answer definitively
all of the questions raised in the above paragraphs. In their submissions, the
parties focussed on what they said were the proper findings of fact in this
case. The parties' submissions were very far apart on that matter. They did

not address all of the matters which I have now raised. In those *a* circumstances, I will now proceed to analyse the facts of this case and in the course of that analysis it will emerge how many of these difficult questions need to be resolved. If a question of that kind does not need to be decided in this case, I would prefer not to do so and to leave it for decision in another case where the decision will affect the outcome and where the court *b* will have full argument on the point.

## DID MR MOORE AND MR ROSSER OWE FIDUCIARY DUTIES TO IAP?

[276] For the reasons given when discussing the question of the fiduciary duties which might be owed by a shadow director, I indicated that I would *c* not deal with the possible fiduciary duties of Mr Moore and Mr Rosser in general terms but I would address that question in the context of the detailed facts of the case and with regard to the allegations made as to their breaches of any such duty. I can however, make two general comments on this subject.

[277] If Mr Moore or Mr Rosser gave directions or instructions to the de *d* jure directors intending the directions or instructions to be acted upon and the de jure directors did act on them causing loss, then that could well be an appropriate case for holding Mr Moore or Mr Rosser liable for the resulting loss.

[278] Further, I consider that there would be obvious difficulties in *e* establishing that a shadow director owed a fiduciary duty and committed a breach of it and is liable for any resulting loss to the company, even though he acted honestly and reasonably, where a de jure director on the same set of facts would not be liable because he would be relieved from liability under s 727 of the 1985 Act or s 1157 of the 2006 Act.

*f*

## THE ALLEGATION OF 'NO OR NO ADEQUATE CONSIDERATION'

[279] In their presentation of their claim, the claimants concentrated on the agreement dated 26 November 2003 whereby IAP contracted with Leadenhall on terms that IAP was obliged to split its commission from Maesbury 50/50. I will therefore proceed in the same way by focussing on *g* the claimants' case in relation to that agreement.

[280] The claimants' case under this heading is made against Mrs Gifford, Mr Moore and Mr Rosser. Mrs Gifford undoubtedly owed to IAP the normal fiduciary duties of a director. I will therefore consider whether the claimants have shown that Mrs Gifford committed a breach of duty. Following my conclusion in relation to Mrs Gifford it will then be *h* appropriate to consider the case against Mr Moore and Mr Rosser and to consider their involvement in the relevant events and, in particular, whether the de jure directors of IAP acted on the directions or instructions of Mr Moore or Mr Rosser and whether they owed fiduciary duties to IAP in relation to these matters and whether they committed breaches of those duties. *i*

[281] In connection with the case against Mrs Gifford for breach of duty in this respect, it is relevant to consider separately whether the agreement between IAP and Leadenhall was a case where Leadenhall provided 'no consideration' to IAP and then to consider whether it was a case where

a Leadenhall provided 'no adequate consideration' to IAP.

[282] The claimants accept that the agreement between IAP and Leadenhall was not a sham. It follows that the claimants accept that the agreement was a contract which was binding on both parties. The agreement imposes obligations upon Leadenhall and IAP has, in law, the benefit of those obligations. Accordingly, as a matter of legal analysis,
b Leadenhall plainly gave consideration to IAP under this agreement.

[283] The claimants' argument about no consideration therefore appears to be that if one carries out an assessment of the value of the consideration given by Leadenhall to IAP, one ought to conclude that the obligations which amounted to consideration as a matter of law were of no economic value to IAP. It was also submitted by the claimants that even if the
c agreement imposed on Leadenhall the obligation to perform services for IAP, IAP could have arranged matters so that it could have performed the services itself and so the services actually performed by Leadenhall were of no value to IAP.

[284] The difficulty with these submissions is that they are wholly incompatible with a considerable body of evidence most of which was not
d challenged by the claimants at the trial.

[285] Mr Rosser's witness statement contained over 30 pages of description as to what work was carried out by Leadenhall (and later Darrencrest). As to the personnel who carried out work for Leadenhall, Mr Rosser referred, first, to the management and administration services
e carried out by JDS but he then went on to identify the following as persons who carried out work for Leadenhall: Mr Moore, Mr Rosser himself, Mr Storey, Ms Forth, Mr Schmidt and Mr Kitto. Mr Rosser then discussed each of these individuals separately and, in the case of Mr Kitto, he distinguished between the work Mr Kitto did for ITS and the work he did for Leadenhall. Mr Kitto and Mr Schmidt also gave evidence which
f corroborated Mr Rosser's evidence.

[286] Mr Rosser then gave detailed evidence as to the categories of work carried out by Leadenhall and he referred to the following:

(1) establishing, maintaining and progressing relationships with developers and conducting due diligence on new developments;

(2) putting in place arrangements with financial and legal service
g providers, rental companies and furniture suppliers to facilitate the completion of property purchases;

(3) providing assistance to developers to enable them to finish developments and tailor their product for consumers;

(4) acting as a liaison between developer and agent to ensure that
h developer, agent and end loan providers had all of the information that they required and to resolve issues that could only be dealt with at developer level; and

(5) ensuring that developers paid commission on time.

[287] Over many pages, Mr Rosser discussed these five categories of work. None of this evidence from Mr Rosser was challenged in
i cross-examination. Mr Phillips submitted that none of this work came within the obligations which Leadenhall had undertaken, in its agreement with IAP, to undertake for IAP. I am unable to accept that submission. Even if it were conceivable that, on the true construction of that agreement, some of the work identified by Mr Rosser might fall outside the obligations

contained in that agreement, it cannot be argued that all of the work fell
outside the agreement so that Leadenhall was not doing the work which it
contracted to do but was instead doing extensive work which it had not
contracted to do.

[288] Mr Phillips argued that I should take the view that Leadenhall was
doing no work for IAP because Leadenhall had no employees whom it
could ask to carry out such work. However, as Mr Rosser explained in his
evidence, Leadenhall was able to draw on the services of a number of
people without those persons being employed by Leadenhall. In the case of
Mr Moore, he did the work which he did for Leadenhall because he was a
potential beneficiary under a discretionary trust of 72.5% of the shares in
Leadenhall and the trustee shareholder received substantial dividends which
were passed on to Mr Moore; Mr Rosser suggested that Mr Moore might in
addition be receiving a consultancy fee from Leadenhall. As regards
Mr Rosser, he benefited from the payments made by Leadenhall to
Sunpuddles Ltd, which payments were passed on to Mr Rosser, and the
dividends paid to the trustee shareholder (who owned 20% of the shares in
Leadenhall) where that trustee passed the dividends on to him. Ms Forth
was in a similar position to Mr Rosser as she was paid a consultancy fee
through Canberra Consulting and she also received dividends through her
trustee shareholder who owned 7.5% of the shares in Leadenhall.
Mr Storey was paid by Leadenhall for the work he did for Leadenhall.
Mr Schmidt was paid referral commissions by Leadenhall.

[289] Could IAP have performed the services itself? Even if it could have,
that did not mean that outsourcing the services to another meant that the
performance of the services by that other was of no benefit to IAP. But the
evidence again established that IAP did not have any pre-existing ability to
perform the services itself and free of any charge to itself.

[290] The case for IAP being able to perform the services itself involved,
I think inappropriately, identifying Mr Moore, Mr Rosser and Ms Forth
with IAP. The case further involved identifying Mr Storey with IAP
although his contract had been with ITS, rather than IAP. None of
Mr Moore, Mr Rosser or Ms Forth was employed by IAP. IAP did not have
the benefit of existing contracts of employment with them under which they
were obliged to perform the relevant services for IAP. It seemed to be
suggested that if I held that Mr Moore and Mr Rosser controlled IAP, that
somehow meant that they were obliged to perform services for IAP directly
so that they could not arrange matters so that IAP contracted with
Leadenhall and Mr Moore and Mr Rosser performed services for
Leadenhall. I do not accept that suggestion. Even if Mr Moore and
Mr Rosser controlled IAP it does not follow that IAP controlled Mr Moore
and Mr Rosser. Whatever fiduciary duties they might have owed to IAP as
shadow directors of IAP, those duties did not oblige them to provide the
services to IAP which were provided by Leadenhall.

[291] Of course, if IAP had wanted to, it could have invited Mr Moore,
Mr Rosser and Ms Forth to perform those services. However, if IAP had
done so, there is no reason to think that they would have performed those
services free of any charge to IAP. That was certainly the position in
November 2003 and remained the position until it suited Mr Moore and
Mr Rosser, for other reasons, to rearrange matters in 2007. Of course, each
of them was a potential beneficiary under a trust which held shares in IAP

*a*  and each of them, no doubt, expected to be the beneficiary of dividends paid by IAP to its shareholders. However, the whole point of creating and using Leadenhall was that some of the commission earned by IAP would be paid to Leadenhall and that would allow Leadenhall to pay dividends to its shareholders and those shareholders could be expected to pass the benefit of the dividends to Mr Moore, Mr Rosser and Ms Forth. These three

*b*  individuals clearly preferred to have dividends from Leadenhall rather than dividends from IAP because of the different tax treatment of the dividends from the two different sources. It may even have been the case that in the unlikely event of Mr Moore, Mr Rosser and Ms Forth agreeing with IAP to perform services for IAP in return for payment, they would have asked for a payment which, when tax was deducted, would have been equivalent to

*c*  the sums they would hope to receive as untaxed dividends from Leadenhall. That would be likely to have cost IAP more than the 50% split of commission in favour of Leadenhall.

[292] For these reasons, I reject the case that IAP gave away 50% of its entitlement to commission for 'no consideration'. I therefore now need to

*d*  consider the claimants' case that the consideration which Leadenhall gave for its 50% share of IAP's commission was 'no adequate' consideration.

[293] I have referred earlier to the meeting of 6 November 2003 when IAP and Leadenhall agreed upon the 50/50 split of commission. I am able to accept that the way in which the parties negotiated the split of commission was not sophisticated and appears to have been influenced by the belief that

*e*  the commission was being split between two entities owned by the same people and what was needed was a figure which could be justified as appropriate for an arm's-length transaction. However, given that Leadenhall was entitled to some share of the commission for the obligations which it undertook, I have no evidence which would allow me to say what share of the commission would have been the true market value of the services to be

*f*  provided by Leadenhall or what would, or even should, have been negotiated by commercial parties acting at arm's-length.

[294] The claimants did not call any evidence as to what they said was the true value of the consideration moving from Leadenhall. Nor did they cross-examine any witness with a view to establishing that the true value of that consideration should have resulted in a split of commission more

*g*  favourable to IAP than 50%. The claimants persisted in their case that the value of the consideration from Leadenhall was nil and they did not attempt to establish an evidential base for a finding by the court that the split should have been a percentage different from 50%. At one point in the evidence, there was a reference to the stance taken in August 2007 by the accountants

*h*  KPMG who were advising Direct Wonen NV, a Dutch company which was interested in buying the shares in ITS and IAP. KPMG advised its client as a potential purchaser of the shares as to the worst case scenario if HMRC were to reject the transfer price between IAP and Leadenhall and between IAP and Darrencrest. No one from KPMG was called to give evidence. The worst case scenario was put to Mr Gandy, of Jeffcote Donnison LLP, in the

*i*  course of his evidence and he said that at that time he had pointed out that KPMG's calculations were a worst case scenario, rather than an opinion as to the correct position, and had furthermore been prepared without reviewing the accounting records and on the basis of a number of incorrect assumptions. Mr Gandy himself believed that the split of commission with

Leadenhall and with Darrencrest was defensible as an arm's-length split.

[295] On this state of the evidence, the claimants have not established that the agreement between IAP and Leadenhall involved 'no adequate' consideration from Leadenhall.

[296] In these circumstances, the claimants have not established (in relation to the agreement with Leadenhall):

(1) that Mrs Gifford did not act in a way which she considered in good faith would be most likely to promote the success of IAP for the benefit of its members;

(2) that she failed to use reasonable care, skill and diligence; or

(3) that IAP suffered any loss as a result of entering into the agreement with Leadenhall;

(4) if, and in so far as, Mr Moore and Mr Rosser caused IAP to enter into the Leadenhall agreement, that they are in any different position from Mrs Gifford, as described above.

[297] The claimants did not make a separate allegation of breach of duty against Mrs Gifford to the effect that she failed to exercise independent judgment, in particular at the meeting on 6 November 2003. Nonetheless, I have considered whether the correct finding to make is that, in particular at that meeting, Mrs Gifford simply acted on the instructions she was given by Mr Moore or Mr Rosser.

[298] I am not able to find that, at the meeting on 6 November 2003, Mrs Gifford simply acted on the instructions of Mr Moore. He was not present at the meeting on 6 November 2003 but Mrs Gifford seems to have known that he wanted Leadenhall to have a 90% share of the commission. Mrs Gifford did not agree with that suggestion so it cannot be said that, in that respect, she acted on the instructions of Mr Moore. As regards Mr Rosser, while the evidence was not clear, to the extent that he asked for Leadenhall to have 90% of the commission or at any rate a percentage share greater than 50%, Mrs Gifford did not agree to that. It may be that Mr Donnison's view as to the split of commission was more important than Mrs Gifford's view; Mr Donnison does appear to have influenced the discussion in arriving at a split which he would regard as defensible if questioned by HMRC. Mrs Gifford appears to have been influenced by that and that does appear to show that she did not act on the instructions of Mr Rosser. Further there was evidence that Mrs Gifford herself argued for a lower percentage than that requested by Mr Rosser and she deployed some evidence from IAP's experience in Spain in support of her argument. I do not reject that evidence. My overall conclusion is that it has not been established that Mrs Gifford failed to exercise independent judgment on and after 6 November 2003 in relation to the agreement with Leadenhall. In any case, even if she did in some way break her duty in this respect, the claimants have not established that IAP suffered any loss as a result.

[299] I have referred earlier to the wider allegations made by the claimants in their pleaded case as to the purpose of the Leadenhall agreement of 26 November 2003 being illegitimate and open to challenge on other grounds. As I understood it, those allegations were not pursued in closing submissions. However, I am able to make brief comments on those matters as follows. Insofar as the claimants allege that Mrs Gifford caused or permitted IAP to enter into the Leadenhall agreement to the detriment of IAP and for no legitimate commercial purpose and instead for various other

*a*  purposes such as avoiding UK tax, my findings as set out above mean that:

   (1) the claimants have not established that the Leadenhall agreement was to the detriment of IAP;

   (2) the Leadenhall agreement was for a legitimate commercial purpose;

   (3) the fact that the Leadenhall agreement involved some of the commission being received offshore and not being subject to UK tax was
*b*  not unlawful;

   (4) it was not the purpose of the Leadenhall agreement to conceal the beneficial ownership and control of Leadenhall;

   (5) the fact that the Leadenhall agreement conferred benefits on the shareholders of Leadenhall and those benefits were passed to Mr Moore and Mr Rosser does not mean that agreement was to the detriment of IAP
*c*  and for no legitimate purpose.

   [300] Although the claimants' submissions on this part of the case concentrated on the agreement between IAP and Leadenhall on 26 November 2003, I will next consider whether the position is any different in relation to any of the other agreements made by IAP.

*d*  [301] I have earlier described the terms of the three agreements entered into on 26 March 2004. These three agreements rearranged matters between the three parties, Maesbury, IAP and Leadenhall. The rearrangement resulted in IAP and Leadenhall continuing to split the commission 50/50. In view of my earlier finding as to the consideration given to IAP by the agreement of 26 November 2003 in return for splitting
*e*  the commission 50/50, the same conclusion is appropriate in relation to the combined effect of the three agreements of 26 March 2004. It has not been established that these agreements resulted in IAP receiving no or no adequate consideration from Leadenhall.

   [302] I have earlier described the terms of the agreement between Darrencrest and IAP on 7 October 2004. Under that agreement,
*f*  Darrencrest conferred on IAP the benefit of receiving 50% of the commission payable to Darrencrest by Maesbury. This was not a case of IAP giving away its rights for no or no adequate consideration. The same reasoning applies to the agreement, to which IAP was a party, on 5 September 2005.

   [303] The last set of agreements were those made in August 2007 when
*g*  IAP moved from being entitled to 50% of the commission paid by the developers to being entitled to 100% of the commission paid by the developers. Prima facie, therefore, there was a considerable improvement in the position of IAP and it cannot be said that it gave away its entitlement for no or no adequate consideration. One of the terms in the agreements
*h*  whereby IAP became entitled to receive all of the relevant commission concerned the transitional arrangements under which Leadenhall was to be entitled to the first $4m of commission and Darrencrest was to be entitled to the first $6.8m of commission. The claimants have not sought to establish that those amounts to be paid in the period of transition were not appropriate. I am not in a position on the evidence to substitute any other
*i*  figures for the figures agreed between the parties.

   [304] The result of these conclusions is that Mrs Gifford did not cause or permit IAP to enter into an agreement for no or no adequate consideration or to divert monies to which IAP was entitled for no or no adequate consideration. It follows that Mrs Gifford was not in breach of any of the

duties which, as a de jure director, she admittedly owed to IAP.

[305] As regards Mr Moore and Mr Rosser, I have held that they were shadow directors of IAP but I have not identified what, if any, fiduciary duties they owed to IAP, either generally or in relation to their involvement which led to IAP entering into the agreements in question. However, I have rejected the claimants' case that the relevant agreements were made for no or no adequate consideration. Therefore, in so far as it is alleged that Mr Moore and Mr Rosser were in breach of whatever duties they owed to IAP by reason of their involvement in the events whereby IAP entered into these agreements because the agreements were for no or no adequate consideration, that allegation fails as against them in just the same way as it failed against Mrs Gifford.

[306] Later in this judgment, I will consider whether, if I had held that Mrs Gifford, Mr Moore or Mr Rosser had been in breach of a duty to IAP in relation to the amount of the consideration agreed between IAP and Leadenhall or Darrencrest, a claim in relation to such a breach of duty would have been statute barred. Prima facie, the claim would have been statute barred because the relevant cause of action arose 6 years before the commencement of these proceedings. However, the claimants sought to counter the limitation defence by contending that the relevant breach of duty was fraudulent. I ought to comment at this stage on the allegation that Mrs Gifford, Mr Moore or Mr Rosser committed a fraudulent breach of duty.

[307] As I have held that Mrs Gifford, Mr Moore and Mr Rosser did not commit the breach of duty alleged against them, I also hold that their conduct could not be described as dishonest or fraudulent. If, contrary to my actual findings, I had held that they had committed a breach of fiduciary duty, for example, by conceding to Leadenhall and Darrencrest too much of the commission payable by developers, I would not have held that any such breach would have been dishonest or fraudulent. As to Mrs Gifford, she had no motive to defraud IAP. In any event, as far as she was concerned, the people who were interested in the shares in IAP on the one hand and Leadenhall and Darrencrest on the other were the same people. It obviously did not occur to her that those people were defrauding themselves. As to Mr Moore and Mr Rosser, again they regarded themselves as being interested in IAP on the one hand and Leadenhall and Darrencrest on the other hand. They wished to derive benefits from all of these companies. The arrangements they entered into were designed to produce the result that the earnings of these companies would be subject to less tax. The earnings of IAP would be subject to less tax because IAP could set the payments to Leadenhall or Darrencrest against its income in order to reduce its taxable profit. The earnings of Leadenhall and Darrencrest would be received in a low, or no, tax jurisdiction. Mr Moore and Mr Rosser did not consider that they were harming themselves as the persons ultimately interested in IAP. The claimants' pleaded case was that Mr Moore, Mr Rosser and Mr Forth were the beneficial owners of IAP, Leadenhall and Darrencrest. If that had been the case, it is difficult to see how their decisions as to how to divide up the earnings of the companies could be described as dishonest or fraudulent. Of course, by the end of the trial, it suited the claimants to say that Mr Moore, Mr Rosser and Ms Forth were not the beneficial owners of the companies and all of the shares were owned

a   by the trustees of discretionary trusts and the three individuals were merely potential beneficiaries under those discretionary trusts. The formal position under the discretionary trusts is not in dispute but it was clear on the evidence that Mr Moore and Mr Rosser regarded themselves (or conceivably their families) as the persons who would benefit from the shares held by their respective discretionary trusts. I add that when the

b   various agreements were made, IAP was not insolvent nor was it in the vicinity of insolvency nor was it at risk of becoming insolvent by reason of the arrangements which were made.

[308] It is alleged that Mr Moore and Mr Rosser (but not Mrs Gifford) owed further fiduciary duties to IAP and it is alleged that they broke those duties. I now turn to consider those allegations.

c

**THE ALLEGATION AS TO OBTAINING A BENEFIT FROM A THIRD PARTY BY REASON OF BEING A DIRECTOR: THE LAW**

[309] The claimants plead that the relevant duty on Mr Moore and Mr Rosser is correctly stated in what is now s 176 of the Companies

d   Act 2006 which imposes a duty on a director not to accept a benefit from a third party conferred by reason of his being a director or his doing, or not doing, anything as a director. For the purposes of this duty, a 'third party' is a person other than IAP. The possibly relevant third party in this case could be Maesbury or Lake Austin. The stipulation that the benefit is obtained from a third party and not from the company is to distinguish this duty

e   from the separate duty which arises where a director proposes to enter into a transaction or an arrangement with the company of which he is a director. Under the current statutory provisions, that duty is not imposed by s 176 but by s 177 and the scope of the duties and the possible steps which can be taken to avoid a breach of the duties are different. As indicated earlier, I will

f   later in this judgment consider the separate case made against Mr Moore and Mr Rosser that they profited in a position of a conflict of interest.

[310] In relation to the duty now being considered, not to accept a benefit from a third party which benefit has become available to the director by reason of his position as a director of IAP, Mr Phillips naturally relied on the leading authority of *Regal (Hastings) Ltd v Gulliver* [1942] 1 All ER

g   378, [1967] 2 AC 134n. In *Regal* the plaintiff company had formed a subsidiary with a view to the subsidiary taking up a lease of two cinemas. The owner of the cinemas required the subsidiary to have a paid-up capital which, in the honest opinion of the plaintiff's board, was greater than the plaintiff could afford to subscribe. The ordinary directors then subscribed at par for part of the balance of the capital required. The remainder of the

h   capital required was subscribed for by third parties (although in the name of the chairman of the plaintiff's board) and by the solicitor who had been acting for the plaintiff. Although the intention was to sell the two cinemas, together with a cinema owned by the plaintiff itself, in the event, the shares of the plaintiff and the subsidiary were sold at a price substantially above par. The plaintiff sued the ordinary directors, the chairman and the solicitor

i   for an account of the profits made by them on the sale of the shares in the subsidiary. It was held that the defendants had acted honestly throughout. Nonetheless, the ordinary directors were held liable to account to the plaintiff on the basis that they had been able to obtain a benefit from a third party by reason of their position as directors of the plaintiff company.

They would not have been liable if they had disclosed their proposed *a* actions to the plaintiff company in general meeting and had been authorised to proceed. The chairman was not liable because he had subscribed for shares on behalf of third parties who owed no fiduciary duties to the plaintiff. The solicitor was not liable because, although he owed fiduciary duties as a solicitor to the plaintiff, his conduct was effectively sanctioned by the board of the plaintiff. In *Regal* it was held that a director could be *b* held to be liable to account for profits he has made even where the company itself could not have made that profit, or had bona fide decided not to try to make that profit or had suffered no loss by reason of the director making that profit.

[311] The key to the decision in *Regal* was that, on the findings of fact in that case, the ordinary directors had made a profit by taking a benefit *c* which was available to them by reason of their being directors of the plaintiff company.

[312] *Regal* was followed and applied in *Boardman v Phipps* [1966] 3 All ER 721, [1967] 2 AC 46 where, again, the essential finding of fact was that the fiduciary had made a profit from the use of information which *d* had been acquired by him by reason of his being a fiduciary.

[313] I was referred to a substantial body of authority both before and after *Regal* which considered this duty and other duties of a fiduciary. However, the principle relied upon by the claimants, derived from *Regal*, was not in dispute. Although I have considered the other authorities which were cited and while they are helpful to me in illustrating how the principle *e* has been applied to different sets of facts, I do not think that it is necessary to cite those authorities in order to define the principle which is to be applied. My task is to apply this principle, which is not in dispute, to the facts of this case as I find them to be.

[314] In the present case, Mr Moore and Mr Rosser were not directors of IAP but I have held that they were shadow directors of IAP. I have not held *f* whether they owed a duty to IAP not to accept a benefit from a third party conferred by reason of their position in relation to IAP or by reason of their doing, or not doing, anything in the course of having that position. In these circumstances, having decided the facts as to the position which Mr Moore and Mr Rosser held in relation to IAP, I consider that it would be useful to *g* consider next whether they did accept a benefit from a third party by reason of their being in that position in relation to IAP.

### THE ALLEGATION OF OBTAINING A BENEFIT FROM A THIRD PARTY BY REASON OF BEING A DIRECTOR: THE FACTS

[315] During 2003 Mr Moore wished to set up a company in an offshore *h* jurisdiction to operate as an international sourcing company. In particular, Mr Moore intended to use that company to source properties in the United States. Mr Moore intended that the company would provide to IAP information about the properties in question and that IAP would pass that information onto its members. Mr Moore intended that the company would be separate from IAP and if the time came when IAP was sold, Mr Moore *i* could retain his interests in the international sourcing company.

[316] In accordance with Mr Moore's intentions, he pursued a relationship with Mr Storey and through Mr Storey he developed a relationship with Mr Oxley of Maesbury. Mr Oxley was interested in

*a*  working with Mr Moore and Mr Storey for the purpose of having his development properties marketed in the UK.

[**317**] Mr Rosser was less involved with Mr Storey and Mr Oxley than Mr Moore but he too was involved in building a relationship with both Mr Storey and Mr Oxley.

[**318**] The international sourcing company intended to be set up by
*b*  Mr Moore was, in the event, Leadenhall. Leadenhall was only acquired for that purpose on 6 November 2003.

[**319**] The commercial structure of the arrangements which were entered into with Maesbury in the autumn of 2003 was devised by Mr Moore. The tax consequences of those arrangements were the subject of advice by Mr Donnison.
*c*
[**320**] If, in the autumn of 2003, Mr Moore had set up Leadenhall and Leadenhall had then entered into an agreement with Maesbury whereby Leadenhall had been appointed as a marketing agent for Maesbury in return for a commission of 20%, it could not be said that Mr Moore had used his position in relation to IAP to obtain that agreement for Leadenhall.
*d*  The correct analysis would have been that Mr Moore had obtained that agreement for Leadenhall by developing his relationship with Mr Oxley and in doing so Mr Moore was not using his position in relation to IAP.

[**321**] If, in the autumn of 2003, Leadenhall had entered into a marketing agreement with Maesbury as described above and then Leadenhall had offered to share its 20% commission with IAP, that would have been an
*e*  attractive and favourable offer to IAP. In such a case, Leadenhall would provide a service to IAP of providing information about development properties which IAP could pass on to its members. In addition, the split of the commission would have been a further way in which the agreement would be attractive and favourable to IAP.

[**322**] Instead of Leadenhall entering into an agreement with Maesbury
*f*  for a commission of 20% and then Leadenhall agreeing to provide a service to IAP, IAP entered into a direct agreement with Maesbury under which it was to receive 20% commission and then, after Leadenhall was set up, IAP agreed with Leadenhall that Leadenhall would provide a service to IAP and would receive half of IAP's commission.

[**323**] Mr Moore did not give much detailed thought as to which of the
*g*  UK companies, ITS or IAP, should be a party to the relevant arrangements. For example, the contract to retain the services of Mr Storey was made with ITS and not IAP. ITS paid Mr Storey until Leadenhall became involved. Nonetheless, as it was IAP which had members who might be potential purchasers of development properties, it made sense for the UK company
*h*  which was to be used to be IAP, rather than ITS.

[**324**] Although it was suggested in the course of the evidence that the reason that IAP had entered into the contract with Maesbury instead of Leadenhall entering into a contract with Maesbury was that there was a delay in setting up Leadenhall and Mr Moore was keen to have a signed agreement with Maesbury so that IAP was used as the counterparty instead
*i*  of Leadenhall, I am not persuaded that that was the real reason for the Maesbury contract being with IAP. I think it is more likely that Mr Moore regarded all the relevant companies, ITS, IAP and Leadenhall as being his companies. What was important to Mr Moore was that a large part of the commission paid by Maesbury should end up with Leadenhall in an

offshore jurisdiction. It did not matter to Mr Moore whether the Maesbury   *a*
agreement was with IAP or with Leadenhall provided an agreement
between Maesbury and IAP would be followed by an agreement between
IAP and Leadenhall under which Leadenhall would charge IAP for its
services. This would result in the charge being a deduction against IAP's
profits and the receipt by Leadenhall being offshore.

[325] Before the arrangements were entered into by Maesbury, IAP and   *b*
Leadenhall, it was contemplated that Mr Rosser and Ms Forth would have
interests in the shares in IAP and Leadenhall. Mr Rosser took the same view
as Mr Moore did as to the commission received from Maesbury being split
between a UK company and an offshore company. It seems that Mr Moore
wanted the offshore company to receive far more than 50% of the
commission, possibly as much as 90%, but in the event the offshore   *c*
company only received 50% of the commission. Mr Rosser would have
liked the offshore company to have received more than 50% of the
commission but on 6 November 2003 he agreed on a 50/50 split of the
commission.

[326] When Mr Moore allowed the opportunity he had created of   *d*
entering into a commission agreement with Maesbury to be taken by IAP it
was always envisaged that IAP could not take all of the commission for
itself. The first reason for that was that the arrangements which had been
devised had always envisaged that the commission would be split with the
offshore company. Secondly, IAP did not have the staff and the contacts to
do what was expected to be involved in respect of sourcing property in the   *e*
US. Of course, IAP could ask Mr Moore, Mr Rosser and Ms Forth to do
that work but they were not obliged to agree to do that work. They were
certainly not obliged to do that work for no consideration and they were
not obliged to do that work for a consideration paid by IAP as distinct from
a consideration paid offshore.

[327] Against that background I now need to consider the agreements   *f*
where companies in which Mr Moore and Mr Rosser had interests
(Leadenhall and Darrencrest) obtained benefits from a third party, namely, a
developer such as Maesbury or Lake Austin. The possible fiduciary duty
which I am now considering is a duty not to obtain a benefit from a third
party and it is not a duty not to obtain a benefit from the company itself.
However, as will be seen, the claimants tried to rely on this possible   *g*
fiduciary duty to challenge agreements between Leadenhall, or Darrencrest,
and IAP. That was misconceived. The agreements where Leadenhall and
Darrencrest obtained benefits under agreements with IAP involve the
potential application of a different principle as to conflict of interest or
self-dealing.

[328] Although there were fourteen agreements entered into which   *h*
involved IAP, Leadenhall and Darrencrest in one way or another, as
described at para [49] above, the claimants' pleaded case of breach of
fiduciary duty refers to only seven of these agreements: see para 102 of the

*i*

*a*  re-re-amended Particulars of Claim. The seven agreements which are referred to in the pleading are:

(1) the agreement dated 26 November 2003 between IAP and Leadenhall;

(2) the agreement dated 26 March 2004 between Leadenhall and Maesbury;

*b*  (3) the agreement dated 26 March 2004 between Leadenhall and IAP;

(4) the agreement dated 7 October 2004 between Darrencrest and IAP;

(5) the agreement dated 4 April 2005 between Lake Austin and Darrencrest;

(6) the agreement dated 1 August 2007 between IAP and Leadenhall;

(7) the agreement dated 28 August 2007 between Darrencrest, Lake Austin and IAP.

*c*  [**329**] The first agreement which is challenged by the claimants as involving a director taking a benefit as a result of his position as a director of IAP is the agreement between IAP and Leadenhall of 26 November 2003. However, that agreement was not made with a third party; it was made with the company (IAP) itself. Thus, I find that that agreement does not fall

*d*  to be assessed by reference to the duty of a director not to take a benefit from a third party which benefit results from his position as a director. Instead that agreement falls to be assessed by reference to the different duty of a director to avoid a conflict of interest with the company or, if there is such a conflict, to disclose it to the company. I will consider that agreement of 26 November 2003, in the light of that duty, later in this judgment.

*e*  [**330**] The next two agreements which are challenged by the claimants by reference to the duty not to take a benefit from a third party are two agreements of 26 March 2004 (but not a third agreement of the same date). Only one of these two agreements was made by Leadenhall with a third party, Maesbury, as the other agreement was between Leadenhall and IAP. I consider that the agreement made by Leadenhall with Maesbury did not

*f*  involve Mr Moore and Mr Rosser, through their position in Leadenhall, taking a benefit from a third party by reason of their position in relation to IAP. First of all, I do not find that the agreements involved Leadenhall receiving a benefit as compared with the pre-existing arrangements. Indeed, it was argued that IAP was the one who was better off by being relieved of its direct liability to Maesbury. Nonetheless, I am inclined to regard the

*g*  agreements made on 26 March 2004 as being essentially neutral as between IAP and Leadenhall. Secondly, Mr Moore and Mr Rosser did not use their position in relation to IAP to receive any conceivable benefit to Leadenhall. There was very little evidence as to how the agreements of 26 March 2004 came about but, so far as the evidence went, it suggested that the initiative

*h*  to rearrange matters in that way was taken by Mr Donnison and did not involve Mr Moore or Mr Rosser using whatever position they might have had.

[**331**] The next agreement which is challenged by reference to the duty not to take a benefit from a third party is the agreement dated 7 October 2004 between Darrencrest and IAP. Again, this is not an agreement with a third

*i*  party; this agreement does not fall to be assessed in relation to the possible duty not to take a benefit from a third party; it may have to be considered in relation to the self-dealing rule. However, I have the following comments on this agreement. Prior to that agreement, Darrencrest had entered into a marketing and commission agreement with Maesbury and by the agreement

of 7 October 2004, Darrencrest split its commission with IAP. Accordingly,  *a*
the agreement of 7 October 2004 was essentially for the benefit of IAP.

[**332**] It may be that the claimants' intention was to challenge a different
agreement (also made on 7 October 2004) namely that made by
Darrencrest with Maesbury, although that is not what the claimants have
pleaded. If that had been the claimants' intention, and ignoring the lack of
a pleading to that effect, I would not hold that the benefit of the agreement  *b*
made by Darrencrest with Maesbury in October 2004 was a benefit
obtained by Mr Moore and Mr Rosser by reason of their position in
relation to IAP. Immediately before October 2004, the direct agreement
with Maesbury was with Leadenhall. Mr Moore wanted to revise the
arrangements so that any further marketing of properties for Maesbury
would be done by Darrencrest rather than by Leadenhall. Darrencrest was  *c*
to take over from Leadenhall. The Darrencrest agreement was obtained by
Mr Moore and to a lesser extent possibly by Mr Rosser but not by them
using their position in relation to IAP.

[**333**] The next agreement which is challenged is the agreement between
Darrencrest and Lake Austin of 4 April 2005. I take the same view of this  *d*
agreement as the view I took of the agreement in October 2004 between
Darrencrest and Maesbury. There is the additional consideration that in
April 2005, Mr Moore and Mr Rosser had an interest in Lake Austin so
that it might be said that obtaining this agreement was influenced by their
position in Darrencrest and in Lake Austin. But that does not amount to
them using their position in IAP.  *e*

[**334**] The next agreement which is challenged on this basis is the
agreement of 1 August 2007 between IAP and Leadenhall. This agreement
was not made by Leadenhall with a third party. Under this agreement, the
earlier agreement between IAP and Leadenhall of 26 March 2004 was
terminated. That was because the other agreement of 26 March between
Maesbury and Leadenhall was terminated. On the face of it, that was  *f*
beneficial to IAP as it allowed IAP to enter into a direct agreement with
Maesbury to receive commission of 20% rather than only half of that sum.
The purpose was to boost IAP's receipts to make IAP more saleable.
However, there was a specific agreement as to the point at which the benefit
of the commission would pass to IAP and under the relevant provision
Leadenhall was to receive the first $4m of commission. The claimants did  *g*
not call any evidence to demonstrate that this agreement was beneficial to
Leadenhall when the purpose of the agreements was to benefit IAP. There
was no evidence on which I could make a finding that the figure of $4m
was beneficial to Leadenhall as compared with the agreements of 26 March
2004 simply continuing.  *h*

[**335**] The last agreement which I need to consider is the agreement of
28 August 2007 between Darrencrest, Lake Austin and IAP. Essentially the
same reasoning applies to that agreement as applied to the agreement of
1 August 2007 considered in the last paragraph.

[**336**] Having examined the claimants' case based on an alleged fiduciary
duty not to accept a benefit from a third party by reason of their position in  *i*
relation to IAP, I find on the facts that neither Mr Moore nor Mr Rosser
used their position in connection with IAP to obtain a benefit for themselves
(through Leadenhall and Darrencrest). Accordingly, the question whether
Mr Moore and Mr Rosser owed a fiduciary duty to IAP not to accept a

*a*  benefit from a third party by reason of their position in IAP does not arise.

[337] As I have held that Mr Moore and Mr Rosser did not commit the alleged breaches of duty, there is no question of them having acted dishonestly or fraudulently. If I had held that Mr Moore and Mr Rosser had committed the alleged breaches of duty, I would still not have held that they had acted dishonestly or fraudulently. I have already discussed a similar

*b*  question in relation to the allegation that they committed a breach of duty by causing IAP to enter into agreements for no or no adequate consideration. I reach a similar conclusion to the one I reached in that context and for the same reasons.

[338] The next question therefore is whether agreements made by Leadenhall or Darrencrest with IAP involved a conflict of interest or a

*c*  breach of the self-dealing rule, given that Mr Moore and Mr Rosser had interests in Leadenhall and Darrencrest.

*d*  **CONFLICT OF INTEREST IN TRANSACTIONS WITH IAP**

[339] I have already considered whether the claimants had pleaded that Mr Moore and Mr Rosser were in breach of an alleged duty not to place themselves in a position of conflict of interest and duty. I held, with considerable hesitation, that an allegation of that kind was made. However, I also explained that the defendants had to face at the stage of closing

*e*  submissions claims that had not been opened at the outset of the trial. In addition, the claimants did not, even in their closing submissions, properly distinguish between the duty of a director not to obtain a benefit from a third party and the duty of a director to avoid a conflict of interest and duty and did not properly address the self-dealing rule. The duty not to obtain a benefit from a third party by reason of the position of being a director of a

*f*  company and the no conflict or self-dealing rule operate in different ways and are subject to different considerations. In particular, in relation to the self-dealing rule, there may be a question as to whether the position has been properly declared to the other directors of the company (as distinct from being disclosed to the general body of shareholders). I did not find the claimants' submissions on this part of the case to be very helpful. I was

*g*  given more assistance by Mr Ashworth on behalf of Mr Rosser but it was probably not clear to him even by the end of the trial what precisely was being said against Mr Rosser (and Mr Moore). Nonetheless, I must do my best to ascertain the relevant legal principles and apply them to my findings of fact.

*h*  [340] The agreements which are potentially said to be relevant to this allegation are the same seven agreements which are identified in para 102 of the re-re-amended Particulars of Claim. For convenience, I will list the seven

*i*

agreements again in this part of the judgment. They are:

(1) the agreement dated 26 November 2003 between IAP and Leadenhall;

(2) the agreement dated 26 March 2004 between Leadenhall and Maesbury;

(3) the agreement dated 26 March 2004 between Leadenhall and IAP;

(4) the agreement dated 7 October 2004 between Darrencrest and IAP;

(5) the agreement dated 4 April 2005 between Lake Austin and Darrencrest;

(6) the agreement dated 1 August 2007 between IAP and Leadenhall;

(7) the agreement dated 28 August 2007 between Darrencrest, Lake Austin and IAP.

[341] I have held that it has not been shown that IAP suffered loss by entering into these contracts. However, I am now considering whether, irrespective of the fact that IAP has suffered no loss, Mr Moore and Mr Rosser are liable to account for any profits which they may have made, directly or indirectly, from these contracts because they broke the self-dealing rule as it would have applied to a director of IAP.

[342] Although para 102 of the re-re-amended Particulars of Claim refers to seven contracts, two of them were not made between IAP and Leadenhall or Darrencrest. I refer to the agreement of 26 March 2004 between Leadenhall and Maesbury and to the agreement of 4 April 2005 between Lake Austin and Darrencrest. The other five agreements did involve IAP and Leadenhall or Darrencrest as parties.

[343] I have already described the interests which Mr Moore and Mr Rosser had in Leadenhall and Darrencrest. Putting on one side the precise position of Mr Rosser in November 2003, I will proceed on the basis that Mr Moore and Mr Rosser throughout had interests in Leadenhall and Darrencrest. In November 2003, it was clear that Mr Rosser was going to have an interest in Leadenhall although it may be that shares in Leadenhall had not by that time been allotted to the trustees of a discretionary trust under which he was a potential beneficiary. However, I will assume against Mr Rosser that his expectation of being interested in Leadenhall was sufficient to make him interested in Leadenhall on or before 26 November 2003.

[344] Of course, Mr Moore and Mr Rosser were not at any time de jure directors of IAP. However, I have held that they were shadow directors. I have not determined whether they owed fiduciary duties to IAP and in particular I have not determined whether they owed a fiduciary duty to IAP to avoid a conflict between the interests of IAP and the interests of Mr Moore and Mr Rosser in other companies. I consider that for the purpose of determining whether Mr Moore and Mr Rosser did owe such a fiduciary duty to IAP, it would be helpful to consider what the position would be, on the facts of the present case, if they had been de jure directors of IAP.

[345] If Mr Moore and Mr Rosser had been de jure directors of IAP, then they would have owed a duty to avoid a conflict between their duty to IAP and their interests in Leadenhall and Darrencrest. However, they would also have had the benefit of art 85 of IAP's articles of association. Article 85 provides that a director may be a party to a transaction with the company and the director shall not be accountable to the company for any benefit which he derives from any such transaction and the transaction is not liable

a    to be avoided on the ground of any such interest or benefit. Article 85 is
expressed to be subject to the proviso that the director has disclosed to the
directors the nature and extent of any material interest of his. Article 85 is
also to be read as subject to the 1985 Act and s 317 of the 1985 Act
imposes a duty on a director to declare to a meeting of the directors of the
company the nature of his interest in any proposed contract with the
b    company. Section 317 lays down a fairly formal procedure for the
disclosure by a director of the nature of his interest in the proposed
contract. So far as I can see, and I was not specifically addressed on this
point, Mr Moore and Mr Rosser did not comply with the formal
requirements of s 317 in this case. Of course, they would not have
appreciated that they had to comply with s 317, qua director, because they
c    were not de jure or de facto directors.

[346] Conversely, I find that the directors of IAP were at all times aware
of the nature (see s 317) and the extent (see art 85) of the material interest
of Mr Moore and Mr Rosser in the proposed contracts with IAP. The
claimants do not assert that Mrs Gifford and Lumley as the de jure
d    directors of IAP were unaware of the interests of Mr Moore and Mr Rosser
in Leadenhall and Darrencrest. Indeed, the claimants say the opposite. In
para 104 of the Particulars of Claim, it is pleaded that Mrs Gifford and
Mr Donnison knew that Mr Moore and Mr Rosser 'were the beneficial
owners and controllers of' Leadenhall and Darrencrest. The claimants plead
that Mrs Gifford knew this from her role as a director of IAP and as a
e    representative of Leadenhall and Darrencrest. In addition, I have found that
Mrs Gifford was aware of the intended arrangements in relation to
Mr Moore and Homestar because on 24 September 2003, she was sent by
email the earlier email of 22 September 2003 with the list of action points
following a meeting between Mr Moore and Mr Donnison on 18 September
2003. Further, on 6 November 2003, Mrs Gifford was told that 'Jim is in
f    Leadenhall'. Mr Rosser gave evidence that, at the meeting on 6 November
2003, he was acting for Leadenhall. In the case of Mr Donnison, the
claimants plead that he knew about the involvement of Mr Moore and
Mr Rosser in Leadenhall and Darrencrest because he advised them on
setting up those companies and taking interests in them. There is no reason
why his knowledge should not be attributed to Lumley when he was acting
g    as the representative of Lumley, a director of IAP.

[347] There is a considerable amount of authority as to the attitude a
court should take in a case where a director has an interest in a proposed
contract with the company, where the other directors know of that interest
but where the interested director has not complied with s 317 of the 1985
Act.
h    [348] In *Guinness plc v Saunders* [1990] BCLC 402 at 414, [1990] 2 AC
663 at 694, Lord Templeman commented on the importance of compliance
with s 317 when he said:

'... s 317 shows the importance which the legislature attaches to the
principle that a company should be protected against a director who
i    has a conflict of interest and duty.'

[349] The object of s 317 was also explained by Lightman J in *Neptune
(Vehicle Washing Equipment) Ltd v Fitzgerald* [1995] 1 BCLC 352 at 359,
[1996] Ch 274 at 283 in these terms:

'The object of s 317 is to ensure that the interest of any director and       *a*
of any shadow director in any actual or proposed contract shall (unless
the procedure has been adopted of giving a general declaration under
sub-s (3)) be an item of business at a meeting of the directors. Where a
director is interested in a contract, the section secures that three things
happen at a directors meeting. First, all the directors should know or be
reminded of the interest; second the making of the declaration should       *b*
be the occasion for a statutory pause for thought about the existence of
the conflict of interest and of the duty to prefer the interests of the
company to their own; third the disclosure or reminder must be a
distinct happening at the meeting which therefore must be recorded in
the minutes of the meeting under s 382 and cl 86 of Table A (consider
in particular s 382(3)). Failure to record the declaration (if made)       *c*
exposes the company and every officer in default to a fine (see s 382(5))
but does not preclude proof that the declaration was made and that
s 317 was complied with. The existence of this record operates as a
necessary caution to directors and shadow directors who might
otherwise think that their interest might pass unnoticed if the contract       *d*
falls to be scrutinised at some later date; and it affords valuable
information as to the existence of any interest and its disclosure and
thereby protection for shareholders and creditors alike in case they later
wish to investigate a contract. A sole director will know of his own
interest, but he may not know of the interest of any shadow director:
s 317 ensures that he should know. The reminder of his duty and the       *e*
making of the record required by s 317 must have enhanced value and
importance in case of a sole director, where there are no other directors
to witness or police his actions.'

**[350]** In *Neptune,* the judge left over the question to a later trial as to
whether the director had made the necessary declaration orally at the       *f*
relevant meeting and, if not, whether it would be appropriate to relieve the
director, under s 727 of the Companies Act 1985, from any resulting
liability arising from a breach of the self-dealing rule. At the subsequent
trial (see *Neptune (Vehicle Washing Equipment) Ltd v Fitzgerald (No 2)*
[1995] BCC 1000), it was held that the director had not acted bona fide in
the best interests of the company and his breach of duty would not be       *g*
relieved under s 717. The trial judge went on to hold that the necessary
disclosure had not been made and that the failure would not be overlooked
as a mere technicality even though 'the requirement for a sole director to
make a declaration to himself of the nature of his interest of which ex
hypothesi he knows everything might at first blush appear to be somewhat       *h*
bizarre and unnecessary': see [1995] BCC 1000 at 1023.

**[351]** Notwithstanding these statements, there are many judicial
comments which go the other way. These were collected by Lewison J in
*Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1454]–[1460]
and it is convenient to set out that passage, as follows:

'[1454] ... In *Lee Panavision Ltd v Lee Lighting* Ltd [1992] BCLC 22       *i*
at 33 Dillon LJ said:

"... if the judge was entitled to make findings of non-disclosure and
non-declaration of interests that he did, the position is that each of the
directors has failed to disclose formally at the board meeting an interest

a    common to all the directors and, ex hypothesi, already known to all the directors. I would hesitate to hold that such apparently technical non-declaration of an interest in breach of s 317 has the inevitable result, as to which the court has no discretion, that the second management agreement is fundamentally flawed and must be set aside if Lee Lighting chooses to ask sufficiently promptly that it be set aside."

b    [1455] In *Runciman v Walter Runciman plc* [1992] BCLC 1084 at 1093 Simon Brown J said:

"Whatever may have been the strict legal requirements of the position, on the particular facts of this case I am perfectly satisfied that for the plaintiff to have made a specific declaration of interest before
c    agreement of the variations here in question would have served no conceivable purpose. It would have been mere incantation."

[1456] In *Re Dominion International Group (No 2)* [1996] 1 BCLC 572 at 598 Knox J said:

"On the other hand it has been held that where the directors are all in
d    fact sufficiently aware of the matter that should be formally disclosed, the absence of formal disclosure may not amount to more than a technical non-declaration of an interest."

[1457] In *MacPherson v European Strategic Bureau Ltd* [1999] 2 BCLC 203 at 218 Ferris J held that a director ought to be relieved against a failure to declare an interest in a contract where: "No amount
e    of formal disclosure by each to the other would have increased the other's relevant knowledge."

[1458] In addition, in *Coleman Taymar v Oakes* Judge Reid QC decided that s 727 might apply so as to relieve a director of a duty to account which would otherwise have arisen because of a failure to disclose an interest. In *Re Duckwari plc (No 2)* [1998] 2 BCLC 315,
f    [1999] Ch 253 Nourse LJ said that the application of s 727 should not be restricted unless it is necessary to do so.

[1459] I therefore reject [counsel's] submission that the court has no discretion at all under s 727 in a case where a contract is vitiated by a director's non-disclosure. The cited cases show a series of judges treating a non-disclosure as being capable of being relieved, and also
g    show the circumstances in which relief should be given.

[1460] Although the position may be different where there is only one director (*Neptune (Vehicle Washing Equipment) Ltd v Fitzgerald (No 2)* [1995] BCC 1000) it seems to me that where a director fails to disclose an interest which is already known to his fellow directors, and where
h    there is no material prospect of a formal declaration changing the decision they have in fact made, the court should be ready to treat the non-disclosure as no more than a technical breach of duty. If, therefore, the director overcomes the two hurdles of having acted honestly and reasonably, the discretion to relieve is likely to be exercised in his favour.'

i    [352] In the present case, if Mr Moore and Mr Rosser had been de jure directors of IAP, then it is clear that there was no material prospect that a formal declaration by them, complying with s 317, would have made the slightest difference. If they had been de jure directors of IAP, they could expect to be relieved from their breach of the self-dealing rule under s 727

of the 1985 Act (s 1157 of the 2006 Act). Of course, if they had known that
they were de jure directors and they had not disclosed their interest under
s 317, there might have been a question as to why they had not done so.
Apart from that possible question, I do not consider that there was anything
in the conduct of Mr Moore and Mr Rosser which was not honest or not
reasonable. Overall, although it is to an extent hypothetical, if they had
been de jure directors this is a case where they could expect to be relieved
from the consequences of a breach of the self-dealing rule.

[353] I now need to consider the actual facts of the case where Mr Moore
and Mr Rosser were not de jure directors but were shadow directors. The
claimants submit that, as shadow directors, they do not have the benefit of
art 85 and that would seem to be correct. Further, they did not comply with
the duty of disclosure on shadow directors: see s 317(8). As to that, I think
it is likely that, for most of the period of their involvement, they did not
consider that they were shadow directors. In particular, I find that they did
not consider that possibility as early as November 2003. On the other hand,
the note of 2 March 2005 suggests that Mr Rosser considered by that date
that it was possible that he was a shadow director of IAP.

[354] The claimants also submit that, as shadow directors, Mr Moore and
Mr Rosser are not entitled to be relieved under s 727. The claimants submit
therefore that I should hold that they owed a fiduciary duty to avoid a
position of conflict, that they broke the duty, that they cannot take
advantage of art 85 and s 317 and the result is that they are liable to
account for the profits made from their breach even if a de jure director in
the same circumstances would not be liable.

[355] I acknowledge the logic of the claimants' submission but it seems to
me to produce an unacceptable result whereby a shadow director is liable to
account for profits when a de jure director would not. I consider that the
flaw in the reasoning is to assume that the duty upon a shadow director is
inevitably expressed in the same terms as the duty on a de jure director. As
explained earlier, the real questions in this case are whether the individual
being sued did owe a fiduciary duty at all and, if so, what was the extent of
that duty. It is relevant in this case to consider whether the individual being
sued acted in good faith. In this case, despite the strenuous submissions of
the claimants to the contrary, I find that Mr Moore and Mr Rosser did act
in good faith in their dealings with IAP in the relevant respects.

[356] It is therefore against that background that I have to consider
whether Mr Moore or Mr Rosser assumed a responsibility to IAP which
required them to avoid participating in the decision of IAP to contract with
Leadenhall and Darrencrest when the de jure directors of IAP knew of
Mr Moore's and Mr Rosser's interest in Leadenhall and Darrencrest and
where Mr Moore and Mr Rosser were acting in good faith in relation to
their dealings with IAP. Having regard to the responsibility which the law
should regard Mr Moore and Mr Rosser as having undertaken and having
regard to the expectations of IAP in relation to their conduct, I hold that
whatever fiduciary duty might be imposed on them, it would not place
upon them a liability to account for profits when a de jure director in the
same position would have been relieved from such a liability.

[357] I have not found this part of the case entirely straightforward to
decide. That may be because the arguments in relation to this part of the
case were not fully developed in closing submissions. In any case, this

*a* discussion may be somewhat theoretical in view of the fact that any breach of duty which might have been committed was committed more than six years before the commencement of these proceedings. Although the claimants have sought to meet the limitation defence by contending that the breaches of duty were dishonest and fraudulent, I am satisfied that Mr Moore and Mr Rosser were not dishonest or fraudulent.

*b*

**RATIFICATION**

[**358**] I have now held that Mr Moore and Mr Rosser did not commit any breach of fiduciary duty to IAP. Mr Rosser argued that if he had committed such a breach, his actions had been ratified by the general body of
*c* shareholders of IAP. In view of my earlier findings, I do not need to decide whether that contention is well founded but as the matter was fully argued, I will express my conclusions in relation to the defence of ratification.

[**359**] On 2 March 2005, in connection with a possible sale of the shares in ITS/IAP, Mr Rosser and/or Mr Berman prepared a note for a meeting
*d* with Mr Dawson, who was the representative of the trustees of the Isle of Man trusts (Jiki Trust, Mhoran Trust and Omegaville Trust) who together with Pearson Foundation were the shareholders in ITS and IAP. Mr Berman copied this note by email to Mr Rosser. I have set out the first paragraph of this note earlier in this judgment. The note contains an explanation as to why it was thought to be desirable to have the shareholders of ITS and IAP
*e* ratify a number of contracts or arrangements which ITS and IAP had made in the past. Mr Berman then acted in accordance with this note and a number of documents were prepared which were intended to provide disclosure by Mr Rosser, Mr Moore and Ms Forth of their interests in a large number of companies, in particular those which had entered into arrangements with ITS and IAP.

*f* [**360**] Unfortunately, not all of the documents which were prepared and which were submitted to ITS and IAP have survived. However, a number of the more important documents are available and I heard evidence from Mr Dawson, the representative of the trustees of the Isle of Man trusts who described the process by which the shareholders of IAP, in particular, passed a resolution to ratify contracts previously made by IAP.

*g* [**361**] Mr Rosser prepared a disclosure statement which referred to a large number of companies including IAP, Leadenhall and Darrencrest. The statement extends to 4½ pages. I will attempt to extract the points which are now of particular relevance. Mr Rosser stated his interests in Leadenhall and Darrencrest. He stated that IAP had from the first discussions in
*h* relation to any proposed arrangement been made fully aware of his and his family's interests in Leadenhall and Darrencrest. He accepted that by virtue of his interests in Leadenhall and Darrencrest, he was to be regarded as having an interest in any transaction or arrangement entered into between IAP and either Leadenhall or Darrencrest. He specifically referred to the transactions whereby Leadenhall and Darrencrest appointed IAP as a
*i* marketing sub-agent. He stated that further detail of the transactions was set out in a shareholders' memorandum. He then stated:

'Once it became clear that there was a demand by members of Instant Access for foreign properties I suggested to Instant Access that I develop an independent property sourcing vehicle for properties overseas. I

agreed to become involved in such project on the basis that I and/or
Montpelier Foundation could benefit from the additional work that
would be necessary in relation to such project. As with all the projects
undertaken by each of the Companies, the other Companies who were
in business at that time had not been actively pursuing the relevant
opportunity albeit that Instant Access was involved on a piecemeal
basis. Indeed, in each case, I was the person who wished, with Jim
Moore, to be involved with the opportunity. Jim and I on each occasion
presented a proposal and explained the terms on which we agreed to be
involved. In each case the Board of each of the Companies stated that
they preferred for their Company not to pursue such opportunity on the
basis that if pursued by me and/or others with whom I am interested
(amongst others) through a new vehicle in accordance with my/others'
proposal, that such new vehicle would agree to provide services for
members of Instant Access such that there would be a greater likelihood
of an increase in business by all of the Companies as a result.'

[362] Mr Rosser's disclosure statement disclosed his interests in
Leadenhall and Darrencrest. The narrative passage discussed above sought
to explain the background to the formation of an independent property
sourcing company for overseas properties. The first sentence of that
narrative stated that Mr Rosser had suggested to IAP that he develop this
independent company. On my findings of fact, the idea of developing the
independent company was originally Mr Moore's although Mr Rosser must
have collaborated with Mr Moore in that respect and it was Mr Rosser,
rather than Mr Moore, who attended the meeting on 6 November 2003
when IAP considered what commercial arrangement to make with
Leadenhall. The narrative is written in general terms so that it describes a
large number of transactions involving a large number of companies. It does
not purport to describe the detailed arrangements between IAP and
Leadenhall and then between IAP and Darrencrest, certainly not in the
amount of detail contained in my findings of fact. However, this disclosure
statement does disclose the essential point for present purposes, which is
that Mr Rosser was interested in Leadenhall and Darrencrest and that those
companies entered into transactions with IAP.

[363] Mr Rosser's disclosure statement referred to the shareholders'
memorandum. This was a lengthy document, of 17 pages, from Lumley and
Mrs Gifford to, or concerning, 26 companies. These companies included
IAP, Leadenhall and Darrencrest. The first 14 pages of the memorandum
are descriptive text relating to a large number of arrangements and the last
3 pages comprise a list of 21 contracts. Some of the contracts are between
IAP and third parties. The list includes the agreements of 24 October 2003,
26 November 2003, two out of the three contracts of 26 March 2004, an
agreement of October 2004 with Lake Austin and the contract of 7 October
2004, which contracts have been described earlier in this judgment. The
memorandum makes a number of statements which are potentially relevant
in this case:

(1) The arrangements were said to have been made on an arms-length
basis;

(2) There is detailed description of the circumstances in which Mr Rosser
became involved with ITS and IAP;

(3) ITS and IAP were kept fully informed of the businesses being

*a*  developed; as to Leadenhall and Darrencrest, it was said:

> '… in relation to the sourcing of properties overseas Leadenhall
> Group Limited and Darrencrest Corp have access to opportunities
> which have been made available to members of Instant Access and … a
> substantial number of properties will be made available at Grand
*b*  Palis[a]des, again to the members of Instant Access …'

(4) The memorandum then stated:

> 'It is also worthy of note that the shareholders of each of the
> Companies understood that without the involvement of Bradley Rosser
> or James Moore, (each of whom has insisted on the approach referred
*c*  to above), the opportunities that have been and are continuing to be
> made available to the Company would not have been made available.
> Each of the Shareholders who is a signatory to this Memorandum
> therefore wishes to avoid any prospect that any of the directors of any
> of the Companies or any of Bradley Rosser, James Moore, Alex Forth
*d*  and Kim Moore could be criticised or held to account or suffer any
> detriment whatsoever or otherwise be criticised for pursuing a policy
> either with the Company or as participants in any of the other
> Companies. It is the individual and joint stance and intent of the
> signatories that (i) to the extent permitted by each signatory, the acts of
> the directors of each of the Companies be ratified, approved and
*e*  confirmed to the greatest extent permitted by law, (ii) that the position
> of each of Bradley Rosser, James Moore, Alex Forth and Kim Moore be
> protected such that:
> (a) their acts in relation to the Company whose shareholders are
> considering the relevant resolutions, be approved, consented to and
> ratified;
*f*  (b) their involvement with each of the other Companies be approved
> and consented to; and
> (c) any benefits derived by any of them as a result of their
> involvement with any of the other Companies or any interest they have
> with or in any of the other Companies be approved and consented to
> such that such interests shall be entitled to be retained in full for their
*g*  own benefit without them being held liable to account in respect thereof
> to the Company.'

(5) The memorandum then described the business of IAP, Leadenhall and
Darrencrest;

*h*  (6) The memorandum then described the arrangements between IAP and
Leadenhall: the claimants criticised certain passages in the memorandum
and for convenience I have highlighted these passages in the text quoted
below; they were not, of course, in italics in the original:

> '**Instant Access having become established, the management team
> began to encounter difficulties in obtaining sufficient opportunities in
> the UK to offer to their members. In addition there was a demand from
*i*  the membership base of Instant Access for access to a greater number of
> overseas opportunities. It was clear that a significant amount of work
> would be required to be conducted abroad if Instant Access were to be
> able to offer to its members a significant amount of property with**

security that issues could be dealt with as they arise. A proposal was made for Leadenhall Group Limited to take over responsibility for exploiting foreign business which until that time had not been actively pursued. Instant Access wanted to ensure insofar as possible that Leadenhall assumed responsibility for all aspects of dealing with developers. **In addition, Neil Storey who was seen as the key to the success of any overseas property sourcing made it clear for tax purposes he wanted to be engaged by Leadenhall and not by Instant Access.** Both Brad Rosser and Jim Moore had made it clear to Instant Access that they would not have been willing to have remained involved in overseas business otherwise than in accordance with the proposed arrangement. **Leadenhall was not willing to take on the role of pursuing overseas opportunities unless the commissions/fees payable by the foreign developers were divided equally between Leadenhall and Instant Access.** Whilst negotiations were continuing but before Leadenhall was in a position to commit to the role, negotiations between Instant Access and certain overseas developers were being finalised. **It was considered by the directors of Instant Access, having received appropriate assurances from those involved with Leadenhall, that it would be best to secure the commitment from the developers at the first opportunity and thereafter to restructure matters accordingly.'**

(7) The memorandum then continued by referring to the agreement of 24 October 2003 (although the date was mis-stated as 2004); the claimants criticised certain passages in this part of the memorandum and again, for convenience, I have highlighted these passages in the text quoted below; they were not, of course, in italics in the original; the memorandum stated:

'Following the conclusion of commercial negotiations Instant Access appointed Leadenhall as its agent to deal with the foreign developers. **One should be aware that Leadenhall helped construct the arrangements between the developers and Instant Access on the understanding it would be entitled to share any commissions with Instant Access on a 50:50 basis.** However, it was soon appreciated that the most sensible way to structure the arrangement was for Leadenhall to be appointed as the agent for the developer and for Instant Access to be given the opportunity (but not the obligation) to be appointed as sub-agent. This would enable Leadenhall to source more aggressively, leaving Instant Access with the time to review each proposal in a measured manner to pick and choose which units to act on. As a consequence, Leadenhall, Instant Access and Maesbury Homes Inc entered into various agreements, copies of which are contained at tabs 7, 8 and 9 of the Bundle, to record such new arrangement. Through the offices of Leadenhall the relationship in particular with Paul Oxley has been extended beyond that which was envisaged at the time that Leadenhall assumed the role as overseas property sourcer. As a result, the overseas business has expanded much faster and to a much greater extent than would have been the case had Instant Access been required to deal with the developers on its own account.'

(8) The memorandum then described the arrangements in relation to Darrencrest; this was a lengthy passage extending to over three pages; in the

a  light of the submissions which were made, I need not set out the whole of that passage but it is relevant to refer to the following; again I have highlighted the passages criticised by the claimants:

   '**Lake Austin Properties has agreed to appoint Darrencrest as its agent to market some or all of the off-plan opportunities in respect of such development** (see the Agreement at tab 11 of the Bundle). **Darrencrest**

b  **in turn has appointed Instant Access as its agent to market the opportunities for which it has been appointed as agent** (see the Agreement at tab 12 of the Bundle).'

   and also:

c     'Darrencrest has entered into arrangements with Instant Access on a similar basis to those existing between Instant Access and Leadenhall. However, Darrencrest, in its arrangements with Lake Austin Properties has, for the reasons described below, accepted a selling commission in respect of units at Grand Pal[i]s[a]des of 10 per cent, not 20 per cent as payable to Leadenhall for sales at Bahama Bay. From the perspective of

d     Instant Access (beyond the fact that sales commission in Florida is generally limited to 6% of the sales price, 4% below that as negotiated by Darrencrest) it has achieved considerable benefit from the arrangement as entered into by Darrencrest.'

   (9) The memorandum then referred further to agreement between Lake

e  Austin and Darrencrest and stated (again, I have highlighted this passage in italics):

   '**This arrangement was made possible by the strength/personal relationship between Brad Rosser, Neil Storey and Paul Oxley.**'

   [**364**] The claimants submitted that the passages in the shareholders'

f  memorandum which I have highlighted in italics were untrue.

   [**365**] The shareholders of IAP passed the following resolution in relation to the disclosure by Mr Rosser:

   'We being all of the shareholders entitled to attend and vote at any general meeting of the Company:

g     1. having been furnished with and having reviewed each of the following documents:

      1.1 a memorandum addressed to the shareholders of the companies listed therein (such companies referred to herein as the "Companies") describing the ambit of business of each such company and the details of the contracts and arrangements between the Companies to include

h     between any of such Companies and the Company (the "Shareholders Memorandum")

      1.2 a memorandum prepared by Bradley John Rosser, a senior executive of Inside Track Limited, addressed to the directors of each of the Companies as identified therein to include the Company ("B J Rosser Memorandum")

i     1.3 the contracts specified in the schedule to the Shareholders Memorandum copies of such have been made available to us for inspection.

   WE HEREBY UNANIMOUSLY RESOLVE having at all times past consented to the business activities of each of the other companies

referred to in the Shareholders Memorandum being conducted by such *a*
other companies rather than the Company and having been kept
informed of any new business opportunities that were subsequently
pursued by such other companies and having consented to the
Company collaborating with such other companies in the progression
of such opportunities and notwithstanding any defect or irregularity by *b*
virtue of any non-disclosure to the directors (if such disclosure were
required to be made by any of Bradley John Rosser) of any interest that
Bradley John Rosser may have had or may now have in any of the
contracts or arrangements disclosed in the Shareholder Memorandum
or in the B J Rosser Memorandum as appropriate (such contracts and
arrangements together and individually the "Contracts") as separate *c*
ordinary resolutions:

THAT the Company do ratify, confirm and approve each of the
Contracts.

THAT all acts carried out by Bradley John Rosser on behalf of the
Company be and are hereby approved and ratified and to the extent
relevant and to the maximum extent permitted by law, and to include *d*
without prejudice to the generality of the foregoing, notwithstanding
any failure to formally or otherwise disclose his interest in any
Contract.

THAT the interests of Bradley John Rosser in each Contract, where
the interests of Bradley John Rosser in the contracting party or parties is
disclosed in the B J Rosser Memorandum, are each hereby each (*sic*) *e*
approved and are consented to and ratified and shall be deemed always
to have been approved and consented to and that any benefit obtained
directly or indirectly by Bradley John Rosser resulting from any such
interest hereby be approved consented to and ratified and that Bradley
John Rosser shall be entitled to maintain his interest in each of the
companies and in each of the Contracts as disclosed by him in the B J *f*
Rosser Memorandum without being personally accountable to the
Company for the benefits derived therefrom.

THAT the actions of each of the directors in assisting and/or acting
for or on behalf of any of the Companies in pursuit of their respective
objectives as set out in any of the Shareholders Memorandum and the
B J Rosser Memorandum hereby be approved, consented to and ratified *g*
to the maximum extent permitted by law and that the right of each of
the directors and the right of Bradley John Rosser to retain any benefit
accruing to him whether directly or indirectly be and is hereby
approved consented to and ratified.

THAT the actions of Bradley John Rosser in assisting and/or acting *h*
for or on behalf of any of the Companies in pursuit of their respective
objectives as set out in any of the Shareholders Memorandum and the
B J Rosser Memorandum hereby be approved, consented to and ratified
to the maximum extent permitted by law and that his right to retain
any benefit accruing to him whether directly or indirectly be and is
hereby approved consented to and ratified. *i*

THAT the Company consents to the directors and Bradley John
Rosser continuing to act for or on behalf of each of the Companies in
pursuing their respective activities as described in the Shareholders
Memorandum and the B J Rosser Memorandum without any liability to

a        the Company for breach of fiduciary or other duty or for conflict of
         interest with the Company to the maximum extent permitted by law.
              THAT to the extent that by acting as described in the Shareholders
         Memorandum or the B J Rosser Memorandum or as otherwise within
         the knowledge and with the consent of the directors there may
b        nevertheless be a breach of fiduciary duty or conflict of interest by
         Bradley John Rosser that to the maximum extent permitted by law
         Bradley John Rosser shall not be liable to account to the Company
         therefor and shall be entitled to maintain any benefit deriving from so
         acting for his own account.
              That Bradley John Rosser shall not be liable to the Company for any
c        benefit or profits received by him or by any other company or any trust
         or foundation or other person or entity with which he is interested or
         connected by virtue of such company, trust, foundation, person or other
         entity having an interest in any Contract.'

d    [366] Mr Dawson gave evidence that the documents referred to above
     were disclosed to the shareholders of IAP and that the shareholders
     executed the resolution set out above.
         [367] The above documents refer to the position of Mr Rosser.
     Mr Dawson gave evidence that a similar process was completed in
     accordance with a disclosure statement of Mr Moore.
         [368] If, contrary to my earlier findings, Mr Moore and Mr Rosser had
e    committed a breach of fiduciary duty in one of the ways alleged by the
     claimants, they could point to the very broad terms in which the resolution
     of the shareholders was expressed. However, Mr Phillips submitted that the
     information provided to the shareholders prior to the resolution was
     misleading so that Mr Moore and Mr Rosser could not rely on a resolution
     made in those circumstances.
f        [369] Before considering the facts as to whether the information provided
     to the shareholders was misleading, I need to consider the question as to
     what the shareholders must know or be told about the subject matter of the
     request for their approval. The relevant authorities deal with what has
     become known as 'the *Duomatic* principle', after the decision in *Re
     Duomatic Ltd* [1969] 1 All ER 161, [1969] 2 Ch 365. The principle was
g    described in that case by Buckley J in these terms ([1969] 1 All ER 161 at
     168, [1969] 2 Ch 365 at 373):

         '… where it can be shown that all shareholders who have a right to
         attend and vote at a general meeting of the company assent to some
         matter which a general meeting of the company could carry into effect,
h        that assent is as binding as a resolution in general meeting would be.'

     In his judgment, Buckley J did not discuss what the shareholders needed to
     know about the subject matter of the request for their approval although he
     referred to the submission of counsel that the matter had been approved
     'with the full knowledge and consent' of the shareholders ([1969] 1 All ER
i    161 at 165, [1969] 2 Ch 365 at 370).
         [370] The question as to the relevant knowledge of the shareholders was
     considered by Mummery LJ in *Gwembe Valley Development Co Ltd v
     Koshy (No 3)* [2003] EWCA Civ 1048, [2004] 1 BCLC 131. In that case, a
     director had committed a breach of the self-dealing rule. The court

considered whether the director had disclosed the relevant interest in *a* accordance with the articles of the company and held that he had not. The court then considered whether the director had disclosed the material facts to the shareholders so that he could say they had acquiesced in what he had done. On that point, Mummery LJ said (at [65]–[66]):

'[65] The requirement of the general law is that, although disclosure *b* does not have to be made formally to the board, a company director must make *full* disclosure to all the shareholders of all the material facts. The shareholders in the company, to which he owes the fiduciary duty not to make an unauthorised profit from his position, must approve of, or acquiesce in, his profit. Disclosure requirements are not confined to the nature of the director's interest: they extend to *c* disclosure of its extent, including the source and scale of the profit made from his position, so as to ensure that the shareholders are "fully informed of the real state of things", as Lord Radcliffe said in *Gray v New Augarita Porcupine Mines Ltd* [1952] 3 DLR 1 at 14.

[66] Rimer J held that Mr Koshy, on whom the onus of proving full *d* disclosure to shareholders lay, fell short of the requirements of the general law. He failed to show that all of the other directors and shareholders were aware of his intended personal interest in Lasco. Further, he did not disclose to them the source and scale of his intended profit, in particular, the nature, existence and scale of the very substantial profit from the top-up payment in December 1986.' *e* (Mummery LJ's emphasis.)

[**371**] In *EIC Services Ltd v Phipps* [2003] EWHC 1507 (Ch), [2004] 2 BCLC 589, [2003] 1 WLR 2360 (at [122]), Neuberger J summarised the *Duomatic* principle in these terms:

'[122] … The essence of the *Duomatic* principle, as I see it, is that, *f* where the articles of a company require a course to be approved by a group of shareholders at a general meeting, that requirement can be avoided if all members of the group, being aware of the relevant facts, either give their approval to that course, or so conduct themselves as to make it inequitable for them to deny that they have given their approval. Whether the approval is given in advance or after the event, *g* whether it is characterised as agreement, ratification, waiver, or estoppel, and whether members of the group give their consent in different ways at different times, does not matter.'

[**372**] In that passage, Neuberger J referred to the shareholders being 'aware of the relevant facts'. He then proceeded to discuss a particular point *h* which arose in that case because the shareholders did not appreciate that they were being asked to give their approval to a proposed transaction as distinct from being informed in advance of the proposal. The judge held that the shareholders could not be held to have consented to the proposal when they did not appreciate that they were being asked to consider the matter and to give their consent. He referred with approval to an Australian *i* case (*Herman v Simon* (1990) 8 ACLC 1094 at 1096) where the judge had referred to the *Duomatic* principle as requiring 'full knowledge and consent' on the part of the shareholders. Neuberger J's actual decision was reversed by the Court of Appeal but without any consideration of the *Duomatic*

a principle: see [2004] EWCA Civ 1069, [2004] 2 BCLC 589, [2005] 1 WLR 1377.

[373] In *Sharma v Sharma* [2013] EWCA Civ 1287, [2014] BCC 73 the Court of Appeal held that the shareholders had with full knowledge of the material facts acquiesced in a director's proposed course of conduct which would otherwise have amounted to a breach of fiduciary duty. Jackson LJ

b considered what had to be shown as to the existence of knowledge on the part of the shareholders. He referred to the cases I have cited and also to *Boardman v Phipps* [1966] 3 All ER 721, [1967] 2 AC 46. In that case, the trial judge (Wilberforce J) had considered whether the beneficiaries had consented to the fiduciary defendants taking an opportunity for their own benefit. Jackson LJ said ([2014] BCC 73 at [43]) that the decision was

c authority for the proposition that the beneficiary's consent does not absolve the fiduciary from liability unless the fiduciary has disclosed all material facts. Jackson LJ summarised the position as follows (at [52]):

'If the shareholders with full knowledge of the relevant facts consent to the director exploiting those opportunities for his own personal gain,
d then that conduct is not a breach of the fiduciary or statutory duty.'

[374] The passage in the judgment of Wilberforce J in *Phipps v Boardman* where the judge considered whether Mr Boardman had given the beneficiaries full information as to the material facts is at [1964] 2 All ER 187 at 204–207, [1964] 1 WLR 993 at 1012–1017. The judge held that the
e disclosure to the beneficiaries had not been sufficient. He considered a letter which was relied upon by Mr Boardman as giving disclosure. He held ([1964] 2 All ER 187 at 205, [1964] 1 WLR 993 at 1012) that although there was no intention to mislead, the disclosure was not sufficient to enable someone coming fresh to the matter to appraise it. He also held
f ([1964] 2 All ER 187 at 207, [1964] 1 WLR 993 at 1017), in relation to the disclosure at a meeting that the plaintiff was justified in thinking that he had only been told half the truth.

[375] These authorities make it clear that before a director can rely upon a ratification by the shareholders in relation to something which would otherwise be a breach of fiduciary duty, the director must show that the
g shareholders had full knowledge of the relevant facts so that they can appraise the situation and make an informed decision as to whether to ratify what has occurred.

[376] I will now seek to apply this principle to the information which was provided to the shareholders in this case. For this purpose, I will refer to the three breaches of fiduciary duty alleged against Mr Moore and Mr Rosser.
h These were that they had: (1) caused IAP to enter into the agreements with Leadenhall and Darrencrest for no or no adequate consideration; (2) obtained a benefit from a third party by reason of their position as shadow directors of IAP; and (3) broken the self-dealing rule.

[377] If, contrary to my earlier findings, I had held that Mr Moore and Mr Rosser had been guilty of the first alleged breach of fiduciary duty, then
i the shareholders were not given full information as to the matter; indeed, the information given to the shareholders was that the arrangements were on an arms-length basis. I add that although the shareholders' resolution was obtained principally for the benefit of Mr Moore and Mr Rosser, it also purported to ratify the actions of Mrs Gifford as a de jure director. If,

contrary to my earlier findings, she had been guilty of the same breach of    *a*
fiduciary duty, then again she would not have been able to rely upon the
shareholders' resolution as removing her liability for that breach.

[378] If, contrary to my earlier findings, Mr Moore and Mr Rosser had
been in breach of fiduciary duty by accepting a benefit from a third party by
reason of their position as shadow directors of IAP, then their ability to rely    *b*
upon the shareholders' resolution would depend upon the findings made as
to how it was that they were in breach of this duty. The shareholders'
memorandum was on the basis of facts which did not give rise to a breach
of duty in this respect and, indeed, I have held that there was no such
breach of duty. Accordingly, one would have to compare the findings of fact
on which a finding of a breach of duty was made with the statements of fact    *c*
in the shareholders' memorandum. I do not consider that it would be a
useful exercise to construct some hypothetical findings of fact in order to
compare them with the facts stated in the shareholders' memorandum. I can
comment, however, that the way in which matters are described in the
memorandum is not the same in all respects as my actual findings of fact.
The principal example of this is that the memorandum proceeds on the    *d*
basis that Leadenhall was involved in a relevant way in the period before
IAP entered into the contract with Maesbury on 24 October 2003 whereas
that was not the case. However, there is considerable force in the argument
that the memorandum was not in substance misleading because 'the people
behind Leadenhall' principally Mr Moore and Mr Rosser were acting in
their own interests and not on behalf of IAP prior to 24 October 2003.    *e*

[379] I can make more useful comments as to what the effect of the
shareholders' resolution would be if I found that Mr Moore and Mr Rosser
were in breach of the self-dealing rule. In such a case, I would hold that the
resolution did ratify the contracts made by IAP with Leadenhall and
Darrencrest, the companies in which Mr Moore and Mr Rosser had an
interest potentially in conflict with their duties to IAP. The shareholders    *f*
were given full information as to the nature and extent of the interests of
Mr Moore and Mr Rosser in Leadenhall and Darrencrest. Indeed, I did not
understand the claimants to argue otherwise. The claimants criticised the
passages I have highlighted in the shareholders' memorandum but those
passages did not relate to the nature and extent of the interests of
Mr Moore and Mr Rosser in Leadenhall and Darrencrest. The passages    *g*
related to the circumstances in which the opportunity to earn commission
was taken by Leadenhall and Darrencrest. In those respects, although my
findings of fact are not in the same terms as the statements in the
memorandum and although the memorandum is not accurate as to the
involvement of Leadenhall before 24 October 2003, I would hold that the    *h*
shareholders had been given full information as to the relevant facts as to
the conflict of interest of Mr Moore and Mr Rosser and had not been
misled in a relevant respect. If I had held that Mr Moore and Mr Rosser
had been in breach of the self-dealing rule, I would have held that the
shareholders' resolution ratified IAP's contracts with Leadenhall and
Darrencrest and exempted Mr Moore and Mr Rosser from any liability for    *i*
any breach of the self-dealing rule.

[380] The shareholders' resolution was made in around March 2005 and
the claimants do allege breach of fiduciary duty in relation to contracts
made by IAP with Leadenhall and Darrencrest after that date. However, the

*a*  resolution recorded the shareholders' consent to the directors of IAP and Mr Rosser continuing to act on behalf of the various companies in pursuing their respective activities as described in the shareholders' memorandum.

## NEGLIGENCE

*b*  [**381**] The second set of claims is brought against JDLLP, Mr Donnison, Mishcon de Reya and Mr Berman, I will deal with the claims against JDLLP and Mr Donnison first and then deal with the claims against Mishcon de Reya and Mr Berman.

[**382**] The claimants have pleaded that IAP retained JDLLP and Mr Donnison to act as its advisers in certain respects. JDLLP says that it
*c*  was not retained by IAP to provide tax planning advice but that, instead, IAP retained a different entity, JDCL to provide tax planning advice. JDLLP accepts that it was retained at some point by IAP to act as IAP's corporation tax compliance agent and advisor and that it duly did so. JDLLP say that the matters complained of by the claimants in these proceedings all relate to
*d*  tax planning advice given by JDCL and cannot be asserted to be a breach of duty by JDLLP. JDCL has not been made a defendant to these proceedings. Mr Donnison agrees with JDLLP that it was JDCL and not JDLLP which was retained by IAP to provide tax advice. Mr Donnison was a member of JDLLP and a director of JDCL. He says that he did not assume any personal responsibility or duty to IAP.

*e*  [**383**] In the remainder of this discussion of the second set of claims, I will assume in the first instance, in the claimants' favour, that it was JDLLP which was retained by IAP to advise it and that Mr Donnison did owe a duty of care personally to IAP in relation to the advice which he gave.

[**384**] The claimants further pleaded that JDLLP and Mr Donnison owed to IAP fiduciary duties and a duty of skill and care. The fiduciary duties
*f*  which were asserted were the duty to act in good faith and in the best interests of IAP. The claimants then pleaded, in para 109 of the re-re-amended Particulars of Claim, that JDLLP and Mr Donnison committed the following breaches of their duties to IAP:

*g*  '109.1. Causing or permitting the diversion of commission revenue to which IAP was entitled to LH and DC through the agreements set out above;
109.2. Advising IAP to enter into the arrangements by which the commission revenue was diverted;
109.3. Causing or permitting IAP to enter into the agreements with LH and DC, which served no valid commercial purpose;
*h*  109.4. Causing or permitting IAP to enter into the arrangements with LH and DC, for the purpose of dishonest tax evasion;
109.5. Failing to self-assess transfer pricing by which the tax charge of IAP for was understated or to advise IAP that it was required to do so;
109.6. Creating false documents, as set out in Section P above, by
*i*  which the ownership and control of LH and DC was concealed and the commercial reasons for the agreements was purportedly justified;
109.7. Representing to Deloitte and HMRC that there was no common ownership and control of IAP, LH and DC, as set out in Sections Q and R above;

109.8. Failing to advise IAP (or to insist as a condition for continuing    *a*
to act) that it should cease the arrangements with LH and DC and the
diversion of revenue from IAP to LH and DC.'

[385] In para 110 of their pleading, the claimants alleged that these
breaches of duty by JDLLP and Mr Donnison were fraudulent. In para 111
of their pleading, the claimants alleged that Mr Donnison and, by him,    *b*
JDLLP—

'acted negligently in advising on and causing IAP to enter into the
arrangements which he knew (or in the alternative should have known)
infringed the UK taxation legislation as to transfer pricing.'

[386] In their opening submissions, the claimants contended that JDLLP    *c*
and Mr Donnison had acted dishonestly throughout. The claimants' lengthy
written opening submissions do not appear to deal with a separate
allegation of negligence on the part of JDLLP and Mr Donnison.

[387] In their closing submissions, the claimants summarised the second
set of claims against JDLLP and Mr Donnison in this way:    *d*

'396. The claims for breach of duty against the advisors can be put
very simply:
(1) Mr Berman and Mr Donnison knew by the time of the
6 November 2003 meeting that IAP had secured agreements with
developers;
(2) Mr Berman and Mr Donnison knew that the individuals behind    *e*
the shareholders of IAP, Leadenhall and Darrencrest were Mr Moore,
Mr Rosser and Ms Forth and they stood to personally profit from the
diversion of commission income to the offshore companies;
(3) Mr Berman and Mr Donnison knew that the purpose of the
agreements with Leadenhall and Darrencrest was to achieve a tax    *f*
advantage and to personally profit Mr Moore, Mr Rosser and
Ms Forth. The agreements were not on commercial terms. There was no
assessment of the commercial value provided by Leadenhall and
Darrencrest for the commission income they received.'

[388] It is clear that the claimants have moved their position significantly    *g*
over the course of the trial in relation to the second set of claims which they
wish to make against JDLLP and Mr Donnison. As originally pleaded, the
case being advanced was one of fraud. The only specific act of alleged
negligence was pleaded in para 111 of the re-re-amended Particulars of
Claim and this allegation was not repeated in the summary of the claimants'
case in their closing submissions. Counsel for JDLLP and Mr Donnison    *h*
submitted that by the end of the trial, there was no surviving allegation of
negligence against those parties which had been pleaded by the claimants.
As against that, the matters pleaded in para 109 of the pleading were
pleaded as a breach of duty by JDLLP and Mr Donnison and it can be said
that some of the matters alleged in para 396(3) of the claimants' closing
submissions were encompassed somewhere within para 109 of the pleading.    *i*

[389] By the end of the trial, it is only the allegations in para 396 of the
claimants' closing submissions which are pursued and with which I need to
deal. What is said in para 396(1) and (2) is not in dispute apart from the
possibility of a disagreement about the use of the term 'diversion', in so far

a    as that suggests something inappropriate. Similarly, the first sentence of para 396(3) does not appear to be in dispute. Accordingly, what matters for present purposes are the second and third sentences of para 396(3).

[390] In the second sentence of para 396(3), it is alleged that 'the agreements were not on commercial terms'. I have earlier held that the claimants have failed to make good that contention. The third sentence of

b    para 396(3) alleges that: '[t]here was no assessment of the commercial value provided by Leadenhall and Darrencrest.' What is surprising is that the claimants' closing submissions do not go on to assert that this alleged fact constituted negligence on the part of JDLLP or Mr Donnison. If it is implicit, although not expressly stated, in para 396(3), that JDLLP and Mr Donnison owed a duty to IAP to assess the commercial value of the

c    consideration provided or, possibly, to advise IAP that it needed to assess the commercial value of that consideration, that is not a matter which is pleaded against JDLLP or Mr Donnison in paras 109 or 111 of the pleading.

[391] In any case, I do not consider that JDLLP and Mr Donnison did

d    owe any duty to IAP to assess the commercial value of the consideration provided by Leadenhall and Darrencrest. Neither JDLLP nor Mr Donnison was retained to advise IAP on a commercial matter such as this and IAP did not expect them to give that advice. As to whether JDLLP or Mr Donnison ought to have advised IAP to consider for itself the commercial value of the consideration, Mr Donnison did advise IAP that the split of commission

e    should appear to be at arm's-length so that it could be justified to HMRC if the need arose and he also favoured a 50/50 split as something that could potentially be justified in that way. I do not consider that there was any negligence in relation to that advice. But in any event, there is no pleaded allegation of negligence of that kind.

[392] In the light of these conclusions, it is not necessary to consider

f    whether the entity retained by IAP to give it tax planning advice was JDLLP (as the claimants alleged) or JDCL (as JDLLP and Mr Donnison alleged). Nor is it necessary to consider whether the duty of care owed by the adviser to IAP was a duty owed by JDLLP or JDCL alone or whether Mr Donnison also owed a personal duty of care to IAP.

[393] I now turn to consider the second set of claims against Mishcon de

g    Reya and Mr Berman. The case against both of these defendants is put in the same terms and for convenience I will discuss only the case against Mr Berman personally. The claimants pleaded that Mr Berman was retained by IAP to act for it and to advise it in certain respects. It was pleaded that Mr Berman owed to IAP the fiduciary duties to act in good faith and in the

h    best interests of IAP and it was further pleaded that he owed to IAP a duty of skill and care.

[394] It was then pleaded that Mr Berman had a personal profit-sharing deal with Mr Rosser and that he had failed to disclose that to IAP. It was pleaded that this arrangement meant that his personal interests conflicted with his duty to IAP. However, the claimants did not appear to claim any

i    specific relief against Mr Berman by reason of there being an alleged conflict of interest and an alleged failure to disclose it. Instead, the claimants appeared to rely upon this arrangement as showing that Mr Berman had an incentive to act inappropriately as regards IAP.

[395] In para 124 of the re-re-amended Particulars of Claim, the

*a*

claimants pleaded that Mr Berman had committed the following breaches of his duties to IAP:

'124.1 Advising upon and drafting the agreements by which commission revenue, to which he knew IAP was entitled, was diverted to LH and DC;

*b*

124.2. Advising upon and drafting the agreements with the knowledge that they were intended to enable IAP to dishonesty (*sic*) evade tax;

124.3. By advising upon and drafting the agreements and diverting revenue to LH and DC, causing or permitting an unlawful distribution to IAP's beneficial owners;

*c*

124.4. Drafting or making the representations to Deloitte and HMRC (referred to above) in order to conceal the breach of the transfer pricing provisions of the UK taxation legislation;

124.5. Failing to advise IAP (or to insist as a condition for continuing to act) that it should cease the arrangements with LH and DC and the diversion of revenue from lAP to LH and DC.'

*d*

[396] In paras 125 and 126 of the pleading, the claimants alleged that these breaches were fraudulent, alternatively, negligent.

[397] In their closing submissions, the claimants summarised their case against Mr Berman in the same terms as they summarised their case against Mr Donnison (and JDLLP). Many of the comments which I have already made about that summary and how it departed from the pleaded case against Mr Donnison (and JDLLP) apply also to the way the case is now put against Mr Berman. Insofar as the claimants wish to allege that Mr Berman was in some way negligent by reason of the fact that the relevant agreements were not on commercial terms, the claimants have failed to prove that the agreements were not on commercial terms. Insofar as the claimants wish to allege that Mr Berman was negligent because he did not himself assess, or advise IAP to assess, the commercial value of the consideration given by Leadenhall and Darrencrest, I do not consider that Mr Berman was obliged to assess the commercial value of the consideration or to give advice to IAP in relation to its commercial value. In any case, it is not pleaded that Mr Berman was negligent in such a way.

*e*

*f*

*g*

[398] In their closing submissions, the claimants contended that Mr Berman knew all of the constituent ingredients of the breaches of fiduciary duties which were, the claimants allege, committed by 'the directors' (a term which I take to include de facto or shadow directors) but did not advise IAP against entering into agreements in circumstances where the directors were acting in breach of fiduciary duty. The short answer to this contention (whether or not it has been pleaded) is that Mrs Gifford as a de jure director and Mr Moore and Mr Rosser as shadow directors did not commit a breach of fiduciary duty.

*h*

## DISHONEST ASSISTANCE OF A BREACH OF FIDUCIARY DUTY

*i*

[399] The third set of claims made by the claimants is that JDLLP, Mr Donnison, Mishcon de Reya and Mr Berman dishonestly assisted breaches of fiduciary duty committed by Mrs Gifford as a de jure director and by Mr Moore and Mr Rosser as de facto or shadow directors.

[400] The short answer to this set of claims is that Mrs Gifford,

*a* Mr Moore and Mr Rosser did not commit breaches of fiduciary duty owed to IAP.

[401] In view of the seriousness of the allegations made against Mr Donnison and Mr Berman, I wish to record that even if I had held that they had somehow or other assisted breaches of fiduciary duties, I would not have found them to have been dishonest.

*b*

## CONSPIRACY TO INJURE BY UNLAWFUL MEANS

[402] The fourth set of claims made by the claimants is that all of the defendants, that is, Mrs Gifford, Mr Moore, Mr Rosser, Mr Donnison (and JDLLP) and Mr Berman (and Mishcon de Reya) entered into a combination or understanding with each other with an intention to injure or cause financial loss to IAP by the use of unlawful means and, in consequence, IAP suffered loss and damage.

*c*

[403] The allegedly unlawful means relied upon by the claimants are breaches of fiduciary duty by Mrs Gifford, Mr Moore and Mr Rosser. The short answers to this set of claims are that Mrs Gifford, Mr Moore and

*d* Mr Rosser did not commit breaches of fiduciary duty owed to IAP and IAP did not suffer any loss or damage. Further, there was no relevant intention to injure.

## SECTION 213 OF THE INSOLVENCY ACT 1986

[404] In the fifth set of claims, the claimants allege that all of the

*e* defendants participated in the carrying on of the business of IAP with the intent to defraud creditors of IAP and/or for a fraudulent purpose, as described in s 213(1) of the Insolvency Act 1986. In such a case, the court has the power, pursuant to s 213(2) of that Act, to declare that any person who was knowingly a party to the carrying on of the business in that

*f* manner is to be liable to make such contribution to the company's assets as the court thinks proper. The claimants accept that in order for a defendant to be liable under this section, the defendant must participate in the carrying on of the business with the knowledge that the transactions in which he participates are intended to defraud creditors or are in some other way fraudulent.

*g* [405] The claimants' pleaded case in relation to the alleged fraudulent trading is as follows:

'131. The business of IAP was carried on with intent to defraud creditors of the company and for a fraudulent purpose in that:

131.1. HMRC was defrauded by reason of the arrangements between

*h* IAP, LH, DC and Lake Austin in that revenue, to which IAP was entitled, was diverted to LH and DC for the purpose of dishonest evasion of tax;

131.2. The true purpose of the arrangements (the dishonest evasion of tax) was concealed by the defendants as set out above in Sections P, Q and R.

*i* 132. The defendants caused IAP to be operated with intent to defraud creditors and for a fraudulent purpose by acting as set out above in paragraphs 102, 103, 109 and 124.'

[406] Paragraph 102 of the pleading set out the allegations that Mrs Gifford, Mr Moore and Mr Rosser had acted in breach of fiduciary

duties owed to IAP. I have discussed those allegations of breach of fiduciary
duty earlier in this judgment and concluded that the claimants have not
established the alleged breaches.

[407] Paragraph 103 of the pleading alleged that Mrs Gifford, Mr Moore
and Mr Rosser committed further breaches of fiduciary duty by attempting
to conceal the true nature of the various agreements entered into by IAP
with Leadenhall, Darrencrest and others. This paragraph cross-refers to the
section of the pleading which identifies a large number of documents which
are alleged to have been fabricated or to have contained false statements.
These documents fell into the following categories:

(1) fabricated documents which purported to be from Leadenhall to IAP
at a time when Leadenhall either did not exist or was not involved with
IAP;

(2) notes of meetings or minutes of IAP which were fabricated or
contained false statements;

(3) the shareholders' memorandum prepared in order to be disclosed to
the shareholders in IAP to induce them to ratify the earlier actions of the
shadow directors;

(4) backdating of correspondence involving IAP, Darrencrest and Lake
Austin;

(5) statements made to Deloittes in connection with the proposed sale of
the businesses of IAP and ITS;

(6) statements made to HMRC as to the basis of the split of commission
between IAP and Leadenhall.

[408] Paragraphs 109 and 124 of the pleading are quoted earlier in this
judgment.

[409] In their closing submissions, the claimants dealt very briefly with
the fraudulent trading claim. At para 436 of their written closing
submissions, they stated:

'The fraudulent trading claim is based upon the same facts as the
Part 7 Claims, and in particular the breaches of fiduciary duty by the
directors and the assistance of the advisors. The fraudulent trading
claim is brought because it is subject to a different limitation period.'

[410] 'The Part 7 Claims' which are referred to in this paragraph of the
closing submissions are the first, second, third and fourth set of claims
referred to earlier in this judgment. I have now considered all of those
claims and have held that the defendants were not in breach of fiduciary
duty, did not dishonestly assist a breach of fiduciary duty, did not conspire
to commit breaches of fiduciary duty and were not negligent. In those
circumstances, the claimants do not seek to say that the facts which I have
found nonetheless amount to the business of IAP being carried on with the
intent to defraud creditors or for a fraudulent purpose.

[411] The fraudulent trading claim, as pleaded, though not as advanced in
closing submissions, did rely upon the fact that persons connected with IAP
fabricated documents and the further alleged fact that documents
containing false statements were created and provided to others. Although
the claimants did not in the end rely on these matters for the purpose of
their case as to fraudulent trading, I do wish to comment on that allegation.

[412] It is fairly clear that Mrs Gifford participated in the fabrication and
back-dating of documents which purported to be documents passing

a  between IAP and Leadenhall. The purpose of creating these documents appeared to be to support the case which IAP wished to put forward, possibly to Deloittes, or possibly to HMRC, as to how the initial arrangements between IAP and Leadenhall came to be made. So far as I am aware, these documents were not shown to Deloittes and it is clear that they were not shown to HMRC. These documents had no influence on the actions of Deloittes or HMRC. Neither HMRC nor any creditor of IAP was
b  adversely affected in any way which was attributable to the existence of these documents. The claimants do not say that the creation of these documents gave the claimants or any third party any cause of action against any of the defendants.

[413] As regards the explanations given to Deloittes as to the relationship
c  and the transactions between IAP and Leadenhall and between IAP and Darrencrest, which explanations are said to have contained false statements, Deloittes was not persuaded that it had been told the whole story in those respects and ultimately withdrew from its involvement in the proposed sale process of the businesses of IAP and ITS. As regards the explanations given
d  to HMRC, which again are said to contain false statements, HMRC do not appear to have acted on those explanations and, in particular, were not persuaded by any such statements to give up any claim which they might have had against IAP.

[414] I find that it is not necessary to examine each and every document relied upon by the claimants, which is said to be fabricated or to contain a
e  false statement, before reaching the conclusion that no creditor was defrauded and no fraud was committed. I further find that the creation of these documents did not result in loss to any third party nor did it lead to a third party (such as HMRC) having a claim against IAP which it did not already have nor did it lead to the misapplication or misappropriation of the assets of IAP.

f  [415] The relevant legal principles as to the application of s 213 of the Insolvency Act 1986 are not in dispute. They have been discussed in a number of cases to which I was referred. For present purposes I can take those principles from the decision of the Court of Appeal in *Morphitis v Bernasconi* [2002] EWCA Civ 289, [2003] 2 BCLC 53, [2003] Ch 552 (at [43], [47], [53]–[55]). Applying those principles to my findings of fact, I
g  conclude that:

    (1) the business of IAP was not carried on with the intent to defraud creditors or for any fraudulent purpose;

    (2) the creation of false documents and the allegedly false statements made in documents did not cause loss to IAP or to any third party;

h  (3) there is no basis for a declaration that any of the defendants is liable to make a contribution to the assets of IAP.


**LIMITATION**

[416] Because I have held that the claimants have not established any of their claims against any defendant it is not necessary to consider the
i  question of limitation. However, I do wish to make some brief comments on that question.

[417] It was always obvious that the claimants faced grave difficulties in relation to limitation. The claims which they wished to advance in tort or in contract or for breach of fiduciary duty by a director or a shadow director

were prima facie subject to a six-year limitation period and the claimants' claims were not brought within that period. The claims in tort and contract were governed by ss 2 and 5 respectively of the Limitation Act 1980. The claims for breach of fiduciary duty by a director or a shadow director were governed by s 21(3) of the 1980 Act: see *First Subsea Ltd v Balltec Ltd* [2017] EWCA Civ 186, [2018] 1 BCLC 20, [2018] Ch 25 and *Burnden Holdings (UK) Ltd (in liq) v Fielding* [2016] EWCA Civ 557, [2017] 1 WLR 39. The claimants sought to avoid the prima facie conclusion that their claims were statute barred in a number of ways. First, they relied on s 213 of the Insolvency Act 1986 where the relevant limitation period began when IAP went in to liquidation on 21 December 2008; the claim under s 213 was brought in time (just) on 18 December 2014. Further, the claimants sought to rely on s 21(1)(a) and 21(1)(b) and 32 of the Limitation Act 1980.

[418] The only claim where the claimants might be said to have come anywhere near establishing liability on the part of the shadow directors, Mr Moore and Mr Rosser, related to the allegation that they had not formally disclosed their interests in Leadenhall and Darrencrest when those companies entered into contracts with IAP. That would have been a very technical breach of fiduciary duty in circumstances where the de jure directors of IAP knew of those interests. It may be helpful to consider the question of limitation on the assumption that the claimants had, contrary to my actual conclusion, succeeded in establishing a breach of fiduciary duty of that kind. In relation to that assumed breach of fiduciary duty, the limitation position would have been as follows:

(1) the breach would not have been a fraudulent breach of trust within s 21(1)(a) of the 1980 Act;

(2) the resulting claim to an account would not have been a claim to recover trust property or the proceeds of trust property within s 21(1)(b) of the 1980 Act: see *First Subsea Ltd v Balltec Ltd* at [59];

(3) the action would not have been an action based on fraud within s 32(1)(a) of the 1980 Act; and

(4) no facts relevant to the claimants' right of action had been deliberately concealed from the claimants, in circumstances where the de jure directors of the claimants knew of the interests of Mr Moore and Mr Rosser so that the claim would not have been within s 32(1)(b) of the 1980 Act;

(5) accordingly, the claim would have been statute barred.

**THE OVERALL RESULT**

[419] The result of my findings is that the claimants have not made out any of the claims which they have brought against any defendant. The claims will therefore be dismissed.

*Actions dismissed.*

Peter Hutchesson   Barrister (NZ).

# Exhibit X



Neutral Citation Number: [2023] EWHC 1279 (Ch)

Case No: CH-2022-000105

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 26/05/2023

**Before** :

**SIR ANTHONY MANN**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **Christopher Charles Fisher** | **Defendant/ Appellant** |
| - and - | |
| **Colin Laverock Dinwoodie** | **Claimant/ Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Andrew Butler KC** and **Richard Alford** (instructed by **Fieldfisher LLP**) for the
**Defendant/Appellant**
**Shane Sibbel** (instructed via **Direct Access**) for the **Claimant/Respondent**

Hearing dates: 22nd & 23rd March 2023
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 10.00am on Friday 26th May 2023 by
circulation to the parties or their representatives by e-mail and by release to the National
Archives.

.............................

SIR ANTHONY MANN

Double-click to enter the short title

**Sir Anthony Mann :**

**Introduction**

1.     This is an appeal which raises the question of whether a fiduciary relationship arose as between the appellant (Mr Fisher) and the respondent (Mr Dinwoodie) because Mr Dinwoodie, who says that such a relationship existed, uses that as the first basis on which he claims an interest in the shares of various companies in circumstances in which legal title to those shares was and is held by Mr Fisher.  It also raises the question of whether a claim can be made to an interest in some of those shares via an express trust or a constructive trust on what are described as *Pallant v Morgan* principles ([1953] Ch 43) or other constructive trust principles.  The judge below (HHJ Monty KC) held in Mr Dinwoodie's favour on both of those counts.  In his order he granted an injunction against Mr Fisher as well, which restrains him from competing with various of the companies concerned.  That remedy is challenged in this appeal by Mr Fisher, as are the findings of fiduciary duty and trust which underpin the claims to the shares.

2.     Mr Andrew Butler KC led for Mr Fisher in this appeal; Mr Shane Sibbel appeared for Mr Fisher.  Both counsel appeared at the trial below, which doubtless partly explains their impressive mastery of the detail of the documents in this case.

3.     A further outline of the facts of this case will assist further navigation round the issues, and I provide it here.  The more detailed facts are set out in a separate section.

4.     Mr Fisher and Mr Dinwoodie had a friendship going back many years before they started a business relationship.  Several years before 2009 they started some sort of business  with a number of projects.  Among those projects was the provision, or intended provision, of consultancy services to third parties.  There is a dispute in this case as to whether that amounted to a partnership - the judge below held that it did.  In 2009 they agreed that the services would be provided by two companies, namely Business E&M Ltd ("BEM") and Business M&E Ltd ("BME").  One was registered for VAT and the other was not.  The idea apparently was that the former would deal with VAT registered clients, and the latter with clients not registered for VAT.  Where it is not necessary to distinguish between these companies I shall call them the BEM companies.  The first main dispute in this case is as to whether, in the circumstances, Mr Dinwoodie has acquired a beneficial interest in those shares by virtue of a fiduciary relationship between him and Mr Fisher.  The judge below held that he did.

5.      It seems a certain amount of activity took place within those companies.  In 2012 Mr Fisher acquired a sole legal shareholding in various other companies originally controlled by Ms Julia Dee.  In the compromise of litigation in a Tomlin order it was acknowledged that, as between Mr Fisher and Ms Dee's interests, Mr Fisher acquired sole rights to the shares in two of those companies, namely Alterations Matter Ltd ("AML") and Queenstown Ventures Ltd ("QVT") - collectively "the DA companies".  The second main dispute in the case was as to whether Mr Dinwoodie acquired an interest in those shares via a constructive trust and the alleged fiduciary relationship, and/or an express declaration of trust and/or the alleged *Pallant v Morgan* constructive trust.  The judge below held that he did under all heads

6.      The third element of the appeal in this case is the terms of the injunction to which I have referred.  In this appeal it is said that that injunction is far too wide.

**The basis of the appeal**

7.      The complaints made in this appeal, and which I have to consider, are as follows:

(i)  The finding of partnership (which was used as a building block, though not an essential one, for the construction of the fiduciary duty case) was not justified on the evidence.

(ii)  The finding of fiduciary duty was not justified on the basis of the approach by the judge and on the basis of the evidence.  The judge did not adopt the right legal approach to finding fiduciary duties, did not identify sufficient facts to justify a relevant duty, did not articulate it sufficiently clearly and failed to take into account the corporate structure in finding that there was a duty.

(iii)  The judge erred in finding on the evidence that there was an express trust of the DA companies shares.

(iv)  The judge erred in finding, on the evidence, that the DA company shares were affected by a constructive trust.

(v)  The injunction granted was too wide in principle.

**The correct approach to the matters in this appeal**

8.    Mr Butler said that there was no challenge to any of the findings of primary fact made by the judge.  From time to time Mr Sibbel complained that the matters raised on this appeal were matters which went to what were essentially evaluative judgments made by the judge, with consequential limits on the extent to which an appellate court can interfere with those findings.  I shall consider those points when I consider the detail of this appeal.  It was common ground that so far as there are evaluative decisions (which is itself in dispute) the relevant authorities lay down the following principles, which appear conveniently in *Re Sprintroom Ltd* [2019] EWCA Civ 932:

> "76.    So, on a challenge to an evaluative decision of a first instance judge, the appeal court does not carry out a balancing task afresh but must ask whether the decision of the judge was wrong by reason of some identifiable flaw in the judge's treatment of the question to be decided, "such as a gap in logic, a lack of consistency, or a failure to take account of some material factor, which undermines the cogency of the conclusion".

> 77.    All this said, when assessing an evaluative decision of the facts found by a trial judge, there can be no doubt that one must also bear in mind the well-known passage in the speech of Lord Hoffmann in *Biogen Inc. v Medeva plc* [1997] RPC 1, 45 where he said:

> "…The need for appellate caution in reversing the judge's evaluation of the facts is based upon much more solid grounds than professional courtesy. It is because specific findings of fact, even by the most meticulous judge, are inherently an incomplete statement of the impression which was made upon him by the primary evidence. His expressed findings are always surrounded by a penumbra of imprecision as to emphasis, relative weight, minor qualification and nuance (as Renan said, la vérité est dans une nuance), of which time and language do not permit exact expression, but which may play an important part in the judge's overall evaluation. It would in my view be wrong to treat *Benmax* as authorising or requiring an appellate court to undertake a de novo evaluation of the facts in all cases in which no question of the credibility of witnesses is involved. Where the application of a legal standard such as negligence or obviousness involves no question of principle but is simply a matter of degree, an appellate court should be very cautious in differing from the judge's evaluation.""

78.  Again, the position is so well summarised by Lewison LJ in his well-known judgment in *Fage UK Ltd. & anor. v Chobani UK Ltd. & anor.* [2014] EWCA Civ 5, at paragraph 114, as follows:

"114. Appellate courts have been repeatedly warned, by recent cases at the highest level, not to interfere with findings of fact by trial judges, unless compelled to do so. This applies not only to findings of primary fact, but also to the evaluation of those facts and to inferences to be drawn from them. The best known of these cases are: *Biogen Inc v Medeva plc* [1977] RPC1; *Piglowska v Piglowski* [1999] 1 WLR 1360; *Datec Electronics Holdings Ltd v United Parcels Service Ltd* [2007] UKHL 23 [2007] 1 WLR 1325; *Re B (A Child) (Care Proceedings: Threshold Criteria)* [2013] UKSC 33 [2013] 1 WLR 1911 and most recently and comprehensively *McGraddie v McGraddie* [2013] UKSC 58 [2013] 1 WLR 2477. These are all decisions either of the House of Lords or of the Supreme Court. The reasons for this approach are many. They include:

i) The expertise of a trial judge is in determining what facts are relevant to the legal issues to be decided, and what those facts are if they are disputed.

ii) The trial is not a dress rehearsal. It is the first and last night of the show.

iii) Duplication of the trial judge's role on appeal is a disproportionate use of the limited resources of an appellate court, and will seldom lead to a different outcome in an individual case.

iv) In making his decisions the trial judge will have regard to the whole of the sea of evidence presented to him, whereas an appellate court will only be island hopping.

v) The atmosphere of the courtroom cannot, in any event, be recreated by reference to documents (including transcripts of evidence).

vi) Thus even if it were possible to duplicate the role of the trial judge, it cannot in practice be done."

Where relevant I shall apply those principles.

**The judge's findings**

9.    The judge made most of his findings of primary fact in a section of his judgment devoted to that issue, but he added in a few more when he was considering the issues that he had to decide.  What follows is an account of those facts.  In some instances I can summarise, but in others I have to give some detail because Mr Butler's appeal depends, in part, on the detail not being sufficient to justify the legal conclusions which the judge based on them.

10.    The two men met in 1981 and became "good friends" before starting becoming involved in a number of business ventures from 2006 and a "consultancy business" in 2008 (paragraph 1).  They included their first project, Technofree, which is said by Mr Fisher to have been a "not for profit" venture to facilitate internet access for the elderly; there was a proposal to acquire equity in a landscaping business called Vernalis (which apparently did not come to fruition); and there was Mr Fisher's purchase of an Italian delicatessen business called Olive, for which Mr Dinwoodie had some involvement in the negotiations.  The judge records:

> "36.  Mr Dinwoodie regarded Mr Fisher as his business partner.
> In my judgment, Mr Fisher did likewise."

The positioning of this paragraph in the judgment indicates that this was a finding in relation to this period of their relationship.

11.    In late 2008 and early 2009 the parties discussed how they could formalise their relationship so as to provide consultancy services to small businesses.  Mr Fisher proposed BEM (then under another name) as a corporate vehicle; he was its sole shareholder, but acknowledged that there were probably brief discussions about issuing a share to Mr Dinwoodie in that company and BME.  A Skype message interchange of 28th May 2009 seems to contain an acknowledgment by Mr Fisher that Mr Dinwoodie should have a share, and the judge considered that Mr Fisher was not being truthful in the witness box when he said he had no intention either way.

12.    In paragraph 41 the judge found that Mr Dinwoodie entrusted Mr Fisher with the paperwork required for organising the corporate affairs of the company, and that that is what happened over the years.  He added:

> "42. I also accept that Mr Dinwoodie believed he was a 50% shareholder in BEM and BME and that this was also Mr Fisher's understanding, belief and intention."

13.    The annual returns of the companies reflected Mr Dinwoodie as being one of the two shareholders in both of the companies from January 2010 (BME) and November 2011 (BEM), and in November 2016 a confirmation statement for BME recorded both Mr Dinwoodie and Mr Fisher as persons with 25-50% significant control. Mr Dinwoodie assumed Mr Fisher had made the relevant transfers and relied on him to have done so, and to have filed correct documents at Companies House (paragraphs 8 and 41). Mr Fisher sought to distance himself from the returns, but the judge did not accept his protestations of non-involvement. He had discussed Mr Dinwoodie's shareholding with a third party (Ms Martin, the companies' book-keeper).

14.    In paragraph 49 the judge made findings that the pre-corporate business continued through the medium of the BEM companies:

> "49. It is clear, in my judgment, that the pre-corporate business then continued through the medium of the consultancy companies. The significant background to this was that it is plain, in my judgment, that Mr Fisher and Mr Dinwoodie were in business together (a business which they referred to either as Project X or as The Business) from before the use of BEM (they offered and provided business consultancy services to a Mr Mason in 2008, they made the offer in respect of the equity in Vernalis, and were also involved in other projects such as Olive), and Mr Fisher's repeated denial that they were rang hollow."

And in paragraph 50 he found that Mr Dinwoodie and Mr Fisher regarded themselves as owners of the consultancy companies, that they were in business together and were sharing the corporate ownership. He backed this up by reference to admissions by Mr Fisher in other proceedings. Then he turned to the DA companies, and said:

> "53. As to the original DA companies, it seems to me that the position is equally clear and to similar effect."

15.    His findings then deal with this. He had already found (paragaph 11) that when BME started to provide consultancy services to the DA group Mr Fisher acquired a single

share in each of four of the companies in the group, including the two DA companies which feature in this claim (AML and QTV).  Litigation took place between Ms Dee and Mr Fisher, which was compromised in a Tomlin order (undated in my papers but which appears to have been in about October 2013) under which it was agreed that Mr Fisher would retain (inter alia) the shares in the DA companies and two other identified individuals would relinquish all interest in those shares.  Mr Dinwoodie was not a party to the litigation or to the compromise, though he did sign the Tomlin order on behalf of BME.  Judge Monty firmly rejected the proposition (advanced by Mr Fisher) that Mr Fisher was intended to be the sole beneficial owner of those shares and he found (without much reasoning) that:

> "55…  after the Tomlin Order the position was that BME had 100% beneficial ownership of the [DA companies], and Mr Fisher and Mr Dinwoodie owned half each in turn."

16.    He also found that in connection with those companies Mr Fisher was given to describing Mr Dinwoodie as his "business partner" to third parties, and added:

> "In my judgment, Mr Fisher meant what he said when referring to Mr Dinwoodie as his partner - he meant more than "business partner" and knew that it carried legal connotations, and he meant it to do so when he used the word." (paragraph 54).

17.    The judge found that the position in relation to the beneficial ownership of the shares in the DA companies was confirmed in a Skype Message from Mr Fisher to Mr Dinwoodie on 13th December 2013.  The terms of that message, so far as relevant, were as follows:

> "I think we agreed the following yesterday:
>
> [Various matters concerning the business of the DA companies and funding]
>
> I am still holding the sole share in [AML and QTV] but we are still agreed that we share equally in DA equity/shareholding until we discuss and agree otherwise.
>
> Have I got this right?"

To which Mr Dinwoodie replied:

> "Broadly agreed (we have subsequently discussed on afternoon of 13/12). Let me know if you are available this afternoon for a chat."

18.   The judge found as a fact that there was actual agreement on the beneficial holdings in the DA companies. What remained to be agreed were the other matters referred to in the message.

19.   Thereafter (as the judge found - paragraph 55) Mr Fisher described Mr Dinwoodie from time to time as "co-owner" to third parties (outsiders and new recruits), and Mr Fisher procured that Mr Dinwoodie and himself be registered as persons with significant control over DA companies. The judge rejected Mr Fisher's attempts to explain those matters away. He found that Mr Dinwoodie was involved in the conduct of the business of all the companies, rejecting Mr Fisher's evidence he was a non-executive director.

20.   In 2017 the two men fell out. The judge charted some of the course of this falling out, and much of the detail does not matter. What is of potential significance is his reference to an email in which Mr Fisher seemed to acknowledge he had only a 50% share in the value of an unidentified company (probably one of the DA companies) and the fact that he did not correct an assertion by Mr Dinwoodie that he had a 50% share. On 31st October 2017 Mr Fisher send an email in which he talked about ending the "partnership" (a word he put in inverted commas) and adding after the word:

> "… that was perhaps never a true one in the first place. Partnership is a very loaded word, just like 'investment' and 'equity'. Multiple meanings and subtleties. Massive scope for misunderstanding."

21.   Thereafter, and once he had realised the true state of the shareholding in November 2017, Mr Fisher embarked on a course of action designed to exclude Mr Dinwoodie from the business. He had references to him removed from Companies House, removed him as director from AML and the BEM companies and diluted the original shareholdings in those companies by the allotment of further shares in those companies. There was a further round of restructuring (unspecified) in 2020 and Mr Fisher has refused to account to Mr Dinwoodie for moneys paid out of the companies for Mr Fisher's benefit since 2017. The judge found (and Mr Fisher did not seem to deny) that Mr Fisher had moved income and assets out of the DA companies into two of his own

companies and registered the trading names of the DA companies ("Design and Alter" and "Bride and Alter") as trade marks in his own name.

22.     With the benefit of those facts the judge embarked on a determination of the issues arising.  He considered authorities relating to the existence of fiduciary duties or a fiduciary relationship and determined that while it is unusual for fiduciary duties to exist in a commercial context, they might do (paragraph 78) and that considering whether or not they exist in any given case is a fact-sensitive exercise.   He accepted the submission that such duties arose in this case out of the following factors:

> (a)  Prior to the involvement of the BEM companies, there was a partnership between Mr Dinwoodie and Mr Fisher.

> (b)  Once the corporate structure was introduced the parties, and in particular Mr Fisher, continued to use the words "partner" and "partnership" and to their interests being 50/50.

> (c)  Mr Fisher had said in his witness statement that the two of them had always acted in good faith and in their mutual interests and agreed completely on a common purpose.   That encapsulated a situation in which there was a legitimate expectation on both sides that one would not use his position in such a way as would be adverse to the other.

> (d)  The close personal relationship meant that it was not primarily a commercial venture and that they did not record their agreement in a personal document.

> (e)  Mr Dinwoodie relied on and was vulnerable to Mr Fisher.  The vulnerability was best illustrated by the events of 2017 when Mr Fisher excluded Mr Dinwoodie from the business and restructured the shareholdings.  Mr Dinwoodie also trusted Mr Fisher to deal with any necessary formalities regarding shareholdings and trusted him to hold the DA companies shares on trust for BEM. Mr Fisher knew that that was Mr Dinwoodie's position.

(f)  It did not gainsay that conclusion that Mr Dinwoodie might have had a remedy of rectification under section 125 of the Companies Act 2006.

23.    Having thus concluded, Judge Monty found that Mr Fisher's retention of title to the shares in the BEM companies and the DA companies was contrary to their agreement and a breach of fiduciary duty

"not to act otherwise than in good faith and with loyalty in relation to the shareholding of the company." (paragraph 101).

24.    Then the judge held there was an express trust in relation to the shares in the DA companies based on the agreement about those shares which he had already found (paragraph 103).

25.    In addition, Judge Monty found that a constructive trust had arisen based on *Pallant v Morgan* [1953] Ch 43, rejecting the argument that such a trust could not arises where the property was already owned by one party at the time the trust was said to arise.

26.    Accordingly, the judge held that Mr Dinwoodie's claim in relation to his beneficial interest in the shares in the BEM companies and the DA companies succeeded.  The new shares which Mr Fisher had issued to himself in those companies and any profits were to be held on trust for the two men equally.

27.    So far as the injunction restraining Mr Fisher from competing with the business of the companies is concerned, this was dealt with in a judgment given on the occasion of the consequentials hearing.  The judge's main points were:

(a)  The injunction was not a restraint of trade because Mr Fisher was not a former employee or former director, but was a member of a joint venture who still owed fiduciary duties to Mr Dinwoodie.

(b)  The fidiciary duties still existed - this would seem to be at the heart of the reasoning on the injunction point.

(c)  He rejected the suggestion that the word "compete" was too vague, pointing out that the word was used in section 30 of the Partnership Act 1890 which provided for a partner to account for his/her profits if he/she "competes" with the business of the partnership.

**The partnership finding**

28.    I have set out above the various bases on which Mr Butler seeks to mount his appeal. His first is an attack on the finding of a partnership before the BEM companies were brought into play.  This finding is not determinative of the fiduciary duty point, and even if it is wrong it does not mean there was no fiduciary relationship, but it is the judge's first building block and falls for consideration in that context.  If there was a form of partnership then that is a significant part of the background for the relationship which followed because a partnership is one of the relationships which of itself attracts fiduciary duties.

29.    Mr Butler sought to criticise the finding by pointing to some very limited evidence given about this in Mr Dinwoodie's witness statement and submitting that the ingredients of a partnership under the Partnership Act 1890 were not there - there was no business carried out on common (with a view to profit), and manifestations of a partnership such as a partnership bank account were not present.  He complained that the judge below did not address the elements of a partnership properly.

30.    I do not consider that Mr Butler gets home on this point.  The judge quoted section 1 of the Act in paragraph 87 of his judgment and must be taken to have had the relevant ingredients in mind.  While he did not set out much of the evidence in the part of his judgment where he made his finding, and had not referred to much more in his earlier factual narrative (paragraph 35), Mr Butler fairly accepted that he had received more evidence than he recited, and Mr Sibbel took me to it (or some of it).  I do not propose to recite it either.  The dispute was really whether the evidence went so far as to establish that the parties had been doing sufficient to amount to the carrying on of a business in common bearing in mind the activities of which the judge received evidence.  This is an evaluative question (see *Ilott v Williams* [2013] EWCA Civ 645 at para 18) and can only be upset if the decision was plainly wrong - see above.  In my view it was not.  This basis of the appeal therefore fails.

**Fiduciary relationships and duties - the underlying law**

31.     This issue is at the heart of the appeal.  Mr Dinwoodie's case is based on an averment of, and reliance on, what he said was the fiduciary relationship between him and Mr Fisher.  It is said that Mr Fisher was under fiduciary duties in relation to the BEM companies' and DA companies' shares such that his denial of Mr Dinwoodie's entitlement, and his subsequent steps to frustrate it, are a breach of those duties.  The existence of this key relationship is denied by Mr Fisher.

32.     The main principles underlying the existence of a fiduciary relationship were not much disputed on this appeal, though the emphasis to be given to some of them was.  The relevant principles can be derived from the following cases.

33.     The leading authority in this area is the much quoted analysis of Millett LJ in *Bristol v West Building Society v Mothew* [1998] Ch 1.  In his oft-cited paragraph at p18 he said:

> "This leaves those duties which are special to fiduciaries and which attract those remedies which are peculiar to the equitable jurisdiction and are primarily restitutionary or restorative rather than compensatory. A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work Fiduciary Obligations (1977), p. 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

34.     In identifying whether a relationship is a fiduciary one or not, there are two further concepts which may be of assistance.  They are the concept of reasonable expectations and an imbalance of power and vulnerability, but as Birss LJ pointed out in *Tulip*

*Trading Ltd v Bitcoin Association for BSV* [2023] 4 WLR 16 paras 46 and 47, those are not touchstones, they are merely helpful explanatory concepts.

35.     At the heart of Mr Butler's submissions on this point was one to the effect that the judge fell into the trap of saying that since Mr Fisher was a fiduciary, he therefore owed all conceivable types of fiduciary duty without considering what those duties were. I will consider separately how the judge below dealt with these points, and for the moment will deal with other points relied on by Mr Butler which he said arose from the authorities.

36.     First, Mr Butler submitted that what existed in the present matter was a joint venture, and authority indicated that fiduciary duties (or relationships) rarely arise in such a context. He pointed to *Al Nehayan v Kent* [2018] EWHC 333 (Comm) in this respect. That was a case described by the the Court of Appeal judge (Leggatt LJ) as one which has elements of the present case:

> "1.  The story is all too familiar. Two friends go into business together. The business founders, their friendship falls apart and they end up in a dispute on opposite sides of a courtroom."

It was a joint venture sort of case, and the submission was made that on the facts each party owed fiduciary duties to the other. Having considered two cases in which there was said to be a fiduciary relationship in a joint venture context, Leggatt LJ said;

> "157.  In considering this submission, I bear in mind that it is exceptional for fiduciary duties to arise other than in certain settled categories of relationship. The paradigm case of a fiduciary relationship is of course that between a trustee and the beneficiary of a trust. Other settled categories of fiduciary include partners, company directors, solicitors and agents. Those categories do not include shareholders, either in relation to the company in which they own shares or to each other. While it is clear that fiduciary duties may exist outside such established categories, the task of determining when they do is not straightforward, as there is no generally accepted definition of a fiduciary.

37.     Mr Butler relied on this as some sort of starting point for him.  While the cautionary words are appropriate, they do not really take this case very far.  As Leggatt LJ pointed out in his judgment, a close personal relationship is not enough (paragraph 163), and all factors have to be considered.  That is obviously right, and it applies to all allegations where such a relationship is alleged.  Anyone outside the normal established categories is going to have to work harder to establish that the necessary relationship exists.  The question in any given case is whether that relationship is established.  It is noteworthy that while Leggatt LJ held that his defendant did not owe fiduciary duties to his claimant, he seems to have been prepared to consider that it was much more arguable that duties existed the other way - see paragraph 162 - so it seems there was at least the potential for fiduciary duties even in that "commercial" environment.

38.     The position was helpfully summarised by Nugee J in *Glenn v Watson* [2018] EWHC 2016, from which Judge Monty himself quoted.  Nugee J carried out an extensive review of the authorities and delivered a summary from which the following relevant principles and guidance can be extracted:

> "131. … (1)     There are a number of settled categories of fiduciary relationship.  The paradigm example is that of trustee and beneficiary; other well-settled examples are solicitor and client, agent and principal, director and company (subject to the impact of the Companies Act 2006), and the relationship between partners: *Snell's Equity* (33rd edn, 2015) at §7-004.
>
> (2) Outside these settled categories, fiduciary duties may be held to arise if the particular facts warrant it.  Identifying the circumstances that justify the imposition of fiduciary duties has been said to be difficult because the courts have consistently declined to provide a definition, or even a uniform description, of a fiduciary relationship: *ibid* at §7-005.
>
> (3) Fiduciary duties will not be too readily imported into purely commercial relationships.  That does not mean that fiduciary duties do not arise in commercial settings – indeed they very frequently do, as the example of agency illustrates – but that outside the settled categories, this is not common, it being normally inappropriate to expect a commercial party to subordinate its own interests to those of another commercial party: *ibid*.
>
> (4)     A joint venture is not one of the settled categories of relationship giving rise to fiduciary duties between the joint venturers.  Although at first sight the analogy with a partnership might suggest that it would be, it is clearly established that the phrase *"joint venture"* is not a term of art either in a business or in a legal context, and each relationship which is described as a joint venture has to be examined on its own facts and terms to

see whether it does carry any obligations of a fiduciary nature: *Ross River Ltd v Waveley Commercial Ltd* [2013] EWCA Civ 910 (**"*Ross River*"**) at [34] per Lloyd LJ.

(5) The default position is that no such fiduciary duties arise. In the absence of agency or partnership, it would require particular and special features for such fiduciary duties to arise between commercial co-venturers …"

….

(7) Without in any way attempting to define the circumstances in which fiduciary duties arise (something the courts have avoided doing), it seems to me that what all these citations have in common is the idea that A will be held to owe fiduciary duties to B if B is reliant or dependent on A to exercise rights or powers, or otherwise act, for the benefit of B in circumstances where B can reasonably expect A to put B's interests first. That may be because (as in the case of solicitor and client, or principal and agent) B has himself put his affairs in the hands of A; or it may be because (as in the case of trustee and beneficiary, or receivers, administrators and the like) A has agreed, and/or been appointed, to act for B's benefit. In each case however the nature of the relationship is such that B can expect A in colloquial language to be on his side. That is why the distinguishing obligation of a fiduciary is the obligation of loyalty, the principal being entitled to *"the single-minded loyalty of his fiduciary"* (*Mothew* at 18A): someone who has agreed to act in the interests of another has to put the interests of that other first. That means he must not make use of his position to benefit himself, or anyone else, without B's informed consent.

(8) This analysis also explains why fiduciary duties will not readily be found in commercial settings. In commercial dealings the relationships are (usually) primarily contractual; and it is of the essence of commercial contracts that each party is (usually) entitled, subject to the express and implied constraints of the contract, to seek to prefer his own interests, and is not obliged to put the interests of the other party first. "

39.     Mr Butler particularly relied in the present case on the transition from a prior relationship to a corporate relationship. He submitted that that new relationship was the one that governed the relationship between the parties. There was no room for fiduciary relationships between venturers in such a situation because it was the relationships arising out of company law which thereafter governed their dealings. He cited *Shalson v Russo* [2005] Ch 281:

"131.  [Fiduciary duties] is the third alternative way in which Mr Mimran seeks to establish that he had a proprietary interest in the money he advanced to Westland [the joint venture company]. The proposition is that Mr Russo had undertaken to act in Mr Mimran's interests with regard to the application of the money advanced; that Mr Russo was in a position to deal with the money in a way which could or would affect Mr Mimran's interests; that Mr Mimran was vulnerable to an abuse by Mr Russo of the position he occupied with regard to dealing with the money so advanced; and that Mr Mimran had not agreed to Mr Russo applying the money merely in his own interests. It is said that these ingredients combined to result in Mr Russo becoming a fiduciary for Mr Mimran with regard to the money the latter advanced to Westland, so giving Mr Mimran a right to trace the money when it was misapplied by Mr Russo in breach of his fiduciary obligations."

132  I do not accept that Mr Russo became such a fiduciary. The argument ignores that the Russo/Mimran venture was one they agreed was to be conducted through Westland. When Mr Mimran made his loans, the money so advanced became (as he intended) Westland's money: it ceased to be his own money. Mr Russo was not a director of Westland, but I find that he gave the instructions as to the dealings with Westland's money, and I accept that he owed fiduciary duties with regard to such dealings. But any such duties would have been owed only to Westland, not to Mr Mimran, since the dealings related to Westland's money, not to Mr Mimran's. It may be that the Westland venture can be characterised as a joint venture between Mr Russo and Mr Mimran personally. But I do not consider that this entitles Mr Mimran to say that, with regard to the Westland money, Mr Russo owed separate fiduciary duties to him as well. They chose to conduct their venture through a company, and it is simply to the company that each would have owed fiduciary duties. Nor can I see any reason why the duties should need to be regarded as being owed more widely than that. If Mr Russo breached his duties to Westland and misapplied its money, it would be open to Mr Mimran – if necessary, by a derivative action - to bring proceedings for Westland's benefit against Mr Russo I do not, therefore, accept this third alternative way of putting Mr Mimran's case."

40.    Mr Butler also relied on what Neuberger LJ said in *Chahal v Mahal* [2005] BCC 655. That was a case where a partnership was succeeded by a company as the business

vehicle, and a question arose as to the extent of the continuation of the partnership.  In that context Neuberger LJ said::

> "25 … In other words, I would accept Mr. Pymont's general point that the law, like business common sense, would presume, in the absence of any reason to the contrary, that the transfer of all the business and assets of a partnership to a limited company, in which all the partners are given shares pro rata to their interests in the partnership, raises the presumption that the partnership is thereby determined. Of course, that does not mean that there will be no continuing liabilities, which will be governed by the partnership relationship, such as liability for any tax or other debts of the partnership which may arise, but, as Mr. Pymont says, that is part of the post-dissolution winding up. The point is that the fact that there has been dissolution does not mean that the relationship between the former partners is no longer governed by the terms of the dissolved partnership agreement. "

41.    While these cases demonstrate a general or prima facie position, they do not give effect to some sort of general rule which would mean that Mr Dinwoodie cannot assert a fiduciary relationship in the present case.  They demonstrate that a joint venture, or a participation in a company, does not, without more, give rise to fiduciary relationships (save for the established one owed by a director to the company), and if such a duty is to be asserted then facts must be established which justify that.

42.    There is one particular aspect of company law which Mr Butler relied on which should be got out of the way at this stage.  He submitted that within the corporate context section 125 of the Companies Act ruled out the existence of any fiduciary relationship because it gave Mr Dinwoodie a remedy and that was the only remedy he was entitled to.   I consider this point to be misconceived.

43.    Section 125 provides for the rectification of the share register and says:

> "125.  Power of court to rectify register

> (1)  If—

(a)  the name of any person is, without sufficient cause, entered in or omitted from a company's register of members, or

(b)  default is made or unnecessary delay takes place in entering on the register the fact of any person having ceased to be a member,

the person aggrieved, or any member of the company, or the company, may apply to the court for rectification of the register.

(2)  The court may either refuse the application or may order rectification of the register and payment by the company of any damages sustained by any party aggrieved.

(3)  On such an application the court may decide any question relating to the title of a person who is a party to the application to have his name entered in or omitted from the register, whether the question arises between members or alleged members, or between members or alleged members on the one hand and the company on the other hand, and generally may decide any question necessary or expedient to be decided for rectification of the register."

44.     The judge rejected this submission, and in my view rightly so.  There are various reasons why it is wrong.  First, it is a remedy, not a source of rights which would somehow displace rights which might otherwise arise out of dealings between the parties.  That is best demonstrated in this case by considering what would happen if Mr Dinwoodie tried to make a claim to his shares in the  BEM companies through this route.  He could not claim simply by asking the company to rectify the register.  He would have to give a reason.  He would have to propound his claims arising out of the alleged fiduciary duty.   So he would have to establish the duty (and breach) in the course of, or before, applying for rectification under section 125.  The section would implement, rather than replace, the fiduciary duty claim.  Second, the remedy is a summary one which is not appropriate for substantial disputes on the merits - see the discussion in *Gore Browne on Company Law*  at para 10A[14].  Third, it is open to question as to whether it can be invoked when the true dispute is between two shareholders, or one shareholder and a would-be shareholder as to the latter's entitlements - [ibid].  The judge below dismissed this part of the claim for different reasons, but he was right to do so for the reasons I have just given.

45.     Mr Butler drew my attention to *Sharp v Blank* [2017] BCC 187 in which Nugee
        explained why it was that generally speaking (though not as a universal rule) directors
        of a company do not owe fiduciary duties to the shareholders (as opposed to the
        company) - see paragraph 9(3) - and submitted that the same factors demonstrated why
        it was that Mr Fisher did not owe Mr Dinwoodie any such duties.  I am afraid I do not
        understand the parallel that Mr Butler sought to draw in this respect.  What is of some
        relevance is what Nugee J said once he had considered the limited number of instances
        where, on special facts, such a duty was held to exist.  He said:

> "13. …If he is to be held to owe fiduciary duties to the individual
> shareholders, there must be something unusual in the nature of
> the relationship which gives rise to it. <u>That no doubt explains
> why the cases where such a duty has been held to exist mostly
> concern companies which are small and closely held, where
> there is often a family or other personal relationship between the
> parties, and where, in almost all cases, there is a particular
> transaction involved in which directors are dealing with the
> shareholders, from which the directors often stand to benefit
> personally.</u> The imposition of a fiduciary duty in such
> circumstances reflects the fact that directors who have a close
> family or other personal relationship with shareholders, and are
> entering into transactions with them, may be tempted to exploit
> that relationship to take unfair advantage of the shareholders for
> their own benefit." (my emphasis)

        The emphasised words refer to factors which are said to exist in this case.

46.     While all the cases emphasise that the existence or otherwise of fiduciary duties is a
        highly fact-specific question, and provide what might be thought of as a starting point
        for instances outside the traditional relationships, the possibility of their being such
        duties owed between joint venturers is expressly left open in some authority.  Of
        particular interest in this respect is *Farrar v Miller* [2018] EWHC Civ 172, because it
        demonstrates that the duties might be confined to a particular aspect of the relationship.
        It concerned a property known as Long Stratton whose development and sale was to be
        the subject of a joint venture.  Following the ownership of the property through various
        companies is a little complicated, but it is sufficient for present purposes that the
        property had started out in a jointly owned company and ended up in a company in
        which one of the joint venturers (Mr Farrar) had no interest.  He claimed, inter alia, that
        that was a result of a breach of duty on the part of his other principal joint venturer, Mr
        Miller.   At first instance he was refused permission to amend to make such a claim and
        appealed to the Court of Appeal.   That court reversed that decision.   The case
        demonstrates that a fiduciary relationship can arise out of a joint venture (which, to be
        fair to him, Mr Butler never disputed) and that is made clearest by the judgment of
        Kitchin LJ:

> "75. I recognise that joint venturers may or may not have a relationship in which one of them owes fiduciary duties to the other. The question, to my mind, is whether the circumstances of their relationship justify the imposition of such duties, and in answering that question it is often helpful to consider whether, to adopt the words of Millett LJ in *Bristol and West Building Society v Mothew* [1998] Ch 1 at 18, one joint venturer has undertaken to act for or on behalf of the other in a particular matter or circumstances which have given rise to a relationship of trust and confidence. It may also be helpful to ask whether one joint venturer is in a relationship with the other which has given rise to a legitimate expectation, which equity will recognise, that he will not use his position in such a way which is adverse to the interests of the other: see, for example, *Arklow Investments Ltd v Maclean* [2000] 1 WLR 594 at 598. Whether a joint venture relationship carries obligations of a fiduciary nature is therefore highly fact-sensitive: see, for example, *Ross River Ltd and anor. v Waverley Commercial Ltd and ors.* [2013] EWCA Civ 910 at [30] to [64]."

47.    Kitchin LJ considered it was arguable that the fiduciary duties might be focused on a particular aspect of the relationship:

> "77. The basis of this aspect of the claim is not simply the fact that Mr Miller and Mr Farrar were shareholders in Saxon or Artillery; nor simply the fact that Mr Miller was a director of Artillery. It is that the parties had been in business together as property developers for very many years and it was in that context that Mr Miller was entrusted with the corporate aspects of the parties' joint ventures and was specifically given or assumed the responsibility of transferring Long Stratton from Saxon to Artillery and then from Artillery to the Joint Venture entity. It was only as a result of that relationship of trust that Mr Miller was able to transfer Long Stratton out of Artillery to Edged Red, the means by which he thereafter denied Mr Farrar any interest in Long Stratton or its traceable proceeds. I appreciate that these allegations are heavily contested by Mr Miller but Mr Sibbel submits and I agree that, if made good at trial, it is arguable that they did indeed give rise to the fiduciary relationship for which Mr Farrar contends."

The significance of this will appear below.

48.     Other authorities were cited to me, but the above authorities are sufficient to demonstrate the principles which need to be applied.

**The appeal in relation to fiduciary duties**

49.     Mr Butler criticised the judge's findings under three heads - treating fiduciary duties as some sort of homogenous mass without considering the actual duties involved (if any); there was an inadequate factual basis for finding a duty at all; and the duty he relied on was insufficiently articulated.

50.     Mr Butler is right to say that fudiciary duties are not some sort of universally applicable homogenous mass, and to say that it is inappropriate to describe them globally as if a relevant one is part of some overall package.  The authorities demonstrate that it is necessary to see what the relevant relationship is in any given case and to ascertain whether any particular fiduciary duties rise out of the relationship.  Some of them (articulated by Millett LJ) will arise in every case, though they can be modified.  However, it is plain that Judge Monty recognised this and applied the law correctly.  He cited Snell's Equity as encapsulating the relevant principles and cited *Farrar v Miller* at paragraph 75 and various paragraphs from *Glenn v Watson*.  The judge then recorded himself as deriving two basic principles from the authorities:

> "78.  First, while it is unusual for there to be fiduciary duties in a commercial context, such duties can sometimes arise on the facts.

> 79.  Secondly, the court must undertake a fact-sensitive enquiry in order to ascertain whether, objectively, fiduciary duties arose in the particular context."

51.     Mr Butler criticised paragraph 78 as turning on a wrong emphasis.  He submitted that "sometimes" should have been "exceptionally".  This seems, with respect, to be a rather nit-picking criticism.  There is really nothing wrong with the formulation of the judge so far as it goes.  Whether one chooses to use the one word or the other depends on the emphasis wishes to place on the point.  What emerges from the authorities is that in a "commercial relationship" parties are expected to define their respective relationships as a matter of agreement.  Where that has happened there is rather less room for the implication of a fiduciary relationship because the parties have pinned down their respective responsibilities.  However, that is not true of all commercial relationships, whatever that expression may mean, and the warnings appearing in the authorities (such

as *Glenn v Watson* above) really do no more than reflect what are the likely commercial realities.   It is also worth pointing out that a partnership would seem to be a "commercial" relationship; no one seems to have had any difficulties in spelling fiduciary duties out of that relationship.

52.     Having arrived at those two basic points, the judge went on to consider various cases where fiduciary duties were owed in a commercial context and elaborated the test in his paragraph 83.

> "I accept that ultimately at the heart of the enquiry is the test set out by  Leggatt LJ in *Al Nehayan,* and is summarised by Falk J at [76]: (a) the existence of trust and confidence is not enough; (b) the test is not whether one party subjectively placed trust in another; (c)  the test is objective: is the nature of the relationship such that one party was entitled to repose trust and confidence in the other, where one had to put aside his own interests and act solely in the interests of the principal?

53.     At paragraph 84 he said:

> "84.  In my judgement, the existence of fiduciary duties is made out on the evidence, and I accept Mr Sibbel's submissions, which I summarise below."

54.     What then followed was a form of analysis of the relationship between the two gentlemen, starting with the existence of the partnership.   After considering the evidence the judge concluded that:

> "91.  In my judgment, this encapsulates a situation where there was a legitimate expectation, on both sides, that one would not use his position in such a way which was adverse to the other.

> 92.  It is because of the close personal relationship between them (which in my view Mr Fisher wrongly attempted to play down in his evidence) that first this should not, as Mr Sibbel submits, be regarded as primarily a commercial venture, and secondly, that the parties did not record their agreements in any formal document.  It was clear on the evidence that each trusted the other."

55.     He then further analysed the relationship, dismissed any effect that the Companies Act 2006 section 125 might have had, and concluded:

> "100.  I therefore conclude that Mr Dinwoodie has established the existence of fiduciary duties.

> 101.  Having made that finding, I have no hesitation in also concluding that Mr Fisher's retention of legal title to the shares in the consultancy companies and the original DA companies was contrary to the parties' agreement and a breach of the fiduciary duty owed by him to Mr Dinwoodie not to act otherwise than in good faith and with loyalty in relation to the shareholding of the company."

56.     None of this demonstrates some sort of inappropriate homogenous approach to the existence of duties or a failure to "unpack".   It considers the circumstances in which duties are said to have arisen, and reaches a conclusion as to one of the relevant duties in paragraph 101.  The judge was not required to articulate other duties which might exist but which were not relevant (which Mr Butler accepted).  This particular criticism of the judgment therefore fails.

57.     The second criticism turns out to be a criticism of the judge's evaluation of the facts. The judge considered the facts under two categories, "mutual" and "reliance", as proposed to him by Mr Sibbel.    Under "mutual" the judge started with the existence of the partnership.  While he did not articulate it, the judge obviously thought that the fiduciary relationship which arose from that was a starting point for what followed. Then he considered the move to the "corporate structure" and Mr Fisher's historic statements that they were 50/50 owners and his frequent references to the use of the word "partner" and "partnership" to describe their relationship.  Labels by themselves do not matter of course, but it is a reasonable inference that the judge considered the relationship between the two men, which started off as a partnership and fiduciary one, continued in the same way into the corporate structure.  He referred to a paragraph in Mr Fisher's witness statement as to the two men always acting in good faith (which, taken by itself, is not particularly probative of a fiduciary relationship but in context has a greater significance) and concluded in paragraph 92 that the closeness of the relationship demonstrated not primarily a commercial relationship and that each trusted the other.

58.     Then he turned to "reliance" and found that Mr Dinwoodie was reliant on and vulnerable to Mr Fisher.  As an example of his vulnerability, he referred to the steps Mr

Fisher took in 2017, which he was able to take because he had retained legal ownership of the shares in all companies, and he found that Mr Dinwoodie trusted Mr Fisher to deal with all formalities in relation to share transfers and registrations (paragraph 93).

59.     On the basis of that material the judge concluded that Mr Dinwoodie had established the existence of fiduciary duties.

60.     That is the material which is said to be inadequate to establish the existence of fiduciary duties.  I think that one might say that that material, as expounded by the judge, might be at the lower limits of what is required, but the judge's findings were in the context of a trial in which he will have heard a lot more about the relationship, and it cannot be said that the finding was one which he was not entitled to reach.  The finding of the prior partnership was particularly significant, in my view.  That relationship is one of the established relationships which give rise to fiduciary duties.   While in many cases a formalised corporate structure which succedes an informal arrangement may leave less scope for a fiduciary relationship, that is not an inevitable consequence.  In a case like the present, where a highly informal partnership was translated into a corporate relationship on the basis of Mr Dinwoodie acquiring an equal shareholding, and where there was a reliance, as found, on Mr Fisher to deal with such matters, a finding of a fiduciary duty of the kind found by the judge was one which the judge was entitled to reach.  Mr Fisher was impliedly given the responsibility to make sure Mr Dinwoodie got his shares.  The BEM shares were owned by, or under the control of, Mr Fisher, so he had to start the ball rolling by a transfer or issue of shares, and it was clearly established that thereafter he made various company filings which were consistent with the obligation that he needed to undertake (and its fulfilment).   In paragraph 93 Judge Monty found that Mr Dinwoodie trusted Mr Fisher to deal with shareholding matters and that Mr Fisher knew that that was Mr Dinwoodie's position.  While there was no evidence of an express undertaking by Mr Fisher to that effect, the two men operated under the same unstated assumption, and that is sufficient.  It gave rise to a fiduciary duty in that respect just as it was arguable in *Farrar v Miller* that Mr Miller's assuming responsibility for a transfer of the property meant he was (at least arguably) under a fiduciary duty in that respect - see paragraph 77 cited above.

61.     The judge's finding was as justifiable in relation to the DA companies shares as in relation to the BEM companies' shares.  In relation to both sets of shares Mr Fisher was in breach of duty in failing to give Mr Dinwoodie his entitlement.

62.     In his oral submissions Mr Butler submitted that a breach had to be deliberate, and that a careless breach did not found a claim for breach of fiduciary duty.   He relied on certain passages in *Mothew* which he submitted was to that effect and he submitted that the judge below made no finding of any deliberate breach until, possibly, 2017.

63.    This point was not specifically raised in the Grounds of Appeal, and it is not dealt with by the judge.  It is not apparent to me that it was raised at all below.  If it was not then it is not appropriate to raise it now, because if it had been raised below then the judge would doubtless have made some findings about it.  However, in any event it is not a good point in law.  In *Mothew* at page 15H Milllett LJ (the first passage relied on by Mr Butler) Millett J is dealing with breach of trust, not breach of fiduciary duty; at 19F he is dealing with a particular breach of duty which is not the same as that alleged in the present case; and at 19F he is dealing with another kind of alleged breach of duty (an unconscious omission which happens to benefit one principal at the expense of another).  The duty in the present case is straightforward and absolute in the sense that it does not import a "best endeavours" requirement, or anything like that.  It was a duty to act in good faith and loyally (as the judge put it) in relation to the shareholding of the company.  Translated into practical terms, it was to make sure that Mr Dinwoodie got his shares.  It would be remarkable if Mr Fisher were liable if he thought about it and decided deliberately not to comply, but not liable if he meant to and simply forgot.  He was under a duty which involved his having to provide shares, and a failure to do so is a breach of duty.  Accordingly, if Mr Butler is allowed to raise this point it does not succeed.

64.    Mr Butler raised an additional point in his reply which concerned the date when the breach of fiduciary occurred and the absence of clarity in the pleadings about this point.  There is no reference to this point in the Grounds of Appeal, or in Mr Butler's supporting skeleton argument.  It is not a point dealt with in the judgment; I do not know if it was raised below.  I am far from convinced that there is anything in it, save for an observation that the breach needs to have occurred before 2013 in relation to the BEM companies in order for a trust relationship to follow through to the DA companies.  The judge's finding would seem to involve a determination that there was a breach from the outset in 2009, and perhaps a continuing breach thereafter (though that is less clear).  I do not propose to allow something which amounts to a further challenge to the judgment in this area.

65.    I add one point of my own.  It seemed to me that Mr Sibbel might well have had a case based on conventional estoppel and constructive trust grounds, which would be less elaborate than his fiduciary duty and *Pallant v Morgan* claims.  However he did not seem to have run them and more or less disclaimed them before me.

**Grounds 3 and 4 - generally**

66.    As appears above, the judge went on to consider alternative ways in which a claim could be made to the DA shares and found an express and a constructive trust.  The fiduciary duty point, on which Mr Dinwoodie now succeeds, gives Mr Dinwoodie what

he seeks in this action, so strictly speaking it is unnecessary to consider these two alternatives.  However, they were fully argued and out of respect to those arguments and the judgment below I will consider them.

## Ground 3 - the finding of express trust in relation to the DA companies shares

67.     A consideration of this ground requires a more detailed study of the findings of the judge in this area.   His actual determinative finding is expressed very shortly:

> "103   I also accept Mr Sibbel's submission that there was an express trust in relation to the shares in the original DA companies, which arose because of the agreement between Mr Fisher and Mr Dinwoodie: see paragraph 55 above."

68.     Paragraph 55 follows on from paragraphs which deal with the circumstances of the Tomlin Order pursuant to which Mr Fisher's title to the DA companies was confirmed. Paragraph 55 then reads:

> "55.  It follows, in my judgment, that after the Tomlin Order the position was that BME had 100% beneficial ownership of the original DA companies, and Mr Fisher and Mr Dinwoodie owned half each in turn.  This was accepted by Mr Fisher in a Skype message of 13 December 2013, in which he said, "I am still holding the sole shares in [the DA companies] , but we are still agreed that we share equally in DA equity/shareholding until we discuss and agree otherwise." I accept that this message starts with, "I think we agreed the following yesterday", but it is plain in my view on any reading of this message that this point was one of the matters which was actually agreed, and I so find as a fact that it had been.  What remained to be decided was the future respective cash contributions, and that continued to be a topic of discussion and debate, but the 50:50 ownership did not (by way of further example, the Skype messages from July and August 2014 show that there was a concluded 50:50 ownership agreement, and that when Mr Dinwoodie proposed a change in the equity, Mr Fisher was adamant that he wanted to stick with 50:50).  In a similar vein other numerous references by Mr Fisher to Mr Dinwoodie as "co-owner" (again, expressed to third parties and internally to new recruits ...) and the various Companies House filings to which I have already referred.  In relation to the latter, I found Mr Fisher's evidence in cross-examination that

> when he was told about the filings and that he and Mr Dinwoodie had been listed as PSC he did not know what PSC meant ("I am not very good on abbreviations… I did not know what those letters stood for") was quite frankly risible in the light of his having responded to emails about what should be in the filings, and what should be said about persons with significant control, just a day before …"

69.    Mr Butler's first criticism of the finding in paragraph 103 is that it is actually inconsistent with the first sentence of paragraph 55, to which it cross-refers. Paragraph 103 finds an express trust in favour of the two individuals in equal shares - the final order in the case grants a matching declaration, and that does seem to have been Mr Dinwoodie's case at the trial, judging by the written final submissions (paras 22ff).

70.    This is certainly a valid criticism so far as it goes. Paragraph 55 finds that the DA companies shares were held within the BME companies, giving Mr Dinwoodie an indirect interest via his 50/50 interest in the latter companies, whereas paragraph 103 makes a finding of a direct shareholding. Mr Sibbel acknowledged as much in his oral submissions. He suggested that the judge cannot have meant what he said in paragraph 55, and was perhaps using "BME" as a sort of collective noun.

71.    I do not think that that is a particularly convincing explanation, but at the end of the day I do not think that this area of dispute matters very much unless it goes to the question of certainty in relation to the creation of trusts. If the judge intended a finding that the DA companies shares were legally owned by BME, giving Mr Dinwoodie and Mr Fisher indirect 50% interests via that route, then the Skype message, and the preceding agreement which the judge found to have been reached, is material supporting that conclusion at the very least. If there was no prior trust (constructive or otherwise) affecting those shares then the judge's findings would be capable of giving rise to the direct interest trust which he seems to have found in paragraph 103. So either way Mr Dinwoodie has an interest which Mr Fisher denied, and it may not matter much at the end of the day which route is taken. Mr Butler's submissions were designed to demonstrate that there was no interest at all. If his submissions failed at that level, I did not detect that Mr Fisher was arguing for or against one or other of the alternatives for the end result.

72.    I therefore turn to those submissions. Mr Butler's arguments, intended to succeed against a background against which Mr Dinwoodie had not already acquired an interest, were evidential and legal, the latter being based on the absence of certainty.

73.    So far as his evidential attack was concerned, he pointed to the fact that the judge found an express trust based not on the Skype message itself, but on what it records as a meeting the previous day. That, he said, was a departure from the pleaded case, but he did not press that strongly. In fact, although the pleading is a bit equivocal, such an express trust would be consistent with it. His main point was that there was no written or oral evidence about the meeting the previous day; Mr Dinwoodie's pre-action letter had not referred to such an express agreement; and indeed Mr Butler said it was contrary to a particular part of Mr Dinwoodie's case that there was an express agreement in late 2012.

74.    It seems to be true that there was no positive evidence from Mr Dinwoodie that that meeting actually happened or as to its contents, but it is not accurate to say there was no evidence of it. The message itself is evidence of it. The judge so relied on it, and he was entitled to do so. In fact, in cross-examination Mr Dinwoodie was prepared to accept the letter as an accurate reconstruction, but he did not profess to any actual recollection of the meeting, though he did say in general terms that the message sets out what was agreed. There may have been matters which can be said to be contra-indications, but the judge made a finding of fact about this (which is not a surprising fact) and it is a finding which cannot realistically be challenged on appeal.

75.    Mr Butler's certainty point was that it was not possible to ascertain at what point of time the three certainties necessary for a trust (words, subject matter and objects) were satisfied. Having considered his submissions on the point it seems to me that it is really more of an evidential one. There is no difficulty about the certainty of objects or subject matter under debate. The objects were Mr Dinwoodie and Mr Fisher, or BME depending on the view one takes of the evidence. The certainty of words point is not a problem if one treats the Skype message as being evidence of the words used, or even as the declaration itself (which the judge did not find). Mr Butler's point involved an analysis of the preceding events and some of the wording of the Skype message which preceded those relied on by the judge (which I will not quote because it contains some obscure references to how the business was to be conducted and seems to me to be irrelevant to this point)  and what were said to be inconsistencies in Mr Dinwoodie's evidence as to when he thought he had an interest in the shares (he said he considered that he always considered he had a 50/50 interest in the DA companies shares). That is a question of evidence, and not really an uncertainty about one of the certainties. He also said that there was no evidence of an intention on the part of Mr Fisher to create a trust. On the judge's findings there was plenty of evidence of that.

76.    In short, there is nothing in Mr Butler's uncertainty point in the light of the findings of the judge, and this ground of appeal falls to be dismissed.

**Ground 4 - the Pallant v Morgan trust affecting the DA companies shares.**

77.    This point is capable of leading one into an area of some complexity, but I propose to deal with it relatively briefly because it does not matter in the light of the other determinations in Mr Dinwoodie's favour.

78.    At paragraph 104 the judge records that he was persuaded by Mr Sibbel that:

> "there is a constructive trust here, an argument which based on *Pallant v Morgan* [1953] Ch 43".

Although he does not expressly say so, his "here" is in relation to the DA companies shares. That is the asset by reference to which Mr Sibbel advanced the case and that is what was understood by both parties in this appeal.

79.    The judge summarised the law at paragraph 105:

> "105.  As is pointed out in Snell's Equity at 24-039, a *Pallant v Morgan* equity typically relates to specific property that is not at first owned by either of the parties, A and B, but where A and B form a common intention that A will take steps to acquire the property, and does so, then B will obtain some interest in it."

80.    He went on to refer to Chadwick LJ in *Banner Homes Group plc v Luff Developments Ltd* [2000] Ch 372 (without quoting from it) and set out a passage from *Farrar v Miller* [2018] EWCA Civ 172 (at para 42) where Kitchin LJ was said by the judge to have acknowledged that a "*Pallant v Morgan*" equity could arise even where the property in question was already owned by the constructive trustee:

> "As Millett LJ explained in *Paragon Finance*, a constructive trust arises by operation of law whenever the circumstances are such that it would be unconscionable for the owner of a property to assert his own beneficial interest in the property and deny the beneficial interest of another. Where a party, though not expressly appointed as a trustee, has lawfully assumed the duties

of a trustee and in that capacity has received trust property but later appropriates that property to his own use then he will be acting in breach of trust. *Pallant v Morgan* may be understood as an example of such a constructive trust. In this and in other such cases the claimant does not impugn the transaction by which the defendant obtained control of the property; he contends that the circumstances in which the defendant obtained that control make it unconscionable for him to treat the property as his own."

81.     Then he referred shortly to a point taken by Mr Butler to the effect that the equity could not arise where one party owns the asset (relying on *Cobbe v Yeoman's Row Management Ltd* [2018] 1 WLR 1752), saying that that point was rejected in *Farrar*. Then he reached his conclusion, expressed briefly in three paragraphs:

"108.    It seems to me, with respect, that this misses the very clear point expressed in *Farrar* that there is nothing in *Cobbe* which lays down a different rule (that the *Pallant v Morgan* equity can only arise where there is a prospective purchase)."

109.    Whilst it is right that on the facts of *Farrar* Kitchin LJ went on to hold that a *Pallant v  Morgan* equity arose on the more conventional basis that the joint venture agreement preceded the relevant acquisition of the property by the joint venture entity, it seems to me that where appropriate, in particular where it would be unconscionable for the owner to assert his own beneficial interest and deny that of the non-owner, and where the owner has assumed the duties of a trustee, equity should impose a trust.

110. So it is, in my judgment, here, because of the fiduciary duties owed (see also *Farrar* at [32], when considering the decision in *Crossco No 4 Unlimited v Jolan Ltd* [2012] All ER 754: "many of the cases giving rise to a *Pallant v Morgan* style equity will have at their heart a fiduciary relationship"), and because of the parties' mutual understanding that the shares would be owned equally."

82.     It is not easy to deal with this aspect of the case because it is not clear on what findings of fact the judge based his conclusion.  His reference to *Pallant v Morgan* suggests that he had in mind a situation (as in that case) in which an asset (the shares in the DA

companies) was acquired by one of the two "partners" on the understanding that the other would have an interest. However, his reference to post-acquisition agreements suggests that he had another point in mind at which the constructive trust arose, but he does not make clear what that point of time was or what the circumstances were. It is on this latter point (a post-acquisition arrangement) that most of the debate before me turned.

83.   Turning to his findings of fact which might be thought to be relevant, at paragraph 11 he recites the original acquisition of shares in the DA companies (with two other companies) by Mr Fisher as part of the terms on which he and Mr Dinwoodie provided consultancy services and at paragraph 13 he recites Mr Dinwoodie's case that Mr Fisher held those share on the basis that the two of them would take 50% each of whatever resulted from an agreement with Ms Dee as to the division of all the companies. He does not make a positive finding at this stage that that was the arrangement, but his later findings indicated that he accepted it.      However, he makes no positive finding of reliance on this (as Mr Sibbel accepted before me), which one would normally expect in a successful constructive trust case.

84.   Then there is the Tomlin Order under which the litigation about the DA companies was settled, and which secured legal title in the shares in the DA companies shares for Mr Fisher. It is not clear how this "acquisition" can be fitted into a typical *Pallant v Morgan* type trust because there is no finding of an arrangement between the two men about that transaction which would lead one into *Pallant v Morgan* territory, other than what is recorded in paragraph 110.

85.   I do not consider that a *Pallant v Morgan*-type constructive trust has been made out on the findings of the judge. There are insufficient findings about a positive arrangement between the two men at the time of the acquisition of the shares in the DA group (whichever date one takes, but especially the later date), and no findings of reliance. Mr Sibbel took me to some evidence in Mr Dinwoodie's witness statement from which it was said that I can infer reliance, but that is not a satisfactory way of dealing with the matter. He accepted that there was no positive element of reliance (though such a piece of evidence would probably have been plausible in the circumstances had it been given). While this might have been capable of being presented and determined as a *Pallant v Morgan* type case, I do not consider that it has actually been so presented.

86.   I strongly suspect that the debate as to whether one can have a *Pallant v Morgan* type trust where the arrangement post-dates the acquisition is sterile, because the debate should be not about timing, but about whether the circumstances are such as to give rise to a constructive trust based on the general principles referred to by Kitchin LJ in *Farrar*. It must be remembered that *Pallant v Morgan* is a sub-species of the species

constructive trust. It is not necessary to look for a sub-sub species or mutation of *Pallant v Morgan* in order to succeed where an arrangement post-dates acquisition of the property. It may be possible to succeed in establishing a constructive trust in such a case, but if that happens it would probably be not because it is a minor mutation of *Pallant v Morgan* but because the circumstances justify the remedy on other constructive princples.

87.    I add one further point, returning to paragraph 110 of the judgment. In that paragraph the judge referred to *Crossco No 4* and a sentence in *Farrar* about many *Pallant v Morgan* cases having a fiduciary relationship at their heart. In *Crossco No 4* Etherton LJ analysed the authorities and held that *Pallant v Morgan* cases can and should be explained by the existence and breach of fiduciary duty (see paragraph 88). The other two Lords Justices did not agree with that, and the Court in *Farrar* did not consider it necessary to consider the point (see paragraph 32). I do not have to consider it either, but it is of interest to note that Judge Monty considered that fiduciary duties and the parties' mutual understandings gave rise to a *Pallant v Morgan* equity. I do not think that is the correct analysis in the light of the Court of Appeal authorities, but Mr Dinwoodie has already got home by reason of the fiduciary duties imposed on Mr Fisher.

88.    It follows that this basis of appeal against the judgment would succeed, but that is irrelevant in the light of the other failed grounds.

## Ground 5 - the injunction

89.    Thus far the appeal falls to be dismissed on liability. However, there remains the question of one aspect of the remedy. After receiving argument on the point the judge made the following order about Mr Fisher's future conduct:

> "8. The Defendant is prohibited, until further order of the Court, from taking the following steps without the consent of the Claimant:
>
> …
>
> (2) competing with the business of AML, QTV, BME or BEM.
>
> whether such steps are taken by the Defendant directly or indirectly, by himself or through his agents, trustees, employees or nominees, or otherwise."

90.    The reasons for this severe order, which is prima facie wider than anything that would normally be ordered in an employee or director/company situation (in terms of its open

ended and wide nature coupled with its duration) were set out in a separate judgment delivered on or after the handing down of the main judgment. The reasons were given in answer to points made by Mr Butler and his junior, so it is necessary to set those out too:

"12. Mr Butler and Mr Alford submit:"

(1) I made no finding in my judgment about competing – I said nothing about whether there was a fiduciary duty not to compete, nor that Mr Fisher has competed.

(2) The proposed order is a clear restraint of trade, and such a wide restriction – had it been the subject of agreement – would have been unenforceable.

(3) The extent of Mr Fisher's duties in this regard are no more than those set out in section 170(2) of the Companies Act 2006, which provides that a person ceasing to be a director continues to be subject to the statutory duties to avoid conflicts of interest and not to accept benefits from third parties. Since the proposed order goes beyond what the companies themselves would be entitled to, it would be anomalous to grant an injunction in favour of Mr Dinwoodie as sought.

(4) In any event, Mr Dinwoodie has no legitimate interest to protect, and he should not be able to prevent Mr Fisher from undertaking such commercial activities as he wishes.

(5) The proposed order is without limit in terms of time or geographical area – it is too wide.

(6) The proposed order is grossly unfair – why should Mr Fisher be so restrained when Mr Dinwoodie is free to do as he chooses – and wrong in principle. There should be no restraint on Mr Fisher for an uncertain period.

(7) The word "compete" is too vague.

"14.  Dealing with the points made by Mr Butler and Mr Alford in turn:

(1) I agree with Mr Sibbel that events post-November 2017 – see paragraph 69 of my judgment – show that Mr Fisher has carried on a business through corporate vehicles under his control which has appropriated the assets, goodwill, trademarks and clients of AML and QTV. That is plainly competition with the joint venture.

Double-click to enter the short title

(2) Mr Fisher is not an ex-employee or former director but a current member of a joint venture who continues to owe fiduciary duties to Mr Dinwoodie.  I agree with Mr Sibbel on this point.  This is not a restraint of trade.

(3) Again, in my view Mr Sibbel is right.  The question of the relief the companies might obtain is not relevant.

(4) Mr Dinwoodie's interest is as a person to whom Mr Fisher owes fiduciary duties.

(5) Mr Butler and Mr Alford refer to an offer made by Mr Dinwoodie on September 2020 which would have left the parties as 50/50 owners of the joint venture.   That offer included an undertaking to be given in the same terms as those in paragraph 8(2) of the draft order.   There was also, in the same letter, an offer of global settlement under which Mr Dinwoodie would purchase all of Mr Fisher's interest in the DA companies, on condition that Mr Fisher agreed to non-solicitation, non-competition and non-dealing covenants.

Mr Butler and Mr Alford say, about this offer, that when Mr Fisher raised the difficulty of the non-competition provisions, Mr Dinwoodie produced "a lengthy list of more specific anti-competition undertakings running to over a page and – notably – limited to a particular geographical area (the UK) and a 12-month period."

In fact, when one looks at the exchange of correspondence surrounding these offers, it is clear that Mr Fisher was only dealing in his response with the global offer, and he asked for clarification of the post-sale undertakings sought, which led to Mr Dinwoodie's "more specific anti-competition undertakings".  Mr Fisher refused.

I agree with Mr Sibbel, that the comparison which is sought to be drawn – and the suggestion that this was a "tacit acknowledgment of the shortcomings of an injunction simply preventing D from 'competing'" – is a false one, because the list of undertakings was in relation to post-venture.

(6) The answer to this point is, as Mr Sibbel says, beyond the scope of this case and there is no suggestion that Mr Dinwoodie would act inconsistently with any duties owed by him.

(7) The word "compete" is used in section 30 of the Partnership Act 1890 ("Duty of partner not to compete with firm").  That section provides:

> "If a partner, without the consent of the other partners, carries on any business of the same nature as and competing with that of the firm, he must account for and pay over to the firm all profits made by him in that business."

> I reject the suggestion that the use of "compete" is unclear or unworkable."

91.    Not all of those points are now in issue.  Mr Butler's case on this appeal is directed mainly to the nature, extent and duration of the fiduciary duties which are said to be the foundation of this injunctive relief.  His submissions can be summarised as follows:

(a)  Being a member of a joint venture, which was important to the judge's reasoning (see his second reason) is not a recognised status in law, let alone a reason for granting this sort of injunction.

(b)  What was required, if fiduciary duties were to be the basis of this injunction, is an analysis of what those duties were, and none appears in the consequentials judgment or the main judgment.

(c)  In any event, it was unreal to talk of the joint venture as still being in existence after the events of 2017.

(d)  The judge failed to unpack such fiduciary duties as might be owed.  There was no evidence of a discussion about non-competition.

(e)  The relief granted is far wider than would have been granted against a departing director, and amounts to a perpetual ban on Mr Fisher ever working in the sector in which he has hitherto worked.

(f)  He repeated his submissions to the effect that the corporate relationship had superceded any fiduciary relationship and duties that might have existed.

92.    For his part Mr Sibbel sought to justify the injunction in part by reference to the conduct of Mr Fisher.  He pointed to Mr Dinwoodie's exclusion from the company and what were said to be Mr Fisher's continuing attempts to cover up what he had been doing and an attempt to wind up the old entities using voluntary striking off (which actions were suspended when Mr Dinwoodie discovered them).  His skeleton argument said this:

> "The fundamental purpose of the injunctive relief [is] to prevent [Mr Fisher] from engaging in further breaches of this nature. The effect of such relief may be to compel [Mr Fisher], if he wishes to continue to be involved in the joint venture businesses,

> to take whatever steps are within his power to restore those
> businesses (including their assets, customer relationships, trade
> marks and income streams) to the original companies."

93.     He submitted that the terms of the injunction went no wider than Mr Fisher's fiduciary
        duties as pleaded (which included a duty not to compete) and narrower relief ran the
        risk of circumvention.  So far as duration is concerned, the injunction could be brought
        to an end by the consent of Mr Dinwoodie, or an order of the court, so it was not
        perpetual.  The relationship between the parties which gave rise to fiduciary duties was
        not lawfully determined in 2017; Mr Fisher merely engaged in a series of unlawful
        activities and Mr Fisher should not be allowed unilaterally to refuse to adhere to those
        duties.  There is no anomaly based on a comparison with a director/company situation;
        the fiduciary relationship in this case is different.

94.     Part of Mr Butler's objections are based on his case as to the absence of an appropriate
        finding of fiduciary duties in this case.  Since I have found that the decision of the judge
        as to the existence of fiduciary duties should stand, that part of Mr Butler's objections
        falls accordingly.

95.     However, I do consider that Mr Butler has a valid criticism of the reasoning which led
        to the grant of this drastic injunction.  It is questionable whether or not the joint venture
        existed in any meaningful manner at the time of the trial, but that is not quite the point.
        The real question is whether there are any continuing underlying duties which justify
        the injunction.  It is not necessarily enough to say that the joint venture exists; the
        question is whether there was, in the circumstances, any relevant duty flowing from the
        relationship, whether it still existed or not.

96.     The first point is therefore to consider whether there is any aspect of the fiduciary duties
        owed by Mr Fisher to Mr Dinwoodie that would prevent his plying his competing trade
        at all, and if so what the scope of that aspect is.  As I have pointed out, the judge made
        a finding of good faith and loyalty in relation to the shareholding of the companies.  It
        follows that he found that the relationship was one which imported the all-important
        aspects of good faith and loyalty, and in my view it plainly follows from that that the
        duty prevented competition with the venture at least while the venture was continuing.
        True it is that the judge did not spell that out in his consequentials judgment, but in my
        view it is obvious from his other findings and it must be what he had in mind in giving
        his reasons for the grant of the injunction.

97.     The next question that necessarily arises is the question of the duration of that particular
        aspect of the fiduciary relationship.  As I have just said, it must be obvious that in this
        case the bar on competing lasts during the continuation of the venture.  However, in my
        view, absent special circumstances, this particular aspect will fall away when the
        relationship giving rise to it comes to an end.  In *A-G v Blake* [1998] Ch 439 Lord
        Woolf MR held:

> "There is more than one category of fiduciary relationship, and the different categories possess different characteristics and attract different kinds of fiduciary obligation. The most important of these is the relationship of trust and confidence, which arises whenever one party undertakes to act in the interests of another or places himself in a position where he is obliged to act in the interests of another. The relationship between employer and employee is of this character. The core obligation of a fiduciary of this kind is the obligation of loyalty. The employer is entitled to the single-minded loyalty of his employee. The employee must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third party without the informed consent of his employer."

> But these duties last only as long as the relationship which gives rise to them lasts. A former employee owes no duty of loyalty to his former employer. It is trite law that an employer who wishes to prevent his employee from damaging his legitimate commercial interests after he has left his employment must obtain contractual undertakings from his employee to this effect. He cannot achieve his object by invoking the fiduciary relationship which formerly subsisted between them. Absent a valid and enforceable contractual restraint, a former employee is free to set up in a competing business in close proximity to his former employer and deal with his former clients. Such conduct involves no breach of fiduciary duty. (p454).

98.    The court recognised that other duties might have a different duration, but that is what it said in relation to the employer/employee relationship.  It seems to me that the same applies in relation to a joint venture relationship such as that between Mr Dinwoodie and Mr Fisher.  So far as competition is concerned, there is no obvious reason why there should be a restraint on competition per se after the venture/relationship has come to an end, though there may well be restraints on using joint venture assets (to use a loose term) for a time.  The non-competition aspect should  come to end when the relationship comes to an end, because there will often be no reason why it should continue after that time.  If the relationship has come to an end then there is no reason for the full panoply of loyalty obligations to continue even if some aspects do.  Apart from anything else, if the joint venture has come to an end there is nothing left to compete with.

99.    There is, however, a difficulty in translating the employment situation into the present situation completely, and that is that the relationship between Mr Dinwoodie and Mr Fisher, as individuals, was not a legally prescribed relationship like a contract of employment.  The relationship arose out of their personal dealings with each other on

a non-contractual basis, or at least no contract is pleaded.  It found its practical embodiment in companies, but that corporate structure is not the relationship which gave rise to the fiduciary duties.  One knows whether an employment contract has come to an end because the law prescribes that.  There is not the same prescription for "joint ventures".

100.   I consider the correct approach in this case is to ask the question: Has the relationship between the two men changed such the duty of loyalty no longer prevents competition, or does it still exist?  What has happened in the present case is that Mr Fisher has sought to withdraw from it unilaterally.  That is apparent from his conduct, and it is also apparent from an email that Mr Fisher sent to Mr Dinwoodie on 8th November 2017 (referred to by the judge in paragraph 65 of his main judgment) in which he said:

> "You have today, for me, ruled out any possibility of our working together in 2018, so I am also curtailing all extant arrangements between us with immediate effect.  I see no benefit of purpose in waiting until 31/12/17."

101.   It is pertinent to consider whether Mr Fisher was entitled to withdraw in this fashion (or at all).  That is a different question from whether the steps he took in relation to excluding Mr Dinwoodie from the business and in adjusting the shareholdings in the companies were proper.  Even if he was fully entitled to withdraw, he was not entitled to take those steps.

102.   Although I have not had full argument on the point, I consider that Mr Fisher, like Mr Dinwoodie, was entitled to withdraw unilaterally from the venture, and thus to affect some of the fiduciary duties existing between them.  No terms were agreed between them as to the duration of the relationship, so it could only exist at will or perhaps on giving reasonable notice.  That being the case, the next question is how any withdrawal was to be done.  It seems to me plain that any proper indication of an intention to withdraw would suffice.  The relationship between the two men existed only for so long as they jointly wished it to, and an indication of withdrawing would suffice to bring it to an end.

103.   It follows that Mr Fisher was entitled to withdraw, as he plainly sought to do in November 2017.  From then on, or from the expiry of reasonable notice (which would have expired long before the injunction was granted) there was no real "joint venture" (if that is a significant question) and Mr Fisher was indicating that from that time the fiduciary relationship was at an end.  He was entitled to do that for the future, but subject to some duties remaining such as non-personal exploitation of joint venture assets.

104.   So one needs to consider whether the duty of loyalty was immediately qualified so as to allow competition thereafter.  There may be a case for saying that if the good faith and loyal winding up of the affairs of the venture still required non-competition for the time being, then the duty of loyalty would still require non-competition for a time.  But that time would be limited, if it existed at all, and it would have that limited purpose.  If there is a further purpose which requires it, that is not apparent to me in the present case.

105.   The judge was considering the point at a trial some 4 years or more after the relationship had plainly broken down.  It is hard to see in what sense the joint venture was continuing even though the affairs of some of the companies had not been wound up, though as I

have indicated the continuation or otherwise of the joint venture is not really the right question. The question is whether the lingering duty of loyalty still required, in 2021, that there still be no competition, and that an open-ended injunction should be granted restraining it.

106.   I do not consider that the injunction should have been granted, at least not without some qualification as to time or purpose (a consideration of which might well have demonstrated that it was completely inappropriate). In the light of Mr Fisher's conduct, it could not seriously be suggested that he and Mr Dinwoodie could continue to work together in 2021, and that had been the case for years. The joint venture, in the sense of a mutually co-operative activity, had come to an end in a real de facto sense. Mr Fisher had demonstrated that he was not going to assume any responsibilities of loyalty for the future, and he was entitled to do that, albeit without divesting himself of the consequences of his prior assumption. I cannot see a proper basis on which he could be personally restrained from competing any longer other than on the limited basis which I have just suggested.

107.   Mr Sibbel's attempt to justify the injunction as a mechanism for preventing further abuses of Mr Fisher's legal shareholdings is not a good reason for preventing competition. The purpose of an injunction such as this is usually to prevent breach of rights which are the counterpart of the injunction, or to prevent breaches which cannot be prevented in another way (for example, if non-competition is the only way of protecting other rights for a time). The injunction is not an in terrorem measure to police or restrain other activities. Nor is it to be used as an in terrorem measure to procure the restoration of benefits.

108.   At the heart of Mr Sibbel's attempts to maintain the injunction was the proposition that the relationship between Mr Fisher and Mr Dinwoodie was not lawfully determined in 2017. That proposition is not correct. As I have pointed out, this was not a relationship such as employer/employee or company/director which was known to law and which had terms governing its subsistence. There was an informal but trusting relationship which gave rise to fiduciary duties. There was no sort of term governing its duration. It existed at will, essentially. Its termination by Mr Fisher was not unlawful; it is his subsequent conduct that was unlawful. Mr Dinwoodie sought to say that the injunction was not perpetual because it could be brought to an end by Mr Dinwoodie's consent, or by the court. The trouble with that is that the criteria which would govern the latter are not apparent from the terms of the injunction. If there were matters which should bring the injunction to an end they ought to be set out in the injunction so that Mr Fisher (and the court) could know what the limits were.

109.   It follows that I find the grant of the apparently perpetual injunction was incorrect and it ought to be set aside. However, I add one significant qualification. As I have pointed out, a full legal analysis of the interaction between the assumption of fiduciary duties and their termination in this area was not the subject of full argument before me. It may just be that some specific case can be made out for maintaining the non-competition injunction on the basis that, for example, it remains necessary in order to complete an orderly winding down (or winding up) of the affairs of the companies, though to be frank I very much doubt it. If Mr Sibbel wishes to make such a case I might be willing to determine it at a further hearing after this judgment, though it is more likely it would have to be the subject of remission to the county court. I will hear further argument on that if necessary on or after the occasion of the hand-down of this judgment.

110.    I also add, if it needs adding, that if Mr Fisher is wrongfully exploiting assets originating during the fiduciary relationship, they it would seem that he could be restrained from that activity.  That would not prevent competition per se, and an injunction ought to be properly framed to cover that particular point.

**Conclusion**

111.    I therefore dismiss the appeal in relation to all matters save for the injunction restraining competition.  In relation to the latter I shall allow the appeal, but subject to the possibility of further argument on the point here or below.

# Exhibit Y

# Fassihi & Ors v Item Software (UK) Ltd                                          A

[2004] EWCA Civ 1244
Court of Appeal (Civil Division).
Mummery and Arden L JJ and Holman J.
Judgment delivered September 30, 2004.

> *Directors – Directors' duties – Fiduciary duties – Duties as director – Duties as*                  B
> *employee – Duty of disclosure – Conflict of interest – Director was also employee*
> *under contract of employment – Confidentiality clause in contract – Renegotiation of*
> *major company contract – Director urged company to take hard line on negotiations*
> *– Director personally interested in contract for himself or new company – Director*
> *involved in new company – Company's major contract terminated – Director*
> *dismissed – Whether director in breach of duty – Appeal – Whether director under*
> *'super-added' duty to disclose misconduct to company – Whether Apportionment*                      C
> *Act applied for accrued salary to date of dismissal although salary payment date not*
> *reached – Apportionment Act 1870, ss.2, 3.*

This was an appeal from a decision of Nicholas Strauss QC, sitting as a deputy High
Court judge, on two issues: (1) whether the deputy judge was correct in law to hold that
the appellant was in breach of his duties as a director and/or an employee of the
respondent company in failing to disclose his own misconduct at the time it occurred ('the
disclosure issue'); and (2) whether the judge was correct in law in holding that the             D
Apportionment Act 1870 did not apply to a claim by an employee to be paid down to the
date of his dismissal even though the date for payment of that remuneration had not then
been reached ('the apportionment issue').

The directors of the respondent company, 'Item', included 'D', the managing director,
and 'F', the appellant, who was the sales and marketing director. F was employed under a
contract which provided for him to receive a salary of £28,000 p.a., payable monthly in          E
arrears by the last working day of each month by an automatic transfer to his bank
account. He was employed from May 1, 1995, for an indefinite period, terminable on
three months' notice. The contract expressly provided that F should not use confidential
information belonging to Item for his own purposes. A major part of Item's business was
the distribution of software products for a company 'Isograph'. In November 1998 Item
decided to negotiate more favourable terms with Isograph. At the same time, F secretly            F
approached Isograph with his own proposals which involved establishing his own
company, 'RAMS', to take over the contract. F encouraged D to press Isograph for
improved terms. In the end, although agreement was nearly reached, the negotiations
failed because Item insisted on terms that Isograph was not prepared to accept. Isograph
terminated the contract by giving 12 months' notice expiring on May 11, 2000. Item then
discovered F's misconduct and F was summarily dismissed on June 26, 2000. Item
brought proceedings against F alleging that he was in breach of duty as a director and           G
employee in seeking to divert the contract with Isograph to RAMS and for having pressed
D to take a hard line in the negotiations with Isograph so as to improve the prospects of
obtaining the business for himself. These claims failed before the deputy judge, but Item
succeeded on a further allegation, which gave rise to the disclosure issue, that F was in
breach of a 'super-added' duty in failing as a director and an employee to disclose to Item
his own wrongdoing. Accordingly Item was entitled to recover from him damages for
breach of that duty suffered as a result of the termination of the Isograph contract and        H
the deputy judge ordered an inquiry as to damages. For his part, F counterclaimed for
wrongful dismissal and for arrears of salary for the period of 26 days prior to his
dismissal on June 26, 2000. The deputy judge dismissed F's claim for wrongful dismissal
as Item was entitled to rely on F's misconduct as justification for his dismissal (applying
*Boston Deep Sea Fishing & Ice Co v Ansell* (1888) LR 39 ChD 339) and that F was not

© **2004 Sweet and Maxwell**

A  entitled to recover a proportionate part of his salary for June 2000: it would be inconsistent with the Boston Deep Sea Fishing case (supra) to apply s.2 of the Apportionment Act 1870 as F was no longer employed when the salary became due and payable under his contract at the end of the month. F appealed on the disclosure issue and the apportionment issue.

*Held*, dismissing the appeal on the disclosure issue and allowing the appeal on the apportionment issue:

B  1.  On the disclosure issue, it was not correct to infer from the cases that a fiduciary owed a separate and independent duty to disclose his own misconduct to his principal or more generally information of relevance and concern to it. So to hold would lead to a proliferation of duties and arguments about their breadth. The fundamental duty to which a director was subject was the duty to act in what he in good faith considered to be the best interests of his company. This duty of loyalty was the 'time-honoured' rule. The

C  duty was expressed in these very general terms, but that was one of its strengths: it focused on principle, not on the particular words which judges or the legislature have used in any particular case or context. The fundamental duty of duty of loyalty that a director owed to act in good faith in the best interests of the company included a requirement for a fiduciary to disclose his own misconduct. On the facts there was no basis on which F could have come to the conclusion that it was not in the interests of Item to know of his breach of duty. He could not fulfil his duty of loyalty to Item except by

D  informing it about his setting up of RAMS and his plan to acquire the Isograph contract for himself.

2.  That conclusion was not affected by the principle of the law of agency that information received by the agent was to be imputed to the principal, subject to an exception in the case of fraud by the agent; this rule of agency was about the attribution of knowledge and not about the liability of a fiduciary to his principal.

E  3.  Bell v Lever Bros Ltd [1932] AC 161 did not decide that an employee could never owe a duty to disclose his own misconduct, nor that a director as a fiduciary could not owe any such duty. In addition Bell v Lever Bros (supra) did not cover the case where there was fraudulent concealment.

4.  The application of the duty of loyalty to disclosure of a director's own misconduct was also supported by policy considerations. This was not a substantive extension of the duties of directors; it was simply a duty which made the remedy for an existing liability of

F  a director to account for secret profits and for the diversion of corporate opportunities more effective. A conclusion that a director owed no obligation to disclose his improper actions would be also inefficient in economic terms. It would mean that the company has to expend resources in investigating his conduct and that the enforcement of a liability to compensate the company for misconduct depended on the happenchance of the company finding out about the impropriety.

G  5. On the apportionment issue, on the proper interpretation of ss.2 and 3 of the Apportionment Act 1870, F could make a time-apportioned claim for his salary for the period June 1 to 26 and the deputy judge was wrong to hold that he was bound not to apply the 1870 Act. Boston Deep Sea Fishing (supra) was not an authority as to the effect of the 1870 Act. Section 2 clearly contemplated that the right to payment might have been lost before the contractual date for payment arrived. The apportioned part of the salary became due when the whole would have become due had it not been for the termination.

H  There was nothing to exclude the application of s.2 in a case of dismissal.

The following cases were referred to in the judgments:

*Barings plc (No. 5), Re* [1999] 1 BCLC 433.
*Bell v Lever Bros Ltd* [1931] 1 KB 557 (CA); [1932] AC 161.
*Bhullar Bros Ltd, Re* [2003] BCC 711.
*Boston Deep Sea Fishing & Ice Co v Ansell* (1888) LR 39 ChD 339.

*Capron v Capron* (1874) 29 LT 826.
*Central De Kaap Gold Mines, Re* (1899) LJ Ch 18.
*Crown Dilmun v Sutton* [2004] 1 BCLC 468.
*El Ajou v Dollar Land Holdings plc* [1994] BCC 143.
*Hampshire Land Co, Re* [1896] 2 Ch 743.
*Harris v Foote's Bus Service Ltd* (1963) 30 SAIR 259.
*Healey v Société Anonyme Française Rubastic* [1917] 1 KB 946.
*Horcal Ltd v Gatland* [1983] BCLC 60 (Ch); (1984) 1 BCC 99,089 (CA).
*Houghton (J C) & Co v Northard, Lowe & Wills* [1928] AC 1.
*Industrial Development Consultants Ltd v Cooley* [1972] 1 WLR 443.
*Inman v Ackroyd* [1901] 1 QB 613.
*Lee v McDonald* 12 DLR (3d) 404.
*London and Northern Bank, McConnell's claim, Re* [1901] 1 Ch 728.
*Mahmud v Bank of Credit and Commerce International SA (in liq.)* [1998] AC 20.
*Meinhard v Salmon* 164 NE 545.
*Miles v Wakefield Metropolitan District Council* [1987] AC 539.
*Moriarty v Regent's Garage & Engineering Co Ltd* [1921] 1 KB 423 (Div Ct);[1921] 2 KB 766 (CA).
*Mutual Life Insurance Co of New York v Rank Organisation Ltd* [1985] BCLC 11.
*Powdrill v Watson* [1995] BCC 319; [1995] 2 AC 394.
*Regal (Hastings) Ltd v Gulliver* [1967] 2 AC 134n.
*Sim v Rotherham Metropolitan Borough Council* [1987] Ch 216.
*Sybron Corp v Rochem Ltd* [1984] Ch 112.
*Tesco Stores Ltd v Pook* [2003] EWHC 823 (Ch), [2004] IRLR 618.
*Treacy v Corcoran* (1874) IR 8 CL 40.
*Wallace v Ross* (1915) XVII Gazette Law Reports 518.
*William Porter & Co Ltd, Re* [1937] 2 All ER 361.
*Winkworth v Edward Baron Development Co Ltd* (1987) 3 BCC 4; [1986] 1 WLR 1512.

Nigel Dougherty (instructed by the Bar Pro Bono Unit) for the appellant.

Ben Quiney (instructed by Placidi & Co) for the respondents.

JUDGMENT

**Arden LJ:**

1. This is an appeal with the permission of the deputy judge from the judgment (reported at [2003] BCC 858) of Mr Nicholas Strauss QC (sitting as a deputy High Court judge) on two issues:

(i)     was the deputy judge correct in law to hold that Mr Fassihi was in breach of his duties as a director and/or an employee of the respondent ('Item') in failing to disclose his own misconduct at the time it occurred ('the disclosure issue')? and

(ii)    was the judge correct in law in holding that the Apportionment Act 1870 ('the 1870 Act') did not apply to a claim by an employee to be paid down to the date of his dismissal even though the date for payment of that remuneration had not then been reached ('the apportionment issue')?

2. Both these questions of law are important, and it is perhaps surprising that the law is unclear.

**Background, the judgment of Mr Nicholas Strauss QC and some of the earlier authorities**

3. The trial before the judge was a trial on liability only. It is not necessary to set out the factual background in great detail. At the relevant time a major part of Item's business was the

© **2004 Sweet and Maxwell Ltd**
bcp2004 bcp   269 Mp   996—bcp23075

A     distribution of software products for a company called Isograph Ltd ('Isograph'). The directors of Item included a Mr Dehghani and the appellant, Mr Fassihi. Mr Dehghani was managing director and Mr Fassihi was the sales and marketing director. He was employed under a contract which provided for him to receive a salary of £28,000 p.a., payable monthly in arrears. It was paid by the last working day of each month by an automatic transfer to his bank account. He was employed from May 1, 1995, for an indefinite period, terminable on three months'

B     notice. The contract expressly provided that Mr Fassihi should not use confidential information belonging to Item for his own purposes.

    4. In November 1998 Item decided to negotiate more favourable terms with Isograph. At the same time, Mr Fassihi secretly approached Isograph with his own proposals which involved establishing his own company, RAMS International Ltd (which I will call 'RAMS'), to take over the contract. Mr Fassihi encouraged Mr Dehghani to press Isograph for improved terms. In the end, although agreement was nearly reached, the negotiations failed because Item

C     insisted on terms that Isograph was not prepared to accept. Isograph terminated the contract by giving 12 months' notice expiring on May 11, 2000.

    5. Item then discovered Mr Fassihi's misconduct and Mr Fassihi was summarily dismissed on June 26, 2000. Item then brought proceedings against Mr Fassihi alleging (so far as material) that he was in breach of duty as a director and employee in seeking to divert the contract with Isograph to RAMS and for having pressed Mr Dehghani to take a hard line in the negotiations with Isograph so as to improve the prospects of obtaining the business for himself.

D     I will call the issues arising from these allegations the 'diversion' and 'sabotage' issues respectively. These claims failed before the deputy judge, but Item succeeded on a further allegation, which gives rise to the disclosure issue, that Mr Fassihi was in breach of duty in failing to disclose to Item his own wrongdoing. For his part, Mr Fassihi counterclaimed for wrongful dismissal and for arrears of salary for the period of 26 days prior to his dismissal on June 26, 2000.

E     6. Other than finding that Mr Fassihi was the sales and marketing director of Item, there are no findings as to his functions as an employee. It would appear from the facts that he may have had day-to-day responsibility for the trading relationship with Isograph but not responsibility for strategic business decisions regarding that relationship.

    7. The reason why Item did not succeed on the diversion or sabotage issues was that the judge found that, in the negotiations with Isograph, Item insisted on terms that Isograph was not prepared to accept and that Item's insistence in this regard was the cause of the failure of the

F     negotiations with Isograph. Moreover, there was nothing to suggest that Mr Dehghani would have negotiated any more cautiously if Mr Fassihi had not pressed him to seek better terms. There is no cross-appeal against the deputy judge's findings on these issues, and accordingly I express no view thereon or on the deputy judge's conclusions on these issues. Accordingly, the focus turns to the disclosure issue, which arises from Item's allegation that Mr Fassihi had failed to disclose his own misconduct in seeking to divert the contract to his own new company.

G     There was no doubt about the egregious nature of Mr Fassihi's conduct in this regard. On April 24, 1999, Mr Fassihi had sent a fax to Isograph referring to his proposal to set up a new company and urging Isograph to accept a conditional notice to terminate the existing distribution arrangements which Item had given. In respect of non-disclosure of this breach of duty, the deputy judge was satisfied that loss resulted. He held:

        '35. ... I have to consider (if the non-disclosure was a further breach of duty) what would have happened on the balance of probabilities.

H         36. In my view it is highly probable that had Mr Fassihi disclosed what he had done, this would have indeed changed Mr Dehghani's attitude to the negotiations with Isograph radically. ... I have little doubt that Mr Dehghani would have been severely shocked by Mr Fassihi's conduct and that this would have led him to accept Isograph's proposal instead of indulging in the further brinkmanship which caused Isograph to lose patience and serve notice of termination.'

8. There is no appeal from the deputy judge's finding of fact on this point and accordingly I express no view thereon.

9. The deputy judge then turned (para.38) to consider what he termed the 'crucial' issue of law, namely:

> 'whether, in addition to Mr Fassihi's breach of duty in seeking to divert Item's main contract to his new company, the failure to disclose that misconduct to Item was a further breach of duty.'

10. The judge's approach was to consider first whether Mr Fassihi was in breach of his duty as an employee of Item by failing to disclose his wrongdoing to it. For this purpose he started with the well-known case of *Bell v Lever Bros Ltd* [1932] AC 161 (referred to below as *Bell v Lever*). This is a decision of the House of Lords and I have shall have to consider it in detail below.

11. The judge then considered a number of more recent authorities. In particular, he referred to *Horcal Ltd v Gatland* [1983] BCLC 60, in which Glidewell J held, obiter, that the failure by a director of a company, as opposed to an employee, to disclose an earlier breach of fiduciary duty would render an agreement terminating his contract of service (on terms advantageous to the director) void on the grounds of mistake. Glidewell J held that *Bell v Lever* did not apply where there was a fiduciary relationship between the parties. He inferred that Lord Atkin was in agreement with a different passage from that to which he (Lord Atkin) refers in the judgment of Greer LJ in the Court of Appeal in *Bell v Lever* [1931] 1 KB 557, at p.600 where Greer LJ said:

> 'It does not seem to me open to question that the directors of a company occupy a fiduciary position towards the company, with the result that they cannot retain a benefit they have obtained by an agreement with the company unless they have made full disclosure of all material facts known to them.'

12. Lawrence LJ expressed a similar view at p.592. Glidewell J also based his conclusion on the well-known principle of law that a director is liable to account for any secret profit which he makes out of his relationship with his company (see, for example, *Regal (Hastings) Ltd v Gulliver* [1967] 2 AC 134n). The decision of Glidewell J was affirmed on other grounds by this court at (1984) 1 BCC 99,089.

13. The deputy judge also considered the decision of this court in *Sybron Corp v Rochem Ltd* [1984] Ch 112, where the issue which arose was whether an employee was bound to disclose the misconduct of his fellow employees at a time when a decision was being taken as to the payment to be made to him under the terms of a pension scheme. The scheme provided for different payments according to whether or not the member of the scheme was dismissed for fraud or serious misconduct. This court unanimously held that the employee in the circumstances of that case was under a duty to disclose the misconduct of his fellow employees, and that this was so even though it inevitably involved disclosure of his own misconduct. This court further held that *Bell v Lever* was distinguishable because the only question raised in that case was whether an employee was bound to disclose his own misdeeds.

14. The deputy judge in this case considered some further authorities, but I do not think that I need to cite them as they take the issue with which this appeal is concerned no further.

15. On the basis of the authorities, the deputy judge held that *Bell v Lever* was authority for two separate propositions (judgment para.51). His first proposition was that an employee's duty to act in good faith and in the interests of his employer would not require him to disclose his own misconduct when it was committed. His second proposition was that an employee still owes no duty to disclose his misconduct if he later enters into a contract with the employer to vary or terminate his contract of employment, even though the misconduct would be a material matter to be taken into account by the employer. He noted that an employee could be required to disclose his own misconduct 'where particular aspects of the employee's functions in the

A    business require disclosure of the relevant facts', for example where he was required to disclose that of his fellow employees. He further held that the general propositions in *Bell v Lever* might be inapplicable if the concealment of the misconduct was fraudulent. He held that it was not clear on the authorities whether the position of a director was the same as that of an employee.

16.   Having first ascertained that the questions before him were largely open, the deputy

B    judge went on to make the following holdings against Mr Fassihi:

'52. I hold that in this case Mr Fassihi's misconduct did give rise to a "super-added" duty of disclosure. I do so principally because, as in *Sybron*, there was a separate and independent aspect of his duties which required him to disclose the facts. He was involved in the negotiations between Item and Isograph and his contractual obligations of fidelity and care required him to disclose important information known to him which was relevant to those negotiations. If he had learned that a rival distributor had been

C    trying to sabotage the negotiations with Isograph, it would have been his duty to tell Mr Dehghani; the fact that it was himself cannot relieve him of the duty. That it would have been in Item's interest to know of the misconduct in order to deal with Mr Fassihi would not have justified the imposition of a duty; what justifies it is its relevance to the ongoing negotiations with Isograph. This therefore seems to me to be a case in which a duty of disclosure was owed.

D    53. Further, this seems to me to be a clear case of fraudulent concealment. Mr Fassihi's failure to tell Mr Dehghani of what he had done while remaining involved in the negotiations with a third party apparently acting as a sales director, was part and parcel of his dishonest scheme to rob his employers of the business. For these reasons too I think that *Bell v Lever Bros Ltd* is distinguishable, and that the non-disclosure of his misconduct was a breach of duty.

E    54. If this is correct, it is not necessary to decide whether *Bell v Lever Bros Ltd* is distinguishable for the additional reason that Mr Fassihi was a director of Item as well as an employee, which is the issue on which different views were expressed by Glidewell J and Robert Goff LJ. However, in case the matter goes further, in my opinion Mr Fassihi did owe a duty of disclosure by virtue of his position as a director, for the following reasons.

F    (a)    It is necessary to distinguish between the two propositions established by *Bell v Lever Bros Ltd* set out at para.51(1) and (2) above. They relate to two quite different duties.

(b)    There is no reason why proposition (2), that an employee owes no duty to disclose his own misconduct as a material fact which affects or may affect a contract he is negotiating with his employer to vary or terminate his employment, should not apply equally to a director. The rationale, that the contract is not one of the utmost

G    good faith, is the same, and the additional considerations to which I have referred apply equally.

(c)    However, the position with regard to proposition (1) is quite different. The director owes fiduciary duties to the company and for the reasons given by Glidewell J in *Horcal* it is difficult to see how a director who was making a profit by appropriating the companies contract for his own benefit would not be under a duty to disclose what he had done, not least as part of his duty to account for the

H    profit. To hold otherwise seems to me, as it did to Glidewell J, inconsistent with the decision of the House of Lords in *Regal* . . .

(d)    The objection raised by Robert Goff LJ, that a director might have to make a "confession" before entering into a contract with his employer, supports the view that proposition (2) applies equally to a director, but is not relevant in relation to proposition (1). No question of a contract with the employer is involved. In

A

> *Horcal* the misconduct and the negotiation of the termination of the contract of
> employment appear to have been more or less simultaneous, but it is still
> necessary to consider the two quite different kinds of duty separately.'

17. He accordingly held that Mr Fassihi was in breach of his duties both as an employee and
as a director for failing to disclose his own misconduct and that accordingly Item was entitled
to recover from him damages for breach of that duty suffered as a result of the termination of
the Isograph agreement, otherwise than in relation to sales in the United States. He held that the
assessment of damages should be on the basis that royalties would have been increased by
75 per cent in respect of any sales above the level of £333,000 p.a. The deputy judge ordered an
inquiry as to damages, which has been stayed pending this appeal. It is apparent that the
liability of Mr Fassihi may be a substantial sum.

B

18. As respects the 1870 Act, Mr Fassihi's claim was for the period June 1 to 26, 2000. I
have referred to the form of his service agreement already. The judge held that he was not
entitled to recover a proportionate part of the salary, citing *Boston Deep Sea Fishing & Ice Co v
Ansell* (1888) LR 39 ChD 339 and Goff & Jones, *The Law of Restitution* (5th ed., 1998, Sweet
& Maxwell), at p.548 and 6th ed. (2000, Sweet & Maxwell) at p.540. The deputy judge held
that it would be inconsistent with the *Boston* case to apply s.2 of the 1870 Act. The deputy
judge held that the rationale of the *Boston* case was that the employee was no longer employed
when the salary became due and payable. The application of the 1870 Act to the salary of a
director had been considered by the Divisional Court in *Moriarty v Regent's Garage &
Engineering Co Ltd* [1921] 1 KB 423. The Divisional Court considered that the 1870 Act
applied but their decision was overruled by the Court of Appeal on procedural grounds. The
Court of Appeal left open the question of whether the 1870 Act would apply.

C

D

19. The deputy judge considered an argument by Mr (now Professor) Paul Matthews in an
article entitled *'Salaries' in the Apportionment Act 1870* in (1982) 2 Legal Studies 302, in
which the author argued that the 1870 Act only applied where there was a change in the person
entitled to the payment occurring in the course of the period at the end of which payment was
due to be made. The deputy judge did not express a view on the argument though he refers to
the article as one of the reasons for not holding that the decision in the *Boston* case was, as he
put it, *per incuriam*.

E

20. The deputy judge considered two further questions, namely the question whether, if the
1870 Act in principle applies, it is prevented from applying in this case because Mr Fassihi's
dismissal was a justified dismissal and the question whether, having regard to his breaches of
duty, Mr Fassihi would be entitled to his salary in any event. The deputy judge decided both
these issues in favour of Mr Fassihi, subject to set off of any damages due to Item. There is no
cross-appeal on these issues, and accordingly I express no view thereon.

F

**Submissions**

G

*The disclosure issue*

21. Mr Nigel Dougherty, for Mr Fassihi, submits that the question whether there is a duty on
a director to disclose his own misconduct is open on the authorities. He submits that it is
invidious for such a duty to be imposed and that it should be left to the employer or company to
ask the director questions which would lead to the discovery of misconduct. In the alternative,
he submits that if there is any duty it is limited to fraudulent misconduct.

H

22. Mr Dougherty submits that in *Bell v Lever* Lord Atkin in fact made no distinction
between directors and employees. He further submits that it was not correct to draw the
conclusion from Lord Thankerton's speech that he thought the duty would arise in the event of
fraud.

A   23. Mr Dougherty submits that the *Horcal* decision does not support the judge's reasoning. This was a case on secret profits, and there is a liability to disclose such profits as a means of avoiding disgorgement.

24. Mr Dougherty submits that the fact that a director has no duty to disclose his own misconduct is not affected by the rule of law that information held by an agent in the course of his agency is to be imputed to his principal. This rule of law is subject to an exception ('the fraud exception') where the agent is committing a fraud on his principal (*Re Hampshire Land*
B   *Co* [1896] 2 Ch 743). In addition, while s.317 of the Companies Act 1985 would require a director to disclose to the board the nature of any interest he may have in a contract which the company proposes to make, a breach of that section would not give the company any claim for damages. Accordingly, even if Item had sought at trial to place reliance on that section (which it did not), it would not have justified the deputy judge's findings against Mr Fassihi.

C   25. For the respondent, Mr Ben Quiney submits that there are good policy reasons for imposing a duty to disclose on directors. He submits that it is not invidious that they should be under such a duty. Nor can it be considered a hardship for them to have to disclose wrongful conduct. Moreover, the imposition of the duty to disclose does not run counter to any policy interest protected by the privilege of self-incrimination.

26. Mr Quiney further submits that fiduciaries owe a general duty to act in what they consider to be the principal's best interests. This will involve a duty to disclose a breach of
D   duty. This would apply whether the breach of duty was fraudulent or not. He also submits that a director owes a fiduciary duty to report relevant information of concern to the company. He bases this submission on *Industrial Development Consultants Ltd v Cooley* [1972] 1 WLR 443. The test as to what information falls in this category is objective and there is also a subjective element, namely whether the director was aware of the information.

27. Alternatively to his main submission, Mr Quiney submits that there is a super-added
E   duty to disclose imposed on an employee by virtue of the duty of fidelity. This duty applies to wrongs occurring in the course of employment. Mr Quiney submits that it was not necessary to consider the position with respect to wrongs committed before the employment started. He submits that the duty arises when the misconduct occurs. In the further alternative, Mr Quiney submits that the liability arises where misconduct is fraudulently concealed. On this, he seeks to uphold the deputy judge's judgment on the basis of *Bell v Lever*.

F   28. Mr Quiney submits that the fraud exception referred to above is not inconsistent with his submission as to the existence of a duty to disclose. In this context, the law does not make the unreal assumption that agents will reveal to their principals the fraud which they are committing on them (see, for example, *J C Houghton & Co v Northard, Lowe & Wills* [1928] AC 1, at pp.14–15). However, the aim of the rules about the attribution of knowledge generally is to protect the interests of third parties dealing with the company. The purpose of the fraud exception is to protect the company's interests. The fraud exception applies in any area where
G   third parties could not expect to have their interests protected.

29. Mr Quiney submits that s.317 of the Companies Act 1985 supports his submissions as to the duty to disclose.

30. Neither counsel was able to refer us to any relevant Commonwealth authorities.

H   *The apportionment issue*

31. Mr Dougherty submits that s.2 of the 1870 Act applies to the claim by Mr Fassihi for the proportion of his salary. He relies on *Moriarty v Regent's Garage and Engineering Co Ltd* and a dictum of Scott J in *Sim v Rotherham Metropolitan BC* [1987] Ch 216 at p.255, where Scott J held that the Act applied where an employee's contract was terminated in the course of a period at the end of which payment would be made. Mr Dougherty submits that in the *Boston* case the

1870 Act was not considered; in any event the *Boston* case is distinguishable on the basis that the contract in that case was a five year contract. He further submits that *Miles v Wakefield MDC* [1987] AC 539 was no assistance to the conclusion which the judge formed.

32. Mr Dougherty relies also on statements in Treitel, *Law of Contract* (11th ed., 1999, Sweet & Maxwell), pp.823–825, and Goff & Jones, *The Law of Restitution* (6th ed., 2002, Sweet & Maxwell), para.20-049 to support the application of the 1870 Act in these circumstances. He submits that this court should not accept the argument made by Professor Matthews in his article entitled *'Salaries' in the Apportionment Act 1870* (1982) 2 Legal Studies 302.

33. Mr Quiney submits that, while there is no authority to the effect that the 1870 Act does not apply in these circumstances, the effect of the Act is limited to allowing a method of calculation and that it does not create a right to a sum. The question whether there is a right to a sum continues to be governed by the common law and that was established in the *Boston* case. He further relies on the argument of Professor Matthews in his article, referred to above, that the Act applies to enable apportioned payments to be made to successive holders. Mr Quiney submits that the Act applies only to salaries where there is no repudiatory breach of contract, for example, where a person retires by agreement. He relies on *Capron v Capron* (1874) 29 LT 826, at p.827, Bennion on *Statutory Interpretation* (4th ed., 2002, Butterworths), sections 327 and 331, and *Inman v Ackroyd* [1901] 1 QB 613, at p.616.

## Conclusions

*The disclosure issue*

34. As I have explained (above, para.10), the deputy judge approached the question of law under the disclosure issue by considering first the position of Mr Fassihi as an employee as a matter of employment law. This was a course which he felt compelled to take because of the leading case of *Bell v Lever*. However, as I have pointed out, there are few findings as to the duties of Mr Fassihi as an employee and in any event the case has primarily been argued in this court on the basis that Mr Fassihi's fiduciary duties as a director required him to disclose his misconduct. In these circumstances, and on the assumption at this stage that *Bell v Lever* does not decide the law on this issue in relation to directors (a point to which I will return when I consider the relevant parts of that decision together below), it seems to me that the logical place to start in relation to the disclosure issue is to consider the position of Mr Fassihi as a director since the duties of a director are in general higher than those imposed by law on an employee. This is because a director is not simply a senior manager of company. He is a fiduciary and with his fellow directors he is responsible for the success of the company's business.

35. Merely to call a person a fiduciary is only the beginning of the analysis. It is necessary to identify the respects in which he is a fiduciary and the duties which follow. These duties are imposed by law. They are not simply default rules, that is rules of law subject to contrary agreement. They are mandatory rules of law which the company and the director cannot contract out of them: see s.310 of the Companies Act 1985, which (with immaterial exceptions) makes void:

> '(1) . . . any provision, whether contained in a company's articles or in any contract with the company or otherwise, for exempting any officer of the company or any person (whether an officer or not) employed by the company as auditor from, or indemnifying him against, any liability which by virtue of any rule of law would otherwise attach to him in respect of any negligence, default, breach of duty or breach of trust of which he may be guilty in relation to the company.'

36. It would be convenient at this point to refer to s.317 of the Companies Act 1985. The immediate significance of this section is that, had a board meeting of Item been called to consider a new contract with Isograph, Mr Fassihi would have been obliged to disclose any

A interest he had in that contract. The fact that Mr Fassihi stood to benefit if the contract was not approved would be such a benefit (see generally, *Buckley on the Companies Acts* (Butterworths, last updated 2004) at para.[317.12]). In material part, s.317 provides:

> '(1) It is the duty of a director of a company who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the company to declare the nature of his interest at a meeting of the directors of the company.'

B 37. Mr Dougherty submits that the better view is that s.317 does not of itself give rise to any civil remedy (see, for example, *Buckley on the Companies Acts* at para.[317.21]).

*Mr Fassihi's duty as a director*

C 38. What is it that distinguishes the position of a director from that of an employee? It is, of course, the fact, as the judge said, that a director is subject to fiduciary duties and obligations. One of those obligations is, as the deputy judge points out, the liability to account for secret profits. The judge relied on this duty in support of his conclusion that the holding in *Bell v Lever* that there was no duty to account did not in any event apply to a director: see his judgment at para.54(c) which I have quoted above. Mr Quiney too relies on this line of authority. These authorities go to show that the fact that a director was acting otherwise than as a director in making a secret profit is no answer to a claim by the company to recover the profits. Thus in

D *Re Bhullar Bros Ltd* [2003] BCC 711, this court held that directors of a company were liable for profits resulting from the acquisition of a property neighbouring that of their company even though they had obtained this information not as directors but as passers-by. Likewise, in *Industrial Development Consultants Ltd v Cooley* [1972] 1 WLR 443, a director was liable to account for the profits which he made from exploiting a commercial opportunity, offered by a customer of the company, of which he became aware before resigning on the grounds of alleged ill-health.

E 39. In the *Bhullar* case and *Cooley* case, the consequence of the failure to disclose was that the director came under a liability to account. This case is not concerned with a claim to recover any profit which RAMS has made, but with a claim for compensation for loss resulting from breach of the duty to disclose. Both the *Bhullar* case and the *Cooley* case speak of the director owing a duty to disclose. Thus in the *Bhullar* case, Jonathan Parker LJ, with whom Brooke and Schiemann L JJ agreed, held that 'the existence of the opportunity was information which it was

F relevant for the company to know, and it follows that [the directors] were under a duty to communicate it to the company.' (at p.723). This followed the holding of Roskill J in the *Cooley* case, where Roskill J held that 'Information which came to [the director] while he was managing director and which was of concern to [the company] and was relevant for [the company] to know, was information which it was his duty to pass on to [the company] because between himself and [the company] a fiduciary relationship existed . . .' (at p.451).

G 40. However, the *Bhullar* and *Cooley* cases do not suggest that the duty to disclose there referred to is some new and separate duty imposed on a fiduciary, breach of which would give rise to a potential liability to pay compensation. It may be that in those cases the courts spoke of a duty to disclose simply to explain why in those cases the information obtained in a private capacity gave rise to a liability to account for secret profits. In addition, it is often said that a fiduciary must disclose a conflict of interest and duty because that is a shorthand way of stating the mechanism by which he can avoid any liability to account for secret profits. It would be

H odd, however, if there was a separate duty to disclose information and it only arose when the court was considering whether a director had come under a liability to account for secret profits. A duty to disclose can arise in other circumstances (see, for example, *El Ajou v Dollar Land Holdings plc* [1994] BCC 143 at pp.156–157. We have been referred to two decisions of Peter Smith J in which he has held *obiter*, distinguishing *Bell v Lever* that a fiduciary owes a positive duty to disclose breaches of fiduciary duty and that no distinction was to be drawn

behind the fiduciary duty to account and any other fiduciary duty (see *Tesco Stores Ltd v Pook* [2003] EWHC 823 (Ch); [2004] IRLR 618 at paras 10–20; *Crown Dilmun v Sutton* [2004] 1 BCLC 468 at p.181).

41. For my part, I do not consider that it is correct to infer from the cases to which I have referred that a fiduciary owes a separate and independent duty to disclose his own misconduct to his principal or more generally information of relevance and concern to it. So to hold would lead to a proliferation of duties and arguments about their breadth. I prefer to base my conclusion in this case on the fundamental duty to which a director is subject, that is the duty to act in what he in good faith considers to be the best interests of his company. This duty of loyalty is the 'time-honoured' rule: per Goulding J in *Mutual Life Insurance Co of New York v The Rank Organisation Ltd* [1985] BCLC 11, at p.21g. The duty is expressed in these very general terms, but that is one of its strengths: it focuses on principle, not on the particular words which judges or the legislature have used in any particular case or context. It is dynamic and capable of application in cases where it has not previously been applied but the principle or rationale of the rule applies. It reflects the flexible quality of the doctrines of equity. As Lord Templeman once put it 'Equity is not a computer. Equity operates on conscience …' (*Winkworth v Edward Baron Development Co Ltd* (1987) 3 BCC 4 at p.8; [1986] 1 WLR 1512, at p.1516.)

42. Professor Robert C Clark has described the fundamental nature of the duty of loyalty in these terms:

> 'The most general formulation of corporate law's attempted solution to the problem of managerial accountability is *the fiduciary duty of loyalty*: the corporation's directors . . . owe a duty of undivided loyalty to their corporations, and they may not so use corporate assets, or deal with the corporation, as to benefit themselves at the expense of the corporation and its shareholders. *The overwhelming majority of particular rules, doctrines, and cases in corporate law are simply an explication of this duty or of the procedural rules and institutional arrangements involved in implementing it*. The history of corporate law is largely the history of the development of operational content for the duty of loyalty. Even many cases that appear to be about dull formalities or rules of the road in fact involve disputes arising out of alleged managerial disloyalty . . . Most importantly, this general fiduciary duty of loyalty is a residual concept that can include factual situations that no one has foreseen and categorized. The general duty permits, and in fact has led to, a continuous evolution in corporate law.' (*Corporate Law* (1986, Little, Brown), pp.34 and 141, emphasis in the original).

43. Although Professor Clark was writing about the duty of loyalty in the United States, his observations seem to me to express qualities of the duty of loyalty applying equally to the law of England and Wales.

44. The only reason that I can see that it could be said that the duty of loyalty does not require a fiduciary to disclose his own misconduct is that it has never been applied to this situation before. As I have explained, that is not a good objection to the application of the fiduciary principle. 'Equity refuses to confine within the bounds of classified transactions its precept of a loyalty that is undivided and unselfish' (*per* Cardozo J in *Meinhard v Salmon* 164 NE 545, at p.548 (US)). Furthermore, on the facts of this case, there is no basis on which Mr Fassihi could reasonably have come to the conclusion that it was not in the interests of Item to know of his breach of duty. In my judgment, he could not fulfil his duty of loyalty in this case except by telling Item about his setting up of RAMS, and his plan to acquire the Isograph contract for himself.

*Other issues*

45. I have referred above to the principle of the law of agency that information received by the agent in the course of his agency is to be imputed to the principal. Under the fraud

A    exception, which applies where the agent is committing a fraud on his principal, the agent is not treated as under any duty to disclose his wrongdoing to his principal. However, I agree with counsel that this principle does not affect the conclusion in this case. This rule of law in agency is about the attribution of knowledge and not about the liability of a fiduciary to his principal.

46. Counsel have addressed arguments to this court on the policy reasons for imposing a duty to disclose. I consider the policy reasons below, (paras 63–68) but first I must consider in detail *Bell v Lever*.

B

### Bell v Lever and subsequent cases

47. I have made the assumption above that *Bell v Lever* does not decide that a director, as opposed to an employee, owes no duty to disclose his own misconduct. I now turn to the question whether that assumption is correctly made. It will be recalled that in para.51 of his judgment the judge concluded that *Bell v Lever* was authority for two propositions, summarised above. For the reasons explained below, I consider that the two propositions need some qualification, and that the assumption which I have made above is justified.

C

48. *Bell v Lever* is best known as an authority on the law of mistake but there was a subsidiary argument that even if the contract was not void for mistake nonetheless it should be set aside because of the appellants' failure to make disclosure of their wrongdoing to their employers. There were two appellants but it is sufficient for my purpose to take the case of Mr Bell alone. Mr Bell was appointed a director and the chairman of 'Niger', a subsidiary of Lever Brothers Ltd ('Lever'), pursuant to his contract with Lever. Lever wished to dispense with Mr Bell's services. Lever offered him compensation of £30,000 for termination of his services. An agreement was made and implemented. Lever then discovered that Mr Bell had made secret profits at the expense of Niger for which he could have been summarily dismissed. Lever brought a claim to obtain the repayment of the sum of £30,000 and it claimed rescission of the compensation agreement on the ground of fraud. The jury specifically found that there was no fraud. The jury found that if Lever had known of the dealings giving rise to the secret profits, it would not have agreed to pay compensation to Mr Bell. Before the trial began, Mr Bell admitted his liability to account to Niger for his secret profits, and made a payment into court. Wright J and the Court of Appeal held that Lever was entitled to succeed on the ground that the agreement for compensation was void as having been made under mutual mistake.

D

E

49. In the House of Lords, however, the majority, Lord Blanesburgh, Lord Atkin and Lord Thankerton, allowed the appeal. They considered that the subject-matter of the agreement was a contract of service and that the only mistake was about a quality of that subject-matter rather than its existence. I need not say more about this aspect of the case because it is the further element in *Bell v Lever* which is material in this case. It was argued that Mr Bell ought to have disclosed to Lever his own wrongdoing. Lord Atkin and Lord Thankerton, with both of whom Lord Blanesburgh agreed, rejected this duty but they expressed slightly different reasons for doing so.

F

G

50. Lord Atkin said:

> 'The servant owes a duty not to steal, but, having stolen, is there superadded a duty to confess that he has stolen? I am satisfied that to imply such a duty would be a departure from the well established usage of mankind and would be to create obligations entirely outside the normal contemplation of the parties concerned. If a man agrees to raise his butler's wages, must the butler disclose that two years ago he received a secret commission from the wine merchant; and if the master discovers it, can he, without dismissal or after the servant has left, avoid the agreement for the increase in salary and recover back the extra wages paid? If he gives his cook a month's wages in lieu of notice can he, on discovering that the cook has been pilfering the tea and sugar, claim the return of the month's wages? I think not. He takes the risk; if he wishes to protect himself he

H

can question his servant, and will then be protected by the truth or otherwise of the answers.

I agree with the view expressed by Avory J in *Healey v Société Anonyme Française Rubastic* on this point. It will be noticed that Bell was not a director of Levers, and, with respect, I cannot accept the view of Greer LJ that if he was in fiduciary relationship to the Niger Company he was in a similar fiduciary relationship to the shareholders, or to the particular shareholders (Levers) who held 99 per cent. of the shares. Nor do I think that it is alleged or proved that in making the agreement of March 19, 1929, Levers were acting as agents for the Niger Company. In the matter of the release of the service contract and the payment of £30,000. they were acting quite plainly for themselves as principals.' (p.228)

51. Lord Atkin's reasons for rejecting the super-added duty of disclosure are contained in the passage from his judgment quoted above. He was principally concerned by the possibility of imposing a duty to disclose in a situation where in practice no disclosure is expected. An employer does not expect to be able to recover the wages of an employee who has committed a breach of duty which he has failed to disclose unless (possibly) he has made enquiries of the employee and the employee has given him false information. This was the general position and Lord Atkin's view was not affected by the fact that the jury found that Lever would not have entered into the agreement with Mr Bell to pay him the compensation for loss of office of £30,000 if it had known about his breach of duty. (Interestingly there was no finding by the special jury in that case as to whether Lever *expected* Mr Bell to inform them of his wrongdoing). A duty to disclose could not have been imposed in the *Bell v Lever* situation without upsetting the usual situation, in which in Lord Atkin's view there was no expectation of disclosure.

52. Lord Thankerton said:

'The learned judges of the Court of Appeal appear to regard the duty to disclose as arising at the time of negotiating the contract, but I am unable to see that any such duty could arise out of the circumstances of these agreements; in my opinion, the first question must be whether the appellants incurred a duty to disclose these transactions at the time that they were completed. The failure to account for the profits to [the subsidiary of Lever Brothers], on which some of the learned judges lay stress, was an integral part of the breach of duty to that company. The appellants had just as much – or just as little – right to continue drawing their salaries without disclosure as they had to negotiate two years later for the commutation of these same salaries. In truth, the negotiations [for the termination agreement] were at arm's length, and not on the footing of the relationship of master and servant, but for the termination of that relationship, and, if there was not an already existing breach of an obligation to disclose, I am unable to see how the circumstances or [these agreements] could be held to create such an obligation.

In the absence of fraud, which the jury has negatived, I am of the opinion that neither a servant nor a director of a company is legally bound forthwith to disclose any breach of the obligations arising out of the relationship, so as to give the master or the company the opportunity of dismissal; on subsequent discovery, the master or company will not be entitled to hold the dismissal as operating from the date of the breach, but will be liable for wages or salary earned by the servant during the intervening period. In my opinion *Healey v Société Anonyme Française Rubastic*, which was the case of the managing director of a company, was rightly decided . . .

Accordingly I am of opinion that the appellants had no legal duty to disclose their cocoa transactions either at the time of their commission or in negotiation for the agreements of March 1929.' (pp.231–232)

53. The present case concerns what Lord Atkin called 'the superadded duty to confess'. Both Lord Atkin and Lord Thankerton were of the view that an employee was not under such a

A    duty whether at the time he commits the wrongful act or subsequently when the employer makes a payment to him for his services. Arguably, Lord Atkin was primarily concerned with the question whether a duty of disclosure arose at the time when the parties entered the agreement terminating the contract of employment while Lord Thankerton focused on the question whether there was a duty to disclose the misconduct at the time it was committed, but I need not decide that point. There are two material differences in their approach for present purposes. First, Lord Thankerton equates the position of an employee with that of a director,

B    whereas Lord Atkin leaves that question open. It is, however, clear on the facts of *Bell v Lever* that, for the reasons which Lord Atkin gives, that the question whether a director was in the same position as an employee was not a question which arose for decision in that case. Secondly, there is a hint in the examples given by Lord Atkin in the passage I have cited that he considered that the existence of a duty of disclosure would depend to some extent on the circumstances. The examples he gives are both of domestic staff and, in the latter example (that of the cook) and probably also the former example (that of the butler), the breach of duty

C    was not very serious. Likewise, in the paragraph which follows, Lord Atkin stresses that Mr Bell was not a director of Lever. (In addition, it was known that Mr Bell had accepted liability to account to Niger.) The breach of duty did not, therefore, directly affect Lever. If Lord Atkin's view depended upon the circumstances of the non-disclosure, then this qualification affects both the proposition that an employee is not bound to disclose his misdeeds at the time he commits them as well as the question in issue in *Bell v Lever* whether he

D    was bound to disclose them before entering into a transaction with his employer about his terms of engagement.

54. In the passage cited above, Lord Atkin also approves *Healey v Société Anonyme Française Rubastic* [1917] 1 KB 946. In the *Healey* case, the issue was whether a director was entitled to his arrears of salary for work done notwithstanding that he had been summarily dismissed for misconduct. Again there was no question of a claim for damages for breach of

E    duty. Lord Atkin's holding that there was no duty to disclose must be read in the context in which the holding was made. The situation where a company seeks to make one of its directors liable for compensation for breach of duty caused by his failure to disclose his breach of duty to his company was not the situation before the House of Lords in *Bell v Lever*.

55. Accordingly, the next question which arises is: what is the ratio of *Bell v Lever* on the non-disclosure point? All that the majority needed to decide was that Mr Bell owed no duty to

F    disclose his misdeeds to Lever before entering into the compensation agreement with it, *i.e.* that, in circumstances such as those in which Mr Bell found himself, Mr Bell owed no duty to disclose his misdeeds to his employer. In my judgment, the majority did not decide that there could never be such a duty on the part of the employee. I do not read Lord Atkin's judgment as going that far.

56. Likewise, the majority did not decide that a fiduciary would not owe any such duty.

G    Only Lord Thankerton agreed and expressed a view on that point, and his observation was in any event obiter. In addition, *Bell v Lever* does not in terms cover the case where there is fraudulent concealment, as the jury had expressly negatived fraud. Accordingly, *Bell v Lever* does not determine the 'crucial' (as the deputy judge put it) issue which arises in this case.

57. In the course of his judgment in the *Horcal* case, Robert Goff LJ (with whom the other members of the court agreed, though Lawton LJ also delivered a separate judgment) noted,

H    without deciding the point, that the argument that a director is under a duty to disclose any breach of duty on his part before making an agreement for compensation for loss of office 'could lead to the extravagant consequence that a director might have to make what counsel . . . has called "a confession" as a prerequisite of such an agreement.' This observation, like those of Lord Atkin in *Bell v Lever*, expresses the philosophy that the law should not impose a duty of disclosure where that would be contrary to the expectations of the parties. It would be difficult to disagree with the logic and good sense of this approach.

58. *Horcal* is an important decision because this court in that case extended Lord Atkin's reasoning in *Bell v Lever* to company directors. However, it did so only in the context of disclosure before an agreement for the payment of compensation or an increase in remuneration was made. Accordingly Robert Goff LJ's observations do not directly cover to the situation with which we are concerned. They were of course strictly *obiter* but it is not necessary for this purposes of this case to consider whether they should nonetheless be followed.

59. In the light of Robert Goff LJ's observations in the *Horcal* case, it would be open to question whether this court should assume, as did Glidewell J at first instance in the *Horcal* case, that Lord Atkin gave his unqualified agreement to the passage from the judgment of Greer LJ in *Bell v Lever*, cited above (para.11). Glidewell J took the view that Lord Atkin must have agreed with Greer LJ's proposition that there would be a liability to account for benefits received under an agreement if the fiduciary does not make full disclosure of all material facts, which in this context would include particulars of any wrongdoing, before the agreement is made. In the light of the conclusions which I reach below it is not necessary to decide that point.

60. Likewise it is unnecessary to consider to what extent an employee has a duty to disclose his own misconduct. Following the *Rochem* case, one route by which it might be concluded that Mr Fassihi had a duty to disclose his own wrongdoing is that no logical distinction can be drawn between a rule that an employee should disclose his own wrongdoing and a rule that he should disclose the wrongdoing of his fellow employees even if that involves disclosing his own wrongdoing too. That is not an issue which needs to be resolved in this case. I should add that we have not been taken to any of the developing jurisprudence on the duty of trust and confidence which an employer and employee mutually owe (see, for example, *Mahmud v Bank of Credit and Commerce International SA (in liq.)* [1998] AC 20). I have already stated that, in my judgment, *Bell v Lever* is not authority for the proposition that there are no circumstances in which an employee can have a duty to disclose his wrongdoing. It is in that respect that I would hold that the two propositions which the judge extracted from *Bell v Lever* (above, para.15) need to be qualified.

61. Likewise, in view of the conclusions reached above, it is also unnecessary to decide whether *Bell v Lever* applies where there has been fraudulent concealment by the employee. I note, however, the observations expressed on that point by Kerr LJ in the *Rochem* case.

62. In the circumstances, in my judgment, *Bell v Lever* does not expressly or by implication hold that Mr Fassihi was not under a duty of disclosure in the present case by virtue of his position as a fiduciary. Accordingly, the assumption which I made above (para.34) is well-founded.

*Policy reasons for holding that a director's duty of loyalty requires him to disclose his misconduct*

63. Both counsel have addressed the court on the policy reasons for holding that Mr Fassihi was in breach of his duty of loyalty in this case. These are relevant questions. If the approach of the law were overly intrusive, legitimate entrepreneurial activity would be discouraged and this would not be a beneficial outcome. But that is not in my judgment the result of holding that a duty of loyalty applies in the present case. This is because, on well-established principles of law, Mr Fassihi's setting up of a new company to which the business of Item would be diverted was not a legitimate enterprenuerial activity. In addition, the effect of my decision in this case (if the majority of the court is of the same opinion) is not to make any substantive extension of the duties of directors, such as would be involved for example if the courts held that a director of one company could not accept a directorship of another company. It is simply a duty which makes the remedy for an existing liability of a director to account for secret profits and for the diversion of corporate opportunities more effective.

A    64. In my judgment, the policy arguments support the conclusion of the judge on the disclosure issue. These reasons are quite separate from the moral objections to the appellant's conduct in secretly setting up RAMS and approaching Isograph in his personal capacity. Moral objections would not of course be enough in themselves to justify imposing a duty.

65. A conclusion that a director owes no obligation to disclose his improper actions would be also inefficient in economic terms. It would mean that the company has to expend resources in investigating his conduct and that the enforcement of a liability to compensate the company
B    for misconduct depends on the happenchance of the company finding out about the impropriety. To this it may be said that the law ought not to hold that the duty of loyalty involves a positive duty to disclose because it is unlikely that the consciously misbehaving director will comply with it: this indeed is the rationale for the fraud exception (in *Re Hampshire Land*) referred to above.

66. My answer to that is two wrongs do not make a right: the fact that a director is unlikely to
C    comply with a duty is not a logically sustainable reason for not imposing it if it is otherwise appropriate. As the facts of this case demonstrate, the consequence of non-disclosure may be that the company makes erroneous business decisions because it lacks essential information. A legal rule which condones this, in my judgment, condones inefficient outcomes. Moreover, there is a constant dilemma in company law as to the manner in which the shareholders of a company can monitor those who manage its business on their behalf. The duty upheld above helps to ameliorate these problems (often called agency problems) by encouraging the
D    provision of information on which proper decision-making can take place. In many companies, an agency problem exists not only between shareholders and directors but between the board and executive or managing directors. There is an oversight duty owed by the board in respect of executives by virtue of their duty of care. (The precise extent of the duty depends on the facts of the case: *Re Barings plc (No. 5)* [1999] 1 BCLC 433.) The duty of loyalty as applied by me above supports the board in the performance of this duty and is thus efficient for that reason
E    also.

67. Accordingly, in so far as my conclusion on this issue involves a new application of the duty of loyalty, it is supported for policy reasons.

68. For all these reasons, in my judgment, the appeal against the judge's judgment on the disclosure issue must be dismissed.

**The apportionment issue**

F    69. Sections 2, 3 and 7 of the 1870 Act provide:

'2. From and after the passing of this Act all rents, annuities, dividends, and other periodical payments in the nature of income (whether reserved or made payable under an instrument in writing or otherwise) shall, like interest on money lent, be considered as accruing from day to day, and shall be apportionable in respect of time accordingly.

G    3. The apportioned part of any such rent, annuity, dividend, or other payment shall be payable or recoverable in the case of a continuing rent, annuity, or other such payment when the entire portion of which such apportioned part shall form part shall become due and payable, and not before, and in the case of a rent, annuity, or other such payment determined by re-entry, death, or otherwise when the next entire portion of the same would have been payable if the same had not so determined, and not before.

. . .

H    7. The provisions of this Act shall not extend to any case in which it is or shall be expressly stipulated that no apportionment shall take place.'

70. There is no doubt but that on the face of it the 1870 Act provides that a proportional part of salary can be claimed. Section 5 provides that the word 'annuities' includes salaries and pensions. Section 2 provides that rents, annuities, dividends and other periodical payments in the nature of income 'shall, like interest on money lent, be considered as accruing from day to

A

day, and shall be apportionable in respect of time accordingly'. Mr Fassihi's salary for June 2000 fell due on June 30, 2000. He was dismissed on June 26, 2000, but on the judge's findings was entitled to arrears of salary at the date of his dismissal. If section 2 applies, Mr Fassihi can claim that part of his June salary which is referable to June 1–26. His employment contract contained no provision expressly excluding the operation of the 1870 Act.

71. On the plain wording of s.2, there seems to be no reason why the 1870 Act should not apply. Mr Quiney submits that s.2 cannot apply because at the date of Mr Fassihi's dismissal, his June salary had not fallen due. But that of itself cannot be a good objection because it is provided in s.3 of the 1870 Act that any apportioned part of (say) salary shall become due when the entire portion would have become due. Mr Quiney seeks to meet that point by submitting that by June 30 the contract had terminated and accordingly there was no longer a date when the entire part would 'become due and payable'. However, the final clause of s.2 addresses this problem. The contract of employment has determined 'otherwise' than by re-entry or death, and accordingly the date when the apportioned part becomes payable is the date on which, but for that termination, arrears of salary would have become due, *i.e.* June 30, 2000. Section 2 therefore clearly contemplates that the right to payment may have been lost before the contractual date for payment arrives.

72. In *Boston Deep Sea Fishing and Ice Co v Ansell* (1888) 39 ChD 339, this court held that a managing director, who was employed for a period of five years at a yearly salary, and who had been dismissed for misconduct, could not recover his salary for the part of the year which he had completed before his dismissal. His right to his salary was conditional on his fulfilling his duties for the year and that condition had not been fulfilled. The contract was indivisible, and no payment under it could be claimed. But in that case there was no attempt to rely on the 1870 Act and therefore it is not an authority as to the effect of the 1870 Act. The 1870 Act now in effect raises a presumption against indivisibility (see s.7, above).

73. In *Miles v Wakefield* [1987] AC 539, at p.570, Lord Oliver treated the *Boston* case as authority for the narrow proposition that:

'An employee, for instance, who is rightly dismissed from his employment can recover salary which has become due and payable at the date of his dismissal but cannot recover sums becoming due and payable at some later date and on the condition that he has performed his contractual duties down to that date: see *Boston Deep Sea Fishing and Ice Company v Ansell* (1888) 39 Ch.D 339, 364 per Bowen LJ.'

74. The *Miles* case, however, is not an authority on the 1870 Act as it is not referred to in the speeches. Moreover, there is no suggestion in this case that Mr Fassihi's right to recover salary for the whole of June 2000 was dependent on his working throughout the month, or that he failed to provide services in the period up to his dismissal. Thus, if ss.2 and 3 of the 1870 Act apply, then salary was due at the date of his dismissal but not payable until June 30, 2000.

75. In *Moriarty v Regent's Garage and Engineering Co Ltd* [1921] 1 KB 423, the Divisional Court applied s.2 of the 1870 Act to a claim for directors' fees on a time-apportioned basis. The company's articles provided that the directors should be entitled to fees of a certain amount per annum. The need for apportionment arose from the fact that the director in question had retired by agreement in the course of the year. The principal issue considered by the Divisional Court was whether directors' fees constituted 'salaries' for the purposes of the 1870 Act. The Divisional Court decided that they were within the term 'salaries'. The decision of the Divisional Court was reversed by this court on appeal on another ground ([1921] 2 KB 766), but this court did not decide the point under the 1870 Act.

76. In *Sim v Rotherham Metropolitan Borough Council* [1987] 1 Ch 216, Scott J held:

'Mr Goudie submitted that the real question was whether a teacher was entitled to be paid for the period of 35 minutes that he or she had not worked. Pay for that period, he said, had not been earned. In my judgment, this approach is fallacious. It involves

A       regarding the teachers' salaries as accruing minute by minute. There is no legal or factual justification for that view of the salaries. Under the contracts, the salaries are based on a yearly scale but are paid by monthly payments. Each month a contractual right to a salary payment vests in the teacher. By reason of section 2 of the Apportionment Act 1870, the salaries are deemed to accrue day by day. If a teacher's contract were, in the middle of a month, to come to an end, by death, dismissal or some other event, section 2 would entitle the teacher, or his estate, to an apportioned part of

B       the month's salary payment,. So the salaries may be regarded as accruing day by day. But they do not accrue minute by minute . . .' (pp.254–255)

77. This case also supports Mr Dougherty's submissions.

78. Mr Dougherty additionally relies on *Powdrill v Watson* [1995] BCC 319; [1995] 2 AC 394, in which the House of Lords accepted the submission of counsel for employees of a company, which had gone into administration, that the 1870 Act could be used to determine

C    arrears of salary attributable to the period prior to the administrators' appointment. This appointment occurred in the course of the period in which the salary was being earned, the salary in question being payable in arrears. However, the *Boston* case was not cited. Since the contracts of employment in question had been adopted by the administrators, the issue in the *Boston* case did not arise. Mr Quiney also seeks to derive assistance from this case: he submits that it shows that the 1870 Act applies to the situation where there is a continuing obligation to pay a sum, whereas here the right to payment terminated in a payment period. That is the

D    argument which I have already dealt with in para.71 above. There is nothing in the *Powdrill* case to limit the 1870 Act in the way for which Mr Quiney contends. In sum, while I am grateful to counsel for drawing the *Powdrill* case to our attention, but I do not consider that it assists either party on the crucial issues on this appeal, which are whether the judge was right to conclude that he was bound not to apply the 1870 Act because of the *Boston* case and, if not, what is the true interpretation of the 1870 Act.

E    79. For the reasons given by Holman J, whose judgment I have had the advantage of reading in draft, the Irish case of *Treacy v Corcoran* (1874) IR 8 CL 40 also supports the argument of Mr Dougherty. We have been referred to other authorities from the Commonwealth. I am grateful to counsel for their researches, but, in my judgment, these cases take the question in this case no further than the judgments of the Divisional Court in the *Moriarty* case and of Scott J in the *Sim* case. The application of the 1870 Act is supported by the leading text books to

F    which we have been referred. I am indebted to Holman J for setting out these authorities in detail.

80. In his article, *'Salaries' in the Apportionment Act 1870* (1982) 2 Legal Studies 302, Professor Matthews argues (among other points) that the 1870 Act is only available where the entitlement to a periodical payment belongs to two or more persons in respect of different parts of the period. The claim of an employee to a broken period, terminating with his ceasing to hold office, does not fall within that description. He takes the view that the Divisional Court in the

G    *Moriarty* case fell into error. The difficulty with this argument is that the 1870 Act treats salaries on the same footing as other periodical payments. There is no reason why, for example, an annuity should not come to an end in the course of a period in respect of which it is paid, as where the annuitant dies during that period. I find it impossible to read any limitation into the Act of the kind Professor Matthews advocates.

H    81. We are not concerned with the question whether Mr Fassihi lost the right to claim arrears for the period June 1 to 26 through his misconduct. The judge decided that point in Mr Fassihi's favour and there is no cross-appeal on that point.

82. None of the authorities cited, in my judgment, detracts from the interpretation which I have given to ss.2 and 3 of the 1870 Act. On that interpretation, Mr Fassihi can make a time-apportioned claim for his salary for the period June 1 to 26, 2000. Accordingly, the appeal on this issue should, in my judgment, be allowed.

A

**Disposition**

83. I would dismiss the appeal on the disclosure issue and allow the appeal on the apportionment issue.

**Holman J: The disclosure issue**

84. I have read in draft the judgment of my Lady, Arden LJ. I agree with her conclusion and her reasoning on the disclosure issue and would dismiss the appeal on this issue.

B

**The apportionment issue**

85. I also agree with Arden LJ's conclusion on the apportionment issue. But as I had already prepared a judgment of my own on this issue I now venture to give it.

86. So far as is material, Mr Fassihi's contract of employment provided that: 'Your starting salary is £28,000 per annum, payable monthly in arrears . . . Your salary will be paid by the last working day of each month by automatic transfer to your bank account.' He was dismissed on June 26, 2000, and claimed arrears of salary for the period June 1 to 26. There is no doubt that at common law he is not entitled. The question is whether that uncompromising outcome is altered and mitigated by the Apportionment Act 1870. Sitting at first instance, the deputy judge considered that he was bound by the authority of *Boston Deep Sea Fishing and Ice Co v Ansell* (1888) LR 39 ChD 339 to hold that it is not.

C

D

87. Section 2 of the Apportionment Act 1870 provides that:

'. . . All rents, annuities, dividends, and other periodical payments in the nature of income . . . shall, like interest on money lent, be considered as accruing from day to day, and shall be apportionable in respect of time accordingly.'

88. Section 3 provides that:

'The apportioned part of any such rent, annuity, dividend, or other payment shall be payable or recoverable in the case of a continuing rent, annuity or other such payment when the entire portion of which such apportioned part shall form part shall become due and payable, and not before, and in the case of a rent, annuity, or other such payment determined by re-entry, death or otherwise when the next entire portion of the same would have been payable if the same had not so determined, and not before.'

E

89. Section 5, the interpretation section, provides that:

'In the construction of this Act –

. . .

The word "annuities" includes salaries and pensions.'

F

90. The deputy judge commented (para.101) that 'A straightforward reading of [s.2] suggests to modern eyes that a proportionate part of the salary can be recovered by an employee.' I agree with that comment. However, on behalf of Item Software, Mr Quiney submitted that the Act seeks 'merely to facilitate the calculation of sums due under contracts', and is not intended to create new rights or interfere with existing rights.

G

91. Section 2 has two limbs: 'shall . . . be considered as accruing from day to day' and 'shall be apportionable in respect of time accordingly'. I agree that the second limb, which employs the word 'accordingly', is consequential on the first and is essentially to do with calculation and arithmetic. But in my view the first limb does, on the face of it, impact upon and alter what would otherwise be the position in the absence of the provision. To my mind the words 'shall . . . be considered as' mean the same thing as 'shall be treated as' and operate as a deeming provision. In this regard I respectfully disagree with the observation of Lush J in *Moriarty v Regent's Garage and Engineering Co Ltd* [1921] 1 KB 423 at p.434 which I quote in para.102 below. Further, in my view the second limb or 'case' of s.3 decisively indicates that the effect

H

A  of the Act is not merely arithmetical but does alter common law rights. Section 3 addresses two quite different 'cases' or situations. The first case is that of continuing rent, etc. which shall be payable or recoverable 'when the entire portion of which such apportioned part shall form part shall become due and payable, and not before . . .' But the second case is that 'The apportioned part of any such rent [etc.] shall be payable or recoverable . . . in the case of a rent [etc.] determined by re-entry, death, or otherwise when the next entire portion of the same would have been payable if the same had not so determined, and not before.' Although this postpones

B  payment or recovery until the entire portion would have been payable, it clearly contemplates payment or recovery, in the case of a period which has not been completed, of the apportioned part of an entire portion which, by hypothesis, has not been fully earned. This reverses the common law rule.

92. However, the construction, scope and effect of the Act has been the subject of both judicial and academic authority which it is necessary to analyse.

C  93. In my view *Boston Deep Sea Fishing*, being a decision of this court, remains the most formidable obstacle in the way of the above construction. In that case the Court of Appeal held that although as a matter of fact the defendant, Ansell, had been paid quarterly, his contract provided for a yearly payment and that he was not entitled to receive a proportionate part of the annual salary. The fact that he was dismissed for misconduct clearly weighed with all three Lords Justices. Cotton LJ (1888) LR 39 ChD 339 at p.360 referred to him as 'having been

D  properly dismissed'. Bowen LJ at p.364 said that '. . . the servant who is dismissed for wrongful behaviour cannot recover his current salary, that is to say, he cannot recover salary which is not due and payable at the time of his dismissal, but which is only to accrue due and become payable at some later date, and on condition that he had fulfilled his duty as a faithful servant down to that later date.' Fry LJ at p.370 said that the quarter's payment was 'really a portion of the current salary, and as such cannot be recovered by a servant who has been dismissed for fraud.'

E  94. In my view there is no material distinction between the position of the defendant, Ansell, in *Boston Deep Sea Fishing* and the appellant, Mr Fassihi, in the present case. So if Mr Fassihi is entitled to recover for the proportionate part of the month in the present case, Mr Ansell should have been entitled to recover for the proportionate part of the year in that case. In short, it is impossible on this issue to distinguish the cases. What is puzzling is that there is simply no mention of the Apportionment Act 1870 anywhere in the only report of

F  *Boston Deep Sea Fishing*, whether in any of the judgments or in the reported arguments of counsel. There seem to be two possibilities. Either it was overlooked, or counsel considered it but considered that it did not apply. It is idle to speculate which. It is hard to imagine that throughout all the litigation it can have been completely overlooked. Yet over 30 years later, in *Moriarty v Regent's Garage and Engineering Co Ltd* [1921] 1 KB 423 and [1921] 2 KB 766, it seems that the simple explanation why the Act was not originally pleaded and relied upon before the county court judge, was that the plaintiff's counsel overlooked that s.5 included

G  'salaries' (see Scrutton LJ at p.778). If that occurred in 1920, it conceivably might also have occurred in 1888. Whatever the explanation, it is not possible in my view to deduce from the fact that the Act was not mentioned, a judicial determination that it did not apply, still less any particular reason why it did not apply. In my view *Boston Deep Sea Fishing* is simply not an authority at all on the construction, scope or effect of the Apportionment Act 1870.

95. In the much more recent case of *Miles v Wakefield Metropolitan District Council* [1987]

H  AC 539 Lord Oliver of Aylmerton referred at p.570 to *Boston Deep Sea Fishing* with obvious approval. He said:

'But where the employee declines to work at all for a particular period . . . I see no ground upon which the employee who declines to perform that condition upon which payment depends can successfully sue for the remuneration which is dependent upon its performance. An employee, for instance, who is rightly dismissed from his employment

can recover salary which has become due and payable at the date of his dismissal but cannot recover sums becoming due and payable at some later date and on the condition that he has performed his contractual duties down to that date: see *Boston Deep Sea Fishing* . . . per Bowen LJ.'

96. However in this part of his speech Lord Oliver is clearly addressing the common law rule. Although the Apportionment Act 1870 had been referred to in argument, neither in this nor any part of his speech did he refer to it. It was simply not in point to the issue in that case, which was (in the words of Lord Bridge of Harwich at pp.551–552):

'. . . if an employee, entitled to a weekly salary for a working week of a defined number of hours refuses to work for the whole or part of a week, is the employer entitled, without terminating the contract of employment and without relying on any right to damage for breach of contract, to withhold the whole or a proportion of part of the week's salary?'

97. In my view *Miles v Wakefield Metropolitan District Council* is simply not in point to the construction and effect of the Apportionment Act 1870.

98. There were several English cases after *Boston Deep Sea Fishing* in which, again, the Act was not expressly considered: *Re Central De Kaap Goldmines* (1899) LJ Ch 18; *Re London and Northern Bank, McConnell's claim* [1901] 1 Ch 728; and *Healey v Société Anonyme Française Rubastic* [1917] 1 KB 946. They do not, in my view, develop or advance the issues from *Boston Deep Sea Fishing* itself.

99. In my view the observations of the Divisional Court in *Moriarty v Regent's Garage and Engineering Co Ltd*, while of obvious interest and importance, are of no weight as an authority. The thrust of all three judgments in the Court of Appeal is that, as the Act had not been pleaded or referred to in the county court, the Divisional Court had no right or business to have considered it at all. All three Lords Justices were at pains to say that they were expressing no opinion at all on the point, although it is of interest that Scrutton LJ said [1921] 2 KB 766 at p.779:

'. . . it seems to me that there is no decision binding on the Court of Appeal as to whether directors' fees are salary within the Apportionment Act in the case where the agreement . . . is simply for payment of so much per year. I do not express any opinion one way or another. It seems to me a very arguable point, and there does not seem to me at present anything to prevent that question being considered in the Court of Appeal when it arises.'

100. The observations of Lush and McCardie JJ in the Divisional Court are, however, of interest. Lush J [1921] 1 KB 423 at p.434 considered that the 'Act, which was passed to remedy a grievance, undoubtedly affected common law rights and obligations'. Referring to earlier cases, McCardie J said at p.447:

'. . . the attitude in the minds of the tribunals was to regard the Apportionment Act as a wrongful encroachment upon common law proprieties. I take exactly the opposite view. The Act remedied a grave injustice; it is a remedial Act, and the inclination of every tribunal should be to extend rather than to restrict its operation.'

101. In that case, the plaintiff's fees as a director were agreed to be '£150 per annum'. During the course of a year he ceased to be a director but there was no impropriety on his part. Both judges of the Divisional Court considered that he would have been entitled under the Act to an apportioned part of his salary; but that he had issued his claim too soon, having regard to the provisions and effect of s.3 of the Act.

102. They differed, however, in their observations (which on any view were entirely *obiter*) as to whether a salaried person would be entitled to apportionment if he had been dismissed for misconduct.

103. Lush J said at p.434:

'. . . I should hesitate to agree with the suggestion that he can claim in such circumstances. It is quite true that the salary is to be considered as accruing from day to

A

day, and it is quite true that a dismissed servant is entitled to salary that has already accrued at all events up to the date of the act of dishonesty, but the Act does not say that in such a case, or for all purposes, the salary shall be deemed to have accrued from day to day; it only says that it shall be considered as accruing from day to day. That provision was merely inserted to facilitate or to extend the apportionment which the legislature was saying should be made. The sum cannot logically be apportioned unless it is treated as accruing from day to day; it is only for that purpose that it is deemed to accrue from

B

day to day. If something has happened during the service which forfeits the right to the salary it may well be that the servant cannot take advantage of the Act ...'

104. However McCardie J at pp.448–449 was perhaps more inclined to extend the Act to such a case. He said:

C

'I do not fail to see the wide stretch of the results which follow from the decision we are now giving, and one of the questions that must arise in the future is whether or not the Apportionment Act will destroy the operation of the rule under which a servant who is dismissed for misconduct loses the whole of the money accruing to him, although he is entitled to get the money that has actually accrued ... I express no opinion on this very serious question, which does not arise for direct decision. It may well be said that no servant dismissed for misconduct can rely on that misconduct as a basis for invoking a remedial Act ... On the other hand I am not altogether satisfied as to the justice of

D

denying the benefit of the Apportionment Act to a man who has been guilty of misconduct. Suppose a salary is payable half yearly to a man, and suppose he has fulfilled his duties with absolute propriety up to the last week; that he then commits an act which justifies his master in dismissing him. Upon the law as it stands the man gets nothing for his five and a half months' work. Is it right that he should be deprived of remuneration for five and a half months' work because during the last fortnight he has done something for which he has been dismissed? I express no opinion upon that point.

E

Ere long it must arise for decision.'

105. There is a passing reference of approval of the view of the Divisional Court in *Moriarty* by Simonds J in the later case of *Re William Porter & Co Ltd* [1937] 2 All ER 361 at p.363B. However the comment is entirely *obiter* (it begins 'If this was material ...') and the relevant sentence must have been misreported for, as printed, it does not make grammatical sense and the precise meaning of Simonds J is not clear. I regard the comment of Simonds J, as reported,

F

as of minimal significance, despite the fact that Glanville Williams at (1941) 57 LQR 373 at p.382 regarded the view of Simonds J as 'encouraging to note'.

106. Much more weighty, though again *obiter*, is the observation of Scott J in *Sim v Rotherham MBC* [1987] 1 Ch 216. The issue in that case was whether, when a teacher had refused to carry out certain work, the employer was entitled to make a deduction, by way of set off, from that teacher's monthly salary payment. But in rejecting as fallacious a submission on

G

behalf of one of the education authorities, Scott J said at p.255:

'Each month a contractual right to a salary payment vests in the teacher. By reason of section 2 of the Apportionment Act 1870, the salaries are deemed to accrue day by day. If a teacher's contract were, in the middle of a month, to come to an end, by death, dismissal or some other event, section 2 would entitle the teacher, or his estate, to an apportioned part of the month's salary payment.'

H

107. I note that in that passage Scott J uses the language '*deemed* to accrue'; and that he contemplates entitlement to the salary even after dismissal during the month.

108. Our attention has been drawn to certain overseas authorities. First, the Irish case of *Treacy v Corcoran* (1874) IR 8 CL 40. In that case the holder of a public office as Clerk of the Crown was entitled to be paid half yearly. During the course of a half year the plaintiff, Treacy, had resigned from that office. At the end of the half year the salary for the whole half year was

paid to his successor, Corcoran. In an action by Treacy against Corcoran (not against the treasurer of the county as payer) the Irish Court of Common Pleas held that Corcoran must pay to Treacy his apportioned share. In part the decision turned on the construction and application of s.110 of the Grand Jury Act pursuant to which a salary was payable to the Clerk of the Crown. But in my view application of the Apportionment Act 1870, which Monahan CJ quoted at length on p.43, was a necessary step in the reasoning of the court. After quoting from the Act, Monahan CJ said:

> 'That being so, it is clear that the salary of the Clerk of the Crown became due to Mr Treacy from day to day up to the 13th of April 1782, being the period during which he filled that office, and became recoverable by him on or after the 24th of July 1872, the proper time for payment having then arrived.'

In an article in (1982) 2 Legal Studies 302, *'Salaries' in the Apportionment Act 1870*, an academic writer, Paul Matthews, treats *Treacy v Corcoran* as a 'perfect example' of the special case of holders of public offices and suggests it is no authority at all for apportionment under the Act of salaries generally. But I do not agree. There is nothing in that part of the judgment which considers the Apportionment Act to limit it in this way, and I agree with the view of Treitel, *The Law of Contract* (11th ed., Sweet & Maxwell), at p.824 and n.87, that *Treacy v Corcoran* does 'support the view that the Act does apply' so as to entitle a person whose salary is payable at the end of a stipulated period to recover a proportionate part of the salary if he works for only part of the period.

109. The New Zealand case of *Wallace v Ross* (1915) XVII Gazette Law Reports 518 concerned commission or bonus. Section 108 of the Property Law Act 1908 was, so far as material, in identical term to the Imperial Apportionment Act 1870. But Hosking J doubted whether it applied to the bonus in that case, to which he held the plaintiff entitled on other grounds; and in my view such comments as Hosking J made about the scope of the Act are of no significance.

110. The Australian case of *Harris v Foote's Bus Service Ltd* (1963) 30 SAIR 259 turned entirely on the construction of the relevant contract or award. The brief comments of Pellew P at p.264 on an alternative argument based on the local equivalent (in identical terms) of the Apportionment Act 1870, are entirely *obiter* and were not intended to be of any weight.

111. However, the Canadian case of *Lee v McDonald* 12 DLR (3d) 404 is, in my view, directly in point although of limited authority being a decision of a county court judge in the county court of Halifax. A teacher was paid monthly. On an application for the attachment of a ganishee order to his salary, it was argued that during the course of the month there was nothing to garnish. Applying the local Apportionment Act 1967 (which he described as being in substantially the same words, with some modernization of the format, as the Apportionment Act 1870) O'Hearn Co Ct J said:

> 'Now, if this means anything, it means that, subject to any agreement to the contrary, a person who earns a salary acquires a claim to it from day to day and the person who has to pay it acquires an obligation to pay it from day to day as earned. There are existing rights and obligations to be discharged in the future so that if a person on salary dies or is prevented from continuing to earn during a part of a payment period, he or his estate becomes entitled to the portion of the salary that he has earned which will, however, be payable only at the end of the pay period. This reasoning would surely be applied in favour of the salary earner and it should also be applied in favour of his creditor . . .'

112. I turn from judicial to academic authority. Writing on 'Partial Performance of Entire Contracts' (1941) 57 LQR 373 at pp.382–383, Professor Glanville Williams clearly considered the Apportionment Act 1870 to have reformed the common law rule. Further, he disagreed with the view of Lush J in *Moriarty*, quoted at para.102 above, that a servant dismissed for misconduct might not be entitled to an apportioned part of his salary on the ground that the right to the salary had been forfeit. Glanville Williams argues that such a view not only perpetuates

© **2004 Sweet and Maxwell Ltd**

A   the harshness of the common law but is unsound in principle, since the common law rule is not based on the idea of forfeiture but on non-completion of the period (the common law rule being exactly the same where the contract is terminated by death and not misconduct).

113. Sir Guenter Treitel in *The Law of Contract* (11th ed., Sweet & Maxwell), at p.825 quotes the rhetorical question of McCardie J in *Moriarty* at p.449: 'Is it right that he should be deprived of remuneration for five and a half months' work because during the last fortnight he has done something for which he has been dismissed?' McCardie J deliberately 'express[ed] no opinion upon that point.' But Sir Guenter is clear that '. . . a negative answer should be given to this question, and that there is nothing in the 1870 Act which makes it inapplicable to such a situation.'

114. Goff and Jones *The Law of Restitution* (6th ed., 2002, Sweet & Maxwell), at para.20-049 take a similar view. They describe it as an 'open question' whether the properly dismissed servant is within the section, but, echoing Glanville Williams, express the hope that the view of Lush J based on forfeiture will not prevail. They say 'For at common law a servant was debarred from claiming his wages not because of any conception of forfeiture but because he had not fully performed his contract.'

115. Our attention has been drawn to one academic article to contrary effect, namely *'Salaries' in the Apportionment Act 1870*, by Paul Matthews at (1982) 2 Legal Studies 302. His argument is that the idea of earlier statutory apportionment provisions, which belonged to the law of landlord and tenant 'is clearly to cover cases where a periodical payment [typically, rent] is made on one occasion to A and on the next to B, A's successor, A having died or otherwise ceased to be entitled.' He argues therefore, that the scope of the word salaries, added by s.5 of the 1870 Act, is limited to salaries payable to holders of a public office which are automatically payable to the successor in office. Despite the ingenuity of the argument, there is absolutely nothing in the Act to limit salaries in this way and the argument has not impressed either Treitel or Goff & Jones, who cite, but do not agree with, Matthews.

116. From this review of authority I conclude as follows:

(1)   There is no English authority which decides whether or not s.2 of the Apportionment Act 1870 applies to payment of salary when the employment has ceased in the middle of a pay period. *Boston Deep Sea Fishing* and the cases mentioned in paras 96 and 97 above are not authorities on the Act at all.

(2)   Such dicta or observations as there are, are all to the effect that the Act does apply. These include the observations of both judges in the Divisional court in *Moriarty*, the reference by Simonds J in *Re William Porter* and, much more weightily, the dictum of Scott J in *Sim v Rotherham MBC*.

(3)   There is a body of views of very eminent academic writers to the effect that the Act applies: Glanville Williams, Treitel, and Goff & Jones. The contrary view of Matthews is, in my view, less convincing.

(4)   *Treacy v Corcoran* is good, though foreign, authority that the Act applies to salaries; and the words of the Canadian county court judge in *Lee v McDonald*, quoted in para.110 above, are robust, clear and convincing.

(5)   I agree with the view of McCardie J in *Moriarty* that the Act should be treated as a remedial Act and there is no justification for striving to restrict its operation.

(6)   The common law rule is obviously unjust, and ordinarily a person should receive an apportioned part of the salary for a period actually worked. If the parties wish and intend otherwise they can exclude the Act by an express stipulation under s.7.

(7)   For the reasons already given in paragraph 90 above, I consider that the language of the Act does indeed extend to apportionment of salaries when the employment ceased during a pay period.

117.  I would accordingly hold that the effect of s.2 of the Apportionment Act 1870 is that, unless the parties otherwise expressly stipulated, the salary of an employee whose employment terminates during a pay period shall be apportioned and paid in respect of the period actually worked (with payment only becoming due and payable at the end of the relevant pay period).

118.  In the present case the judge had posed three discrete questions, namely '(i) whether arrears of salary are payable by virtue of sections 2 and 5 of the Act where the director or employee works for part of a period; (ii) if so, whether this applies in a case of justified dismissal; and (iii) whether having regard to his breaches of duty Mr Fassihi would be entitled to his salary in any event.'

119.  The judge answered the first question negatively but gave permission to appeal from that answer on that issue. I consider he should have answered it affirmatively.

120.  The judge went on to hold that if, contrary to his answer to the first question, the Act does apply, then it applies also to an employee who has been justifiably dismissed for misconduct (as Mr Fassihi had been); and in answer to his third question, that Mr Fassihi could claim arrears of salary despite his misconduct. There was no appeal from these answers to the second and third questions. Mr Fassihi did not seek to appeal them since they were answered favourably to him. Item Software did not seek to appeal them, apparently nailing their colours to the single proposition that the Act simply did not apply at all. Thus the very important issue which, perhaps, divided Lush and McCardie JJ in *Moriarty* is not squarely before us. But it demands an answer, for Mr Fassihi is only entitled to his apportioned salary if indeed the judge was right in his answer to the second and third questions.

121.  In my view he was. The Act is quite general. There is nothing at all in s.2 to exclude its application in the case of dismissal.

122.  The second case in s.3 (which, by hypothesis, is the one which would apply in the case of dismissal) refers to a payment determined by 'death, or otherwise'. I see no warrant to exclude the case of dismissal from the generality of 'otherwise'. Although McCardie J expressed no opinion in answer to his rhetorical question ([1921] 1 KB 423) at p.449, it has now arisen for decision (not ''ere long, but 80 year later). In my view, even in the case of dismissal for misconduct, it is not right that the employee should be deprived of remuneration for work actually done; although he may be liable to his employer for damages flowing from his misconduct. I agree with the views of Glanville Williams, Treitel and Goff & Jones on this point; and I gratefully adopt the principled analysis of Glanville William that the common law rule is not based on the idea of forfeiture. In short, an employee whose employment terminated during a pay period is entitled under the Act to apportioned salary irrespective of the cause of termination. This includes Mr Fassihi.

123.  I would accordingly allow the appeal on the apportionment issue.

**Mummery LJ:**

124.  I agree with the judgment of Arden LJ.

(*Appeal allowed in part*)

───────────────